# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCOTTS VALLEY BAND OF POMO INDIANS,<br>    2727 Systron Drive<br>    Concord, CA 94520<br><br>              *Plaintiff,*<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF THE INTERIOR,<br>    1849 C Street, N.W.<br>    Washington, D.C. 20240<br><br>DAVID BERNHARDT, in his official capacity as Secretary of the U.S. Department of the Interior<br>    1849 C Street, N.W.<br>    Washington, D.C. 20240<br><br>TARA SWEENEY, in her official capacity as Assistant Secretary for Indian Affairs of the U.S. Department of the Interior<br>    1849 C Street, N.W.<br>    Washington, D.C. 20240<br><br>and<br><br>JOHN TAHSUDA, in his capacity as Principal Deputy to the Assistant Secretary for Indian Affairs of the U.S. Department of the Interior<br>    1849 C Street, N.W.<br>    Washington, D.C. 20240<br><br>              *Defendants.* | Civil No.:<br><br>**COMPLAINT** |

## INTRODUCTION

This is an action for declaratory, injunctive, and other relief by Plaintiff Scotts Valley Band of Pomo Indians ("Scotts Valley" or "Tribe") that final agency action by Defendants United States Department of the Interior (the "Department"), Secretary Bernhardt (the "Secretary"), Assistant Secretary - Indian Affairs Sweeney ("AS-IA"), and Principal Deputy Tahsuda ("Principal Deputy"), dated April 26, 2019 (the "Decision"), to deny the Tribe's request for an Indian lands opinion ("ILO") is arbitrary, capricious, and otherwise not in accordance with law. Specifically, the final agency action relates to gaming eligibility of a 128-acre parcel of land located in the City of Vallejo, California (the "Parcel") as restored land under the Indian Gaming Regulatory Act, 18 U.S.C. §§ 2701, 2719 ("IGRA"), and 25 CFR Part 292.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1362, as a civil action brought by an Indian tribe with a governing body duly recognized by the Secretary of the Interior wherein the matter in controversy arises under the Constitution, laws or treaties of the United States, including Art. I, § 8, cl. 3, U.S. Constitution; IGRA; regulations implementing IGRA at 25 CFR Part 292; the Indian Reorganization Act ("IRA"), as amended in 1994, 25 U.S.C. §§ 5108 and 5123(f), (g); the Administrative Procedure Act, 5 U.S.C. §§ 701-706; and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

2. Venue is proper in this District under 28 U.S.C. § 1391 (b)(2) and (e), in that a substantial part of the events or omissions giving rise to the claim occurred in this District and Defendants are an agency of the United States and officers thereof acting in their official capacities.

## PARTIES

3. The Plaintiff Tribe is a federally recognized Indian tribe with tribal offices in Lakeport and Concord, California. *See* Indian Entities Recognized by and Eligible to Receive Services from the United States Bureau of Indian Affairs, 84 Fed. Reg. 1200, 1203 (Feb. 1, 2019) (listing "Scotts Valley Band of Pomo Indians of California").

4. The Defendant Department is the federal agency charged by statute with the primary administration of Indian affairs for the federal government. 25 U.S.C. §§ 2 and 9.

5. Defendant Secretary is the Secretary of the Department and, as such, is vested with authority to execute federal law and policy respecting Indian tribes; he is sued in his official capacity.

6. Defendant AS-IA Sweeney is the Assistant Secretary for Indian Affairs at the Department and, as such, holds delegated authority to execute federal law and policy respecting Indian tribes; she is sued in her official capacity.

7. Defendant Principal Deputy Tahsuda is the Principal Deputy to the AS-IA at the Department and, as such, may be redelegated general administrative and program authority to execute federal law and policy respecting Indian tribes; he is sued in his official capacity.

## GENERAL ALLEGATIONS

8. The Tribe is a political successor to signatory bands to the Treaty of August 20, 1851, with the United States, known as the Treaty of Camp Lu-pi-yu-ma at Clear Lake, California ("1851 Treaty"). By the terms of the 1851 Treaty, the signatory bands acknowledged themselves under the exclusive jurisdiction, authority, and protection of the United States; the signatory bands ceded aboriginal territory known as Royce Area 296; and the United States agreed to set aside a reservation for the signatory bands known as Royce Area 295.

