# SCOTTS VALLEY BAND OF POMO INDIANS

January 28, 2016

Honorable Lawrence S. Roberts
Acting Assistant Secretary – Indian Affairs
United States Department of the Interior
Main Interior Building
1849 C Street, N.W.
Washington, D.C. 20006

RE: Scotts Valley Band of Pomo Indians Request for Indian Lands Opinion

Dear Acting Assistant Secretary Roberts:

Congratulations on your appointment to serve as the Acting Assistant Secretary for Indian Affairs, and continuing President Obama's unparalleled commitment to correcting historic wrongs throughout Indian Country. I very much appreciate the opportunity to meet with you on February 4, 2016 to discuss the Scotts Valley Band's plans to establish a restored trust land base on a parcel of land located within the City of Vallejo, Solano County, California.

The Band met with Assistant Secretary Kevin Washburn on November 6, 2015 and I advised Mr. Washburn of the Band's plan to seek an Indian Lands Opinion that the Band's Vallejo Property would qualify as restored lands of a restored Indian tribe under 25 C.F.R. Part 292.7. Please find attached a Memorandum from the Band's legal counsel, Fredericks Peebles & Morgan LLP, explaining that the Band has both significant historic and modern connections to the area in which the Vallejo Property is located, and that upon the United States acquiring the Property in trust for the Band the Property would constitute the restored lands of a restored Indian tribe pursuant to 25 C.F.R. Part 292.7. Attached also are a report each from the Band's expert historian and anthropologist, Professors Albert Hurtado and Dorothea Theodoratus, explaining and documenting relevant portions of the history and ethnology of the Band. Additionally, we have attached a combined and minimally-edited copy of the three reports (which consisted of an initial report and two addenda) prepared by Heather Howard and James McClurken in 2005 and 2007, explaining and documenting other portions of the history and ethnology of the Band, including documentation of the genealogy of the Band and its members.

The Restored Lands exception of the Indian Gaming Regulatory Act (IGRA) is remedial in nature, designed to compensate Indian tribes, such as the Scotts Valley Band, for "not only what [they] lost by the act of termination, but also for opportunities lost

[between termination and restoration.]" City of Roseville v. Norton, 348 F.3d 1020, 1025 (D.C. Cir. 2003). While I know you are somewhat familiar with the Band, I wanted to take this opportunity to briefly highlight some of the critical points in the Band's history, as well as the impact termination had, and continues to have on the Band nearly 25 years after its restoration to Federal status.

The Band is the modern day successor of the historic Yimabak (Moalkai), Kulanapo and Habenepo bands of Pomo Indians, each of which was a party to the August 20, 1851 Treaty of Camp Lu-pi-yu-ma at Clear Lake. As explained in Professor Hurtado's historical report and the Band's counsel's legal analysis, the United States entered into the Clear Lake Treaty with the Clear Lake Pomo bands both jointly and severally. The Clear Lake Treaty was neither the first nor the last time the United States would view and deal with the Clear Lake Pomo bands collectively. In the Treaty, the bands jointly and severally ceded the land from Clear Lake to the shores of San Pablo Bay, including the Vallejo Property. Thus, the Vallejo Property qualifies as land capable of being "restored" to the Band. The Treaty also provided that the United States would furnish beef cattle and flour to the Clear Lake Pomo bands collectively for three years and deliver the provisions to the bands at a location within the current City of Vallejo that is less than two and one-half miles from the Vallejo Property. The Clear Lake bands' having travelled to, camped at and received beef at that location in late 1851 is explained and documented in the historical report and legal analysis. Although we think sufficient in themselves to establish the Band's significant historical connection to the Vallejo Property, these were not the Band's only significant connections to the area. As Professor Hurtado explains and documents, the Band's ancestors were enslaved and held as captive labor at the Town of Sonoma and on the numerous Mexican ranchos in the North Bay area near the Vallejo Property, and probably including the very Mexican rancho out of which the City of Vallejo was carved and within whose historical boundaries the Vallejo Property is situated.

It is a well-established historical fact that the 1851-52 California treaties were never ratified by the Senate, and that by the beginning of the 20th century, the plight of California Indians was so deplorable that Congress passed several appropriations bills, and Special Agent Charles Kelsey was charged with procuring land bases for homeless Indians in California.

The Sugar Bowl Rancheria, which Special Agent Kelsey purchased in 1911 and which, unlike many of the small rancherias established in the early 20th century, was not a home for a disparate group of individual landless Indians. Despite being landless, the Yimabak (Moalkai), Kulanapo and Habenapo managed to maintain their tribal identity throughout the second half of the 19th century, primarily under the protection of the St. Tiburius Mission on the western shore of Clear Lake in the heart of their combined traditional territory. Rather than move on to the small parcel to the north that Agent Kelsey had purchased for other landless Indians in the Clear Lake area, the Yimabak, Kulanapo and Habenapo, through their leader, Joe Augustine, insisted that Special Agent Kelsey purchase a land base specifically and exclusively for the Indians that thereafter became known as the Scotts Valley Band of Pomo Indians. Several years later, another

Hon. Lawrence S. Roberts, Acting Asst. Secretary
January 28, 2016
Page 3 of 4

parcel was acquired for the remaining Indians in the area that thereafter became known as the Big Valley Band of Pomo Indians. Thus, the members of the Yimabak, Kulanapo and Habenapo bands, close relatives and allies who had almalgamated as Professor Theodoratus explains, recombined and separated into two successor modern-day Indian tribes—Scotts Valley and Big Valley.

Unfortunately the Sugar Bowl Rancheria lacked an adequate water supply and was completely unsuitable for even the subsistence farming necessary to minimally sustain the Band, and the United States was wholly unable to provide adequate, reliable water, sewage or electrical service to the Sugar Bowl Rancheria. Well before the termination and relocation policies of the 1950s and 1960s, conditions were so deplorable at Sugar Bowl that tribal members began leaving the Rancheria in the 1920s and 1930s in search of gainful employment and tolerable living conditions.

The termination era, culminating in the California Rancheria Termination Act of 1958 (the Termination Act), greatly accelerated the migration of tribal members from Sugar Bowl. When the Rancheria passed the Distribution Plan required under the Termination Act in 1959, there were 46 tribal members residing on the Rancheria. Over the next several years, 43 of these tribal members left the Rancheria, with the vast majority relocating to the Bay Area. The fact is that the relocation policies during the termination era were so complete and effective with respect to Scotts Valley, that the California Rancheria Task Force, created by the United States to study the impact of termination on California Indian tribes under the Termination Act, recommended that the entire Scotts Valley Band be relocated from the Sugar Bowl Rancheria. Of all the terminated California Indian tribes, Scotts Valley is one of only two terminated Indian tribes that the Task Force recommended for complete relocation.

Today, our tribal members are widely dispersed throughout California. The Band really has two roughly equal population centers: one located in the Bay Area, and one located further north in Lake and Mendocino Counties. We have two governmental offices to serve our population, a northern office and a southern office. The reality is that the Band has not had a viable homeland since California became part of the United States in 1850, and the Tribal Council is dedicated to restoring a trust land base which is capable of sustaining a complete, comprehensive tribal community. The Tribal Council believes that the Vallejo Property is perfectly situated to serve that purpose, and have decided to establish a restored land base on that Property.

We think it is important for you to understand that the Band's combined historical connections to the Vallejo Property are shared with only one other recognized Indian tribe—the Big Valley Rancheria—which has trust land on which it is currently engaged in gaming. While the other successors to the Clear Lake bands share connections through the Clear Lake Treaty and the 1851 Vallejo encampment, only the successors of the three bands located on the western shore of Clear Lake—the Yimabak (Moalkai), Kulanapo and Habenapo—can establish those connections together with the history of enslavement and captive labor at and near the Vallejo Parcel. Thus, the Band is the only Indian tribe able to

Hon. Lawrence S. Roberts, Acting Asst. Secretary
January 28, 2016
Page 4 of 4

qualify as having a "significant historical connection" to the Vallejo Property based on the evidence and analysis relied upon in this request.

As you know, the temporal connection regulatory requirement of the Restored Lands exception provides that a restored Indian tribe must file a trust application for a restored trust land base within 25 years of its restoration. As we discussed with Assistant Secretary Washburn, the Band believes that it must file a trust application for the Vallejo Property no later than September 5, 2016 or risk losing the ability to secure a restored trust land base eligible for gaming under IGRA. The Band appreciates the time and resources the Band, the Bureau, the State of California, and local governmental units, stakeholders and communities must devote to a trust application, and for this reason the Council has determined to seek an Indian lands Opinion before any interested party must spend the time, energy and resources required in connection with a complete trust application. Accordingly, the Council respectfully request that the Bureau issue an Indian Lands Opinion prior to September 5, 2016.

I look forward to meeting with you and your staff on Thursday, February 4.

Very truly yours,

Gabriel Ray, Chairman

Attachments:

Legal Memorandum, Request for Indian Lands Opinion – Restored Lands
Steven J. Bloxham, Fredericks Peebles & Morgan LLP

Scotts Valley Report
Dorothea J Theodoratus, Ph.D., Anthropological Consultant

The Scotts Valley Band of Indians and the North San Francisco Bay Region
Albert L. Hurtado, PhD., Historian

Scotts Valley Band of Pomo Indians: History from the Late Nineteenth to the Late Twentieth Centuries – Ancestral Ties, Community, and Use and Occupation of Land and Territory in the Clear Lake and the Northern San Francisco Bay Areas
Heather A. Howard, Ph.D. and James M. McClurken, Ph.D., McClurken & Associates

Declaration of Patricia Franklin, Secretary, Scotts Valley Band of Pomo Indians

# Legal Analysis by

## Steven J. Bloxham

## Fredericks Peebles & Morgan LLP

---

**Scotts Valley Band of Pomo Indians**

**Request for Indian Lands Determination**

**January 29, 2016**

AR0000005

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................................2

ANALYSIS .................................................................................................3

    The "Restored Lands" Exception ........................................................3

    The Tribe is a "Restored Tribe" ..........................................................4

    The Tribe Meets the "Modern Connection" and "Temporal Connection
    Requirements ...................................................................................4

        *Modern Connection* ....................................................................4

        *Temporal Connection*..................................................................5

    The Tribe Has a Significant Historical Connection to the Subject Lands ...........6

        *The Meaning and Application of the Significant Historical Connection
        Requirement* ..............................................................................6

        *The Land is within the Area Ceded by the Tribe and the Clear Lake
        Bands to the United States under an Unratified Treaty*.........................11

            The Scotts Valley Band is a Successor in Interest to the Clear
            Lake Bands ........................................................................12

            The United States Recognized and Treated with the Clear Lake
            Bands in both their Individual and Collective Capacities .............15

            The Treaty Constituted Formal Legal Recognition that the Clear
            Lake Bands Individually and Collectively Were Legal Successors
            in Interest with Authority to Cede the Area Ceded  ...................19

            The Proposed Restored Lands Are Part of the Land Individually
            and Collectively Ceded by the Clear Lake Bands to the United
            States in the 1851 Treaty ........................................................20

        *The Land is within the Area to which the Clear Lake Bands Retained and
        Exercised Reserved Rights under an Unratified Treaty*........................ 21

AR0000006

Reserved Rights to Use Vallejo Lands ........................................21

Exercise of Reserved Rights to Use Vallejo Lands ....................21

*The Land is within the Area Where the Tribe's Ancestors Were Held as Captive Labor* ........................................................................25

Conclusion ..........................................................................................26

AR0000007



**STEVEN J. BLOXHAM**
2020 L STREET, SUITE 250
SACRAMENTO, CA 95811
T: (916) 441-2700
F: (916) 441-2067
E: sbloxham@ndnlaw.com
www.ndnlaw.com

# MEMORANDUM

**TO:**      Honorable Paula Hart, Director
Office of Indian Gaming
United States Department of the Interior

**FROM:**      Steven J. Bloxham
Fredericks Peebles & Morgan LLP

**DATE:**      January 28, 2016

**RE:**      Scotts Valley Band of Pomo Indians – Request for Indian Lands Opinion –
Restored Lands – Vallejo Parcel

---

We are writing on behalf of the Scotts Valley Band of Pomo Indians in support of its request for an opinion pursuant to 25 CFR 292.3(b) that a certain parcel of newly acquired lands located in Vallejo, California, meets, or will meet, one of the exceptions under subpart B of part 292, such that gaming will be allowed on the lands in accordance with the Indian Gaming Regulatory Act, 25 U.S.C. 2719(a). The lands are being purchased for the Tribe and the Tribe will be requesting the Secretary to take into trust on its behalf in the next several months. Specifically, the Tribe seeks a determination that the lands will meet the requirements of the "restored lands" exception of § 2719(b)(1)(B)(iii) in accordance with the provisions of 25 CFR 292.7 upon the lands being taken into trust. This letter provides legal analysis in support of such determination.

As you are aware, the Tribe is a federally-recognized Indian tribe included on the list of recognized tribes published by the Secretary in accordance with 25 U.S.C. 479a-1. *See, e.g.,* Indian Entities Recognized and Eligible To Receive Services . . . , 80 Fed. Reg. 1942, 1945 (Jan. 14, 2015).

The lands in question are comprised of a parcel situated within portions of sections 4 and 5, Township 3 North, and sections 32 and 33, Township 4 North, Range 3 West, Mount Diablo Base and Meridian, in the City of Vallejo, County of Solano, State of California, designated as Solano County Assessor's Parcel Number 0182-010-010, and more fully described as:

> That certain parcel of land delineated on the Map entitled "Record of Survey of a Parcel of Land East of U.S. 40 & North of Columbus Parkway, Vallejo, California", made by Edward F. Schwafel, Engineer, Inc., filed in the Office of the County Recorder of Solano County, California, on July 28, 1965, in Book 9 of Surveys, at Page 61,

subject to certain exceptions of record, and containing 128.32 acres, more or less.

As explained more fully below, the lands qualify as "restored lands" under the requirements of 25 CFR 292.7.

## EXECUTIVE SUMMARY

- The Department already has determined that the Tribe is a "restored tribe"
- The Tribe has a "modern connection" to the land because the Tribe has no reservation and the land is both:
  - "near where a significant number of tribal members reside" and have resided for many years, and
  - "within a 25-mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least 2 years"
- The "temporal connection" requirement is satisfied because the Tribe is not gaming on other lands and the Tribe's application to have the land taken into trust will be filed within 25-years of the Tribe having been restored
- The Tribe has a "significant historical connection" to the land because:
  - the land is within the area ceded jointly by the Tribe and related Clear Lake Pomo bands to the United States by an unratified treaty in 1851
  - the land is very near the location in Vallejo where the Treaty and the Indian agent directed the Tribe and related Clear Lake Pomo bands collectively to take delivery of provisions the United States promised in the Treaty
  - the Tribe and related Clear Lake Pomo bands took delivery of promised provisions at the specified location in Vallejo in late 1851
  - the United States recognized and dealt with the Tribe and related Clear Lake bands collectively and recognized their collective capacity to cede the lands in and around Vallejo

- o the land is within Rancho Suscol, a former Mexican rancho claimed and operated by Mariano G. Vallejo, where the Tribe's ancestors were probably enslaved and held as captive labor, and
- o the land is near both Rancho Petaluma, another former Mexican rancho owned by Mariano G. Vallejo, and the Town of Sonoma, where the Tribe's ancestors were enslaved and held as captive labor

## ANALYSIS

## The "Restored Lands" Exception

IGRA generally prohibits Indian tribes from conducting gaming on lands acquired in trust after October 17, 1988, but it provides for certain exceptions, including an exception for lands taken into trust as part of "the restoration of lands for an Indian tribe that is restored to Federal recognition." 25 U.S.C. 2719(b)(1)(B)(iii). The Department's regulations set forth criteria for determining whether this "restored lands" exception applies. First, the tribe in question must have been restored or acknowledged by Congress, or through the administrative acknowledgement process, or by a Federal court. 25 CFR 292.7-292.11. For tribes restored by a Federal court, the only other requirement is to "establish a connection to the newly acquired lands" by meeting certain criteria:

(a)  The newly acquired land must be located within the State or States where the tribe is now located, as evidenced by the tribe's governmental presence and tribal population, and the tribe must demonstrate one or more of the following modern connections to the land:

(1)  The land is within reasonable commuting distance of the tribe's existing reservation;

(2)  If the tribe has no reservation, the land is near where a significant number of tribal members reside;

(3)  The land is within a 25-mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least 2 years at the time of the application for land-into-trust; or

(4)  Other factors demonstrate the tribe's current connection to the land.

(b)    The tribe must demonstrate a significant historical connection to the land.

(c)    The tribe must demonstrate a temporal connection between the date of the acquisition of the land and the date of the tribe's restoration. To demonstrate this connection, the tribe must be able to show that either:

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 4 of 27

       (1) The land is included in the tribe's first request for newly acquired lands since the tribe was restored to Federal recognition; or

       (2) The tribe submitted an application to take the land into trust within 25 years after the tribe was restored to Federal recognition and the tribe is not gaming other lands.

25 CFR 292.12.

## The Tribe is a "Restored Tribe"

The Department has previously determined that the Tribe has "satisfied the requirements of 25 C.F.R. § 292.7(a)-(c) and thus qualifies as a 'restored tribe' . . . ," by virtue of having been restored pursuant to the Stipulation for Entry of Judgment in *Scotts Valley Band of Pomo Indians v. United States*, No. C-86-3660-WWS (N.D. Cal. Mar. 15, 1991). *See* Memorandum from Edith Blackwell, Associate Solicitor, to George Skibine, Acting Deputy Assistant Secretary – Policy and Economic Development, at p. 4 (Nov. 18, 2011). *See also* Notice of Reinstatement to Former Status for . . . the Scotts Valley Band of Pomo Indians . . . , 57 Fed. Reg. 5214 (Feb. 12, 1992). This previous determination establishes that the Tribe was restored by a "Federal court determination in which the United States is a party or court-approved settlement agreement entered into by the United States" within the meaning of 25 CFR 292.10(c). *See* Letter to Donald Arnold, Chairperson, Scotts Valley Band of Pomo Indians, from Donald E. Laverdure, Acting Assistant Secretary – Indian Affairs, at 4-5 (May 25, 2012).

Accordingly, it remains for the Tribe to demonstrate the Tribe's connections to the lands under the criteria articulated in 25 CFR 292.12, which are applicable in accordance with 25 CFR 292.7(d) and 292.11(c).

## The Tribe Meets the "Modern Connection" and "Temporal Connection" Requirements

Two of the three criteria contained in 25 CFR 292.12—the requirements of a "modern connection" of the Tribe to the lands under § 292.12(a) and a "temporal connection" between the date of the acquisition of the land and the date of the Tribe's restoration under § 292.12(c)—are readily satisfied by reference to well-known facts contained in the public record.

### *Modern Connection*

Initially, the "lands [are] located within the State . . . where the tribe is now located, as evidenced by the tribe's governmental presence and tribal population . . . ." Section 292.12(a). As indicated above in the legal description of the lands, the lands are located within the State of California. The Tribe is and always has been located within what is now the State of California. *See* Declaration of Patricia Franklin ¶ 4 (Jan.

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 5 of 27

28, 2016) ("Franklin Declaration"); *see generally*, D. Theodoratus, "Scotts Valley Report" (Jan. 18, 2016) ("Theodoratus Report"); A. Hurtado, "The Scotts Valley Band of Indians and the San Pablo Bay Region" (Jan. 18, 2016) ("Hurtado Report"). Indeed, the Tribe is listed in the official list of federally-recognized Indian tribes as the "Scotts Valley Band of Pomo Indians of California." *See* Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 80 Fed. Reg. 1942, 1945 (Jan. 14, 2015).

Further, the Tribe has no reservation, and the land is both "near where a significant number of tribal members reside" and is "within a 25-mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least 2 years . . . ." Section 292.12(a)(2) & (3). In 2000, the Assistant Secretary – Indian Affairs designated the "counties of Mendocino, Lake, Sonoma and Contra Costa in the State of California" as the Tribe's "'near-reservation' areas" within which the Tribe is "authorized to extend financial assistance and social services to their eligible tribal members (and their family members who are Indian) . . . ." *See* Notice of Near-Reservation Designations for California Tribes, 65 Fed. Reg. 31188 (May 16, 2000). Since 2008, the Tribe continuously has provided such services in part from its southern governmental offices within Contra Costa County. The Tribe's southern governmental offices currently are located at 2727 Systron Drive, Suite 100, Concord, California 94518, where they have been since 2012, prior to which they were located at 1465 Enea Circle (aka 1465 Civic Court), Suite 700, Concord, California 94520. The land is within less than a 16-mile radius from each of these governmental facilities. *See, e.g.*, Franklin Declaration ¶ 16. The vast majority of the Tribe's members (approximately 72.7%) live within such designated "near-reservation area," with a significant number (approximately 12.4%) living within Contra Costa and Sonoma Counties (each of which has boundaries contiguous with Solano County). Approximately 10.0% of Tribal members live within a 25-mile radius of the land, and 18.0% of Tribal members—nearly one-fifth of the entire Tribe—live within a 36-mile radius of the land. *See* Franklin Declaration ¶¶ 16 and 17 & Ex. B.

### Temporal Connection

The Tribe will submit its "application to take the land into trust within 25 years after the tribe was restored to Federal recognition and the tribe is not gaming on other lands." Section 292.12(c)(2). The Tribe was restored to Federal recognition "[e]ffective September 6, 1991". *See* Notice of Reinstatement of Former Status for . . . the Scotts Valley Band of Pomo Indians . . . , 57 Fed. Reg. 5214 (Feb. 12, 1992). Therefore, the Tribe will satisfy this criterion so long as it actually has submitted its application to take the land into trust on or before September 6, 2016.[1]

---

[1] In addition, the lands will be "included in the tribe's first request for newly acquired lands since the tribe was restored to Federal recognition." Section 292.12(c)(1). *See* Gaming on Trust Lands Acquired After October 17, 1988 (Adopting 25 CFR Part 292), 73 Fed. Reg. 29354, 29366-29367 (May 20, 2008) (Preamble – Review of Public Comments – Section 292.12 – Paragraph (c)).

In the Review of Public Comments, the Bureau of Indian Affairs explained that:

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 6 of 27

The balance of this submission will address the remaining requirement under § 292.12—that the Tribe "demonstrate a significant historical connection to the land." Section 292.12(b).

## The Tribe Has a Significant Historical Connection to the Subject Lands

### *The Meaning and Application of the Significant Historical Connection Requirement*

"Significant historical connection" is defined to mean "the land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty, or a tribe can demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land." 25 CFR 292.2.

The requirement that a "significant historical connection" exist between a tribe and particular lands for the lands to qualify as "lands . . . taken into trust as part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition" under IGRA, 25 U.S.C. § 2719(b)(1)(B)(iii), stems from federal court decisions prior to the adoption of the Part 292 Regulations. The federal court decisions were the "cases cited by [one of] the commenter[s]", which the Department explained "provide guidance for the interpretation of section 2719(b)(1)(B)(iii)." Gaming on Trust Lands Acquired After October 17, 1988 (Adopting 25 CFR Part 292), 73 Fed. Reg. 29354, 29365 (May 20, 2008) (Preamble – Review of Public Comments – Section 292.12 – Paragraph (b)).[2] Referring to the same decisions, the Department also noted that its definition of the term "significant historical connection" incorporates the existing case law:

> *One comment suggested **(b)(2) should reflect advisories in case law that support the general idea that there are limits to what can be***

---

Paragraph (c)(1) considers that there are often a number of impediments involved in a tribe's efforts to acquire restored lands after the event officially restoring the tribe. Also, placing a time cap on the ability of a tribe to acquire land for gaming, when it is their first attempt to acquire a site for gaming, is contrary to Federal Indian policy as stated in IGRA. However, a cap of 25 years, as discussed in (c)(2), addresses the concerns about a tribe's open ended ability to acquire lands for gaming. If a tribe already has newly acquired lands, then a time cap and its limiting effect to acquire a site for gaming does not undermine IGRA's stated policy goals.

*Id.* at 29367. *See also In re Cloverdale Rancheria Request for Indian Land Determination*, Letter to P. Hermosillo, Chairperson, Cloverdale Rancheria, from G. Skibine, Acting Deputy Asst. Secretary at p. 3 & n. 5 (Dec. 12, 2008).

[2] The decisions include "*e.g., Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney*, 198 F.Supp. 2d 920 (W.D. Mich. 2002), aff'd 369 F.3d 960 (6th Cir. 2004); *Confederated Tribes of the Coos, Lower Umpqua, and Suislaw Indians v. Babbitt*, 116 F.Supp. 2d 155 ([D.]D.C. [] 2000)". 73 Fed. Reg. at 29365.

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 7 of 27

> **included as restored lands.** *Another comment suggested that the term "significant" in paragraph (b) is too vague.*
>
> *Response: These recommendations were addressed through the addition of a definition for "significant historical connection."*

73 Fed. Reg. 29354, 29366 (emphasis added).[3]  More recently, the Department explained that, "When interpreting and applying the definition of a 'significant historical connection' in subsection 292.2, the preamble to the regulations, as well as previous Department Solicitor, NIGC, and judicial opinions, are instructive." *In re* Guidiville Band of Pomo Indians Indian Lands Determination, Letter to M. Sanchez, Chairperson, from L. Echo Hawk, Asst. Secretary – Indian Affairs at 9 (Sept. 1, 2011).  "Federal court decisions prior to the promulgation of the Part 292 regulations instruct that 'the land that could be considered part of such restoration might appropriately be limited by the factual circumstances of the acquisition, the location of the acquisition, or the temporal relationship of the acquisition to the restoration.'"  *Id.* at 9-10, quoting *Confederated Tribes of the Coos, Lower Umpqua, and Suislaw Indians v. Babbitt*, 116 F.Supp.2d 155, 164 (D.D.C. 2000).

These Federal court decisions in turn relied upon and upheld (in the case of *Grand Traverse Band*), or determined to be too restrictive and overturned (in the *Coos Bay* case), the decisions of the NIGC and the Department applying the "restored lands" provisions of IGRA.  In one of the earliest "restored lands" decisions by the Department, the Solicitor relied upon the "plain meaning" of the term "restored" to determine that reacquisition of lands previously ceded by a tribe to the United States qualified as lands that were "restored."

> IGRA does not define what tribes or lands qualify as "restored" under IGRA's Section 20. The dictionary definition is: "1) to give back (as something lost or taken away): make restitution of: return; 2) to put or bring back (as into existence or use)." Webster's Third New International Dictionary.
> * * *
> *Since the lands* proposed for acquisition lie within this ten county area and *are thus part of the territory the Bands' predecessors ceded to the U.S. in*

---

[3] The references are to section 292.12(b) and (b)(2) of the proposed rule published in the Notice of proposed rulemaking, Gaming on Trust Lands Acquired After October 17, 1988 (25 CFR Part 292), 71 Fed. Reg. 58769, 58774 (Oct. 05, 2006).  The proposed provisions read:

> (b) A significant historical connection to the land can be established if:
> (1) The land is located within the boundaries of the tribe's last reservation reserved to the tribe by a ratified or unratified treaty; or
> (2) The land is located in an area to which the tribe has significant documented historical connections, significant weight being given to historical connections documented by official records of the Bureau of Indian Affairs or the Department of the Interior, or by the Indian Claims Commission, other Federal court, or congressional findings.

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 8 of 27

> *earlier treaties*, these proposed acquisitions made pursuant to the Restoration Act are properly characterized as "restored" lands.

Pokagon Band of Potawatomi Indians, Memorandum to Secretary of the Interior from the Solicitor, Dept. of the Interior, M-36991, at 3 & 7-8 (Sept. 19, 1997) (emphasis added). Relying upon this decision, the District Court in the *Grand Traverse Band* case explained:

> Having concluded that the tribes were restored, the Solicitor took a broad view of what constituted lands taken into trust as part of a restoration of lands within the meaning of § 2719(b)(1)(B)(iii). *The Solicitor concluded that **the lands at issue were part of a restoration simply on the basis that the lands at issue were** within the twenty-county area **ceded by the tribe to the United States.***

*Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Attorney For W. Dist. of Michigan*, 198 F. Supp. 2d 920, 935 (W.D. Mich. 2002) (emphasis added), *aff'd sub nom. Grand Traverse Band of Ottawa & Chippewa Indians v. Office of U.S. Atty. for W. Div. of Michigan*, 369 F.3d 960 (6th Cir. 2004). The Court then applied the Solicitor's reasoning in the Pokagon Band memorandum to support the Court's decision upholding the NIGC's determination that the lands at issue in *Grand Traverse Band* constituted "restored lands."

> *By the reasoning contained in the Solicitor's opinions, if a tribe is a restored tribe under the statute,* **any lands taken into trust that are located within the areas historically occupied by the tribes** *are properly considered to be lands taken into trust as part of the restoration of lands under § 2719. . . . Further, in light of the virtually identical history of these tribes with the Grand Traverse Band, reliance on the Solicitor's analysis is particularly appropriate. Treating similarly situated tribes in a similar manner is consistent with federal legislation that counsels against interpretations that distinguish among tribes in ambiguous circumstances. See 25 U.S.C. § 476(f)* ( "Departments of agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the Act of June 18, 1934 (25 U.S.C. 461 et seq., 48 Stat, 984) as amended, or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.")

*Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Attorney For W. Dist. of Michigan*, 198 F. Supp. 2d 920, 935-36 (W.D. Mich. 2002) (emphasis added), *aff'd sub nom. Grand Traverse Band of Ottawa & Chippewa Indians v. Office of U.S. Atty. for W. Div. of Michigan*, 369 F.3d 960 (6th Cir. 2004).

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 9 of 27

These decisions establish that land which a tribe previously ceded to the United States is land capable of being "restored" to the tribe within the plain meaning of that term and therefore is land to which that tribe has a "significant historical connection" and qualifies as "restored land" (where the other requisite connections—modern and temporal—exist) when taken into trust for that tribe.

The Department's Federal Register notice adopting Part 292 further outlines the contours of the "restored lands" category. The discussion in the Preamble to Part 292 indicates that the criteria listed in the Department's definition of "significant historical connection" do not limit a tribe to its "aboriginal" or "traditional" territory,—i.e., territory over which it had exercised "exclusive use and occupancy,"[4] but nevertheless require "something more" than a tribe having "merely passed through a particular area."[5] In

---

[4] Useful guidance is found not only in the Department's discussion of its regulations dealing with the "restored lands" exception, but also with respect to the "initial reservation" exception. Both exceptions require a "significant historical connection." *See* 25 CFR 292.6(d), 292.12(b).

> *One comment suggested that the word "area," as it relates to the term "significant historical connection," is too broad.* The comment suggested that gaming should be limited to ancestral homelands and that language should be inserted to reference 25 CFR 151.11(b) so that as distance from homeland increases—nearby local officials, State officials and tribe's input gains greater weight.
>
> Response: *This recommendation was not adopted because **the actual land to which a tribe has significant historical connection may not be available.** Additionally, input from nearby local officials, State officials and other tribes is not part of the Initial Reservation analysis in section 2719.*
>
> *One comment suggested that the significant historical connection requirement should be **uninterrupted connection**. Another comment suggested that the requirement should show **historically exclusive use**.*
>
> Response: *These recommendations were not adopted. They **would create too large a barrier to tribes in acquiring lands and they are beyond the scope of the regulations and inconsistent with IGRA**.*
>
> \* \* \*
> One comment suggested that the tribes should be required to analyze sites that are close to aboriginal homelands.
>
> Response: This recommendation was not adopted. Newly acquired lands with significant historical and cultural connections may or may not include those that are close to aboriginal homelands.

Gaming on Trust Lands Acquired After October 17, 1988 (Adopting 25 CFR Part 292), 73 Fed. Reg. 29354, 29360-39361 (May 20, 2008) (Preamble – Review of Public Comments – Section 292.6 – Paragraph (c)) (emphasis added).

[5]

> *One comment suggested adding **specific examples** of significant historical and cultural connections in paragraph (c), for example, "designated in a treaty, whether ratified or not." Another comment stated that the term "significant historical connection" is*

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 10 of 27

addition, the listed criteria are not intended to be an exhaustive list or the exclusive means by which a tribe might demonstrate its historic connection to land, but rather are intended to serve to illustrate some of the ways a tribe might demonstrate a "significant historical connection."[6]

---

*too vague* to offer any protection to tribes or citizens *and that the regulation should not allow gaming on lands to which a tribe has **only a transient connection**.* Several comments specifically suggested a definition for "significant historical connections."

Response: This recommendation was adopted in part through the addition of the new definition "significant historical connections."

Gaming on Trust Lands Acquired After October 17, 1988 (Adopting 25 CFR Part 292), 73 Fed. Reg. 29354, 29360 (May 20, 2008) (Preamble – Review of Public Comments – Section 292.6 – Paragraph (c)) (emphasis added).

*One comment suggested that a tribe should not be able to establish a historical connection if they are a disparate group of traveling Indians traveling through territory at some point in their distant history.*

Response: *We received comments* pertaining to the issue raised by this comment that argue *both in favor of and against a tribe's ability to establish a connection to the land when their past contacts were **transitory or brief in nature**. The definition of "significant historical connection" establishes criteria which **require something more than evidence that a tribe merely passed through a particular area**.*

Gaming on Trust Lands Acquired After October 17, 1988 (Adopting 25 CFR Part 292), 73 Fed. Reg. 29354, 29366 (May 20, 2008) (Preamble – Review of Public Comments – Section 292.12 – Paragraph (b)) (emphasis added).

[6]

A few comments suggested deleting the reference to *"**cultural connection**"* because it *is essentially a subset of historical connections* and adds redundancy and confusion to the regulation.

Response: This recommendation was adopted.

Gaming on Trust Lands Acquired After October 17, 1988 (Adopting 25 CFR Part 292), 73 Fed. Reg. 29354, 29360 (May 20, 2008) (Preamble – Review of Public Comments – Section 292.6 – Paragraph (c)) (emphasis added).

One comment stated that the phrase "significant historical connection" in (b) is interpreted too broadly, and that it should only be found when a tribe has had exclusive use and occupancy of an area. Additionally, the comment suggested that an Indian Claims Commission determination on restored lands should be binding.

Response: This recommendation was not adopted. In response to numerous comments, *the term "significant historic connection" is now defined in the definition section of these regulations. **While not limited to the tribe's exclusive use and occupancy area, the definition specifies certain criteria** that a tribe must show in order to meet the definition, **e.g.,** [an abbreviation of "exempli gratia," meaning "for example," see* Black's Law Dictionary (10th ed. 2014)] "the land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty, or a tribe can demonstrate by

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 11 of 27

### *The Land is within the Area Ceded by the Tribe and the Clear Lake Bands to the United States under an Unratified Treaty*

On August 20, 1851, the United States entered into a "treaty of peace and friendship made and concluded at Camp Lu Pi-yu-ma" with eight "tribes or bands" of Pomo Indians located in and around Clear Lake, California ("Clear Lake bands").[7]

---

> historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land."

Gaming on Trust Lands Acquired After October 17, 1988 (Adopting 25 CFR Part 292), 73 Fed. Reg. 29354, 29366 (May 20, 2008) (Preamble – Review of Public Comments – Section 292.12 – Paragraph (b)) (emphasis added).

> *The significant historical connection requirement insures that the tribe has **a preexisting connection** to the newly acquired lands proposed to be its initial reservation. Furthermore, the Department does not believe it is good policy to create an initial reservation in an area where the tribe has no preexisting connection.*

Gaming on Trust Lands Acquired After October 17, 1988 (Adopting 25 CFR Part 292), 73 Fed. Reg. 29354, 29360 (May 20, 2008) (Preamble – Review of Public Comments – Section 292.6 – Paragraph (c)) (emphasis added).

> One comment suggested that the regulations require a tribe to provide information about the tribe's ancestral ties to the land.
>
> Response: The recommendation was not adopted; however, ancestral ties would be part of the significant historical connection analysis.

Gaming on Trust Lands Acquired After October 17, 1988 (Adopting 25 CFR Part 292), 73 Fed. Reg. 29354, 29360 (May 20, 2008) (Preamble – Review of Public Comments – Section 292.6 – General comments on § 292.6), 73 Fed. Reg. 29354, 29361.

> *One comment suggested adding the words "or by other means" in paragraph (b)(1) because there are other valid means by which a reservation may have been established other than by treaty* for purposes of § 292.12(b).
>
> Response: *This recommendation was* not adopted because it is *unnecessary*. The reference to reservation under a ratified or unratified treaty is only one manner in which a significant historical connection can be demonstrated according to the definition. *There is no need to broaden this portion of the definition because the **evidence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land will identify the historical connections without raising the ambiguity that "other means" may create.***

Gaming on Trust Lands Acquired After October 17, 1988 (Adopting 25 CFR Part 292), 73 Fed. Reg. 29354, 29366 (May 20, 2008) (Preamble – Review of Public Comments – Section 292.12 – Paragraph (b) (emphasis added)).

[7] The identification of the Clear Lake bands as "Pomo" reflects modern English-language terminology, which did not develop and become solidified in usage until well after the time of the treaty negotiations. At the time of the treaty negotiations, the name "Pomo" was associated with only one of the bands that are now referred to in modern usage as being Pomo. *See generally,* McClendon and Oswalt, "Pomo: Introduction," 8 *Handbook of North American Indians* 274, 277 (Heizer, ed., 1978). *See also* C.H.

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 12 of 27

Treaty of August 20, 1851, United States-Calanapo Tribe, etc., 4 C. Kappler, *Indian Affairs: Laws and Treaties* 1108 (1929). The Clear Lake bands were identified in the Treaty as the "Ca-la-na-po tribe," the "Ha-bi-na-po tribe," the "Da-no-ha-bo tribe," the "Mo-al-kai tribe," the Che-com tribe," the "How-ku-ma tribe," the Cha-nel-kai tribe," and the "Me-dam-a-dec tribe." Treaty Preamble & Signatures, *id.*, at 1108-1109 & 1111. *See generally* Hurtado Report at 77-86.

<u>The Scotts Valley Band is a Successor in Interest to the Clear Lake Bands</u>

The Scotts Valley Band is a modern-day legal, political and genealogical successor-in-interest to at least three of the eight Clear Lake bands individually—the "Mo-al-kai," the "Ca-la-na-po" and the "Ha-bi-na-po." The "Mo-al-kai" treaty party was the Pomo band located in what is now commonly called "Scotts Valley," west of Lakeport on the western shore of Clear Lake. It is more commonly referred to as the "Yimaba" or "Yimabak." The "Ca-la-na-po" and "Ha-bi-na-po" treaty parties were the Pomo bands located in the western and eastern portions, respectively, of what is now commonly called "Big Valley," on the south-western shore of Clear Lake. Their names are more commonly spelled "Kulanapo" and "Habenapo." *See generally* Theodoratus Report at 2, 4-8 & esp. 5 (map), 9-12.

The Clear Lake bands that were parties to the Clear Lake treaty were not separate entities in the sense that they had mutually exclusive citizenship or membership, but rather they were organized as separate territorial entities with a fluid citizenship or membership. Thus, bands were defined primarily by location—i.e., by territory, but individuals and families could and did move back and forth to and from one territory to and from another, because they were part of families at more than one location. And, because the extended families were exogamous, persons living within separate band territories were related to persons living within neighboring band territories. *See generally* Theodoratus Report at 3-8. As Peter Kunkel explained:

> It is quite clear . . . that *the Pomo area was characterized by constantly shifting political alignments with residential kin groups the most stable elements in the system. Tribelets were important but somewhat fragile political entities, breaking up fairly often into their component parts—the kin groups—which then recombined in new ways.*
> * * *
> Gifford's descriptive ethnographic data indicate that *residence was a matter of choice throughout the Clear Lake zone. This is, in fact, the key to understanding corporate kin groups of this sort.* There is the possibility of choice, after marriage, between residence with the husband's joint natal family household and residence with the wife's. With the Pomo, such

---

Merriam, *Ethnogeographic and Ethnosynonymic Data from Central California Tribes*, Univ. of Cal. Arch. Research Facility (Heizer, ed., 1977) 5 (Northern Pomo) at 24 ("Pomo" & "Po'-mo"). That band was one of the signatories to the Treaty concluded with the Pomo bands on the Russian River ("Russian River bands") on August 22, 1851, at Camp Fernando Feliz. Treaty of August 22, 1851, United States-Sainell Tribe, etc. 4 C. Kappler, *Indian Affairs: Law and Treaties* 1112 (1929).

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 13 of 27

*choice seems to have been tentative just after marriage. <u>There was a good deal of moving back and forth, especially if the kin groups involved were in different villages. But, ultimately, a final choice was made, thus determining initial chiefly allegiance for children. Chiefly allegiance for in-married spouses remained ambiguous</u>, a fact that is reflected in apparently inconsistent statements of allegiance presented in some of Gifford's tables.*

P. Kunkel, The Pomo Kin Group and the Political Unit in Aboriginal California, 1(1) J. Calif. Anthropology 7, 11-13 (1974) (emphasis added).[8]  *See also* P. Kunkel, *Yokuts and Pomo Political Institutions: A Comparative Analysis* (1962).

Thus, by way of example, Omer Stewart in *Notes on Pomo Ethnogeography*, 40(2) Univ. of Calif. Pubs. In American Archaeology and Ethnology 29-62 (1943), reported that his informant for the "*Yimaba of Scott's Valley*", "Joe Augustin (JA)", was born of "parents from Southern Pomo village of Kulanapo [and] has lived most of his life in Scott's Valley, is now considered chief." *Id.* at 30.   Stewart explained that "The Yimaba Indians occupied about three and a half miles of land fronting on Clear Lake, from the Cinal area southward to just north of Lakeport.  The boundary between the Yimaba and the Kulanapo [was] about five miles long . . . .  Thus the drainage of Scott's Creek from the summit of the mountains to the edge of Clear Lake, an area approximately ten miles long and seven miles wide, was occupied by the Yimaba Tribe." *Id.* at 41-42.   "[M]y informant JA [Joe Augustine] called Scott's Valley Boalkai, the people Yimaba." *Id.* at 41, n 31.

<u>*The Yimaba tribelet of Scott's Valley, on the west side of the main body of Clear Lake, was the result of an aboriginal amalgamation process, involving remnants of the earlier tribelets. These remnant groups were*</u>

---

[8] Kunkel further explained (at *id.*):

My interpretation is that whatever their past these chiefly allegiance groups were not lineages by 1850. Further, in view of our present knowledge about the frequent occurrence of non-lineal corporate groups, I see no need to set up an assumption that these groups were ever lineages.
* * *
Gifford's Clear Lake data go beyond the village tribelet of Shigomba in respect to certain matters. Among other things, he records 23 contemporary chiefs of equal secular rank for the Lake zone, as of ca. 1850 (Gifford 1926b:333-346). Thus 23 kin groups are indicated for the zone. My analysis suggests that these kin groups were single village tribelets like Shigomba; others belonged together in rather complexly confederated tribelets, at least in proto-historic times (according to unpublished notes of C. Hart Merriam on file with the Department of Anthropology, University of California, Berkeley), although most Pomo ethnographers have treated the villages in all cases as separate tribelets (e.g., Gifford 1926b; Kroeber 1925; Stewart 1943).

Gifford's scattered census data for other Clear Lake communities suggest the same ambilateral pattern for allegiance to chiefs as that indicated at Shigom (1926b). Moreover, the residence pattern is ambilocal as at Shigom.

AR0000020

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 14 of 27

> *called Boalke and Komli*. . . . Gifford indicates that the Boalke and Komli
> were ultimately united in one principal village, Yima (1926b: pp. 290, 297,
> 314, and passim). . . . *The Komli were originally part of a Northern Pomo
> tribelet which occupied a village called Cokatcal in the northern part of
> Ukiah Valley*, on the upper Russian River (Kroeber 1925: p. 253; Merriam
> n.d.: Clear Lake Tribes other than 'Ham-fo and Ki-yow-bah). The Central
> Pomo tribelet, Yokaia, which then occupied the southern half of the same
> valley, claimed that Cokotcal people were only "tolerated intruders". On
> the other hand, the Northern Pomo claimed that they had territorial rights
> in Ukiah Valley. In any case, *the Yokaia eventually broke up Cokatcal
> village and drove one fragment of the population, the Komli, over the
> mountains into Scott's Valley. There they were welcomed by the already-
> resident Eastern Pomo, Boalke. At first, the Komli group was assigned
> territory in Eight-mile Valley, at the head of Scott's Creek, while Boalke
> retained the lower reaches of the stream. (Barrett 1908: p. 158). Later,
> however, the two groups united, forming a new, multi-kin-group village,
> Yima, replacing the earlier, separate, villages.* After Yima was established,
> the Boalke seem to have constituted one residential kin-group, while the
> Komli were another.

P. Kunkel, *Yokuts and Pomo Political Institutions: A Comparative Analysis* 264-265
(1962) (emphasis added).

The Yimaba/Boalke are the Mo-al-kai that were one of the Clear Lake band
parties to the Clear Lake treaty. *See* Theodoratus Report at 4-7. *See generally* C. H.
Merriam, *Ethnogeographic and Ethnosynonymic Data from Central California Tribes*,
Univ. of Cal. Arch. Research Facility (Heizer, ed., 1977) at 121 ("Mo-al-kai")[9] and 108
("Bo-al ka'-ah"),[10]. *See also id.*, at 102 ("Bo-al' ka'-ah"),[11] 104 ("Kom-le"),[12] 117 ("Kom-

---

[9] "(18 Calif. Treaties 1852); Moal-kai (John McKee 1853); Moal-kai (Gibbs 1853; Bancroft 1874; and
Barrett 1908); Mo-al-kai (Royce 1901); Moal-kai (Kroeber 1925). See synonymy of Bo-al' ka'-ah."

[10] "Tribe in northern part of Scott Valley. Name usually stretched to cover the Ye-mahl-bahch in southern
part of Scott Valley.-CHM. Synonymy: Boalkea (Kroeber in Handbook Am. Indians, 155, 1907); Boil-kai-
pomo (Kroeber, Hdbook. Indians Calif., 231, Index, 984, 1925); Boil-ka-ya (Palmer, Hist. Napa and Lake
Counties, pub. Slocum, Bowen & Co., pp. 35, 37, 1881); Boil-ka-ya (Barrett, after Palmer, Ethno-Geog.
Pomo, 156, 1908; see also No-baw'-rahl); Mo-al-kai (18 Calif. Treaties, 1852, Senate reprint, pp. 4, 53,
56, 1905); Moal-kai (John McKee, Senate Ex. Doc. 4, Special Session, p. 136, 1853); Moal-kai (Gibbs in
Schoolcraft, III, 109, 1853; see also Na'-po bati'n); Moalkai (Bancroft, after Gibbs, Native Races, I, 451,
1874); Mo-al-kai (Royce, 18th Ann. Rept. Bur. Eth. for 1896-1897, Pt. 2, p. 784, 1899, Publ. 1901; without
hyphens p. 956); Moal-kai (Barrett, after Gibbs); and Moal-kai (after McKee; Ethno-Geog. Pomo, 156,
1908; see also No-baw'-rah, main list); Moal-kai or Boil-kai-pomo (Kroeber, Hdbook. Indians Calif., 231,
1925); Moal-kai-pomo (Index, p. 984)."

[11] "Scott Valley tribe, reaching Clear Lake north of Lakeport.-CHM."

[12] "Given by Barrett as camp in Eight-mile Valley at head of Scott Creek 3 miles north-northeast of Red
Mountain. Written Cum-le-bah by Palmer who gives it as a tribe at upper end of Scott Valley."

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 15 of 27

le"),[13] and 125 ("Ye-mah'-bah(ch)").[14] *And see id.*, at 122 ("Scott's Valley Tribe");[15] and E. Loeb, *Pomo Folkways*, 19(2) Univ. of Calif. Pubs. In Amer. Archaeology and Ethnology 149, 207-210 (1926).

### The United States Recognized and Treated with the Clear Lake Bands in both their Individual and Collective Capacities

The Scotts Valley Band also is one of the several modern-day legal and political successors-in-interest to all of the Clear Lake bands collectively with respect to matters involving the Treaty.

The Clear Lake Treaty provisions reflect that the United States established a relationship between the United States and the Clear Lake bands both individually and as a unit, i.e., in both their individual and collective capacities.

Article 1 of the Treaty provided that "The said tribes or bands acknowledge themselves, *jointly and severally*, under the exclusive jurisdiction, authority, and protection of the United States . . . ." (Emphasis added.)[16] Article 3 provided that "The

---

[13] "Tribe and rancheria formerly located on ground now covered by northern part of city of Ukiah. Stephen Knight, a trustworthy Yokiah Indian, was told by an old Yokiah woman, (Mother-in-law of Dan Scott, a Lah-ta of Yorkville) that many years ago (several hundred years ago, Knight thinks) the Kom-le occupied the northern part of Yokiah Valley, including present site of Ukiah and the asylum at Talmage. They quarreled with the Yokiah and were driven out of the valley, crossing the mountains to the east and settling in Scott Valley, Lake Co. Some of the old people say the Kom-le established themselves on the narrow flat between Blue Lakes and Cold Creek (but this was in the territory of the Ki-yowl-bahc tribe). Knight does not believe this. Where the Kom-le came from "no one knows". Stephen Knight adds, "They spoke a language half Yokiah and half Calpella (Mah-soo'-tah-ki'-ah) .-CHM. Barrett gives the location of the Scott Valley settlement as in Eight-Mile Valley at head of Scott Creek, 3 miles north-northeast of Red Mt. (Ethno-Geog. PoU, 158, 1908). Synonymy: Cum-le-bah ('Koo-lan nap-po name for tribe in upper end of ScottValley, on the Deming place; Palmer's History of Napa and Lake Counties, Calif.; pub. Slocum, Bowen and Co., San Francisco, 35, 37, 1881); Cum-le-bah (Barrett, after Palmer, Ethno-Geog. Pomo, 158, 1908); ko'mll (Old camp site in Eight-Mile Valley at head of Scott Creek, about 3 miles northnortheast of Red Mountain; Barrett, Ethno-Geog. Pomo, 158, 1908; old village of same name at Ukiah; Ibid. 137-138); Komli (The Komli people as a whole left their village in the north end of Ukiah Valley, journeyed up the East Fork of Blue Lakes, and finally settled in Scott Valley; Kroeber, after Barrett, Hdbook. Indians Calif., pp. 235-236, 1925); Komli ("Scott's valley tribe"; Loeb, after Barrett, Pomo Folkways, p. 207, 1926); Scott's valley tribe (See Komli, Loeb)."

[14] "Tribe in southern part of Scott Valley. Their name for themselves. Best regarded as a division of the Bo-al' ka'-ah.-CHM. Synonomy: Ye'-mah (Name used by Kulanapo.-CHM); Yemabak (Loeb, Pomo Folkways, p. 280, 1926)."

[15] "(Loeb 1926). See synonomy of Kom'-le."

[16] Nineteen years before the 1851 Treaty with the Clear Lake bands, Chief Justice John Marshall explained the import of the protection provisions of treaties between Indian tribes and the United States. Referring to the 1785 Treaty of Hopewell between the Cherokee Nation and the United States, Justice Marshall observed:

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 16 of 27

said tribes or bands hereby *jointly and severally* relinquish, cede, and forever quit claim to the United States, all their right, title, claim, or interest of any kind, which they or either of them have to lands or soil in California." (Emphasis added.)

"Joint (adjective)" is defined to mean "united, combined" (def. 1), "common to two or more: as . . . involving the united activity of two or more . . . [or] shared by or affecting two or more" (def. 2(a)(1)&(b)), and, as most specifically relevant to its usage in the Treaty, to mean "united, joined, or sharing with another (as in a right or status)" (def. 3). Webster's Third New International Dictionary, http://www.merriam-webster.com/dictionary/joint. In legal usage specifically, "Joint and several contracts" are defined to be "Contracts in which *the parties bind themselves* both individually and *as a unit* (jointly)", Black's Law Dictionary 751 (5th Ed. 1979), and "Jointly" is defined to mean "unitedly, combined or joined together in unity of interest or liability." *Id.* at 752 (5th Ed. 1979).

George Gibbs, who was a part of the 1851 treaty expedition and kept and published an official journal of the expedition, explained that the first six of the Clear Lake bands parties to the Treaty (those "belonging to the lake," while the remaining two bands lived "in a valley situated to the north of it, on the east fork of the Russian River) were collectively known as the "Na-po-batin," which he translated to mean "many houses." G. Gibbs, "Journal of the Expedition of Colonel Redick M'Kee, United States Indian Agent, through North-Western California. Performed in the Summer and Fall of 1851 (Feb. 23, 1852), published in 3 H. Schoolcraft, *Archives of Aboriginal Knowledge* 99-177 (1860), at 109-110. "They give to the first six tribes collectively the name of "Na-po-batin," or many houses; an appellation, however, not confined to themselves, as they term the Russian river tribes the "Boh-Napo-batin," or western many houses." *Id.* at p. 110. *See also* C. H. Merriam, *Ethnogeographic and Ethnosynonymic Data from Central California Tribes* at 121 ("Na'-po-batin, Na'po-batins").[17]

---

The second article repeats the important acknowledgement, that the Cherokee nation is under the protection of the United States of America, and of no other sovereign whosoever.
*The meaning of this has been already explained. The Indian nations were, from their situation, necessarily dependent on some foreign potentate for the supply of their essential wants, and for their protection from lawless and injurious intrusions into their country.* That power was naturally termed their protector. They had been arranged under the protection of Great Britain: but *the extinguishment of the British power in their neighbourhood, and the establishment of that of the United States in its place, led naturally to the declaration, on the part of the Cherokees, that they were under the protection of the United States, and of no other power.* They assumed the relation with the United States, which had before subsisted with Great Britain.
*This relation was that of a nation claiming and receiving the protection of one more powerful: not that of individuals abandoning their national character, and submitting as subjects to the laws of a master.*

*Worcester v. Georgia*, 31 U.S. (6 Pet.) 515 at 555 (1832) (emphasis added).

[17] "Given by Gibbs as collective name (meaning "'many houses') for Kulanapo, Habe-napo, Dahno-habe, Moal-kai, She-cum and How-ku-ma (Gibbs in Schoolcraft, III, 110, 1853)."

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 17 of 27

Nor were the 1851 treaty negotiations the first time that the United States had dealt with the Clear Lake bands collectively. As Professor Hurtado explained in his report, in 1848, official representatives of the United States had entered into a treaty with the Indians at Clear Lake. *See* Hurtado Report at 61 (Vallejo Treaty). *See also id.*, at 73; and L. Palmer, *History of Napa and Lake Counties* (1881) – (Lake) at 62 (Teschemacher Treaty). Indeed, as Professor Hurtado points out, the official appointment of Mariano Vallejo as an Indian sub-agent by the U.S. military governor Brigadier General Stephen Kearney showed that Kearney "understood that for the purposes of Indian administration the territory between San Pablo Bay and Clear Lake was one unit. Vallejo, as mission administrator, military commandant, and private ranchero, was largely responsible for creating this geographic concept." Hurtado Report at 53. *See also id.*, at 69-72 (recounting U.S. military response to the Kelsey and Stone killings).

As the United States recently explained, "***It is treaty relations, not the ratification of the treaty that establishes the relationship*** *and demonstrates that the United States views that entity as … a sovereign entity capable of engaging in a formal treaty relationship with the United States.*" United States' Reply in Support of Cross-Motion for Summary Judgment, *Confederated Tribes of the Grand Ronde Community of Oregon v. Jewell*, No. 13-cv-00849, ECF No. 65 at 6-7, 2014 WL 10093565 (D.D.C. Jan. 29, 2014) (quoting Record of Decision (emphasis added). *See also* Proposed Finding for Federal Acknowledgment of the Cowlitz Indian Tribe, 62 Fed. Reg. 8983 (Feb. 27, 1997), aff'd Final Determination To Acknowledge the Cowlitz Indian Tribe, 65 Fed. Reg. 8436 (Feb. 18, 2000) ("Although the Lower Cowlitz refused to sign the Chehalis River Treaty, **their participation in the negotiations constitutes unambiguous Federal acknowledgment of the tribe's sovereignty**." (Emphasis added)); "CIT [Cowlitz] **was Federally acknowledged in 1855 when its leaders represented the tribe at the Chehalis River Treaty negotiations**." 65 Fed. Reg. 8436 (February 18, 2000) (emphasis added); Reconsidered Final Determination for the Cowlitz Indian Tribe at 5 fn. 4 (Dec. 31, 2001) ("The Lower Cowlitz did not sign a treaty; **they**, however, **participated in treaty negotiations, activity which indicated that the Federal Government recognized the negotiating entity as a tribe**." (Emphasis added)).[18]

Furthermore, "[f]or purposes of an evaluation under Section 83.8 of the regulations, however, **the issue is not the reality of Indian political organization and autonomy, but the Federal Government's definition of the Indian entities it treated as political units**." Summary under the Criteria and Evidence of Proposed Finding

---

[18] The Department has consistently relied upon proposed and final determinations by the Department of petitions for federal acknowledgment through the Part 83 administrative process. *See, e.g.,* Record of Decision re Trust Acquisition of, and Reservation Proclamation for the 151.87-acre Cowlitz Parcel in Clark County, Washington, for the Cowlitz Indian Tribe at 121-122 (Apr. 2013); 78 Fed. Reg. 26802 (May 8, 2013) (Notice of Final Agency Determination).

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 18 of 27

Against Acknowledgment of the Burt Lake Band of Ottawa and Chippewa, Indians, Inc. at 20 (Mar. 25, 2004) (emphasis added).

This principle was also expressly applied in the Cowlitz determinations, where the Department found that subsequent treatment by Indian agents constituted acknowledgment of a combined entity. "This final determination now extends the date of previous Federal acknowledgment to 1878-1880 to when Federal Indian agents appointed Atwin Stockum chief in 1878 *and included both the Lower Cowlitz and Upper Cowlitz bands in Office of Indian Affairs censuses taken in 1878 and 1880.* The proposed finding found that *the government administratively joined the Lower Cowlitz*, which included the Lower Cowlitz métis, and the Upper Cowlitz. ***Although Government documents of the 1860's and 1870's noted separate groups, they handled them together*.*" Final Determination To Acknowledge the Cowlitz Indian Tribe, 65 Fed. Reg. 8436, 8436 (Feb. 18, 2000) (Emphasis added).

As explained in the next section concerning Reserved Rights under the Treaty, following the conclusion of the Treaty, the United States continued to view and conduct relations with the Clear Lake bands collectively with respect to implementation of the treaty provisions.

As recently as the Thirteenth Decennial Census, conducted in 1910, the Clear Lake bands were reported as a single Indian tribe—"Clear Lake"—both on the official individual census returns and on the official report on the "Indian Population in the United States and Alaska, 1910" (Dept. of Commerce, Bureau of the Census, GPO 1915) ("1910 Indian Census").[19] *See, e.g., id.*, Table 8 (Number of Indians Reported on Special Indian Schedule, Classified by Linguistic Stocks and Tribes: 1910) at p. 15 ("[Linguistic Stock and Tribe] Pomo Stock (syn. Kulanapan)—Clear Lake; [Number]—193"); Table 9 (Indians by Tribes, by States: 1910) at p. 17 ("[Tribe and State]—Clear Lake (Pomo)—California; [Number]—193"); Table 10 (Indian Population of the Different States, By Tribes: 1910) at p. 22("[State and Tribe]—California—Clear Lake]; [Number]—193"); Table 100 (Indians 10 Years of Age and Over, Classified by Sex, etc.) at p. 246 ("[Stock, Tribe and State]—Pomo Stock—Tribe: Clear Lake— . . . .").

---

[19] The report noted that:

> The statistics of Indians were gathered in part by means of the general populations schedule and in part by means of a special schedule containing, in addition to the questions found on the general schedule, inquiries as to tribe and purity of blood. . . .

> Special agents, most of whom had had some experience in the service of the Office of Indian Affairs, were appointed for the collection of statistics by means of the special schedule. *In the conduct of the field work and in the preparation of schedules, the Bureau of the Census was effectively aided by the Office of Indian Affairs* and Bureau of American Ethnology.

Indian Population in the United States and Alaska, 1910 at 9 (emphasis added).

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 19 of 27

<u>The Treaty Constituted Formal Legal Recognition that the Clear Lake Bands
Individually and Collectively Were Legal Successors in Interest with Authority to
Cede the Area Ceded</u>

Just as the fact of treaty negotiations between the United States and a tribal
group necessarily demonstrates that the United States recognizes the legal capacity of
that group to enter into the treaty, *a fortiori* it also necessarily demonstrates that the
United States recognizes the legal capacity of the group with respect to the subject
matter of the treaty.

In his concurring opinion in *Worcester v. Georgia*, Justice McClean articulated
the fundamental requirements for treaty relations, which in turn explain the underlying
reason that treaty relations themselves constituted recognition of the legal existence
and capacity of tribes with whom the United States engaged in treaty negotiations:

> It is said that these treaties are nothing more than compacts, which cannot
> be considered as obligatory on the United States, from a want of power in
> the Indians to enter into them.
> ***What is a treaty? The answer is, it is a compact formed between two
> nations or communities, having the right of self government***.
> Is it essential that each party shall possess the same attributes of
> sovereignty, to give force to the treaty? This will not be pretended: for, on
> this ground, very few valid treaties could be formed. ***The only requisite
> is, that <u>each of the contracting parties shall possess</u> the right of self
> government, and <u>the power to perform the stipulations of the treaty</u>***.

31 U.S. at 581 (McClean, J., concurring) (emphasis added).

The subject matter of the Treaty with the Clear Lake bands included the cession
of territory by the Clear Lake bands to the United States.   Accordingly, the Treaty
constituted legal recognition that the Clear Lake bands were the Indian tribes with
authority to cede the area to the United States, i.e., with "the power to perform the
stipulations of the treaty."  31 U.S. at 581 (McClean, J., concurring).

This conclusion is also consistent with the usual international law rule regarding
state succession in relation to territory.  "When a state succeeds another state with
respect to particular territory, the capacities, rights, and duties of the predecessor state
with respect to that territory terminate and are assumed by the successor state, as
provided in §§ 209-210." Restatement (Third) Foreign Relations Law of the United
States § 208 (Succession of States).  *See also id.,* § 209(1) (State Succession: State
Property and Contracts); § 210(4) (State Succession: International Agreements) &
Reporters' Note 9 (*Previous Restatement*) ("This section is generally consistent with §§
159-160 of the previous Restatement"); Restatement (Second) Foreign Relations Law
of the United States §§ 159 (Disappearance of State) and 160 (Transfer of Territory).
"The field of federal Indian law has its roots in international law.  Many Supreme Court
decisions regarding Indian affairs drew directly on the law of nations to explain and

justify the relationship between the national government and Indian tribes." F. Cohen, *Handbook of Federal Indian Law* § 5.01[2], p. 386 (Newton, et al., eds., 2012) (citing to, *e.g., Worcester*, 31 U.S. 515, 520, 561).

Ethnographers have long been in agreement that the area in and around what is now the City of Vallejo and adjacent portions of southern Napa and Solano counties were part of the territory of the Patwin people. *See, e.g.,* P. Johnson, "Patwin," 8 *Handbook of North American Indians* 350-351 (1978). Not surprisingly, ethnographers also agree that California Indians used all of their territories. *See* R. Heizer & A. Kroeber, For Sale: California at 47 Cents Per Acre, 3(2) J. Calif. Anthro. 38-65 (1976). The closest documented Patwin village to the subject lands was known as "Suskol," and was located immediately adjacent to what is now State Highway 29, south of City of Napa, approximately 6-1/8 miles north of the City of Vallejo, and approximately 6-3/4 miles from the subject lands. *See* Johnson, "Patwin," 8 *Handbook of North American Indians* at 350, Fig. 1 (Tribal territory and villages) no. 34 ("Suskol"); D. Gardner, "Suscol in Napa County: An Historic Report 1835-1977" (1977) at 1-2, 9-11 & Exhibits 1 ("Key Map"), 2 ("Location Map") & 3 ("Air View of Transportation Corridors").

However, the record indicates that by 1851 there were no surviving Patwin (or any other Indian) villages, and not independent bands or tribes, in southern Napa and Solano Counties. *See, e.g.,* S. Cook, The Aboriginal Population of the North Coast of California, 16(3) Univ. of Calif. Pubs. Archaeological Records 81, 125-126 (1956) (discussing the reports of surviving populations in the area as of 1843, and noting that the evidence indicates that the "the aboriginal village organization had broken down utterly, and the Indians were living in new places in conformity with new economic and social requirements."). *See also* D. Gardner, "Suscol in Napa County: An Historic Report 1835-1977" (1977) at 2 ("The Patwin village at Suscol seems to have been inhabited until the early 1830's. . . . By 1849, William Neely Thompson, who was reputedly one of the first Anglo visitors to the areas and who later had a role in Suscol's development, made no mention of Indian inhabitants.")

Because the legal requisites for treaty relations required that "each of the contracting parties shall possess the right of self government, and the power to perform the stipulations of the treaty," *Worcester v. Georgia*, 31 U.S. at 581 (McClean, J., concurring), it is evident that the United States recognized and treated with the Clear Lake bands as successors to the former aboriginal occupants of the lands in the Vallejo area.

<u>The Proposed Restored Lands Are Part of the Land Individually and Collectively Ceded by the Clear Lake Bands to the United States in the 1851 Treaty</u>

The lands "jointly and severally" ceded by the Clear Lake bands to the United States comprised a distinct territory extending from the Clear Lake region in the north to the northeast shore of San Pablo Bay and the Carquinez Straits in the south. *See* C. Royce, *Indian Land Cessions in the United States*, Eighteenth Annual Report of the Bureau of American Ethnology, 1896-'97, Part 2 (GPO 1899) at 784-785 (Schedule of

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 21 of 27

Indian Land Cessions) Treaty of Aug. 20, 1851 with the Ca-la-na-po, etc., "Reserve a tract on Clear Lake"—Map Area 295 (California 1); "Cede all claim to other territory"—Map Area 296 (California 1); & at Maps ff. p. 997, Map 7, Plate CXIV, "California 1" (Area 296).[20]

These sources indicate that the ceded lands included the City of Vallejo, including the proposed "Restored Lands."

### *The Land is within the Area to which the Clear Lake Bands Retained and Exercised Reserved Rights under an Unratified Treaty*

#### Reserved Rights to Use Vallejo Lands

The Treaty reserved to the Clear Lake bands certain lands and rights to certain other lands within the cession area.  Article 4 of the Treaty between the Clear Lake bands and the United States provided that:

> it is hereby stipulated and agreed on the part of the United States, that the following tract or district of land shall be appropriated and set apart as an Indian reservation, and the use and possession thereof forever guaranteed to the said tribes, their successors, and to such other tribes as the United States may hereafter remove from the valley of the Russian river or elsewhere, and settle thereupon, . . . .

Article 5 of the Treaty between the Clear Lake bands and the United States provided that:

> **To aid the said tribes or bands in their subsistence** *with removing to and making their settlement upon the said lands,* **the United States**, in addition to the presents of ten head of beef cattle, three sacks of bread, and sundry clothing, made to them at this council, ***will also furnish them, free of charge,*** **at or near Vallejo**, or elsewhere, as may be most convenient, with one hundred (100) head of beef-cattle, to average in weight five hundred pounds net, and two hundred (200) sacks of flour of fifty pounds each in all ten thousand pounds, during the present year (1851), and a like quantity in each of the years 1852 and 1853, to be divided among them by the agent according to their respective numbers.

---

[20] The Department has consistently relied upon Charles Royce's classic work *Indian Land Cessions in the United States*, and specifically the maps California 1 and 2.  *See, e.g., In re* Guidiville Band of Pomo Indians Indian Lands Determination, Letter to M. Sanchez, Chairperson, from L. Echo Hawk, Asst. Secretary – Indian Affairs at 11-12 (Sept. 1, 2011).  As to the extensive official reliance upon Royce's work generally, *see* Sutton, *Cartographic Review of Indian Land Tenure and Territoriality: A Schematic Approach*, 26(2) Am. Ind. Culture and Research J. 63-114 (2002).

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 22 of 27

Treaty of Aug. 20, 1851, art. 5, 4 C. Kappler, *Indian Affairs: Laws and Treaties* 1108, 1110 (1929) (emphasis added).

The Treaty thus contemplated that the United States would furnish provisions to the bands, and that the bands would take possession of the furnished provisions, "at or near Vallejo."

This provision of the Treaty established reserved rights to such off-reservation lands identical in kind and similar in scope to those established in treaties that reserved off-reservation hunting, fishing and gathering rights over lands ceded in those treaties. "Treaty-reserved hunting, fishing, and gathering rights on off-reservation lands are akin to easements running with the burdened lands, and include easements to access hunting, fishing, and gathering sites." F. Cohen, *Handbook of Federal Indian Law* § 18.02, p. 1157 (Newton, et al., eds., 2012). "Treaties reserving hunting, fishing, and gathering rights over previously owned lands to do not constitute a 'grant of rights to the Indians, but a grant of rights from them—a reservation of those not granted.'" *Id.* at § 18.02, p. 1156 (quoting *United States v. Winans*, 198 U.S. 371, 381 (1905)). The only difference here is the scope of the use that is the subject of the reserved right—in this case, the Clear Lake bands making use of ceded lands to take delivery of food provisions furnished by the United States, rather than making use of ceded lands by engaging in hunting, fishing and gathering food provisions directly. This is a minor distinction without a difference in the context of proper interpretation of the Treaty. "[T]reaties were imposed upon them and they had no choice but to consent. As a consequence, this Court has often held that treaties with the Indians must be interpreted as they would have understood them . . . and any doubtful expressions in them should be resolved in the Indians' favor." *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 631 (1970). *See also, e.g., Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196 (1999). *See generally* F. Cohen, *Handbook of Federal Indian Law* § 2.02[1], pp. 113-116 (Newton, et al., eds., 2012).

Further, the Treaty necessarily contemplated that the bands would have a right of access to and from Vallejo—to travel from their reservation to Vallejo to receive the provisions, and to return to their reservation from Vallejo with the provisions they received. "Tribal members possess an easement of access over privately held land as necessary to the exercise of the treaty hunting, fishing, and gathering rights. In *United States v. Winans*, the United States Supreme Court held that an access easement was necessarily implied from the treaty's specific reservation of fishing rights at a usual and accustomed station." *Id.* at § 1804[2][e], p. 1174 (citing to, *inter alia, Winans*, 198 U.S. 371, 381-382 (1905); *New York ex rel. Kennedy v. Becker*, 241 U.S. 556, 562 (1916); and *Grand Traverse Band v. Mich. Dept. of Natural Resources*, 141 F.3d 636, 638-639 (6th Cir. 1998))(footnotes omitted).

The official record of the treaty negotiations kept by the Secretary of the federal treaty delegation indicates that the location "at or near Vallejo" where the Clear Lake bands were to receive the provisions was the ranch of General J. M. Estelle of the

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 23 of 27

California State Militia, 2d Division, who was a member of the treaty delegation.    *See* Hurtado Report at 77-85.    The official minutes of the proceedings reflect that:

> The several articles of the treaty as agreed upon were read separately, and again fully explained; also the duty due the government of the United States by the Indians. That no agent would be sent among them at present, and that *any flour and beef given them this fall the chiefs must send runners for* as the mountains surrounding this lake are impassable for wagons, and it would cause the President great expense to send it here now. *The chiefs said they were perfectly willing to enter into and sign the treaty, and send after any food the agent might give them.*
> Agent McKee resumed: *General Estelle's ranche is on the Bay of San Francisco, near Vallejo, and he has agreed to take care of any flour I may order for you*, as some of your people are sick, *and you must send to his ranche for it.*
> This was agreed to.
> R. McKee again: *Should any disturbances or difficulties arise among you, or with the whites, you must also go to General Estelle, as he has offered to advise you in these matters till I return.*
> * * *
> *R. McKee ordered fifty sacks of flour to be sent from San Francisco to Estelle's ranche for the use of the Indians in this reservation*; and after *again explaining that it must be sent for*, we broke up our camp . . . .

Minutes of Proceedings, Camp Lupiyuma, August 20, 1851, Sen. Exec. Doc. No. 4, 32d Cong., Spec. Sess., at 141-142 (Mar. 17, 1853) (emphasis added).

<u>Exercise of Reserved Rights to Use Vallejo Lands</u>

The record demonstrates that the Clear Lake bands complied with and took advantage of the treaty provisions and the directions of Indian Agent McKee.    *See* Hurtado Report at 83-85.  Because having done so resulted in much consternation to the regional U.S. military authorities, one particular occasion was extensively documented in correspondence between the military commander, Brevet Brigadier General Ethan Hitchcock, and Indian Agent Redick McKee:

> I must remind you that some time after your return to San Francisco from the expedition, you personally applied to me for an issue of flour from the United States commissary stores, to be delivered to the Clear Lake Indians, to comply, as you stated, with your engagements with those Indians. This must have been two or three months after you had concluded your treaty with those Indians . . . .
> I declined to furnish you the flour, and you informed me that you could procure it in San Francisco; but whether you did so or not, and, if so, how the delivery was made, I have never inquired.

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 24 of 27

> I have to state that, *on one occasion, **subsequent to your treaty with the Clear Lake Indians***, *and while you were absent on the expedition further north,* ***I saw a considerable body of those Indians encamped by the brook at General Estelle's house***, *within nine miles of this place, whither the Indians had come to receive a quantity of beef,* ***in fulfilment, as I understood, of your arrangements***. They had left their proper homes, and had travelled fifty or sixty miles, through the white settlements, to receive that beef from your contractor; and if it was in any way authorized by you, I must take leave to say that nothing should have been more ill-judged, to say nothing of the manner of the issue . . . . Who superintended the issue of the beef on that occasion, or why it was issued at all, was, and still is, equally unknown to me . . . .

E. A. Hitchcock, B. B. General, Br. C. 2d Infantry, to R. McKee, U. S. Ind. Agent, Northern California, Mar. 23, 1852, Sen. Exec. Doc. No. 4 at 301 (emphasis added). Agent McKee responded, denying that he had promised to furnish beef, but acknowledging that he had arranged for flour to be supplied and that he had told the Clear Lake bands with whom he had treated to go to General Estelle's ranch to pick up that flour:

> That you **"saw a considerable body of Indians encamped by the brook, at General Estelle's ranche, within nine miles of Benicia," I have no reason to question, nor yet their perfect right to make a visit there**, *if it suited their convenience or their whims*. It is no uncommon thing for parties to come over from the lake to work for farmers in the valleys of Sanoma, Nappa, &c., and sometimes on a visit to the white settlements. ***When at the lake, in August, I told the chiefs that***, *as some of their people were sick, and a change of diet desirable,* ***if they would, about a certain time, send over some of their people to carry it up, I would order up to that ranche twenty or thirty sacks of flour for their use, as a present. I did so; and I suppose the Indians you saw were those who came over for it***. I made no promise about furnishing them beef; authorized none to be issued to them, and have I paid for none so issued. If they were supplied, they owe it to the hospitable liberality of General Estelle.

R. McKee, U. S. Indian Agent, Northern California, to E. A. Hitchcock, Bvt. Brig. Gen., Mar. 26, 1852, Sen. Exec. Doc. No. 4 at 305 (emphasis added). General Estelle confirmed to Agent McKee that he had delivered and the Clear Lake bands representatives had consumed beef at his ranch, but that he had not charged the government for it:

> I now have to reply to a remark in General Hitchcock's letter that I would had not been made. He intends to convey the impression that Indians were sent to my ranche to consume beef at the expense of the United States; that he saw them there himself; &c. I would reply that no

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 25 of 27

> charge was ever made by me for beef or other provisions consumed on
> my ranche; and if not so, like all other contracts, it certainly can be found
> in the payment of the money.

J. M. Estelle to Colonel R. McKee, Jul. 6, 1852, Sen Exec. Doc. No. 4 at 349.  General
Hitchcock rejected Agent McKee's denial concerning provision of beef, but made clear
that his objections were independent of whether beef or flour or both had been
promised and supplied:

> You endeavor to make a point in denying that you engaged to
> furnish beef to the Indians at General Estelle's ranche. It would be a waste
> of words to labor to convince a man who will not see that the point does
> not lie in the fact you deny. I indeed saw the Indians receiving beef at
> General Estelle's ranche, and was told they had come there to receive it
> under an arrangement made by yourself; and when I express my opinion
> that such an arrangement, requiring the Indians to make a long journey
> into the white settlements, was injudicious, you tell me you made no
> contract with General Estelle for the issue of beef at his ranche; but
> immediately add, that you engaged to send flour to General Estelle's for
> the Indians; as if this altered the matter . . . .

E. A. Hitchcock, Brevet Brig. General, Col. Second Infantry, to Col. R. McKee, U.S.
Indian Agent, Jul. 26, 1852, Sen. Exec. Doc. No. 4 at 355.

Professor Hurtado has determined the likely location of Eden Ranch and the
brook by which the Clear Lake bands were camped when observed by General
Hitchcock.  *See* Hurtado Report, Historical Note at 102-105.  Based upon his research
and calculations as explained in the Historical Note, Professor Hurtado has concluded
that the Clear Lake bands' historic encampment is approximately 2.4 miles from the
Vallejo parcel, i.e., the lands that are the subject of the Tribe's Indian lands opinion
request.

### The Land is within the Area Where the Tribe's Ancestors Were Held as Captive Labor

The evidence demonstrates that the Tribe's ancestors also historically "used and
occupied" the lands in and around Vallejo in another way—they were enslaved and held
as captive labor on and near ranchos in the North Bay area that were near the Vallejo
parcel, likely including the rancho that encompassed the Vallejo parcel itself.  In one
incident in the spring of 1848 documented by historian Lyman Palmer, 172 Indians from
Scotts Valley were captured and "driven to Sonoma where they built adobe houses in
the growing town."  Hurtado Report at 64; *see also* L. Palmer, *History of Napa and Lake
Counties* (1881) – (Lake) at 50-54.  The Town of Sonoma is approximately 17.1 miles
from the Vallejo Parcel.  Professor Hurtado also documents that "'Indians from the Clear
Lake country'" were enslaved and held as captive labor "on all of the ranchos 'north of
the bay of San Francisco.'"  Hurtado Report at 45 (quoting Captain William Heath Davis,

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 26 of 27

*Seventy-Five Years in California* at 25 (1967)).  Professor Hurtado concludes that the preponderance of the evidence indicates that Clear Lake band members—as Clear Lake Indians as such, and not as isolated individuals—repeatedly were enslaved and held as captive Indian labor at North Bay ranchos, likely including at Rancho Suscol, the historical boundaries of which encompass the present-day Vallejo parcel.  *See* Hurtado Report at 89-101.

Professor Hurtado concludes that the entire historical record demonstrates that the Tribe is part of the history of the lands in and around Vallejo and that those lands are part of the history of the Tribe.  As Professor Hurtado explains:

> *In the nineteenth century the homes and ranches of the North Bay Region were common places of employment for Indians.  Clear Lake was often mentioned as a place of origin for these workers whether enslaved, indentured, or free.*  Under these violent and inhumane conditions the North Bay region became a part of the SVBI homelands.  *The historical record frequently refers to "Clear Lake Indians" without further identification.  Yet when non-Indian observers specifically described Clear Lake Indians who were driven to work on the ranchos in the North Bay region they mention Rancho Lup-Yomi and Scotts Valley.*  These were the places that were most closely associated with early non-Indian settlement of the Vallejos, Stone, and the Kelseys.  These Indians were among those who signed the 1851 treaty and reported to General Estell's ranch in Vallejo for food.  Thus, *the historical record is consistent.  **In all cases that have come to my attention "Clear Lake Indians" taken as captives were Habenapo, Kulanapo, and Yimabak/Molakai who were associated with Rancho Lup-Yomi and Scotts Valley.** Thus the preponderance of evidence supports a conclusion that the "Clear Lake Indians" who are mentioned in the record are the Habenapo, Kulanapo, and Yimabak/Molakai – the ancestors of today's SVBI.*
>
> * * *
>
> ***Whether by force or by choice Habenapo, Kulanapo, and Yimabak/Molakai and their descendants have repeatedly relocated to the North Bay region over a period of almost two centuries.***  *Whether under the authority of Mexico, the state of California, or the United States, the power of the state has been the impetus for these movements.* ***Thus the North Bay region, including Rancho Suscol, Vallejo, and Solano County became part of the SVBI's historic territory****.*

*Id.* at 99-101.

## Conclusion

The Scotts Valley Band is a "restored tribe," as the Department has already determined.  The subject land qualifies for gaming under IGRA's "restored lands" rule and the Department regulations.

AR0000033

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 27 of 27

The land's location in California, within 25 miles of a Tribal governmental facility and near where a significant number of the landless Tribe's members live, establishes the modern connection between the Tribe and the subject land.

The Tribe is not gaming on any other lands, and the Tribe will submit its fee-to-trust application within 25 years of its restoration, satisfying the requirement for a close temporal connection between restoration of the Tribe and acquisition of the land.

Finally, the historical record demonstrates that the Tribe has a significant historical connection to the land. The Tribe's predecessors-in-interest negotiated to jointly and severally cede the subject land to the United States in an unratified 1851 treaty. Under the Department's Pokagon opinion and *Grand Traverse Band*, this qualifies the land as "restored land." *See* Pokagon Band of Potawatomi Indians, Memorandum to Secretary of the Interior from the Solicitor, Dept. of the Interior, M-36991, at 7-8 (Sept. 19, 1997); *Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Attorney for W. Dist. of Michigan*, 198 F.Supp.2d 920, 935-36 (W.D. Mich. 2002). *See also* Reconsidered Final Determination to Acknowledge the Cowlitz Indian Tribe at 5 fn. 4 (Dec. 31, 2001). Furthermore, in the 1851 treaty, the United States and the Tribe's predecessors agreed to reserve the Indian parties' rights to use and access a Vallejo location in the immediate vicinity of the subject land. The subsistence use of this reserved right further demonstrates the Tribe's historical connection to the subject land. *See* 25 CFR 292.2. Lastly, additional evidence of the Tribe's significant historical connection to this land is found in the captive Clear Lake Indians' forced "use and occupation" as captive slave labor in the 1840s, 1850s and 1860s at locations throughout the North Bay area near and likely including the Vallejo parcel. Thus, the totality of the historical evidence demonstrates that "the North Bay region, including Rancho Suscol, Vallejo, and Solano County became part of the SVBI's historic territory." Hurtado Report at 101.

Based on the foregoing, we respectfully ask that the Office of Indian Gaming issue an affirmative response to the Tribe's request, and determine that the subject lands constitute "restored lands" on which the Tribe may conduct gaming in accordance with IGRA.

sjb:se

Curriculum Vita

**ALBERT L. HURTADO**
7608 Summertime Lane
Roseville, CA 95747
ahurtado@ou.edu

**EDUCATION:**

B.A., 1969, California State University, Sacramento.
M.A., 1975, California State University, Sacramento.
Ph.D., 1981, University of California, Santa Barbara.
Doctoral dissertation: "Ranchos, Gold Mines and Rancherías:  A Socioeconomic History of
Indians and Whites in Northern California, 1820-1860," completed under the direction of
Professor Wilbur R. Jacobs.

**PROFESSIONAL EXPERIENCE:**

May 2012 to present, Professor Emeritus of History, University of Oklahoma.

Fall 1998-2012, Professor, Paul H. and Doris Eaton Travis Chair in Modern American History,
University of Oklahoma.

Fall 1992-1998, Director of Graduate Studies, Department of History, Arizona State University.

Fall 1990-1998, Associate Professor, Department of History, Arizona State University.

Fall 1986-Spring 1990, Assistant Professor, Department of History, Arizona State University.

1983-1986, Assistant Professor, Department of History, Indiana University-Purdue University at
Indianapolis; Coordinator, M.A. program in public history; Assistant Editor, Journal of the Early
Republic, 1984-85.

1983 (Spring), Lecturer, University of Maryland, College Park, MD.

1981-82, Instructor, Social Science Division, Sierra College, Rocklin, CA.

1980- to present, Consulting Historian specializing in Indian history, policy, land, water, cultural
resource management, national register, historical research and interpretation.

1978-80, Senior Staff Historian, Theodoratus Cultural Research, Fair Oaks, CA, specializing in
cultural resource management.

**PROFESSIONAL EXPERIENCE (continued):**

1977-78, Park Interpretive Specialist, Office of Historic Preservation, California Department of Parks and Recreation, Sacramento, CA.

1975-77, Teaching Assistant, Department of History, University of California, Santa Barbara.

**UNDERGRADUATE COURSES TAUGHT:**

| | |
|---|---|
| American Indian History | American West to 1850 |
| Indians of the Southwestern U.S. | American West from 1850 |
| Perspectives on the Americas | U.S. History to 1865 |
| History of Sexuality in the U.S. | U.S. History from 1865 |
| American Borderlands: West in | American Frontier |
| Biography and Fiction | Hispanic Southwest to 1848 |
| | American Sou |

**GRADUATE COURSES TAUGHT:**

| | |
|---|---|
| New Western History | American Frontier |
| Historiography | Community History |
| Research Methods | Research Seminar |
| Colloq. in Public History | Intro. to Public History |
| American Indian History | |

**PUBLICATION PRIZES:**

John W. Caughey Prize, 2007, for *John Sutter: A Life on the North American Frontier* (Norman: University of Oklahoma Press, 2006). Given by the Western History Association for the most distinguished book on the history of the American West.

Co-Founders Award, 2007, for *John Sutter: A Life on the North American Frontier* (Norman: University of Oklahoma Press, 2006). Awarded by Westerners International for best book on the history of the American West.

Norman Neuerburg Award, 2001, for *Intimate Frontiers: Sex, Gender and Culture in Old California* (Albuquerque: University of New Mexico Press, 1999). Awarded by the Historical Society of Southern California for distinguished research in early California history.

2

AR0000072

**PUBLICATION PRIZES (continued):**

Bolton-Kinnaird Award in Borderlands History, 1994, for "Herbert E. Bolton, Racism, and American History," *Pacific Historical Review* 62 (May 1993):127-42. Awarded every two years by the Western History Association for the best article on Spanish Borderlands History published in any journal.

Louis Knott Koontz Award, 1994, for "Herbert E. Bolton, Racism, and American History," *Pacific Historical Review* 62 (May 1993):127-42. Awarded annually by the American Historical Association, Pacific Coast Branch, for the "most deserving article," published in the *PHR*.

Vivian A. Paladin Award, 1990, for "Public History and the Native American: Issues in the American West," *Montana, the Magazine of Western History* 40 (Spring 1990):58-69. Awarded annually by the Montana Historical Society for the best article published in *Montana*.

Ray A. Billington Prize for American Frontier History, 1989, for *Indian Survival on the California Frontier* (New Haven: Yale University Press, 1988). Awarded by the Organization of American Historians every two years for the best book in the field.

Herbert Eugene Bolton Award in Spanish Borderlands History, 1982, for "'Hardly a Farm House--a Kitchen Without Them': Indian and White Households on the California Borderland Frontier in 1860," *Western Historical Quarterly* 13 (July 1982): 245-70. Awarded every two years for the best article on borderlands history.

**HONORS AND AWARDS:**

President, Western History Association, 2011-2012.

*Los Angeles Times* Distinguished Fellow, Henry E. Huntington Library, 2007-2008.

Distinguished Lecturer, Organization of American Historians, 2002-2005.

Distinguished Service Award, 1999. California State University, Sacramento, Alumni Association.

President, Pacific Coast Branch of the American Historical Association, 1997-1998.

Quality of Student Life Award, 1996. Office of the Vice President of Student Affairs, Arizona State University.

AR0000073

**HONORS AND AWARDS (continued):**

Outstanding Mentor Award, for graduate education, 1992-1993. Awarded annually by the Associated Students of Arizona State University.

California Committee for the Promotion of History, Award of Merit, 1989.

California State University, Sacramento, outstanding alumni, 1989.

**BOOKS:**

*Herbert Eugene Bolton: Historian of the American Borderlands* (Berkeley: University of California Press, 2012).

*Reflections on American Indian History: Honoring the Past, Building the Future*, ed. (Norman: University of Oklahoma Press, 2008).

*John Sutter: A Life on the North American Frontier* (Norman: University of Oklahoma Press, 2006). Paper edition, 2008.

*Intimate Frontiers: Sex, Gender and Culture in Early California*, (Albuquerque: University of New Mexico Press, 1999). Paper edition, 2000.

*Major Problems in American Indian History*, ed. with Peter Iverson (Lexington, Mass.: D. C. Heath, 1994). Second edition (Boston: Houghton Mifflin, 2001). Third edition (Stamford, CT: Cengage, 2015).

*Indian Survival on the California Frontier* (New Haven: Yale University Press, 1988). First paper edition published in 1989; second paper printing 1998.

**WORK IN PROGRESS:**

"The American Historical Profession and the Problem of Regionalism."

**ARTICLES, CHAPTERS IN BOOKS, AND INTRODUCTIONS:**

"John Sutter and the Indian Business," in Christopher J. Castaneda and Lee M. A. Simpson, eds., *River City and Valley Life: An Environmental History of the Sacramento Region* (Pittsburgh: University of Pittsburgh Press, 2013), 13-30.

"Bolton and Turner: the Borderlands and American Exceptionalism," *Western Historical Quarterly*, 44 (Spring 2013), 5-20.

4

AR0000074

**ARTICLES, CHAPTERS IN BOOKS, AND INTRODUCTIONS (continued):**

"False Accusations: Herbert Bolton, Jews, and the Loyalty Oath at Berkeley, 1920-1950, *California History* 39, no. 2 (2012), 38-56.

"Herbert E. Bolton and the Bancroft Library," in Charles B. Faulhaber, ed., *The Bancroft Library at 150: A Sesquicentennial Symposium* (Berkeley: The Bancroft Library, 2011), 95-106.

"Their Flag, Too: Immigrants in the Making of California," *Boom: A Journal of California* 1 (Winter 2011), 45-53.

"The Luck of the Draw: Why Herbert Bolton Became Director of the Bancroft Library," *Bancroftiana*, no. 137 (Fall 2010), 11-12.

"Professors and Tycoons: The Creation of Great Research Libraries in the American West," *Western Historical Quarterly* 41 (Summer 2010), 149-169.

"California's Fantasy Heritage and the Professional Empire of Herbert E. Bolton," in Stephen W. Hackel, ed., *Alta California: Peoples in Motion, Identities in Formation, 1769-1850* (Berkeley: University of California Press, 2010), 197-214.

"Pacific Visions," *Pacific Historical Review* 78 (February 2009), 165.

"Empires, Frontiers, Filibusters, and Pioneers: the Transnational World of John Sutter," *Pacific Historical Review* 77 (February 2008), 19-47.

"Spanish Borderlands," *Latinas in the United States: An Historical Encyclopedia* (Bloomington: Indiana University Press, 2006), 695.

"California Missions," Latinas *in the United States: An Historical Encyclopedia* (Bloomington: Indiana University Press, 2006), 108.

"Sex, Gender, Culture, and a Great Event: The California Gold Rush," in Nancy Hewitt and Kirstin Delegard, eds., *Women, Families and Communities*, 2nd ed. (New York: Longmans, 2006). Reprinted from *Pacific Historical Review* 68 (March 1999), 1-19.

"Introduction," John A. Sutter, Jr., *The Sutter Family and the Origins of Gold-Rush Sacramento*, Allan R. Ottley, ed. (Norman: University of Oklahoma Press, 2002), 1-7.

AR0000075

**ARTICLES, CHAPTERS IN BOOKS, AND INTRODUCTIONS (continued):**

"Clouded Legacy: Indians and the California Gold Rush," in *Riches for All: The California Gold Rush as a World Event*, ed. Kenneth N. Owens (Lincoln: University of Nebraska Press, 2002), 90-117.

"Settler Women and Frontier Women: The Unsettling Past of Western Women's History," *Frontiers, a Journal of Women Studies* 22:3 (2001), 1-5.

"Sexuality in California's Franciscan Missions: Cultural Perceptions and Sad Realities," in Kim M. Phillips and Barry Reay, eds., *Sexualities in History: A Reader* (New York and London: Routledge, 2002), 166-182. Reprint of Chapter 1, *Intimate Frontiers* (1999).

"Romancing the West in the Twentieth Century: The Politics of History in a Contested Region," *Western Historical Quarterly* 32 (Winter 2001), 417-35.

"Sex, Gender, Culture, and a Great Event: The California Gold Rush," *Pacific Historical Review* 68 (March 1999), 1-19.

"The Spanish Borderlands," in *American Stories: Collected Scholarship in Minority History from the OAH Magazine of History* (Bloomington, Indiana: Organization of American Historians, 1998)

"More Shadows on the Brass: Herbert E. Bolton and the Fake Drake Plate," in  Paul Hutton, ed., *Frontier and Region: Essays in Honor of Martin Ridge* (Albuquerque: University of New Mexico Press, 1997), 215-30.

"When Strangers Met: Sex and Gender on Three Frontiers," in Elizabeth Jameson and Susan Armitage, eds., *Writing the Range: Race, Class, and Culture in the Women's West* (Norman: University of Oklahoma Press, 1997), 122-42.

"When Strangers Met: Sex and Gender on Three Frontiers," *Frontiers, a Journal of Women Studies* 17, no. 3 (1996), 52-75.

"Staring at the Sun: Thinking about Gender in the American West," in *A New Significance: Re-Envisioning the History of the American West* (New York: Oxford University Press, 1996), 279-83.

"Introduction," Wilbur R. Jacobs, *The Fatal Confrontation: Historical Studies of American Indians, Environment, and Historians* (Albuquerque: University of New Mexico Press, 1996), ix-xvi.

6

AR0000076

**ARTICLES, CHAPTERS IN BOOKS, AND INTRODUCTIONS (continued):**

"Introduction," Herbert E. Bolton, *The Spanish Borderlands* (Albuquerque: University of New Mexico Press, Historians of the Frontier and American West, 1996), ix-xliv.

"The Spanish Borderlands," *OAH Magazine of History* 10 (Winter 1996), 13-14.

"Foragers and Gatherers: Great Basin, California, Plateau," in, *America's Fascinating Indian Heritage* (New York: Reader's Digest, 1995), 250-87.

"Introduction," John Walton Caughey, ed., *The Indians of Southern California in 1852* (Lincoln: University of Nebraska Press, 1995).

"Parkmanizing the Spanish Borderlands: Bolton, Turner and the Historians' World," *Western Historical Quarterly* 26 (Summer 1995):149-67.

"The Proffered Paradigm: Finding the West in Time and Space," *Western Historical Quarterly* 25 (Winter 1994):467-69.

"John A. Sutter and the Indian Business," in *John Sutter and the Wider West*, ed. Kenneth N. Owens (Lincoln: University of Nebraska Press, 1994), 51-75.

"Indians, Missionaries, and Other Interlopers: Resistance and Accommodation to the Spanish Missions in California," in *The Spanish Missionary Heritage of the United States*, ed. Howard Benoist (San Antonio: National Park Service, 1993), 90-99.

"Herbert E. Bolton, Racism, and American History," *Pacific Historical Review* 62 (May 1993):127-42.

"Introduction," Robert F. Heizer, ed., *The Destruction of the California Indians* (Lincoln: University of Nebraska Press, 1993).

"Sexuality in the California Missions: Cultural Perceptions and Sad Realities," *California History* 71 (Fall 1992):371-85, 451-53.

"California Indians and the Workaday West: Labor, Assimilation, and Survival," *California History* 69 (Spring 1990):2-11, 77-79.

"Public History and the Native American: Issues in the American West," *Montana, the Magazine of Western History* 40 (Spring 1990):58-69.

"Introduction," Edward W. Gifford and Gwendoline Harris Block, comps., *California Indian Nights* (Lincoln: University of Nebraska Press, 1990).

AR0000077

**ARTICLES, CHAPTERS IN BOOKS, AND INTRODUCTIONS (continued):**

"California Indian Demography, Sherburne F. Cook and the Revision of American History," *Pacific Historical Review* 58 (August 1989):323-43.

"Indians in Town and Country: The Nisenan Indians' Changing Economy and Society as Shown in John A. Sutter's 1856 Correspondence," *American Indian Culture and Research Journal* 12, no. 2 (1988):31-51.

"The Significance of Public History in the American West: An Essay and Some Modest Suggestions," *Western Historical Quarterly* 19 (August 1988):202-12.

"Historians and Their Employers: A Perspective on Professional Ethics," *The Public Historian* 8 (Winter 1986):47-56.

"'Hardly a Farm House--a Kitchen Without Them': Indian and White Households on the California Borderland Frontier in 1860," *Western Historical Quarterly* 13 (July 1982): 245-70.

"Giving a Damn About the Past," *OAH Newsletter* 10 (January 1982): 6 (with Kenneth N. Owens).

"'Saved so Much as Possible for Labour': Indian Population and the New Helvetia Work Force," *American Indian Culture and Research Journal*, vol. 6, no. 4 (1982): 63-78.

"The Modocs and the Jones Family Indian Ring: Quaker Administration of the Quapaw Agency, 1873-1879," Robert E. Smith, ed., *Oklahoma's Forgotten Indians* (Oklahoma City: Oklahoma Historical Society, 1981), pp. 86-107.

"Controlling California's Indian Labor Force: Federal Administration of California Indian Affairs during the Mexican War," *Southern California Quarterly* 61 (1979): 217-38.

**BOOK REVIEW ESSAYS:**

"The Future of Western History," a review of *Its Your Misfortune and None of My Own: A History of the American West*, by Richard White, in *Reviews in American History* 22 (June 1994):286-91.

"The Underside of Colonial New Mexico," a review of *When Jesus Came the Corn Mothers West Away*, by Rámon A. Gutiérrez, in *New Mexico Historical Review* 68 (April 1993):181-88.

AR0000078

**BOOK REVIEW ESSAYS (continued):**

"Scholarly Consequences: Current Views of the Conquest of the American Southwest," a review of *Columbian Consequences*, vol. 1, *Archaeological and Historical Perspectives on the Spanish Borderlands West*, edited by David Hurst Thomas, in *American Ethnologist* 18 (May 1991):362-65.

*The Country of Streams and Grottoes: Expansion, Settlement, and the Civilizing of the Sichuan Frontier in Song Times*, by Richard von Glahn, in *Bulletin of Sung Yuan Studies*, no. 20 (1988):111-18.

**OTHER PUBLICATIONS AND PROJECTS:**

Historical Consultant, *Indians of California* (Alexandria, Virginia: Time-Life Books, 1994).

Chapter outlines for a fourth grade U.S. social studies textbook, Ligature, Inc., Publishers, Boston, Massachusetts, April 1990.

Consulting services, two chapter outlines for a fourth grade California social studies textbook, Ligature, Inc., Publishers, Boston, Massachusetts, June 1989.

*Public History in America: A Guide*, ed. and comp. (with Theodore J. Karamanski and Cullom Davis) (Indianapolis: National Council on Public History, 1986).

**PUBLIC ADDRESSES AND INVITED LECTURES:**

"Why I Wrote *Indian Survival on the California Frontier*," Native Literature Showcase, State Indian Museum, Sacramento, California, November 10, 2012.

"Bolton and Turner: the Borderlands and American Exceptionalism," Presidential Address, Annual Meeting of the Western History Association, Denver, Colorado, October 4-7, 2012.

"Transition of Fort Ross to John Sutter," Fort Ross Bicentennial Series Lecture sponsored by the Fort Ross Conservancy, San Francisco Public Library, September 15, 2012.

"A Path Not Taken: Turner, Bolton and the Borderlands," USC-Huntington Early Modern Studies Institute, San Marino, California, February 26, 2011.

"Bolton, the Bancroft, and the Struggle for American History," The Bancroft at 150: A Sesquicentennial Symposium, University of California, Berkeley, March 5-6, 2010.

9

AR0000079

"Herbert **PUBLIC ADDRESSES AND INVITED LECTURES (continued):**

Bolton, Jews, and Red Baiting at Berkeley, 1920-1950," JuSt Lunch, Judaic Studies
Brown Bag Lecture Series, University of Oklahoma, Norman, November 4, 2009.

"Cattle, Hides, Commerce, and Horse Rustling: The Hard Realities of Equestrian Culture
on the Mexican Borderland Frontier," Docent Lecture, Cowboy Hall and Museum of
Western Heritage, Oklahoma City, November 2, 2009.

"Men of Wealth, Men of Letters: Henry E. Huntington and the Creation of California's
Great Research Libraries," Huntington Library, San Marino, February 27, 2008.

"How the Borderlands Changed Bolton, Workshop, The Autry Museum, Los Angeles,
California, December 6, 2007.

"Their Flag Too: The Problem of Undocumented Immigrants in Mexican California,"
Immigration, the Bellarmine Forum, Loyala Marymount University, Los Angeles,
California, October 28- November 3, 2007.

"Herbert Bolton and the Recovery of Spanish American History," The Spanish
Contribution to the Independence of the United States: Between Reform and Revolution,
1763-1848, Symposium, *Sociedad Estatal para la Acción Cultural Exterior de España*
(SEACEX) and the National Portrait Gallery, Washington, D.C., September 27-29, 2007.

"More than Ishi: Comments on Khal Schneider,'Land, Tribes and the State: California's
Indian Rancheriás,'" Woodrow Wilson Center, Washington, DC, April 12, 2007.

"How the Borderlands Changed Bolton,"
"'Oh the Humanity!': Californians and *The Grapes of Wrath*," The Big Read: Analyzing
*The Grapes of Wrath*, Sam Noble Oklahoma Museum of Natural History, Norman,
Oklahoma, February 15, 2007.

"John Sutter and His World," Friends of the Bidwell Mansion, California State
University, Chico, California, January 28, 2007.

"Herbert E. Bolton and the Rise of Professional History in the American West,"
"Presidential Session: The Historical Profession in the West," Annual Meeting of the
Western History Association, October 11-14, 2006.

"Herbert E. Bolton and California's Fantasy Heritage," Alta California: Peoples in
Motion, Identities in Formulation, The Huntington Library, San Marino, California,
September 29-30, 2006.

10

AR0000080

**PUBLIC ADDRESSES AND INVITED LECTURES (continued):**

"Scoundrels, Scholars, and Other Borderers," Plenary Session, Annual Meeting of the Pacific Coast Branch of the American Historical Association, Tucson, Arizona, August 1-3, 2002.

"Settler Women and Frontier Women: The Unsettling Past of the American West," Plenary Session, Conference, Coalition of Western Women Historians, Pullman Washington, July 28-29, 2000.

"Romancing the West in the Twentieth Century: The Politics of History in a Contested Region," Inaugural Address, Paul H. and Doris Eaton Travis Chair in Modern American History, University of Oklahoma, Norman, April 15, 2000.

"Clouded Legacy: Indians and the California Gold Rush," Gold Rush Sesquicentennial Lecture Series, California State University, Sacramento, February 10, 1999.

"Everything You Wanted to Know About Sex in the Old West (but Were Afraid to Ask)," Board of Visitors Lecture, University of Oklahoma, November 21, 1998.

"A Historians's Career," Phi Alpha Theta. Rho Xi Chapter, California State University, Sacramento, October 20, 1998.

"Sex, Gender, Culture, and a Great Event: The California Gold Rush," Presidential Address, Annual Meeting of the Pacific Coast Branch of the American Historical Association, University of San Diego, California, August 6-9, 1998.

"Indian Survival on the California Frontier," Green and Gold: California's Environments, Memories, and Visions, University of California, Santa Cruz, July 30-August 2, 1998.

"Colonial and Territorial Arizona," Teaching Arizona's Hispanic Heritage, Arizona State University, Tempe, July 6-17, 1998.

"Women and Men in the California gold Fields: The Mysterious Death of Amelia Kuschinsky," California Gold Rush Sesquicentennial Lecture Series, Sierra College, Rocklin, California, February 10, 1998.

"Amelia's Body: The Limits of Female Agency in Frontier California," Department of History, University of California, Santa Barbara, May 3, 1996.

11

AR0000081

**PUBLIC ADDRESSES AND INVITED LECTURES (continued):**

"The Significance of Mission History to California Indians," UCSB History Associates, Museum of Natural History, Santa Barbara, California, May 2, 1996.

"Herbert E. Bolton and the Politics of Hero Worship in the Great Southwest," Luncheon Address, Phi Alpha Theta Southwest Regional Conference, Northern Arizona University, Flagstaff, Arizona, April 7-8. 1995.

"The Historian as Cultural Mediator: Herbert E. Bolton, Culture, and Power in the Southwest," The Power of Ethnic Identities in the Southwest, The Huntington Library, San Marino, California, September 23-24, 1994.

"Indian History, Social History: The Past Meets the Future," public lecture, Humanities Councils for Colorado and New Mexico, Greeley, Colorado, Pueblo Colorado, Santa Fe, New Mexico, Albuquerque, New Mexico, June 15-18, 1994.

"Sex and Gender in California's Franciscan Missions," public lecture, Center for Canadian Studies, Duke University, April 24, 1993.

"More Shadows on the Brass: Herbert E. Bolton and the Fake Drake Plate," Conference on the American West, The Huntington Library, San Marino, California, April 12-14, 1993.

"Herbert E. Bolton's World of Race and Ethnicity: Professional Life at Berkeley in the Early Twentieth Century," Department of History, University of New Mexico, Albuquerque, February 6, 1992.

"Sexuality in California's Franciscan Missions: Cultural Perceptions and Sad Realities," Denver Art Museum Symposium, Observations on the New Western History, April 25, 1992.

"Herbert E. Bolton and the Politics of California Hero Worship," Spain in the Americas Conference, The Huntington Library, San Marino, California, May 15-16, 1992.

"When Strangers Met: Sexuality on Three American Frontiers," Symposium on Violence in the West, Portland State University, Portland, Oregon, May 30, 1992.

"Intimate Frontiers: Sex, Gender and Culture in the American West," public lecture, Amherst College, Amherst, Massachusetts, October 20, 1992.

"Catholic Missionization," Arizona Humanities Day, Arizona Historical Society/Arizona Humanities Council, Phoenix, November 1991.

12

AR0000082

**PUBLIC ADDRESSES AND INVITED LECTURES (continued):**

"Between Two Grizzlies' Paws: Indian Women in the California Gold Rush," invited lecture, California Studies Seminar, Berkeley Faculty Club, March 1, 1990.

"Between Two Grizzlies'Paws: Indian Women in the California Gold Rush," invited lecture, California History, San Francisco State University, March 1, 1990.

"Indian Survival on the California Frontier," invited speaker, California State University, Graduate Seminar and guests, Sacramento, March 4, 1990.

"Indians, Missionaries, and Other Interlopers: The Dynamics of the California Mission Frontier," National Park Service Quincentenary Symposium at San Antonio, Texas, November 8-10, 1990.

"John Sutter and the Indian Business," John Sutter Lecture Series, Sacramento, October 24, 1990.

"California Indians and the Workaday West," luncheon address, Annual Meeting of the Arizona Historical Society, Yuma, Arizona, April 28, 1989.

**CONFERENCE PAPERS AND COMMENTS:**

"From Pacific Rim to the Hemispheric Perspective: The Origins of Bolton's History of the Americas," Annual Meeting of the Organization of American Historians, April 11-14, 2013, San Francisco, California.

Moderator, "Boundary Markers and Border Crossers: Histories of Immigration in the American West, Annual Meeting of the Western History Association, Denver, Colorado, October 4-7, 2006.

"From Pacific Coast to Spanish Borderlands: 'Hebert Eugene Bolton and the Reconfiguration of Western History," Annual Meeting of the American Historical Association, January 7-10, 2010, San Diego, California.

Chair, "Mining Masculinities," Annual conference of the Western History Association," Denver, Colorado, October 7-10, 2009.

"Road Trip: Herbert Bolton and the American Southwest," Annual Meeting of the Pacific Coast Branch of the American Historical Association, Albuquerque, New Mexico, August 6-9, 2009.

AR0000083

**CONFERENCE PAPERS AND COMMENTS (continued):**

Chair and Comment, "Race and Religion in Constructing States," Annual Conference of the Western History Association, Oklahoma City, October 3-6, 2007.

"Bad Company: John A. Sutter and the Horse Thieves of the Great Southwest,"Annual Meeting of the Pacific Coast Branch of the American Historical Association, Tucson, Arizona, August 1-3, 2002.

Chair and Comment, "Natives and Organizations in a World Context," Annual Meeting of the Pacific Coast Branch of the American Historical Association, Tucson, Arizona, August 1-3, 2002.

Chair, "Patriarchy and the State in the Spanish Borderlands," Annual Conference of the Western History Association, San Antonio, Texas, October 11-14, 2000.

Chair and Comment: "Thicker than Water: Interracial Marriage, Mestizaje, and Citizenship in the Southwest," Annual Conference of the Western History Association, Portland, Oregon, October 6-9, 1999.

Chair and Comment, "Race, Space, and Crime," Annual Meeting of the Pacific Coast Branch of the American Historical Association, Ka'anapali, Maui, Hawaii, August 5-8, 1999.

"California Indians, Federal Indian Policy, and the Gold Rush," Sovereignty Symposium, Tulsa, Oklahoma, June 10, 1999.

Chair, "Reassessing Recent Scholarship in American Indian History," Phi Alpha theta Regional Conference, Tulsa, Oklahoma, February 26-27, 1999.

Chair, "Women and Violence in Comparative Perspective," Annual Meeting of the American Historical Association, Washington, D.C., January 7-10, 1999.

Chair and Comment, "Gender, Politics, and Boundaries in the West," Annual Meeting of the Organization of American Historians, Indianapolis, Indiana, April 2-5, 1998.

"Herbert E. Bolton's Views of the Mexican People," read at the Annual Meeting of the American Society for Ethnohistory, Mexico City, November 13-16, 1997.

Chair, "New Directions in Gender History: Manhood in the West," Annual Conference of the Western History Association, St. Paul, Minnesota, October 15-18, 1997.

14

AR0000084

**CONFERENCE PAPERS AND COMMENTS (continued):**

"Something Old, Something New . . . : The New California History," read at the Annual Conference of the California Council for the Promotion of History, Sacramento, October 17-20, 1996.

Comment, "Female Agency in the Remaking of Western and American Indian History," Annual Conference of the Western History Association, Lincoln, Nebraska, October 2-5, 1996.

"Herbert E. Bolton and Catholic-Protestant Rivalry over California History," read at the Annual Meeting of the American Historical Association, Atlanta, Ga., January 4-7, 1996.

Chair and Discussant, "Periodization of American Indian History," Annual Meeting of the American Society for Ethnohistory, Kalamazoo, Michigan, November 2-5, 1995.

Chair and Comment, "Spirituality and Sickness Among Native Americans and Filipino Immigrants," Annual Meeting of the Pacific Coast Branch of the American Historical Association, August 4-7, 1995, Kihei, Maui, Hawaii.

Chair, "Beyond 'Cowboys and Indians': The Construction of Identity in the American West," Annual Meeting of the Organization of American Historians, March 30-April 2, 1995, Washington, D.C.

Chair, "Doing Ethnohistory," Annual Meeting of the American Society for Ethnohistory, November 10-13, 1994, Tempe, Arizona.

Chair, "Native Life on the North Pacific Coast," Annual Meeting of the American Society for Ethnohistory, November 10-13, 1994, Tempe, Arizona.

Comment, "The Significance of Gender in the History of the American West," A New Significance: Re-Envisioning the History of the American West, a Conference sponsored by the National Endowment for the Humanities, July 29-August 1, 1992, Utah State University, Logan, Utah.

Chair, "Cultural Interaction in Alta California," The Spanish Beginnings in California, 1542-1822, A Symposium, University of California, Santa Barbara, July 15-19, 1991.

"Whose West Is It?" Round Table discussion, American Studies Association, November 2, 1990, New Orleans, Louisiana.

AR0000085

**CONFERENCE PAPERS AND COMMENTS (continued):**

"Turner and Bolton: Contrasting Approaches to Ethnic History in the American West," read at the meeting of the Organization of American Historians, March 24, 1990, Washington, D.C.

"Rape in the Missions and the Mines: Indian Women and the Conquest of California," presented at the 1989 Conference of the Society for the Scientific Study of Sex, Toronto, Canada.

Sex, Gender and Culture in the American West," presented at the 1989 Annual Conference of the Western History Association, Tacoma, Washington, October 11-14, 1989.

"Scholarship in the Field: Towards a New Tradition," presented at the Annual Meeting of the Pacific Coast Branch of the American Historical Association, Honolulu, Hawaii, August 13-16, 1986.

"Pioneers, Politicians, and Demographers: The Genesis of an Intellectual Revolution in the Far West," presented at the 1986 Conference of the Western History Association, Billings, Montana, October 14-18, 1986.

"The Value of Oral History in Public Historical Studies," presented at the Southwestern Oral History Conference, Long Beach, California, October 23, 1986.

"The Significance of Public History to Western Historical Studies," presented at the Annual National Meeting of Phi Alpha Theta at the American Historical Association meeting, New York, December 28-30, 1985.

Chair, "The Indian and the Early Republic," Annual Meeting of the Society for the History of the Early Republic, Indianapolis, Indiana, July 18-20, 1985.

"Prostitution in the Nineteenth Century West: Sex, Race and Class Meet on the Frontier," presented at the Annual Meeting of the New Mexico Historical Society, Taos, April 26-28, 1984.

"Another Kind of Western Women's Experience: Indian and White Sexuality during the California Gold Rush," presented at the Conference of the Western History Association, Salt Lake City, Utah, October 12-15, 1983.

"Historical Advocacy in California," presented at the Annual Meeting of the Pacific Coast Branch, American Historical Association, University of San Francisco, August 11-14, 1982.

AR0000086

**CONFERENCE PAPERS AND COMMENTS (continued):**

Commentator, "Historian in the Environmental Review Process," Annual Meeting of the National Council on Public History, Chicago, Illinois, April 24-25, 1982.

"Toward a Quantitative Predictive Model for Historical Resources," presented at the Annual Meeting of the National Council on Public History, Chicago, April 24-25, 1982.

"The California Committee for the Promotion of History," presented at the Annual Meeting of the Pacific Coast Branch, American Historical Association, University of Oregon, Eugene, August 16-19, 1981.

"The Federal Land Records of California: Methods and Opportunities for Research in the Bureau of Land Management," presented at a meeting of the Institute for Historical Study, Sacramento, March 14, 1981.

"Indians and Whites in the California Census Records: A Preliminary Report and Analysis," presented at the Annual Meeting of the American Society for Ethnohistory, San Francisco, October 23-25, 1980.

"Controlling Native Americans: California Indian Relations during the Mexican War," presented at the Rocky Mountain Conference for Latin American Studies, Las Cruces, New Mexico, March 11-13, 1976.

**PUBLIC HISTORY REPORTS AND SERVICES:**

Expert Report, in the matter re: "The State of Arizona, the Gila River Community, and the Salt River Pima-Maricopa Indian Cummunity v. the Tohono O'odham Nation (Case No.2:11-ev-00296-DGC)." Deposed in Phoenix, Arizona, October 18, 2012.

"Federal Indian Policy in California, 1848-1934: A Review of Published Literature," for the U.S. Department of Justice (June 1996)

"A History of the Trinity River," (with Richard Adkins), for the Hoopa Valley Tribal Council, (Fall 2000).

"Navigability of the Trinity River, Phase I, Repository Evaluation," for the Hoopa Valley Tribal Council, (Fall 1993).

Consultant, Organization of American Historians and the National Park Service, Revision of NPS Thematic Framework for Historic Sites and Parks, June 1993.

17

AR0000087

**PUBLIC HISTORY REPORTS AND SERVICES (continued):**

Historical overview in "Stringtown Survey Report," Center for American Studies, IUPUI, for the Indiana Office of Historic Preservation, September, 1985.

Historical overview for "Historical Survey of West Washington Street," Center for American Studies, IUPUI, for Indianapolis Historic Preservation Commission, July, 1985.

Historical overview (with Jan Shipps) for "Historical  Survey of IUPUI," Center for American Studies, IUPUI, for Indianapolis Historic Preservation Commission, July, 1985.

Litigation support and historical research services in relation to *State of New Mexico v. United States et al.*, in association with Jackson Research Projects for the State of New Mexico, 1983.

Historic Resource Predictive Model chapters in "A Cultural Resource Overview for the Mendocino National Forest and the East Lake Planning Unit, BLM, California," vol. 2, "History," Public History Services Associates in association with the Great Valley History Company and California Archaeological Consultants, Inc., 1982.

Expert witness testimony, State of California, ex rel., *State Public Works Board v. Southern Pacific Transportation Company, et al.*, in the Superior Court of the State of California, Sacramento County, 1982.

Historical research in association with Jackson Research Projects, for the U.S. Army Corps of Engineers, Bismarck, North Dakota, 1982.

"History of the Clunie Hotel Building," Public History Services Associates for Nathan and Michel, Realtors and Insurers, Sacramento, 1981.

Historical research services for Diepenbrock, Wulff, Plant & Hannegan, attorneys for the Southern Pacific Corporation, 1981.

History chapters in "Historical Overview of San Antonio Plaza, San Jose, California," Santa Clara County.  Theodoratus Cultural Research for the San Jose Redevelopment Agency, 1980.

History Section, Vol. 2, in "Ethnographic Survey of Gasquet-Orleans Road," Humboldt and Del Norte Counties, California.  Theodoratus Cultural Research for the U.S. Department of Agriculture, Forest Service, Six Rivers National Forest, 1979.

18

AR0000088

**PUBLIC HISTORY REPORTS AND SERVICES (continued):**

History chapters in "Warm Springs Cultural Resources Study," Sonoma County, California. Theodoratus Cultural Research in association with Sonoma State University for the U.S. Army Corps of Engineers, San Francisco, 1979.

Historic Overview in "Cultural Resources Evaluation: Edenvale Redevelopment Project Area Expansion," San Jose, Santa Clara County, California. Theodoratus Cultural Research in association with David J. Powers and Associates for the San Jose Redevelopment Agency, 1979.

History chapters in "Balsam Meadows Cultural Resource Study," Fresno County, California. Theodoratus Cultural Research for Southern California Edison , 1978.

Several minor projects and eight national register nominations, 1977 to present.

**BOOK REVIEWS:**

*Murder State: California's Native American Genocide, 1846-1873*, by Brendan C. Lindsay, in *American Historical Review* (June 2013).

*Children of Coyote, Missionaries of Saint Francis: Indian-Spanish Relations in Colonial California, 1769-1850*, by Steven W. Hackel, in *Southern California Quarterly* 89, no.1 (2007): 419-420.

*Bárbaros: Spaniards and Their Savages in the Age of Enlightenment*, by David J. Weber, in *Western Historical Quarterly* 38 (Winter 2007): 511-512.

*Race and Homicide in Nineteenth-Century California*, by Clare V. McKanna, Jr., in *American Historical Review* (December 2004): 1585-86.

*Ishi in Three Centuries*, edited by Karl Kroeber and Clifton Kroeber, in *American Indian Culture and Research Journal* 28, no. 2 (2004): 158-159.

*Black Sun of the Miwok*, by Jack Burrows, in *New Mexico Historical Review*, 79,  no. 3 (2004):  424-425.

*Women and the Conquest of California, 1542-1840: Codes of Silence*, by Virgina M. Bouvier, in *Pacific Historical Review* 71 (November 2002): 683-684.

*Frederick Jackson Turner: Strange Roads Going Down*, by Allan G. Bogue, in H-SHGAPE, H-Net Reviews, (May 1999): http://www.h-net.msu.edu/reviews/.

AR0000089

**BOOK REVIEWS (continued):**

*Conquests and Historical Identities*, by Elizabeth Haas, in *Journal of American Ethnic History* 18, no. 1 (1998): 129.

*The Spanish Frontier in North America*, by David J. Weber, in *Montana, the Magazine of Western History* 45, no. 1 (1995): 66.

*The Zuni Man-Woman*, by Will Roscoe, in *Montana, the Magazine of Western History* 44, no. 2 (1994): 82.

*Henry E. Huntington and the Creation of Southern California*, by William B. Fredericks, in *American Historical Review* 98 (October 1993):1328.

*California in 1792: A Spanish Naval Visit*, by Donald S. Cutter, in *American Indian Quarterly* 17 (Winter 1993):132-33.

*The Spanish-American Homeland: Four Centuries in New Mexico's Río Arriba*, by Alvar W. Carlson, in *American Historical Review* 97(December 1992):1632.

*The Mythical Pueblo Rights Doctrine: Water Administration in Hispanic New Mexico*, by Daniel Tyler, in *New Mexico Historical Review*, 67, no. 1 (1992): 85.

*Utmost Good Faith: Patterns of Apache-Mexican Hostilities in Northern Chihuahua Border Warfare, 1821-1848*, by William B. Griffen, in *Journal of the Early Republic*, 5 (Autumn 1990): 436-437.

*Apaches at War and Peace: The Janos Presidio, 1750-1858*, by William B. Griffen, in *American Historical Review* 95 (June 1990): 951-52.

*Hispanic Arizona, 1536-1856*, by James E. Officer, in *Ethnohistory* 37 (Winter 1990): 90.

*No Separate Refuge: Culture, Class, and Gender on an Anglo-Hispanic Frontier in the American Southwest*, by Sarah Deutsch, in *New Mexico Historical Review* 64 (April 1989): 231-32.

*Atlas of Great Lakes Indian History*, by Helen Hornbeck Tanner, in *History: Reviews of New Books* 16 (Winter 1988): 63.

*Las Carneradas: The Sheep Trade in New Mexico, 1700-1860*, by John O. Baxter, in *New Mexico Historical Quarterly* 63 (October 1988):400-01.

AR0000090

**BOOK REVIEWS (continued):**

*The Missions of California: A Legacy of Genocide*, ed. Rupert and Jeanette Henry Costo, in *Western Historical Quarterly* 19 (November 1988):458-59.

*The Life and Times of James Willard Schulz*, by Warren L. Hanna, in *The Journal of Arizona History* 29 (Spring 1988): 105-106.

*The Spirit and the Flesh: Sexual Diversity in American Indian Culture*, by Walter L. Williams, in *American Indian Culture and Research Journal* (1988 ).

*Lewis and Clark Among the Indians*, by James P. Ronda, in *Annals of Iowa* 49 (Summer/Fall 1987).

*The Iroquois Struggle for Survival: World War II to Red Power*, by Laurence M. Hauptman, in *History: Reviews of New Books* 15 (March/April 1987):102.

*The Great Father: The United States Government and the American Indians*, by Francis Paul Prucha, in *Nevada Historical Society Quarterly* 30 (Fall 1987):205-06.

*Daughters of Joy, Sisters of Misery: Prostitutes in the American West, 1865-90*, by Anne M. Butler, in *Indiana Magazine of History*, 82 (March 1986): 116-118.

*Indian Life at the Old Missions*, by Edith Buckland Webb, in *Western Historical Quarterly* 15 (October 1984): 447.

*Women Teachers on the Frontier*, by Polly Welts Kaufman, in *Indiana Magazine of History* 80 (December 1984): 389-390.

*Tecumseh and the Quest for Indian Leadership*, by R. David Edmunds, in *Indiana History Bulletin* (November/December1984).

*Indians of California: The Changing Image*, by James J. Rawls, in *Ethnohistory*, vol. 32, no. 4 (1985): 402-403.

*Women and Indians on the Frontier, 1825-1915*, in *Journal of the Early Republic* 5 (Autumn 1985): 412-413.

*A Sender of Words: Essays in Memory of John G. Neihardt*, ed. Vine Deloria, Jr., in *Arizona and the West* 27 (Winter 1985): 381-382.

21

**BOOK REVIEWS (continued):**

*The Indian Rights Association: The Herbert Welsh Years, 1882-1904*, by William T. Hagan, in *History, Reviews of New Books* 13 (July/August 1985): 145.

*Lakota Society*, by James R. Walker, Raymond J. DeMallie, ed., in *The Public Historian* 7 (Summer 1985): 115-116.

*This Promised Land*, by Robert Easton, in *The Public Historian* 6 (Fall 1985): 105-106.

*Structures of American Social History*, by Walter Nugent, in *Public Historian* 6 (Fall 1984): 146-147.

*Stanislaus: The Struggle for a River*, by Tim Palmer, in *Pacific Historian* 25 (Fall 1983).

*Shadows of the Indian: Stereotypes in American Culture* by Raymond William Stedman, in *Journal of San Diego History* 29 (Summer 1983): 227-228.

*Tacoma, the Union Depot District: Tacoma, Washington, 1979 Rehabilitation Study* by the Heritage Resource and Conservation Service, in *The Public Historian* 4 (Fall 1982): 151-153.

**OFFICES AND COMMITTEES IN PROFESSIONAL ORGANIZATIONS:**

American Historical Association
    2000, Program Committee
    1997, Program Committee

Organization of American Historians
    2002-2007 Distinguished Lecturer
    2000, Chair, Binkley-Stevenson Prize
    1999-2001, Jury, Binkley-Stevenson Prize
    1996-97, Nominating Committee (elected)
    1990-91, Jury, Frederick Jackson Turner Prize

Pacific Coast Branch, American Historical Association
    2007-, Chair, Finance Committee
    2000-03, Chair, Constitutional Revision Committee
    1997-98, President
    1990-93, Council (elected)
    1990, Program Committee

AR0000092

**OFFICES AND COMMITTEES IN PROFESSIONAL ORGANIZATIONS (continued):**

Western History Association
> 2011-12, President
> 2010-11, President Elect
> 2008-, Chair, Bolton-Cutter Prize Endowment Fund Committee
> 2007, Co-chair Local Arrangements Committee
> 2006-2008, Martin Ridge Award Committee
> 2000, Chair, Walter Rundell Committee
>
> 1998-2000, Walter Rundell Graduate Student Award Committee
> 1995-97, Executive Council (elected)
> 1991-92, Nominating Committee (elected), Chair 1992
> 1991, Chair, Program Committee
> 1985-86 Historical Affairs Committee

National Council on Public History
> 1982-85 Board of Directors (elected)
> 1985-87 Treasurer (elected)

California Council for the Promotion of History
> 1981-82 Chair
> 1993-96, Executive Council (elected)

Indianapolis Chapter of the Society for Architectural Historians
> 1984 Vice President

**EDITORIAL POSTS:**
> 2003-05, Board of Editors, <u>Western Historical Quarterly</u>
> 1990-02, Board of Editors, <u>New Mexico Historical Review</u>
> 1997-99, Executive Editorial Board, H-AmIndian
> 1995-99, Managing Editor, H-West
> 1994-97, Board of Editors, <u>Pacific Historical Review</u>.
> 1990-93, Board of Editors, <u>Journal of Arizona History</u>.
> 1984-85 Assistant Editor, <u>Journal of the Early Republic</u>.

**RESEARCH GRANTS:**

> 2007-2008, Los Angeles *Times*, Distinguished Fellow in American History, Huntington
> Library, $60,000
> 1987-97, Arizona State University, CLAS Mini Grants for research.
> 1987, Arizona State University, Grant-in-Aid for summer research.
> 1986, NEH Seminar: Southwestern America: New Approaches to the Hispanic Past,

23

AR0000093

1540-1910, Southern Methodist University,  David J. Weber, Director.
1985, Summer Faculty Research Fellowship, Indiana University,  Summer.
1984, Research Grant, Center for American Studies, IUPUI, Summer.
1983, DeGolyer Fellowship Award, Southern Methodist University, (not accepted).
1979, Patent Fund research Award, University of California, Santa Barbara.

## UNIVERSITY SERVICE:

University of Oklahoma
    University
        Search Committee, Merrick Chair in Western American history
        Executive Council, Western History Collection, 1998-present
        Planning Committee, Noble Museum opening, 1999-2000
    College of Arts and Sciences
        Co-chair, Search Committee, Director, Native American Studies, 2006-07
        Tenure and Promotion Committee, 2000-02, 2008-2010
    Department (University of Oklahoma)
        Search Committee, Nineteenth-Century U.S., 1998-
        Committee A. 2000-02
        Graduate Committee, 2000-07

Arizona State University
    University
        African-American Studies Search Committee, Antebellum Slavery,1997-98
        Three Year Review, Center for Latin American Studies 1995
        Executive Committee, Committee on Law and the Social Sciences, 1988 to 1992
    College of Liberal Arts and Sciences
        Search Committee, Chair, Chicano/a Studies Department, 1996-97
        Student Grievance Committee, 1989-91
           Search Committee, Chair, Zoology Department, 1989
    Department of History
        Director of Graduate Studies, 1992-1998
        Graduate Committee, 1987-1998
        Search Committee (Department Chair), 1997-98
        Seven Year Review Committee, 1994-1995
        Ad Hoc Action Now Planning Committee, 1990
        Search Committee (Civil War) 1989-90
        Personnel Advisory Committee, 1988-1990, 1991-92
        Search Committee (Western History) 1987-88
        Search Committee (Public History) 1991
        Search Committee (Department Chair), 1991-92
        Search Committee (Chicano Studies), 1993

24

AR0000094

**UNIVERSITY SERIVE (CONTINUED):**

Indiana University-Purdue University, Indianapolis
School of Liberal Arts
Committee for Museum Studies, 1985-86
Graduate Committee, 1983-84
Department of History (IUPUI)
Search Committee (Public History), 1986

Coordinator, M.A. Program in Public History, 1983-86
Graduate Committee, 1983-86

Wichita State University
External Review Team, Department of History, 1991

University of Nevada, Las Vegas
External Review Team, Department of History, 1997

**MEMBERSHIP IN PROFESSIONAL ORGANIZATIONS:**

American Historical Association, Organization of American Historians, Pacific Coast Branch
of the American Historical Association, Western History Association, American
Society for Ethnohistory, National Council on Public History, California Council for the
Promotion of History, California Historical Society, New Mexico Historical Society,
Arizona Historical Society, Arizona Humanities Council, Oklahoma Historical Society,
Oklahoma Humanities Council

**GRADUATE STUDENTS, DEGREES COMPLETED:**

Ph.D.

John Rhea, "Women and the Construction of American Indian Scholarship, 1830-1941,"
(Norman: University of Oklahoma, 2012).

David Beyreis, "Bent, St. Vrain and Company: Conflict, Accommodation and Enterprise
in the Southwest Borderlands, 1830-1849," (Norman: University of Oklahoma, 2012.
Teacher, Casady School, Oklahoma City.

Sunu Kodumthara, "Suffragist Rhetoric with Anti-Suffragist Goals: How Anti-Suffragists
Used the West," (Norman: University of Oklahoma, 2011).  Assistant Professor,
Southwestern Oklahoma State University, Weatherford, Oklahoma.

AR0000095

**GRADUATE STUDENTS, DEGREES COMPLETED (continued):**

Nicky Michael, "Delaware Cherokee Relations, 1865-1990," (Norman: University of Oklahoma, 2010).

Mandy Taylor-Montoya, "Family, Labor and Ethnicity in Las Vegas, New Mexico, 1880-1920," (Norman: University of Oklahoma, 2009), Assistant Professor, University of Texas, Brownsville.

Damon Akins, "Indians, Identity, and Water Rights in Arizona and Southern California, 1880-1920," (Norman: University of Oklahoma, 2009), Assistant Professor, Guilford College, Greensboro, South Carolina.

Richard Adkins, "The Destruction of the Trinity River," (Norman: University of Oklahoma, 2007). Consulting historian, Salt River Reservation Tribal Council.

Linda English, "Revealing Accounts: General Stores on the South Central Plains, 1870-1890," (Norman: University of Oklahoma, 2005). Assistant Professor, University of Texas-Pan American.

Brian Frehner, "From Creekology to Petroleum Geology: Finding and Conserving Oil on the Southern Plains, 1859-1930," (Norman: University of Oklahoma, 2004). Assistant Professor, Oklahoma State University.

William J. Bauer, "Agricultural Labor, Race, and Indian Policy on the Round Valley Reservation, 1850-1941," (Norman: University of Oklahoma, 2003). Associate Professor, University of Nevada, Las Vegas.

Sarah Janda, "The Intersection of Feminism and Indianess in the Activism of Wilma Mankiller and LaDonna Harris," (Norman: University of Oklahoma, 2002). Associate Professor, Cameron University.

William Carter, "Indian Alliances in the Southwest, 1300-1706," (Tempe, Arizona State University, 2002). Instructor of History, South Texas Community College, McAllen Texas.

Rebecca Bales, "You Will be the Bravest of All: The Modoc Nation to 1909," (Tempe, Arizona State University, 2001). Assistant Professor, California State University, Monterey Bay.

Jeb Stuart Rosebrook, "Professional Baseball in Arizona, 1865-1959." (Tempe, Arizona State Univesity, 2000). Development Officer, William and Mary College.

26

**GRADUATE STUDENTS, DEGREES COMPLETED (continued):**

James M. Bailey, "The Politics of Dunes, Redwoods and Dams: Arizona's 'Brothers Udall' and America's National Parklands, 1961-1969," (Tempe: Arizona State University, 1999).   Historian, Bureau of Reclamation, Denver, Colorado.

John W. Heaton. "'Stalwart and Unafraid': The Emergence of a Modern Shoshone Bannock Community at Fort Hall Reservation, 1867-1939," (Tempe: Arizona State University, 1999).  Associate Professor of History, University of Alaska, Fairbanks.

Timothy Braatz, "The Yavapais: A History of Indians in North Central Arizona to 1910," (Tempe: Arizona State University, 1997).  Instructor of History, Saddleback College, Mission Viejo, California.

Edward Byerly, "Beyond the Illumination of *Terra Incognita*: A Cartographic History of California, 1541-1903," (Tempe: Arizona State University, 1997).  Instructor of History, Victoria College, Victoria, Texas.

Lawrence Guillow, "The Origins of Race Relations in Los Angeles, 1820-1880: A Multi-Ethnic Study," (Tempe: Arizona State University, 1996).  Contract instructor, Los Angeles area colleges.

David Introcaso "Water Storage and Hydroelectric Development in Central Arizona," (Tempe: Arizona State University, 1995).  Development officer, nonprofit organization, Washington, D.C.

<u>M.A.</u>

Jeb Stuart Rosebrook, "The Black Canyon Highway: Highway to History, 1863-1948," (Tempe: Arizona State University, 1994)

Shelly Patricia Bennett, "Wildlife Management in Arizona: The Evolution of Public Policy," (Tempe: Arizona State University, 1992)

Jay Antle, "Grazing on Arizona's National Forests, 1891-1960: An Environmental History," (Tempe: Arizona State University, 1992)

Candi Helms, "The Chamber of Commerce and the Building of Great Falls, Montana, 1888-1945," (Tempe: Arizona State University, 1992)

Kathleen Mary Garcia, "They Made the Best of It: Officers' Wives in the American West, 1865-1890," (Tempe: Arizona State University, 1992).

AR0000097

unilineal kin-groups" where people made residence choice and held allegiance to a chief.  Kinship ties beyond the group were recognized, yet residential choice limited membership (Kunkel 1962:10-12).  Each kin group leader (or chief) was part of a ruling unit, one of them being the principal leader, and all of them together functioning as a council for their tribelet.  These independent political units could, and sometimes did, confederate, particularly for military purposes.  These complex units maintained military and trade alliances among themselves and with non-Pomo groups (Bean and Theodoratus 1978:293).

According to Kunkel there may have been seven to twelve tribelets in residence in the "lake zone."  He bases his data on the work of C Hart Merriam who determined seven tribelets there, the number he uses for his analysis (1962:242).  Four of these tribelets spoke an Eastern dialect, one spoke Southeastern, and two spoke both Northern and Eastern dialects (Kunkle 1962:242-243, ft. 386).  The non-Pomo groups included the Lake Miwok located southeast of the Lake and a small area (approximately five square miles) of a Wappo use area located on the Lake in the southern portion (Sawyer 1978:256).  The majority of the Wappo are located further south separated from Lake Pomo by Central Pomo and Lake Miwok **(**See Map**)**.  The Lake Miwok had dwelling areas along small creeks and stream valleys south of the Lake near the outlet of Lower Lake in the Cache Creek area.  The oldest known Lake Miwok site is about four miles south of Lower Lake (Callahan 1978:264).  In general, data show the Clear Lake area to be one of fluctuating diversity.

Although these several Lake Pomo tribelets co-existed around the Lake, well-defined territorial boundaries were strongly defended, unless permission to enter had been granted among the Lake groups.  Use rights within a group varied and were intricately defined and followed according to the assigned category.  The area supported a population density estimated to be from 4.69 to 8.75 depending on the analysis  (Cook 1956:11-12; Kunkel 1962:247).

Each group of Eastern Pomo was recognized as a distinct group by other tribelets, especially those who belonged to the other Eastern and the Southeastern Pomo linguistic groups, all of whom resided on the Lake shores.  Each held specific lands recognized by the other local groups.  Col. Redick McKee and George Gibbs, although not the first non-Indian observers, made the first attempt to describe cultural features of these tribes when they visited the Pomo area as treaty negotiators in 1851.  These early intruders observed the people here as if they were one people and wrote about them as such, although they recognized the names of the distinct village groups in their negotiations as, e.g., qu-lá-napo, xá-bé-napo, da-ńa-xà, ší-kom, and Moal-kai (i.e., Yimaba).  Another group, the Xowalek, although not in attendance, was left treaty papers to be given them by the other groups.  The treaty proposed that land be set aside as a common residential area for these tribes, as well as for other tribes the

AR0002875



Map showing the territories of the Eastern, Northeastern and Southeastern Pomo at Clear Lake. The Scotts Valley people (descendants of the Yimabak/Molakai) continue to reside in their ancestral locality (darkened area) with Tribal Government headquarters at Lakeport. Note the Northern and Eastern amalgamation of tribes on the west side of the Lake and the Wappo use area in the south near Mt. Konocti. The Kulanapo and Habenapo discussed in the text are located between Lakeport and the Wappo use area.

["The Upper Lake area is shown in its original form (after Barrett), before a 1920s reclamation project changed its shoreline by dredging and filling."]

(from McLendon and Oswalt 1978:286)

5

AR0002876

ninety-nine of the 213 current members of the Tribe, or about 93 percent, trace their lineage to this family.[20]

Some of the Tribe's ancestors born in the 1800s include people identified as "Napa" Indians and Marin County "Mission" Indians.[21] Local historians Lewis et al. also note that some Clear Lake Pomo "were related to tribes of Napa Valley."[22] Specifically, the Tribe's ancestors include individuals identified as Wappo, a tribe whose use and occupancy range extended from Sonoma County to Lake County, and into southern Napa County, where it overlapped with that of the Patwin.[23] Ancestors of the Tribe described as "Napa Indians" were likely Wappo, or possibly Patwin from Napa County.[24] Many of these ancestors of the Tribe were born before

---

RG75], Sacramento Area Office, Tribal Group Files, 1915-1972, Box 25, Scotts Valley.

[20] Appendix B: Table 2: Lineal Descendants of Fernando and Mary Frese.

[21] Application No. 11067 of Ervin J. Maysee for Enrollment with the Indians of the State of California, 24 April 1932, National Archives and Records Administration Facility at Washington, D.C., Record Group 75, Records of the Bureau of Indian Affairs [Hereafter NARA-DC, RG75], Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932; Application No. 8542 of Laura Cassia Faber for Enrollment with the Indians of the State of California, 28 July 1930, NARA-DC, RG75, Entry 576 Records Relating to Enrollment of California Indians, Applications, 1928-1932; Application No. 8543 of Juanita Kanae Household for Enrollment with the Indians of the State of California, 28 July 1930, NARA-DC, RG75, Entry 576 Records Relating to Enrollment of California Indians, Applications, 1928-1932; Application No. 8544 of Arthur Faber Household for Enrollment with the Indians of the State of California, 28 July 1930, NARA-DC, RG75, Entry 576 Records Relating to Enrollment of California Indians, Applications, 1928-1932; Application No. 8545 of Pearl Faber for Enrollment with the Indians of the State of California, 28 July 1930, NARA-DC, RG75, Entry 576 Records Relating to Enrollment of California Indians, Applications, 1928-1932; Application No. 8546 of Joaquin Faber for Enrollment with the Indians of the State of California, 28 July 1930, NARA-DC, RG75, Entry 576 Records Relating to Enrollment of California Indians, Applications, 1928-1932; Family Tree Chart for Della Augustine, 30 August 1995, Private Collection of Scotts Valley Band of Pomo Indians.

[22] Ruth Lewis et al., *Stories & Legends of Clear Lake* (1936; reprint Santa Rosa, CA: Press Democrat, 1949), p. 11 [Hereafter Lewis et al., *Stories & Legends*].

[23] Although it appears that the ethnographic literature is in consensus about the Patwin, Wappo, and Coast Miwok occupying areas that border the waters of San Francisco and San Pablo Bay, ethnologists do not agree on which tribes used and occupied southern Napa County, where significant ancestors of the Tribe were from. Alfred Kroeber attributes it to the Patwin in 1932, but this ethnography offers little evidence for his conclusion. Later Kroeber attributes it to the Coast Miwok. Moreover, other scholars of the Wappo, such as Richard Dillon and Jesse O. Sawyer, delineate Wappo occupation of southern Napa County as overlapping with the area outlined in Kroeber's assessment. Kroeber also notes a number of migrations and population movements in the region, which he attributes to the "pre-Caucasion conquest" of the area. A. L. Kroeber, "The Patwin and Their Neighbors," *University of California Publications in American Archaeology and Ethnology*, vol. 29, no. 4 (Berkeley, CA: University of California Press, 1932), p. 270, and map titled "Tribelet Centers of the Patwin and Their Neighbors" [Hereafter Kroeber, "The Patwin"]; A. L. Kroeber, "Ethnographic Interpretations: Some New Group Boundaries in Central California, 4," *University of California Publications in American Archaeology and Ethnology*, vol. XLVII, no. 2 (Berkeley, CA: University of California Press, 1959), pp. 215-217; Richard H. Dillon, *Napa Valley's Indians* (Fairfield, CA: James Stevenson Publisher, 2001), pp. 5-31; Jesse O. Sawyer, "Wappo," *Handbook of North American Indians, California*, ed. Robert F. Heizer, vol. 8 (Washington, DC: Smithsonian Institution, 1978), p. 257.

[24] Application No. 8542 of Laura Cassia Faber for Enrollment with the Indians of the State of California, 28 July 1930, NARA-DC, RG75, Entry 576 Records Relating to Enrollment of California Indians, Applications, 1928-1932; Application No. 8543 of Juanita Kanae Household for Enrollment with the Indians of the State of California, 28 July

7

in the vicinity of the former Rancheria lands.  Of the remaining 164 people for whom the Tribe has birth records during this period, almost half – 78 individuals or 48 percent – were born in the Bay Area cities of Alameda, Berkeley, Castro Valley, Fremont, Hayward, Oakland, Petaluma, Richmond, Santa Clara, San Francisco, San Jose, San Leandro, Santa Rosa, and Vallejo.[91]

The Arnold family tree illustrates the mobility from the mid-nineteenth century up to the present.  The earliest ancestors in the tree – Fred and Fannie Arnold – were born in Sonoma County in the 1820s.[92]  In the 1860s, the family was generally in the same area; however, by the 1880s, their grandchild, Susie Santiago, was born farther north in Mendocino County, perhaps as a result of the general exodus of Native people northward.  Susie married at Hopland, and most of her children were born there.[93]  Her brother Louis Arnold married Hazel Elliott of the Yokayo/Guidiville rancherias around 1910, and this couple's children were born at Guidiville, Hopland, and Calpella (Mendocino County).[94]  By the 1930s, Louis and Hazel's children were further dispersed toward Lake County and the Bay Area, where many members of the family now live.[95]

One collateral ancestor of the Tribe, James Ross Quill, was born in San Francisco in 1903.  His grandparents – John Piner and Mary Peters – are ancestors to several current Tribe members belonging to the Ray family.[96]  Also in this family line are the Henthornes, who are intermarried with members of the group referred to in some documents as "Napa County Indians."[97]  Pearl and Bernice Henthorne, born on the Round Valley Reservation in the early 1900s, were themselves of mixed Pitt River and Pomo heritage.  Pearl and Bernice moved to Clear Lake, settling at Big Valley, where Pearl's father, Johnny Augustine (a son of Victoria Frese Augustine), lived.[98]  Bernice's children were born at Scotts Valley, Big Valley, and Lower

[91] Of the 85 persons who were not born near the Rancheria or in the Bay Area since 1965, a cluster of 67 (or 41 percent) were born in the Ukiah area of Mendocino County.  The remaining 17 persons (10 percent) were born in other California counties (8 persons ) or out of state ( 9 persons). Appendix C: Table: Birth Places of Scotts Valley Band Members and Ancestors, 1912-Present; Appendix C: Map 4: Birth Places of Scotts Valley Band Members and Ancestors, 1912-Present.
[92] Appendix B: Family Tree of Fred and Fannie Arnold.
[93] Appendix B: Family Tree of Fred and Fannie Arnold.
[94] Appendix B: Family Tree of Fred and Fannie Arnold.
[95] See *infra* Section III. E-J; Appendix B: Family Tree of Fred and Fannie Arnold.
[96] Appendix B: Family Tree of Mary Peters.
[97] Application No. 8544 of Arthur Faber Household for Enrollment with the Indians of the State of California, 28 July 1930, NARA-DC, RG75, Entry 576, Records Relating to Enrollment of California Indians, Applications, 1928-1932.
[98] Appendix B: Family Tree of Bukalnis.

19

# Report by

# Albert L. Hurtado, Ph.D.

# Historian

## Scotts Valley Band of Pomo Indians

## Request for Indian Lands Determination

## January 29, 2016

AR0002975

# **TABLE OF CONTENTS**

Introduction ........................................................................................................................ 1

Missions and the San Pablo Bay Region ...................................................................... 4

Mexican California, Land Grants, and Indians ......................................................... 18

The State of California and Federal Administration of Indian Affairs ............................ 75

Conclusion ....................................................................................................................... 99

Historical Note:  The Location of Estell's Ranch .................................................... 102

Bibliography .................................................................................................................... 106

AR0002976

The Scotts Valley Band of Indians and the North San Francisco Bay Region

Albert L. Hurtado, PhD.

January 18, 2016

**Introduction**

      This report is a history of the Indian people who lived in the region extending from the shores of San Pablo Bay to the vicinity of Clear Lake from about 1769 to 1860.  During these years first Spain, then Mexico, and finally the United States assumed control over northern California.  This area includes the marshy lowlands bordering San Pablo Bay, the valleys formed by the creeks and rivers that drain into it, and the territory around Clear Lake extending west to the Russian River.  Before the arrival of Spaniards and other newcomers this large extent of country was home to several Indian tribes that spoke different languages but that shared a general way of life, traded, intermarried and in the main cooperated with one another.[1]

      The Scotts Valley Band of Indians (SVBI) is descended from several Pomo speaking communities in the Clear Lake area.  Untrained observers, ethnographers, and linguists have used a dizzying array of spellings for these communities.  The basic anthropological reference work uses technical linguistic spellings that are impractical to reproduce in this report.[2]  For the sake of clarity, consistency, and ease of pronunciation this report uses "Kulanapo and Habenapo" for the two Eastern Pomo speaking communities in Big Valley near the southern shore of Clear

---

[1] Theodoratus, "Scotts Valley Report," 1-4.
[2] Bean and Theodoratus, "Western Pomo and Northeastern Pomo," 289-305

AR0002977

Lake.[3]  The historic Scotts Valley communities are called "Yimabak and Molkai,"
Eastern and Northern Pomo speakers who eventually combined their villages in
Scotts Valley.[4]  Historical sources use other terms for these people and places.  "Lup-
Yomi" refers to the Habenapo and Kulanapo villages.  "Lup-Yomi" is evidently a
Patwin word that refers to these places, which were incorporated in a Mexican land
claim known as Rancho Lup-Yomi that often appears in the historical record.
Therefore this report uses that spelling for the sake of consistency and clarity.  The
report retains historical spellings in quotation marks when the meaning is clear
(e.g., Habe-napo).   The Yimabak and Molkai were usually just called the Scotts
Valley Indians.

   During the Spanish colonial period the establishment of Roman Catholic
missions for the Indians set in motion social, political, and environmental changes
that disrupted long standing patterns of Indian land use and tenure throughout
California.  Under Mexican aegis private rancheros exacerbated these changes with
demands for more land and Indian labor.  By the time the United States took control
of California in 1846 federal officials found a cultural landscape that was radically
different than the one that had existed in 1769, yet that reflected the traditional
seasonal migration and marriage patterns.  The extreme conditions of the gold rush
further dislocated native people and forced them to adapt to yet another set of
changed circumstances as thousands and then tens of thousands of newcomers

---

[3] See map, Theodoratus, "Scotts Valley Report," 6.
[4] See map, Theodoratus, "Scotts Valley Report," 6, and 7-8

AR0002978

invaded Indian homelands.  This era of tumultuous changes obliterated some native tribes and greatly reduced the numbers of the survivors.

The SVBI are mostly of Pomo descent but also include Patwin, Wappo, Miwok, Wailaki, and other California tribes among their members.  Intermarriage among these and other Indian groups occurred before the arrival of Europeans and continues to this day.  Thus mixed marriages characterized social life and conditioned relations between linguistic groups that were ostensibly separate but that in practice coexisted and cohabited with one another.[5]  Spanish missionaries' efforts further emphasized this conjugal characteristic.

---

[5] Theodoratus, "Scotts Valley Report," 8.

AR0002979

**Missions and the San Pablo Bay Region**

In 1769 Spain established the first Roman Catholic missions in Alta California at San Diego. Missions were a standard part of the Spanish imperial institutional structure throughout the Western Hemisphere.[6] The missions were meant to convert Indians to the Catholic religion while inculcating Spanish cultural values and loyalty to the Spanish crown. Priests who were members of the Franciscan order administered the missions and taught Christianity with stern discipline. Under Spanish and Catholic law Indians could not be compelled to accept Christianity, but the soldiers who accompanied the missionaries made it clear that resistance to Spanish authority would be met with violence. The number of Indian converts (called neophytes by the Spaniards) was at first small but the neophyte population grew once the missions gained a foothold.[7]

Franciscan missionaries were often horrified and offended by the customs and practices of native people who they hoped to Christianize. Priests, who regarded nakedness as both a mark of innocence and a sign that Indians were uncivilized, were especially shocked at Indian nudity. Most Indian women customarily were bare-breasted and wore only a knee length skirt made of tule grass or skins. Men often went entirely naked, weather permitting. Missionaries were determined to eliminate Indian sexual practices such as homosexuality and sex out of wedlock.[8] The priests, many of whom had years of experience among Indians

---

[6] Weber, *The Spanish Frontier in North America*, 92-121.

[7] The literature on California missions is very large. The most recent treatments include, Beebe and Senkewicz, *Junípero Serra*; Hackel, *Children of Coyote*; and Sandos, *Converting California*.

[8] Hurtado, "Sexuality in the California Missions," 371-385.

4

AR0002980

elsewhere, regarded California Indians as primitive people who were as much in need of tutoring in civilization as they were in spiritual matters.  As Franciscan Rafael Verger explained to a Spanish official, Spanish conquistadors in Mexico had found Indians who lived in cities and towns "well formed, civilized, and provisioned with everything" and only lacked "knowledge of the True God and the Holy Law." California Indians, Verger averred, "go about naked and wander in their remote hills and valleys."  Unlike Mexican Indians, Californians "do not grow crops but live off wild grasses and fruits of trees, and their hunting, with arrows, differs little from that of irrational brutes."[9]

Verger and his Franciscan colleagues were not anthropologists.  His comments reflected the rigid prejudice, misunderstanding, and ethnocentrism that informed European attitudes towards Native American people from the time of Columbus through the colonization of California.  Insofar as missionaries understood Indian culture they believed that it was their duty to stamp out Indian beliefs, or at least their outward manifestations.  As Father FermÍn Francisco de Lasuén frankly believed, California Indians were a "savage" people who must be transformed "into a society that is human, Christian, civil, and industrious.  This can be done only by denaturalizing them."[10]

In 1769 Indians had no need of civilization as Spaniards understood it, or of a new mode of economic life, or new rules of sexual behavior.  Up to that time they had lived in self-sufficient, self-governing, but interdependent communities.  These small communities that seldom numbered more than a few hundred, usually got

---

[9] Verger quoted in Hackel, *Children of Coyote*, 131.
[10] Lasuén quoted in Beebe and Senkewicz, eds., *Lands of Promise and Despair*, 274.

AR0002981

along and shared resources through diplomatic arrangements that included interethnic marriages. Poaching sometimes led to violence but peaceful relations were the rule.[11]

Spanish civil and religious authorities were not impressed with the efficacy or antiquity of native society. They imposed new modes of life on Indians whether they wanted them or not. The seemingly exurban nature of California Indian culture made it necessary, Franciscans believed, to gather new Christians into missions that would in time become civil communities like other pueblos in the Spanish realm. In effect the missions would be multi-ethnic communities that included Spaniards, Mexicans, and California Indians of various ethnicities. The cosmopolitan nature of the missions also encouraged interethnic marriages that blended Indian communities that met there.

Environmental change played a key role in convincing Indians to go to the missions. The missions were essentially large agricultural operations that featured extensive livestock grazing. Each mission owned thousands of animals that grazed on tens of thousands of acres that Indians had formerly used for gathering plant foods and hunting. Spaniards planted crops that were alien to California – wheat, barley, and oats, for example. Those exotic plants, plus noxious weeds that the newcomers inadvertently brought with them, crowded out the native plants that

---

[11] Theodoratus, "Scotts Valley Report," 1-4.

AR0002982

Indians had formerly relied on.  Thus the once abundant landscape became less productive of customary foods.[12]

New diseases debilitated native people and reduced their numbers. Spaniards brought small pox, measles, syphilis, and other diseases to which California Indians had not been exposed.  Consequently neophytes and unconverted Indians (called gentiles or wild Indians by the Spaniards) died in large numbers. Thus weakened by diseases that were new and unresponsive to traditional native healing practices, some Indian individuals and communities sought refuge in the missions.[13]

The missions were supposed to minister to the spiritual needs of Indians, but they also had to support the earthly requirements of the neophytes, priests, and soldiers who lived there.  Neophytes did virtually all of the labor associated with the mission establishments.  They constructed the churches and other buildings, tilled the gardens, cleaned, cooked, and did every kind of work that was required to keep the missions functioning.  They also tended the vast livestock herds that were an essential part of the mission economy.  Thus many mission Indians became vaqueros (cowboys) during the mission era.[14]

It is important to recognize the extent of cattle ranching to understand how the livestock economy came to dominate Spanish California, alter the environment, and affect Indian society.  By the end of the mission period (1820s) the missions

---

[12] Cook, "The Indian Versus the Spanish Mission," 1-194; Hackel, *Children of Coyote,* 65-123.  See also Sandos, *Converting California,* 1-13; and Randall Milliken, *A Time of Little Choice,* 1-7.
[13] Cook, "Indian Versus the Spanish Mission," 13-55; Hackel, *Children of Coyote*, 80.
[14] Sandos, *Converting California*, 9.

7

AR0002983

held at least 193,000 sheep, 150,000 cattle, and 20,000 horses.[15]   All of these animals competed directly with Indians for food so it is not surprising that livestock grazing was a source of contention between Indians and the missions. Large livestock herds permanently altered the California environment by destroying native plants through overgrazing and spreading new plants with seeds in their dung and hair.  These new plants displaced many of California's native plants.  By the 1840s wild oats were so common that observers thought that they were a native species.[16]   Gentile Indians often resorted to killing livestock both as a means of eliminating the impact on the traditional native economy and to acquire food. Indian attacks on livestock could not restore the environment or completely replace the food resources that they had lost.  Consequently many native people acknowledged the new reality of the California environment and entered the missions.[17]

The first mission on San Francisco Bay, San Francisco de Asís (commonly known as Mission Dolores or Old San Francisco), was founded in 1776 in the present city of San Francisco.  Mission Santa Clara de Asís (1777) in Santa Clara, and San José Guadalupe (1797) in the present town of Fremont dominated the southern and eastern sides of the bay respectively.   These three missions recruited Indian converts in the bay area and San Joaquin Valley, but their reach in the North Bay region was limited until about 1800.  At about that time Coast Miwoks from the

---

[15] Hackel, *Children of Coyote*, 80.  Dasmann, *The Destruction of California*, 65, claims that there were early 400,000 cattle and 300,000 sheep at the height of mission expansion.
[16] Dasmann, *The Destruction of*, 65-68; Bakker, *An Island Called California*, 149-150.
[17] Milliken, *A Time of Little Choice*, 72-74, 120-122.

AR0002984

southern Marin peninsula began to migrate to Mission Dolores in large numbers.

This apparently peaceful and voluntary movement may have been caused by

population collapse that was brought about by deadly epidemic diseases, especially

measles.[18]

Mission recruitment and disease depopulated a broad band of territory that

stretched from the Marin Peninsula to the Carquinez Straits, an area that had been

Miwok and Patwin territory.[19] In 1804 fourteen Costanoan[20] neophyte men were

given permission to visit East Bay villages, but the men were evidently in pursuit of

relatives who had fled into Patwin territory in the North Bay region. The mission

Indians crossed Carquinez Strait into present day Solano County where Suisun

Patwin Indians killed them. The Suisun's motives are unclear, but they evidently

wanted to limit the area of mission influence by killing Indians who were supportive

of the missions. This was the beginning of Patwin attempts to dominate and control

the North Bay region.[21]

---

[18] Milliken, *A Time of Little Choice*, 176-179.
[19] There is some dispute about the linguistic affiliation of the Carquin Indians who according to Milliken occupied both sides of Carquinez Strait and spoke a Costanoan dialect. According to James A. Bennyhoff Costanoan speakers occupied only the southern shore of the strait while the northern shore was home to Patwin speakers who were known as Aguastos. Milliken writes that the Huichin-Aguastos held the area between Glenn Cove to Mare Island, "but they were clearly Costanoan speakers and heavily intermarried with the Carquins." C.f. Milliken, *A Time of Little Choice*, 238, and Bennyhoff, *Ethnogeograpjy of the Plains Miwok*, 137-144. In volume 8 of the *Handbook of North American Indians*, Johnson, "Patwin," 350, has them Patwins on the north side of the strait and and Levy, "Costanoan," 385, has Costanoans confined to the south shore.
[20] Costanoan was the language that most Indians spoke in the San Francisco Bay region.
[21] Milliken, *A Time of Little Choice*, 180-181.

AR0002985

The Spanish military lacked the resources to defeat the Suisun so for several years the Suisun villages were relatively safe havens for escaped mission neophytes, much to the dismay of mission priests. Loyal mission neophytes were also unhappy because some of their relatives had fled to the Suisun. In 1807 several neophytes left Mission Dolores for Suisun country where a number of other former neophytes were already living. There the wife of one of the mission fugitives left him or was taken from him. The jilted husband returned to the mission where he recruited friends and relatives to help him get her back. More than one hundred neophytes marched to the Patwin country where they rounded up some runaways, but the expedition did not work out as intended. Suisuns and others attacked the neophytes and killed twelve of the Christians before the survivors retreated to the mission.[22]

Controlling the Suisun country proved difficult. By 1810 there was "no buffer" between the Suisuns and the Spanish settlements.[23] In February Suisuns killed three recently baptized neophytes who went there. Four other neophytes decided to remain with the Suisuns. This episode shows how divided neophyte loyalties could be. These neophyte killings and escapes inspired Spanish authorities to do something about a bad situation that was getting worse. In May 1810 Sergeant Gabriel Moraga in command of seventeen soldiers and a force of Christian Indians was sent across Carquinez Strait to punish the residents of Sespesuyu, which was evidently a Suisun Patwin village near present day Fairfield. Their encounter with Indians on the north side of the strait was violent. Moraga took 18 prisoners but he soon abandoned them because they were so badly wounded that he was certain

---

[22] Milliken, *A Time of Little Choice*, 206.
[23] Milliken, *A Time of Little Choice*, 209.

AR0002986

they would die.  Surviving Sespessuyu Indians refused to surrender and barricaded themselves in three brush houses that Christian Indians set afire.  They burned to death rather than surrender.  Moraga reported that his force fought as many as 120 Indians.  An unknown number of them died in the battle.  He returned to Mission Dolores with six boys and six girls, who were Bay Miwok and Patwin.[24]

The effect of Moraga's assault on the Suisun was devastating.   This violent encounter evidently convinced many Suisun to move to Mission San Francisco in 1811.[25]  Nevertheless, the North Bay region had become a borderland that was home to non-mission Indians, such as the Patwin, other Indian communities that were still free, and fugitives from the missions who formed multi ethnic communities in lands that had been vacated by mission recruitment and violence. One Spanish official charged that Father Narciso Duran sometimes raided the Suisun country and forced the Indians to return to his Mission San José mission.[26]

By the early nineteenth century the population of Mission Dolores was declining.  The mission either had to be abandoned or new neophytes had to be found among those who had not yet been Christianized.  The troubled North Bay region was the closest place where a source of new converts could be found. Establishing new missions north of San Francisco Bay would have several benefits: they would replenish Mission Dolores (or at least keep neophytes from fleeing);

---

[24] Bancroft, *History of California*, 2:91; Milliken, *A Time of Little Choice*, 209-210, 319-320.
[25] Milliken, *A Time of Little Choice*, 210.
[26] Bancroft, *History of California*, 2:500.

AR0002987

quiet the rebellious independent Indian frontier; and the new establishments would extend the reach of Spanish and Catholic influence.[27]

Foreign influence further encouraged Spanish expansion in northern California. The Russian American Company, a royal monopoly on the fur trade granted by the Tsar, had built permanent trading settlements in Russian Alaska. From there they sailed down the Pacific Coast to hunt sea otters, eventually reaching Spanish California waters.  In 1808 Russians and their native Alaskan hunters reached Bodega Bay where they stayed for about eight months.  At Bodega the Russians met Coast Miwok people.  In 1812 the Russian American Company established a small port at Bodega and Fort Ross, a fortified trading post twenty miles to the north of Bodega.  Fort Ross, which was in Kashaya Pomo territory, was intended primarily as an agricultural colony that would supply the company's fur trading posts in Russian Alaska.  Spanish authorities protested the Russian encroachment on land claimed by the Spanish Crown, but some Spanish colonists, including missionaries, welcomed the opportunity for clandestine trade with the Russians.  Under Spanish rule trade was restricted to the Spanish Empire. California, which was a minor backwater in the Spanish trade network, had little opportunity to sell the few agricultural products they produced or to acquire much needed manufactured goods.  Consequently there was an exchange of smuggled merchandise from 1812 until 1841 when the Russians left.[28]

The Russian settlement provided expanded economic opportunities for Native Americans as well as Spaniards.  Pomo and Coast Miwok communities

---

[27] Bancroft, *History of California*, 2:330-331.
[28] Owens, *Empire Maker*, 222-223, 230-238.

AR0002988

opened trade with the newcomers and eventually some went to work for them as farmers and herders of stock that was acquired from Spanish sources. Following long-established practices on the Russian-American frontier Russians and their Alaskan Indian workers married local California Indian women. These marriages cemented diplomatic and military alliances as well as kinship ties. In 1818 a Russian navy captain reported that a Miwok headman brought him gifts, "regalia, arrows, and household items . . . and asked to be taken under Russian protection." Speaking through an Indian interpreter who had lived among the Miwoks for a year, the Miwok leader said he wanted more Russians to settle in his neighborhood, "in order to protect them from Spanish oppression." He asked for a Russian flag so that he could raise it as a sign of friendship whenever he saw a Russian ship.[29]

Relations between the Kashaya Pomo and Coast Miwok people and the Russians were generally friendly. Some Pomos learned to speak Russian and adopted some aspects of Russian religion and culture.[30] One source reports that Russians kidnapped some Pomo children and sent them to Russia, but overall Pomos and Miwoks established cooperative relations with the Russians.[31]

The Spanish Californians welcomed the new Russian presence from an economic standpoint, but the newcomers posed a challenge to Spanish and Catholic political and religious hegemony. To meet that challenge, and to address longstanding problems with Indians in the North Bay region Franciscan missionaries established a new mission. In 1817 the friars founded Mission San

---

[29] Captain Vasilii Golovnin quoted in Owens, *Empire Maker*, 231-232.
[30] Bean and Theodoratus, "Western Pomo and Northeastern Pomo," 299.
[31] Brown and Andrews, *The Pomo Indians*, 9.

AR0002989

Rafael on the Marin Peninsula. The first residents were some 200 neophytes from Mission San Francisco. This core of Christian Indians, some of whom were no doubt Miwok who originally came from the Marin Peninsula, helped to build the new mission and encourage new converts to come in. Missionaries reached out to Pomo communities for the first time. Seventy-six Pomos from "Lupuyomi" were baptized at the new mission in 1823 and 1824. There is some doubt about where these Pomo neophytes were from because "Lupuyomi" may be a Miwok word. Milliken argues that in the Pomo dialect "Lupuyomi" is actually "Kabemali," which is on the Pacific Ocean between the mouth of the Russian River and Bodega Bay.[32] Barrett states that the Miwok name for Big Valley on Clear Lake was "Lupayuma" or some similar word.[33] In 1844 Salvador Vallejo named his Big Valley cattle ranch Rancho Lup-Yomi.[34] In 1848 Mariano Vallejo identified "Lupuyomi" as a ranchería on Clear Lake.[35] If the "Lupuyomi" neophytes' village was on the coast they were recruited from the heart of the Russian sphere of influence. If they were from Big Valley the missionaries had made a great leap to the north, perhaps to avoid conflict with the Russians.

While the location of Lupuyomi is uncertain it is clear that the Indians who lived there were Pomo. Consequently, by the mid-1820s Pomo, Patwin, and Miwok neophytes were cohabiting in Mission San Rafael. The founding of a mission at the present day town of Sonoma reinforced this pattern of multi ethnic community building. The decline of Mission San Francisco motivated friars to propose a new

---

[32] Milliken, *A Time of Little Choice*, 246.
[33] Barrett, *The Ethnogeography of the Pomo*, 233.
[34] Hoffman, *Reports*, "Appendix," 106.
[35] Vallejo, Treaty with Clear Lake Indians, June 1, 1848, M210, roll 4.

AR0002990

mission in the vicinity of the Petaluma Miwoks.  The country between Mission San
Rafael and the Suisun was little known so an exploration under the direction of
Father José Altimira and Sergeant José Sanchez with an escort of nineteen soldiers
set out from San Rafael in June of 1823.  They proceeded eastward through the
Petaluma, Sonoma, Napa, and Suisun valleys.  Altimira determined that Sonoma
would be the best location for a new mission because it possessed ample water,
stone, arable land and other resources.  The nearby Petaluma and Napa valleys
could be stocked with mission cattle.  And most importantly, there was a large
population of Indians from which to draw converts.   The new mission was about ten
miles closer to the Russian settlements at Bodega and Ross, which improved
opportunities for trade but was still far enough away so that the Russians could not
interfere with the mission.  The mission was at first called New San Francisco but
eventually it was renamed San Francisco Solano to distinguish it from the older San
Francisco de Asís.[36]

San Francisco Solano was the last mission established in California.   It was
unusual because it was established after Mexico had established its independence
from Spain and California became a part of Mexico.  Under Mexican rule the
missions were to be secularized, that is, missions were to become parish churches
with only enough land to support local church activities.  Secularized mission
Indians would become citizens.   Under the management of secular administrators
former mission land and resources were to be distributed to the Indians with the
surplus going to the Mexican government and then to worthy Mexican citizens.

---

[36] Bancroft, *History of California*, 2:496-500.

AR0002991

Unfortunately for neophytes, this process usually benefitted non-Indians more than the neophytes that had built and maintained the missions. Secularization was delayed for years so in the meantime priests ran the missions much as they had under Spanish rule.[37]

When San Francisco Solano was founded it was decided that neophytes from old San Francisco, San José, and San Rafael could go there voluntarily, provided that they came originally from the Sonoma region. New converts could be recruited from anywhere in the North Bay region but no force could be used.[38] While the Mission at Sonoma was short lived it actively recruited converts from various tribes in the region. Mission books show that neophytes came from at least thirty-five villages. The ethnicity of the community is given in parentheses if known: Aloquiomi, Atenomac, Canoma (Patwin), Carquin (Costanoan), Canijolmano (Wappo), Caymus (Wappo), Chemoco (Patwin), Chichoyomi, Chocuyem, Coyayomi (or perhaps Joyayomi), Huilue, Huymen, Lacatuit, Loaquiomi, Linayto or Libayto (Patwin), Locnoma (Wappo), Mayacama (Wappo), Muticolmo, Malaca (Patwin), Napato (Patwin), Oleomi, Pacque, Petaluma (Coast Miwok), Polnomanoc, Putto or Putato (Patwin), Suisun (Patwin), Satiyomi (Pomo), Soneto (Patwin), Tolen (Patwin), Tlayacma, Topoyato (Patwin), Ululato (Patwin), Zaclom, Ultinomanoc (Wappo).[39] These villages were evidently in addition to the people who had already been taken in to the San Rafael, San José, and old San Francisco missions. Mission

---

[37] Weber, *The Mexican Frontier*, 15-42, 62-68; Servín, "The Secularization of the California Missions," 133-149; Garr, "Planning, Politics, and Plunder," 291-312.
[38] Bancroft, *History of California* 2:504.
[39] Bancroft, *History of California*, 2:506, n. 42. Village spellings are as given in Bancroft. See also Sawyer, "Wappo," 258; Johnson, "Patwin," 351; Kelly, "Coast Miwok," 414;

AR0002992

activity occurred at least as far north as Middletown where the Locnoma Wappos were located, and perhaps as far north as Big Valley depending on the correct identification of Lupuyomi. Bean and Theodoratus state that as many as 600 Pomos were baptized at the San Rafael and San Francisco Solano missions.[40]

The missions San Rafael and San Francisco Solano attempted to forge multi-ethnic communities from the Pomo, Patwin, Miwok, and Wappo communities in the North Bay region. Missionaries hoped to make Indians into Roman Catholic, Spanish-speaking, subjects of the Spanish Crown and to a certain extent they succeeded. However the mission era was also marked by neophyte flight and rebellion. The new Christians did not immediately forget their native cultural norms or religious beliefs. Rather they retained aspects of traditional religious practice and authority in the mission while they simultaneously adopted Christian beliefs and practices. Priests were often blind to the religious and cultural syncretism that existed in their midst.[41]

---

[40] Bean and Theodoratus, "Western Pomo and Northeastern Pomo," 299.
[41] Hackel, "The Staff of Leadership," 347-376; and Hackel, 228-271, and passim.

AR0002993

**Mexican California, Land Grants, and Indians**

When Mexico established its independence in 1821 California became a part of Mexico. Mexico liberalized its trade policy and opened its doors to foreigners. In Spanish California clandestine foreign trade had gone on for years but the new policy made it possible to lawfully expand trade as never before. Hides and tallow quickly became California's principle export, and Mexico embarked on a policy of secularization, which ultimately meant that the California missions' vast rangelands would fall into private hands.[42]

The population of California Indians had declined during the mission era, but Indians were still the majority by a large margin. Under Mexican law Indians were free, but large landholders employed Indians under abusive arrangements that included wage labor, debt peonage, and outright slavery although that was illegal under Mexican law.[43]

Indian labor was essential to the extensive livestock operations of Mexican rancheros (also known as Californios), just as it had been in the missions. On the other hand, Indians could be troublesome to the new landholding class because they stole livestock, especially horses. During the Mexican era livestock raiding took on an international dimension. Prior to that time the market for stolen livestock had been essentially local. Indians, gentiles as well as neophyte runaways, stole horses and drove them to a free Indian community where some of the animals were eaten and others were kept for transportation. In 1827 the arrival of American mountain men (fur trappers and traders) changed the dynamics of livestock rustling. These

---

[42] Robinson, *Land in California*, 59-72.
[43] Hurtado, *Indian Survival on the California Frontier*, 55-71.

AR0002994

rough and well-armed frontiersmen wanted horses to drive back to the United States where they could be sold.  They made alliances with California Indians, especially the Miwok and Yokut Indians in the San Joaquin Valley, raided Mexican herds near the coast, and drove the animals through the valley and east over mountain passes on the long road back to U.S. markets.  Trained horses and mules were the prime target of these rustlers, or "adventurers of all nations" as the Mexicans called them.  Californios also nicknamed foreign rustlers *chaquanosos*, which was a corruption of the tribal name Shawnee, because so many Shawnee and Delaware Indians from the Missouri-Kansas border participated in this illicit business.  Whatever they were called, these raiders preferred to steal trained horses because there was a ready market for them.  Therefore they rode through large herds of feral horses that had grown up in the San Joaquin Valley in order to reach the trained animals that every ranchero owned as a part of his cattle ranching business.  In the 1830s international horse rustling was carried out on a grand scale in California.  Every year thousands of horses were driven out of the Mexican province, often with irate Californios in hot pursuit.[44]

The devastation of California's *remudas* (bands of trained cow horses) was a significant problem for the California economy, which was based entirely on the hide and tallow trade.  Without enough trained horses to do the work of rounding up wild cattle Californios could not carry on their essential business.  Thus California's governors took Indian livestock theft very seriously.  Men who could stop, or at least curtail livestock theft were admired and rewarded.  Mariano Vallejo

---

[44] Hurtado, *John Sutter*, 22-23, 76-77.

AR0002995

and his brother Salvador were such men.  The Vallejo brothers distinguished themselves as soldiers and foes of Indians who resisted Mexican authority.    For two decades the Vallejo brothers dominated the North Bay region, which they ruled with an iron fist.  Pomo, Coast Miwok, Patwin, and Wappo people alike came under the influence of the Vallejos, worked for them, and changed their ways of life in order to accommodate them and other rancheros who converted Indian country into a pastoral landscape.  Thus Indian history in the North Bay region cannot be understood with knowing about the Vallejo family.

Mariano was born in 1807, the son of a Spanish soldier.  He aspired to military life and the rewards that it could bring.  The Vallejo family claimed pure Castilian blood, an important marker for the small social elite in Hispanic California who gave Mariano the honorific title of *don*.  Don Mariano (sometimes called Don Guadalupe after his middle name) did not have to wait long to prove himself as a leader against Indians who resisted Mexican authority.  At age seventeen he enrolled as a cadet in the army company at Monterey.  Vallejo rose quickly through the ranks and by the time he was twenty-two he was a second lieutenant.[45]  In 1829 Estanislao, an ex-neophyte Valley Miwok, had become the acknowledged leader of the horse raiders in the San Joaquin Valley.  Born and raised in the Mission San José, Estanislao had learned the trades of vaquero and mule tamer.  Eventually he fled the mission, established his headquarters on the Stanislaus River, and with a band of

---

[45] Rosenus, *Genereal M. G. Vallejo*, 3-11.

AR0002996

like-minded Miwok and former mission Indians regularly attacked the Mexican rancho herds.[46]

Matters came to a head when Estanislao and six confederates stole horses from Indian vaqueros from the Mission San José. Even worse, in the mind of Father Narciso Duran who reported the theft, one of the mission Indians decided to join the thieves. Estanislao sent a message back to Duran saying that "now they are really going to become active" in their attacks on the ranchos.[47]

Lieutenant Vallejo was selected to lead a combined force of soldiers from the Monterey and San Francisco presidios against Estanislao. His army consisted of about two hundred troops from the presidio as well as a force of fifty Indian auxiliaries and some volunteers from the pueblo of San José. Vallejo found Estanislao's band in a well-fortified camp but managed to breach their defenses with cannon fire. After desperate fighting in which the auxiliary Indian troops led the way many Indian rebels were killed but Estanislao escaped. Vallejo's men executed survivors and hanged some from tall trees with nooses made from vines as a warning to the Indians who had escaped.[48]

Estanislao returned to the Mission San José where Father Duran secured his pardon from the governor. Duran was not so forgiving of Vallejo whom he accused of "horrible assassinations" at Estanislao's ranchería and demanded just punishment for the crimes against the Miwoks. Nothing came of Duran's

---

[46] Holterman, "The Revolt of Estanislao," 44.
[47] Duran quoted in Cook, "Expeditions, 1820-1840," 169.
[48] Osio, *The History of Alta California*, 89-94.

21

accusations.[49]  Rather, Vallejo had established his military reputation among Californios who demanded strong action against Indian horse thieves.

By 1833 Vallejo was military commandant of the San Francisco presidio where he attracted the favorable attention of Governor José Figueroa who ordered him to lead a military escort to Fort Ross (as a warning to the Russians) and to scout for a spot to establish a new presidio north of the bay.  Not surprisingly, Vallejo recommended Sonoma for the new military establishment.  The Mission San Francisco Solano had already established a permanent settlement there and everyone understood that secularization of the mission was in the near future. Figueroa ordered Vallejo to establish the new presidio and sweetened the move to the Sonoma frontier with a grant of land called Petaluma – some 66,000 acres that included much of the land between the Petaluma River and Sonoma Creek. Missionaries objected because this land had been mission rangeland but without avail.  The Petaluma Rancho would become the basis for Vallejo's substantial fortune in land and livestock, but it would not be the last piece of mission land that he claimed.[50]

The governor named Vallejo military commander of the northern frontier, a post that gave him military authority over everything north of San Francisco Bay to Oregon.  Ultimately he was promoted to general.  Figueroa also made Vallejo director of colonization of the northern frontier, a post that gave him authority to grant land to individual settlers in that vast domain.  While he was at it Governor Figueroa appointed Mariano Vallejo *comisionado,* administrator in charge of

---

[49] Osio, *The History of Alta California*, 94.
[50] Rosenus, *General M. G. Vallejo*, 14.

22

AR0002998

secularizing Mission San Francisco Solano. Vallejo was directed to use half of the mission's assets to improve the budding pueblo of Sonoma, the rest was supposed to go to benefit Indians. The governor's general secularization order required that Indians labor on the surplus lands that had formerly belonged to the missions. With little choice in the matter former mission Indians became *peones* who worked the herds of the new owners of vast estates that were carved out of mission holdings, such as Mariano Vallejo and his Rancho Petaluma.[51] Other private rancheros held their land through Vallejo's recommendation and continuing patronage.

Mariano exercised nearly absolute personal and official power over land and life in the North Bay region. He was commander of the northern frontier with a military force at his disposal. As comisionado he distributed the holdings of the mission and was in charge of former mission Indians, except in spiritual matters. Private ranchero Vallejo benefitted from the labor of Indians who were required to work for him under Figueroa's secularization order – a labor obligation that General Vallejo was in a position to enforce.

When Vallejo took over as comisionado he compiled an inventory stating that the mission grazed 6,000 cattle, 2,000 horses, and 6,000 sheep.[52] There can be little doubt that Vallejo took most of these animals for himself and his relatives. Cayetano Juarez, one of Vallejo's neighbors, claimed that Mariano at one time owned ten to twelve thousand cattle and one thousand horses on just one of several ranchos that he claimed. William Heath Davis, a contemporary of Juarez wrote that Vallejo had as

---

[51] Rosenus, *General M.G. Vallejo*, 14-15; Weber, *The Mexican Frontier*, 65-66.
[52] Mariano G. Vallejo, Inventorio Incompleto de [Mision] San Francisco Solano.

23

many as 50,000 cattle on all of his ranches plus four to six thousand horses.[53]  The

labor requirement for managing herds of this magnitude on open range was very

large and there was only one practical source – the surrounding Indian population

consisting of Miwok, Wappo, Pomo, and Patwin Indians.  If neophytes could not

meet the labor needs of the new ranchero class they turned to free Indians, or as

Vallejo and other Mexicans called them, gentiles or "wild" Indians.  Some Indians

worked willingly but others had to be forced.

While the Indian population had been sharply reduced by 1835 they still

comprised a majority that far outnumbered the military forces at Vallejo's

command.  However, as his brother Salvador said, "by following the astute policy of

the ancient Romans, who created dissensions among their neighbors for the

purpose of afterwards being called in to act as mediators," Mariano Vallejo was able

to control Indian affairs in the North Bay region.  According to Salvador the "*mansos*

(tame)" Indians hailed his brother as "a liberator" who would protect them from the

"Satiyomi [Wappo] and their allies."[54]

In order to carry out a policy of divide and conquer the Vallejos would need

an Indian partner.  A Patwin leader by the name of Francisco Solano proved to be

the man for the job.  By the time the Vallejos moved to Sonoma most of the free

Indians between the Napa River and Suisun Bay were under the leadership of

Solano.  Solano was baptized in the mission San Francisco de Asís in 1810 when he

---

[53] Cayetano Juarez, California Land Claims, vol. 26, Commission Number 291, 7.
Juarezz's estimate of Vallejo's holdings was by no means the largest.  Davis, *Seventy-Five Years in California*, 22.
[54] Salvador Vallejo, Notas historicas sobre California, 84-85, translation that is included with the original in Spanish manuscript.

AR0003000

was ten or twelve years old.  Sina was his native name.  He was a Suisun Patwin who had probably been captured and taken to the mission a couple of months before his baptism.  In 1824 Solano was among the Suisuns who were sent back to their home country as Mission San Francisco Solano neophytes.  At the new mission Solano became an *alcalde* (a neophye supervisor) by the time he was thirty-five.[55]

Francisco Solano was a remarkable man who impressed all who met him. Described as tall, handsome, intelligent and commanding, Solano and his followers posed a threat to Vallejo's authority.  In 1835 Vallejo learned that Indians under Solano had gathered to oppose him at the Patwin village of Suscol, which is sometimes spelled Soscol, or Soskol.  (The Suscol village site is located at the junction of State Highway 29 and Soscol Road.  It is on the northern boundary of Vallejo's Rancho Suscol land claim and the Tulucay Mexican land grant.)[56]  Vallejo led a force of about two hundred men to Suscol where a battle ensued.  At first Vallejo's men drove off their opponents but more Indians from surrounding valleys showed up and fought under the leadership of Solano.  They surrounded Vallejo who was forced to send to Governor Figueroa for reinforcements that arrived in due course.  Once confronted by superior numbers and armament Solano called for a meeting with Vallejo.  Solano proposed a mutually beneficial alliance with Vallejo. Solano and his people were at war with the Satiyomi (Wappo) and Cainamero

---

[55] Early California Population Project, Baptismal Number 4024, Mission San Francisco de Asís. Randall Milliken, "Ethnographic and Ethnohistoric Context for the Archaeological Investigation of the Suisun Plain, Solano County, California," unpublished paper in author's possession.  Others argue that Solano was baptized at Mission San Francisco Solano, Peterson, "The Career of Solano," 13,

[56] Gardner, "Suscol in Napa County," 2-3, 10-11.

AR0003001

(Pomo) groups that lived to the west and north.  Vallejo agreed to aid Solano in his

wars against the Pomos and Wappos if the Patwin would remain at peace with him

and the nascent Mexican settlements near Sonoma.[57]  This was precisely the kind of

alliance that Vallejo needed to carry on his divide and conquer strategy.  "Prince

Solano," as Salvador styled him, became Vallejo's "confidential agent" who "obtained

timely advice of every impending attack."[58]

Vallejo and Solano immediately put their alliance to work.  In 1835 the

Vallejo brothers and Solano together with sixty "Californians and Mexicans, 22

foreigners [mostly Americans] . . . and some 200 Indian auxiliaries" under the

command of Solano marched north of Sonoma.[59]  Charles Brown, one of the

foreigners who went with them, recalled that they may have gone as far as two

hundred miles north, although this may not have been an estimate of air miles.

During the journey it rained much of the time and Brown was severely wounded

during a battle with Indians, factors that may have caused Brown to overestimate

the distance in his recollection of events.  In any case, the Sonoma forces marched

far north of Sonoma where they found a ranchería in a deep mountain valley.  It is

impossible to know the exact identity of this Indian community but it was probably

in Northern Pomo territory.  The Indians were accused of stealing livestock from the

Sonoma settlements.

They attacked the village at sunset, killed "a great many of them and took a

large number of prisoners."  Brown's description of the fighting reveals the brutal

---

[57] Peterson, "The Career of Solano," 23-24.
[58] Salvador Vallejo, Notas historicas sobre California, 86-87.
[59] Brown, Statement of Recollections, 11, states that it was in the fall of 1835.

AR0003002

nature of these frontier conflicts.  "The worst thing I ever saw in my life was done there by Solano," Brown recalled.  Solano killed a child that was being carried by a pregnant woman "and then lanced the woman, ripping the belly open & pulling the phoetus out."[60]  Enraged by what he had seen, Brown was about to shoot Solano when Salvador Vallejo stopped him saying that Solano was his best friend. [61]  Thus restrained, Brown turned to looting the ranchería and was shot with eleven arrows before Solano could kill the assailant.  Solano then removed the arrows from Brown's body, dressed the wounds with herbs, and "in due time made me well."[62]  Indians carried Brown back to Sonoma on a litter, an uncomfortable journey that lasted six days.[63]

While the ostensible purpose of the raid into Pomo country was that the Indians had stolen livestock Brown did not report any cattle or horses when he described the booty taken from the ransacked village.  They had killed between two and three hundred people and took about one hundred prisoners, including what Brown called "64 or 65 bucks" (mature men).  The rest of the captives were women and children.  "The prisoners were divided among the different ranches of the mission and put to work at the different trades," Brown recalled.  Brown got sixty-five beaver pelts, a commodity that probably indicated that these Indians traded with the Russians, Hudson's Bay Company, or American fur trappers.  Other loot included animal skins, nuts and other foods that had been stored for the winter.  The

---

[60] Brown, Statement of Recollections, 12.
[61] Brown, Statement of Recollections, 13.
[62] Brown, Statement of Recollections, 13.
[63] Brown, Statement of Recollections, 14.

AR0003003

Mexican soldiers and their allies took everything of value, but it seems clear that the Indian men were the most valuable prize of the expedition.[64]

The Vallejos were not unique. In Mexican California strong men used whatever means were necessary to obtain native labor. John Sutter established a land grant rancho in the Sacramento Valley in 1839 using the same methods as the Vallejos.[65] All rancheros relied on Indian labor. For men like the Vallejos and Sutter who had military forces at their disposal the ability to force Indians into servitude had economic advantages. Sutter sometimes sold or leased Indian labor to his neighbors.[66]

Vallejo's alliance with Solano worried other free Indians in the North Bay region as far away as the Clear Lake country. A Patwin leader named Zampay a Yolotoy Patwin, (Ululato on Ulatis Creek) was determined to destroy Solano and perhaps replace him as the most important Indian leader in the region. By 1837 he had already killed seven Indian leaders who were friendly to Vallejo and Solano. General Vallejo described Zampay as "a terrible man" when he ordered his brother to attack the Yollotoy village. "If you succeed in capturing Zampay's people," General Vallejo commanded, "you will bring them here."[67] Deposing Zampay would make friends as well as enemies. According to Salvador Zampay was a ruthless leader who was feared and hated by friend and foe alike.[68] Solano came up with a scheme defeat Zampay. He sent Indian spies to Zampay with false information that

---

[64] Brown, Statement of Recollections, 13.
[65] Hurtado, "Sutter and the Indian Business," 51-75.
[66] Hurtado, "Sutter and the Indian Business," 64-65.
[67] Vallejo to Captain Salvador Vallejo, June 25, 1837, Documentos.
[68] Salvador Vallejo, Notas historicas sobre California, 87.

AR0003004

enabled Solano and Salvador Vallejo to capture the Patwin leader. Captain Vallejo wanted to execute Zampay on the spot, but Solano insisted that Zampay should be sent to Sonoma with the other prisoners. Following Solano's advice, Mariano pardoned Zampay on the condition that he lived a peaceful agricultural life. General Vallejo ordered Solano to return the children that Zampay had kidnapped to their families, a task that emphasized Solano's power and that put grateful parents in his debt.[69] Zampay accepted the conditions, became prosperous, and left a sizeable estate to his children who eventually moved to Clear Lake where they were still living in the 1870s. When Vallejo asked Solano why he did not want to kill Zampay he replied that he wanted the pleasure of reminding Zampay every day that Solano had been his savior.[70]

Mariano Vallejo used violence to round up uncooperative Indians and set them to labor on the mission and ranchos in the territory that he controlled, but he reserved to himself the power to abduct Indians. Interlopers like Sutter interfered with his control of Indian labor and unsettled the balance of power, fear, and violence that enabled Mexican rancheros to safely (and profitably) live in the North Bay region. Vallejo was willing to punish anyone who poached on the Indian country that he commanded, even if that someone was Francisco Solano.

In September of 1838 several men from south of Carquinez Strait devised a plan to get Solano's aid in a kidnapping scheme. Saying that they wanted to discuss the sale of some wheat they called Solano and some other Suisun and unnamed

---

[69] Salvador Vallejo, Notas historicas sobre California, 95
[70] Mariano Vallejo, "Recuerdos," vol. 3, ch. 47; Salvador Vallejo, Notas historicas sobre California, 95.

AR0003005

Cainamero Pomo leaders to a meeting at Rancho Suscol where they had secreted some Pisco brandy, cheap liquor imported from Peru. The meeting turned into a drinking bout and the inebriated Solano agreed to allow his hosts to steal Indian children in the North Bay region. Whether the Cainameros were in on this deal is unclear. In the next two weeks thirty children were taken from their homes and spirited to ranches across the Bay. When Mariano learned of Solano's part in these kidnappings he imprisoned Solano and demanded an explanation. Solano admitted his role and helped to restore the stolen children to their parents. Vallejo then released Solano without further punishment and restored his authority over the free Indians. Vallejo's failure to punish Solano enraged Cainamero Pomo and other Indians whose children had been stolen. Nevertheless, Vallejo and Solano maintained their alliance and through it dominated the surrounding Indians.[71]

Salvador claimed that from the time of Solano's brief imprisonment until the Mexican American War "not a single Indian was sold." Salvador perhaps revealed too much about the Vallejos' methods when he added that "a great many were hired out to persons who gave security as to their ability of taking good care and educating the children thus entrusted to their keeping." Furthermore, in cases where "Indian babies were left without parents," a circumstance that the Vallejos' raids practically guaranteed, brother Mariano "was ready to watch over the welfare of the poor outcasts," and "had them educated at his own expense."[72] The education of Indian orphans included a great deal of practical experience in the

---

[71] Peterson, "The Career of Solano," 46-50; Lothrop, "The Indian Campaigns of General M.G. Vallejo," 181-182. Salvador Vallejo claimed that an immoral priest was behind this plot, Notas historicas sobre California, 97-99.
[72] Salvador Vallejo, Notas historicas sobre California, 98.

AR0003006

trades associated with farming, ranching, and domestic service. Salvador pointed out that the "rich men of the country" (like the Vallejos themselves) each had from twenty to sixty domestic servants.[73] William Heath Davis, a sea captain who knew the Vallejos, observed that at Rancho Petaluma alone Vallejo employed "six hundred vaqueros and laborers."[74] Most of these workers were Indians. Captain Davis noted that Vallejo with Solano's assistance "conquered and controlled the numerous Indians," and thus "had command of all the laborers he needed for the vast improvements he introduced in Sonoma and Petaluma."[75]

It did not take long for the Indians of Clear Lake to recognize that the little town of Sonoma and the expanding operations of the Vallejos were a threat to them. In October 1838 a band of Clear Lake Indians appeared in Sonoma. These men were not identified but were most likely Pomos. They were a scouting party for a larger fighting force that was hidden outside the town. They planned to attack in the night. A little boy who understood their language overheard the scouts discussing their plans and went to Mariano who called for Solano. Before the Clear Lake Indians could fall on Sonoma the Suisun leader and his men and attacked the hidden band killing nearly all of them. This fight no doubt added to the animosity and fear of Clear Lake Indians of all ethnicities.[76]

Solano's strategy for consolidating power included marrying women from native communities he wished to dominate. His most important wife, the only one

---

[73] Notas historicas sobre California, 99.
[74] Davis, *Seventy-five Years in California*, 104.
[75] Davis, *Seventy-five Years in California*, 103. Davis was under the erroneous impression that Solano and Vallejo had done this "without shedding blood."
[76] Peterson, "The Career of Solano," 51-52.

31

AR0003007

whose name we know, was a Patwin woman named Isadora Filomena.  The Vallejos referred to her as Princess Isadora.  She was the daughter of a chief of a village near Cache Creek (probably Churup).  Solano went there to negotiate with Cache Creek and Satiyomi (Wappo) people.  The date and specific purpose of the meeting is not known, but Solano decided to kidnap the young Isadora.  Isadora's father and the Satiyomis gave chase but they got away.  Solano took Isadora to Father Lorenzo Quias at the mission in Sonoma.   She learned the Christian faith but there is no record of a Catholic marriage in the mission records.  Father Quias "taught me how to be very charitable toward the poor, very gentle with my husband, she recalled in her old age, "and very compassionate to the [Indian] prisoners."  She added that she prevented Solano from killing captives.  "Leave them with Vallejo," she told him.  "He will make them work the land."[77]

The Vallejos and Solano made many forays into Indian country, but it is uncertain when they first learned about Clear Lake.[78]  The Indians who lived around Sonoma no doubt told the Vallejos about Clear Lake.  Missionaries may have gone there as early as 1823, although this is in dispute (see above).  In 1840 or 1841 "an Indian chief named Minac" told Salvador Vallejo about Lup-Yomi, the Big Valley area on the northwestern end of Clear Lake.[79]  Lup-Yomi meant "town of stones" according to ethnographer George Gibbs who visited Clear Lake in 1851.[80]  "Lup-Yomi," which is spelled in several ways in the historical record, is what Putah Creek Patwins in Coyote Valley called Habe-napo, a village of Pomo speakers near Adobe

[77] Beebe and Senkewicz, eds., *Testimonios*, 3-16, Isadora quoted at 10-11.
[78] Lothrop, "The Indian Campaigns of General M.G. Vallejo," 161-205.
[79] Hoffman, *Reports of Land Cases*, 35-36.
[80] Gibbs, "Journal of the Expedition of Colonel Redick M'Kee," 110.

AR0003008

Creek in Big Valley.[81]  The ethnicity of Minac is unknown, but it stands to reason that a Patwin, perhaps one of the Solano's allies, would have led the Vallejos to Clear Lake.

Juan Bojorges recalled that in May 1842 about eighty "citizens" from Sonoma under the command of Salvador set out for Clear Lake "for the purpose of bringing back the . . . Lake Indians to work for him and for the citizens who accompanied him."[82]  An Indian from Sonoma (perhaps Minac) guided them.  Once at the lake Vallejo told the first Indians he met through an interpreter (presumably the Indian guide) that he meant no harm.  Vallejo gave the Indians some beads and they reciprocated with beaver skins.

Bojorges did not identify the location of this first village but says that from there they marched northward along the shore of the lake.  A chief from the first village accompanied them as an interpreter but he could not communicate with the Indians at the next village they encountered because it was on an island and the distance was too far for voices to carry.  Vallejo proceeded to the next village, also on an island, where the interpreter did not speak the language of the inhabitants.  Consequently Vallejo returned to one of the island villages previously visited.  There he explained through an interpreter that he wanted to build a ranch on the mainland to which, according to Bojorges, the leader assented.  However, when Vallejo wanted some of the Indians go back to Sonoma with him they refused.  José Ramon Carrillo, a brother-in-law of the Vallejos, suggested that they shut the Indians up in their round house.  About half of the Indians had entered when Carrillo lanced

---

[81] "Journal of the Expedition of Colonel Redick M'Kee," 110; Johnson, "Patwin," 350.
[82] Bojorges, "Statement," 67.

33

AR0003009

the chief in the stomach. Indians began to flee.  Some who were attempting to swim away from the island were shot in the water.  Indian auxiliaries from Sonoma blocked the round house exit and set it afire.  When the interpreter told them that they would be protected if they came out the trapped Indians replied that they would rather die than be taken prisoner and perished in the flames.[83]

Fearing that other Clear Lake Indians would descend on Vallejo's small army he decided to retreat.  They crossed the mountains with Clear Lake Indians in pursuit.  Finally they got down into the Russian River Valley near a Central Pomo ranchería called "Sanel," which is near the present town of Hopland.[84]  At this point the weary men no longer wished to follow Vallejo, but he induced them to continue with him by promising to give them Indian captives.  Thus inspired the men carried on and in four days found an unidentified ranchería that they sacked, taking about three hundred prisoners.  They marched the prisoners back to Sonoma without food.  After four days they arrived at the pueblo in a starving condition.  Vallejo promised to distribute the prisoners to his followers, but Bojorges was "ashamed to say he never kept his word, either as an official or in any particular instance."[85]  Salvador Vallejo presumably kept the prisoners for himself and other family members.

It is impossible to know with certainty exactly which villages on Clear Lake that Bojorges and Vallejo visited.  Because of the linguistic transition it is possible that the first village was in Wappo territory.  That would explain why the chief and

---

[83] Bojorges, "Statement," 67-68.
[84] McLendon and Oswalt, "Pomo: Introduction," 278, 282.
[85] Bojorges, "Statement," 70.

AR0003010

interpreter from that place had trouble understanding the language of the Eastern Pomo speakers farther to the north.  Salvador Vallejo's interest in establishing a ranch on Clear Lake, as indeed he did, suggests that his expedition had proceeded as far as Big Valley at the place he later called Rancho Lup-Yomi and where he may have attacked either the Habenapo or Kulanapo communities.  Whatever the case, it seems clear that the Indians that Vallejo fought were wary of his intentions, an attitude that was probably based on previous experience with Mexican and Spanish intruders.

Bojorges recalled that 1842 was Salvador Vallejo's first visit to Clear Lake, but other sources have him there as early 1836.[86]  Despite the violence of Vallejo's first encounter with the Indians at Clear Lake (or perhaps because of it) the Habenapo and Kulanapo Indians at Big Valley came to terms and worked for him. Sometime in the early 1840s Vallejo stocked Big Valley with cattle, employed local Indians as vaqueros, and put a major domo in charge of them.  One of the major domos known only as Alvarado (possibly Miguel Alvarado, a soldier at Sonoma) had some livestock of his own that he grazed in what became known as Scotts Valley, home of Northern and Eastern Pomo speakers known as the Molkai and Yimabak. For a time Alvarado claimed one league that included Scotts Valley, but according to one source he sold his claim to Vallejo.  As late as 1846 cattle that grazed in Scotts Valley were recognized as Alvarado's, no doubt because of their distinctive brands.[87] Jacob Leese, a brother-in-law of the Vallejos, grazed stock in Coyote and Loconoma

---

[86] Palmer, *History of Lake and Napa Counties*, (Lake) 48.
[87] Palmer, *History of Napa and Lake Counties*, (Lake) 66; Bancroft, *History of California*, 2:694.

AR0003011

valleys some twenty-five miles southeast of Big Valley in the vicinity of present day Middletown.[88]

Born in about 1830, Augustine (whose Indian name was Shuk), a Kulanapo Pomo was a child when Salvador Vallejo first came to Clear Lake. As a teenager he became one of Vallejo's vaqueros. Augustine dictated his recollections to Lyman Palmer, Lake County's first historian, in 1880. His account of events is a key to understanding the history of the SVBI and events in the crucial period of U.S. military government (1846-1850), discussed below. Eventually he became chief of the "Hoo-la-nap-o" and through his progeny was a founder of what is now known as the SVBI. Augustine is also an important source of information about rancherías located around Clear Lake when he was young. His village, "Hoo-la-nap-o," meaning "a lily village," was just south of Lakeport. Their neighbors the "Ha-be-nap-o," the "city of rocks" was located at the mouth of Kelsey Creek. The "Boil-ka-ya," a "city built in the west," was located in Scotts Valley. Augustine gave names and locations for fifteen other villages on Clear Lake or nearby.[89]

Over a period of a few years Salvador Vallejo sent several majordomos who oversaw the construction of a log house and a corral near the present town of Kelseyville. Indians did all of this work and tended Vallejo's cattle as well. After a few years Big Valley, Scotts Valley, and some nearby smaller valleys to the southeast were full of livestock.[90] In 1844 Salvador and his brother Juan Antonio formally

---

[88] Palmer, *History of Napa and Lake Counties*, (Lake) 66.
[89] Palmer, *History of Lake and Napa Counties*, (Lake) 37.
[90] Palmer, *History of Lake and Napa Counties*, (Lake) 49.

AR0003012

applied for a sixteen league grant to the lands around Clear Lake that he called Rancho Lup-Yomi.[91]

The Clear Lake episode beginning with a fight and resulting in eventual accommodation of Clear Lake Indians reveal the methods and objectives of the Vallejos: the use of force to acquire land and Indian labor for their huge livestock ranchos. The Vallejos' use of Clear Lake Indians was well known by their contemporaries. Captain Davis noted that Salvador had ranchos in Napa Valley and at Clear Lake. Davis further explained that "to the north of the bay of San Francisco, wild Indians from the Clear Lake country assisted in farm work, such as making soap, *matanza* work [slaughtering] and plowing lands for wheat, barley, beans, corn, and small vegetables, onions, peas, cabbages, *calabazas, lantejas* and melons."[92] Working for the Vallejos was a common fate for the ancestors of today's SVBI. Tom Smith, who is included in the SVBI genealogy, recalled that his maternal aunt Saturnina worked for Mariano Vallejo.[93] The recollections of Maria Copa, a Coast Miwok who descended from mission Indians from old San Francisco, San Rafael, and San Francisco Solano, while not related to the SVBI, provided a rare glimpse into life among the Vallejos from an Indian point of view. Her paternal grandfather was a Mexican soldier named Copa; her paternal grandmother "was a Solano Indian," which probably meant that she was raised in the Mission San Francisco Solano or possibly that she was associated with chief Solano. "Vallejo was mean to his men and abused them," Maria Copa said. Her grandfather ran away with some Indian

---

[91] Hoffman, *Reports of Land Cases*, Appendix, "Table of Land Claims,"
[92] Davis, *Seventy-Five Years in California*, 23, quote at 25.
[93] Kelly, *Interviews with Tom Smith and Maria Copa*, 24.

AR0003013

soldiers who killed and ate a cow. Soldiers surrounded the runaways in the night. In the morning one of Vallejo's men called out in Spanish, "Do you surrender or do you die?" Copa replied, "I'd better die. I don't want to suffer any more. I shall die with my people." He was killed in the ensuing fight and his body was burned on the spot along with his dead compatriots.[94]

Under the Vallejo regime the punishment for assisting a fugitive was severe. Maria Copa's maternal aunt worked for Mariano Vallejo's wife. When she was an old woman she helped her husband escape from confinement by smuggling a file to him in a bowl of acorn meal mush. After he was captured he was forced to reveal how he had escaped. "Then they took the poor old woman and tied her to a cannon wheel." They whipped her and shot her husband.[95]

Maria Copa's family stories reveal the atmosphere of fear that Indians lived in, even when employed in the Vallejo household. She also revealed some of the ethnic complexity of Indian society in the North Bay region. She identified herself as a Coast Miwok, spoke the language, and knew the traditional ceremonies. Yet she descended from a Mexican soldier who so completely identified with Indians that he chose to die with them rather than surrender. Copa's grandfather was probably part Indian himself. Her mission Indian forebears may have been of mixed backgrounds that included various ethnic groups from around the Bay. Whatever her specific genetic and cultural makeup may have been, Maria Copa made it clear that Indians who tried to escape from the Vallejos' grasp might pay with their lives. The lesson from these stories was clear. Indians who worked at any of the Vallejos'

---

[94] Kelly, *Interviews with Tom Smith and Maria Copa*, 75.
[95] Kelly, *Interviews with Tom Smith and Maria Copa*, 75.

AR0003014

holdings in Sonoma, Rancho Petaluma, Rancho Suscol, or Rancho Suisun had better
stay put until further notice.  To do otherwise would put the lives of the fugitive and
his family in jeopardy.

The Vallejo family expanded their private empire, but Indians who were
employed on their vast estates suffered dire consequences.  In 1837 a small pox
epidemic swept most of them away.  The Vallejos were the indirect cause of this
disaster.  An officer under the command of Salvador Vallejo had contracted the
disease while on a mission to Fort Ross.  When he returned to the Sonoma region he
spread the illness among Indians.  Salvador claimed that "upwards of sixty thousand
Indians died," doubtless an exaggeration yet it emphasized the deadly effects of
small pox among northern California Indians.[96]

The ravages of small pox devastated the Patwin communities in Solano
County, including the Soscol ranchería.[97]  By then Vallejo was running the land that
became known as Rancho Suscol as Rancho Nacional, a pasturage for government
livestock. The decimation of the Patwin community made the animals a tempting
target for Muquelumne Miwok livestock raiders from the San Joaquin Valley.
Without a substantial Indian population on Vallejo's eastern flank his herds were
left exposed to depredations from that direction.  For that reason (and to check the
ambition of his uncle Mariano) Governor Juan B. Alvarado gave John Sutter
permission to settle in the interior in 1839.  For the next seven years Vallejo and
Sutter would dispute who had authority over Indians in the Sacramento and San
Joaquin valleys.

---

[96] Salvador Vallejo, Notas historicas sobre California, 45.
[97] Gardner, "Suscol in Napa County," 2.

39

AR0003015

As soon as he arrived in the Sacramento Valley Sutter made an alliance with the Miwok chief Narciso, formerly a Mission San José neophyte. Narciso had been loyal to Mariano Vallejo, but now moved his people to Sutter's settlement near the mouth of the American River. [98] In April 1840 Narciso and some of his followers went to Rancho Suscol, probably with the intent of stealing livestock. Mariano, Salvador, and Solano led a force against the intruders and captured Narciso with twenty-one others.[99] Sutter probably had nothing to do with Narciso's foray but it must have been troubling for the Vallejos to see a former ally turn against them.

Perhaps Narciso's perfidy caused Salvador to lead sixty soldiers to the San Joaquin Valley in June of 1840. Staying well south of Sutter's establishment Salvador's regiment ranged over Miwok and Yokuts territory for several weeks and returned to Sonoma with eighty prisoners. These captives had not come without cost. Indians had wounded Salvador and killed five soldiers. Salvador wanted to execute the captives, perhaps in revenge for his wounds and the other casualties. When he was an old man Mariano claimed that he opposed Salvador's plan. Instead he sent the prisoners to Mission San Francisco de Asís but surreptitiously had his sergeant release them along the way except for six hostages.[100] Depending on which way the coffle went from Sonoma they would have passed through Rancho Petaluma, Rancho Suscol and other ranchos where Indian labor was in demand. In other words, Vallejo probably "released" the prisoners to a life of labor.

---

[98] Hurtado, *John Sutter*, 55-58, 72.
[99] Vallejo, "Recuerdos," vol. 4, ch. 55.
[100] Vallejo, "Recuerdos," vol. 4, ch. 57.

AR0003016

The events of the spring and summer may have been a response to Sutter's presence in the Sacramento Valley. Salvador's campaign may have been an attempt to undercut Sutter's authority among the Indians. Or, it may have been a routine Indian enslavement campaign. Whatever the case may have been, Sutter's presence complicated the Vallejos' ability to manage Indian affairs as they saw fit.

In October 1840 José de Jesús Vallejo, a brother of Mariano and Salvador who was comisionado of the Mission San José, issued passports to several neophytes to trade in Sutter's territory. The Indians duly presented their passports to Sutter while assuring him of their peaceful intentions. However, they attacked a nearby ranchería that was unprotected because the able-bodied men were working at Sutter's place. The San José men killed the elderly and infants and kidnapped the women and older children to sell to rancheros on the coast. Upon learning of this atrocity Sutter led a force of angry Indian relatives who caught up with the kidnappers, killed some in a fight, and executed others. Sutter then wrote to José de Jesús informing him that he would no longer tolerate mission Indians in his territory.[101]

Patwin territory was depopulated but Solano lived on. His association with the Vallejos had made him a wealthy man. He boasted that he owned many cultivated fields, two thousand cattle, and dozens of Satiyomi girls, captives no doubt.[102] Solano's benefactor, General Vallejo, did not attempt to liberate these captives. Indeed Vallejo's Indian campaigns gave Solano new opportunities to add to his personal wealth by acquiring more booty and Indian prisoners. In 1837

---

[101] Hurtado, *John Sutter*, 74-75.
[102] Peterson, "The Career of Solano," 49.

AR0003017

Vallejo arranged for Solano to join California's landed elite when he applied for a four league grant of land appropriately called Suisun, an estate that formed part of Rancho Soscol's northwestern boundary. The governor confirmed the Suisun grant in January 1842. Five months later General Vallejo purchased the grant from Solano, although it is not clear if any money actually changed hands.[103]

The amount of land that the Vallejos controlled and claimed to own is almost unimaginable. Between 1835 and 1846 when the United States conquered California Mariano and Salvador Vallejo established claims to several ranchos located between San Pablo Bay and Clear Lake. Not all of them were confirmed under U.S. law but that did not stop them from using the land as their own. Much of this land was carved out of the grazing lands associated with the Mission San Francisco Solano. The previously mentioned 66,000-acre Rancho Petaluma was the centerpiece of the Mariano's landed estates. He also claimed Rancho Soscol, formerly mission rangeland about the same size as Petaluma that included the present cities of Vallejo and Benicia in Solano County. To the north east of Rancho Suscol Vallejo acquired by purchase Rancho Suisun from Francisco Solano (more than 17,000 acres). He also claimed Rancho Yulupa, three square leagues (approximately 13,000 acres) and Rancho Agua Caliente (3,200 acres) in Sonoma County. In all, Mariano Vallejo personally claimed and controlled approximately 100,000 acres during the Mexican period. His brother Salvador claimed Rancho Lup-Yomi (60,000 acres) at Clear Lake, Rancho Yajome (6,500 acres) in Sonoma

[103] *Confirmation by the Land Commissioners of the Claim of A. A. Ritchie to the Rancho of Suisun*, 3-4; Milliken, "Indian People of the Near North Bay prior to 1840," unpaginated, unpublished report in possession of author.

AR0003018

County, and 3,100 acres that were parts of grants in Napa County. The Vallejo's brother-in-law, Jacob P. Leese, was granted Rancho Huichica (18,700 acres) in Sonoma County. Another brother-in-law, Victor Prudon claimed the 35,000 acre Bodega grant on the coast in Sonoma County. All told the Vallejos controlled land from the Pacific Ocean to Suisun Bay and north to Clear Lake totaling more than 220,000 acres.[104] By using Mexican law to confiscate Indian land and compelling Indians to work for them the Vallejos established for themselves a lordly domain that they ruled by personal fiat. This was the state of Indian affairs that confronted U.S. officials when they assumed control of California in 1846.

It was one thing to own hundreds of thousands of acres but it was another to derive wealth from the land. Cattle ranching was the principal business of Mexican California and the Vallejo brothers devoted themselves to it. Captain Davis estimated that Mariano owned 50,000 cattle on his ranches, with some 14,000 on Rancho Soscol alone.[105] The value of these animals was chiefly in their hides and tallow which were sold around the world.

California cattle ranching was labor intensive, especially at roundup times. California was open range; there were no fences to divide one rancho from another. Long-horned and dangerous, the cattle were as wild as deer. Davis recalled that Mariano's cattle "used to stray a long distance along the margin of Suisun Bay."[106] From time to time these strays had to be driven back to their home range. Cattle had to be moved from one open pasture to another to avoid over grazing. Free-

---

[104] Figures compiled from Hoffman, *Reports of Land Cases*, Appendix, "Table of Land Claims," 1-109; and Beck and Haase, *Historical Atlas of California*, Map 29.
[105] Davis, *Seventy-Five Years in California*, 105.
[106] Davis, *Seventy-Five Years in California*, 105.

AR0003019

roaming cattle mixed with the herds on neighboring ranchos so rancheros made sure that their distinctive brands marked the hides of their animals. The daily work of a vaquero routine included such tasks as rounding up strays, driving herds to new pastures, and protecting herds from animal predators and Indian raiders.[107]

Vallejo held two large-scale roundups per year. In March vaqueros gathered about 10,000 calves to be branded, castrated, and ear-marked (a secondary form of identification made by a distinctive cut or notch in each calf's ear). The March roundup occurred on each of his ranchos. The second annual roundup was the *matanza* or slaughter for hides and tallow. Mariano slaughtered 8,000 steers annually. His men drove mature steers to slaughter at Rancho Petaluma, with the exception of the animals at Rancho Soscol that were slaughtered there.[108]

The sheer labor involved in these roundups is difficult to imagine for people without a ranching background. Driving thousands of cattle to some central location where the herd could be controlled was the work of scores, perhaps one hundred vaqueros, but the men on horseback were not the only workers on the scene. There would have been many more Indians to do the less appealing and more dangerous work on the ground. Imagine the herd of milling wild cattle being held in place by the vaqueros that surrounded them. As dust from thousands of hooves rose from the plain the major domo would point out an animal. One vaquero would separate the steer from the herd while another vaquero advanced with a loop slowly twirling above his head until he deftly roped the horns of his intended victim. A third vaquero came in from behind and roped the hind legs as the steer was pulled

---

[107] Jordan, *North American Cattle-Ranching Frontiers*, 159-169
[108] Davis, *Seventy-Five Years in California*, 105.

AR0003020

off to the side.  The ropers stretched the luckless animal on the ground so an Indian could run in and cut its throat with a knife.  The same procedure was used when branding, castrating, and earmarking calves.  At the *matanza* Indian workers descended on the lifeless carcass with butcher knives to strip off the hide.  The carcass was further butchered so that fatty parts could be thrown into a large kettle over a fire to render the tallow.  The hides were set in the sun to dry.  Eventually the dried skins would be stacked in store houses until they were sold to merchants like Captain Davis.  The tallow was stored in large rawhide bags so that it could be shipped.  Indians did all of this labor, including much of the work on horseback.[109]

It is worth emphasizing that Captain Davis wrote that "Indians from the Clear Lake country" assisted on all of the ranchos "north of the bay of San Francisco." These Indians were distinctive enough to Davis that he described "Clear Lake Indians at their *temescales*, or steaming places."[110]  He described how they built the structure and how they used it.  Davis may have been especially observant of ethnic practices because he came from a mixed racial background.  His maternal grandmother was a native Hawaiian and Davis was known as "Kanaka Bill." Whatever the reason for his interest in such matters, Davis saw a lot of Clear Lake Indians on Vallejo's property.  Given the amount of work associated with the cattle industry in the 1840s it is probable that Mariano Vallejo employed Clear Lake Indians on Rancho Soscol as well as his other properties.

---

[109] Robinson, *Life in California*, 85-86; Dakin, *The Lives of William Hartnell*, 156-157; Bancroft, *California Pastoral*, 344-345.
[110] Davis, *Seventy-Five Years in California*, 25.

45

The Vallejos prospered but the Indians who built their pastoral empire did not. Solano's people were devastated by disease. He continued to lead an Indian force on behalf of the Vallejos but it consisted of men hand-picked by Mariano. In the absence of substantial numbers of Suisun men Solano's regiment must have been a mixed company of various Indian ethnicities who were willing to follow him.[111]

While Solano still had significant prestige and power in the North Bay region what we know of his reproductive history tells a different story. He and Isadora Filomena had eight children, but only one survived to adulthood.[112] While perhaps an extreme case this sad story mirrors the general reproductive history of California Indians during the Mexican era. Epidemic diseases like smallpox and measles had severely weakened the population, but syphilis was especially devastating. Often deadly in its own right syphilis increased the rate of stillbirths and sterility. Thus it was nearly impossible to replace losses from warfare and other diseases. Observers thought that syphilis was present in all of the Indian communities that were in association with whites. The Napa Valley was singled out as an example.[113] Contact with Europeans had set the California Indian population on a downward path. They would not recover for generations.[114]

Solano had many wives from his wars against and alliances with the Indians of the North Bay region. His extended household probably included captive Pomo

---

[111] Vallejo, "Recuerdos," vol. 3, ch. 47.
[112] Beebe and Senkewicz, eds., *Tetimonios*, 11.
[113] Cook, "The Physical and Demographic Reaction of the Nonmission Indians," 209 and passim.
[114] Cook, *The Population of the California Indians*, 44-77.

AR0003022

women.  Maria Copa's mother, a Coast Miwok, said Solano had forty wives.  She saw them all gather one day when Solano took them to visit a nearby rancho.[115]  The presence of his wives was a display of Solano's power, wealth, and prestige.  These women were among the benefits that Solano derived from his connection with the Vallejos.  The fate of the children from these unions is unknown.

---

[115] Kelly, *Interviews with Tom Smith and Maria Copa*, 318.

AR0003023

**U.S. Military Government of California Indian Affairs**

Alta California was an especially unstable province of the Mexican Republic. In the 1830s and 40s Californios had rebelled against three Mexican governors and installed members of the ranchero class in their place. Unable to force Californios to bend a knee, the central government simply recognized the new man as the duly constituted governor until a new and presumably more popular governor could be sent from Mexico. Most recently Californios had thrown out Governor Manuel Micheltorena and replaced him with Pío Pico. Such political instability gave local strong men like Mariano Vallejo and John Sutter more latitude as they threw their support to one side or another, or remained aloof as Vallejo sometimes did. Local political upheavals set the table for international intrigue. Everyone wondered if Great Britain, France, or the United States would pluck California from the grasp of weak, poorly governed, and bankrupt Mexico.[116]

The spring of 1846 was especially rife with revolutionary possibilities. Unhappy with Governor Pico (who was from southern California) some northern Californians planned a revolt under General José Castro, a Californio who was a good friend of General Vallejo's. Captain John C. Frémont, commander of a U.S. exploring expedition with dubious authority to be in California, camped out near the Sutter Buttes in the Sacramento Valley. Frémont's presence inspired Americans who had settled around Sutter's Fort to think seriously about rebelling against the Mexican government that they feared would expel them from California. They knew nothing about Castro's plans. Sutter disliked Frémont and reported his movements to

---

[116] Harlow, *California Conquered*, 22-30.

AR0003024

Castro. Frémont distrusted Sutter because he flew the Mexican flag over his fort and wore a Mexican colonel's uniform. Vallejo despised Sutter because the newcomer challenged his authority and had purchased the Russian improvements at Ross and Bodega in 1841, a prize that Vallejo had hoped would fall to him. In that year Sutter also had the effrontery to threaten a rebellion of his own under the French flag. Sutter's threat proved to be empty but it convinced General Vallejo that the upstart had to go. Castro agreed and in 1846 paid an Indian to assassinate Sutter, but Sutter hired another Indian to kill his erstwhile assailant instead. Sutter had the dead man's head mounted above his fort's gate. Such were the fortunes of war and rumors of war in frontier California.[117]

Unbeknownst to anyone in California in June of 1846 the United States and Mexico were already at war along the Texas border. The slowness of communication would keep this news from Californians for about a month. In early June General Castro purchased from General Vallejo two hundred horses to be used in the revolt against governor Pico. The horses came from Rancho Nacional at Suscol.[118] Two lieutenants with a small escort drove the herd towards Mission Santa Clara where General Castro waited. By modern standards their route seems circuitous. They headed due east, crossed the Sacramento River near Knight's Landing. This roundabout way enabled the drovers to circle the San Francisco Bay and lands flooded by snow melt and spring freshets. Then they turned south and crossed the American River near Sutter's Fort, which caught the attention of Sutter

---

[117] Hurtado, *John Sutter*, 175-198.
[118] Roseunus, *General M. G. Vallejo*, 102.

AR0003025

and the Americans.  Arce and his compatriots made camp for the night on the Cosumnes River a few miles south of the fort.[119]

Some of the Americans at Sutter's fort believed that the horses would be used in a military effort to drive them out of California and decided to steal the herd.  On the morning of June 9 they did just that setting in motion what became known as the Bear Flag Rebellion.  Now well supplied with horses, the Americans rode to Sonoma, captured it without a fight, and captured Mariano and Salvador Vallejo as well as their brother-in-law Victor Prudon.  Then they took their prisoners to Frémont who agreed to lead the Bear Flag rebels and ordered the Vallejo men imprisoned in Sutter's Fort.  There they remained under the charge of Frémont until August when he was finally released.[120]  While he was at it Frémont took command of Sutter's Fort and took charge of Sutter's private Indian army.[121]

The opening salvo of the Mexican American War in California had the effect of taking out of action the two most important men in Indian affairs in northern California, Vallejo and Sutter.  Their involuntary retirement from the field did not last long.  In early July American Naval forces arrived with the news that the United States and Mexico were at war and that henceforth California would be part of the United States.  Frémont and the Bear Flag rebels became the California Battalion and joined the U.S. forces.  Sutter became useful by recruiting a company of mostly Miwok Indians who fought with the California Battalion.  After his release from what Vallejo called "Sutter's death-dealing fort," the former general was temporarily blind

---

[119] Harlow, *California Conquered*, 97.
[120] Harlow, *California Conquered*, 99-101.
[121] Hurtado, *John Sutter*, 193-187.

AR0003026

and sick from malaria that was endemic in the Sacramento Valley.[122]  Once restored to health Vallejo would once again become a kingpin in Indian affairs under U.S. aegis.  Oddly, he would share this responsibility with his old enemy Sutter.

At this point in time Solano made an awkward and unexplained exit.  After the Bear Flag rebels captured the Vallejos Solano disappeared from the historical record except for a few mentions that seem apocryphal.  There are stories that he roamed far to the north – perhaps as far as Alaska! – and then returned in 1858 asking Mariano for his old position.  He is said to have died shortly thereafter.  Other sources say that he died in 1849 or 1850.  Others claim Solano is buried in an unmarked grave in Suisun territory.  Still another story has him interred on an island in the Petaluma River.  Perhaps the most interesting story is attributed to an unnamed Pomo Indian.  He said that Pomos dug up Solano within twenty-four hours of his burial, dismembered him, and scattered the remains.  The Pomos' motives were said to be hatred and revenge for the suffering that Solano had caused them.  All of these stories are conjectural, but true or not, the Pomo story is a testament to a memory of Solano's role in their subjugation and dispossession.[123]

Whatever Solano's ultimate fate he left a living monument behind when he left Sonoma – his wife, Isadora Filomena.  "My name is Isadora," she said in 1874.  "The Indians who knew me when I was the wife of Chief Solano called me 'Princess' and they still treat me like a princess."  Not only Indians but "Captain Salvador

---

[122] Vallejo quoted in Hurtado, *John Sutter*, 196-197.
[123] Platon Vallejo, *Memoirs of the Vallejos*, 71-72; Peterson, "The Career of Solano," 73-85.  See 83-84, n. 5 for Pomo story.

51

Vallejo, and many others . . . still call me Princess."[124]  Mariano provided a house for
Isadora as a token of respect not only for her but also for the long departed Solano.
To him she was a reminder of better days; not so for the Pomos who dreamed of
scattering Solano's mutilated remains for the buzzards to eat.

While Vallejo recuperated in the fall of 1846 U.S. forces were devoted to
pacifying Mexican California.  No forces were immediately available to hold Indian
livestock raiders in check.  Moreover, Indians who had been accustomed to working
on ranchos were out of work because of the war.  Complaints about livestock raiding
came in from all over California, including the North Bay region.[125]

Military authorities had established a small garrison in Vallejo's old presidio
quarters at Sonoma in part to control the Indians and in part to keep an eye on the
Mexican population.  In early 1847 Lieutenant G. W. Harrison reported that Indians
were about to attack Sonoma and asked for reinforcements.  By March, however,
Harrison had learned the truth.  In January a party of Californians (probably
meaning Mexican Californians) went to the "Ranchería Tulea, situated between the
Russian River and the Laguna grand or large lake" [Clear Lake].  This was probably a
Pomo village although it does not appear in anthropological sources.  The
Californians surrounded the village at night and at dawn took everyone prisoner.
"All of them were compeled [sic] to accompany their captors to their respective
ranches in order to work," according to E. J. Bale, the Napa alcalde who took a
statement from the Indians.  After a short time all of the captives escaped and
returned to their home.  Another party of Californians assailed their village claiming

---

[124] Isadora quoted in Beebe and Senkewicz, eds., *Testimonios*, 9.
[125] Hurtado, "Controlling California's Indian Labor Force," 222.

AR0003028

that the alcalde at Sonoma had given them authority to capture them because they had fled from their employers. When the Pomos refused to return the Californians attacked, killing five and wounding many more. The Indians defended themselves, killed one of their assailants and forced the rest to retreat without their horses and saddles. Seven Indian survivors reported these events to a justice of the peace in Napa presenting the hat of the man they had killed as evidence of their veracity. They said that they were keeping the horses for the owners who could retrieve them at their village. "I examined the seven who came to inform me of the affair," wrote Alcalde Bale who saw that "all were wounded, some badly."[126]

The harrowing Indian testimony convinced Lieutenant Harrison that military reinforcements were needed at Sonoma, not only to control Indians, "but some of our own bad countrymen."[127] Harrison would not be the last U.S. officer to learn that lesson.

It was clear that something had to be done to address Indian affairs in California. To Brigadier General Stephen Watts Kearny, who was military governor in the spring of 1847, it seemed wise to rely on the opinions of men who were intimately familiar with the situation. In April he called Mariano Vallejo to the military government's capital at Monterey and appointed him U.S. subagent "for the Indians on the North side of the Bay of San Francisco, including those on Cash [sic] Creek & on the Lakes." Governor Kearny reminded Vallejo that the Indians had "lately assumed a threatening attitude, & given some alarm to the Inhabitants not

---

[126] Affidavit of E. J. Bale, March 4, 1847, enclosed with Harrison to DuPont, March 17, 1847, M210, reel 2.
[127] Harrison to DuPont, March 17, 1847, M210, reel 2.

AR0003029

only near Sonoma, but to those North & East of it."  Kearny hoped that by Vallejo's "good advice & prudent counsels & the well known influence you possess over the Indians, they may be induced by you to remain quiet & refrain from committing any acts of depredation or hostility upon the people or their Property!"  If Indians misbehaved, General Kearny wrote, "they will most assuredly be punished by an armed force sent among them."  Kearny asked Vallejo to keep him informed of any developments and promised to send presents to the Indians when he could get them.[128]  Kearny also appointed John Sutter sub agent for the Sacramento and San Joaquin valleys.[129]

Impressed with the danger from Indians that Vallejo and others had communicated to him, General Kearny provided a military escort and loaned Vallejo a carbine for the trip back to Sonoma.  Sub-agent Vallejo got to work immediately. He organized the residents in his neighborhood to go after hostile Indians although this would be difficult because many of them were without arms and saddles that had evidently been confiscated as part of the U.S. war effort.  The Indians understood this, Vallejo claimed, and "go about robbing in the town itself with the greatest scandal and impunity."  Some people were so desperate that they fought the Indians "with the *lazo* [lasso or lariat] against their arrows, and this is certainly no fair match."  The Sonoma alcalde had provided Vallejo with a list of men who were prepared to fight Indians.  Presumably some of them were the men who had attempted to enslave Pomos at Tulea just a few weeks previously.  "I desire General that so many clamours may cease, and that you with your accredited prudence &

---

[128] M182, Kearny to Vallejo, April 14, 1847.
[129] M182, Kearny to Sutter, April 7, 1847.

AR0003030

experience will bring about the confidence and union of all the inhabitants who dwell in this country," Vallejo wrote. "I am always disposed to assist the Government in every way that may be compatible with my honour & duty," he added, "and as far as my private circumstances & business will permit."[130]

The appointments of Sutter and Vallejo are important because they demonstrate that the U.S. military governors intended to rely on the advice of men who had been in charge of Indian affairs during the Mexican era. Indeed, the secretary of war in his instructions to General Kearny enjoined him to "conciliate the inhabitants, and render them friendly to the United States" so as not to inflame rebellion among the recently conquered population.[131] Vallejo and Sutter had been ruthless and violent whenever it suited their needs, which primarily revolved around their demand for Indian labor. Kearny and other military governors would continue to develop an Indian policy that was meant to satisfy the labor demands of California's rancheros. In the case of Vallejo's appointment, Kearny showed that he understood that for the purposes of Indian administration the territory between San Pablo Bay and Clear Lake was one unit. Vallejo, as mission administrator, military commandant, and private ranchero, was largely responsible for creating this geographic concept.

Insofar as Indians knew about the appointments of Vallejo and Sutter the governor's actions may well have convinced Indians that the new military government meant business and that it would be business as usual. The "bad men" that Mason and others told authorities about did not regard the appointments as a

[130] M210, Vallejo to Kearny, April 18, 1847, reel 2.
[131] William L. Marcy to Kearny, June 3, 1846, U.S. Cong. Serial Set, 507

AR0003031

serious brake on their activities. In early July 1847 Sutter reported that three residents of Sonoma had attacked an Indian ranchería in the Sacramento Valley, killed thirteen and enslaved thirty-seven others. Kearny's successor to the military governorship, Colonel Richard Barnes Mason, had the culprits arrested and sent them to Sonoma to stand trial. Vallejo, Sutter, and Lillburn W. Boggs (former governor of Missouri and now alcalde of Sonoma), were to act as judges. If a jury found the accused men guilty, Governor Mason wrote Sutter, he would have them executed. If the prisoners were worried about hanging they need not have been. The Sonoma jury did not find their neighbors guilty of kidnapping or killing Indians. Vallejo complained that Sutter had not filed a proper affidavit against the accused and had not even showed up for the trial (he was sick). Vallejo thought the root cause of Indian problems stemmed from their laziness and alcoholism.[132]  Thus Mariano Vallejo, the author of so many attacks on Indian communities, discounted the wanton assaults on Indian rancherías as a cause of Indian disaffection.

Governor Mason informed his superiors in Washington D.C. that Indians continually committed depredations on the herds of Californians. He needed a mounted force of 150 or 200 light cavalry to augment the platoons of soldiers he had deployed at Sonoma and Sutter's Fort. The mounted soldiers were required not only to control Indians, but because there were "bad men in California who were ever ready to charge such acts [depredations], and in this way much excitement is

---

[132] Hurtado, *John Sutter*, 209-211.

AR0003032

sometimes created."[133]  The recent trial in Sonoma proved that it was unlikely that such bad men could be easily controlled by judicial means.

If the military government could not punish men who enslaved Indians then it would attempt to pacify the frontier by controlling the Indian labor force. Between August 16 and November 29, 1847, Governor Mason and his Secretary of State, Lieutenant Henry W. Halleck promulgated a series of orders that reinforced Kearny's stringent policy towards Indian livestock raiding.  If caught in the act Indian livestock thieves could be shot on sight.  Indians could bring complaints against whites to local authorities for redress.  Secretary Halleck explained to Sutter and Vallejo that their duties included not only the "gentiles or wild Indians; but they will also embrace the Neophytes, or tame Indians of the missions and Ranchos."[134] Indian workers were subject to all regulations that Vallejo and Sutter deemed necessary.  Indian laborers were required to carry certificates of employment from their masters.  Any Indian who was found without this document was liable to arrest as a horse thief.[135]   Thus, under military administration of Indian affairs, U.S. authority established two classes of Indians in California: horse thieves and laborers.

The difficulty of managing the Indian labor force may have been a factor in Salvador Vallejo's decision to sell most of his cattle at Rancho Lup-Yomi in 1847.  In the fall of that year he sold about 800 head of cattle that remained in Big Valley to a partnership that included Benjamin and Andrew Kelsey, Charles Stone and Edward

---

[133] M210, Mason to R. Jones, July 19, 1847, reel 1.
[134] M182, Halleck to Sutter and Halleck to Vallejo, August 16, 1847.
[135] M182, "Circular to Indian Agents and Others," September 6, 1847.

AR0003033

Shirland. Vallejo permitted the partnership to graze their animals at Rancho Lup-Yomi, perhaps on the basis of a lease of some kind but that is unknown. Andrew Kelsey and Stone moved to Lup Yomi where they employed Augustin and other Indian vaqueros. Salvador probably gave the partnership permission to make use of the Indians who lived on his ranch, but again, this is not clear. With or without Vallejo's permission Stone and Kelsey forced the Indians to work under deplorable conditions. In addition to tending cattle the native workers built an adobe house for the two white men to live in. They paid the Indians nothing but a few trifles like handkerchiefs and fed them as little as possible. The Indians responded by surreptitiously eating cattle from the herds that they tended. The owners retaliated with brutal beatings.[136] This ugly situation continued through the last months of 1847 and into the next year.

Under the regulations of the military government sub-agent Vallejo should have taken matters in hand, demanded that Stone and Kelsey treat their workers fairly, and informed the military government. In fairness, Vallejo probably didn't know the details of life at Rancho Lup-Yomi, but even if he had reported the situation military governors had limited to ability to enforce their policies on Indians or non-Indians in 1847. As Governor Mason explained, he had only 750 troops under his command, and they had to patrol Alta *and* Baja California.[137] The situation became much worse in 1848 after gold was discovered in January at Coloma. That tumultuous event drew tens of thousands of gold seekers to California

---

[136] Palmer, *History of Napa and Lake Counties*, (Lake) 50.
[137] M210, Mason to R. Jones, July 19, 1847, reel 1.

AR0003034

and inspired many of Governor Mason's soldiers to abscond to the mines.[138]  The gold rush was directed at the Sierra Nevada foothills, but it affected Indians in the North Bay region nonetheless.

The gold rush accelerated the increase in property values that was bound to result after the United States took over California.  The Vallejos and all others who held Mexican land claims suddenly saw the value of their lands multiply enormously.  Speculation in land made muddy lots in the nascent towns of San Francisco and Sacramento worth more than an entire rancho had been in Mexican California.[139]  Vallejo with his huge holdings north of San Francisco Bay stood to become fabulously rich, if he played his cards right.  At the same time the value of cattle increased because of the need to feed an ever-increasing horde of miners.  For the first time in California meat became more important than hides and tallow as prices rose from four dollars per head to one hundred times that price when delivered in the mines.[140]  Indian labor also became more valuable as rancheros took their workers to the mining district and set them to washing gold.  The employment of large numbers of Indians in the mines made some small fortunes for rancheros in the first days of the gold rush.[141]

In May of 1848 -- just as the gold rush gathering momentum – Stone and Kelsey reported to Sonoma authorities that Clear Lake Indians were about to rebel.  By this time additional settlers had established homesteads on the Lake.  Walter Anderson, his wife and son Henry and a man called Beson lived in a house at the foot

[138] Hurtado, *John Sutter*, 216-231.
[139] Robbins, *Land in California*, 73-90.
[140] Jelinek, "Property of Every Kind," 233-234.
[141] Hurtado, *Indian Survival on the California Frontier*, 104.

59

of the lake, perhaps 12 or 15 miles southeast of Big Valley.  On May 20 Henry told Stone and Kelsey that "the Indians" had threatened to kill his father.  Kelsey went to the Anderson's house where he learned that the Indians had gathered on a nearby island (probably Indian Island).  Kelsey sent an Indian messenger to the island where he was told that as soon as more Indians arrived from other Clear Lake rancherías they would kill Anderson and all of the other whites around the lake, at least this was the story that Charles Stone carried to Sonoma alcalde Lillburn W. Boggs.[142]    Boggs took an affidavit from Stone and presented it to sub-agent Vallejo who in turn gave it to the Major James Hardie and his subordinate Captain J. E. Brackett at Sonoma.  Vallejo recommended an immediate attack on the Clear Lake Indians.[143]

Hardie was skeptical.  He thought that Vallejo and Boggs inflated the danger because the soldiers in Sonoma were scheduled to be redeployed to Baja California. Boggs was a merchant who did not want sixty of his customers to leave town. Hardie sent a small detachment under Brackett's command with sub-agent Vallejo to Clear Lake to meet with the Indians.  There Brackett learned that while Indians may have threatened Anderson, but Anderson had actually killed an Indian.  "I believe that secret efforts [were] made to get the Indians to work," Major Hardie reported.  The Indians were unhappy because settlers had occupied Indian lands without compensation.  Indians expected to receive at least some beef and trade goods in exchange for their land and labor, but the newcomers refused even this small compensation.  Hardie did not believe that the Indians would cause any

---

[142] Stone, Affidavit Sworn before Lillburn Boggs, May 22, 1848, M210, reel 3.
[143] Hardie to Mason, May 28, 1848, M210, reel 3.

AR0003036

trouble if they were fairly treated.  Yet there were two thousand or more Indians

around the lake and if mismanaged a war could break out.  Consequently he

recommended that a few troops be retained in Sonoma.[144]

Vallejo and Brackett called on the Clear Lake Indians to attend a council in

Sonoma on May 31.  Eleven "chiefs" from as many Clear Lake rancherías signed the

agreement on June 1, 1848:

Be it known that we the undersigned Chiefs of the Tribes and Rancherias in and
about the Big Lakes on the Sonoma Frontier of upper California do solemnly affirm
&& declare that we are friends with good hearts towards the whites our powerful
friends and neighbors, that we will make no aggression upon them nor their
property and if injured ourselves by anybody we will apply to the proper authorities
of the whites for protection and redress.[145]

Vallejo and Hardie signed for the United States.  Indian signatories were "Menác of

Atenok, Tháyte of Chiliyomi, Cuyáquin of Tuliyomi, Shonepóca of Limacoma, Hiláli of

Moslyomi, Namósik of [illegible], Tspal of Chitionacmyomi, Tum Tum of

Malqueyacomi, Culqui of Hochonpiyomi, Coliohem of Meynimocyomi, [and]

Hutznum of Lupuyomi" [punctuation added].  The Lupuyomi ranchería was no

doubt the village associated with Rancho Lup-Yomi.  Major Hardie praised Hutznum

for the impressive speech he gave to the assembled Indians.[146]

Hardie and Brackett were confident that the Indian signatories would keep

their word, but Brackett warned that the men who signed "were not engaged"

in the recent affray with Anderson.[147]  If difficulties arose Hardie reckoned that the

cause would probably stem from men who settled among the Indians and

---

[144] Hardie to Mason, June 1, 1848, M210, reel 3.
[145] Treaty enclosed with Hardie to Mason, June 1, 1848, M210, reel 3.
[146] Hardie to Mason, June 1, 1848, M210, reel 3.
[147] Brackett to Mason, June 1, 1848, M210, reel 3.

AR0003037

mistreated them. "The Indians have always some reason for their demands or complaints." In any case, Hardie thought that Sonomans and other frontiersmen were capable of defending themselves and predicted that if a real war broke out that miners would quickly go to the scene in order to protect their families and property.[148]

A company was retained in Sonoma until August 1848 when they were mustered out of service because the war with Mexico had ended. Regulars replaced them, but desertion to the mines reduced the unit's roster from sixty to twenty-three men.[149] While Sonoma residents clamored for protection few were willing to volunteer to assist the troops even when a war was seemingly imminent. Sonomans would not even lend saddles to the troops who rode to Clear Lake with Vallejo.[150]

Sonoma residents may not have been willing to aid the U.S. Army but they were ready to ride to Clear Lake to obtain Indian workers. Their nefarious activities, carried out under the pretext of a looming Indian attack, occurred sometime in the spring of 1848, probably after the treaty council ended.[151] The weakness of Brackett's company and the U.S. officers' insistence that local residents were capable of defending themselves probably emboldened the participants.

Events began to unfold when a friendly Indian arrived at Ben Kelsey's Rancho Buena Vista near Sonoma. He reported that Indians surrounded Stone and Kelsey in their adobe house and threatened to kill them if they did not return their

---

[148] Hardie to Mason, June 1, 1848, M210, reel 3.
[149] Bancroft, *History of California*, 5:515-516, n. 17, 667-668, n. 3.
[150] Hardie to Mason, June 1, 1848, M210, reel 3.
[151] The date of this episode is given only as spring 1848. It is not mentioned in the military records so it is possible that it happened after the Sonoma company was mustered out of service.

AR0003038

weapons. Stone and Kelsey had managed to confiscate their bows and arrows for safekeeping in their house, possibly while Vallejo, Brackett and his men were there to discourage Indian hostility in May. Kelsey and Sam (another Kelsey brother) assembled a party of Sonomans consisting of William Boggs, and a few others and rode to Rancho Lup-Yomi. They arrived at night and found that the house was barricaded and surrounded. They charged among the surprised Indians and scattered them. Ben Kelsey told a few Indians who were willing to talk with him that the soldiers were on their way and would be there soon. The bluff worked. In the morning the Kelseys called for the still unarmed Indians to assemble at the adobe. He demanded that they join in an assault on the Scotts Valley ranchería that he said was responsible for killing the Kelseys' cattle. One hundred and forty four Indian men were enrolled in a company to go to Scotts Valley and Kelsey returned their bows and arrows. The Indian force probably consisted mainly of the Kulanapo and Habenapo who worked at Rancho Lup-Yomi. The return of their weapons was probably the chief inducement that caused them to join in this expedition against the Scotts Valley people.[152]

The hastily assembled force proceeded on their mission but found that the Indians had fled Scotts Valley and were heading towards Blue Lakes canyon. A Scotts Valley Indian captive revealed his kinsmen's hiding place after enduring severe torture. The entire Scotts Valley band was captured and marched back to Rancho Lup-Yomi. While enroute some of the whites burned the Scotts Valley

---

[152] Palmer, *History of Napa and Lake Counties*, (Lake) 50-52.

AR0003039

ranchería. The captives, now homeless and destitute, had no choice but to work for Stone and Kelsey under whatever terms their masters prescribed.[153]

It was decided to take the captives to Sonoma where they would be put to work. One hundred and seventy-two Indians were driven to Sonoma where they built adobe houses in the growing town. Some non-Scotts Valley Indians, including Augustine, were also forced to accompany the captives and labor on the ranchos in Sonoma and probably beyond. Augustine was sent to Ben Kelsey's ranch near Sonoma.[154] After about a month Augustine fled back to Clear Lake where he by this time had a wife and infant child. To punish him Andrew Kelsey tied Augustine and six other Indians in standing position in the round house and starved them for a week. When released Augustine was allowed to remain at Clear Lake but Kelsey sent the six men who had been bound with him and many other Indians to Napa to build an adobe house for Salvador Vallejo. According to Augustine Kelsey "took Indians down to the lower valleys [presumably the Napa and Sonoma valleys] and sold them like cattle or other stock."[155]

The need for Indian labor increased as men went to the mines to make their fortunes, or so they hoped. Indian workers were especially valuable in the mining districts where gangs of poorly paid Indians panned gold for their employers. In the spring of 1849 Stone and Andrew Kelsey called in Indians from Sanel, Ukiah, Potter Valley and the "head of the lake," Pomos all. They selected "twenty-six young Indians, all stout and strong," including Augustine. After a season of mining on the

---

[153] Palmer, *History of Napa and Lake Counties*, (Lake) 53-54.
[154] Palmer, *History of Napa and Lake Counties*, (Lake) 54.
[155] Augustine quoted in Palmer, *History of Napa and Lake Counties*, (Lake) 60.

AR0003040

Feather River they went home to Clear Lake. Stone and Kelsey had a bag of gold "as large as a man's arm," but they gave each Indian only a pair of overalls, a hickory shirt, and a handkerchief for their labor.[156] Stone and Kelsey bought one thousand head of cattle from Sonoma Valley ranchers. Augustine and twelve other Indian vaqueros drove them up to Big Valley. It took six trips to get them all home.[157]

In the spring of 1849 Ben Kelsey also formed a mining partnership[158] with his brother Sam, Lilburn and William Boggs, Salvador Vallejo, and a few others. Ben went to Clear Lake and picked fifty Indians to accompany the party to the headwaters of the Sacramento River. They were not successful. Many of them, including the Clear Lake Indians, contracted malaria. Ben was so sick that he had to be taken back to his Sonoma ranch on a litter that was probably carried by Indians. He was recuperating there in early August. The Indians had no one to carry them home. All but three died. In the meantime Stone and Kelsey assured their Clear Lake kin that their relatives would return soon.[159]

On August 3 Nancy Kelsey, wife of the ailing Ben, rode from the Kelsey ranch towards Sonoma. A few of her Indian servants were on foot some distance behind her. On the trail she happened upon an Indian vaquero named Pipito who was urinating by the side of the trail. After mounting his horse Pipito took up his rawhide lariat, made a loop and threatened to lasso Mrs. Kelsey. The frightened

---

[156] Palmer, *History of Napa and Lake Counties*, (Lake) 59.
[157] Palmer, *History of Napa and Lake Counties*, (Lake) 59.
[158] Palmer published two accounts of these expeditions, one based on Augustine's recollections and another based on other sources. Augustine said that Stone and Andrew Kelsey were involved in both expeditions, but it seems more probable that brother Ben put together a separate expedition that went to a different mining locale. C.f., Palmer, *History of Napa and Lake Counties*, (Lake) 54-56, and 59.
[159] Palmer, *History of Napa and Lake Counties*, (Lake) 55.

AR0003041

woman dismounted so as to make it difficult for Pipito to catch her.  When she asked why he wanted to hurt her he said that it was because she was Ben Kelsey's wife and that he intended to kill her with a club.  When her Indian servants came running Pipito asked where she going and she said to the mission.  He said if she went that way he would kill her and rode off.  Mrs. Kelsey then went to Sonoma and informed Alcalde Boggs about the incident.  Boggs called out a posse to arrest the accused Indian.  The posse included Sam Kelsey, Nancy's brother-in-law.  Evidently Sam knew the Indian and brought him in within hours.  Mrs. Kelsey identified him.[160]

Boggs ordered the town sheriff to summon a jury.  Under questioning Pipito admitted frightening Mrs. Kelsey with his lariat, but denied threatening to kill her. He said if he had wanted to lasso her he would have done so.  Since his testimony required an interpreter one wonders how Mrs. Kelsey gleaned all of the details about Pipito's intentions and alleged threats.  The jury was unperturbed by such questions and found Pipito guilty (the exact crime was not specified), and sentenced him to be "tied by the neck to the flag staff and receive on his Bare Back one hundred lashes well laid on."  The sentence was immediately carried out.[161]

The public torture of Pipito was not the end of his travails.  A few hours after the public lashing Ben Kelsey heard of the affair and went to town.  He acquired a pair of pistols from alcalde Boggs, and went to the ranchería where the beaten

[160] Affidavit of Nancy Kelsey taken by Lilburn Boggs, August 4, 1849, Confession of the Indian Pipito in Court, August 4, 1849, M210, reel 4.
[161] Affidavit of Nancy Kelsey taken by Lilburn Boggs, August 4, 1849, Confession of the Indian Pipito in Court, August 4, 1849, M210, reel 4.

AR0003042

Indian had been taken.  Kelsey called Pipito out of his brush house, and shot him in the head.  "God forgive me," he said, mounted his horse and rode away.[162]

Lieutenant J.W. Davidson sent a concise report to his commander in San Francisco.  He stopped short of saying that a murder had been committed but clearly laid out the chronology of events, submitted affidavits from witnesses, and stated that Kelsey had killed Pipito.[163]  Nothing came of it.  It may be worth remembering that Boggs and Kelsey were partners in the ill-fated mining venture along with sub-agent Vallejo's brother Salvador.   It is also curious that no affidavits were taken before Pipito's trial.  The witnesses were deposed the day after Kelsey killed him.  Subagent Mariano Vallejo witnessed all the affidavits.  The killing threw into sharp relief how fruitless it would be for Indians to complain of mistreatment at the hands of white men.

Pipito's origin is not known.  It is possible that he was one of the Pomo vaqueros who assisted Augustine in moving cattle from Sonoma to Clear Lake.  Or he may have been one of the Scotts Valley and Clear Lake Indians who were forced to go to Sonoma.  That would have explained his alleged animus towards the Kelseys.  It is just as likely that he was one of the many hundreds of cowboys and field hands who tended the flocks and fields of the Vallejos and their contemporaries.  Had he not been slain by Ben Kelsey he would have remained entirely anonymous to history.  Because he was murdered we know him for what he was: an Indian who

---

[162] Affidavits of Lilburn Boggs, John Cooper, and William Boggs, August 4, 1849, M210, reel 4.
[163] Davidson to E. Canby, August 4, 1849, M210, reel 4.

AR0003043

was killed under the very noses of the U.S. officials who were sworn to protect him. They did not help him in life and they would not give him justice in death.

At Clear Lake Stone and Andrew Kelsey continued to abuse the Indians who were working for them. They whipped Indians for sport and fed them very little. They took Augustine's wife and infant child and made her live with them in the adobe house as their concubine. Augustine was understandably furious. In December Augustine and the other Indians had had enough of Stone Kelsey. As Augustine told the story his wife poured water down the barrels of Stone and Kelsey's rifles when the two white men were out of the house. In a different account the Indians managed to steal all of the weapons from the house. The next morning the Indians killed Stone and Kelsey.[164]

In addition to Augustine's version of events there is a second Indian account from William Ralganal Benson, a Pomo who was born near Lakeport in 1862. Ralganal was Benson's Pomo name. According to him the killing of Stone and Kelsey grew out of Augustine's (whom he calls Shuk) attempt to feed the starving people of Rancho Lup-Yomi. Stone and Kelsey gave each vaquero only one and one-half cups of boiled wheat per day. The herders had to share this meager ration with their families. Some Indians starved to death. Some starving Indians hired Shuk to kill a beef for them. Xasis, who was a Pomo from either "Qu-Lah-Na-Poh" (Shuk's ranchería) or "Xa-Bah-Na-Poh," which was just to the east of Adobe Creek, agreed to help him. One night after Stone and Kelsey were asleep they took the two best horses and saddles from the barn, intending to return them before daylight. Shuk

---

[164] Palmer, *History of Napa and Lake Counties*, (Lake) 56, 60; Radin and Benson, "The Stone and Kelsey 'Massacre,'" 270.

AR0003044

roped a steer, but his horse fell because it was raining and the ground was slippery. The horse and steer got away. Shuk and Xasis now feared that Stone and Kelsey would kill them and perhaps other Indians. Shuk and Xasis believed they had little choice but to kill Stone and Kelsey. In the morning Shuk and Xasis told Indian children who were the house servants to take all of the guns and other weapons out of the house and hide them. When Stone came out to boil wheat for the vaqueros Shuk hesitated and a man named Qka-Nas took the bow and arrows from him and shot Stone in the stomach. Stone managed to get back into the house where he died. Then Kelsey arrived and he too was killed.[165]

Now rid of their tormentors the Indians knew that they would have to flee to avoid retribution from their friends or the soldiers who were sure to come. They gathered up all of the food that Stone and Kelsey had stored in the house. There were about one thousand horses grazing in Big Valley. Every man who could ride caught a horse. Indians from all around the lake began to slaughter Rancho Lup-Yomi's four thousand cattle, "so the Indians lived fat for a while." Then the "Qu-Lah-Na-Poh" and "Xa-Bah-Na-Poh" left Big Valley and went to a hiding place. Some went to Scotts Valley.[166]

Somehow Ben Kelsey learned that his brother and Stone had been killed. On Christmas day he informed Lieutenant Davidson who started to Clear Lake the next morning with a force of twenty-two dragoons. On the way he met the Anderson family who had abandoned their farm and were driving their stock before them. When Davidson arrived at Rancho Lup-Yomi he found that Kelsey and fifteen armed

---

[165] Radin and Benson, "The Stone and Kelsey 'Massacre,'" 269-270.
[166] Ralganal quoted in Radin and Benson, "The Stone and Kelsey 'Massacre,'" 271.

AR0003045

men were already there. The house had been looted and the rancherías were abandoned. They buried Stone's body but did not immediately locate Kelsey's corpse. While the burial was going on dragoons managed to capture twelve Indians of what were identified the "Isla" tribe, which probably meant only that they were from one of several Clear Lake rancherías that lived on islands near the shore. Kelsey and his men wanted to kill the captives immediately but Davidson prevented them. The captives said they had nothing to do with the killings but said that two "chiefs of the tribe" that worked for the Kelseys knew all about it. They were on an island.[167]

Davidson directed three of the captives to go to the island and fetch the two chiefs while he kept the other nine as hostages. His plan failed. On a signal from one of the Indians the hostages ran whereupon the dragoons and civilians fired. Three of the Indians were killed and the rest escaped. Davidson and his men then trailed the escapees south where they located an island about three hundred yards off shore. The soldiers had no means to go to the island and the Indians refused to surrender. Davidson returned to the house, found Kelsey's body and buried him. Davidson's command remained at the lake until Ben Kelsey and his men drove away some of the stock that remained.[168]

Davidson supposed that all of the Indians around the lake "are more or less concerned in this atrocious murder." Winter prevented further operations against the Indians until spring, but Davidson proposed a plan that was ultimately carried out. He suggested sending two parties of soldiers to opposite ends of the lake who

[167] Davidson to E. R. S. Canby, January 6, 1850, U.S. Cong. Serial Set 561.
[168] Davidson to E. R. S. Canby, January 6, 1850, U.S. Cong. Serial Set 561.

AR0003046

would drive the Indians to the islands. Then another contingent of soldiers on boats that had been transported to Clear Lake for the purpose could surprise them and "cut them to pieces." Davidson also recommended attacking rancherías on the Russian River to attack the Indians there. Thus Davidson proposed, and his superiors adopted, a plan to attack all the Pomos on Clear Lake and the upper Russian River whether they had anything to do with the Stone and Kelsey killings or not.[169] Now that white blood had been spilled no one seemed to care much about root causes or sorting the guilty from the innocent.

In the spring of 1850 Captain Nathaniel Lyon led a military force to the south end of Clear Lake on May 11. Boats for the island assault were brought to that point on wagons. A contingent under the command of Lieutenant Davidson marched north along the western shore, fired a howitzer at a ranchería killing four and capturing a chief. This skirmish had the effect of driving Indians to an island at the north end of the lake. According to Captain Lyon Indians were still gathering on the island on May 15 when the boats arrived with soldiers to make a surprise landing. Lyon thought that his troops killed at least sixty and maybe one hundred Indians. His command suffered no casualties. Then he quickly marched to the Russian River where he attacked the "Yuhaiyah" ranchería, the home of "Priesta" and his people who Lyon believed were "the most active participants in the atrocious murders." The Indians took refuge on an island formed by a slough of the Russian River and

---

[169] Davidson to E. R. S. Canby, January 6, 1850, U.S. Cong. Serial Set 561.

AR0003047

soon turned it into a "perfect slaughter pen." Lyon estimated that his troops killed at least seventy-five Indians and perhaps double that number.[170]

The dry professional language of Lyon's military report conceals the horror of the events that he described. The Pomo Ralganal heard from survivors how soldiers bayoneted children and killed women at the island in Clear Lake, now known appropriately as Bloody Island. "O my baby!" a woman cried as her infant was killed and thrown into the water. Such searing details became part of the Indian memory of events at Bloody Island. The assault on the Russian River ranchería was just as brutal.[171]

When the killing was over Captain Lyon heard some "very unexpected intelligence" from a captured Indian who claimed that Mexicans had "instigated the Indians against the Americans." Lieutenant Davidson said that he would check into the matter in Sonoma.[172] Davidson was already well informed about the animosity between the Kelseys and Sonoma Indians, many of whom were from Clear Lake. Insofar as Mexicans were at fault in the Kelsey and Stone killings it was because they had created a system of land tenure and Indian labor that exploited native people. Whites like the Kelsey brothers may have been uncommonly sadistic but they carried on Indian labor practices that the Vallejos and others had established long before Anglo Americans arrived in California. U.S. authorities, as Davidson and his superiors well knew, did almost nothing to restrain the brutal appetites of men like the Kelseys.

---

[170] Lyon to E. R. S. Canby, May 22, 1850, M210, reel 5.
[171] Radin and Benson, "The Stone and Kelsey 'Massacre,'" 272.
[172] Lyon to E. R. S. Canby, May 22, 1850, M210, reel 5.

AR0003048

Sometime after the Bloody Island massacre in 1850 Salvador and his brother Juan Antonio conveyed most of the Rancho Lup-Yomi claim (fourteen of sixteen leagues) to H. F. Teschemacher. The Vallejos reserved two leagues for themselves, perhaps the Scotts Valley parcel that had been acquired from Alvarado, but this is not known. Teschemacher sent word to the Indians in Scotts Valley and around the lake to come to Kelsey's ranch (meaning no doubt the adobe ranch house) to make a treaty. Augustine was evidently in Scotts Valley at the time. Teschemacher's men killed a lot of cattle and deer for a feast and the Indians came in although it is not clear that Augustine was at the negotiations. The details of the agreement are unknown, but it probably called for peace, friendship, and a working relationship between Teschemacher and the Indians. According to Augustine, ten men drove Kelsey's cattle out of Big Valley, although some of the wild cattle remained in inaccessible places. Teschemacher no doubt intended to stock Rancho Lup-Yomi with his own animals.[173]

The period of U.S. military government did not introduce a new era of Indian relations in California. If anything U.S. military governors actively supported the rancheros who relied on Indian labor. Governor Kearny and his successors did their best to conciliate the inhabitants of California, except for the Indians. Andrew Kelsey and Charles Stone, whose sense of security from prosecution under U.S. law gave them the confidence to kill and torture Indians, were the beneficiaries and victims of this policy. Indians too paid a high price for federal failure to take firm

---

[173] Palmer, *History of Lake and Napa Counties,* 62; Hoffman, *Reports of Land Cases,* 28-37, "Appendix," (Lake) 69, 106.

AR0003049

control of Indian affairs in California. Under the American flag enslaved Indians continued to work on the ranchos in the North Bay region.

AR0003050

**The State of California and Federal Administration of Indian Affairs**

While Captain Lyon was attacking Indian communities at Clear Lake Congress was debating whether to admit California to the Union. Senator Daniel Webster supported the admission of California as a free state, contrary to the wishes of southerners who wanted the newly won territory to be open to slavery. Webster argued that since cotton could not be grown in California nature had already decreed that slavery could not profitably exist there. Webster was ignorant of California's agricultural possibilities as well as the existence of a system of forced Indian labor that met the needs of California's farmers and ranchers, Mexican and American alike. Nevertheless on September 9, 1850, the President signed the bill admitting California to the Union as a free state as part of the Compromise of 1850.[174]

In anticipation of favorable Congressional action Californians had already elected a governor and legislators who were making laws. Providing a legal basis for landowners to secure Indian labor was one of the legislature's agenda items. On April 22, 1850, the governor signed "An Act for the Government and Protection of the Indians."[175] This law was to be adjudicated before county justices of the peace. Justices could hire out to the highest bidder any adult Indian who was found "loitering or strolling about" for a period of up to four months. Indians who were found guilty of stealing could be lashed or fined as much as $200.00, a sum that very few Indians would have been able to pay. Convicted Indians who were unable to pay their fines were sentenced to work for someone who was willing to pay the

---

[174] Morris and Morris, ed., *Encyclopedia of American History*, 250-253.
[175] *Statutes of California*, 1850, chapter 133.

AR0003051

fines for them.  Indian children were also subject to this law.  With the consent of their parents the justice of the peace could indenture children to white masters until they reached the age of majority.  Indian orphans were also subject to indenture. Masters were supposed to treat their Indian servants well and could be punished if they did not.  Justices were supposed to approve any labor contract between Indians and whites.  While the law provided some protection for Indians "in no case" could a "white man be convicted of any offense upon the testimony of an Indian."  Thus the law virtually required that Indians work for whites or starve.  This law and its amendments remained on the books until 1863.[176]

Despite some provisions that ostensibly protected Indians the state law codified the practices of the Vallejos, Sutter, the Kelsey brothers, and their contemporaries.  The provision that made Indian testimony inadmissible made prosecution of miscreants like Ben Kelsey almost impossible.

The gold rush had greatly exacerbated the situation of Indians in the mining districts as thousands of miners flooded onto their lands.  These newcomers had no knowledge of Mexican labor practices or sympathy for Indians.  They believed that they should be free to exploit the gold deposits without regard for native claims to the land, competition with gangs of Indian slave labor, or interference from the government.  In many cases miners drove Indians out of the mining districts, killing as many people as they thought necessary.  The new state government helped things along by authorizing volunteer militias to fight Indians who were thought to be causing trouble.  California's first governor went so far as to predict that a "war of

---

[176] Hurtado, *Indian Survival on the California Frontier*, 129-131; Lindsay, *Murder State*, 152-156; Magliari, "Free Soil, Unfree Labor," 349-389.

AR0003052

extermination will continue to be waged between the races until the Indian race becomes extinct."  Indians who were not killed were driven out of the mining areas and into remote areas or into the arms of farmers and ranchers who were willing to employ them.[177]

As it became clear that Indian affairs were out of control federal authorities tried to take matters in hand.  Late in 1850 the President appointed a commission of three men to meet with California tribes and negotiate treaties with them.[178]  Once the commissioners met in California they decided to divide the work along geographical lines as individual.  After some delays agent Redick McKee took charge of treaty negotiations with the Indians north of San Francisco Bay and headed north in August 1851.  Thirty-six dragoons commanded by Major W. W. Wessells escorted him.  Among McKee's retinue were his son John who acted as secretary, interpreter George W. Gibbs, a commissary, and a guide.   James Madison Estell also went along. Estell (sometimes spelled Estelle or Estill in the records) was to "supply any number of beef cattle that may be required by agent McKee for Indian purposes, at such time and place as he may direct, said Estelle to receive the customary price of beef in the country where the cattle may be wanted."[179]

Given the number of cattle ranches in California Estelle, a newcomer, was an interesting choice for a beef contractor.  Born to a prominent Kentucky family about 1799 Estelle arrived in California during the gold rush with fifteen African

---

[177] Hurtado, *Indian Survival on the California Frontier*, 132-135.  Burnett quoted at 135.

[178] A. S. Loughery to Redick McKee, George Barbour, and O. M. Wozencraft, October 15, 1850, Serial 688, 8-9.

[179] John McKee, "Minutes Kept by John McKee," August 11, 1851, Serial 688, 134.

AR0003053

Americans whom he had purchased as slaves in Missouri. He brought them to California with the understanding that after they had worked for him two years they would be freed.[180] On October 16, 1850, Estell went into partnership with Mariano Vallejo and Vallejo's son-in-law John B. Frisbie. Under their partnership Estell selected 500 acres from what was left of Rancho Suscol and called the parcel Eden Ranch. Estell was to receive "just compensation" for his part in managing the cattle business and making improvements. Vallejo had already sold parts of his claim to Rancho Suscol including the town of Benicia that was rapidly growing on Carquinez Strait. He had set aside land for the town of Vallejo. Eden Ranch was situated just north of Vallejo on Napa Bay.[181]

The three men were in business "concerning the Sale and Slaughtering of undomesticated Cattle," including some that Vallejo still owned on the Soscol claim. Eventually U.S. courts would deny his claim, but in the meantime he used the land as if it were his or sold it. The partnership purchased the land from Vallejo at $15 per acre. Estell paid his share by supplying labor (no doubt supplied by his indentured former slaves) and materials to make improvements.[182]

In less than a year the partnership broke up, but not before John McKee had made arrangements with Estell to provide cattle for the Indians at government expense. Before the treaty-making expedition left for the North Coast John McKee had been Estell's house guest at Eden Ranch where he undoubtedly reached an

---

[180] U.S. Population Census, 1850, Solano County, California, 132; Estell, James M., California Room, Pioneer file.

[181] Article of Agreement and Partnership between Vallejo, Frisbie , and Estell, October 16, 1850, Solano County Book of Deeds F, 56-58.

[182] Article of Agreement and Partnership between Vallejo, Frisbie , and Estell, October 16, 1850, Solano County Book of Deeds F, 56-58.

AR0003054

agreement with Estell regarding the cattle business.[183]  On August 8, 1851 Frisbie agreed to pay $5,000 for Estell's share of Eden Ranch.  After the accounts of their joint cattle business were totted up Frisbie agreed to pay Estell in livestock from Rancho Soscol.  By this same agreement Frisbie agreed to purchase the improvements (a slaughterhouse, corrals, and fenced pasture) at two thirds of their actual cost to build, although a dollar amount was not specified.  Estell also had the right to use the corrals as long as he gave notice to Frisbie.[184]

Estell (presumably with the help of vaqueros) drove 70 or 80 old Rancho Soscol cattle north to catch McKee who was a few days ahead of him.[185]  Estell made the trip in his official capacity as General of the California State Militia complete with his staff, ostensibly to provide military assistance if needed.  Assistance was not necessary (as regular army officers huffily pointed out).  Some suspected that the reason for assuming his militia general's persona was so that he could charge the state for the trip.  Such charges would then be passed on to the federal government to reimburse the state.[186]

McKee stopped in Sonoma where he sent two Indians (probably Vallejo's men) in advance to inform the Indians that he was coming to talk with them.  After leaving Sonoma the expedition proceeded to Santa Rosa and up the Russian River Valley.  On August 14 General Estell with his California State Militia staff arrived

---

[183] Redick McKee to Hitchcock, March 26, 1862, Serial 688, 306.
[184] Agreement between Frisbie and Estell, August 8, 1851, Solano County Book of Deeds, E, 134-135.
[185] Redick McKee to Hitchcock, March 26, 1852, Serial 688, 305.
[186] Hitchcock to Redick McKee, March 23, 1852, Serial 688, 301-302.

AR0003055

along with his cattle.  The governor had sent him, he said, to render assistance if needed, but he was probably more interested in securing beef contracts.[187]

On August 16 one of the Indian runners from Sonoma came in from Clear Lake where he had arranged for a meeting on the following day.  McKee took a small detachment of soldiers under Major Wessells to the lake while leaving the main force on Russian River.  General Estell and his staff accompanied McKee.  "Several gentlemen from the country below, who had come up on a hunting excursion," joined them.  The hunters were heavily armed.[188]  One of the hunters was Ben Kelsey.  Kelsey's connection with the Clear Lake Indians was not mentioned in McKee's official account.  After a hard day of travel they reached a place they called Camp Lupiyuma on "table-lands immediately adjoining the lake," which was probably located near the Stone and Kelsey adobe.[189]

On the next morning a delegation of Indian leaders representing eight rancherías appeared at the encampment.  According to John McKee's journal they were:

> Juliio, reprenting the Ca-ba-na-po tribe and captains;
> Prieto, representing the Ha-bi-na-pa tribe and captains;
> Ku-kee, representing the Do-na-ha-be tribe and captains;
> Moh-shaw, representing the Moal-kai tribe and captains;
> Chi-bee, representing the How-ru-ma tribe and captains;
> Cal-i-a-hem, representing the Che-com tribe and captains;
> Con-chu, representing the Cha-net-kai tribe and captains; and
> Coe-ne, representing the Me-dama-rec tribe and captains.[190]

---

[187] John McKee, "Minutes Kept by John McKee," August 14, 1851, Serial 688, 135.
[188] Gibbs, "Journal of the Expedition of Colonel Redick Mckee," 105.
[189] John McKee, "Minutes Kept by John McKee," August 17, 1851, Serial 688, 136.
[190] John McKee, "Minutes Kept by John McKee," August 18, 1851, Serial 688, 136.

80

Edward Shirland, who was evidently a member of Kelsey's hunting party as well as Kelsey's partner in the Rancho Lup-Yomi cattle business, offered to assist in translation because he had once lived for several months at Clear Lake. Interpreter Gibbs was expert in Chinook jargon but was not familiar with Pomo dialects so Shirland's assistance was readily accepted. Shirland informed McKee that he owned some of the cattle that still roamed around Clear Lake. The effect on the Indians of the presence of Shirland and Kelsey can only be imagined. Likewise, Shirland's influence on the negotiations through his interpretative assistance to Gibbs is open to question. Kelsey and Shirland may have discouraged the Indians from complaining about the treatment they had received from the Kelseys.

Negotiations proceeded smoothly. Agent McKee said that he had come to learn the cause of their troubles, "if you have any," and to learn generally about their condition. "I understand that several treaties have been made with portions, perhaps all of you, by officers of the Spanish-Mexican government and by private individuals," he said referring to the Vallejos and Teschemacher. McKee said he understood that the Indians were the original owners of the country and that the "Spaniards, Mexicans, and Californians have been in turn your conquerors and masters, until finally the President , my great chief, has conquered and owns this great country." Using the usual diplomatic language that was reserved for Indian negotiations, McKee endeavored to explain who the "Great Father" was, where he lived, and that his warriors were "more numerous than the leaves around this camp. Fortunately the Great Father was a benevolent chief who took good care of his "red children." Now the President wanted to gather the Indians of Clear Lake to a place

81

AR0003057

where they would be safe and where "the product of their labor would be their own." The reservation that McKee envisioned was not "designed upon the old mission principle, where the Indian labored to make the white man rich."[191]

The chiefs had many questions. How would Indians be gathered to Clear Lake? Did they have to live in one big village and become one people? McKee thought that some of them worried about how such an amalgamation would affect their authority as chiefs. He explained that while the Great Father would prefer them to live in one village but that as long as they lived on the reservation there was no reason that they could not live on different places. Prieto said that he had heard about the treaties that had been made with other tribes near the San Joaquin River and was willing to agree to the treaty and reservation the McKee proposed. Julio thought it would be a good thing to educate the Indians so that "his young people would know more than he did." If they agreed to the reservation, McKee explained, "you must give up all right to all other lands, and never move again without the President's permission." He added, perhaps with an eye toward Kelsey, that "your young men may hire out to work upon the different ranches," but their families "must always remain at one place," the reservation.[192]

The Indians at the council were more than willing to sign a treaty and accept the conditions that McKee outlined. The only detectable reluctance came when the agent, suspecting that Julio and Prieto were giving undercounts of their rancherías,

---

[191] Redick McKee quoted in John McKee, "Minutes Kept by John McKee," August 18, 1851, Serial 688, 137.
[192] Redick McKee quoted in John McKee, "Minutes Kept by John McKee," August 18, 1851, Serial 688, 138.

AR0003058

insisted that they bring all of their people at the council on the next day. Even then not all of them came in. Prieto brought thirty-nine men, women, and children, but under questioning said that some fifty-five people were absent. Julio brought in one hundred and thirty-one people, but sixty-four were absent. McKee still thought that the men had not given the true numbers and added twenty-five percent to the numbers provided by the chiefs. He thought that brought the number of Indians affected by the treaty would be about "900 or 1,000 souls. All told – far short of the generally supposed number."[193] On the other hand, a relatively small population made Clear Lake an attractive place to locate other Indians from around the state.

The reason for Indian reluctance to give a full census of their people is easy to understand. For decades they had been subject to slaving expeditions that had ravaged their families. Indeed, one of their main tormentors stood in the council while they negotiated the treaty at Clear Lake. Whatever their misgivings may have been, all of the chiefs in council agreed to the treaty. The Indians were immediately given ten cattle and other presents that McKee had brought for the purpose. The treaty provided that the Indians would receive in 1851 "free of charge" one hundred beef cattle averaging in weight 500 pounds each, and ten thousand pounds of flour in sacks to be furnished at or near Vallejo. The same amount of cattle and flour would be provided in 1852 and 1853. After that time the treaties would be ratified and the reservation would be operating.[194]

---

[193] Redick McKee quoted in John McKee, "Minutes Kept by John McKee," August 18, 1851, Serial 688, 140.
[194] "Treaty with the Ca-La Na-Po. Etc., 1851," in Kappler, *Indian Affairs: Laws and Treaties*, 4:1110. Original treaty found in M234, reel 32, 397-404.

AR0003059

The treaty reserved the country around the northern part of the lake, the habitable portion of which was about six by twelve miles. Indians would have exclusive fishing rights. The United States could place Russian River tribes or tribes from "elsewhere" on the reservation as well.[195]

The treaty envisioned a reservation that would be self-sustaining. It provided for bulls and "milch cows," stallions and brood mares to propagate herds. Plows to break the virgin soil and abundant seeds to plant were also provided for, as well as a "practical farmer" to superintend the agricultural operations and to teach the Indians. Work mules and oxen would plow the fields and haul produce to market in wagons that would also be provided. Clothing, bolts of cloth, thread and needles would arrive at the reservation and Indian women would dress themselves and their families accordingly. Teachers would instruct women and children in the "domestic arts," and "the manual-labor system." Everyone would learn to read and write.[196]

McKee's oral instructions for delivery of the provisions were specific. The Indians had to pick up their provisions in Vallejo because the roads to Clear Lake were impassable for wagons and it would be too expensive for the Great Father to bring the stuff there. "General Estelle's ranche is on the Bay of San Francisco, near Vallejo, and he has agreed to take care of any flour I may order for you," he said. While promising beef in Vallejo Agent McKee assured that there would be little or none in Big Valley. "There are two gentlemen present – Messrs. Price and Shirland –

---

[195] "Treaty with the Ca-La Na-Po. Etc., 1851," in Kappler, *Indian Affairs: Laws and Treaties*, 4:1109. Original treaty found in M234, reel 32, 397-404.
[196] "Treaty with the Ca-La Na-Po. Etc., 1851," in Kappler, *Indian Affairs: Laws and Treaties*, 4:1110. Original treaty found in M234, reel 32, 397-404.

AR0003060

who have property, cattle, and horses, upon this reservation. You must permit and assist them to remove their stock, and you must not destroy any of it." The Indians agreed to this. McKee ordered fifty sacks of flour to be delivered to Estell's ranch and reminded the Indians that they must go there to get it. Then he left the valley.[197]    The treaty's provisions for a reservation and Indian subsistence are not unusual except for the requirement that Indians take delivery at Estell's ranch. How could Indians haul tons of flour from Vallejo to Clear Lake if the U.S. government could not do so? Taking delivery of cattle at Vallejo meant that Indians would have to drive the herd home, thus taking responsibility for any losses along the way, including the inevitable loss of weight that would occur during the drive. If Price and Shirland (most likely on behalf of Kelsey) took the horses that were still at Clear Lake how would Indian vaqueros drive the herd? These were questions that the Indians would have to address without assistance from the U.S. government.

Julio and Prieto accompanied McKee back to Russian River to explain the treaty they had made at Clear Lake. Five leaders represented as many rancherías at the council at Camp Fernando Feliz:

> Chas-Kan, representing Sai-nell tribe,
> Ko-Yo-To-Was-Sa, representing Yu-ki-as
> Cal-Pel-La, representing Mas-su-ta-ka-ya,
> Chi-Bem, representing Po-mo, and
> José María, representing an unidentified ranchería.[198]

McKee began his oration much as he had at Clear Lake. "You are no longer slaves to the rancheros," he said, "but free." He explained about the Great Father

---

[197] Redick McKee quoted in John McKee, "Minutes Kept by John McKee," August 18, 1851, Serial 688, 142.
[198] "Treaty with the Sai-Nell, Yu-Ki-As, Etc., 1851," in Kappler, *Indian Affairs: Laws and Treaties*, 4:1112-1113. Original treaty found in M234, reel 32, 391-395.

AR0003061

and their responsibilities as his children.  Then he introduced Julio and Prieto who explained the benefits of the treaty from their perspective.  McKee promised that if the Russian River people moved to Clear Lake they would be treated exactly like the rancherías that already lived there.  Only José María refused to go to Clear Lake.  The others signed a treaty that incorporated the provisions of the Clear Lake document by reference.  The Russian River rancherías were also to receive 100 cattle and 10,000 pounds of sacked flour for three years to be picked up at Estell's Ranch.[199]

McKee's two treaties with Pomos had obligated the U.S. to purchase 600 cattle from General Estell for the Indians' benefit over a period of three years. Having finished his business with McKee, General Estell rode back to Sonoma where he had a proposition for General Vallejo.  On September 29 Estell closed out his business with Vallejo who owed Estell $8,009 which was to be paid for with 600 head of cattle – less than three dollars per head, which was far below the $40 per head that McKee was paying him.  In return Estell conveyed to Vallejo his share of Eden Ranch.  It is clear from subsequent developments that Estell continued to operate a ranch in this vicinity, perhaps on a lease arrangement from Vallejo.[200]

The cattle dealing of Estell and the McKees caught the attention General Ethan A. Hitchcock, Commander of the Pacific Division headquartered in Benicia, a town on Carquinez Strait that General Vallejo carved out of Rancho Suscol in

---

[199] "Treaty with the Sai-Nell, Yu-Ki-As, Etc., 1851," in Kappler, *Indian Affairs: Laws and Treaties*, 4:1112-1113.  Original treaty found in M234, reel 32, 391-395; Redick McKee quoted in John McKee, "Minutes Kept by John McKee," August 18, 1851, Serial 688, 143.

[200] Indenture between Estell and Vallejo, September 29, 1851, Solano County Book of Deeds, F, 54-56; Release, Vallejo and Estell, September 29, 1851, Solano County Book of Deeds, F, 57-59; "Account of debts and liabilities of the Indian department in California," Serial 688, 285.

AR0003062

1847.[201]  Sometime after McKee had concluded negotiations in Clear Lake (probably in the fall of 1851) a "considerable body" of Clear Lake Indians camped by "the brook at General Estelle's house," to receive the provisions that had been promised them.  General Hitchcock complained to McKee that the Indians had travelled fifty or sixty miles "through white settlements" to receive "beef from your contractor." Hitchcock believed that McKee's directive to collect beef at Estell's place was "ill-judged" and that it furnished "decisive proof of irregularity" in McKee's beef contracting.  The general wrote that it was "a matter of public notoriety" that Estell and John McKee were partners in the business.  He accused the McKees and Estell of overcharging the government for beef and made sundry other complaints.[202]

Hitchcock used strong language and Agent McKee replied in kind.  He denied any improprieties and claimed that they had gone to Estell's only for flour.  McKee had decided to suspend all other deliveries until the treaty was ratified.  He claimed that he had made no promises to them about delivering the Indians beef, although the unratified treaty clearly called for beef to be delivered to them in Vallejo in 1851, 1852, and 1853.  McKee claimed that the Indians were satisfied with his unilateral amendment to the treaty they had negotiated, but that seems doubtful.  As for his son's staying with Estell, McKee asked "what of it?"  His son had a perfect right to stay with whomever he pleased. As for the Clear Lake Indians traveling through white settlements, "It is no uncommon thing for parties to come over from

---

[201] Rosenus, *General M.G. Vallejo*, 192-193; Bruegmann, *Benecia*, 3.
[202] Hitchcock to Redick McKee, March 23, 1852, Serial 688, 301-302.  See also Wessells to Hichcock, March 21, 1852, Serial 688, 302-304.

AR0003063

the lake to work for farmers in Sonoma, Nappa [sic], &c., and sometimes on a visit to the white settlements."[203]

McKee's defense of his cattle contracts could not obscure the plain fact that supplying subsistence to California Indians was very expensive business. Cattle purchased by Indian agents at inflated gold rush prices (with perhaps some added for graft and corruption as General Hitchcock had suggested) amounted to hundreds of thousands dollars, which seemed like enormous sums to officials in Washington who had to convince Congress to provide the money. McKee his colleague Agent G. W. Barbour spent about $30,000 on beef in 1851.[204] The third agent, O. M. Wozencraft, bought $60,000 worth of cattle during the same period. Wozencraft's operations made McKee appear frugal by comparison. It was estimated that Wozencraft had obligated the U.S. for about $346,000, including the aforementioned cattle expenditure.[205]

By the standards of the day these were enormous sums that alarmed Washington officials and gave California opponents of the treaties plenty of ammunition to fight ratification in Congress. Californians who had once supported the treaties changed their minds. Farmers and ranchers who were accustomed to using Indian labor would now have to compete with federally subsidized Indian farms and livestock ranches. The state legislature objected to the treaties because they withdrew too much land that was potentially valuable for agriculture and

---

[203] Redick McKee to Hitchcock, March 26, 1852, Serial 688, 304-308.
[204] "Account of debts and liabilities of the Indian department in California," Serial 688, 285.
[205] "Statement of beef cattle furnished by O.M. Wozencraft," Serial 688, 189; "Estimate of the amount required to fulfill the stipulations contained in the respective treaties made by O.M. Wozencraft," Serial 688, 190.

AR0003064

mining.  The questionable beef contracts were publicly criticized.  Both houses of the legislature sent memorials to Congress recommending the defeat of the treaties.[206]  The state senate's report on public land disposal recommended that Indians who were working for whites should not be "disturbed," because they were already "in the best school of civilization."[207]

In July 1852 the U.S. Senate, following the overwhelming sentiment of white Californians, refused to ratify the California treaties.  This Congressional action left California Indians in the ambiguous and precarious position of being Indians without land and without treaty protection or clearly defined rights.  The Indians were subject to the laws of the state of California, in particular An Act for the Government and Protection of the Indians, a law that gave whites legal authority to indenture Indian adults and children as farm workers and domestic servants.  Many unscrupulous men ignored the legal means of Indian indenture (with that law's modest provision for the protection of Indians) and simply enslaved Indians wherever they could find them.

In 1852 slave raiders from Rancho San Pablo and elsewhere in Contra Costa County entered the Clear Lake country and captured at least one hundred Indians.  An observer claimed that Hernan Briones, Ramon Mesa, José M. Quiera, José Francisca, and Juan Berryessa had "for some time made it a business of catching, and in various ways dispensing of" their captives.  "I have been informed that many Indians have been murdered in these expedition."  The kidnappers worked their

---

[206] Hurtado, *Indian Survival on the California Frontier*, 138-141.
[207] "Report of the Special Committee on the Disposal of Public Lands," quoted in Hurtado, *Indian Survival on the California Frontier*, 140.

AR0003065

prisoners on short rations for several months and then attempted to lease them to Contra Costa farmers for one dollar per day each. But by then the Indians were "so low in flesh" that the farmers demanded a reduced price. Rather than lower the price the kidnappers refused to lease their captives and kept them at San Pablo and another place near Martinez without enough food. By January 1853 eighteen of them had starved to death.[208]

The questionable cattle contracts of agents and unpopular treaties convinced the Indian office that a change in personnel was needed in California. In 1852 Edward Fitzgerald Beale was appointed California's first federal Superintendent of Indian Affairs. Faced with the impossibility of making Indian reservations by the usual treaty process and the impracticability of removing Indians from the state Beale devised a novel system of temporary reservations. The temporary reserves were not subject to the ratification process, although Congress had to allocate money for them. Beale envisioned several military posts of not more than 25,000 acres each where Indians would be assembled and taught the agricultural arts. The reservation would be self-sustaining and might even support the troops who were stationed there. Beale proposed to locate his reservations in places that were not coveted by whites. When non-Indians decided that they wanted the land, the reservation could be moved to some other as yet undesirable location. Thus, if carried out in the way that Beale imagined, the Indians would become a permanent migratory class without land or identifiable rights to locate anywhere

---

[208] R. M. Woods to J. H. Jenkins, January 13, 1853, Serial 665, 7:9-10.

AR0003066

permanently.[209]  Yet these temporary homes were the only places where Indians might reasonably expect protection from slave raiders.

The legal indenture and illegal enslavement of Indians continued during Beale's administration of California Indian affairs.  Despite ongoing assaults on Clear Lake Indians little was done for them until 1855 when the Mendocino subagency was set aside (on a temporary basis) for several Pomo speaking groups and other tribes in the general vicinity.  The Mendocino reservation was located on the coast about fifty miles south of Cape Mendocino and about one hundred miles northeast of Clear Lake.  It never housed all of the Indians who were associated with the tribes it was supposed to serve.  Moreover California militia sometimes drove Indians to reservations that were far removed from their homelands.  In 1859, for example some Pit River Indians from northeastern California were forced to go to Mendocino.[210]

The Mendocino reservation did not provide a secure refuge for the Indians who lived there.  In May 1855 Robert White, a hunter who supplied game to feed the Indians on Mendocino reserve, reported to Thomas Henley (then the Superintendent of California Indian Affairs) that a man named McDonald "with others who live on Cache Creek," had stolen an Indian woman and two boys.  The kidnappers headed back to Cache Creek intending to sell "or trade them for cattle, which has been much practiced of late by parties from a distance."[211]  McDonald and

---

[209] Hurtado, *Indian Survival on the California Frontier*, 141-144.
[210] Hill, *the Office of Indian Affairs, 1824-1880*, 19-27; Hurtado, *Indian Survival on the California Frontier*, 176.
[211] White to Henley, May 13, 1855, in Heizer, ed., *The Destruction of California Indians*, 226-227.

91

AR0003067

his friends carried on the California custom of kidnapping Indians regardless of federal reservations or the details of state law.  White informed the Superintendent, that the Cache Creek kidnappers were not alone.  In August 1855 White reported that "Spaniards" kidnapped twenty to twenty-five young women and killed one other from a ranchería about twenty-five miles inland.  The Indians knew the slavers and said that they lived about twenty miles east of Big Valley.[212]

As it turned out the young women escaped and made their way home, but that was not the end of White's encounters with Indian kidnappers.  A week later an Indian told White that "two white men and a party of Indians had stolen from their tribe a lot of Squaws and children."  White caught up with the kidnappers and their captives in the Mah-to Valley, perhaps on the Mattole River, and found two white men with fifty or sixty Indians who were "well armed, some having guns."  They were holding thirteen Indian women. The whites professed to be hunters from Clear Lake who had nothing to do with the Indian captives.   White, who probably had no choice given the numbers he faced, took the captives but allowed the hunting party and their Indian companions to go.  Afterwards he learned from the freed women that their captors had killed an old woman and mortally wounded an Indian boy.  White, who did not lack nerve, went after the white men but could not overtake them.[213]

In the 1850s most Indians in California did not live on the temporary reservations or the few permanent ones that were eventually established.  Few of

---

[212] White to Henley, August 9, 1855, Heizer, ed., *The Destruction of California Indians*, 227.
[213] White to Henley, August 20, 1855, Heizer, ed., *The Destruction of California Indians*, 227-228.

AR0003068

them wanted to live on these places that became known for their starving conditions and brutal treatment.  Indians who were driven to reservations on one day often fled on the next day.  Organized state militia units and crowds of miners attacked rancherías, sometimes killing everyone.[214]  Some found refuge on private ranches where owners allowed them to stay in exchange for their labor or out of sympathy.

To his credit, Superintendent Henley attempted to prosecute kidnappers under state law.  He soon learned, however, that county district attorneys were unwilling to bring charges.  In 1856 he hired a private attorney at government expense to prosecute the accused in Solano County.  The defendants were Mexicans and Henley claimed that the Mexican community was able to intimidate the jury. After two trials resulted in hung juries a change of venue to Contra Costa County resulted in a conviction.  Henley intended to prosecute similar cases in other counties, including Napa (which then included Clear Lake).[215]

The successful Contra Costa County prosecution encouraged the presiding judge to opine that the case had put an end to Indian kidnapping in the North Bay region.[216]  The judge far overestimated the impact of the trial.  Some unscrupulous individuals continued to make a regular business Indian kidnapping no matter what the legal risks.  In 1861 Superintendent Henley informed the Commissioner of Indian Affairs that kidnappers followed in the wake of California militia units that

---

[214] Lindsay, *Murder State*, 179-222, and passim.
[215] Henley to George W. Manypenny, April 14, 1856, Heizer, ed., *The Destruction of California Indians*, 232-233.
[216] R. N. Wood to Henley, March 18, 1856, Heizer, ed., *The Destruction of California Indians*, 234.

AR0003069

attacked Indian rancherías and seized "the younger Indians" who were taken to white settlements.   The captives were used to fulfill "the orders of those who have applied for them at rates from $50 to $200 a piece," purchases that Henley said were "tolerated" under the state's Indian indenture law.[217]

The impact of these ubiquitous enslavement expeditions and legal indentures may be gauged by the state and federal censuses that reported Indians.  In the 1850 federal census form limited racial categories to White, Black, or Mulatto (W, B, or M).  Yet there are hints that census takers tried to take Indians into account.  In the household of John Frisbie who was then living in Benicia we find several "herdsmen" born in California with only one name -- Jose, Chinito, and Napomusano. José could have been a Californio for whom the census taker didn't bother to record a last names, but Chinito, and Napomusano seem to be Indian names.  A fourth California-born herder in the Frisbie household is identified as Christo, or perhaps Chinte (the handwriting and microfilm make it difficult to be certain).  Also in Frisbie's very large household we find Antonio, Pablo, and Rafael (or perhaps Rafero) who are called rancheros but who do not have any personal or real property.  Interestingly, the census-taker listed all of these men as mulattos, perhaps because it was the only way to account for them because their true racial identity (Indian or mixed-race Mexican) was not accounted for on the census form.[218]

The racial identities of the Frisbie household residents in 1850 are debatable, but subsequent state and federal censuses enumerate Indians.  Perhaps the most

---

[217] Henley to Charles E. Mix, July 23, 1861, Heizer, ed., *The Destruction of California Indians*, 230.
[218] U.S. Population Census, 1850, Benicia, Solano County, 6-7.

94

striking thing about the Indians enumerated in the 1852 state census is the number of Indian children without parents. Two boys, nine year old Ronaldo and Antonio who was seven are found listed among farmers from Michigan, Wisconsin, and New Mexico. Because this census did not delineate households there is no way which of these people the children were associated with. We can only speculate if they were brothers or if somehow fate conspired to throw them together as strangers. Mananis, a seven year old girl and Nicolas, a nine year old boy are listed together, also among a group of male farmers. Four girls, Polach, María Antonia, Terresa, and Amparo (aged fifteen, eighteen, six, and one respectively) lived among farmers from California and from Chile.[219]

Adult Indians also appear in the 1852 census. Blass, Santiago, Potrero, Tomas, and José María were all Solano County vaqueros who evidently worked together.[220] Three Indian vaqueros, Simion, José, and Tomas lived with Louise and Ursa, Indian women in their twenties.[221] More specific examples could be given but the general pattern tells the story. There were at least forty-six Indians who lived in Solano County among whites in 1852. Seventeen of them were children under the age of sixteen with no adult Indian anywhere near them in the census. There can be little doubt that the orphaned Indians were in Solano County because of the state indenture act or because they were kidnapped. Most of the adult Indians worked as vaqueros or laborers. This is a general pattern that was well established before the United States took control of California.

---

[219] California Population Census, 1852, Solano County, 33.
[220] California Population Census, 1852, Solano County, 34.
[221] California Population Census, 1852, Solano County, 13.

AR0003071

In 1860 the overall numbers of Indians in Solano County declined, but there were still Indian children in Vallejo and Benicia households. John Frisbie now employed many Irish immigrants on his farm, but still had a ten-year-old California Indian named Martin E. Cook. No occupation is given for Cook, but it is perhaps revealing that he was listed among four adult servants, two Irish women and an African American man. One hopeful sign was that Cook had attended school for at least part of the year.[222] Only three other Indians lived in Vallejo in 1860, two adult laborers and a child who did not attend school.[223]

The census taker found more Indians living in Benicia than in Vallejo – a total of twenty-seven, including eleven children under the age of sixteen. There were two California Indian servants who were slightly older (16 and 17). One of them (James Brook) was evidently part of the servant class who attended the soldiers at the Benicia barracks.[224] None of these Indian children lived in households with Indian adults. None of them attended school.

Perhaps the most interesting household was that of Serranus C. Hastings, prominent jurist, first Chief Justice of the State Supreme Court, and founder of Hastings School of Law.[225] The Hastings home included three California Indians who bore his name: Beppo Hastings, a seventeen year old servant boy; Nella Hastings, fifteen years old with no occupation listed, and nine year old Ukiah Hastings, a girl with no occupation listed. None of them went to school during the previous year. Ukiah's name, of course, provides a clue as to where she and perhaps

---

[222] U.S. Population Census, 1860, Vallejo, Solano County, 70.
[223] U.S. Population Census, 1860, Vallejo, Solano County, 54, 64.
[224] U.S. Population Census, 1860, Vallejo, Solano County, 95, 318.
[225] Bruegmann, *Benecia*, 13.

AR0003072

the other young Indians had come from – the Ukiah Pomo ranchería on the Russian River. But when and under what circumstances they arrived in Judge Hastings's home can only be guessed at. Either he acquired them under the terms of the Indian indenture act, or they were among the many Indians who were illegally pressed into service in white households and farms.

At about the time that the 1860 census enumerators were canvassing the streets of Vallejo and Benicia a baby girl named Victoria was born on board a boat or a ship anchored in San Francisco Bay. The mother was Mary Frese, a Wappo or Patwin who had been born either in Carneros Valley in present-day Napa County, or Sonoma, or somewhere in present-day Lake County in about 1845.[226] While Mary's place of birth is unclear, the possibilities stated by census records and SVBI family members reflect the history of forced migration between Clear Lake and San Pablo Bay. As a teenager Mary was kidnapped and taken aboard a ship. Somewhere during her captivity someone impregnated her. It is unclear whether Mary escaped from the boat or if her captors simply let her go. After camping on a beach somewhere on San Francisco Bay Mary and her daughter made their way to Clear Lake. Eventually Victoria married Robert Augustine the son of Chief Augustine, the vaquero who had worked for Salvador Vallejo and the Kelseys. This marriage was the foundation of one of the important families of the SVBI. While most of the descendants of the Frese-Augustine stayed in the Clear Lake area many other SVBI

---

[226] Theodoratus, "Scotts Valley Report," 11-12; Howard and McClurken, "Scotts Valley Band of Pomo Indians," 6, 24-25.

AR0003073

ancestors continued to move back and forth between Clear Lake and the North Bay

Region.[227]

---

[227] Howard and McClurken, "Scotts Valley Band of Pomo Indians," 15-18.

AR0003074

**Conclusion**

The patterns that emerge from the censuses of Solano County are consistent with historical developments in the North Bay Region from the time of Spanish conquest through the gold rush.  By force or by circumstance Indians became a part of the new agricultural and household economies of the conquerors, whether under Spain, Mexico, or the United States.  Indians from Clear Lake had gone to the shores of San Pablo Bay for generations before the arrival of Euro-Americans.  That migratory pattern became more pronounced under the Spanish mission system and still more so during the Mexican rancho era.  When U.S. military authorities first arrived they did little to curtail the forced labor system that had been established by men like the Vallejos and Sutter.   Once California was admitted to the Union the state passed a law that virtually forced Indians to work for white landholders, much as they had been doing for the previous thirty years.  Under the circumstances of statehood and the chaos of the gold rush treaties with California Indians could not be ratified in the U.S. Senate.  Consequently U.S. officials created stopgap temporary reservations that gave Indian residents scant protection and independent Indians no shelter at all.  They had little choice but to work for ranchers or as domestic servants wherever they were compelled to go by violence or because of hunger.

In the nineteenth century the homes and ranches of the North Bay Region were common places of employment for Indians.  Clear Lake was often mentioned as a place of origin for these workers whether enslaved, indentured, or free.  Under these violent and inhumane conditions the North Bay region became a part of the SVBI homelands.  The historical record frequently refers to "Clear Lake Indians"

99

AR0003075

without further identification. Yet when non-Indian observers specifically described Clear Lake Indians who were driven to work on the ranchos in the North Bay region they mention Rancho Lup-Yomi and Scotts Valley. These were the places that were most closely associated with early non-Indian settlement of the Vallejos, Stone, and the Kelseys. These Indians were among those who signed the 1851 treaty and reported to General Estell's ranch in Vallejo for food. Thus, the historical record is consistent. In all cases that have come to my attention "Clear Lake Indians" taken as captives were Habenapo, Kulanapo, and Yimabak/Molakai who were associated with Rancho Lup-Yomi and Scotts Valley. Thus the preponderance of evidence supports a conclusion that the "Clear Lake Indians" who are mentioned in the record are the Habenapo, Kulanapo, and Yimabak/Molakai – the ancestors of today's SVBI.

Some of the Habenapo, Kulanapo, and Yimabak/Molakai people who worked in the North Bay region evidently returned to their Clear Lake homelands when they were finally free to go in the nineteenth century. They lived in community with one another and eventually obtained a federally recognized Rancheria in Scotts Valley. However, in the 1950s the federal government established new policies that in effect replicated the patterns of the nineteenth century. Federal termination of the Scotts Valley Rancheria resulted in the loss of their Clear Lake homelands. Federal relocation efforts sent Scotts Valley Indians to the Bay Area for vocational training and permanent employment.[228] There were no soldiers, guns, or whips associated with these twentieth-century migrations, but the effect was the same as it had been

---

[228] Theodoratus, "Scotts Valley Report," 13.

AR0003076

under the Vallejo brothers: a wholesale movement of Clear Lake Indians to the North Bay region. They went down a path that had been well-trodden by their ancestors. Whether by force or by choice Habenapo, Kulanapo, and Yimabak/Molakai and their descendants have repeatedly relocated to the North Bay region over a period of almost two centuries. Whether under the authority of Mexico, the state of California, or the United States, the power of the state has been the impetus for these movements. Thus the North Bay region, including Rancho Suscol, Vallejo, and Solano County became part of the SVBI's historic territory.

101

**Historical Note:  The Location of Estell's Ranch**

In 1851 Clear Lake Indians took delivery of provisions provided by the federal government at James M. Estell's ranch near Vallejo, California.  The location of Estell's ranch was not further identified in the treaty or related documents.  Napa County property records and other documents make it possible to establish where Estell's ranch was.  In 1850 Estell went into partnership with Mariano Vallejo and John B. Frisbie.  Vallejo claimed to own Rancho Soscol under a grant from a Mexican governor.[229]  The Soscol claim included the property that eventually became the cities of Benicia and Vallejo and much of Solano County.  Frisbie, formerly a Captain in the New York volunteer regiment that occupied Sonoma, was Vallejo's son-in-law.[230]  Recently arrived in California, Estell was a general in the state militia and became Napa County State Senator in 1852.[231]

The partnership was made in order to establish a cattle business.  The partnership called for the establishment of a five hundred acre parcel to be called Eden Ranch.  The deed description of Eden Ranch follows:

> All that certain tract[,] piece and parcel of land known as Eden Ranche[,] situate[,] lying and being in the County of Solano commencing at a point on Napa Bay indicated by a certain line of fence which divides said 'Eden Ranche' from 'Soscol Ranche' on the south side of said Eden Ranche – thence nearly an Easterly Course along said line of fence to or near a dam across a Branch [stream] – Thence nearly a north course along another line of fence and or in the same direction to a point about Three Hundred Yards North East of the corner of the corral at the House to a point indicated by a partial

---

[229] "Transcript of Proceedings in Case No. 29," Land Cases, Bancroft Library.
[230] Rosenus, *General M. G. Vallejo*, 196-197.
[231] Palmer, *History of Napa and Lake Counties*, (Napa), 136.

AR0003078

or incomplete line of fence running in nearly a west course until it strikes Napa Bay to the place of beginning."[232]

The meets and bounds description lacks precise points of beginning and distances.  At the time the property had not been surveyed by the U.S. General Land Office so there are no designations of Township, Range, and section that one usually finds in property descriptions.  However, there is an additional description in the agreement that covers Estell's right to lay out Eden Ranch:

> The land [is] to be situated by Estill [sic] for the concern and is situated on a Small creek or branch running between the City of Vallejo and the Rancho of Soscol being near the former.[233]

This description makes clear that the northern boundary of Vallejo and the southern boundary of Eden Ranch are nearby if not actually the same.  There are natural landmarks that make the parcel easy to identify on the earliest General Land Office (GLO) maps of the area.  In 1862 the GLO directed E. H. Dyer to survey the section lines in Township 3 North, Range 3 West (T3N, R3W), and Township 3 North, Range 4 West (T3N, R4W), Mount Diablo Base and Meridian.[234]  These maps show natural landmarks such as rivers and streams as well as some improvements, such as roads, fences, houses, and barns.   First, the shore of Napa Bay (also called Napa Strait, Napa River, and Mare Island Straits) forms the western boundary of the parcel so Eden Ranch must be on Mare Island Straits, as that body of water is labeled on the plats.  Second, extending east from Napa Bay the southern boundary of Eden Ranch strikes a dam on a "branch" and then turns north.  On the 1862 plat there is

---

[232] Article of Agreement and Partnership between Vallejo, Frisbie , and Estell, October 16, 1850, Solano County Book of Deeds F, 55.
[233] Article of Agreement and Partnership between Vallejo, Frisbie , and Estell, October 16, 1850, Solano County Book of Deeds F, 57.
[234] Plat T3N, R4W, Plat T3N, R3W, Bureau of Land Management, Sacramento.

AR0003079

only one stream that runs between Rancho Suscol and the city of Vallejo.

Consequently when General Hitchcock wrote of Indians camping on a "brook," it

must be the "branch" for there was no other that connected Vallejo and Rancho

Soscol.[235]

The 1862 GLO plat of T3N, R4W shows that Frisbie still retained the western

portion of the former Eden Ranch.  It also shows that a portion of the property had

been surveyed as part of U.S. Reservation No. 7.[236]  There is a house and barn owned

by Ira P. Austin near the place where the "branch" crosses into the city of Vallejo.

Austin and a man named White own the eastern portion of Eden Ranch.

Approximately 500 feet  south of the northern boundary of Vallejo near its

northeastern corner in section 13, Township 3 North, Range 4 West, is a building

called "Slaughter Hse," the slaughterhouse that may have been part of Eden Ranch in

1851.

The location of Eden Ranch may be tested against the statement of General E.

A. Hitchcock that the Indians camped "within nine miles" of the Army post at

Benicia.  The Clear Lake Indians could have camped anywhere on the "branch." The

point where the "branch" crosses the line between sections 12 and 13 (T3N, R4W)

puts it within Eden Ranch and is a reasonable spot to place the camp for the

purposes of measuring the distances between the Army post at Benicia.  That point

---

[235] Hitchcock to Redick McKee, March 23, 1852, Serial 688, 301.

[236] The history of Reservation No. 7 is beyond the scope of this study.  Apparently the U.S. proposed setting aside some 2,634 acres on the eastern bank of Napa Strait, probably to expand the Mare Island naval yard.  The parcel included the entire town of Vallejo.  Evidently the U.S. never took possession of this reserved land.  Virtually all of the property is in private hands today.  "Plat of the Reservation No. 7, Bureau of Land Management.  "Plat of the Reservation No. 7," Bureau of Land Management, Sacramento.

AR0003080

is approximately 7.4 air miles from a point marked "buildings occupied by staff officers" at the southeast corner of the plat (T3N, R3E), which is well within nine miles as General Hitchcock wrote.[237]

It is also worth pointing out that the site of the encampment is not far from the land that SVBI Project proposes to take into trust. The SVBI Project Site is located approximately at the southwest corner of the northeast quarter of section 5 (T3N, R3W), which is 2.4 miles from the supposed Eden Ranch campsite.

---

[237] Distances calculated by measuring with a steel rule on the plat with a scale of 46.5mm = 1mile.

AR0003081

**Bibliography**

**Archives, Manuscript Repositories, Government Documents, and Microfilm:**

Bancroft Library, University of California, Berkeley.

> Brown, Charles.  Statement of Recollections of Early Events in California.  C-D 53.

> "Transcript of Proceedings in Case No. 29, M.G, Vallejo & Assigns Claimant vs. the United States, Defendant, for the Place Called "Soscol."  Land Cases.

> Vallejo, Mariano Guadalupe.  Documentos para la historia de California.  36 vols.

> _____.  Inventorio Incompleto de [Mision] San Francisco Solano. C-C 219.

> _____.  "Recuerdos históricos y personales tocantes à la Alta California, 1769-1849."  5 vols.

> Vallejo, Salvador.  Notas historicas sobre California.  C-D 22. http://cdncalisphere.org.data/13030/99/hb8s201099/fileshb8s2...

Bureau of Land Management, Sacramento, California

> General Land Office Plats.

California Room, State Library, Sacramento.

> "Confirmation by the U.S. Land Commissioners of the Claim of A. A. Ritchie to the Ranchp of Suisun.  California Land Pamphlets.  Vol. 7.

> Pioneer File

Law Library, Rare Book Library, State Library, Sacramento.

> *California Land Claims.*  Vol. 26. Soscol

California, State of.  *Statutes of California.*  1850.

California State Population Census.  1852.  Solano County.

Henry E. Huntington Library, San Marino, California.

> Early California Population Project.  Online at http://www.huntington.org/information/ecppmain.htm

AR0003082

Solano County Office of the Assessor/Recorder, Fairfield, California.

    Books of Deeds.

U.S. National Archives Microfilm

    M182.  Letters Sent by the Governors and Secretary of State of California, 1847-1848.

    M210.  Records of the Tenth Military Department.

    M234.  Letters Received by the Office of Indian Affairs, 1824-1881.  California Superintendency.

U.S. Congressional Serial Set

    Serial 561.  31st Cong., 1st sess.  1850.  Sen. Exec. Doc. 52.  *Message on Indian Affairs in California and Oregon.*

    Serial 665.  7 vols.  32nd Cong., Se, Exec. 1853.  Doc. 57.  *Report on Indian Affairs in California.*

    Serial 688.  33rd Cong., spec. sess.  1853.  Sen. Exec. Doc. 4.  *Report of the Secretary of Interior Communicating, . . . Correspondence Between the Department of Interior and the Indian Agents and commissioners in California.*

U.S. Population Census.  1850.  Solano County.

U.S. Population Census.  1860.  Solano County.

**Published Sources**:

Bakker, Elna. *An Island Called California: An Ecological Introduction to Its Natural Communities.* Berkeley: University of California Press, 1971.

Bancroft, Hubert Howe.  *History of California.* 7 vols.  San Francisco: The History Company, 1886-1890.

_____. *The Works of Hubert Howe Bancroft*, vol. 34, *California     Pastoral.*  San Francisco: The History Company, 1888.

Barrett, Samuel A.  *The Ethnogeography of the Pomo and Neighboring Indians.* University of California Publications in American Anthropology and Ethnology, vol. 6, no 1 (1908), 1-332.

AR0003083

Beebe, Rose Marie, and Robert M. Senkewicz, eds. *Testimonios: Early California through the Eyes of women, 1815-1848.* Berkeley: Heyday Books, 2006.

_____, eds. *Lands of Promise and Despair: Chronicles of Early California, 1535 – 1846.* Norman: University of Oklahoma Press, 2015.

_____. *Junípero Serra: California, Indians, and the Transformation of a Missionary.* Norman: University of Oklahoma Press, 2015.

Bean, Lowell W. and Dorothea Theodoratus. "Western Pomo and Northeastern Pomo." In *Handbook of North American Indians*, vol. 8, *California*, edited by Robert F. Heizer, 289-305. Washington, D.C.: Smithsonian Institution, 1977.

Beck, Warren A., and Ynez D. Hasse. *Historical Atlas of California.* Norman: University of Oklahoma Press, 1974.

Bennyhoff, James A. *Ethnogeography of the Plains Miwok.* Davis, Calif.: Center for Archaeological Research at Davis, 1977.

Bojorges, Juan. "Statement of Juan Bojorges." In Robert F. Heizer, ed. *Collected Documents on the Causes and Events in the Bloody Island Massacre of 1850.* Berkeley: Anthropological Research Facility, 1973.

Brown, Vinson, and Douglas Andrews. *The Pomo Indians of California and Their Neighbors.* Healdsburg, Calif.: Naturegraph, 1969.

Bruegmann, Robert. *Benecia: Portrait of an Early California Town.* San Francisco: 101 Productions, 1980.

Cook, Sherburne F. "The Indian Versus the Spanish Mission." In Sherburne F. Cook, *The Conflict Between the California Indian and White Civilization.* Berkeley: University of California Press, 1976, 1-194.

_____. "The Physical and Demographic Reaction of the Nonmission Indians in Colonial and Provincial California." In Sherburne F. Cook, *The Conflict Between the California Indian and White Civilization.* Berkeley: University of California Press, 1976, 197-251.

_____. *The Population of the California Indians.* Berkeley: University of California Press, 1976.

Dakin, Susanna Bryant. *The Lives of William Hartnell.* Stanford, Calif.: Stanford University Press, 1949.

AR0003084

Davis, William Heath. *Seventy-Five Years in California: Recollections and Remarks by One Who Visited these Shores in 1831, and Again in 1833, and Except When Absent on Business Was a Resident from 1838 Until the End of a Long Life in 1909*. San Francisco: John Howell Books, 1967.

Dasmann, Raymond F. *The Destruction of California*. New York: Collier Books, 1968.

Engelhardt, Zepyrin. *The Franciscans in California*. Harbor Springs, Mich,: Holy Childhood Indian School, 1897.

Gardner, David. "Suscol in Napa County: An Historic Report." Sacramento: California Department of Parks and Recreation, 1977.

Garr, Daniel. "Planning, Politics, and Plunder: The Missions and Indian Pueblos of Hispanic California." *Southern California Quarterly* 54 (1972), 291-312.

Gibbs, George. "Journal of the Expedition of Colonel Redick M'Kee, United State Indian Agent, through North-Western California." In *Historical and Statistical Information Respecting the History, Condition and Prospects of the Indian Tribes of the United States*, vol. 3, edited by Henry Rowe Schoolcraft, 99-177. Philadekphia: Lippincott, Grambo, 1853.

Hackel, Steven W. "The Staff of Leadership: Indian Authority in the Missions of Alta California." *William and Mary Quarterly*, 3rd series, 54 (April 1997), 347-376.

_____. *Children of Coyote, Missionaries of Saint Francis: Indian-Spanish Relations in Colonial California, 1769-1850*. Chapel Hill: University of North Carolina Press, 2005.

Harlow, Neal. *California conquered: War and Peace on the Pacific, 1846-1850*. Berkeley: University of California Press, 1982.

Heizer, Robert F., ed. *The Destruction of the California Indians: A Collection of Documents from the period 1847 to 1865 in Which Are Described Some of the Things that Happened to the Indians of California*. Santa Barbara, Calif.: Peregrine Smith, Inc., 1974.

Hill, Edward E. *the Office of Indian Affairs, 1824-1880: Historical Sketches*. New York: Clearwater Publishing Co., 1974.

Hoffman, Ogden. *Reports of Land Cases Determined in the United States District Court for the Northern District of California*. San Francisco: Numa Hubert Publisher, 1862.

AR0003085

Howard, Heather A., and James M. McClurken. "Scotts Valley Band of Pomo Indians," edited by Steven J. Bloxham and Corbett K. Hodson. Fredericks Peebles and Morgan, 2016.

Hurtado, Albert L. "Controlling California's Indian Labor Force: Federal Administration of Indian Affairs During the Mexican War." *Southern California Quarterly* 61 (Fall 1979), 217-238.

_____. *Indian Survival on the California Frontier*. New Haven: Yale University Press, 1988.

_____. "Sexuality in the California Missions: Cultural Perceptions and Sad Realities." California History 71 (Fall 1992), 371-85, 451-53.

_____. "John A. Sutter and the Indian Business." In *John Sutter and a Wider West*, edited by Kenneth N. Owens, 51-75. Lincoln: University of Nebraska Press, 1994.

_____. *John Sutter: A Life on the North American Frontier*. Norman: University of Oklahoma Press, 2006.

Jelinek, Lawrence James. "'Property of Every Kind': Ranching and Farming during the Gold Rush Era." In *A golden State: Mining and Economic Development in Gold Rush California*, edited by James J. Rawls and Richard J. Orsi, 233-249. Berkeley: University of California Press, 1999.

Johnson, Patty L. "Patwin." In *Handbook of North American Indians*, vol. 8, *California*, edited by Robert F. Heizer, 350-360. Washington, D.C.: Smithsonian Institution, 1977.

Jordan, Terry G. *North American Cattle-Ranching Frontiers: Origins, Diffusion, and Differentiation*. Albuquerque: University of New Mexico Press, 1993.

Kelly, Isabel. "Coast Miwok." In *Handbook of North American Indians*, vol. 8, *California*, edited by Robert F. Heizer, 414-425. Washington, D.C.: Smithsonian Institution, 1977.

Levy, Richard. "Costanoan." In *Handbook of North American Indians*, vol. 8, *California*, edited by Robert F. Heizer, 485-495. Washington, D.C.: Smithsonian Institution, 1977.

Lindsay, Brendan C. *Murder State: California's Native American Genocide, 1848-1873*. Lincoln: University of Nebraska Press, 2012.

AR0003086

McLendon, Sally, and Robert L. Oswalt. "Pomo: Introduction." In *Handbook of North American Indians*, vol. 8, *California*, edited by Robert F. Heizer, 274-288. Washington, D.C.: Smithsonian Institution, 1977.

Magliari, Michael. "Free Soil, Unfree Labor: Cave Couts and the Binding of Indian Workers in California, 1850-1867." *Pacific historical Review* 73 (2004), 349-389.

Milliken, Randall. *A time of Little Choice: The Disintegration of Tribal Culture in the San Francisco Bay Area, 1769-1810.* Menlo Park, Calif.: Ballena Press, 1995.

_____. "Indian People of the Near North Bay prior to 1840." Unpublished report in possession of author, 2005.

_____. "Ethnographic and Ethnohistoric Context for the Archaeological Investigation of the Suisun Plain, Solano County, California." Unpublished report in possession of author, n.d.

Morris, Richard B. and Jeffrey B. Morris, ed. *Encyclopedia of American History.* 6th ed. New York: Harper & Row, 1982.

Osio, Antonio María. *The History of Alta California: A Memoir of Mexican California.* Translated and edited by Rose Marie Beebe and Robert M. Senkewicz. Madison: University of Wisconsin Press, 1996.

Owens, Kenneth N. *Empire Maker: Aleksandr Baranov and Russian Colonial Expansion into Alaska and Northern California.* Seattle: University of Washington Press, 2015.

Palmer, Lyman L. *History of Napa and Lake Counties, California.* San Francisco: Slocum, Bowen, 1881.

Peterson, Marcus Edward. (1957). "The Career of Solano, Chief of the Suisuns." Master's Thesis. University of California,Berkeley, 1957.

Radin, Max, and William Ralganal Benson. "The Stone and Kelsey 'Massacre' on the Shores of Clear Lake in 1849: The Indian Viewpoint." *California Historical Society Quarterly* 11 (1932), 266-273.

Robinson, Alfred. *Life in California during a Residence of Several Years in that Territory.* New York: Wiley & Putnam, 1846.

Robinson, W. W. *Land in California: The Story of Mission Lands, Ranchos, Squatters, Mining Claims, Railroad Grants, Land Scrip, Homesteads.* Berkeley: University of California Press, 1948.

AR0003087

Rosenus, Alan. *General M. G. Vallejo and the Advent of the Americans*. Albuquerque: University of New Mexico Press, 1995.

Sandos, James A. *Converting California: Indians and Franciscans in the Missions.* New Haven: Yale University Press, 2004.

Sawyer, Jesse O. "Wappo." In *Handbook of North American Indians*, vol. 8, *California*, edited by Robert F. Heizer, 256-263. Washington, D.C.: Smithsonian Institution, 1977.

Servín, Manuel P. "The Secularization of the California Missions: A Reappraisal." *Southern California Quarterly* 47 (1965), 133-149.

Theodoratus, Dorothea. "Scotts Valley Report." January 18, 2016.

Vallejo, Platon M. G. *Memoirs of the Vallejos: New Light on the History, Before and after the "Gringos" Came, Based on Original Documents and Recollections of Dr. Platon M. G. Vallejo*. Fairfield, Calif.: James D. Stevenson, 1994.

Weber, David J. *The Mexican Frontier, 1821-1846: The American Southwest under Mexico*. Albuquerque: University of New Mexico Press, 1982.

_____. *The Spanish Frontier in North America*. New Haven: Yale University Press, 1992.

AR0003088

AR0003089



# SCOTTS VALLEY BAND OF POMO INDIANS

May 3, 2018

Honorable John Tahsuda III
Principal Deputy Assistant Secretary- Indian Affairs
Department of the Interior
1849 C Street, N.W.
MS-4660-MIB
Washington, D.C. 20240

RE: Scotts Valley Band of Pomo Indians Request for Indians Lands Opinion

Dear Secretary Tahsuda,

On behalf of the Scotts Valley Band, we look forward to working with you and this Administration on the restoration of our tribal homeland.

As you may know, the Band was unlawfully terminated in 1965 and restored in 1991. No land has been restored to the Band and we presently have no land in trust or restricted status. We have requested the Secretary of the Interior to accept trust title to a parcel of land in the City of Vallejo, California. The subject property is an undeveloped 128-acre parcel located within an area ceded to the United States in 1851 under an unratified treaty. If taken into trust, this property will become the Band's restored homeland upon which we intend to build a complete tribal community with tribal member housing, a governmental headquarters, health facilities, and economic development ventures including an integrated casino resort with.

On January 29, 2016, the Band submitted a request for a legal opinion from the Department that the land, if accepted into trust status, would qualify under the restored lands exception of the Indian Gaming Regulatory Act of 1988 (IGRA). On August 11, 2016, the Tribe submitted a fee-to-trust application to the Pacific Regional Office of the Bureau of Indian Affairs. Throughout 2016, we worked closely with the Office of Indian Gaming and the Office of the Solicitor to answer questions, provide supplemental legal authority and produce additional evidence of our Tribe's modern, significant historical and temporal connections to the Vallejo Property.

While the Band has already submitted substantial arguments and evidence of its connection to the Vallejo Property, we redoubled our research efforts in 2017 and 2018. This new effort has produced significant and compelling direct evidence of the Tribe's historical connection to the subject property and the area around it.

AR0004411

As a final thought, the landless restoration of the Tribe in 1991 was only a partial remedy by the United States – and that came only after we brought litigation to reacquire it. A generation of our people have gone during this wait for complete restoration. Without an economic engine, we will be unable to secure a homeland. We ask that the Department issue a favorable Indian lands opinion so that we may be able to finally and fully provide for our members.

Sincerely,

Shawn Davis
Chairman

cc: Kyle Shearer, Acting Deputy Solicitor for Indian Affairs
    Paula Hart, Director, Office of Indian Gaming

## INTRODUCTION

Upon the request of the Scotts Valley Band of Pomo Indians ("Band") and by letter dated January 17, 2017, the Department of the Interior suspended action on the Band's pending request for an Indian Lands Opinion ("ILO") for a parcel of land located in the City of Vallejo, Solano County, California.[1]   Since that time, the Band's researchers have conducted additional research and found substantial and compelling evidence of the Band's historic tie to the area in very close proximity to the parcel.[2]   The purpose of submission is to present that evidence to the Department and to request that the Department promptly resume its consideration of the Band's ILO request.

As the Band's trust application for the Vallejo parcel demonstrates, the Band's members are a widely dispersed and impoverished people.   The membership resides today in the adjoining counties of Contra Costa, Lake, Mendocino, Santa Clara, Solano and Sonoma, California.[3]   *See* Location Map, Exhibit 2.   Out of 165 adult tribal members, 71 (or approximately 43%) are unemployed.   Declaration of Secretary Gabriel Ray, ¶ 5, Dec. 2017

---

[1]   The Band wrote on January 10 and January 13, 2017, requesting that action be suspended so that it could develop and present additional historical material in support of the request for an ILO regarding the parcel.

[2]   The 128-acre parcel is designated as APN 0182-010-010 by Solano County.   *See* August 11, 2016 trust application, attached as Exhibit 1.

[3]   Approximately 70% of the members reside in the counties of Contra Costa, Lake, Mendocino, and Sonoma, which have been designated by the Bureau of Indian Affairs ("BIA") as the Band's near-reservation area for the delivery of BIA services.   Exhibit 1; 65 Fed. Reg. 31, 188 (May 16, 2000).   An additional 18% of the tribal members reside within thirty-five miles of the Vallejo site, located in Solano County.   Master Plan, attached as Exhibit 3.

AR0004413

Supplement to Trust Application, attached as Exhibit 3.   Out of 161 tribal households, 60 (or approximately 38.5%) experience homelessness or overcrowding.  *Id.*   Unsurprisingly, then, roughly half of the tribal households have indicated their intention to relocate to the Band's homeland as soon as the parcel is developed, where jobs and homes will be available. Declaration of Chairman Shawn Davis, ¶ 4, Exhibit 3.   Once the tribal homeland is developed, the Band can also consolidate its government functions and services that are now provided in two, rented tribal offices, a northern office in Lakeport and a southern office in Concord, California, to service the Band's dispersed membership.   Declaration of Secretary Gabriel Ray, ¶ 8, Exhibit 3.

The trust acquisition and gaming eligibility of the Vallejo parcel will allow the Band to establish this much needed homeland.   Indeed, most of the 128-acre parcel (73 acres or approximately 57%) will be dedicated to homeland purposes.   The homeland construction plans call for a 20,000 square foot tribal government center; estimated construction cost of the tribal government center is $5 million.   Declaration of Chairman Shawn Davis, ¶ 5, Exhibit 3.[4]   The plans also call for a 14,000 square foot community center, with the second floor to be used as a senior center, at an estimated cost of $7 million.   *Id.*   Finally, the construction plans call for 100-125 tribal homes of approximately 2,000 square feet each, at a total estimated cost of $33.06 million.   *Id.*[5] The construction cost alone for the homeland, excluding site work and

---

[4]   The commercial development cost estimate is based upon a $250 per square foot cost.   *See* www.rsmeans.com.

[5]   The average residential construction cost in Solano County is $253 per square foot.   *See* www.zillow.com/solano-county-ca/home-values/.   But the Band calculates its cost will be approximately $145 per square foot, since the land costs and the need to match the market can be backed out of

2

contingencies, totals $45.06 million.

The remaining 55 acres (or 43%) of the Vallejo parcel will be dedicated to the integrated resort, the funding engine for the Band's homeland development.   As the Master Plan shows, the parcel is well suited to these multiple uses.   Exhibit 4.   The homeland development will take place at the northern end of the parcel and at a higher elevation than the integrated resort development at the southern end of the parcel.   Thus, there is a natural demarcation between the two uses - homeland and resort development - based on elevation.

The Band and its development partner will seek financing for the development of the Vallejo parcel in advance of the pre-development and first construction phases.   The pre-development of the parcel will include tribal homeland and the integrated resort elements, specifically, site work for the whole parcel, design development, preparation of construction documents, and engineering surveys and studies.   The first construction phase will include the tribal government and community centers, the first sub-division of tribal housing (24 units), and the integrated resort project with gaming, hotel, retail, and restaurants.   Exhibit 4.   Tribal revenues from the integrated resort development will fund the remaining tribal housing sub-divisions.   Affidavit of Chairman Shawn Davis, ¶ 7, Exhibit 3.

In short, the physical reconstitution of the Band's community is at stake with this trust application and the gaming eligibility of the parcel.   Without both, the Band cannot bring its people together again in one place, with homes and jobs for them.   The Department has already determined that the Band is a restored tribe, one that is landless.   Now, the Band asks that the

_____

the Band's costs.

3

AR0004415

Department conclude its ILO analysis and find that the Vallejo parcel is gaming eligible as restored land under the regulations and as demonstrated by the existing administrative record and this supplement.

This supplement to the Band's request for an ILO makes three arguments.   First, the Band establishes that the location of the Vallejo parcel alone should be given great weight, as it has been given in other opinions by the Solicitor's Office and the Nation Indian Gaming Commission ("NIGC").   Second, a summary of the historic evidence, including new data presented by the Band's researchers, demonstrates actual use and occupation of the area in very close proximity to the Vallejo parcel.   Third, the Band summarizes data and reports that refute arguments made by the Band's opponents against the requested ILO.   Finally, a supplemental historical report by Drs. Hurtado and Theodoratus ("Hurtado, Theodoratus Report"), dated April 30, 2018, is attached as Exhibit 5.   Together, these arguments and data make a persuasive case that the Department should find the Vallejo parcel to be restored land, once taken into trust.

I.   The location of the Vallejo parcel within the territory ceded by the Band to the United States should be given substantial weight by the Department in its analysis.

The governing regulations require that a tribe demonstrate a modern, temporal and historic connection to a parcel of land to meet the definition of restored land.   25 CFR § 292.12. There is no question that the Band has established a modern[6] and temporal[7] connection to the

---

[6]   As demonstrated in the Band's original request for the ILO, the Vallejo parcel is located in proximity to tribal members and the Band's southern office, which the Band has maintained since 2012, is less than 20 miles from the Vallejo parcel.   These facts demonstrate a modern connection.   *See* 25 CFR § 292.12(a); Tribal Office Map, Exhibit 6.

[7]   On the temporal connection, the regulations require that the application be the tribe's first trust acquisition and that the application be made within twenty-five years of the tribe's

4

Vallejo parcel.   There is also no question that the Vallejo parcel is located within the boundaries of the territory ceded by the Band and others to the United States in the unratified August 20, 1851 treaty.   C. Royce, *Indian Land Cessions in the United States* (GPO 1899), Part 2, at 784, California 1, Area 296.[8]   *See* Vallejo Parcel Map, Exhibit 7.   This fact alone is entitled to considerable weight on the inquiry regarding the Band's historic connection to the Vallejo parcel.

Courts and the Department have consistently given weight to the location of the proposed trust acquisition in relation to boundaries set in treaties, including the unratified California treaties.   In *Grand Traverse Band of Ottawa and Chippewa Indians v. US Atty.,* 198 F. Supp. 2d 920 (W.D. Mich.), *aff'd* 369 F.3d 960 (6th Cir. 2004), the court considered whether the Grand Traverse Band had demonstrated historic ties to the Turtle Creek site (previously cited in the Band's Jan. 29, 2016, ILO request).   The court concluded that the tribe had demonstrated such ties, relying upon a federal treaty with Grand Traverse and opinions by the Solicitor's Office in other cases indicating that location of a site in territory previously ceded by the tribe demonstrated an historic tie.   *Id.,* at 935.   Specifically, the court cited an 1836 treaty by which the Grand Traverse Band ceded territory to the United States that included Turtle Creek.   *Id.,* at 936; *see also* 2006 ILO for Ione Band (parcel located in boundaries of what would have been a

---

restoration.   25 CFR § 292.129(c).   The Band is currently landless and the trust application was submitted in August 2016, less than twenty-five after the Band's restoration on September 6, 1991.   *See* Notice of Reinstatement to Former Status, 57 Fed. Reg. 5214 (Feb. 12, 1992).

[8]   Similarly, there is no question that the Band descends from at least three of the eight tribal signatories to the August 1851 treaty.   *See* Band's January 28, 2016, Request for an ILO, at 12-15.

5

AR0004417

reservation under the unratified treaty of 1851), upheld in *County of Amador v. US DOI*, No. 15-17253 (9th Cir. Oct. 6, 2017). The Department of the Interior has since relied upon the *Grand Traverse* decision for the proposition that location of a parcel within the boundaries of land ceded, or reserved, is entitled to probative weight in an ILO determination. *See* 2014 Mechoopda ILO (parcel in boundaries of what would have been reservation under treaty of Aug. 1, 1851); 2012 Karuk ILO (parcel located in ceded territory under treaty of Nov. 4, 1851); 2007 Pomo of Upper Lake ILO (parcel located in ceded territory under treaty of Aug. 20, 1851); 2002 Bear River ILO (parcel located in ceded territory under 1851 treaty.)[9]

Neither did any of these opinions depend upon a treaty that had a single tribal signatory. To the contrary, in each instance, there were multiple tribal signatories and yet territories ceded by those treaties were deemed evidence of historic tie to a single tribe. The *Grand Traverse* case is the best illustration of this point. There, the tribe was one of six separately identifiable tribal signatories (some represented by multiple leaders) which executed the March 28, 1836, treaty with the United States. 7 Stat. 491. In the first article of the treaty, the signatory tribes jointly ceded a ten-county area to the United States. *Id.* Later provisions in the treaty reserved reservations out of the ceded territory for specified, individual tribes. Without inquiring into which portion of the ceded territory was associated with each ceding tribe, the court nonetheless relied upon the location of the parcel in question within the ceded territory as evidence connecting the parcel historically to the Grand Traverse Band. The opinions of the Solicitor's Office for the Pokagon Band of Potawatomi and Little Traverse Band of Odawa, relied upon by

---

[9] These opinions are accessible at www.nigc.gov/general-counsel/indian-lands-opinions.

AR0004418

the court in *Grand Traverse*, also involved large cessions by multiple tribal signatories as evidence of an historic connection to a single, signatory tribe. 198 F. Supp.2 at 935. The Band's historic connection to the Vallejo parcel based upon the 1851 treaty, then, is not distinguishable from this precedent based upon the presence of multiple tribal signatories.

The only actual analysis of this precise issue was made by the Department in the Karuk request for an ILO. In 2004, the NIGC initially decided that the parcel in question did not qualify as restored land, even though it was located within territory ceded by Karuk and other tribes in the unratified treaty of November 4, 1851. The NIGC noted that, while the court in *Grand Traverse* relied upon the location of the parcel in question within the ceded territory of the tribe, the court had also found substantial evidence that the parcel had been historically important to the tribe in support of its favorable conclusion. 2004 Karuk ILO, above. But in 2012, the NIGC reversed its 2004 conclusion, based upon additional evidence submitted by the tribe. The NIGC noted that payments had been made by the BIA to local schools in the area for attendance of Karuk children, the long-standing presence of the tribe in the area, and tribal oral tradition. 2012 Karuk ILO, above. With this corroborating evidence, the NIGC concluded that the parcel was restored land.

Taken together, this precedent clearly indicates that the location of the Vallejo parcel in the territory ceded by the Band and others in the 1851 treaty is probative evidence of an historic tie. Whether that alone is sufficient to qualify the Vallejo parcel as restored land is less certain. In the case of the Band, though, there is corroborating historical evidence of a tie to the very close proximity of the Vallejo parcel, just as there was for the Karuk and other tribes. Indeed, the long-standing presence of the Clear Lake Indians in the vicinity of the parcel was known to

AR0004419

the federal negotiator of the 1851 treaty, Redick McKee.   Even though territory to be ceded in the treaty included the vicinity of the Vallejo site, McKee reassured the Indians that they could nonetheless continue to hire themselves out to work on the various ranches "if they are well-behaved, and the agent gives them permission."   Quoted in Report by Albert L. Hurtado, Ph.D., Historian, Jan. 29 2016, at 82.[10]

Now, the Band has historical, census, and other data specifically demonstrating its historic ties to the close vicinity of the Vallejo site.   This evidence is summarized below and strongly corroborates the Band's tie to the parcel based upon the 1851 cession.   Taken together, as was done in the other cases, the cession of the area in the 1851 treaty with the Band and the direct evidence of the Band's tie to the area demonstrate a significant historic tie**.**

## II.   The historic record and other data confirm the Band's specific use and occupation of the area in very close proximity to the Vallejo site.

The Band has already submitted substantial arguments and evidence of its connection to the Vallejo parcel.   These appear in the following: the January 29, 2016 Legal Analysis in Support of Request for an ILO; the January 29, 2016 Report by Dr. Dorothea Theodoratus; the January 29, 2016 Report by Dr. Albert Hurtado ("Hurtado Report 1"); the January 29, 2016 Consolidated Report by Dr. Heather Howard and Dr. James McClurken ("Consolidated Report"); the January 29, 2016 Declaration of Patricia Franklin, Tribal Secretary; the June 29, 2016, Memorandum of Dr. Hurtado to Maria Wiesman; the November 13, 2016, Comments by

---

[10]   The record also reflects McKee's desire to secure the white settlements in the same region, presumably including any claims that might be made by the tribes from their use and occupation of the region.   In fact, his reference to the region to be secured included the nascent town of Vallejo.  *See* Dec. 6, 2016, Comments of Dr. Hurtado, at 10.

8

AR0004420

Dr. Theodoratus;   the November 14, 2016, Comments by Dr. Hurtado; and the December 6,

2016, Comments by Dr. Hurtado.   The Band continues to rely upon these reports and comments

as demonstrating the Band's historical presence in the vicinity of the Vallejo parcel before and

after the treaty of 1851.   A chronological summary of this evidence is set out below.   *See* A,

below.   The Band also submits additional historical data, appearing in two reports: first, Chief

Augustine: Significant Ancestor of the Scotts Valley Band of Pomo Indians (SVBI), by Dr.

Hurtado, April 30, 2018 ("Augustine Biography"); and second, Supplemental Report:   History

of the Scotts Valley Band of Pomo Indians and the San Pablo Bay Region, by Dr. Hurtado and

Dr. Theodoratus, April 30, 2018 ("Hurtado, Theodoratus Report").   Both these reports are

attached as Exhibit 5.   The documents and data set out in these supplemental reports are also

summarized here.   *See* B.

**A.   The record shows the post-contact development of a ranch economy in the San Pablo Bay region, the consequent disruption of native communities and subsistence patterns, the reliance on native labor force (through enslavement and voluntary employment), and the participation of the Band's ancestors in this economy in the region and in the vicinity of the Vallejo parcel.**

• Before Mexico acquired California in 1821, Spain established a Roman Catholic

mission in the territory for the purposes of converting and "civilizing" the native population and

facilitating non-Indian development and control.   Two missions were established in the San

Pablo Bay region - San Rafael Arcangel in present day San Rafael (1817) and San Francisco

Solano in Sonoma (1823).[11] During this mission period, extensive cattle ranching was

---

[11]   Sonoma remained the only mission in the San Pablo Bay region until 1867 when a mission was established by Turibius at Big Valley.   Up until that time, Sonoma was the only source of Catholic sacraments such as baptism and teaching for the region.

9

established in the San Pablo Bay region, natives' traditional economy was severely disrupted, and native population declined.   When Mexico acquired the territory, the missions were secularized, that is converted to private ownership.   Mariano Vallejo was appointed military commander and director of colonization of the northern frontier; he and his brothers became the largest property owners in the region.   Hurtado Report 1, pp. 1-26.

     • The Vallejos relied largely on Patwin Indians as the labor source for their ranchos. These ranchos ranged from Clear Lake (Lup-Yomi, established in 1839) to Sonoma and surrounding area (Ranchos Petaluma, Suisun, Suscol, and Tulocay) *See* Rancho Map, Exhibit 9. They were operated largely as a single economic unit, with livestock numbering in the tens of thousands and requiring the employment of hundreds of native vaqueros.   Each rancho had its own annual round-up of livestock in March.   Rancho Lup-Yomi's cattle had to be driven to slaughter grounds near landings around San Pablo Bay in order to process the hides for sale and shipment.   Mariano Vallejo's livestock was also driven annually from all the other ranchos (with the exception of Suscol, which slaughtered its own livestock) by the vaqueros to Rancho Petaluma for slaughter.    Clear Lake Indians routinely worked in these ranch operations. Hurtado Report 1, pp. 43-45.

     • In 1837, a small-pox epidemic decimated the Patwin communities.   Thousands died, particularly in southern Solano County, which forced the ranchos to turn to other native communities to resupply their labor pool.   Hurtado Report 1, p. 39.

     • In 1842, Vallejo agents went to Clear Lake where they attempted to force Pomo Indians to go to the southern settlements.   The Indians initially resisted and drove the Vallejo force out of Clear Lake country; but Vallejo continued to operate Rancho Lup-Yomi through his

AR0004422

overseers.   Hurtado Report 1, p. 32-38.   Nonetheless, the record is clear that between 1842 and 1847, Clear Lake Indians became a significant source of labor on all of the ranchos north of San Francisco.   Thus, the Clear Lake Indians were either compelled to go to San Pablo Bay ranchos or they went there of their own volition.   Hurtado Report 1, pp. 45-58.

  • In 1847, a party of unnamed ranchers attacked a Pomo community near Clear Lake and took captives to work on their ranchos in the vicinity of Sonoma.   The kidnappers claimed that the Sonoma alcalde (mayor) had authorized the raid.   Hurtado Report 1, pp. 52-53.   That same year, Salvador Vallejo sold his interests in Rancho Lup-Yomi to a partnership consisting of brothers Andrew and Benjamin Kelsey, Charles Stone, and Edward Shirland.   According to an account of Augustine, a Scotts Valley ancestor and tribal chief, the partners continued the employment of Indians but their abuse of Indians was extreme, even by the standards of the day. Hurtado Report 1, pp 57-58.

  • Also in 1847, the United States Military Governor of California appointed Mariano Vallejo as a sub-Indian agent for the San Pablo Bay region, including Clear Lake.   After a report from the Andrew Kelsey and Charles Stone (Lup-Yomi owners) that Clear Lake Indians were about to rebel, Vallejo negotiated a treaty of friendship with the Clear Lake Indians; it required the Indians to remain at peace and to report abuses by whites to proper authorities.   Hurtado Report 1, pp. 53-64.   Nonetheless, in 1848 a force of Sonoma residents rode to Clear Lake, apparently to rescue Andrew Kelsey and Charles Stone who were reportedly surrounded by Indians.   The force captured all the Indians of Scotts Valley, burned their village, and took the captives including Augustine and other Indians to work in Sonoma.   *Id.*

  • In 1849, and because of the abuse suffered by the Indian laborers at the hands of the

11

Lup-Yomi owners, the Indians led by Augustine rebelled and killed Kelsey and Stone.   The Indians had no choice but to flee and went into hiding in the south.   As a result of the Kelsey and Stone killings, the U.S. Army sent an expedition to Clear Lake to punish the Indians.   The force attacked an Indian village on Bloody Island and killed 60-100 Indians, although they appear to have had nothing to do with the murder being avenged.   Hurtado Report 1, pp. 64-69; 71-72.

   • In 1850, California was admitted to the Union.   The State passed a law which provided for the virtual enslavement of Indians not already employed by ranchers or other non-Indians. By this time, the Clear Lake native communities had been severely disrupted by the non-Indian encroachment on their territory and ill-treatment at the hands of the rancho owners.   The dispersion of the Band's ancestors was well underway, to the southern ranchos and elsewhere. Hurtado Report, pp. 71-76.

   • In 1851, the federal negotiator McKee executed a treaty with the Clear Lake Indians that would have extinguished those tribes' interests to the region south of Clear Lake to the San Pablo Bay region.   He did so with full knowledge of the tribes' connection to the ranchos. Hurtado Report 1, pp. 83-88; Hurtado Memo, Dec. 6, 2016.   In the fall of that year, the tribal signatories to the treaty took delivery of provisions on a ranch near Vallejo, as agreed in the treaty.   McKee indicated that this arrangement was acceptable to the tribes because "it was no uncommon thing for the parties to come over from the lake to work for farmers in Sonoma, Nappa, &c., and sometimes on a visit to the white settlements."   Hurtado Report 1, p. 87-88.

   • In the four decades following the 1851 treaty, the diaspora of the Band's ancestors continued, with families living and working in Solano County.   Hurtado Report 1, pp. 94-98;

12

Consolidated Report, pp. 23-28; Hurtado, Theodoratus Report, pp. 13-15.   Between 1870 and

1880, some of the Band's ancestors began to return to Clear Lake.   Theodoratus Report, Jan. 29,

2016, pp. 8-9.   By that time, though, the Band's migratory pattern was well established and, as

the ranch economy had given way to an agricultural one, tribal members adapted as well and

became migratory farm workers.   Consolidated Report, pp. 23-28.

   • In 1908, ethnographer S. A. Barrett identified a village of the Band's ancestors at Clear

Lake consisting only of five houses, totaling fifteen people.   Consolidated Report, p. 28.

Despite pressure from the BIA, the Band's ancestors refused to relocate to the Upper Pomo

rancheria, and continued to press for their own land base.   *Id.,* pp. 34-37.   Even so, most of the

Band's ancestors remained dispersed and continued to earn wages as migrant farm workers,

traveling "a circuit beginning at Clear Lake and traveling south through Napa Valley and

Sonoma Valley - the same migration that Redick McKee described in the 1850's."   *Id.,* p. 37..

   • In 1911, the BIA purchased a five-acre rancheria for the Band and fifty-eight tribal

members relocated to the rancheria and vicinity.   An analysis of the Band's census taken at that

time shows an amalgamation of families from the Clear Lake area as well as other counties,

including southern Napa County. Consolidated Report, p. 39.   The parcel was too small and its

water supply too unreliable to accommodate the return of the majority of the Band's members or

to alter the Band's need to continue its migratory pattern for pay wages.   *Id*; Hurtado,

Theodoratus, pp. 18-19.

   • Because of economic conditions, the Band's community was never able to fully

reconstitute itself at the rancheria.   For example, between 1915 and 1930, fifteen Band members

attended the BIA's Sherman Institute to learn technical skills.   These and other Band members

13

continued to reside away from, or moved away from, Clear Lake, many to the San Francisco area and elsewhere.   Consolidated Report, pp. 45-58; Hurtado, Theodoratus, pp. 19-20.

• In 1965, the Band's rancheria was terminated and the land distributed.   By 1991 when the Band was restored, there was only a single acre remaining in tribal hands.   Consolidated report, p. 69.   As a result, those tribal members then at Clear Lake dispersed again, mostly to the San Francisco Bay area.   *Id.,* pp. 70-71.

**B.   The Band's researchers have located additional data that specifically confirms the Band's presence in the very close vicinity of the Vallejo parcel.**

As indicated above, Drs. Hurtado and Theodoratus have prepared a supplemental historical report and Dr. Hurtado has prepared a biography of Augustine.   Exhibit 5.   The supplemental reports are based on additional research conducted into United States census records, mission baptismal records, and document collections at the Bancroft Library, California State Library, and county historical societies.   Hurtado, Theodoratus Report, p. 2.   The supplemental reports include a biography of Augustine, a primary informant and Band leader in the late nineteenth century and a narrative summarizing and placing into overall context the new data.

**1.   Augustine biography**

The biography of Augustine is significant because it documents the residence of Augustine over his lifetime in the very close proximity of the Vallejo parcel.   The Augustine biography identifies a baptism record for Augustine, showing his baptism on September 24, 1837, at the Mission San Francisco Solano in Sonoma, or approximately 17 miles from the

14

AR0004426

Vallejo parcel.[12] Augustine Biography, p. 3.   Augustine was six years old at the time.   The record does not disclose how long Augustine was in residence there; the record next records him as a teenager working as a vaquero for one of the Vallejo brothers at Rancho Lup-Yomi in the 1840's.  *Id.,* p. 5.

In the fall of 1847, Stone and Kelsey (Rancho Lup-Yomi owners) forced Augustine's young wife to live in their adobe as a concubine.   In the spring of 1848, Stone and Kelsey drove Augustine and 172 other Clear Lake Indians to Sonoma to work on a rancho about sixteen miles from the Vallejo parcel.   After a month there, Augustine escaped and returned to Lup-Yomi, where he was punished severely.   In 1849, Augustine and his Clear Lake kin killed the abusive Lup-Yomi owners.   The Indians involved fled.   Augustine Biography, pp. 6-7.

Augustine next appears in the written record in 1870, residing at and employed at Rancho Tulocay.   The 1870 federal census shows recorded Augustine living in Napa township, just one household away from the household of the owner, Cayetano Juarez.[13]   Augustine Biography, p. 8.  This is eleven miles from the Vallejo parcel.   Exhibit 8.   Augustine was identified in the census as a laborer.

In 1880, Augustine appeared on the Lakeport township, back at Clear Lake, with his wife

---

[12]   This distance is calculated from the mission church itself.   While there are no known boundaries of the full extent of the mission before it was secularized (three years before Augustine was baptized there), the mission encompassed thousands of acres, including that portion of Rancho Suscol where the Vallejo parcel is located.   Indeed, when the mission was secularized, Vallejo (some time employer of Augustine) became the mission administrator who managed Rancho Suscol as former mission lands.   Augustine Biography, p. 5.

[13]   Cayetano was the first manager of the Lup-Yomi Rancho, again corroborating the close connections between Clear Lake and the southern ranchos.

15

Mary.   He is again identified as a laborer.   Augustine continued as an important leader until his death in 1903.   Augustine Biography, p, 9.

Thus, Augustine's life illustrates the Band's experience - the early association with the vicinity of the Vallejo parcel through the Sonoma Mission and the Catholic Church and life-long association through residence and employment.   Significantly (and as discussed below), Augustine was present in the area, living and working, along with other kin.   Finally, it is important that Augustine is a founding father of the present Band's community, with a kinship tie to approximately 90% of the Band's current membership.   Augustine Biography, p. 1.

## 2.   The presence of other Band ancestors

The record also shows that Augustine was not alone among the Band's ancestors, either in his connection to the Mission as a child in 1837 or living and working at Rancho Tulocay in 1870.   Other ancestors and apparent kin appear in both sets of records.

The 1837 baptism record of Augustine shows that, on that same date, two other known ancestors of the Band were also baptized.   They were identified in the record as Francisco and Truppi, both of whom have descendants among modern day Band members.   They were identified as from the same native village as Augustine and were baptized on the same day (immediately before Augustine), indicating a kinship tie.   Hurtado, Theodoratus Report, pp. 7-8.

On that same day, twelve other children were baptized with parents from the same community as Augustine and the other Band ancestors.[14] The state of the records is such that it

---

[14]   The record does not disclose the precise location of Potrique-Yomi, the named village of the children.   But by association with Augustine, known to belong to one of the component bands of the modern-day Band, the children from the same village were all affiliated with the Band.

AR0004428

cannot be determined whether these children had any descendants in the modern-day Band.    But it is clear that these fifteen children, all from Augustine's village, were in residence at the Mission.[15]    Again, we cannot know how long these children remained in residence but the presence of such a large group of natives from the same village shows a close connection between the Band and the Vallejo parcel at that time.    In other words, the presence of the Band in significant numbers is not simply presumed or likely; it is documented.    *Id.*, pp. 3-4.

Similarly, the 1870 federal census showing Augustine living and working at Rancho Tulocay shows the presence of others as well.    The federal census shows Augustine lived in Family 741 with sixteen other Indians.    There were multiple generations in the household, with ages ranging from five to the sixty's.    There were men and women.    The men were identified as laborers and the women were domestic servants.    These numbers and relationships indicate a community of related people who were there on a long term basis.    Augustine Biography, p. 9.

Other prominent family lines in the Band also show multiple Napa County relationships. The Frese family is the best example, showing births, marriages, and residence in southern Napa County.    Augustine Biography, p. 15.    In addition, other census records show the presence of the Band's ancestors in the vicinity of the Vallejo parcel.    For example, the 1850 census shows the presence of a Band ancestor, Jose, in residence as a "herdsman" in the household of John Frisbie; Frisbie was a son-in-law of Mariano Vallejo in Benicia, about six miles from the Vallejo parcel.    Jose is a well known Band ancestor, also known by tribal tradition to be associated with

---

[15]    Only one of these children had a parent identified in the baptism record.    Thus, it is likely that these children were captured and removed to the Mission, where they would have been taught the Catholic faith and trained in a useful trade (in Augustine's case, as a vaquero.)

17

AR0004429

the area as a "Napa County Indian."  *Id.*, p. 16-17.

Significantly, at the same time that Augustine and other Band ancestors appear on federal records in residence in vicinity of the Vallejo parcel after 1850, they do *not* appear on federal records in Clear Lake in significant numbers.   The historic pressures summarized above clearly had pushed the Indians south to the San Pablo Bay region.   For example, the federal census for Clear Lake in 1860 shows no Indians enumerated.   Appendix, Exhibit 5, p. 38.   The federal census for Lakeport Township (officially named in 1861) in 1870 showed only a single female Indian in residence.  *Id.*, p. 59.[16]  By 1880, though, small numbers of Indians (including Augustine) began to reappear in Clear Lake.   That census shows twenty-two dwellings in Lakeport Township occupied solely by Indians.  *Id.*, p. 71.   The presence of Band ancestors in the south, and the absence of Indians in Lakeport at the same time, shows that the Band had been effectively ousted from Clear Lake and Band ancestors came together elsewhere in small settlements, including in the very close vicinity of the Vallejo parcel.   Even between 1911 and 1965 (when the United States held the rancheria in trust for the Band), the pattern continued. During this period, for example, one-third of the births of tribal members occurred in San Francisco or in Sonoma and Solano Counties.   Hurtado, Theodoratus Report, p. 20.   After 1965, almost half of all tribal births occurred in these places.   *Id.*   Thus, the Band's historic connection with the San Pablo Bay region continued until the twenty-first century.   *Id.*

Finally, it should be noted that the location of the sites discussed in the researchers'

---

[16]    It can be presumed from this data that Augustine remained in residence in Tulocay during this time.

AR0004430

documents and report, relative to the location of the Vallejo parcel, compares favorably with

distances considered and found probative of an historic tie by the Department in other cases.

Distances of fifteen miles (Mooretown ILO), ten miles (Mechoopda ILO), and six miles (Bear

River ILO) have been determined by the Department as sufficiently close in distance to support

an historic tie.   The proximity between the demonstrated presence of the Band historically and

the Vallejo parcel are obviously in this range.   Because the Band's historical presence was close

to the Vallejo site and it was long-standing occupation and use of the area, the Band's historic

presence meets the regulatory requirement of an historic tie.


**III.    The record contains a refutation of all arguments made by opponents to the Band's requested ILO.**

The Band received the following letters of support from the following officials,

organizations and business entities.


*Legislative Correspondence*
- Assemblyman Jim Frazier, Chair Assembly Transportation Committee letters, October 6, 2017 and Nov. 14, 2016.

*Tribal Government Correspondence*
- Big Valley Rancheria, letter, December 19, 2016.
- Sherwood Valley Band of Pomo Indians, letter, December 21, 2016.

*Organized Labor Correspondence*
- Laborers' International Union of North America, Local 324 letter (undated - 2016).
- Napa-Solano Counties Building and Construction Trade Council letter (undated-2016).
- Northern California Carpenters Regional Council letter, December 14, 2016.
- Sprinkler Fitters and Apprentices Local 438 letter, November 21, 2016.
- United Brotherhood of Carpenters and Joiners of America (undated-2016).

19

AR0004431

*Business Leader Correspondence*
- Avison Young of Northern California Realtor, letter October 6, 2016.
- Vallejo Capital, Inc. letter, (undated-2016)

The Band has also been provided or discovered the following letters, reports and legal

memoranda authored by interested parties and opponents to the project. At the request of the

Bureau of Indian Affairs, the Band has responded to these claims through various

correspondence and reports.


*Legislative Correspondence*
- U.S. Reps. Thompson, Huffman and Garamendi joint letter, August 29, 2016.
- U.S. Senator Feinstein letter, July 22, 2016.

*Local Government Correspondence*
- Napa County letter, September 20, 2016.
- Solano County letters, August 23, 2016 and December 23, 2016 (with Legal Memorandum).
- Vallejo City letters, July 28, 2016 and September 1, 2016.

*Tribal Government Correspondence*
- Federated Indians of Graton Rancheria letter, July 8, 2016.
- Yocha Dehe Wintun Nation letters, July 18, 2016, November 8, 2016 (with Legal Memorandum and enclosures: Stephen Dow Beckham, *"Scotts Valley Band of Pomo: Preliminary Report for 'Indian Lands Determination,' Vallejo, Solano County, California*;" Andrés Reséndez, *"Comments about the historical basis for the Scotts Valley Band of Pomo Indians' Request for Indian Lands Determination in the City of Vallejo*;" and Jennifer Whiteman, *"Native American Ethnogeography and Ethnohistory in the Vicinity of Vallejo, California.*"), November 22, 2016 (with Supplemental Legal Memorandum).

The following table provides a general index of the claims by interested parties and

opponents and the Band's response and evidence.

20

| Topic | Opponents' Claims | Band's Response and Evidence |
|---|---|---|
| **RESTORED TRIBE STATUS** | | |
| | No dispute. | The Department has previously determined that the Band has "satisfied the requirements of 25 C.F.R. § 292.7(a)-(c) and thus qualifies as a 'restored tribe' . . .," by virtue of having been restored pursuant to the Stipulation for Entry of Judgment in *Scotts Valley Band of Pomo Indians v. United States*, No. C-86-3660-WWS (N.D. Cal. Mar. 15, 1991). *See* Memorandum from Edith Blackwell, Associate Solicitor, to George Skibine, Acting Deputy Assistant Secretary – Policy and Economic Development, at p. 4 (Nov. 18, 2011). *See also* Notice of Reinstatement to Former Status for . . . the Scotts Valley Band of Pomo Indians ..., 57 Fed. Reg. 5214 (Feb. 12, 1992). <br><br> This previous determination establishes that the Band was restored by a "Federal court determination in which the United States is a party or court-approved settlement agreement entered into by the United States" within the meaning of 25 CFR 292.10(c). *See* Letter to Donald Arnold, Chairperson, Scotts Valley Band of Pomo Indians, from Donald E. Laverdure, Acting Assistant Secretary – Indian Affairs, at 4-5 (May 25, 2012). |
| **TEMPORAL CONNECTION** | | |
| | Scotts Valley cannot prove the requisite "temporal connection," meaning it has applied to have the proposed restored land taken into trust within 25 years of its restoration.  Yocha Dehe Letter to Roberts (July 18, 2016), p. 6. *See also* Vallejo City Letter to Acting Assistant Secretary Roberts (July 28, 2018). P. 3. <br><br> Solano County "concedes that the Scotts Valley Band may be able to establish a temporal connection... Despite seemingly complying with the letter of the law, it strains credulity that it took 24 years, 11 months and one week for the Scotts Valley Band to determine that lands… should be taken in trust." Solano County Letter | In accordance with 25 CFR 292.12(c)(2), the Band submitted its "application to take the land into trust within 25 years after the tribe was restored to Federal recognition and the tribe is not gaming on other lands." <br><br> The Band was restored to Federal recognition "[e]ffective September 6, 1991". *See* Notice of Reinstatement to Former Status for . . . the Scotts Valley Band of Pomo Indians . . ., 57 Fed. Reg. 5214 (Feb. 12, 1992). |

AR0004433

| | | |
|---|---|---|
| | to Acting Assistant Secretary Roberts (Aug. 23., 2016). p. 2. | On August 12, 2016, Scotts Valley Band submitted an application to take the land into trust in accordance with Section 292.12(c)(2). *See* Letter from Amy Dutschke, Regional Director to Gabriel Ray, Chairman (Aug. 30, 2016). |
| **MODERN CONNECTION** | | |
| |    "The Band's Legal Analysis asserts that the lands where the Band's proposed gaming facility would be located is near where a significant number of the Band's members reside because the Bureau of Indian Affairs (BIA) in an unrelated matter has designated the counties of Mendocino, Lake, Sonoma and Contra Costa as the Band's near reservation service area… [t]he City of Vallejo believes the designation… does not mean that the lands are near the location of the Band's former rancheria or the residences of the Band's members for purposes of determining whether IGRA's restored land exception applies." Vallejo City Letter to Acting Assistant Secretary Roberts (Sept. 1, 2016). p. 5. (internal quotations removed).<br><br>"The County has been unable to find any modern connection between the Scotts Valley Band and the proposed gaming site in Vallejo or any other location within the borders of Solano County. . . While the Scotts Valley Band does have Tribal TANF offices in both Contra Costa County and Lake County . . . these offices refuse to provide any services to residents of Vallejo or Solano County.    The presence of a tribal social services office in a neighboring county that will not provide services to any tribal members living in Solano County cannot satisfy the modern connection requirement, regardless of how close to the Solano County border this particular office is located." Solano County Letter to Acting Assistant Secretary Roberts (Aug. 23, 2016). p. 2. (internal quotations removed). See also, Vallejo City Letter to Acting Assistant Secretary Roberts (Sept. 1, 2016). p. 4. (internal quotations removed).  *See also* Solano County Legal Memo (Dec. 23, 2016). p. 3.<br><br>"The Scotts Valley Indians' governmental headquarters is in Lakeport within Lake County, which is over 80 miles away from the City of Vallejo. Lake County is also the site of the tribe's original reservation. Further, there is no sizable membership of Scotts Valley Indians residing in or around Vallejo. Napa County has worked | The Department's notice of the final rule for 25 CFR 292 states: *"[T]he headquarters test is a useful means of determining whether a tribe has a modern connection to the newly acquired land and the 25-mile radius is both useful and consistent. … Nonetheless, the concerns raised by these comments are legitimate because the version of the headquarters test in the proposed rule could be construed as being open to manipulation.   Therefore, the qualifier was added in the final rule that the tribe's headquarters or other tribal governmental facilities be in existence at that location for at least two years at the time of the application for land-into-trust.   The language of "other tribal governmental facilities" was added to address concerns that tribes often operate out of more than one headquarters or facility."* Gaming on Trust Lands…, 73 Fed. Reg. 29354, 29365 (May 20, 2008). *See* S. Bloxham to E. Shepard, Associate Solicitor (Sept. 15, 2016) at 7-8.<br><br>The Vallejo property is "located within the State . . . where the tribe is now located, as evidenced by the tribe's governmental presence and tribal population…" Section 292.12(a). The Band is and always has been located within what is now the State of California. *See* Declaration of Patricia Franklin ¶ 4 (Jan. 28, 2016) ("Franklin Declaration"); *see generally*, D. Theodoratus, "Scotts Valley Report" (Jan. 18, 2016) ("Theodoratus Report"); A. Hurtado, "The Scotts Valley Band of Indians and the San Pablo Bay Region" (Jan. 18, 2016) ("Hurtado Report").<br><br>Further, the Band has no reservation, and the land is both "near where a significant number of tribal members reside" and is "within a 25-mile |

<center>22</center>

| | | |
|---|---|---|
| | hard to maintain its agricultural heritage and stands opposed to what is commonly called casino shopping by Native Americans seeking to site a casino in lands that may be highly sensitive and critical to the population, its economy, and culture." Napa County to Acting Assistant Secretary Roberts (Sep. 20, 2016). p.1. | radius of the tribe's headquarters <u>or other tribal governmental facilities</u> that have existed at that location for at least 2 years . . .." Section 292.12(a)(2) & (3). |
| | | Since 2008 (8 years before the fee-to-trust application was filed), the Band continuously has maintained governmental offices within Contra Costa County. *See, e.g.,* Franklin Declaration ¶ 16. This office houses numerous tribal departments and is the location for nearly all government-to-government meetings with federal and state agencies and other Indian tribes. *See* Franklin Declaration ¶ 10. *See also* Memorandum from Patrick Bergin, Fredericks Peebles & Morgan to Acting Assistant Secretary Roberts, pp. 4-6 (Sept. 15, 2016); Letter from Steven Bloxham, Fredericks Peebles & Morgan to Associate Solicitor Eric Shepard, pp.-7 (Sept. 15, 2016). |
| | | The vast majority of the Band's members (approximately 72.7%) live within such designated "near-reservation area," with a significant number (approximately 12.4%) living within Contra Costa and Sonoma Counties (each of which has boundaries contiguous with Solano County). Approximately 10.0% of Tribal members live within a 25-mile radius of the land, and 18.0% of Tribal members—nearly one-fifth of the entire Band—live within a 36-mile radius of the land. *See* Franklin Declaration ¶¶ 16 and 17 & Ex. B. |
| **SIGNIFICANT HISTORICAL CONNECTION** | | |
| **Treaty Issues** | | |
| Treaty:  Land Cessions / 25 CFR Part 292 regulations | The Department's Part 292 regulations do not speak to whether "land within the ceded area of an unratified treaty can establish a significant historical connection to a parcel of land." "To adopt Scotts Valley's premise, the Department would necessarily (and impermissibly) have to deviate from its regulations by considering a factor not listed in | Scotts Valley does not ask the Department to ignore the plain language of its regulation or add criteria. Qualifying certain lands for "restored lands" status by showing that the requesting tribe had ceded the lands in a treaty is an approach developed by the Department and affirmed in judicial opinions before Part 292 was |

23

| | | |
|---|---|---|
| | the definition of the term significant historical connection in section 292.2." "The plain regulatory language makes clear that a particular treaty tribe purportedly ceding particular territory is not the same as its occupancy or subsistence use of that territory, and so Scotts Valley cannot use this theory to prove a significant historical connection to the Vallejo Parcel." Yocha Dehe Legal Memorandum (Nov. 8, 2016). pp. 1, 6-8. "Simply, no significant historical connection exists as defined by the regulations, evidenced by, among other things, the fact that the proposed gaming site in Vallejo is not within the boundaries of any Scotts Valley Band reservation established by treaty." Solano County Letter to Acting Assistant Secretary Roberts (Aug. 23, 2016). p. 2. "… the Clear Lake Bands were located a substantial distance from the City of Vallejo and thus did not have a significant historical connection to the area where the Band proposes to conduct its gaming facility…" Vallejo City Letter to Acting Assistant Secretary Roberts (Sept. 1, 2016). p. 3. | promulgated. *See Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Atty. for Western Dist. of Mich. ("Grand Traverse II")*, 198 F.Supp.2d 920 (W.D. Mich. 2002), *aff'd* 369 F.3d 960 (6th Cir. 2004) ("*Grand Traverse III*"); *See also*, Pokagon Band of Potawatomi Indians, Memorandum to Secretary of the Interior from the Solicitor, Dept. of the Interior, M-36991 (Sept. 19, 1997) ("Pokagon Mem."). Following enactment of the regulations, the Department continued to interpret Part 292 with reference to prior cases, including *Grand Traverse II* specifically. Pokagon Mem. at 3 & 7-8; *see Coos*, 116 F.Supp.2d at 161-62; *Grand Traverse II* at 928, 935. With the requirement for a "significant historical connection," the regulations reflect the plain meaning of IGRA's term, "restoration of lands," as the Department and the courts had already construed the term – the "restoration" of lands to an Indian tribe, in accordance with the "dictionary definition" means the "return" of lands "lost or taken away," which as a rule includes lands that are part of the area the Band or its predecessors "ceded to the U.S. in earlier treaties." *See* Scotts Valley Restored Lands Opinion (May 25, 2012) at 7, fn. 23 (noting that the regulations do not expressly specify every aspect of the restored lands requirements because some requirements are "inherently understood" to be reflected in the analysis). |
| Treaty: Joint Cession of Lands | The Department should reject the premise of Scotts Valley's argument, namely, that it may establish a significant historical connection to the Vallejo Parcel merely because its alleged "predecessors-in-interest negotiated to jointly and severally cede the subject land to the United States" by the Treaty of Lupiyuma. Yocha Dehe Legal Memo p. 8. | Cession of land by an Indian tribe in a treaty *per se* demonstrates significant use and occupancy of ceded land sufficient to find a significant historical connection. Bloxham memo at pp. 6-9 (citing *Pokagon* decision (1997); and *Grand Traverse Band* decisions (2002 & 2004)). The Treaty of Lupiyuma effected a "joint and several" cession of the treaty area. The federal government treated the Clear Lake Indians as having lands outside their core aboriginal territory, for treaty purposes. Bloxham memo at pp. 19-20. Both in fact and from the federal government's point of view, the bands exercised *joint* control |

24

AR0004436

| | | |
|---|---|---|
| | | over these lands; this part of the treaty area was not *severally* controlled or ceded, as the bands' aboriginal lands were. Bloxham memo at pp. 11-21, & esp. 15-18.

This is analogous to the Grand Traverse Band's treaty, which was also a joint treaty involving tribal parties combined for the United States' convenience in acquiring land.  The property at issue in the Grand Traverse restored lands litigation "was within the Band's 1836 treaty lands."   The joint cession of the treaty area means, as it does for Scotts Valley Band, that when property within that area is reacquired by any one of the joint tribal parties to the "treaty," that property is a "restoration of land" to that tribal party.   If the party is also a restored tribe, as Scotts Valley is, then the property qualifies for the restored land exception.

In the case of the Treaty of Lupiyuma, there is no evidence that the federal government viewed any of the jointly ceded land which lay outside the Clear Lake Bands' core aboriginal territory as belonging to any individual band.   In the government's view, evidenced by the treaty, the Bands had the joint authority to cede such lands. *See* Memorandum of Steven Bloxham, Fredericks Peebles & Morgan to Director Paula Hart (Bloxham memo) (Jan. 29, 2016).  pp. 5-7.

 *See also*, Assemblyman Jim Frazier letter, Oct. 6, 2016; Sherwood Valley letter, Dec. 21, 2016; Big Valley letter, Dec. 19, 2016. |
| Treaty: Occupancy of Lands | The plain regulatory language makes clear that a particular treaty tribe purportedly ceding particular territory is not the same as its "occupancy or subsistence use" of that territory, and so Scotts Valley cannot use this theory to prove a "significant historical connection" to the Vallejo Parcel. Yocha Dehe Legal Memo. p. 8

**But compare:** "Yocha Dehe agrees that an area ceded by treaty is evidence of occupancy that the Department would consider under the second prong of the 'significant historical connection' test." Yocha Dehe Supplemental Legal Memo. p. 2. | A tribe requesting a restored lands opinion can "demonstrate by historical documentation … occupancy … in the vicinity of the land," in order to show that it has a "significant historical connection" to the land.   The regulations do not provide further details, including what type of historical documentation can or cannot be used to demonstrate occupancy.   In this case, occupancy is demonstrated by the treaty cession.  Bloxham Memo. p 2;   25 C.F.R. §§ 292.2, 292.12(b).

Scotts Valley does *not* claim that the subject property meets the first part of the "significant historical connection" definition, land "located within the boundaries of the Band's last |

25

| | | |
|---|---|---|
| | | reservation under a ratified or unratified treaty." The property is *not* within Scotts Valley's last reservation, but it *is* within the area ceded by Scotts Valley's ancestors to the United States under an unratified treaty.<br><br>By analogy, the Court in Grand Traverse concluded that the Grand Traverse Band's site, also part of an area ceded by treaty, constituted restored lands under 25 U.S.C. § 2719.  *Grand Traverse II* at 935-36.<br><br>Thus, one way to show that lands were "historically occupied" by a tribe seeking a restored lands opinion – one way to demonstrate a "historical connection" in the form of "occupancy," in the language of the regulations – is to demonstrate that the lands are within the area "ceded by the Band to the United States." Bloxham Memo. p 5 |
| Treaty: Royce Maps | Royce Map Area 296 is not a reasonable proxy for the lands historically occupied and ceded by the Treaty signatories.<br><br>The map Charles C. Royce prepared for the Treaty of Lupiyuma was "grossly inaccurate," "embracing a vast tract extending from Clear Lake on the north to San Pablo and San Francisco bays on the south and from the Sacramento River on the east to west of the Napa River to the west."   Yocha Dehe Legal Memo., p. 13. *Citing* Stephen Beckham Report p. 64. | The Vallejo Parcel is within Royce Area 296, the area authoritatively mapped as representing the lands ceded in the Treaty of Lupiyuma. Bloxham Mem. pp.-8<br><br>Charles C. Royce's maps are highly regarded and uniformly relied upon by the Department of the Interior, the Indian Claims Commission, the courts, litigants and legal writers to identify land cessions. The Department regularly relies on the Royce maps, including the Royce maps that identify the land ceded in the unratified California treaties.   See Guidiville Restored Lands Opinion (Sept. 1, 2011) at 11.<br><br>It did so when denying Scotts Valley's previous restored lands request in 2012, basing its negative decision in part on the conclusion that the Richmond parcel at issue there was outside of Royce Area 296, which extends from San Pablo Bay to Clear Lake.  It would be unfair and indefensible to blatantly move the goalposts and now conclude that a parcel that *is* within Royce Area 296 is still unacceptable because the maps are wrong; if that is so, should the Department not revisit its Richmond decision? See Scotts Valley Restored Lands Opinion (May 25, 2012) at 14. |

AR0004438

| | | |
|---|---|---|
| | | Professor Hurtado observes that Royce Map 296 "is a fair approximation of the region that [United State Military Governor, Stephen] Kearny assigned to sub-Indian agent [Mariano] Vallejo in 1847.    Hurtado Report (Jan. 29, 2016), p. 14; Hurtado Comments (Nov. 14, 2016), p. 13. |
| Treaty: Commissioners | The Treaty Commissioners never met with representatives of some of the Bands who lived in the area that the treaty would be deemed to have ceded — not the Wappo, Coast Miwok, or Southern Patwin. Three weeks after the Treaty with the Clear Lake Indians, another Commission negotiated a treaty at Camp Colus and three of the signatories were Patwin. Yocha Dehe Legal Memo., p. 14-15, Beckham Rep. p. 64

Redick McKee was completely ignorant about California Indian affairs when he was appointed as Indian treaty commissioner. | The fact that the United States did not meet with representatives of those Bands is evidence that, in that area and at that time, those Bands were not identified as political entities with the capacity to make treaties (though individual members of those Bands still may have been present).

The historical evidence submitted by Scotts Valley amply supports the conclusion that the United States dealt with the Clear Lake Bands to obtain the desired cession of the Vallejo area because by 1851, no independent villages, bands or tribes remained there. Bloxham Memo. p. 8

There is no doubt that McKee was not well informed when he was appointed but his letters show that he made an effort to learn as much as he could about the California Indian situation while he was *en route* to California. See for example, McKee to Luke Lee, December 6, 1850, Ser. 688, 33rd Cong, spec. sess., 1853, Sen. Ex. Doc. 4, *Report of the Secretary of the Interior Communicating . . . Correspondence Between the Department of the Interior and the Indian Agents and Commissioners in California,* 52-53.

Once McKee arrived in California he had access to knowledgeable people in the military, longtime residents, and newspapers.   McKee stayed for several days in Sonoma where Vallejo resided before going on to Clear Lake and the Russian River.   Moreover, Vallejo's business associate and cattle contractor James Estell, as well as Major Wessells, accompanied McKee.   He met several experienced residents while on his journey, including some who were associated with Rancho Lup-Yomi.    Hurtado Comments (Nov. 14, 2016), p. 13.

For a favorable assessment of McKee's operations in California see Ray Raphael, *Little* |

27

AR0004439

| | | *White Father: Redick McKee on the California Frontier* (Eureka, Calif.: Humboldt County Historical Society, 1993). |
|---|---|---|
| Treaty: Political Succession | Scotts Valley rewrites history to suggest the Clear Lake Indian tribes succeeded the Patwin Indian tribes when negotiating with the United States. The Patwin were not absent from their traditional territory at the time of treaty-making. | Such claims misstate or misunderstand Scotts Valley's position that it was a successor to the former aboriginal inhabitants of the Vallejo area.    Scotts Valley and the other Clear Lake Bands succeeded to that role because the United States placed them in it, which it did by identifying the Bands as the parties capable of entering into a treaty to cede the land in that area. Bloxham Memo. pp. 8-9.<br><br>There is evidence to the contrary about the number of Patwin in the area. Professor Hurtado determined that in 1837, a smallpox epidemic decimated the Patwins who lived in southern Solano County, especially the Suscol rancheria (around Vallejo). Albert Hurtado Report, dated November 14, 2016. p. 7.<br><br>The United Stated did treat with other Patwin villages in a different area, leading to the Colusa Treaty.   The historical evidence submitted by Scotts Valley amply supports the conclusion that the United States dealt with the Clear Lake Bands to obtain the desired cession of the Vallejo area because by 1851, no other independent villages, bands or tribes remained there. Bloxham Memo. pp. 8-9. |
| Treaty: Provisions | The Treaty Tribes' single trip to Vallejo to pick up provisions promised to Clear Lake Indians under the Treaty hardly demonstrates a significant historical connection – a sustained occupancy or subsistence use – to the Vallejo area, let alone, to the Vallejo parcel. Yocha Dehe Legal Memo., pp.18-20<br><br>The record shows Vallejo was selected out of convenience to the military, not because it bore some significance to the California Indians, or because the Bands were already occupying the area. There are no "Reserved Rights" to the ceded area in the Treaty. Reséndez Report, p. 3. | The treaty promises and the Bands' actions pursuant to the promise are significant because they demonstrate Scotts Valley's occupancy and its subsistence use in the vicinity of the subject property.    Bloxham Memo. pp. 9-10.<br><br>These facts themselves are the evidence; they are not merely suggestive of an inference that, separately from obtaining provisions in Vallejo, Scotts Valley made use of the lands in the vicinity (although they do lead to that inference as well).    The United States promised to furnish provisions "at or near Vallejo, or elsewhere, as may be most convenient[.]"<br><br>Undoubtedly the U.S. government's convenience was a factor, but this does not mean the location was not also known to, and convenient to, the Bands.    Agent McKee insisted it was "no uncommon thing" for Indians |

28

| | | |
|---|---|---|
| | | to come down from Clear Lake to the "white settlements" like Vallejo. See R. McKee, U.S. Indian Agent, N. Calif., to E.A. Hitchcock, Bvt. Brig. Gen., Mar. 26, 1852, Sen. Exec. Doc. No. 4 at 305.<br><br>In addition to establishing a significant historical connection to the land through the fact that the land is within the area ceded by treaty, its other connections are at least as substantial as those found to satisfy the test in prior Department decisions regarding the North Fork Rancheria and the Cowlitz Indian Tribe. *See* S. Bloxham to E. Shepard, Associate Solicitor (Sept. 15, 2016) at 5-6, discussing the North Fork Rancheria Secretarial Determination (Sept. 1, 2011) and the Cowlitz Indian Tribe Revised Initial Reservation Opinion (Oct. 1, 2012). |
| Treaty: Provisions - Why Vallejo? | The Band's legal analysis does not, however, indicate why the United States agreed to furnish certain goods to the Clear Lake bands "at or near Vallejo, or elsewhere." Vallejo City Letter to Acting Assistant Secretary Roberts (Sept. 1, 2016). p. 3 and Solano county Letter to Acting Assistant Secretary Roberts (Dec. 23, 2016). p. 8.<br><br>"Scotts Valley tries to draw significance from the fact that the Clear Lake Indians were directed to Vallejo to pick up provisions, including beef, under Treaty O. The argument is that Vallejo must have been historically significant to the allegedly predecessor Pomo tribes because that place was selected for the delivery of the promised provisions. …In fact, other tribal groups also were directed to pick up provisions at Vallejo. For example, signatories to Treaty P, whose tribal groups were even farther from Vallejo than the Clear Lake Indians… had to make the long trip there to pick up the goods the United States government promised." Yocha Dehe Legal Memo. p. 18. | The Treaty called for the tribal parties to come to Vallejo for provisions for three years – 1851, 1852 and 1853.  This established for the tribal parties a reserved right in the ceded area: the right to make use of the ceded lands to take delivery of subsistence provisions furnished by the United States, and the corresponding right of access.  Bloxham Memo. p. 10<br><br>The significant historical connection to Vallejo is established within the Treaty itself. The Band's ancestors were told to travel to Vallejo and in fact they did travel there. Such travel was not intended to be an isolated event, but rather a frequent occurrence.  During one visit in late 1851, the Band's ancestors were encamped at General Estelle's ranch at Vallejo, approximately 2.4 miles from the Vallejo Property. Bloxham memo at pp. 21-25; Hurtado report (Jan. 29, 2016). pp. 77-85 & 102-105.<br><br>In fact, Band's ancestors were expressly advised to seek assistance from General Estelle "should any disturbances or difficulties arise among [the other Clear Lake bands] or with the whites…" Hurtado Comments (Dec. 6, 2016) at p. 6.<br><br> Of all the treaties entered into between the United States and Indian tribes, it remains extraordinary to require the treating tribe to travel away from a proposed reservation for provisions.  Although both the Russian River |

AR0004441

| | | |
|---|---|---|
| | | treaty ("Treaty P") and Scotts Valley's treaty ("Treaty O") mention Vallejo, both treaties were for the same reservation. As a group the Indians on that one reservation would travel to Vallejo. Treaty O was the first treaty and that those signers consented to the addition of other bands from Treaty P into the reservation. The reservation was to be the Clear Lake tribes' reservation and that those tribes consented to the Russian River tribes coming into it. |
| **Ancestry of the Band** | | |
| | Band's expert anthropologist report "does not resolve this core issue of which tribelet(s) were the ancestors of the modern Scotts Valley band; instead, it raises more questions. Is the present Scotts Valley Band descended from one or three Clear Lake Pomo tribelets?" Solano County Legal Memo (Dec. 23, 2016). p. 5. | Scotts Valley Band, first and foremost, is and always has been the "Indians of Scotts Valley." The extensive and undisputed historical documentation proves that the "Indians of Scotts Valley" are the Moalkai/Yimabak, which was a party to the 1851 treaty. *See* Letter from Steven Bloxham to Assistant Secretary Roberts (Nov. 14, 2016). pp 10-11; Preliminary Report of Stephen Dow Beckham (Nov. 7, 2016). p. 67.

Scotts Valley Band is also a successor to two other treaty bands located on the west shores of Clear Lake — the Kulanapo [a/k/a Ca-la-na-po] and Habenapo. Bloxham memo at pp. 12-15; Dorothea Theodoratus report (Jan. 29, 2016). pp. 2, 3, 4-8 & esp. 5 (map), 9-12. See also, Dorothea Theodoratus Comments (Nov. 13, 2016). pp. 2-3.

At the time of the distribution of Scotts Valley Rancheria lots in 1958 approximately 90% of SVBPI members traced their lineage back to Augustine, which is a common surname among the SVBPI. Hurtado Augustine Report (May 3, 2018), p.1. |
| **Ancestral Language Differences** | Friendly exchange among Pomo and Patwin groups occurred although occasional unfriendly circumstances did occur. Jennifer Whiteman Report, pp 15-16.

The Pomo weren't known for distance travel because they could not "effectively communicate" because of linguistic differences is curious. Language would be a deterrent to intertribal communication making travel to | Records for Central California groups indicate that some people often spoke and had some knowledge of several languages.   This would be more evident for men than women, although some women are also reported to have been multilingual, especially if they married into a tribe from another group. Communication occurred regularly for trade, ceremony and |

30

AR0004442

| | | |
|---|---|---|
| | other tribal areas unreasonable.    Stephen Beckham Report p. 64.; See also Yocha Dehe Legal Memorandum. p. 16. | community functions which required participants in these ventures to be multilingual. Theodoratus Report, p. 3. |
| Ancestral Social Organization | Understanding and recognizing the implications of a tribe's social organization is crucial to comprehending the structure of intra- and inter-tribal relations. Yocha Dehe Legal Memorandum, pp. 22-23. | "Kin groups were both ambilateral and ambilocal, which allowed for movement of members among the various tribelets, meaning they could recombine socially and politically in various ways." Theodoratus Report, p. 3.<br><br>These political units could, and sometimes did, confederate… Theodoratus Report, p. 4.<br><br>Trade alliances were held among Pomo groups and with non-Pomo groups Theodoratus Report, p. 5.<br><br>Pomo culture in general, and particularly the Clear Lake area was one of "fluctuating diversity."   In addition to tribal re-combinations, this comes through contact with other tribes who, through alliances, came to Clear Lake seasonally to participate in an abundant fishing season (see also Whiteman Report, pp.  15-16, who notes some Patwin came to the Lake to fish).   Theodoratus Comments, p. 2.<br><br>Understanding this openness to diversity does not eliminate the possibility of altercation among Pomo and non-Pomo groups.   However, the importance of Lake food resources and intertribal agreements to cross tribal lands may have mitigated the extent of such situations. Theodoratus Comments, p. 2.<br><br>Patwin trade with Clear Lake peoples and that inter-marriages "solidified positive relationships with neighboring tribes" which enhanced trade and "reciprocal hunting and gathering rights" Whiteman Report, pp. 15-16; Theodoratus Comments, p. 2.<br><br>The tribes also cooperated in ceremony.   The early historical period did not curtail traffic in and out of Clear Lake, provided where agreements had been developed.   "Intertribal communication was and remained a part of Indian life." Theodoratus Comments, p. 2. |

AR0004443

| Origin of the Modern Scotts Valley Band | The Band's anthropologist report provides "a general overview of the Pomo Indians who lived around Clear Lake… By contrast, the Indians who lived immediately north of San Francisco and San Pablo Bay (the location of Vallejo) spoke dialects of different language families: Patwin, Wappo or Coast Miwok." Solano County Legal Memo (Dec. 23, 2016). p. 4.

"Pomo is not a cultural or political description. Pomo is not a "tribe" or "nation" and the Indians who spoke these related Pomo dialects did not recognize an overarching political, cultural or social relationship amongst the groups (called village-communities and/or "tribelets" by scholars) whose members spoke closely related dialects." Solano County Legal Memo (Dec. 23, 2016). p. 4.

Each tribelet was autonomous, often having at least one permanent village and perhaps a few seasonal camps within a given valley. The Pomo speakers around upper and western Clear Lake spoke Eastern Pomo which in turn had dialectal variations among the tribelets living around the Lake. Solano County Legal Memo (Dec. 23, 2016) p. 5.

The three tribes that make up the Scotts Valley Pomo "militates in favor of heightened skepticism" is unfounded at best. Yocha Dehe Legal Memo., p. 22. | Pomo is a linguistic division (family) of the Hokan linguistic stock that resided in a large area north of San Francisco Bay.   It is agreed that the Lake Miwok (Utian family, Penutian stock) are immediately to the south of the Lake, the Patwin (Wintuan family, Penutian stock) are east and southeast, and the Wappo (Wappo, Yukian family) southwest of the Lake Miwok. Neither the Wappo nor the Lake Miwok extend south as far as San Pablo Bay.   It is known that tribes were aware, traded, and intermarried each other; many individuals were multilingual enough to conduct cross-tribal communication. Theodoratus Report (Jan. 29, 2016). pp. 3-5.

The Band's experts do not use the term Pomo as a cultural or political description. However, as noted in the Band's expert anthropologist report, each tribal linguistic grouping is divided by scholars into smaller groups or tribelets, a tribelet being a "basic, autonomous, self-governing, and independent socio-political group" (citing Heizer 1978:5).   Theodoratus Report (Jan. 29, 2016). p. 3.

Each tribelet (also called a village community) consisted of residents who lived in two or more settlements and who acknowledged a leader or "chief" who resided in the largest of the villages. See Theodoratus Report (Jan. 29, 2016). p. 3.

The combination or incorporation of tribes is absolutely feasible in Pomo social organization where kinship designation is a matter of choice within the constructs of the social system, therefore is multi-linear.   The Scotts Valley groups intermarried with the Habenapo and Kulanapo and ceased to exist separate groups as a result of this intermarriage. Theodoratus Comments, p. 3. |
| How Scotts Valley's Ancestors Relate to the Modern Band | The Band's expert states that Scotts Valley "are descendants of one tribelet (variously termed Yemabak/Yima/Boilkai/Moal-kai) which occupied land northwest of the town of Lakeport on the western side of Clear Lake." Some sources state that "a Northern Pomo group (Komli) immigrated to Clear Lake from the Ukiah Valley (to the north and west of Clear Lake) just before non-Indian contact. The Komli were allowed to reside with the Yemabak and at first retained a separate | The Yemabak tribelet (Yimaba), on the west side of Clear Lake, clearly demonstrates the flexible aspects of this complex Pomo social system.   The tribelet was composed of two distinct groups: The Komli who spoke a northern Pomo dialect and the Boalke, who spoke an eastern dialect came together a few years prior to non-Indian contact…The Komli came to Clear Lake from the Ukiah valley |

32

captain. Over time, the two groups amalgamated into a single tribelet at Scotts Valley. The Band's expert presents no information as to when the two groups no longer had separate captains and no longer spoke variations of Pomo. Solano County Legal Memo (Dec. 23, 2016). p. 5.

By contrast, the Scotts Valley Tribal Chairman submitted a statement that his Band is descended from three Eastern Pomo tribelets that occupied territories on the west side of Clear Lake: Yimabak/Moalkai, Kulanapo and Habenepo. These tribelets were among several that were party to the August 20, 1851 Treaty that was negotiated by Agent Redick McKee. In turn, the Howard and McClurken Report claims that the modern Scotts Valley Band has ancestors from diverse Pomo villages (not just from the Eastern Pomo ones around Clear Lake) as well as from some non-Pomo villages. Solano County Legal Memo (Dec. 23, 2016). p. 5.

where they had been driven away by a Central Pomo group. The Boalke provided them territory for a village in the Clear Lake vicinity and eventually the two groups united into one village, replacing two separate villages. Theodoratus Report (Jan. 29, 2016), pp. 6-7.

As to the issue of "when the two groups no longer had separate captains and no longer spoke variations of Pomo," the Komli came to the Clear Lake area previous to non-Indian contact and maintained their political structure at the Lake. After being there "a while" they were incorporated into a single village with two captains, one from each group. This demonstrates the flexibility of the Pomo socio-political system.

There is no evidence of whether the Komli spoke variations of Pomo after remaining at Clear Lake. This is an odd assumption that the Komli would no longer speak their dialects. That said, we do know that the descendants form a very large contingent of the Scotts Valley tribe intermarried people from other areas. Theodoratus Report (Jan. 29, 2016). p. 11.

It is true that Kulanapo and Habenapo are groups to the south also speaking Eastern Pomo dialects that participated in the 1851 treaty negotiations. These groups intermarried prior to contact. Theodoratus Report (Jan. 29, 2016). p. 11.

The political and social system was greatly disrupted in post contact times and eventually many (60 – 100) tribal people came together at Mission Turibius near Kelsey Creek in Big Valley (1867-1893) located in the Kulanapo/Habenapo Eastern Pomo territory. This area had a great influx of persons from other tribelets during the 1870 Ghost Dance movement. Clear Lake was an important area where people came to learn the new religion brought to them by the Patwin. Theodoratus Report (Jan. 29, 2016). pp. 8-9.

Howard and McClurken make note of the many people who came and stayed in the Clear Lake area, settling there and marrying local tribal

33

AR0004445

| | | persons.  Howard and McClurken Report (January 29, 2016), *passim*. |
|---|---|---|
| Establishment of Scotts Valley Rancheria | According to the Howard and McClurken Report the Indians who were accorded a reservation in 1911 known as the Scotts Valley or Sugar Bowl Rancheria not only descended from Clear Lake Pomo, but also from non-Eastern Pomo and even non-Pomo Indians who were born outside of the Clear Lake area. The reason for this stems from the way in which the Rancheria was established. | The Bureau of Indian Affairs subsequently charged Special Agent Charles E. Kelsey with purchasing lands for landless Pomo people.  In 1909, Kelsey negotiated with landowners for the purchase of a parcel located north of Clear Lake, land that became Upper Lake Rancheria. The agent intended to move all Pomo living in the vicinity to Upper Lake, but the Scotts Valley Band resisted… Agent Kelsey optioned a second location for the Scotts Valley Pomo in 1911.  Howard and McClurken Report, pp. 35-36.<br><br>The Scotts Valley Rancheria was meant to provide a secure home for the SVBPI ancestors who lived there.  However, the Rancheria was not capable of supporting the people who lived there so they and other SVBPI ancestors continued to live in the San Pablo Bay Region in the twentieth century.  Supplemental Report: History of the Scotts Valley Band of Pomo Indians and the San Pablo Bay Region, by Dr. Hurtado and Dr. Theodoratus.  (May 3, 2018) |
| Ancestors at the Scotts Valley Rancheria | The Howard and McClurken report states that those at the 1911 reservation came from many different tribelets, something that is not addressed by Theodoratus. Solano County Legal Memo (Dec. 23, 2016). p. 5, f.3. | Charles E. Kelsey prepared a list of the Indians in Scott Valley that were slated to receive land for a Rancheria.  This list was contained in a letter, dated May 26, 1911, to Commissioners of Indian Affairs, Washington, D. C. ("Kelsey Letter").  The Kelsey Letter lists 16 households, which include a total of 58 individuals.  Only the head of each household was named. See, the 1910 United States Federal Census, Indian Population, Township 4 Scotts Valley precinct, and Township 4 Big Valley precinct included all 58 people.  Theodoratus Appendix (February 2018). p. 9.<br><br>The 58 people were counted in 15 households more or less correspond to those counted by Kelsey as the original households of the Scotts Valley Rancheria. Howard and McClurken Report, p. 28.<br><br>In the Theodoratus Appendix, these 58 individuals are traced back to the 1880 census to |

34

AR0004446

| | | |
|---|---|---|
| | | show the connection of Scotts Valley to the earlier population, thus providing the continuity through time of the Eastern Pomo population and the inclusion of some Patwin ancestry. |
| Augustine | [A] large number of contemporary Scotts Valley tribal members descend from Clear Lake Pomo Captain Augustine (1830-1919) who purportedly was a prominent figure historically. However, his brother and the latter's descendants are not members of the Scotts Valley Band. Are they members of other Clear Lake Pomo bands? How did Captain Augustine's sole son become the ancestor of a large number of contemporary Scotts Valley Band members? Who else was a member of the Band contemporaneously with Captain Augustine in the nineteenth century? Solano County Legal Memo (Dec. 23, 2016), p. 5. | This topic is addressed at length in the Hurtado Augustine Report (May 3, 2018).

Augustine, also known as Shuk or Cuk, is significant for three reasons.  First, Augustine was a chief of the Kulanapo that is a major subdivision of the SVBPI. At the time of the distribution of Scotts Valley Rancheria lots in 1958 approximately 90% of SVBPI members traced their lineage back to Augustine, which is a common surname among the SVBPI. Augustine selected his brother as his successor sometime before his death in 1903.   From Augustine's time forward, the Augustine name has been associated with SVBPI leadership.

Second, Augustine's testimony published in 1880 is one of the most important sources of historical knowledge about the period c. 1840-1851.   Indeed, his testimony is the only first-hand SVBPI ancestral account of that era at Clear Lake and the San Pablo Bay Region (SAN PABLO BAY REGION).   He was a key figure in the well-known Kelsey-Stone killings, an event that led to the infamous Bloody Island massacre in 1850.

Third, Augustine began to work for Salvador Vallejo in southern Napa County in the 1840s. He does not appear in censuses of the Clear Lake region in 1850, 1852, or 1860 (or in Napa County for that matter).   However, many Indians who worked on ranches were not enumerated in this time period. Augustine was no doubt one of many SVBPI ancestors who worked for ranchers in Napa County in the 1850s and 1860s, but who went unnoticed in the official record.   However, Augustine is identified in the 1870 census in southern Napa County. Thus, Augustine is an exemplar of the SVBPI labor connection with the Napa Valley. Augustine's life illustrates the relationship between Clear Lake Indians and the Mexican rancheros around San Pablo Bay and in the vicinity of Vallejo.   Augustine was a source for my first report on Clear Lake Indians in the San |

AR0004447

| | | |
|---|---|---|
| | | Pablo Bay region, but now we can document his presence and residence in close proximity to the Vallejo site as a child and an adult.   As set out in this brief biography, Augustine's relationship with this area was long-lasting and extended well into the American period. |
| Ancestral Connections to Vallejo | The Band's expert anthropologist provides no information in her report that connects the Scotts Valley Band historically to land in or near Vallejo. | The Band has submitted substantial arguments and evidence of its connection to the Vallejo parcel.   These appear in the following: the January 29, 2016 Legal Analysis in Support of Request for an ILO, the January 29, 2016 Report by Dr. Dorothea Theodoratus; the January 29, 2016 Report by Dr. Albert Hurtado ("Hurtado Report 1"); the January 29, 2016 Consolidated Report by Dr. Heather Howard and Dr. James McClurken ("Consolidated Report"); the January 29, 2016 Declaration of Patricia Franklin, Tribal Secretary; the June 29, 2016, Memorandum of Dr. Hurtado to Maria Wiesman; the November 13, 2016, Comments by Dr. Theodoratus;   the November 14, 2016, Comments by Dr. Hurtado; the December 6, 2016, Comments by Dr. Hurtado;   and the May 3, 2018) Supplemental Report:   History of the Scotts Valley Band of Pomo Indians and the San Pablo Bay Region, by Dr. Hurtado and Dr. Theodoratus. |
| Presence in San Pablo Bay Region | | |
| | "No evidence of any kind has been found linking the Band to Vallejo, to Solano County, or to the north shore of San Pablo and San Francisco Bays" Stephen Beckham Report, pp. x-xi. | The Band has submitted substantial arguments and evidence of its connection to the Vallejo parcel.   These appear in the following: the January 29, 2016 Legal Analysis in Support of Request for an ILO; the January 29, 2016 Report by Dr. Dorothea Theodoratus; the January 29, 2016 Report by Dr. Albert Hurtado ("Hurtado Report 1"); the January 29, 2016 Consolidated Report by Dr. Heather Howard and Dr. James McClurken ("Consolidated Report"); the January 29, 2016 Declaration of Patricia Franklin, Tribal Secretary; the June 29, 2016, Memorandum of Dr. Hurtado to Maria Wiesman; the November 13, 2016, Comments by Dr. Theodoratus;   the November 14, 2016, Comments by Dr. Hurtado; the December 6, 2016, Comments by Dr. Hurtado;   and the May __, 2018) Supplemental Report:   History of the Scotts Valley Band of Pomo Indians and the San |

36

AR0004448

| | | Pablo Bay Region, by Dr. Hurtado and Dr. Theodoratus. |
|---|---|---|
| **Band as Seasonal and Permanent Labor Force** | | |
| Decimation of Suisun Patwins | | Before contact with the people and institutions of Spain (after 1769) the San Pablo Bay region was the ancestral homeland of Patwin, Miwok, and Wappo people.  In particular, the land where the Mexican land grant claim to Rancho Soscol, Solano County, and the City of Vallejo and now stands was Patwin territory Hurtado Report (Jan. 29, 2016). p. 9.<br><br>The Patwin population substantially declined due to the ravages of the 1837 smallpox epidemic.  Early twentieth century reported that the Patwins were reduced from 60,000 to a mere 200.  Hurtado Comments (Nov. 14, 2016). pp. 12-13. |
| Shared historical connection with Patwin | "Vallejo is widely and consistently documented as Patwin territory…" Yocha Dehe Supplemental Legal Memo. p. 1.<br><br>"It is, in fact, undisputed that the northeastern area of San Francisco/San Pablo Bay was the homeland of Patwin (or Wintu speaking) groups, and all of the area encompassing Vallejo, indeed all of Solano County, is well recognized as Patwin (or Wintu territory)." Yocha Dehe letter to Acting Assistant Secretary Roberts (July 18, 2016). p. 2. | The Band does not argue that its historical connections to San Pablo Bay region somehow negates Patwin history.  Rather, the Band have an independent historical connection to the region based on their work and other activities there.  It is not unusual for more than one group to have a historical connection to one place. Hurtado Comments (Nov. 14, 2016). p. 12. |
| Seasonal, Voluntary labor in the vicinity of the Project Site | While it was common for the neophytes to become laborers at Mexican ranchos after secularization, Hurtado provides no evidence that the Indians who worked at Mariano Vallejo's rancho in Sonoma County were from Clear Lake and specifically from the tribelets that are allegedly ancestral to the contemporary Scotts Valley Band. If the neophytes at the missions were not Clear Lake Indians to begin with, then there is no evidence that Clear Lake Indians generally and Scotts Valley ancestors in particular were forced to work at ranchos in Patwin territory and far from their indigenous villages. Solano County Legal Memo, pp. 7-8. | Patwin population losses made it impossible for the Vallejos, Juarez and other local rancheros. to rely solely on local Indians for the labor that they required.  Hurtado Comments (Nov. 14, 2016). p. 12.<br><br>Fortunately for San Pablo Bay rancheros Salvador Vallejo had located an abundant source of Indian labor at Clear Lake. Augustine, SVBPI ancestors, and other Clear Lake Pomo eventually worked and resided on the ranchos of the Vallejos, Juarez, and other local rancheros. Hurtado and Theodoratus Supplemental Report (May 3, 2018), p. 7.<br><br>Contemporary observers noted that it was quite common for the Band's ancestors to come down |

37

AR0004449

|  |  |  | from Clear Lake to work for the farmers in the area of the Vallejo Property during the period of contact - especially in the adjacent Napa area. Hurtado Comments (Dec. 6, 2016). pp. 9-11

SVBPI ancestors began living in the San Pablo Bay Region in 1837 when at least three children (including Chief Augustine) were baptized at the mission in Sonoma, approximately 15 miles from the SVBPI project site in Vallejo. Hurtado and Theodoratus Supplemental Report (May 3, 2018). p. 2.

The hiring of Indians from Clear Lake was a matter of common knowledge that was widely reported, although specific origins were not always given.  Frank Leach, a newspaperman, moved to Napa as a boy in 1857 and recalled that in the summer and during harvest "hundreds of Indians from the north would come to Napa and camp *with their families* about the town."   By this time wheat farming had replaced livestock ranching as the primary agricultural pursuit in Napa Valley.  In 1862 a Napa newspaper reported that "Harvest time has brought our valley a large number of Clear Lake Indians, many of whom, we are told, are exceedingly useful in the field, and bind [wheat] equal to, or better than many white men."   The same newspaper reported that after the harvest, the Indians were "flush with money," and were able to afford stage fare for their travels. Hurtado and Theodoratus Supplemental Report (May 3, 2018), pp. 13-14.

Thus, by the 1860s there was a well-established pattern: Indians from Clear Lake lived part of the time on ranches around the lake and part of the time they took their families to Napa and other places in the south to do agricultural labor for wages.   Their labor was essential for Napa County farmers, and the wages were an integral part of the economic and social life of the Indians.   Hurtado and Theodoratus Supplemental Report (May 3, 2018). pp. 13-14.

Writing specifically about the SVBPI ancestors at Rancho Lup-Yomi, special agent Bailey emphasized the integration of wage labor in Napa Valley and subsistence farming at Clear Lake.   With the permission of the owner, the |
|---|---|---|---|

AR0004450

| | | |
|---|---|---|
| | | Indians (SVBPI ancestors) on Rancho Lup-Yomi cultivated fields near the lake and fished in order to "subsist themselves comfortably. In the Spring time and harvest, the men go down into Napa and Sonoma Valleys, and hire themselves, at good wages to the farmers there, and thus procure the means of clothing themselves and families." Thus, SVBPI ancestors and their families occupied private ranchos at Clear Lake *and* the Napa Valley. SVBPI ancestors had to do this in order to survive as viable communities. Hurtado and Theodoratus Supplemental Report (May 3, 2018). pp. 13-14. *See also*, Sherwood Valley letter, Dec. 21, 2016. |
| Occupancy and subsistence in the vicinity of the Project Site | | The historical record shows that there was a significant historical connection between SVBPI ancestors and the San Pablo Bay region. SVBPI ancestors were taken to the mission at Sonoma as early as 1837. Like Augustine, they eventually worked for Mexican rancheros such as Salvador Vallejo and Cayetano Juarez whose property was near the SVBPI project area. During the American period (c. 1846-1880) SVBPI ancestors continued to work as agricultural and domestic laborers. Federal Indian agents reported that SVBPI ancestors worked in Napa and Sonoma counties. During that period SVBPI ancestors subsisted for part of the year on hunting, fishing, and some crops grown on land with the farmer's permission. For the other part of the year they and their families worked for money on ranches in Sonoma and Napa counties near the SVBPI project area. These two activities were mutually reinforcing: SVBPI ancestors needed to work in the San Pablo Bay Region in order to supply their families with cash to buy market goods. Thus, the SVBPI ancestors' economic territory necessarily included the San Pablo Bay Region because they needed both areas in order to survive a time when they were dispossessed and exploited. The significant historical connection between the SVBPI and the San Pablo Bay Region continued through the twentieth century and to the present day. Hurtado and Theodoratus Supplemental Report (May 3, 2018). pp. 20-21. |

39

| | | |
|---|---|---|
| Kidnapped and Enslaved Indians; Forced Labor | Hurtado notes for example that Indians were kidnapped for labor in the second half of the nineteenth century and that there were Indian children with no listed last name in households not headed by an Indian adult in the 1852 and 1860 Solano County censuses. While these individuals may in fact have been kidnapped at some point in their life, Hurtado provides no evidence that those children were Scotts Valley ancestors or even from Clear Lake. They could have been kidnapped from myriad tribes in California. Without specific evidence that these individuals were in fact from Clear Lake and from the tribelets that were allegedly ancestral to the Scotts Valley Band, the data is of no significance with respect to the Band's historic connection to land at Vallejo. Solano County Legal Memo, p. 9. | Although some Clear Lake Indians and SVBPI ancestors worked voluntarily for whites, the enslavement of some Indians continued through the end of the Mexican period and was adopted by Americans who settled in the region after the United States conquered California.   Hurtado and Theodoratus Supplemental Report (May 3, 2018). p. 11.

In the 1940s, Henry Mauldin, a farmer in Big Valley, began to interview Lake County residents about the history of the region.    He interviewed the descendants of white settlers and Indians who repeated stories that they heard from their parents and other old-timers.    The dates of events were often unstated but may be broadly inferred from internal evidence (e.g., the 1850s).   Mauldin had a special interest in Indians and took extensive notes about them and their history.   Some Americans made a business of capturing Clear Lake Indians and selling them to ranchers.   One woman who lived in Big Valley (which is an important part of the SVBPI homeland) reported seeing kidnappers with Indian children hanging in bags on pack horses as they were being transported to Sonoma and Napa counties for sale in the 1850s.      Hurtado and Theodoratus Supplemental Report (May 3, 2018). pp. 11-12.

The killing of adults and kidnapping of children had a devastating effect on the Clear Lake Indian population.   In 1859 a Napa newspaper reported that Clear Lake Indians had "dwindled from 10,000 in 1849 to a mere remnant of about 500 in all."   Hurtado and Theodoratus Supplemental Report (May 3, 2018). p. 13. |
| Mission San Francisco de Solano and Rancho Suscol | After the missions were secularized, Hurtado's report also leaves unanswered many questions with respect to what happened to the neophytes (Christianized Indians) at the missions. While it was common for the neophytes to become laborers at Mexican ranchos after secularization, Hurtado provides no evidence that the Indians who worked at Mariano Vallejo's rancho in Sonoma County were from Clear Lake and specifically from the tribelets that are allegedly ancestral to the contemporary Scotts Valley Band. If the neophytes at the missions were not Clear Lake Indians to begin with, | Mission San Francisco de Solano is 17 miles from the project site.

In 1837, thirty Pomo children were taken to the mission San Francisco Solano at Sonoma where they were baptized.   This group included Augustine.   Two other SVBPI ancestors, Francisco, and Truppi can be traced in SVBPI family history.   Hurtado and Theodoratus Supplemental Report (May 3, 2018). p. 7. In fact, at least sixteen Indians from Augustine's |

40

| | | |
|---|---|---|
| | then there is no evidence that Clear Lake Indians generally and Scotts Valley ancestors in particular were forced to work at ranchos in Patwin territory and far from their indigenous villages. Solano County Legal Memo, pp. 7-8. | community of origin were associated with the Mission San Francisco de Solano. Hurtado and Theodoratus Supplemental Report (May 3, 2018). p. 8.<br><br>Augustine remained in the mission for an unknown length of time before becoming a vaquero (cowboy) for Salvador Vallejo who had extensive land grants in southern Napa County. Before the mission was secularized in 1834, the establishment included many thousands of acres of pasturelands for the mission's extensive cattle herds.  These cattle grazed on the land that became Rancho Suscol, site of the SVBPI project site.  Mission Indians, such as Augustine, herded the mission cattle.  Mariano Vallejo was the first administrator of San Francisco Solano, and in 1839 his brother Salvador took over that post.  Thus, the Vallejos managed mission holdings until they were disposed of.  Management of the Rancho Suscol was part of the Vallejo's responsibilities as administrators.  Eventually Mariano claimed Rancho Suscol, even though it was regarded as government property, and sold the cattle that grazed there.  According to a Mexican soldier who served under the Vallejos, after 1845 Mariano "had vaqueros & cattle on the Rancho [Suscol]."  These vaqueros could well have included Augustine or any of the other SVBPI ancestors who passed through the mission. Hurtado Augustine Report, p. 5. |
| Census Records Provide Substantial Evidence of Scotts Valley very near the Project Site from the 1840s to 1880s. | There is much in the Hurtado report that does not address the composition and actions of the historical ancestors of the Scotts Valley Band. And much that he does address is speculative and without documentary support, as discussed above. This simply does not provide the necessary evidence to show that Scotts Valley has a "significant historical connection" to lands in Vallejo. Solano County Legal Memo, p. 10. | Analysis of census data demonstrates that several SVBPI families have historic connections to the San Pablo Bay Region that existed over a long period of time.  Hurtado and Theodoratus Supplemental Report (May 3, 2018) addresses this issue at length.   The Augustine and Frese families are prime examples.   Professors Hurtado and Theodoratus provide several other examples.    See also Theodoratus Appendix.<br><br>In short, SVBPI ancestors began living in the San Pablo Bay Region in 1837 when at least three children (including Chief Augustine) were baptized at the mission San Francisco de Solano. Hurtado and Theodoratus Supplemental Report (May 3, 2018). p. 2.    By the 1860s there was a well-established pattern: Indians |

41

AR0004453

| | | from Clear Lake lived part of the time on ranches around the lake and part of the time they took their families to Napa and other places in the south to do agricultural labor for wages. Hurtado and Theodoratus Supplemental Report (May 3, 2018). pp. 13-14. |
|---|---|---|
| **General Issues** | | |
| Notice to Local Governments | No notice was given to the surrounding tribes with historic ties to the area or to the affected cities and counties, or to the State. Senator Feinstein letter to Secretary Sally Jewell (July 22, 2016). p.1. | The Band, as a restored Indian tribe, is seeking a legal opinion that the property in Vallejo, were it to be accepted into trust status, would be eligible for gaming under the restored lands exception. This opinion is not a final decision of the Bureau of Indian Affairs constituting final agency action.    It is just that – a <u>legal opinion.</u> <br><br> Nothing in IGRA or the implementing regulations require notice to the State, nearby Indian tribes or local governments when the Bureau opines on whether land may qualify for a legal exception to general prohibition contained in IGRA. By contrast, local government "consultation" is integral to the "two-part determination," which is a separate exception for allowing gaming on land acquired into trust status after 1988.   But IGRA does not require such input to be a part of the Secretary's "restored lands" opinion.   It is a rational distinction because a restored lands opinion is fact-based and does not depend on satisfying the State's public policy or evaluating potential impacts on the local community. <br><br> In any case, public comment, including input from State and local government, is always a part of the NEPA assessment that will be required before the U.S. takes the land into trust. Furthermore, state and local governments will also be allowed to provide comments on any jurisdictional problems or land use conflicts associated with the fee-to-trust acquisition. <br><br> Nevertheless, the Band has provided copies of its submission materials to the City of Vallejo and County of Solano, as well as continuing to engage in numerous meeting with various city, county and state government officials and have earned the support of a local state Assemblyman.   See Letter from Assemblyman |

42

| | | Jim Frazier to Assistant Secretary Roberts (Nov. 14, 2016).<br><br>The Band has met with stakeholders and earned the support of critical labor organizations. See Letter from Napa-Solano Building Trades to Assistant Secretary Roberts (Nov. 2016); Letter from Sprinkler Fitters to Assistant Secretary Roberts (Nov. 21, 2016). Local businesses and other Indian tribes from Clear Lake have also expressed support for our proposal. |
|---|---|---|
| Local Government desire to participate in ILO process | An ILO concluding the property qualifies as "restored lands" under IGRA would pave the way for the Interior Department to approve the Band's construction and operation of a casino in or near the City of Vallejo. City of Vallejo's letter to Acting Assistant Secretary Roberts (July 28, 2016). p. 1-2.<br><br>The City requests to be fully apprised and informed concerning the Interior Department's processing the Band's request for a restored lands opinion, and that the City be given an opportunity to review submitted documents and to fully participate in the process. Id.<br><br>"Not only is it essential that stakeholders and interested parties have an opportunity to express their views from the outset, but concurrent consideration can provide DOI with vital information that not otherwise enter the record." Rep. Mike Thompson, et al to Secretary Sally Jewell (Aug. 29, 2016). p.1.<br><br>"There are many local issues that necessitate local input." Napa County letter to Acting Assistant Secretary Roberts (Sep. 20, 2016), p.1. | A favorable ILO would be the first step. The road to opening a casino also requires that the U.S. take the land into trust, which will involve NEPA analysis and associated public participation, including input from the City and other local governments. The process also requires that the State and the Band negotiate a gaming compact, which is likely to include provisions that require the Band to negotiate separate enforceable agreements with local governments, including the City, and to mitigate any adverse impacts to the City.<br><br>However, Congress did not intend public comment to be part of the restored lands process. Under IGRA, local government "consultation" is integral to a "two-part determination," which is a separate method for allowing gaming on land taken into trust since 1988. But IGRA does not require such input to be a part of the Interior Secretary's "restored lands" determination. Compare 25 USC § 2719(b)(1)(A) (two-part) and § 2719(b)(1)(B)(iii) (restored lands).<br><br>This is expressly recognized in Interior's notice adopting the relevant regulations. It is a rational distinction because a restored lands determination is fact-based and does not depend on the State's public policy or evaluating impacts on the local community. That said, if the property is taken into trust and a gaming compact is executed, the City will be able to exercise some regulatory control over the property through its agreement with the Band. Furthermore, State and local government authority over crime at the property would be unchanged. |

AR0004455

| | | |
|---|---|---|
| | | In any case, public comment, including input from State and local government, is always a part of the NEPA assessment that will be required before the U.S. takes the land into trust. 73 Fed. Reg. 29354, 29361 (May 20, 2008).<br><br>Finally, the City and County collect less than $12,000 per year in property tax for the parcel. Because the property is undeveloped, no sales tax or other tax revenues are generated on the property. The property tax loss would be barely perceptible in comparison to the total collected annually - $15 million for the City and County and $487 million for the State. In addition, the loss of tax revenues and potential tax revenues will more than mitigated by direct payments the Band expects to make through local government agreements and its gaming compact, by the economic benefits of the addition of nearly 3,000 jobs, and the purchase of goods and services from local merchants by the Casino, its employees, and its patrons. |
| Distance from prior reservation | The property is "60 miles from the Band's reservation," or is "more than 60 miles from the Band's original reservation in distant, rural Lake County." Senator Feinstein letter to Secretary Sally Jewell (July 22, 2016). p.1.<br><br>"In fact, the Scotts Valley Band has its governmental headquarters in Lakeport within Lake County, which is over 80 miles away from the City of Vallejo. Lake County is also the site of the Band's original reservation." Solano County Letter to Acting Assistant Secretary Roberts (Aug. 23, 2016). p. 2. | Scotts Valley Band has absolutely no reservation land, trust land or other land held in restricted status. It is one of the last landless Indian tribes in California. Bloxham Memo p. 5; Fee-To-Trust Application ("FTT App.") (Aug. 11, 2016). p. 3<br><br>As a matter of historical fact, the Scotts Valley Band was landless until a very small parcel was acquired for the Band by the United States in 1911. Although inadequate to provide either a home or a living for the members of the Band, even that small parcel was taken from them a half-century later in 1965, when the Band was unlawfully "terminated" under the California Rancheria Act. Although the Band was restored to federal recognition in 1991, the Band's land base has yet to be restored. The Band is and has remained without an adequate land base since 1851 -- 165 years -- and has been without *any* land, adequate or not, for the past 51 years. Bloxham Memo p. 11-; Fee-to-Trust Application (August 11, 2016), p. 6.<br><br>The distance from the property to a prior reservation the Band had 51 years ago is not determinative of whether the Band should be permitted to establish connections to other land |

44

| | | |
|---|---|---|
| | | today. Indeed, more important is the substantial evidence that the Band has significant historical, modern and temporal connections to the property in which it hopes to have acquired in trust status.   These are the legal requirements imposed on Indian tribes by the United States for establishing connections to newly acquired land for the purposes of the restored lands exception, as contained in 25 C.F.R. § 292.12.<br><br>It is true that the Band has a presence in Lake County, but it is certainly no newcomer to the East Bay area. In fact, it has a widely dispersed membership from Lake County to Alameda County that has been acknowledged by the United States for at least 16 years.   In order to effectively serve the Band's dispersed membership, the Band has maintained both northern and southern governmental offices in Lakeport (within Lake County) and in Concord (within Contra Costa County), respectively since 2008. The southern office is a mere 16 miles from the site in Vallejo. Prior to 2008, the Band met for years in various eastern Bay Area locations including at a tavern, in a trailer, in rented rooms and in public parks. |
| Effects on local communities | "These casinos can also cause conflicts with local communities since the Indian Gaming Regulatory Act does not require tribes or the Department of the Interior to mitigate the effects of casino developments.   That is true even if the casino is incompatible with the local communities' planned land uses for the area, is not welcome by the local government, and creates increased burdens on local resources like police, fire, water, and traffic." Senator Feinstein letter to Secretary Sally Jewell (July 22, 2016). p. 1-2.<br><br>"The proposed area already suffers from severe traffic problems and severe water issues. A casino would exacerbate these two problems and many others, not just for Vallejo and Solano County, but for other surrounding areas as well, including Napa County, whose boundary is less than a mile from the proposed casino site." Napa County to Acting Assistant Secretary Roberts (Sep. 20, 2016). p.1. | First, the intended use of the land as a gaming facility is completely compatible with the local zoning. Here, the property is undeveloped land that is zoned for commercial use. Generally used for grazing, the land is adjacent to Interstate 80 and across from a Six Flags amusement park and the Solano county fairgrounds.   Two large commercial retail centers, including Costco and Target stores, are located on its southern border. It is flanked by vacant city-owned land on its other borders.<br><br>Second, these are concerns that are appropriately addressed in the tribal-state compact process.   While gaming compacts differ from one another, it is almost certain that the Band's compact with the State of California will require mitigation measures, including agreements between the Band and local government to address local concerns.   Tribal governments often commit in its compact or in local government agreements to fully fund the cost of additional burdens on police, fire, water, and traffic. These concerns will also be |

45

AR0004457

| | | addressed during the NEPA review process long before the United States takes the land into trust. |
|---|---|---|
| Fairness to other Indian tribes | "Equally problematic are the questions of fundamental fairness to other tribes, some who have ancestral ties to the area.  The 'restored lands' exception was never intended to give restored tribes an open-ended license to game on newly acquired lands.  Its purpose, instead, was to promote parity between established tribes, which had substantial land holdings at the time of IGRA's passage, and restored tribes, which did not." Senator Feinstein letter to Secretary Sally Jewell (July 22, 2016). p. 2.<br><br>"However, this 'reservation shopping' by the Scotts Valley Band takes away economic opportunity from tribes that actually have historic ties to the lands encompassed by Solano County." Solano County Letter to Acting Assistant Secretary Roberts (Aug. 23, 2016). p. 3. | The "restored lands" exception promotes parity by giving Indian tribes like Scotts Valley, which the federal government illegally terminated 60 years ago and disbursed what little land had been provided to it, a chance to enjoy the benefits of the most significant economic engine available to tribal governments, by restoring to the Band the right to exercise its sovereignty within a small portion of the land it formerly occupied.<br><br>The "restored lands" exception is narrow, not "open-ended."  It requires the Band to satisfy specific factual criteria.  It is potentially available only to a small number of Indian tribes, as a means of providing a measure of justice to tribes who are recovering from wrongful termination.  Nearly every restored tribe had their federal recognition restored by court order more than 25 years. The regulations set a 25-year deadline for acquiring lands in trust under the restored lands exception. As such, very few Indian tribes other than Scotts Valley Band can now seek to utilize the restored lands exception. See Letter from Chairman Gabriel Ray to Assistant Secretary Roberts (Oct. 5, 2016).<br><br>The Band was thoughtful and deliberate in the choice of the site with regard to its sister tribes. As a practical matter, there is no place in California where the Band can locate a gaming facility that will not be in competition to some degree with another Indian tribe's facility. There are already four small casinos in Lake County where our former reservation is located, three of which are in the immediate vicinity of that land.  There are several casinos in neighboring counties that are within close driving distance of the land.  Seeking to restore a homeland with a gaming component would be severely detrimental to the surrounding Indian tribes. |

46

AR0004458

| | | |
|---|---|---|
| *Carcieri v. Salazar* | The recent United States Supreme Court decision, *Carcieri v. Salazar*, No. 07-526 (2/24/09) disqualifies the Scotts Valley Indians from acquiring land for casino purposes, since they were not officially recognized by the federal government by 1934. Napa County to Acting Assistant Secretary Roberts (Sep. 20, 2016). p.2. | Recent legal authority confirms that the Secretary has authority to accept the Vallejo Property into trust for the Band in two respects.<br><br>First, the BIA conducted a so-called accept-or-reject election for the Band on whether to opt-out of the IRA, and the Band consequently appeared on the 1947 Haas list of such tribes. The Department of the Interior has determined that appearance on the Haas list of tribes is conclusive proof of a tribe's status as "under Federal jurisdiction" within the meaning of the IRA, as construed by the Supreme Court in *Carcieri v. Salazar,* 555 U.S. 379 (2009).   M-37029, March 12, 2014; Scotts Valley Band Fee-to-Trust Application (Aug. 11, 2016), p. 47; Scotts Valley Band Supplement to Fee-to-Trust Application (Dec. 6, 2017) pp. 4-47.<br><br>The Ninth Circuit and District of Columbia Courts of Appeals have since upheld the Department's M Opinion in general as a correct explication of the term "under Federal jurisdiction."   *County of Amador v. United States Department of the Interior,* 872 F.3d 1012, 1025 (9th Cir. 2017); *Confederated Tribes of Grand Ronde Community v. Jewell,* 830 F.3d 552, 563-565 (D.C. Cir. 2016).<br><br>Courts have also since upheld the Department's specific determination that appearance on the 1947 Haas list is conclusive proof of a tribe's status as "under Federal jurisdiction."   *Starkey v. Pacific Regional Director, Bureau of Indian Affairs,* 63 IBIA 254, 262 (2016); *State of Kansas v. Acting Eastern Oklahoma Regional Director,* 62 IBIA 225, 235-236 (2016) *Village of Hobart, Wisconsin v. Midwest Regional Director, Bureau of Indian Affairs,* 57 IBIA 4, 23-25 (2013); *Shawano County, Wisconsin v. Acting Midwest Regional Director, Bureau of Indian Affairs,* 53 IBIA 62, 71 (2011). Scotts Valley Band Supplement to Fee-to-Trust Application (Dec. 6, 2017). pp. 4-47.<br><br>Second, this conclusion regarding the Band's eligibility under the IRA is not affected by the fact that, at the time of the accept-or-reject election, the Band voted to reject the IRA.   In 1983, Congress overrode tribes' opt-out votes under the IRA in the Indian Land Consolidation |

47

AR0004459

| | | Act, 25 U.S.C. § 2201, *et seq.* Specifically, Congress determined that the IRA provision authorizing the acquisition of trust land "shall apply to all tribes notwithstanding the provision of section 478" which allowed tribes to opt out of the IRA. *Id., § 2202.* The Second Circuit Court of Appeals recently construed this provision to authorize the Secretary to accept land in trust for a tribe that had voted to reject the IRA at its accept-or-reject election, as had the Band. *Upstate Citizens for Equality, Inc. v. US,* 841 F.3d 556, 572 (2d Cir. 2016). Scotts Valley Band Supplement to Fee-to-Trust Application (Dec. 6, 2017). pp. 4-48. |
|---|---|---|

48

AR0004460



# SCOTTS VALLEY BAND OF POMO INDIANS

August 11, 2016

Amy Dutschke
Regional Director
Pacific Regional Office
Bureau of Indian Affairs
2800 Cottage Way
Sacramento, CA 95825

RE: Scotts Valley Band of Pomo Indians Fee-to-Trust Application

Dear Director Dutschke:

On behalf of the Scotts Valley Band of Pomo Indians ("Tribe"), I am very pleased to present the attached fee-to-trust application requesting the Secretary of the Interior to accept trust title to approximately 128 acres of land located in the City of Vallejo, California ("Vallejo Property"). This request is made pursuant to 25 U.S.C. § 465 and 25 C.F.R. Part 151.

As one of the last remaining Indian tribes in California with absolutely no trust land, we seek to have the Vallejo Property accepted in trust status to reestablish our homeland and build on that property a tribal community comprised of housing, governmental headquarters and economic development ventures, including, potentially, a gaming facility.

The Vallejo Property is at the southern end of land that the Tribe's ancestors ceded to the United States in an unratified treaty. It is centrally located between our two primary tribal population centers of the San Francisco Bay Area and further north in Lake and Mendocino Counties. We have selected land that is suitable for the purpose of reuniting our members in one location and in an area that will sustain our tribal community through social, cultural and economic opportunities.

Thank you for your time and attention to important matter. We stand ready to assist the Bureau of Indian Affairs and provide any additional information necessary to complete the process. If you have any questions, please feel free to contact the Tribe's Counsel, Patrick R. Bergin of Fredericks Peebles & Morgan LLP at (916) 441-2700.

Very truly yours,

Gabriel Ray, Chairman

1005 Parallel Drive • Lakeport, California 95453
Office 707 263-4220 • Fax 707 263-4345

AR0004461

The Tribe's members descend from the original Pomo band located in what is now called Scotts Valley near the western shores of Clear Lake, known as the Moalkai or Yimaba, as well as their closest neighbors and relatives the Kulanapo and Habenapo Pomo bands located in what is now called Big Valley on the western shores of Clear Lake. The three bands were parties to the unratified treaty concluded August 20, 1851, at Camp Lu pi-yu-ma between the United States and the eight Pomo bands located around Clear Lake.[3] In that treaty, the bands agreed to cede to the United States the lands between Clear Lake and the San Pablo Bay (including the Vallejo Property), and the United States agreed to secure the lands in and around Clear Lake as a reservation for the bands. Unfortunately for the Clear Lake bands and the other Indian peoples of California, neither the Treaty with the Clear Lake bands nor any of the other 17 treaties negotiated by federal officials in 1851 and 1852 were ever ratified by the Senate. As a result, neither the reservation contemplated by the Camp Lu pi-yu-ma Treaty, nor those provided in the companion treaties, were ever established.

Nevertheless, whether the land cessions were treated as if they had been effective, or perhaps as having been unnecessary to begin with, from the execution of the treaties the Clear Lake Bands were treated as if they had no existing property rights, and the Scotts Valley Band was landless until a very small parcel was acquired for the Band by the United States in 1911. Although inadequate to provide either a home or a living for the members of the Band, even that small parcel was taken from them a half-century later in 1965, when the Tribe was unlawfully "terminated" under the California Rancheria Act of 1958.[4] Nearly all of this land has passed to non-Indian ownership. Today, there is less than ½ acre of the original Rancheria left and it is held as an allotment by a tribal member. Although the Tribe was restored to federal recognition in 1991 by stipulated judgment in litigation between the Tribe and the United States, the Tribe's land base has yet to be restored, and the Tribe is and has remained without an adequate land base since 1851 -- 165 years -- and has been without *any* land, adequate or not, for the past 60 years. The termination of the Tribe's status as a federally recognized Indian tribe and subsequent landless restoration serves as a continuation of the historic wrongs inflicted upon the Tribe.

---

[3] *See* Exhibit 2, a true and correct copy of the Treaty of Camp Lu pi-yu-ma (August 20, 1851).
[4] *See* Act of August 18, 1958, P.L. No. 85-671, 72 Stat. 619, amended by Act of August 11, 1964, P.L. No. 88-419, 78 Stat. 390.

AR0004468



CALIFORNIA

Scotts Valley Band
BIA and IHS
Service Area

Clear Lake

Rancho Lupyomi

San Pablo Bay

296

Location Map
Northern California (1784 - 1894)
INDIAN LAND CESSION No. 296

AR0004501

**Part I.    The updated demographic profile of the Tribe confirms the Tribe's need for the proposed trust acquisition.**

In its original application, the Tribe addressed its need for the proposed trust acquisition, supported by the Declaration of Patricia Franklin. The data in Ms. Franklin's Declaration is updated in the attached Declaration of Gabriel Ray, now the Tribal Secretary, ("Ray Declaration"), Exhibit 21.[2] As did the Franklin Declaration, the Ray Declaration establishes the Tribe's dire and urgent need for the trust acquisition of the Vallejo Property, because of the need to establish a tribal territory for tribal governance, the need for tribal housing and employment, and the need for economic development.

First, the Ray Declaration confirms that the Tribe is currently landless. It has no territory to govern, despite having been restored to federal recognition twenty-six years ago.[3] The Tribe operates out of two offices that it rents, located in Lakeport and Concord, California, to support tribal government activities. Ray Declaration, ¶¶ 7, 8. Two tribal offices are necessary to provide services to the Tribe's members, now widely dispersed due to the illegal termination of the Tribe and loss of its Rancheria in 1965. As a result, the BIA has designated the Tribe's "near-reservation area" for purposes of the delivery of services as Contra Costa, Lake, Mendocino, and Sonoma Counties. *Id.* The Vallejo Property is only 16 miles from the Tribe's

---

even pending trust applications such as the Tribe's. As a result, prudence dictates that the Tribe respond to the proposed changes (as well as to any amendments to the proposed changes), to ensure that its application is complete at the time of processing.

[2] The exhibits attached to this supplement are numbered following those attached in support of the August 2016 Trust Application.

[3] The Tribe has established in its request for an Indian lands determination that its trust application for the Vallejo Property was made within the twenty-five-year ("ILD") deadline required for gaming eligibility. *See* 25 CFR 292.12 (c) (2).

AR0004505

southern office and, thus, will well accommodate the Tribe's need to consolidate tribal government functions. *Id., ¶* 11.

Second, tribal members' need for services, delivered in as efficient a manner as possible, is evident from the demographic profile of tribal members. There are currently 282 enrolled tribal members, including 165 adults, 117 minors, and 161 tribal households. *Id., ¶* 5. Out of the adult members, 71 (or approximately 43%) are presently unemployed. *Id., ¶* 6. And only 20 of the tribal households (or approximately 12%) are homeowners, with 38.5% of tribal households experiencing homelessness or overcrowding. *Id., ¶* 5. The Ray Declaration makes plain that the Tribe's decision-making on the trust application was driven, in large part, by the need to enhance tribal members' economic and housing security. *Id., ¶* 12. Indeed, more than half of the tribal households have indicated a desire to relocate to the Vallejo Property to take advantage of employment opportunities and housing to be developed there. *Id.* The Vallejo Property is well located for this purpose as well, since 25 of the tribal households (approximately 16%) reside within a 36-mile radius of the parcel and an additional 12% live in adjacent counties. *Id., ¶* 11.

Third, the development of the tribal homeland on the Vallejo Property requires an economic engine, which will be the casino resort. The Tribe has already demonstrated that the casino resort will generate far more jobs than there are employable tribal members and will result in sufficient tribal revenues to support the full build-out proposed on the Vallejo Property for all tribal purposes - consolidation of tribal government offices and residences for tribal members. *See* Exhibit 9, August 2016, trust application.

Given the Tribe's status as one of the few remaining landless tribes and the demographic profile and location of its members, there can be no serious doubt as to the

AR0004506

Tribe's need for trust land, in general, and the appropriateness of the acquisition of the Vallejo Property, in particular.

## Part II.    Recent legal authority confirms that the Secretary has authority to accept the Vallejo Property into trust for the Tribe.

The Tribe established in its August 2016 trust application that the Secretary has authority under the Indian Reorganization Act ("IRA") to acquire the Vallejo Property in trust for the Tribe.  August 2016 Trust Application, pp. 12-15.  Recent legal authority confirms the correctness of that analysis in two respects.

First, as the Tribe has already indicated, the BIA conducted a so-called accept-or-reject election for the Tribe on whether to opt-out of the IRA, and the Tribe consequently appeared on the 1947 Haas list of such tribes.  The Department of the Interior has determined that appearance on the Haas list of tribes is conclusive proof of a tribe's status as "under Federal jurisdiction" within the meaning of the IRA, as construed by the Supreme Court in *Carcieri v. Salazar,* 555 U.S. 379 (2009).  M-37029, March 12, 2014.  The Ninth Circuit and District of Columbia Courts of Appeals have since upheld the Department's M Opinion in general as a correct explication of the term "under Federal jurisdiction."  *County of Amador v. United States Department of the Interior,* 872 F.3d 1012, 1025 (9th Cir. 2017); *Confederated Tribes of Grand Ronde Community v. Jewell,* 830 F.3d 552, 563-565 (D.C. Cir. 2016).  Courts have also since upheld the Department's specific determination that appearance on the 1947 Haas list is conclusive proof of a tribe's status as "under Federal jurisdiction."  *Starkey v. Pacific Regional Director, Bureau of Indian Affairs,* 63 IBIA 254, 262 (2016); *State of Kansas v. Acting Eastern Oklahoma Regional Director,* 62 IBIA 225, 235-236 (2016) *Village of Hobart, Wisconsin v. Midwest Regional Director, Bureau of Indian Affairs,* 57 IBIA 4, 23-25 (2013); *Shawano*

AR0004507

*County, Wisconsin v. Acting Midwest Regional Director, Bureau of Indian Affairs,* 53 IBIA 62, 71 (2011).

Second, this conclusion regarding the Tribe's eligibility under the IRA is not affected by the fact that, at the time of the accept-or-reject election, the Tribe voted to reject the IRA. In 1983, Congress overrode tribes' opt-out votes under the IRA in the Indian Land Consolidation Act, 25 U.S.C. § 2201, *et seq.* Specifically, Congress determined that the IRA provision authorizing the acquisition of trust land "shall apply to all tribes notwithstanding the provision of section 478" which allowed tribes to opt out of the IRA. *Id.,* § 2202. The Second Circuit Court of Appeals recently construed this provision to authorize the Secretary to accept land in trust for a tribe that had voted to reject the IRA at its accept-or-reject election, as had the Tribe. *Upstate Citizens for Equality, Inc. v. US,* 841 F.3d 556, 572 (2d Cir. 2016). Similarly, the Secretary now has authority to accept the Vallejo Property in trust for the Tribe, notwithstanding the Tribe's earlier vote to opt out of the IRA.

**Part III.    The Tribe's application meets the additional considerations for off-reservation gaming acquisitions set out in the recent Consultation Draft changes to 25 CFR Part 151.11.**

As noted above, the Department has announced a discussion draft of proposed changes to the regulations governing the off-reservation trust acquisition process. In some respects, the proposed changes clarify or restate factors now required as part of any trust application. For example, the existence of statutory authority for the acquisition, the Tribe's need for the land, a map showing the location of the proposed trust site, and the economic benefits for the Tribe appear in the current regulations and are restated in the proposed changes. Those factors have already been addressed by the Tribe in its August 2016

AR0004508



50x100 Residential Lots

50x100 Residential Lots

50x100 Residential Lots

50x100 Residential Lots

50x100 Residential Lots

Tribal Residential Center

Tribal Government Offices

Central Plant

Surface Parking

Hotel

Casino Podium

Surface Parking

Steelman Partners℠
© 2016 Steelman Partners LLP

AR0004565

Scotts Valley Resort

MASTER PLAN (HOTEL, GOV'T OFFICES AND RESIDENTIAL CENTER PHASE 2)

January 26, 2016

Chief Augustine:

Significant Ancestor of the Scotts Valley Band of Pomo Indians (SVBI)

Albert L. Hurtado, Ph.D.

Professor Emeritus, University of Oklahoma

This report supplements and expands previous historical reports written by me and filed on behalf of the Scotts Valley Band of Pomo Indians (SVBI). Those reports are included here by reference.[1] This report is based on new information derived from research in historical records that are cited below. In sum, the report strengthens the SVBI's significant historical association with the project site and adjacent lands.

## 1. The Significance of Augustine

Augustine, also known as Shuk or Cuk, is significant for three reasons. First, Augustine was a chief of the Kulanapo that is a major subdivision of the SVBI. At the time of the distribution of Scotts Valley Rancheria lots in 1958 approximately 90% of SVBI members traced their lineage back to Augustine, which is a common surname among the SVBI. Augustine selected his brother as his successor sometime before his death in 1903. From Augustine's time forward, the Augustine name has been associated with SVBI leadership.[2]

Second, Augustine's testimony published in 1880 is one of the most important sources of historical knowledge about the period c. 1840-1851.[3] Indeed, his testimony is the only first-hand

---

[1] Hurtado, "The Scotts Valley Band of Pomo Indians," (2016); Hurtado, "Comments on Reports Submitted by the Yocha Dehe Nation Regarding SVBI Request for Determination," (2016); Hurtado, "Additional Comments on the Yocha Dehe Response," (2016).

[2] This figure was established by dividing the number of Scotts Valley distributees descended from Augustine by the total number of lots distributed. A Plan for the Distribution of the Assets of the Scotts Valley Rancheria, According to Provisions of Public Law 85-671, Enacted by the 85th Congress, 25 June 1959.

[3] Palmer, *History of Lake County*, 49-61, and passim.

1

AR0004566

SVBI ancestral account of that era at Clear Lake and the San Pablo Bay Region (SPBR).  He was a key figure in the well-known Kelsey-Stone killings, an event that led to the infamous Bloody Island massacre in 1850.

Third, Augustine began to work for Salvador Vallejo in southern Napa County in the 1840s.  He does not appear in censuses of the Clear Lake region in 1850, 1852, or 1860 (or in Napa County for that matter).  However, many Indians who worked on ranches were not enumerated in this time period. Augustine was no doubt one of many SVBI ancestors who worked for ranchers in Napa County in the 1850s and 1860s, but who went unnoticed in the official record.  However, Augustine is identified in the 1870 census in southern Napa County. Thus, Augustine is an exemplar of the SVBI labor connection with the Napa Valley. Augustine's life illustrates the relationship between Clear Lake Indians and the Mexican rancheros around San Pablo Bay and in the vicinity of Vallejo.  Augustine was a source for my first report on Clear Lake Indians in the San Pablo Bay region, but now we can document his presence and residence in close proximity to the Vallejo site as a child and an adult.[4]  As set out in this brief biography, Augustine's relationship with this area was long-lasting and extended well into the American period.


## 2. Augustine's Childhood in the Vicinity of the Vallejo Site

According to SVBI tradition and anthropologist E. W. Gifford, Augustine was born c. 1832 in the Kulanapo village of Bohanapwene, an Eastern Pomo-speaking group located near

---

[4] Hurtado, "The Scotts Valley Band of Pomo Indians," 36-37, 58-64.

AR0004567

present-day Kelseyville.  His father and mother were Bukalnis and Butckulu.[5]  Augustine's

Indian name was Shuk (or Cuk), which begs the question, how did he get the name Augustine? [6]

On September 24, 1837 about thirty Pomo Indian children were baptized at the Mission

San Francisco Solano in Sonoma.  The priest named one of them Agustin (the Spanish spelling

of Augustine).  His age was estimated as six, which would have made him about the same age as

Augustine, the SVBI ancestor.   Two other Pomo children were baptized with ties to Augustine's

Clear Lake community.  One child was given the name Francisco.   The SVBI Posh family says

that one of their ancestors was named Francisco and that he was a mission Indian.  The three

boys' parents were from Potriqui-Yomi. The native name of another child was given as

"Truppi," from whom the SVBI Treppa family appears to be descended.  Francisco was

baptismal number 1403; Truppi (Christian name Domingo) was baptismal number 1404; and

Agustin was number 1405, a pattern that further corroborates a probable relationship among the

boys.[7]

In addition to the three known SVBI ancestors, twelve additional children who were

baptized had both parents from Potriqui-Yomi making fifteen children who were from the same

[5] Gifford, *Clear Lake Pomo Society*, nos. 310, 311, 316, pp. 312-313.  Augustine's approximate year of birth is established in federal census records, e.g., U.S. Decennial Population Census, Manuscript, 1870, Napa County, Napa Township, p. 93, dwelling 721.
[6] In the nineteenth century it was common for Indians to adopt the name of the rancher who employed them, but there are no known ranchers with that name in the vicinity of Clear Lake or in the San Pablo Bay region in the Mexican and early American periods. Bancroft, *History of California*, "Pioneer Register," 2:688-689.
[7] All were identified as "Chujuluya (vulgo Cainamero)" in the mission records.  The meaning of Chujuluya is unknown, but vulgo Cainamero translates roughly as Pomo crowd or mob.  Almost all of the parents of these children were gentiles (non-Christians).  Franciscan missionaries gave Hispanic names (usually a saint's name) to newly baptized Indians.  Priests often recorded additional information about the origin and ethnicity of these so-called neophytes, or new Christians.  Mission San Francisco Solano, Baptismal numbers 1399-1429, Early California Population Project.  Indian children were sometimes brought to the Mission San Francisco Solano as prisoners taken in raids upon Indian communities.  As early as 1836 Salvador Vallejo took a military force to Clear Lake. After such forays Vallejo usually took prisoners back to Sonoma.  According to Charles Brown, a participant in one of these raids, "The prisoners were divided among the different ranches of the mission and put to work at the different trades.  The young women were put in the Monjero [a female dormitory] and the children taken care of."  Salvador Vallejo, January 15, 1853, in U.S. v. Henry F. Teschmaker, et al., *California Land* Claims, vol. 26, 4-5; Palmer, *History of Napa and Lake Counties*, 48; Brown, "Statement of Recollections of Early Events in California," 14; Hurtado, "The Scotts Valley Band of Indians," 27-38.

AR0004568

Pomo community as Augustin. The officiating priest noted that the father of one of the boys was a mission Indian, even though the father's origin was listed as Potriqui-Yomi.[8] Thus, in 1837 at least sixteen Indians from Augustine's community of origin (Potriqui-Yomi) were associated with the Mission San Francisco Solano in Sonoma. The identification of the Potriqui-Yomi father indicates that the SVBI ancestral presence in Sonoma may have been larger than the number that can be documented in the mission record.[9] The mission records, therefore, support SVBI ancestral presence in the SPBR approximately twenty miles from the project site.

The term Potriqui-Yomi is not found in the historical or anthropological literature. Because the Yomi suffix indicates that the names are in a Coast Miwok dialect, it is possible that Potriqui-Yomi is a Miwok word for Bohanapwene.[10] Lup-Yomi, for example, derives from a Miwok word.[11]

1837 was the year that smallpox devastated the Indian population of the San Pablo Bay region, especially the Patwin who had lived in southern Napa County and on Suscol Ranch. This demographic catastrophe decimated the labor force on which the rancheros had depended. Consequently, a new source of Indian labor had to be found.[12] Indians from Clear Lake like Augustine provided an ample source of replacement labor. A contemporary of Augustine,

---

[8] Mission San Francisco Solano, Baptismal numbers 1406, Early California Population Project.
[9] The baptism record for San Francisco Solano is not consistent. The group baptized on September 24, 1837, is unusual because the priest took the trouble to provide ethnic identity, parents' names, ages and other details for each child baptized. For whatever reason this level of detail usually was not provided at this mission. Consequently, we do not have a complete accounting of all SVBI ancestors at the mission.
[10] Milliken, "Ethnohistory and Ethnogeography of the Coast Miwok and Their Neighbors, 1783-1840," 99, assumed that the Potiyomi baptized at the Mission San Rafael in 1831 were the same as the Potriqui-Yomi people baptized at Mission San Francisco Solano in 1837, but he does not explain why he believes why "Poti" is the same word as "Potriqui." Nor does he explain the identification of the Potriqui-Yomi with "Chujulja (vulgo Cainamero)" as the ethnicity of the children at San Francisco Solano, while the Potiyomi were identified as "Col-locachama."
[11] Barrett, "The Ethno-Geography of the Pomo and Neighboring Indians," 195, 233.
[12] Hurtado, "The Scotts Valley Band of Pomo Indians," 39-41; Hurtado, "Additional Comments on the Yocha Dehe Response," (2016), 2-3.

AR0004569

Captain William Heath Davis, reported that Clear Lake Indians worked on all of the ranchos in the San Pablo Bay region.[13]

### 3.  Augustine Was Employed by Salvador Vallejo and other Rancheros as a Teenager and Adult

Augustine remained in the mission for an unknown length of time before becoming a vaquero (cowboy) for Salvador Vallejo who had extensive land grants in southern Napa County. Before the Mission San Francisco Solano was secularized in 1834, the establishment included many thousands of acres of pasturelands for the mission's extensive cattle herds.  These cattle grazed on the land that became Rancho Suscol, site of the SVBI project site.  Mission Indians, such as Augustine, herded the mission cattle.  Mariano Vallejo was the first administrator of San Francisco Solano, and in 1839 his brother Salvador took over that post.  Thus, the Vallejos managed mission holdings until they were disposed of.  Management of the Rancho Suscol was part of the Vallejo's responsibilities as administrators.  Eventually Mariano claimed Rancho Suscol, even though it was regarded as government property, and sold the cattle that grazed there.  According to José Ramon Mesa, a Mexican soldier who served under the Vallejos, after 1845 Mariano "had vaqueros & cattle on the Ranch [Suscol]."  These vaqueros could well have included Augustine or any of the other SVBI ancestors who passed through the mission.[14]

In 1838 Vallejo and his brother asked for permission to settle Rancho Lup-Yomi on Clear Lake, which he first visited in 1836.  They agreed to "domesticate those tribes [Kulanapo and their neighbors] and to convert them by gentle means, if possible, to a better system of

---

[13] Davis, *Seventy-Five Years in California*, 25.
[14] Davis, *Seventy-Five Years in California*, 25; Bancroft, *History of California*, "Pioneer Register," 5:759; Rosenus, *General M. G. Vallejo*, 14; Mesa, Transcript of Proceedings in Case No. 318, M. G. Vallejo and Assigns, Claimants vs. the United States, Defendant, for the Place Called "Soscol."

AR0004570

life."[15]  Accordingly, in 1839 the brothers built a house and corrals and placed thousands of livestock in Big Valley.[16]

Augustine reported that the Vallejo's first majordomo was a man named Juarez, probably Salvador Vallejo's Napa Valley neighbor and associate Cayetano Juarez who owned Rancho Tulucay that abutted Rancho Soscol (now known as Suscol) that was only 10-11 miles north of the SVBI project site.[17]  Juarez employed Clear Lake Indians at Rancho Tulucay, an arrangement that his connection with Rancho Lup-Yomi would have facilitated.[18]

By the time Augustine was a teenager he worked for Salvador Vallejo as a vaquero.[19] Whether he learned his trade while a mission neophyte or on Vallejo's rancho in Big Valley or one of Vallejo's Napa County ranchos is unknown.  In any case, one of the duties of vaqueros would have been to drive cattle to the killing grounds near the bay so that their hides could be transported to foreign markets.[20]

In the fall of 1847 Augustine found that he had new employers who had bought out the Vallejo's interest in Rancho Lup-Yomi.  The new owners included Benjamin and Andrew Kelsey, Charles Stone and Edward Shirland.[21]  They were cruel masters who beat Augustine and otherwise abused him and the other Indians who lived in Big Valley.  Stone and Kelsey took a fancy to Augustine's young wife and forced her to live with them in their adobe house.

---

[15] Salvador and Juan A. Vallejo to Mariano Vallejo, October 11, 1838, in U.S. v. Henry F. Teschmaker, et al., *California Land* Claims, vol. 26: 9.
[16] Salvador Vallejo, January 15, 1853, in U.S. v. Henry F. Teschmaker, et al., *California Land* Claims, vol. 26, 4-5.
[17] Palmer, *History of Napa and Lake Counties*, 49.  Cayetano was the only Juarez reported living in the San Pablo Bay region in Bancroft, *History of California*, "Pioneer Register," 4:696.
[18] The longstanding relationship between Clear Lake Indians and the Juarez ranch is well illustrated by a reminiscence from the Juarez family.  In about 1885 two old Indians came to Rancho Tulucay.  They had come all the way from Lake County to see "'Chief' Don Cayetano," who had been "very good to all of them and . . . they wanted to see him and thank him."  Vivien Juarez Rose, "The Past is Father to the Present," 31.
[19] Palmer, *History of Lake and Napa Counties*, 50.
[20] Hurtado, "The Scotts Valley Band of Indians," 43-45.
[21] Palmer, *History of Lake and Napa Counties*, 50.

6

In the spring of 1848 Kelsey, Stone and other whites drove Augustine and 172 Scotts Valley and Big Valley Indians to Sonoma to work on Benjamin Kelsey's Rancho Buena Vista, which is about sixteen miles from the project site in Vallejo.  Augustine stayed for about one month and then went back to Rancho Lup-Yomi where he was severely punished for leaving Sonoma.  Augustine was allowed to remain at Clear Lake, but Kelsey sent "a lot of other Indians" from Big Valley to Napa where they built an adobe house for Salvador Vallejo.  According to Augustine, these Indians were gone "for a long time."[22]

Augustine and his Clear Lake kin decided to rid themselves of their abusive overlords.  In December 1849 they killed Andrew Kelsey and Charles Stone.  Augustine and his young wife played a leading role in the killings.[23]  The following year a U.S. Army force marched to Clear Lake where they killed 75-150 Indians on Bloody Island at the northwest end of the lake.[24]  Augustine survived this onslaught.[25]

White witnesses described how the labor system operated at Rancho Lup-Yomi in the 1850s.  In 1858, Indian laborers were the rancher's "feudatories, and while he protects them, they serve him."[26]  Indeed, Rancho Lup-Yomi Indians "made capital vaqueros," G. Bailey wrote, who could be employed "at a moderate price."  In addition to livestock work Clear Lake Indians

---

[22] Palmer, *History of Lake and Napa Counties*, 60.  The structure that they built was very likely the Vallejo house that became known as the Longwood Adobe situated approximately thirteen miles north of the project site.  Hendry and Bowman, *The Spanish and Mexican Adobe and Other Buildings*, 3:392-393; Hoover, Rensch, and Rensch, *Historic Spots in California*, 3rd ed., 243.

[23] Palmer, *History of Lake and Napa Counties*, 56, 60; Radin and Benson, "The Stone and Kelsey 'Massacre,'"269-271.

[24] Palmer, *History of Lake and Napa Counties*, 61-62; Nathaniel Lyon to E.R.S. Canby, May 22, 1850, M210, reel 5.

[25] One year later the federal government sent commissioners to California to negotiate treaties with the Indians.  In August 1851 one of them, Redick McKee, and a force of soldiers went to Clear Lake and parlayed with the Habenapo, Kulanapo, Moal-ki (Yi-ma), and other Clear Lake Indians.  All agreed to the establishment of a reservation that encompassed Clear Like while obligating the government to provide provisions to the Indians.  Significantly, the Indians were required to take delivery of the provisions at Eden Ranch, a farm on the outskirts of Vallejo (not far from the project site), which they did in the fall.  Hurtado, "The Scotts Valley Band of Indians," 77-87.

[26] U.S. Department of the Interior, Bureau of Indian Affairs, G. Bailey to Commissioner of Indian Affairs, November 4, 1858, M234:36.  Emphasis in original.

AR0004572

found employment in the fields. "In the springtime and harvest, the men go down into Napa and Sonoma Valleys, and hire themselves, at good wages, to the farmers there, and thus procure the means of clothing themselves and families."[27]

In the 1860s Clear Lake Indians continued to be important to Napa agriculture. "Harvest time has brought our valley a large number of Clear Lake Indians," who "were exceedingly useful in the field," a Napa newspaper reported in 1862.[28]

## 4. In 1870, Augustine Was Employed in Napa Township in Close Proximity to the Vallejo Site

It is not known exactly when Augustine was recognized as a chief among the Kulanapo but by the late 1870s white observers understood that he held this position.[29] According to SVBI tradition Augustine derived some of his prestige because of his ability to find employment for his people.[30] Employment was not merely an economic issue, it could be a matter of personal liberty, life, or death. California law required Indians to be employed or be subject to indenture to white ranchers.[31] Regardless of the law slave raiders attacked Clear Lake Indian communities and kidnapped children to be sold to ranchers in Napa Valley and elsewhere.[32] Consequently, Indians sought employment with ranchers in order to have some protections from kidnappers as well as the state Indian indenture law. Augustine's work experience, connections to rancheros

---

[27] U.S. Department of the Interior, Bureau of Indian Affairs, G. Bailey to Commissioner of Indian Affairs, November 4, 1858, M234:36.
[28] "Mucho Indian, Napa *Pacific Echo*, July 4, 1862, p. 2.
[29] Palmer, *History of Lake and Napa Counties*, 32.
[30] Jesse Gonzalez, SVBI historian, explained this to anthropologist Dorothea Theododratus.
[31] Hurtado, "The Scotts Valley Band of Indians," 75-76.
[32] This practice was widespread in the Clear Lake region. One old settler in Big Valley reported seeing Indian children being transported southward in saddle bags. Another account describes a slaver creeping into an Indian camp at night, cutting the throats of sleeping adults, and taking the children to sell. In 1852 slave raiders had taken their captives as far south as Contra Costa County where they hoped to sell them to ranchers. Mauldin Notes, 1:79; Mauldin Notes, 1:94; Hurtado, "The Scotts Valley Band of Indians," 89-90.

AR0004573

such as the Vallejos and Juarez, and linguistic skills, placed him in a good position to perform the vital role of labor negotiator.

While the historical record established the likelihood of Augustine's employment on ranchos in the San Pablo Bay region, we can now demonstrate that he was employed in 1870 on or very near Rancho Tulucay, which was owned by Cayetano Juarez, who was probably the first majordomo at Rancho Lup-Yomi. In 1870 the federal census recorded Augustine, born in 1832, laborer, living in Napa township, just one household away from Cayetano Juarez's house.[33] The site of Juarez adobe and a half dozen adobe houses that Juarez had built for his Indian workers is about eleven miles north of SVBI project site in Vallejo.[34] Augustine lived in Family 741 with sixteen other Indians, at least some of whom were likely his Clear Lake kinsmen. The census taker indicated that all of the Indians lived in one household, an arrangement that is indicative of kinship.

The census taker first listed the names of all the males. Six men were from 30 to 40 years of age. Two males were 15 and 16, and there were two boys aged 5 and 6. Three women were in their sixties, one was 38, and another was 30. The only girl was eight years old. All of the men and the teen aged boy were listed as laborers. So were the two boys, but someone crossed out the word "laborer" in their case. One woman was listed as a "Domestic Servant," which probably meant that she worked in the home of her employer. The other women were merely "Servants." The little girl'' occupation was listed as "At Home." The two women in their thirties were probably the mothers of the young children. Two of the men may have been

---

[33] U.S. Decennial Population Census, Manuscript, 1870, Napa County, Napa Township, p. 93, dwelling 721. See also Haas, "Official Map of the County of Napa," 1876, which shows land owners' parcels c. 1876, https://www.loc.gov/item/2005625303/.
[34] M. G. Vallejo, Deposition, June 2, 1852, Transcript of Proceedings in Case No. 126, Cayetano Juarez, 6. The Cayetano adobe home still exists. The Indian housing that he built was very close to it but was razed sometime around 1950. Albertazzi, oral history, "The Old Adobe," https://archive.org/details/cnchi_000086.

AR0004574

married to two of the women, but the census taker's decision to list in order of gender obscured specific relationships.[35]

By 1880 Augustine lived back in Lakeport township with his wife Mary.[36] He worked as a laborer and she was a washerwoman. He continued as an important leader until his death in 1903.

## 5. The Augustine-Frese Family in Napa and County

Augustine's connection to the San Pablo Bay Region was augmented by marriage with the Frese family, another important SVBI family line. One of Augustine's sons, Robert (b. 1850), married Victoria (aka Della) Frese (b. c. 1848), daughter of Mary Frese, who said that she had been born near the town of Sonoma, although there were reports that she had been born in Napa County or Lake County. Mary married Fernando Frese in Napa County. Fernando had been born on Rancho Rincon de los Carneros, a Mexican land grant that abutted Rancho Tulucay on the east and Rancho Suscol on the south. Mary had two children by Fernando, but the father of her first daughter, Victoria, is unknown. Victoria was born in Napa County c. 1848 and lived in Lake and Napa counties. In 1928 she stated that she lived in Napa County until about 1878.[37] The variant reporting of residence and birth places in the Frese family line probably reflects the labor migration of Indians that was prevalent at the time. Nevertheless, the Augustine/Frese family history illustrates a significant connection between SVBI ancestors and the region that includes the SVBI project site.

---

[35] The census taker may have taken the information about the Indians through a major domo or translator.
[36] 1880 Census, Lake County, Lakeport Township, p. 27/51.
[37] United States, Department of the Interior, Applications for Enrollment with the Indians of the State of California under the Act of May 18, 1928, App. 5778.

10

AR0004575

**Conclusion**

Augustine's history illustrates a significant connection between SVBI ancestors and the region that includes the SVBI site. Some children, including Augustine, were baptized at the mission in Sonoma. Augustine worked on ranchos as far south as Napa. His relatives were born, married, and had children in Napa.[38] Augustine lived and worked on or near Rancho Tulucay as late as 1870. All these locations are within a few miles of the SVBI project site and show a historic connection between that site and the Tribe.

---

[38] United States, Department of the Interior, Applications for Enrollment with the Indians of the State of California under the Act of May 18, 1928), Apps. 5778, 5804, 5807, 5941.

AR0004576

Supplemental Report:

History of the Scotts Valley Band of Pomo Indians and the San Pablo Bay Region

By

Albert L. Hurtado, Ph.D.

Dorothea Theodoratus, Ph.D.

With the assistance of

Patricia McCorkle Welsh, M.A.

Diane Star Hicks, B.A.

**Introduction:**

This report supplements and expands previous historical reports written by Professor Hurtado and Professor Theodoratus that were filed on behalf of the Scotts Valley Band of Pomo Indians (SVBI). Those reports are included here by reference.[1] This report is based on new information derived from research in historical records that are cited below. In sum, the report strengthens the SVBI's significant historical association with the San Pablo Bay Region project site (see Map).

This portion of the report presents a general view of SVBI and Clear Lake Indian history that 1) places Chief Augustine's life in context, and 2) demonstrates that his connection with the San Pablo Bay Region (SPBR) was part of a common pattern for SVBI and other Clear Lake Indians.[2] For the sake of clarity this narrative necessarily restates in summary form some of the information presented in previous reports. In such cases this report cites the relevant report.

---

[1] Hurtado, "The Scotts Valley Band of Pomo Indians," (2016); Hurtado, "Comments on Reports Submitted by the Yocha Dehe Nation Regarding SVBI Request for Determination," (2016); Hurtado, "Additional Comments on the Yocha Dehe Response," (2016); Theodoratus, "Scotts Valley Report," (2016).
[2] Hurtado, "Chief Augustine: Significant Ancestor of the Scotts Valley Band of Pomo Indians (SVBI)" (2018).

AR0005013

This report is based on additional sources that were not reviewed in previous reports, and on more extensive research and analysis of sources that were cited previously. In general, the authors have intensively reviewed the U.S. censuses from 1850 to 1880 for Solano, Napa, Sonoma, and Lake counties, as well as special Indian censuses. The baptismal records of the Mission San Francisco Solano have also yielded significant information. We have reviewed the California land claims records for all of the Mexican ranchos near San Pablo Bay in Solano, Napa, and Sonoma counties, as well as Rancho Lup-Yomi in Lake County. Records of the Office of Indian Affairs have been reviewed as well as document collections in the Bancroft Library, California State Library, and the historical societies of Napa, Mendocino counties, and the Lake County Library. A complete list of sources will be found in "Sources Cited" at the end of this report.

**Executive Summary:**

The following report demonstrates that SVBI ancestors began living in the SPBR in 1837 when at least three children (including Chief Augustine) were baptized at the mission in Sonoma, approximately 15 miles from the SVBI project site in Vallejo. The SVBI connection with the mission is corroborated by testimony that Clear Lake Indians were Roman Catholics as early as 1859, which was several years before the first Catholic services were held in the Clear Lake area. During the Mexican era (1821-1846) SVBI ancestors worked for Mexican rancheros in Sonoma and Napa counties. Salvador Vallejo and Cayetano Juarez were known to employ SVBI ancestors who continued to work in south Napa County during the American period (1846-). The Vallejos and their associates frequently raided Clear Lake communities for Indian workers. American ranchers in Napa and Solano counties adopted the practice of employing slave and free

2

Indians from Clear Lake in 1850s and 1860s. The movement of SVBI ancestors to the SPBR was recognized and commented on by federal agents at that time.

Government censuses of Indians provide specific information about SVBI ancestors. Beginning in 1850 the federal government conducted decennial censuses that enumerated California Indians along with other residents. In 1852 California conducted a census that included a count of Indians. The federal government took special Indian censuses in 1910 and 1911. In 1928 a federal law provided for the enrollment of California Indians so that they could sue the federal government. Individual Indian applications reveal SVBI family history details that are not otherwise available. This report is based in part on analysis of all of these documents.

Censuses from all periods show households that included Indian men, women and children living on white ranches, which indicates that the work force consisted of families. Men worked mostly as ranch hands, while women served as domestic labor within the households. Some men also worked as servants or cooks. This pattern persisted at least into the 1870s when we find Augustine and other Indians living close to Cayetano Juarez just about 10 miles from the project site in Vallejo.[3]

From about 1870 onward SVBI ancestors and other Clear Lake Indians returned to the Clear Lake area because conditions had improved. By that time slave raiding had abated. A small Roman Catholic mission had been established for Indians near the site of an SVBI village in Big Valley that became a safe haven for SVBI ancestors and Clear Lake Indians. At about the

---

[3] The SVBI experience c. 1850-1870 was similar to other Pomo Indians who also dispersed and worked in the agricultural economy in Solano, Napa, and Sonoma counties. Some Indian workers were enslaved as children and transported southward. Others voluntarily worked for white ranchers as a matter of economic necessity. Some Indian communities established villages on ranches with the permission of the owners, which afforded Indians some protection from slave raiders who were at their nefarious work from the 1830s through the 1860s. Bean and Theodoratus "Western Pomo and Northeastern Pomo," 299.

3

same time a new native revival called the Ghost Dance was also established in Big Valley. This new rite and the mission attracted Indians from all over Northern California, including SVBI ancestors who had left in previous decades.[4] For example, in 1870 the census reported that Lake County townships of Big Valley, Scotts Creek, and Lakeport had only six Indians.[5] In 1880, however, Lakeport township alone reported 142 Indians.[6] The 1870 census for Napa County in the township where Rancho Tulocay was located reported 35 Indians, but only two Indians were enumerated ten years later.[7] Thus, the period from 1837 to 1870 was an era of diaspora, while the succeeding years were a period of repatriation that has never been fully consummated.

**Early SVBI and SPBR Connections**

In 1836 Salvador Vallejo led a Mexican military force to Clear Lake to retaliate against Indians who were accused of stealing livestock from the Mexican settlements. Vallejo was so impressed with the potential for ranching that he left some horses there to stake a claim to the country. He and his brother Juan asked permission from their eldest brother, Mariano Guadalupe Vallejo (director of colonization on the northern frontiers) to occupy what he called Rancho Lup-Yomi that consisted of sixteen leagues of land surrounding Clear Lake.[8] Salvador and Juan explained to their brother that the Clear Lake region was "uncultivated and in the power of a multitude of savage tribes" who, they claimed, had committed depredations on the herds of Mexican settlers to the south. They offered "to domesticate those tribes and to convert them by

---

[4] McLendon and Lowy, "Eastern Pomo and Southeastern Pomo," 319-321.
[5] U.S. Decennial Population Census, Manuscript, 1870, Lake County, Big Valley Township, p. 32, dwelling 254; Scotts Creek Township, p. 57, dwelling 489; Lakeport Township, p. 33, dwelling 265.
[6] U.S. Decennial Population Census, Manuscript, 1880, Lake County, Lakeport Township, pp. 11-27, dwellings 103, 131, 132, 133, 134, 144, 145, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 182, 245, 246, 247, 248, 249.
[7] U.S. Decennial Population Census, Manuscript, 1870, Napa County, Napa Township, pp. 1-93, dwellings 4, 6, 299, 497, 528, 534, 543, 581, 589, 590, 597, 605, 628, 670, 717, 720; U.S. Decennial Population Census, Manuscript, 1880, Napa County, Suscol Township, p. 8, dwelling 38; Napa State Insane Asylum, p. 49, Ward N.
[8] Salvador Vallejo, in U.S. v. Henry F. Teschmaker, et al., *California Land* Claims, vol. 26, 4-5.

4

AR0005016

gentle means, if possible, to a better system of life."[9]  Brother Mariano granted permission to settle on condition that his siblings "endeavor to reduce the wild nature of the Indians, assuring them that the government wishes a treaty and friendship with them."[10]  The Vallejos drove "about one thousand head of cattle, between three and four hundred horses and mares, and from 800 to 1,000 hogs" from Napa Valley to Rancho Lup-Yomi.[11]

The Vallejos appointed a series of overseers to manage Rancho Lup-Yomi and the Indians who lived there.  Augustine said that the first majordomo was named Juarez, who was probably Cayetano Juarez, owner of Rancho Tulocay.[12]  Juarez and the other majordomos employed SVBI ancestors including Augustine to tend the thousands off animals that roamed in Big Valley.  Driving cattle to the slaughter grounds near shipping points on San Pablo Bay was one of the common chores of vaqueros (cowboys) such as Augustine.  Once the cattle were driven to the killing grounds they were slaughtered for their hides and tallow that were then shipped to markets around the world.[13]  SVBI ancestors took part in this process.  A friend of the Vallejos, Captain William Heath Davis, recalled that "Indians from the Clear Lake country" assisted on all of the ranchos "north of the bay of San Francisco."[14]  Salvador Vallejo's Rancho Napa, Rancho Tulocay, and Rancho Rincon de los Carneros were located in present day southern Napa County, about eleven miles north of the SVBI project site.  The SVBI project site is located on Mariano Vallejo's Rancho Suscol, which is immediately south of the aforementioned ranchos.

---

[9] Salvador and Juan A. Vallejo to Mariano Vallejo, October 11, 1838, in U.S. v. Henry F. Teschmaker, et al., *California Land* Claims, vol. 26, 9.

[10] M. G. Vallejo, March 15, 1839, in U.S. v. Henry F. Teschmaker, et al., *California Land* Claims, vol. 26, 9-10.

[11] Juan Castañeda and Salvador Vallejo, in U.S. v. Henry F. Teschmaker, et al., *California Land* Claims, vol. 26, 3-5.

[12] Palmer, *History of Napa and Lake Counties*, 49.  Cayetano was the only Juarez reported living in the San Pablo Bay region in Bancroft, *History of California*, "Pioneer Register," 4:696.

[13] Hurtado, "The Scotts Valley Band of Indians," 43-45.

[14] Davis, *Seventy-Five Years in California*, 25.

AR0005017

Mexican raids on Clear Lake and vicinity for the purpose of capturing Indians continued after Salvador Vallejo established Rancho Lup-Yomi. After such forays Vallejo usually took prisoners back to Sonoma. According to Charles Brown, a participant in one of these raids, "The prisoners were divided among the different ranches of the mission and put to work at the different trades. The young women were put in the Monjero [a female dormitory] and the children taken care of."[15] Thus, SVBI ancestors were swept up in a colonial system where church, state, and private enterprise collaborated in order to create a labor force that served the livestock economy of Mexican California. As Captain Davis clearly stated, Clear Lake Indians were an important part of that economy in the SPBR. SVBI ancestors were a component of that labor force.

SPBR rancherias that had been decimated by the smallpox epidemic of 1837 were often abandoned and the victims buried in mass graves. Consequently, new living quarters had to be provided for Indian workers who replaced the smallpox victims. In 1837 or 1838 Cayetano Juarez settled on Rancho Tulocay and built an adobe house approximately ten to eleven miles north of the SVBI project site in Vallejo. According to Mariano Vallejo, he also built "numbers of" small adobe houses for his Indian workers at about that time. Vallejo stated that the buildings were constructed in 1836.[16] However, the leading authority on adobe buildings in the San Francisco Bay area states that the year of construction was more likely 1837 or 1838.[17] The construction of dwellings for the Indians indicates that Juarez was not relying on an existing Indian ranchería for his work force. It is unlikely that Juarez's house, the Indian houses, and "a

---

[15] Salvador Vallejo, January 15, 1853, in U.S. v. Henry F. Teschmaker, et al., *California Land* Claims, vol. 26, 4-5; Palmer, *History of Napa and Lake Counties*, 48; Brown, "Statement of Recollections of Early Events in California," 14; Hurtado, "The Scotts Valley Band of Indians," 27-38.

[16] Mariano Vallejo, June 2, 1852, Transcript of Proceedings in Case No. 126, Private Land Claims, 6-7.

[17] Hendry and Bowman, "Spanish and Mexican Adobe and Other Buildings in the Nine San Francisco Counties," 3:396. For an oral description of the Juarez adobe and ruined Indian houses in the twentieth century see the oral history of Albert Albertazzi: https://archive.org/details/cnchi_000086.

6

AR0005018

large store house" were all built at the same time. It is more likely that Juarez's home was built first, followed by other buildings that were constructed in the following year, after the Patwin community of Tulocay had been ravaged by smallpox and there were not enough workers to meet the labor needs of rancheros like Juarez and the Vallejos. Fortunately for SPBR rancheros Salvador Vallejo had located an abundant source of Indian labor at Clear Lake. Augustine, SVBI ancestors, and other Clear Lake Pomo eventually worked and resided on the ranchos of the Vallejos, Juarez, and other SPBR rancheros. Thus, SVBI ancestors who worked for Juarez, like Augustine, lived in the small adobes that were built for Indian workers at Rancho Tulocay.

**SVBI Ancestors and the Missions**

One year after Salvador Vallejo's first foray to Clear Lake thirty Pomo children were taken to the mission San Francisco Solano at Sonoma where they were baptized. This group included Augustine. Two other SVBI ancestors, Francisco, and Truppi can be traced in SVBI family history. Lizzie (Posh) Caben described her father, Francisco Posh, as a mission Indian. Caben also described her mother, Ellen Minargy, as a mission Indian although her name was not found in the mission record.[18] Trupi is thought to be Treppa. Jim Treppa believed that his father, Treppa, was born about 1827 and died in 1887.[19] The birth year for Treppa (provided by his son, Jim Treppa) is inconsistent with the mission record for Trupi. However, Indians did not keep vital records so the ages that they gave were often rough guesses.

The mission record states that the parents of Augstin, Trupi, and Francisco were from Potriqui-Yomi, therefore it follows that other children whose parents were associated with

---

[18] United States, Department of the Interior, Applications for Enrollment with the Indians of the State of California under the Act of May 18, 1928), App. 3510.
[19] United States, Department of the Interior, Applications for Enrollment with the Indians of the State of California under the Act of May 18, 1928), App. 5786.

7

AR0005019

Potriqui-Yomi belonged to the same community.  In addition to the three known SVBI ancestors, twelve additional children who were baptized had both parents from Potriqui-Yomi: Juan de Dios (male, age seven), Hipolino (male, age one), Pedro Alcantara (male, age not given), Refugio (female, age fifteen), Encarnacion (female, age four), Purificacion (female, age three), Hilaria (female, age seven), Paulina (female, age one), Priscila (female, age two), Fabiana (female, age six), Ponciana (female, age one month), and Caridad (female, age 6).[20]  In all fifteen children were from the same Pomo community as Augustin.  Moreover, the priest noted that Juan de Dios's father (Bessénnon) was a mission Indian, even though Bessénnon's origin was listed as Potriqui-Yomi.[21]  Thus, in 1837 at least sixteen Indians from Augustine's community of origin (Potriqui-Yomi) were associated with the Mission San Francisco Solano in Sonoma. Bessénnon's identification as a mission Indian as well as Potriqui-Yomi indicates that the SVBI ancestral presence in Sonoma may have been larger than the number that can be documented in the mission record.[22]  The mission records, therefore, support SVBI ancestral presence in the SVBR approximately twenty miles from the project site.

At the mission these children were instructed in the Roman Catholic faith and trained to do manual labor, including ranch work.  The California missions were conceived primarily as religious institutions that were self-supporting with Indian labor, but by the time the Potriqui-Yomi children were baptized the missions were being "secularized," which meant that non-Church administrators such as the Vallejos managed them while distributing their resources (land and livestock) to private owners.  Missionaries became parish priests with the usual religious

---

[20] Mission San Francisco Solano, Baptismal numbers 1399-1429, Early California Population Project.
[21] Mission San Francisco Solano, Baptismal numbers 1406, Early California Population Project.
[22] The baptism record for San Francisco Solano is not consistent.  The group baptized on September 24, 1837, is unusual because the priest took the trouble to provide ethnic identity, parents' names, ages and other details for each child baptized.  For whatever reason this level of detail usually was not provided at this mission.  Consequently, we do not have a complete accounting of all SVBI ancestors at the mission.

AR0005020

responsibilities, but no longer had charge of the extensive agricultural fields, pasturelands, livestock, and the necessary Indian labor force.[23]

Mariano and Salvador Vallejo both administered the mission at Sonoma at various times. The Indian leader Francisco Solano and his Indian auxiliaries were instrumental in the conquest of the SPBR.[24]  Solano was also a key figure in the Vallejos' management of the mission and its Indian workers.  Years later when Salvador was being deposed concerning a land grant he was asked if Solano "belonged to the mission as a neophyte?"  "On the contrary," Salvador answered, "the mission belonged to him.  [H]e commanded the priest and all that were annexed to the Mission." He commanded a military force that ranged "between the Sacramento [River] and Cape Mendocino," territory that included Clear Lake.[25]   As George Yount testified, Solano "did more in civilizing the north than any other person[,] Genl. [Mariano] Vallejo perhaps excepted." Solano "was all the time fighting – Commanded the Indians and always fought with the Mexican Indians [sic] against the Wild ones."[26]  One of Solano's objectives was to bring in captive Indians.  According to Yount, Indian captives "were all carried to the Mission, there to be taught [C]hristianity, agriculture, and the arts – For a season notwithstanding, they must submit to a kind of servitude, to be 'hewers of wood and drawers of water' for the establishment."[27]  Occasionally Indian prisoners were sent from the mission at Sonoma to others farther afield where they would have fewer opportunities to escape.  In December1837, for example, Yount and Solano brought 39 Indian prisoners to Sonoma from whence they were sent on to the Mission Dolores in present-day San Francisco.[28]

---

[23] Hurtado, "The Scotts Valley Band of Pomo Indians," 23.
[24] Hurtado, "The Scotts Valley Band of Pomo Indians," 25-28.
[25] Vallejo, n.d., Halleck, Peachy and Billings records, Carton 5, Suisun.
[26] Yount, n.d., Halleck, Peachy and Billings records, Carton 5, Suisun.
[27] Yount, *Yount and his Chronicles of the West*, 136.
[28] Yount, *Yount and his Chronicles of the West*, 140-142.

9

The experience of a Southeastern Pomo village demonstrates the disruption and dispersal of the Indians around Clear Lake. Originally this group lived on Indian Island, near the present-day community of Lower Lake, but "Spaniards," as Mexican Californians were commonly called in the mid-nineteenth century, drove them away from their home. They then settled on Slater Island, but Spaniards found them there and captured some of them, including a nine-year-old boy. They took him to Mariano Vallejo who sent him to the Mission San Rafael, which was about twelve miles southwest of Vallejo's Rancho Petaluma. Subsequently the boy wound up in the hands of Salvador Vallejo and eventually took the name Salvador. (Salvadore was the Anglicized spelling used by Americans.) As an adult the Indian Salvador returned to the Clear Lake area. His children took *Salvadore* as their surname. His son, Clifford Salvadore, became an important member of his community and was well known to anthropologists such as S. A. Barrett and Dorothea Theodoratus.[29]

While Salvador's association with the Vallejos and missionaries began in servitude, he eventually established a friendly working relationship with them. During the American period, after Salvador had returned to Clear Lake, he heard a rumor that all of the Clear Lake Indians were to be removed to the reservation at Round Valley. Alarmed at this prospect, Salvador went back to the priests at San Rafael and then to Salvador Vallejo to ask for help. They told him that there was nothing they could do, but the incident illustrates that Clear Lake Indians' association with the SPBR and the non-Indians who lived there continued to be important even after they returned to Clear Lake.[30]

In 1859, which was probably about the time that Salvador asked for help from the priests and Vallejo, a delegation of Clear Lake Indians went to Jonathan Markle, a special Indian agent

---

[29] Mauldin, Notes, 6:1149; personal communication with Theodoratus.
[30] Mauldin Notes, 6:1149.

AR0005022

who lived in Cloverdale, to beg that they not be sent to the reservation. "The whole of these Indians here are Civilized and [the] greater part of them members of the Catholic Church," Markle wrote.[31] There was no Catholic Church at or near Clear Lake in 1859.[32] Except for a Catholic Church established in Napa in 1857 the only Catholic churches in the SPBR were the missions. In 1867 Father Luciano Osuna established the St. Turibius Mission in Big Valley for Indians.[33] Therefore, in the 1850s the Catholic Indians at Clear Lake had to be associated with the Catholic missions in Sonoma and San Rafael, or perhaps the church in Napa, which seems less likely. Many SVBI members still practice the Catholic faith, a religious tradition that began in Sonoma as early as 1837 and continues to the present day. Continuing SVBI religious affiliation with the Roman Catholic Church is evidence for their historic connection to the SPBR.

The year that Augustine and other Pomos were baptized in Sonoma was an important moment in California Indian history. A smallpox epidemic that swept the SPBR region was especially hard on the native Patwin, Miwok, and Wappo. Death rates were so high that Indian victims were buried in mass graves.[34] The dramatic die off of SPBR Indians may have spurred raiding of SVBI ancestral communities at Clear Lake. Thus, the baptism of Augustine may have been a direct result of the smallpox epidemic.

**Indian Labor in the American Period**

Although some Clear Lake Indians and SVBI ancestors worked voluntarily for whites, the enslavement of some Indians continued through the end of the Mexican period and was

---

[31] U.S. Department of the Interior, Bureau of Indian Affairs, Markle, January 23, 1859, M234 37:409.
[32] The first Catholic Church in Mendocino County was established in 1863, Palmer, *History of Mendocino County*, 415-416.
[33] Mauldin Notes, 7:1379; Palmer, *History of Lake and Napa Counties*, 184-185; Dwyer, "Father Luciano Osuna," n.p.
[34] Hurtado, "Additional Comments on the Yocha Dehe Response," 2-3.

AR0005023

adopted by Americans who settled in the region after the United States conquered California.[35]

In the 1940s Henry Mauldin, a farmer in Big Valley, began to interview Lake County residents

about the history of the region.   He interviewed the descendants of white settlers and Indians

who repeated stories that they heard from their parents and other old-timers.  The dates of events

were often unstated but may be broadly inferred from internal evidence (e.g., the 1850s).

Mauldin had a special interest in Indians and took extensive notes about them and their history.

Some Americans made a business of capturing Clear Lake Indians and selling them to ranchers.

One woman who lived in Big Valley (which is an important part of the SVBI homeland) reported

seeing kidnappers with Indian children hanging in bags on pack horses as they were being

transported to Sonoma and Napa counties for sale in the 1850s.[36]  J. Broome Smith kidnapped

Indian children, as did a man named Eaton who bragged that he crept into Indian camps at night,

slit the throats of the sleeping adults and took the children.[37]

While many of these captives were transported to Napa and Sonoma counties others were

bought and sold by Clear Lake ranchers.  One woman, who had owned slaves in the American

South, moved to Lake County in the 1860s and bought a seven- or eight-year-old Indian boy

named Joe.  Her grandson reported that other Lake County families purchased children "for

chore purposes" and let them go free when they grew up.[38]

The kidnapping of children did not entirely destroy Indian families and communities.

Many of them sought refuge on ranches around Clear Lake.  William Noble reported that most of

---

[35] Hurtado, "The Scotts Valley Band of Pomo Indians," 91-97.
[36] Frank Crawford, Mauldin Notes, 1:79.  Until 1861 Lake County was part of Napa County.  The people whom Mauldin interviewed in the mid-twentieth century, however, distinguished Lake and Napa counties as separate places with the modern boundaries that they were familiar with.
[37] Mauldin Notes, 1:94.  See also Mauldin Notes, 1:1, and 1:79
[38] Mauldin Notes, 1:18.

AR0005024

the ranches around Clear Lake had Indian villages and that the Indians worked on the ranches. They "lived in families mostly," Noble said.[39]

### An SPBR Perspective on SVBI Ancestors and Indian Labor

The killing of adults and kidnapping of children had a devastating effect on the Clear Lake Indian population. In 1859 a Napa newspaper reported that Clear Lake Indians had "dwindled from 10,000 in 1849 to a mere remnant of about 500 in all."[40] While the paper may have exaggerated the numbers, the drastic decline of the Indian population was important to Napa readers because they depended on Indian agricultural workers from Clear Lake as Indian Office special agent G. Bailey explained in 1858. The Indians who lived at Lup-Yomi got their basic subsistence from fishing and crops that they cultivated on the ranch but depended on the money they earned in the south for things that they had to buy.[41] Thus, according to special agent Bailey, SVBI ancestors had added wage labor in the SPBR to their traditional subsistence economy.

The hiring of Indians from Clear Lake was a matter of common knowledge that was widely reported, although specific origins were not always given. Frank Leach, a newspaperman, moved to Napa as a boy in 1857 and recalled that in the summer and during harvest "hundreds of Indians from the north would come to Napa and camp *with their families* about the town."[42] By this time wheat farming had replaced livestock ranching as the primary agricultural pursuit in Napa Valley. In 1862 a Napa newspaper reported that "Harvest time has brought our valley a large number of Clear Lake Indians, many of whom, we are told, are

---

[39] Mauldin Notes, 2:239.
[40] Quoted in Mauldin Notes, 17:3392.
[41] U.S. Department of the Interior, Bailey, November 4, 1858, M234:36:572.
[42] Leach, *Recollections of a Newspaperman*, 46. Emphasis added.

AR0005025

exceedingly useful in the field, and bind [wheat] equal to, or better than many white men."[43]
The same newspaper reported that after the harvest, the Indians were "flush with money," and
were able to afford stage fare for their travels.[44]

Thus, by the 1860s there was a well-established pattern: Indians from Clear Lake lived
part of the time on ranches around the lake and part of the time they took their families to Napa
and other places in the south to do agricultural labor for wages.  Their labor was essential for
Napa County farmers, and the wages were an integral part of the economic and social life of the
Indians.  Writing specifically about the SVBI ancestors at Rancho Lup-Yomi, special agent
Bailey emphasized the integration of wage labor in Napa Valley and subsistence farming at Clear
Lake.  With the permission of the owner, the Indians (SVBI ancestors) on Rancho Lup-Yomi
cultivated fields near the lake and fished in order to "subsist themselves comfortably.  In the
Spring time and harvest, the men go down into Napa and Sonoma Valleys, and hire themselves,
at good wages to the farmers there, and thus procure the means of clothing themselves and
families."[45]  Thus, SVBI ancestors and their families occupied private ranchos at Clear Lake *and*
the Napa Valley.  SVBI ancestors had to do this in order to survive as viable communities.[46]

The long-standing relationship between the Indians of Clear Lake and the Juarez ranch is
well illustrated by a reminiscence from the Juarez family.  In about 1885 two old Indians
approached the Juarez adobe from the north.  They had come all the way from Lake County to
see "'Chief' Don Cayetano," who had been "very good to all of them and . . . they wanted to see

---

[43] "Mucho Indian," *Pacific Echo*, July 4, 1862, p. 2.
[44] "Aristocratic Diggers, *Pacific Echo*, August 2, 1862, p. 3.
[45] U.S. Department of the Interior, Bailey, November 4, 1858, M234:36:572.
[46] This pattern was not unique.  As California Indian historian William J. Bauer explains in his study of Indian labor (including migrant work) on the Round Valley Reservation, Indian labor, "forged the social relations so necessary to the establishment of the Round Valley community," on and off reservation.  Bauer, *We Were All Like Migrant Workers Here*, 6.

AR0005026

him and thank him."[47]  When told that Juarez had died the Indians expressed their regret and walked back to their homes in the north.  Their willingness to undertake such a journey on foot at an advanced age shows how important their relationship with Juarez had been.

**Analysis of Census and SVBI Family History Data**

Analysis of census data demonstrates that several SVBI families have historic connections to the SPBR that existed over a long period of time.  We calculate that by the time the tribe was terminated in 1958 that approximately 90%, of the SVBI had a historical connection to SPBR through their family relationship to Augustine.[48]

The Augustine family is a prime example of this phenomenon, but it is not the only one. The Frese family was briefly discussed in the attached biography of Augustine because members of the two families married, which resulted in a large number of the present SVBI population. The first SVBI Frese was Mary who said she was born near "Sonoma City."  Her daughter, however, variously stated that Mary was born in Lake County or in Sonoma.  Mary lived in both Lake and Napa counties as well as Sonoma County.[49]  She married Fernando Frese who was born in the Carneros Valley that is the location of the Rancho Rincon de los Carneros.  Carneros is southwest of Cayetano Juarez's Rancho Tulocay and south of Salvador Vallejo's Rancho Napa.  The three ranchos abut and are immediately northwest of Rancho Suscol where the SVBI project site is located.[50]

---

[47] Vivien Juarez Rose, "The Past is Father to the Present," 31.
[48] This figure was established by dividing the number of Scotts Valley distributees descended from Augustine by the total number of lots distributed.  A Plan for the Distribution of the Assets of the Scotts Valley Rancheria, According to Provisions of Public Law 85-671, Enacted by the 85th Congress, 25 June 1959.
[49] United States, Department of the Interior, Applications for Enrollment with the Indians of the State of California under the Act of May 18, 1928, Apps. 5778, 5804, 5807, 5941.
[50] Beck and Haase, *Historical Atlas of California*, 29.

15

AR0005027

Mary had three children who were born in Napa County.  In 1928 Victoria Frese wrote, "I think I was born in Napa," and that her first recollections were of living in Napa.[51]  The other daughters, Louisa and Mary, were also born in Napa County.  Victoria married Robert (Bob) Augustine, son of Chief Augustine.  Mary (Mary Frese's daughter) married Francisco M. John (aka Francisco Bushaw, and Bashaw) who was the son of Captain John, who was an SVBI leader.[52]  Thus, two of Mary Frese's daughters, both of whom were raised in Napa County, married into important SVBI leadership families.  It is customary for leadership families in Northern California to intermarry, which implies high status for Mary Frese's daughters.

References to other SVBI ancestors living in SPBR or moving back and forth between Lake County and SPBR are found in the historical record.  The 1850 federal census for Benicia Township, Solano County, enumerated nine Indians living in the household of John Frisbie, son-in-law of Mariano Vallejo and an important landholder in Solano County.[53]  One of the Frisbie household Indians was an SVBI ancestor who was listed as "Jose," a twenty-nine-year-old "herdsman" was Jose Murphy.  The Frisbie home was approximately six miles south of the SVBI project Vallejo.

In 1928 Jose's daughter, Juana (Murphy) Casia Bello, stated that her father was a "full-blooded" Napa County Indian, which indicates that he moved north from Solano County to work on ranches there.  She was born in Napa County in about 1849.  Juana's estimate of her deceased father's age matches that of Juan in the Frisbie household.  She lived in Napa County for about thirty years and stated that her first husband (Loreto Casio) was also a Napa County Indian.[54]

[51] United States, Department of the Interior, Applications for Enrollment with the Indians of the State of California under the Act of May 18, 1928, App. 5778.
[52] 1880 Census, Lake County, Lakeport Township, p14/4 4, household 103; 1913 Big Valley Census.
[53] Hurtado, "The Scotts Valley Band of Pomo Indians," 78-79.
[54] United States, Department of the Interior, Applications for Enrollment with the Indians of the State of California under the Act of May 18, 1928, App. 8541.

AR0005028

Several other Jose Murphy descendants described themselves as Napa County Indians in 1928, including Laura (Cassia) Faber, Arthur Faber, and Juanita (Faber) Kanae.[55]  SVBI members use of the term Napa County Indian indicates that they knew their ancestors' association with Napa County was stronger than occasional periods of work there.

A second Indian in the Frisbie household, José Mariá, may have been the Pomo leader who attended treaty negotiations at Camp Fernando Feliz on the Russian River in 1851.  The treaty commissioner, Redick McKee wanted all of the Indians to remove to the proposed reservation at Clear Lake.  Should they do so, McKee promised that "you can come over to work on the ranches as you chose, and return" to Clear Lake, but their women and children must remain at the reservation."[56]  José Mariá decided to remain with his people where they were, so he did not sign the treaty.  The José Mariá in the 1850 census was twenty-six and was identified as a servant.

McKee's permission to work on ranches outside the reservation indicates that he understood the importance of this pattern of migrant labor to for treaty signatories.   His insistence that women and children remain on the reservation infers that men would prefer to take their families with them if they went to work in the SPBR.  The treaties at Clear Lake and Fernando Feliz had extinguished Indian signatories' interest in SPBR so McKee did not want them to establish permanent communities outside of the reservation.  McKee's restrictions on family movement became moot when the treaties were not ratified.[57]

---

[55] United States, Department of the Interior, Applications for Enrollment with the Indians of the State of California under the Act of May 18, 1928, Apps. 8541, 8542, 8543, 8544, 8545.
[56] Redick McKee quoted in John McKee, "Minutes Kept by John McKee," August 21, 1851, Serial 688, 144.
[57] For an analysis of McKee's thoughts on extinguishing Indian signatories' interests see Hurtado, "Additional Comments on the Yocha Dehe Response," (2016), 11-17.

AR0005029

In 1928 Lizzie Posh Caben reported that both of her parents were associated with a mission, probably San Francisco Solano in Sonoma. She reported that her father, Francisco Posh, who was born about 1842, was a "Mission Band Indian." Lizzie also identified her mother, Ellen (Minargy) Posh as a mission Indian who was born about 1849.[58]

Susan and Frank Marando, who are described in 1928 as "half-Pomo" in 1928 were found in censuses in close association with the Pony family, although a precise family connection has not been established.[59] The father of Frank, Mariano Marando (also identified as half Pomo) was from Sonoma county and was born around 1843. Mariano was still living in Sonoma County in 1928. Frank's mother Susan was born in Napa County around 1846 and died in 1886.[60]

Movement to and from Lake and Napa counties continued in the twentieth centuries. Tom Johnson, born about 1865, lived in Lake County until 1915 and then moved to Napa County where he lived for nine years. Thereafter he moved to Sebastol in Sonoma County, about twenty miles from old Rancho Petaluma and thirty-five miles from Vallejo.[61]

**SVBI in the SPBR 1912 to the Present**

The Scotts Valley Rancheria was meant to provide a secure home for the SVBI ancestors who lived there. However, the Rancheria was not capable of supporting the people who lived there so they and other SVBI ancestors continued to live in the SPBR in the twentieth century.

---

[58] United States, Department of the Interior, Applications for Enrollment with the Indians of the State of California under the Act of May 18, 1928, App. 3510.
[59] Gifford, "Clear Lake Pomo Society," 293.
[60] United States, Department of the Interior, Applications for Enrollment with the Indians of the State of California under the Act of May 18, 1928, App. 5795; Kelsey "Schedule Showing Indians in Scotts Valley," 47.
[61] United States, Department of the Interior, Applications for Enrollment with the Indians of the State of California under the Act of May 18, 1928, Apps. 5933, 5935, 5937.

AR0005030

Examples from the report of Howard and McClurken submitted in 2016 demonstrates SVBI residence in Napa and Sonoma counties.

For example, in 1932 Ervin Maysee, related that he was a member of the "Mission tribe," and that he had moved continuously between Napa, Sonoma, and Mendocino counties in his lifetime. His son, Theodore, and SVBI member Rose Ray had a son named Leslie Anthony Miller who became SVBI tribal chairman.[62] Francis Allen lived in and worked in Napa County in 1929.[63]

Bureau of Indian Affairs officials encouraged Clear Lake Pomos to move to the Bay Area the area for training and employment. Beatrice Ray went to Oakland for training in 1938. She worked and lived in Oakland for several years.[64] In 1941 following the suggestion of a BIA official Della Augustine moved to Oakland to seek employment.[65]

SVBI members who lived in the SPBR were not merely a few people seeking temporary labor. In the 1920s the "Henthornes and Fabers and their extended kin formed a small community in the vicinity of Agua Caliente," which is about two miles from Sonoma and approximately eighteen miles from the Vallejo project site. Pearl Henthorne was a granddaughter of Victoria Frese Augustine, an important SVBI ancestor. She married Arthur Faber, a "Napa Indian" who was born in Sonoma County.[66] The ethnicity of Arthur Faber is not given, but his marriage to Pearl Henthorne underscores one of the main points of this report: there was a significant historical connection between the SVBI and the SPBR. The marriages of

---

[62] Howard, and McClurken, "Consolidated Report," 15-16.
[63] Howard, and McClurken, "Consolidated Report," 18.
[64] Howard, and McClurken, "Consolidated Report," 48-49.
[65] Howard, and McClurken, "Consolidated Report,"49-50.
[66] Howard, and McClurken, "Consolidated Report," 19-20.

19

AR0005031

Scotts Valley Pomo and "Napa Indians" in the nineteenth and twentieth centuries were fundamental to the creation of the SVBI as it exists today.

The connection between the SVBI and SPBR continued through the twentieth century until the present day. Howard and McClurken established that between 1912 and 1964 (the period when the Scotts Valley Rancheria existed), that among SVBI ancestors there were 39 recorded births. One-third of those births occurred in San Francisco or in Sonoma and Solano counties.[67] Between 1965 and 2007 almost half of SVBI births occurred in "the Bay Area cities of Alameda, Berkeley, Castro Valley, Fremont, Hayward, Oakland, Petaluma, Richmond, Santa Clara, San Francisco, San Jose, San Leandro, Santa Rosa, and Vallejo."[68] Thus, the connection between SVBI and SPBR, which was established in the nineteenth century, is demonstrably present in the twenty-first.

**Conclusion**

The historical record shows that there was a significant historical connection between SVBI ancestors and the SPBR. SVBI ancestors were taken to the mission at Sonoma as early as 1837. Like Augustine, they eventually worked for Mexican rancheros such as Salvador Vallejo and Cayetano Juarez whose property was near the SVBI project area. During the American period (c. 1846-1880) SVBI ancestors continued to work as agricultural and domestic laborers. Federal Indian agents reported that SVBI ancestors worked in Napa and Sonoma counties. During that period SVBI ancestors subsisted for part of the year on hunting, fishing, and some crops grown on land with the farmer's permission. For the other part of the year they and their families worked for money on ranches in Sonoma and Napa counties near the SVBI project area.

---

[67] Howard, and McClurken, "Consolidated Report," 18.
[68] Howard, and McClurken, "Consolidated Report," 19.

AR0005032

These two activities were mutually reinforcing: SVBI ancestors needed to work in the SPBR in order to supply their families with cash to buy market goods.  Thus, the SVBI ancestors' economic territory necessarily included the SPBR because they needed both areas in order to survive a time when they were dispossessed and exploited.  The significant historical connection between the SVBI and the SPBR continued through the twentieth century and to the present day.

21

AR0005033



CALIFORNIA
296
Sacramento
Napa
Sonoma
Solano
Proposed Site
Marin
San Francisco
Vallejo Parcel
Northern California (1784 - 1894)
INDIAN LAND CESSION No. 296



COLUSA

YOLO

SONOMA

296

NAPA

SOLANO

Rancho Lupyomi
*Approx. 67 miles*

Rancho Tulocay
*Approx. 11 miles*

Rancho Suisun

Mission San Francisco
Solano at Sonoma
*Approx. 17 miles*

Proposed Site

Rancho Suscol

MARIN

Benecia
*Approx. 6.5 miles*

CONTRA
COSTA

**Rancho Map**

Northern California (1784 - 1894)
**INDIAN LAND CESSION No. 296**

ALAMEDA

AR0005039

The children who were baptized in 1837 were in all likelihood orphaned as a result of the Salvador Vallejo raid into the Clear Lake country in 1836.[3]  Orphaned girls were immediately placed in the monjero where they were cared for and learned domestic skills.  Boys were placed in a dormitory, but they were not closely confined like the girls.  Godparents took a strong role in the upbringing of orphans.[4]  According to Charles Brown, a participant in one of Vallejo's raids, "The prisoners were divided among the different ranches of the mission and put to work at the different trades.  The young women were put in the Monjero [a female dormitory] and the children taken care of."[5]

While priests were attentive to the spiritual lives of neophytes, Christian Indians' principal role in the mission was to labor.  According to a leading authority on the subject, "the Franciscan tradition of creating schools to teach reading and writing – a more formal education – to their Indian charges was never pursued in California."[6]  A few promising children were taught to read and write, but the vast majority learned to work at trades taught them by Spaniards, Mexicans, or neophytes who had already learned a trade.

Most of the children who were baptized at Mission San Francisco Solano in 1837 were orphans or had been separated from their parents who were identified as gentiles, which meant unbaptized Indians.[7]  Presumably these children were placed in dormitories as described above, or perhaps were placed in the homes of godparents.

---

[3] Hurtado, et al., "Supplemental Report," 4-6.
[4] Edith Buckland Webb, *Indian Life at the Old Missions* (1952; reprint, Lincoln: University of Nebraska Press, 1982), 27-29.
[5] Salvador Vallejo, January 15, 1853, in U.S. v. Henry F. Teschmaker, et al., *California Land* Claims, vol. 26, 4-5; Palmer, *History of Napa and Lake Counties*, 48; Brown, "Statement of Recollections of Early Events in California," 14; Hurtado, "The Scotts Valley Band of Indians," 27-38.
[6] Sandos, *Converting California*, 95.
[7] Mission San Francisco Solano, Baptismal numbers 1399-1429, Early California Population Project.

3

AR0005300

**Mission Indian Children as a Proportion of the Chujuluya/Potriqui-Yomi**

There were fifteen children including Augustine who were ethnically identified as Chujuluya/Potriqui-Yomi in the 1837 baptismal record.[15]  There is no village known as either Chujuluya or Potriqui-Yomi.  Consequently, there is no population estimate for the place Augustine came from.   There is a careful reconstruction of the population of Cigom, a Clear Lake Eastern Pomo village that was about seven air miles from present day Lakeport.  In the 1920s noted anthropologist E. W. Gifford worked elderly Pomos, including one who was born at Cigom in the 1840s, to carefully reconstruct the community at the household level c. 1849.[16] They found that there had been 235 people of all ages living there.  Only 25 of the Cigom people were children, which is to say about 11% of the total population.  If the demographic structure of Cigom was typical of other Eastern Pomo Clear Lake villages it follows that the Chujuluya/Potriqui-Yomi children represented 60% of the juvenile population of the village. When one considers the future potential for marriage, family formation, and childbirth birth in these relatively small communities it can be seen that these children's presence at the mission amounted to a substantial tribal presence.

**Percentage of Current SVBI population descended from the Band Ancestors Baptized at the Mission**

---

[15] Mission San Francisco Solano, Baptismal numbers 1399-1429, Early California Population Project.
[16] E. W. Gifford, "Eastern Pomo Society," *University of California Publications in American Archaeology and Ethnology*, vol. 18, no. 2 (1926):281-295.

6

AR0005303

The proportion of the current Scotts Valley Indian population that is descended from the three Band ancestors baptized at the mission in 1837 is very large.  Analysis of the genealogical data compiled for the tribe in 2007 (the last thorough genealogical examination on record) indicates that 201 of 213 Scotts Valley enrolled members were descended from Indians baptized at San Francisco Solano in 1837.  In other words, about 94% of the enrolled tribe were connected to the mission (see Appendix 1 and Appendix 2).

**Scotts Valley Labor in Southern Napa County**

Our previous reports have documented Scotts Valley ancestors and other Clear Lake Indians living and working in the vicinity of the project area in southern Napa County ranches from the 1830s through 1870.  Augustine, the most prominent Scotts Valley ancestor, was located in southern Napa County with sixteen other adult and juvenile Indians.[17]  While we cannot document the connection between Scotts Valley and other residents of that particular household, we can document the occupation of other Scotts Valley ancestors in other households in Napa township near Augustine.

For example, Ed Smith, identified only as an Indian in the 1870 census, has been determined to be a Band ancestor through marriage in the Augustine line.[18]  Smith was a listed as a 14-year-old domestic servant in southern Napa County in 1870.[19]  Fifteen-year-old Bill who was a domestic servant in Napa township in 1870 may have been Billy, another Scotts Valley ancestor.[20]  Likewise, Bettie, a 13-year-old domestic servant in Napa township in 1870 may have

---

[17] Hurtado, "Chief Augustine," 8-10.
[18] Diane Star Hicks, Ed Hicks Family Tree, constructed from Field Notes.
[19] 1870 Census, Napa County, Napa Township, p. 82, dwelling 628; 1880 Census, Lake County, Lakeport Township, p. 18, dwelling 159; Theodoratus et al., "Appendix," p. 77.
[20] 1870 Census, Napa County, Napa Township, p. 69/62, dwelling 543; 1880 Census, Lake County, Lakeport Township, p. 15, dwelling 134.

AR0005304

# Arlinda F. Locklear, Esquire

ALocklearEsq@verizon.net
facsimile (202) 237-0382

4113 Jenifer Street, NW
Washington, D.C. 20015
(202) 237-0933

December 4, 2018

Kyle Scherer
Deputy Solicitor for Indian Affairs
United States Department of the Interior
1849 C Street, NW
Washington, DC 20240

> Re: Scotts Valley Indian Lands Opinion Request
> New data and analysis
> (via email and first class mail)

Dear Mr. Scherer:

Attached please find a brief report by the Scotts Valley Band of Pomo Indian ("Band") historian, Dr. Hurtado, on subjects that were identified in my letter to you dated November 14, 2018. This report summarizes the new data that the Band has been able to locate or prepare on the specific subjects identified in the November 14 letter. The hard copy to follow by first class mail will include copies of the primary documents cited therein.

The Band urges the Department to appreciate the limited historical record that it is dealing with as a general matter. In both the Mexican and early American period (specifically, 1837 in the Mexican period and 1850-1910 in the American period), there is very little data available from any source on native communities. Natives were viewed essentially as peons and, during the American period, natives attracted very little federal attention because they were not living on or near a reservation. Given the limited record, the Band believes the following are particularly significant indications of its historical connection to the proposed Vallejo site:

> • **federal agents' reports - 1850 to 1920.** The Band's historian searched federal agent reports for the period 1850 to 1920 on the condition or location of the Band and its ancestors and found new evidence in letters of the federal Field Matron indicating that Scotts Valley ancestors lived in the vicinity of the project site as late as 1918.

> • **1837 baptismal record.** As the Band indicated in its May 2018 submission, there is an 1837 baptismal record that identifies 15 children from one of the Band's aboriginal villages in close proximity (15 miles) to the Vallejo site. See Hurtado & Theodoratus Supplemental Report, pp. 7-9. That report further identified 3 of those children as the Band's ancestors. Now, based on an analysis of the genealogies of modern-day members, the Band can report that approximately 94% of the currently enrolled members are genealogically connected to those three ancestors. This confirms a significant tribal connection.

tribe, represented by the chief, Moh-shan and his captains; Che-com tribe, represented by the chief, Cal-i-a-him and his captains, How-ku-ma tribe, represented by the chief, Chi vee and his captains; Cha-nel-kai tribe, represented by the chief, Con clu; and the Me-dam-a-dee tribe, represented by the chief, Co-co-u-e.

ARTICLE 1. The said tribes or bands acknowledge themselves, jointly and severally, under the exclusive jurisdiction, authority, and protection of the United States, and hereby bind themselves to refrain hereafter from the commission of all acts of hostility and aggression towards the government or citizens thereof, and to live on terms of peace and friendship among themselves and with all other Indian tribes which are now or may hereafter come under the protection of the United States.

ART. 2. Lest the peace and friendship established between the United States and the said tribes should be interrupted by the misconduct of individuals, it is expressly agreed that for injuries received on either side, no private revenge or retaliation shall take place, or be attempted; but instead thereof, complaint shall be made by the party aggrieved to the other, through the Indian agent of the United States in their district, whose duty it shall be to investigate, and, if practicable, adjust the difficulty; or in case of acts of violence being committed upon the person or property of a citizen of the United States by an Indian or Indians belonging to or harbored by either of said tribes or bands, the party or parties charged with the commission of the crime shall be promptly delivered up when demanded, to the civil authorities of the State of California for trial; and in case the crime has been committed by a citizen or citizens of the United States upon the person or property of an Indian or Indians of either of tribes, the agent shall take all proper measures to bring the offender or offenders to trial in the same way.

ART. 3. The said tribes or bands hereby jointly and severally relinquish, cede, and forever quit claim to the United States, all their right, title, claim, or interest of any kind, which they or either of them have to lands or soil in California.

ART. 4. To promote the permanent settlement and improvement of said tribes or bands, it is hereby stipulated and agreed on the part of the United States, that the following tract or district of land shall be appropriated and set apart as an Indian reservation, and the use and possession thereof forever guaranteed to the said tribes, their successors, and to such other tribes as the United States may hereafter remove from the valley of the Russian river or elsewhere, and settle thereupon, to wit: commencing at a point on Clear lake, where a spur from Mount McKee (heretofore called the Chemisal mountain) juts into the same; thence along a line running southwardly over said mountain and over the hills behind the same to the summit level of the mountains dividing the Clear lake valley from the waters of the Rio Dolores; thence westwardly along the same and along the summit of those dividing said valley from the waters of Russian river, to where said mountains meet those dividing said valley from the waters of Eel river; thence along said ridge to a point where said last-mentioned mountains meet those dividing said valley from the waters of the Sacramento; thence along the summit of the same to a point due north of the place of beginning; thence south to the said point. Containing all that part of the valley of Clear lake lying westward of said Mount McKee, the habitable part of said tract being by estimation about twelve miles in length by about six miles in width, together with the exclusive right of fishing in that part of said lake included within the foregoing boundaries. It is however expressly understood and agreed that the United States reserves the right of way over said lands, and of using for farming purposes any quantity thereof not exceeding one thousand acres; also the right to establish such military posts, erect such buildings, and make such improvements for the accommodation of their agent and other officers or servants as the President may direct; also, that said tribes or bands shall never sell or alienate their right or claim to any part thereof, except to the United States, nor shall they ever lease to or permit white men to settle, work, or trade upon any part thereof without the written permission of the United States Indian agent for the district. And it is further understood and agreed that, if the tribe or band of Indians known as the Cho-tam-o-man-as, now living near the lower end of Clear lake, but not directly represented in this council, shall so desire, the said tribe or band may remove to, and settle upon said reservation without further stipulation, and thereby become



Figure 1: Richmond Parcels and Scotts Valley Tribal Headquarters and Former Rancheria

AR0006386

On January 22, 2005, the Band filed its fee-to-trust application for the Richmond Parcels. Several months later, on November 9, 2005, the Band requested an Indian Lands Determination, seeking the Department's determination that the Richmond Parcels are eligible for gaming pursuant to IGRA's restored lands exception.[2] Thereafter, the Band and the County of Contra Costa (County) submitted extensive information to the Department arguing, respectively, for and against a restored lands determination and refuting the other's claims.[3] The Department has carefully reviewed and considered these submissions, as well as other materials now within the administrative record.

---

[2] Request for Indian Lands Determination from the Scotts Valley Band of Pomo Indians to the Bureau of Indian Affairs, U.S. Dep't of Interior (Nov. 9, 2005) [hereinafter Band's Nov. 9, 2005 Request for Indian Lands Determination].

[3] *See* Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to Kenneth Salazar, Sec'y, U.S. Dep't of Interior (Oct. 18, 2011) [hereinafter Band's Oct. 18, 2011, letter]; Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to Pilar Thomas, Deputy Solicitor of the Division of Indian Affairs, U.S. Dep't of Interior (Oct. 18, 2010) [hereinafter Band's Oct. 18, 2010, letter]; Letter from Paul Filzer, Attorney, Scotts Valley Band of Pomo Indians, to Scott Keep, Assistant Solicitor, U.S. Dep't of Interior, and Jonathan Damm, Attorney-Advisor, U.S. Dep't of Interior (May 18, 2009) [hereinafter Band's May 18, 2009, letter); Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to George Skibine, Acting Assistant Sec'y – Indian Affairs, U.S. Dep't of Interior (Oct. 21, 2008) [hereinafter Band's Oct. 21, 2008, letter]; Letter from Federal Glover, Chair of the Board of Supervisors, Contra Costa County, to Scott Keep, Assistant Solicitor, U.S. Dep't of Interior, and Jonathan Damm, Attorney-Advisor, U.S. Dep't of Interior (Sept. 30, 2008) [hereinafter County's Sept. 30, 2008, letter]; Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to George Skibine, Acting Assistant Sec'y – Indian Affairs, U.S. Dep't of Interior (Sept. 2, 2008) [hereinafter Band's Sept. 2, 2008 letter]; Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to George Skibine, Acting Assistant Sec'y – Indian Affairs, U.S. Dep't of Interior (Aug. 25, 2008) [hereinafter Band's Aug. 25, 2008, letter]; Letter from Federal Glover, Chair of the Board of Supervisors, Contra Costa County, to Scott Keep, Assistant Solicitor, U.S. Dep't of Interior, and Jonathan Damm, Attorney-Advisor, U.S. Dep't of Interior (July 23, 2008) [hereinafter County's July 23, 2008, letter]; Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to George Skibine, Acting Assistant Sec'y – Indian Affairs, U.S. Dep't of Interior (June 10, 2008) [hereinafter Band's June 10, 2008, letter]; Letter from Paul Filzer, Attorney, Scotts Valley Band of Pomo Indians, to Scott Keep, Assistant Solicitor, U.S. Dep't of Interior, Jane Smith, Attorney-Advisor, U.S. Dep't of Interior, and Jonathan Damm, Attorney-Advisor, U.S. Dep't of Interior (May 16, 2008) [hereinafter Band's May 16, 2008, letter]; Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to Carl Artman, Assistant Sec'y – Indian Affairs, U.S. Dep't of Interior (April 30, 2008) [hereinafter Band's April 30, 2008, letter]; Letter from Cathy Christian, Attorney, Contra Costa County, to George Skibine, Dir. of the Office of Indian Gaming Mgmt., U.S. Dep't of Interior (April 22, 2008) [hereinafter County's April 22, 2008, letter]; Second Supplement to the Request for Indian Lands Determination from the Scotts Valley Band of Pomo Indians to the Bureau of Indian Affairs, U.S. Dep't of Interior (Oct. 10, 2007) [hereinafter Band's Oct. 10, 2007, Second Supplement to Request for Indian Lands Determination]; Supplement to the Request for Indian Lands Determination from the Scotts Valley Band of Pomo Indians to the Bureau of Indian Affairs, U.S. Dep't of Interior (Mar. 31, 2007) [hereinafter Band's March 31, 2007, Supplement to Request for Indian Lands Determination]; Letter from John Gioia, Board of Supervisors Chair, to Carl Artman, Assoc. Solicitor, U.S. Dep't of the Interior, and Scott Keep, Assistant Solicitor, U.S. Dep't of Interior (Dec. 11, 2006) [hereinafter County's Dec. 11, 2006, letter]. These are the major submissions of the Band and the County; not a complete list of the materials submitted and considered.

3

the Band's application of a 25-mile radius to define the term "vicinity." Where the Department intended to use 25 miles as a relevant distance in the regulations, it did so explicitly.[56] As to the term "vicinity," the Department chose no such bright line.

The Department used the word "vicinity" in the Part 292 regulations to permit a finding of restored land on parcels where a tribe lacks any direct evidence of actual use or ownership of the parcel itself, but where the particular location and circumstances of available direct evidence on other lands cause a natural inference that the tribe historically used or occupied the subject parcel as well.[57] Part 292's inclusion of the word "vicinity" was not meant to expand IGRA's definition of "restored land," which always has been limited to lands that a tribe used or occupied.[58] It was included because it would be unduly burdensome and unrealistic to require a tribe to produce direct evidence of actual use or occupancy on every parcel within a tribe's historic use and occupancy area. A definition of "vicinity" based solely on proximity would expand "restored land" beyond land that was historically used or occupied by a tribe. Instead, a determination of whether a particular site with direct evidence of historic use or occupancy is within the vicinity of newly acquired land depends on the nature of the tribe's historic use and occupancy, and whether those circumstances lead to the natural inference that the tribe also used or occupied the newly acquired land.[59]

---

[56] 25 C.F.R. § 292 (defining "appropriate state and local officials" to mean "the Governor of the State and local government officials within a 25-mile radius of the proposed gaming establishment"); *id.* (defining "nearby Indian tribe" to mean "an Indian tribe with tribal Indian locations located within a 25-mile radius of the location of the proposed gaming establishment, or, if the tribe has no trust lands, within a 25-mile radius of its government headquarters"); *id.* § 292.6(d)(2) (permitting a tribe that does not have a reservation to establish a modern connection to newly acquired land by demonstrating that "[t]he land is within a 25-mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least 2 years at the time of the application for land-into-trust" to meet the "initial reservation" exception); *id.* § 292.12(a)(3) (permitting a tribe to establish a modern connection to newly acquired land by demonstrating that "[t]he land is within a 25-mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least 2 years at the time of the application for land-into-trust" to meet the "restored lands" exception).

[57] During the promulgation of Part 292, the Department received a suggestion that it include a requirement that a tribe submit "evidence of an aboriginal or significant historical connection to the land, including cultural ties based upon actual inhabitance." 73 Fed. Reg. 29,354, 29,368 (May 20, 2008). In response, the Department explained that such a requirement was inconsistent with IGRA. *Id.*

[58] *Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney*, 198 F. Supp. 2d 920, 935 (W.D. Mich. 2002); *Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt*, 116 F. Supp. 2d 155, 162 (D.D.C. 2000) ("Under a natural (and broad) reading of the provision, restored tribes which reacquired lands previously held by the tribe would qualify for the exemption."). An exception to this general rule is in the context of some tribal specific restoration acts where Congress identifies certain lands that must be considered restored, irrespective of any prior use or occupancy.

[59] This analysis is, necessarily, fact-intensive, and will vary based on the unique history and circumstances of any particular tribe. Past Indian lands determinations by the Department and the NIGC are instructive. A number of those decisions have found that a tribe established a significant historical connection to newly acquired land by providing evidence of historic use and occupancy of land other than the newly acquired land at issue, but implicating use of the newly acquired parcels. In the NIGC's Bear River Indian Lands Determination, in addition to the Tribe's ancestors living in the area, the Tribe had

15

**B. The Department does not address whether the Band has established modern or temporal connections to the Richmond Parcels.**

As previously stated, Section 292.12 requires a tribe to demonstrate three independent connections to its newly acquired land: (1) a "modern connection" to the land; (2) a "significant historical connection" to the land; and (3) a "temporal connection" between the date of the acquisition of the land and the date of the tribe's restoration.[67] As the Band has failed to establish a significant historical connection to the Richmond Parcels, the land does not qualify as restored lands. Therefore, there is no present need to address whether the Band has established modern or temporal connections to the Parcels.

## Conclusion

I believe that the Parcels do not meet the regulatory requirements to qualify for the Restored Lands Exception to IGRA's general prohibition against gaming on lands acquired in trust after October 17, 1988. The Band has not claimed that the Parcels would be eligible for gaming under any other exception to this prohibition. Therefore, it is my determination that the Parcels, if acquired in trust on behalf of the Band, would not be eligible for gaming under the IGRA.

This decision does not preclude the Band from considering alternative, non-gaming uses for the Parcels. The limitation imposed by Congress on lands acquired for gaming purposes should not be interpreted as a prohibition against acquiring land in trust for any other purpose. Therefore, if the Band wishes to have the Department acquire the land in trust for any other purpose, please amend the application accordingly. Please be advised that the Department would review such an application pursuant to our regulations at 25 C.F.R. Part 151, which require us to consider, among other factors, the purpose for which the land would be used, environmental concerns, and public comments.

Should the Band wish to continue to pursue gaming on the Parcels, it will need to submit an application for a Secretarial Determination pursuant to 25 U.S.C. § 2719(b)(1)(A).

I regret that our decision could not be more favorable at this time.

Sincerely,

Donald E. Laverdure
Acting Assistant Secretary – Indian Affairs

---

[67] 25 C.F.R. § 292.12(a)-(c).

19

# SCOTTS VALLEY BAND OF POMO INDIANS

## Fee-to-Trust Application

Prepared for

**Bureau of Indian Affairs – Pacific Region**
**U.S. Department of the Interior**
**2800 Cottage Way**
**Sacramento, CA 95825**

Fredericks Peebles & Morgan LLP
2020 L Street, Suite 250
Sacramento, CA 95811

August 2016

AR0006681

# **Table of Contents**

**EXECUTIVE SUMMARY**                                                                    **3**

**1.0    INTRODUCTION AND OVERVIEW OF THE REQUEST**                      **5**

**1.1    Profile of the Scotts Valley Band of Pomo Indians**                         **5**

**1.2    Identification of Proposed Trust Land – Vallejo Property**                **7**

**1.3    Description of the Proposed Action**                                            **9**

**2.0    STATUTORY AND REGULATORY REQUIREMENTS**                       **11**

**2.1    Authority for Acquisition Pursuant to 25 C.F.R. Part 151**               **11**

**2.2    Identification of the Applicant**                                                **11**

**2.3    Criteria for Landless Tribe Applications**                                    **12**

**2.4    Criteria for Statutory Authority for the Acquisition**                     **12**

**3.0    TRIBAL NEED FOR THE ACQUISITION OF LAND**                        **16**

**3.1    Consolidation of Tribal Government Offices**                                **16**

**3.3    Need for Economic Development**                                              **19**

**3.4    Tribal Housing**                                                                   **20**

**4.0    PURPOSE FOR THE PROPOSED ACQUISITION**                          **21**

**5.0    IMPACTS OF THE ACQUISITION INTO TRUST STATUS**               **23**

**6.0    JURISDICTIONAL CONFLICTS AND FEDERAL RESPONSIBILITIES**   **27**

**6.1    Potential Jurisdictional Conflicts**                                            **27**
   **6.1.1    Current Land Use**                                                         **27**
   **6.1.2    Criminal and Civil Regulation of the Land**                           **28**
   **6.1.3    Public Services**                                                           **28**

**6.2    Gaming Compliance**                                                            **28**

**6.3    Additional Federal Responsibilities**                                        **29**

**7.0    NEPA COMPLIANCE / HAZARDOUS SUBSTANCES**                     **30**

AR0006682

8.0    LOCATION OF STATE BOUNDARIES                            31

9.0    BUSINESS PURPOSE                                         32

10.0   ACTION ON REQUEST AND TITLE REQUIREMENTS                33

11.0   INDIAN GAMING REGULATORY ACT                            35

12.0   CONCLUSION                                              36

TABLE OF EXHIBITS                                              37

AR0006683

# Executive Summary

The Scotts Valley Band of Pomo Indians ("Tribe") is requesting that the Secretary of the Interior accept trust title to a 128-acre parcel of land in the City of Vallejo for the benefit of the Tribe. The Tribe presently has no land in trust or restricted status. The Tribe seeks to have the Vallejo Property taken into trust to reestablish its homeland and build a tribal community with housing, a unified governmental headquarters, and economic development ventures including a class III gaming facility.

The Tribe's ancestors were among the eight bands of Pomo Indians who signed a treaty with the United States in 1851. The treaty ceded to the United States the lands between Clear Lake and San Pablo Bay, including the Vallejo Property. The U.S. Senate refused to ratify the treaty, however. The United States did not establish the reservation near Clear Lake for the Pomo bands which the treaty contemplated. The Tribe was landless until 1911, when the United States acquired a very small parcel for the Tribe. The Tribe became landless again when it was unlawfully terminated in 1965. The Tribe's status was restored in 1991, but to date none of its lands have been restored to it.

The property is an undeveloped 128-acre parcel located within the northern boundary of the City of Vallejo. It is owned in fee by the Tribe's gaming development partner.

The Tribe is submitting its fee-to-trust application pursuant to 25 C.F.R. § 151.9. Because the Tribe is landless, the Secretary will consider its application using the criteria listed in § 151.11 for "off-reservation" trust acquisitions. The Tribe's application demonstrates that each of the criteria supports a positive decision.

Congress authorized the Secretary to acquire lands in trust for Indian tribes with the Indian Reorganization Act of 1934. The primary basis for this acquisition is that it is necessary to facilitate tribal self-determination, economic development, and tribal member housing. The acquisition of the Vallejo Property for the Tribe will allow the Tribe to establish a consolidated governmental headquarters to replace the two government offices it currently maintains in leased facilities in Lakeport and Concord. The trust acquisition will also allow the Tribe to exercise sovereign authority over a portion of its homeland, enabling effective self-

AR0006684

governance and self-determination.  Taking the land into trust will permit the Tribe to provide much-needed housing for many of its members, and to pursue economic development projects on territory within its sovereign control.  Significant among the Tribe's plans to develop its economy is a proposed casino resort to be located on the Vallejo Property.  The Tribe's separate request to have the land deemed eligible for class III gaming is currently pending.

Taking the Vallejo Property into trust will remove a relatively small amount from city and county property tax revenues, but these losses will be more than offset if the Tribe operates a class III casino on the trust land.  The Tribe anticipates making direct payments to the city and county, and anticipates significant positive impacts on the local economy from a successful casino resort through the creation of thousands of jobs and other economic stimuli, such as the purchase of goods and services from local merchants.

No jurisdictional problems are anticipated to arise from the proposed trust acquisition.  The Tribe's plans are compatible with existing zoning.  Enforcement of criminal laws will remain the same.  Federal laws, including environmental laws, will apply to the Vallejo Property.  If the Tribe operates a casino, it is anticipated that the Tribal-State Gaming Compact will require that the Tribe adhere to standards no less stringent than existing state laws.

The Tribe's application provides a detailed examination of these criteria and others, and supplies all the information required by applicable regulations.

The trust acquisition of the Vallejo Property will restore a portion of homeland to one of the last landless federally-recognized Indian tribes in the nation.  If this land is entrusted for the Scotts Valley Band, the Tribe will finally be able to effectively plan and provide for future generations of its member families.

AR0006685

# 1.0  Introduction and Overview of the Request

By Tribal Resolution dated August 3, 2016, the Scotts Valley Band of Pomo Indians ("Tribe") requests the Secretary of the Interior (the Secretary") accept trust title to land located in the City of Vallejo, California ("Vallejo Property").[1]  The Tribe has prepared this application for the transfer of the Vallejo Property from fee title to Federal trust status. The application and its exhibits were compiled for submission to the U.S. Department of the Interior, Bureau of Indian Affairs.  Under Title 25 of the Code of Federal Regulations, Part 151, the Bureau of Indian Affairs has authority to review and approve such applications for Indian tribes.

The Tribe has absolutely no trust land base and seeks to have the Vallejo Property accepted in trust status to reestablish its homeland and build a tribal community comprised of housing, governmental headquarters and economic development ventures, including, potentially, a gaming facility.  The Vallejo Property is at the southern end of land which the Tribe's ancestors ceded to the United States in an unratified treaty. It is centrally located between the primary tribal population centers in Northern California. The Tribe has selected land that is suitable for the purpose of reuniting its citizens in one location and in an area that will provide substantial social, cultural and economic opportunities to its members.

## 1.1    Profile of the Scotts Valley Band of Pomo Indians

The Tribe is a federally-recognized Indian tribe included on the list of recognized Indian tribes maintained and published by the Secretary.[2]  The Tribe has no reservation and no land held in trust or restricted status.  Although the Tribe's traditional or aboriginal territory is generally <u>perceived</u> to be in and around the town of Lakeport on the western shores of Clear Lake in what is now Lake County, California, as a result of historical forces during the Spanish, Mexican and American eras (approximately 1820 to present), the majority of the Tribe's members reside in several counties across Northern California, reaching from Lake and Mendocino Counties in the north to Sonoma, Contra Costa and Alameda Counties in the south.

---

[1] *See* Exhibit 1, a true and correct copy of Resolution No. 20-16 of the Scotts Valley Band of Pomo Indians.
[2] *See* Indian Entities Recognized and Eligible To Receive Services . . . , 81 Fed. Reg. 25826, 26830 (May 4, 2016).

AR0006686

The Tribe's members descend from the original Pomo band located in what is now called Scotts Valley near the western shores of Clear Lake, known as the Moalkai or Yimaba, as well as their closest neighbors and relatives the Kulanapo and Habenapo Pomo bands located in what is now called Big Valley on the western shores of Clear Lake. The three bands were parties to the unratified treaty concluded August 20, 1851, at Camp Lu pi-yu-ma between the United States and the eight Pomo bands located around Clear Lake.[3] In that treaty, the bands agreed to cede to the United States the lands between Clear Lake and the San Pablo Bay (including the Vallejo Property), and the United States agreed to secure the lands in and around Clear Lake as a reservation for the bands. Unfortunately for the Clear Lake bands and the other Indian peoples of California, neither the Treaty with the Clear Lake bands nor any of the other 17 treaties negotiated by federal officials in 1851 and 1852 were ever ratified by the Senate. As a result, neither the reservation contemplated by the Camp Lu pi-yu-ma Treaty, nor those provided in the companion treaties, were ever established.

Nevertheless, whether the land cessions were treated as if they had been effective, or perhaps as having been unnecessary to begin with, from the execution of the treaties the Clear Lake Bands were treated as if they had no existing property rights, and the Scotts Valley Band was landless until a very small parcel was acquired for the Band by the United States in 1911. Although inadequate to provide either a home or a living for the members of the Band, even that small parcel was taken from them a half-century later in 1965, when the Tribe was unlawfully "terminated" under the California Rancheria Act of 1958.[4] Nearly all of this land has passed to non-Indian ownership. Today, there is less than ½ acre of the original Rancheria left and it is held as an allotment by a tribal member. Although the Tribe was restored to federal recognition in 1991 by stipulated judgment in litigation between the Tribe and the United States, the Tribe's land base has yet to be restored, and the Tribe is and has remained without an adequate land base since 1851 -- 165 years -- and has been without *any* land, adequate or not, for the past 60 years. The termination of the Tribe's status as a federally recognized Indian tribe and subsequent landless restoration serves as a continuation of the historic wrongs inflicted upon the Tribe.

---

[3] *See* Exhibit 2, a true and correct copy of the Treaty of Camp Lu pi-yu-ma (August 20, 1851).
[4] *See* Act of August 18, 1958, P.L. No. 85-671, 72 Stat. 619, amended by Act of August 11, 1964, P.L. No. 88-419, 78 Stat. 390.

AR0006687

## 1.2   Identification of Proposed Trust Land – Vallejo Property

The Vallejo Property is a parcel of approximately 128 acres of undeveloped grazing land situated on the northern edge of the boundary of the City of Vallejo in the County of Solano. It ranges in elevation from approximately 140 - 550 feet above sea level.   It is specifically found at the portions of sections 4 and 5, Township 3 North, and sections 32 and 33, Township 4 North, Range 3 West, Mount Diablo Base and Meridian, designated as Solano County Assessor's Parcel Number 0182-010-010, and more fully described as:

> That certain parcel of land delineated on the Map entitled "Record of Survey of a Parcel of Land East of U.S. 40 & North of Columbus Parkway, Vallejo, California," made by Edward F. Schwafel, Engineer, Inc., filed in the Office of the County Recorder of Solano County, California, on July 28, 1965, in Book 9 of Surveys, at Page 61, subject to certain exceptions of record, and containing 128.32 acres, more or less.

The Vallejo Property is owned by the Tribe's development partner, Integrated Resort Development LLC.

**Vallejo Property Location Map**



AR0006688

## Proposed Trust Land – Vallejo Property



AR0006689

## 1.3    Description of the Proposed Action

The proposed action consists of the conveyance of one parcel, 128 +/- acres of land owned by the Tribe's development partner and in which the Tribe has an interest pursuant to an agreement between the parties.[5] The transfer would be made in accordance with the procedures set forth in 25 C.F.R. Part 151. The proposed action includes the development of tribal housing, governmental headquarters and a casino resort complex. The Tribe may construct in the future a family entertainment center which could include movie theatres, arcades and food and beverage outlets, and a convention center that could accommodate small and large conferences, corporate events and tribal ceremonies.



## Site Plan of Proposed Action



---

[5] Please see Section 10.0 for additional information on the Tribe's interest in the land.

AR0006690

**Conceptual Architectural Rendering of Proposed Action**



**Conceptual Architectural Rendering of Proposed Action**



AR0006691

# 2.0  Statutory and Regulatory Requirements

## 2.1    Authority for Acquisition Pursuant to 25 C.F.R. Part 151

25 C.F.R. Part 151 provides a list of factors which the Secretary shall consider in evaluating a request for the acquisition of land in trust status.[6] The land acquisition policy of the United States outlined in 25 C.F.R. § 151.3(a)(3) authorizes the Secretary to acquire land in trust for Indians and Indian tribes for purposes of facilitating tribal self-determination, economic development or Indian housing. The Tribe's application satisfies these requirements because acquisition of the Vallejo Property will facilitate tribal self-determination, economic development, and tribal member housing.

## 2.2    Identification of the Applicant

**25 CFR § 151.9 — *An individual Indian or tribe desiring to acquire land in trust status shall file a written request for approval of such acquisition with the Secretary. The request need not be in any special form but shall set out the identity of the parties, a description of the land to be acquired, and other information which would show that the acquisition comes within the terms of this part.***

The official applicant is the Scotts Valley Band of Pomo Indians, a federally recognized Indian tribe located in the State of California.[7]

Article III, Section 1 of the Tribe's Constitution establishes the Tribal Council as the governing body of the Tribe.[8] The Tribal Council is empowered under Article VI, Section 1(a) of the Tribal Constitution to advise and consult with the Secretary and other federal officials on all federal projects for the benefit of the Tribe. Furthermore, the Tribal Council is empowered under Article VI, Section 1(f) of the Tribal Constitution to initiate and approve the acquisition of land, as well as to initiate and administer land development projects for the Tribe on tribal lands.

---

[6] The criteria for this acquisition is found in 25 C.F.R. § 151.10. However, 25 C.F.R. § 151.5 through § 151.8 are either not applicable or require no response.

[7] *See* Indian Entities Recognized and Eligible To Receive Services From the United States Bureau of Indian Affairs, 81 Fed. Reg. 26826-26832 (May 4, 2016).

[8] *See* Exhibit 3, a true and correct copy of the Constitution of the Scotts Valley Band of Pomo Indians.

---

AR0006692

On August 3, 2016, the Tribal Council adopted Resolution No. 20-16 authorizing the Tribal Council Chairman to take the necessary steps to cause the Vallejo Property to be transferred to the United States in trust status for the benefit of the Tribe.[9]   As noted herein, the Vallejo Property is one parcel comprised of approximately 128.32 acres situated on the outskirts of the City of Vallejo, County of Solano, State of California and designated as Solano County Assessor's Parcel Number 0182-010-010.

In accordance with Section 151.9, the Tribe hereby requests the Secretary to take action to acquire title to the Vallejo Property in trust status for the benefit of the Tribe, pursuant to this application.

## 2.3   Criteria for Landless Tribe Applications
### 25 C.F.R. § 151.11(a) - *Off-reservation acquisitions*

As an initial matter, the Secretary considers the Tribe's application under the so-called off-reservation criteria of Section 151.11 because the Tribe is landless and has no reservation.[10] Section 151.11(a) requires the Secretary to consider the criteria listed in Sections 151.10(a) - (c), and (e) - (h), as discussed below.

## 2.4   Criteria for Statutory Authority for the Acquisition
### 25 C.F.R. § 151.10(a) - *The existence of statutory authority for the acquisition and any limitations contained in such authority*

The Secretary 's statutory authority for the acquisition of land in trust for Indian tribes by the Secretary of the Interior is found in Section 5 of the Indian Reorganization Act (IRA), 25 U.S.C. § 465.  Section 465 provides, in pertinent part:

> The Secretary of the Interior is authorized, in his discretion, to acquire, through purchase, relinquishment, gift, exchange, or assignment, any interest in lands, water rights, or surface rights to lands, within or without existing reservations, including trust or otherwise restricted allotments, whether the allottee be living or deceased, for

---

[9] *See* Exhibit 1, a true and correct copy of Tribal Resolution No. 20-16.
[10] *See* Record of Decision, Trust Acquisition for Mashpee Wampanoag Tribe (September 2015), at 79.

AR0006693

the purpose of providing land for Indians.

...

   Title to any lands or rights acquired pursuant to this Act or the Act of July 28, 1955 (69 Stat. 392), as amended (25 U.S.C. 608 *et seq.*) shall be taken in the name of the United States in trust for the Indian tribe or individual Indian for which the land is acquired, and such lands or rights shall be exempt from State and local taxation.

In addition, the Secretary has promulgated regulations, found at 25 C.F.R. Part 151, which set forth the procedures for implementing Section 5. The Department's land acquisition policy, found at Section 151.3(a), sets forth the conditions under which land may be acquired in trust by the Secretary for an Indian Tribe:

   (a) Subject to the provisions contained in the acts of Congress which authorize land acquisitions, land may be acquired for a tribe in trust status: (1) when the property is located within the exterior boundaries of the tribe's reservation or adjacent thereto, or within a tribal consolidation area; or (2) when the tribe already owns an interest in the land; or (3) when the Secretary determines that the acquisition of the land is necessary to facilitate tribal self-determination, economic development, or Indian housing.

Section 5 of the IRA and Section 151.3(a)(3) authorize the Secretary to acquire land in trust for Indians and Indian tribes for purposes of facilitating tribal self-determination, economic development or Indian housing. The Tribe's application satisfies these requirements because acquisition of the Vallejo Property will facilitate tribal self-determination, economic development, and tribal member housing. Moreover, the stipulated judgment entered into in *Scotts Valley Band of Pomo Indians, et al. v. United States*, (Case No.: C-86-3660-VRW) anticipates that the United States will acquire land in trust for the benefit of the Tribe as part of the Tribe's restoration to federal recognition.[11]

---

[11] *See* Exhibit 4, a true and correct copy of the Stipulated Judgement entered into in <u>Scotts Valley Band of Pomo Indians, et al. v. United States</u> (Case No.: C-86-3660-VRW).

AR0006694

Section 151.3(a)(2) authorizes the Secretary to acquire land in trust for an Indian tribe when the Tribe already owns an interest in the land. Here, the Tribe has an interest in the land pursuant to an agreement between the Tribe and its development partner, which owns the land in fee.[12]

In addition to statutory authority, Section 151.10(a) requires consideration of any limitations on such authority. In *Carcieri v. Salazar*, 555 U.S. 379 (2009), the United States Supreme Court held that the Secretary's authority to acquire land in trust for Indian tribes under the first definition of "Indian" in the IRA extended only to those Indian tribes that were "under Federal jurisdiction" when the IRA was enacted on June 18, 1934. Section 19 of the IRA defines the term "Indian" as follows:

> The term "Indian" as used in this Act shall include all persons of Indian descent who are [1] members of any recognized Indian tribe now under Federal jurisdiction, and [2] all person who are descendants of such members who were, on June 1, 1934, residing within the present boundaries of any reservation, and shall further include [3] all other persons of one-half or more Indian blood.

(Emphasis added)

The Solicitor of the Department of the Interior has addressed the question of whether an Indian tribe was "under Federal jurisdiction" and has construed the phrase to require a two-part inquiry.[13] The Solicitor determined that the "first question is to examine whether there is a sufficient showing in the tribe's history, at or before 1934, that it was under Federal jurisdiction, *i.e.,* whether the United States had taken an action or series of actions - through a course of dealings or other relevant acts for or on behalf of the Tribe or in some instances tribal members - that are sufficient to establish Federal obligations, duties, or responsibility for or authority over the Tribe by the Federal Government."[14] Further, the Solicitor determined that "[o]nce having identified that the Tribe was under Federal jurisdiction prior to 1934, the second question is to ascertain whether the Tribe's

---

[12] Please see Section 10.0 for additional information on the Tribe's interest in the land.
[13] *See* M-37029, <u>The Meaning of "Under Federal Jurisdiction" for Purposes of the Indian Reorganization Act</u> (Mar. 12, 2014). *See* Exhibit 5, a true and correct copy of M-37029.
[14] *Id.* at 19

AR0006695

jurisdictional status remained intact in 1934."[15]   The Solicitor further determined that the Indian tribes that voted to opt out of the IRA in the Section 18 elections held between 1934 and 1936 are an example of unambiguous Federal actions that obviate the need to examine a particular Indian tribe's history prior to 1934.[16]

As stated in the report prepared in 1947 by Theodore H. Haas, Chief Counsel for the United States Indian Service, 10 of the 17 adult Indians residing at the Tribe's reservation voted to reject adoption of the IRA to the Tribe's reservation at a special election duly held by the Secretary on June 8, 1935.  The calling of a Section 18 election at the Tribe's reservation unambiguously and conclusively establishes that the Tribe was under Federal jurisdiction in 1934. The IRA vote is dispositive as to a finding of Federal jurisdiction in 1934.

---

[15] *Id.*
[16] *Id.*

AR0006696

# 3.0  Tribal Need for the Acquisition of Land

## 25 C.F.R. § 151.10(b) - *The need of the Tribe for additional land*

Section 151.10(b) requires the Secretary to consider the need of the Tribe for additional land.  The Tribe, which was restored to federal recognition nearly twenty-five years ago, has no trust land over which to govern.

## 3.1    Consolidation of Tribal Government Offices

In 2000, the Assistant Secretary – Indian Affairs designated the "counties of Mendocino, Lake, Sonoma and Contra Costa in the State of California" – an area covering approximately 7,800 square miles and extending approximately 120 miles from its northern to its southern reaches – as the Tribe's "'near-reservation' areas" within which the Tribe is "authorized to extend financial assistance and social services to their eligible tribal members (and their family members who are Indian) . . .."  The vast majority of the Tribe's members, approximately 72.7%, live within the designated "near reservation area" and a significant number, 12.4%, live in adjacent counties to the Vallejo Property.[17]  Indeed, approximately 18.0% or one-fifth of the tribe's members live in 25 houses located within thirty-five miles of the proposed homeland.[18]

Since 2008 the Tribe has maintained both northern and southern governmental offices in Lakeport (within Lake County) and in Concord (within Contra Costa County), respectively, in order to effectively serve the Tribe's dispersed membership.[19]    The Tribe's current southern office is located at 2727 Systron Drive, Suite 100, Concord, CA 94518.[20]  From 2008 to 2012, the Tribe's southern office was located at 1465 Enea Circle, Bldg. D, 1st Floor, Suite 700, Concord, CA 94520.[21]  Prior to 2008, the Band met for years in various southern Bay Area locations at a tavern, rented rooms and in public parks.[22]

---

[17] *See* Exhibit 7, a true and correct copy of the Declaration of Patricia Franklin at ¶ 13.
[18] *Id.*
[19] *Id.* at ¶ 8.
[20] *Id.*
[21] *Id.*
[22] *Id.*

AR0006697

**Twenty-five separate tribal member residences -- housing one-fifth of the total membership -- are near the Vallejo Property. The Tribe's current and former southern offices are located less than 16 miles from the Property.**



AR0006698

With a significant number of tribal members living in the San Francisco Bay area, the Tribe uses its southern office is for many governmental activities and services, including General Council and Tribal Council meetings.[23] In addition, the Tribe maintains at the southern office its government administration and operations; information technology department, health and wellness departments (that provide services such as Temporary Assistance for Needy Families, Indian Child Welfare Act, housing, grant oversite, counseling and case management); and the transportation department.[24] This location is used for nearly all on-site meetings with the Department of the Interior, Bureau of Indian Affairs, Indian Health Services, Administration for Children and Families, as well as with the California Tribal TANF Coalition.[25] It is also the location where the Tribe holds most tribal celebrations and reunions.[26] Operating from two leased offices presents challenges to effective governance of the Tribe. The solution is to consolidate its governmental functions at one central location. Acceptance of this property into trust status would achieve that goal.

## 3.2    Tribal Self-Determination

On April 11, 2016, the Tribe was selected to participate in the Self-Governance Program in accordance with the Indian Self-Determination and Education Assistance Act, as amended.[27] As a self-governance tribe, the Tribe is permitted to enter into compacts for annual funding agreements that allow the Tribe to administer a block of funding as it sees fit.[28] The Tribe will have control over the planning and administration of certain programs and services.[29] Trust land is essential to effective self-governance. Merely owning the property in fee status would not permit the Tribal government to exercise its complete sovereign powers. On the other hand, conveyance of the property into trust status for the benefit of the Tribe will allow for greater self-sufficiency.

Moreover, the Vallejo Property is located in an area ceded by the Tribe's ancestors to the United States. It is in a suitable location for the Tribe to establish

---

[23] *Id.* at ¶ 9.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] Section 402, Pub. L. 93-638. *See also* Exhibit 6, a true and correct copy of the letter, dated April 11, 2016, from Sharee Freeman, Director of Office of Self Governance to Gabriel Ray, Chairman of the Tribe.
[28] Los Coyotes Band of Cahuilla & Cupeno Indians v. Jewell, 729 F.3d 1025, 1031, n.3 (9th Cir. 2013).
[29] 25 U.S.C. § 458cc(b)(1)-(2)

AR0006699

a new homeland and will enable the Tribe to preserve its culture, language and arts in one central location.

## 3.3  Need for Economic Development

Acquisition of the Vallejo Property in trust status will enable the Tribe to generate a dependable stream of income that can be used to support tribal government functions and meet the needs of its 268 tribal members.[30]  Currently, the adult Tribal member unemployment rate is approximately 54%.[31] The Tribe's proposed gaming project for the Vallejo Property will do much to reduce that rate. Based on a comprehensive gaming market assessment prepared by Global Market Advisors for the Tribe in 2015, the Tribe estimates that its proposed gaming facility will generate between $157 million and $255 million in annual tribal income during the first five years of operation.[32]  The Tribe anticipates that up to twenty percent (20%) of its annual gaming revenue will be distributed to tribal members in accordance with a Per Capita Distribution Plan approved by the Secretary pursuant to 25 U.S.C. § 2710(b)(3).

Federal funding is insufficient to meet Tribal member needs, and future funding of Indian programs are regularly endangered by budgetary considerations and constraints. This land would enable the Tribe to meet its needs for economic development, self-sufficiency and self-governance; and will provide its membership with employment and educational opportunities, and needed social and governmental services. For example, federal funding for services related to the Indian Child Welfare Act is deficient to the point that the Tribe often cannot provide relief for children caught in domestic violence situations.

The Vallejo Property is located in an area of Vallejo that already provides a mix of commercial and residential uses and offers a suitable infrastructure for the Tribal development. If the Vallejo Property in placed into trust status, the Tribe will be able to develop the lands in a manner similar to state and local government

---

[30] The Tribe has 158 adult members and 110 members under age 18. *See* Exhibit 7, a true and correct copy of Declaration of Patricia Franklin at ¶ 5.
[31] The unemployment rates in the State of California and the primary counties in which tribal members reside (Counties of Alameda, Contra Costa, Mendocino, Solano, and Sonoma) is under 6%. The unemployment rate in the County of Lake is under 7%. *See* Exhibit 8, a true and correct copy of the Unemployment Rate and Labor Force, California Employment Development Department (June 2016).
[32] *See* Exhibit 9, a true and correct copy of the Gaming Market Assessment, Global Market Advisors at 23.

AR0006700

developments. The Tribe will be able to reinvest revenue into other business ventures and into the local economy.

Increased revenue and job opportunities from the casino resort would improve the socioeconomic condition of tribal members and reduce dependence on public assistance programs. Most importantly, the acquisition would restore to the Tribe a land base that it hasn't had since the termination era.    Indeed, the future of the Tribe depends on the ability of the Tribe to achieve economic independence.

## 3.4    Tribal Housing

The Tribal homeownership rate is approximately 13%.[33] The national homeownership rate is 62.9%.[34]  By contrast, the tribal homeless rate is 41%.[35] Federal funding through the Housing and Urban Development Department is also limited. There is insufficient funding for the acquisition or maintenance of tribal member homes or to correct the homelessness rate.

The Tribe has 158 adult members and 110 members under age 18.  With nearly one half of the Tribe being under the age of 18, housing will be required to satisfy the needs of a rapidly growing tribal population and emerging young families. To address these challenges, the Tribe anticipates using a significant portion of the annual gaming revenue to construct more than 100 homes and recreational areas on the Vallejo Property for its members and their families.

---

[33] *See* Exhibit 7, Declaration of Patricia Franklin at ¶ 12.
[34] *See* Exhibit 10, a true and correct copy of Residential Vacancies and Homeownership in the Second Quarter 2016, U.S. Census Bureau, U.S. Department of Commerce (July 28, 2016).
[35] The Tribe observes that there may be many "official" definitions of homelessness. The Tribe relies on the definition used by health centers of the U.S. Department of Health and Human Services. A homeless individual is defined in the Public Health Service Act as "an individual who lacks housing (without regard to whether the individual is a member of a family), including an individual whose primary residence during the night is a supervised public or private facility that provides temporary living accommodations and an individual who is a resident in transitional housing." 42 U.S.C. § 254(b). Of this category, the Tribe's homeless rate is 15%.  However, "an individual may be considered to be homeless if that person is 'doubled up,' a term that refers to a situation where individuals are unable to maintain their housing situation and are forced to stay a series of friends and/or extended family members." *See* Bureau of Primary Health Care, Program Assistance Letter 99-12, Health Care for the Homeless Principles of Practice, p.7. Of this category, the tribal rate of homelessness is an additional 26%. *See* Exhibit 7, Declaration of Patricia Franklin at ¶ 12.

---

AR0006701

# 4.0  Purpose for the Proposed Acquisition

## 25 C.F.R. § 151.10(c) - *The purposes for which the land will be used*

Section 151.10(c) requires the Secretary to consider the purposes for which the land will be used. The trust acquisition of the Vallejo Property will be the initial component of the Tribe's plan to fully restore the tribal community at that location. The Tribe proposes to develop the parcel in multiple phases.   In phase I, the Tribe proposes to commercially develop a portion of the land to offer Class II and Class III gaming (as defined by the Indian Gaming Regulatory Act of 1988, 25 U.S.C. §§ 2701 *et seq.*) to the public at the proposed casino resort.

| Phase I | Approximate Square-Feet |
|---|---|
| Casino | 113,000 |
| Hotel | 104,335 |
| Retail | 7,240 |
| Restaurants / Food Service | 42,870 |
| Back of the House / Administration | 114,000 |
|  |  |
| **Total** | **381,445** |

As currently planned, this first phase would consist of an approximately 381,455 s.f. casino-resort.   In addition to the casino, the project would include a five story hotel with approximately 211 guest rooms and suites.  The hotel would also include food and beverage facilities, spa/health club, retail, reception/lobby, common areas and recreation.[36]  The casino and hotel would be open 24 hours a day, 7 days a week.  Parking would include approximately 3,978 spaces (a three level self-parking structure with 2,884 spaces and 1,094 surface parking spaces).

The Tribe may also construct and maintain water supply facilities on the Vallejo Property with a central plant which would house a water treatment plant, water storage tanks, a pumping system, and a piped delivery system.

In subsequent phases 2-4, the Tribe proposes to add a family entertainment center which could include movie theatres, arcades and food and beverage outlets, a bowling center for family outings, events and entertainment, and a convention center that could accommodate small and large conferences, corporate events and

---

[36] Depending on market conditions and financing options available to the Tribe at the time the land is acquired in trust the Tribe may wish to construct the hotel in a subsequent phase.

AR0006702

ceremonies. The Tribe also proposes to build a tribal member community consisting of Tribal Government Offices, Senior Center, Tribal Residential Center with community pool and amenities, and more than 100 homes.

AR0006703

# 5.0  Impacts of the Acquisition into Trust Status

**25 C.F.R. § 151.10(e) -** *If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls.*

Section 151.10(e) requires the Secretary to consider the impact on the state and its political subdivisions resulting from removal of the land from the tax rolls. The current tax assessments on the Property are as follows:

| TAX FUND (APN: 0182-010-010) | 1ST INSTALLMENT | 2ND INSTALLMENT | TOTAL ANNUAL TAX |
|---|---|---|---|
| 1 PCT Tax | $4,779.66 | $4,779.66 | $9,599.32 |
| SC Water Agency | $95.59 | $95.59 | $191.18 |
| VJO 202 GOB Bond | $293.68 | $293.68 | $587.36 |
| Vallejo Measure A 02 | $34.91 | $34.91 | $69.82 |
| Vallejo Measure A 04 | $48.11 | $48.11 | $96.11 |
| Vallejo Measure A 06 | $25.99 | $25.99 | $51.98 |
| SCC GOB 06 | $8.50 | $8.50 | $17.00 |
| SCC GOB 12 Series A | $58.89 | $58.89 | $117.78 |
| SCC GOB 12 Series B | $15.59 | $15.59 | $31.18 |
| SCC GOB 14 Series A | $7.06 | $7.06 | $14.12 |
| SCC GOB 14 Series B | $76.83 | $76.83 | $153.66 |
| VJO Recreation Dist | $250.00 | $250.00 | $500.00 |
|  |  |  |  |
| TOTAL | $5,695.01 | $5,695.01 | $11,390.02 |

Accepting the Vallejo Property into trust will result in the loss of $11,390.02 in local property tax receipts annually.[37]  The total annual property taxes levied for the City of Vallejo for the Fiscal Year ending June 30, 2015 was $15,455,643,[38] and the total annual property taxes levied for Solano County for the Fiscal Year ending June 30, 2015 was $487,553,004.[39]   The loss of $11,390.02 from the tax base of both Solano County and the City of Vallejo is *de minimis*, and barely perceptible as a mathematical percentage.

---

[37] *See* Exhibit 11, a true and correct copy of the Tax Bill dated September 16, 2015.
[38] *See* Exhibit 13.1, a true and correct copy of the City of Vallejo Comprehensive Annual Financial Report for the Fiscal Year Ending June 30, 2015, at p. 165.
[39] *See* Exhibit 13.2, a true and correct copy of the Solano County Comprehensive Annual Financial Report for the Fiscal Year ending June 30, 2015, at p. 139.

AR0006704

The loss of $11,390.02 in tax revenue will be more than mitigated in several ways if the United States acquires title to the Vallejo Property in trust for the benefit of the Tribe and the Tribe is able to develop and operate the planned casino resort.

First, the Tribe will make direct payments to the State of California, the City of Vallejo, Solano County and other local governmental units based on comparable municipal service agreements.  Upon the United States acquiring title to the Vallejo Property in trust for the Tribe as "restored lands" of the Tribe, the Vallejo Property will qualify as "Indian lands" eligible for gaming within the scope and meaning of the IGRA, and the State of California will have an obligation to negotiate in good faith the terms of a Class III Gaming Compact with the Tribe.  Based on Compacts the State of California has already negotiated with federally-recognized tribes, the Tribe anticipates making annual payments to the State of California ranging from $76,877,979 during the first year of operation to $99,784,341 during the fifth year of operations.[40]  While the Tribe's Compact payments to the State of $458,927,759 over the first 5 years of operations does not directly mitigate the loss of $56,950.10[41] in tax revenue by local political subdivisions,  California Compacts typically require a tribe engaging in Class III Gaming to work cooperatively with local governments to reach agreement on (i) the provisions of municipal services to the Vallejo Property after the United States acquires title to the Vallejo Property in trust for the benefit of the Tribe, and (ii) mitigation of adverse impacts on the local community.

The Tribe fully anticipates and intends to enter into inter-governmental agreements with the City of Vallejo, Solano County, and other local governmental units which will provide direct payments from the Tribe to such governmental units in consideration for the services such governmental units provide to the Tribe, the casino resort and the Vallejo Property and to mitigate any and all potential adverse impacts identified in the Environmental Impact Statement.  Based upon the various inter-governmental agreements entered into by the Lytton Band of Pomo Indians, the Rumsey Band of Wintun Indians, the Graton Rancheria, the United Auburn Indian Community and the Shingle Springs Band of Miwok, the Tribe anticipates making direct payments to the City of Vallejo, Solano County and other local

---

[40] *See* Gaming Market Assessment, Global Market Advisors at 23.
[41] Given the length of time typically associated with the  trust acquisition process, this figure assumes local taxation of the Property would remain constant over the 5 year period because no development will occur on the Property during the trust acquisition process so as to result in any increase in the assessed value of the Property for tax purposes.

AR0006705

governmental units ranging from $13,795,303 during the first year of operation to $14,932,479 during the fifth year of operations.[42]    The payments the Tribe will make directly to the City of Vallejo, Solano County and other local governmental units pursuant to inter-governmental agreements the Tribe will enter into pursuant to a Compact with the State of California will more than mitigate the loss of tax revenue those governmental units will experience as a result of the United States acquiring title to the Property in trust for the benefit of the Tribe.

In addition to direct payments the Tribe will make to the State of California, the City of Vallejo, Solano County and other local governmental units pursuant to a Compact and inter-governmental agreements mandated by the Compact, both the construction and operation of the casino resort will have a direct positive impact on the local economy which will more than mitigate the loss of local tax revenue. The total estimated costs of designing, developing and constructing the casino resort is $699,006,953.[43] Construction of the casino resort will create 2,700 full time equivalent direct construction jobs and 2,800 full time equivalent indirect / induced construction jobs for the 24-30 month construction and development period.[44]

While the benefits associated with the Tribe's creation of construction jobs is limited to the construction and development period, the casino resort will create 2,553 full time equivalent positions while employing a total of 2,962 people during the first year of operations.[45]   Given the limited size of the tribal membership, virtually all of the employment opportunities will be filled by local residents.  Total salaries and wages for the casino resort during the first year of operations are estimated at $91,985,121, and including benefits, the casino resort's total labor expense for the first year of operations is estimated at $125,607,039.[46]    Based upon these figures, the Tribe will surpass Kaiser Permanente Medical Center (2,735 employees) as the leading employer in the City of Vallejo.[47] The Tribe will also become the second largest employer in Solano County, trailing only Travis Air Force Base, which has a combined military and civilian work force of 14,353 people.[48]   Not only will the Tribe becoming a major employer within the City of

---

[42] *See* Gaming Market Assessment, Global Market Advisors, at 23.
[43] *See* Exhibit 12, Scotts Valley Proposed Construction Budget.
[44] This data was provided by Impact Data Source, LLC using the Regional Input-Output Modeling System (RIMS II) formula.
[45] *See* Gaming Market Assessment, Global Market Advisors, at 21.
[46] *Id.*
[47] Vallejo Comprehensive Annual Financial Report for the Fiscal Year ending June 30, 2015, at 176. Exhibit 13.1.
[48] Solano County Comprehensive Annual Financial Report for the Fiscal Year Ending June 30, 2015, at 145. Exhibit 13.2.

AR0006706

Vallejo and Solano County mitigate the loss of tax revenue local jurisdictions will experience from the United States acquiring title to the Vallejo Property, the casino resort will also be a major purchaser of goods and services from local businesses, thereby further contributing to the expansion of the local economy.

The direct impacts of the Tribe's operation of the casino resort will more than adequately mitigate the loss of tax revenue the City of Vallejo, Solano County and other local jurisdictions will experience if the United States acquires title to the Property in trust for the benefit of the Tribe. The indirect and induced impacts the Tribe's operation of the casino resort will have on the local economy resulting from (i) salaries and benefits paid to employees of the casino resort, (ii) the casino resort's purchase of goods and services from local merchants, and (iii) salaries and benefits local merchants pay to the increased number of their employees required to provide goods and services to the casino resort, will further mitigate the impacts of lost tax revenue to these jurisdictions.  As part of the environmental review process, the Tribe will commission additional studies using the IMPLAN (Impact Analysis for Planning) economic model to estimate the indirect and induced impact of the casino resort on the local economy.

Clearly, the direct, indirect and induced impacts of the Tribe's operation of the casino resort will more than adequately mitigate the impact local jurisdictions will experience from the loss of tax revenue resulting from the United States acquiring title to the Vallejo Property in trust for the benefit of the Tribe.

# 6.0 Jurisdictional Conflicts and Federal Responsibilities

## 6.1 Potential Jurisdictional Conflicts
### 25 C.F.R. §151.10(f) – *Jurisdictional problems and potential conflicts of land use which may arise*

Section 151.10 (f) requires the Secretary to consider jurisdictional problems and potential conflicts of land use which may arise. There are no jurisdiction problems anticipated at this time.

## 6.1.1 Current Land Use

The Vallejo Property is undeveloped land that is zoned for commercial use.[49]  The land is generally used for grazing.  It is adjacent to Interstate 80 on its western border with a residential area on the opposite and lower side of the interstate. The location is across from a Six Flags amusement park and the Solano county fairgrounds to the south-west.   Two large commercial retail centers, including Costco and Target stores, are located on its southern border. It is flanked by vacant city-owned land on its northern and eastern borders. The planned use of the land is compatible with local zoning.  Once the land is brought into trust, any inconsistent zoning laws will not apply.



---

[49] The parcel is zoned for Commercial – Freeway (CF): Freeway Shopping and Service, as well as Mixed-Use Planned Development (City of Vallejo, 2015). Exhibit 14, Phase I Environmental Site Assessment, at 2.1.

AR0006708

## 6.1.2 Criminal and Civil Regulation of the Land

Land held in trust by the United States is not subject to the regulatory requirements of the State or local jurisdictions. Federal laws, including environmental laws, will apply to the Vallejo Property. Any development or construction on land not held in trust would be fully subject to local laws, laws of the State, and regulatory permitting programs.

The Vallejo Property is subject to the full criminal/prohibitory jurisdiction of the State of California and the City of Vallejo. Upon acquisition of the land into trust status, the State of California will continue to exercise the same criminal jurisdiction over the Vallejo Property under Public Law 280 (67 Stat. 588). Under 18 U.S.C. § 1162 and 28 U.S.C. § 1360, the State of California will retain jurisdiction to enforce its criminal/prohibitory laws against all persons and conduct occurring on the land. Providing police services will continue to be the responsibility of the City of Vallejo's Police Department, and criminal prosecutions for offenses committed on the Tribe's land will continue to be brought in State courts.

## 6.1.3 Public Services

The Tribe is committed to negotiating and reaching a municipal services agreement with the City of Vallejo and other local jurisdictions for the provision of municipal services to the Tribe, the Vallejo Property and the homes, offices and facilities located thereon. In addition, the Tribe plans to enter an agreement with Pacific Gas & Electric Company, which provides electrical service to the vicinity of the Vallejo Property.

## 6.2    Gaming Compliance

As with all Indian tribes operating class III gaming in the State of California, the Tribe will negotiate and conclude a gaming compact for the regulation of class III gaming activities. In California, tribal-state gaming compacts are signed by the Governor and ratified by the Legislature, but do not take effect without the approval of the Secretary pursuant to 25 U.S.C. § 2710(d)(3)(B).

---

AR0006709

## 6.3    Additional Federal Responsibilities

**25 C.F.R. § 151.10(g) – *If the land to be acquired is in fee status, whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status***

Section 151.10(g) requires the Secretary to consider any additional federal responsibilities resulting from the trust acquisition. The Tribe submits that the Bureau of Indian Affairs will not incur any additional responsibilities as a result of the conversion of the property to trust status. The Tribe intends to be responsible for all expenses and maintenance with regard to the Property and to address all legal matters that may arise with regard to the property. Furthermore, the Tribe will continue to work towards complete self-governance.  As the Tribe becomes more self-sufficient, its dependence on assistance from the Bureau will diminish.

Furthermore, the Tribe's plans to establish its governmental headquarters and a tribal community on the Vallejo Property coupled with the highly regulated nature of Indian gaming would minimize the need for on-site inspections by the Bureau of Indian Affairs.. Nonetheless, the Vallejo Property is only 60 driving miles from the Pacific Regional Office of the Bureau located in Sacramento, California. Should any federal oversight be necessary, this short distance should not affect the Bureau's capacity to occasionally visit the Vallejo Property.

AR0006710

# 7.0   NEPA Compliance / Hazardous Substances

**25 C.F.R. § 151.10(h) –** *The extent to which the applicant has provided information that allows the Secretary to comply with 516 DM 6, appendix 4, National Environmental Policy Act Revised Implementing Procedures, and 602 DM 2, Land Acquisitions: Hazardous Substances Determinations.*

Section 151.10(h) requires the Secretary to consider environmental reports and related information submitted by the Tribe.

Attached as Exhibit 14 is a Phase I Environmental Site Assessment prepared in December 2015 for the Tribe by Analytical Environmental Services of Sacramento, California. The Tribe anticipates that an Environmental Impact Statement may be required and it intends to promptly meet with the Bureau of Indian Affairs to confirm the scope of work required for compliance with the National Environmental Policy Act.

AR0006711

# 8.0  Location of State Boundaries

**25 C.F.R. § 151.11(b) – *The location of the land relative to state boundaries, and its distance from the boundaries of the tribe's reservation***

Section 151.11(b) provides that as the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition and give greater weight to the concerns raised by the state and local governments having regulatory jurisdiction over the land to be acquired.

Although the Tribe has always been located in what is now the State of California, it does not have a reservation.[50]  The Tribe seeks to have the Vallejo Property placed into trust status because the Tribe has significant historical and modern connections to the specific area in which the land is located.  In fact, the vast majority of the Tribe's members (approximately 72.7%) live within such designated "near-reservation area," with a significant number -- 18% of Tribal members (or nearly one-fifth of the entire Tribe) -- living within a 36-mile radius of the proposed casino resort site.[51]

The Vallejo Property is approximately 305 driving miles from Hornbook, CA (very near the California-Oregon boundary), and approximately 157 driving miles from Lake Tahoe (on the California-Nevada boundary).

---

[50] Presently, the Tribe does not have trust land, restricted land or an Indian reservation as those terms are defined at 25 C.F.R. § 151.2 (d), (e) and (f).
[51] *See* Exhibit 7, Declaration of Patricia Franklin, ¶ 13.

AR0006712

## 9.0  Business Purpose

**25 C.F.R. § 151.11(c) –** *Where land is being acquired for business purposes, the tribe shall provide a plan which specifies the anticipated economic benefits associated with the proposed use.*

In accordance with 25 C.F.R. § 151.11(c), the Tribe has included a Five Year Business Plan ("Business Plan"), as Exhibit 15, that addresses the proposed casino resort's anticipated economic benefits.[52]

As explained herein, the Business Plan estimates that the total net revenue from the casino resort will range from $157 million in the first year to $255 million in the fifth year of operation.[53] Of the total 2,962 employees, 2,553 of those will be full time equivalent positions with estimated salaries, wages and benefits totaling over $125 million.[54] This project can stimulate job growth not only from the resort but many existing and new businesses that will expand or be created from this project and for this project. Employee wages will spark job creation throughout the surrounding communities through their buying activities.

The business plan estimates that potential payments to the State, County and local municipalities could equate to over $90 million per year. This could lead to bigger investments in other initiatives such as education, police, fire, water, infrastructure and other social programs to allow the State and local communities to create more opportunity for their citizens.

---

[52] *See* Exhibit 15, a true and correct copy of the Business Plan.
[53] Section 5.1 of the Business Plan, Proforma Income Statement.
[54] Section 5.3 of the Business Plan, Job Creation and Economic Impact.

AR0006713

# 10.0 Action on Request and Title Requirements

**25 C.F.R. § 151.12 – *Action on Requests***
**25 C.F.R. § 151.13 – *Title Review***

Section 151.12 is related to the Secretary's review and decisions on requests for land acquisitions. The Tribe stands ready to provide any additional information deemed necessary by the Secretary in order to render a decision.

Section 151.13 is related to the Secretary's duty to require the applicant to furnish adequate title evidence upon a determination to acquire the property in trust status.[55] Enclosed herewith, as Exhibit 16, is a Preliminary Title Report prepared by Fidelity National Title Company. Attached as Exhibit 17 is a copy of the Vacant Land Purchase Agreement and Joint Escrow Instructions, dated May 8, 2015, between IRD and the previous owner, Viejo Capital, Inc. Attached as Exhibit 18 is a copy of the Grant Deed for the Vallejo Property recorded on March 15, 2016.

Lastly, submitted with this application, as Exhibit 19, is the Development Agreement, dated July 5, 2016, between Integrated Resort Development LLC. ("IRD") and the Tribe.[56] Under the terms of that Development Agreement, IRD (which owns the Vallejo Property) is required to transfer its title in the land to the Department of the Interior, to be held in trust on behalf of the Tribe. Pursuant to the Development Agreement, IRD agrees to assist the Tribe to finance, develop and construct the gaming facility on the Vallejo Property.

The terms of the Development Agreement require that the Vallejo Property be held by the United States government in trust for the Tribe for gaming purposes and must meet the requirements of the United States to be accepted in trust for the Tribe for the operation of Class II and Class III gaming. Section 1.4.1 of the Development Agreement states that the Tribe has designated IRD as the party acquiring the Vallejo Property on behalf of the Tribe. Section 1.4.6 states that IRD is obligated to transfer directly to the United States its interest in the Vallejo Property when, among other conditions, the Secretary publishes in the Federal Register a Record of Decision reflecting the Secretary's determination to acquire title to the Vallejo Property in trust for the benefit of the Tribe.

---

[55] This is pursuant to 81 Fed. Reg. 10479 (Mar. 1, 2016).
[56] On June 16, 2016, the General Counsel of the National Indian Gaming Commission determined that this agreement does not constitute a management agreement as that term is understood with regard to the Indian Gaming Regulatory Act of 1988, 25 U.S.C. §§ 2701, *et seq.*

AR0006714

Furthermore, Section 7.1 provides that the transfer of the Vallejo Property, free of any liens or encumbrances, to the United States to be held in trust for the Tribe is a condition precedent for IRD to obtain financing for the construction and initial operation of the proposed gaming facility. Consequently, if the Vallejo Property is not held by the United States government in trust for the Tribe, then IRD is not obligated to arrange for financing for the Tribe pursuant to Section 7.1 of the Development Agreement.

AR0006715

# 11.0    Indian Gaming Regulatory Act

As more fully explained in the Tribe's written request for an Indian Lands Opinion, submitted on January 29, 2016 to the Office of Indian Gaming, the Tribe meets the requirements of the Restored Lands Exception of Section 20 of the Indian Gaming Regulatory Act of 1988, 25 U.S.C. 2719(b)(1)(B)(iii), and the Department's implementing regulations contained at 25 C.F.R. Part 292 because the Tribe qualifies as a "restored Tribe," and the Vallejo Property qualifies as "restored lands."

Attached hereto, as Exhibit 20, are the primary submission documents supporting the Tribe's request for an opinion of the Department that the Vallejo Property, should it be accepted in trust status, would be eligible for gaming activity under the restored lands exception of the Indian Gaming Regulatory Act of 1988, 25 U.S.C. § 2719(b)(1)(B)(iii). These materials include: (1) Legal Analysis by Steven J. Bloxham, Fredericks Peebles & Morgan LLP, (2)  Report by Albert L. Hurtado, Ph.D., Historian, (3) Report by Dorothea J. Theodoratus, Ph.D., Anthropological Consultant, (4) Consolidated Report by Heather A. Howard, Ph.D. and James M. McClurken, Ph.D. as edited by Steven J. Bloxham, Fredericks Peebles & Morgan LLP, (5) Declaration of Patricia Franklin, dated January 28, 2016 (superseded, in part, by Exhibit 7), and (6) Transmittal Letter from Chairman Ray to Acting Assistant Secretary Roberts, dated January 28, 2016.

The complete submission package, including all exhibits and declarations, is on file with the Office of Indian Gaming, Department of the Interior. 1849 C Street, NW, Washington, D.C. 20240.

AR0006716

# 12.0    Conclusion

The Tribe is determined to establish a homeland for its tribal members in an area that is centrally located between its two primary population bases and that will provide the Tribe with important cultural and socioeconomic benefits. In addition, the Tribe seeks to establish its homeland in an area with which the Tribe has a significant historical connection, as well as a modern connection.

The fee-to-trust transfer is necessary to allow the Tribe to develop a casino-resort to promote economic development and growth, to provide land for governmental operations and much-needed homes for its members, to preserve tribal culture and to exercise sovereign powers over its own territory. This land, if accepted into trust status, will allow the Tribe to provide for its members and their families for generations.

AR0006717

# Table of Exhibits

Exhibit 1      Resolution No. 20-16 of the Scotts Valley Band of Pomo Indians

Exhibit 2      Treaty of Camp Lu pi-yu-ma (August 20, 1851) - Compiled and edited by Charles J. Kappler (1929)

Exhibit 3      Constitution of the Scotts Valley Band of Pomo Indians

Exhibit 4      Stipulated Entry of Judgment in Scotts Valley Band of Pomo Indians v. United States, (Case No.: C-86-3660-VRW) (September 6, 1991)

Exhibit 5      M-37029, The Meaning of "Under Federal Jurisdiction" for Purposes of the Indian Reorganization Act, (March 12, 2014)

Exhibit 6      Letter, dated April 11, 2016, from Sharee Freeman, Director of Office of Self Governance to Tribal Chairman Gabriel Ray

Exhibit 7      Declaration of Patricia Franklin, Tribal Secretary

Exhibit 8      Unemployment Rate and Labor Force, California Employment Development Department (June 2016)

Exhibit 9      Gaming Market Assessment, Global Market Advisors (April 2016) **EXEMPT FROM DISCLOSURE UNDER F.O.I.A.**

Exhibit 10     Residential Vacancies and Homeownership in the Second Quarter 2016, U.S. Census Bureau, U.S. Department of Commerce (July 28, 2016)

Exhibit 11     Property Tax Bill (September 16, 2015)

Exhibit 12     Scotts Valley Proposed Construction Budget **EXEMPT FROM DISCLOSURE UNDER F.O.I.A.**

Exhibit 13.1   City of Vallejo Comprehensive Annual Financial Report for the Fiscal Year Ending June 30, 2015

Exhibit 13.2   Solano County Comprehensive Annual Financial Report for the Fiscal Year ending June 30, 2015

AR0006718

Exhibit 14     Phase I Environmental Site Assessment, Analytical Environmental Services (December 2015)

Exhibit 15     Five Year Business Plan of the Scotts Valley Resort and Casino
**EXEMPT FROM DISCLOSURE UNDER F.O.I.A.**

Exhibit 16     Preliminary Title Report prepared by Fidelity National Title Company

Exhibit 17     Vacant Land Purchase Agreement and Joint Escrow Instructions (May 8, 2015)
**EXEMPT FROM DISCLOSURE UNDER F.O.I.A.**

Exhibit 18     Grant Deed for the Vallejo Property (Recorded March 15, 2016)

Exhibit 19     Development Agreement between Tribe and Integrated Resort Development LLC (July 5, 2016)
**EXEMPT FROM DISCLOSURE UNDER F.O.I.A.**

Exhibit 20     Primary Submission Documents Supporting the Tribe's Request for a Restored Lands Opinion:

        20.1     Legal Analysis by Steven J. Bloxham, Fredericks Peebles & Morgan LLP

        20.2     Report by Albert L. Hurtado, Ph.D., Historian

        20.3     Report by Dorothea J. Theodoratus, Ph.D., Anthropological Consultant

        20.4     Consolidated Report by Heather A. Howard, Ph.D. and James M. McClurken, Ph.D. as edited by Steven J. Bloxham, Fredericks Peebles & Morgan LLP

        20.5     Declaration of Patricia Franklin, dated January 28, 2016. Superseded, in part, by Exhibit 7

        20.6     Transmittal Letter from Chairman Ray to Acting Assistant Secretary Roberts, dated January 28, 2016

AR0006719

**From:**      john_tahsuda@ios.doi.gov
**Sent:**      10/25/2018 8:28:55 AM
**To:**      eric.shepard@sol.doi.gov <eric.shepard@sol.doi.gov>; darryl.lacounte@bia.gov <darryl.lacounte@bia.gov>; kyle.scherer@sol.doi.gov <kyle.scherer@sol.doi.gov>; IA-Asst Secretary Indian Affairs Conference Room 4145 <doi.gov_36373939323332653766398333323665656435663433323630626130326630396537333234343735@resource.calendar.google.com>; tyler.fish@bia.gov <tyler.fish@bia.gov>; joe.findaro@akerman.com <joe.findaro@akerman.com>; paula.hart@bia.gov <paula.hart@bia.gov>; alocklearesq@verizon.net <alocklearesq@verizon.net>
**Subject:**      Invitation: External: Scotts Valley Band of Pomo @ Tue Nov 13, 2018 2pm - 2:30pm (EST) (kyle.scherer@sol.doi.gov)
**Start:**      11/13/2018 2:00:00 PM
**End:**      11/13/2018 2:30:00 PM
**Show Time As:**   Free

**Recurrence:**      (none)
**Required**      eric.shepard@sol.doi.gov; darryl.lacounte@bia.gov; kyle.scherer@sol.doi.gov; IA-Asst Secretary Indian Affairs Conference Room 4145;
**Attendees:**      tyler.fish@bia.gov; joe.findaro@akerman.com; paula.hart@bia.gov; alocklearesq@verizon.net
**Attachments:**      invite.ics

more details »

**External: Scotts Valley Band of Pomo**
Topic: Interior process for review of the restored land opinion.
Also, M&G w/ASIA at end of meeting.

Attendees:
Shawn Davis, Chairman
Crista Ray, Council
Jesse Gonzalez, Council
Patrick Bergin, Council
Arlinda Locklear, Counsel for Tribe
Joe Findaro, Wash Counsel for Tribe
POC: Joe Findaro 202 215 5665

When      Tue Nov 13, 2018 2pm – 2:30pm Eastern Time - New York

Where     IA-Asst Secretary Indian Affairs Conference Room 4145 (map)

Calendar kyle.scherer@sol.doi.gov

Who

- john_tahsuda@ios.doi.gov - organizer
- anita.personius@bia.gov - creator
- eric.shepard@sol.doi.gov
- darryl.lacounte@bia.gov
- kyle.scherer@sol.doi.gov
- tyler.fish@bia.gov
- joe.findaro@akerman.com
- paula.hart@bia.gov
- alocklearesq@verizon.net

Going (kyle.scherer@sol.doi.gov)? Yes - Maybe - No more options »
Invitation from Google Calendar

You are receiving this email at the account kyle.scherer@sol.doi.gov because you are subscribed for invitations on calendar kyle.scherer@sol.doi.gov.

**From:** Google Calendar <calendar-notification@google.com> on behalf of Eric Shepard
**Sent:** 10/25/2018 8:34:29 AM
**To:** john_tahsuda@ios.doi.gov <john_tahsuda@ios.doi.gov>
**Subject:** Accepted: External: Scotts Valley Band of Pomo @ Tue Nov 13, 2018 2pm - 2:30pm (EST) (john_tahsuda@ios.doi.gov)
**Start:** 11/13/2018 2:00:00 PM
**End:** 11/13/2018 2:30:00 PM
**Show Time As:** Free

**Recurrence:** (none)
**Required Attendees:** john_tahsuda@ios.doi.gov
**Attachments:** invite.ics

**Eric Shepard has accepted this invitation.**

**External: Scotts Valley Band of Pomo**
Topic: Interior process for review of the restored land opinion.
Also, M&G w/ASIA at end of meeting.

Attendees:
Shawn Davis, Chairman
Crista Ray, Council
Jesse Gonzalez, Council
Patrick Bergin, Council
Arlinda Locklear, Counsel for Tribe
Joe Findaro, Wash Counsel for Tribe
POC: Joe Findaro 202 215 5665

When    Tue Nov 13, 2018 2pm – 2:30pm Eastern Time - New York

Where   IA-Asst Secretary Indian Affairs Conference Room 4145 (map)

Calendarjohn_tahsuda@ios.doi.gov

       • john_tahsuda@ios.doi.gov - organizer
       • anita.personius@bia.gov - creator
       • kyle.scherer@sol.doi.gov
       • alocklearesq@verizon.net
Who    • eric.shepard@sol.doi.gov
       • joe.findaro@akerman.com
       • darryl.lacounte@bia.gov
       • tyler.fish@bia.gov
       • paula.hart@bia.gov

Invitation from Google Calendar

You are receiving this email at the account john_tahsuda@ios.doi.gov because you are subscribed for invitation replies on calendar john_tahsuda@ios.doi.gov.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to modify your RSVP response. Learn More

AR0008530

| | |
|---|---|
| **From:** | Google Calendar <calendar-notification@google.com> on behalf of Paula Hart |
| **Sent:** | 10/25/2018 8:43:25 AM |
| **To:** | john_tahsuda@ios.doi.gov <john_tahsuda@ios.doi.gov> |
| **Subject:** | Accepted: External: Scotts Valley Band of Pomo @ Tue Nov 13, 2018 2pm - 2:30pm (EST) (john_tahsuda@ios.doi.gov) |
| **Start:** | 11/13/2018 2:00:00 PM |
| **End:** | 11/13/2018 2:30:00 PM |
| **Show Time As:** | Free |
| | |
| **Recurrence:** | (none) |
| **Required Attendees:** | john_tahsuda@ios.doi.gov |
| **Attachments:** | invite.ics |

**Paula Hart has accepted this invitation.**

**External: Scotts Valley Band of Pomo**
Topic: Interior process for review of the restored land opinion.
Also, M&G w/ASIA at end of meeting.

Attendees:
Shawn Davis, Chairman
Crista Ray, Council
Jesse Gonzalez, Council
Patrick Bergin, Council
Arlinda Locklear, Counsel for Tribe
Joe Findaro, Wash Counsel for Tribe
POC: Joe Findaro 202 215 5665

When    Tue Nov 13, 2018 2pm – 2:30pm Eastern Time - New York

Where    IA-Asst Secretary Indian Affairs Conference Room 4145 (map)

Calendarjohn_tahsuda@ios.doi.gov

- john_tahsuda@ios.doi.gov - organizer
- anita.personius@bia.gov - creator
- kyle.scherer@sol.doi.gov
- alocklearesq@verizon.net
Who  - eric.shepard@sol.doi.gov
- joe.findaro@akerman.com
- darryl.lacounte@bia.gov
- tyler.fish@bia.gov
- paula.hart@bia.gov

Invitation from Google Calendar

You are receiving this email at the account john_tahsuda@ios.doi.gov because you are subscribed for invitation replies on calendar john_tahsuda@ios.doi.gov.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to modify your RSVP response. Learn More

AR0008533

| From: | john_tahsuda@ios.doi.gov |
|---|---|
| Sent: | 11/13/2018 9:41:02 AM |
| To: | paula.hart@bia.gov <paula.hart@bia.gov>; joe.findaro@akerman.com <joe.findaro@akerman.com>; darryl.lacounte@bia.gov <darryl.lacounte@bia.gov>; tyler.fish@bia.gov <tyler.fish@bia.gov>; kyle.scherer@sol.doi.gov <kyle.scherer@sol.doi.gov>; [PII]  eric.shepard@sol.doi.gov <eric.shepard@sol.doi.gov>; james_cason@ios.doi.gov <james_cason@ios.doi.gov>; IA-Asst Secretary Indian Affairs Conference Room 4145 <doi_36373939323332653766393833323665656435663433323630626130326630396537333234343735@resource.calendar.google.com> |
| Subject: | Updated invitation: External: Scotts Valley Band of Pomo @ Tue Nov 13, 2018 2pm - 2:30pm (EST) (eric.shepard@sol.doi.gov) |
| Start: | 11/13/2018 2:00:00 PM |
| End: | 11/13/2018 2:30:00 PM |
| Show Time As: | Free |

| Recurrence: | (none) |
|---|---|
| Required Attendees: | paula.hart@bia.gov; joe.findaro@akerman.com; darryl.lacounte@bia.gov; tyler.fish@bia.gov; kyle.scherer@sol.doi.gov; [PII]  eric.shepard@sol.doi.gov; james_cason@ios.doi.gov; IA-Asst Secretary Indian Affairs Conference Room 4145 |
| Attachments: | invite.ics |

This event has been changed.

more details »

**External: Scotts Valley Band of Pomo**

Changed: Topic: Interior process for review of the restored land opinion.
Also, M&G w/ASIA at end of meeting.

Attendees:
Shawn Davis, Chairman
Crista Ray, Council
Jesse Gonzalez, Council
Patrick Bergin, Council
Arlinda Locklear, Counsel for Tribe
Scott Dacey, Proj Manager
Joe Findaro, Wash Counsel for Tribe
POC: Joe Findaro 202 215 5665

When    Tue Nov 13, 2018 2pm – 2:30pm Eastern Time - New York

Where   IA-Asst Secretary Indian Affairs Conference Room 4145 (map)

Calendar eric.shepard@sol.doi.gov

Who
- john_tahsuda@ios.doi.gov - organizer
- anita.personius@bia.gov - creator
- paula.hart@bia.gov
- joe.findaro@akerman.com
- darryl.lacounte@bia.gov
- tyler.fish@bia.gov
- kyle.scherer@sol.doi.gov
- [PII]
- eric.shepard@sol.doi.gov
- james_cason@ios.doi.gov

Going (eric.shepard@sol.doi.gov)? Yes - Maybe - No more options »

AR0008565

# Arlinda F. Locklear, Esquire

ALocklearEsq@verizon.net
facsimile (202) 237-0382

4113 Jenifer Street, NW
Washington, D.C. 20015
(202) 237-0933

Kyle Scherer
Deputy Solicitor for Indian Affairs
United States Department of the Interior
1849 C Street, NW
Washington, D.C. 20240

November 14, 2018

Re: Scotts Valley Indian Lands Opinion (ILO) Request

Dear Mr. Scherer:

Thank you for the opportunity to discuss with you and your staff attorneys the Scotts Valley Band of Pomo Indians ("Band") request for an ILO today. We welcomed the chance to hear your collective concerns regarding the Band's evidence of its historic connection to the proposed trust parcel located in the City of Vallejo, California.

As we discussed at the meeting, I contacted the Tribe's expert historian, Dr. Hurtado, today to inquire about the existence of additional documentation of the Band's historic connection, documentation that is not contained in the current administrative record. Dr. Hurtado is currently working on another matter but is prepared to immediately turn his attention to the following, which he believes may yield new documentation that goes to the issues raised in our meeting:

– federal agents' reports for landless California Indians for the period 1850 to 1880. These records have not been researched by the Band up to this point and would contain any federal records indicating tribal activity in the vicinity of the parcel. These records are located at San Bruno, which is the San Francisco branch of the National Archives. To review these records, Dr. Hurtado has to identify the relevant documents to staff, which then pulls the records for review; as a result, it will take Dr. Hurtado two days to get into the records. Dr. Hurtado initiated this process today and is scheduled to review those records on Monday, November 19. The research itself will take 2-3 days, depending upon the quantity of records.

– an examination of existing genealogical data to possibly determine the identity of the other Indian occupants in the household in which Chief Augustine was recorded in residence in the 1870 census on Rancho Tulucay. The Band has not done this analysis and cannot know at this point whether it will yield new data, but data about relationships among the residents of that household and descent of modern day Band members from individuals in that household other than Chief Augustine would corroborate the tribal connection to the area. This analysis will take several days to complete.

– an examination of existing genealogical data regarding the other children baptized along with Chief Augustine in 1837 in vicinity of the project. There were 15 children identified

| | |
|---|---|
| **From:** | ARLINDA LOCKLEAR <alocklearesq@verizon.net> |
| **To:** | Paula Hart |
| **Sent:** | 11/15/2018 8:15:17 AM |
| **Subject:** | SV & Royce Area 296 |

According to Royce, the Aug. 20, 1851, treaty with the Clear Lake Indians includes both Royce Areas 295 and 296. Area 295 includes the northern 2/3 of Clear Lake and is the area that was to be set aside as a reservation for the Indians. Area 296 includes the southern third of Clear Lake and everything south; this is the area that was ceded in the 1851 treaty.

So the map in the SV materials shows both areas 295 & 296 because both were the subject of the 1851 treaty, the first being reserved and the second being ceded.

As a result, it is wrong to suggest that SV is claiming the wrong Royce Area as its ceded territory. Royce Area 296 is the ceded territory in the Clear Lake treaty.

A.

AR0009900

**From:**            ARLINDA LOCKLEAR <alocklearesq@verizon.net>
**To:**              Maria Wiseman
**Sent:**            6/22/2017 5:09:31 PM
**Subject:**         the Scotts Valley trust application
**Attachments:**     Untitled (5)

Is attached (sorry this took so long, lost my internet until today...)  When we do a supplement to the Indian lands opinion request, we will include this as an exhibit.
A.

| | |
|---|---|
| **From:** | anita.personius@bia.gov |
| **Sent:** | 7/28/2017 12:36:03 PM |
| **To:** | philip.bristol@bia.gov <philip.bristol@bia.gov>; alocklearesq@verizon.net <alocklearesq@verizon.net>; troy.woodward@bia.gov <troy.woodward@bia.gov>; joe.findaro@akerman.com <joe.findaro@akerman.com>; maria.wiseman@bia.gov <maria.wiseman@bia.gov> |
| **Subject:** | Invitation: Scotts Valley @ Fri Jul 28, 2017 5:45pm - 6:15pm (joe.findaro@akerman.com) |
| **Start:** | 7/28/2017 1:45:00 PM |
| **End:** | 7/28/2017 2:15:00 PM |
| **Show Time As:** | Free |

| | |
|---|---|
| **Recurrence:** | (none) |
| **Required Attendees:** | philip.bristol@bia.gov; alocklearesq@verizon.net; troy.woodward@bia.gov; joe.findaro@akerman.com; maria.wiseman@bia.gov |
| **Attachments:** | invite.ics |

more details »

**Scotts Valley**
Re: Scotts Valley

Attendees:
Arlinda Locklear
Joe Findaro

When    Fri Jul 28, 2017 5:45pm – 6:15pm Coordinated Universal Time

Where    OIG Director 3657 (map)

Calendarjoe.findaro@akerman.com

Who
- anita.personius@bia.gov - organizer
- philip.bristol@bia.gov
- alocklearesq@verizon.net
- troy.woodward@bia.gov
- joe.findaro@akerman.com
- maria.wiseman@bia.gov

Going? Yes - Maybe - No more options »
Invitation from Google Calendar

You are receiving this email at the account joe.findaro@akerman.com because you are subscribed for invitations on calendar joe.findaro@akerman.com.

To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.

Forwarding this invitation could allow any recipient to modify your RSVP response. Learn More

AR0010161

**Arlinda, Joe - SVB**

**20180419T133000Z**
**CONFIRMED**

<u>PRODID</u>
-//Google Inc//Google Calendar 70.9054//EN

<u>Version</u>
2.0

<u>CALSCALE</u>
GREGORIAN

<u>METHOD</u>
REQUEST

<u>Start Date/Time</u>
20180419T133000Z

<u>End Date/Time</u>
20180419T140000Z

<u>DTSTAMP</u>
20180418T145659Z

<u>ORGANIZER</u> ( CN=maria.wiseman@bia.gov )
mailto:maria.wiseman@bia.gov

<u>UID</u>
05r70hk4utbtuee6gslnv7q4hq@google.com

| <u>Attendee</u> | | <u>mailto:troy.woodward@bia.gov</u> |
|---|---|---|
| | *Role* | REQ-PARTICIPANT |
| | *RSVP* | TRUE |

| <u>Attendee</u> | | <u>mailto:adam.seligman@bia.gov</u> |
|---|---|---|
| | *Role* | REQ-PARTICIPANT |
| | *RSVP* | TRUE |

| <u>Attendee</u> | | <u>mailto:maria.wiseman@bia.gov</u> |
|---|---|---|
| | *Role* | REQ-PARTICIPANT |
| | *RSVP* | TRUE |

<u>CREATED</u>
20180418T142800Z

<u>Description</u>
-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-::-:
Please do not edit this section of the description.

View your event at
https://www.google.com/calendar/event?action=VIEW&eid=M0VyNzBoazRIdGJ0dWVlNmdzMW52N3E0aHEgYWRhbS5zZWxpZ21hbkBiaWEuZ292&tok=MjEjbWFyaWEud21zZW1hbkBiaWEuZ292Z292Y2i0Tg4Mjg50WRjZDI3Nzc3YjBhM2I4MWRhMjdiMThiYjk5ZTA5NwBctz=America%2FNew_York&hl=en&es=I.
-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-:~:-::-:

<u>Last Modified</u>
20180418T145659Z

<u>Location</u>

<u>Sequence Number</u>

AR0010384

| | |
|---|---|
| **From:** | ARLINDA LOCKLEAR <alocklearesq@verizon.net> |
| **To:** | john-michael.partesotti@sol.doi.gov; samuel.ennis@sol.doi.gov |
| **Sent:** | 10/10/2018 2:14:40 PM |
| **Subject:** | Re: Invitation: Scotts Valley Band meeting @ Thu Oct 11, 2018 9am - 10am (EDT) (alocklearesq@verizon.net) |

John-Michael, I realize this is your meeting but could you invite Phil Bristol from the Office of Indian Gaming to join us?  The Tribe has been working to keep OIG up to date on their issues & Phil is pretty engaged on them.
Arlinda

---

**From:** "john-michael.partesotti@sol.doi.gov" <john-michael.partesotti@sol.doi.gov>
**To:** alocklearesq@verizon.net; samuel.ennis@sol.doi.gov
**Sent:** Monday, October 1, 2018 1:25 PM
**Subject:** Invitation: Scotts Valley Band meeting @ Thu Oct 11, 2018 9am - 10am (EDT) (alocklearesq@verizon.net)

### Scotts Valley Band meeting

**more details »**

| | |
|---|---|
| When | Thu Oct 11, 2018 9am – 10am Eastern Time - New York |
| Where | DIA Conference Room 6511 (map) |
| Video call | https://hangouts.google.com/hangouts/_/doi.gov/john-michael-pa |
| Calendar | alocklearesq@verizon.net |
| Who | • john-michael.partesotti@sol.doi.gov - organizer |
| | • samuel.ennis@sol.doi.gov |
| | • alocklearesq@verizon.net |

Going?  **Yes** - **Maybe** - **No**   more options »

Invitation from Google Calendar
You are receiving this email at the account alocklearesq@verizon.net because you are subscribed for invitations on calendar alocklearesq@verizon.net.
To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.
Forwarding this invitation could allow any recipient to modify your RSVP response. Learn More.

| | |
|---|---|
| **From:** | Ennis, Samuel <samuel.ennis@sol.doi.gov> |
| **To:** | alocklearesq@verizon.net |
| **CC:** | John-Michael Partesotti |
| **Sent:** | 10/10/2018 2:20:57 PM |
| **Subject:** | Re: [EXTERNAL] Re: Invitation: Scotts Valley Band meeting @ Thu Oct 11, 2018 9am - 10am (EDT) (alocklearesq@verizon.net) |

Hi Arlinda,

Since this is a legal issue that the Solicitor's Office is evaluating, we plan on keeping the meeting between attorneys and not including OIG at this juncture.  SOL can reach out to OIG internally as necessary to keep them up to date on the process.  Thanks,

Sam

On Wed, Oct 10, 2018 at 2:14 PM ARLINDA LOCKLEAR <alocklearesq@verizon.net> wrote:
John-Michael, I realize this is your meeting but could you invite Phil Bristol from the Office of Indian Gaming to join us?  The Tribe has been working to keep OIG up to date on their issues & Phil is pretty engaged on them.
Arlinda

---

**From:** "john-michael.partesotti@sol.doi.gov" <john-michael.partesotti@sol.doi.gov>
**To:** alocklearesq@verizon.net; samuel.ennis@sol.doi.gov
**Sent:** Monday, October 1, 2018 1:25 PM
**Subject:** Invitation: Scotts Valley Band meeting @ Thu Oct 11, 2018 9am - 10am (EDT) (alocklearesq@verizon.net)

### Scotts Valley Band meeting                    **more details »**

| | |
|---|---|
| When | Thu Oct 11, 2018 9am – 10am Eastern Time - New York |
| Where | DIA Conference Room 6511 (map) |
| Video call | https://hangouts.google.com/hangouts/_/doi.gov/john-michael-pa |
| Calendar | alocklearesq@verizon.net |
| Who | • john-michael.partesotti@sol.doi.gov - organizer |
| | • samuel.ennis@sol.doi.gov |
| | • alocklearesq@verizon.net |

Going?  **Yes** - **Maybe** - **No**  more options »

Invitation from Google Calendar
You are receiving this email at the account alocklearesq@verizon.net because you are subscribed for invitations on calendar alocklearesq@verizon.net.
To stop receiving these emails, please log in to https://www.google.com/calendar/ and change your notification settings for this calendar.
Forwarding this invitation could allow any recipient to modify your RSVP response. Learn More.

--
**Samuel E. Ennis**
Assistant Solicitor, Branch of Tribal Government Services
Division of Indian Affairs

| | |
|---|---|
| **From:** | ARLINDA LOCKLEAR <alocklearesq@verizon.net> |
| **To:** | Philip Bristol |
| **Sent:** | 10/17/2018 12:38:56 PM |
| **Subject:** | [EXTERNAL] an article for Scotts Valley |
| **Attachments:** | Indian Servitude in California.pdf |

Fyi, I provided the attached to the Solicitor's Office.  It is a chapter out of the Handbook of North American Indians which is pretty brief but confirms the history of enslavement of Indians in northern California, beginning in the mission period (ending in 1834), through the Mexican period, & continuing into the American period.

Arlinda

AR0010531



# FREDERICKS PEEBLES & MORGAN LLP
## ATTORNEYS AT LAW

ROSS D. COLBURN
2020 L STREET, SUITE 250
Sacramento, CA 95811
T: (916) 441-2700
F: (916) 441-2067
E: rcolburn@ndnlaw.com
www.ndnlaw.com

February 3, 2016

**VIA FEDEX**

Paula Hart
Director, Office of Indian Gaming
Office of Public Affairs
Indian Affairs
MS-3658 MIB
1849 C Street, N.W.
Washington, D.C. 20240

> **Re:    Scotts Valley Band of Pomo Indians
> Indian Lands Opinion Request**

Dear Director Hart:

Pursuant to your request, please find enclosed two compact discs containing documents regarding the Indian Lands Opinion Request submitted by Chairman Gabriel Ray of the Scotts Valley Band of Pomo Indians on January 28, 2016.

The compact discs contain the following:

(1) Exhibits and Index to the McClurken and Howard Report edited by Steven J. Bloxham, Esq. and Corbrett Hodson; and

(2) Transmittal Letter, Memorandum, Reports, Exhibits and Documents regarding the Indian Lands Opinion Request.

Please do not hesitate to contact me at (916) 441-2700 should you have any questions regarding this matter or should you need additional information.

Sincerely,

**FREDERICKS PEEBLES & MORGAN LLP**

Ross D. Colburn

> **RECEIVED**
>
> – 4  2016
>
> AS - IA
> Office of Indian Gaming

RDC:smb

CALIFORNIA  •  COLORADO  •  MICHIGAN  •  NEBRASKA  •  NORTH DAKOTA  •  SOUTH DAKOTA  •  WASHINGTON, DC

AR0010684



## FREDERICKS PEEBLES & MORGAN LLP
ATTORNEYS AT LAW

PATRICK R. BERGIN
2020 L STREET, SUITE 250
Sacramento, CA 95811
T: (916) 441-2700
F: (916) 441-2067
E: pbergin@ndnlaw.com
www.ndnlaw.com

February 9, 2016

**VIA FEDEX**

Paula Hart, Director
Office of Indian Gaming
Office of Public Affairs, Indian Affairs
MS-3658 MIB
1849 C Street. N.W.
Washington, D.C. 20240

> **Re:    Scotts Valley Band of Pomo Indians**
> **Indian Lands Opinion Request**

Dear Director Hart:

Attached for your review, please find the following items:

1. A thumb-drive containing submission documents and exhibits;
2. Index to Sources Cited in the McClurken Report; and
3. Archival Documents and Published Sources Produced in Support of The Scotts Valley Band of Indians and the North San Francisco Bay Region.

Please do not hesitate to contact me at (916) 441-2700 should you have any questions regarding this matter or require additional information.

Sincerely,

FREDERICKS PEEBLES & MORGAN LLP

Patrick R. Bergin

PRB:se
Enclosures

**RECEIVED**

FEB 1 ? 2016

AS - IA
Office of Indian Gaming

CALIFORNIA • COLORADO • MICHIGAN • NEBRASKA • NORTH DAKOTA • SOUTH DAKOTA • WASHINGTON, DC

AR0010687



1 of 2

**FREDERICKS PEEBLES & MORGAN LLP**
ATTORNEYS AT LAW

**PATRICK R. BERGIN**
2020 L STREET, SUITE 250
Sacramento, CA 95811
T: (916) 441-2700
F: (916) 441-2067
E: pbergin@ndnlaw.com
www.ndnlaw.com

**RECEIVED**

APR - 6 2016

AS - IA
Office of Indian Gaming

Hand delivered
by Joe Findoro
1:30pm

April 5, 2016

*VIA HAND DELIVERY*

Ms. Paula L. Hart
Director, Office of Indian Gaming
Department of the Interior
1849 C Street, N.W.
Washington DC 20240

RE: Scotts Valley Band of Pomo Indian Request for Indian Lands Determination

Dear Ms. Hart,

The enclosed table provides a comparison of historical connection issues raised by the Assistant Secretary in his 2012 determination that the Scotts Valley Band of Pomo Indians did not have a significant historical connection to the proposed gaming site in Richmond, California ("Richmond Parcel") and the Band's 2016 pending request for a so-called restored lands opinion for a proposed gaming site in Vallejo, California ("Vallejo Parcel").

As you are aware, the regulations found at 25 C.F.R. Part 292 allow an Indian tribe to establish a significant historical connection through two ways: (1) the site is within the Tribe's former reservation under a ratified or unratified treaty; or (2) the Tribe submits historical documentation that it engaged in subsistence use or occupancy in the vicinity of the Site.

In the 2012 decision, the Assistant Secretary determined that the Band's reliance on the unratified 1851 Treaty was deficient because the location of the Richmond Parcel was not within the area ceded under the Treaty (described on Royce Area 296) and that the Treaty did not demonstrably add to the Band's claims of significant use and occupancy of the vicinity. The Assistant Secretary also found that the Band's historical documentation fell short of demonstrating that its ancestors engaged in the use or occupancy of the lands in the vicinity of the Richmond Parcel. In addition, the Assistant Secretary questioned the Band's claims that its ancestors were held captive by the Vallejo Ranchos. Specifically, the Assistant Secretary noted that several tribes were located in the Clear Lake area in 1853 and that the Indians taken from Clear Lake could have come from any one or more of those tribes.

In this case, the record contains several significant historical connections:

- The Vallejo Parcel <u>is</u> located within the territory ceded by the Band's ancestors in the unratified 1851 Treaty and within Royce Area 296.

CALIFORNIA • COLORADO • MICHIGAN • NEBRASKA • NORTH DAKOTA • SOUTH DAKOTA • WASHINGTON, DC

# SCOTTS VALLEY BAND OF POMO INDIANS

## Supplement to Fee-to-Trust Application

Prepared for

**Bureau of Indian Affairs – Pacific Region**
**U.S. Department of the Interior**
**2800 Cottage Way**
**Sacramento, CA 95825**

Fredericks Peebles & Morgan LLP
2020 L Street, Suite 250
Sacramento, CA 95811

Arlinda F. Locklear
4113 Jenifer Street, NW
Washington, DC 20016

**December 2017**

AR0010720

# Introduction

On August 11, 2016, and as authorized by Scotts Valley Tribal Council Resolution No. S.V. 20-16, the Scotts Valley Band of Pomo Indians ("Tribe") submitted to the Pacific Regional Office, Bureau of Indian Affairs ("BIA") an application requesting that the Secretary of the Interior accept into trust for the benefit of the Tribe a parcel consisting of approximately 128 acres located in Vallejo, California ("Vallejo Property"). Since that time, there have been legal and administrative developments that are relevant to the BIA's consideration of the application under the governing regulations. *See* 25 CFR Part 151. In addition, there are tribal demographic facts, also relevant to the BIA's consideration of the application, that have changed modestly. This supplement updates the 2016 application with those factual and legal considerations.

In Part I, the Tribe addresses the modest changes in the Tribe's demographic profile since 2016. These are set out in the attached Declaration of Gabriel Ray, the Tribal Secretary. The Ray Declaration addresses the Tribe's need for trust land to finally develop a homeland for its government and members, in general, and the appropriateness of trust acquisition of the Vallejo Property, in particular. *Id.,* 151.10(b), (c). In Part II, the Tribe discusses recent case law in further support of the Secretary's authority for the proposed trust acquisition. *Id.,* 151.10(a). In Part III, the Tribe addresses the additional considerations under section 151.55 for off-reservation trust acquisitions recently proposed. [1]

---

[1] These proposed changes appear in a Consultation Draft released by the Department to tribal leaders by letter on October 4, 2017. As of this date, the proposed changes have not been published for formal comment; also, it is unknown when the proposed changes might become final or whether further changes will be made. But the Consultation Draft includes a provision stating that the additional considerations will be become immediately effective upon promulgation, making them applicable to

AR0010721

**Part I.    The updated demographic profile of the Tribe confirms the Tribe's need for the proposed trust acquisition.**

In its original application, the Tribe addressed its need for the proposed trust acquisition, supported by the Declaration of Patricia Franklin. The data in Ms. Franklin's Declaration is updated in the attached Declaration of Gabriel Ray, now the Tribal Secretary, ("Ray Declaration"), Exhibit 21.[2] As did the Franklin Declaration, the Ray Declaration establishes the Tribe's dire and urgent need for the trust acquisition of the Vallejo Property, because of the need to establish a tribal territory for tribal governance, the need for tribal housing and employment, and the need for economic development.

First, the Ray Declaration confirms that the Tribe is currently landless. It has no territory to govern, despite having been restored to federal recognition twenty-six years ago.[3] The Tribe operates out of two offices that it rents, located in Lakeport and Concord, California, to support tribal government activities. Ray Declaration, ¶¶ 7, 8. Two tribal offices are necessary to provide services to the Tribe's members, now widely dispersed due to the illegal termination of the Tribe and loss of its Rancheria in 1965. As a result, the BIA has designated the Tribe's "near-reservation area" for purposes of the delivery of services as Contra Costa, Lake, Mendocino, and Sonoma Counties. *Id.* The Vallejo Property is only 16 miles from the Tribe's

---

even pending trust applications such as the Tribe's. As a result, prudence dictates that the Tribe respond to the proposed changes (as well as to any amendments to the proposed changes), to ensure that its application is complete at the time of processing.

[2] The exhibits attached to this supplement are numbered following those attached in support of the August 2016 Trust Application.

[3] The Tribe has established in its request for an Indian lands determination that its trust application for the Vallejo Property was made within the twenty-five-year ("ILD") deadline required for gaming eligibility. *See* 25 CFR 292.12 (c) (2).

AR0010722

southern office and, thus, will well accommodate the Tribe's need to consolidate tribal government functions. *Id.,* ¶ 11.

Second, tribal members' need for services, delivered in as efficient a manner as possible, is evident from the demographic profile of tribal members. There are currently 282 enrolled tribal members, including 165 adults, 117 minors, and 161 tribal households. *Id.,* ¶ 5. Out of the adult members, 71 (or approximately 43%) are presently unemployed. *Id.,* ¶ 6. And only 20 of the tribal households (or approximately 12%) are homeowners, with 38.5% of tribal households experiencing homelessness or overcrowding. *Id.,* ¶ 5. The Ray Declaration makes plain that the Tribe's decision-making on the trust application was driven, in large part, by the need to enhance tribal members' economic and housing security. *Id.,* ¶ 12. Indeed, more than half of the tribal households have indicated a desire to relocate to the Vallejo Property to take advantage of employment opportunities and housing to be developed there. *Id.* The Vallejo Property is well located for this purpose as well, since 25 of the tribal households (approximately 16%) reside within a 36-mile radius of the parcel and an additional 12% live in adjacent counties. *Id.,* ¶ 11.

Third, the development of the tribal homeland on the Vallejo Property requires an economic engine, which will be the casino resort. The Tribe has already demonstrated that the casino resort will generate far more jobs than there are employable tribal members and will result in sufficient tribal revenues to support the full build-out proposed on the Vallejo Property for all tribal purposes - consolidation of tribal government offices and residences for tribal members. *See* Exhibit 9, August 2016, trust application.

Given the Tribe's status as one of the few remaining landless tribes and the demographic profile and location of its members, there can be no serious doubt as to the

AR0010723

Tribe's need for trust land, in general, and the appropriateness of the acquisition of the Vallejo Property, in particular.

**Part II.    Recent legal authority confirms that the Secretary has authority to accept the Vallejo Property into trust for the Tribe.**

The Tribe established in its August 2016 trust application that the Secretary has authority under the Indian Reorganization Act ("IRA") to acquire the Vallejo Property in trust for the Tribe.  August 2016 Trust Application, pp. 12-15.  Recent legal authority confirms the correctness of that analysis in two respects.

First, as the Tribe has already indicated, the BIA conducted a so-called accept-or-reject election for the Tribe on whether to opt-out of the IRA, and the Tribe consequently appeared on the 1947 Haas list of such tribes.  The Department of the Interior has determined that appearance on the Haas list of tribes is conclusive proof of a tribe's status as "under Federal jurisdiction" within the meaning of the IRA, as construed by the Supreme Court in *Carcieri v. Salazar*, 555 U.S. 379 (2009).  M-37029, March 12, 2014.  The Ninth Circuit and District of Columbia Courts of Appeals have since upheld the Department's M Opinion in general as a correct explication of the term "under Federal jurisdiction."  *County of Amador v. United States Department of the Interior*, 872 F.3d 1012, 1025 (9th Cir. 2017); *Confederated Tribes of Grand Ronde Community v. Jewell*, 830 F.3d 552, 563-565 (D.C. Cir. 2016).  Courts have also since upheld the Department's specific determination that appearance on the 1947 Haas list is conclusive proof of a tribe's status as "under Federal jurisdiction."  *Starkey v. Pacific Regional Director, Bureau of Indian Affairs*, 63 IBIA 254, 262 (2016); *State of Kansas v. Acting Eastern Oklahoma Regional Director*, 62 IBIA 225, 235-236 (2016) *Village of Hobart, Wisconsin v. Midwest Regional Director, Bureau of Indian Affairs*, 57 IBIA 4, 23-25 (2013); *Shawano*

AR0010724

*County, Wisconsin v. Acting Midwest Regional Director, Bureau of Indian Affairs,* 53 IBIA 62, 71 (2011).

Second, this conclusion regarding the Tribe's eligibility under the IRA is not affected by the fact that, at the time of the accept-or-reject election, the Tribe voted to reject the IRA. In 1983, Congress overrode tribes' opt-out votes under the IRA in the Indian Land Consolidation Act, 25 U.S.C. § 2201, *et seq.* Specifically, Congress determined that the IRA provision authorizing the acquisition of trust land "shall apply to all tribes notwithstanding the provision of section 478" which allowed tribes to opt out of the IRA. *Id.,* § 2202. The Second Circuit Court of Appeals recently construed this provision to authorize the Secretary to accept land in trust for a tribe that had voted to reject the IRA at its accept-or-reject election, as had the Tribe. *Upstate Citizens for Equality, Inc. v. US,* 841 F.3d 556, 572 (2d Cir. 2016). Similarly, the Secretary now has authority to accept the Vallejo Property in trust for the Tribe, notwithstanding the Tribe's earlier vote to opt out of the IRA.

**Part III.    The Tribe's application meets the additional considerations for off-reservation gaming acquisitions set out in the recent Consultation Draft changes to 25 CFR Part 151.11.**

As noted above, the Department has announced a discussion draft of proposed changes to the regulations governing the off-reservation trust acquisition process. In some respects, the proposed changes clarify or restate factors now required as part of any trust application. For example, the existence of statutory authority for the acquisition, the Tribe's need for the land, a map showing the location of the proposed trust site, and the economic benefits for the Tribe appear in the current regulations and are restated in the proposed changes. Those factors have already been addressed by the Tribe in its August 2016

AR0010725

application and are not repeated here.

In addition, the proposed changes add new factors that the Department will consider in determining whether to accept land into trust for gaming purposes.[4]  Those new, additional factors are addressed here *seriatim*.

### 1. The Tribe's historical or modern connection to the land

Because the Tribe is a restored Indian tribe, it must prove historical and modern connections to the land to establish its gaming eligibility.  *See* 25 CFR § 292.12.  As a result, those factors are addressed by the Tribe in its request for an ILD.  That request is attached as Exhibit 20 to the August 2016 Trust Application.

### 2. An analysis of whether the acquisition promotes land consolidation

Technically, this factor is not applicable to the Tribe because the Tribe is landless.  It has no reservation or trust land that might be consolidated by the acquisition of the Vallejo Property.  However, it should be noted that the trust acquisition of the Vallejo Property would dramatically promote consolidation of the Tribe in a far more profound sense.

After the illegal termination of the Tribe's Rancheria in 1965, the Tribe's members dispersed.  For example, available birth records of tribal members for the fifty years before termination show that 62% of the tribal members were born on or near the Scotts Valley Rancheria.  But in the forty years after termination, only 14% of tribal members were born on or near the former rancheria.  Exhibit 20, 2016 Trust Application, Consolidated Howard,

---

[4] The Discussion Draft also proposes new, but fewer, additional factors for non-gaming trust acquisitions.  But all the new factors for non-gaming purposes also are required for gaming trust acquisitions.  The Tribe addresses the new gaming factors here, thereby also establishing the same factors for the non-gaming purposes proposed for the Vallejo Property.

AR0010726

McClurken Report, p. 18.  Economic necessity exacerbated this dispersion of tribal members. As a result, tribal members now reside throughout the Tribe's four-county service area.

The Vallejo Property is centrally located for the Tribe's dispersed membership.  Solano County is adjacent to the Tribe's designated service area.  Approximately 15.5% of the current tribal members reside within a 36-mile radius of the parcel and an additional 12.4% reside in counties adjacent to Solano County.  Exhibit 21, ¶ 11.  Largely as a result of its central location, a majority of tribal member households have expressed an intention to relocate to the Vallejo Property once developed.[5]  Id.

Thus, the trust acquisition of the Vallejo Property, and its development as proposed, will accomplish the consolidation of the Tribe itself.  The tribal community will be able to come together again at a central location, where the members can live and work.  In large part, this is the goal of tribal land consolidation in the technical sense - to assist in bringing together the tribal community.  Acquisition of the Vallejo Property will accomplish this goal directly.

### 3. An analysis of the Tribe's ability to effectively govern parcel

As discussed above, the Tribe currently operates its government out of two, rented tribal offices located in separate, but adjacent, counties.  The Tribe's ability to govern its affairs under these challenging circumstances is well-established.  Indeed, the Tribe was selected by the BIA to participate in the applicant pool for the Department's Self-Governance Program. Exhibit 6, August 2016 Trust Application.

---

[5] It should be noted that the Tribe cannot rebuild the tribal community at its former rancheria.  A term of the restoration agreement provides that the Tribe will not seek and the federal government will not agree to re-establish the former boundaries of the rancheria.  Exhibit 4, ¶ 14, August 2016 Trust Application.

AR0010727

The BIA explicitly noted the Tribe's ability to effectively govern its affairs in determining the Tribe's eligibility for the Self-Governance Program.  In the words of the BIA, the Tribe "[h]as demonstrated, for the previous three fiscal years, financial stability and financial management capability as evidenced by the tribe having no material audit exceptions in the required annual audit of the self-determination contracts of the tribe." *Id; see also* 25 U.S.C. § 5362.  As a result, the BIA has already determined that the Tribe effectively governs its affairs.

Relocation to the Vallejo Property would further enhance, not strain, the Tribe's ability to effectively exercise its governmental and regulatory powers.  As the Tribe discusses in the August 2016 Trust Application, trust acquisition of the Vallejo Property will allow the Tribe to consolidate all its governance and programs in a single office, one located on the Tribe's homeland and within the consolidated tribal community and residences.  The Tribe's demonstrated ability to govern effectively and the improved circumstances resulting from consolidation of tribal offices show that the trust acquisition of the Vallejo Property will facilitate the Tribe's already demonstrated ability to govern effectively.

### 4. Economic benefits of development for Tribe and local community

In three new factors, the Discussion Draft proposes that an off-reservation trust application for gaming demonstrate the economic benefits of the project for the Tribe, economic benefits for the local community from the project, and specifically the impact on the Tribe's unemployment rate and job opportunities for the local community.  The Discussion Draft also notes that, while these factors are made explicit for the first time, gaming trust applications already address these issues in practice.  The Tribe followed this practice in its trust application, as well.

The Tribe's August 2016 Trust Applications includes a business plan for the casino

AR0010728

resort showing that the project will reach $635.9 million in total revenue at full development (i.e., in the fifth year of development) and more than 2,500 full time jobs. Exhibit 15, August 2016 Trust Application, p. 8. The Tribe is relatively small, with 165 adult members of which 71 are unemployed. Obviously, the project at full development will provide the opportunity for employment of all tribal members as well as significant job opportunities for the local community. This would also make the project the largest employer in the City of Vallejo and the second largest employer in Solano County. *Id.*

In addition, these economic benefits, for both the Tribe and local community, will be one of the subjects addressed in the NEPA analysis of the project, as also noted in the Discussion Draft. As a result, the Tribe has already addressed these issues and will continue to do so in other administrative processes related to the trust acquisition of the Vallejo Property.

It should be noted, however, that the economic benefits of the casino resort cannot be separated from the homeland development of the Vallejo Property. As stated in Chairman Davis' Declaration, homeland development of the parcel will proceed in tandem with the casino resort. ("Davis Declaration"), Exhibit 24. The pre-development construction phase of the Vallejo Property will address all aspects of development, i.e., tribal government, community center, tribal housing, and the casino. Davis Declaration, ¶ 6. The first construction phase will include the tribal government and community center, the first sub-division of tribal housing consisting of 24 houses, and the casino floor with related hotel and retail services. *Id.* As a result, the Tribe and its development team's efforts to obtain financing for the development will fund this initial build out, with tribal revenues from the casino resort to fund construction of the remaining tribal housing sub-divisions. *Id.*, ¶ 7. Thus, the proposed development from the beginning will reflect the Tribe's commitment to building a homeland for the tribal community.

AR0010729

## 5. Evidence of cooperative efforts to mitigate local impacts

The Tribe has already indicated its intention to negotiate service agreements with local governments regarding the de minimis impact of proposed trust acquisition on the Solano County tax base. August 2016 Trust Application, pp. 23-25. Further, NEPA requires that appropriate mitigation steps be analyzed and adopted for the project to obtain the necessary federal approval. As a result, cooperative efforts will take place to mitigate local impacts of the projects. It should be noted, though, that there are currently two dynamics at play that make immediate negotiation of intergovernmental agreements difficult, if not impossible.

First, Solano County entered into the Northern California Counties Tribal Matters Consortium in 2005, which agreement sets out the terms and timing for which the county would negotiate an intergovernmental agreement with the Tribe. *See* Exhibit 22. According to that agreement, the county will oppose any trust acquisition for gaming purposes unless the tribe has significant historical ties to the location. *Id.,* Exhibit A thereof, p. 3. Further, until the county is satisfied that such ties exist, "no proposals for county-tribal agreements will be entertained." *Id.* Apparently, then, the county will decline to even commence negotiations with the Tribe unless and until the Tribe obtains a favorable ILD. Because consideration of the requested ILD remains on-going, it is not possible for the Tribe to negotiate an intergovernmental agreement with Solano County at this time.

Second, the Yocha Dehe Wintun Nation, which is on the record in opposition to the Tribe's trust acquisition of the Vallejo Property, is attempting to manufacture facts that will lead to Solano County opposition, as well. On October 1, 2017, Yocha Dehe made a donation to Solano County ostensibly for the purpose of improving the "health and well-being of the People of Solano County" in the amount of $1,000,000 to fund certain health programs by the county.

AR0010730

Exhibit 23, Oct. 1, 2017, IGA.  But the recitals in the IGA reveal another possible purpose: time and again the IGA refers to Yocha Dehe's "ancestral territory" throughout Solano County, its "historical connection to the lands within Solano County," the affiliation of the Patwin people with Solano County, and Yocha Dehe's "deep connection to lands and people within its ancestral territory, including Solano County." *Id:* Obviously, were these recitals taken as historical fact, it would undermine the Tribe's historical connection to Solano County and set the stage for the county's refusal to negotiate with the Tribe.[6]  Of course, Yocha Dehe, and its successful Cache Creek Casino Resort, are located in Yolo County, not Solano County. Yochadehe.org/enterprises/cache-creek-casino-resort (accessed October 23, 2017).  These circumstances suggest a commercial motivation behind the Yocha Dehe donation, not historical one.

Notwithstanding these considerations, the Tribe is actively engaged with officials from the City of Vallejo and Solano County in the expectation that, at the appropriate time, those officials will negotiate service agreements for and terms to mitigate the impact of the trust acquisition of the Vallejo Property.

---

[6] The Tribe does not deny that the county was in the far, southern end of Patwin territory in pre-1851 treaty times; it should be noted, though, that there is no indication that the ancestors of the Yocha Dehe, as opposed to other Patwin communities, had any ties to modern day Solano County.  But the Patwin presence in the county, whether of Yocha Dehe ancestors or other Patwin tribes, was greatly diminished by 1840, by disease and otherwise, and was replaced largely by the ancestors of the Tribe and other Clear Lake Indians.  For this and other reasons, the United States treated with the Clear Lake Pomos in 1851 to extinguish tribal title to Solano and surrounding counties.  This history is set out in the Tribe's ILD request.

AR0010731

## Conclusion

The United States illegally deprived the Tribe of its territory to govern and its members of a homeland in 1965.  The Tribe has been restored to the federal relationship, but the ill-effects of termination will not be reversed until the United States acts to re-establish a homeland for the Tribe and its people.  All discretion must be exercised in favor of the Tribe's proposed trust application, for the reasons set out in the Tribe's 2016 Trust Application and herein.

AR0010732

# Table of Exhibits

Exhibit 21    Declaration of Gabriel Ray, Tribal Secretary

Exhibit 22    Northern California Counties Tribal Matters Consortium Agreement

Exhibit 23    Intergovernmental Agreement Between Yocha Dehe and Solano County

Exhibit 24    Declaration of Shawn Davis, Tribal Chairman

Exhibit 25    Resolution No. 16-17 of the Scotts Valley Band of Pomo Indians

AR0010733

# Exhibit 21

AR0010734

1

**BEFORE THE**
**DEPARTMENT OF THE INTERIOR**
**BUREAU OF INDIAN AFFAIRS**

---

*IN RE*

**SCOTTS VALLEY BAND OF POMO**
**INDIANS' REQUEST FOR INDIAN**
**LANDS OPINION**

---

### DECLARATION OF GABRIEL RAY

I, Gabriel Ray, now declare:

1. My name is Gabriel Ray and I am the duly elected Secretary of the Tribal Council of the Scotts Valley Band of Pomo Indians ("Band"), having succeeded Patricia Franklin.

2. As part of my usual and accustomed duties as Secretary, I keep and file all tribal correspondence, make and complete accurate records of all matters transacted at meetings of the General Council and Tribal Council and attest to the accuracy of all Council decisions, ordinances, resolutions or other enactments by the General Council and the Tribal Council.

3. The Band is and has always been located in what is now the State of California.

4. The Band's status as a federally recognized Indian tribe was illegally terminated in 1965 under the California Rancheria Termination Act, and restored on September 6, 1991, pursuant to a judgment of the Federal District Court for the Northern District of California, as noticed in the Federal Register at 57 FR 5,214 (Feb. 12, 1992). The Band has since appeared on all published lists of federally recognized tribes, including that published on January 17, 2017 (82 FR No. 10, at 4918).

2

5. The Band currently has 282 enrolled members, of which 117 are minors under eighteen years of age and 165 are adults. There are currently 161 tribal member households, of which only 20 (or approximately 12%) are homeowners. Out of the 161 tribal households, approximately 38.5% of tribal households currently experience homelessness or overcrowding. As a result, there is now and has always been a desperate need for the Tribe to provide housing for its members.

6.    Out of the 165 adult tribal members, 71 (or approximately 43%) are currently unemployed. As a result, there is now and has always been a desperate need for the Tribe to provide employment opportunities for its members.

7. The Band has no reservation or trust land which to govern. In fact, the 1991 judgment specifically precludes the Band from re-establishing our former Rancheria as tribally governed territory. As a result of the illegal termination of the Band and the prohibition against re-establishing the Band's former Rancheria, tribal members have become widely dispersed across Northern California. In 2000, the Assistant Secretary - Indian Affairs designated Contra Costa, Lake, Mendocino and Sonoma Counties as the Band's "near-reservation area" within which the Band is authorized to extend financial assistance and social services to our eligible tribal members and their family members who are Indian, as noticed in the Federal Register at 65 FR 31,188 (May 16, 2000).

8. In order to serve its dispersed population, the Tribal Council has maintained two governmental offices for more than a decade. Our northern office is currently located (and has been since 2013) at 1005 Parallel Drive, Lakeport, CA 95453 and our southern office is currently located (and has been since 2012) at 2727 Systron Drive Suite 100, Concord, CA 94518. From

AR0010736

3

2005 to 2013, our northern office was located at 301 Industrial Boulevard, Lakeport, CA 95453. From 2008 to 2012, our southern office was located at 1465 Enea Circle, Bldg. D, 1st Floor, Suite 700, Concord, CA 94520. Thus, we have maintained a northern office since 2005 and a southern office since 2008.

9. The Tribe's southern office is used for many governmental activities and to support tribal services, including: General Council and Tribal Council meetings; government administration and operations; the Tribe's information technology department; the Tribe's health and wellness departments that provide services such as Temporary Assistance for Needy Families, Indian Child Welfare Act, housing, grant oversight, counseling and case management; and Tribal Transportation Department. This location is used for nearly all on-site meetings with the Department of the Interior, Bureau of Indian Affairs, Indian Health Services, Administration for Children and Families, as well as with California Tribal TANF Coalition. It is also the location where the Tribe holds most tribal celebrations and reunions.

10. By Resolution No. 20-16, dated August 3, 2016, the Tribal Council authorized the preparation of a fee-to-trust application to request the Secretary to acquire a parcel of land located in Vallejo, Solano County, California, to be developed as a new tribal homeland for the Tribe. Specifically, the parcel is Assessor Parcel Number 0182-010-010, consisting of approximately 128 acres of vacant land. The application was submitted to the Pacific Regional Office, Bureau of Indian Affairs, Department of the Interior, on August 11, 2016.

11. Solano County is adjacent to the designated on-or-near-reservation service area for the Tribe. The specific proposed trust site for development of a new homeland for the Tribe is located sixteen (16) miles from the current southern office for the Tribe. In addition, 25 of the

AR0010737

4

tribal member households (approximately 15.5% of tribal households) are located within a 36

mile radius of the proposed trust acquisition. An additional 12.4% of tribal households is located

in counties adjacent to the proposed trust acquisition.

12. As part of its deliberations on the resolution authorizing the request for the proposed trust

acquisition and new homeland development, the Tribe conducted formal General Council

meetings as well as numerous informal consultations between elected Tribal Council officers and

members with general tribal membership. As a result of these deliberations, roughly one-half of

the tribal households (or 80 tribal households) have indicated their intention to relocate to the

Tribe's new homeland on the proposed trust acquisition immediately upon availability of tribal

housing on the site. Because of tribal members' strong desire to rebuild their physical

community on the proposed trust acquisition, the proposed development approved by the Tribal

Council includes full development of a new tribal homeland, including a minimum of 100 tribal

homesites and tribal government headquarters to replace the rented tribal offices, funded by a

casino resort complex on the site.

I declare under penalty of perjury under 28 U.S.C. § 1746(2) that the foregoing is true and

correct.

Executed this 29 day of November, 2017, at 1005 Parallel Drive, Lakeport, CA 95453.

Gabriel Ray, Secretary

AR0010738

# Exhibit 22

AR0010739

**APPROVED**

JAN 2 5 2005

BY ~~Myra Childs deputy~~

CLERK OF THE BOARD

## AGENDA SUBMITTAL TO SOLANO COUNTY BOARD OF SUPERVISORS

| SUBJECT | BOARD MEETING DATE | AGENDA NUMBER |
|---|---|---|
| Consider approval and authorization for the Chair to sign an agreement creating the Northern California Counties Tribal Matters Consortium and approval of the general policy principles of the Consortium | January 25, 2005 | 21 C |

| Dept: Contact: Extension: | County Administrator's Office Michael D. Johnson, County Administrator 421-6100 | Supervisorial District Number All | |
|---|---|---|---|
| | Noticed/Public Hearing Required? | Yes_____ | No___x___ |

## DEPARTMENTAL RECOMMENDATION:

The County Administrator recommends approval of and authorization for the Chair to sign an agreement with Sonoma, Napa and Yolo Counties creating the Northern California Counties Tribal Matters Consortium (NCCTMC) and approval of the NCCTMC General Policy Principles.

## SUMMARY:

The proposed agreement between the Counties of Napa, Solano, Sonoma & Yolo Counties, is the formal action that is recommended in order to establish the Northern California Counties Tribal Matters Consortium (NCCTMC). The purpose of the Consortium is for counties to work together to share expertise and respond to federal legal and policy decisions driving tribal development. The agreement is the result of discussions conducted by the Working Group composed of Board members and staff appointed from each County.

The Working Group developed a Statement of General Principles for the Consortium, which is incorporated as part of the agreement. The Statement cites the growth of tribal casino development in California since 1999, and the lack of local government participation and influence in federal decisions regarding tribal development. The principles address the interest of the Consortium member counties to restrict "reservation shopping" opportunities unless a tribe has demonstrated significant ties to the land, and to increase local government voice in acknowledgement and fee to trust processes.

The agreement includes the purpose, membership, administration and contribution of funds for the Consortium. Additionally, the Agreement requires that each County Board of Supervisors, appoint one member and one alternate Board Member to serve on the Steering Committee of the NCCTMC.


C.A.O. Suite (10 avg.) √
C.C. √

AR0010740

Board of Supervisors Agenda Submittal
Subject: Northern California Counties Tribal Matters Consortium Agreement
Date: January 25, 2004 - Page 2

The Solano County Board of Supervisors previously appointed two standing members and one alternate, to the multi-county consortium. Supervisor Silva has stepped down from his committee seat, leaving Supervisor Kromm as the standing member and Supervisor Vasquez as the alternate member, which was approved by the Board on January 11, 2005.

The Counties of Napa, Sonoma, and Yolo will also consider this matter today and the Consortium, if formed, will hold its first meeting in March. Prior to that first meeting, it is anticipated that some potential lobbying opportunities will occur in conjunction with the National Association of Counties conference in Washington, DC.

FINANCING:

Financing for the Consortium's activities will be provided by the four member counties. There is no Consortium budget at this time, and any future financial contribution would have to be approved by each County. To date each County has contributed $5,000 toward legal consulting services to prepare the strategic planning documents.    It is anticipated that legislative consultants and advocates may be retained from time to time. Funding for this purpose is budgeted in the County Administrator's Budget in FY 04/05.    Staffing to the Consortium is provided in-kind by the member counties.

DISCUSSION:

At the joint meeting of the Board of Supervisors of Solano, Sonoma and Napa Counties on March 26, 2004, the Board voted to direct staff to cooperate in the formation of a Joint Powers Authority (JPA) between the three counties and Yolo County in order to jointly retain legislative advocacy and representation on tribal gaming issues of interest to our counties.

Ad Hoc Working Group

On May 11, 2004, the Solano County Board approved appointment of two Board members, Supervisors Silva and Kromm, with Supervisor Vasquez as an alternate, to a working group comprised of staff and Board Members from the counties.   The working group has meet on an ad hoc basis to consider recommendations of the staff regarding the proposed structure of the Consortium agreement, membership, administration and the goals and objectives of the Consortium. The Working Group retained the services of a legal consultant from the firm Perkins-Coie, in Washington, D.C. to assist in defining the policies and principles of the Consortium and to advise the group of the laws and procedures for tribal acknowledgement and land trust. The Working Group drafted a General Policy Principles Statement which is incorporated within the proposed agreement between the Counties and will guide the Consortium in its positions and actitivies.

Provisions of the Multi-County Agreement

Purpose
The agreement creates a multi-county group named the Northern California Counties Tribal Matters Consortium, for the purpose of developing a better understanding and a regional approach to tribal

Board of Supervisors Agenda Submittal
Subject: Northern California Counties Tribal Matters Consortium Agreement
Date: January 25, 2004 - Page 3

matters, tribal land use and other related policies. The Consortium may jointly hire lobbying or consultant services to monitor legislation and advocate on behalf of the Consortium. The focus of advocacy would be regarding shared concerns about the Consortium's desire to minimize impacts that new gaming facilities or other development on tribal trust lands might have on the environment, agricultural land, sensitive habitat and wetlands, local infrastructure, public services, and health and safety.

Membership
Members to the Consortium are the Counties of Napa, Solano, Sonoma and Yolo.  New parties (counties) may be added by approval of the Steering Committee of the Consortium and adoption of a resolution of the requesting county.  Procedures for additional counties to join are included in Exhibit B of the Agreement

Administration
A Steering Committee will be composed of one Supervisor (and one alternate) from each participating county. The Steering Committee would interview consultants to the consortium, develop policies and procedures for the consortium and bring matters to the member Boards of Supervisors regarding modifications to the MOU and budgets for approval.  Each County has one vote on the Steering Committee.

Sonoma County is designated the lead agency for the consortium with specified administrative and fiduciary tasks, including executing contracts, and whose costs are funded by 1% of all revenues received by the consortium. A sub-committee composed of staff appointed by the CAO of each county will provide staffing to the Steering Committee.

Funds
Counties will contribute an equal amount of money to pay for lobbying, consultants and administrative costs

Withdrawal from Agreement
A County may withdraw as a party to the Agreement by adopting a resolution of the Board of Supervisors and providing 30 days notice of intent to withdraw.

Policy Principles

The principles draw a distinction between tribal trust land acquisitions sought by tribes without significant, long-term, and documented ties to the specific proposed location in the county as compared to those sought by tribes with such ties. The policy presumption is that proposals will be opposed until the county in question is satisfied that such ties exist. The principles were drafted, so as not to be inconsistent with principles and policy language adopted by both the California State Association of Counties and the National Association of Counties on these issues.

Board of Supervisors Agenda Submittal
Subject: Northern California Counties Tribal Matters Consortium Agreement
Date: January 25, 2004 - Page 4

The principles state that Consortium Counties:

- Will work with the Tribe on a government-to-government basis to consider development proposals within the policy framework of the Consortium;
- Will consider proposals to have land placed into trust for any development purpose in accordance with applicable legal authority on tribal purpose, need, and other factors, and to ensure consistency with county ordinances, zoning, environmental standards, health and safety standards, and other applicable development rules and standards;
- Will disfavor gaming-related proposals until it is conclusively shown that the development is fully consistent with Consortium principles and is in the best interest of the county;
- Will reserve the right to participate actively in any tribal acknowledgment proceeding based on the merits of the petition;
- Will oppose federal acknowledgment proposals by groups seeking federal recognition outside the BIA administrative process (by legislation, for example) in the absence of approval of the county or an existing county-tribal agreement;
- Will require that any county-tribal agreement will fully mitigate environmental impacts of the proposed project and that there will be guarantees of substantial compliance with county ordinances, zoning and environmental policies through a Memorandum of Understanding or similar agreement, in which the tribe must provide a sufficient waiver of tribal sovereign immunity to permit enforcement of the agreement; and
- Will oppose the Congressional designation of trust land or the authorization of trust land selections in the absence of approval of the county or the existence of a county-tribal agreement.

## ALTERNATIVES:

The Board could choose not to participate in the Consortium by not approving this agreement. Any changes to the language in the agreement would have to be approved by all member counties.

## OTHER AGENCY INVOLVEMENT:

The County Administrators and County Counsel's of Napa, Solano, Sonoma and Yolo Counties have been involved in the development of this proposal. Additionally, the law firm Perkins-Coie provided consultation in the development of the Principles Statement.

## DEPARTMENT HEAD SIGNATURE:

Michael D. Johnson, County Administrator

Attachments:   Multi-County Agreement for Addressing Tribal Matters
NCCTMC General Policy Principles – Exhibit A
Procedures for Becoming a Party to the Agreement – Exhibit B

AR0010743

# Northern California Counties Tribal Matters Consortium
## General Policy Principles

### I.    Introduction

California, more than any other state, has experienced an explosion of tribal gaming and land development since the 1988 enactment of the Indian Gaming Regulatory Act ("IGRA"). This development accelerated in California with the 1999 passage of Proposition 1A, and the 1998 passage of Proposition 5. The result is 54 operational casinos maintained by 53 tribal governments in 34 counties, with at least 25 additional tribal casinos in the planning stage. The scope of potential casino development is also reflected in the over 100 federally recognized tribes in California, with over 60 existing compacts, many of them providing for two casinos per tribe. As these IGRA casinos have proliferated, increased tribal gaming wealth, or its promise, has provided capital for still more gaming and non-gaming tribal development. All levels of state government now face significant challenges raised by tribal development initiatives. It is a key consideration that these tribal development proposals are generally governed by federal Indian law, which affords little protection to communities struggling to address the profound local impacts that often accompany gaming or other large tribal projects.

### A.    Purpose of the Consortium

Many tribal development initiatives, particularly gaming, have regional impacts beyond any specific jurisdiction. The Northern California Counties Tribal Matters Consortium ("Consortium") is founded by county governments based on the realization that they must work together to share expertise and respond effectively to the federal legal and policy decisions driving tribal development.

Along the legal pathway to any type of tribal development, there are a series of federal decisions and procedural steps. These steps may include tribal acknowledgment, land acquisition, fee-to-trust land conversion, approvals for gaming uses of trust lands, and approvals for gaming itself. Most of the steps offer a role and some measure of influence for the state and affected local governments. While this role is not as strong as it should be, it does afford an opportunity to take action. Proactive state and local participation is crucial as federal decisions are under consideration, because once made, jurisdiction over the tribal entity and its members is vitiated by the tribe's sovereign status, and key local regulatory powers are preempted once the property becomes tribal land. Formation of the Consortium is

NCC Tribal Matters Agreement                                    **Exhibit A**

important to allow local governments to work together to understand the rules and laws applicable to tribal status and development and to play a meaningful and united role in shaping federal and state decisions.

County coordination is especially critical in Northern California where a growing number of tribal entities are attempting to acquire land, seek trust status, and advance development proposals for casinos and other uses in locations based solely upon market appeal. Some tribes are attempting to develop land without regard to current reservation location or the existence of historic or other significant ties to a chosen location. There are many legal permutations of "reservation shopping," and many jurisdictions are forced to deal with the complex legal issues it raises, often on an emergency basis. Reservation shopping is fueled by improved tribal financial capability, usually through third-party investors. This creates the ability not only to buy land, but also to sustain long-term procedural and political campaigns and legal disputes, often exploiting ambiguous federal rules and policies.

Federal laws, regulations, and policies do provide states and local government with some opportunity to influence the outcome of tribal land development issues. Whether an affected state or local government can effectively take advantage of the procedural opportunities available to them depends on the governmental entity's knowledge of federal law and procedures, its readiness to respond appropriately, and its commitment to persevere in a position. A consortium of counties provides a more influential body to address federal or state legislative and administrative proposals regarding tribal matters.

**B.     Consortium Goals**

The Consortium has been organized to inform member counties of federal Indian law and policy so that they can effectively exercise their authority to respond to emerging policy and tribal development proposals. Each county belonging to the Consortium has varying degrees of experience with the conversion of fee land to federal trust status on behalf of Indian tribes and related proposals to develop that land for gaming or other economic purposes. In almost all cases, tribal plans for trust lands are inconsistent with the host county's general plans, ordinances, zoning, environmental standards or other policies. These lands and the facilities built on them become exempt from state and local taxation, and land use control, and potentially lead to serious adverse consequences on affected communities.

The Consortium's goal is to develop common principles that will guide the actions of each county and enable them to influence legislative and administrative policies in order to avoid or reduce impacts as much as possible. These general principles are intended to provide a proactive foundation for county action regarding trust land

AR0010745

proposals, to give advance notice of county policies and standards to those who intend to propose tribal development on such land, and to advise federal and state decisionmakers of a county's position.

The Consortium approach explicitly recognizes the distinction between tribal entities that have significant documented ties to specific locations in a county and those that do not. While federal processes may also apply to this determination, Consortium counties will make their own determination with respect to such ties. This will guide county responses to tribal development proposals or development initiatives, and assist the counties in taking positions in federal proceedings. The presumption is that proposals by tribal entities without significant ties to specific locations in a county will be generally opposed and therefore ineligible for agreements with the counties. Those having significant documented ties will be eligible for government-to-government discussions and potential agreements consistent with Consortium principles.

## II.    Consortium Basic Principles

The following principles represent the Consortium's general policies toward tribal trust land acquisitions and other development proposals on trust lands:

A.    The Consortium is opposed to any federal fee-to-trust request on behalf of any tribe that lacks significant, long-term and documented ties to the specific location in the county where the trust land acquisition or development is proposed.

The policy presumption is that each Consortium county will oppose any trust land request, regardless of the developmental purpose, where the tribe on behalf of which trust status is proposed, lacks significant ties. Counties will make their own determination on this issue and will be active participants in applicable federal proceedings. Until the county in question is satisfied that such ties exist, or are reasonably likely to be proven, no proposals for county-tribal agreements will be entertained, and other agreements related to the trust land proposal, such as those involving local governments or the State, will be disfavored.

B.    In circumstances where a county is satisfied that a tribe, or an unrecognized group seeking federal acknowledgment as a tribal entity, has significant ties to a specific location, Consortium member counties:

1.    Will work with the Tribe on a government-to-government basis to consider development proposals within the policy framework of the Consortium;

AR0010746

2. Will consider proposals to have land placed into trust for any development purpose in accordance with applicable legal authority on tribal purpose, need, and other factors, and to ensure consistency with county ordinances, zoning, environmental standards, health and safety standards, and other applicable development rules and standards;

3. Will disfavor gaming-related proposals until it is conclusively shown that the development is fully consistent with Consortium principles and is in the best interest of the county;

4. Will reserve the right to participate actively in any tribal acknowledgment proceeding based on the merits of the petition;

5. Will oppose federal acknowledgment proposals by groups seeking federal recognition outside the BIA administrative process (by legislation, for example) in the absence of approval of the county or an existing county-tribal agreement;

6. Will require that any county-tribal agreement will fully mitigate environmental impacts of the proposed project and that there will be guarantees of substantial compliance with county ordinances, zoning and environmental policies through a Memorandum of Understanding or similar agreement, in which the tribe must provide a sufficient waiver of tribal sovereign immunity to permit enforcement of the agreement; and

7. Will oppose the Congressional designation of trust land or the authorization of trust land selections in the absence of approval of the county or the existence of a county-tribal agreement.

## III. Implementation Guidelines

In carrying out these principles, Consortium counties agree that they will be committed to the following:

A. <u>Mutual Respect</u>. The counties will be committed to respectful government-to-government relationships with tribal entities and recognize the unique role and interest of each. The same respect extends to the affected state and local governments. The concept of reciprocal respect will guide the actions of Consortium members.

AR0010747

B.  <u>Information Gathering.</u>  The counties affected by tribal development proposals will obtain information needed to evaluate the unique character of tribal status and the impacts of tribal development on the community, and the well-being and economic self-sufficiency of the tribal entity.

C.  <u>Education.</u>  The counties will develop, on an individual county or cooperative basis, a public education program to promote informed decisions on tribal proposals.

D.  <u>Active Participation.</u>  To protect local interests, the counties, through the Consortium, will participate actively and appropriately in state and federal policy and legislative processes to support the principles of the Consortium.

E.  <u>Trust Land/Development Response.</u>  The counties will ensure that any fee-to-trust transaction or other tribal development proposal by a recognized tribe:

1.  Is subject to a comprehensive agreement (e.g., Memorandum of Understanding) enforceable in federal or state court between the tribal entity and the county;

2.  Is consistent with the county's general plan;

3.  Undergoes environmental review that is at least equivalent to the level of environmental review applicable to any comparable non-tribal proposal, including impacts, cumulative impacts, mitigation requirements, and other factors;

4.  Includes enforceable provisions between the tribal entity and the county under which the tribal entity agrees to make payments to compensate for the government services typically covered by applicable taxes, to provide a negotiated fair share for health, welfare, and safety services, and to offset impacts of whatever developmental activity is proposed.  This recognizes that such costs include: a) processing and administrative costs (such as permitting); b) impact mitigation; and c) the ongoing impacts of the activity or development;

5.  Provides for the payment or mitigation from tribal entities to cover all public sector costs and economic impacts (police, fire,

NCC Tribal Matters Agreement          -5-              Exhibit A

AR0010748

sewer, road, education, housing and others) associated with any development on trust lands;

6. Satisfies the health and safety standards (ordinances) of the county, either directly or by enforceable (third part enforcement) tribal ordinances;

7. Includes enforceable conditions and limitations with respect to the future development and/or changed use of any land that is to be placed in trust on behalf of the tribal entity; and

8. Includes a limited waiver of sovereign immunity of the tribal entity sufficient to permit enforcement of the terms of an agreement in federal or state court, or includes acceptable alternative enforcement provisions.

F. <u>State and Local Government Relationships.</u> With respect to the relationship between the counties and the State of California, and with local governments in each respective County:

1. The counties will respect and seek a partnership with the State and local governments consistent with these principles and the legal rights and responsibilities of these other governments;

2. Wherever possible, the counties will provide support and assistance to local governments and the State as they consider trust land and related tribal development proposals;

3. The counties will communicate these principles and standards, once adopted, to local governments in each county, the State, and any tribal entity interested in land within the respective county; and

4. The counties will seek to make decisions that are consistent with the interests of local governments within the counties that are likely to be significantly impacted by any proposed development.

## IV.    Conclusion

Tribal gaming and economic development on trust land presents a significant challenge to local governments. Through these principles, the counties in the

AR0010749

Consortium will cooperate in efforts that protect the public interest, and provide information to tribal governments regarding the expectations that must be met to proceed with development activities. The ultimate goal is to establish a foundation upon which legitimate tribal development initiatives can proceed through a process of mutual respect and cooperation while fully protecting local community and tribal rights and interests.

NCC Tribal Matters Agreement          -7-                    Exhibit A

AR0010750

## Procedures for Becoming a Party to
## The Northern California Counties Tribal Matters Consortium

The Northern California Counties Tribal Matters Consortium Multi-County Agreement includes provisions for adding parties (counties) to the Consortium, when approved by the majority of the members of the Consortium's Steering Committee. The process for becoming a party to the Consortium requires the following actions:

1) A County that is interested in becoming a party to the Consortium may send a letter of interest from the Chairperson of the Board of Supervisors to the Consortium through the Sonoma County Administrator's Office.

2) Once the Consortium receives a letter of interest, it will be considered by the Steering Committee during a regular meeting of the Committee.

3) Following approval by the Steering Committee, the Consortium will send a resolution packet to the interested County for possible action by that County Board of Supervisors. Included in packet will be:

    i) A Board resolution requesting to become a party to the Consortium;
    ii) The current Memorandum of Understanding;
    iii) The Basic Principles of the Consortium;
    iv) Any known Consortium costs.

4) In order to complete the process of becoming a party to the consortium, a County Board of Supervisors shall:

    a) Adopt the resolution provided by the Consortium. Amendments to the resolution will not be accepted, unless approved in writing by the Steering Committee;
    b) Designate and provide the name of (two) appointees, *one regular and one alternate appointee* from the Board of Supervisors to the Consortium;
    c) Provide the name and address of the County Administrator or other designee for the purpose of receiving communications and notices from the Consortium;
    d) Remit the County's share of cost for Consortium financial commitments.

5) A County is deemed a member of the Consortium upon adoption of the resolution and designation of Board of Supervisor appointees.

NCC Tribal Matters Agreement                        **Exhibit B**

AR0010751

RESOLUTION NO._____

**RESOLUTION OF THE _____COUNTY BOARD OF SUPERVISORS REQUESTING TO BE A PARTY TO THE NORTHERN CALIFORNIA COUNTIES TRIBAL MATTERS CONSORTIUM MULTI COUNTY AGREEMENT**

**Whereas,** the Board of Supervisors of _____County (herein referred to as "Board") desire to develop a regional and statewide approach with other counties for addressing tribal matters including land use and other policy issues; and

**Whereas,** the Board wants to maintain positive relations with regional Indian tribes and encourage tribes to work with counties on recognition, land trust and gaming issues; and

**Whereas,** the Board has considered and agrees to the Basic Principles Statement developed by the Northern California Counties Tribal Matters Consortium; and

**Whereas,** the Board agrees to be bound by the terms and conditions of the Multi-County Agreement for Addressing Tribal Matters; and

**Whereas,** the Board agrees to appoint one member and alternate member of the Board of Supervisors to participate in regular and special meetings of the Steering Committee;

**Therefore now be it resolved** that the _____County Board of Supervisors requests to be a Party to the Northern California Counties Tribal Matters Consortium Multi-County Agreement; and

**Therefore be it further resolved** that the _____County Board of Supervisors agree to be bound by the terms and conditions of the Multi-County Agreement for Addressing Tribal Matters.

Passed and adopted by the _____County Board of Supervisors at its regular meeting on _____by the following vote:

AYES:          Supervisors:_____

NOES:          Supervisors:_____

EXCUSED:   Supervisors:_____

_____
Chair, Board of Supervisors

ATTEST:
By:_____

AR0010752

## MULTI-COUNTY AGREEMENT FOR
## ADDRESSING TRIBAL MATTERS

THIS AGREEMENT ("the Agreement"), is effective as of January 25, 2005 by and between the founding COUNTIES OF NAPA, SOLANO, SONOMA, AND YOLO, political subdivisions of the State of California (hereinafter collectively referred to as "COUNTIES").

### RECITALS

WHEREAS, COUNTIES have expressed an interest in developing a regional approach for addressing tribal matters; and

WHEREAS, COUNTIES desire to develop and maintain positive relations with regional Indian tribes and wish to encourage regional Indian tribes to work cooperatively with COUNTIES; and

WHEREAS, COUNTIES have identified a need for joint representation and advocacy related to tribal matters at the federal and state levels; and

WHEREAS, COUNTIES wish to work together in educating the public concerning local impacts of tribal matters; and

WHEREAS, COUNTIES, through this Agreement, have adopted a statement of basic principles to guide their actions.

NOW THEREFORE, the COUNTIES agree as follows:

I.    **GENERAL CONCEPT** COUNTIES shall enter into the Agreement for the purpose of developing a regional approach to tribal matters, land use, and other policy issues. The objective of the Agreement is for COUNTIES to work together to better understand regional Indian-tribal issues through information gathering and policy monitoring and to bring a unified voice to advocate on behalf of local government in administrative and legislative forums at the federal and state levels. The statement of basic principles adopted by the COUNTIES is attached as Exhibit A and incorporated by reference.

II.   **JOINT ACTION** The multi-county group created by this Agreement shall be named, "Northern California Counties Tribal Matters Consortium" (hereinafter "CONSORTIUM"). The CONSORTIUM shall assess and share Indian-tribal policy issues from individual county jurisdictions and jointly develop a scope of work for the purpose of addressing common concerns. This scope of work may include hiring lobbying and/or other consultant services (individually or collectively "consulting services") to monitor legislation and advocate the CONSORTIUM'S interests or to assess the regional environmental impact of specific land use development proposals. The CONSORTIUM intends that lobbyists or other consultants hired shall advocate on the CONSORTIUM'S behalf and communicate shared concerns about the CONSORTIUM'S desire to minimize impacts that new gaming facilities or other development on trust lands might have on the environment, agricultural land, sensitive habitat and wetlands, local infrastructure, public services, and health and safety. Any

1

lobbyist or consultant hired shall communicate the CONSORTIUM'S desire to maintain positive relations with regional Indian tribes and encourage regional Indian tribes to work with the CONSORTIUM on recognition, land trust, and gaming issues. Any lobbyist or consultant hired shall work on the CONSORTIUM'S behalf and shall not represent individual counties that are part of this agreement. If a specific issue arises affecting a county, under circumstances in which the CONSORTIUM concludes collectively that it is not a common issue, the county may individually hire the same lobbyist or consultant working on behalf of the CONSORTIUM.

III.    **ADMINISTRATION**

A.    There is created a Steering Committee, composed of one supervisor (or one alternate supervisor) from each participating county who shall meet to (1) interview future consultant applicants for the CONSORTIUM, (2) develop policies and procedures for the CONSORTIUM, (3) review, decide and respond to new counties who request to become a member of the CONSORTIUM, and (4) bring matters back to the CONSORTIUM member Boards when dealing with issues relating to modifications to the Agreement and budget approval.

All action taken by the Steering Committee requires a majority vote and the presence of a quorum. At least 2/3 of the members of the Steering Committee shall constitute a quorum. Each county of the CONSORTIUM shall have one vote.

B.    There is created a sub-committee Working Group, composed of two staff members from each participating county, appointed by the county's CEO/CAO, who shall monitor the consulting services and issues of mutual interest to the COUNTIES. When items require policy development, the Working Group shall present the issues to the Steering Committee for further review and direction.

C.    Each county shall be responsible for noticing within its individual county every Steering Committee meeting as is required by The Ralph M. Brown Act, Government Code §§ 54950 - 54963.

D.    Staff members of the CONSORTIUM shall alternate in the responsibility of the administrative tasks (i.e. Steering Committee Agenda and Minutes) to be arranged in advance of the scheduled meetings by the Working Group.

E.    The County of Sonoma shall be the lead agency for the CONSORTIUM. The County of Sonoma is authorized to execute, on behalf of the CONSORTIUM, an Agreement with any consultant selected by the Steering Committee, and with a majority vote of the Steering Committee, any subsequent amendments to the consulting Agreement within the approved contract budget.

F.    The Treasurer of the County of Sonoma is designated as the depository, shall have custody of all CONSORTIUM funds from whatever source, and shall perform the functions set forth within Government Code § 6505.5.

G.    The Auditor-Controller of the County of Sonoma is designated to perform the

2

functions of Auditor for the CONSORTIUM, and shall provide fiscal oversight and strict accounting of all funds utilized or held pursuant to this agreement. This fund shall be included in the overall annual County audit. At the request of the CONSORTIUM, the Auditor shall either make or contract for a separate audit of the accounts and records of the CONSORTIUM. Costs of such a separate audit will be borne by the CONSORTIUM.

H.    The County of Sonoma shall keep the Steering Committee and Working Group informed of any significant events that may develop relating to the project and shall seek the opinion of the Steering Committee on all matters of importance involving the CONSORTIUM.

I.    No additional powers are granted to the County of Sonoma as lead agency other than those indicated in this Agreement.

J.    Any county's membership in the CONSORTIUM does not bind that county to adopting a policy made by the CONSORTIUM unless that policy is adopted by the respective Board of Supervisors.

K.    Individual county relationship(s) with their respective tribe(s) is/are a matter of the respective county and is/are in no way controlled by the county's membership in the CONSORTIUM.

IV.    **CONTRIBUTION OF FUNDS**  COUNTIES shall each contribute an equal amount of money to the CONSORTIUM, with the Steering Committee determining the amount to be contributed. The monies shall be paid to the County of Sonoma to pay for lobbying, consultant, and administrative costs and services. Funds must be paid to the County of Sonoma prior to the execution of any contract and within 30 days of being provided an invoice from the lead agency. Administrative costs shall equal one percent (1%) of all revenues received from the CONSORTIUM.

V.    **INDEMNIFICATION**  Each County agrees to indemnify, defend and hold harmless each other County, its officers, employees, and agents from any claim, loss demand or judgment that may arise out of the activities of its officers, employees or agents under this Agreement.

VI.    **NOTICES**  All communications between the COUNTIES shall be deemed given when made in writing and delivered or mailed to such County Administrator or Executive Officer at its address, as follows for the founding counties:

COUNTY OF NAPA
County Executive Office
1195 Third Street, Suite 310
Napa CA 94559

COUNTY OF SOLANO
County Administrator's Office
675 Texas Street, Suite 6500
Fairfield, CA 94533

3

AR0010755

COUNTY OF SONOMA
County Administrator's Office
575 Administration Drive, Suite 104A
Santa Rosa, CA 95403

COUNTY OF YOLO
County Administrative Office
625 Court Street, Room 202
Woodland, CA 95695

VII.   **TERM**  This agreement shall take effect on January 25, 2005 and shall remain effective until terminated by the COUNTIES.

VIII.   **MODIFICATION OF AGREEMENT**  Any modifications to this Agreement shall be in writing and executed by the COUNTIES identified in this Agreement.  An addition of new counties shall not be considered a modification of this Agreement.

IX.   **NEW PARTIES**  Any county requesting to become a party to this Agreement shall follow the procedures set forth in Exhibit B.  Upon majority approval of the Steering Committee, additional counties may become new parties to this Agreement.

X.   **EXECUTION IN COUNTERPARTS**  This Agreement becomes effective after adoption by resolution of the respective COUNTIES, all of which collectively shall constitute one document and agreement.

XI.   **WITHDRAWAL FROM THE AGREEMENT**  A County may withdraw as a party to this Agreement by adopting a resolution of its governing body providing 30 days written notice of its intent to withdraw as a member of the CONSORTIUM. If any county fails to fulfill in a timely and proper manner that county's financial obligations under Section IV of this Agreement, the defaulting county will automatically be withdrawn as a party to this Agreement. A County electing to withdraw or automatically withdrawn as a party to this Agreement will not be able to recover any funds held for any outstanding contracts or funds deposited with the lead agency.

XII.   **ENTIRE AGREEMENT**  This agreement is the entire agreement between the COUNTIES. Each County to this agreement acknowledges that no representations, inducements, promises, or agreements have been made by or on behalf of any other county, except as those promises and agreements contained in it.

4

AR0010756

IN WITNESS WHEREOF, the parties hereto have entered into this agreement on the date first above mentioned.

**COUNTY OF NAPA, a political subdivision of the State of California**

_____
DIANE DILLON, Chairperson
Napa County Board of Supervisors

ATTEST:

PAMELA A. MILLER
Clerk of the Board

By: _____

| Approved by the Napa County Board of Supervisors |
|---|
| Date: |
| Processed by: |
| Deputy Clerk of the Board |

| APPROVED AS TO FORM Office of Napa County Counsel |
|---|
| By: _____ Deputy County Counsel |
| Date: _____ |

**COUNTY OF SOLANO, a political subdivision of the State of California**

_____
BARBARA KONDYLIS, Chairwoman
Solano County Board of Supervisors

ATTEST:

PATTY CRITTENDEN
Clerk to the Board

By: Myra Chinla, deputy

| Approved by the Solano County Board of Supervisors |
|---|
| Date: 1-25-05 |
| Processed by: Myra Chinla, deputy Deputy Clerk of the Board |

| APPROVED AS TO FORM Office of Solano County Counsel |
|---|
| By: _____ Deputy County Counsel |
| Date: _____ |

5

AR0010757

**COUNTY OF SONOMA, a political subdivision**
**of the State of California**

_____
TIM SMITH, Chairperson
Sonoma County Board of Supervisors

ATTEST:

EEVE LEWIS
Clerk of the Board

By: _____





**COUNTY OF YOLO, a political subdivision**
**of the State of California**

_____
HELEN THOMSON, Chairperson
Yolo County Board of Supervisors

ATTEST:

ANA MORALES
Clerk of the Board

By: _____

6

## Procedures for Becoming a Party to
## The Northern California Counties Tribal Matters Consortium

The Northern California Counties Tribal Matters Consortium Multi-County Agreement includes provisions for adding parties (counties) to the Consortium, when approved by the majority of the members of the Consortium's Steering Committee. The process for becoming a party to the Consortium requires the following actions:

1) A County that is interested in becoming a party to the Consortium may send a letter of interest from the Chairperson of the Board of Supervisors to the Consortium through the Sonoma County Administrator's Office.

2) Once the Consortium receives a letter of interest, it will be considered by the Steering Committee during a regular meeting of the Committee.

3) Following approval by the Steering Committee, the Consortium will send a resolution packet to the interested County for possible action by that County Board of Supervisors. Included in packet will be:

    i) A Board resolution requesting to become a party to the Consortium;
    ii) The current Memorandum of Understanding;
    iii) The Basic Principles of the Consortium;
    iv) Any known Consortium costs.

4) In order to complete the process of becoming a party to the consortium, a County Board of Supervisors shall:

    a) Adopt the resolution provided by the Consortium. Amendments to the resolution will not be accepted, unless approved in writing by the Steering Committee;
    b) Designate and provide the name of (two) appointees, *one regular and one alternate appointee* from the Board of Supervisors to the Consortium;
    c) Provide the name and address of the County Administrator or other designee for the purpose of receiving communications and notices from the Consortium;
    d) Remit the County's share of cost for Consortium financial commitments.

5) A County is deemed a member of the Consortium upon adoption of the resolution and designation of Board of Supervisor appointees.

NCC Tribal Matters Agreement             **Exhibit B**

AR0010759

## RESOLUTION NO._____

**RESOLUTION OF THE _____ COUNTY BOARD OF SUPERVISORS REQUESTING TO BE A PARTY TO THE NORTHERN CALIFORNIA COUNTIES TRIBAL MATTERS CONSORTIUM MULTI COUNTY AGREEMENT**

**Whereas,** the Board of Supervisors of _____County (herein referred to as "Board") desire to develop a regional and statewide approach with other counties for addressing tribal matters including land use and other policy issues; and

**Whereas,** the Board wants to maintain positive relations with regional Indian tribes and encourage tribes to work with counties on recognition, land trust and gaming issues; and

**Whereas,** the Board has considered and agrees to the Basic Principles Statement developed by the Northern California Counties Tribal Matters Consortium; and

**Whereas,** the Board agrees to be bound by the terms and conditions of the Multi-County Agreement for Addressing Tribal Matters; and

**Whereas,** the Board agrees to appoint one member and alternate member of the Board of Supervisors to participate in regular and special meetings of the Steering Committee;

**Therefore now be it resolved** that the _____County Board of Supervisors requests to be a Party to the Northern California Counties Tribal Matters Consortium Multi-County Agreement; and

**Therefore be it further resolved** that the _____County Board of Supervisors agree to be bound by the terms and conditions of the Multi-County Agreement for Addressing Tribal Matters.

Passed and adopted by the _____ County Board of Supervisors at its regular meeting on _____by the following vote:

AYES:        Supervisors:_____

NOES:        Supervisors:_____

EXCUSED:    Supervisors:_____


                                   _____
                                   Chair, Board of Supervisors

ATTEST:
By:_____

NCC Tribal Matters Agreement                                    **Exhibit B**

AR0010760

2/C

## Tribal Recognition and Trust Acquisition Process

### A.     Tribal Recognition Procedures

There are four possible routes through which tribes are federally recognized: 1) by treaties; 2) by Congress; 3) by administrative decisions by the BIA; or 4) by the courts.  Today, the vast majority of tribes seek recognition through the administrative process, and if recognition has not yet been obtained, the local community will most likely be dealing with the administrative process.

### Recognition Criteria

A tribe must demonstrate that it meets the following seven criteria to qualify for federal recognition by BIA action:

    a)  the petitioner has been identified as an American Indian entity on a substantially continuous basis since 1900;

    b)  a predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present;

    c)  the petitioner has maintained political influence or authority over its members as an autonomous entity from historical times until the present;

    d)  the group must provide a copy of its present governing documents and membership criteria;

    e)  the petitioner's membership consists of individuals who descend from a historical Indian tribe or tribes, which combined and functioned as a single autonomous political entity;

    f)  the membership of the petitioning group is composed principally of persons who are not members of any acknowledged North American Indian tribe; and

    g)  neither the petitioner nor its members are the subject of congressional legislation that has expressly terminated or forbidden recognition.

25 C.F.R. § 83.7.

### Recognition Process

There are a number of steps in the tribal recognition process.  The Indian group initiates the process by filing a letter of intent to petition for federal recognition.  Id. § 83.4.  The BIA is required to acknowledge receipt of the letter within 30 days, file a notice of receipt within 60 days, and notify the Governor and Attorney General in the state where petitioner is located, as well as any other tribe or petitioner that may have potential interest.  Id. § 83.9.

Once the letter of intent is filed, and notice has been issued, the tribal petitioner provides BIA with documents and evidence supporting the seven criteria listed above. Id. § 83.6. BIA conducts a technical assistance (TA) review when the petition is considered complete. Id. § 83.10(b). Petitioners can either respond to the TA review with additional materials or proceed with active consideration using the materials already submitted. Id. § 83.10(c). After the group responds to the TA review, and before the petition is placed on active consideration, BIA investigates the petitioner to determine if there is little or no evidence that the group can meet criterion (e), (f), or (g). Id. § 83.10(e). If the review finds that the evidence clearly establishes that the group does not meet one or more of these criteria, BIA can issue a proposed finding declining to recognize the tribe. Id. § 83.10(e)(1).

If BIA determines that criteria (e), (f) and (g) have been met, it will place the petition on the "ready, waiting for active consideration" list. Id. § 83.10(e)(2). BIA will notify the petitioner and all interested parties when the petition comes under active consideration. Id. § 83.10(f). After reviewing the petition, BIA prepares a report summarizing the evidence, reasoning, and analyses that form the basis for the recommendation it makes to the Assistant Secretary-Indian Affairs. Id. § 83.10(h). The Assistant Secretary then makes a proposed determination regarding the petitioner's status. Id. A summary of this determination is published in the Federal Register. Id. The timeline is one year from the time the petitioner is placed on active consideration. Id.

Following the Assistant Secretary's proposed determination, there is a comment period (usually 180 days) during which the petitioner and any third party may submit arguments and evidence to the BIA. Id. § 83.10(i). Following the close of the comment period, the petitioner has another 60 days to respond to public comments. Id. § 83.10(k). BIA will then consult with the petitioner and third parties regarding the timeline for consideration of arguments and evidence submitted during the response period. Id. § 83.10(l).

BIA technical staff is to provide a recommendation to Assistant Secretary within 60 days of the close of the consultation period. Id. § 83.10(l)(2). The Assistant Secretary makes the final determination, a summary of which is published in the Federal Register. Id. The determination becomes final unless the petitioner, or a third party, files a request for reconsideration within 90 days. Id. § 83.10(l)(4).

The request for consideration is filed before the Interior Board of Indian Appeals. Id. § 83.11(a). The Board will consider requests for reconsideration that allege there is new evidence, that the evidence or research used to make the final determination is faulty, or that there is a reasonable interpretation of the evidence not previously considered. Id. § 83.11(d). The Board has two choices: it can either affirm the decision or remand it to the Assistant Secretary for reconsideration. Id. § 83.11(e)(9),(10).

If the Board affirms a decision, but finds the request alleges other grounds, the request is sent to the Secretary of the Interior who has the discretion to request the Assistant Secretary to reconsider, after receiving further comments from the petitioners and interested parties. Id. § 83.11(f)(2),(3). The Secretary will determine whether to request reconsideration within 60 days of receipt of all comments. Id. § 83.11(f)(5). The Assistant Secretary will issue a reconsidered determination stemming from either the Board's remand or the Secretary's request for reconsideration. Id. § 83.11(g)(1). At this point, the administrative process is complete. A petitioner or interested party may contest the decision in federal court.

AR0010762

Options for Communities

Communities joining the process at the recognition stage have the opportunity to ensure an accurate decision and to play a substantial role in the outcome. Federal recognition is a significant hurdle for an Indian group, and it is at this point that a community may have its best chance to shape the result. Participation from the outset ensures that the local community will have a voice in all that follows, including appeals and litigation, in the event that the petitioner gets past the recognition hurdle.

Tribal recognition involves a factual inquiry. While legal and strategic guidance is helpful, the greater investment typically is in experts in genealogy, history and cultural anthropology, with a specialty in Indians from the relevant geographic area. These are often inquiries in which local governments can play an important substantive role through records and research. Areas that currently tend to generate the greatest controversy, for example, are whether the tribe has maintained existence as an Indian entity on a substantially continuous basis since 1900, meets the tests for continued social community and political activity, and can trace its ancestry to the historical tribe.

B.    **Trust Land Acquisition: Part 151 Review**

The Secretary of the Department of the Interior is authorized under the Indian Reorganization Act to acquire land in trust for Indian tribes. 25 U.S.C. § 465. The general purpose of the Act is to improve the economic, cultural, social and governmental well-being of Indian tribes, and land acquisition is an integral part of achieving that goal. Acquiring land in trust is a long process, however, that requires the participation of tribal, Federal, state and local government agencies, as summarized below.

The BIA reviews trust land acquisitions under Part 151 of the Code of Federal Regulations. The regulations establish standards for trust land acquisition that differ, depending on whether the land to be placed in trust is within or adjacent to the tribe's reservation or is an "off-reservation" acquisition. Compare 25 C.F.R. § 151.10 with § 151.11. The BIA must review the following factors: 1) tribal need for the land; 2) purpose of the land acquisition; 3) impacts on state and local governments; 4) jurisdictional problems; and 5) ability to comply with certain environmental laws. Id. § 151.10(b),(c),(e),(f),(h). If the acquisition is for off-reservation land, the tribe must also identify the anticipated economic benefits of the acquisition, and the BIA must scrutinize the tribe's justifications more closely than for on-reservation acquisitions, thereby making off-reservation acquisitions more difficult. Id. § 151.11 (b),(c).

Section 20 Review

If a tribe plans to use proposed trust land for gaming or gaming-related purposes, the BIA must also review the application under section 20 of the Indian Gaming Regulatory Act. 25 U.S.C. 2701 et seq. Section 20 prohibits tribes from conducting class II and III gaming on lands acquired in trust after October 17, 1988, unless certain exceptions apply, including whether the land involved is restoration land or the land is adjacent to an existing reservation. Id. § 2719. If no exception applies, a tribe may still conduct gaming, but only if the Secretary, after consultation with appropriate state and local officials, and officials of nearby Indian tribes, determines that gaming will (1) be in the best interest of the tribe and its members, and (2) not be

AR0010763

detrimental to the surrounding community. Id. § 2719(b)(1)(A). In addition, the state governor must concur in the Secretary's determination. Id.

<u>NEPA Environmental Compliance</u>

As part of the Part 151 and Section 20 reviews, the BIA must comply with the National Environmental Policy Act (NEPA) before making a determination on a land acquisition application. 42 U.S.C. 4321 et seq. As a federal agency, the BIA must consider environmental concerns when reviewing trust land acquisitions and determine whether the proposed land acquisition and any subsequent development will significantly impact the environment. Id. § 4332. This determination dictates the level of environmental analysis required. The levels of environmental analysis include a categorical exclusion determination, an environmental assessment (EA), and/or an environmental impact statement (EIS). 40 C.F.R. §§ 1501.3, 1501.4. Depending on the level of analysis determined necessary, the NEPA process can take anywhere from a few months to several years. During the last year, the BIA has adopted an informal policy of conducting an EIS for every off-reservation trust request. Not all regional offices, however, follow this informal policy. Appeal to the national office may be necessary to ensure the BIA conducts this level of review.

<u>State Law Review</u>

State and local governments also participate in the trust land acquisition process. As noted above, 25 C.F.R. Part 151 and Section 20 both establish consultative roles for state and local authorities. This consultative role is expanded under NEPA review. See e.g., 40 C.F.R. § 1501.7(a). In addition, state and local governments have the option to work cooperatively with Indian tribes, by developing legally enforceable agreements that cover the primary concerns of state and local governments. Such agreements, which themselves must comply with state law, generally cover environmental issues and the provision of utilities, emergency services, and security, among other services. It is important to note that these types of agreements include a waiver of sovereign immunity, an essential provision that allows state and local governments to pursue disagreements with tribes in court.

<u>Process</u>

The procedural requirements for a trust land application are straightforward. A tribe initiates the process by filing a written request to the BIA identifying the proposed trust land. 25 C.F.R. § 151.9. BIA then notifies the state and local governments having regulatory jurisdiction over the land. Id. §§ 151.10, 151.11(d). BIA conducts a preliminary review, which can last from a few weeks to a year or more (which is typically the case). State and local governments then have 30 days to provide written comments regarding the potential impacts of the acquisition on regulatory jurisdiction, real property taxes, and special assessments. Id. This deadline is often extended. The applicant has a reasonable amount of time to reply to the comments. BIA then considers the application and comments of the various parties and may request additional information during its deliberations. Id. In addition, BIA will also determine the applicability of Section 20. If Section 20 applies, the BIA will then contact state and local authorities, as well as the governor, to satisfy Section 20 requirements. 25 U.S.C. § 2719.

While BIA is considering Part 151 and Section 20 requirements, it must also initiate environmental review. 40 C.F.R. § 1501.2. (In some cases, the applicant will initiate environmental review before filing an application for trust land to accelerate the process.) BIA

will initially determine whether a categorical exclusion applies or whether an EA or EIS will be prepared. Id. §§ 1501.3, 1501.4. Generally, the BIA provides public notice of the level of environmental review required and contacts the various agencies from which it will require information. If BIA decides an EA is required, one can expect a lower level of public involvement than with an EIS. See id. part 1503. Quite frequently, BIA will not circulate a draft EA, for example, but will provide a copy of the EA, if specifically requested. Once the EA is prepared, BIA will either determine that a more detailed EIS is necessary or will issue a Finding of No Significant Impact (FONSI). Id. § 1501.4. The FONSI is made available for public review under certain limited circumstances. Id. § 1501.4(e)(2).

If BIA determines, either at the outset of the process or after an EA has been prepared, that an EIS is necessary, there are far more opportunities for public participation. The agency will start a scoping process, during which it invites the participation of other federal and state agencies and interested parties to determine the scope of issues to be addressed in the document. Id. § 1501.7. Finally, the regulations require both the draft and final EISs to be circulated for public comment before the agency makes its final decision on the trust land application. Id. § 1502.9. Once a final decision is issued, it is subject to appeal to the Interior Board of Indian Appeals. See 25 C.F.R. part 2. That appeal must be filed within 30 days. Id. § 2.9(a). The appeal process itself can take up to two years. The appellant may have to post a bond to cover the Tribe's losses due to delay. Id. § 2.5. After the appeal, if the decision is upheld, it can be challenged in court. If, however, the trust decision is made at a high level in BIA, the administrative appeals phase is skipped and court review occurs right away. Id. § 2.6(c).

AR0010765

# Exhibit 23

AR0010766

# INTERGOVERNMENTAL AGREEMENT
## BETWEEN
## YOCHA DEHE WINTUN NATION
## AND
## THE COUNTY OF SOLANO
## TO IMPROVE THE HEALTH AND WELL-BEING OF THE PEOPLE OF SOLANO COUNTY

THIS INTERGOVERNMENTAL AGREEMENT ("Agreement") is entered into as of October 1, 2017 between the YOCHA DEHE WINTUN NATION, a federally recognized tribal government ("Yocha Dehe") and the COUNTY OF SOLANO, a subdivision of the State of California ("County"). Unless identified, the two governments may be referenced herein individually as "Party" or collectively as "Parties".

## RECITALS

WHEREAS, Yocha Dehe is a sovereign Native American nation, so recognized by the United States, which operates under its own constitution and under the governance of an elected Tribal Council; and

WHEREAS, Yocha Dehe's ancestral territory extends throughout the boundaries of Solano County as recognized by the Native American Heritage Commission;

WHEREAS, because of Yocha Dehe's historical connection to the lands within Solano County, Yocha Dehe protects the cultural resources affiliated with the Patwin people within Solano County, and in that regard, the Tribe holds an unprecedented cultural easement entered in 2011 with the City of Vallejo to protect the sacred resources and sites at its waterfront park development at Glen Cove from desecration and disturbance; and

WHEREAS, Yocha Dehe is committed to improving the environment, education status, and the health, safety and general welfare of not only its citizens, but Native American and non-Native American people throughout California; and

WHEREAS, Yocha Dehe feels a particularly deep connection to lands and people within its ancestral territory, including Solano County, and it has a strong commitment to fostering a good-neighbor and government-to-government relationship throughout this territory; and

WHEREAS, revenues from gaming operations have enabled Yocha Dehe to help the non-tribal community in meaningful ways, including supporting worthy programs and local jurisdictions in ways that positively affect people's lives; and

WHEREAS, the Solano County Departments of Health & Social Services and First 5 Solano provide services that benefit the Solano community, and the County has presented the Tribal Council with proposals that each entity would deliver to help impoverished and needy persons within Solano County; and

105243674\V-1

AR0010767

WHEREAS; Yocha Dehe desires to partner with Solano County to support these programs, and provide services which improve the health and well-being of the people of Solano County.

## FUNDING AGREEMENT

**NOW, THEREFORE,** in consideration of the mutual promises set forth in this Agreement, the Parties agree:

### Part I
### Description of Activities

Yocha Dehe agrees to provide financial support in October 2017 to support the following service activities which will be conducted over the following one-year period, also referenced herein individually as "Project" or collectively as "Projects," with the payment of $1,000,000 (one million dollars), and with the County to allocate funding among the three Projects along the lines proposed to the Tribal Council:

1.  Vibe Solano: A multi-pronged health campaign intended to prevent and reduce chronic diseases by increasing access to healthy choices, places, messages and community engagement to make a more vibrant, healthy Solano.

2.  Mobile Food Pharmacy: The We're All Family! Mobile Food Pharmacy project will bring healthy and nutritious food to the low-income, food insecure patients of Solano County Family Health Services Medical Clinics.

3.  Basic Needs: Provide for the immediate basic needs for a family in crisis, so the family can focus on stabilizing and strengthening to avoid crisis in the future.

### Part II
### Respective Roles and Responsibilities

**A. County's Role and Responsibilities.**

County agrees to:
1.  Complete the Projects, as shown in Exhibit A, no later than September 30, 2018, unless the Parties otherwise agree an extension is appropriate.
2.  Provide a mid-course report no later than April 30, 2018 on activities and funding uses for the period October 1, 2017-March 30, 2018, and a final report on all activities and funding uses no later than October 31, 2018.
3.  Provide the Tribal Council and staff a tour of the Projects' operations in January 2018, so the Tribe can personally evaluate and assess their success.

**B. Yocha Dehe Role and Responsibilities.**

Yocha Dehe agrees to provide a payment to the County, in the amount of $1,000,000 (one million dollars) within 10 calendar days of this Agreement's execution by the County, with funding to be allocated among the foregoing Projects along the lines of the County's proposal to the Tribe. The funding to the County will be made, and program will be overseen, by a wholly

Intergovernmental Agreement between Yocha Dehe and the County of Solano    Page 2 of 7

AR0010768

owned tribal entity Yocha Dehe established for the purpose of implementing Compact credits, specifically, *Doyuti T'uhkama ([Doy-you-tee Tuck-ah-mah])*, which means [To Give the Acorn] in the Tribe's Patwin language.

**C. Mutual Responsibilities.**

In the spirit of a respectful government-to-government relationship, the Parties agree to notify the other of information that may be reasonably considered relevant to the Projects, and to communicate that information in a timely format. To the extent that any Party is not performing its duties under this Agreement in such a manner as to impact either the schedule and/or Project funding, the Parties agree to meet and confer to resolve any dispute.

<div align="center">

**Part III**
**Funding**

</div>

Yocha Dehe agrees to provide County $1,000,000 for the Projects. Funding shall be payable to the County, and provided in one lump sum within 10 calendar days of execution of this Agreement by the County. The Parties agree that this Agreement is a funding mechanism only, and further believe and agree that none of the activities contemplated by the Projects are a "project" within the meaning of the California Environmental Quality Act ("CEQA"). However, the Parties further agree that any activity essential to the Project and requiring compliance with any applicable state law (including but not limited to "CEQA") will be satisfied before the Project may proceed.

<div align="center">

**Part IV**
**General Terms and Conditions**

</div>

*A. Term of Agreement*

This Agreement shall remain in effect through September 30, 2018, unless it is terminated or amended earlier as stipulated in this Agreement. This Agreement may be extended upon mutual agreement of the parties to allow for the continued services of the Projects and/or include additional funding opportunities.

*B. Indemnification*

County agrees to indemnify, defend, protect, hold harmless, and release Yocha Dehe, its governing body, agents, officers and employees, from and against any and all claims, losses, proceedings, damages, causes of action, liability, costs, or expense (including attorneys' fees and witness costs) arising from or in connection with, or caused by any negligent act or omission or willful misconduct of County in the deliverance of the Projects.

*C. Insurance*

1. County agrees to maintain its status as a legally self-insured public entity for general, auto and professional liability insurance coverage with limits of no less than $1,000,000 per occurrence and no less than twenty-five million dollars ($25,000,000) aggregate.

Intergovernmental Agreement between Yocha Dehe and the County of Solano    Page 3 of 7
105243674V-1

2. County will require all consultants, contractors, and subcontractors engaged to work on this Project to carry insurance in levels commensurate with the exposure of the respective work provided by the consultant, contractor or subcontractor.

## D. No Waiver

The waiver by any Party of any breach or violation of any requirement of this Agreement shall not be deemed a waiver of any such breach in the future, or of the breach of any other requirement of this Agreement.

## E. Assignability

No Party to this Agreement shall assign or transfer any interest nor perform any duties or obligations, without the prior written consent of the other Parties, and any attempt by a Party to so assign or transfer this Agreement or any rights, duties or obligations arising shall be void and of no effect.

## F. Governing Law and Venue

The construction and interpretation of this Agreement shall be governed by the laws of California with venue residing in Solano County, except to the extent an issue may be governed by federal law.

## G. Force Majeure

No Party shall be liable or deemed in default for any delay or failure in performance under this Agreement or for any interruption of services, directly or indirectly, from acts of god, civil or military authority, acts of public enemy, war, strikes, labor disputes, shortages of suitable parts, materials, labor or transportation, or any similar cause beyond the reasonable control of the Party.

## I. Subcontracts

Within the funds allocated by the Parties under this Agreement, any Party may be authorized to contract for any and all of the tasks necessary to undertake the Projects or studies contemplated by this Agreement.

## J. Prior Agreements and Amendments

This Agreement represents the entire agreement of the Parties regarding the matter described, and no representation, warranties, inducements or oral agreements have been made by the Parties except as expressly set forth in this Agreement. This Agreement may only be modified by a written amendment duly executed by the Parties.

## K. Severability

Intergovernmental Agreement between Yocha Dehe and the County of Solano    Page 4 of 7
105243674\V-1

If any provision or portion of this Agreement is found by any court of competent jurisdiction to be unenforceable or invalid such provision shall be severable and shall not impair the enforceability of any other provision of this Agreement.

*L. Non-Discrimination Clause*

1. While performing this Agreement, the County and its subcontractors shall deny no benefits or privileges to any person on the basis of race, religion, color, ethnic group identification, national origin, ancestry, physical handicap, mental disability, medical condition, marital status, age, sex or sexual orientation, nor shall they discriminate unlawfully against any employee or applicant for employment because of race, religion, color, ethnic group identification, national origin, ancestry, physical handicap, mental disability, medical condition, marital status, age, sex or sexual orientation. County shall ensure that the evaluation and treatment of employees and applicants for employment are free of such discrimination.

2. The Parties shall comply with Title VI of the Civil Rights Act of 1964, the Fair Employment and Housing Act (Government Code section 12900, et seq.), the regulations promulgated under it (Title 2, California Code of Regulations, section 7285.0, et seq.), Article 9.5, Chapter 1, Part 1, Division 3, Title 2 of the Government Code (sections 11135-11139.5) and any state or local regulations adopted to implement the foregoing, as such statutes and regulations may be amended from time to time.

Upon execution, this Agreement shall be effective on the day and year first written above.

YOCHA DEHE WINTUN NATION

By: _____          By: _____
Leland Kinter, Tribal Chairman          Yocha Dehe Legal Counsel

COUNTY OF SOLANO

By: _____          By: _____
Birgitta E. Corsello, County Administrator    Solano County Counsel

AR0010771

Exhibit A
## SCOPE OF WORK

### Project 1: Vibe Solano

VibeSolano, a project of Health & Social Services, works to prevent chronic disease by:
- partnering with students, schools and parks to install water stations with bottle fillers
- increasing availability of safe, smoke-free, places to live and play
- conducting healthy store makeovers to make the healthy choice the easy choice by adding healthy snacks, fresh produce, and water right at checkout
- encouraging safer, more walkable neighborhoods
- reducing youth access to alcohol, tobacco, and other drugs; and
- placing positive media messages that encourage residents to take charge of their health and offering practical tips for community improvement.

Specific activities include:

| Activities | Description | Deliverables |
|---|---|---|
| Community Education & Training | Train community health promoters to teach & facilitate injury prevention and chronic disease prevention and management classes for their community | Train 20 people |
| Media Messages | Tell the story of supporting healthy places, drinking water, healthy store makeovers, and testimonials boosting confidence in making positive, life-saving changes | Paid and social media messages |
| Healthy Corner Store Makeovers | Add fresh fruits, vegetables, healthy snacks, water, to checkout and/or improve food and beverage procurement policies | Makeover and/or improve food and beverage procurement policies in three businesses |
| Increase Healthy Options | Improve access to water in schools and parks | Stainless steel water stations with bottle fillers & installation |
| Economic Incentives | Incentivize local farmers & ranchers to: sell food to local schools, farmer's markets, corner stores; or for businesses to introduce healthy policies/standards into their operations | 5 farmers/ranchers/ businesses |
| Smoke-Free Places | Work to increase safe and smoke-free parks; work with apartment complex owners to designate buildings and/or properties as smoke free | Signage and educational materials at 10 complexes |
| Drug & Alcohol Prevention | See media messages above | Paid and social media messages |

105243674V-1

AR0010772

| Safe and Healthy Spaces | Support community engagement and social cohesion for community well-being | Convene community forums and gatherings |
|---|---|---|

## Project 2: Mobile Food Pharmacy

The We're All Family! Mobile Food Pharmacy (MFP), a project of Health & Social Services, will alleviate anxiety by making healthy food options available for patients during their Family Health Services (FHS) primary care appointments. Patients will receive a prescription for fresh produce that they pick up from the MFP parked outside the FHS clinics or alongside the Mobile Medical Clinic. Recipe cards corresponding to the produce received will be distributed to assist them in the preparation of healthy and appetizing dishes. Solano County plans to partner with the Food Bank of Contra Costa and Solano to ensure the success of the MFP project. The MFP will have a regular FHS rotation schedule in order to provide healthy food options and education to all FHS patients.

Deliverables
1. Procurement of a refrigerated delivery truck and partnership with Food Bank of Contra Costa and Solano to secure support staff and supplies to implement project.
2. Mid-year and year-end reports including information on the number of families served, the number of prescriptions written, appointments kept, and patient feedback. It is anticipated that the MFP could serve between 3,500 and 7,500 families per year. (As the project progresses, prescription recipients' specific health measures will be compared to see if the healthy food and education provided results in positive life changes.)

## Project 3: Basic Needs

The Fund for Supporting Basic Needs, a project of First 5 Solano, will provide for the immediate basic needs for a family in crisis, so the family can focus on stabilizing and strengthening to avoid crisis in the future. Financial concerns, such as not being able to pay rent or buy food, can create extreme stress for parents and children that can lead to a more extreme crisis such as homelessness or the breaking up of the family. By removing the immediate financial crisis, a struggling family is better able to engage in case management, address root issues, and make long term plans for stabilization.

First 5 Solano partners with Family Resource Centers (FRCs) located in each city in Solano County. FRCs support families with children through a multi-disciplinary approach including case management, linkage to community resources, parent education, and financial literacy. While this multi-disciplinary approach assists in moving families from a position of crisis to stability, often there is an immediate barrier due to lack of resources for basic needs. With a Basic Needs Support Fund accessed through the FRCs to alleviate this barrier, the focus can swiftly transition to activities that promote family strengthening and improve child well-being.

Deliverables
1. Partner with the family resources centers throughout Solano County to provide direct basic needs support to families, such as assistance with food, rent, clothing, utilities, transportation, medications, and toiletries for up to 350 families.

AR0010773

# Exhibit 24

AR0010774

1

**BEFORE THE**
**DEPARTMENT OF THE INTERIOR**
**BUREAU OF INDIAN AFFAIRS**

*IN RE*

**SCOTTS VALLEY BAND OF POMO**
**INDIANS' REQUEST FOR INDIAN**
**LANDS OPINION**

## DECLARATION OF SHAWN DAVIS

I, Shawn Davis, now declare:

1.  My name is Shawn Davis and I am the duly elected Chairman of the Tribal Council of the Scotts Valley Band of Pomo Indians ("Tribe").

2.  As Chairman, I am responsible for the oversight of the design and construction planning, financing, and other major aspects of planning the development of the Vallejo Property, Solano County Assessor's Parcel Number 0182-010-010, as a tribal homeland and to support tribal economic development, as set out in Scotts Valley Tribal Council Resolution No. S.V. 20-16, authorizing the submission of a request to the Bureau of Indian Affairs to accept the Vallejo Property into trust for the Tribe.

3.  As a Tribal Council member and enrolled tribal member, I participated in general membership discussions leading up to the adoption of Resolution No. S.V. 20-16 and have since been involved in formal and informal tribal meetings and discussions of development of the Vallejo Property.

4.  Throughout the Tribe's deliberations on acquisition and development of the Vallejo Property,

2

the Tribe's desire to develop a tribal homeland has been the paramount concern. This desire is driven by the dispersion of tribal members that occurred after termination, the high unemployment rate among tribal members, and the severe housing shortage that tribal members suffer, as set out in the Declaration of Tribal Secretary Gabriel Ray. These deliberations also indicate that more than half of the tribal households (161) intend to relocate to the newly developed homeland as soon as housing stock becomes available.

5. The Vallejo Property consists of approximately 128 acres, of which approximately 73 acres (or 57%) will be dedicated to homeland purposes and 55 acres (or 43%) to the casino resort. The homeland development will include: a tribal government center of approximately 20,000 square feet; a community center of approximately 14,000 square feet; a senior center of approximately 14,000 on the second floor of the community center; and 100-125 tribal houses of 2,000 square feet each (tribal approval for this last design still pending). The casino resort will include: a casino of approximately 113,000 square feet; a five story hotel of approximately 104,335 square feet; and back of the house for administration, retail and restaurants totaling approximately 164,000 square feet.

6. The pre-development phase of the overall development of the Vallejo Property, both homeland and casino project, will include: site work to locate each element (including access and services); design development and construction documents; and engineering surveys and studies. The first construction phase will include: the tribal government and community centers; the first sub-division of tribal housing (24 houses); the casino project with hotel, retail, and restaurants.

7. The Tribe and its partner will seek financing for the development in advance of the pre-development and first construction phase. Tribal revenues from the casino project will fund

AR0010776

3

construction of the remaining tribal housing sub-divisions.

8. Because of the Tribe's severe housing shortage, the Tribe began planning for tribal housing years ago, with the formation of a tribal housing authority. In 2012, the Tribe dissolved its tribal housing authority and established the Housing and Community Development Department of the Tribe. Resolution No. S.V. 17-12. This tribal department participated in tribal consideration leading to the identification of housing as a principal purpose of the proposed trust acquisition of the Vallejo Property.

9. Full development of the homeland will also include offsite requirements, the particulars of which will be determined by negotiation with local governments and through the mitigation analysis performed as part of the environmental review of the project. The Tribe has committed itself to negotiate memoranda of understanding with local governments for these and other purposes.

10. Likely offsite requirements may include enhancements to the municipal water and sewer systems, road improvements to all affected roads and highways, potential new access ways to the site, and utility improvements such as power, gas and communication lines.

11. It is the Tribe's goal to develop a homeland on the Vallejo Property that will allow for consolidation of the two existing tribal offices, the consolidation of the now dispersed tribal members, and employment and economic development, all driven by the casino project. This would truly restore the Band to the position it would have occupied but for the illegal termination by the United States in 1965.

I declare under penalty of perjury under 28 U.S.C. § 1746 that the foregoing is true and correct.

4

Executed this _29_ day of November, 2017, at 2727 Systron Drive, Concord, CA.

Shawn Davis, Chairman

AR0010778

# Exhibit 25

AR0010779



# SCOTTS VALLEY BAND OF POMO INDIANS

SCOTTS VALLEY TRIBAL COUNCIL
RESOLUTION NO. S.V. _16_-17

**A RESOLUTION APPROVING A SUPPLEMENT TO THE FEE-TO-TRUST APPLICATION PENDING BEFORE THE SECRETARY OF THE INTERIOR**

WHEREAS,    the Scotts Valley Band of Pomo Indians is a federally recognized Indian tribe eligible for all rights and privileges afforded to recognized tribes; and

WHEREAS,    the Tribal Council of the Scotts Valley Band of Pomo Indians is the governing body of the Tribe pursuant to Article III, Section 1 of the Tribal Constitution; and

WHEREAS,    the Tribal Council is empowered under Article VI, Section 1 (a) of the Tribal Constitution to advise and consult with the Secretary of the Interior and other federal officials on all federal projects for the benefit of the Tribe; and

WHEREAS,    the Tribal Council is further empowered under Article VI, Section 1 (f) of the Tribal Constitution to initiate and approve the acquisition of land, as well as to initiate and administer land development projects for the Tribe on tribal lands; and

WHEREAS,    as memorialized in tribal resolution No.: SV 20-16, the Tribal Council authorized the Secretary of the Department of the Interior to acquire certain land located in Vallejo, California known as Solano County APN 0182-010-010 into trust status for the benefit of the Tribe; and

WHEREAS,    on August 11, 2016, the Tribe submitted a written application to have that certain land acquired into trust status for the purposes of facilitating tribal self-determination, economic development and Indian housing; and

WHEREAS,    the Tribal Council has identified modest changes in the Tribe's demographic profile since August 11, 2016 and believes it is appropriate to update the application to reflect these changes. In addition, the Tribal Council believes it is prudent to update the application to reflect changes in case law that further support of the Secretary's authority for the proposed trust acquisition; and

NOW, THEREFORE, BE IT RESOLVED THAT the Tribal Council of the Scotts Valley Band of Pomo Indians, acting at a lawful meeting with a quorum present, hereby requests the Secretary of the Interior to accept the supplemental

Resolution #__16_-17                                                                                                1

1005 Parallel Drive • Lakeport, California 95453
Office 707 263-4220 • Fax 707 263-4345

AR0010780

NOW, THEREFORE, BE IT RESOLVED THAT the Tribal Council of the Scotts Valley Band of Pomo Indians, acting at a lawful meeting with a quorum present, hereby requests the Secretary of the Interior to accept the supplemental memorandum as part of the application to accept into trust status the land known as Solano County APN 0182-010-010 for the benefit of the Scotts Valley Band of Pomo Indians.

BE IT FURTHER RESOLVED THAT the Tribal Council resolves, and hereby does, confer upon the Chairman of the Tribal Council the authority to submit this information on behalf of the Scotts Valley Band of Pomo Indians.

## CERTIFICATION

The foregoing resolution was duly enacted on this _6_ day of December, 2017, and approved by a vote of _4_ ayes, _2_ noes, and _0_ abstentions by the Scotts Valley Band of Pomo Indians Tribal Council and that said resolution has not been rescinded or amended in any way.

ATTEST:

_____     12-6-17
Shawn Davis, Chairperson          Date

_____     12-6-17
Gabriel Ray, Secretary            Date

Resolution # _16_ -17                                        2

AR0010781

9/24/2018

Case 1:19-cv-01544-ABJ    Document 60-1    Filed 12/06/21    Page 398 of 432
DEPARTMENT OF THE INTERIOR Mail - Re: Scotts Valley Indian Lands Opinion



Hart, Paula <paula.hart@bia.gov>

## Re: Scotts Valley Indian Lands Opinion

1 message

**Ennis, Samuel** <samuel.ennis@sol.doi.gov>                     Fri, Sep 21, 2018 at 11:20 AM
To: Philip Bristol <philip.bristol@bia.gov>
Cc: John-Michael Partesotti <john-michael.partesotti@sol.doi.gov>, paula.hart@bia.gov, John Hay <john.hay@sol.doi.gov>

Thanks, Philip.  Why don't you and John-Michael arrange to talk next week.  J-M can touch base with John Hay with follow up, or with me once I'm back in in two weeks.

On Fri, Sep 21, 2018 at 10:03 AM Bristol, Philip <philip.bristol@bia.gov> wrote:

Good Morning Sam,

Our meeting request is not urgent.  We wanted to connect names and faces on this project to facilitate our coordination with SOL.  The Office of Indian Gaming is the keeper of the administrative record on these applications and would like to coordinate the timing of your opinion with our work on the fee-to-trust application.  Further, we would like to discuss some factual and policy aspects of this case with your team.  I am happy to meet with John-Michael next week or if you would prefer we can meet when you are back in the office.

If you have any questions please feel free to call me.

Thank you,

***Philip Bristol***
Policy Advisor
Office of Indian Gaming
Office of the Assistant Secretary - Indian Affairs

1849 C St., NW
MS 3657 MIB
Washington, DC 20240
Office Phone:  (202) 219-4066
Direct:  (202) 219-0439
Fax:  (202) 273-3153
email:  philip.bristol@bia.gov

*The Bureau of Indian Affairs' mission is to enhance the quality of life, to promote economic opportunity, and to carry out the responsibility to protect and improve the trust assets of American Indians, Indian tribes and Alaska Natives.*

http://www.bia.gov/index.htm

https://www.bia.gov/as-ia/oig


On Fri, Sep 21, 2018 at 9:36 AM Ennis, Samuel <samuel.ennis@sol.doi.gov> wrote:

Hi Philip,


My name is Sam Ennis, I'm supervising John-Michael on the Scotts Valley project.  What's the timeline for your meeting request?  I'm out today and all of next week, so if it's urgent enough the you'll need to sit down with us next week, I just want to arrange coverage.  Thanks,


Sam

AR0010783

---------- Forwarded message ----------
From: **Bristol, Philip** <philip.bristol@bia.gov>
Date: Thu, Sep 20, 2018 at 2:26 PM
Subject: Scotts Valley Indian Lands Opinion
To: John-Michael Partesotti <john-michael.partesotti@sol.doi.gov>


Good afternoon Mr. Partesotti,

I have been informed that you are working on the Scotts Valley restored lands opinion for SOL.  Are you working on this project?

I have been reviewing the Tribe's application record for the Office of Indian Gaming and would like to coordinate with you on the Indian Lands Opinion.  Is there a time we could meet to briefly discuss this application?

Thank you,

**Philip Bristol**
Policy Advisor
Office of Indian Gaming
Office of the Assistant Secretary - Indian Affairs

1849 C St., NW
MS 3657 MIB
Washington, DC 20240
Office Phone:  (202) 219-4066
Direct:  (202) 219-0439
Fax: (202) 273-3153
email:  philip.bristol@bia.gov

*The Bureau of Indian Affairs' mission is to enhance the quality of life, to promote economic opportunity, and to carry out the responsibility to protect and improve the trust assets of American Indians, Indian tribes and Alaska Natives.*

*http://www.bia.gov/index.htm*

*https://www.bia.gov/as-ia/oig*



--
**Samuel E. Ennis**
Assistant Solicitor, Branch of Tribal Government Services
Division of Indian Affairs
Office of the Solicitor, Department of the Interior
Phone: (202) 208-3306
Samuel.Ennis@sol.doi.gov

*This e-mail (including attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected by applicable law.  If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or use of this e-mail or its contents is strictly prohibited.  If you receive this e-mail in error, please notify the sender immediately and destroy all copies.  Thank you.*


--
**Samuel E. Ennis**
Assistant Solicitor, Branch of Tribal Government Services
Division of Indian Affairs
Office of the Solicitor, Department of the Interior
Phone: (202) 208-3306
Samuel.Ennis@sol.doi.gov

AR0010784

*This e-mail (including attachments) is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential, or otherwise protected by applicable law. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, copying, or use of this e-mail or its contents is strictly prohibited. If you receive this e-mail in error, please notify the sender immediately and destroy all copies. Thank you.*

AR0010785

# Arlinda F. Locklear, Esquire

ALocklearEsq@verizon.net
facsimile (202) 237-0382

4113 Jenifer Street, NW
Washington, D.C. 20015
(202) 237-0933

**RECEIVED**

**DEC 10 2018**

AS - IA
Office of Indian Gaming

December 4, 2018

Kyle Scherer
Deputy Solicitor for Indian Affairs
United States Department of the Interior
1849 C Street, NW
Washington, DC 20240

Re: Scotts Valley Indian Lands Opinion Request
New data and analysis
(via email and first class mail)

Dear Mr. Scherer:

Attached please find a brief report by the Scotts Valley Band of Pomo Indian ("Band") historian, Dr. Hurtado, on subjects that were identified in my letter to you dated November 14, 2018. This report summarizes the new data that the Band has been able to locate or prepare on the specific subjects identified in the November 14 letter. The hard copy to follow by first class mail will include copies of the primary documents cited therein.

The Band urges the Department to appreciate the limited historical record that it is dealing with as a general matter. In both the Mexican and early American period (specifically, 1837 in the Mexican period and 1850-1910 in the American period), there is very little data available from any source on native communities. Natives were viewed essentially as peons and, during the American period, natives attracted very little federal attention because they were not living on or near a reservation. Given the limited record, the Band believes the following are particularly significant indications of its historical connection to the proposed Vallejo site:

• **federal agents' reports - 1850 to 1920.** The Band's historian searched federal agent reports for the period 1850 to 1920 on the condition or location of the Band and its ancestors and found new evidence in letters of the federal Field Matron indicating that Scotts Valley ancestors lived in the vicinity of the project site as late as 1918.

• **1837 baptismal record.** As the Band indicated in its May 2018 submission, there is an 1837 baptismal record that identifies 15 children from one of the Band's aboriginal villages in close proximity (15 miles) to the Vallejo site. See Hurtado & Theodoratus Supplemental Report, pp. 7-9. That report further identified 3 of those children as the Band's ancestors. Now, based on an analysis of the genealogies of modern-day members, the Band can report that approximately 94% of the currently enrolled members are genealogically connected to those three ancestors. This confirms a significant tribal connection.

Addendum to the Supplemental Report:

History of the Scotts Valley Band of Pomo Indians and the San Pablo Bay Region

By Albert L. Hurtado, Ph.D.

With the Assistance of Dorothea Theodoratus, Ph.D.

Diane Star Hicks, B.A.

**Introduction**

This report is meant to answer questions about the supplement reports previously submitted by the Band to the Bureau of Indian Affairs. In addition, this addendum presents new information that supports the Band's historical association with the project area near Vallejo, California that lasted well into the twentieth century. This new information comes from federal records found in the San Francisco branch of the National Archives, analyses of tribal genealogies, and cited secondary sources.

**Indian Children and the Mission San Francisco Solano**

The lives of Augustine and other SVBI Indian children baptized at the Mission San Francisco Solano in 1837 cannot be specifically determined because of the limitations of the historical record. However, the experiences of mission Indians in California have been described by scholars in some detail. This body of scholarship enables us to reconstruct a general account of what happened to Indian children in similar circumstances.

The chief purpose of the California missions was to baptize Indians in the Roman Catholic faith. In theory, there was a rigorous procedure for the instruction of new converts in the rudiments of Catholicism before baptism could occur. However, the problem of native

1

AR0010793



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC 20240

JAN 1 9 2017

The Honorable Shawn Davis
Chairman, Scotts Valley Band of Pomo Indians
1005 Parallel Drive
Lakeport, California 95453

Dear Chairman Davis:

Thank you for your letters dated January 10th, 2017, and January 13th, 2017, addressed to
Assistant Secretary Lawrence S. Roberts, requesting the Department of the Interior suspend
action on the Scotts Valley Band of Pomo Indians' request for an Indian Lands Opinion
regarding property in Vallejo, California. The Assistant Secretary has requested that I respond on
his behalf.

We acknowledge receipt of your recent requests and, as of January 10, 2017, we suspend action
on the request for an Indian Lands Opinion until we hear further from the Tribe.

Sincerely,

Paula L. Hart
Director, Office of Indian Gaming

AR0011152

# Conversation Contents

### Scotts Valley

### Attachments:

/39. Scotts Valley/1.1 image001.png
/39. Scotts Valley/1.2 Jan 13 2017 CA Letter to DOI re Scotts Valley.pdf
/39. Scotts Valley/2.1 image001.png
/39. Scotts Valley/2.2 Jan 13 2017 CA Letter to DOI re Scotts Valley.pdf
/39. Scotts Valley/2.3 image001.png

## Joe Dhillon <Joe.Dhillon@gov.ca.gov>

| | |
|---|---|
| **From:** | Joe Dhillon <Joe.Dhillon@gov.ca.gov> |
| **Sent:** | Fri Jan 13 2017 18:20:43 GMT-0700 (MST) |
| **To:** | "'paula.hart@bia.gov'" <paula.hart@bia.gov>, "'Woodward, Troy'" <troy.woodward@bia.gov>, "'Personius, Anita'" <anita.personius@bia.gov> |
| **CC:** | "'Grigonis, Alison'" <alison.grigonis@bia.gov>, "'Shepard, Eric'" <eric.shepard@sol.doi.gov>, "'Sara Drake'" <Sara.Drake@doj.ca.gov> |
| **Subject:** | Scotts Valley |
| **Attachments:** | image001.png Jan 13 2017 CA Letter to DOI re Scotts Valley.pdf |

Dear Ms. Hart,

Please find attached a letter from the State of California, Office of the Governor, with comments regarding the potential restored lands advisory opinion for the Scotts Valley Band of Pomo Indians. As always, do not hesitate to contact me if you have any questions. A hard copy will follow.

Respectfully,

Joe

**Joginder S. Dhillon**
*Senior Advisor for Tribal Negotiations*
**Office of Governor Edmund G. Brown Jr.**
916.445.8612 | joe.dhillon@gov.ca.gov



*Click to learn how to conserve water.*

AR0011492

# Label: "Scotts Valley/emails on scotts valley"

**Created by:paula.hart@bia.gov**

Total Messages in label:253 (107 conversations)

Created: 05-22-2019 at 07:28 AM

# Conversation Contents

**Fwd: Solano Legal Memorandum for Scotts Valley Determination**

**Attachments:**

/42. Fwd: Solano Legal Memorandum for Scotts Valley Determination/1.1 Solano Legal Memo Scotts Valley 12.23.2016.pdf
/42. Fwd: Solano Legal Memorandum for Scotts Valley Determination/2.1 Solano Legal Memo Scotts Valley 12.23.2016.pdf

## Sarah Walters <sarah_walters@ios.doi.gov>

| | |
|---|---|
| **From:** | Sarah Walters <sarah_walters@ios.doi.gov> |
| **Sent:** | Sat Dec 24 2016 09:45:59 GMT-0700 (MST) |
| **To:** | paula.hart@bia.gov, alison.grigonis@bia.gov, john.hay@sol.doi.gov |
| **Subject:** | Fwd: Solano Legal Memorandum for Scotts Valley Determination |
| **Attachments:** | Solano Legal Memo Scotts Valley 12.23.2016.pdf |

Begin forwarded message:

**From:** "Smith, Davina S." <DSSmith@solanocounty.com>
**To:** "lawrence_roberts@ios.doi.gov" <lawrence_roberts@ios.doi.gov>
**Cc:** "sarah_walters@ios.doi.gov" <sarah_walters@ios.doi.gov>
**Subject: FW: Solano Legal Memorandum for Scotts Valley Determination**

Dear  Assistant Secretary Roberts:

Please find attached a letter and legal memorandum from the County of Solano in regards to the restored lands determination submitted by the Scotts Valley Band of Pomo Indians.

Sincerely,
Davina Smith

Davina Smith
Deputy County Counsel
County of Solano
675 Texas Street
Suite 6600
Fairfield, CA 94533
707-784-6155
dssmith@solanocounty.com

## "Hart, Paula" <paula.hart@bia.gov>

| | |
|---|---|
| **From:** | "Hart, Paula" <paula.hart@bia.gov> |
| **Sent:** | Wed Dec 28 2016 05:57:46 GMT-0700 (MST) |
| **To:** | Nancy Redhouse <nancy.redhouse@bia.gov>, "Sullivan, Bethany" <bethany.sullivan@sol.doi.gov> |
| **Subject:** | Fwd: Solano Legal Memorandum for Scotts Valley Determination |
| **Attachments:** | Solano Legal Memo Scotts Valley 12.23.2016.pdf |

Nancy please log in. Bethany FYI.
---------- Forwarded message ----------
From: **Sarah Walters** <sarah_walters@ios.doi.gov>
Date: Sat, Dec 24, 2016 at 11:45 AM
Subject: Fwd: Solano Legal Memorandum for Scotts Valley Determination
To: paula.hart@bia.gov, alison.grigonis@bia.gov, john.hay@sol.doi.gov

Begin forwarded message:

> **From:** "Smith, Davina S." <DSSmith@solanocounty.com>
> **To:** "lawrence_roberts@ios.doi.gov" <lawrence_roberts@ios.doi.gov>
> **Cc:** "sarah_walters@ios.doi.gov" <sarah_walters@ios.doi.gov>
> **Subject: FW: Solano Legal Memorandum for Scotts Valley Determination**
>
> Dear  Assistant Secretary Roberts:
>
> Please find attached a letter and legal memorandum from the County of Solano in regards to the restored lands determination submitted by the Scotts Valley Band of Pomo Indians.
>
> Sincerely,
> Davina Smith
>
> Davina Smith
> Deputy County Counsel
> County of Solano
> 675 Texas Street
> Suite 6600
> Fairfield, CA 94533
> 707-784-6155
> dssmith@solanocounty.com

# Conversation Contents

**Scotts Valley - Carpenters Local 180 Support Letter**

**Attachments:**

/46. Scotts Valley - Carpenters Local 180 Support Letter/1.1 Carpenters Local 180 Support Letter.pdf
/46. Scotts Valley - Carpenters Local 180 Support Letter/1.2 ATT00001.htm
/46. Scotts Valley - Carpenters Local 180 Support Letter/2.1 ATT00001.htm
/46. Scotts Valley - Carpenters Local 180 Support Letter/2.2 Carpenters Local 180 Support Letter.pdf

## Patrick Bergin <PBergin@ndnlaw.com>

| | |
|---|---|
| **From:** | Patrick Bergin <PBergin@ndnlaw.com> |
| **Sent:** | Wed Dec 14 2016 06:42:10 GMT-0700 (MST) |
| **To:** | "paula.hart@bia.gov" <paula.hart@bia.gov> |
| **Subject:** | Scotts Valley - Carpenters Local 180 Support Letter |
| **Attachments:** | Carpenters Local 180 Support Letter.pdf ATT00001.htm |

Good morning Paula -

Attached is another letter of support for Scotts Valley.

PATRICK R. BERGIN
FREDERICKS PEEBLES & MORGAN LLP
LEGAL ASSISTANT: SALLY EREDIA | SEREDIA@NDNLAW.COM
2020 L STREET, SUITE 250, SACRAMENTO, CA 95811
MAIN: 916.441.2700 | FAX: 916.441.2067

CONFIDENTIALITY NOTICE: This message, along with any attachments, is covered by federal
and state law governing electronic communications and may contain confidential and legally
privileged information. If the reader of this message is not the intended recipient, you are hereby
notified that any dissemination, distribution, use or copying of this message is strictly prohibited.
If you have received this message in error, please reply immediately to the sender and delete
this message. Thank you.

## "Hart, Paula" <paula.hart@bia.gov>

| | |
|---|---|
| **From:** | "Hart, Paula" <paula.hart@bia.gov> |
| **Sent:** | Wed Dec 14 2016 07:24:15 GMT-0700 (MST) |
| **To:** | Nancy Redhouse <nancy.redhouse@bia.gov>, "Sullivan, Bethany" <bethany.sullivan@sol.doi.gov> |

# Conversation Contents

**Updated Invitation: Call with Scotts Valley @ Wed Dec 14, 2016 11:30am - 12pm (paula.hart@bia.gov)**

**Attachments:**

/47. Updated Invitation: Call with Scotts Valley @ Wed Dec 14, 2016 11:30am - 12pm (paula.hart@bia.gov)/1.1 invite.ics
/47. Updated Invitation: Call with Scotts Valley @ Wed Dec 14, 2016 11:30am - 12pm (paula.hart@bia.gov)/1.2 invite.ics

## Faith Begay <faith.begay@bia.gov>

| | |
|---|---|
| **From:** | Faith Begay <faith.begay@bia.gov> |
| **Sent:** | Tue Dec 13 2016 19:41:36 GMT-0700 (MST) |
| **To:** | paula.hart@bia.gov, bethany.sullivan@sol.doi.gov, eric.shepard@sol.doi.gov, lawrence_roberts@ios.doi.gov, alison.grigonis@bia.gov |
| **Subject:** | Updated Invitation: Call with Scotts Valley @ Wed Dec 14, 2016 11:30am - 12pm (paula.hart@bia.gov) |
| **Attachments:** | invite.ics invite.ics |

This event has been changed.

### Call with Scotts Valley

Purpose: Indian Land Determination

Participants:
Chairman Gabe Ray
Crista Ray, Tribal Council Member
Shawn Davis, Tribal Council Member

Patrick Bergin, Attorney
Joe Findaro, Attorney

POC: Joe Findaro
████████████

**more details »**

| | |
|---|---|
| When | Wed Dec 14, 2016 11:30am – 12pm Eastern Time |
| Where | ████████████████████████████████████████████ |
| Calendar | paula.hart@bia.gov |
| Who | • lawrence_roberts@ios.doi.gov - organizer |
| | • faith.begay@bia.gov - creator |
| | • bethany.sullivan@sol.doi.gov |
| | • eric.shepard@sol.doi.gov |
| | • jennifer.turner@sol.doi.gov |

# Label: "Scotts Valley/emails on scotts valley"

**Created by:paula.hart@bia.gov**

Total Messages in label:253 (107 conversations)

Created: 05-22-2019 at 07:31 AM

AR0011518

# Conversation Contents

**Scotts Valley Band Support Letters**

**Attachments:**

/49. Scotts Valley Band Support Letters/1.1 Avison Young Support for Scotts Valley.pdf
/49. Scotts Valley Band Support Letters/1.2 California State Assemblyman Frazier Support for Scotts Valley.pdf
/49. Scotts Valley Band Support Letters/1.3 Elliot Real Estate Support for Scotts Valley.pdf
/49. Scotts Valley Band Support Letters/1.4 Laborers Local 324 Support Letter.pdf
/49. Scotts Valley Band Support Letters/1.5 Napa Solano Building Trades Support for Scotts Valley.pdf
/49. Scotts Valley Band Support Letters/1.6 Sprinkler Fitters Support Letters.pdf
/49. Scotts Valley Band Support Letters/1.7 Times Herald - Gabriel Ray - Looking to be good neighbors.pdf
/49. Scotts Valley Band Support Letters/1.8 Viejo Capital Support for Scotts Valley.pdf
/49. Scotts Valley Band Support Letters/2.1 Avison Young Support for Scotts Valley.pdf
/49. Scotts Valley Band Support Letters/2.2 California State Assemblyman Frazier Support for Scotts Valley.pdf
/49. Scotts Valley Band Support Letters/2.3 Elliot Real Estate Support for Scotts Valley.pdf
/49. Scotts Valley Band Support Letters/2.4 Laborers Local 324 Support Letter.pdf
/49. Scotts Valley Band Support Letters/2.5 Napa Solano Building Trades Support for Scotts Valley.pdf
/49. Scotts Valley Band Support Letters/2.6 Sprinkler Fitters Support Letters.pdf
/49. Scotts Valley Band Support Letters/2.7 Times Herald - Gabriel Ray - Looking to be good neighbors.pdf
/49. Scotts Valley Band Support Letters/2.8 Viejo Capital Support for Scotts Valley.pdf

## Patrick Bergin <PBergin@ndnlaw.com>

| | |
|---|---|
| **From:** | Patrick Bergin <PBergin@ndnlaw.com> |
| **Sent:** | Mon Dec 12 2016 10:20:15 GMT-0700 (MST) |
| **To:** | "paula.hart@bia.gov" <paula.hart@bia.gov> |
| **Subject:** | Scotts Valley Band Support Letters |
| **Attachments:** | Avison Young Support for Scotts Valley.pdf California State Assemblyman Frazier Support for Scotts Valley.pdf Elliot Real Estate Support for Scotts Valley.pdf Laborers Local 324 Support Letter.pdf Napa Solano Building Trades Support for Scotts Valley.pdf Sprinkler Fitters Support Letters.pdf Times Herald - Gabriel Ray - Looking to be good neighbors.pdf Viejo Capital Support for Scotts Valley.pdf |

Hi Paula –

Attached are some of the support letters that Scotts Valley has received in the past month. We understand that some of the Clear Lake tribes will also be sending support letters.

PATRICK R. BERGIN | PARTNER

# Conversation Contents

**Scotts Valley Request for Indian Lands Opinion**

**Attachments:**

/54. Scotts Valley Request for Indian Lands Opinion/1.1 Prof. Hurtado Further Comments on the Report of Stephen Dow Beckham (2016-12-06).pdf

## Patrick Bergin <PBergin@ndnlaw.com>

| | |
|---|---|
| **From:** | Patrick Bergin <PBergin@ndnlaw.com> |
| **Sent:** | Tue Dec 06 2016 16:01:26 GMT-0700 (MST) |
| **To:** | "paula.hart@bia.gov" <paula.hart@bia.gov> |
| **CC:** | "eric.shepard@sol.doi.gov" <eric.shepard@sol.doi.gov>, "john.hay@sol.doi.gov" <john.hay@sol.doi.gov>, "Jennifer.turner@sol.doi.gov" <Jennifer.turner@sol.doi.gov>, "Sullivan, Bethany" <bethany.sullivan@sol.doi.gov>, "Yost, Paula M." <paula.yost@dentons.com> |
| **Subject:** | Scotts Valley Request for Indian Lands Opinion |
| **Attachments:** | Prof. Hurtado Further Comments on the Report of Stephen Dow Beckham (2016-12-06).pdf |

Ms. Hart –

Please find attached Professor Hurtado's comments and research in further support of Scotts Valley Band's request for an Indian lands opinion.

**PATRICK R. BERGIN | PARTNER**
**FREDERICKS PEEBLES & MORGAN LLP**
LEGAL ASSISTANT: SALLY EREDIA | SEREDIA@NDNLAW.COM
2020 L STREET, SUITE 250, SACRAMENTO, CA 95811
MAIN: 916.441.2700 | FAX: 916.441.2067

CONFIDENTIALITY NOTICE: This message, along with any attachments, Is covered by federal and state law governing electronic communications and may contain confidential and legally privileged information. If the reader of this message is not the intended recipient, you are hereby notified that any dissemination, distribution, use or copying of this message is strictly prohibited. If you have received this message in error, please reply immediately to the sender and delete this message. Thank you

# Conversation Contents

### Scotts Valley

## "Rooney, Kenneth (Feinstein)" <Kenneth_Rooney@feinstein.senate.gov>

| | |
|---|---|
| **From:** | "Rooney, Kenneth (Feinstein)" <Kenneth_Rooney@feinstein.senate.gov> |
| **Sent:** | Fri Jul 15 2016 13:04:28 GMT-0600 (MDT) |
| **To:** | "Hart, Paula (Paula.Hart@bia.gov)" <Paula.Hart@bia.gov> |
| **Subject:** | Scotts Valley |

Hi, Paula – wanted to see if either you or Maria were available to chat about the Scotts Valley Indian Lands Determination?

Thanks,

Ken

## "Rooney, Kenneth (Feinstein)" <Kenneth_Rooney@feinstein.senate.gov>

| | |
|---|---|
| **From:** | "Rooney, Kenneth (Feinstein)" <Kenneth_Rooney@feinstein.senate.gov> |
| **Sent:** | Tue Jul 19 2016 07:43:35 GMT-0600 (MDT) |
| **To:** | "Hart, Paula (Paula.Hart@bia.gov)" <Paula.Hart@bia.gov> |
| **Subject:** | RE: Scotts Valley |

Hi – pinging you all again on this.

**From:** Rooney, Kenneth (Feinstein)
**Sent:** Friday, July 15, 2016 3:04 PM
**To:** Hart, Paula (Paula.Hart@bia.gov) <Paula.Hart@bia.gov>
**Subject:** Scotts Valley

Hi, Paula – wanted to see if either you or Maria were available to chat about the Scotts Valley Indian Lands Determination?

Thanks,

Ken



# United States Department of the Interior

## OFFICE OF THE SECRETARY
Washington, DC 20240

**FEB 0 7 2019**

The Honorable Shawn Davis
Chairman, Scotts Valley Band of Pomo Indians
1005 Parallel Drive
Lakeport, California 95453

Dear Chairman Davis:

I am writing regarding the Scotts Valley Band of Pomo Indians' (Scotts Valley Band or Band) request that the Department of the Interior (Department) acquire 128.32 acres of land in the City of Vallejo, Solano County, California (Vallejo Parcel or Parcel) into trust on its behalf pursuant to 25 C.F.R. § 151.9.[1]  On January 28, 2016, the Band further requested a "restored lands" determination with regard to the Parcel.[2]  I have therefore considered whether the Parcel, if taken into trust, would qualify as "restored lands" within the meaning of Federal regulations governing Indian gaming.[3]  If the Parcel does qualify, then it would be exempt from the general prohibition on gaming on lands acquired by the Secretary of the Interior (Secretary) in trust after October 17, 1988.[4]

## I.  DECISION

I have considered the Band's application pursuant to the Indian Gaming Regulatory Act (IGRA) and the Department's regulations at 25 C.F.R. Part 292, which implement Section 2719 of IGRA.  I have also reviewed the voluminous documentation that the Band submitted in support of its Request,[5] as well as materials submitted by parties opposed to the Request.  Alongside local

---

[1] Letter and accompanying application from Gabriel Ray, Chairman, Scotts Valley Band of Pomo Indians, to Amy Dutschke, Reg'l Dir., Pac. Reg'l Office, Bureau of Indian Affairs (Aug. 11, 2016); *see also* 25 U.S.C. § 5108 (previously codified at 25 U.S.C. § 465) (authorizing the Secretary to acquire land for the purpose of providing land to Indians). The United States does not currently hold any land in trust for the Band.

[2] Letter from Gabriel Ray, Chairman, Scotts Valley Band of Pomo Indians, to Lawrence S. Roberts, Acting Assistant Sec'y – Indian Affairs, Dep't of the Interior (Jan. 28, 2016) [hereinafter, the "Request"]. *See also* 25 C.F.R. § 292.3(b) (regarding gaming on "newly acquired lands that require a land-into-trust application").

[3] *See* 25 C.F.R. § 292.7 (setting forth the criteria for meeting the requirements of the "restored lands" exception).

[4] *See* 25 U.S.C. § 2719(b)(1)(B)(iii) (listing the exception from the prohibition for restored lands). Alongside tribal member housing, a governmental headquarters, and health facilities, the Band is interested in developing an "integrated casino resort" on the Parcel to serve as the "economic engine" for its tribal community. Letter from Shawn Davis, Chairman, Scotts Valley Band of Pomo Indians, to John Tahsuda III, Principal Deputy Assistant Sec'y – Indian Affairs, Dep't of the Interior (May 3, 2018). The casino would offer class II and III gaming, as defined in the Indian Gaming Regulatory Act ("IGRA"). 25 U.S.C. §§ 2701–2721, 18 U.S.C. § 1166.

[5] *See, e.g.*, Letter and accompanying materials from Shawn Davis, Chairman, Scotts Valley Band of Pomo Indians, to John Tahsuda III, Principal Deputy Assistant Sec'y – Indian Affairs (May 3, 2018); Memorandum and accompanying materials from Steven J. Bloxham, Fredericks Peebles & Morgan LLP, to Lawrence S. Roberts, Acting Assistant Sec'y – Indian Affairs (Nov. 14, 2016); Letter from Steven J. Bloxham, Fredericks Peebles & Morgan LLP, to Eric Shepard, Assoc. Solicitor, Div. of Indian Affairs, Office of the Solicitor, Dep't of the

1

governments,[6] objecting parties include the Yocha Dehe Wintun Nation (Yocha Dehe) and the United Auburn Indian Community of the Auburn Rancheria.[7]

Upon review of these various submissions, I regret to inform you that the Department has determined that the Parcel does not qualify as restored lands within the meaning of applicable law. Specifically, the Band has failed to provide sufficient evidence of a "significant historical connection" to the Parcel, as required to qualify this particular property for the restored lands exception.[8]  I have set forth the bases for my decision below.

## II. LEGAL FRAMEWORK

The IGRA was enacted "to provide express statutory authority for the operation of such tribal gaming facilities as a means of promoting tribal economic development, and to provide regulatory protections for tribal interests in the conduct of such gaming."[9]  Section 20 of IGRA generally prohibits gaming on lands taken into trust after October 17, 1988.[10]  However, Congress expressly carved out the restored lands exception to this prohibition, which authorizes gaming on lands that were "taken into trust as part of the restoration of lands for an Indian tribe that is restored to Federal recognition."[11]  One of the purposes behind the restored lands exception is "ensuring that tribes lacking reservations when IGRA was enacted are not disadvantaged relative to more established ones."[12]

Part 292 of Title 25, Code of Federal Regulations, implements Section 20 of IGRA.  For a parcel to meet the requirements of the restored lands exception, a tribe must demonstrate the following:

> (1) the tribe has been restored to Federal recognition, as defined in 25 C.F.R. §§
> 292.7(a)-(c), 292.8–292.10; and

---

Interior (Sept. 15, 2016); Letter and accompanying table from Patrick R. Bergin, Fredericks Peebles & Morgan LLP, to Paula L. Hart, Dir., Office of Indian Gaming (Apr. 5, 2016); Legal Analysis by Steven J. Bloxham, Fredericks Peebles & Morgan LLP (Jan. 29, 2016); Report by Albert J. Hurtado, Historian (Jan. 29, 2016); Report by Dorothea J. Theodoratus, Anthropological Consultant (Jan. 29, 2016); Consolidated Report by Heather H. Howard et al. (Steven J. Bloxham ed. 2016).

[6] *See, e.g.*, Letter from Erin Hannigan, Chairwoman, Bd. of Supervisors, Solano Cnty., to Lawrence S. Roberts, Acting Assistant Sec'y – Indian Affairs, Dep't of the Interior (Aug. 23, 2016); Letter from Claudia Quintana, City Attorney, City of Vallejo, to Lawrence S. Roberts, Acting Assistant Sec'y – Indian Affairs, Dep't of the Interior (July 28, 2016).
[7] *See, e.g.*, Letter and accompanying report from Gene Whitehouse, Chairman, United Auburn Indian Cmty. of the Auburn Rancheria, to Lawrence S. Roberts, Principal Deputy Assistant Sec'y – Indian Affairs, Dep't of the Interior (Nov. 7, 2016); Letter, legal memorandum, and accompanying materials from James Kinter, Tribal Sec'y, Yocha Dehe Wintun Nation, to Lawrence S. Roberts, Principal Deputy Assistant Sec'y – Indian Affairs, Dep't of the Interior (Nov. 8, 2016); Letter, legal memorandum, and accompanying materials from Leland Kinter, Tribal Chairman, Yocha Dehe Wintun Nation, to Lawrence S. Roberts, Principal Deputy Assistant Sec'y – Indian Affairs, Dep't of the Interior (Nov. 22, 2016).
[8] *See* 25 C.F.R. § 292.12(b).
[9] *Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Attorney for the W. Dist. of Mich.*, 198 F. Supp. 2d 920, 933 (W.D. Mich. 2002), *aff'd*, 369 F.3d 960 (6th Cir. 2004); *see also* 25 U.S.C. § 2702(1) (stating that one purpose of IGRA is to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments").
[10] 25 U.S.C. § 2719(a).
[11] 25 U.S.C. § 2719(b)(1)(B)(iii).
[12] *City of Roseville v. Norton*, 348 F.3d 1020, 1030 (D.C. Cir. 2003).

AR0011598

(2) the lands qualify as restored lands, as defined in 25 C.F.R. §§ 292.7(d), 292.11–292.12.

### (a) Restored Tribe Criteria

In a memorandum dated November 18, 2008, the Solicitor's Office opined that the Band qualified as a restored Tribe for the purposes of the restored lands exception.[13]  The Band was terminated pursuant to the California Rancheria Act[14] and restored to Federal recognition pursuant to a Stipulation for Entry of Judgment in *Scotts Valley Band of Pomo Indians of the Sugar Bowl Rancheria v. United States* (the "1991 Stipulated Judgment").[15]  The Department published the notice of the Band's Federal recognition status in the Federal Register on February 12, 1992.[16]  Therefore, the Band is a restored Tribe and has met the requirement of the first part of the two-part restored lands exception analysis.

### (b) Restored Lands Criteria

Section 292.11 sets forth the criteria for newly acquired lands to qualify as restored lands. Relevant here, the Band was restored pursuant to a Federal court determination in which the United States was a party or by a court-approved settlement agreement entered into by the United States (specifically, the 1991 Stipulated Judgment). The Band therefore must demonstrate that the Parcel meets the requirements of 25 C.F.R. § 292.12.[17]

Under 25 C.F.R. § 292.12, the tribe must demonstrate (a) "modern connections" to the newly acquired land; (b) "a significant historical connection to the land"; and (c) "a temporal connection between the date of the acquisition of the land and the date of the tribe's restoration."

The Band has demonstrated the required modern[18] and temporal[19] connections to the Parcel.  The question is therefore whether the Band has demonstrated that it has a "significant historical connection" to the Parcel.  Section 292.12(c) states that one of the criteria that a tribe must meet for the purposes of the restored lands exception is a significant historical connection to the land. A

---

[13] Memorandum from Edith R. Blackwell, Assoc. Solicitor, Div. of Indian Affairs, Office of the Solicitor, Dep't of the Interior, to George T. Skibine, Acting Assistant Sec'y for Policy & Econ. Dev., Dep't of the Interior (Nov. 18, 2008).
[14] Act of Aug. 18, 1958, Pub. L. No. 85-671, 72 Stat. 619, *amended by* Act of Aug. 11, 1964, Pub. L. 88-419, 78 Stat. 390.
[15] No. C-86-3660 WWS (N.D. Cal. Mar. 15, 1991).
[16] Notice of Reinstatement to Former Status for the Guidiville Band of Pomo Indians, the Scotts Valley Band of Pomo Indians and Lytton Indian Community of CA, 57 Fed. Reg. 5,214 (Feb. 12, 1992).
[17] 25 C.F.R. § 292.11(c).
[18] In relevant part, the Band has demonstrated that (1) both the Parcel and the Band are located in the same state, 25 C.F.R. § 292.12(a), and that the Parcel is within a 25-mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least 2 years at the time of the application for land-into-trust. 25 C.F.R. § 292.12(a)(3). *See generally* Memorandum from Scotts Valley Band of Pomo Indians 1 n.3, 4 n.6 (May 3, 2018); Fee-to-Trust Application, Scotts Valley Band of Pomo Indians, 16–18 (Aug. 11, 2016).
[19] In relevant part, the Band requested to take the Parcel into trust on August 11, 2016, *see* Letter and accompanying application from Gabriel Ray to Amy Dutschke, *supra* note 1, within 25 years of its restoration to Federal recognition, *see* 57 Fed. Reg. 5,214 (listing the "[e]ffective" date of reinstatement to pre-termination status as September 6, 1991), and the Band is not gaming on other lands. 25 C.F.R. § 292.12(c)(2).

AR0011599

tribe can establish a "significant historical connection" where (1) "the land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty, . . ." or (2) "a tribe can demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land."[20]

The Band has not made the required showing, and the Parcel therefore does not qualify as "restored lands" within the meaning of IGRA. I elaborate below.

## III. APPLICATION OF RESTORED LANDS CRITERIA TO THE VALLEJO PARCEL

### (a) As a preliminary matter, the evidence indicates that the Scotts Valley Band is a successor-in-interest to the Ca-la-na-po and the Mo-al-kai.

If a tribe is seeking to establish a historical connection to a parcel through evidence of subsistence use or occupancy by the tribe's predecessors, as the Band is here, it is important to identify those predecessors. As the Department acknowledged in a 2012 restored lands determination concerning an unrelated set of parcels submitted by the Band, the Band has established a line of political succession and significant genealogical descent from the Ca-la-na-po tribelet, and it is a successor-in-interest to the Ca-la-na-po.[21] Additionally, the Band has provided persuasive evidence of political succession or significant genealogical descent from another tribelet, the Mo-al-kai.

Dorothea Theodoratus, an anthropologist commissioned by the Band, wrote in her report that kin groups among Pomo Indians "were both ambilateral and ambilocal, which allowed for movement of members among the tribelets . . . ."[22] An analysis relating to the connection between an alleged predecessor of the Band and the Band itself must acknowledge the "flexibility of Pomo social and political structure."[23]

Here, the evidence suggests such fluidity existed between the Ca-la-na-po (also known as the Kulanapo or Hoolanapo) and the Mo-al-kai (also known as the Molkai, Yimaba, or Yimabak). In a 1928 interview with Scotts Valley Band's ancestor Joe Augustine, anthropologist Omer Stewart explained: "Joe Augustine was identified as being chief of the 'Yimaba of Scotts Valley,' with parents from the 'village of Kulanapo.'"[24] Aside from the bloodline tying the Mo-al-kai to the Band, the fact that the aboriginal territory of the Mo-al-kai overlaps with the land presently

---

[20] 25 C.F.R. § 292.2.

[21] *See* Letter from Donald E. Laverdure, Acting Assistant Sec'y – Indian Affairs, Dep't of the Interior, to Donald Arnold, Chairperson, Scotts Valley Band of Pomo Indians 12 (May 25, 2012) [hereinafter, the "2012 Restored Lands Determination"], *available at* https://www.bia.gov/sites/bia.gov/files/assets/public/pdf/idc-018517.pdf ("According to the record, when the Scotts Valley Rancheria was established in 1911, the Band existed as a strong political entity led by the Augustine family, both politically and genealogically descended from the Ca-la-na-po.").

[22] Report by Dorothea J. Theodoratus, *supra* note 5, at 3.

[23] Comments on Documents Regarding "Restored Lands" in the Vicinity of Vallejo, Solano County, CA by Dorothea J. Theodoratus 2 (Nov. 13, 2016).

[24] Memorandum from Steven J. Bloxham, Fredericks Peebles & Morgan LLP, to Lawrence S. Roberts, Acting Assistant Sec'y – Indian Affairs 11 (Nov. 14, 2016). That Joe Augustine is related to members of the present-day is undisputed. *See, e.g.*, Scotts Valley Band of Pomo: Preliminary Report for "Indian Lands Determination," Vallejo, Solano County, California from Stephen D. Beckham to United Auburn Indian Cmty. 26–26 (Nov. 7, 2016) [hereinafter, the "Beckham Report"] (in report submitted to tribe opposing the Band's Request, stating that Joe Augustine is "a collateral relative of several current members of the Scotts Valley Band of Pomo").

AR0011600

occupied by the Band is also significant.  The Mo-al-kai were located in Scotts Valley, west of Lakeport, on the western shore of Clear Lake,[25] and the Band continues to reside there, with a tribal government headquarters at Lakeport.[26]

In light of this information, evidence of both the Ca-la-na-po's and Mo-al-kai's historical connection to the Vallejo Parcel is relevant to this analysis.[27]

> **(b)  The Vallejo Parcel is not located within the boundaries of the Band's last reservation under a ratified or unratified treaty.**

Because the Vallejo Parcel is not located within the boundaries of the Band's last reservation (or the reservation promised to its ancestors), the Band cannot establish a significant historical connection through the first method listed above.  As background, the Ca-la-na-po tribelet was one of eight tribal signatories to an unratified treaty with the United States, signed in August 1851.[28]  The tribal signatories "jointly and severally" ceded "their right, title, claim, or interest of any kind" to lands in California.[29]  In exchange, the United States designated a tract of land to be set apart as an Indian reservation, on the western shore of Clear Lake, Lake County, California.[30]  In the late 1800s, cartographer Charles Royce compiled maps depicting Indians' land cessions in the United States, including the land that would have been ceded under the 1851 Treaty, as well as tracts set apart for reservations, including the reservation at Clear Lake.[31]  The area numbered "296" (Area 296) in the map below shows the ceded territory, and the area numbered "295" (Area 295) shows the Clear Lake reservation, in relation to San Francisco and Sacramento.

---

[25] Memorandum from Steven J. Bloxham to Lawrence S. Roberts, *supra* note 24, at 12; *see also* Comments on Reports Submitted by the Yocha Dehe Nation Regarding SVBI Request for Determination from Albert L. Hurtado, Historian, to Lawrence S. Roberts, Acting Assistant Sec'y – Indian Affairs 8 (Nov. 14, 2016) [hereinafter, the "Hurtado Comments"] ("Scotts Valley . . . was the home of Molkai and Yimabak Pomo.").

[26] Report by Dorothea J. Theodoratus, *supra* note 5, at 5.

[27] The Band also claims a connection to the Ha-bi-na-po tribelet that occupied the eastern portion of Big Valley, as discussed in Legal Analysis by Steven J. Bloxham, *supra* note 5, at 12; however, the evidence is insufficient to establish such a finding. Furthermore, as discussed below in Part III.d.iii.B, whether or not the connection exists is not dispositive in this restored lands determination.

[28] Treaty with Ca-la-na-po, etc. (Aug. 20, 1851), *in* 4 *Indian Affairs, Laws and Treaties* (Charles J. Kappler ed., 1927) [hereinafter, the "1851 Treaty"], *available at* https://dc.library.okstate.edu/digital/collection/kapplers/id/24015.

[29] *Id.* art. 3.

[30] *Id.* art. 4.

[31] Charles C. Royce & Cyrus Thomas, *Indian Land Cessions in the United States* (1899), *available at* https://www.loc.gov/resource/g3701em.gct00002 (select "Image 7 of 67" ("California 1")).

AR0011601



The Vallejo Parcel is located in the southwestern portion of Area 296, south of Napa, clearly outside of the boundaries of the reservation under the 1851 Treaty. The Parcel is similarly far from the rancheria that the United States acquired for the Band in 1911 (Scotts Valley Rancheria), which Area 295 encompasses.[32]

### (c) The Vallejo Parcel is not proximate to the boundaries of the Band's last reservation under a ratified or unratified treaty.

In previous restored lands determinations relating to California tribes, the Department has noted that "[a] parcel's proximity to a tribe's historic reservation or rancheria is evidence that the tribe has a significant historical connection to that parcel."[33] For example, in reaching a favorable determination on the Wilton Rancheria's restored lands request, the Department noted that the tribe's proposed site was less than six miles from the tribe's historic rancheria.[34] Similarly, in reaching a favorable restored lands determination regarding the Mechoopda Indian Tribe of the Chico Rancheria, the Department explained that the land at issue was only ten miles from the

---

[32] Consolidated Report by Heather H. Howard et al., *supra* note 5, at 4 (stating that "in the 1910s, the federal government established the Scotts Valley (or Sugar Bowl) Rancheria, on lands southwest of Clear Lake").
[33] Record of Decision, Trust Acquisition of 35.92 +/- Acres in the City of Elk Grove, California, for the Wilton Rancheria 67 (Dep't of the Interior Jan. 2017).
[34] *Id.*

6

AR0011602

tribe's former Rancheria.[35]  Here, the Parcel is located approximately 90 driving miles (75 straight-line miles) southeast of the former Scotts Valley Rancheria, near the present-day city of Lakeport. As such, the distance between the Vallejo Parcel and the Band's historic Rancheria, standing alone, does not evince a significant historical connection.

**(d) The Band has not demonstrated the existence of the Band's villages, burial grounds, occupancy or subsistence use in the vicinity of the Parcel.**

The Band does not assert that the Parcel is in the vicinity of the Band's villages or burial grounds.[36]  Therefore, the Band must establish a significant historical connection to the Vallejo Parcel by demonstrating its occupancy or subsistence use in the vicinity of the land.  As noted in the 2012 Restored Lands Determination, "[t]he tribe's history of use and occupancy inherently includes the use and occupancy of its tribal predecessors, even if those tribes had different political structures and were known under different names."[37]  Evidence of use and occupancy by the Ca-la-na-po and Mo-al-kai is therefore relevant to this determination, as well.

(i) <u>The joint and several cession of the large area encompassing the Vallejo Parcel by the eight tribal signatories does not automatically demonstrate occupancy or subsistence use in the vicinity of the Parcel by the specific signatories related to the Band.</u>

First, the Band argues that its ancestors' cession of land pursuant to the 1851 Treaty *per se* demonstrates use and occupancy sufficient to establish a significant historical connection to the Vallejo Parcel, given that the ceded land (Area 296) encompasses the Parcel.[38]  In support of its argument, the Band cites the district court's decision in *Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney for the Western District of Michigan*,[39] as well as the Office of the Solicitor's M Opinion concerning the Pokagon Band of Potawatomi Indians' (Pokagon Band) request for restored lands.[40]  According to the Band, these opinions establish that lands ceded by treaty and subsequently returned to a tribe qualify, *per se*, as restored lands for the purposes of the restored lands exception.[41]  However, the Band misconstrues the reasoning in both *Grand Traverse Band* and the Pokagon Band Opinion.

---

[35] Letter from Kevin K. Washburn, Assistant Sec'y – Indian Affairs, Dep't of the Interior, to Dennis Martinez, Chairman, Mechoopda Indian Tribe of Chico Rancheria 25 (Jan. 24, 2014). Additionally, the land at issue was located within the boundaries of a reservation that would have been established through an unratified treaty, thus establishing a significant historical connection through the first method listed above. *Id.*

[36] *See, e.g.*, Legal Analysis by Steven J. Bloxham, *supra* note 5, at 20 (stating that, prior to the 1850s, "the area in and around what is now the City of Vallejo and adjacent portions of southern Napa and Solano counties were part of the territory of the Patwin people" and that "the record indicates that by 1851 there were no surviving Patwin (*or any other Indian*) villages, and not independent bands or tribes, in southern Napa and Solano Counties") (emphasis added) (citations omitted).

[37] 2012 Restored Lands Determination, *supra* note 21, at 7.

[38] Memorandum from Scotts Valley Band of Pomo Indians, *supra* note 18, at 24–25 (citations omitted).

[39] 198 F. Supp. 2d 920 (W.D. Mich. 2002), *aff'd*, 369 F.3d 960 (6th Cir. 2004) ["*Grand Traverse Band*"].

[40] Sol. Op. M-36991 (Sept. 19, 1997) [hereinafter, the "Pokagon Band Opinion"], *available at* https://solicitor.doi.gov/opinions.html.

[41] Legal Analysis by Steven J. Bloxham, *supra* note 5, at 7–8, 27; *see also* Memorandum from Steven J. Bloxham to Lawrence S. Roberts, *supra* note 24, at 2.

AR0011603

A. *Grand Traverse Band*

In holding that a casino site qualified for gaming under the restored lands exception, the Federal district court in *Grand Traverse Band* concluded that "the Band's evidence clearly established that the parcel was of historic, economic and cultural significance to the Band."[42]  The fact that the parcel fell within the boundaries of land the Band's predecessors had ceded via treaty was merely one of several facts supporting that conclusion, but it was not a stand-alone proposition, as the Band asserts.  The court further observed:

> The land, located on the east shore of Grand Traverse Bay, is at the heart of the region that comprised the core of the Band's aboriginal territory and was historically important to the economy and culture of the Band. . . . The Band itself has occupied the region continuously from at least 100 years before treaty times until the present. . . . In the late nineteenth century, Band members continued to reside on the east shore of Grand Traverse Bay and sought title to land in order to remain in the region.[43]

The facts here are distinguishable from those supporting the favorable decision in *Grand Traverse Band*.  First, the court found that the land at issue was located only 1.5 miles outside of the reservation contemplated by the 1836 treaty between the United States and the Ottawa and Chippewa, of which representatives of the Grand Traverse Band were signatories.[44]  The court additionally found evidence suggesting that the proposed acquisition site was located within the boundaries of the contemplated reservation at the time the treaty was signed.[45]  As noted above, such evidence—not present here—helps establish a significant historical connection.  Second, while the land in *Grand Traverse Band* lies at the core of that tribe's aboriginal territory, the Vallejo Parcel is 90 miles by road (75 straight-line miles) away from the Band's aboriginal territory.  Finally, as explained below in Part III.d.ii–iii, unlike the tribe in *Grand Traverse Band*, which had continuously resided on the land in question for uninterrupted centuries, the Scotts Valley Band has failed to establish a comparable level of historical connection to the parcel in question.  *Grand Traverse Band* therefore does not establish the bright line rule concerning ceded territory that the Band asserts.

B. Pokagon Band Opinion

As in *Grand Traverse Band*, the fact that the Pokagon Band parcel fell within an area ceded by one or more of the Pokagon Band's predecessors was an important, but non-dispositive, reason why the Office of the Solicitor recommended a favorable restored lands determination.  As background, Congress restored the Pokagon Band through the Pokagon Restoration Act (Act).[46]  The Act directed the Secretary to "acquire real property for the Band" and named ten counties in Michigan and Indiana that would comprise the Band's "service area."[47]

---

[42] 198 F. Supp. 2d at 925.
[43] *Id.*
[44] *Id.* at 936.
[45] *Id.* at 925.
[46] Restoration of Federal Services to the Pokagon Band of Potawatomi Indians, Pub. L. No. 103-323, 108 Stat. 2152 (previously codified at 25 U.S.C. §§ 1300j) (1994).
[47] *Id.* §§ 6–7, 108 Stat. at 2154.

8

AR0011604

In the Pokagon Band Opinion, the Office of the Solicitor concluded that the parcel in question qualified as restored lands because (1) the parcel fell within the ten-county service area identified in the Act and (2) the service area was part of the territory that the Band's predecessors had ceded to the United States through treaties.[48]  In contrast, the Vallejo Parcel does not fall within the Scotts Valley Band's service area, which includes the counties of Mendocino, Lake, Sonoma, and Contra Costa, but not Solano.[49]  Additionally, whereas Congress established the Pokagon Band's service area through the Act, the Bureau of Indian Affairs (BIA) designated the Scotts Valley Band's service area pursuant to 25 C.F.R. Part 20.

Furthermore, there are fundamental differences between the legal analysis in the Pokagon Band Opinion and the one required here.  First, the Pokagon Band Opinion predated the implementation of 25 C.F.R. Part 292 by more than ten years,[50] and it did not discuss the modern, temporal, and significant historical connections described in § 292.12 that are central to the Scotts Valley Band determination.[51]  Even if the Pokagon Band Opinion established a standard whereby lands ceded by treaty qualify, *per se*, as restored lands—which it does not—the Department did not incorporate that standard into the criteria deemed necessary for lands to qualify as restored when it promulgated Part 292, which the Band must now satisfy.[52]

Second, even if the Pokagon Band's request had been reviewed under Part 292, the Pokagon Band was restored by Congressional legislation, whereas the Scotts Valley Band was restored under the terms of a stipulated judgment.  Consequently, lands sought by the Scotts Valley Band must qualify as restored under § 292.11(c) and § 292.12, whereas lands sought by tribes restored in the manner of the Pokagon Band must meet the standards established in § 292.11(a).[53]  Also, § 292.11(a)(1) sets out criteria that would not have required the Pokagon Band to establish the modern, temporal, and significant historical connections that the Scotts Valley Band must show under § 292.12.

Restored lands determinations issued after the Pokagon Band Opinion confirm that a parcel's location within an area ceded by treaty is not a dispositive factor in establishing a significant historical connection.  For example, as early as 2004, prior to the implementation of Part 292, the National Indian Gaming Commission (NIGC) concluded that the Karuk Tribe of California (Karuk Tribe) failed to show a "sufficient historical nexus" to a parcel even though the parcel was located within the cessation area of a treaty.  In reaching a decision unfavorable to the Karuk Tribe, the NIGC explained, in part, that evidence of "aboriginal settlements" at the location of the parcel was

---

[48] Pokagon Band Opinion, *supra* note 40, at 7–8.

[49] *See* Notice of Near-Reservation Designations for California Tribes, 65 Fed. Reg. 31,188 (May 16, 2000) (listing "near-reservation designations" that are "appropriate for the extension of BIA financial assistance and/or services" for certain California tribes).

[50] *Compare* 73 Fed. Reg. at 29,354 (listing the effective date of Part 292 as June 19, 2008), *with* Pokagon Band Opinion, *supra* note 40 (stating date of issuance as September 19, 1997).

[51] *See* Pokagon Band Opinion, *supra* note 40, at 7–8 (containing a brief analysis—limited to only one paragraph—as to whether the parcel in question was restored).

[52] For a discussion on the Department's authority to exclude non-legislatively created, ad hoc standards from its regulations, see *Miami Nation of Indians of Indiana, Inc. v. Babbitt*, 887 F. Supp. 1158, 1169–70 (N.D. Ind. 1995).

[53] *See* Record of Decision, Trust Acquisition of 165.81± Acres in the City of South Bend, Indiana, for the Pokagon Band of Potawatomi Indians 57–59 (Dep't of the Interior Nov. 2016).

AR0011605

"scant and based largely on the speculation of an ethnologist."[54]  Similarly, when the NIGC issued an updated, favorable Indian Lands Opinion to the Karuk Tribe in 2012, the NIGC based the change in its opinion on new evidence showing a history of Karuk activity around the parcel, not on the location of the parcel within the cessation area.[55]  Specifically, a historian commissioned by the Karuk Tribe had uncovered a decades-old BIA report finding that "'the aboriginal subentities of the Karok [sic] Tribe consisted of the communities at Happy Camp, Orleans and Siskiyou (Yreka),'" Yreka being the location of the parcel at issue in that matter.[56]  The BIA report, combined with additional correspondence from the BIA acknowledging "aboriginal camp sites" in those communities, as well as oral history corroborating the written record, established a historical connection between the Karuk Tribe and the parcel in question.[57]

Based upon the different laws and facts at issue in both *Grand Traverse Band* and the Pokagon Band Opinion as compared to those of Scotts Valley Band, those two opinions do not establish a *per se* rule that parcels within ceded territory are "restored lands."  While that may create a favorable inference for the Band here, the Band must still demonstrate additional historical connection comparable to that identified in *Grand Traverse Band* and for the Pokagon Band and the Karuk Tribe.  As discussed *infra*, the Scotts Valley Band has failed to establish such historical connection.

(ii) <u>Vallejo's designation in the 1851 Treaty as a pick-up site for promised provisions and the subsequent collection of provisions at that site do not demonstrate occupancy or subsistence use in the vicinity of the Parcel by the Band or its ancestors.</u>

Next, the Band argues that Vallejo's designation in the 1851 Treaty as a pick-up site for promised provisions and the subsequent collection there of such provisions demonstrate the Band's occupancy and subsistence use in the vicinity of the Parcel.[58]  Under Article 5 of the 1851 Treaty, the United States promised to furnish the signatory bands with supplies such as cattle, bread, and clothing for pick-up "at or near Vallejo."[59]  Albert Hurtado, a historian commissioned by the Band to prepare a report in conjunction with its Request, identified the likely pick-up site for the supplies as the ranch of J.M. Estelle, a general in the California State Militia.[60]  The location of Gen. Estelle's ranch is 2.4 miles from the Vallejo Parcel.[61]  The Band asserts that the 1851 Treaty reserved rights to those pick-up site lands akin to reserved hunting, fishing, and gathering rights found in other treaties.[62]  According to the Band, its ancestors made use of the lands by exercising

---

[54] Indian Lands Opinion from Penny J. Coleman, Acting Gen. Counsel, Nat'l Indian Gaming Comm'n, to Bradley G. Bledsoe Downes, Dorsey & Whitney LLP 7–8 (Oct. 12, 2004), *available at*
https://www.nigc.gov/images/uploads/indianlands/17_karuktribeofcalifornia.pdf.
[55] Memorandum from John R. Hay, Senior Attorney, to Tracie Stevens, Chairwoman, Nat'l Indian Gaming Comm'n 10 (Apr. 3, 2012), *available at* https://www.nigc.gov/images/uploads/indianlands/Karuk4912.pdf.
[56] *Id.*
[57] *Id.*
[58] Memorandum from Steven J. Bloxham to Lawrence S. Roberts, *supra* note 24, at 9; *see also* Legal Analysis by Steven J. Bloxham, *supra* note 5, at 21–25.
[59] 1851 Treaty, *supra* note 28, art. 5.
[60] Report by Albert L. Hurtado, *supra* note 5, at 84–86.
[61] *Id.* at 102–05.
[62] Legal Analysis by Steven J. Bloxham, *supra* note 5, at 21–25.

10

treaty-reserved rights in the vicinity of the Parcel and by camping at the Estelle ranch while awaiting the delivery of the provisions promised under Article 5.[63]

The Band's argument is unavailing. The activities described here do not constitute occupancy or subsistence use of the lands in the vicinity of the Vallejo Parcel. In the restored lands determination relating to the Guidiville Band of Pomo Indians' (Guidiville Band) request for restored lands, the Department explained:

> Subsistence use and occupancy requires something more than a transient presence in an area. . . . Accordingly, activities that would tend to show a tribe was using land for subsistence purposes might include sowing, tending, harvesting, gathering and hunting on lands and waters. "Occupancy" can be demonstrated by a consistent presence in a region supported by the existence of dwellings, villages or burial grounds, as alluded to in the regulations.[64]

The Guidiville Band had sought to establish a significant historical connection to a parcel near an aboriginal trade route that, according to the Guidiville Band, its ancestors had used to engage in commerce and harvest natural resources. In response, the Department concluded that "the Band cannot establish its subsistence use or occupancy based on the fact that its ancestors traveled to various locations to trade and interact with other peoples and then returned to the Clear Lake region."[65]

The situation here is analogous; the encampments at the Estelle ranch for the purpose of picking up supplies—pursuant to an arrangement that was to last only three years (1851–1853)—do not

---

[63] *Id.* at 23–25.

[64] Letter from Larry Echo Hawk, Assistant Sec'y – Indian Affairs, Dep't of the Interior, to Merlene Sanchez, Chairperson, Guidiville Band of Pomo Indians 14 (Sept. 1, 2011) [hereinafter, the "Guidiville Restored Lands Determination"], *available at* https://www.bia.gov/sites/bia.gov/files/assets/public/pdf/idc015051.pdf. For an example of the kinds of activities that constitute occupancy and subsistence use, see Record of Decision, Secretarial Determination Pursuant to the Indian Gaming Regulatory Act for the 305.49-Acre Madera Site in Madera County, California, for the North Fork Rancheria of Mono Indians 60–61 (Dep't of the Interior Sept. 2011), explaining that the tribe's predecessors: "hunted game in the areas of the San Joaquin Valley near the Site," "gathered plants and other materials from the areas of the San Joaquin Valley near the Site," "occupied the Fresno River Farm in the vicinity of the Site," and "earned a living from activities, such as logging and agriculture, conducted on lands in the vicinity of the Site." For another example, see *Confederated Tribes of Grand Ronde Cmty. of Oregon v. Jewell*, stating that the Secretary found the following evidence of the Cowlitz occupancy and use in the vicinity of the parcel at issue:

> (1) the Cowlitz's occupancy, namely hunting camp sites and "treaty-time" villages, at Warrior's Point, a site on the Columbia River and only three miles from the Parcel; (2) the Cowlitz reliance on the natural resources of the Columbia River for subsistence use and trade; (3) Cowlitz' "extensive and intensive" trading activities at both Bellevue Point (ten miles from the Parcel), and the intersection of the Lewis River and Columbia River (three miles from the Parcel); (4) a major battle between the Cowlitz and the Chinook at a site three miles from the Parcel; (5) historical report about an individual Cowlitz who used the Lewis River area for subsistence hunting, (about 6 miles from the Parcel); (6) the fact that Cowlitz were expert boatmen and helped guide large boats carrying goods through the mouth of the Lewis River, less than three miles from the Parcel; (7) census information showing that the Cowlitz occupied the lands in the vicinity of the Parcel.

75 F. Supp. 3d 387, 413–14 (D.D.C. 2014), *aff'd*, 830 F.3d 552 (D.C. Cir. 2016).

[65] Guidiville Restored Lands Determination, *supra* note 64, at 14.

AR0011607

demonstrate subsistence use or occupancy. The plain language of the 1851 Treaty and the related minutes of the treaty negotiations indicate that the United States chose Vallejo as the pick-up location because it was convenient for federal officials[66] who were reluctant to deliver provisions to the Clear Lake bands in the mountainous territory where they lived.[67] Contrary to the Band's assertion, the short-term right to collect provisions at Vallejo differs significantly from a treaty-reserved right that would demonstrate occupancy or subsistence use, such as a right to hunt, fish, or gather at a designated site in perpetuity.[68]

> (iii) Evidence of the Band's ancestor Augustine living and laboring on ranchos north of San Pablo Bay does not demonstrate occupancy or subsistence use in the vicinity of the Vallejo Parcel.

Lastly, the Band argues that its documented, historical connection to the Vallejo Parcel has existed since the 1840s or earlier, upon the advent of the ranching economy in the San Pablo Bay region.[69] In support of its claim, the Band has submitted documentation concerning an individual named Augustine, a "chief of the Hoolanapo Indians" who lived and worked in the North Bay region during the mid-1800s.[70] "Many in the Scotts Valley Tribe trace ancestry back to Augustine," and the Band contends that Augustine's biography helps establish the Band's significant historical connection to the Parcel.[71] According to the Band's anthropologist, Augustine's whereabouts and activities are representative of those of the Band's ancestors in general and shed light on their shared experiences.[72] Furthermore, Augustine's life is relatively well-documented, which is unique given the disruption in Pomoan village life, economy, and culture that occurred during the timeframe at issue.[73] The Band's documentation includes contemporaneous accounts and

---

[66] 1851 Treaty, *supra* note 28, art. 5 (designating the pick-up site "at or near Vallejo, or elsewhere, as may be most convenient").

[67] Legal Analysis by Steven J. Bloxham, *supra* note 5, at 23 (quoting an excerpt from the minutes, which read: "[A]ny flour and beef given [to the Clear Lake bands] this fall the chiefs must send runners for as the mountains surrounding this lake are impassable for wagons, and it would cause the President great expense to send it here now.").

[68] *See, e.g.*, Treaty with the Ottawa, etc. (Mar. 28, 1836), *in* 2 *Indian Affairs, Laws and Treaties* (Charles J. Kappler ed., 1904), *available at* https://dc.library.okstate.edu/digital/collection/kapplers/id/26291 (stating that the perpetual right of fishing at the falls of St. Mary's reserved by an earlier treaty "remains unaffected"); *see also* 73 Fed. Reg. at 29,366 ("The definition of 'significant historical connection' establishes criteria which require something more than evidence that a tribe merely passed through a particular area.").

[69] Memorandum from Scotts Valley Band of Pomo Indians, *supra* note 18, at 11 (stating that "the record is clear that between 1842 and 1847, Clear Lake Indians became a significant source of labor on all of the ranchos north of San Francisco").

[70] Lyman L. Palmer, *History of Napa and Lake Counties* 49 (1881).

[71] Dorothea J. Theodoratus et al., *Clear Lake Indian Census Data Early 1800s to 1911 (Emphasis on Eastern Pomo)* 81 (2018) (stating, further, that by 1958, "when the tribe was terminated under the Rancheria Act, 90.1% of the tribe were Augustine descendants"); *see also* Supplemental Report: History of the Scotts Valley Band of Pomo Indians and the San Pablo Bay Region by Albert L. Hurtado et al. 15 (May 3, 2018) [hereinafter, the "Supplemental Report"] (explaining how that percentage was calculated).

[72] *See* Albert L. Hurtado, *Chief Augustine: Significant Ancestor of the Scotts Valley Band of Pomo Indians* 11 (2018) ("Augustine's history illustrates a significant connection between [the Band's ancestors] and the region that includes the [Vallejo Parcel].").

[73] *See* Theodoratus et al., *supra* note 71, at 5 (stating that, in the mid-1800s, "[a]lthough some concentrated village life continued to exist among Indian communities, many previous Indian village-life patterns were forced into a new, somewhat dispersed, living pattern accompanied by new labor patterns"); *see also* Lowell J. Bean & Dorothea J. Theodoratus, Western Pomo and Northeastern Pomo, *in* 8 *Handbook of North American Indians* 299 (Robert F. Heizer ed., 1978) (explaining that, in the 1830s, "diseases, plus displacement, enslavement, massacres, raids, and the

AR0011608

anecdotal evidence tracking his movement, as well as genealogical data about his family.[74] What follows is an abbreviated discussion of Augustine's life and the surrounding context as submitted by the Band, followed by an analysis of the information presented.

### A. Augustine and the Agricultural Economy in the North Bay Region

The earliest reference to Augustine suggested by the Band seems to be on a list of Indian children baptized in 1837 at Mission San Francisco Solano, located in the city of Sonoma, 17 miles from the Parcel.[75] The list includes a six year-old child named Agustin who "could have been [the Band's ancestor] Augustine, but this is not verified."[76] According to the Band, 29 other Pomo children were baptized at the mission at that time, at least 14 of whom were from the same village as Augustine, and at least two of whom were ancestors of the present-day Band.[77] The Band alleges that the children "were instructed in the Roman Catholic faith and trained to do manual labor, including ranch work," at the mission.[78]

Based on an 1880 interview with historian Lyman Palmer, Augustine had returned to the Clear Lake area by around 1840, where he observed Salvador Vallejo take "formal possession" of the valley where the Band's ancestors lived.[79] Salvador Vallejo's older brother was Mariano Vallejo, a Mexican military commander who, according to the Band's historian, "exercised nearly absolute personal and official power over land and life in the North Bay region."[80] Mariano Vallejo acquired huge swaths of land formerly associated with Mexican missions,[81] including Ranchos Suscol and Petaluma.[82] Andrés Reséndez, a historian commissioned by the Yocha Dehe (which opposes the Band's Request), states that Rancho Suscol (the rancho within which the Vallejo Parcel is located) was an 84,000-acre property, and Rancho Petaluma was 66,000 acres.[83] The Band's historian estimates that by 1846 the Vallejo family's landholdings totaled 220,000 acres "from the Pacific Ocean to Suisun Bay and north to Clear Lake."[84]

The livestock operations on those ranchos were labor-intensive, and, according to the Yocha Dehe's historian, a study of Rancho Petaluma estimates that "at any one time there may have been between 600 and 1000 Indian laborers living there."[85] Although Rancho Suscol was located in

---

beginnings of Anglo-American migration set the stage for the ever more rapid decline of the Pomo people and their cultural heritage" in the ensuing decades).

[74] *See generally* Hurtado, *supra* note 72 (containing excerpts from such material); Theodoratus et al., *supra* note 71, at 29–31 (summarizing census data pertaining to Augustine and his family).

[75] Memorandum from Scotts Valley Band of Pomo Indians, *supra* note 18, at 14–15.

[76] Theodoratus et al., *supra* note 71, at 29.

[77] Supplemental Report by Albert L. Hurtado et al., *supra* note 71, at 7–8.

[78] *Id.* at 8.

[79] Palmer, *supra* note 70, at 49; *see also* Beckham Report, *supra* note 24, at 106 (discussing Palmer's interview with Augustine); Hurtado Comments, *supra* note 25, at 8 (explaining that Salvador Vallejo oversaw the creation of Rancho Lup-Yomi in an area known as Big Valley, near Clear Lake).

[80] Report by Albert L. Hurtado, *supra* note 5, at 23.

[81] Hurtado Comments, *supra* note 25, at 7.

[82] Report by Albert L. Hurtado, *supra* note 5, at 42–43.

[83] Comments About the Historical Basis for the Scotts Valley Band of Pomo Indians' Request for Indian Lands Determination in the City of Vallejo by Andrés Reséndez, Professor, Dep't of History, Univ. of Cal., Davis 3 (Nov. 2016) [hereinafter, the "Reséndez Comments"].

[84] Report by Albert L. Hurtado, *supra* note 5, at 43.

[85] Reséndez Comments, *supra* note 83, at 3.

AR0011609

traditional Patwin territory,[86] and Rancho Petaluma was located in traditional Coast Miwok territory,[87] Salvador Vallejo raided Pomo Indian communities "in order to force them to work on the ranchos owned by the Vallejos and others."[88] Ultimately, Indians from the Clear Lake area, Coast Miwok, Southern Patwin, and Wappo all labored on ranchos established in what had been Coast Miwok and Patwin territory.[89] According to the Band's historian, the Band's ancestors, including Augustine, helped "tend the thousands off [sic] animals that roamed in Big Valley" and drove cattle to slaughter grounds at one San Pablo Bay.[90] In 1847, Salvador Vallejo sold Rancho Lup-Yomi to new owners,[91] who at one point used Augustine and other Indians as forced labor to build adobe houses in Sonoma.[92] Augustine escaped after about a month and fled back to Clear Lake where his wife and infant child resided.[93]

Augustine next appears in an 1850 census (created in 1926 by anthropologist E.W. Gifford) that identifies him as a "Kulanapo" chief,[94] living at Clear Lake in an Eastern Pomo village.[95] The historical record is then scant in regard to Augustine's whereabouts and activities between 1850 and 1870. During those decades, farming became an increasingly important part of the economy, and Indians from the Clear Lake area started engaging in a pattern of migrant labor on ranchos south of their aboriginal territory.[96] By the 1860s, Clear Lake Indians mixed seasonal work on ranchos in Napa Valley and elsewhere in the North Bay region with subsistence farming and fishing at Clear Lake.[97]

The next reference to Augustine seems to be in the 1870 census data for Napa City Township, Napa County, which indicates that, at age 38, Augustine was living in a household of 17 Indians of varying ages, a "collection of native people working out from the household."[98] The Band also identifies a few other possible or confirmed ancestors living in Napa in 1870.[99] In total, the 1870 census lists 43 Indians living in Napa County at the time, compared with 17 in Lake County (with

---

[86] Hurtado Comments, *supra* note 25, at 6; *see also* Jennifer Whiteman, *Native American Ethnogeography and Ethnohistory in the Vicinity of Vallejo, California* 33 (2016) ("The Yocha Dehe and Cortina Indian Rancheria are recognized by the Native American Heritage Commission (NAHC) as Most Likely Descendants for the City of Vallejo and vicinity.").

[87] Reséndez Comments, *supra* note 83, at 3.

[88] Hurtado Comments, *supra* note 25, at 8; *see also* Supplemental Report by Albert L. Hurtado et al., *supra* note 71, at 3 (explaining that, between the 1830s and 1860s, some Pomo Indians worked voluntarily for white ranchers as a matter of economic necessity, but others were enslaved as children and transported southward to Solano, Napa, and Sonoma counties); Report by Albert L. Hurtado, *supra* note 5, at 89 (stating that, in the early 1850s, "[t]he Indians were subject to . . . a law that gave whites legal authority to indenture Indian adults and children as farm workers and domestic servants").

[89] Reséndez Comments, *supra* note 83, at 5.

[90] Supplemental Report by Albert L. Hurtado et al., *supra* note 71, at 4–5.

[91] Report by Albert L. Hurtado, *supra* note 5, at 57.

[92] *Id.* at 64.

[93] *Id.*

[94] Theodoratus et al., *supra* note 71, at 29.

[95] *Id.* at 5.

[96] Supplemental Report by Albert L. Hurtado et al., *supra* note 71, at 13.

[97] *Id.* at 14 (quoting a federal agent who witnessed the "integration of wage labor in Napa Valley and subsistence farming at Clear Lake").

[98] Theodoratus et al., *supra* note 71, at 30.

[99] Addendum to the Supplemental Report: History of the Scotts Valley Band of Pomo Indians and the San Pablo Bay Region by Albert L. Hurtado et al. 7–8 (Dec. 2018) [hereinafter, the "Addendum to the Supplemental Report"].

AR0011610

only one in Big Valley and one in Lakeport).[100] Augustine and the other Indians in the household may have been working at nearby Rancho Tulucay at the time,[101] approximately 11 miles north of the Vallejo Parcel.[102] The name listed next to Augustine's on the census is that of Chi-Bem, who may have signed the 1851 Treaty on behalf of the How-ru-ma (one of the eight tribal signatories to the treaty).[103]

Augustine's name next appears in the 1880 census data for Lakeport Township, Lake County, which places him, age 50, in a household with his wife Mary, his brother or Mary's brother, and two younger males, ages 15 and 40.[104] The 1880 Lakeport census lists many other households occupied by Indian families in the area, which is approximately 90 miles by road (75 straight-line miles) northwest of the Vallejo Parcel, including the household next to Augustine's consisting of Augustine's brother Pete, Pete's wife, and their son.[105] By 1911, the year that the United States acquired the Scotts Valley Rancheria for the Band, "a number of Augustine descendants and relatives were present at the rancheria" and "continued to reside at Lakeport" through the mid-1900s,[106] although the Band contends that it also maintained a connection with Napa County through 1918, as demonstrated by a contemporaneous record indicating that several Scotts Valley people contracted the Spanish influenza there.[107] Augustine died around 1919 at or near the age of 89.[108]

   B.   Analysis of the Narrative Presented Above

As a starting point, the fact that the Parcel falls within aboriginal territory of the Patwin people, and not the Pomo, is not, *ipso facto*, a barrier to a favorable determination for the Band. As the NIGC explained in its 2012 Karuk Indian Lands Opinion, "IGRA's restored lands exception does not require the [tribe] to demonstrate that it was the only tribe with historical connections to the area, or that the subject area was the only place where the [tribe] has historical connections."[109] Nevertheless:

> evidence of the presence of . . . Pomos, generally, on ranchos in the Bay Area, by itself, does not demonstrate the Band's occupancy or subsistence use on or in the vicinity of the Parcel. The Band must offer historical documentation of its significant historical

---

[100] *Id.* at 10. The 1870 census data, which documents a sizeable Indian presence in the North Bay region but a noticeable absence around Clear Lake, is consistent with the conclusion drawn by the Band's historian and anthropologist that "the period from 1837 to 1870 was an era of diaspora" for the Band's ancestors, followed by a period of repatriation to the Clear Lake area. Supplemental Report by Albert L. Hurtado et al., *supra* note 71, at 4.

[101] Hurtado, *supra* note 72, at 9 (stating that the census recorded Augustine living "just one household away" from Cayetano Juarez, the owner of Rancho Tulucay); *see also* Beckham Report, *supra* note 24, at 112 (stating that the 17 Indians in the household "were probably workers on Rancho Tulucay," and, in regard to Augustine, stating that "[i]t is not known if he was identical to the Augustine of the Scotts Valley Rancheria or was another Indian named Augustine").

[102] Memorandum from Scotts Valley Band of Pomo Indians, *supra* note 18, at 15.

[103] Theodoratus et al., *supra* note 71, at 53.

[104] *Id.* at 30, 78.

[105] *Id.* at 30, 71–78.

[106] *Id.* at 31.

[107] Addendum to the Supplemental Report, *supra* note 99, at 8–9.

[108] Report by Dorothea J. Theodoratus, *supra* note 5, at 11.

[109] Memorandum from John R. Hay to Tracie Stevens, *supra* note 55, at 12.

15

AR0011611

connection to the Parcel, not simply evidence of Pomoan presence in the much larger Bay Area.[110]

The first shortcoming in the Band's evidence is the inability of the Band to demonstrate that its specific predecessors (the Ca-la-na-po and Mo-al-kai)—as opposed to Indians generally (Pomo or otherwise) in the Clear Lake area—occupied land or engaged in subsistence use in the vicinity of the Parcel. The lack of an identifiable Ca-la-na-po or Mo-al-kai presence in the vicinity of the Parcel contrasts with the descriptions in favorable decisions of tribes occupying land or using land for subsistence in the vicinity of a parcel.[111] In addressing the lack of such identifying information, the Band's historian points out that "[t]he historical record frequently refers to 'Clear Lake Indians'" and that "[i]n all cases that have come to [his] attention 'Clear Lake Indians' taken as captives were Habenapo, Kulanapo, and Yimabak/Molakai who were associated with Rancho Lup-Yomi and Scotts Valley."[112] The historian's suggestion that the term "Clear Lake Indians" refers only to those tribelets to which the Band claims a connection is unpersuasive in light of other information provided about Indians traditionally associated with the Clear Lake area. For example, Peter Kunkel, an anthropologist cited by the Band's anthropologist who conducted significant ethnographic research on Pomo subdivisions,[113] observed:

> [T]here may have been seven to twelve tribelets in residence in the 'lake zone.' . . . Four of these tribelets spoke an Eastern dialect, one spoke Southeastern, and two spoke both Northern and Eastern dialects. The non-Pomo groups included the Lake Miwok located southeast of the Lake and a small area . . . of a Wappo use area located on the Lake in the southern portion . . . . In general, data show the Clear Lake area to be one of fluctuating diversity."[114]

Even if the Band were a successor-in-interest not only to the Ca-la-na-po and Mo-al-kai, but also to the Ha-bi-na-po, the Department cannot assume without more information that references to Clear Lake Bands and to the Band's predecessors are one and the same given the variety of ethnic groups and the number of tribelets that lived around the lake and worked on North Bay ranchos.

Likewise, it would be erroneous to attribute the connections made by a specific tribal member like Augustine, or a handful of members, to the entire Band, or to its predecessors. In support of its request for restored lands, the Guidiville Band had sought to establish a significant historical connection to a parcel in the Bay Area based, in part, on approximately a dozen of its ancestors' participation in the federally-sponsored BIA Outing Program.[115] That "[a]llegedly 'voluntary'" program had relocated young Indian women to the Bay Area in the first decades of the twentieth

---

[110] Guidiville Restored Lands Determination, *supra* note 64, at 17.
[111] *See, e.g.*, Record of Decision, Trust Acquisition of, and Reservation Proclamation for the 151.87-Acre Cowlitz Parcel in Clark County, Washington, for the Cowlitz Indian Tribe 128–29 (Dep't of the Interior Apr. 2013) (mentioning the Cowlitz Indian Tribe's "villages and/or hunting camp sites along the Columbia River," which a contemporaneous account described as "several large lodges of [Cowlitz] Indians; in all probably one hundred persons," in the vicinity of the parcel at issue in that decision).
[112] Report by Albert L. Hurtado, *supra* note 5, at 99–100.
[113] Report by Dorothea J. Theodoratus, *supra* note 5, at 2.
[114] *Id.* at 4.
[115] Guidiville Restored Lands Determination, *supra* note 64, at 13.

AR0011612

century to work as domestic servants for white middle-class families.[116] In rejecting the Band's argument, the Department explained: "As regrettable as the Outing Program was, the relocation of some of the Band's members to various locales throughout the Bay Area does not equate to the Band itself establishing subsistence use or occupancy in the region apart from its Rancheria in Ukiah."[117] While the historical treatment of the local Indians here is similarly inexcusable, and even assuming *arguendo* that all of the sometimes inconclusive references to Augustine that the Band provided did in fact refer to the same individual, Augustine's varied and singular experiences—his possible baptism at Mission San Francisco Solano in 1837, his construction of houses in Sonoma in the late 1840s, his dwelling in Napa in 1870, among others—are of limited evidentiary value in establishing the significant historical connections of Band *in toto*.[118]

Furthermore, even assuming that Augustine's living and labor patterns are representative of those of the Band's ancestors, such patterns do not constitute occupancy or subsistence use.  In fact, Augustine's back-and-forth movements between the Clear Lake area and the North Bay region reveal an inconsistent, if not transitory, presence at odds with the Band's claim to occupancy and subsistence use of the Parcel.  Returning to the examples in the previous paragraph, although allegedly baptized at Mission San Francisco Solano in Sonoma, Augustine returned to Clear Lake shortly thereafter to witness Salvador Vallejo's takeover.[119]  Although forced to work in Sonoma, Augustine escaped after about a month and returned to Clear Lake, where his wife and infant child were living.[120]  Also, although part of a household in Napa, Augustine appears to have lived not in a family dwelling, like the one at Clear Lake reflected in the 1880 census data,[121] but in a house of migrant workers,[122] with at least one person of an unrelated tribelet or ethnic group.[123]  While the definition of a "significant historical connection" does not include a temporal requirement,[124] Augustine's on-again, off-again presence in the North Bay region over a 30- to 40-year span stands in stark contrast to the description of, for example, the Grand Traverse Band's continuous, centuries-old connection to the parcel of land at issue in *Grand Traverse Band*.

---

[116] *Id.* at 18.

[117] *Id.* at 19.

[118] The Band also seeks to establish its historical connection to the North Bay region by highlighting marriages between certain members and non-Band members, Indian or otherwise, who happen to hail from the North Bay region. *See, e.g.*, Supplemental Report by Albert L. Hurtado et al., *supra* note 71, at 15–18. By the same logic applied to Augustine's connections, it would erroneous to attribute such individual connections to the Band as a whole. *See* Beckham Report, *supra* note 24, at 97 (stating, "While this documentation is a measure of the mixed ancestry of modern tribal members, it misrepresents who were the Scotts Valley Band of Pomo of Lakeport, California.").

[119] Palmer, *supra* note 70, at 49. The record does not disclose how long Augustine or any other children remained in residence at the mission. Memorandum from Scotts Valley Band of Pomo Indians, *supra* note 18, at 15, 17. Nor does the record document the extent of religious instruction or vocational training received by the Band's ancestors, which the Band alleges took place. *See* Supplemental Report by Albert L. Hurtado et al., *supra* note 71, at 8; *see also* Addendum to the Supplemental Report, *supra* note 99, at 1–3. Thus, insofar as the Band seeks to establish a close connection with the Parcel based on its ancestors' presence at the mission, the evidence is insufficient.

[120] Report by Albert L. Hurtado, *supra* note 5, at 64.

[121] Theodoratus et al., *supra* note 71, at 30, 78.

[122] *Id.* at 30.

[123] *Id.* at 53.

[124] 73 Fed. Reg. at 29,366. However, this requirement, while not creating a *per se* temporal requirement (i.e., a minimum of 40 years), nevertheless contemplates the length of connection factoring into the overall consideration of historical ties. *Id.*

AR0011613

Finally, even if Augustine's experience as migrant worker extended to the Band's other ancestors, and even if such work constituted occupancy or subsistence use, there is no evidence—direct or inferential—indicating that the Band's ancestors conducted such activity on the Parcel (as opposed to elsewhere). As the Department noted in the 2012 Restored Lands Determination, "IGRA's definition of 'restored land' . . . always has been limited to lands that a tribe used or occupied."[125] If the Band cannot provide direct evidence of historic use or occupancy on the Parcel itself, then it must provide direct evidence of historic use or occupancy close enough to the vicinity of the Parcel that one could naturally infer that the Band also used or occupied the Parcel.[126] The Bear River Indian Lands Determination offers an instructive example of direct evidence leading to a natural inference of historic use or occupancy.[127] Like the Scotts Valley Band, the Bear River Band of the Rohnerville Rancheria, a restored California Tribe, sought to game on a parcel located outside the boundaries of the reservation contemplated by the tribe's unratified treaty.[128] The Bear River Band demonstrated that the parcel in question is located among many sites known to have been used by the tribes' ancestors.[129] Based on the presence of such surrounding sites, the NIGC concluded that it could assume that the parcel, too, was used by the tribes' ancestors.[130]

Here, the Band asserts that evidence of the Band's ancestors working at various ranchos owned by the Vallejos creates an inference that those ancestors must have also worked at Rancho Suscol.[131] (As noted above, the boundaries of Rancho Suscol would have surrounded the Vallejo Parcel). However, such an inference, even if granted, is insufficiently broad and cannot serve as the basis to connect the Band with the Parcel itself. Rancho Suscol extended over "approximately 84,000 acres — an area equal to more than 130 square miles"; in contrast, the Vallejo Parcel comprises only 128 acres.[132] Similarly, the Band's alleged, generalized connection with Napa County through 1918 falls short of establishing a significant historical connection to the Parcel itself.

The shortcomings in the Band's evidence here are analogous to those described in the Guidiville Restored Lands Determination, which concerned a nearby group of Pomo Indians that endured some of the same consequences from non-Indian contact in the 1800s that the Band's ancestors

---

[125] 2012 Restored Lands Determination, *supra* note 21, at 15.

[126] *Id.*

[127] *See* Memorandum from NIGC Acting General Counsel to NIGC Chairman Deer 12–13 (Aug. 5, 2002), *available at* https://www.nigc.gov/general-counsel/indian-lands-opinions.

[128] *Id.* at 12.

[129] *Id.* (listing, in part: within a one-mile radius of the parcel, "a mythic pond that is the setting of an old tribal story" and "two (2) aboriginal villages . . . that were major [tribal ancestor] settlements in 1850"; within a three-mile radius of the parcel, "five (5) aboriginal villages"; and, within a six-mile radius of the parcel, "the first [tribal ancestor] town established after European contact; eleven aboriginal villages . . . and the Rohnerville Rancheria").

[130] *Id.* at 13.

[131] *See, e.g.*, Hurtado Comments, *supra* note 25, at 3 ("The record does not place any identifiable individual Indians on . . . Rancho Suscol, but it is natural to infer that some of the Clear Lake Indians worked there. . . . Suscol was claimed by Mariano, and it is reasonable to think that Salvador sent some of his Indian workers to assist when needed. . . . The case for Clear Lake Indians working on Suscol is a natural inference from the historical record."); Legal Analysis by Steven J. Bloxham, *supra* note 5, at 2–3 ("The Tribe has a 'significant historical connection' to the land because . . . the land is within Rancho Suscol . . . where the Tribe's ancestors were *probably* enslaved and held as captive labor . . . .") (emphasis added); Report by Albert L. Hurtado, *supra* note 5, at 45 ("Given the amount of work associated with the cattle industry in the 1840s it is *probable* that Mariano Vallejo employed Clear Lake Indians on Rancho Soscol as well as his other properties.") (emphasis added).

[132] Supplemental Legal Memorandum in Opposition to the Scotts Valley Band of Pomo Indians' Request for "Restored Lands" in the City of Vallejo, Solano County, California from Yocha Dehe 10 (Nov. 22, 2016).

AR0011614

did. In that determination, the Department acknowledged that "the mission and rancheria eras were marked by significant displacement of Indian peoples in present-day northern California"; nevertheless, the Department found that Guidiville Band's ethno-historian did not provide "reliable historical documentation of the Band's presence on the Parcel, or lands in its vicinity."[133] Here, while the Band's narrative concerning its ancestors' dispersal throughout the North Bay region during the mid-1800s is compelling, missing from this Request is the identification of significant historical sites in the vicinity of the Parcel, similar to that provided by the applicant tribe the Bear River Indian Lands Determination. While a general connection to Rancho Suscol would place the Band's ancestors in the vicinity of the Parcel, it does not create the necessary, natural inference that they occupied or used the Parcel itself.

## IV. CONCLUSION

Based upon the reasoning detailed above, I have concluded that the tribe has failed to demonstrate the required significant historical connection to the Vallejo Parcel. Consequently, the Department should decline to take the Vallejo Parcel in trust for gaming purposes as the Parcel does not meet the regulatory requirements necessary to qualify for the restored lands exception under IGRA.

I note that this decision is limited to whether or not the parcels could be considered restored lands. I offer no opinion on whether the tribe could use other IGRA exemptions for gaming on lands acquired after 1988, specifically 25 U.S.C. § 2719(b)(1)(A). Further, an unfavorable restored lands determination does not preclude the Band from considering, if it so chooses, alternative, non-gaming uses for the Parcel.

I regret that our decision could not be more favorable at this time.

Sincerely,

John Tahsuda
Principal Deputy Assistant Secretary – Indian Affairs

---

[133] Guidiville Restored Lands Determination, *supra* note 64, at 17.

AR0011615