9. The 1851 Treaty was not ratified by the Senate and the United States did not otherwise establish a reservation for the Tribe or its predecessors.

10. By the time of the 1851 Treaty, the traditional native subsistence pattern in Royce Area 296 had been completely displaced by the development of the cattle-ranching economy in the region. The ranch owners acquired title to the region under Spanish land grants that were confirmed through a process established by Congress in the California Land Act, 9 Stat. 631 (Mar. 3, 1851), and native laborers were employed, and oftentimes enslaved, to work the ranches. This pattern of native labor extended through Royce Area 296 and was known to the United States when it negotiated the 1851 Treaty.

11. The Tribe's ancestors participated in this established economy throughout Royce Area 296, including in close proximity to the Parcel for decades following the 1851 Treaty.

12. In 1911, the United States acquired a 56-acre parcel for the Tribe, known as the Sugar Bowl Rancheria. The Rancheria lacked an adequate water supply and basic infrastructure. As a result, the Rancheria was never occupied by a majority of the Tribe's members.

13. In 1958, Congress enacted the California Rancheria Termination Act, 72 Stat. 619 (Aug. 18, 1958). The Act terminated the federal trust relationship with the Tribe, required the termination of the reservation status of the Sugar Bowl Rancheria, among others, and directed the distribution of the Rancheria lands; the distribution was completed, and the Rancheria was terminated, in 1965. At the time of the distribution plan implementing the Act, there were 46 members of the Tribe in residence at the Sugar Bowl Rancheria. Following the loss of the Rancheria, members of the Tribe left the immediate environs of the Rancheria and relocated to areas in Royce Area 296 historically associated with the Tribe.

14. In 1986, the Tribe (and other California Indian tribes) sued the United States, alleging that the termination of the federal trust relationship with the Tribe was unlawfully done because the United States had not complied with all the requirements of the 1958 Rancheria Termination Act. As part of a settlement of the lawsuit, the United States reinstated the status of the Tribe as a federally recognized tribe, effective September 5, 1991. 57 Fed. Reg. 5214 (Feb. 12, 1992). Since that time, the United States has continuously recognized the Tribe as entitled to all the privileges and immunities of Indian tribes recognized by the United States.

15. Since the termination of the Sugar Bowl Rancheria, the Tribe has remained, and continues to be to this day, landless.

### *The IRA*

16. On June 18, 1934, Congress enacted the IRA, section 5 of which authorizes the Secretary to acquire and hold land in trust for Indian tribes. 48 Stat. 985, now codified at 25 U.S.C. § 5108.

17. On May 31, 1994, Congress amended the IRA to, among other things, prohibit the Secretary from promulgating any regulation, making any decision under any act of Congress, or making any administrative decision that classifies, enhances, or diminishes the privileges and immunities available to a federally recognized Indian tribe relative to other federally recognized Indian tribes. 108 Stat. 709, now codified at 25 U.S.C. § 5123 (f) & (g).

### *IGRA and Implementing Regulations*

18. On October 17, 1988, Congress enacted IGRA for the purposes of, among other things, "provid[ing] a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments[.]" 25 U.S.C. § 2702(1).

5

19. IGRA governs the conduct of gaming on "Indian lands," which are defined by the Act as: "(A) all lands within the limits of any Indian reservation; and (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe of individual or held by any Indian tribe of individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power." 25 U.S.C. § 2703(4).

20. IGRA prohibits gaming "on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988," subject to certain specified exceptions. 25 U.S.C. § 2719.

21. One of the specified exceptions to the prohibition on gaming on post-1988 trust acquisitions is the "restored lands" exception, which provides that the section 2719 prohibition "will not apply when ...lands are taken into trust as part of...the restoration of lands for an Indian tribe that is restored to Federal recognition." 25 U.S.C. § 2719(b)(1)(B)(iii).

22. From 1988 until 2008, the Department made *ad hoc* administrative decisions on whether land taken into trust after 1988 qualified for gaming under one of the specified IGRA exceptions.

23. In 2008, the Department, through the Bureau of Indian Affairs ("BIA"), promulgated regulations to "articulate standards that the BIA will follow in interpreting the various exceptions to the gaming prohibitions contained in section 2719 of IGRA." Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. 29354 (May 20, 2008); 25 CFR §§ 292.1-292.26.

24. The first requirement of the regulations to qualify for the restored lands exception is that the tribe must have been federally recognized, then "lost its government-to-government relationship," then had its government-to-government relationship restored (25 CFR § 292.7 (a),

6

(b), (c)). The regulations also define each of these terms. 25 CFR §§ 292.8, 292.9, 292.10.

25. The second requirement of the regulations to qualify for the restored lands exception relates to the land itself: the land must be located within the same state as the tribe; there must be a "modern connection" between the land and the restored tribe; there must be a "significant historical connection" between the land and the tribe; and there must be a "temporal connection" between the date of the request for trust acquisition and the tribe's restoration. 25 CFR §§ 292.11 (c), 292.12.

26. The regulations authorize Indian tribes to request an opinion, before land is placed into trust, whether that parcel would qualify for one of the exceptions to the prohibition against gaming on trust land acquired after 1988. The regulations specify that such requests, commonly called an Indian land opinions ("ILO"), are to be submitted to the Office of Indian Gaming ("OIG"), an office within AS-IA that is the primary advisor to the Secretary and AS-IA on Indian gaming and the requirements of IGRA.

### *The Tribe's request for an ILO*

27. On January 29, 2016, the Tribe submitted a request for an ILO that the Parcel qualified for the restored lands exception to IGRA prohibition against gaming on trust land acquired after 1988. The Tribe's request addressed the regulatory requirements necessary to qualify as restored lands. The Tribe's request was supported by legal analysis; an historical report prepared by Dr. Albert Hurtado; an anthropological report prepared by Professor Dorothea J. Theodoratus, Ph.D.; and an historical report by Dr. Heather A. Howard and Dr. James M. McClurken, focused on the Tribe's presence in the proximity of the Parcel after 1851.

28. The Tribe's 2016 request for an ILO established: that the Tribe is a restored tribe within the meaning of IGRA and regulations; that the Parcel is located in California, the same

state as the Tribe; that the Tribe has a modern connection with the Parcel; that the Tribe has a significant historical connection to the Parcel; and that the Tribe has a temporal connection to the Parcel.

29. On August 11, 2016, the Tribe submitted to the BIA an application to place the Parcel into trust for the Tribe. The trust application identified multiple uses for the Parcel, including development as a homeland and a casino resort complex (including gaming as defined in IGRA.) The Tribe supplemented its trust application on December 6, 2017.

30. On May 3, 2018, the Tribe submitted a supplement to its request for an ILO on the Parcel. The supplement addressed the Tribe's significant historical connection to the Parcel and included: legal analysis; the Tribe's response to letters of opposition from third parties; a supplemental historical report by Drs. Hurtado and Theodoratus; and maps depicting the Parcel's location in modern and historical times.

31. The Tribe's May 2018 supplement demonstrated, among other things: that the Parcel is located within Royce Area 296, known to the United States to have been seasonally occupied by the Tribe and its members in employment as laborers at the time of the 1851 Treaty; a majority of the known minor members of the Tribe were in residence in the vicinity of the Parcel in 1837 for a period of time; that known, major families of the Tribe can be documented in the vicinity of the Parcel from 1870 onward; and that Chief Augustine, the known leader of the Tribe until his death in 1903, was known to reside and work in the vicinity of the Parcel in 1870.

32. During the Department's consideration of the Tribe's ILO request, the Tribe repeatedly sought the input and involvement of OIG, in accordance with 25 CFR § 292.3 (b). Defendants declined the Tribe's requests and, upon information and belief, the Tribe alleges that

the OIG was not substantively involved in the Department's deliberations on the Tribe's request.

*The Decision*

33. On February 26, 2019, the Department released a letter to the Tribe, dated February 7, 2019 (the "February letter"), in which the Department determined that the Parcel did not qualify under IGRA or the regulations as restored lands. The letter was signed by Principal Deputy Tahsuda.

34. The February letter concluded that the Tribe is a restored tribe within the meaning of IGRA and the regulations, 25 CFR §§ 292.8 - 292.10.

35. The February letter concluded that there is a "modern connection" between the Parcel and the Tribe within the meaning of IGRA and the regulations, 25 CFR § 292.12 (a).

36. The February letter concluded that there is a "temporal connection" between the Parcel and the Tribe's restoration under IGRA and the regulations, 25 CFR § 292.12 (c).

37. The February letter reached its negative conclusion based solely on the historical connection requirement. The February letter acknowledged that there is evidence of an historical connection between the Tribe and the Parcel but concluded that the evidence is insufficient to constitute "significant historical connections." 25 CFR § 292.12 (b).

38. In a letter dated February 28, 2019, addressed to AS-IA Sweeney, the Tribe's Chairman Shawn Davis requested reconsideration of the February letter and advised that the Tribe would specify the grounds for reconsideration no later than March 15. By letter dated March 14, 2019, the Tribe's counsel provided the specific grounds upon which it sought reconsideration of the February letter.

39. In its March 14, 2019, letter, the Tribe sought reconsideration of the February letter on three grounds: first, OIG had been excluded from the Department's deliberations on the

9

Tribe's ILO request, in violation of the regulations and agency practice; second, Principal Deputy Tahsuda lacked authority, by delegation or redelegation, to discharge the Department's responsibility to respond to the Tribe's ILO request; and third, the February letter is arbitrary and capricious because it does not reflect reasoned decision-making and is not in accordance with law for specified reasons.

40. On April 26, 2019, AS-IA Sweeney mailed the Decision to the Tribe by first class mail, which the Tribe received on May 2, 2019, advising that she denied the Tribe's request for reconsideration.

41. The Decision addressed only the procedural grounds for reconsideration identified by the Tribe: whether Principal Deputy Tahsuda held the delegated or redelegated authority to issue the February letter; and in a footnote, the role of OIG in the decision-making process. The Decision made no reference to and did not address the Tribe's arguments that the February letter is arbitrary and capricious and otherwise not in accordance with law. The Decision designated the February letter as final agency action. The February letter and the Decision together constitute the Department's final agency action.

## FIRST CLAIM FOR RELIEF

### (*Ultra vires* action by Defendant Tahsuda)

42. Congress explicitly delegated authority to the Secretary of the Interior in IGRA to, among other things, make determinations regarding gaming on lands acquired after 1988. 25 U.S.C. § 2719 (b).

43. The Secretary has delegated his authority regarding gaming on lands acquired after 1988, including authority to issue regulations regarding departmental decisions on lands that qualify for exceptions thereto, to the Assistant Secretary for Indian Affairs. 209 Departmental

Manual 8; 73 Fed. Reg. 29354 (May 20, 2008), Gaming on Trust Lands Acquired After October 17, 1988 ("Supplementary Information: The authority to issue this document is 5 U.S.C. 301 and 25 U.S.C. 2, 9, and 2719). The Secretary has delegated this authority to the Assistant Secretary - Indian Affairs by part 209 of the Departmental Manual.")

44. AS-IA alone is authorized to "discharge" these delegated duties. 110 Departmental Manual 8.1. In the event the office of AS-IA is vacant, the Principal Deputy is authorized to discharge these delegated duties for a limited period of time. Otherwise, the Principal Deputy is not authorized to discharge the duties of the AS-IA. 110 Departmental Manual 8.2.

45. The Principal Deputy is authorized to advise AS-IA in the discharge of her duties and to manage, direct, and coordinate programs, including gaming. General administrative and program authorities may also be redelegated by AS-IA to the Principal Deputy. Such redelegation must be in writing and published in the Departmental Manual. 209 Departmental Manual 8.3.

46. The office of AS-IA was not vacant in February 2019 and there is no written and published redelegation of authority by AS-IA to the Principal Deputy to AS-IA regarding the making or issuance of decisions on ILOs.

47. In the absence of a written and published redelegation of authority, Principal Deputy Tahsuda could not discharge the duty of AS-IA regarding the Tribe's ILO and, therefore, had no authority to sign the February letter. His act in doing so is *ultra vires*. The Decision did not purport to address the merits of the Tribe's ILO request but merely restated the erroneous view that Principal Deputy Tahsuda had authority to sign the February letter.

48. Because the February letter claimed as the basis for the Decision is *ultra vires*, the Decision itself is also *ultra vires* and, hence, not in accordance with law.

## SECOND CLAIM FOR RELIEF

**(Decision beyond Secretary's authority in IGRA)**

49. In IGRA, Congress made an exception for lands taken into trust as part of "the restoration of lands for an Indian tribe that is restored to Federal recognition." 25 U.S.C. § 2719 (b)(1)(B)(iii). Congress did not impose further restrictions upon the exception, such as those in 25 CFR Part 292 and applied to the Tribe as the basis for denial of the ILO requested by the Tribe, specifically "significant historical connections."

50. The imposition of this requirement upon the Tribe, beyond that required in IGRA itself, violates the Secretary and his delagatees' authority, rendering the Decision not in accordance with law.

## THIRD CLAIM FOR RELIEF

**(Agency violation of its own regulations)**

51. The February letter, which the Decision declined to reconsider, based the conclusion of insufficient significant historical connection, in part, upon the lack of evidence of a connection between "the Band and the Parcel itself..." There is no requirement in 25 CFR 292 that there be a connection between the tribe and the specific parcel, only that there be a connection between the tribe and "the vicinity of the proposed trust land." *See* 25 CFR § 292.2 ("Significant historical connection means...a tribe can demonstrate by historical documentation the existence of the tribe's villages, burial grounds occupancy or subsistence use in the vicinity of the land.")

52. The February letter, which the Decision declined to reconsider, based the conclusion regarding significant historical connection, in part, upon the lack of a "continuous" historical connection with the Parcel. There is no requirement in 25 CFR 292 that there be a continuous historical connection between the tribe and the land. To the contrary, the Department

12

specifically rejected the necessity of "uninterrupted" connection with the land when it promulgated Part 292.   73 Fed. Reg. 29360 (May 20, 2008).

53. The February letter, which the Decision declined to reconsider, based the conclusion regarding significant historical connection, in part, upon the distance between the Parcel and the Tribe's aboriginal village.   There is no requirement in 25 CFR Part 292 that lands with significant historical connections be located close to aboriginal villages.   To the contrary, the Department specifically rejected the necessity of geographic proximity between lands with significant historical connections and aboriginal homelands.   73 Fed. Reg. at 29367.

54. There is no indication in the Decision or the February letter that OIG advised AS-IA upon or was consulted regarding the Tribe's ILO, as required by the regulations and administrative practice.   *See* 25 CFR § 292.3; 110 Departmental Manual 8.2 (D) (identifying OIG areas of responsibility as including "requests to take land into trust for the purpose of gaming.")

55. Agencies are obliged to follow their own regulations.   The Department's failure to apply its regulations as written and as interpreted by the Department to the Tribe's ILO request renders the Decision arbitrary and capricious and not in accordance with law.

## FOURTH CLAIM FOR RELIEF

**(Failure to consider relevant data)**

56. The February letter, which the Decision declined to reconsider, dismissed the evidence of Chief Augustine's presence in the vicinity of the Parcel as "singular," "not reflective of the presence of the Band *in toto*."   In making this conclusion, the February letter and the Decision failed to take into account, or even acknowledge, contrary evidence submitted by the Tribe: that Chief Augustine's experience was the same as that of other significant families of the

13

Tribe; and that the majority of the known minor members of the Tribe in 1837 were resident in the vicinity of the Parcel in 1837.

57. The February letter, which the Decision declined to reconsider, failed to consider all admittedly relevant evidence of a significant historical connection in totality.

58. The February letter, which the Decision declined to reconsider, failed to even acknowledge that the Tribe is currently landless, an admittedly relevant consideration under IGRA since the purpose of the restored tribe exception is to help ensure that tribes lacking reservations are not disadvantaged relative to more established tribes.

59. The failure to take all relevant evidence into account in the February letter and the Decision is a violation of the Department's obligation to undertake reasoned decision-making and resulted in an arbitrary and capricious Decision.

## FIFTH CLAIM FOR RELIEF

### (Violation of privileges and immunities clauses of the IRA)

60. As amended in 1994, the IRA prohibits the promulgation of any regulation, the making or decision under the IRA or any other act of Congress, or any administrative decision that classifies, enhances, or diminishes the privileges and immunities available to a federally recognized tribe relative to other federally recognized Indian tribes. 25 U.S.C. § 5123 (f) & (g).

61. The February letter, which the Decision declined to reconsider, based the conclusion in part on its determination that the location of the Parcel within the Tribe's ceded territory, i.e., Royce Area 296, was insufficient evidence of a significant historical connection. The February letter and the Decision did so, in part, based on its conclusion that Indian tribes which received ILOs before the promulgation of the regulations in 2008 were treated differently by the Department than restored tribes that sought ILOs after the promulgation of the regulations.

14

62. This distinction between pre-2008 decisions and post-2008 decisions violates the regulations as interpreted by the Department. The Department has acknowledged that ILO decisions under the 2008 regulations can rely upon decisions on ILOs made by the Department before adoption of the regulations as precedent. The failure of the Decision to treat the Tribe the same as restored Indian tribes that received ILOs before adoption of the regulations violates both the regulations as interpreted by the Department and the 1994 amendments to the IRA precluding disparate treatment of similarly situated tribes.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Scotts Valley Band of Pomo Indians prays for the following relief:

1. A declaration that 25 CFR § 292.12 (b) is beyond the Secretary's statutory under IGRA, 25 U.S.C. § 2719(b)(1)(B)(iii), as applied to the Tribe, insofar as it purports to require proof of a significant historical connection to qualify as restored lands, which requirement does not appear in the Act;

2. An injunction against imposition of the significant historical connection requirement on the Tribe's ILO request on remand;

3. An injunction against disparate treatment of restored tribes on the historical connection requirement under 25 CFR Part 292 and the historical connection of restored tribes considered before adoption of the regulations;

4. A declaration that the Decision violates the Department's regulations inasmuch as it requires evidence of continuous connection to the Parcel, evidence of connection to the specific Parcel rather than land in the vicinity of the Parcel, and evidence that the Parcel is in close proximity to aboriginal villages of the Tribe;

15

5. A declaration that the Department's evaluation of the Tribe's request for an ILO as to the Parcel violates the Department's regulations and practice inasmuch as the Department failed to either include in the decision-making process or take into account the expressed views of OIG; and

6. A remand to the Department for reconsideration of the Tribe's ILO request in accordance with IGRA and 25 CFR Part 292 in accordance with this Court's order.

Dated: May 24, 2019                    Respectfully submitted,

**SCOTTS VALLEY BAND OF POMO INDIANS**

By: *s/ Patrick R. Bergin*

Patrick R. Bergin (D.C. Bar No. 493585)
FREDERICKS PEEBLES & PATTERSON LLP
2020 L Street, Suite 250
Sacramento, California 95811
(916) 441-2700
pbergin@ndnlaw.com

Arlinda F. Locklear (D.C. Bar No. 962845)
4113 Jenifer Street, N.W.
Washington, DC 20015
(202) 237-0933
alocklearesq@verizon.net

*Attorneys for Plaintiff Scotts Valley Band of Pomo Indians*