## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

SCOTTS VALLEY BAND OF )
POMO INDIANS, )
 )
   Plaintiff, )
 )
    v. )  Civil Action No.  19-cv-1544 (ABJ)
 )
UNITED STATES )
DEPARTMENT OF )
THE INTERIOR, *et al*., )
 )
   Defendants. )
           )

## <u>YOCHA DEHE WINTUN NATION'S APPENDIX OF PORTIONS OF THE ADMINISTRATIVE RECORD</u>

**INDEX**

| Document Name (from ECF 23) | AR Pages Included |
|---|---|
| 2016.01.29 Bloxham legal analysis | AR0000027 |
| 2016.01.29 Theodoratus Report | AR0002883 |
| S2016.01.29 Consolidated Rpt | AR0002889, AR0002916 |
| 2016.01.29 Hurtado Report | AR0002977, AR0002985, AR0003000-02, AR0003015-21, AR0003060, AR0003062 |
| Tab 4 | AR0003144-45 |
| Exhibit 5 - Addendum - Chief Augustine | AR0004573-75 |
| Exhibit 5 - Supplemental Report | AR0005025-30 |
| 2016.11.07 Beckham Report Parts 1 - 4 | AR0005377-5579 |
| 2016.11.07 Ltr from United Auburn Indian Communities | AR0005580-83 |
| 2016.11.08 Cover Letter from Yocha Dehe to AS-IA | AR0005584-85 |
| 2016.11.08 Tab D Resendez Report | AR0005593 |
| 2016.11.08 Tabs G-K | AR0005603-35 |
| 2016.11.08 YDWN Legal Memorandum | AR0005687-92 |
| 2016.11.08 Yocha Dehe Index and Tabs A-C | AR0005716-23, AR0005816 |
| 2016.11.08 Appendix A Combined Village Table | AR0005849, AR0005853 |
| 2016.11.08 Appendix B Maps | AR0005863-64, AR0005866, AR0005868 |
| 2016.11.08 Appendix C Treaties | AR0005871-81 |
| 2016.11.08 Ethnogeography and Ethnography of Vallejo | AR0005886, AR0005890-98, AR0005900-02, AR0005906-12, AR0005914-15, AR0005922-23 |
| 2016.11.07 Beckham Report Part 1 | AR0005967 |
| 2016.11.22 EXHIBIT A | AR0006159-63 |
| 2016.11.22 EXHIBIT B | AR0006222, AR0006235 |
| 2012.05.25 Scotts Valley Richmond Parcels Decision | AR0006385-6403 |
| 2016.07.08 Graton Letter to DOI Roberts | AR0006657-60 |

1

| | |
|---|---|
| 2016.07.28 Letter from City of Vallejo | AR0006671-73 |
| 2016.08.23 Solano County Letter | AR0006721-23 |
| 2016.09.20 Napa County Letter | AR0006740-41 |
| 2016.11.14 Hurtado Response to Yocha Dehe Submissions | AR0006789, AR0006791 |
| 2016.11.14 Jim Frazier Support Letter | AR0006803 |
| 2016.12.23 Solano County Legal Memo re Scotts Valley | AR0006848-60 |
| 2017.01.10 Letter from SVB to ASIA | AR0006863-64 |
| 2017.03.06 Auburn Submission | AR0006868-82 |
| Scotts Valley Letter 090116 from Daniel Keen | AR0006899-6903 |
| Request for "restored lands" opinion | AR0007015-16, AR0007019 |
| Incoming Scotts Valley Casino Proposal in Vallejo, CA 8.12.16 | AR0007087-89 |
| Letter from Chairman Sarris - Federated Indians of Graton Rancheria | AR0007461 |
| Scotts Valley letter to DOI Roberts 070816 FINAL | AR0007462-65 |
| Ltr - Scotts Valley Band of Pomo Indians fee-to-trust application Solano | AR0008971 |
| Jan 13 2017 CA Letter to DOI re Scotts Valley | AR0009874 |
| 2016.09.01 City of American Canyon Opposition letter | AR0010713-15 |
| 072216 Feinstein to DOI Sec | AR0010870-71 |
| 082916 Thompson Huffman Letter to DOI | AR0010872-73 |
| 2016.11.29 Letter to Jewell re Scotts Valley Casino | AR0011564-65 |
| 2019.02.07 Scotts Valley Indian Lands Decision | AR0011597-615 |

Hon. Paula Hart, Director, Office of Indian Gaming
January 28, 2016
Page 20 of 27

justify the relationship between the national government and Indian tribes." F. Cohen, *Handbook of Federal Indian Law* § 5.01[2], p. 386 (Newton, et al., eds., 2012) (citing to, *e.g., Worcester*, 31 U.S. 515, 520, 561).

Ethnographers have long been in agreement that the area in and around what is now the City of Vallejo and adjacent portions of southern Napa and Solano counties were part of the territory of the Patwin people. *See, e.g.,* P. Johnson, "Patwin," 8 *Handbook of North American Indians* 350-351 (1978). Not surprisingly, ethnographers also agree that California Indians used all of their territories. *See* R. Heizer & A. Kroeber, For Sale: California at 47 Cents Per Acre, 3(2) J. Calif. Anthro. 38-65 (1976). The closest documented Patwin village to the subject lands was known as "Suskol," and was located immediately adjacent to what is now State Highway 29, south of City of Napa, approximately 6-1/8 miles north of the City of Vallejo, and approximately 6-3/4 miles from the subject lands. *See* Johnson, "Patwin," 8 *Handbook of North American Indians* at 350, Fig. 1 (Tribal territory and villages) no. 34 ("Suskol"); D. Gardner, "Suscol in Napa County: An Historic Report 1835-1977" (1977) at 1-2, 9-11 & Exhibits 1 ("Key Map"), 2 ("Location Map") & 3 ("Air View of Transportation Corridors").

However, the record indicates that by 1851 there were no surviving Patwin (or any other Indian) villages, and not independent bands or tribes, in southern Napa and Solano Counties. *See, e.g.,* S. Cook, The Aboriginal Population of the North Coast of California, 16(3) Univ. of Calif. Pubs. Archaeological Records 81, 125-126 (1956) (discussing the reports of surviving populations in the area as of 1843, and noting that the evidence indicates that the "the aboriginal village organization had broken down utterly, and the Indians were living in new places in conformity with new economic and social requirements."). *See also* D. Gardner, "Suscol in Napa County: An Historic Report 1835-1977" (1977) at 2 ("The Patwin village at Suscol seems to have been inhabited until the early 1830's. . . . By 1849, William Neely Thompson, who was reputedly one of the first Anglo visitors to the areas and who later had a role in Suscol's development, made no mention of Indian inhabitants.")

Because the legal requisites for treaty relations required that "each of the contracting parties shall possess the right of self government, and the power to perform the stipulations of the treaty," *Worcester v. Georgia*, 31 U.S. at 581 (McClean, J., concurring), it is evident that the United States recognized and treated with the Clear Lake bands as successors to the former aboriginal occupants of the lands in the Vallejo area.

<u>The Proposed Restored Lands Are Part of the Land Individually and Collectively Ceded by the Clear Lake Bands to the United States in the 1851 Treaty</u>

The lands "jointly and severally" ceded by the Clear Lake bands to the United States comprised a distinct territory extending from the Clear Lake region in the north to the northeast shore of San Pablo Bay and the Carquinez Straits in the south. *See* C. Royce, *Indian Land Cessions in the United States*, Eighteenth Annual Report of the Bureau of American Ethnology, 1896-'97, Part 2 (GPO 1899) at 784-785 (Schedule of

land, rather than relocating the tribe to Upper Lake, was supported by C. E. Kelsey, the Special Agent for securing land for California Indians.  The largest membership is comprised of the Augustine Frese descendants, although other families also are strong components of the tribe.

The basic tribal areas around Clear Lake remain today as they were.  Although no longer defined by language groups, the Clear Lake tribes form communities based on traditional standards of cultural continuity.  The Scotts Valley Band of Pomo Indians continues to maintain a community at or near the same location, where they were originally recorded, in the 1800s (Scotts Valley Tribal Council Data).

The Scotts Valley Band of Pomo Indians is presently centered in their offices at Lakeport in Lake County CA., and in Concord, Contra Costa County (Scotts Valley Tribal Council data).  Their "traditional territory" (early 1850s) was located on the western side of Clear Lake.  This Band was provided with a 56.88-acre parcel of land for a Rancheria in 1911, but the land was determined unsuitable for subsistence and was terminated (1965) with deeds given to individual residents called distributees (California Rancheria Act, August 18, 1958; 72 Stat. 619, as amended).   After termination many of the former residents were relocated to Bay Area vicinities under the Indian Relocation Act of 1956 (P.L. 959).  The tribe's Federal recognition was restored in 1991 through court action (U.S. District Court, Scotts Valley Band et al., vs. United States, et al., No. C-86-3660) (California State Governor's Office Tribal Directory 2015:2-184-185).   Subsequently, many relocated members have returned to their former home, while others remain in the East Bay and North Bay areas (Theodoratus consultation, Nov. 6, 2015).

AR0002883

# Consolidated Report by

## Heather A. Howard, Ph.D.

## James M. McClurken, Ph.D.

## James M. McClurken & Associates

## Edited by

## Steven J. Bloxham

## Fredericks Peebles & Morgan LLP

---

**Scotts Valley Band of Pomo Indians**

**Request for Indian Lands Determination**

**January 29, 2016**

AR0002889

the 1830s to being "so entirely extinct that the sight of an Indian has become a rarity."[122] In a thirty-year period, Palmer noted that the region around the town of Napa had "seen the wild plains, on which Indians and wild animals roamed at will, changed into wide stretches of smiling grain."[123]

It is unlikely that the two linguistically different branches of the Scotts Valley families- Pomo and Patwin- would have come to share the same community unless there were significant ties between them, as established by and based in Indigenous practices. Numerous historians and anthropologists have described the intricate ties between the Clear Lake Indians (generally Pomo) and those to their south near San Pablo Bay (generally Patwin). In the *Handbook of North American Indians* volume on California, Patti J. Johnson writes, "Historically there was a friendly exchange between the Patwin of Long Valley and the Southeastern Pomo. Long Valley Patwin could freely visit Clear Lake to fish or hunt with or without permission, depending on the particular Pomo tribelet… likewise these Pomoans would… gather seeds in Long Valley Area… Both groups in this region intermarried frequently."[124] Lake County historians Lewis, et al., who also wrote extensively about Chief Augustine, note that some Clear Lake Pomo "were related to tribes of Napa Valley."[125] These authors also note that ancestors of the Tribe did not make bows, but rather purchased them from the Long Valley Patwin, who had in turn obtained them from other Native peoples to the northeast.[126] The Patwin formed links between the Native peoples of the Sacramento Valley, Clear Lake and the Bay Area.

Lyman Palmer found the Patwin and Pomo to be so similar and interrelated that he simply referred his readers to his description of the Clear Lake Indians, to understand Patwin "general habits, customs, legends, etc."[127] In particular, he described them as "very clannish," noting that usually two or three families co-habited, and that "family influence is all-potent."[128] Stephen Powers, who first published his description of the Patwins in 1877, described a pre- American period feud between two Patwin groups which resulted in one whole tribe of Patwins moving to

---

[122] Lyman L. Palmer, *History of Napa and Lake Counties, California* (San Francisco, CA: Slocum, Bowen & Company, 1881), "Indians of Napa County," p. 46 [Hereafter Palmer, *History of Napa and Lake Counties*].
[123] Palmer, *History of Napa and Lake Counties, supra* note 122, "General History and Settlement," p. 55.
[124] Patti J. Johnson, "Patwin," in *Handbook of North American Indians, vol. 8, California*, ed. Robert F. Heizer (Washington, D.C.: Smithsonian Institution, 1978), p. 352.
[125] Lewis et al., *Stories & Legends, supra* note 22, p. 11.
[126] Lewis et al., *Stories & Legends, supra* note 22, p. 9.
[127] Palmer, *History of Napa and Lake Counties, supra* note 122, "Indians of Napa County," p. 46.
[128] Palmer, *History of Napa and Lake Counties, supra* note 122, "Indians of Lake County," p. 29.

26

AR0002916

The Scotts Valley Band of Indians and the North San Francisco Bay Region

Albert L. Hurtado, PhD.

January 18, 2016

**Introduction**

This report is a history of the Indian people who lived in the region extending from the shores of San Pablo Bay to the vicinity of Clear Lake from about 1769 to 1860. During these years first Spain, then Mexico, and finally the United States assumed control over northern California. This area includes the marshy lowlands bordering San Pablo Bay, the valleys formed by the creeks and rivers that drain into it, and the territory around Clear Lake extending west to the Russian River. Before the arrival of Spaniards and other newcomers this large extent of country was home to several Indian tribes that spoke different languages but that shared a general way of life, traded, intermarried and in the main cooperated with one another.[1]

The Scotts Valley Band of Indians (SVBI) is descended from several Pomo speaking communities in the Clear Lake area. Untrained observers, ethnographers, and linguists have used a dizzying array of spellings for these communities. The basic anthropological reference work uses technical linguistic spellings that are impractical to reproduce in this report.[2] For the sake of clarity, consistency, and ease of pronunciation this report uses "Kulanapo and Habenapo" for the two Eastern Pomo speaking communities in Big Valley near the southern shore of Clear

---

[1] Theodoratus, "Scotts Valley Report," 1-4.
[2] Bean and Theodoratus, "Western Pomo and Northeastern Pomo," 289-305

1

AR0002977

southern Marin peninsula began to migrate to Mission Dolores in large numbers. This apparently peaceful and voluntary movement may have been caused by population collapse that was brought about by deadly epidemic diseases, especially measles.[18]

Mission recruitment and disease depopulated a broad band of territory that stretched from the Marin Peninsula to the Carquinez Straits, an area that had been Miwok and Patwin territory.[19] In 1804 fourteen Costanoan[20] neophyte men were given permission to visit East Bay villages, but the men were evidently in pursuit of relatives who had fled into Patwin territory in the North Bay region. The mission Indians crossed Carquinez Strait into present day Solano County where Suisun Patwin Indians killed them. The Suisun's motives are unclear, but they evidently wanted to limit the area of mission influence by killing Indians who were supportive of the missions. This was the beginning of Patwin attempts to dominate and control the North Bay region.[21]

---

[18] Milliken, *A Time of Little Choice*, 176-179.

[19] There is some dispute about the linguistic affiliation of the Carquin Indians who according to Milliken occupied both sides of Carquinez Strait and spoke a Costanoan dialect. According to James A. Bennyhoff Costanoan speakers occupied only the southern shore of the strait while the northern shore was home to Patwin speakers who were known as Aguastos. Milliken writes that the Huichin-Aguastos held the area between Glenn Cove to Mare Island, "but they were clearly Costanoan speakers and heavily intermarried with the Carquins." C.f. Milliken, *A Time of Little Choice*, 238, and Bennyhoff, *Ethnogeograpjy of the Plains Miwok*, 137-144. In volume 8 of the *Handbook of North American Indians*, Johnson, "Patwin," 350, has them Patwins on the north side of the strait and and Levy, "Costanoan," 385, has Costanoans confined to the south shore.

[20] Costanoan was the language that most Indians spoke in the San Francisco Bay region.

[21] Milliken, *A Time of Little Choice*, 180-181.

AR0002985

many as 50,000 cattle on all of his ranches plus four to six thousand horses.[53]  The labor requirement for managing herds of this magnitude on open range was very large and there was only one practical source – the surrounding Indian population consisting of Miwok, Wappo, Pomo, and Patwin Indians.  If neophytes could not meet the labor needs of the new ranchero class they turned to free Indians, or as Vallejo and other Mexicans called them, gentiles or "wild" Indians.  Some Indians worked willingly but others had to be forced.

While the Indian population had been sharply reduced by 1835 they still comprised a majority that far outnumbered the military forces at Vallejo's command.  However, as his brother Salvador said, "by following the astute policy of the ancient Romans, who created dissensions among their neighbors for the purpose of afterwards being called in to act as mediators," Mariano Vallejo was able to control Indian affairs in the North Bay region.  According to Salvador the "*mansos* (tame)" Indians hailed his brother as "a liberator" who would protect them from the "Satiyomi [Wappo] and their allies."[54]

In order to carry out a policy of divide and conquer the Vallejos would need an Indian partner.  A Patwin leader by the name of Francisco Solano proved to be the man for the job.  By the time the Vallejos moved to Sonoma most of the free Indians between the Napa River and Suisun Bay were under the leadership of Solano.  Solano was baptized in the mission San Francisco de Asís in 1810 when he

---

[53] Cayetano Juarez, California Land Claims, vol. 26, Commission Number 291, 7. Juarezz's estimate of Vallejo's holdings was by no means the largest.  Davis, *Seventy-Five Years in California*, 22.
[54] Salvador Vallejo, Notas historicas sobre California, 84-85, translation that is included with the original in Spanish manuscript.

AR0003000

was ten or twelve years old. Sina was his native name. He was a Suisun Patwin who had probably been captured and taken to the mission a couple of months before his baptism. In 1824 Solano was among the Suisuns who were sent back to their home country as Mission San Francisco Solano neophytes. At the new mission Solano became an *alcalde* (a neophye supervisor) by the time he was thirty-five.[55]

Francisco Solano was a remarkable man who impressed all who met him. Described as tall, handsome, intelligent and commanding, Solano and his followers posed a threat to Vallejo's authority. In 1835 Vallejo learned that Indians under Solano had gathered to oppose him at the Patwin village of Suscol, which is sometimes spelled Soscol, or Soskol. (The Suscol village site is located at the junction of State Highway 29 and Soscol Road. It is on the northern boundary of Vallejo's Rancho Suscol land claim and the Tulucay Mexican land grant.)[56] Vallejo led a force of about two hundred men to Suscol where a battle ensued. At first Vallejo's men drove off their opponents but more Indians from surrounding valleys showed up and fought under the leadership of Solano. They surrounded Vallejo who was forced to send to Governor Figueroa for reinforcements that arrived in due course. Once confronted by superior numbers and armament Solano called for a meeting with Vallejo. Solano proposed a mutually beneficial alliance with Vallejo. Solano and his people were at war with the Satiyomi (Wappo) and Cainamero

---

[55] Early California Population Project, Baptismal Number 4024, Mission San Francisco de Asís. Randall Milliken, "Ethnographic and Ethnohistoric Context for the Archaeological Investigation of the Suisun Plain, Solano County, California," unpublished paper in author's possession. Others argue that Solano was baptized at Mission San Francisco Solano, Peterson, "The Career of Solano," 13,

[56] Gardner, "Suscol in Napa County," 2-3, 10-11.

AR0003001

(Pomo) groups that lived to the west and north. Vallejo agreed to aid Solano in his wars against the Pomos and Wappos if the Patwin would remain at peace with him and the nascent Mexican settlements near Sonoma.[57] This was precisely the kind of alliance that Vallejo needed to carry on his divide and conquer strategy. "Prince Solano," as Salvador styled him, became Vallejo's "confidential agent" who "obtained timely advice of every impending attack."[58]

Vallejo and Solano immediately put their alliance to work. In 1835 the Vallejo brothers and Solano together with sixty "Californians and Mexicans, 22 foreigners [mostly Americans] . . . and some 200 Indian auxiliaries" under the command of Solano marched north of Sonoma.[59] Charles Brown, one of the foreigners who went with them, recalled that they may have gone as far as two hundred miles north, although this may not have been an estimate of air miles. During the journey it rained much of the time and Brown was severely wounded during a battle with Indians, factors that may have caused Brown to overestimate the distance in his recollection of events. In any case, the Sonoma forces marched far north of Sonoma where they found a ranchería in a deep mountain valley. It is impossible to know the exact identity of this Indian community but it was probably in Northern Pomo territory. The Indians were accused of stealing livestock from the Sonoma settlements.

They attacked the village at sunset, killed "a great many of them and took a large number of prisoners." Brown's description of the fighting reveals the brutal

---

[57] Peterson, "The Career of Solano," 23-24.
[58] Salvador Vallejo, Notas historicas sobre California, 86-87.
[59] Brown, Statement of Recollections, 11, states that it was in the fall of 1835.

26

AR0003002

holdings in Sonoma, Rancho Petaluma, Rancho Suscol, or Rancho Suisun had better stay put until further notice. To do otherwise would put the lives of the fugitive and his family in jeopardy.

The Vallejo family expanded their private empire, but Indians who were employed on their vast estates suffered dire consequences. In 1837 a small pox epidemic swept most of them away. The Vallejos were the indirect cause of this disaster. An officer under the command of Salvador Vallejo had contracted the disease while on a mission to Fort Ross. When he returned to the Sonoma region he spread the illness among Indians. Salvador claimed that "upwards of sixty thousand Indians died," doubtless an exaggeration yet it emphasized the deadly effects of small pox among northern California Indians.[96]

The ravages of small pox devastated the Patwin communities in Solano County, including the Soscol ranchería.[97] By then Vallejo was running the land that became known as Rancho Suscol as Rancho Nacional, a pasturage for government livestock. The decimation of the Patwin community made the animals a tempting target for Muquelumne Miwok livestock raiders from the San Joaquin Valley. Without a substantial Indian population on Vallejo's eastern flank his herds were left exposed to depredations from that direction. For that reason (and to check the ambition of his uncle Mariano) Governor Juan B. Alvarado gave John Sutter permission to settle in the interior in 1839. For the next seven years Vallejo and Sutter would dispute who had authority over Indians in the Sacramento and San Joaquin valleys.

---

[96] Salvador Vallejo, Notas historicas sobre California, 45.
[97] Gardner, "Suscol in Napa County," 2.

AR0003015

As soon as he arrived in the Sacramento Valley Sutter made an alliance with the Miwok chief Narciso, formerly a Mission San José neophyte.  Narciso had been loyal to Mariano Vallejo, but now moved his people to Sutter's settlement near the mouth of the American River. [98]  In April 1840 Narciso and some of his followers went to Rancho Suscol, probably with the intent of stealing livestock.  Mariano, Salvador, and Solano led a force against the intruders and captured Narciso with twenty-one others.[99]  Sutter probably had nothing to do with Narciso's foray but it must have been troubling for the Vallejos to see a former ally turn against them.

Perhaps Narciso's perfidy caused Salvador to lead sixty soldiers to the San Joaquin Valley in June of 1840.  Staying well south of Sutter's establishment Salvador's regiment ranged over Miwok and Yokuts territory for several weeks and returned to Sonoma with eighty prisoners.  These captives had not come without cost.  Indians had wounded Salvador and killed five soldiers.  Salvador wanted to execute the captives, perhaps in revenge for his wounds and the other casualties.  When he was an old man Mariano claimed that he opposed Salvador's plan.  Instead he sent the prisoners to Mission San Francisco de Asís but surreptitiously had his sergeant release them along the way except for six hostages.[100]  Depending on which way the coffle went from Sonoma they would have passed through Rancho Petaluma, Rancho Suscol and other ranchos where Indian labor was in demand.  In other words, Vallejo probably "released" the prisoners to a life of labor.

---

[98] Hurtado, *John Sutter*, 55-58, 72.
[99] Vallejo, "Recuerdos," vol. 4, ch. 55.
[100] Vallejo, "Recuerdos," vol. 4, ch. 57.

AR0003016

The events of the spring and summer may have been a response to Sutter's presence in the Sacramento Valley. Salvador's campaign may have been an attempt to undercut Sutter's authority among the Indians. Or, it may have been a routine Indian enslavement campaign. Whatever the case may have been, Sutter's presence complicated the Vallejos' ability to manage Indian affairs as they saw fit.

In October 1840 José de Jesús Vallejo, a brother of Mariano and Salvador who was comisionado of the Mission San José, issued passports to several neophytes to trade in Sutter's territory. The Indians duly presented their passports to Sutter while assuring him of their peaceful intentions. However, they attacked a nearby ranchería that was unprotected because the able-bodied men were working at Sutter's place. The San José men killed the elderly and infants and kidnapped the women and older children to sell to rancheros on the coast. Upon learning of this atrocity Sutter led a force of angry Indian relatives who caught up with the kidnappers, killed some in a fight, and executed others. Sutter then wrote to José de Jesús informing him that he would no longer tolerate mission Indians in his territory.[101]

Patwin territory was depopulated but Solano lived on. His association with the Vallejos had made him a wealthy man. He boasted that he owned many cultivated fields, two thousand cattle, and dozens of Satiyomi girls, captives no doubt.[102] Solano's benefactor, General Vallejo, did not attempt to liberate these captives. Indeed Vallejo's Indian campaigns gave Solano new opportunities to add to his personal wealth by acquiring more booty and Indian prisoners. In 1837

[101] Hurtado, *John Sutter*, 74-75.
[102] Peterson, "The Career of Solano," 49.

41

AR0003017

Vallejo arranged for Solano to join California's landed elite when he applied for a four league grant of land appropriately called Suisun, an estate that formed part of Rancho Soscol's northwestern boundary. The governor confirmed the Suisun grant in January 1842. Five months later General Vallejo purchased the grant from Solano, although it is not clear if any money actually changed hands.[103]

The amount of land that the Vallejos controlled and claimed to own is almost unimaginable. Between 1835 and 1846 when the United States conquered California Mariano and Salvador Vallejo established claims to several ranchos located between San Pablo Bay and Clear Lake. Not all of them were confirmed under U.S. law but that did not stop them from using the land as their own. Much of this land was carved out of the grazing lands associated with the Mission San Francisco Solano. The previously mentioned 66,000-acre Rancho Petaluma was the centerpiece of the Mariano's landed estates. He also claimed Rancho Soscol, formerly mission rangeland about the same size as Petaluma that included the present cities of Vallejo and Benicia in Solano County. To the north east of Rancho Suscol Vallejo acquired by purchase Rancho Suisun from Francisco Solano (more than 17,000 acres). He also claimed Rancho Yulupa, three square leagues (approximately 13,000 acres) and Rancho Agua Caliente (3,200 acres) in Sonoma County. In all, Mariano Vallejo personally claimed and controlled approximately 100,000 acres during the Mexican period. His brother Salvador claimed Rancho Lup-Yomi (60,000 acres) at Clear Lake, Rancho Yajome (6,500 acres) in Sonoma

---

[103] *Confirmation by the Land Commissioners of the Claim of A. A. Ritchie to the Rancho of Suisun*, 3-4; Milliken, "Indian People of the Near North Bay prior to 1840," unpaginated, unpublished report in possession of author.

AR0003018

County, and 3,100 acres that were parts of grants in Napa County. The Vallejo's brother-in-law, Jacob P. Leese, was granted Rancho Huichica (18,700 acres) in Sonoma County. Another brother-in-law, Victor Prudon claimed the 35,000 acre Bodega grant on the coast in Sonoma County. All told the Vallejos controlled land from the Pacific Ocean to Suisun Bay and north to Clear Lake totaling more than 220,000 acres.[104] By using Mexican law to confiscate Indian land and compelling Indians to work for them the Vallejos established for themselves a lordly domain that they ruled by personal fiat. This was the state of Indian affairs that confronted U.S. officials when they assumed control of California in 1846.

It was one thing to own hundreds of thousands of acres but it was another to derive wealth from the land. Cattle ranching was the principal business of Mexican California and the Vallejo brothers devoted themselves to it. Captain Davis estimated that Mariano owned 50,000 cattle on his ranches, with some 14,000 on Rancho Soscol alone.[105] The value of these animals was chiefly in their hides and tallow which were sold around the world.

California cattle ranching was labor intensive, especially at roundup times. California was open range; there were no fences to divide one rancho from another. Long-horned and dangerous, the cattle were as wild as deer. Davis recalled that Mariano's cattle "used to stray a long distance along the margin of Suisun Bay."[106] From time to time these strays had to be driven back to their home range. Cattle had to be moved from one open pasture to another to avoid over grazing. Free-

---

[104] Figures compiled from Hoffman, *Reports of Land Cases*, Appendix, "Table of Land Claims," 1-109; and Beck and Haase, *Historical Atlas of California*, Map 29.
[105] Davis, *Seventy-Five Years in California*, 105.
[106] Davis, *Seventy-Five Years in California*, 105.

AR0003019

roaming cattle mixed with the herds on neighboring ranchos so rancheros made sure that their distinctive brands marked the hides of their animals. The daily work of a  vaquero routine included such tasks as rounding up strays, driving herds to new  pastures, and protecting herds from animal predators and Indian raiders.[107]

Vallejo held two large-scale roundups per year. In March vaqueros gathered about 10,000 calves to be branded, castrated, and ear-marked (a secondary form of identification made by a distinctive cut or notch in each calf's ear). The March roundup occurred on each of his ranchos. The second annual roundup was the *matanza* or slaughter for hides and tallow. Mariano slaughtered 8,000 steers annually. His men drove mature steers to slaughter at Rancho Petaluma, with the exception of the animals at Rancho Soscol that were slaughtered there.[108]

The sheer labor involved in these roundups is difficult to imagine for people without a ranching background. Driving thousands of cattle to some central location where the herd could be controlled was the work of scores, perhaps one hundred vaqueros, but the men on horseback were not the only workers on the scene. There would have been many more Indians to do the less appealing and more dangerous work on the ground. Imagine the herd of milling wild cattle being held in place by the vaqueros that surrounded them. As dust from thousands of hooves rose from the plain the major domo would point out an animal. One vaquero would separate the steer from the herd while another vaquero advanced with a loop slowly twirling above his head until he deftly roped the horns of his intended victim. A third vaquero came in from behind and roped the hind legs as the steer was pulled

---

[107] Jordan, *North American Cattle-Ranching Frontiers*, 159-169
[108] Davis, *Seventy-Five Years in California*, 105.

AR0003020

off to the side. The ropers stretched the luckless animal on the ground so an Indian could run in and cut its throat with a knife. The same procedure was used when branding, castrating, and earmarking calves. At the *matanza* Indian workers descended on the lifeless carcass with butcher knives to strip off the hide. The carcass was further butchered so that fatty parts could be thrown into a large kettle over a fire to render the tallow. The hides were set in the sun to dry. Eventually the dried skins would be stacked in store houses until they were sold to merchants like Captain Davis. The tallow was stored in large rawhide bags so that it could be shipped. Indians did all of this labor, including much of the work on horseback.[109]

It is worth emphasizing that Captain Davis wrote that "Indians from the Clear Lake country" assisted on all of the ranchos "north of the bay of San Francisco." These Indians were distinctive enough to Davis that he described "Clear Lake Indians at their *temescales*, or steaming places."[110] He described how they built the structure and how they used it. Davis may have been especially observant of ethnic practices because he came from a mixed racial background. His maternal grandmother was a native Hawaiian and Davis was known as "Kanaka Bill." Whatever the reason for his interest in such matters, Davis saw a lot of Clear Lake Indians on Vallejo's property. Given the amount of work associated with the cattle industry in the 1840s it is probable that Mariano Vallejo employed Clear Lake Indians on Rancho Soscol as well as his other properties.

---

[109] Robinson, *Life in California*, 85-86; Dakin, *The Lives of William Hartnell*, 156-157; Bancroft, *California Pastoral*, 344-345.
[110] Davis, *Seventy-Five Years in California*, 25.

45

AR0003021

The treaty reserved the country around the northern part of the lake, the habitable portion of which was about six by twelve miles. Indians would have exclusive fishing rights. The United States could place Russian River tribes or tribes from "elsewhere" on the reservation as well.[195]

The treaty envisioned a reservation that would be self-sustaining. It provided for bulls and "milch cows," stallions and brood mares to propagate herds. Plows to break the virgin soil and abundant seeds to plant were also provided for, as well as a "practical farmer" to superintend the agricultural operations and to teach the Indians. Work mules and oxen would plow the fields and haul produce to market in wagons that would also be provided. Clothing, bolts of cloth, thread and needles would arrive at the reservation and Indian women would dress themselves and their families accordingly. Teachers would instruct women and children in the "domestic arts," and "the manual-labor system." Everyone would learn to read and write.[196]

McKee's oral instructions for delivery of the provisions were specific. The Indians had to pick up their provisions in Vallejo because the roads to Clear Lake were impassable for wagons and it would be too expensive for the Great Father to bring the stuff there. "General Estelle's ranche is on the Bay of San Francisco, near Vallejo, and he has agreed to take care of any flour I may order for you," he said. While promising beef in Vallejo Agent McKee assured that there would be little or none in Big Valley. "There are two gentlemen present – Messrs. Price and Shirland –

---

[195] "Treaty with the Ca-La Na-Po. Etc., 1851," in Kappler, *Indian Affairs: Laws and Treaties*, 4:1109. Original treaty found in M234, reel 32, 397-404.
[196] "Treaty with the Ca-La Na-Po. Etc., 1851," in Kappler, *Indian Affairs: Laws and Treaties*, 4:1110. Original treaty found in M234, reel 32, 397-404.

AR0003060

and their responsibilities as his children.  Then he introduced Julio and Prieto who explained the benefits of the treaty from their perspective.  McKee promised that if the Russian River people moved to Clear Lake they would be treated exactly like the rancherías that already lived there.  Only José María refused to go to Clear Lake.  The others signed a treaty that incorporated the provisions of the Clear Lake document by reference.  The Russian River rancherías were also to receive 100 cattle and 10,000 pounds of sacked flour for three years to be picked up at Estell's Ranch.[199]

McKee's two treaties with Pomos had obligated the U.S. to purchase 600 cattle from General Estell for the Indians' benefit over a period of three years. Having finished his business with McKee, General Estell rode back to Sonoma where he had a proposition for General Vallejo.  On September 29 Estell closed out his business with Vallejo who owed Estell $8,009 which was to be paid for with 600 head of cattle – less than three dollars per head, which was far below the $40 per head that McKee was paying him.  In return Estell conveyed to Vallejo his share of Eden Ranch.  It is clear from subsequent developments that Estell continued to operate a ranch in this vicinity, perhaps on a lease arrangement from Vallejo.[200]

The cattle dealing of Estell and the McKees caught the attention General Ethan A. Hitchcock, Commander of the Pacific Division headquartered in Benicia, a town on Carquinez Strait that General Vallejo carved out of Rancho Suscol in

---

[199] "Treaty with the Sai-Nell, Yu-Ki-As, Etc., 1851," in Kappler, *Indian Affairs: Laws and Treaties*, 4:1112-1113.  Original treaty found in M234, reel 32, 391-395; Redick McKee quoted in John McKee, "Minutes Kept by John McKee," August 18, 1851, Serial 688, 143.

[200] Indenture between Estell and Vallejo, September 29, 1851, Solano County Book of Deeds, F, 54-56; Release, Vallejo and Estell, September 29, 1851, Solano County Book of Deeds, F, 57-59; "Account of debts and liabilities of the Indian department in California," Serial 688, 285.

AR0003062

you would like to put in those two villages it would make the multiethnic character of Mission San Francisco Solano, which is something that you emphasize in the essay, even stronger.

I also found the following rancherías mentioned in the baptismal records of San Francisco Solano, which are not on the list, although some of them might well be variant spellings of the places that are already there: Cacaa, Cactoy, Calacala, Canijolmanos, Caquetoy, Chichiritoy, Copetoy, Guilucs, Hachi/Hachitoy, Lihuay/Lihuaitoy, Mosoy/Mosoytoy, Ollaa/Ollatoy, Pormatoy,Ubutoy, Yochatoy, Yucal/Yucaltoy.

3. On the expeditions in 1842 and 1843, the letters cited by Lothrop on page 169 come from 1841 and 1843. The 1841 document (10:230) is mainly about the Russians, with a couple of sentences that the Satiyomi still present a danger to the people of the Valley (of Napa or Sonoma, I assume). The 1843 document (11:366) is a letter from Gov. Micheltorena asking for a report on the death of 170 Indians in the recent expedition.

In addition, there is a March 13, 1843 letter from Salvador Vallejo to Mariano which, according to the summary is a report of the expedition to Sonoma. As far as I can tell Lothrop does not cite this. The document, at least on microfilm, is extremely difficult to read, although Rose Marie will give it a shot. If it is in bad shape in the original, that might be the reason that Lothrop did not cite it.

II: From Rose Marie and Bob. We put your questions and comments in italics, and our answers indented

*It all looks like good stuff. I'll try to be selective. You needn't do a full translation. I don't necessarily need direct quotes. A good paraphrase will do unless you think there is something that is particularly important (or perhaps ambiguous?).*

*Chapter 55. this is important, especially if you can attach a date. Hinkley was the pilot in SF Bay, right?*

The year was 1840, he says. Hinkley was not yet captain or pilot of the port. At this point he was involved in business with Nathan Spear and Jacob Leese. He had a lot in Yerba Buena. This particular event that took place in Sonoma, where Mariano treated a group of people from Monterey and Yerba Buena to a round-up and then Solano, according to Vallejo, organized a dance of the Indians for the entertainment of the guests.

After all this was concluded, the party went back to Yerba Buena. Vallejo says that, two years later, Henry Mellus, who was one of the party, told him that Hinkley was so impressed with the Suisun oarsmen who were taking them back to Yerba Buena that he told him that when he got back to Monterey he was going to tell Gov. Alvarado that he should give them a land grant of three leagues of land in the Napa Valley and a thousand head of cattle that they could use for stocking this grant. According to Mellus, the Indians looked disdainfully at Hinkley and told him that the governor of California had no power to give out land in the North, since the land all belonged to them. They did not have any titles from the governor, nor did they want any, because they were the ones who were the owners of the lands and it was their place to give the government titles, not the government' s place to give them titles.

*Chapter 56. I think this is the 1838/39 incident that I mention in the report I just sent to you. If so, can you confirm that Narcisco was a leader in that party? Narciso (if this is the same guy) eventually defected to Sutter. Again, I don't need a lot of detail, just confirmation with dates if possible.*

Vallejo dates this in 1840. He's very specific about that, because he says that on the very day that Graham was taken prisoner, he, Salvador, and Solano were in the Suscol Valley, stopping an invasion of these three groups. He says that his soldiers and the Suisuns  were able to stop the invasion and pursue the invaders to the "Gulpines." There he took Narciso and 21 of his companions prisoner. He says he remembers it very specifically because right when he got back to Sonoma he was met by a group of Americans who were very worried that Graham had just been captured.

*Chapter 57. This seems to be the same incident that I recount in Sutter. Sutter caught up with the kidnappers and executed some of them. So where did that busy boy Salvador get his prisoners?*

Vallejo says this happened in the summer of 1840. He says that they were two expeditions sent out, one from ex-Mission San Jose under the leadership of José de Jesus Vallejo and Prado Mesa, and one from Sonoma under the leadership of Salvador Vallejo and Francisco Sánchez. The expedition from Sonoma, which consisted of 60 soldiers, was supposed to go around about the area watered by the Tuolumne, Dolores, Guadalupe and San Francisco Rivers and round up every suspicious looking Indian that they saw. They were able to rescue eight of the girls who had been stolen from Sutter's Indians. They lost five soldiers in conflict with the Indians. After five weeks in the field they

AR0003145

found employment in the fields.  "In the springtime and harvest, the men go down into Napa and Sonoma Valleys, and hire themselves, at good wages, to the farmers there, and thus procure the means of clothing themselves and families."[27]

In the 1860s Clear Lake Indians continued to be important to Napa agriculture.  "Harvest time has brought our valley a large number of Clear Lake Indians," who "were exceedingly useful in the field," a Napa newspaper reported in 1862.[28]

## 4.  In 1870, Augustine Was Employed in Napa Township in Close Proximity to the Vallejo Site

It is not known exactly when Augustine was recognized as a chief among the Kulanapo but by the late 1870s white observers understood that he held this position.[29]  According to SVBI tradition Augustine derived some of his prestige because of his ability to find employment for his people.[30]  Employment was not merely an economic issue, it could be a matter of personal liberty, life, or death. California law required Indians to be employed or be subject to indenture to white ranchers.[31]  Regardless of the law slave raiders attacked Clear Lake Indian communities and kidnapped children to be sold to ranchers in Napa Valley and elsewhere.[32]  Consequently, Indians sought employment with ranchers in order to have some protections from kidnappers as well as the state Indian indenture law.  Augustine's work experience, connections to rancheros

---

[27] U.S. Department of the Interior, Bureau of Indian Affairs, G. Bailey to Commissioner of Indian Affairs, November 4, 1858, M234:36.
[28] "Mucho Indian, Napa *Pacific Echo*, July 4, 1862, p. 2.
[29] Palmer, *History of Lake and Napa Counties*, 32.
[30] Jesse Gonzalez, SVBI historian, explained this to anthropologist Dorothea Theododratus.
[31] Hurtado, "The Scotts Valley Band of Indians," 75-76.
[32] This practice was widespread in the Clear Lake region.  One old settler in Big Valley reported seeing Indian children being transported southward in saddle bags.  Another account describes a slaver creeping into an Indian camp at night, cutting the throats of sleeping adults, and taking the children to sell.  In 1852 slave raiders had taken their captives as far south as Contra Costa County where they hoped to sell them to ranchers.  Mauldin Notes, 1:79; Mauldin Notes, 1:94; Hurtado, "The Scotts Valley Band of Indians," 89-90.

AR0004573

such as the Vallejos and Juarez, and linguistic skills, placed him in a good position to perform the vital role of labor negotiator.

While the historical record established the likelihood of Augustine's employment on ranchos in the San Pablo Bay region, we can now demonstrate that he was employed in 1870 on or very near Rancho Tulucay, which was owned by Cayetano Juarez, who was probably the first majordomo at Rancho Lup-Yomi.  In 1870 the federal census recorded Augustine, born in 1832, laborer, living in Napa township, just one household away from Cayetano Juarez's house.[33]  The site of Juarez adobe and a half dozen adobe houses that Juarez had built for his Indian workers is about eleven miles north of SVBI project site in Vallejo.[34]  Augustine lived in Family 741 with sixteen other Indians, at least some of whom were likely his Clear Lake kinsmen.  The census taker indicated that all of the Indians lived in one household, an arrangement that is indicative of kinship.

The census taker first listed the names of all the males.  Six men were from 30 to 40 years of age.   Two males were 15 and 16, and there were two boys aged 5 and 6.  Three women were in their sixties, one was 38, and another was 30.   The only girl was eight years old.  All of the men and the teen aged boy were listed as laborers.  So were the two boys, but someone crossed out the word "laborer" in their case.  One woman was listed as a "Domestic Servant," which probably meant that she worked in the home of her employer.  The other women were merely "Servants."  The little girl'' occupation was listed as "At Home."  The two women in their thirties were probably the mothers of the young children.  Two of the men may have been

---

[33] U.S. Decennial Population Census, Manuscript, 1870, Napa County, Napa Township, p. 93, dwelling 721.  See also Haas, "Official Map of the County of Napa," 1876, which shows land owners' parcels c. 1876, https://www.loc.gov/item/2005625303/.

[34] M. G. Vallejo, Deposition, June 2, 1852, Transcript of Proceedings in Case No. 126, Cayetano Juarez, 6.  The Cayetano adobe home still exists.  The Indian housing that he built was very close to it but was razed sometime around 1950.  Albertazzi, oral history, "The Old Adobe," https://archive.org/details/cnchi_000086.

AR0004574

married to two of the women, but the census taker's decision to list in order of gender obscured specific relationships.[35]

By 1880 Augustine lived back in Lakeport township with his wife Mary.[36] He worked as a laborer and she was a washerwoman. He continued as an important leader until his death in 1903.

### 5. The Augustine-Frese Family in Napa and County

Augustine's connection to the San Pablo Bay Region was augmented by marriage with the Frese family, another important SVBI family line. One of Augustine's sons, Robert (b. 1850), married Victoria (aka Della) Frese (b. c. 1848), daughter of Mary Frese, who said that she had been born near the town of Sonoma, although there were reports that she had been born in Napa County or Lake County. Mary married Fernando Frese in Napa County. Fernando had been born on Rancho Rincon de los Carneros, a Mexican land grant that abutted Rancho Tulucay on the east and Rancho Suscol on the south. Mary had two children by Fernando, but the father of her first daughter, Victoria, is unknown. Victoria was born in Napa County c. 1848 and lived in Lake and Napa counties. In 1928 she stated that she lived in Napa County until about 1878.[37] The variant reporting of residence and birth places in the Frese family line probably reflects the labor migration of Indians that was prevalent at the time. Nevertheless, the Augustine/Frese family history illustrates a significant connection between SVBI ancestors and the region that includes the SVBI project site.

---

[35] The census taker may have taken the information about the Indians through a major domo or translator.
[36] 1880 Census, Lake County, Lakeport Township, p. 27/51.
[37] United States, Department of the Interior, Applications for Enrollment with the Indians of the State of California under the Act of May 18, 1928, App. 5778.

AR0004575

the ranches around Clear Lake had Indian villages and that the Indians worked on the ranches. They "lived in families mostly," Noble said.[39]

### An SPBR Perspective on SVBI Ancestors and Indian Labor

The killing of adults and kidnapping of children had a devastating effect on the Clear Lake Indian population. In 1859 a Napa newspaper reported that Clear Lake Indians had "dwindled from 10,000 in 1849 to a mere remnant of about 500 in all."[40] While the paper may have exaggerated the numbers, the drastic decline of the Indian population was important to Napa readers because they depended on Indian agricultural workers from Clear Lake as Indian Office special agent G. Bailey explained in 1858. The Indians who lived at Lup-Yomi got their basic subsistence from fishing and crops that they cultivated on the ranch but depended on the money they earned in the south for things that they had to buy.[41] Thus, according to special agent Bailey, SVBI ancestors had added wage labor in the SPBR to their traditional subsistence economy.

The hiring of Indians from Clear Lake was a matter of common knowledge that was widely reported, although specific origins were not always given. Frank Leach, a newspaperman, moved to Napa as a boy in 1857 and recalled that in the summer and during harvest "hundreds of Indians from the north would come to Napa and camp *with their families* about the town."[42] By this time wheat farming had replaced livestock ranching as the primary agricultural pursuit in Napa Valley. In 1862 a Napa newspaper reported that "Harvest time has brought our valley a large number of Clear Lake Indians, many of whom, we are told, are

---

[39] Mauldin Notes, 2:239.
[40] Quoted in Mauldin Notes, 17:3392.
[41] U.S. Department of the Interior, Bailey, November 4, 1858, M234:36:572.
[42] Leach, *Recollections of a Newspaperman*, 46. Emphasis added.

AR0005025

exceedingly useful in the field, and bind [wheat] equal to, or better than many white men."[43] The same newspaper reported that after the harvest, the Indians were "flush with money," and were able to afford stage fare for their travels.[44]

Thus, by the 1860s there was a well-established pattern: Indians from Clear Lake lived part of the time on ranches around the lake and part of the time they took their families to Napa and other places in the south to do agricultural labor for wages. Their labor was essential for Napa County farmers, and the wages were an integral part of the economic and social life of the Indians. Writing specifically about the SVBI ancestors at Rancho Lup-Yomi, special agent Bailey emphasized the integration of wage labor in Napa Valley and subsistence farming at Clear Lake. With the permission of the owner, the Indians (SVBI ancestors) on Rancho Lup-Yomi cultivated fields near the lake and fished in order to "subsist themselves comfortably. In the Spring time and harvest, the men go down into Napa and Sonoma Valleys, and hire themselves, at good wages to the farmers there, and thus procure the means of clothing themselves and families."[45] Thus, SVBI ancestors and their families occupied private ranchos at Clear Lake *and* the Napa Valley. SVBI ancestors had to do this in order to survive as viable communities.[46]

The long-standing relationship between the Indians of Clear Lake and the Juarez ranch is well illustrated by a reminiscence from the Juarez family. In about 1885 two old Indians approached the Juarez adobe from the north. They had come all the way from Lake County to see "'Chief' Don Cayetano," who had been "very good to all of them and . . . they wanted to see

---

[43] "Mucho Indian," *Pacific Echo*, July 4, 1862, p. 2.
[44] "Aristocratic Diggers, *Pacific Echo*, August 2, 1862, p. 3.
[45] U.S. Department of the Interior, Bailey, November 4, 1858, M234:36:572.
[46] This pattern was not unique. As California Indian historian William J. Bauer explains in his study of Indian labor (including migrant work) on the Round Valley Reservation, Indian labor, "forged the social relations so necessary to the establishment of the Round Valley community," on and off reservation. Bauer, *We Were All Like Migrant Workers Here*, 6.

AR0005026

him and thank him."[47]  When told that Juarez had died the Indians expressed their regret and walked back to their homes in the north.  Their willingness to undertake such a journey on foot at an advanced age shows how important their relationship with Juarez had been.


**Analysis of Census and SVBI Family History Data**

Analysis of census data demonstrates that several SVBI families have historic connections to the SPBR that existed over a long period of time.  We calculate that by the time the tribe was terminated in 1958 that approximately 90%, of the SVBI had a historical connection to SPBR through their family relationship to Augustine.[48]

The Augustine family is a prime example of this phenomenon, but it is not the only one.  The Frese family was briefly discussed in the attached biography of Augustine because members of the two families married, which resulted in a large number of the present SVBI population.  The first SVBI Frese was Mary who said she was born near "Sonoma City."  Her daughter, however, variously stated that Mary was born in Lake County or in Sonoma.  Mary lived in both Lake and Napa counties as well as Sonoma County.[49]  She married Fernando Frese who was born in the Carneros Valley that is the location of the Rancho Rincon de los Carneros.  Carneros is southwest of Cayetano Juarez's Rancho Tulocay and south of Salvador Vallejo's Rancho Napa.  The three ranchos abut and are immediately northwest of Rancho Suscol where the SVBI project site is located.[50]

---

[47] Vivien Juarez Rose, "The Past is Father to the Present," 31.
[48] This figure was established by dividing the number of Scotts Valley distributees descended from Augustine by the total number of lots distributed.  A Plan for the Distribution of the Assets of the Scotts Valley Rancheria, According to Provisions of Public Law 85-671, Enacted by the 85th Congress, 25 June 1959.
[49] United States, Department of the Interior, Applications for Enrollment with the Indians of the State of California under the Act of May 18, 1928, Apps. 5778, 5804, 5807, 5941.
[50] Beck and Haase, *Historical Atlas of California*, 29.

AR0005027

Mary had three children who were born in Napa County.  In 1928 Victoria Frese wrote, "I think I was born in Napa," and that her first recollections were of living in Napa.[51]  The other daughters, Louisa and Mary, were also born in Napa County.  Victoria married Robert (Bob) Augustine, son of Chief Augustine.  Mary (Mary Frese's daughter) married Francisco M. John (aka Francisco Bushaw, and Bashaw) who was the son of Captain John, who was an SVBI leader.[52]  Thus, two of Mary Frese's daughters, both of whom were raised in Napa County, married into important SVBI leadership families.  It is customary for leadership families in Northern California to intermarry, which implies high status for Mary Frese's daughters.

References to other SVBI ancestors living in SPBR or moving back and forth between Lake County and SPBR are found in the historical record.  The 1850 federal census for Benicia Township, Solano County, enumerated nine Indians living in the household of John Frisbie, son-in-law of Mariano Vallejo and an important landholder in Solano County.[53]  One of the Frisbie household Indians was an SVBI ancestor who was listed as "Jose," a twenty-nine-year-old "herdsman" was Jose Murphy.  The Frisbie home was approximately six miles south of the SVBI project Vallejo.

In 1928 Jose's daughter, Juana (Murphy) Casia Bello, stated that her father was a "full-blooded" Napa County Indian, which indicates that he moved north from Solano County to work on ranches there.  She was born in Napa County in about 1849.  Juana's estimate of her deceased father's age matches that of Juan in the Frisbie household.  She lived in Napa County for about thirty years and stated that her first husband (Loreto Casio) was also a Napa County Indian.[54]

---

[51] United States, Department of the Interior, Applications for Enrollment with the Indians of the State of California under the Act of May 18, 1928, App. 5778.
[52] 1880 Census, Lake County, Lakeport Township, p14/4 4, household 103; 1913 Big Valley Census.
[53] Hurtado, "The Scotts Valley Band of Pomo Indians," 78-79.
[54] United States, Department of the Interior, Applications for Enrollment with the Indians of the State of California under the Act of May 18, 1928, App. 8541.

AR0005028

Several other Jose Murphy descendants described themselves as Napa County Indians in 1928, including Laura (Cassia) Faber, Arthur Faber, and Juanita (Faber) Kanae.[55]  SVBI members use of the term Napa County Indian indicates that they knew their ancestors' association with Napa County was stronger than occasional periods of work there.

A second Indian in the Frisbie household, José Mariá, may have been the Pomo leader who attended treaty negotiations at Camp Fernando Feliz on the Russian River in 1851.  The treaty commissioner, Redick McKee wanted all of the Indians to remove to the proposed reservation at Clear Lake.  Should they do so, McKee promised that "you can come over to work on the ranches as you chose, and return" to Clear Lake, but their women and children must remain at the reservation."[56]  José Mariá decided to remain with his people where they were, so he did not sign the treaty.  The José Mariá in the 1850 census was twenty-six and was identified as a servant.

McKee's permission to work on ranches outside the reservation indicates that he understood the importance of this pattern of migrant labor to for treaty signatories.   His insistence that women and children remain on the reservation infers that men would prefer to take their families with them if they went to work in the SPBR.  The treaties at Clear Lake and Fernando Feliz had extinguished Indian signatories' interest in SPBR so McKee did not want them to establish permanent communities outside of the reservation.  McKee's restrictions on family movement became moot when the treaties were not ratified.[57]

---

[55] United States, Department of the Interior, Applications for Enrollment with the Indians of the State of California under the Act of May 18, 1928, Apps. 8541, 8542, 8543, 8544, 8545.
[56] Redick McKee quoted in John McKee, "Minutes Kept by John McKee," August 21, 1851, Serial 688, 144.
[57] For an analysis of McKee's thoughts on extinguishing Indian signatories' interests see Hurtado, "Additional Comments on the Yocha Dehe Response," (2016), 11-17.

AR0005029

In 1928 Lizzie Posh Caben reported that both of her parents were associated with a mission, probably San Francisco Solano in Sonoma. She reported that her father, Francisco Posh, who was born about 1842, was a "Mission Band Indian." Lizzie also identified her mother, Ellen (Minargy) Posh as a mission Indian who was born about 1849.[58]

Susan and Frank Marando, who are described in 1928 as "half-Pomo" in 1928 were found in censuses in close association with the Pony family, although a precise family connection has not been established.[59] The father of Frank, Mariano Marando (also identified as half Pomo) was from Sonoma county and was born around 1843. Mariano was still living in Sonoma County in 1928. Frank's mother Susan was born in Napa County around 1846 and died in 1886.[60]

Movement to and from Lake and Napa counties continued in the twentieth centuries. Tom Johnson, born about 1865, lived in Lake County until 1915 and then moved to Napa County where he lived for nine years. Thereafter he moved to Sebastol in Sonoma County, about twenty miles from old Rancho Petaluma and thirty-five miles from Vallejo.[61]

**SVBI in the SPBR 1912 to the Present**

The Scotts Valley Rancheria was meant to provide a secure home for the SVBI ancestors who lived there. However, the Rancheria was not capable of supporting the people who lived there so they and other SVBI ancestors continued to live in the SPBR in the twentieth century.

---

[58] United States, Department of the Interior, Applications for Enrollment with the Indians of the State of California under the Act of May 18, 1928, App. 3510.
[59] Gifford, "Clear Lake Pomo Society," 293.
[60] United States, Department of the Interior, Applications for Enrollment with the Indians of the State of California under the Act of May 18, 1928, App. 5795; Kelsey "Schedule Showing Indians in Scotts Valley," 47.
[61] United States, Department of the Interior, Applications for Enrollment with the Indians of the State of California under the Act of May 18, 1928, Apps. 5933, 5935, 5937.

AR0005030

# Scotts Valley Band of Pomo:

# Preliminary Report for

# "Indian Lands Determination,"

# Vallejo, Solano County, California



Report submitted to

United Auburn Indian Community
10720 Indian Hill Road
Auburn, California 95603

Stephen Dow Beckham
1389 SW Hood View Lane
Lake Oswego, OR. 97034-1505

November 7, 2016

AR0005377

# Scotts Valley Band of Pomo:

# Preliminary Report for

# "Indian Lands Determination,"

# Vallejo, Solano County, California

Report submitted to

United Auburn Indian Community
10720 Indian Hill Road
Auburn, California 95603

Stephen Dow Beckham
1389 SW Hood View Lane
Lake Oswego, OR. 97034-1505

November 7, 2016

AR0005378

## Introduction

The following report was researched and written at the request of the United Auburn Indian Community, 10720 Indian Hill Road, Auburn, California, 95603.  My assignment was to examine the question of whether or not the Scotts Valley Band of Pomo possessed a significant historical connection to a potential casino site at Vallejo, California.  This criterion is an essential requirement to qualify lands for gaming under the Indian Gaming Regulatory Act of October 17, 1988.

The Federal Regulations, 25 C.F.R., sections 292.7 to 292.12, mandate a tribe must demonstrate a "modern connection" to the land, that it has a "temporal connection" between the acquisition of the land and the restoration of the tribe's federal recognition, and that it has an "historical connection" to the land.  The Scotts Valley Band of Pomo has argued through the reports of its experts that it qualifies for a "lands determination" to land at Vallejo. California.  It claims:

(1) Scotts Valley Band of Pomo Indians is the modern day successor of the Ca-la-na-po Tribe.

(2) The Tribe's Ca-la-na-po ancestors traveled south from the Clear Lake area.

(3) Vallejo was the terminus of Indian trails.

(4) The Tribe's ancestors provided the labor force for General Mariano Vallejo's Rancheria (Rancho Suscol, and Rancho Suisin).

(5) The Ca-la-na-po Tribe ceded to the United States much of the present day Lake, Napa and Solano counties under the unratified Treaty of Camp Lu-Pi-Yu-Ma on August 20, 1851.

(6) The 1851 treaty demonstrates that the Tribe possessed aboriginal tie to lands extending from Clear Lake to the San Pablo Bay.

(7) The Tribe's federal recognition was terminated in 1965.

(8) In 1992, the Tribe was formally restored pursuant to a consent judgment.

i

AR0005379

(9) The proposed trust land is located within Royce Area Map 296.

This report questions and challenges the first six and the ninth arguments of significant "historical connection." It examines the scholarly literature on tribal distribution and that of the Pomo, in particular, in the region from the upper Eel River and Clear Lake south toward San Francisco and San Pablo bays. It examines the unratified treaty of August 20, 1851, and the erroneous contention that the Clear Lake Pomo ceded the lands of the Coast Miwok, Wappo, and Patwin tribes who did not participate in that treaty council. It examines the lack of evidence that the Pomo possessed and used a well-established trail system between their aboriginal lands and Vallejo. It examines the scholarly literature on tribal distribution along the north shore of San Francisco and San Pablo bays in the nineteenth century. It discusses the expert reports submitted by the Scotts Valley Band of Pomo and how they singularly fail to document any Pomo enslavement or employment on the Vallejo ranchos Suscol and Suisun in Napa and Solano counties, and, more importantly how all the reports fail in twelve categories of "historical connection" to document a single way in which the Scotts Valley Band meets this criterion.

The research and findings in this report are my own. I have drawn on published scholarly literature and manuscript materials of the National Archives, San Bruno, and the Bancroft Library, University of California, Berkeley. I have used the extensive collection of primary documents with which I worked starting in 2005 when the Scotts Valley Band of Pomo attempted unsuccessfully to document its historical connection to lands at Richmond, Contra Costa County, California, where I was retained as an expert by the County Supervisors. I likewise have drawn on documents I researched when the Guidiville Band of Pomo attempted unsuccessfully to document its historical connection to lands at Point Mattole, Contra Costa County, and at Vallejo, Solano County.

Stephen Dow Beckham

ii

Stephen Dow Beckham is the Pamplin Professor of History, Emeritus, Lewis & Clark College. He earned his M.A., 1966, and Ph.D., 1969, at the University of California, Los Angeles. He taught college students for forty-two years with concentration on U.S. History, the American West, and Native Americans. He is recipient of the Asher Distinguished Teaching Award, American Historical Association, and is a former Oregon Professor of the Year.

Cover illustration: Portion of Plat of Survey, Township 14 North, Range 10 West, showing "Indian Rancheria" and "Indian Gardens" in Section 11 on Scott Creek and location of lands purchased in 1911 for the Scotts Valley Rancheria in Section 13 (Brown 1875).

Brown, D. D.
    1875 Plat of Survey, Township 14 North, Range 10 West, Mount Diablo Meridian. BLM Archives, Sacramento, CA.

iii

# Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . .    I

Contents . . . . . . . . . . . . . . . . . . . . . . . .    iv

List of Figures . . . . . . . . . . . . . . . . . . . . .    vi

Tables . . . . . . . . . . . . . . . . . . . . . . . . . .    viii

Executive Summary . . . . . . . . . . . . . . . . . . .    ix

Pomo Tribal Distribution . . . . . . . . . . . . . . . .    1

Tribal Distribution Along the North Shore of
    San Francisco and San Pablo Bays . . . . . .    43

Treaty of Lupiyuma, 1851 . . . . . . . . . . . . . . .    58

Ambiguous Ancestry of Victoria (Frese)
    Augustine . . . . . . . . . . . . . . . . . . . . .    68

Alleged Link to the Ca-ba-na-po Tribe . . . . . . .    82

Scotts Valley Band Enrollments, 1928 . . . . . . .    87

Alleged Migration to San Francisco Bay Area . . .    95

Alleged "Historical Connection" to Vallejo . . . . .    97

Conclusions . . . . . . . . . . . . . . . . . . . . . . .    113

Bibliography . . . . . . . . . . . . . . . . . . . . . . .    119

Appendices

    A. Residents of Scotts Valley Rancheria,
        1900, Federal Census, Indian
        Schedule . . . . . . . . . . . . . . . . . . .    129
    B. Pomo Indians, Lakeport and Vicinity,
        1905-06 . . . . . . . . . . . . . . . . . . .    136
    C. Adult Residents of Scotts Valley

AR0005382

Rancheria, 1909 . . . . . . . . . . . . . .    138

D. Residents of Scotts Valley Rancheria, 1910, Federal Census, Indian Schedule . . . . . . . . . . . . . . . . . . .    139

E. Residents of Scotts Valley Rancheria, 1911 . . . . . . . . . . . . . . . . . . . . . .    151

F. Residents of Scotts Valley Rancheria, 1915 . . . . . . . . . . . . . . . . . . . . . .    152

G. Residents of Scotts Valley Rancheria, 1916 . . . . . . . . . . . . . . . . . . . . . .    155

H. Residents of Scotts Valley Rancheria, 1917 . . . . . . . . . . . . . . . . . . . . . .    158

I. Residents of Scotts Valley Rancheria, 1918 . . . . . . . . . . . . . . . . . . . . . .    161

J. Residents of Scotts Valley Rancheria, 1919 . . . . . . . . . . . . . . . . . . . . . .    164

K. Residents of Scotts Valley Rancheria, 1920, Indian Census . . . . . . . . . . .    167

L. Residents of Scotts Valley Rancheria, 1920, Federal Census . . . . . . . . . .    170

M. Residents of Scotts Valley Rancheria, 1921 . . . . . . . . . . . . . . . . . . . . . .    174

N. Residents of Scotts Valley Rancheria, 1923 . . . . . . . . . . . . . . . . . . . . . .    177

O. Residents of Scotts Valley Rancheria, 1930 . . . . . . . . . . . . . . . . . . . . . .    180

P. Indian Voters, Scotts Valley Rancheria, 1935 . . . . . . . . . . . . . . . . . . . . . .    184

Q. Census, Scotts Valley Rancheria, November 12, 1940 . . . . . . . . . . . .    185

R. Residents of Scotts Valley Rancheria, 1940, Federal Schedule . . . . . . . .    187

S. Residents of Scotts Valley Rancheria, 1948 . . . . . . . . . . . . . . . . . . . . . .    188

T. Distributees of Scotts Valley Rancheria, 1958 . . . . . . . . . . . . . . . . . . . . . .    190

AR0005383

# List of Figures

| Fig. | | Page |
|------|---|------|
| 1. | Pomo villages in the vicinity of Clear Lake . . . . | 10 |
| 2. | Distribution of Hokan-speakers in California . . . | 20 |
| 3. | Southern boundary of the Pomo . . . . . . . . . . | 22 |
| 4. | Pomo communities . . . . . . . . . . . . . . . . . . | 25 |
| 5. | Pomo of Clear Lake . . . . . . . . . . . . . . . . . . | 31 |
| 6. | Key to Pomo of Clear Lake . . . . . . . . . . . . . . | 32 |
| 7. | Territorial extent of 7 Pomoan languages . . . . . | 35 |
| 8. | Territory of Northeastern, Eastern, and South-eastern Pomo . . . . . . . . . . . . . . . . . . . . . | 36 |
| 9. | Pomo languages and their major dialects . . . . | 38 |
| 10. | Languages and dialects of the Clear Lake . . . . | 39 |
| 11. | Coast Miwok territory and settlements . . . . . . | 44 |
| 12. | Coast Miwok territory . . . . . . . . . . . . . . . . | 45 |
| 13. | Patwin tribal territory and villages . . . . . . . . | 47 |
| 14. | Tribes of the Napa vicinity and ethnolinguistic group distribution in the San Francisco Bay . . | 49 |
| 15. | Wappo territory . . . . . . . . . . . . . . . . . . . . | 54 |
| 16. | Land Cession No. 296, Plate CXIV . . . . . . . . . | 64 |
| 17. | Household 371, Fernando and Mary Frese . . . . | 74 |
| 18. | Bob and Della Augustine family . . . . . . . . . . . | 76 |

AR0005384

19. Line 22 (2nd on page), continuation of "Special Inquiries" for Della Augustine                    77

vii

AR0005385

## List of Tables

| Table | Page |
|---|---|
| 1. Measures of significant "historical connection" | 100 |

AR0005386

# Executive Summary

This report is concerned with the claims of the Scotts Valley Band of Pomo to a significant "historical connection" to a potential gaming site in Vallejo, California. It first reviews tribal distribution in northwestern California and identifies the scholars and their major publications on the Pomo. The subjects include the language distribution, aboriginal territory, and identification of some of their villages, especially in the Clear Lake Basin. This information is based on the testimony of over 100 Pomo elders shared with scholars in the past 163 years and documents the lands where the Pomo had a "historical connection."

The next section addresses some of the scholarly literature on the tribes who resided south of the Pomo and along the northern shores of San Francisco and San Pablo Bays. This was the country of the Coast Miwok, Lake Miwok, Wappo, and Patwin–all of whom spoke languages markedly different from Pomo. These were the tribes with their own significant "historical connection" to that region as confirmed by their elders and their knowledge of use and occupancy of that region. It constitutes the ethnogeography and ethnography of the peoples of that region, none of whom were Pomo.

The report discusses the unratified Treaty of Lupiyuma of August 20, 1851. It identifies the context of the treaty, the poor communications that occurred, and the identity of the eight tribelets of the Clear Lake area participating in the council. The report points out that the treaty purported to create a reservation for the eight bands of the Clear Lake Basin but did not cede lands south to San Francisco and San Pablo bays. None of those tribes–other than Clear Lake Pomo--was present or involved in the council with Redick McKee. The report addresses the significant error in the Charles C. Royce map of a purported but entirely fictional cession of lands in Map Area 296.

The Scotts Valley Band has insisted its claims to significant historical connections to Richmond, California (2005-12) and now to Vallejo, California (2016) are founded on the ancestry of Victoria Della (Frese) Augustine. This report examines her self-identification of ancestry and places of birth in the Censuses of 1900, 1910, 1920, and in an enrollment affidavit in 1928. Concealed in all expert reports presented to the Department of the Interior by the Scotts Valley Band was her claim in the Census of 1900 that she was born in Mexico, as

ix

were her parents, that she immigrated to California in 1861, and that she had lived in the state 39 years. The father of Victoria was certainly not Fernando Frese, an alleged Patwin Indian. Victoria claimed her father was non-Indian and the Scotts Valley expert, Albert Hurtado, when looking at the record only said "someone impregnated Mary," Victoria's mother. Victoria Augustine's ancestry is unclear and contradicted by her own self-identifications. Some of the important contradictions have been purposefully concealed.

The Scotts Valley Band of Pomo claims it is the political successor in interest to the signers of the unratified Treaty of Lupiyuma of August 20, 1851. The political succession is undocumented and the band identification in the treaty does not match with the tribelet headed by Chief Augustine in 1880. In 1928 the heads of households and single adult members of the Scotts Valley Band of Pomo filled out ten-page affidavits for their enrollment as California Indians. Question No. 13 asked all to identify the chiefs and headmen of their tribe in 1851. None of the Scotts Valley adults could answer this question. They all said: "I do not know." This documentary record disputes any claim to the band's political succession in interest to the signers of the 1851 treaty.

The report examines the historical record and the reports of five experts retained by the Scotts Valley Band to document the tribe's alleged migration south from Clear Lake to San Francisco Bay and San Pablo Bay. There is no evidence for this migration. Historian Albert Hurtado who is known for his publications on the Spanish and Mexican ranchos and the enslavement and employment of California Indians, hedged his analysis with "perhaps," "possibly," "maybe" and other speculation. He could not document a single ancestor of the Scotts Valley Pomo or other Clear Lake Pomo on the ranchos of Solano or Napa counties in the nineteenth century. His conclusion that the "North Bay region, including Rancho Suscol, Vallejo, and Solano County became part of the SVBI's historic territory" is without foundation and documentation.

The report posits twelve fundamental measures of "historical connection" and discusses how each should document the ways in which the Scotts Valley Band has an interest in lands at Vallejo, California. Of the seventy-two measures in the six expert reports filed by the Tribe there is not a single confirmation of an "historical connection." There is none because no evidence of any kind has been

x

found linking the Tribe to Vallejo, to Solano County, or to the north shore of San Pablo and San Francisco bays.

Finally the report reproduces the twenty-one census, residency, voter, and distributee records of the Scotts Valley Band from 1905 to 1954. These records confirm that for six decades in the twentieth century the home and place of significant "historical connection" of the Tribe was at the Scotts Valley Rancheria, Lakeport, Lake County, California, a location nearly ninety miles north of Vallejo.

xi

AR0005389

## Pomo Tribal Distribution

Studies on tribal distribution in northwestern California commenced in 1851 with the field interviews and work of George Gibbs, linguist and member of the McKee treaty commission. Subsequently a number of scholars have worked with tribal informants to document further tribal and language distribution from San Francisco and San Pablo bays to the Oregon border. Dozens of informants helped inform these scholarly accounts and maps.

Tribal distribution focuses on areas where there was common language and ease of communication, on use and occupancy of specific areas, and on the location of villages. Some of the studies touch on all three of these factors. Linguists are primarily concerned with language families, dialects, and the areas where they were spoken. Some of the studies are overtly "ethnogeographical." They focus on use and occupancy of areas and the place names used by the tribes or tribelets that lived there. The following is an overview of the major studies of tribal distribution north of San Francisco and San Pablo bays and the findings of their authors. They are representative of the scholarly identification and assessment of tribal distribution based on the memories recorded from tribal informants.

### George Gibbs, 1851

Gibbs (1815-1873) was a Harvard-educated lawyer who spent the years 1849 to 1861 on the Pacific Slope engaged in linguistic and ethnographic studies. While he was independently wealthy through the estate inherited from his father, Colonel George Gibbs, he facilitated his travels and studies by securing a variety of government assignments. These included working in the Customs House (Astoria, Oregon), Willamette Valley Treaty Commission, California Treaty Commission (Redick McKee's division), Pacific Railroad Surveys (George McClellan's reconnaissance), U.S. Topographical Engineers (military wagon road surveys), Western Washington Treaty Commission (Isaac I. Stevens' councils), and the U.S. Boundary Survey (Archibald Campbell's reconnaissance of the 49th parallel) (Beckham 1969).

Between August 11 and December 28, 1851, Gibbs was employed as interpreter and cartographer by treaty commissioner

1

Redick McKee in northwestern California. Gibbs collected twelve Indian vocabularies, population statistics, ethnographic information, and artifacts of material culture he shipped to the Smithsonian Institution. Gibbs's fascination with native languages was shaped in the 1840s by his friendship in New York City with Albert Gallatin, author of a *Synopsis of the Indian Tribes of North America* (1836). Gallatin had expended several decades collecting, comparing, and classifying Indian languages into families. Gibbs served as librarian of the New York Historical Society at the time Gallatin was president of the organization. Gibbs employed Gallatin's 180 word vocabulary list in California. Following his work with McKee in 1851, Gibbs forwarded his journal, population data, and vocabularies to Henry Rowe Schoolcraft who published them in *Historical and Statistical Information, Respecting the History, Condition and Prospects of the Indian Tribes of the United States* (Gibbs 1853[3]:100-77, 428-445, Appendix R, 80).

While at Clear Lake, Gibbs compiled a "Kala-na-po" (Clear Lake Pomo) vocabulary of words spoken by the Indians of that area and another of the "Cop-êh (Hill Patwin). The Gibbs map of the terrain and tribal distribution in northwestern California remains unpublished (Gibbs 1851). As the pioneer linguist of the region, Gibbs was uncertain about tribal and linguistic distribution primarily because he visited only a limited number of tribelets and villages during the course of travels of the McKee expedition. He wrote:

> How many really different languages will ultimately be determined between the heads of the Russian river and San Francisco bay, it is impossible as yet to conjecture. On a cursory examination there appears to be several; but more critical inquiry will, perhaps, reduce them. That of the Napo-batins [Pomo], in its various dialects, seems to be one of the most extensive, reaching from the Sacramento range [mountains east of Clear Lake] to the coast, and up as far as the head-waters of Eel river (Gibbs 1853[3]:110).

### Stephen Powers, 1871-75

Powers (1840-1904) was born in Ohio and graduated in 1863 from the University of Michigan. He worked during the Civil War as a correspondent for the *Cincinnati Commercial*. Following travels in

2

AR0005391

Europe in 1866-67, he journeyed to Savannah, Georgia, and set out on a trek of 3,700 miles to the Pacific Ocean. He wrote of his adventures in *Afoot and Alone* (1871). Between 1871 and 1875 Powers traveled constantly to study the languages, religious practices, material culture, and oral literature of the Indians of California's central valley, central coast, and northwestern part of the state. He supported himself by submitting essays on his observations to *The Overland Monthly, Atlantic,* and newspapers. Powers also collected ethnographic information for Hubert H. Bancroft's *The Native Races*, a work in five volumes (Park 1975:3, 9-12, 14-16). Sensing the value of what Powers had done, John Wesley Powell, director of the U.S. Geographical and Geological Survey, reprinted the material in that agency's *Contributions to North American Ethnology* (Powers 1877).

Powers visited the Pomo and worked with local settlers who had gained familiarity with the Indian languages during approximately twenty years of residing among them. In Chapters 16 and 17 of his book on California Indians, Powers defined the traditional homeland of the Pomo:

> Under this name [Pomo] are included a **great number of tribes or little bands–sometimes one in a valley, sometimes more–clustered in the region where the head-waters of the Eel and Russian Rivers interlace, along the latter and around the estuaries of the coast**. Below Calpello they do not call themselves Pomo, but their languages include them in this large family. **There are many dialectic variations as one goes along. An Indian may start from Potter Valley, which may be considered the nucleus and starting-point of the family, and go over a low range of mountains, ten miles or so, and find himself greatly at fault in attempting to converse; then miles father, and he would find himself still more at sea, so rapidly does the language shade away from valley to valley, from dialect to dialect** (Powers 1877:146) [Emphasis supplied].

Powers attempted to differentiate the various Pomo dialects and where those speakers lived: "The broadest and most obvious division of the Pomo family is into Eel River and Russian River Pomo. There are **two tribes on Eel River, between it and South Fork**, who call themselves Pomo (Kas'-tel Pómo and Kai Pó-mo), though it is an assumed name, because they belong to the Wailakki family, and prefer

3

their company." Powers continued his discussion of Pomo language groups and residency areas:

> Besides the Kato Pó-mo [south fork of Eel River], there are many other little bands in divers valleys, of whom the most important are here mentioned. In **Potter Valley**, taken as a whole, are the Bal-ló-Kai Pó-mo (Oat Valley People); in **Sherwood Valley**, the Ku-lá Kai-Pó-mo (*kula* is the name of a kind of fruit, like little pumpkins, growing on water, as the Indians describe it); in **Redwood Cañon**, the Dá-pi-shùl Pó-mo (dapishul means 'high sun'; that is, a cold place, because of the depth of the cañon); at **Calpello**, the Choam Cah-dí-la Pó-mo (Pitch Pine People); at **Ukiah City**, the Yo-kai'-a Pó-mo or Kam'a-lel Pó-mo; on the coast, and along **Usal Creek**, the Yú-sâl Pó-mo or Kam'a-lel Pó-mo (Ocean People); at **Little Lake**, the Mi-toam' Kai Pó-mo (Wooded Valley People); on the **Rio Grande, or Big River**, the Bul'-dam Pó-mo. At **Clear Lake, about Lakeport**, is a branch of this family called the Eastern People (I do not know the Indian word). The Ku-lá Kai Pó-mo are also called by the Kato tribe, Shi-bal'-ni Pó-mo (Neighbor People) (Powers 1877:147, 154) [Emphasis supplied].

Powers noted: "The Se-nel', together with three other petty tribes, mere villages, occupy that broad expansion of **Russian River Valley**, on one side of which now stands the American village of Sanel." In **Rancheria and Anderson valleys** he found the Ko-ma'-cho and noted that they, too, "are a branch of the great Pomo family, although more nearly related to the Senel than to the Pomo proper. Their name is derived from their present chief, whose authority extends over both valleys" (Powers 1877:172) [Emphasis supplied].

During his travels, Powers learned that the Pomo also occupied at their most southwesterly extent part of the lower Russian River Valley:

> In the Russian River Valley, from **Cloverdale down to the redwood belt and south to Santa Rosa Creek, and also in Dry Creek Valley**, live the remnants of a tribe whom the Spaniards called the Gali-li-no-mé-ro nation. The Gali-li-no-mé-ro proper occupy only **Dry Creek and Russian River, below Healdsburg**, within the limits above named; while above Healdsburg, principally between **Geyersville and Cloverdale**,

4

are the Mi-sal'-la Ma-gun', or Mus-sal-la-kun', and the Kai-mé. This nation may be considered a branch of the great Pomo, whose *habitat* is co-extensive with Russian River Valley, covers the **lowlands on the northwest of Clear Lake, and includes the habitable coast from Usal Creek down to Bodega."** Yet another group of Pomo, the Gua-lá-la, Powers found living on a creek of that name which emptied into the Pacific Ocean in the northwest corner of Sonoma County (Powers 1877:174, 194) [Emphasis supplied].

Powers visited the Pomo of Clear Lake and wrote:

In the **Clear Lake Basin** the Indians may be divided into two main bodies, those on the west side and those on the east. On the west they are related in language slightly to the Pomo; on the east, equally slightly, to the Patwin. In the northwest corner of the basin [vicinity of Scotts Valley] a constant communication was kept up with the Pomo; hence **the villages about Lakeport speak a Pomo dialect**, and are properly included with that large nation; but all the dwellers around the lake should be enumerated as distinct peoples, being divided into the two bodies above mentioned. **Big Valley and Cobb Valley** were the principal abode of the western lacustrine tribes; Höschla Island and the narrow shore adjacent that of the eastern (Powers 1877:204) [Emphasis supplied].

Powers noted a significant difference in Indian languages of the Pomo of the Russian River watershed and the Coast Miwok Indians of the San Rafael peninsula. In his comments on "The San Rafael Indians" he noted: "Under this name the Spaniards collected at the San Rafael Mission most of the Indians of the peninsula who spoke a different language from the Gallinomero. Among them were the Tá-mal from whom Mount Tamalpais is named, and the Li-kat'-u-it, whose last great chief was Ma-rin'." Of the Cho-kú-yen, he wrote: "The same is true of this tribe, who occupied Sonoma Valley, which was named from one of their celebrated chiefs" (Powers 1877:195).

During his field studies in the 1870s Powers discerned that the Marin Peninsula–a region reaching from Bodega Bay on the Pacific Ocean east to Glen Ellen (near Sonoma) was not Pomo country. The native peoples, mostly removed to Mission San Rafael, and the Cho-kû-yen who lived near Sonoma, were Coast Miwok. They were a

5

totally different linguistic stock than the Pomo.  They occupied part of the country south of the Pomo toward San Francisco and San Pablo bays (Powers 1877:194-95).

Powers' informants defined the aboriginal area of the Pomo as the country at the headwaters of the Russian and Eel rivers and along the estuaries of the coast to the west.  Most importantly, he pointed out the significant dialectic differences in Pomo that rendered communication more and more challenging within the Pomo language area.  It is important to note that the southern boundary of Pomo languages was at least seventy miles north of San Pablo Bay and that tribes speaking other languages completely different from Pomo inhabited that country.

### Samuel Alfred Barrett, 1903–06

In 1901 Samuel A. Barrett (1879-1951) entered the University of California, Berkeley.  He paid for his college education by selling his prized Pomo Indian basketry collection.  He had grown up at Yukiah, California, where his father owned a general store and often took baskets in payment for staples.  Barrett graduated with a B.A. in 1905 and then commenced studies for a Ph.D. with Dr. Alfred L. Kroeber. Three years later Barrett earned the first doctorate in anthropology from the University of California.  Barrett moved to Columbia University to carry out post-doctoral studies with Dr. Franz Boas, Kroeber's mentor.  Following that work, Barrett returned to California well-trained in linguistics, ethnology, archaeology, and museology.  He ultimately had a distinguished career at the Milwaukee Public Museum (Laszewski 2009).

Barrett traveled in 1903, 1904, and 1906 through Pomo country south of Cape Mendocino to work with dozens of tribal informants. Phoebe Apperson Hearst, a patron and collector of Native American arts and crafts, funded Barrett's research at the same time she was purchasing items for what became the Phoebe Apperson Hearst Museum of Anthropology at the University of California, Berkeley. The museum, founded in 1901, became a major depository for material culture, archaeological objects, and art of indigenous cultures around the world.  Barrett explained the mission for his extensive field reconnaissance in northwestern California:

6

AR0005395

The chief purpose of the present investigations has been to establish the aboriginal territorial boundaries of the Pomo linguistic stock, and to determine the number of dialects of this stock, their relationships one to another, the exact limits of the area in which each was spoken, and the locations of the various ancient and modern villages and camp sites (Barrett 1908a:7).

In addition to seeking information on the Pomo, Barrett also recorded as much data as possible "concerning all the territory lying between the Pomo area and San Francisco Bay, as also concerning the Southerly Wintun territory" (Barrett 1908a:7). He continued:

The territory in the present investigation and shown on the accompanying maps lies immediately north of San Francisco Bay and covers Marin, Sonoma, Napa, Solano, Yolo, and Lake, together with the greater portions of Mendocino, Glenn, and Colusa counties, California. It extends about one hundred miles east and west. It reaches from the shore-line of the ocean to the Sacramento river, thus lying chiefly within what is known to geographers as the Coast Range of mountains (Barrett 1908a:10).

Barrett reported this large study district inhabited by Indians speaking seventeen or more distinct dialects of five different linguistic stocks: Pomo, Yuki, Athapascan, Wintun, and Moqueluman. "These people lived in villages," he wrote, "for which the name rancheria, used by the early Mexican settlers, has come into common use. Each of these communities was independent of the others, and corresponded, in being the principal political unit existing among the people, to the tribe in the eastern part of the continent; but was by no means equivalent to it in size and organization" (Barrett 1908a:14-15).

Barrett found consistent local autonomy and rigorous distinctions between villages, bands, and language groups:

While the Indians recognized the fact that the people of certain other villages spoke the same language as they themselves, **they did not recognize the people of a linguistic family or dialect as a unit, or the territory occupied by a linguistic family or dialect as a unit area.**

**Usually each village community was named separately**

7

**and considered separate from the adjacent communities, its name most often being that of the particular village site combined with an ending signifying 'there,' 'from there,' or 'place'; the language there spoken being called the language of that particular village without reference to the neighboring villages using the same language** (Barrett 1908a:20-21) [Emphasis supplied].

In the Northern Pomo dialect area, Barrett identified forty informants from Potter Valley, Pinoleville, Sherwood Valley, Coyote Valley, Redwood Valley, and Guidiville. He interviewed twenty-six informants from the Central Pomo dialect area, especially at the Hopland and Yokaia rancherias. In the Eastern Pomo dialect area he worked with thirty informants; and then ten for the Southeastern Pomo dialect, nineteen for the Southern Pomo dialect, nine for the Southwestern Pomo dialect, and three for the Northwestern Pomo dialect (Barrett 1904).

Barrett found that geography was a major factor in defining band and village territory in aboriginal northern California. Tribelets usually occupied a watershed or valley, a factor defined by the hill and valley corridors lying between the Pacific Ocean and the Coast Range. He summarized the relationship between geographical and cultural configuration:

As has been shown, a large part of the territory under consideration lies within the ranges of the Coast Range mountains. These ranges of mountains, with their general northwesterly-southeasterly trend, quite definitely separate the larger topographic divisions, each with its special features of climate, flora, and fauna; and, since culture here as elsewhere is to a great extent governed by environment, these topographic divisions may be taken as the basis of classifications of the special cultural divisions or regions (Barrett 1908a:23)

The more than 100 Pomo informants with whom Barrett worked confirmed the importance of geography. Their homeland was complex: Pacific shore and small estuaries, redwood forests, a valley region–the basins of the Eel and Russian rivers and Clear Lake, and that portion of the Sacramento Valley lying between the Coast Range and the Sacramento River. With few exceptions, Barrett found "**the special characteristics of culture are confined quite strictly to**

8

AR0005397

**the topographic divisions"** (Barrett 1908a:23) [Emphasis supplied].

Barrett identified the Pomo residing on the west side of Clear Lake as the Kabe'na-po:

> As nearly as can be determined, the kuLa'napo occupied the lake-shore and valley from Lakeport eastward to Adobe creek, and their principal village, at least immediately prior to the coming of the settlers, was at kaci'badon. The kabe'napo held the region between Adobe creek and a line passing about half way between Kelsey and Cole creeks, their principal village being bida'miwina. **These two communities used the same language with perhaps very slight differences in the character of the phonetics, and in all other matters such as culture they were identical, but they had separate governments and were entirely distinct from each other, sometimes even engaging in war against each other.** . . . The third unit area of this valley was occupied by the li'leek, a people speaking the Yukian Wappo dialect, and extended from the eastern limit of the kane'napo territory, between Kelsey and Cole creeks, eastward beyond the limits of the valley proper to the vicinity of Soda bay" (Barrett 1908a:18) [Emphasis supplied].

9

AR0005398



Fig. 1. Pomo villages in the vicinity of the Clear Lake
Basin and a portion of the upper Russian River Valley: □
Inhabited modern villages in 1903-06; X Old camp sites; ▲ Old
village sites; ❋ Modern camp sites (Barrett 1908b:Map 1).

10

AR0005399

Barrett identified the Scotts Valley Pomo as speakers of the Northern Pomo dialect. He wrote specifically about their use and occupancy area west of Clear Lake:

> From here [on the ridge separating the headwaters of Eel River from Middle Creek], taking a southerly course, the boundary passes along the ridge immediately west of Middle Creek, passing but a short distance east of Tule lake; and thence along the ridge which lies west of Upper lake, the northernmost arm of Clear Lake, to a point known as Rocky point, on the western shore of the strait joining Upper lake with the main body of Clear lake. The people speaking the Northern dialect held possession of the shore of Clear lake from this point south nearly to the town of Lakeport, a distance of about five and one-half miles. From the town of Lakeport the line runs in a generally southerly direction to the summit of the ridge south of the southern headwaters of Scotts creek, and then a short distance in a westerly direction to the ridge separating the drainage of Clear lake from that of Russian river. This portion of the boundary separates the Northern and Eastern dialectic areas. From this point the boundary extends in a northwesterly direction along this ridge, passes over Red mountain, and thence probably to the ridge south of Mill creek, where it takes a westerly course down into Russian river valley (Barrett 1908a:125).

In his discussion of the Pomo living in the western part of the Clear Lake basin Barrett wrote about a community near Lakeport:

> **Scotts Valley Rancheria, about a mile northwest of the town of Lakeport, and on the west bank of Scott's creek. This village consists of five houses and about fifteen inhabitants, mostly former residents of Scott's valley, but with a few from other old villages. This is considered and called a village by the Indians, although the houses are not assembled at any one site are scattered for three quarters of a mile along the creek** [Emphasis supplied].

When Barrett visited the rancheria in the summer of 1903, he found "the dilapidated remains of a native tule house" (Barrett 1908a:155).

Pomo informants identified a number of "Old Village Sites" along Scott Creek:

11

*maiyi'*, contagion (?), at the foot of the hills on the extreme western side of Upper Lake valley, and at a point a short distance north of Scott's creek, where it cuts through the divide between Tule lake and Upper lake valley. This is the only point at which the territory occupied by the people speaking the Northern dialect extended beyond the divide and into Upper Lake valley. This was a large village and the site seems to be one of the very old ones of the region. Many of the myths originate here. The residence of Mr. Sleeper stands just west of this site. [Charles Sleeper, a farmer, was born in January, 1858, and lived in 1900 with his wife and three children in Township 3, Lake County (Bureau of the Census 1900a].

*mama'mamau*, from mama', projecting, on a point projecting out into Tule lake from its northern shore near the outlet of the lake. This was probably never a very large village. It seems to have been occupied both before and since the coming of the whites to this region.

*xaro'* or *xarao'malugal*, from xaro,' valley oak acorn black bread, malu', to bake, and gal, homeward, close to the shore at the head of a small bay extending northward from the northern part of Tule lake. This bay also bears the name xaro'.

*ho'mtcati*, from hom, nettle and tacati', village, or ko'pbutu in the Eastern dialect, from kop, nettle, and bu'tu, knoll, at a point about three quarters of a mile north of Tule lake, and near the foot-hills on the eastern side of the valley. The village was situated on a small knoll which rises from the general level of the valley.

*tsiya'kabeyo*, on the creek tributary to Middle creek heading on the south side of Buckner mountain. Informants differ as to whether the inhabitants of this village were more intimately associated with the people of the Tule lake or the Potter valley region. This difference is, however, of very little importance, as the people of these two locations used the same language and were on friendly terms.

*sama'kahna*, on the west bank of Scott's creek at a point about three and one-half miles north-northwest of Lakeport.

12

*si'wakal*, on the west bank of Scott's creek at a point about two miles north-northwest of Lakeport.

*nobo'ral*, from no, ashes, bor, mud, and hnal, on, on the west bank of Scott's creek at a point about two and one-half miles north-northwest of the town of Lakeport.  The people of this village may be the ones referred to by Gibbs by the name of 'Möal-kai,' by McKee as 'Moal-kai,' and by Slocum, Bowen and Company as 'Boil-ka-ya.'

*ka'raka*, from kar, a dry limb filled with woodpecker holes, and ka, water, on the eastern border of Scott's valley at a point about a mile and a half north-northwest of Lakeport.  A portion or possibly all of the area covered by this site is on the ranch owned by Mr. J [George] F. Burger. [George F. Burger, born in November, 1854, Iowa, resided with his wife and six children in Township 4, Lake County (Bureau of the Census 1900a).]

There is a site of a village, the name of which could not be recalled by the informant, on the west bank of Scott's creek at a point about a mile and a half northwest of the town of Lakeport. It is located on the ranch of Mr. M. C. Scudamore.

*kabe'l*, or *xabe'l* in the Eastern dialect, probably from kabe' or xabe, rock, on the eastern slope of a prominent point, called Rocky point, which projects from the western shore of the channel connecting the main body of Clear lake with Upper lake, its northernmost arm . . . .  While the control of the place seems to have been left to the people of Scott's valley, there were no restrictions to the rights of the Upper Lake people in this vicinity, and people from both Upper Lake and Scott's valley camped here and enjoyed equal rights in the adjacent waters of the lake (Barnett 1908a:155-157).

Pomo informants in the vicinity of Lakeport also identified a number of "Old Camp Sites" in the vicinity of Scotts Creek: *bo'tcawel, yo'togago, ko'mli, kile'lio, ko'batap, kaba'i, kale'cokon, katsa'mugal* and *kala'bida*.  They said that *da'tsin* was a modern camp site on a small creek, *da'tsin-bida*, flowing into Clear Lake about a mile and a half south of Rocky Point (Barrett 1908a:157-159).

Of the thirty-eight informants working with Barrett on the

13

Northern Pomo language, three had direct ties to Scotts Valley:

> 105. Bati, Yokaia and Upper Lake. Born Scotts Valley. Mother, Scotts Valley; Father, Big Valley. Born about 1850. Speaks both N and E Pomo. Stepfather of Tom Mitchell.

> 109. Bob Pot, Garcia River, Mendocino Co. Born at Scott's Valley about 1850. Mother, Scotts Valley; Father, Yokaia. Very good inter[preter].

> 304. Charlie Mor[g]an, Scott's Valley, Lake Co. Born in Bachelor Valley. He is N[orthern] Dialect man (Barrett ca. 1904).

Barrett's Pomo informants between 1903 and 1906 in the vicinity of Lakeport confirmed extensive familiarity with the setting and its use and occupancy. They named villages and old campsites. They provided their locations and, in many instances, gave the meaning of the component parts of the place names. These were speakers of the "Lake Division" of the "Northern Dialect" of Pomo. This detailed information was representative of a peoples' use and occupancy of an area.

## C. Hart Merriam (1905-08)

C. Hart Merriam (1855-1942), an American ethnographer and zoologist, gained appointment at age sixteen as naturalist on the Hayden Geological Survey of 1872 to Utah, Idaho, Wyoming, and Montana. His "Report on the Birds and Mammals of the Expedition" was his first publication (Merriam 1873). In 1874 Merriam studied at the Sheffield School of Science at Yale and in 1879 earned his M.D. at Columbia University. Natural history, ethnography, and linguistics were almost equal passions of Merriam during a long and distinguished career as a scholar. With funding by the Harriman family, Merriam began work in the early twentieth century to collect as much information as possible from California's native people (Osgood 1944).

His early field work with Pomo and Miwok informants overlapped the research mounted by Samuel A. Barrett. Alfred Louis Kroeber of the University of California noted in 1906: "Since Mr. Barrett's paper on the Geography and Dialects of the Miwok Indians was sent to press and announced, there has appeared an article on the same subject by

14

Dr. C. Hart Merriam. While these two contributions, which were made entirely independently corroborate each other closely in the main, they differ on certain points" (Barrett 1908d; Merriam 1907; Kroeber 1908:369).

In later years, Merriam drafted a comparison of his notes with Barrett's published account on Pomo ethnogeography. The following is a section of the extensive and comparative integration of information Merriam developed. At numerous points, Merriam recorded Barrett's spelling or rendering of the same place name. Where he did so, he identified Barrett's usage in parentheses. The following information documents villages and places in the vicinity of the Scotts Valley Rancheria.

Lake Division

Bah-kah'-sah (baka'sa). Old camp a little W[est] of Bo'-chah-wel

Ah-kop'-shoo. Kinamara (So[uthern] Pomo) name for the tribe at Upper Lake

Bo'chah-wel (bo'tcawel Barrett). Camp on W[est] shore of Tule Lake, just N[orth] of where Scott's Creek enters

Boil-ka-ya. Band in Scott Valley. See Moal-kai

Dah'-tsin (da'tsin). Modern camp on small creek (dasinbida) emptying into Clear Lake 1 ½ miles S[outh] of Rocky Point on W[est] shore of strait connecting Upper Lake with main body; ½ mile back from lake shore

'Hah-raw' or 'Haraw'mahloogal' (xaro' or xaromalugal Barrett). Village close to shore at head of small bay extending N[orth] from N[orth] part of Tule Lake. (Bay, also, xaro)

Hom-chah-te (ho'mtcati Barrett). Village 3/4 mile N[orth] of Tule Lake, near foothills on E[ast] side of valley; on the small knoll

Kah-bah'-I (kaba'i Barrett). (Xabahi in E[astern] dialect). Camp on W[est] shore Clear Lake, 2 1/4 miles N[orth] of Lakeport

15

Kah-bel' ('Hah-bel or Xabel in E[astern] dialect).  Village on E[ast] slope of 'Rocky Point', projecting from W[est] shore of channel connecting main body of Clear Lake with Upper Lake, its N[orth] arm Kah'-nal.  Kinamara name for tribe at Blue Lakes, W[est] of Upper Lake

Kah-lah'be-da (kala'bida Barrett).  Camp on W[est] shore Clear Lake 3/4 mile N[orth] of Lakeport; on W[est] shore small cove on L. P. Burger's place

Kahles-shok-on (kale'eco-kon Barrett).  Camp on W[est] shore Clear Lake, 1 3/4 miles N[orth] of Lakeport

Kah'rah-ka (ka'raka Barrett).  Village on E[ast] border Scott Valley 1 ½ miles N[orth] N[orth]W]est of Lakeport; part or all on ranch of J. F. Burger.

Kah-tsah'moc-gal (katsa'mu-gal Barrett).  Camp on W[est] shore Clear Lake 1 1/4 mile N[orth] Lakeport

Kil-le'-le-o.  Camp on W[est] shore Clear Lake ½ mile S[outh] of Rocky Point, at strait connecting Upper Lake with main Clear Lake

Ko-bah-tap (ko'batap Barrett).  Camp on W[est] shore Clear Lake, 4 miles N[orth] of Lakeport

Kom'le (ko'mil Barrett) Cum-le-bah camp in 'Eight-mile valley', situated at head of Scott Creek, 3 miles N[orth] N[orth]E[ast] of Red Mountain

Mah-mah-mah-mah-oo I (mama'mamau Barrett).  Village on point projecting into Tule Lake from N[orth] shore near outlet

Mi-ye' (maiji Barrett).  Village at foot of hills on extreme W[est] side Upper Lake valley, a little N[orth] of Scott's Creek where it cuts divide between Tule Lake and Upper Lake valley

Mo-al-kai (Mal-kai, Boil-ka-ya) Band in Scott Valley, W[est] of Clear Lake (McKee & Gibbs 1851)

No-bawa-ral (no-boral Barrett).  Village on W[est] bank Scott's Creek 2 ½ miles N[orth] N[orth]W[est] of Lakeport (moal-kai &

16

Boil-k-aya, prob[ably] same)

Sah-mah-kah-na (sama'kahna Barrett) Village on W[est] bank of
Scott's Creek 3 ½ miles N[orth] N[orth]W[est] of Lakeport

Se-wah-kal (si'wakal Barrett).  Village on W[est] slope and near
summit of ridge W[est] of Clear Lake, 2 miles N[orth] of Lakeport

Shoke Pomo Name used by Upper Ukiah Redwood & Potter Valley
Pomo for those on Clear Lake (Carl Purdy)

Tse-yah'-kah-bay-yo (tsi-ya'kabe-yo Barrett).  Village on creek
tributary to Middle Creek heading on S[outh] side Buckner Mt.,
was 3 miles S[outh] of Shanaki

Yo'-to-gah-go (yo'-to-ga-go Barrett).  Camp in very small valley
on head of Scott's Creek, 2 ½ miles N[orth]E[ast] of Red
Mountain
(Merriam 1905-ff.[125]: frs. 67-79)

Similar to Barrett, Merriam summarized Pomo band distribution in
the area west of Clear Lake and the vicinity of the Scotts Valley
Rancheria:

Dan-no'-ka-ah.  Upper Lake tribe proper, extending from the
southerly slope of Elk Mountain to Upper Lake, thus including the
main part of Middle Creek with its east and west forks and coming
south to the north shore of Clear Lake on both sides of Upper
Lake.  Sometimes called Sho'-ke, which however is not a tribal
name but means East & applies to all Clear Lake people alike as
spoken by Russian River Indians.

She'-kum.  Occupying the eastern shore of the main Clear Lake,
including Bartlett Landing, and extending southerly to or nearly to
Floyd Hill.  A few of these people are still to be found on a small
reservation on the west side of Upper Lake on the road that leads
from Upper Lake to Lakeport.

Kah-kan'-nap-po (Big Valley tribe).  Territory extended along the
west shore of Clear Lake from just above the town of Lakeport
southerly to Bynum Springs and Highland Springs (probably a
little farther), and on the east included Kelseyville and the

17

AR0005406

westerly slopes of Mt. Konokti.  These people have lived for some years on a small rancheria on the ground of the St. Turebias Mission, but are now located by themselves on a small reservation not far from Lakeport.

*Bo-al ka-ah* (Scott Valley tribe).  Occupying Scott Valley between Blue Lake and the northern shore of Clear Lake.  There are said to be a few of these people still at the Upper Lake rancheria and a few at the Big Valley rancheria (now located near Lakeport).  *Bo-al* means on the west, referring to those on west side of the lake.  An old Indian man of this tribe was tied to a tree and burned alive because he refused to tell Capt. Nathan Lyon and his troops w[h]ere the Indians were hiding during Lyon's infamous expedition of May 1850.

*Kow'-oo-nah'ka'-ah* (Sulphur Bank tribe).  Hold Sulphur Bank arm and thence southerly along Lower Lake and probably around the Lower Lake to the Narrows (Merriam 1905-ff.[10]: fr. 100).

Merriam's work, like that of Barrett, found conclusive evidence of the use and occupancy of Clear Lake and adjacent Scotts Valley by Pomo Indians.  Both referred to people who "are still to be found on a small reservation on the west side of Upper lake on the road that leads from Upper Lake to Lakeport."  The Pomo of that district confirmed they knew their homeland and shared their knowledge with both Merriam and Barrett early in the twentieth century.


## Alfred Louis Kroeber, 1901-46

Alfred L. Kroeber (1876-1960) became one of the most distinguished teachers and scholars in the Department of Anthropology at the University of California, Berkeley.  He earned his Ph.D. in 1901, the first doctoral degree in anthropology granted by Columbia University where he was a student of Dr. Franz Boas.  Kroeber spent more than four decades as a cultural anthropologist with particular focus on the Indians of California.  He also worked as an archaeologist and was head of what became the Phoebe Apperson Hearst Museum of Anthropology.  He was involved in linguistic studies, particular Penutian in California, a language surrounding the Hokan-speaking Pomo.  Among his major works was *Handbook of the Indians of California* published by the Smithsonian Institution (1925).

18

AR0005407

In the Preface to the *Handbook* Kroeber explained that the volume "is a history in that it tries to reconstruct and present the scheme within which these people in ancient and more recent times lived their lives. It is concerned with their civilization–at all events the appearance they presented on discovery, and whenever possible an unraveling, from such indications as analysis and comparison now and then afford, of the changes and growth of their culture" (Kroeber 1925:v). The volume contained 995 pages and remained a major reference work for the rest of the twentieth century.

Kroeber referred to the Pomo as "one of the best-known groups in California." Although they had Hokan linguistic cousins in California–the Karuk, Shasta, Achomawi, Atsugemi, Yana, Washo, Esselen, Salinan, Chumash, and Yuman–none of these tribes lived adjacent to them. The Pomo were linguistically isolated on the coast and in the Russian River Valley fifty to 100 miles north of San Francisco Bay (Kroeber 1925:223).

Kroeber defined the territory occupied and used by the Pomo:

> Except for a barely detached offshoot over the main Coast Range in the Sacramento drainage, **the Pomo form a wholly continuous and rather compact body.** They also harbored no aliens within their boundaries, except for a minute subdivision of the Wappo, the Lile'ek, apparently a single village community, that had moved a short distance from its ancestral hills to the shores of Clear Lake. Roughly, the Pomo are inclosed between members of the Yukian, Wintun, and Miwok stocks and the ocean. In detail and sequence their neighbors are: Coast Yuki, Huchnom, Yuki, Wintun, Lake Miwok, Wappo, Coast Miwok–all, except the Wintun, much smaller bodies than Pomo (Kroeber 1925:222) [Emphasis supplied].

Kroeber considered the Clear Lake basin, homeland of the Scotts Valley Rancheria, a special setting. He described its fertile, lower shores, hills, and mountains and wrote that it was "altogether one of the ideal spots for Indian residence in the State." The thirty-mile long lake exited east via Cache Creek cutting through the Coast Range into the tule marshes along the Sacramento River. "In the ultimate reckoning," concluded Kroeber, "the Clear Lake basin belongs, therefore, to the great interior valley rather than the coast region (Kroeber 1925:224).

19

AR0005408



FIG. 17.—Distribution of the Hokan family in California.

Fig. 2.  Distribution of Hokan-speakers in California (areas identified by cross-lining) documenting the linguistic isolation of the Pomo (Fig. 17 in Kroeber 1925:223).

Similar to Barrett and Merriam, Kroeber identified seven major Pomo dialects.  Pomo political structure was based on village

AR0005409

autonomy: "The village community was a political unit comprising ordinarily several settlements, but with one principal village in which lived a chief recognized by all members of the group," he wrote. "Within the tract claimed by the community everyone belonging to it was at liberty to hunt, fish, or gather plant food, it would appear without limitations of private ownership . . . ." He concluded: **"The boundaries of the land owned by the group, were, however, definite; and as regards other groups, the rights of property and utilization were clearly established"** (Kroeber 1925:228-229) [Emphasis supplied].

In 1925 Kroeber reported there was information on 479 Pomo settlements and added that this number "does not exhaust the list of those recollectable by informants, without recognized camping places." He identified seventy-five principal villages (Kroeber 1925:229). Like others, he discussed the "Eastern or Clear Lake Pomo" from which the Scotts Valley Band drew its membership.

Howalek, on Middle Creek near Upper Lake town. Damot was chief at the time of settlement.

Yobutui, on the opposite side of lower Scott Creek from the northern Pomo village of Mayi. The two towns were rival but friendly metropolises of the region. Djamto was the Yobutui chief.

Danoha, some miles up an eastern affluent of lower Scott Creek. Guki was chief. Connected with this group was Badonnapoti on Bloody Island in Upper Lake off the mouth of Scott Creek. Both sites were permanently inhabited, but the people were a unit. Intermediate in location, and therefore part of the same community, was Behaepal or Babehe, which in the early [eighteen] seventies was the scene of an active ghost dance propaganda initiated by the Wintun of Grand Island on the Sacramento River. Many Indian were killed at Badannapoti by troops in 1850.

Shigon, on the east side of main Clear Lake.

Kashibadon, at Lakeport on the west side of the lake, was the main town of the Kuhla-napo or 'water lily people,' who ranged southwestward to Adobe Creek.

21

AR0005410

Bidamiwina was the more recent, Nonapoti the ancient, and
Shabegok a third center of the Habe-napo or 'rock people,' who
lived around Kelseyville between the Kuhla-napo and the Yukian
Lile'ek.  Kabinapek is another version of Habe-napo, and the
near-by Lake Miwok translated the word into Lupu-yama.  The
Kula-napo and the Habe-napo chiefs in 1851 were Hulyo and
Perieto, as the Indians render their Spanish names (Kroeber
1925:231-232).



FIG. 22.—Coast Miwok territory and settlements.   (After Merriam and Barrett.)

Fig. 3.  Southern boundary of the Pomo adjoining the Coast
Miwok, Wappo, and Wintun lands extending to San Francisco and
San Pablo bays (Fig. 22 in Kroeber 1925:274).

AR0005411

Kroeber identified the southernmost boundary of the Pomo as reaching from Duncan's Point a few miles south of the mouth of the Russian River eastward toward Santa Rosa Valley to the homeland of the Wappo. Nowhere did Kroeber identify the aboriginal territory of the Pomo as reaching to the northern shore of San Francisco Bay or San Pablo Bay, the territory of the Coast Miwok and the Patwin, or Wintun-speakers.

## E. W. Gifford, 1935

In the mid-1930s the Department of Anthropology, University of California, Berkeley, engaged a number of graduate students and professors to work with tribal informants on a major study of Cultural Elements. The field reconnaissance with tribes extended along most of the Pacific Coast. The interviewers carried a checklist of more than 1,800 measures of aboriginal culture (technology, foods, religious practices, political structure, and other features) and recorded the presence, absence, or uncertainty of these "elements" as they interviewed their informants.

E. W. Gifford carried out the cultural element study of the Pomo. Born in California, Gifford in 1912 joined the staff of the museum of the California Academy of Sciences. His longest association was with the Anthropology Museum on the campus in Berkeley. He became a curator in 1925 and a professor in 1945. Over his long career he wrote and published more than 100 articles, a number of them in collaboration with Alfred L. Kroeber who did the statistical analysis of the cultural elements Gifford recorded. Gifford worked with twenty informants. In addition to sixteen Pomo these included William Benjamin, River Patwin; George Bill, Hill Patwin; Salvador Chapo, Lake Miwok; and Billy Freeman, Hill Wintun (Gifford and Kroeber 1937:122-124).

Gifford identified approximately eleven Pomo communities in the Clear Lake basin: two speaking Northern dialect; six speaking Eastern, and three speaking Southeastern.

*Eastern Pomo of Clear Lake*

*Habe'napo (Ha)*, 'rock-people,' is the name of a group, not of a village site. They shared Big v[alley] with 'water-lily people,'

23

Kuhla-'appo, Adobe cr[eek], being dividing line.  Main Habenapo village site apparently shifted, Nonapoti being best known.

Following Barrett, most maps give E[ast] edge of Big v[alley] to a Wappo group, the Lile'ek.  I have previously shown that Lile'ek were probably not an aboriginal community, but transient intruders.  List inf[orman]t had not heard of them.  Another, Jo Augustine, volunteered that Lile'ek, 'mixed speech,' were assembly of Geyserville Wappo, Lake Miwok, Cache cr[eek] Wintun, SE Pomo Elem, and Habenapo, with chief of their own, and houses at Nonapoti, near steel bridge N[orth]W[est] of Kelseyville, on E[ast] side Kelsey cr[eek].  They were given hunting and fishing privileges by Habenapo.  They were renegades–presumably from missions, or perhaps in conflict with Spaniards.  This seems finally to eliminate the anomalous Wappo 'island' from our ethnic maps.

*Shi'gom (Cigom, Ci)*, at Lucerne, on N[orth]E[ast] side of lake.  Subdialect different from Habenapo.  Once attacked Elem.  Close contacts with Long v[alley] Patwin over ridge at their rear.  I have a published census of this community.

*Southeastern Pomo of (Lower) Clear Lake*

*E'lem (El)*, on Sulphur Bank or Rattlesnake i[slan]d.  In 'East lake' arm.  Fighting with Shi-gom and, over acorn lands, with Cache cr[eek] Patwin.

*Koi (Ko)*, on Lower Lake i[slan]d.  A few miles s[outh] was first Lake Miwok community (Gifford and Kroeber 1937:122).

Gifford's recording of Pomo cultural elements led to the calculation of affiliations of specific Pomo groups and some of their neighbors.  Gifford and Kroeber found the Lake Miwok "definitely belong with the Clear Lake Pomo rather than with the Patwin whom they equally adjoin and who lived in the Great [Sacramento] Valley."  They further concluded: "The Southeast and East Pomo are very similar, as might be expected from their living on the same lake.  They stand slightly but perceptibly nearer the South than the Central Pomo" (Gifford and Kroeber 1937:242).

24

AR0005413



POMO COMMUNITIES

Fig. 4. Pomo Communities outlined in black and surrounding tribes (Gifford and Kroeber 1937[4]:frontispiece).

25

AR0005414

## Omer Call Stewart, 1936–37

Omer Call Stewart (1908-1992) taught for many years as a professor of anthropology at the University of Colorado, Boulder. While a graduate student in the 1930s, he became involved in field interviews for the Cultural Element Distribution studies, a project of the Department of Anthropology, University of California, Berkeley. His field work among California Indians led to publication of "Notes on Pomo Ethogeography" (Stewart 1943). Stewart acknowledged the major contribution of his predecessors, especially Samuel A. Barrett, and wrote: "The main purpose of the paper is to determine more exactly the extent of probable subdivisions, indicated by Kroeber in the map of the Pomo in his *Handbook of the Indians of California*" (Stewart 1943:29).

As part of his methodology, Stewart carried topographic maps "used to locate boundaries, trails, village sites, 'mines,' and other geographical features." Joe Augustin[e], a man aged about sixty-three, was Stewart's informant for the "Yimba of Scotts Valley." Augustine stated that his parents came from the Southern Pomo-speaking village of Kulanapo. Stewart wrote: "J[oe] A[ugustine] has lived most of his life in Scott's Valley, is now considered chief (Stewart 1943:30). Joe Augustine in his application of enrollment as a California Indian stated that he was born on June 29, 1875, in Lake County and that he had lived there all his life. He was the son of Pete Augustine and Jessie Rickabow (Augustine, Joe 1928).

Using Augustine's information, Stewart described the occupancy area of the "Yimaba of Scott's Valley:"

> The Yimaba Indians occupied about three and a half miles of land fronting on Clear Lake, from the Cinal area southward to just north of Lakeport. The boundary between the Yimaba and the Kulanapo, about five miles long, was also the dividing line for the Northern and Eastern dialects. To the northwest, Yimaba lands touched the territory of the Central dialect. Thus the drainage of Scott's Creek from the summit of the mountains to the edge of Clear Lake, an area approximately ten miles long and seven miles wide, was occupied by the Yimaba tribe. Only one village, Karka ('dead brush water'–H[alpern]) was founded by this tribe. The ceremonial house, under the supervision of an assistant chief, was situated there (Stewart 1943:42).

26

AR0005415

Stewart further wrote:

> **My informant J[oe] A[ugustine] said that the Yimaba never went to the coast; they obtained seaweed and clamshells by trade, and salt either by expeditions to Stonyford** [a community at 1,100 feet in Colusa County to the east] **or by trade from the ocean.** The Yimaba did not have private ownership of sources of food, and, if my informant is correct, in this respect they resembled the other Northern Pomo (except Potter Valley) and the Eastern Pomo Cigom and Xowalek. **They obtained food from the coast in exchange for dried fish, obsidian, and magnesite** (Stewart 1943:42) [Emphasis supplied].

Chief Joe Augustine, a collateral relative of several current members of the Scotts Valley Band of Pomo, thus affirmed that the trade relations of his people connected west through Pomo country to the Pacific Ocean and not south to San Francisco or San Pablo bays. The Pomo of the Clear Lake basin offered dried fish, obsidian, and magnesite used for manufacturing beads for the products of the Pomo living to the west along the shore of the Pacific Ocean.

### Fred B. Kniffen, 1938-39

Fred B. Kniffen (1900-1993) studied anthropology at the University of California, Berkeley. His graduate mentors were Alfred L. Kroeber and Carl Sauer. He pursued work in anthropology and geography and, ultimately, became a geography professor at the Louisiana State University, Baton Rouge. During a career of nearly sixty years, Kniffen wrote more than 150 articles, including "Pomo Geography" (1939). The monograph was an exercise wherein Kniffen tested and verified in field interviews the information collected in 1903-06 by Samuel A. Barrett. Unlike Barrett's comprehensive study of the Pomo and their neighbors, Kniffen concentrated on the Clear Lake Pomo. Following his discussion of the extensive fish and bird resources of the basin, he noted "Clear Lake was overwhelmingly a Pomo lake, that is, in a linguistic sense" (Kniffen 1939:358).

Kniffen found twelve Indian groups in the Clear Lake basin and another along Cache Creek, the lake's outlet east through the Coast Range to the Sacramento River. The traditional villages were removed

27

from the shore of the lake and primarily stood along tributary streams flowing into it, except in the southeastern area where there were lakeshore dwellers mostly on islands. "It appears," he wrote, "that for each [sub-group] there was a main village which served as headquarters, contained the sudatory [sweat lodge] and dance house, and was lived in during off seasons. Main village sites were shifted a good deal throughout a period of time." The movement of villages was to insure good supplies of firewood, to avoid disease, and to erect new structures when a village became too old to be safe (Kniffen 1939:359).

The dozen Indian communities of the Clear Lake basin had specific territories. "Group boundaries," he wrote, "were well defined but were not rigidly enforced when all were at peace. Various things dictated whether or not boundaries might be disregarded without engendering ill feeling." Konocti Mountain, for example, was the primary source of angelica root prized for ceremonies. "On the mountain," his informants said, "there were certain patches where anyone might gather without special permission of the Lile'ek, Habenapo, or Limakma; certain patches were reserved" (Kniffen 1939:360).

Kniffen's informants told him that they mostly remained close to home. He explained:

**The Pomo were not great travelers. When parties went to the coast; or to Stony Creek [a source of salt in Colusa County in the Sacramento Valley], they were composed of selected individuals; they numbered only a few, as compared to those who remained at home. Many persons in their whole lifetime never left the bounds of their own communities.** Nevertheless, trips were made with some degree of regularity (Kniffen 1939:361) [Emphasis supplied].

In the late summer, before the acorn-gathering season, parties went to Bodega Bay for shells. At the same time another party might set out for the Salt Pomo [on the Pacific Ocean] for salt. In late winter, if the acorn store was running short, a party went over the mountains to Russian River people to trade for a supply. There were local trips for obsidian, magnesite, angelica root, and for red earth for making acorn bread.

AR0005417

The lake people also received visitors regularly. The Mutuho, Potter Valley people [Pomo from Russian River Valley], came regularly to hunt and fish with the Kaiyo. The Yokaia [from Russian River Valley] came each year to fish with the Boalke at Kabel, and packed their fish back across the mountains. The Lil'ek and Tsoiwal [from the southern end of Clear Lake] were visitors among the Habenapo. The Cache Creek Patwin [living to the east] and the Coyote Valley Miwok came to Lower and East Lakes, and the Long Valley Patwin to Shigom and Upper Lake. The visitors were welcome; some of them, as for example the Matuho and Yokaia, had linguistic affiliations with the people visited (Kniffen 1939:361).

Kniffen's informants identified trade items. In the Clear Lake basin they had access to angelica root, furs, skins, obsidian, magnesite, dried fish, and red earth for making acorn bread. They needed and traded for acorns in the Russian River Valley and for clam shells, seaweed, yew for bows, and salt from the Pomo along the Pacific Ocean to the west. They bartered with peoples to the north for the fibers from the leaves of iris to use as fibers in deer snares (Kniffen 1939:361).

Kniffen's informants provided detailed information on subsistence. From that he developed a chart of the seasonal round wherein the Pomo of Clear Lake subsisted wholly within the basin where they resided:

| Season | Activity | Place of abode |
|---|---|---|
| Spring: | | |
| March | Stream fishing | Main village |
| April | Stream fishing (Men) Clover (women) | Main village |
| May | Some clover Lake fishing | Scattered. A large number camped on lake shore |
| Summer: | | |
| June | Root digging, tule, clams. Lake fishing in early June | Scattered. Camped on lake; in hills after roots |
| July | Roots, tule, clams. Carrying in the harvest | Main village |
| August | Gathering pinole seed. Trips to coast and for salt | Main village |
| Fall: | | |
| September | Pinole seed | Main village and camp |

29

AR0005418

| | | |
|---|---|---|
| | Return from trips | |
| October | Acorns | Camp |
| November | Continued gathering acorns and carrying them Waterfowl in latter part | Main village |
| | | |
| Winter: | | |
| December | Waterfowl | Main village |
| January | Waterfowl | Main village |
| February | Waterfowl until mid-February. Stream fishing in latter February | Main village |

(Kniffen 1939:366)

Similar to Barrett, Merriam, Kroeber, Gifford, and Stewart, Kniffen identified each of the dialectic groups inhabiting the Clear Lake basin, identified their villages and locations, and provided supplementary information such as that recorded in 1880 by Lyman Palmer.

30

AR0005419



Map. 1. Pomo of Clear Lake.

Fig. 5.  Pomo of Clear Lake, Part 1, Map (Kniffen
1939:frontispiece)

31

AR0005420

## KEY TO MAP OF CLEAR LAKE

*Shigom*
- A  Shigom
- B  Bududa
- C  Halika
- D  Taawina
- E  Modern village
- 1  Sand beach
- 2  Ketsidano, red mountain

*Danoxa (Danoha)*
- A  Danoxa
- B  Badonnapoti (Bloody Island village)
- C  Behepal
- 3  Danoxabidame, Clover Creek

*Howalek*
- A  Howalek or Titsmagi
- 4  Taabidame, lower course of Clover Creek

*Yobotui*
- A  Yobotui
- B  Danobidao
- C  Pulidsiwi
- 5  Gusha-dano, mountain
- 6  Fishing dams
- 7  Kayebidos, bay

*Kaiyao*
- A  Kaiyao
- B  Mayi
- 8  Tsiynhahro, mouth of Daile Creek Canyon

*Boalke and Komli*
- A  Noboral
- B  Komli, Eight-mile Valley
- C  Debotabel
- D  Kabel
- E  Xabi
- F  Katsannugal
- 9  Datsiao-bidame, small fishing stream
- 10  Kobatap, seed-gathering flat
- 11  Kelem, island
- 12  Yeakianno, lookout hill
- 13  Witglao, Four-mile Glade

*Koi*
- A  Koi
- B  Kaochil

*Kahdanapo*
- A  Boomli
- B  Kashibadon
- C  Xadabutam
- D  Chuwish-bidame
- 14  Gubi, point
- 15  Kaledai, inlet
- 16  Xahe-dano, mountain
- 17  Boxa-bidame, small stream
- 18  Chuwish-bidame, Cole Creek
- 19  Taxlol, point
- 20  Wayoi-dano, mountain
- 21  Aawise, spring
- 22  Sise, spring
- 23  Lauwai-dano, mountain
- 24  Taawina, flat

*Habenapo*
- A  Nonnapoti
- B  Bidame-wina
- C  Xalewini
- D  Xalebim
- E  Tsallahoi
- F  Shabegok
- G  Sedileo
- 25  Gixgi-bidame, small stream
- 26  Manatol, flat
- 27  Ghiphaho, flat
- 28  Xalebim-bidame, Adobe Creek
- 29  McGough Slough
- 30  Long tule point
- 31  Hapol, bay
- 32  Haikaolise, "dry wood brush"
- 33  Bataumise, "oaks"
- 34  Sixaho, "brush land"
- 35  Kapashapasha, bay and small stream

*Lile'ck*
- A  Data-dano
- B  Kabetsawam
- 36  Hadauo, mountain
- 37  Dadauo, mountain
- 38  Shigasho, pond in Cold Creek

*Kamdot*
- A  Kamdot
- B  Patolkalou

*Elem*
- A  Elem
- B  Village

Fig. 6.  Key to Pomo of Clear Lake, Part 2 (Kniffen 1939: frontispiece).

32

AR0005421

### Andrew P. Vayda, 1967

Andrew P. Vayda earned a Ph.D. in anthropology in 1956 at Columbia University and subsequently taught at Columbia, the University of British Columbia, and at Rutgers until he retired. As founder and editor of *Human Ecology* he concentrated his research and writing on human and environmental interactions. For many years his fields of study were Southeast Asia, New Guinea, and Polynesia. Vayda was the author of "Pomo Trade Feasts" in *Tribal and Peasant Economies: Readings in Economic Anthropology* (Dalton 1967). In this essay, Vayda described Pomo territory:

> **The Russian River drainage in the Coast Range north of San Francisco area was the heart of the territory of the Pomo Indians.** Aboriginally, the region was among the most densely populated areas north of the Rio Grande . . . . **Each community relied mainly on its immediate environs for its subsistence, but some foods had to be obtained from distant points, since there were geographical differences in the availability of such foods as lake fish, salmon, sea food, acorns, game, etc. Thus, for example, the people living in the interior journeyed to the coast for sea foods once or twice every year, and the coast residents made journeys inland to get foods not common to their region.** Permission to harvest what they wanted was usually granted to visitors (Vayda 1967:495) [Emphasis supplied].

### Sally McLendon, 1960s-present

Sally McLendon, professor emeritus of linguistics, Hunter College emerged as one of the leading scholars working with Pomo informants and engaging in Pomo linguistic analysis in the last half of the twentieth century. In 1978 she co-authored with Robert L. Oswalt the essay "Pomo: Introduction" for the California volume of *the Handbook of North American Indians* (McLendon and Oswalt 1978[8]:274-288) and she co-authored with Michael J. Lowy the essay "Eastern Pomo and Southeastern Pomo" in this same volume (McLendon and Lowy 1978[8]:306-323).

McClendon and Oswalt discussed in detail each of the seven Pomo language areas, identifying villages, place names, illustrating them with

33

AR0005422

maps, and other information. They devoted a section to "Eastern Pomo," in which they wrote:

> The chief of a fifth group attended the treaty negotiations in 1851. Gibbs transcribed the name of this group as Moal-kai. This seems to have been a group that the Eastern Pomo referred to as *bówalkʰeya* (Northern Pomo *bówal-kʰeya?* 'People from the west'), who are said to have lived in Scotts Valley. The western shore of Clear Lake proper and Scotts Valley, which runs parallel to this portion of shoreline but separated from it by a low range of foothills, were assigned to the Northern Pomo by Barrett (1908), but the place-names he gives for this area are mostly Eastern Pomo terms. The Eastern Pomo name for Scotts Valley is *yi'má*, which could mean 'at the sinew' (McClendon and Oswalt 1978[8]:286-287).

They continued: "The place-names indicate that this area was used by Eastern Pomo as well as Northern Pomo. (Since the western shore was regularly flooded in winter and spring, it was not a suitable location for a permanent village, but was only used for camping.) This seems to have been an area into which the Northern Pomo were moving at about the time of contact" (McClendon and Oswalt 1978[8]:287).

AR0005423



Fig. 7. Territorial extent of the 7 Pomoan languages and their constituent tribelets or village-communities, with probable boundaries at the time of first White contact. The redwood zone is approximated (Fig. 2, McLendon and Oswalt 1978[8]:276).

35

AR0005424



Fig. 8. Territory of the Northeastern, Eastern, and Southeastern Pomo. For the names corresponding to the numbers, see text. Upper Lake is shown in its original form (after Barrett), before a 1920s reclamation project changed its shoreline by dredging and filling (Fig. 6, McClendon and Oswalt 1978[8]:286).

36

AR0005425

Locations 1, 2, and 3 in Fig. 8 were the villages or tribelets of 1. *ší·kom* (north shore of Clear Lake), 2. *da·nó-xà* (Clover Valley), and 3. *xówalekʰ* (west of Middle Creek in Upper Lake Valley). The linguists struggled with situating *qu·lá-na·pʰo*. They wrote:

> The exact location of the permanent village of the *qu·lá-na·pʰo* is difficult to determine, perhaps because Salvador Vallejo's men forced them to move from their former location when he began to run cattle in Big Valley in the 1840s. All sources seem to agree that they controlled that portion of Big Valley roughly from Lakeport to Adobe Creek, which they controlled access to. Other names are kūLa'napō, Hula·napo, KuLanapo, Bohanapwena (from *bó·xaNawɨ(?)* 'on top of on the west water' given as name of village), Kuhlanapo, Kahibadon (from qa·ší-na·dòn 'island off shore from present town of Lakeport' given as the main town), Ku'lenap'-po, Hoo-la-nap-o (McClendon and Oswalt 1978[8]:287).

The Scotts Valley Band of Pomo has argued that its ancestor Augustine was chief of the Hoo-la-nap-o. McClendon and Oswalt's analysis of place names thus suggests that these were the Pomo living on the island off-shore from Lakeport but not in the villages in Scotts Valley, later site of the federal fee purchase of land in 1911 for the Scotts Valley Rancheria.

### Victor Golla, 1960s–present

Victor Golla (1939-living) is the most recent scholar to analyze and map Indian languages north of San Francisco Bay and the central valley of California. Golla is an emeritus professor at Humboldt State University. *California Indian Languages* (2011) is the culmination of fifty years of his linguistic work and is extensively illustrated with maps and photographs. The volume is particularly useful for weighing and explaining language and tribal distribution drawn from 163 years of field work and publications on the subject.

Golla identified the Pomo-speakers as living along the Pacific Ocean from Fort Bragg at the Noyo River on the north to near Duncan Point north of Bodega Bay on the south. Their country embraced the upper watersheds of the Eel and Russian rivers as far south as Santa Rosa and the Clear Lake basin except for an island of Wappo-speakers

37

AR0005426

living north of the Wappo and Lake Miwok (Golla 2011:105).



MAP 17. Pomo languages and their major dialects.

Fig. 9.  Pomo languages and their major dialects (Map 17, Golla 2011:105).

38

AR0005427

Golla classified four primary Pomo languages: Southeastern, Eastern, Northeastern, and Western. The Western Pomo he divided into Northern Pomo and Southern Pomo, and the latter group he subdivided further into Central Pomo, Southern Pomo, and Kashaya (Southwestern Pomo). Golla founded this classification on the decades of linguistic studies of Robert Oswalt (Golla 2011:106-10).



MAP 18. Languages and dialects of the Clear Lake Basin.

Fig. 10. Languages and dialects of the Clear Lake Basin (Map 18, Golla 2011:106).

39

AR0005428

The Scotts Valley Rancheria was located in the traditional homeland of the Northern Pomo/Eastern Pomo and, more particularly, the Bowal/Yima. Golla wrote:

> There were five Eastern Pomo tribelets in the western portion of the Clear Lake basin, with their principal settlements located along streams well back from the shoreline. These included Kuhlanapo (qy:xána:pò) in Big Valley, south of Lakeport; Habenapo (xa:béna:pʰò) on the south shore of the lake along Kelsey Creek; Kdanoha (da:nóxà) in Clover Valley northeast of Upper Lake; Howalek (xówalekʰ) along Middle Creek in Upper Lake Valley; and Shigom (ší:kom) on the north shore of the lake near Lucerne. In addition, the Shinal (N Pomo šinál 'at the head') or Kayaw (E Pomo kʰa:yáw, same meaning) tribelet west of Upper Lake and the Cowal (N Pomo bówal 'west side') or Yima (E Pomo yi:má: 'gristle, sinew') tribelet along Scotts Creek northwest of Lakeport represented recent amalgamation of Northern and Eastern Pomo populations and were bilingual in the historic period. There was a noticeable dialect difference between the two south shore districts (Kualanapo and Habenapo) and those on the upper lake (Golla 2011:107).

Golla's dialectic differentiation is important. The Scotts Valley Rancheria was situated in the Bowal/Yima homeland along Scotts Creek. The Kuhlanapo lived in the vicinity of Lakeport and the Big Valley Rancheria. The Habenapo lived southwest of Clear Lake in the watershed of Kelsey Creek. Golla noted the "dialectic difference between the two south shore districts (Kualanapo and Habenapo) and those on the upper lake." Within the Northern and Eastern Pomo dialect areas there existed important dialectic differences and challenges in communication (Golla 2011:107).

## Findings of Fact

1. The large district between San Francisco and San Pablo bays on the south and Cape Mendocino on the north and east to the Sacramento Valley was occupied in the mid-nineteenth century by five major language groups and more than twenty different dialects. Communication was highly localized. When a person entered a different language or dialectic area, they were immediately perceived as a stranger and, possibly, an enemy. The native communities were

40

AR0005429

localized and independent.  Samuel A. Barrett concluded: **"While the Indians recognized the fact that the people of certain other villages spoke the same language as they themselves, they did not recognize the people of a linguistic family or dialect as a unit, or the territory occupied by a linguistic family or dialect as a unit area"** (Barrett 1908a:20-21) [Emphasis supplied].  The entire area was inhabited by people whose identity and focus was their village, or that district immediately nearby, and no farther.

In light of the pervasive and pronounced village autonomy and localization, it is not surprising that there is no evidence of ethnographic connections of the Pomo of Clear Lake with Vallejo on the northeastern shore of San Pablo Bay.  The Pomo had no villages, trade sites, quarries, cemeteries, myth tale locations, or place names for Solano County.  It was not their home and they identified no historical connections there.

2.  The notes of Samuel A. Barrett and C. Hart Merriam recorded in the first decade of the twentieth century were illustrative of the detailed ethnographical information provided by Pomo informants in the vicinity of the Scotts Valley Rancheria and the Clear Lake basin.  Pomo informants identified villages by traditional names, often provided the derivation of those names, and identified their exact locations.  The comparative integration of the field notes developed by Merriam confirmed the data recorded by Barrett.  **Nowhere in any ethnographical account–manuscript or published–did Pomo informants provide any information on the northeast shore of San Pablo Bay, the north shore of San Francisco Bay, the Napa River watershed, nor anywhere in Solano County** [Emphasis supplied].

3.  Pomo informants repeatedly identified they were members of villages and tribelets, small, isolated communities, each with its own chief.  Within the territory of the tribelet there was shared exploitation of resources and no private ownership.  Kroeber, however, stressed: **"The boundaries of the land owned by the group, were, however, definite; and as regards other groups, the rights of property and utilization were clearly established"** (Kroeber 1925:228-339) [Emphasis supplied].  Nowhere did any Pomo informant identify use and occupancy or property rights outside of Pomo aboriginal territory.  No Pomo informant identified use and occupancy of any kind in the vicinity of Vallejo in Solano County.

AR0005430

4. When Pomo of the Clear Lake Basin sought marine resources such as salt, seaweed, or clam shells for decoration, they traded via an east-west corridor with other Pomo-speakers living along the shore of the Pacific Ocean. Joe Augustine, chief of the Scotts Valley Rancheria, recounted in the 1930s how his people obtained marine resources by an east-west trade and not one extending south ninety miles to San Pablo Bay. They exchanged dried fish and magnesite (for making stone beads) from Clear Lake for the resources of the sea (Stewart 1943:42).

5. Fred B. Kniffen's Pomo informants identified trade exchanges from Clear Lake west into the Russian River Valley and to the Pacific Ocean, north to the Eel River watershed, and east via Cache Creek to the salt springs in Colusa County. None discussed trails or trade networks reaching south to San Pablo Bay or San Francisco Bay or any into Wappo and Coast Miwok country south and southwest of the Clear Lake basin. Kniffen summed up the situation: "The Pomo were not great travelers." They identified a seasonal round with fairly abundant resources close at hand. They could survive wholly with the primary foodstuffs of the Clear Lake basin (Kniffen 1939:361).

6. Scholarly publications from 1853 to the present, based on information from Pomo informants, have repeatedly and consistently identified their aboriginal territory, dialectic groups, villages, camps, and use and occupancy areas. The literature is consistent and extensively documented.

AR0005431

## Tribal Distribution Along the North Shore
## of San Francisco and San Pablo Bays

The Scotts Valley Band of Pomo has contended that its members resided, worked, and traded in lands along the northern shores of San Francisco and San Pablo bays in the nineteenth century. That territory lay significantly south of Pomo aboriginal lands and was the homeland of other tribes speaking Penutian languages far different from that of the Hokan-speaking Pomo.

### Coast Miwok of the Marin Peninsula

The Coast Miwok occupied the extensive Marin Peninsula. Their territory commenced on the north at Duncan's Point on the Pacific Ocean south of the mouth of Russian River and extended southerly for seventy miles along the shore to Point Bonita at the entrance into San Francisco Bay. The northern boundary of Coast Miwok homelands reached east from Duncan's Point, crossed the hills immediately south of Santa Rosa, continued east to Glen Ellen, and stopped at the watershed divide between Santa Rosa Creek and the Napa River, a distance of approximately sixty miles. The territory included all the land south to San Francisco Bay and east to beyond the mouth of the Napa River (Kelly 1978[8]:414).

In 1925 in his discussion of the Coast Miwok Alfred L. Kroeber identified three groups or "tribes": Olamentko of Bodega Bay, the Lekahtewut between Petaluma and Freestone, and the Hookooeko of Marin County. He speculated that there were likely more than three political units because of the diversity of the geographical setting of shoreline, bays, creeks, rivers, and hills (Kroeber 1925:273).

Isabel Kelly wrote the essay "Coast Miwok" for the California volume of the *Handbook of North American Indians* (1978[8]:414-425). Kelly was born in California and earned her B.A., M.A., and Ph.D. in anthropology at the University of California, Berkeley. From December, 1931, to May, 1932, she carried out field work with Coast Miwok informants of the Marin Peninsula. Her career interests and major publications included the Southern Paiute and extensive archaeological investigations in Mexico where she lived for many years (Knobloch 1989:175-180).

43

AR0005432



Fig. 22.—Coast Miwok territory and settlements.  (After Merriam and Barrett.)

Fig. 11.  Coast Miwok territory and settlements (Fig. 22, Kroeber 1925:274).

Kelly noted that the Coast Miwok were engaged in trade with the Pomo and Wappo who lived to the north and east of them. She observed:

Sometimes the Coast Miwoks went to Wappo country to collect medicinal plants.  They went also to South Pomo territory: to Sebastopol for turtles and willow for basketry; there and to San

44

Rosa for angelica; to Healdsburg for one kind of datura (monoi); to Healdsburg and Santa Rosa creeks for tobacco. There was no mention of payment in connection with such forays and, in reciprocity, South Pomos visited the coast to fish and to dig clams (Kelly 1978[8]:419).



Fig. 1. Tribal territory and villages. 1, pakahuwe; 2, patawa yómi; 3, ʔóye yómi; 4, suwutene; 5, kén·e kó·no; 6, pulya-lakum; 7, ho-takala; 8, helapattai; 9, tiwut-huya; 10, tokau; 11, hime-takala; 12, awachi; 13, ewapait; 14, utumia; 15, sakloki; 16, shotomko-wi; 17, ʔéč·a kúlum; 18, uli-yómi; 19, páyin ʔéč·a; 20, kót·aṭi; 21, susuli; 22, tulme; 23, tuchayelin; 24, likatiut; 25, etem; 26, pèṭa lú·ma; 27, wotoki; 28, melé·ya; 29, amayelle; 30, olompolli; 31, čóik ʔéiče(?); 32, ʔéč·a támal; 33, olema-loke; 34, puyuku; 35, shotomoko-cha; 36, ewu; 37, awani-wi; 38, bauli-n; 39, liwanelowa; 40, lúmen laká·lu(?); 41, wúki líwa; 42, huchi; 43, tuli; 44, temblek. All names from Kroeber (1925); those italicized have been respelled by Catherine Callaghan.

Fig. 12.  Coast Miwok territory (Fig. 1, Kelly 1978[8]:415).

45

AR0005434

In none of these activities did Kelly document subsistence or trade activities between the Clear Lake Pomo and the Coast Miwok. The trade and exploitation of resources was with the Southern Pomo and Wappo, immediate neighbors of the Coast Miwok.

**Patwin Occupancy of Napa Valley, San Pablo and Suisun Bays**

The South Patwins were speakers of the Wintun language, classed in the Penutian stock and markedly different from that of the Pomo, speakers of a Hokan language. Patti J. Johnson, an anthropologist at the University of California, Davis, wrote the essay "Patwin" for the California volume of the *Handbook of North American Indians* (1978[8]:350-360). She noted:

> At one time Patwin occupied the southern portion of the Sacramento River Valley to the west of the river, from the town of Princeton south to San Pablo and Suisun bays. They were bounded on the east by Nisenan and Konkow, on the north by Nomlaki, on the south by Costanoan and Plains Miwok, and on the west by Yuki, Wappo, Lake Miwok, and Pomoans. In actuality the region so delimited was occupied by many groups usually called tribes in the earlier literature and tribelets in the later. The Patwin were also divided among speakers of many different dialects, for example, Kabalmem, Cache Creek, Cortina, Tebti (Hill Patwin), Colusa and Grimes (River Patwin); Knight's Landing and Suisun (Johnson 1978[8]:350).

Johnson said that Patwin aboriginal country extended ninety miles from north to south and forty miles from east to west. She divided it by three physiographic regions: both banks of the Sacramento River with its tule marshes; the flat grassland plains and oak groves; and the lower hills of the eastern flank of the Coast Range rising to 1,400 feet. Because much of the land along the Sacramento was subjected to flooding in winter and aridity in summer, many of the Patwin lived in intermontane valleys and along drainages such as Cache and Putah creeks (Johnson 1978[8]:351).

In the northern part of their territory, the Patwin of Long Valley established a friendly exchange with the Southeastern Pomo. "Long Valley Patwin could freely visit Clear Lake to fish or hunt with or without permission, depending on the particular Pomo tribelet. It was

AR0005435

necessary to request permission when acorns or grass seeds were sought," she wrote.  The Southeastern Pomo also came into Hill Patwin country for obsidian (Johnson 1978[8]:352).



Fig. 1. Tribal territory and villages. 1, Bo'-do; 2, Katsil (*kač'il*); 3, Si'-ko-pe; 4, Til-til; 5, Dok'-dok; 6, Koru; 7, No'pah; 8, Gapa; 9, P'ālo; 10, Nawidihu; 11, Kusêmpu; 12, Koh'pah do'-he; 13, unknown; 14, unknown; 15, Yo'doi; 16, Churup; 17, Moso; 18, Kisi; 19, Imil; 20, Lopa; 21, Tebti; 22, Sukui; 23, Ho'lokomi; 24, Tokti; 25, Tebti; 26, Chemocu; 27, Putato; 28, Liwai; 29, Ululato; 30, Soneto; 31, Napato; 32, Tulukai; 33, Suskol; 34, Aguasto; 35, Tolenas. Village names after Kroeber 1925; Kroeber 1932a; Merriam (Heizer and Hester 1970); Bennyhoff 1961.

Fig. 13.  Patwin tribal territory and villages (Fig. 1 in Johnson 1978[8]:350).

Johnson observed "Not all relationships among Patwin tribelets and with other tribes were friendly."  She referred specifically to the

AR0005436

Patwin of the Napa Valley where disputes arose because of poaching or deaths attributed to poisoning. "Retaliation might be against the individual or the group caught poaching at the time," she noted, and explained that sometimes these conflicts erupted in battles with men armed with spears and bows confronting one another. She concluded: "There are several recorded feuds for both the Hill and River people: Cortina Valley Patwin against a Pomoan group; and then again against some of the River Patwin, the Long Valley people against those of Cache Creek, Nisenan against River Patwin, and various River Patwin villages against one another" (Johnson 1978[8]:352-353).

John R. Johnson of the Santa Barbara Museum of Natural History published in 2006 an interesting account on the identity of the Napa Indians. He discovered that about 1876 Lorenzo G. Yates interviewed Constancio Occaye whom he identified as the last "Chief of the Napas." Yates's interest was primarily in myth texts. Constancio's native name was *Occaye* and he was baptized on December 1, 1814, at Mission San José. His father and mother were baptized the following month and all were identified as from the rancheria of *Napian* (Napa). In his study of sacramental records of the missions San José and San Francisco Asis, Randall Milliken documented the baptism of 221 Napa tribal members (Johnson 2006:194).

It has long been reported that the Indians of the lower Napa Valley were Southern Patwin, especially in the information dictated by Antonio, a Hill Patwin, to Stephen Powers in 1874. Johnson examined the three literary texts Constancio (Occaye) dictated to Yates and ten native words. Johnson analyzed the content of the texts and the vocabulary words and noted the myths "fall within the Central California oral literary tradition" and contained "elements that are very much like those in the known corpus of Coast Miwok myths, including some shared vocabulary." Johnson concluded: "In light of Constancio's clearly documented identity as a Napa Indian and the demonstrated Coast Miwok affinities of most of his myths and terms, it would seem that his people's ethnolinguistic identity was likely to have been Coast Miwok, rather than Southern Patwin" (Johnson 2006:201-202).

48



Figure 1. Tribes of the Napa Vicinity and Ethnolinguistic Group Distributions in the San Francisco Bay Region (based on Bennyhoff 1977, with some revisions from Milliken 1995).

Fig. 14. Tribes of the Napa Vicinity and Ethnolinguistic Group Distribution in the San Francisco Bay Region (Based on Bennyhoff 1977, with some revisions from Milliken 1995) (Fig. 1, Johnson 2006:195).

Randall Milliken mounted one of the most useful accounts of the tribes and tribelets residing along the north shore of San Francisco and

49

AR0005438

San Pablo bays. For several years Milliken translated, collated, and analyzed the sacramental records (births, deaths, baptisms, confirmations, and marriages) of the Spanish and Mexican missions at San Jose, Santa Clara, Santa Cruz, San Francisco, Ran Rafael, and Sonoma. The Franciscans frequently named the band or tribelet of the person receiving the rites of the church. Milliken was thus able to trace the origins of the neophytes and their families who came under Catholic instruction. Following his review of thousands of entries in the registers, Milliken wrote: "The tribes around the Bay spoke dialects of five mutually unintelligible languages: Costanoan (also called Ohlone), Bay Miwok, Plains Miwok, Patwin, and Wappo (Milliken 1995:13).

Milliken found information about the Patwins from the east end of San Pablo Bay, Suisun Bay, Napa Valley, and the shoreline east to the lower Sacramento River. Following is his summary of the Patwin groups founded on the mission records that dated to the late eighteenth century:

> **Malaca (Patwin language).** Only 64 Malaca people were ever baptized, most at Mission San Francisco Solano from 1827 to 1832. **Time of baptism and marriage ties place them on the plains on the north side of Suisun Bay, east of the present town of Fairfield.** They were closely tied to the Suisuns and many of the 326 Suisuns at San Francisco may actually have been Malacas (Milliken 1995:247) [Emphasis supplied].

> **Napa (probably Patwin language). The Napa tribe held the east side of the lower reaches of the Napa River below the present town of Napa.** They had four marriages with the Huchiun-Aguastos, four with the Choquoimes, and two with the Tolenas. The overall regional pattern of intermarriages places the Napas as southern neighbors of the Caymus, even though I could find only one marriage between them. Some 221 Napa people were baptized. Fifty-seven went to Mission San Francisco from 1809 through 1815. A larger group, 164 people, went to Mission San Jose from 1814 to 1818 (Milliken 1955:248) [Emphasis supplied].

> **Suisun (Patwin language). The Suisuns lived on the north shore of Suisun Bay** (Gudde 1969:324). Gabriel Moraga attacked their village in May of 1810 (Chapter 9). His diary

AR0005439

gives no details beyond the facts that the villages were north of Carquinez Strait.  The route of Father Abella, who visited them in 1811, indicates a location in the present Fairfield area on the north side of Suisun Bay (Cook 1960:265).  Suisuns were baptized at San Francisco between 1810 and 1815 (326 people).  Francisco Solano, the Mexican-era associate of Mariano Guadelupe Vallejo, was a Suisun baptized at Mission San Francisco in July of 1810 at the age of 10 (SFR-B 4024) (Milliken 1995:255) [Emphasis supplied].

**Tolena (Patwin language).  The Tolenas lived on the very northern edge of the San Francisco Bay Area, in Green Valley just north of the Suisun Plain.**  The first of them to go to a mission, a small group of nine people, went down to Mission San Francisco with some Suisuns in 1812, at which time they were called Caguapattos and were said to speak the 'lengua de Napa' (SFR-B 4439).  A total of 139 people went to Mission San Jose from 1815 until 1820 under the name Tolena.  Another 19 were baptized at Mission San Jose (Milliken 1995:257) [Emphasis supplied].

In addition to the identification of Patwin-speakers on the northern shore of San Pablo and San Francisco bays, Milliken also found Wappo in the sacramental registers.  The Wappo lived in the watershed of the Napa River as far south as tidewater, on upper Pope Creek, on the headwaters of Putah Creek that drains into the Sacramento River, the upper course of Sulphur Creek and its south branch running into the Russian River, and along a small part of Russian River (Kroeber 1925:218).  Milliken wrote:

**Caymus (Wappo language).  The Caymus held the present Yountville area of the Napa River north of San Pablo Bay (Yount in Heizer 1953:312).  The majority of them went down to Mission San Francisco in 1821, where they were among 240 Wappo-speaking people from four tribes all baptized under the generic term for all Wappo speakers, Canicaymus.**  Many of them transferred north to help found Mission San Francisco Solano [Sonoma] in the Napa Valley in 1823.  It is in the mission registers of Mission San Francisco Solano that one can find evidence that the majority of the Canicaymus that went to Mission San Francisco were in fact Caymus, and that only a few were Canijolmano, Huiluc, and

51

AR0005440

Maycama, other Wappo-speakers of the North Bay Area.  Only five additional Caymus people were baptized after Mission San Francisco Solano opened (Milliken 1995:238) [Emphasis supplied].

**Carquin (Costanoan language).  A tribe on both sides of the Carquinez Strait in the present Port Costa, Martinez, Benicia area.  Father Abella of Mission San Francisco passed through the 'estrecho de los Carquines' during an exploration of the Central Valley in 1811 (Cook 1960:261).  The 'Estrecho de Car Plano Topográfico quines' also appears on Father Duran's 1825 (Bennyhoff 1977:137-144) felt strongly that they held only the southern side of Carquinez Strait, while the Aguastos, whom he identified as Patwin speakers, held the north side of the Strait**.  The specific Aguasto group of that area, the Huchiun-Aguastos, may have held the north side of Carquinez Strait from Glenn Cove west to Mare Island, but they were clearly Costanoan (see Hutiun-Agusto in this appendix).  I see no evidence for any other group to the north of Carquinez Strait until one reaches the Napa and Suisun tribes, tribes definitely not located on Carquinez Strait.  A total of 152 Carquins went to Mission San Francisco, most of them in 1808 and 1810 (Milliken 1995:238) [Emphasis supplied].

**Chemoco (Mixed Wappo and Patwin languages)**.  The Chemoco group appears occasionally in the baptismal registers for Mission San Francisco Solano from 1824 through 1834.  Altogether only 34 of them were baptized.  **I have tentatively placed them in the Wooden Valley area, rugged hill country north and east of Napa Valley**, on the basis of their inter-marriages with the Tolenas, the Caymus, and the Aloquiome to the north (Milliken 1995:239) [Emphasis supplied].

**Huiluc (Wappo language).  The Huilucs held the upper valley of Sonoma Creek north of San Pablo Bay**.  The Mexican period land grant Los Guilicos, in the present Kenwood area, derives its name from this group.  A significant portion of the 240 Canicaymos baptized at Mission San Francisco in 1821, perhaps as many as 100 people, were from the Huiluc tribe.  Thirty-four 'Guilucs' went to Mission San Rafael in 1822 and 1823.  Another thirty-six Huilucs were baptized at Mission San

AR0005441

Francisco Solano in the Napa Valley between 1825 and 1832 (Milliken 1995:244) [Emphasis supplied].

Milliken's meticulous reconstruction of the ethnogeography of the San Francisco Bay area extended from Bodega Bay on the north to Monterey Bay on the south, from the Pacific Ocean on the west to the Sacramento and San Joaquin valleys on the east. Milliken's findings documented tribal distribution between 1769 and 1834-36. His findings are significant.

(1) Milliken identified only two Southern Pomo groups: one from the Santa Rosa area and the other from Duncan's Point on the Pacific Ocean. At no point did either of these Pomo groups have lands reaching south to San Pablo or San Francisco bays nor to the lower Sacramento River.

(2) Milliken found no evidence of any Pomo of the Clear Lake basin—ancestors of the Scotts Valley Band—resident anywhere on San Francisco Bay, San Pablo Bay, or the lower Sacramento River between 1769 and 1834-36, the period of secularization of the Franciscan missions.

(3) Milliken found extensive documentation of the residency of the Coast Miwok and Patwin along the northern shores of San Francisco and San Pablo bays and farther east through the Straits of Carquinez to the vicinity of the mouth of the Sacramento River.

(4) Milliken documented Costanoan (Ohlone) residency south of San Pablo Bay and on the east and west sides of San Francisco Bay.

**Wappo of the Upper Napa Valley**

The Wappo were speakers of a language classified as Yuki, though of the four languages in the group it was the most divergent. Wappo speech was influenced by the tribes surrounding it: the Lake and Coast Miwok, the Southern, Eastern, and Southeastern Pomo, and various Wintun dialects (Sawyer 1978[8]:256).

In July, 1932, Harold Driver (1907-1992) traveled to Geyserville

53

AR0005442

in the Russian River Valley to interview Wappo elders. Driver was part of the ambitious Culture Elements studies mounted by the Department of Anthropology, University of California, Berkeley. He earned his Ph.D. at Berkeley in 1936 and subsequent to World War II became a professor at the University of Indiana. Perhaps his most significant book was *Indians of North America* (1961), an ambitious 700-page overview of Native Americans focused on specific topics, such as the subjects examined in the cultural element distribution studies. He worked with three Wappo informants: John Trippo, Mary Eli, and George Fish who were living among the Pomo at the Geyserville Rancheria. "The land, however, was formerly Wappo," wrote Driver, "and on it can still be seen sweat-house pit and leveled places in the sloping ground where the beds were placed inside the grass houses" (Driver 1936:179-180).

Driver elicited considerable information from the Wappo informants and published it as "Wappo Ethnography" in the *University of California Archaeology and Ethnology* series (1936). His informants defined their aboriginal territory:

> The former range of the Wappo was a small territory some fifty miles long and from fifty to twenty miles wide, lying directly north of San Francisco bay, and almost contiguous to it. The center was about halfway between the Sacramento river and the Pacific ocean on the east and west, and between Clear Lake and San Francisco bay on the north and south. The land is mostly hilly or mountainous, but there are several fertile valleys in which most of the aboriginal population lived. The altitude varies from the peak of Mount St. Helena, some 4000 feet above sea level, to the mouth of the Napa river at tidewater. The land is drained by streams flowing into the Pacific on the west, the Sacramento river on the east, and San Francisco by on the south. It forms a sort of hinterland, internally marginal to the Clear Lake region, Russian River valley, Sacramento valley, and the Bay region (Driver 1936:181).

AR0005443



Fig. l. Tribal territory.

Fig. 15.  Wappo territory (Fig. 1, Sawyer 1978[8]:257).

Jesse O. Sawyer, specialist on Yukian languages at the University of California, Berkeley, wrote the essay "Wappo" for the California volume of the *Handbook of North American Indians* (1978[8]:256-263).  He noted that some Wappo made an annual trip in summer west to the Pacific Ocean and north to Clear Lake and, by the early historic period, they had a small enclave at Lower Lake in the Clear Lake basin, surrounded by the Pomo and Lake Miwok.  Although Sawyer found the Wappo generally got along with their neighbors, he discussed the Wappo-Pomo War in the Alexander Valley.  The Wappo attacked the Alexander Valley Pomo who had taken acorns from their territory; there were two attacks and a number of Pomo were killed. "The Pomo sought peace," he wrote, "which was granted at once, but they never returned to their Alexander Valley villages.  The abandonment of Alexander Valley to the Wappo is the only documented account of any change in the boundaries between the Wappo and the surrounding tribes" (Sawyer 1978[8]:258).

55

AR0005444

Sawyer concluded that neither war nor trade were important in Wappo culture. They mostly made do with the resources close at hand in their aboriginal homeland. They imported yellowhammer feathers from the north and magnesite cylinders and small fish caught in Clear Lake from the northeast. They exchanged basketry materials for abalone and clamshells from the Pacific coast. They also traveled as far as Calistoga to Glass Mountain, an obsidian source. Sawyer thought they may have gone to dances at Hopland, Sulphur Bank, Lakeport, and Coyote Valley but noted "Record of travel is available only for the Russian River areas" (Sawyer 1978[89]:260).

There is no documentation of the Wappo occupying or visiting the northern shore of San Francisco and San Pablo bays. They were a hill people who occupied the upper Napa Valley between the Pomo-speakers to the north and the Coast Miwok and South Patwin to the south.

## Findings of Fact

1. In their discussions of Coast Miwok territory, language, and use areas, neither Kroeber nor Kelly identified the presence of Clear Lake Pomo anywhere on the Marin Peninsula nor along the northern shore of San Francisco and San Pablo bays. The only relationship they noted were reciprocal resource uses of Coast Miwok into Southern Pomo country and that of Southern Pomo into Coast Miwok homelands.

2. Patwin relations with each other and with surrounding language groups were sometimes hostile. Feuds over resource use and alleged poisonings sometimes erupted into warfare. The exchanges were usually friendly along immediate boundaries but more problematic the greater the distance of a group from its neighbors. In the discussion of the Patwin-speakers there is no identification of a trade interface with the Clear Lake Pomo or any Pomo-speakers extending to South Patwin country in the vicinity of Vallejo.

3. Randall Milliken's study of the sacramental registers of six Catholic missions in the San Francisco Bay area established a clear picture of tribal distribution in the early nineteenth century. Thousands of Indians were identified in the registers by their tribe or tribelet names. His research in documentary materials from 1776 to 1834 confirmed the presence of Coast Miwok and Patwin peoples from

AR0005445

the north shore of San Francisco and San Pablo bays. Southern Pomo were baptized at missions San Rafael and San Francisco Solano. Nowhere did Milliken find Clear Lake Pomo residing in the Bay Area nor were they subjects of the rites of the church during the Spanish and Mexican mission periods.

4. The Wappo were yet another tribe of Yukian-speakers living between the Pomo and the Coast Miwok. These Indians of the upper Napa Valley sometimes traded and traveled west to the Pacific and east to Glass Mountain, but were not engaged in a major trade network with the tribes living to the south along the north shore of San Francisco and San Pablo bays. Their territory lay between that of the Clear Lake Pomo and the Coast Miwok.

57

## Treaty of Lupiyuma, 1851

The Scotts Valley Band of Pomo's lawyers and expert witnesses have put considerable emphasis on the relevance of the Treaty of Lupiyuma of August, 20, 1851. This unratified treaty was negotiated by Colonel Redick McKee of the California Indian Commission. Several points are important when considering this treaty.

### Inexperience and Lack of Knowledge of Commissioner Redick McKee

In 1851 President Millard Fillmore appointed Redick McKee (1800-1886) to serve as one of three commissioners to negotiate the cession of Indian lands in California. Born in McKeesport, Pennsylvania, McKee had no prior experience in Indian affairs and had no prior knowledge of California or its native people before his arrival in 1851. He had never previously visited the tribes nor the lands in northwestern California for which he was to negotiate cessions, a vast country reaching from San Francisco Bay to the Oregon border. The region included the watersheds of the Russian, Eel, and Klamath rivers and was completely unknown to McKee.

### Inexperience and Lack of Knowledge of Interpreter George Gibbs

George Gibbs (1815-1871) was educated at the Round Hill School in Northampton, Massachusetts, where he studied Latin, Greek, French, and Spanish. In 1838 he graduated from Harvard Law School. Between 1838 and 1849 he practiced law in New York City, served as librarian of the New York Historical Society, and authored the two-volume *History of the Administrations of George Washington and John Adams* (New York, 1845). Developing a keen interest in comparative Native American languages, he traveled overland on the Oregon Trail in 1849 and settled at Astoria, Oregon, where he practiced law, served as Assistant Collector of Customs, and began compiling Indian vocabularies and recording ethnographic information (Beckham 1969).

In May and June, 1851, because of his knowledge of the Chinook Jargon, a lingua franca for the Pacific Northwest fur trade, the Willamette Valley Treaty Commission hired Gibbs to serve as surveyor

58

AR0005447

and secretary in the negotiations securing cession of Indian lands in the northern Willamette Valley. Gibbs recorded nearly verbatim notes of the treaty councils. Learning that his younger brother, Alfred Gibbs, had been assigned to service in the U.S. Army at Sonoma Barracks, Gibbs sailed in the last week of July to San Francisco where he visited his Gibbs merchant cousins before traveling to Sonoma to see Alfred. At Sonoma Gibbs encountered Colonel McKee who, learning of Gibbs's skills as a linguist and experience in the treaty councils in the Willamette Valley, immediately hired him as "Interpreter" for his work in California. McKee and his son, John, who served as his secretary, had also arrived in Sonoma in the first week of August (Beckham 1969:83-85).

Redick McKee described his encounter with Gibbs:

At Sonoma I was fortunate in securing the services of George Gibbs, formerly of New York, and recently attached to the Indian commission in Oregon. He is acquainted with the Tchinook (Chinook) language, and the *jargon* spoken by all the tribes on the borders of Oregon and California. He is, moreover, a practical topographical engineer . . . (Gibbs 1853:100).

Gibbs was eager to meet new tribes and expand the vocabularies of Indian languages he was compiling. The Chinook Jargon had no use in any of the eighteen treaty councils held by McKee. This trade language ceased as a communication tool among the tribes of the central Oregon Coast, a distance 400 miles north of Clear Lake, California.[1] Gibbs had no knowledge of California Indian languages when two weeks after his hire at Sonoma Barracks he began duties as McKee's interpreter in the council at Clear Lake. Gibbs was an astute observer. He recorded four Pomo vocabularies: "Kula-napo," "Yukai," "Chow-e-shak," and "Batem-da-kai-ee" (Gibbs 1853:428-445).

Gibbs kept a detailed diary of McKee's negotiations in the fall of 1851, developed a map of the treaty commission's travels and tribes encountered, and collected items of material culture he shipped to the Smithsonian Institution (Beckham 1969).

---

[1]

Only on Humboldt Bay did Gibbs find a few words of the Chinook Jargon, such as "ma-witch," meaning deer, but also "pappoose," a term from the Atlantic Coast (Gibbs 1853[3]:127).

59

### Inexperience of Ed Shirland and George Whitehorn, Assistant Interpreters

In an effort to try to communicate with the tribes and bands of northwestern California, McKee hired an assistant interpreter. Ed Shirland was described by John McKee as "having lived for several months among the Indians in this neighborhood [Clear Lake]." Shirland in the fall of 1847 had joined Benjamin and Andrew Kelsey and Charles Stone to purchase cattle in Big Valley from Salvador Vallejo. Although Kelsey and Stone settled at Clear Lake where they were murdered in 1849, there is no record of Shirland's residency in that district (Palmer 1881:50). McKee also hired George Whitehorn. In November, 1850, Ed Shirland, age 18, born in Tennessee, was a miner residing in Calavaras County in the Sierra foothills of California. George Whitehorn did not appear in the 1850 census of California. There is no evidence that either Shirland or Whitehorn had competency in Spanish or the Pomo languages (Bureau of the Census 1850).

### Chiefs and Tribes Participating in the Treaty of Lupiyuma, 1851

John McKee noted that on August 18 the council spent its first hour in securing the names of the chiefs, tribes, and locations of those meeting with the commission. He identified eight chiefs and tribes as did Gibbs:

| John McKee's List | George Gibbs's List |
|---|---|

Clear Lake Tribes:

| | |
|---|---|
| Julio, of the Ca-ba-na-po tribe | Hula-napo |
| Prieto, of the Ha-bi-na-pa tribe | Habe-napo |
| Ku-kee, of the Do-no-ha-be tribe | Dah-no-habo |
| Moh-shaw, of the Moal-kai tribe | Moal-kal |
| Chi-bee, of the How-ru-ma tribe | How-ku-ma |
| Cal-i-a-hem, of the Che-com tribe | She-kom |

Tribes on Eel River-Clear Lake Divide:

| | |
|---|---|
| Con-chu, of the Cha-net-kai tribe | Shanel-kaya |
| Coe-ne-ne, of the Me-dama-rec tribe | Bedah-marek |

60

(McKee 1853:136-37)                    (Gibbs 1853[3]:109)

Major Herny W. Wessells, commander of the U.S. Army escort, wrote on August 18, 1851: "Having formed a camp in the valley, about two miles from Kelsey's Rancho several conferences were there held with representatives of Clear Lake Indians, or Lu-pi-yu-ma (Stone) numbering according to their own account, about 700 souls, though they have been generally represented by the Whites, as exceeding 1500 and even 2000" (Anderson and Anderson 2015:200).

John McKee noted: "The chiefs Con-chu and Co-e-ne live with their tribes upon the hills dividing the waters of Clear Lake from Eel River, and are not familiar with the language of the Clear Lake tribes." He added that two or three Indians at the council had some knowledge of Spanish and were to serve as intermediaries in communicating Colonel McKee's words (McKee 1853:136-37).  Gibbs further confirmed an English-Spanish-Pomo line of communication: "A vocabulary of this [Pomo] language was obtained from the Indian who accompanied us, and who spoke Spanish sufficiently to be enabled to interpret with his people.  It was carefully taken down, and may be relied on as tolerably accurate."  Gibbs added that the Indian interpreter appeared more competent at understanding the languages "much better than he could reply" (Gibbs 1853[3]:109).

The council minutes also clearly identified the location of the other six chiefs and their tribes.  John McKee noted that those assembling were "a number of the **chiefs and braves of the Clear Lake Indians**."  These six tribes were thus the Pomo of Clear Lake. To confirm the residency and populations of other Pomo of the Clear Lake district, McKee and his party on August 19 visited the village of Chief Prieto and found 84 men, women, and children, and then the village of Chief Julio who had 195 men, women, and children.  Further interrogation of these chiefs enabled McKee to estimate that he had negotiated a treaty with 900 to 1,000 Indians of the Clear Lake area (McKee 1853:138-39).[2] [Emphasis supplied].

---

[2]  Based on interviews with Pomo informants at Clear Lake, 1903-06, Samuel A. Barrett wrote: "Kabenapo is also first mentioned by Gibbs, by whom it is called 'Habe-napo,' meaning 'stone house,' and is given as one of the six large villages, designated by Gibbs as 'tribes' or 'bands,' in Big valley.  M'Kee mentions two of the 'tribes' about Clear lake, viz: the 'Ca-ba-na-po' and the 'Ha-bi-na-pa,' either one or both of which are probably meant for the kabē'napŏ" (Barrett 1908a:194).

AR0005450

The other two tribes participating in the council lived in the country north and northwest of Clear Lake "upon the hills dividing the waters of Clear Lake from Eel River" (McKee 1853:136-37). This was the aboriginal territory of the speakers of Northern Pomo and Central Pomo dialects (Golla 2011:105-06) [See Figs. 9 and 10 (Golla 2011:105 and 106]. The experts for the Scotts Valley Band, however, have argued to the contrary and stated: "the two linguistic groups represented in the origins of the Scotts Valley Band under discussion in this report (Pomo and Patwin) were signatories at these treaty negotiations, which indicates their integration at the beginning of American jurisdiction" (Howard and Quick 2007:20). **This statement is false as to the languages of the tribes involved in the council of August 20, 1851, and presumes a cultural and linguistic "integration" that is unfounded and undocumented** [Emphasis supplied].

Major Wesells observed: "The obligations of a treaty were explained to them, as far as their stupid ignorance would permit, and on the 20[th] a paper was executed and duly signed by the prinicipal chiefs, defining the limits of a reserve on which they were to reside as their own possession, stipulating also, for the removal to it, of all the tribes on Russian and headwaters of Eel Rivers (Anderson and Anderson 2015:200).

McKee made no effort to invite and secure the participation of the Wappo, Southern Patwin, Lake Miwok, and Coast Miwok tribes who lived between Clear Lake and San Francisco and San Pablo bays to the south. Gibbs had noted on August 11, when camped near Joaquin V. Carillo's Rancho near Santa Rosa "A large number of Indians, belonging to this and the neighboring ranches, were collected in the afternoon, and informed of the objects of the agent, who promised at a future time, to meet them for the purpose of making a formal treaty" (Gibbs 1853[3]:100). The only subsequent treaty was that McKee made on August 22, 1851, at Camp Fernando Feliz in the upper Russian River Valley with the Sai-nell, Yu-ki-as, Mas-su-ta-ya, and Pomo. In that unratified treaty these Pomo ceded their lands in the area of the Feliz Rancho in the upper Russian River Valley (Kappler 1927[4]:1112-13).

McKee wrote on September 12, 1851, to the Commissioner of Indian Affairs that he anticipated the reservation created by the Treaty of Lupiyuma might, in the future, become the home of all the tribes

AR0005451

extending to the coast and south to San Francisco Bay. "I concluded to reserve and set apart the *whole valley*, and if practicable induce the entire Indian population, scattered along the coast about Bodega, Petaloma, &c., to San Francisco, together with those on Russian river, and the head waters of Eel river, to remove to and colonize there" (McKee 1851:238). McKee did not identify the watersheds of Putah Creek, Sonoma Creek, and the Napa River, as the homelands of other tribes and bands (Wappo, Southern Patwin, and Coast Miwok) who might at some future date be colonized at the reservation in the Clear Lake Valley.

The Treaty of Lupiyuma was negotiated only with six bands or tribes of Clear Lake Pomo and two bands who lived in the hills between Clear Lake and the Eel River to the north.

## Lands Ceded by the Unratified Treaty of August 20, 1851

Article 3 of the treaty identified the cession area: "The said tribes and bands [eight identified in the opening paragraph] hereby jointly and severally relinquish, cede, and forever quit claim to the United States, all their right, title, claim, or interest of any kind they or either of them have to land or soil in California" (Kappler 1929[4]:1108-09).[3] The agreement referred only to the lands of the treaty signatories. Article 4 defined a reservation for the "use and possession thereof forever guaranteed to the said tribes" in the Clear Lake basin (Kappler 1927[4]:1109).

## Erroneous Map of Land Cession Drawn by Charles J. Royce

The presentations of the Scotts Valley Band of Pomo have referred to the map of California Indian land cessions drafted by Charles J. Royce and published in 1899. The map area 296, Plate CXIV, "California I," was one sixty-seven developed by Royce of Washington, D.C. The key to the map index identified the cession as

---

[3]

In the "Historical Background Response to Solicitor Inquiry" (Howard and Quick 2007), the expert witnesses for the Scotts Valley Band of Pomo erroneously claimed: "This treaty [of August 20, 1851] ceded the lands between Clear Lake and San Pablo Bay, and included the region in the Bay Area where Mary and Fernando Frese were born and lived for a significant portion of their lives" (Howard and Quick 2007:18).

AR0005452

that of August 20, 1851, made by the Ca-la-na-po, Ha-bi-na-po, Da-no-ha-bo, Mo-al-kai, Che-com, How-ku-ma, Cha-nel-kai, and Me-dam-a-rec tribes." The description of the cession stated "Cede all claim to other territory" and "Reserve a tract on Clear Lake" (Royce 1899:784).

Royce (1845-1923) moved from Ohio to Washington, D.C., in 1862 where he took a position in the Department of the Treasury. In the 1870s he began mapping Indian land cessions to the United States. The project led to his publications on Indian cessions in Indiana (1881) and *The Cherokee Nation of Indians* (1887). The latter volume was described as part of Royce's plan to compile an "Historical Atlas of Indian Affairs." That work was ultimately published as *Indian Land Cessions in the United States* (1899) by the Smithsonian Institution's Bureau of American Ethnology. The imprint was impressive and the volume was useful, but the Royce Map, "California 1," was grossly inaccurate in showing the area of the McKee treaties of August 20 and 22, 1851.

Royce mapped the lands ceded in the unratified treaty of August 20, 1851, at Clear Lake as embracing a vast tract extending from Clear Lake on the north to San Pablo and San Francisco bays on the south and from the Sacramento River on the east to west of the Napa River on the west. **The map gratuitously assumed the negotiations with the eight tribelets in the vicinity of Clear Lake ceded the lands of the Wappo, Southern Patwin, and Coast Miwok to the south. Those tribes never met with Redick McKee in any treaty council. The Royce map showing Cession No. 296 is erroneous and in no way reflected tribal distribution, use, or occupancy of lands in the boundaries it delineated** [Emphasis supplied].

64

AR0005453



Fig. 16. Land cession No. 296, Plate CXIV, "California 1,"
illustrating the erroneous area of the Treaty of Lupiyuma, August
20, 1851 (Royce 1899:Plate CXIV).

65

AR0005454

**Findings of Fact**

1. Redick McKee was poorly prepared in 1851 to negotiate treaties with the Indians northwestern California. He had never visited the region previously, had no knowledge of the tribes and their languages, and was a novice in Indian affairs until his appointment for service in California.

2. Although skilled as a linguist, George Gibbs could play no effective role as an interpreter. His knowledge of Chinook Jargon acquired between 1849 and 1851 during his residency at Astoria, Oregon, was irrelevant to communicating with the tribes of northwestern California. His values to the McKee expedition were his keen observational skills, dutiful recording of a diary, and developing a manuscript map of the country between San Francisco Bay and the northern border of California.

3. There is no evidence that Ed Shirland and George Whitehorn were able to communicate effectively in Pomo, though both may have lived among them for a few months. The diary accounts of the expedition confirm an English-Spanish-Pomo-Spanish-English chain of translation which probably provided little insight into the concepts of land cessions, understandings of tribal territories, and the creation of a reservation for the Indians of the Clear Lake area.

4. There is no evidence that any of the Lake Miwok, Wappo, Hill Patwin, or Southern Patwin living east and south of Clear Lake in Napa and Solano counties were involved in any treaty council with Redick McKee. The cession map in Royce's map Area 296, "California I," in *Indian Land Cessions* did not reflect the lands ceded in Article 3 of the Treaty of Lupiyuma of August 20, 1851.

5. In 1881 Lyman L. Palmer identified Augustine as chief of the Hoo-la-nap-os, one of many tribelets or villages occupying the Clear Lake basin. Augustine named seventeen tribelets and gave their locations. Palmer wrote: "The Hoo-la-anp-o tribe were just below the present site of Lakeport, on the place formerly owned by Dr. J. S. Downes. At one time there were two hundred and twenty warriors, and five hundred all told in the rancheria. They are now reduced to sixty. Sa-vo-d-no was the chief before their present one, Augustine" (Palmer 1881:35). The identification of residency was not in Scotts Valley. **The Hoo-la-nap-os were not mentioned in the unratified**

**treaty of 1851**[Emphasis supplied].

6. There is no documentation that Chief Augustine's Hoo-la-nap-o Tribe, if a predecessor to the Scotts Valley Band of Pomo, is the political successor in interest to any of the tribelets signing the unratified treaty.

7. C. Hart Merriam, ethnographer working with Pomo informants in the first decade of the twentieth century, recorded that "Mo-al-kai (Moal-kai, Boil-ka-ya) were the band of Indians residing in Scott Valley west of Clear Lake. He found their name in the 1851 diaries of John McKee and George Gibbs (Merriam 1905-ff., Reel 125, frs. 67-69). The tribelet, signatory to the unratified 1851 treaty, was not the Hoo-la-an-po of which Augustine was chief in 1880.

8. The Treaty of Lupiyuma was never ratified. It has no legal standing and only serves as an interesting historical document identifying, as best as could be determined in 1851, the tribes living in the vicinity of Clear Lake.

67

AR0005456

## Ambiguous Ancestry of Victoria (Frese) Augustine

The reports of Heather Howard and James McClurken, submitted on behalf of the Scotts Valley Band of Pomo's casino initiative in Contra Costa County, California, identified Victoria Della (Frese) Augustine as a pivotal ancestor whose life linked the Tribe to the vicinity of Richmond, California.[1] In 2016 Steven J. Bloxham, an attorney, edited and condensed the reports of 2005 and 2007 (two reports) for an Indian "lands determination" at Vallejo in Solano County, California. Bloxham submitted the fourth iteration of the information as "Consolidated Report by Heather A. Howard, Ph.D., and James M. McClurken, Ph.D. (Bloxham 2016). The consolidated report focuses on the Frese family as "the most significant Bay Area ancestors of the Tribe" (Bloxham 2016:6).

These reports were initially used to justify a significant "historical connection" of the Scotts Valley Band of Pomo to a projected casino site near Richmond in Contra Costa County. The reports are now used to justify a significant "historical connection" to Vallejo in Solano County. It is important to examine what these accounts presented on the Frese family, what the Tribe presently contends, and what has been purposefully omitted from the record.

## Frese Family (Howard, McClurken, et al.), Report of June 7, 2005

This account includes a section on "Kidnaping and Enslavement of Pomo People on the California Frontier." Based on an interview on August 7, 2004, between researcher McClurken and tribal members Marlene Besnoi and Jesse Gonzales, the narrative presented their recollection that probably in the 1830s a female ancestor was kidnapped and taken to Spain. Based on the recollection, Howard and McClurken wrote: "The woman, named Mary Juarez, was an Indian

---

[1]

See: Scotts Valley Pomo Use and Occupation of the San Francisco Bay Area (Howard, McClurken, Overton, Cron, Elendu, and Cripe (2005:39-42); Ancestral Ties of the Scotts Valley Band of Pomo Indians to the San Francisco Bay Area: An Addendum to the Report *Scotts Valley Pomo Use and Occupation of the San Francisco Bay Area* (7 June 2005) (Howard and McClurken 2007); Historical Background for Response to Solicitor Inquiry Prepared for the Scotts Valley Band (Howard and Quick 2007:15-17); Steven J. Bloxham, ed., Consolidated Reort by Heather A. Howard, Ph.D., James M. McClurken, Ph.D., James M. McClurken & Associates (2016:6-7).

AR0005457

from the Bay area. She married a Spanish man and, upon his death, returned to California pregnant with Marlene's grandmother, Della. The ship was anchored in the San Francisco Bay when Della was born onboard. Della married Bob Augustine, a Pomo chief who brought her to Clear Lake" (Howard and McClurken 2005:40).

The report next reported a similar oral history heard on the same day, August 7, 2004, from Jerridine Arnold Davies who had heard the account from her grandmother Bessie Augustine Ray. This story, directly quoted, explained: "And, she said her grandmother was born in San Francisco on . . . she seemed like she said like they were on a boat or something. It wasn't coming from anyplace. It was, the baby was born there, and they camped on the beach in San Francisco" (Howard and McClurken 2005:40-41).

Issues in this account:

1. Was Mary Juarez, mother of Victoria Della (Frese) Augustine, an Indian of any identifiable California tribe or band? The report provides no information on her tribal identity.

2. If Mary Juarez returned from Spain pregnant and gave birth to Victoria (Frese) Augustine on a ship in San Francisco Bay, how was Fernando Frese, an alleged Patwin Indian, the father of Victoria? This question is not answered in the report.

## Frese Family (Howard and Quick), Report of October 3, 2006

This report, written to document the significant "historical connection" of the Scotts Valley Band of Pomo to Richmond, Contra Costa County, included a discussion on the Frese family:

Mary and Fernando Frese are estimated to have been born around 1845 in the Carneros Valley, which is located in southern Napa County. While few of the Suisun Patwin people to whom this place was indigenous continued to occupy this area—many if not most of the Suisun perished in an 1837 smallpox epidemic—numerous aspects of Mary and Fernando's lives suggest that they were Patwin Indians, not the least of which was their relationship to Clear Lake Pomo Indians, and to other

69

AR0005458

Patwin communities.  That the Pomo of Clear Lake and the Patwin to their south near San Pablo Bay had close ties is well-documented, and will be detailed below.  Researchers believe that it is most likely that Mary and Fernando were of the Suisun dialectic group of Patwins, who had villages along the Napa River, west Benicia, in the vicinity of where the Frese's [sic] were born.  The Carneros Valley is directly adjacent to the west of this area, between Sonoma Creek and the Napa River.  It is also south of Long Valley, a location of other well-documented Patwin communities, with which the Scotts Valley Band has numerous ties, including, for instance, that Joe Augustine's wife was a Patwin from there (Howard and Quick 2007:15).

**In providing information to George F. Martin, federal census enumerator for Lake County in 1900, Victoria Della (Frese) Augustine, stated that her mother and father were "Yackies" (Yaqui) Indians and that both were born in Mexico (Bureau of the Census 1900) [See Figures 18 and 19 and Appendix C].** This information directly contradicts the assertions of Howard and Quick.  Howard and Quick provided a narrative analysis of "The 1900 Census" of the Scotts Valley Rancheria population, but they did not report the self-identification of Mexican birth and "Yackie" ancestry of Victoria Della Augustine and her parents  (Howard and Quick 2007:33-34). [Emphasis supplied].

The extent of their analysis of the 1910 census was two sentences: "The 1910 federal census, in particular, included a special schedule for the Indian population.  It shows 63 Indians in the 'Scotts Valley Precinct,' and is helpful in providing details about the identity of un-named wives and children enumerated in 1911 as the original residents of the rancheria" (Howard and Quick 2007:42).

Issues in this account:

1. What "numerous aspects of Mary and Fernando's lives suggest that they were Patwin Indians?"  The report does not answer this question and does not document Patwin ancestry.

2. What evidence led researchers to believe "Mary and Fernando were of the Suisun dialectic group of Patwins, who had villages along the Napa River, west Benicia, in the vicinity

70

of where the Frese's [sic] were born?"  The report does not
document this claim of linguistic affiliation.

3. Why did the researchers omit the ancestry information
   provided by Victoria Della (Frese) Augustine on her
   "Yackie" (Yaqui) Mexican birth and parents?  Their use of
   evidence was highly selective.

## Frese Family (Howard and McClurken), Report of March 27, 2007

In a further effort to bolster the claims of significant "historical
connection" of the Scotts Valley Band of Pomo to a projected casino
site near Richmond, Contra Costa County, California, Heather Howard
and James M. McClurken co-authored an addendum to their report of
2005.  They again placed emphasis on the Frese family's history:
"Most significantly, the 'Napa Indians' in the Tribe's ancestry include
members of the Frese family, who are ancestors to a vast majority of
the current members of the Tribe (discussed in more detail later in this
report).  They were among the Indians living in the vicinity of Lakeport
in 1905 . . ." (Howard and McClurken 2007:25).

Although the Frese family resided near Lakeport in 1905, they
appeared in other census enumerations.  In 1880 "Indian Franando,"
his wife Mary, and three children–Manwell [Manuel], age 7; Mary, age
5; and Louisa, age 4–lived in Long Valley, Lake County (Bureau of the
Census 1880).  In 1900 Fernando and Mary Freas/Frese and a
daughter, Louisa, lived in Leesville Township, Colusa County.
Fernando/Fernandez Freas was a laborer.  Mary Freas said she had
given birth to twelve children of whom five were living.  A daughter,
"Louis[a]," born in 1877, lived in the household.  The Frese family was
enumerated as "white" on the regular schedule though the enumerator
also had filled out an Indian schedule for Native Americans living at
Leesville in 1900.  The Freas/Frese family was not on the Indian
Schedule (Bureau of the Census 1900b).

The authors again summarized the Frese family history:

The Frese family, which originates in southern Napa County, is
the most significant Bay Area ancestral family in the genealogy
of the Scotts Valley Band.  While there are variations of the

71

AR0005460

story, the primary sources that researchers consulted for this report support the Tribe's oral history regarding the Frese family. The earliest documented ancestor of the Frese family, Mary Frese, was born in Napa County or "near Sonoma City" in about 1845, and the Tribe's understanding that she was born in the Bay Area agrees with these records. The Tribe's oral history states that Mary was enslaved in the Bay Area, and that she was taken away on a ship with a Spanish or Mexican man, and returned to San Francisco pregnant (as is detailed in the *Scotts Valley Pomo* report). As the story goes, Mary gave birth to a daughter on board the ship while it was anchored in San Francisco Bay in about 1860. Mary's daughter was Victoria Frese Augustine. According to the Tribe's story, Victoria lived in the Bay Area as a child, and then moved toward Clear Lake, where she met and married Robert Augustine, a Pomo leader and son of the well-known Chief Augustine (Howard and McClurken 2007:46-47).

Footnote No. 136 in this report explains that Mary Frese was also known as Mary Juarez, and that her date of birth "is estimated at 1845 based on varied information contained in a number of documents."

Issues in this account:

1. Mary Frese's date of birth, about 1845, and birthplace are presented as uncertain: either in Napa County or "near Sonoma City" in Sonoma County. How does either place connect the Scotts Valley Band of Pomo to Vallejo in Solano County?

2. Mary Frese was reportedly "enslaved in the Bay Area, and that she was taken away on a ship with a Spanish or Mexican man, and returned to San Francisco pregnant." She gave birth to a daughter, Victoria, "on board the ship while it was anchored in San Francisco Bay about 1860." Who was the father of Victoria (Frese) Augustine? Was he a Spaniard? Was he a Mexican? Was Juarez the father of her child Victoria?

3. Who was Fernando Frios or Frese, identified in 1910 federal census as the husband of Mary A. Frios and a resident on the Scotts Valley Rancheria. Was he the father of Victoria

72

AR0005461

(Frese) Augustine or most likely the stepfather?

**Frese Family (Bloxham), Report of January 29, 2016**

The "Consolidated Report" of Howard and McClurken, edited by Steven J. Bloxham, again repeated the history of the Frese family and Victoria (Frese) Augustine:

> In the violent atmosphere of Spanish, Mexican, and American colonization, the ancestors of the Tribe were among the Native people kidnaped and enslaved on missions, ranchos, and, later, American farms and ranches in the Bay Area. At least one such instance involving Mary Frese, a direct lineal ancestor of the Tribe, is documented in the oral, written, and genealogical records of the Tribe . . . .
>
> The Frese family is the most significant Bay area ancestors of the Tribe. The earliest documented ancestors of the Frese family, Fernando and Mary Frese, originate in the Carneros Valley in southern Napa County. Mary, who was kidnaped and enslaved in the Bay Area, had her first child, Victoria Frese Augustine, 'at sea' in the San Francisco Bay Area in about 1860. Later, Mary returned to Napa with Victoria, and she and Fernando Frese had two more daughters, Mary and Louisa. This family was likely Wappo or Patwin – a fact that correlates with the diversity in the Tribe's ancestry. The family moved to Clear Lake in about 1878 and was among the founding families of the Scotts Valley Rancheria. Victoria married Robert Augustine, a Pomo leader and son of the well-known Chief Augustine (Bloxham 2016:6).

In another section of this report is the following statement:

> Mary, who was at least fifteen years old at the time, may have been pregnant when she was kidnapped. She escaped her captors when Victoria was still a newborn, and returned to her family in southern Napa County. Mary and Fernando worked as farm laborers in this area, and perhaps began to participate in the migratory Indian labor route that stretched across Lake, Sonoma, Napa, and Mendocino counties on the northern shore of San Pablo Bay to the Russian River Valley by the 1870s (Bloxham 2016:24).

73

Issues in this account:

1. What is the basis for the conclusion that this "family was likely Wappo or Patwin—a fact that correlates with the diversity in the Tribe's ancestry." This is undocumented speculation.

2. Who was the father of Victoria Frese? Was it Francisco Frese/Frios? A Mexican who kidnaped Mary? A Spaniard who kidnaped Mary? This matter is unresolved in this report but inextricably linked to the issue of alleged Patwin ancestry. Albert Hurtado who filed a report for the Scotts Valley Band in 2016 could not find evidence of who was the father of Victoria. In writing about her mother Mary he merely said: "Someone impregnated her" (Hurtado 2016:97).

3. What is the evidence that Fernando and Mary A. Frese and their daughter Victoria resided in "southern Napa County" in the 1870s? If this is true, why were they enumerated in the federal census of 1880 as residing in Long Valley Precinct, Lake County (Bureau of the Census 1880) or in 1900 in Leesville Precinct, Colusa County (Bureau of the Census 1900)?

**Victoria (Frese) Augustine's Self-Identification of Ancestry**

The expert reports on tribal ancestry filed by the Scotts Valley Band of Pomo have identified Fernando Frese, or Frios, and Mary A. Frese, or Frios, as the parents of Victoria Della (Frese) Augustine. In 1910 both Fernando and Mary A. Frios were enumerated on the "Indian Schedule" of the federal census. Fernando Frios, age 65, said he was born in the Carneros Valley in Napa County. He said his father's and mother's birthplaces were unknown and that he did not know their tribal affiliations. He identified his tribe as "Clear Lake" (Pomo). Mary A. Frios, age 63, stated that she was born "near Sonoma," that her parents were born in California and that she did not know their tribal affiliations, but she identified her tribe as "Clear Lake" (Pomo) (Bureau of the Census 1910).

Mary A. Frese/Frios in 1910 stated that she had been previously

AR0005463

married.  Fernando Frese/Frios was her second husband and that she had been married to him for 46 years.  Thus Fernando Frios was likely not the father, but, instead was the stepfather of Victoria Della Augustine.  His birth in the Carneros Valley in Napa County did not make him a descendant of the Patwin Indians of that area.  Fernando Frese/Frios in 1910 did not know the tribe of either his father or mother.



Fig. 17.  Household 371, Fernando and Mary Frios; household 372, Robert and Della Augustine, Scotts Valley, 1910, Indian Schedule (Bureau of the Census 1910).

▪ Fernando Frios, age 65, born "Carneros Valley, Napa County."  Birthplaces of father and mother unknown.  In column 13 of this schedule, Fernando identified his tribe as "Clear Lake."  He stated he was 3/4 Indian and 1/4 "White."

AR0005464

■ Mary A. Frios, age 63, "M2" [Second marriage], mother of
   12 children, 4 living. In column 13 of this schedule Mary
   identified her tribe as "Clear Lake. She stated the tribe of
   her father and her mother were "Unknown" and that she
   was 3/4 "Indian" and 1/4 "White."

On at least three occasions Victoria (Frese) Augustine provided
information about her ancestry. It is important to examine what she
reported and the contradictions in her accounts.

In 1900 George F. Martin, enumerator for the Bureau of the
Census, visited the Scotts Valley Rancheria in Township Four, Lake
County, California. On June 18, 26, and 29 he compiled the population
statistics of this community on the special schedule "Indian
Population." This form, unlike the regular census schedule, had thirty-
eight categories of information. The manuscript record confirmed that
Martin neatly and carefully solicited information for all of these
categories and entered it onto the schedules provided by the Bureau of
the Census. See Appendix A, Table 1, "Residents of Scotts Valley
Rancheria, 1900."

Among the information Martin recorded was the gender, age,
state of birth, tribe of the person, tribe of the person's father, and the
tribe of the person's mother. When he entered the data for Della
(Victoria) Augustine, wife of Bob Augustine, **Martin noted that she
was 40 years old and born in Mexico. She identified her tribe
as "Yackies" and provided the same affiliation for her father
and her mother.** The Yacqui Tribe resides in the province of Sonora
south of the United State border and Arizona. **As Martin continued
to fill out the thirty-eight categories of information for the six
Augustine children, he noted "Tribe of Mother: Yackies"** (Bureau
of the Census 1900a) [Emphasis supplied].

When asked about her citizenship, Della (Victoria) Augustine
offered the following information:

> **"18. Year of immigration to the United States: 1861"**
> **"19. Number of years in the United States: 39"**

Della Augustine thus in 1900 provided additional information about her
immigration from Mexico to the United States and her years of
residency in the country (Bureau of the Census 1900a) [Emphasis

AR0005465

supplied]. This information, reproduced in a photocopy of the census record in Appendix C of "Ancestral Ties of the Scotts Valley Band of Pomo Indians to the San Francisco Bay Area (Howard and McClurken 2007), remained unidentified and not discussed in the examination of the ancestry of Victoria Della (Frese) Augustine nor was this matter raised in the condensed report (Bloxham 2016) [See Figures 18, 19].



Fig. 18. Bob and Della Augustine family, Household 5, Township Four, Indian Population, Lake County, 1900. In Column 15 is "1861" (year of Della's immigration to the United States) and in Column 16 is "39" (years of Della's residency in the United States) (Bureau of the Census 1900a).

77

AR0005466

Fig. 19. Line 22 (2nd on page), continuation of "Special Inquiries" for Della Augustine. Column 30, Tribe of this Indian: "Yackies." Column 31, Tribe of Father of this Indian, "Yackies." Column 32, Tribe of Mother of this Indian, "Yackies." (Bureau of the Census 1900a).

Two other residents of the Scotts Valley Rancheria in 1900 also identified Indian ancestry other than "Digger" (California Indian). Laurence Berry was a Bannock Indian born in Idaho; John Combs was

78

AR0005467

a Cherokee Indian who was unable to identify his place of birth. The detailed information in thirty-eight categories for all fifty-seven residents at Scotts Valley confirmed the seriousness enumerator Martin exercised in recording accurate data (Bureau of the Census 1900a).

In 1910 O. L. Stanley, enumerator for the Bureau of the Census, visited the Scotts Valley Rancheria, Scotts Valley Precinct, Lake County, California. On May 3, 4, 5, and 21 he compiled the census statistics of this community on the "1910-Indian Population" special schedule. This form had forty-six categories of information. The manuscript record confirmed that Stanley neatly and carefully solicited and recorded information for these categories (Bureau of the Census 1910).

Among the information Stanley recorded was the gender, age, place of birth, and tribe of each person he enumerated. Della (Victoria) Augustine stated she was born "at sea." She did not identify where. She stated that her father was born in the "Carneros Valley" of Napa County and that his tribe was "Clear Lake." She stated that her mother was born "near Sonoma City" in Sonoma County and that her tribe was "Clear Lake." By this self-identification, Victoria Augustine asserted that both of her parents were Pomo, namely "Clear Lake" and not Patwin Indians (Bureau of the Census 1910) [See Fig. 17].

On May 18, 1928, Victoria (Frese) Augustine responded to the questions on the ten-page affidavit for the enrollment of California Indians. She stated that she resided at Lakeport, Lake County, California. She said: "I think I was born in Napa County, California." "I first recollect living in Napa County, and for the last 50 years or more I have lived in Lake County, California." Bob Augustine, her husband, had died in 1921. **She stated that her mother, Mary, was born in Lake County and died in 1922. She stated that her father was non-Indian and that she was ½ Pomo** (Augustine, Victoria 1928) [Emphasis supplied]. Victoria Augustine's non-Indian father was also affirmed by Dorothea Theodoratus in her expert witness report (2016:11).

In May, 1928, when Paul P. Augustine, son of Robert and Victoria Della Augustine, filed his affidavit for enrollment as a California Indian, he was asked about his maternal grandfather–the father of his mother Victoria. He said he was "Unknown" and a "Non-Indian." His maternal

79

grandmother, Mary, he identified as 4/4 Indian born in Lake County (Augustine, Paul 1928).  Paul Augustine's affidavit is further evidence that his maternal grandfather was an unknown non-Indian.

**Findings of Fact**

1. Contradictory information on birth, parents, birthplaces, and tribal affiliations:

> 1900: Victoria Della (Frese) Augustine self-identified as a "Yackies" (Yaqui) Indian born in Mexico and stated that her father and mother were "Yackies" Indians born in Mexico. She stated that she immigrated to the United States in 1861 and had lived in the country for 39 years.

> 1910: Victoria Della (Frese) Augustine self-identified as "born at sea" (unknown location). She said her father was born in the Carneros Valley in Napa County and that her mother was born "near Sonoma City." She identified her father and mother as "Clear Lake" (Pomo) Indians.

> 1910: Fernando and Mary A. Frios resided in the Scotts Valley Precinct, Lake County.  Fernando Frios said he was born in the Carneros Valley in Napa County but that he did not know the birthplace of either his father or mother.  Mary A. Frios said she was born "near Sonoma City" and that her parents were born in California, location unknown.  Both self-identified their tribe as "Clear Lake" but were unable to identify a tribe for any of their parents.

> 1928: Victoria Della (Frese) Augustine self-identified her place of birth as possibly Napa County and stated that her mother was born in Lake County and died in 1922 and that her father was non-Indian.  She self-identified her blood quantum as ½ Pomo.

2. The information on the ancestry of Victoria (Frese) Augustine is inconsistent and contradictory.  In no documentary record did she claim Patwin, Wappo, or Coast Miwok ancestry.  Instead she self-identified "Yackies" ancestry in Mexico in 1900, "Clear Lake" ancestry in 1910, and "Pomo" ancestry in 1928.  In none of the several reports submitted by Howard and McClurken nor in any of the documentary

80

AR0005469

materials provided by the Scotts Valley Band of Pomo was the documentary evidence of "Yackies" (Yaqui) ancestry from Mexico submitted for the record. The oral tradition in the Augustine family that their female ancestor Mary Juarez had a daughter, Victoria, by a Mexican or Spaniard resonates with Victoria Augustine's self-identification as Mexican in the federal census of 1900; this information has been omitted from all filings.

81

**Alleged Link of Scotts Valley Band of Pomo
to the Ca-ba-na-po or Hoo-la-nap-o Tribe and the Patwin Tribe**

The Scotts Valley Band of Pomo claims it is the political successor in interest to the Ca-la-na-po Tribe (Kappler 1927[4]:1108), or Ca-ba-na-po (McKee 1853:136-37), or Habe-napo Tribe (Gibbs 1853[3]:109) signatories to the unratified treaty of August 20, 1851. In the "Historical Background for Response to Solicitor Inquiry" (Howard and Quick 2007), a report filed for casino gaming near Richmond, Contra Costa County, California, the experts Howard and Quick claimed that Augustine was "definitely the chief by 1880" of the Scotts Valley Pomo (Howard and Quick 2007:21). They quoted the essay "Indians of Lake County," in History of Napa and Lake Counties:

> The Hoo-la-nap-o tribe were just below the present site of Lakeport, on the place formerly owned by Dr. J. S. Downes. At one time there were two hundred and twenty warriors, and five hundred all told in the rancheria. They are now reduced to sixty. Sa-vo-di-no was the chief before their present one, Augustine (Palmer 1881:35).

In 1851 John McKee identified Julio as chief of the "Ca-ba-na-po." In 1851 John McKee identified Prieto as chief of the "Ha-bi-na-pa"; this tribe was possibly identical to the Habe-napo identified by Gibbs (McKee 1853:136-37; Gibbs 1853[3]:109). Chief Augustine, about 1880 when working as an informant for Lyman L. Palmer, further noted: "The Ha-be-nap-o tribe were located at the mouth of Kelsey Creek, on the north side. They numbered three hundred, but only about forty of them are left. Ba-cow-shun was their chief" (Palmer 1881:35).

On the basis of this complex but specific information, the experts for the Scotts Valley Band of Pomo concluded: "Taken together, the historical and ethnographic record show that Augustine was a chief of the 'Ca-la-na-po tribe' (Hulanapo or Hoo-la-nap-o), signatory to the Treaty of August 20, 1851 with the United States ceding the lands south to San Pablo Bay, and that this band, which became known as the Scotts Valley band at the turn of the twentieth century is the successor to the tribe referred to as the Ca-la-na-po on the treaty (Howard and Quick 2007:21).

The political successor of interest, however, is not that clear.

82

AR0005471

The historical record has a disconnect between Julio, signer of the unratified treaty, and Sa-vo-di-no, chief of the Hoo-la-nap-o prior to Augustine. More significantly Howard and Quick gratuitously and inaccurately asserted that the Ca-la-na-po Tribe, by signing the treaty of August 20, 1851, was "ceding the lands south to San Pablo Bay." This is incorrect. Article 3 of the treaty identified the cession of lands only in the vicinity of Clear Lake by the eight tribes signing the agreement. There was no mention of land cessions south nearly ninety miles to San Pablo Bay nor any record of the Lake Miwok, Hill Patwin, Southern Patwin, or Coast Miwok participating in the council. Their lands were never ceded in any treaty council with the United States.

In 2016 Dorothea J. Theodoratus, an anthropologist with more than forty years research experience on the Pomo, prepared a "Report" for the Scotts Valley Band in its "Indian Lands" application relating to property at Vallejo, California. Theodoratus drew on her own field work as well as a century of interviews and publications by others addressing the Pomo of the Clear Lake and upper Russian River areas. She found useful the studies by Gifford (1926) and Kunkel (1962) which attempted to clarify tribal and band distribution in the vicinity of the Scotts Valley Rancheria. She wrote:

> The Pomo tribelets located in the western vicinity of the large main body of Clear Lake were known as Kulanapo (qu-lá-na-phò), Habenapo (xa-bé-na-phò), and Yemabak (aka, yimá, yi-ma-bax). Kulanapo and Habenapo, to the southeast of the Yemabak, spoke the same sub-dialect of Eastern Pomo. Both held drainages that had important fishing sites; and both had three equal secular chiefs who resided at the three principal villages of each tribelet with a preferred chief heritage form of sister's son approved by the community (Theodoratus 2016:6).

She added: "It is believed that the Kulanapo and Habenapo residence patterns shifted and combined into a new single living site during the early non-Indian occupation of Big Valley located in the southern area of the main part of the lake. These two groups were present and their representatives were signatories at the US government treaty signing at Clear Lake in 1851." Theodoratus based this conclusion on the work of Kunkel and the expert witness report of Hurtado submitted in 2016 by the Scotts Valley Band (Theodoratus 2016:6).

83

AR0005472

While summarizing and clarifying the complex language and tribelet distribution of Clear Lake, Theodoratus offered no information and no conclusions on the role of Augustine or his descendants in the governance of the Scotts Valley Band nor on the prior claims by McClurken and Associates researchers on the political succession of interest from the Ca-ba-na-po or Hoo-la-nap-o to the modern Scotts Valley Band of Pomo Tribe.

Chief Augustine, a Pomo, was not the head man or chief of the Patwin Indians who resided in Solano and Napa counties. He self-identified to historian Lyman L. Palmer in 1880 as a Pomo. That year Augustine and his wife, Mary, were enumerated in the federal census in the Lakeport District, Lake County. Augustine was approximately 50 years old, a laborer; Mary was about age 42, a "washer." John Augustine, age 43, brother, and Indians named Jim, age 40, and Johnny, age 15, occupied the "same hut" (Bureau of the Census 1880).

Fernando Frese, who was likely not the father of Victoria Della Augustine, daughter-in-law of Chief Augustine, was not a chief of the Patwin Indians. Although the 1910 Census listed his birthplace as "Carneros Valley" in Napa County, the census gave his tribe as "Unknown." The enumerator was also unable to secure information on the father or mother of Fernando Frese. The passing of political succession of the Patwin Tribe (or any of its many tribelets) to Bob Augustine, husband of Victoria and son of Chief Augustine, is thus without foundation (Bureau of the Census 1910). The Augustine family's claim to Patwin ancestry is clouded by inconsistencies and by Victoria Augustine's self-identification in 1900 as "Yackies" and her birth in Mexico along with that of her parents (Bureau of the Census 1900a). The 1900 census information has been consistently omitted from all of the narratives prepared by the experts addressing the history of the Scotts Valley Band of Pomo and its ancestors.

When Victoria Della (Frese) Augustine filed her affidavit in 1928 for the California Indian Enrollment she stated that her mother was born in Lake County and died in 1922. She also stated that her father, was a non-Indian and that she was ½ Pomo. Her signed affidavit confirms a Pomo heritage but further confuses the family's ancestry, especially with her claim to only half-Indian heritage, a fact reflected in the blood quanta she then provided for her children by Bob Augustine

84

AR0005473

(Augustine, Victoria 1928).

For information on Pomo linguistic distribution in the Clear Lake basin see Fig. 10 (Golla 2011:106). This modern map identifies the location of the Habenapo in the watershed of Kelsey Creek, the Kuhlanapo at Big Valley and Lakeport, and the Bowal/Yima in the watershed of Scotts Creek, site of the Scotts Valley Rancheria. This area around the middle and northern shores of Clear Lake was Pomo country at the time of the extension of the jurisdiction of the United States in 1850 over the tribes of northwestern California. The Hill Patwin, Southern Patwin, and Coast Miwok of San Pablo Bay, San Francisco Bay, and the Napa River watershed did not live at Clear Lake, were not governed by chief Augustine, and were of a totally different linguistic stock and origin.

In 1928-33 the heads of households and single adults of the Scotts Valley Rancheria participated in the California Indian enrollments as prescribed and funded by Congress on May 18, 1928. Among the several questions on this affidavit was No. 13: "Give the names of the Chiefs, Captains, and Headmen of the Tribe or Band to which your ancestors belonged on June 1, 1852, who executed the Treaty or Treaties herein referred to if you know them." **None of these elders and adult heads of households could answer this question. 100% of them said: "I do not know their names"** (Bureau of Indian Affairs 1928-33) [Emphasis supplied].

## Findings of Fact

1. In light of the inability of any of the Scotts Valley Band of Pomo adults in 1928-33 to identify any tribal chief, captain, or headman at the time of the unratified Treaty of Lupiyuma on August 20, 1851, it is highly problematic that the modern Tribe can claim that it is the "political successor in interest" to any specific tribe or band signing that agreement. It has no claim to political succession to the aboriginal Patwins and no documented claim to the political succession of the signatory Pomo tribelets to the unratified treaty of August 20, 1851.

2. Victoria Della (Frese) Augustine self-identified as half-Pomo. Albert Hurtado, an expert witness for the Scotts Valley Band, was unable to document the identity of her father (Hurtado 2016:97).

85

Even if Fernando Frese was Patwin (though he self-identified in the Census of 1910 as "Clear Lake" (Pomo), he was the stepfather of Victoria Augustine, not her father.  Dorothea Theodoratus, an expert witness for the Scotts Valley Band, identified Victoria Della (Frese) Augustine's father as "non-Indian" (Theodoratus 2016:11).  Thus the Scotts Valley Band is unable to document a political succession in interest to any of the signatory tribelets of the unratified treaty of 1851 and unable to document Patwin ancestry through Fernando Frese.

AR0005475

## Scotts Valley Band Enrollments, 1928

In anticipation of settlement of the unresolved land claims of the Indians of California, Congress on May 18, 1928 (45 Stat. 602) passed a statute authorizing the enrollment of California Indians. Each single adult Indian and heads of households participated between 1928 and 1933 in meeting with an official of the Bureau of Indian Affairs, answering in so far as possible the questions on a ten page form, and signing the completed form as an affidavit attesting to the accuracy of the information. Several members of the Scotts Valley Band of Pomo enrolled in this program. They provided detailed information in the application on their family histories including names, places of birth and residency, parents, grandparents, tribal affiliations, and blood quanta. They were also asked to identify the leaders of their tribe or tribelet at the time of the unratified treaty negotiations in 1851.

The following information is drawn from the enrollment affidavits of the Scotts Valley Band for the years 1928-33.

### Augustine, Byron (Application No. 5782)

- Byron Augustine was born February 2, 1892/94
- He identified as 3/4 Pomo
- He said: "I was born in Lake County, California. My daughter [Della Augustine] was born in Lake County, California."
- "I have lived most of my life in Lake County. My daughter lives with me."
- Evelyn Anderson, his wife, was born January 19, 1894.
- She was 3/4 Pomo.
- Byron Augustine's father was Robert Augustine, 4/4 Pomo, born in Lake County; he was living in Lake County in 1852.
- Byron Augustine's mother was Victoria Augustine, ½ Pomo, born in Napa County; she was born subsequent to 1852.
- Question 13. "Give the names of the Chiefs, Captains, and Headmen of the Tribe or Band to which your ancestors belonged on June 1, 1852, who executed the Treaty or Treaties herein referred to if you know them." Answer: "I do not know their names."
- Parents were married by Indian custom in Lake County where they resided.
- Della Augustine, daughter, was born April 18, 1913, 3/4 Pomo. [Pencil note added indicating she had married a man named Steele] (Bureau of Indian Affairs 1928-33, App. 5782)

### Augustine, Victoria [Della] (Application No. 5778)

- Victoria Augustine was born "about 1860," ½ Pomo
  [Her son, John Augustine, age 43, born March 8, 1885, 3/4 Pomo, enrolled with her. Her other children included Bessie (Augustine) Ray, App. No. 5777, Paul T. Augustine, App. No. 5781, and Byron

87

AR0005476

Augustine, App. No. 5782.]
- She resided on May 18, 1928, at Lakeport, Lake County, California.
- "I think I was born in Napa County, California.  My son was born in Big Valley, Lake County, California."
- "I first recollect living in Napa County, and for the last 50 years or more I have lived in Lake County, California."
- Victoria was a widow in 1928; her husband, Robert Augustine died in 1921, aged about 75, 4/4 Pomo.
- Question 13. "Give the names of the Chiefs, Captains, and Headmen of the Tribe or Band to which your ancestors belonged on June 1, 1852, who executed the Treaty or Treaties herein referred to if you know them." Answer: "I do not know their names."
  (Bureau of Indian Affairs 1928-33, App. No. 5778)

## Augustine, Joe (Application No. 5779)

- Joe Augustine was born on June 29, 1875, 4/4 Pomo
  [He was the father of Weston Augustine, App. No. 5780; and father of Clarence Augustine, App. No. 5847).
- He resided on May 18, 1928, at Lakeport, Lake County, California.
- "I was born in Lake County, California." "I have lived all my life in Lake County, California."
- Mary Frank, his wife, Pomo, died about 1907, aged about 32 years.
- Son of Pete Augustine, 4/4 Pomo, and Jessie Rickabow, 4/4 Pomo.
- Question 13. "Give the names of the Chiefs, Captains, and Headmen of the Tribe or Band to which your ancestors belonged on June 1, 1852, who executed the Treaty or Treaties herein referred to if you know them." Answer: "I do not know their names."
- His parents were married by Indian custom in Lake County, California, and resided in Lake County.
  (Bureau of Indian Affairs 1928-33, App. No. 5779)

## Augustine, Clarence (Application No. 5847)

- Clarence Augustine was born on November 24, 1899, 4/4 Pomo
  [He enrolled with his daughter, Erline Augustine, born August 22, 1924, 3/4 Pomo.]
- Clarence was the son of Joe Augustine, App. No. 5779.
- Lena Smith, his wife, filed App. No. 5858. She was born December 8, 1888, ½ Pomo.
- Clarence was the brother of Weston Augustine, App. No. 5780.
- He resided on May 18, 1928, at Lakeport, Lake County, California.
- "I was born at Ukiah, Mendocino County, California."
- Clarence's father, Joe Augustine, was born on June 29, 1875, in Lake County, California, and was living in 1928.
- Clarence Augustine's mother, Mark Frank, was born at Cache Creek, Lake County, California, and died in 1907.
- Clarence Augustine's parents were married by Indian custom and lived in Lake County, California.
- Clarence said his father's father was Pete Augustine, Pomo.
- Clarence said his father's mother was Jessie Rickabow, Pomo.
- Clarence said his mother's father was Frank Hanson, Pomo.

88

AR0005477

- Clarence said his mother's mother was Julia Hanson, Pomo.
- Question 13. "Give the names of the Chiefs, Captains, and Headmen of the Tribe or Band to which your ancestors belonged on June 1, 1852, who executed the Treaty or Treaties herein referred to if you know them." Answer: "I do not know their names."
- "I have also lived my life in Mendocino and Lake Counties, California. (Bureau of Indian Affairs 1928-33, App. No. 5847)

### Augustine, Paul P. (Application No. 5781)

- Paul P. Augustine was born June 15, 1887, 3/4 Pomo
- He resided on May 18, 1928, at Lakeport, California. "I have lived all of my life in Lake County."
- Paul was the son of Robert Augustine, 4/4 Pomo, born in Lake County, and Victoria, ½ Pomo, born in Napa County. His parents resided in Lake County after their marriage by Indian custom.
- Paul was the brother of Byron Augustine
- Question 13. "Give the names of the Chiefs, Captains, and Headmen of the Tribe or Band to which your ancestors belonged on June 1, 1852, who executed the Treaty or Treaties herein referred to if you know them." Answer: "I do not know their names."
- Paternal grandparents: unknown
- Maternal grandfather, unknown non-Indian; maternal grandmother, Mary, 4/4 Indian born in Lake County.
    (Bureau of Indian Affairs 1928-33, App. No. 5781)

### Augustine, Weston (Application No. 5780)

- Weston Augustine was born May 14, 1892, 4/4 Pomo
- He resided on May 18, 1928, at Lakeport, California.
- Weston was the son of Joe Augustine, 4/4 Pomo, App. No. 5799, and brother of Clarence Augustine, App. No. 5847.
- Weston said he was the son of Mary (Frank) Augustine, 4/4 Pomo and both his parents were born in Lake County and married by Indian custom.
- He gave the following ancestry:
    Father's father: Pete Augustine
    Father's mother: Jessie Rickabow, Pomo
    Mother's father: Frank Hanson, Pomo
    Mother's mother: Julia Hanson, Pomo
- Question 13. "Give the names of the Chiefs, Captains, and Headmen of the Tribe or Band to which your ancestors belonged on June 1, 1852, who executed the Treaty or Treaties herein referred to if you know them." Answer: "I do not know their names."
- Michael Augustine, a son, was born on May 21, 1920, 4/4 Pomo
    (Bureau of Indian Affairs 1928-33, App. No. 5780)

### Barnes, Belton (Application No. 5785)

- Belton Barnes was born April 8, 1906, ½ Pomo

89

AR0005478

- He resided on May 18, 1928, at Lakeport, California
- He was born in Lake County and had resided there since birth.
- He said his parents were not married and were:
  Father: John Barnes, non-Indian, living in 1928
  Mother: Juanita Billy, born in Lake County, died in 1906
- He gave the following ancestry:
  Mother's mother's father: Stanley Morgan
  Mother's mother's mother: Unnamed, died 1913 about age 75
  Mother's mother: Mary, Pomo, died about 1904, age 57
  Mother's father, Bill Rickabow, Pomo, died about 1900, age 58
- Question 13. "Give the names of the Chiefs, Captains, and Headmen of the Tribe or Band to which your ancestors belonged on June 1, 1852, who executed the Treaty or Treaties herein referred to if you know them." Answer: "I do not know their names."
- Charles Rockhart, App. No. 5783, made the enrollment application for Belton Barnes and stated that he had Belton Barnes in his care since he was born and that Belton Barnes was the grandson of his sister, Kate Morgan.
  (Bureau of Indian Affairs 1928, App. No. 5785).

## Charlie, Ed (Application No. 5793)

- Ed Charlie was born 1875, 4/4 Pomo
- He identified as the brother of Charley Rockhart and as the father of Ralph Holder, App. No. 5724.
- He lived on May 18, 1928, at Lakeport, California, and said: "I was born at Lakeport, Lake County, California."
- He was separated from his wife, Edna Charley, age about 60, 4/4 Pomo
- He identified his parents married by Indian custom in Lake County:
  Father was Charley Morgan, 4/4 Pomo, born in Lake County
  Mother was Mary, 4/4 Pomo, born in Lake County
- Question 13. "Give the names of the Chiefs, Captains, and Headmen of the Tribe or Band to which your ancestors belonged on June 1, 1852, who executed the Treaty or Treaties herein referred to if you know them." Answer: "I do not know their names."
- Ed Charlie's son was Ralph Holder, born June 15, 1901, 4/4 Pomo, who married Susie Moore, App. No. 5725.
  (Bureau of Indian Affairs 1928, App. No. 5793)

## Faught, Sarah (Application No. 5784)

- Sarah Faught was born in 1862 or 1863 in Lake County and was the widow of Bob Faught
- She lived on May 18, 1928, at Lakeport, California, and in response to Question 5 stated: "I have lived all of my life in Lake County."
- Question 13. "Give the names of the Chiefs, Captains, and Headmen of the Tribe or Band to which your ancestors belonged on June 1, 1852, who executed the Treaty or Treaties herein referred to if you know them." Answer: "I do not know their names."
- Question 16. She stated her father was born "In Big Valley, Lake County,

90

California" and that her mother was born "In Upper Lake, Lake County, California." Her father died about 1863 and her mother about 1870. (Bureau of Indian Affairs 1928, App. No. 5784)

### Faught, Lyda (Application No. 5727)

- Lyda Faught was born in 1894 and said: "I was born at Upper Lake, Lake County, California."
- She resided on May 18, 1928, at Middle Creek Rancheria, Upper Lake, California
- Lyda identified several relationships:
    - ~ She was the daughter of Ed Anderson, 4/4 Pomo, and of Emma Charley, 4/4, App. No. 5726
    - ~ She was the mother of Luther Faught, born 1910, 3/4 Pomo
    - ~ She was the mother of Fred Anderson, born 1929
    - ~ She was the half-sister of Ralph Holder, App. No. 5724
    - ~ She was the half-sister of Ethan Anderson, App. No. 5767

### McCaw, Clyde (Application No. 5791)

- Clyde McCaw was born in 1895, 4/4 Pomo, and said: "I was born in Lake County, California" and added: "I have lived all my life in Lake County, California."
- He resided on May 18, 1928, at Lakeport, California
- He married Clara Brown, ½ Pomo
    - ~ Clara's father's father was Charles Morgan, Pomo
    - ~ Clara's father's mother was Mary Morgan, Pomo
- Question 13. "Give the names of the Chiefs, Captains, and Headmen of the Tribe or Band to which your ancestors belonged on June 1, 1852, who executed the Treaty or Treaties herein referred to if you know them." Answer: "I do not know their names."
- Clyde was the son of Charles McCaw, 4/4 Indian, who died in 1926; his mother was Rosa Rickabow, 4/4 Indian, who died in 1923. He said his parents were married by Indian custom and resided in Lake County, California.

### McCaw, Clara (Brown) (Application No. 5792)

- Clara Brown was born in 1897, 4/4 Pomo. She said: "I was born in Sebastapool Valley, Sonoma County, California." "I have lived all of my life in Lake and Sonoma Counties."
- She resided on May 18, 1928, at Lakeport, California.
- She said her maiden name was Clara Brown. She first married McCloud Alvino who died in 1923 and was the father of Roseta Alvino.
- She said her father was Santiago Brown, 4/4 Pomo, and that her mother was Alice Brown, 4/4 Pomo. Her parents were married by Indian custom in Sonoma County. In 1928 her father lived in Sonoma County and her mother in Lake County.
- Question 13. "Give the names of the Chiefs, Captains, and Headmen of the

91

AR0005480

Tribe or Band to which your ancestors belonged on June 1, 1852, who
executed the Treaty or Treaties herein referred to if you know them."
Answer: "I do not know their names."
(Bureau of Indian Affairs 1928-33, App. No. 5792)

### Patrick, William (Application No. 5709)

- William Patrick was born in 1867, 4/4 Pomo
- He said: "I was born at Big Valley, Lake County, California, and my children
  were born at Upper Lake, Lake County, California." He continued: "I
  was born at Big Valley, then moved to Ukiah, Mendocino County, for
  14 years, then went to Upper Lake, Lake County, California, where I
  have since lived; my children live with, son Lloyd, is at Sherman
  Institute, Riverside, California."
- He resided on May 18, 1928, at Lakeport, California
- William Patrick identified his children:
  ~ Lloyd Patrick, born July 16, 1912, 4/4 Pomo
  ~ Ida Boone, App. No. 5752
- William Patrick was separated form his wife, Clara Bateman, born 1872, 4/4
  Pomo
- He identified his ancestry:
  ~ Father was Bosolio, 4/4 Pomo; died 1888, age about 75 or 80
  ~ Mother was Mary, 4/4 Pomo; died 1894, age about 75
- Question 13. "Give the names of the Chiefs, Captains, and Headmen of the
  Tribe or Band to which your ancestors belonged on June 1, 1852, who
  executed the Treaty or Treaties herein referred to if you know them."
  Answer: "I do not know their names."
  (Bureau of Indian Affairs 1928-33, App. No. 5709)

### Ray, Gene (Application No. 1776)

- Gene Ray was born March 12, 1894, 4/4 Pomo. He said: "I was born at
  Laytonville, Mendocino County, California. All of my children were
  born in Lake County, California."
- He resided on May 18, 1928, at Lakeport, Lake County, California
- Gene Ray married on August 7, 1891 to Bessie Augustine, 3/4 Pomo
- Gene Ray was the son of Gill Ray, App. No. 3997, 4/4 Pomo, born in
  Laytonville, California, and of Rose Ray whose father was George
  Stevenson, non-Indian. His parents were married by Indian custom
  and resided in Mendocino County, California and near Laytonville after
  their marriage. Rose Ray, ½ Pomo, was born at Ten Mile River,
  Mendocino County, California.
- Gene Ray identified the following children:
  ~ Teresa Ray, 14, F, born June 29, 1914, 3/4
  ~ Beatrice Ray, 13, F, born July 23, 1915, 3/4
  ~ Catherine B. Ray, 9, F, born August 12, 1921, 3/4
  ~ Eugene P. Ray, 5, M, born February 2, 1923, 3/4
  ~ Douglas J. Ray, 3, M, born June 2, 1925, 3/4
  ~ Chris V. Ray, 1, M, born December 24, 1927, 3/4
  ~ Merline F. Ray, F, born May 1, 1929, 3/4

AR0005481

- Gene Ray gave his ancestry:
  - Father's father: Bill Ray, Pomo, born near Laytonville
  - Father's mother: Lucy Ray, Pomo, born near Laytonville
  - Mother's mother: Ellen Chockley, born near Laytonville
  - Father's father's father: Mah-din-jet-jose, born near Laytonville
  - Father's mother's mother: Tul-lis, born near Laytonville
  - Father's mother's father: Teet-rage, born near Laytonville
  - Father's Mother's father: Shirt-ah-nee-bun, born near Laytonville
- Question 13. "Give the names of the Chiefs, Captains, and Headmen of the Tribe or Band to which your ancestors belonged on June 1, 1852, who executed the Treaty or Treaties herein referred to if you know them."
  - Answer: "I do not know their names."
  - (Bureau of Indian Affairs 1928-33: App. No. 5776)

### Ray, Bessie (Augustine) (Application No. 5777)

- Bessie (Augustine) Ray was born August 7, 1891, 3/4 Pomo
- She was the daughter of Victoria Augustine, App. No. 5778; sister of Paul T. Augustine, App. No. 5781; sister of Byron Augustine, App. No. 5782; and wife of Eugene Ray, App. No. 5776.  She was the daughter of Bob Augustine, 4/4 Pomo, born in Lake County.
- She resided on May 18, 1928, at Lakeport, Lake County, California, and noted: "I was born in Lake County, California" and "I have lived all my life in Lake County, California."
- Bessie married Eugene Ray, born March 12, 1894, 3/4 Pomo.
- Her mother's mother, Mary, was Pomo
- Question 13. "Give the names of the Chiefs, Captains, and Headmen of the Tribe or Band to which your ancestors belonged on June 1, 1852, who executed the Treaty or Treaties herein referred to if you know them." Answer: "I do not know their names."
  - (Bureau of Indian Affairs 1928-33, App. No. 5777)

### Rockhart, Charley (Application No. 5783)

- Charley Rockhart was born 1873/77, 4/4 Pomo
- He was a single man with no children.
- He resided on May 18, 1928, at Lakeport, California and said "I have lived all of my life in Lake County, California."
- He identified his parents:
  - ~ Charley Morgan, 4/4 Pomo, born in Lake County
  - ~ Mother, 4/4 Pomo, born in Lake County
- Question 13. "Give the names of the Chiefs, Captains, and Headmen of the Tribe or Band to which your ancestors belonged on June 1, 1852, who executed the Treaty or Treaties herein referred to if you know them." Answer: "I do not know their names."
  - (Bureau of Indian Affairs 1928-33, App. No. 5783)

These sixteen individuals identified in several of the census

93

AR0005482

records for the Scotts Valley Rancheria provided a detailed documentation of where they were born, where they lived, where their parents were born, where their parents lived, and sometimes additional information on their grandparents. Three enrollees–Victoria Della Augustine (born ca. 1860), Sarah Faught (born ca. 1862/63), and William Patrick (born ca. 1867) were born within fifteen years of the unratified treaty of August 20, 1851. Joe Augustine (born 1875), Ed Charles (born 1875), and Charles Rockhart (born 1873/77) were born in the 1870s. All single adults and heads of households were asked Question 13: "Give the names of the Chiefs, Captains, and Headmen of the Tribe or Band to which your ancestors belonged on June 1, 1852, who executed the Treaty or Treaties herein referred to if you know them." All of them answered: "I do not know their names."

Almost all declared: "I have lived all of my life in Lake County, California." The exceptions were persons who had lived in Mendocino County, Victoria Augustine who thought she had been born in Napa County, and Clara (Brown) McCaw who had been born in Sonoma County.

**Findings of Fact**

1. None of the enrollees could identify the name of any chief or headman of their tribe or tribelet who participated in the unratified treaty councils of 1851.

2. These records confirm that from 1850 to 1933 at least 95% of the people enrolled, their children, and their ancestors were residents of Lake County, California. No one mentioned any Patwin, Wappo, Lake Miwok, or Coast Miwok ancestry nor did they identify any connections by birth or residency in the vicinity of Vallejo or anywhere in Solano County, California.

94

AR0005483

**Alleged Migration to San Francisco Bay Area**

In the argument for an "Indian Lands Determination" near Richmond in Contra Costa County and for an "Indian Lands Determination" at Vallejo in Solano County, the Scotts Valley Band of Pomo has posited a southward migration in the twentieth century that has allegedly created a modern significant "historical connection" to these target sites for casino development.  Steven J. Bloxham in condensing the Howard and McClurken reports of 2005 and 2007) asserted:

> The ancestors of the Tribe attempted to settle on the Scotts Valley Rancheria, however, the lands were inhospitable for farming and too small to support the Tribe's population (Bloxham 2016:5).

The tract of 56.88 acres in the Scotts Valley Rancheria was small and relatively unattractive for subsistence farming.  The population enumerations of the rancheria, however, confirm that the property for more than sixty years of the twentieth century was occupied and used by the ancestors of the present Tribe. [See Appendices A-T].  The census enumerations by the Bureau of Indian Affairs and the Bureau of the Census documented a consistent residential population.

| Appendix | Year | Population | Households |
|---|---|---|---|
| A | 1900 (BIA) | 57 | 14 |
| B | 1905-06 (BIA) | 67 | 22 |
| C | 1909 (Tribe) | 48 | |
| D | 1910 (Federal) | 80 | 20 |
| E | 1911 (BIA) | 58 | 16 |
| F | 1915 (BIA) | 78 | 20 |
| G | 1916 (BIA) | 73 | 22 |
| H | 1917 (BIA) | 71 | 35 |
| I | 1918 (BIA) | 78 | 34 |
| J | 1919 (BIA) | 77 | 35 |
| K | 1920 (BIA) | 74 | 34 |
| L | 1920 (Federal) | 24 | 6 |
| M | 1921 (BIA) | 74 | 33 |
| N | 1923 (BIA) | 59 | 28 |
| O | 1930 (Federal) | 34 | 12 |
| P | 1935 (BIA) | 16 (voters) | 12 |

AR0005484

| Q | 1940 (BIA) | 22 | 9 |
| R | 1940 (Federal) | 11 | 5 |
| S | 1948 (BIA) | 27 | 10 |
| T | 1958 (BIA) | 46 (39 resident at Lakeport) | |

In nineteen different population enumerations the total population was 1,058 or an average of fifty-six people in any census. The census tallies thus confirm that the core community of the Scotts Valley Band of Pomo between 1900 and 1958 resided until Termination on the rancheria near Lakeport or its vicinity. Additional information from the federal census also documents some of the ancestral families of the modern Scotts Valley Rancheria resided at other rancherias or on their own lands in Lake County or in nearby Mendocino County.

Stephen J. Bloxham claimed that "After the 1920s, the ancestors of the Tribe settled more permanently in the urban centers of the Bay Area" (Bloxham 2016:5). Again the census statistics in Appendices A-T and, most especially the "List of Distributees, Scotts Valley Rancheria" (1958) refute this claim. The Bureau of Indian Affairs identified forty-six people to receive the Tribe's assets. Of those, seven (14%)--the family of Beatrice M. (Ray) Arnold--lived in Corning, California. The remaining thirty-nine (85%) lived at Lakeport, California, the location of the Scotts Valley Rancheria.

**Finding of Fact**

1. Although residents came and went from the Scotts Valley Rancheria as a function of work and connections with other Pomo families, the rancheria was the land base and center of the community for the Scotts Valley Band of Pomo for more than sixty years in the twentieth century. At Termination in 1958 85% of the distributees of the rancheria's assets lived at Lakeport. Only one family was located in Corning in Tehama County. None of the distributees lived at Vallejo or in Solano or Napa counties.

96

AR0005485

### Alleged "Historical Connection"

The following discussion covers contentions in expert witness reports prepared by consultants for the Scotts Valley Band of Pomo wherein they have attempted to identify a significant "historical connection" for "Indian lands determination[s]" in Contra Costa and Solano Counties.  Since the application for such a determination was raised in 2016 for Solano County, emphasis is on that location.

### Problems with the Scotts Valley Band Birthplace Tables

The experts working for the Scotts Valley Band of Pomo have employed several strategies to try to link the residents of the rancheria at Lakeport, Lake County, California, to San Francisco Bay and San Pablo Bay in particular.  In 2007 among the materials the Tribe submitted for an "Indian Lands Determination" in Contra Costa County, California, were two tables in Appendix A.  These were the "Birth Places of Ancestors of the Scotts Valley Band, 1780-1930" and "Birth Places and Residences of the Scotts Valley Band Ancestors in the North Bay Area, 1700s and 1800s" (Howard and McClurken 2007).

The researchers identified the ancestry as far as possible of the in-marrying spouses into the Augustine/Frese family and others.  They then traced the ancestors of those in-marrying non-members of the Scotts Valley Band to claim that their places of residency and tribal affiliations devolve on the descendants enrolled in the modern tribe. While this documentation is a measure of the mixed ancestry of modern tribal members, it misrepresents who were the Scotts Valley Band of Pomo of Lakeport, California.  To try to find connections to San Francisco Bay, the researchers cast a wide net through all tribal ancestors, not just Pomo or those enumerated with or living in the Scotts Valley Indian community.  They have identified dozens of lineal ancestors who were not Pomo and never had any connection to the Scotts Valley Rancheria excepting that a child, grandchild, a great grandchild, or a great great grandchild married someone in that community.

When one considers that each person has eight great grandparents and sixteen great great grandparents, the prospect of documenting a large number of birthplaces and tribal identities multiplies geometrically.  To use this information to document the

97

significant "historical connection" of the Scotts Valley Band of Pomo to Vallejo, Solano County, or to Richmond, Contra Costa County, California, is dishonest. Other federally recognized tribes in California also claim these same ancestors who lived in the aboriginal areas of those language groups. By this logic had a Scotts Valley descendant married a Navajo from New Mexico or a Paiute from Nevada, the birthplaces and residency of those ancestors vicariously become evidence of the Scotts Valley Band's significant "historical connection" to those places as well.

The Scotts Valley Band researchers have pulled a "fast one" in these tables. The information does not document the significant "historical connection" of the federally-recognized Scotts Valley Band of Pomo to lands in the San Francisco Bay area and to San Pablo Bay or Vallejo in particular.

**Dorothea Theodoratus's Report (2016)**

This report provides a brief overview of the Lake Pomo and identifies the Scotts Valley Band as a group within the Eastern Pomo dialect. Theodoratus wrote that "kin groups were both ambilateral and ambilocal, which allowed for movement of members among the tribelets, meaning they could recombine socially and politically in various ways." She drew from the Ph.D. dissertation of Peter H. Kunkel (1962) who found seven to twelve tribelets in the Clear Lake basin. Theodoratus then wrote: "**Although these several Lake Pomo tribelets co-existed around the Lake, well-defined territorial boundaries were strongly defended, unless permission to enter had been granted among the Lake groups. Use rights within a group varied and were intricately defined and followed according to the assigned category**" (Theodoratus 2016:4) [Emphasis supplied]. Her statement confirms that aboriginal use and occupancy areas were known, defined, and protected. Theodoratus does not explain what she meant by "assigned category." Her report, however, makes clear that the Pomo had a clear perception of subsistence areas and their rights to use and defend that area from others.

In her essay "Western Pomo and Northeastern Pomo" co-authored with John Lowell Bean, Theodoratus addressed "External Relations" and "Trade." She found that the Pomo had difficult relations

98

with the tribes living between them and San Francisco Bay. **"Intense conflict at the border, ritual defense as evidenced in Kuksu cult differences, burial versus cremation of the dead, and drastically different basketry technology reveal the differences"** (Bean and Theodoratus 1978[8]:298) [Emphasis supplied]. These statements confirm differences between the Pomo of Clear Lake and the Russian River Valley and the native peoples living from the Marin Peninsula to San Pablo Bay along the north side of San Francisco Bay.

In the discussion of trade, Bean and Theodoratus identified "trade-feast congeries" that integrated the economies of the Pomo and facilitated the exchange of goods, especially tool materials and foodstuffs. **"The nexus of this system," they wrote, lay in the [Russian River] valley zone (central to southern)** and according to Aginsky formed a kind of protocapitalistic trading complex involving banking against future scarcity of items by overproduction of goods" (Bean and Theodoratus 1978[8]:298) [Emphasis supplied]. Bean and Theodoratus did not report the trade network connected the Pomo with the northern shore of San Francisco and San Pablo bays.

Nowhere in her report of 2016 nor the essay co-authored with Bean did Theodoratus identify trails or trading networks that linked the Pomo of Clear Lake or the Russian River Valley to San Francisco or San Pablo bays. To the contrary, she observed in 1978: "The Central groups [of Pomo] acted as middlemen between the Eastern and Northern, and Southern groups in the traffic of goods, manufactured goods, and raw materials. They became the market places for goods and were able to amass greater 'wealth' than other groups" (Bean and Theodoratus 1978[8]:298). The trade systems she identified were internal within the Pomo language area which reached from the shores of the Pacific Ocean to the crest of the Coast Range in the Russian River Valley, upper Eel River valley, and Clear Lake basin.

Theodoratus included a section on the "Augustine-Frese Family" in her report. She provided no identification of the tribal affiliation of the Frese family and noted that Victoria D. Frese, wife of Robert Augustine, was "from a prominent family in that area [Clear Lake]." She further mentioned that Victoria's father was "not Indian," based on her self-identification of parentage in the 1928 California Indian enrollment, and that her mother "was born in Lake County (although oral history reports she was born in Napa area)." The Theodoratus report thus avoided any statement about the alleged Patwin ancestry

99

of Victoria Della Augustine and purported connections via that lineage to Vallejo, California (Theodoratus 2016:11-12).

Theodoratus drew an important conclusion about the Scotts Valley Band. **She wrote: "Their 'traditional territory' (early 1850s) was located on the western side of Clear Lake."** She then discussed the purchase of land in 1911 for creation of the Scotts Valley Rancheria. Her report posited no linkage or connection in any way of these people with Vallejo, California (Theodoratus 2016:12) [Emphais supplied]. Her lack of finding and documenting such a connection is founded on her nearly fifty years of anthropological work with the Pomo.

### Albert Hurtado's Report (2016)

Historian Albert Hurtado wrote a "Report" submitted on January 29, 2016, in the "Indian Lands determination" for a Scotts Valley Band of Pomo property at Vallejo, California. The report is based on Hurtado's decades of experience as an ethnohistorian and, in particular, his knowledge of the enslavement and exploitation of Indian laborers in nineteenth century California. His report briefly explores the missions of the San Francisco Bay area and more particularly examines "Mexican California, Land Grants, and Indians." He presented a discussion of ranchos, especially those of the extended Vallejo family, from the Pacific Coast to the Sacramento Valley which embraced from the 1820s to the 1850s as much as 220,000 acres north of San Francisco Bay. Hurtado provided some evidence that Clear Lake Pomo, among other tribes, became part of the laboring force on these properties or those of other rancheros in the region (Hurtado 2016:18-45). Neither Hurtado's report nor those prepared by McClurken & Associates provided documentation of any ancestor of the Augustine, Frese, or other antecedent families to confirm a significant "historical connection" to the vicinity of Vallejo or anywhere in Solano and Napa counties.

In spite of his research in primary documents, Hurtado hedged his analysis with "probable/probably" (pp. 25, 26, 35, 40, 45, 46), "could have been" (p. 94), "most likely" (p. 31), "but it is uncertain" (p. 32), "it is impossible to know the exact identity of this Indian community" (p. 26), and "it is impossible to know with certainty exactly which villages on Clear Lake" (p. 34). His report is populated

AR0005489

with uncertain assumptions such as "it is probable that Mariano Vallejo employed Clear Lake Indians on Rancho Soscoi as well as his other properties" (Hurtado 2016:45). Although he covered the role of vaqueros, the machinations of Chief Francisco Solano who was not related to the Augustine/Frese family and the Scotts Valley Band of Pomo, and some of the ranching activities of the Vallejo family, nothing in his discussion confirmed that the Scotts Valley Band of Pomo or their ancestors had any connection whatsoever to Vallejo, California, or to Solano County.

The lack of documentation of a Scotts Valley Band of Pomo connection to Vallejo, California, was most evident in Hurtado's efforts to try to find Pomo Indians living or working in the latter half of the nineteenth century in Solano or Napa counties. In this discussion he made a series of statements (quoted in the following topics he identified) that are followed with comments on the problems with his evidence and statements.

Federal Census of 1850

"In the household of John Frisbie who was then living at Benicia we find several 'herdsmen' born in California with only one name–José, Chinito, and Napomusano. José could have been a Californio for whom the census taker didn't bother to record a last names [sic], but Chinito, and Napomusano **seem to be Indian names**" (Hurtado 2016:94) [Emphasis supplied]. This analysis is speculation and in no way identifies these laborers as Pomo or ancestors of the Scotts Valley Band of Pomo.

"Also in Frisbie's very large household we find Antonio, Pablo, and Rafael (or perhaps Rafero) who are called rancheros but who do not have any personal or real property. Interestingly, the census-taker listed all of these men as mulattos, **perhaps because it was the only way to account for them** because their true racial identity (Indian or mixed-race Mexican) was not accounted for on the census form" (Hurtado 2016:94) [Emphasis supplied]. This information is speculative and has no bearing on the Scotts Valley Band of Pomo. Hurtado admitted that the racial identities in 1850 of those living in the Frisbee household were "debatable" (Hurtado 2016:94).

California State Census, 1852

101

In Solano County Hurtado found two boys, Ronaldo (age 9), and Antonio (age 7), enumerated among farmers from Michigan, Wisconsin, and New Mexico, but with which family they lived was unclear. **"We can only speculate,"** he wrote, **"if they were brothers or if somehow fate conspired to throw them together as strangers."** He continued: "Mananis, a seven year old girl and Nicholas, a nine year old boy are listed together, also among a group of male farmers. Four girls, Polach, Maria Antonia, Terresa, and Amparo (aged fifteen, eighteen, six, and one respectively lived among farmers from California and from Chile" (Hurtado 2016:95) [Emphasis supplied]. The presence of these children of unknown origins is irrelevant to the Scotts Valley Band of Pomo's alleged significant "historical connection" to Vallejo, California.

Hurtado continued: "There were at least forty-six Indians who lived in Solano County among whites in 1852. Seventeen of them were children under the age of sixteen with no adult Indian anywhere near them in the census. There can be no little doubt that the orphaned Indians were in Solano County because of the state indenture act or because they were kidnapped" (Hurtado 2016:95). While these statistics document a sad situation, the information is irrelevant to the Scotts Valley Band of Pomo's alleged significant "historical connection" to Vallejo, California.

In his conclusion, Prof. Hurtado wrote: "Some of the Habenapo, Kulanapo, and Yimabak/Molakai people who worked in the North Bay region evidently returned to their Clear Lake homelands when they were finally free to go in the nineteenth century. They lived in community with one another and eventually obtained a federally recognized Rancheria in Scotts Valley (Hurtado 2016:100). Nowhere in his report, however, did Hurtado document that "Habenapo, Kulanapo, and Yamabak/Molakai people" worked in the North Bay area. Nowhere did he establish the identities of these Indians nor produce evidence that they "returned to their Clear Lake homelands." The conclusion is ambiguous and without foundation.

In his conclusion, Prof. Hurtado compared the late twentieth century migration of Scotts Valley Indians to the San Francisco Bay area to that of undocumented enslavement and laboring of Scotts Valley Band ancestors for the Vallejo brothers. He then wrote: "They went down a path that had been well-trodden by their ancestors." Hurtado's report, however, did not identify aboriginal trail systems,

102

trade networks, or other evidence that created and sustained significant connections between the Indians of Clear Lake with San Pablo Bay. The only instance he cited was the possibility that in 1851 Indians from Clear Lake traveled to James M. Estell's ranch near Vallejo to get cattle purchased by Redick McKee under the provisions of the unratified treaty of August 20. There is no identification of who these Indians were or how one possible trip created a significant "historical connection." The "well-trodden" path was undefined and its travelers were unidentified.

Prof. Hurtado's final sentence stated: **"Thus the North Bay region, including Rancho Suscol, Vallejo, and Solano County became part of the SVBI's historic territory**" (Hurtado 2016:101) [Emphasis supplied]. His conclusion is not sustained by evidence. It makes no effort to reconcile his rewriting tribal distribution in northwestern California as established by the research and publications of the following scholars:

- Stephen Powers (1840-1904). Tribes of California, *Contributions to North American Ethnology*. Vol. 3. Washington, D.C.: U.S. Geographical and Geological Survey of the Rocky Mountain Region.

- Sameul A. Barrett (1879-1965). "The Ethnogeography of the Pomo and Neighboring Indians," *University of California Publications in American Archaeology and Ethnology*, 6[1]7-332; Map of the Territory of the Pomo Linguistic Stock and of the Adjacent Territories of other Linguistic Stocks Showing Dialectic Subdivisions and Village Sites, Map 1, The Ethno-Geography of the Pomo Indians, 1:7-332; Southern Territory of the Wintun Linguistic Stock, Map 2, The Ethno-Geography of the Pomo Indians, 1:7-332; The Geography and Dialects of the Miwok Indians, *University of California Publications in American Archaeology and Ethnology*, 6[2]:333-368.

- C. Hart Merriam (1855-1942). C. Hart Merriam Papers, MSS 80/18c, Microfilm Reels 10 and 125, Bancroft Library, University of California, Berkeley, CA.; Distribution and Classification of the Mewan Stock in California, *American Anthropologist* n.s. 9[2]:338-357.

- Alfred Louis Kroeber (1876-1960). On the Evidences of the

103

AR0005492

Occupation of Certain Regions by the Miwok Indians, *University of California Publications in American Archaeology and Ethnology* 6[3]:369-380; Handbook of Indians of California, *Bureau of American Ethnology Bulletin 78.* Washington, D.C.: Smithsonian Institution.

- Edward Winslow Gifford (1887-1959). Ethnographic Notes on the Southwestern Pomo, *University of California Anthropological Records*, 25:1-47; Clear Lake Pomo Society, *University of California Publications in American Archaeology and Ethnology*, 18(2):287-390.

- Fred B. Kniffen (1900-1993). Pomo Geography, *University of California Publications in American Archaeology and Ethnology* 36(3):353-400.

- Harold E. Driver (1907-1992). Wappo Ethnography. *University of California Publications in American Archaeology and Ethnology,* 36(3):179-220.

- Omer Call Stewart (1908-1991). Notes on Pomo Ethnogeography, *University of California Publications in American Archaeology and Ethnology*, 40[2]:29-62.

- Andrew P. Vayda (living). Pomo Trade Feasts. *Tribal and Peasant Economies: Readings in Economic Anthropology*. Garden City: The American Museum of Natural History.

- Robert L. Oswalt (1923-2007) and Sally McLendon (living). Pomo: Introduction, California, 8:274-288. *Handbook of North American Indians*, Robert Heizer, ed. Washington, D.C.: Smithsonian Institution.

- John Lowell Bean and Dorothea Theodoratus (living). Western Pomo and Northeastern Pomo, California, 8:289-305*. Handbook of North American Indians*, Robert Heizer, ed. Washington, D.C.: Smithsonian Institution.

Federal Census of 1860

Hurtado reported Martin E. Cook, a California Indian age 10, living in the John Frisbee household. He added: "Only three other

104

Indians lived in Vallejo in 1860, two adult laborers and a child who did not attend school." The census enumerator found twenty-seven Indians living in Benicia, including eleven children under age sixteen, and none lived in households with Indian adults (Hurtado 2016:96). This information is irrelevant to the Scotts Valley Band of Pomo's alleged significant historical connection to Vallejo, California.

Hurtado analyzed the household of Serranus C. Hastings, first chief justice of California's Supreme Court. Living there were Beppo Hastings, age 17, a servant; Nella Hastings, age 15, no occupation; and Ukiah Hastings, a girl with no occupation. In his commentary, Hurtado wrote: "But when and under what circumstances they [the three children] arrived in Judge Hastings' home **can only be guessed at**" (Hurtado 2016:96-97) [Emphasis supplied]. The identity of these three young Indians was undocumented and guessing does not confirm a significant the Scotts Valley Band's "historical connection" to Vallejo, California.

Story of Mary Frese

Hurtado recounted the alleged history of Mary Frese who he identified as a "Wappo or Patwin who had been born either in Carneros Valley in present-day Napa County, or Sonoma, or somewhere in present-day Lake County in about 1845." These contradictions confirm that the place of birth of Mary Frese was unclear. Hurtado did not refer to the census of 1900 [See Figs. 18 and 19] where Victoria Della (Frese) Augustine identified her mother as a "Yackie" Indian born in Mexico (Bureau of the Census 1900).

Hurtado then wrote: "Somewhere during her captivity [i.e., that of Mary Frese] someone impregnated her." This means Victoria's biological father was unknown and could not have been Francisco Frese, the alleged Patwin Indian. The Tribe's expert witnesses repeatedly have stressed the Victoria Della (Frese) Augustine's Patwin ancestry came from her father's birth in the Carneros Valley of Napa County, but Hurtado rightly found her father undocumented and only said "**someone impregnated**" Mary Frese (Hurtado 2016:97) [Emphasis supplied].

105

AR0005494

### Other Expert Witness Findings

The expert witnesses–Dorothea Theodratus, Albert Hurtado, Virginia Howard, James M. McClurken, and Steven J. Bloxham–have the obligation in their reports to document a significant "historical connection" of the Scotts Valley Band of Pomo to the lands at Vallejo, Solano County, California, that are to be taken into trust. The prior work of Howard and McClurken (along with their associates Joseph Quick, G. Russell Overton, William R. Cron, Jr., Laurie Elendu, and David A. Cripe) were condensed in 2016 by attorney Steven J. Bloxham into the "Consolidated Report" submitted for the "Indian Lands Determination" at Vallejo, California.

The Tribe's experts relied on and cited Lyman L. Palmer's essay, "Indians of Lake County," *Napa and Lake Counties, California* (1881). During his research in 1880 Palmer interviewed Chief Augustine of the Hoolanapos at Lakeport and founded his narrative on that conversation, George Gibbs's diary (1853), Hubert Howe Bancroft's *Native Races of the Pacific States* (1874-76), and Stephen Powers's *Tribes of California* (1877). Palmer expended ten pages discussing the traditional culture of the Pomo of Lake County and then turned to the information on the tribelets of Lake County identified by Chief Augustine. He added "The last census, 1880, shows that there are seven hundred and sixty-five Indians in Lake County, which is about one-third more than Augustine's estimate" (Palmer 1881:34-36).

Palmer's account is important because it was secured from Chief Augustine, a focal ancestor of the Scotts Valley Band of Pomo. Nowhere in his discussion of the tribelets or Pomo population of the Clear Lake Basin did Augustine discuss enslavement, kidnapping, or residency of the Pomo in Solano, Napa, or Sonoma counties. Augustine's information provided detailed information on the names of tribelets, or villages, their locations, their populations, and the names of their chiefs. It is logical to conclude that had Augustine, his family, his tribelet, or other Pomo of Clear Lake been carried off or compelled to live and labor in Solano and Napa counties, that he would have shared that information. He reported nothing on this matter to Lyman Palmer.

There are several reasonable measures of documenting a tribe's significant connection to land and its surrounding area. These are often termed evidence of "use and occupancy" and were insisted on in

106

most Indian land claims cases litigated with the United States in the Claims Court and the Indian Claims Commission.

1. Pomo Ethnogeography

What are the Pomo place names for bays, estuaries, creeks, rivers, mountains, and other geographical sites areas in the vicinity of Vallejo?  If the Scotts Valley Band of Pomo had significant historical connection to this area, the tribal ethnogeography should provide information on these features.

2. Pomo Villages and Camps

What are the names and locations of Pomo villages either seasonal or permanent in the vicinity of Vallejo?  If the Scotts Valley Band of Pomo had significant historical connection to this area, the names of Pomo villages should prove useful.

3. Pomo Trails

Where were the important trails connecting the Scotts Valley Band of Pomo aboriginal areas at Clear Lake with northeastern San Pablo Bay?  When were these trails used, who used them, and for what purposes were they traveled?

4. Pomo Quarry Sites

What Pomo quarry sites were used for obtaining stone materials for tool and bead manufacturing in the Vallejo area?  If the Scotts Valley Band of Pomo had deep historical connection with this area, its informants should have identified resource sites for obsidian, flint, chert, schist, magnesite and other useful stone materials as well as red ochre and other paints.

5. Pomo Subsistence Areas

Where were the primary Pomo subsistence areas used for gathering acorns, digging roots and bulbs, fishing, and hunting in the vicinity of Vallejo?  If the Scotts Valley Band of Pomo obtained foods in the lands surrounding northeastern San Pablo Bay, where were the most important of these locations and when were they used?

107

AR0005496

6. Pomo Cemeteries

Where were the cemeteries used by the Scotts Valley Band of Pomo in the historic period in the vicinity of Vallejo? If members of the Tribe lived and worked in Napa and Solano counties subsequent to 1870 what were the locations of the family or tribal cemeteries used in the past 120 years?

7. Pomo Mythological Sites

What geographical features in the vicinity of Vallejo were identified in the oral literary texts of the Pomo? If the Pomo of Clear Lake had a deep and continuing connection with the northeastern shores of San Pablo Bay, where in their narrative and myth texts are there specific features associated with that area? What were the names of these sites?

8. Pomo Religious Sites

Where were the locations of traditional Pomo spirit quest or "power" enhancement sites in the vicinity of Vallejo. If the Pomo used and occupied the lands along the shore and into the interior of northeastern San Pablo Bay where were their important religious sites?

9. Pomo Messianic Religious Sites

In the latter 19th century where did the Pomo gather in the vicinity of Vallejo for dances and ceremonies associated with the Earth Lodge Cult, Ghost Dance, Bole Maru, or other messianic religions?

10. Pomo Employment on Ranchos in Napa and Solano Counties

It is alleged that members of the Scotts Valley Band of Pomo from the 1840s and following were enslaved or worked on the Mexican Ranchos and American farms in Napa and Solano Counties and that such presence contributed to the "significant historical connection" of the tribe to Vallejo. Where in the federal census schedules or manuscript records (lists of workers, census enumerations, business ledgers, or general correspondence) of the ranchos and farms is this labor and

108

AR0005497

residency confirmed?

Ranchos of Solano County:

Rancho Los Putos, 17,755 acres granted in 1843 to Juan F. Peña
        and Juan Manuel Cabeza Vaca
Rancho Los Ulpinos, 17,726 acres granted in 1844 to John
        Bidwell
Rancho Rio de los Putos, 17,795 acres granted in 1842 to
        William Wolfskill (Partly in Yolo County)
Rancho Suisun, 18,237 acres granted in 1842 to Francisco
        Solano and sold in 1850 to M. G. Vallejo
Rancho Suscol, 84,000 acres granted in 1843 to Manuel G.
        Vallejo (partly in Napa County)
Rancho Tolenas, 13,316 acres granted in 1840 to Jose Francisco
        Armijo

Ranchos of Napa County:

Rancho Carne Humana, 17,962 acres granted in 1851 to Edward
        Turner Bale
Rancho Catacula, 8,546 acres granted in 1844, to Joseph B.
        Chiles
Rancho Caymus, 11,887 acres granted in 1836 to George Yount
Rancho Chimiles, 17,762 acres granted in 1846 to Jose Y.
        Berreyesa
Rancho Entre Napa, 7,000 acres granted in 1836 to Nicholas
        Higuera
Rancho Huichica, 18,704 acres granted in 1841 to Jacob P. Leese
Rancho La Jota, 4,454 acres granted in 1843 to George C. Yount
Rancho Las Putas, 35,516 acres granted in 1843 to José de
        Jesús Berreyesa and Sexta Berreyesa
Rancho Locoallomi, 8,873 acres granted in 1841 to William S.
        Pope
Rancho Mallacomes, 17,742 acres granted in 1843 to José de los
        Santos Berryesa
Rancho Napa, 22,718 acres granted in 1838 to Salvador Vallejo
Rancho Suscol, 84,000 acres granted in 1843 to Mariano G.
        Vallejo (Napa and Solano Counties)
Rancho Tolenas, 13,316 acres granted in 1840 to José Francisco
        Armijo (Napa and Solano Counties)
Rancho Tulucay, 8,866 acres granted in 1841 to Cayetano Juarez

109

AR0005498

Rancho Yojome, 6,654 acres granted in 1841 to Damasco
Rodriguez

11. Documentation of Scotts Valley Ancestors in Census Records of
1870 to 1940 in Solano and Napa Counties

In documenting significant "historical connection" to the lands for
the "Indian Lands Determination" at Vallejo where are the
ancestors of the present members of the Scotts Valley Band of
Pomo enumerated? There are readily available schedules,
including the important Indian Schedules of 1900 and 1910, for
these counties. Where have the expert witnesses found
members of the Scotts Valley Band residing during these six
decades in Solano and Napa counties?[1]

12. Documentation in the sacramental registers of Mission San
Francisco Solano (Sonoma), San Rafael Arcangel (San Rafael),
and Mission San Francisco de Asis (San Francisco) of the lineal
ancestors of the Scotts Valley Band of Pomo community as
enumerated in BIA and federal census schedules and lists, 1900-
58.[2]

Where among the Indians baptized and identified by name and
tribal affiliation in the sacramental registers of Mission Sonoma
(San Francisco Solano), Mission San Francisco de Asís (Delores),

---

[1]

The expert witness reports of Howard and McClerken (2005), Howard and Quick
(2007), Howard and McClurken (2007), Hurtado (2016), Theodratus (2016) and
Bloxham (2016) reported no members of the Scotts Valley Band of Pomo residing in
Napa or Solano counties between 1880 and 1940. To the contrary, the reports
identified and reproduced as exhibits the decennial census records from 1880 to
1940, the Indian Census Schedules of 1915, 1916, 1917, 1918, 1919, 1920, 1921,
and 1923, and the BIA census records of 1905-06, 1911, 1935, and 1958. Of the
nearly 1000 enumerations of Scotts Valley Band members in these records,
approximately 99% were listed as living at Scotts Valley or Lakeport, Lake County,
California.

[2]

Albert Hurtado reviewed the sacramental registers of Mission Sonoma and found
Indian neophytes from at least thirty-five villages. He also reported that Bean and
Theodoratus stated that "at least 600 Pomos were baptized at the San Rafael and
San Francisco missions" (Hurtado 2016:16-17). In spite of this documentation,
there is no trace of a direct ancestor of the Scotts Valley Band of Pomo community at
Clear Lake identified in any of these records in Hurtado's report (2016) nor in that of
Theodoratus (2016).

110

AR0005499

and Mission San Rafael Archángel are the Pomo ancestors of the Scotts Valley Band who enumerated in the federal census and Indian Census between 1870 and 1940? [Note: These are not the ancestors of in-marrying non-members of the Scotts Valley Band of Pomo.]

The following table is based on the expert reports of these twelve measures of significant "historical connection."

Table 1

Measures of Historical Connection

|     | Hurtado (2016) | Theodratus (2016) | H & M (2005) | H & M (2007) | H & Q (2007) | Bloxham (2016) |
|-----|-----|-----|-----|-----|-----|-----|
| 1.  | No | No | No | No | No | No |
| 2.  | No | No | No | No | No | No |
| 3.  | No | No | No | No | No | No |
| 4.  | No | No | No | No | No | No |
| 5.  | No | No | No | No | No | No |
| 6.  | No | No | No | No | No | No |
| 7.  | No | No | No | No | No | No |
| 8.  | No | No | No | No | No | No |
| 9.  | No | No | No | No | No | No |
| 10. | No | No | No | No | No | No |
| 11. | No | No | No | No | No | No |
| 12. | No | No | No | No | No | No |

This matrix charts seventy-two measures of documented significant "historical connection" of the Scotts Valley Band of Pomo from the early contact period of approximately 1820 to the ending of messianic religious movements among the Indians of northwestern California in the 1890s. **In no instance did any of the reports produce affirmative evidence in any category to link the Scotts**

111

**Valley Band of Pomo to Vallejo, to Solano County, or with any credibility to Napa County** [Emphasis supplied].

Further documentation of the presence of ancestors of the Scotts Valley Band of Pomo residing on the northeast shores of San Pablo Bay, or anywhere in Napa and Solano Counties, could be found in an analysis of the federal census records of 1880, 1900, 1910, 1920, 1930, and 1940. These population schedules are available for research for a period of sixty years, excepting the 1890 census destroyed in a fire in Washington, D.C. These schedules provide information on name, age, gender, and race. The records include the special Indian Schedules of the decennial census for 1900 and 1910 with the extended categories of information, including tribal membership of the individual and that of their parents and their places of birth. **None of the expert witness reports nor accompanying exhibits identified any information on the ancestors of the Scotts Valley Band in or near Vallejo or anywhere in Solano or Napa counties**[3] [Emphasis supplied].

Further documentation of the presence of ancestors of the Scotts Valley Band of Pomo residing on the northeast shores of San Pablo Bay, or anywhere in Napa and Solano Counties, is preserved in the Indian Census Schedules. The schedules for Scotts Valley Band Rancheria are available in Appendices B (1905-06), C (1909), E (1911), F (1915), G (1916), H (1917), I (1918), J (1919), K (1920), M (1921), N (1923), and Q (1940). These census records consistently identified the families of the Scotts Valley Rancheria as resident near Lakeport, Lake County, California. **None of the expert witness reports nor accompanying exhibits identified any information on the ancestors of the Scotts Valley Band in or near Vallejo or anywhere in Solano or Napa counties** [Emphasis supplied].

---

[3]

The only exception was the identification of an Indian laborer, Augustine, who in 1870 lived in a household of seventeen Indians: 10 male laborers, 7 female, and one child, in Napa Township, Napa County. These Indians were probably workers on Rancho Tulucay, a grant in 1840 to Cayeton Juarez (1809-1883). Augustine appeared but once in the record. It is not known if he was identical to the Augustine of the Scotts Valley Rancheria or was another Indian named Augustine (Bureau of the Census 1870).

AR0005501

## Conclusions

This report responds to several expert witness reports prepared for the Scotts Valley Band of Pomo for Department of Interior "Indian Lands Determinations" near Richmond, Contra Costa County, and Vallejo, Solano County, California. The current lands request (2016) is for property at Vallejo. The reports of Dorothea Theodoratus, Albert Hurtado, and the condensed McClurken & Associates reports submitted by Stephen J. Bloxham were the predicate to this report. Throughout my presentation there are "Findings of Fact" based on the evidence researched and presented.

In response to the fundamental contentions of the Scotts Valley Band of Pomo I conclude the following:

**1. The Scotts Valley Band of Pomo has failed to document that it is the political successor in interest to the Ca-la-na-po, a signatory tribelet of the unratified Treaty of Lupiyuma of August 20, 1851.**

The Tribe traces to Chief Augustine who, as of 1880, was identified as the chief of the Hoolanapos, a Pomo tribelet living on the west side of Clear Lake. That tribelet was not identified in the treaty Redick McKee forwarded to Washington, D.C. There is no trace of a succession of leadership from any of the signers of the Treaty of Lupiyuma to Chief Augustine.

In the enrollment by the Bureau of Indian Affairs of single adults and heads of households of the Scotts Valley Band of Pomo in 1928-32 no one could identify their tribal leader who participated in the unratified treaty of August 20, 1851. All responded to Question 13: "I do not know."

**2. The Scotts Valley Band of Pomo has singularly failed to document that its ancestors traveled south from the Clear Lake area and maintained significant "historical connection" to Vallejo, California.**

Generations of Pomo elders working with anthropologists–including the tribe's own expert witness Dr. Dorothea Theodoratus–have documented "trade feast congeries" or networks within the Pomo aboriginal area and, most particularly,

113

AR0005502

via east and west trails. The Clear Lake Pomo offered dried fish, acorns, angelica root, furs, hides, and magnesite from their home in trade for mussel shells, abalone shells, salt, seaweed, acorns, and resources from the Pomo living to the west. To the east they traded for obsidian and other materials. Nowhere has the Scotts Valley Band documented a trail system between Clear Lake and San Pablo Bay, its use by its ancestors, nor identified the commodities exchanged over such trails.

**3. The Scotts Valley Band has contended that Vallejo was the terminus of Indian trails. While this may be true, the expert witnesses for the Tribe have not identified these trails, when they were used, where they went, who used them, or the purposes for which they were used.**

The only mention of such a route was the possible journey of unidentified signatories of the McKee treaty of August 20, 1851, to James M. Estell's ranch near Vallejo to take delivery of cattle. Prof. Hurtado was unable to document whether this trip was ever made or who participated in it.

**4. The Scotts Valley Band has argued that it provided the labor force of General Marino Vallejo's Rancho Suscol and Rancho Suisun. The expert witnesses have, however, provided no documentation to sustain this contention.**

There is not a single ancestor of the Scotts Valley Band who has been identified in the correspondence or business ledgers of the Vallejo family nor in the federal census enumerations of Solano and Napa counties in the nineteenth century. Possibly Pomo worked for the Vallejo family between 1844 and 1853 when Salvador and Juan Antonio Vallejo established a cattle ranch–Laguna de Lup-Yomi–in Big Valley in the Clear Lake Basin. There are no extant records documenting who worked or was enslaved on that property in Lake County.

Randall Milliken's translation and analysis of the Franciscan records of the six Catholic missions surrounding San Francisco and San Pablo bays, 1778 to 1834-36, did not identify a single ancestor of the Scotts Valley Band of Pomo nor did his studies confirm the baptism, marriage, or other rites of the church performed for Clear Lake Pomo during the Spanish and Mexican

114

AR0005503

mission periods.

Prof. Albert Hurtado examined 19th century census records and the history of ranchos north of San Francisco Bay and was unable to find any identification of ancestors of the Scotts Valley Band or other Clear Lake Pomos enslaved or employed on those properties.

**5.  The Scotts Valley Band has argued that the Ca-la-na-po Tribe ceded to the United States much of present Lake, Napa, and Solano counties in the Treaty of Lupiyuma of August 20, 1851.  This is not true.**

No Coast Miwok, Wappo, Lake Miwok, or Patwin participated in the council of August 20, 1851.  The treaty clearly identified that the land cession was territory of the eight signatory tribelets of the Clear Lake basin.  It purported to create a reservation in that district.  There is no record of any subsequent treaty with the tribes living north of San Francisco and San Pablo bays and south of Clear Lake.

The McKee treaty council had only poor communication via a circuitous English-Spanish-Pomo-Spanish-English chain of conversation.  None of the "interpreters" had competency in speaking Pomo.  McKee and his son, the secretary, had no knowledge of the geography of the area.  They had been in the Sonoma Valley about ten days before setting out with their party and in the Clear Lake basin one day before entering into treaty negotiations.

The Indian land cession map prepared by Charles C. Royce is in error.  Royce mapped a cession area not identified in Article 3 in the unratified treaty.

**6.  The Scotts Valley Band has argued that the property for a proposed "lands determination" at Vallejo is located with Royce Area Map No. 296.  This is true, but Charles C. Royce, the cartographer, misread the description of the lands ceded in the unratified treaty.**

Charles C. Royce was a federal cartographer who worked in Washington, D.C.  He attempted to map land cessions of all

115

AR0005504

treaties (ratified and unratified) entered into by the United States between September 7, 1778, and suspension of the treaty process in 1872. Royce had not visited California prior to developing the map—one of sixty-seven in the atlas attached to the chronological tables documenting Indian land cessions. Royce had no knowledge of the lay of the land in California and misread the treaty which only identified tribelets in the Clear Lake basin as ceding lands. The treaty, published in *Indian Laws & Treaties, Volume 2, Treaties* (Kappler 1927[4]:1108-1111) did not describe cession of lands south of Clear Lake to San Francisco and San Pablo bays.

The Wappo, Patwin, Lake Miwok, and Coast Miwok who lived between the Pomo and San Francisco Bay were not participants in the council of August 20, 1851. The treaty made no mention of them nor did Article 3 describe their lands.

## 7. The Scotts Valley Band has selectively used evidence to try to establish its significant "historical connection" to Vallejo and Solano County.

■ McClurken & Associates in three expert reports and in the condensed version of these reports by Stephen J. Bloxham omitted mention of Victoria Della Augustine's self-identification in the federal census of 1900 as a "Yackie" Indian, the daughter of "Yackies," and her immigration in 1861 from Mexico to California. This information only further clouds and confuses her uncertain ancestry.

■ McClurken & Associates in their reports and in the Bloxham condensed version have argued the fiction that Fernando Frese was the Patwin father of Victoria Della Augustine. Documentary evidence, however, indicates that Fernando was the second "husband" of Mary Frese. Albert Hurtado examined Victoria's ancestry and concluded that "someone impregnated Mary," but he did not find any proof it was Fernando. Descendants have testified Victoria's father was a Spaniard or a Mexican and that Mary, her mother, was kidnapped and taken to Mexico or to Spain before returning to California for Victoria's birth.

● McClurken & Associates have argued Patwin ancestry for the Augustine family because of the purported paternity of Victoria

116

by Fernando Frese. Victoria Della Augustine, however, self-identified as ½ Pomo (through her mother, Mary), and stated that her father was non-Indian.

■ McClurken & Associates have argued that Fernando Frese was a Patwin Indian because he was "born in the Carneros Valley." No evidence, however, identified him as Patwin. Fernando self-identified as "Clear Lake" in 1910. There is no documentation that the Augustine family is descended from a Patwin Indian, and most certainly it was not if Fernando Frese was Victoria's stepfather.

■ The experts writing reports for the Scotts Valley Band of Pomo, except for Dorothea Theodoratus, did not discuss the scholarly literature documenting tribal distribution north of San Francisco and San Pablo bays. Theodoratus limited her discussion only to the Pomo.

The scholarly accounts of tribal distribution are an extensive literature that commenced in 1853. The information was obtained from tribal members and covers languages and tribal distribution with identification of the region's ethnography. Many of the studies included maps. None of the report narratives reproduced these maps and generally ignored the documentation of the tribes living between the Pomo of Mendocino, Sonoma, and Lake counties and the tribes of Marin, Napa, and Solano counties to the south.

■ The Scotts Valley Band submitted family history materials in 2007 in its efforts to gain a lands determination near Richmond, California. The ancestry documentation in that material was based on the family histories of all in-marrying Indians. This is a disingenuous way to try to find tribal ancestors living south of Pomo country. For example, because a great granddaughter of Victoria Della Augustine married a person of Coast Miwok descent does not suddenly make that in-marrying person's ancestors the ancestral link of the Scotts Valley Band of Pomo to Marin County. This is a grossly dishonest representation.

■ Except for Dorothea Theodoratus, the other experts retained by the Scotts Valley Pomo, have argued that the tribe's ancestors possessed significant "historical connections" to San

117

AR0005506

Pablo Bay.  Albert Hurtado concluded: "Thus the North Bay region, including Rancho Suscol, Vallejo, and Solano County became part of the SVBI's historic territory" (Hurtado 2016:101).  In light of the lack of evidence in his report and 160 years of scholarly publications on tribal and language distribution in California, this statement is false and unsustainable.

**8. Table 1 (p. 111 of this report) is a tabulation of "Measures of Historical Connection" of the Scotts Valley Band of Pomo to Vallejo, California.  The table is based on twelve specific measures that were examined in six reports of experts retained by the Scotts Valley Band.  None of the reports documented any of the seventy-two measures of historical connection.**

The failure of the Scotts Valley Band in 100% of the measures is clear and unequivocal confirmation that it does not meet the essential "historical connection" for a lands determination at Vallejo.

AR0005507

# Bibliography

Anderson, Gary Clayton and Laura Lee Anderson, editors
    2015 *The Army Surveys of Gold Rush California: Reports of Topographical Engineers.* Norman: University of Oklahoma Press.

Augustine, Joe
    1928 Application No. 5779, California Indian Enrollment, Indians Qualified Under Section 1 of the Act of May 18, 1928. Central Classified Files, 1952-71. RG 75: Records of the Bureau of Indian Affairs, National Archives, Washington, D.C.

Augustine, Paul
    1928 Application No. 5781, California Indian Enrollment, Indians Qualified Under Section 1 of the Act of May 18, 1928. Central Classified Files, 1952-71. RG 75: Records of the Bureau of Indian Affairs, National Archives, Washington, D.C.

Augustine, Victoria
    1928 Application No. 5778, California Indian Enrollment, Indians Qualified Under Section 1 of the Act of May 18, 1928. Central Classified Files, 1952-71. RG 75: Records of the Bureau of Indian Affairs, National Archives, Washington, D.C.

Bancroft, Hubert Howe
    1874-76 *The Native Races of the Pacific States of North America.* 5 vols. New York: D. Appleton.

Barrett, Samuel Alfred
    ca. 1904 Pomo Informants. MSS 86172C, Samuel A. Barrett Papers, Box 12, Pomo Information Lists. Bancroft Library, University of California, Berkeley.

    1908a The Ethno-Geography of the Pomo and Neighboring Indians. *University of California Publications in American Archaeology and Ethnology*, 6(1):7-332.

    1908b Map of the Territory of the Pomo Linguistic Stock and of

AR0005508

the Adjacent Territories of other Linguistic Stocks Showing Dialectic Subdivisions and Village Sites, Map 1. The Ethno-Geography of the Pomo and Neighboring Indians. *University of California Publications in American Archaeology and Ethnology*, 6(1):7-332.

1908c Southern Territory of the Wintun Linguistic Stock, Map. 2. The Ethno-Geography of the Pomo and Neighboring Indians. *University of California Publications in American Archaeology and Ethnology*, 6(1):7-332.

1908d The Geography and Dialects of the Miwok Indians. *University of California Publications in American Archaeology and Ethnology*, 6(2):333-368.

Bean, Lowell John and Dorothea Theodoratus
1978 Western Pomo and Northeastern Pomo. In *Handbook of North American Indians*. Vol. 8, Robert F. Heizer, ed., 289-305.

Beckham, Stephen Dow
1969 George Gibbs, 1815-1873: Historian and Ethnologist. Ph.D. dissertation, Department of History, University of California, Los Angeles.

Bloxham, Steven J.
2016 Consolidated Report by Heather A. Howard, Ph.D., James M. McClurken, Ph.D., James M. McClurken & Associates. [Scotts Valley Band of Pomo Indians Request for Indian Land Determination, January 29, 2016]

Bureau of the Census
1850 Eighth Census of the United States, Microcopy 432, Roll 33, "Calavaras District," Calavaras County, California. RG 29: Records of the Bureau of the Census, National Archives, Washington, D.C.

1880 Tenth Census of the United States, Microcopy T-9, Roll 66, "Long Valley," Lake County, California. RG 29: Records of the Bureau of the Census, National Archives, Washington, D.C.

120

1900a Twelfth Census of the United States, Microcopy T-623, Roll 88, Enumeration District No. 46, Township Four, "Indian Population," and Population," Lake County, California. RG 29: Records of the Bureau of the Census, National Archives, Washington, D.C.

1900b Twelfth Census of the United States, Microcopy T-623, Roll 85, "Leesville," Colusa County, California. RG 29: Records of the Bureau of the Census, National Archives, Washington, D.C.

1910 Thirteenth Census of the United States, Microcopy T-624, Roll 78, Enumeration District #4, Scotts Valley Precinct, "Special Inquiries Relating to Indians," Lake County, California. RG 29: Records of the Bureau of the Census, National Archives, Washington, D.C.

1920 Fourteenth Census of the United States, T-625, Roll 101, Enumeration District 79, Township 3, Upper Lake Precinct; Enumeration District 80, Township 4, Lake County, California. RG 29: Records of the Bureau of the Census, National Archives, Washington, D.C.

1930 Fifteenth Census of the United States, T-626, Roll 120, Township 4, Enumeration District 6, Lake County, California. RG 29: Records of the Bureau of the Census, National Archives, Washington, D.C.

1940 Sixteenth Census of the United States, T-627, Roll 218, Enumeration District, Lake County California. RG 29: Records of the Bureau of the Census, National Archives, Washington, D.C.

Bureau of Indian Affairs

1905-06 Schedule Showing Non-Reservation Indians in Northern California, 1905-1906. RG 75: Records of the Bureau of Indian Affairs, CCF-California Special 5340-1909, 034. National Archives I, Washington, D.C. [Scotts Valley Band Bucket 1, No. 12]

1928-32 California Indian Enrollment, Indians Qualified Under Section 1 of the Act of May 18, 1928. Central Classified

121

AR0005510

Files, 1952-71.  RG 75: Records of the Bureau of Indian Affairs, National Archives, Washington, D.C.

1935 Indian Voters of the Scotts Valley Rancheria.  Sacramento Agency, Records of Indian Organizations, 1936-1946. Folder, Indian Reorganization Act #2, Indian Reorganization Act Referendum and Election Records, 1934; Indian Reorganization Act Referendum Ballots and Returns, 1935, Box 1.  RG 75: Records of the Bureau of Indian Affairs, National Archives, San Bruno, CA.

1940 Scotts Valley Rancheria Census, November 12. Miscellaneous Tribal Operations Records, 1970-1986, Census Folder 1 or 3a, Sacramento Agency.  RG 75: Records of the Bureau of Indian Affairs, National Archives, San Bruno, CA.

1948 Scotts Valley Rancheria Census, June 3.  Miscellaneous Tribal Operations Records, 1970-1986, Census Folder 1 or 3a, Sacramento Agency.  RG 75: Records of the Bureau of Indian Affairs, National Archives, San Bruno, CA.

1958 Scotts Valley Base Roll.  Private Collection, Scotts Valley Band of Pomo.  Appendix C, Ancestral Ties of the Scotts Valley Band of Pomo Indians to the San Francisco Bay Area, An Addendum to the Report Scotts Valley Pomo Use and Occupancy of the San Francisco Bay Area (7 June 2005) (Howard and McClurken 2007).

Driver, Harold E.
1936 Wappo Ethnography.  *University of California Publications in American Archaeology and Ethnology,* 36(3):179-220.

Gibbs, George
1851 Sketch of the northwestern part of California accompanying a journal of the expedition of Colonel Redick McKee, United States Indian Agent, during the summer and fall of 1851.  Map 47, Tube 123, RG 77: Records of the Office of Chief of Engineers, National Archives, Washington, D.C.

1853 Journal of the Expedition of Colonel Redick McKee, United

AR0005511

States Indian Agent, through Northwestern California.
Performed in the summer and fall of 1851.  In Henry
Rowe Schoolcraft (ed), *Information Respecting the
History, Condition and Prospects of the Indian Tribes of
the United States,* 3:99-177 (Philadelphia, 1853).

Gifford, E. W. and A. L. Kroeber
  1937 Culture Element Distributions: IV.  *University of California
       Publications in American Archaeology and Ethnology*,
       37(4):117-254.

Golla, Victor
  2011 *California Indian Languages*.  Berkeley: University of
       California Press.

Howard, Heather A., James M. McClurken, G. Russell Overton, William
  R. Cron, Jr., Laurie Elend, David A. Cripe
  2005 Scotts Valley Band of Pomo Use and Occupation of the San
       Francisco Bay Area.  Lansing, MI.: James M. McClurken &
       Associates.

Howard, Heather A. and James M. McClurken
  2007 Ancestral Ties of the Scotts Valley Band of Pomo Indians
       to the San Francisco Bay Area: *An Addendum to the
       Report Scotts Valley Pomo Use and Occupation of the San
       Francisco Bay Area (7 June 2005)*.  Lansing, MI.: James
       M. McClurken & Associates.

Howard, Heather A. and Joseph Quick, II
  2007 Historical Background for Response to Solicitor Inquiry
       Prepared for the Scotts Valley Band.  Lansing, MI.:
       McClurken & Associates.

Hurtado, Albert L.
  2016 Report, January 29, 2016.  Report submitted to Scotts
       Valley Band of Pomo.

Hutchison, E. A.
  1915 Census of the Scotts Valley and Lakeport Indians, Round
       Valley Agency, California, June 30.  Microcopy 595, Roll
       448, 1915:84-87.  Indian Census Rolls 1885-1940.  RG
       75: Records of the Bureau of Indian Affairs, National

123

Archives, Washington, D.C.

1916 Census of the Scott Valley and Lakeport Indians Round
        Valley Agency, California, June 30.  Microcopy 595, Roll
        448, 1916, frs. 166-169.  Indian Census Rolls 1885-1940.
        RG 75: Records of the Bureau of Indian Affairs, National
        Archives, Washington, D.C.

Johnson, John R.
    2006 On the Ethnolinguistic Identity of the Napa Tribe: The
        Implications of Chief Constancio Occaye's Narratives as
        Recorded by Lorenzo G. Yates. *Journal of California and
        Great Basin Anthropology* 26(2):193-204.

Johnson, Patti J.
    1978 Patwin.  In *Handbook of North American Indians*.  Vol. 8,
        Robert F. Heizer, ed., 350-360.

Kappler, Charles J., ed.
    1927 *Indian Laws and Treaties*.  Vol. 4, Treaties.  Washington,
        D.C.: Government Printing Office.

Kelly, Isabel
    1978 Coast Miwok.  In *Handbook of North American Indians*.
        Vol. 8, Robert F. Heizer, ed., 414-425.

Kelsey, C. M.
    1911 Schedule showing Indians in Scott Valley, Lake Co., Calif.
        Letter of May 26 to Commissioner of Indian Affairs.
        Central Classified Files 1907-1939, California Special, Box
        7, 86407-1909, 307.4. RG 75: Records of the Bureau of
        Indian Affairs, National Archives, Washington, D.C.

Kniffen, Fred B.
    1939 Pomo Geography.  *University of California Publications in
        American Archaeology and Ethnology*, 36(6):353-400.

Knobloch, Patricia J.
    1989 Isabel Truesdell Kelly (1906-1983).  *Women
        Anthropologists: Selected Biographies*, Ute Gacs, Jerrie
        McIntyre, and Ruth Weinberg, eds., 175-180.
        Champaign: University of Illinois Press.

124

AR0005513

Kroeber, Alfred Louis
　　1908 On the Evidence of the Occupation of Certain Regions by
　　　　the Miwok Indians. *University of California Publications in
　　　　American Archaeology and Ethnology*, 6(3):369-380.

　　1925 Handbook of the Indians of California. *Bureau of
　　　　American Ethnology Bulletin 78.* Washington, D.C.:
　　　　Smithsonian Institution.

Laszewski, Jim
　　2009 Samuel A. Barrett, 1879-1965. Http://www.mnsu.edu/
　　　　emuseum/information/biography/abcde/ barrett_ samuel.
　　　　html [Viewed 15 October 2016].

McConihe, J. W.
　　1917 Census of the Scott Valley and Lakeport Indians Round
　　　　Valley Agency, California, June 30. Microcopy 595, Roll
　　　　448, 1917, frs. 280-284. Indian Census Rolls 1885-1940.
　　　　RG 75: Records of the Bureau of Indian Affairs, National
　　　　Archives, Washington, D.C.

　　1918  Census of the Scott Valley and Lakeport Indians Round
　　　　Valley Agency, California, June 30. Microcopy 595, Roll
　　　　448, 1918, frs. 400-404. Indian Census Rolls 1885-1940.
　　　　RG 75: Records of the Bureau of Indian Affairs, National
　　　　Archives, Washington, D.C.

　　1919  Census of the Scott Valley and Lakeport Indians Round
　　　　Valley Agency, California, June 30. Microcopy 595, Roll
　　　　448, 1919. Indian Census Rolls 1885-1940. RG 75:
　　　　Records of the Bureau of Indian Affairs, National Archives,
　　　　Washington, D.C.

　　1920  Census of the Scott Valley and Lakeport Indians Round
　　　　Valley Agency, California, June 30. Microcopy 595, Roll
　　　　448, 1920, frs. 89-93. Indian Census Rolls 1885-1940.
　　　　RG 75: Records of the Bureau of Indian Affairs, National
　　　　Archives, Washington, D.C.

　　1921  Census of the Scott Valley and Lakeport Indians Round
　　　　Valley Agency, California, June 30. Microcopy 595, Roll
　　　　448, 1921, frs. 221-225. Indian Census Rolls 1885-1940.

AR0005514

RG 75: Records of the Bureau of Indian Affairs, National Archives, Washington, D.C.

1923  Census of the Scott Valley and Lakeport Indians Round Valley Agency, California, June 30.  Microcopy 595, Roll 448, 1923, frs. 493-496.  Indian Census Rolls 1885-1940. RG 75: Records of the Bureau of Indian Affairs, National Archives, Washington, D.C.

McKee, John
1853 Minutes Kept by John McKee, Secretary, on the Expedition from Sonoma, through Northern California.  Pp. 134-180 in U.S. Congress, Senate, *Senate Executive Document No. 4*, 33d Congress, Special Session (Serial 688). Washington, D.C.: Government Printing Office.

McKee, Redick
1851 Letter of September 12, 1851 to Luke Lea.  *Annual Report of the Commissioner of Indian Affairs . . . 1851*, pp. 236-41.  Washington, D.C.: Gideon & Company, Printers.

McLendon, Sally and Robert L. Oswalt
1978 Pomo: Introduction.  In *Handbook of North American Indians*.  Vol. 8, Robert F. Heizer, ed., 274-288.

McLendon, Sally and Michael J. Lowy
1978 Eastern Pomo and Southeastern Pomo.  In *Handbook of North American Indians*.  Vol. 8, Robert F. Heizer, ed., 306-323.

Merriam, C. Hart
1873 Report on the Mammals and Birds of the Expedition.  *Sixth Annual Report of the United States Geological Survey of the Territories*: 661–715.

1905-ff.  C. Hart Merriam Papers, Bancroft Library, University of California, Berkeley, California, MSS 80/18c.  Microfilm Reels 10 and 125.

1907 Distribution and Classification of the Mewan Stock in California.  *American Anthropologist* n.s. 9(2):338-357.

AR0005515

Milliken, Randall
       1995 A *Time of Little Choice: The Disappearance of Tribal
            Culture in the San Francisco Bay Area, 1769-1810.* Menlo
            Park: Ballena Press.

Osgood, Wilfred.
       1944  Biographical Memoir of Clinton Hart Merriam
            (1855-1942), *National Academy of Sciences of the United
            States of America Biographical Memoirs.* 24.

Palmer, Lyman L.
       1881 *Napa and Lake Counties, California.* San Francisco:
            Slocum, Bowen & Company, Publishers.

Park, Susan
       1971 Stephen Powers, California's First Ethnologist, Part 1.
            *Contributions of the University of California's
            Archaeological Research Facility, No. 28.* Berkeley:
            University of California.

Powers, Stephen
       1871 *Afoot and Alone: A Walk from Sea to Sea by the Southern
            Route, Adventures in Southern California, New Mexico,
            Arizona, Texas.* Hartford: Columbian Book Company.

       1877 Tribes of California. *Contributions to North American
            Ethnology* 3. Washington, D.C.: U.S. Geographical and
            Geological Survey of the Rocky Mountain Region.

Royce, Charles C.
       1899 Indian Land Cessions in the United States. *Eighteenth
            Annual Report of the Bureau of American Ethnology . . .
            Smithsonian Institution, 1896-1897.* Washington, D.C.:
            Government Printing Office.

Sawyer, Jesse O.
       1978 Wappo. In *Handbook of North American Indians.* Vol. 8,
            Robert F. Heizer, ed., 256-263.

Scotts Valley Band of Pomo
       1909 Petition of October 11 to Commissioner of Indian Affairs.
            Enclosure with letter of E. B. Fry to Ed Charley, November

127

AR0005516

    8, 1909, Central Classified Files, 1907-09, California Special, Box 2, 94623-1909, 162.  RG 75: Records of the Bureau of Indian Affairs, National Archives, Washington, D.C. [Exhibit in Appendix C (Howard and McClurken 2007).

Stewart, Omer Call
    1943 Notes on Pomo Ethnogeography. *University of California Publications in American Archaeology and Ethnology* 40(2):29-62.

Theodoratus, Dorothea
    2016 Report, January 29, 2016.  Report submitted to Scotts Valley Band of Pomo.

Vayda, Andrew P.
    1967 Pomo Trade Feasts.  In *Tribal and Peasant Economies: Readings in Economic Anthropology*, pp. 494-500.  Garden City: The American Museum of Natural History.

AR0005517

**Appendix A**

**Residents of Scotts Valley Rancheria, 1900,
Federal Census, Indian Schedule**

In 1900, George F. Martin, enumerator for the Bureau of the Census, visited the Scotts Valley Rancheria in Township Four, Lake County, California.  On June 18, 26, and 29 he compiled the population statistics of this community on the special schedule "Indian Population."  This form had 38 categories of information.  The manuscript record confirmed that Martin neatly and carefully solicited information for these categories and entered it onto the schedules provided by the Bureau of the Census.

Each head of household provided information on his or her age, gender, place of birth, tribal membership, tribe of father, tribe of mother, and other data on occupation, education or school status, and dwelling.  The 1900 Indian Schedule thus provided detailed information on the identity of the members of Scott Valley Band of Pomo resident at Scotts Valley.

Total households:            14
Total population:            57
Tribes enumerated:
      Digger       55
      Yackies       1
      Cherokee      1
         Total:       57

Martin, the census enumerator, used the racist term "Digger" to identify all Indians born in California.  In the case of Della Augustine, however, he wrote that she was born in Mexico and identified her tribe as "Yackies" [Yaqui], a Uto-Aztecan people living in Mexico, some of whom settled south of Tucson in the late nineteenth century. Laurence Barry was a Bannock Indian born in Idaho and John Combs was a Cherokee who did not know where he was born.

The census identified the birthplaces of the fifty-seven persons resident at Scotts Valley:

      California   54 [96.5% of population]
      Idaho        1 [1.75% of population]

129

| | | |
|---|---|---|
| Mexico | 1 [1.75% of population] |
| Unknown | 1 [1.75% of population] |

## Summary from 1900 Indian Schedule, Scotts Valley Rancheria

| Name | Gender | Age | Birthplace |
|---|---|---|---|
| **McCord, Charley** | M | 34 | California |
|     Tribe of Person: | Digger | | |
|     Tribe of Father: | Digger | | |
|     Tribe of Mother: | Digger | | |
| McCord, Rosa | F | 30 | California |
|     [Wife] | | | |
|     Tribe of Person: | Digger | | |
|     Tribe of Father: | Digger | | |
|     Tribe of Mother: | Digger | | |
| McCord, Clyde | M | 4 | California |
|     Tribe of Person: | Digger | | |
|     Tribe of Father: | Digger | | |
|     Tribe of Mother: | Digger | | |
| Bailey, William | M | 18 | California |
|     [Stepson] | | | |
|     Tribe of Person: | Digger | | |
|     Tribe of Father: | Digger | | |
|     Tribe of Mother: | Digger | | |
| **Moon, Solomon** | M | 26 | California |
|     Tribe of Person: | Digger | | |
|     Tribe of Father: | Digger | | |
|     Tribe of Mother | Digger | | |
| Moon, Lucy | F | 30 | California |
|     [Wife] | | | |
|     Tribe of Person: | Digger | | |
|     Tribe of Father: | Digger | | |
|     Tribe of Mother | Digger | | |
| Moon, Andy | M | 5 | California |
|     Tribe of Person: | Digger | | |
|     Tribe of Father: | Digger | | |
|     Tribe of Mother | Digger | | |
| Moon, Hazen | F | 3 | California |
|     Tribe of Person: | Digger | | |
|     Tribe of Father: | Digger | | |
|     Tribe of Mother | Digger | | |
| Moon, Baby | M | 8/12 | California |
|     Tribe of Person: | Digger | | |
|     Tribe of Father: | Digger | | |
|     Tribe of Mother | Digger | | |
| Bateman, Maggy | F | 14 | California |
|     [Stepdaughter] | | | |
|     Tribe of Person: | Digger | | |

130

AR0005519

| | | | |
|---|---|---|---|
| Tribe of Father: | Digger | | |
| Tribe of Mother | Digger | | |
| Bateman, Maud | F | 10 | California |
| Tribe of Person: | Digger | | |
| Tribe of Father: | Digger | | |
| Tribe of Mother | Digger | | |
| Thompson, Sallie [Aunt] | F | 70 | California |
| | | | |
| **Bartlett, Barteel** | M | 52 | California |
| Tribe of Person: | Digger | | |
| Tribe of Father: | Digger | | |
| Tribe of Mother | Digger | | |
| Bartlett, Susie [Wife] | F | 40 | California |
| Tribe of Person: | Digger | | |
| Tribe of Father: | Digger | | |
| Tribe of Mother | Digger | | |
| | | | |
| **Deming, Robert** | M | 52 | California |
| Tribe of Person: | Digger | | |
| Tribe of Father: | Digger | | |
| Tribe of Mother | Digger | | |
| Deming, Sarah [Wife] | F | 44 | California |
| Tribe of Person: | Digger | | |
| Tribe of Father: | Digger | | |
| Tribe of Mother | Digger | | |
| Deming, Walter | M | 12 | California |
| Tribe of Person: | Digger | | |
| Tribe of Father: | Digger | | |
| Tribe of Mother | Digger | | |
| Deming, Clara | F | 6 | California |
| Tribe of Person: | Digger | | |
| Tribe of Father: | Digger | | |
| Tribe of Mother | Digger | | |
| Deming, Lizzie | F | 3 | California |
| Tribe of Person: | Digger | | |
| Tribe of Father: | Digger | | |
| Tribe of Mother | Digger | | |
| Jours, Lucy [Aunt] | F | 80 | California |
| Tribe of Person: | Digger | | |
| Tribe of Father: | Digger | | |
| Tribe of Mother | Digger | | |
| | | | |
| **Augustine, Bob** | M | 50 | California |
| Tribe of Person: | Digger | | |
| Tribe of Father: | Digger | | |
| Tribe of Mother | Digger | | |
| Augustine, Della [Wife] | F | 40 | Mexico |

131

AR0005520

|  |  |  |  |
|---|---|---|---|
| Tribe of Person: | Yackies |  |  |
| Tribe of Father: | Yackies |  |  |
| Tribe of Mother | Yackies |  |  |
| Augustine, John | M | 15 | California |
| Tribe of Person: | Digger |  |  |
| Tribe of Father: | Digger |  |  |
| Tribe of Mother | Yackies |  |  |
| Augustine, Paul | M | 12 | California |
| Tribe of Person: | Digger |  |  |
| Tribe of Father: | Digger |  |  |
| Tribe of Mother | Yackies |  |  |
| Augustine, Bessie | F | 10 | California |
| Tribe of Person: | Digger |  |  |
| Tribe of Father: | Digger |  |  |
| Tribe of Mother | Yackies |  |  |
| Augustine, Louise | F | 8 | California |
| Tribe of Person: | Digger |  |  |
| Tribe of Father: | Digger |  |  |
| Tribe of Mother | Yackies |  |  |
| Augustine, Biar [Byron] | M | 6 | California |
| Tribe of Person: | Digger |  |  |
| Tribe of Father: | Digger |  |  |
| Tribe of Mother | Yackies |  |  |
| Augustine, Melvin | M | 3 | California |
| Tribe of Person: | Digger |  |  |
| Tribe of Father: | Digger |  |  |
| Tribe of Mother | Yackies |  |  |
|  |  |  |  |
| **Scotts Valley, Sam** | M | 65 | California |
| Tribe of Person: | Digger |  |  |
| Tribe of Father: | Digger |  |  |
| Tribe of Mother | Digger |  |  |
| Scotts Valley, Dick [Brother] | M | 70 | California |
| Tribe of Person: | Digger |  |  |
| Tribe of Father: | Digger |  |  |
| Tribe of Mother | Digger |  |  |
| Scotts Valley, Mamie [Niece] | F | 19 | California |
| Tribe of Person: | Digger |  |  |
| Tribe of Father: | Digger |  |  |
| Tribe of Mother | Digger |  |  |
|  |  |  |  |
| **Morgan, Charley** | M | 70 | California |
| Tribe of Person: | Digger |  |  |
| Tribe of Father: | Digger |  |  |
| Tribe of Mother | Digger |  |  |
| Morgan, Mary [Wife] | F | 71 | California |
| Tribe of Person: | Digger |  |  |
| Tribe of Father: | Digger |  |  |
| Tribe of Mother | Digger |  |  |

132

AR0005521

Morgan, Kate                      F       20      California
    Tribe of Person:        Digger
    Tribe of Father:        Digger
    Tribe of Mother         Digger
Augustine, Juanita                F       9       California
    [Granddaughter]
    Tribe of Person:        Digger
    Tribe of Father:        Digger
    Tribe of Mother         Digger

**Paredes, Rachel**               F       35      California
    Tribe of Person:        Digger
    Tribe of Father:        Digger
    Tribe of Mother         Digger
Praedes, Myrtle                   F       13      California
    Tribe of Person:        Digger
    Tribe of Father:        Digger
    Tribe of Mother         Digger

**Barry, Laurence**               M       49      Idaho
    Tribe of Person:        Bannock
    Tribe of Father:        Bannock
    Tribe of Mother:        Bannock

**Jones, Enoch**                  M       32      California
    Tribe of Person:        Digger
    Tribe of Father:        Digger
    Tribe of Mother         Digger
Jones, Lucy                       F       34      California
    [Wife]
    Tribe of Person:        Digger
    Tribe of Father:        White Man
    Tribe of Mother         Digger

Augustine, Pete                   M       55      California
    Tribe of Person:        Digger
    Tribe of Father:        Digger
    Tribe of Mother         Digger
Augustine, Mary                   F       50      California
    [Wife]
    Tribe of Person:        Digger
    Tribe of Father:        Digger
    Tribe of Mother         Digger
Augustine, Joe                    M       24      California
    Tribe of Person:        Digger
    Tribe of Father:        Digger
    Tribe of Mother         Digger
Augustine, Eliza                  F       21      California
    [Daughter-in-law]
    Tribe of Person:        Digger
    Tribe of Father:        Digger
    Tribe of Mother         Digger

AR0005522

| | | | |
|---|---|---|---|
| Augustine, Weston [Grandson] | M | 5 | California |
|    Tribe of Person: | Digger | | |
|    Tribe of Father: | Digger | | |
|    Tribe of Mother | Digger | | |
| Augustine, Clarence [Granddaughter ?] | F | 1 | California |
|    Tribe of Person: | Digger | | |
|    Tribe of Father: | Digger | | |
|    Tribe of Mother | Digger | | |
| **Rickabaw, Tom** | M | 70 | California |
|    Tribe of Person: | Digger | | |
|    Tribe of Father: | Digger | | |
|    Tribe of Mother | Digger | | |
| Rickabaw, Nanny [Wife] | F | 72 | California |
|    Tribe of Person: | Digger | | |
|    Tribe of Father: | Digger | | |
|    Tribe of Mother | Digger | | |
| **Boggs, Peter** | M | 65 | California |
|    Tribe of Person: | Digger | | |
|    Tribe of Father: | Digger | | |
|    Tribe of Mother | Digger | | |
| Boggs, Ellen [Wife] | F | 60 | California |
|    Tribe of Person: | Digger | | |
|    Tribe of Father: | Digger | | |
|    Tribe of Mother | Digger | | |
| **Post, Charley** | M | 67 | California |
|    Tribe of Person: | Digger | | |
|    Tribe of Father: | Digger | | |
|    Tribe of Mother | Digger | | |
| Post, Ellen [Wife] | F | 49 | California |
|    Tribe of Person: | Digger | | |
|    Tribe of Father: | Digger | | |
| Post, Ned | M | 22 | California |
|    Tribe of Person: | Digger | | |
|    Tribe of Father: | Digger | | |
|    Tribe of Mother | Digger | | |
| Post, Grace | F | 9 | California |
|    Tribe of Person: | Digger | | |
|    Tribe of Father: | Digger | | |
|    Tribe of Mother | Digger | | |
| Post, Francis | F | 4 | California |
|    Tribe of Person: | Digger | | |
|    Tribe of Father: | Digger | | |
|    Tribe of Mother | Digger | | |

134

AR0005523

**Combs, John**              M       67        Unknown
    Tribe of Person:      Cherokee
    Tribe of Father:      Cherokee
    Tribe of Mother      Cherokee
Combs, Mary              F       47        California
    [Wife]
    Tribe of Person:      Digger
    Tribe of Father:      Digger
    Tribe of Mother      Digger

135

## Appendix B

### Pomo Indians, Lakeport and Vicinity, 1905–06

In 1905-06 the Bureau of Indian Affairs compiled a "Schedule Showing Non-Reservation Indians in Northern California." The enumeration included Pomo Indians "Without land" and "Owning land" in "Lakeport and Vicinity" and nearby places.

    Total households:    22
    Total population:    67

## Lakeport and Vicinity: Without Land

| Family | Total |
|---|---|
| McCall & wife<br>1 child | 3 |
| Charley McCall | 1 |
| Old Sam Boxey | 1 |
| Old John | 1 |
| Fernando & wife<br>[Frias/Frese] | 2 |
| Manuel Frese & wife<br>1 child | 3 |
| Pete Warden & wife<br>1 child | 3 |
| Joe Paradise & wife<br>1 child | 3 |
| Woods & wife<br>7 children | 9 |
| Kate McCall<br>2 children | 3 |

136

| | |
|---|---|
| Pete Boggs & wife | 2 |
| Rock Hart & wife | 2 |
| Tony & wife<br>2 children | 4 |
| George Boxey & wife | 2 |
| Ed Charles & wife<br>4 children | 6 |
| Joe Augustine & wife<br>3 children | 5 |
| Pat Augustine & wife<br>1 step-mother | 3 |
| Casaret John & wife | 2 |
| Frank Buckley & wife | 2 |

**Lakeport and Vicinity: Owning Land**

| | |
|---|---|
| Pete Augustine & wife<br>Tom | 3 |

**Kelsey Creek: Living on land owned by Roman Catholic Church**

| | |
|---|---|
| Bob Augustine & wife<br>6 children | 8 |
| Francisco Posh | 1 |

(Bureau of Indian Affairs 1905-06)

137

AR0005526

## Appendix C

## Adult Residents of Scotts Valley Rancheria, 1909

On October 11, 1901, the adult residents of the "Scotts Val[le]y Indians, Lakeport, California, wrote to the Commissioner of Indian Affairs in Washington, D.C. "We the undersigned known as the Scotts Val[le]y Indians 48 in No. Ask you if you approve a Superintendent to appoint a Male Person and that he be in or near Lakeport which is about the center of the Indian population."

Enoch James
Ed Charley (x)
Coco (x)
Bartlet (x)
George Johnson
Solomon Moore
Charley Morgan (x)
Bob Fought (x)
Walter Fought (x)
Kate Charley (x)
Mckaro Charley (x)
Rockhart Charley (x)
Jim Buckro (x)
Jo Adames (x)
Sam S[?]
Earnest Boon (x)
Bob Augustine
Pete Augustine
Western Augustine
Clarance Augustine
Roger Augustine
John Augustine
Paul Augustine
Louis A[?]
Pete Warden
Elee Bateman
Andi Moore
William Patric
Fernandes Freece [Frese]
Jack Southerland
(Scotts Valley Band of Pomo 1909)

138

AR0005527

**Appendix D**

**Residents of Scotts Valley Rancheria, 1910**

In 1910, O. L. Stanley, enumerator for the Bureau of the Census, visited the Scotts Valley Rancheria in Scotts Valley Precinct, Lake County, California.  On May 3, 4, 5, and 21 he compiled the population statistics of this community on the special schedule "1910-- Indian Population."  This form had 46 categories of information.  The manuscript record confirmed that Stanley neatly and carefully solicited information for these columns and entered it onto the schedules provided by the Bureau of the Census.

Each head of household provided information on his or her age, gender, place of birth, tribal membership, the place of birth of their father, his tribal membership, the place of birth of their mother, her tribal membership, and comparable information in so far as it was known for all members of the household, including non-family members such as servants and boarders.  The 1910 Indian Schedule thus provided detailed information on the identity of the members of Scott Valley Band of Pomo resident at Scotts Valley.  The following summary covers that population:

| | |
|---|---|
| Total households: | 20 |
| Total population: | 80 |
| Tribes enumerated: | |
| Clear Lake | 72 |
| Pomo | 3 |
| Pitt River | 2 |
| Yuki | 1 |
| Unknown | 2 |

The census identified the birthplaces of the 80 persons resident at Scotts Valley:

Lake County:

| | |
|---|---|
| Scotts Valley | 29 |
| Big Valley | 25 |
| Upper Lake | 7 |
| Bachelor Valley | 2 |
| Lower Lake | 1 |
| Clear Lake | 1 |

139

AR0005528

```
        Lakeport          1
        Sulphur Bank      1
            Total:        67 [92.5% of population]

Mendocino County
        Hopland           1
        Sherwood Valley   1
        Near Ukiah        1
        Malpost           1
            Total:        5 [5.5% of population]

Napa County
        Camaro Valley     1
        Berryessa         1
        Near St. Helena   1
            Total:        3 [3.0% of population]

Sonoma County
        Near Sonoma       1
            Total:        1 [1.0% of population]

Humboldt County
        Humboldt          1
            Total:        1 [1.0% of population]

Shasta County
        Pitt River        1
            Total:        1 [1.0% of population]

At Sea
        Pacific Ocean     1 [1.0% of population]
            Total:        1

Unknown
        Unknown           1
            Total:        1 [1.0% of population]
```

　　　None of the members of the Scotts Valley community in 1910 was born in Solano County. Ninety-eight percent were born in Lake, Mendocino, Humboldt, and Shasta counties at least 70 miles distant from Vallejo, California, and most identified birthplaces 90 or more miles distant to the north. None of the tribal backgrounds in the

AR0005529

Scotts Valley community–self-identified by tribal members–was Patwin, Wappo, or Coast Miwok–tribes living in Solano, Napa, and Sonoma counties.  To the contrary, the rancheria population was 94% "Clear Lake" or "Pomo."  These people did not reside on the shores of San Pablo Bay or San Francisco Bay.

### Summary from 1910-Indian Population Schedule, Lake County

| Name | Gender | Age | Birthplace | Tribe of Individual |
|---|---|---|---|---|
| **Frios, Fernando** | M | 65 | Camaro Valley Napa | Clear Lake |
| Father's Birthplace: Unknown | | | | |
| Father's Tribe: Unknown | | | | |
| Mother's Birthplace: Unknown | | | | |
| Mother's Tribe: Unknown | | | | |
| Frios, Mary A. | F | 63 | Near Sonoma | Clear Lake |
| [Wife] | | | | |
| Father's Birthplace: California | | | | |
| Father's Tribe: Unknown | | | | |
| Mother's Birthplace: California | | | | |
| Mother's Tribe: Unknown | | | | |
| **Augustine, Robert** | M | 60 | Big Valley | Clear Lake |
| Father's Birthplace: Big Valley, Lake Co. | | | | |
| Father's Tribe: Clear Lake | | | | |
| Mother's Birthplace: Big Valley, Lake Co. | | | | |
| Mother's Tribe: Clear Lake | | | | |
| Augustine, Della | F | 45 | At sea | Clear Lake |
| [Wife] | | | | |
| Father's Birthplace: Camaro Valley, Napa | | | | |
| Father's Tribe: Clear Lake | | | | |
| Mother's Birthplace: Near Sonoma City, Sonoma | | | | |
| Mother's Tribe: Clear Lake | | | | |
| Augustine, John | M | 25 | Big Valley, Lake | Clear Lake |
| [Son] | | | | |
| Father's Birthplace: Clear Lake, Lake | | | | |
| Father's Tribe: Clear Lake | | | | |
| Mother's Birthplace: At sea | | | | |
| Mother's Tribe: Clear Lake | | | | |
| Augustine, Paul | M | 23 | Lakeport, Lake | Clear Lake |
| [Son] | | | | |
| Father's Birthplace: Clear Lake, Lake | | | | |
| Father's Tribe: Clear Lake | | | | |
| Mother's Birthplace: At sea | | | | |
| Mother's Tribe: Clear Lake | | | | |
| Augustine, Bessie | F | 20 | Sulphur Bank, Lake | Clear Lake |
| [Daughter] | | | | |
| Father's Birthplace: Clear Lake, Lake | | | | |
| Father's Tribe: Clear Lake | | | | |

141

AR0005530

Mother's Birthplace: At sea
Mother's Tribe: Clear Lake

Augustine, Louis          M    18    Scotts Valley, Lake    Clear Lake
[Son]
Father's Birthplace: Clear Lake, Lake
Father's Tribe: Clear Lake
Mother's Birthplace: At sea
Mother's Tribe: Clear Lake

Augustine, Roger         M    16    Scotts Valley, Lake    Clear Lake
[Son]
Father's Birthplace: Clear Lake, Lake
Father's Tribe: Clear Lake
Mother's Birthplace: At sea
Mother's Tribe: Clear Lake

**Sutherlin, Jerry**        M    28    Westport, Lake        Clear Lake
Father's Birthplace: Missouri
Father's Tribe: None
Mother's Birthplace: California
Mother's Tribe: Clear Lake

Sutherlin, Louise         F    29    Near St. Helena, Napa      Clear Lake
[Wife]
Father's Birthplace: Near Sonoma, Sonoma
Father's Tribe: Clear Lake
Mother's Birthplace: Sonoma, Sonoma
Mother's Tribe: Clear Lake

Sutherlin, Lafayette      M    6    Scotts Valley, Lake      Clear Lake
[Stepson]
Father's Birthplace: Westport, Lake
Father's Tribe: Clear Lake
Mother's Birthplace: Near Sonoma, Sonoma
Mother's Tribe: Clear Lake

Sutherlin, Theodore       M    2    Scotts Valley, Lake      Clear Lake
[Son]
Father's Birthplace: Westport, Lake
Father's Tribe: Clear Lake
Mother's Birthplace: Near St. Helena, Napa
Mother's Tribe: Clear Lake

**Berryessa, John**         M    80    Berryessa Valley, Napa     Clear Lake

**Patrick, William**        M    45    Big Valley, Lake         Clear Lake
Father's Birthplace: Big Valley, Lake
Father's Tribe: Clear Lake
Mother's Birthplace: Unknown
Mother's Tribe: Clear Lake

Patrick, Cardie           F    29    Upper Lake, Lake         Pomo
[Wife]
Father's Birthplace: Upper Lake, Lake
Father's Tribe: Pomo
Mother's Birthplace: Upper Lake, Lake
Mother's Tribe: Pomo

142

AR0005531

Patrick, Emma              F    10    Scotts Valley, Lake          Pomo
    [Step-Daughter]
    Father's Birthplace: Big Valley, Napa
    Father's Tribe: Clear Lake
    Mother's Birthplace: Upper Lake, Lake
    Mother's Tribe: Pomo
Patrick, Lucy M.           F    1     Hopland, Mendocino
    [Daughter]
    Father's Birthplace: Big Valley, Napa
    Father's Tribe: Clear Lake
    Mother's Birthplace: Upper Lake, Lake
    Mother's Tribe: Pomo
Bowsi                      F    80    Big Valley, Lake             Clear Lake
    [Mother]
    Father's Birthplace: Unknown
    Father's Tribe: Unknown
    Mother's Birthplace: Unknown
    Mother's Tribe: Unknown

**Morgan, Charles**        M    90[?]  Big Valley, Lake            Clear Lake
    Father's Birthplace: Big Valley, Lake
    Father's Tribe: Clear Lake
    Mother's Birthplace: Bachelor Valley, Lake
    Mother's Tribe: Pomo
Morgan, Kate               F    38    Bachelor Valley, Lake        Clear Lake
    [Daughter]
    Father's Birthplace: Big Valley, Lake
    Father's Tribe: Clear Lake    Mother's Tribe: Clear Lake
Morgan, Flora              F    12    Scotts Valley, Lake          Clear Lake
    [granddaughter]

    Mother's Birthplace: Big Valley, Lake
    Father's Birthplace: Unknown
    Father's Tribe: Unknown
    Mother's Birthplace: Unknown
    Mother's Tribe: Clear Lake
Morgan, Crawford           M    3     Scotts Valley, Lake          Clear Lake
    [grandson]
    Father's Birthplace: Unknown
    Father's Tribe: Unknown
    Mother's Birthplace: Unknown
    Mother's Tribe: Clear Lake
Sabine, Sam                M    80    Upper Lake, Lake             Pomo
    [Boarder]
    Father's Birthplace: Unknown
    Father's Tribe: Unknown
    Mother's Birthplace: Unknown
    Mother's Tribe: Unknown

**Morgan, Edward C.**      M    29    Scotts Valley, Lake          Clear Lake
    Father's Birthplace: Big Valley, Lake
    Father's Tribe: Clear Lake

143

AR0005532

Mother's Birthplace: Bachelor Valley, Lake
Mother's Tribe: Clear Lake

Morgan, Amy          F     30     Upper Lake, Lake         Pomo
[Wife]
Father's Birthplace: Unknown
Father's Tribe: Pomo
Mother's Birthplace: Unknown
Mother's Tribe: Pomo

Gilbert, McKinley     M    14    Scotts Valley, Lake    Clear Lake
[Stepson]
Father's Birthplace: Scotts Valley, Lake
Father's Tribe: Clear Lake
Mother's Birthplace: Upper Lake, Lake
Mother's Tribe: Clear Lake

Gilbert, Nina        F    11    Scotts Valley, Lake    Clear Lake
[Stepdaughter]
Father's Birthplace: Scotts Valley, Lake
Father's Tribe: Clear Lake
Mother's Birthplace: Upper Lake, Lake
Mother's Tribe: Clear Lake

**Morgan, Rockhart**    M    33    Scotts Valley, Lake    Clear Lake
[Also identified as Charley Rockhart in 1915, 1917, 1918]
Father's Birthplace: Big Valley, Lake
Father's Tribe: Clear Lake
Mother's Birthplace: Bachelor Valley, Lake
Mother's Tribe: Clear Lake

Morgan, Ellen       F    35    Upper Lake, Lake    Clear Lake
[Wife]
Father's Birthplace: Upper Lake, Lake
Father's Tribe: Clear Lake
Mother's Birthplace: Upper Lake, Lake
Mother's Tribe: Clear Lake

Thompson, Sallie    F    75    Upper Lake, Lake    Clear Lake
[Mother-in-law]
Father's Birthplace: Unknown
Father's Tribe: Clear Lake
Mothers' Birthplace: Unknown
Mother's Tribe: Clear Lake

**Johnson, George**    M    50    Sherwood Valley, Mendocino   Clear Lake
Father's Birthplace: Unknown
Father's Tribe: Clear Lake
Mother's Birthplace: Unknown
Mother's Tribe: Clear Lake

Johnson, Jennie    F    40    Scotts Valley, Lake    Clear Lake
[Wife]
Father's Birthplace: Scotts Valley, Lake
Father's Tribe: Clear Lake
Mother's Birthplace: Scotts Valley, Lake
Mothers' Tribe: Clear Lake

144

AR0005533

**Teet, Bah**                   M     65      Scotts Valley, Lake        Clear Lake
    Father's Birthplace: Unknown
    Father's Tribe: Clear Lake
    Mother's Birthplace: Unknown
    Mother's Tribe: Clear Lake
Teet, Susan                     F     60      Scotts Valley, Lake        Clear Lake
    [Wife] Father's Birthplace: Unknown
    Father's Tribe: Clear Lake
    Mother's Birthplace: Unknown
    Mother's Tribe: Clear Lake

**Moon, Solomon**               M     43      Scotts Valley, Lake        Clear Lake
    Father's Birthplace: Scotts Valley, Lake
    Father's Tribe: Clear Lake
    Mother's Birthplace: Scotts Valley, Lake
    Mother's Tribe: Clear Lake
Moon, Lucy                      F     60      Scotts Valley, Lake        Clear Lake
    [Wife]
    Father's Birthplace: Unknown
    Father's Tribe: Clear Lake
    Mother's Birthplace: Unknown
    Mother's Tribe: Clear Lake
Bateman, Alex B.                M     24      Scotts Valley, Lake        Clear Lake
    [Stepson]
    Father's Birthplace: Unknown
    Father's Tribe: Clear Lake
    Mother's Birthplace: Scotts Valley, Lake
    Mother's Tribe: Clear Lake
Bateman, Maggie                 F     22      Scotts Valley, Lake        Clear Lake
    [Stepdaughter]
    Father's Birthplace: Unknown
    Father's Tribe: Clear Lake
    Mother's Birthplace: Scotts Valley, Lake
    Mother's Tribe: Clear Lake
Bateman, Maud                   F     20      Scotts Valley, Lake        Clear Lake
    [Stepdaughter]
    Father's Birthplace: Unknown
    Father's Tribe: Clear Lake
    Mother's Birthplace: Scotts Valley, Lake
    Mother's Tribe: Clear Lake
Bateman, Andrew                 M     15      Scotts Valley, Lake        Clear Lake
    [Stepson]
    Father's Birthplace: Unknown
    Father's Tribe: Clear Lake
    Mother's Birthplace: Scotts Valley, Lake
    Mother's Tribe: Clear Lake
Bateman, Hazel                  F     11      Scotts Valley, Lake        Clear Lake
    [Stepdaughter]
    Father's Birthplace: Unknown
    Father's Tribe: Clear Lake
    Mother's Birthplace: Scotts Valley, Lake
    Mother's Tribe: Clear Lake

AR0005534

Bateman, Elmer     M   8    Scotts Valley, Lake    Clear Lake
   [Stepson]
   Father's Birthplace: Unknown
   Father's Tribe: Clear Lake
   Mother's Birthplace: Scotts Valley, Lake
   Mother's Tribe: Clear Lake

Bateman, Levina    F   5    Scotts Valley, Lake    Clear Lake
   [Daughter]
   Father's Birthplace: Unknown
   Father's Tribe: Clear Lake
   Mother's Birthplace: Scotts Valley, Lake
   Mother's Tribe: Clear Lake

Bateman, Lon W.    M   5    Scotts Valley, Lake    Clear Lake
   [Stepson]

Moon, Infant    F   1/12   Scotts Valley, Lake    Clear Lake
   [Child]
   Father's Birthplace: Unknown
   Father's Tribe: Clear Lake
   Mother's Birthplace: Scotts Valley, Lake
   Mother's Tribe, Clear Lake


**Bogg, Pete**    M   68    Big Valley, Lake    Clear Lake
   [Also identified as Pete Boggs, 1915, 1917, 1918]
   Father's Birthplace: Big Valley, Lake
   Father's Tribe: Clear Lake
   Mother's Birthplace: Big Valley, Lake
   Mother's Tribe: Clear Lake

Bogg, Lucy    F   65    Unknown    Clear Lake
   [Wife]
   Father's Birthplace: Unknown
   Father's Tribe: Clear Lake
   Mother's Birthplace: Unknown
   Mother's Tribe: Clear Lake

Jones, Enoch    M   40    Lower Lake, Lake    Clear Lake
   Father's Birthplace: Lower Lake, Lake
   Father's Tribe: Clear Lake
   Mother's Birthplace: Unknown
   Mother's Tribe: Clear Lake

Jones, Mary    F   40    Big Valley, Lake    Clear Lake
   [Wife]
   Father's Birthplace: Big Valley, Lake
   Father's Tribe: Clear Lake
   Mother's Birthplace: Big Valley, Lake
   Mother's Tribe: Clear Lake

Jones, Maggie    F   16    Big Valley, Lake    Clear Lake
   [Daughter]
   Father's Birthplace: Lower Lake, Lake
   Father's Tribe: Clear Lake
   Mother's Birthplace: Big Valley, Lake
   Mothers Tribe: Clear Lake

Jones, Lucy    F   12    Big Valley, Lake    Clear Lake
   [Daughter]

AR0005535

Father's Birthplace: Lower Lake, Lake
Father's Tribe: Clear Lake
Mother's Birthplace: Big Valley, Lake
Mothers Tribe: Clear Lake

**Posh, Ned**                        M       26      Big Valley, Lake              Clear Lake
Father's Birthplace: Big Valley, Lake
Father's Tribe: Clear Lake
Mother's Birthplace: Big Valley, Lake
Mother's Tribe: Clear Lake

Posh, Mary                          F       23      Big Valley, Lake              Clear Lake
[Wife]
Father's Birthplace: Big Valley, Lake
Father's Tribe: Clear Lake
Mother's Birthplace: Big Valley, Lake
Mother's Tribe: Clear Lake

Posh, William                       M       4       Big Valley, Lake              Clear Lake
[Son]
Father's Birthplace: Big Valley, Lake
Father's Tribe: Clear Lake
Mother's Birthplace: Big Valley, Lake
Mother's Tribe: Clear Lake

Posh, Susie                         F       2       Big Valley, Lake              Clear Lake
[Daughter]
Father's Birthplace: Big Valley, Lake
Father's Tribe: Clear Lake
Mother's Birthplace: Big Valley, Lake
Mother's Tribe: Clear Lake

**Mitchell, Wilford**               M       20      Upper Lake, Lake              Clear Lake
Father's Birthplace:  Upper Lake, Lake
Father's Tribe: Clear Lake
Mother's Birthplace: Unknown
Mother's Tribe: Clear Lake

**Faught, Robert (Kahone)** M       62      Near Ukiah, Mendocino         Yuki
Father's Birthplace: Ukiah, Mendocino
Father's Tribe: Yuki
Mother's Birthplace: Scotts Valley, Lake
Mother's Tribe: Clear Lake

Faught, Sarah                       F       46      Bachelor Valley, Lake         Pomo
[Wife]
Father's Birthplace: Bachelor Valley, Lake
Father's Tribe: Pomo
Mother's Birthplace: Bachelor Valley, Lake
Mother's Tribe: Pomo

Faught, Walter                      M       24      Scott Valley, Lake            Clear Lake
[Son]
Father's Birthplace: Near Ukiah, Mendocino
Father's Tribe: Yuki
Mother's Birthplace: Bachelor Valley, Lake
Mother's Tribe: Pomo

147

AR0005536

Faught, Clara             F     17      Scotts Valley, Lake       Clear Lake
    [Daughter]
    Father's Birthplace: Near Ukiah, Mendocino
    Father's Tribe: Yuki
    Mother's Birthplace: Bachelor Valley, Lake
    Mother's Tribe: Pomo
Faught, Lizzie            F     14      Scotts Valley, Lake       Clear Lake
    [Daughter]
    Father's Birthplace: Near Ukiah, Mendocino
    Father's Tribe: Yuki
    Mother's Birthplace: Bachelor Valley, Lake
    Mother's Tribe: Pomo
Faught, Pendy B.          M     6       Scotts Valley, Lake       Clear Lake
    [Son]
    Father's Birthplace: Near Ukiah, Mendocino
    Father's Tribe: Yuki
    Mother's Birthplace: Bachelor Valley, Lake
    Mother's Tribe: Pomo

**Augustine, Peter**      M     74      Big Valley, Lake          Clear Lake
    Father's Birthplace: Big Valley, Lake
    Father's Tribe: Clear Lake
    Mother's Birthplace: Big Valley, Lake
    Mother's Tribe: Clear Lake
Augustine, Joseph         M     40      Big Valley, Lake          Clear Lake
    [Son]
    Father's Birthplace: Big Valley, Lake
    Father's Tribe: Clear Lake
    Mother's Birthplace: Big Valley, Lake
    Mother's Tribe: Clear Lake
Augustine, May            F     40      Upper Lake, Lake          Clear Lake
    [Daughter-in-law]
    Father's Birthplace: Unknown
    Father's Tribe: Clear Lake
    Mother's Birthplace: Unknown
    Mother's Tribe: Clear Lake
Augustine, Weston         M     17      Big Valley, Lake          Clear Lake
    [Grandson[
    Father's Birthplace: Big Valley, Lake
    Father's Tribe: Clear Lake
    Mother's Birthplace: Upper Lake, Lake
    Mother's Tribe: Clear Lake
Augustine, Claude         M     10      Big Valley, Lake          Clear Lake
    [Grandson]
    Father's Birthplace: Big Valley, Lake
    Father's Tribe: Clear Lake
    Mother's Birthplace: Upper Lake, Lake
    Mother's Tribe: Clear Lake

**Osborne, William**      M     64      Pitt River, Shasta        Pitt River
    Father's Birthplace: Unknown
    Father's Tribe: Pitt River

AR0005537

Mother's Birthplace: Unknown
Mother's Tribe: Pitt River

Frios, Nancy            F    43    Humboldt                Unknown
    Father's Birthplace: Unknown
    Father's Tribe: Unknown
    Mother's Birthplace: Unknown
    Mother's Tribe: Unknown

Frios, Finnie          F    4     Malpost, Mendocino      Pitt River
    [Stepdaughter]
    Father's Birthplace: Pitt River, Shasta
    Father's Tribe: Pitt River
    Mother's Birthplace: Humboldt
    Mother's Tribe: Unknown


**Moranda, Frank**       M    34    Big Valley, Lake        Clear Lake
    Father's Birthplace: Big Valley, Lake
    Father's Tribe: Clear Lake
    Mother's Birthplace: Big Valley, Lake
    Mother's Tribe: Clear Lake

Moranda, Louisa        F    30    Big Valley, Lake        Clear Lake
    [Wife]
    Father's Birthplace: Big Valley, Lake
    Father's Tribe: Clear Lake
    Mother's Birthplace: Big Valley, Lake
    Mother's Tribe: Clear Lake

Moranda, Chris F.      M    5/12  Big Valley, Lake        Clear Lake
    Father's Birthplace: Big Valley, Lake
    Father's Tribe: Clear Lake
    Mother's Birthplace: Big Valley, Lake
    Mother's Tribe: Clear Lake


**Somorandi, Stanislaus** M   47    Clear Lake, Lake        Unknown
    Father's Birthplace: Chili [?]
    Father's Tribe: None
    Mother's Birthplace: Unknown
    Mother's Tribe: Unknown

Somorandi, Emma        F    24    Big Valley, Lake        Clear Lake
    [Wife]
    Father's Birthplace: Big Valley, Lake
    Father's Tribe: Clear Lake
    Mother's Birthplace: Big Valley, Lake
    Mother's Tribe: Clear Lake

Somorandi, Margaret    F    1     Big Valley, Lake        Clear Lake
    Father's Birthplace: Big Valley, Lake
    Father's Tribe: Unknown
    Mother's Birthplace: Big Valley, Lake
    Mother's Tribe: Clear Lake


**Hogan, Fred**          M    48    Big Valley, Lake        Clear Lake
    Father's Birthplace: Big Valley, Lake
    Father's Tribe: Unknown
    Mother's Birthplace: Big Valley, Lake

AR0005538

```
                    Mother's Tribe: Clear Lake
Hogan, Rosa                 F    50    Big Valley, Lake           Clear Lake
     [Wife]
          Father's Birthplace: Big Valley, Lake
          Father's Tribe: Unknown
          Mother's Birthplace: Big Valley, Lake
          Mother's Tribe: Clear Lake
Hogan, Daisy                F    13    Big Valley, Lake           Clear Lake
     [Daughter]
          Father's Birthplace: Big Valley, Lake
          Father's Tribe: Unknown
          Mother's Birthplace: Big Valley, Lake
          Mother's Tribe: Clear Lake
```

(Bureau of the Census 1910)

AR0005539

## Appendix E

## Residents of Scotts Valley Rancheria, 1911

On March 11, 1911, C. E. Kelsey, Indian Agent, compiled a "Schedule showing Indians in Scott Valley, Lake Co., Calif." (Kelsey 1911). The list included the following:

| Family | Total |
| --- | --- |
| Capt. Charles (McCall) Holder, 4 children | 5 |
| Barteet, wife | 2 |
| George Johnson | 1 |
| Ed Holder, wife, 2 children | 4 |
| McCall Holder, wife, 1 child | 3 |
| Joe Augustine, wife, 7 children | 9 |
| Bob Faught, wife, 3 children | 5 |
| Sol Moore, wife, 3 children | 5 |
| Alec Bateman, wife, 2 children | 4 |
| Enoch Jones, wife | 2 |
| Mrs. [Victoria] Augustine, daughter Bessie | 2 |
| Juan Frias, wife | 2 |
| Manuel Frias, wife, 6 children | 8 |
| Berryessa Tom | 1 |
| William Osborne | 1 |
| Sullivan, wife, 2 children | 4 |
| Total: | 58 |

151

## Appendix F

## Residents of Scotts Valley Rancheria, 1915

On June 30, 1915, E. A. Hutchison, Superintendent of the Round Valley Agency, compiled a census of the Scott Valley and Lakeport Indians, Lake County, California.

Total households:       20
Total population:       78

Summary from 1915 Indian Census, Scotts Valley and Lakeport

| Name | Gender | Relationship | Year of Birth |
|------|--------|--------------|---------------|
| **Augustine, Joe** | M | Husband | 1867 |
| Augustine, Mary | F | Wife | 1878 |
| Augustine, Weston | M | Son | 1892 |
| Augustine, Clarence | M | Son | 1898 |
| Augustine, Pete | M | Grandfather | 1832 |
| **Augustine, Della** | F | Mother | 1869 |
| Augustine, John | M | Son | 1886 |
| Augustine, Paul | M | Son | 1888 |
| Augustine, Byron | M | Son | 1894 |
| **Bartlette, Old** | M | Husband | 1822 |
| Bartlette, Susie | F | Wife | 1852 |
| **Boggs, Pete** | M | Husband | 1842 |
| **Buccaneer, Jim** | M | Alone | 1852 |
| **Faught, Bob** | M | Husband | 1857 |
| Faught, Sarah | F | Wife | 1862 |
| Faught, Lizzie | F | Daughter | 1894 |
| Faught, Walter | M | Son | 1889 |
| Faught, Lyda | F | Daughter | 1894 |
| Scudamore, Sam | M | Grandfather | 1842 |
| **Johnson, George** | M | Husband | 1865 |
| Johnson, Jennie | F | Wife | 1862 |
| **McCaw, Charley** | M | Husband | 1870 |
| McCaw, Rosa | F | Wife | 1862 |
| McCaw, Clyde | M | Son | 1895 |
| **Patrick, William** | M | Husband | 1867 |
| Patrick, Mary | F | Wife | 1872 |

152

AR0005541

| | | | |
|---|---|---|---|
| Patrick, Emma | F | Daughter | 1911 |
| Patrick, Baby | M | Son | 1911 |
| Parades, Rachel | F | Mother | 1857 |
| Parades, Myrtle | F | Daughter | 1889 |
| | | | |
| **Posh, Francisco** | M | Father | 1842 |
| Posh, Franc[e]s | F | Daughter | 1892 |
| | | | |
| **Posh, Ned** | M | Husband | 1877 |
| Posh, Barger Flora | F | Wife | 1898 |
| Posh, Marquite | F | Daughter | 1899 |
| Posh, Rodger | M | Son | 1902 |
| | | | |
| **Rockhart, Charley** | M | Husband | 1877 |
| Rockhart, Ellen | F | Wife | 1869 |
| | | | |
| **Thompson, Sally** | F | Mother | 1825 |
| Frios, Nancy | F | Mother | 1862 |
| Frios, Frank | M | Son | 1900 |
| Frios, Frederick | M | Son | 1902 |
| Frios, Manuel | M | Son | 1906 |
| Frios, Finney | M | Son | 1907 |
| Stillwell, Georgia | F | Daughter | 1895 |
| Stillwell, Willie | M | Son | 1897 |
| | | | |
| **Haron, Ellen (Mrs. C.A.)** | F | Mother | 1881 |
| Haron, Viola | F | Daughter | 1905 |
| Haron, Guadrify | M | Son | 1907 |
| Haron, Hazel | F | Daughter | 1909 |
| Haron, Leta | F | Daughter | 1911 |
| Haron, Baby | M | Son | 1915 |
| | | | |
| **Miranda, Ellen** | F | Mother | 1887 |
| Haron, Eva | F | Daughter | 1907 |
| Haron, Ruby | F | Daughter | 1910 |
| Haron, Ruth | F | Daughter | 1911 |
| | | | |
| **Holdor, Morgan Chas.** | M | Father | 1842 |
| Holdor, Kate | F | Daughter | 1867 |
| Crawford, Belton | M | Grandson | 1906 |
| | | | |
| **Jonas, Enoch** | M | Husband | 1872 |
| Jonas, Lucy | F | Wife | 1867 |
| | | | |
| **Sutherland, Jack** | M | Husband | 1872 |
| Sutherland, Louisa | F | Wife | 1872 |
| Sutherland, Lafayette | M | Son | 1902 |
| Sutherland, Tom | M | Son | 1908 |
| Sutherland, Isabella | F | Daughter | 1910 |
| | | | |
| **Warden, Pete** | M | Husband | 1848 |
| Warden, Florence | F | Wife | 1876 |

153

AR0005542

| | | | |
|---|---|---|---|
| **Woods, Mary** | F | Mother | 1874 |
| Woods, Lola | F | Daughter | 1894 |
| Woods, Erma | F | Daughter | 1897 |
| Woods, Sam | M | Son | 1899 |
| Woods, Beverly | F | Son | 1905 |
| Woods, Erick | M | Son | 1906 |
| Schomake, Lena | F | Daughter | 1897 |
| McEwen, Cecelia | F | Wife | 1890 |
| McEwen, Mary | F | Daughter | 1910 |
| McEwen, Elizabeth | F | Daughter | 1912 |

(Hutchison 1915)

154

AR0005543

# Appendix G

## Residents of Scotts Valley Rancheria, 1916

On June 30, 1918, W. W. McConihe, Superintendent of Round Valley Agency, compiled the census of the Indians of Scotts Valley Rancheria and Lakeport, Lake County, California.

Total Households:     22
Total Population:      73

### Summary from 1916 Census, Scotts Valley and Lakeport

| Name | Gender | Relationship | | Year of Birth |
|------|--------|--------------|---|---------------|
| **Augustine, Joe** | M | Husband | | 1867 |
| Augustine, Mary | F | Wife | | 1878 |
| Augustine, Weston | M | Son | | 1892 |
| Augustine, Clarence | M | Son | | 1898 |
| Augustine, Pete | M | Grandfather | 1832 | |
| | | | | |
| **Augustine, Della** | F | Mother | | 1869 |
| Augustine, John | M | Son | | 1886 |
| Augustine, Robert | M | Son | | 1914 |
| Augustine, Paul | M | Son | | 1898 |
| | | | | |
| **Augustine, Byron** | M | Husband | | 1894 |
| Augustine, Evaline [Ackerman] | F | Wife | | ? |
| Augustine, Delphina | F | Daughter | | 1912 |
| Augustine, Paul | M | Son | | 1914 |
| | | | | |
| **Bartlett, Old** | M | Husband | | 1822 |
| Bartlett, Susie | F | Wife | | 1852 |
| | | | | |
| **Boggs, Pete** | M | Single | 1842 | |
| | | | | |
| **Buccaneer, Jim** | M | Alone | 1852 | |
| | | | | |
| **Faught, Bob** | M | Husband | | 1857 |
| Faught, Sarah | F | Wife | | 1862 |
| | | | | |
| **Faught, Walter** | M | Husband | | 1889 |
| Faught, Lyda | F | Wife | | 1894 |
| Faught, Luther | M | Son | | 1910 |
| Faught, Elvira | F | Daughter | | 1912 |
| Scudamore, Sam | M | Grandfather | 1842 | |

155

| | | | |
|---|---|---|---|
| **Johnson, George** | M | Husband | 1863 |
| Johnson, Jennie | F | Wife | 1862 |
| | | | |
| McCaw, Charlie | M | Husband | 1870 |
| McCaw, Rosa | F | Wife | 1862 |
| McCaw, Clyde | M | Alone | 1895 |
| | | | |
| **Patrick, William** | M | Husband | 1867 |
| Patrick, Mary | F | Wife | 1872 |
| Patrick, Emma | F | Daughter | 1901 |
| Patrick, Unknown | M | Baby | 1911 |
| | | | |
| **Parades, Rachael** | F | Widow | 1867 |
| Parades, Myrtle | F | Daughter | 1899 |
| | | | |
| **Posh, Francisco** | M | Father | 1842 |
| Posh, Frances | F | Daughter | 1892 |
| Posh, Ned | M | Husband | 1877 |
| Posh, Flora Berger | F | Wife | 1898 |
| Posh, Marquito | F | Daughter | 1899 |
| Posh, Rodger | M | Son | 1902 |
| | | | |
| **Rockhart, Charley** | M | Husband | 1877 |
| | | | |
| **Heron, Ellen** (Mrs. C.A.) | F | Mother | 1881 |
| Heron, Viola | F | Daughter | 1905 |
| Heron, Guadrify | M | Son | 1907 |
| Heron, Hazel | F | Daughter | 1909 |
| Heron, Lete | F | Daughter | 1911 |
| Heron, Baby | F | Daughter | 1915 |
| | | | |
| **Miranda, Ellen** | F | Mother | 1887 |
| Heron, Eva | F | Daughter | 1907 |
| Heron, Unknown | M | Son | 1915 |
| Heron, Ruby | F | Daughter | 1910 |
| Heron, Ruth | F | Daughter | 1911 |
| Holdor, Drawford Belton | M | Grandson | 1906 |
| | | | |
| **Jones, Enoch** | M | Husband | 1872 |
| Jones, Lucy | F | Wife | 1867 |
| | | | |
| **Sutherland, Jack** | M | Husband | 1872 |
| Sutherland, Louisa | F | Wife | 1872 |
| Sutherland, Lafayette | M | Son | 1902 |
| Sutherland, Tom | M | Son | 1908 |
| Sutherland, Isabelle | F | Daughter | 1910 |
| | | | |
| **Warden, Peter** | M | Husband | 1848 |
| Warden, Florence | F | Wife | 1876 |
| | | | |
| **Woods, Mary** | F | Mother | 1874 |

AR0005545

| Woods, Lola | F | Daughter | 1894 |
| Woods, Erma | F | Daughter | 1897 |
| Woods, Sam | M | Son | 1899 |
| Woods, Beverly | M | Son | 1905 |
| Woods, Erick | M | Son | 1906 |
| **Shoemake, Lena** | F | Alone | 1897 |
| **McEwen, Cecelia** | F | Wife | 1890 |
| McEwen, Mary | F | Daughter | 1910 |
| McEwen, Elizabeth | F | Sister | 1912 |

(McCohnie 1916:166-169)

157

AR0005546

# Appendix H

## Residents of Scotts Valley Rancheria, 1917

On June 30, 1917, W. W. McConihe, Superintendent, Round Valley Agency, compiled a census of the Scotts Valley Rancheria, Lakeport, Lake County, California.

Total households:      35
Total population:      71

Summary from 1917 Indian Census, Scotts Valley Rancheria

| Name | Gender | Relationship | Year of Birth |
|------|--------|--------------|---------------|
| **Augustine, Joe** | M | Husband | 1867 |
| Augustine, Mary | F | Wife | 1878 |
| Augustine, Clarence | M | Son | 1898 |
| **Augustine, Weston** | M | Husband | 1892 |
| Augustine, Clara | F | Wife | 1892 |
| **Augustine, Peter** | M | Widower | 1832 |
| **Augustine, Della** | F | Mother | 1869 |
| Augustine, Robert | M | Grandson | 1914 |
| **Augustine, John** | M | Alone | 1886 |
| **Augustine, Paul** | M | Alone | 1888 |
| **Augustine, Bryan** | M | Alone | 1894 |
| **Augustine, Evaline** | F | Mother | 1894 |
| Augustine, Delphenia | F | Daughter | 1912 |
| **Bartlett, Old** | M | Husband | 1822 |
| Bartlett, Susie | F | Wife | 1852 |
| **Boggs, Pete** | M | Single | 1842 |
| **Buccaneer, Jim** | M | Alone | 1882 |
| **Faught, Bob** | M | Husband | 1889 |
| Faught, Sarah | F | Wife | 1862 |
| **Faught, Walter** | M | Husband | 1889 |
| Faught, Lyda | F | Wife | 1894 |
| Faught, Luther | M | Son | 1910 |

158

AR0005547

| | | | |
|---|---|---|---|
| **Johnson, George** | M | Husband | 1865 |
| Johnson, Jennie | F | Wife | 1862 |
| | | | |
| **McCaw, Charlie** | M | Widower/Alone | 1870 |
| | | | |
| **McCaw, Clyde** | M | Alone | 1895 |
| | | | |
| **Patrick, William** | M | Husband | 1867 |
| Patrick, Mary | F | Wife | 1872 |
| Patrick, Emma | F | Daughter | 1901 |
| Patrick, Unknown | M | Son | 1911 |
| | | | |
| **Parades, Rachael** | F | Widow | 1867 |
| | | | |
| **Parades, Myrtle** | F | Alone | 1899 |
| | | | |
| **Posh, Francisco** | M | Widower | 1842 |
| | | | |
| **Posh, Frances** | F | Daughter | 1892 |
| | | | |
| **Posh, Ned** | M | Husband | 1877 |
| Posh, Flora | F | Wife | 1898 |
| Posh, Rodger | M | Son | 1902 |
| | | | |
| **Posh, Marquite** | F | Single | 1899 |
| | | | |
| **Rockhart, Charley** | M | Husband | 1877 |
| Rockhart, Ellen | F | Wife | Unknown |
| | | | |
| **Heron, Ellen** | F | Mother | 1881 |
| Heron, Viola | F | Daughter | 1905 |
| Heron, Guadrify | M | Son | 1907 |
| Heron, Hazel | F | Daughter | 1909 |
| Heron, Lete | F | Daughter | 1911 |
| Heron, Unknown | F | Daughter | 1915 |
| | | | |
| **Miranda, Ellen** | F | Mother | 1887 |
| Heron, Eva | F | Daughter | 1907 |
| Heron, Unknown | M | Son | 1915 |
| Heron, Ruby | F | Daughter | 1910 |
| Heron, Ruth | F | Daughter | 1911 |
| Belton, David Crawford | M | Grandson | 1906 |
| | | | |
| **Jones, Enoch** | M | Husband | 1872 |
| Jones, Lucy | F | Wife | 1867 |
| | | | |
| **Sutherland, Jack** | M | Husband | 1872 |
| Sutherland, Louisa | F | Wife | 1872 |
| Sutherland, Lafayette | M | Son | 1902 |
| Sutherland, Tom | M | Son | 1908 |
| Sutherland, Isabelle | F | Daughter | 1910 |

159

AR0005548

| | | | |
|---|---|---|---|
| **Warden, Peter** | M | Husband | 1848 |
| Warden, Florence | F | Wife | 1876 |
| | | | |
| **Woods, Mary** | F | Mother | 1874 |
| Woods, Sam | M | Son | 1899 |
| Woods, Beverly | M | Son | 1905 |
| Woods, Erick | M | Son | 1906 |
| | | | |
| **Woods, Lola** | F | Alone | 1894 |
| | | | |
| **Woods, Erma** | F | Alone | 1897 |
| | | | |
| Shoemake, Lena | F | Alone | 1897 |
| | | | |
| **McEwen, Mary** | F | Orphan | 1910 |
| McEwen, Elizabeth | F | Sister | 1912 |
| MeEwen, Baby | F | Sister | 1917 |

(McConihe 1917:269-273)

AR0005549

## Appendix I

## Residents of Scotts Valley Rancheria, 1918

On June 30, 1918, Walter W. McConihe, Superintendent of Round Valley Agency, compiled the census of the Indians of Scotts Valley Rancheria and Lakeport, Lake County, California.

Total Households:    34
Total Population:    78

Summary from 1918 Census, Scotts Valley and Lakeport

| Name | Gender | Relationship | Year of Birth |
|---|---|---|---|
| **Augustine, Joe** | M | Father | 1867 |
| Augustine, Clarence | M | Son | 1898 |
| **Augustine, Newton** | M | Alone | 1892 |
| **Augustine, Peter** | M | Alone | 1832 |
| **Augustine, Della** | F | Grandmother | 1869 |
| Augustine, Robert | M | Grandson | 1914 |
| Augustine, Delphinia | F | Granddaughter | 1912 |
| **Augustine, John** | M | Alone | 1886 |
| **Augustine, Paul** | M | Alone | 1888 |
| **Augustine, Bryan** | M | Alone | 1894 |
| **Bartlett, Old** | M | Husband | 1822 |
| Bartlett, Susie | F | Wife | 1852 |
| **Boggs, Pete** | M | Single | 1842 |
| **Buccaneer, Jim** | M | Alone | 1852 |
| **Faught, Bob** | M | Husband | 1889 |
| Faught, Sarah | F | Wife | 1862 |
| **Faught, Clara** | F | Alone | 1892 |
| **Johnson, George** | M | Husband | 1865 |
| Johnson, Jennie | F | Wife | 1862 |
| **McCaw, Charlie** | M | Widower | 1870 |
| Barnes, Belton | M | Nephew | 1906 |

161

| | | | |
|---|---|---|---|
| **McCaw, Clyde** | M | Alone | 1895 |
| **Charlie, Ed** | M | Alone | Unknown |
| **Patrick, William** | M | Husband | 1867 |
| Patrick, Mary | F | Wife | 1872 |
| Patrick, Emma | F | Daughter | 1901 |
| Patrick, Lloyd | M | Son | 1917 |
| **Parades, Rachael** | F | Widow | 1867 |
| **Loncoe, Myrtle** | F | Mother | 1899 |
| Loncoe, Orville | M | Son | 1917 |
| Loncoe, Virginia | F | Daughter | 1915 |
| **Posh, Francisco** | M | Widower | 1842 |
| **Posh, Ned** | M | Husband | 1877 |
| Posh, Flora | F | Wife | 1898 |
| Posh, Rodger | M | Son | 1902 |
| Posh, Christiana | F | Daughter | 1916 |
| **Posh, Marquito** | F | Alone | 1899 |
| **Rockhart, Charley** | M | Husband | 1877 |
| Rockhart, Ellen | F | Wife | 1878 |
| **Heron, Ellen** | F | Mother | 1881 |
| Heron, Viola | F | Daughter | 1905 |
| Heron, Guadrify | M | Son | 1907 |
| Heron, Hazel | F | Daughter | 1909 |
| Heron, Lete | F | Daughter | 1911 |
| Heron, Unknown | F | Daughter | 1915 |
| Heron, Roy Douglas | M | Son | 1915 |
| Heron, Georgia Maria | F | Daughter | 1917 |
| **Miranda, Ellen** | F | Mother | 1887 |
| Heron, Eva | F | Daughter | 1907 |
| Heron, Eugene | M | Son | 1916 |
| Heron, Ruby | F | Daughter | 1910 |
| Heron, Ruth | F | Daughter | 1911 |
| Heron, Robert | M | Son | 1918 |
| **Jones, Enoch** | M | Husband | 1872 |
| Jones, Lucy | F | Wife | 1867 |
| **Sutherland, Jack** | M | Husband | 1872 |
| Sutherland, Louisa | F | Wife | 1872 |
| Sutherland, Lafayette | M | Son | 1902 |
| Sutherland, Tom | M | Son | 1908 |
| Sutherland, Isabelle | F | Daughter | 1910 |

AR0005551

| **Warden, Peter** | M | Husband | 1848 |
| Warden, Florence | F | Wife | 1876 |

| **Woods, Mary** | F | Mother | 1874 |
| Woods, Sam | M | Son | 1899 |
| Woods, Adrian | M | Son | 1901 |
| Woods, Beverly | F | Daughter | 1905 |
| Woods, Erick | M | Son | 1906 |

**Church, Lola** (Woods)    F    Mother    1894
[In 1920 Lola Church resided with her husband, Victor W. Church, white, age 36, and three children in Ukiah, CA. (Bureau of the Census, 1920, Ukiah, Mendocino Co., CA.)]

| Church, Winfred Ernest | M | Son | 1915 |
| Church, Arthur Samuel | M | Son | 1917 |
| Church, Lorena M. | F | Daughter | 1919 |

(Bureau of the Census 1920, Ukiah, Mendocino Co., CA.]

| **Hubbard, Erma (Woods)** | F | Mother | 1897 |
| Hubbard, Henry Neal | M | Son | 1916 |

| **Shoemake, Lena** | F | Alone | 1897 |

| **McEwen, Mary** | F | Orphan | 1910 |
| McEwen, Elizabeth | F | Sister | 1912 |
| MeEwen, Cecelia | F | Sister | 1917 |

| **Yee, John** | M | Husband | 1894 |
| Yee, Ethel | F | Wife | 1897 |
| Yee, Milford | M | Son | 1917 |

(McConlhe 1918:384-389)

AR0005552

## Appendix J

## Residents of Scotts Valley Rancheria, 1919

On June 30, 1919, Walter W. McConihe, Superintendent of Round
Valley Agency, compiled the census of the Indians of Scotts Valley and
Lakeport, Lake County, California.

Total Households:     35
Total Population:      77

Summary from 1919 Census, Scotts Valley and Lakeport

| Name | Gender | Relationship | Year of Birth |
|---|---|---|---|
| **Augustine, Byran** | M | Single | 1894 |
| **Augustine, Clarence** | M | Single | 1898 |
| **Augustine, Della** | F | Gr-Mother | 1869 |
| Augustine, Robert | M | Gr-Son | 1914 |
| Augustine, Delphina | F | Gr-Daughter | 1912 |
| **Augustine, Joe** | M | Alone | 1867 |
| **Augustine, John** | M | Alone | 1896 |
| **Augustine, Paul** | M | Alone | 1886 |
| **Augustine, Weston** | M | Single | 1892 |
| **Bartlett, Old** | M | Husband | 1822 |
| Bartlett, Susie | F | Wife | 1852 |
| **Charlie, Ed** | M | Alone | Unknown |
| **Church, Lola** | F | Mother | 1894 |

[In 1920 Lola Church resided with her husband, Victor W. Church, white, age 36, and three children in Ukiah, CA. (Bureau of the Census, 1920, Ukiah, Mendocino Co., CA.]

| Name | Gender | Relationship | Year of Birth |
|---|---|---|---|
| Church, Winfred | M | Son | 1915 |
| Church, Arthur | M | Son | 1917 |
| Church, Unknown | M | Son | 1918 |

[Lorena M. Church, daughter, age 15 months, 1920 (Bureau of the Census, 1920, Ukiah, Mendocino Co., CA.]

| Name | Gender | Relationship | Year of Birth |
|---|---|---|---|
| **Faught, Bob** | M | Husband | 1857 |

164

| | | | |
|---|---|---|---|
| [Died March 22, 1920] | | | |
| Faught, Sarah | F | Wife | 1862 |
| [Died March 12, 1920] | | | |
| | | | |
| **Faught, Clara** | F | Single | 1892 |
| | | | |
| **Heron, Ellen** | F | Mother | 1881 |
| Heron, Viola | F | Daughter | 1906 |
| Heron, Guadrify | M | Son | 1908 |
| Heron, Hazel | F | Daughter | 1909 |
| Heron, Lete | F | Daughter | 1911 |
| Heron, Roy | M | Son | 1915 |
| Heron, Georgia | F | Daughter | 1917 |
| Heron, Unknown | M | Son | 1919 |
| | | | |
| **Hubbard, Erma** | F | Mother | 1897 |
| Hubbard, Henry | M | Son | 1916 |
| Hubbard, Unknown | M | Son | 1919 |
| | | | |
| **Johnson, George** | M | Husband | 1865 |
| Johnson, Jennie | F | Wife | 1862 |
| | | | |
| **Jones, Enoch** | M | Husband | 1872 |
| Jones, Lucy | F | Wife | 1867 |
| | | | |
| **Longoor, Myrtle** | F | Mother | 1899 |
| Longsor, Orville | M | Son | 1917 |
| Longsor, Virginia | F | Daughter | 1915 |
| | | | |
| **McCaw, Charlie** | M | Widower | 1870 |
| McCaw, Belton | M | Nephew | 1906 |
| | | | |
| **McCaw, Clyde** | M | Single | 1895 |
| | | | |
| **McEwen, Mary** | F | Orphan | 1910 |
| McEwen, Elizabeth | F | Orphan | 1912 |
| McEwen, Cecelia | F | Orphan | 1917 |
| | | | |
| **Miranda, Ellen** | F | Mother | 1887 |
| Heron, Eva | F | Daughter | 1907 |
| Heron, Eugene | M | Son | 1916 |
| Heron, Ruby | F | Daughter | 1910 |
| Heron, Ruth | F | Daughter | 1918 |
| Heron, Robert | M | Son | 1918 |
| | | | |
| **Parades, Rachael** | F | Alone | 1867 |
| | | | |
| **Patrick, Emma** | F | Alone | 1901 |
| | | | |
| **Patrick, William** | M | Husband | 1867 |
| Patrick, Mary | F | Wife | 1872 |

AR0005554

| | | | |
|---|---|---|---|
| Patrick, Lloyd | M | Son | 1917 |
| **Posh, Francisco** | M | Alone | 1842 |
| **Posh, Marquito** | F | Single | 1899 |
| **Posh, Ned** | M | Husband | 1877 |
| Posh, Flora | F | Wife | 1898 |
| Posh, Rodger | M | Son | 1902 |
| Posh, Christina | F | Daughter | 1916 |
| **Rockhart, Charley** | M | Husband | 1877 |
| Rockhart, Ellen | F | Wife | 1878 |

[Daughter of Jim Bucheroo/Buccaneer, U.S. Census 1920, Scotts Valley, Lake County, CA.]

| | | | |
|---|---|---|---|
| **Shoemake, Lena** | F | Single | 1897 |
| **Sutherland, Jack** | M | Father | 1872 |

[Died August, 1919]

| | | | |
|---|---|---|---|
| Sutherland, Lafayette | M | Son | 1902 |
| Sutherland, Tom | M | Son | 1908 |
| Sutherland, Isabella | F | Daughter | 1910 |
| **Warden, Peter** | M | Husband | 1848 |
| Warden, Florence | F | Wife | 1876 |
| **Woods, Adrian** | M | Single | 1901 |
| **Woods, Mary** | F | Mother | 1874 |
| Woods, Beverly | M | Son | 1905 |
| Woods, Erick | M | Son | 1906 |
| **Woods, Sam** | M | Single | 1899 |
| **Yee, John** | M | Husband | 1894 |
| Yee, Ethel | F | Wife | 1897 |
| Yee, Milford | M | Son | 1917 |

(McConihe 1919)

AR0005555

## Appendix K

### Residents of Scotts Valley Rancheria, 1920, Indian Census

On June 30, 1920, Walter W. McConihe, Superintendent of Round
Valley Agency, compiled the census of the Indians of Scotts Valley and
Lakeport, Lake County, California.

Total Households:     34
Total Population:      74

### Summary from 1920 Census, Scotts Valley and Lakeport

| Name | Gender | Relationship | Year of Birth |
|------|--------|--------------|---------------|
| **Augustine, Byran** | M | Single | 1894 |
| **Augustine, Clarence** | M | Single | 1898 |
| **Augustine, Della** | F | Gr-Mother | 1869 |
| Augustine, Robert | M | Gr-Son | 1914 |
| Augustine, Delphina | F | Gr-Daughter | 1912 |
| **Augustine, Joe** | M | Alone | 1867 |
| **Augustine, John** | M | Alone | 1896 |
| **Augustine, Paul** | M | Alone | 1886 |
| **Augustine, Weston** | M | Single | 1892 |
| **Bartlett, Old** | M | Husband | 1822 |
| Bartlett, Susie | F | Wife | 1852 |
| **Charlie, Ed** | M | Alone | Unknown |
| **Church, Lola** | F | Mother | 1894 |

[In 1920 Lola Church resided with her husband, Victor W. Church, white,
age 36, and three children in Ukiah, CA. (Bureau of the Census,
1920, Ukiah, Mendocino Co., CA.]

| | | | |
|------|--------|--------------|---------------|
| Church, Winfred | M | Son | 1915 |
| Church, Arthur | M | Son | 1917 |
| Church, Unknown | M | Son | 1918 |

[Lorena M. Church, daughter, age 15 months, 1920 (Bureau of the Census,
1920, Ukiah, Mendocino Co., CA.]

167

AR0005556

| | | | |
|---|---|---|---|
| **Faught, Bob** | M | Husband | 1857 |
| [Died March 22, 1920] | | | |
| Faught, Sarah | F | Wife | 1862 |
| [Died March 12, 1920] | | | |
| | | | |
| **Faught, Clara** | F | Single | 1892 |
| | | | |
| **Heron, Ellen** | F | Mother | 1881 |
| Heron, Viola | F | Daughter | 1906 |
| Heron, Guadrify | M | Son | 1908 |
| Heron, Hazel | F | Daughter | 1909 |
| Heron, Lete | F | Daughter | 1911 |
| Heron, Roy | M | Son | 1915 |
| Heron, Georgia | F | Daughter | 1917 |
| Heron, Unknown | M | Son | 1919 |
| | | | |
| **Hubbard, Erma** | F | Mother | 1897 |
| Hubbard, Henry | M | Son | 1916 |
| Hubbard, Unknown | M | Son | 1919 |
| | | | |
| **Johnson, George** | M | Husband | 1865 |
| Johnson, Jennie | F | Wife | 1862 |
| | | | |
| **Jones, Enoch** | M | Husband | 1872 |
| Jones, Lucy | F | Wife | 1867 |
| | | | |
| **Longsor, Myrtle** | F | Mother | 1899 |
| Longsor, Orville | M | Son | 1917 |
| Longsor, Virginia | F | Daughter | 1915 |
| | | | |
| **McCaw, Charlie** | M | Widower | 1870 |
| McCaw, Benlton | M | Nephew | 1906 |
| | | | |
| **McCaw, Clyde** | M | Single | 1895 |
| | | | |
| **McEwen, Mary** | F | Orphan | 1910 |
| McEwen, Elizabeth | F | Orphan | 1912 |
| McEwen, Cecelia | F | Orphan | 1917 |
| | | | |
| **Miranda, Ellen** | F | Mother | 1887 |
| Heron, Eva | F | Daughter | 1907 |
| Heron, Eugene | M | Son | 1916 |
| Heron, Ruby | F | Daughter | 1910 |
| Heron, Ruth | F | Daughter | 1918 |
| Heron, Robert | M | Son | 1918 |
| | | | |
| **Parades, Rachael** | F | Alone | 1867 |
| | | | |
| **Patrick, Emma** | F | Alone | 1901 |
| | | | |
| **Patrick, William** | M | Husband | 1867 |

168

AR0005557

| | | | |
|---|---|---|---|
| Patrick, Mary | F | Wife | 1872 |
| Patrick, Lloyd | M | Son | 1917 |
| **Posh, Francisco** | M | Alone | 1842 |
| **Posh, Marquito** | F | Single | 1899 |
| **Posh, Ned** | M | Husband | 1877 |
| Posh, Flora | F | Wife | 1898 |
| Posh, Rodger | M | Son | 1902 |
| Posh, Christina | F | Daughter | 1916 |
| **Rockhart, Charley** | M | Husband | 1877 |
| Rockhart, Ellen | F | Wife | 1878 |

[Daughter of Jim Bucheroo/Buccaneer, U.S. Census 1920, Scotts Valley, Lake County, CA.]

| | | | |
|---|---|---|---|
| **Shoemake, Lena** | F | Single | 1897 |
| **Sutherland, Jack** | M | Father | 1872 |

[Died August, 1919]

| | | | |
|---|---|---|---|
| Sutherland, Lafayette | M | Son | 1902 |
| Sutherland, Tom | M | Son | 1908 |
| Sutherland, Isabella | F | Daughter | 1910 |
| **Warden, Peter** | M | Husband | 1848 |
| Warden, Florence | F | Wife | 1876 |
| **Woods, Adrian** | M | Single | 1901 |
| **Woods,Mary** | F | Mother | 1874 |
| Woods, Beverly | M | Son | 1905 |
| Woods, Erick | M | Son | 1906 |
| **Woods, Sam** | M | Single | 1899 |
| **Yee, John** | M | Husband | 1894 |
| Yee, Ethel | F | Wife | 1897 |
| Yee, Milford | M | Son | 1917 |

(McConihe 1920:89-93)

169

**Appendix L**

**Residents of Scotts Valley Rancheria, 1920,
Federal Census**

On January 6, 1920, Anna M. Evey, the census enumerator for
Lakeport, Township 4, included information for what she identified as
"Indian Rancheria 76 to 99 inclusive," the lines on the census form.
Evey's enumerations were for the Scotts Valley Rancheria. Evey made
a marginal note on the census schedule: "These Indians are married
Indian fashion, not legally."

Other Pomo tribal communities existed in the vicinity of Clear
Lake. On January 19, 20, 21 and 22, 1920, Frank Louis Vann,
enumerator of the Bureau of the Census, visited Pomo families living
on Indian Reservation Road, Township 3, Upper Lake Precinct, Lake
County, California. He compiled the population statistics of this
community on the general schedule of the Fourteenth Decennial
Census. Among the twenty-two households was Bob Augustine,
divorced, age 70. Augustine, his former wife, Della, and children
were listed in 1910 at Scotts Valley. Also in the Vann enumeration
were William and Caddie/Cardie Patrick and their children who in 1910
were residing at Scotts Valley Rancheria.

The Scotts Valley Rancheria community as listed by Anna M.
Evey had diminished significantly from the 1910 enumeration when O.
L. Stanley identified 20 households and 80 residents.

Total households:        6
Total population:        24
Tribes enumerated:       No tribes named

The census identified all 30 Indians as born in California.
Although some were of mixed Indian and white ancestry, the
enumerator gave all parental birthplaces as California.

Summary from 1920 Schedule, Scotts Valley Rancheria

Name                Gender      Age       Birthplace

Data recorded by Anna M. Evey, 1920

170

| | | | |
|---|---|---|---|
| **Rockhart, Charles** | M | 48 | California |
| Rockhart, Ellen [Wife] | F | 58 | California |
| Boone, Earnest [Nephew] | M | 24 | California |
| Boone, Edith [Niece] | F | 26 | California |
| Buckeroo, Jim [Father-in-law] | M | 78 | California |
| | | | |
| **Ray, Gene** | M | 25 | California |
| Ray, Bessie [Wife] | F | 29 | California |
| Ray, Theresa | F | 5 | California |
| Ray, Beatrice | F | 4 | California |
| Ray, Catherine | F | 9/12 | California |
| Ray, Mamie [Sister] | F | 17 | California |
| | | | |
| **Augustine, Weston** | M | 27 | California |
| Augustine, Lily [Wife] | F | 26 | California |
| Augustine, Francis [Son] | M | 4 | California |
| Augustine, Pete [Grandfather] | M | 70 | California |
| | | | |
| **Augustine, Victoria** | F | 55 | California |
| Augustine, Paul [Son] | M | 32 | California |
| Augustine, Delphina [Granddaughter] | F | 7 | California |
| Augustine, Robert [Grandson] | M | 6 | California |
| Augustine, Byron [Son] | M | 24 | California |
| | | | |
| **Faught, Bob** | M | 75 | California |
| Faught, Sarah [Wife] | F | 60 | California |
| | | | |
| **Bartlett** | M | 80 | California |
| Bartlett, Susie [Wife] | F | 64 | California |

(Bureau of the Census 1920)

Other Pomo tribal communities existed in the vicinity of Clear Lake. On January 19, 20, 21 and 22, 1920, Frank Louis Vann, enumerator of the Bureau of the Census, visited Pomo families living

171

AR0005560

on Indian Reservation Road, Township 3, Upper Lake Precinct, Lake County, California. He compiled the population statistics of this community on the general schedule of the Fourteenth Decennial Census. Among the twenty-two households was Bob Augustine, divorced, age 70. Augustine, his former wife, Della, and children were listed in 1910 at Scotts Valley. Also in the Vann enumeration were William and Caddie/Cardie Patrick and their children who in 1910 were residing at Scotts Valley Rancheria.

| **Augustine, Bob** | M | 70 | California |
|---|---|---|---|
| **Patrick, William** | M | 59 | California |
| Patrick, Caddie [Wife] | F | 35 | California |
| Tule, Emma [Daughter] | F | 19 | California |
| Tule, Lloyd | M | 7 | California |
| Tule, Ray | M | 2.6 | California |
| Tule, Irvin | M | 20 | California |

(Bureau of the Census 1920)

Several families enumerated on the Scotts Valley Rancheria, Indian Census Schedules, resided in 1920 on Martin Street, Lakeport, Lake County, CA.

| **Woods, May** [Widow] | F | 46 | California |
|---|---|---|---|
| Woods, Samuel [Son] | M | 21 | California |
| Woods, Adrain [Son] | M | 18 | California |
| Woods, Beverly [Son] | M | 15 | California |
| Woods, Eric [Son] | M | 13 | California |
| McEwen, Mary [Granddaughter] | F | 9 | California |
| McEwen, Beth [Granddaughter] | F | 7 | California |
| McEwen, Cecelia [Granddaughter] | F | 3 | California |
| **Worden, Peter** | M | 65 | California |
| Worden, Florence | F | 42 | California |
| **Praedes, Rachel** | F | 55 | California |

[Widow; Father born in Alabama; mother born in California.]

172

| | | | |
|---|---|---|---|
| Hubbard, Pearl O. [Not Indian] | M | 40 | Nebraska |
| **Hubbard, Irma E.** | F | 23 | California |
| Hubbard, Henry N. | M | 3 | California |
| Hubbard, Adrian L. | M | 11/12 | California |

(Bureau of the Census 1920)

173

AR0005562

## Appendix M

## Residents of Scotts Valley Rancheria, 1921

On June 30, 1921, Walter W. McConihe, Superintendent of Round Valley Agency, compiled the census of the Indians of Scotts Valley and Lakeport, Lake County, California.

Total Households:   33
Total Population:   74

### Summary from 1921 Census, Scotts Valley and Lakeport

| Name | Gender | Relationship | Year of Birth |
|---|---|---|---|
| **Augustine, Byron** | M | Husband | 1894 |
| Augustine, Clarence | M | Single | 1898 |
| **Augustine, Della** | F | Grandmother | 1869 |
| Augustine, Robert | M | Grandson | 1914 |
| Augustine, Delphina | F | Granddaughter | 1912 |
| **Augustine, Joe** | M | Single | 1867 |
| **Augustine, John** | M | Single | 1886 |
| **Augustine, Paul** | M | Single | 1888 |
| **Augustine, Weston** | M | Single | 1892 |
| **Bartlett, Old** | M | Husband | 1822 |
| Bartlett, Susie | F | Wife | 1862 |
| **Charlie, Ed** | M | Single | Unknown |
| **Church, Lola** | F | Mother | 1894 |
| Church, Winfred | M | Son | 1915 |
| Church, Arthur | M | Son | 1917 |
| Church, Unknown | M | Son | 1918 |
| **Faught, Clara** | F | Single | 1898 |
| **Heron, Ellen** | F | Mother | 1881 |
| Heron, Viola | F | Daughter | 1908 |
| Heron, Guadrify | M | Son | 1908 |
| Heron, Hazel | F | Daughter | 1909 |
| Heron, Leta | F | Daughter | 1911 |
| Heron, Roy | M | Son | 1915 |

174

AR0005563

| | | | |
|---|---|---|---|
| Heron, Georgia | F | Daughter | 1917 |
| Heron, Unknown | M | Son | 1919 |

| | | | |
|---|---|---|---|
| **Hubbard, Erma** [Irma] | F | Single | 1897 |

[In 1920 Irma Hubbard, wife, lived with her husband, Pearl O. Hubbard, age 40, on Martin Street, Lakeport, Lake Co., CA. (Bureau of the Census, 1920, Lakeport, Lake Co., CA.)]

| | | | |
|---|---|---|---|
| Hubbard, Henry | M | Son | 1916 |
| Hubbard, Unknown | M | Son | 1919 |

[Adrian Hubbard, 11/12 in 1920 (Bureau of the Census 1920, Lakeport, Lake County, CA.)

| | | | |
|---|---|---|---|
| **Johnson, George** | M | Husband | 1865 |
| Johnson, Jennie | F | Wife | 1862 |

| | | | |
|---|---|---|---|
| **Jones, Enoch** | M | Husband | 1872 |
| Jones, Lucy | F | Wife | 1867 |

| | | | |
|---|---|---|---|
| **Longsor, Myrtle** | F | Mother | 1899 |
| Longsor, Orville | M | Son | 1917 |
| Longsor, Virginia | F | Daughter | 1906 |

| | | | |
|---|---|---|---|
| **McCaw, Charlie** | M | Husband | 1870 |
| McCaw, Benlton | M | Nephew | 1906 |

| | | | |
|---|---|---|---|
| **McCaw, Clyde** | M | Single | 1895 |

| | | | |
|---|---|---|---|
| **McEwen, Mary** | F | Orphan | 1910 |
| McEwen, Elizabeth | F | Orphan | 1912 |
| McEwen, Cecelia | F | Orphan | 1917 |

| | | | |
|---|---|---|---|
| **Miranda, Ellen** | F | Mother | 1887 |
| Haron, Eva | F | Daughter | 1908 |
| Haron, Eugene | M | Son | 1915 |
| Haron, Ruby | F | Daughter | 1910 |
| Haron, Ruth | F | Daughter | 1918 |
| Haron, Robert | M | Son | 1918 |

| | | | |
|---|---|---|---|
| **Parades, Rachel** | F | Single | 1847 |

[In 1920 Rachel Praedes, age 55, widow, lived on Martin Street, Lakeport, Lake Co., CA. Her father was born in Alabama; mother born in California; she was a widow (Bureau of the Census, 1920, Lakeport, Lake Co., CA.]

| | | | |
|---|---|---|---|
| **Patrick, Emma** | F | Single | 1901 |

| | | | |
|---|---|---|---|
| **Patrick, William** | M | Husband | 1867 |
| Patrick, Emma | F | Wife | 1872 |
| Patrick, Lloyd | M | Son | 1917 |

175

AR0005564

| | | | |
|---|---|---|---|
| **Posh, Francisco** | M | Alone | 1842 |
| **Posh, Marquito** | F | Single | 1899 |
| **Posh, Ned** | M | Husband | 1877 |
| Posh, Flora | F | Wife | 1898 |
| Posh, Rodger | M | Son | 1902 |
| Posh, Christina | F | Daughter | 1916 |
| **Rockhart, Charley** | M | Husband | 1877 |
| Rockhart, Ellen | F | Wife | 1878 |
| **Shoemake, Lena** | F | Single | 1897 |
| **Sutherland, Lafayette** | M | Son | 1902 |
| Sutherland, Tom | M | Son | 1908 |
| Sutherland, Isabelle | F | Daughter | 1910 |
| **Warden, Peter** | M | Husband | 1845 |

[Resided on Martin Street, Lakeport, Lake County CA. (Bureau of the Census, 1920, Lakeport, Lake County, CA.)]

| | | | |
|---|---|---|---|
| Warden, Florence | F | Wife | 1876 |
| **Woods, Adrian** | M | Single | 1861 |
| **Woods, Mary** [May] | F | Mother | 1874 |

[Resided in 1920 on Martin Street, Lakeport, Lake Co., CA. (US Census, 1920, Lakeport, Lake Co., CA.)

| | | | |
|---|---|---|---|
| Woods, Beverly | M | Son | 1906 |
| Woods, Erick | M | Son | 1906 |
| **Woods, Sam** | M | Single | 1899 |
| **Yee, John** | M | Husband | 1894 |

[Chinese, Father born in China (US Census 1920, Lakeport, Lake Co., CA.]

| | | | |
|---|---|---|---|
| Yee, Ethel | F | Wife | 1897 |
| Yee, Wilfred [Milford] | M | Son | 1917 |

[Mary Frese, born ca. 1840 in Mexico, mother-in-law, living with this family in 1920 (US Census, Lakeport, Lake Co., CA.)

[Isabel Sutherlin, born 1913, cousin, living with this family in 1920 (US Census, 1920, Lakeport, Lake Co., CA.]

(McConihe 1921:221-225)

AR0005565

## Appendix N

## Residents of Scotts Valley Rancheria, 1923

On June 30, 1923, Walter W. McConihe, Superintendent of Round Valley Agency, compiled the census of the Indians of Scotts Valley and Lakeport, Lake County, California.

Total Households:
Total Population:    59

Summary from 1923 Census, Scotts Valley and Lakeport

| Name | Gender | Relationship Birth | Year of |
|------|--------|-------------------|---------|
| **Augustine, Byron** | M | Husband | 1894 |
| **Augustine, Clarence** | M | Single | 1898 |
| **Augustine, Della** | F | Grandmother | 1869 |
| Augustine, Robert | M | Grandson | 1914 |
| Augustine, Delphina | F | Granddaughter | 1913 |
| **Augustine, Pete** | M | Single | 1860 |
| **Augustine, Joe** | M | Single | 1867 |
| **Augustine, John** | M | Single | 1886 |
| **Augustine, Paul** | M | Single | 1888 |
| **Augustine, Weston** | M | Single | 1892 |
| Augustine, Michael | M | Son | 1920 |
| **Bartlett, Susie** | F | Single | 1852 |
| **Bucharia, Jim** [Buccaneer, Buckaroo?] | M | Single | 1860 |
| **Charlie, Ed** | M | Single | Unknown |
| **Church, Lola** | F | Mother | 1894 |
| [In 1920 Lola Church resided with her husband, Victor W. Church, white, age 36, and three children in Ukiah, CA. (Bureau of the Census, 1920, Ukiah, Mendocino Co., CA.] | | | |
| Church, Winfred | M | Son | 1915 |

177

| | | | |
|---|---|---|---|
| Church, Arthur | M | Son | 1917 |
| Church, John | M | Son | 1918 |

[Lorena M. Church, daughter, age 15 months, 1920 (Bureau of the Census, 1920, Ukiah, Mendocino Co., CA.]

| | | | |
|---|---|---|---|
| **Heron, Ellen** | F | Mother | 1881 |
| Heron, Viola | F | Daughter | 1908 |
| Heron, Guadrify | M | Son | 1908 |
| Heron, Hazel | F | Daughter | 1909 |
| Heron, Leta | F | Daughter | 1911 |
| Heron, Roy | M | Son | 1915 |
| Heron, Georgia | F | Daughter | 1917 |
| Heron, Herbert | M | Son | 1919 |

| | | | |
|---|---|---|---|
| **Hubbard, Erma** [Irma] | F | Single | 1897 |

[In 1920 Irma Hubbard, wife, lived with her husband, Pearl O. Hubbard, age 40, on Martin Street, Lakeport, Lake Co., CA. (Bureau of the Census, 1920, Lakeport, Lake Co., CA.)]

| | | | |
|---|---|---|---|
| Hubbard, Henry | M | Son | 1916 |
| Hubbard, Unknown | M | Son | 1919 |

[Adrian Hubbard, 11/12 in 1920 (Bureau of the Census 1920, Lakeport, Lake County, CA.)

| | | | |
|---|---|---|---|
| **Jones, Enoch** | M | Husband | 1872 |
| Jones, Lucy | F | Wife | 1867 |

| | | | |
|---|---|---|---|
| **Longsor, Myrtle** | F | Mother | 1899 |
| Longsor, Orville | M | Son | 1917 |
| Longsor, Virginia | F | Daughter | 1906 |

| | | | |
|---|---|---|---|
| **McCaw, Charlie** | M | Husband | 1870 |
| McCaw, Benlton | M | Nephew | 1906 |

| | | | |
|---|---|---|---|
| **McCaw, Clyde** | M | Single | 1895 |
| McCaw, Nina (Gilbert) | F | Wife | 1899 |

| | | | |
|---|---|---|---|
| **McEwen, Mary** | F | Orphan | 1910 |
| McEwen, Elizabeth | F | Orphan | 1912 |

| | | | |
|---|---|---|---|
| **Miranda, Ellen** | F | Mother | 1887 |
| Haron, Eva | F | Daughter | 1908 |
| Haron, Eugene | M | Son | 1915 |
| Haron, Ruby | F | Daughter | 1910 |
| Haron, Ruth | F | Daughter | 1918 |
| Haron, Robert | M | Son | 1918 |

| | | | |
|---|---|---|---|
| **Parades, Rachel** | F | Single | 1847 |

[In 1920 Rachel Praedes, age 55, widow, lived on Martin Street, Lakeport, Lake Co., CA. Her father was born in Alabama; mother born in California; she was a widow (Bureau of the Census, 1920, Lakeport, Lake Co., CA.]

178

AR0005567

| | | | |
|---|---|---|---|
| **Rockhart, Charley** | M | Husband | 1877 |
| Rockhart, Ellen | F | Wife | 1878 |
| | | | |
| **Schoemake, Lena** | F | Single | 1897 |
| | | | |
| **Sutherland, Lafayette** | M | Orphan | 1902 |
| Sutherland, Isabelle | F | Orphan | 1910 |
| | | | |
| **Warden, Florence** | F | Single | 1875 |
| | | | |
| **Woods, Adrian** | M | Single | 1901 |
| | | | |
| **Woods, Mary** | F | Mother | 1874 |
| Woods, Beverly | M | Son | 1905 |
| Woods, Erick | M | Son | 1906 |
| | | | |
| **Woods, Sam** | M | Single | 1899 |

(McConihe 1923:493–496)

179

AR0005568

## Appendix O

## Residents of Scotts Valley Rancheria, 1930

In April, 1930, Robert A. Kinleyside, the census enumerator for Lakeport, Township 4, listed the residents of the Scotts Valley Rancheria. These Indians resided in Township 4, Lake County, California. The families primarily lived on "Government Land" in the Scotts Valley Rancheria. On April 22 and 23, 1920, Kinleyside enumerated another Pomo community also living on "Government Land." The surnames confirm that this village included several families enumerated in 1910 by Frank Venn.

Total households:       12
Total population:       34
Tribes enumerated:      Pomo

The census identified all 34 Indians as born in California. The enumerator gave the place of birth of all persons as California. For the Father's Birthplace he then gave blood quantum data such as "Full" or "Mixed." For the Mother's Birthplace he gave tribal affiliation—consistently "Pomo" in every instance.

| Name | Gender | Age | Birthplace |
|------|--------|-----|------------|
| **Augustine, Victoria** [Widow; own land] Father: Full Mother: Pomo | F | 60 | California |
| Augustine, Paul Father: Mixed Mother: Pomo | M | 40 | California |
| Augustine, Della [Granddaughter] Father: Mixed Mother: Pomo | F | 16 | California |
| **Ray, Gene** [Government Land] Father: Mixed Mother: Pomo | M | 37 | California |
| Ray, Bessie [Wife] Father: Full Mother: Pomo | F | 38 | California |

180

| | | | |
|---|---|---|---|
| Ray, Tressa<br>Father: Mixed<br>Mother: Pomo | F | 16 | California |
| Ray, Beatrice<br>Father: Mixed<br>Mother: Pomo | F | 15 | California |
| Ray, Katherine<br>Father: Mixed<br>Mother: Pomo | F | 11 | California |
| Ray, Rose<br>Father: Mixed<br>Mother: Pomo | F | 9 | California |
| Ray, Gene, Jr.<br>Father: Mixed<br>Mother: Pomo | M | 7 | California |
| Ray, Douglas<br>Father: Mixed<br>Mother: Pomo | M | 5 | California |
| Ray, Merelin<br>Father: Mixed<br>Mother: Pomo | F | 8/12 | California |
| Ray, Chris<br>Father: Mixed<br>Mother: Pomo | M | 3 | California |
| **Augustine, Sarah**<br>[Widow; Government Land]<br>Father: Full<br>Mother: Pomo | F | 70 | California |
| **Augustine, Joe**<br>[Widower; Government Land]<br>Father: Full<br>Mother: Pomo | M | 65 | California |
| **May, John**<br>[Widower; Government Land]<br>Father: Full<br>Mother: Pomo | M | 60 | California |
| **Fisher, Lil**<br>[Widower; Government Land]<br>Father: Full<br>Mother: Pomo | M[?] | 60 | California |
| **Augustine, Byron**<br>[Divorced; Government Land]<br>Father: Mixed<br>Mother: Pomo | M | 35 | California |

181

AR0005570

| | | | |
|---|---|---|---|
| **McCaw, Clyde** | M | 35 | California |
| [Government Land] | | | |
| Father: Mixed | | | |
| Mother: Pomo | | | |
| McCaw, Clara | F | 32 | California |
| [Wife] | | | |
| Father: Mixed | | | |
| Mother: Pomo | | | |
| McCaw, Roselias | F | 10 | California |
| Father: Mixed | | | |
| Mother: Pomo | | | |
| | | | |
| **Ayers, Frank** | M | 28 | California |
| Father: Mixed | | | |
| Mother: Pomo | | | |
| | | | |
| **Barnes, Belton** | M | 25 | California |
| [Government Land] | | | |
| Father: Mixed | | | |
| Mother: Pomo | | | |
| | | | |
| **Pete, Tiney** | M | 26 | California |
| Father: Mixed | | | |
| Mother: Pomo | | | |
| Pete, Annie | F | 22 | California |
| [Wife] | | | |
| Father: Mixed | | | |
| Mother: Pomo | | | |
| Pete, Leona | F | 5 | California |
| Father: Mixed | | | |
| Mother: Pomo | | | |
| Pete, Velma | F | 2 | California |
| Father: Mixed | | | |
| Mother: Pomo | | | |
| | | | |
| **Augustine, Weston** | M | 40 | California |
| Father: Mixed | | | |
| Mother: Pomo | | | |
| Augustine, Mary | F | 35 | California |
| Father: Mixed | | | |
| Mother: Pomo | | | |
| Augustine, Leander | M | 15 | California |
| Father: Mixed | | | |
| Mother: Pomo | | | |
| Augustine, Lucenda | F | 12 | California |
| Father: Mixed | | | |
| Mother: Pomo | | | |
| Augustine, Susanna | F | 7 | California |
| Father: Mixed | | | |
| Mother: Pomo | | | |

182

AR0005571

Augustine, Michael          M              8    California
Father: Mixed
Mother: Pomo

**Ayers, Emma**              F              36   California
Father: Mixed
Mother: Pomo

(Bureau of the Census 1930)

183

## Appendix P

## Indian Voters, Scotts Valley Rancheria, 1935

| Name of Voter | Age | Birth Date |
|---|---|---|
| Augustine, Byron | 41 | 1894 |
| Augustine, Enos | 39 | 1896 |
| Augustine, Clarence | 37 | 1898 |
| Augustine, Lena (wife) | ? | ? |
| Augustine, Della | 66 | 1869 |
| Augustine, Delphine | 22 | 1913 |
| Augustine, Sarah (wife) | ? | ? |
| Charley, Ed | 65 | 1870 |
| Augustine, Paul | 47 | 1888 |
| Barnes, Belton | 29 | 1906 |
| Barnes, Grace (wife) | 19 | 1906 |
| McCall, Clyde | 40 | 1895 |
| McCall, Clara (wife) | ? | ? |
| Rockhart, Charley | 65 | 1870 |
| Ray, Eugene | 41 | 1894 |
| Ray, Bessie (wife) | ? | ? |

(Bureau of Indian Affairs 1935)

184

AR0005573

## Appendix Q

## Census, Scotts Valley Rancheria, November 12, 1940, Federal Census

On November 12, 1940, Michael Harrison of the Sacramento Agency compiled a census of the Scotts Valley Rancheria and enumerated the following residents.

Total Households:    9
Total Population:    22

| Name | Gender | Birth Date | Tribe | Blood Quantum |
|---|---|---|---|---|
| Anderson, Alvin | M | ? | Pomo | 4/4 |
| Anderson, Beulah (Augustine) [Wife] | F | 6-1-1929 | Pomo | 4/4 |
| Augustine, Joe [Widower] | M | 6-17-1872 | Pomo | 4/4 |
| Augustine, Weston | M | 5-14-1892 | Pomo | 4/4 |
| Augustine, Michael [Son] | M | 3-21-1923 | Pomo | 4/4 |
| Augustine, Byron | M | 2-2-1892 | Pomo | 4/4 |
| Augustine, Paul | M | 8-14-1887 | Pomo | 4/4 |
| Barnes, Belton | M | 4-8-1908 | Pomo | ½ |
| Barnes, Grace (Elliott) | F | 1-1-1907 | Pomo | 4/4 |
| Barnes, Lewey | M | 3-19-1932 | Pomo | 3/4 |
| Charley, Rock | M | 68 years | Pomo | 4/4 |
| Charley, Ed | M | 1875 | Pomo | 4/4 |
| Ray, Gene | M | 3-12-1892 | Pomo | 4/4 |
| Ray, Bessie (Augustine) | F | 8-7-1890 | Pomo | 4/4 |
| Ray, Gene, Jr. | M | 2-2-1922 | Pomo | 4/4 |
| Ray, Douglas | M | 6-2-1924 | Pomo | 4/4 |
| Ray, Christopher | M | 12-24-1926 | Pomo | 4/4 |
| Ray, Merline | F | 5-31-1929 | Pomo | 4/4 |
| Ray, George | M | 12-22-1930 | Pomo | 4/4 |

185

AR0005574

Anderson, Rudolph    M                ?                Pomo  4/4
  [Son of Alvin Anderson; died 9-6-1940 Sonoma County Hospital]
Anderson, Nelda
  Delores              F                8-9-1941        Pomo  4/4
  [Daughter of Alvin Anderson]

Arnold, Douglas
  Darold               M                7-19-1940        4/4
  [Grandson of Bessie (Augustine) Ray]

(Bureau of Indian Affairs 1940)

186

## Appendix S

## Census, Scotts Valley Rancheria, June 3, 1948

On June 3, 1948, the Bureau of Indian Affairs, Sacramento Agency, compiled a census of the residents of "Scotts Valley (Sugar Bowl) Rancheria."

Total Households:    10
Total Population:     27

| Name | Relationship | Age or Birth Date |
|---|---|---|
| Ray, Gene | Head | |
| Ray, Bessie Augustine | Wife | |
| Ray, Gene, Jr. | Son | |
| Ray, Douglas | Son | U.S. Army |
| Ray, Christopher | Son | |
| Ray, Merline | Daughter | |
| Ray, George | Son | |
| Ray, Theresa Boggs | Daughter | |
| | | |
| Miller, Nelson | Head | 39 |
| Miller, Rese | Wife | |
| Miller, Sylvia | Daughter | July 22, 1941 |
| Miller, Arvada | Daughter | November 22, 1943 |
| Miller, Byron | Son | November 28, 1944 |
| | | |
| Charley, Ed | Head | |
| | | |
| Augustine, Alvin | Head | |
| Augustine, Beulah (Anderson) | Wife | |
| Augustine, Delores | Daughter | 4 |
| | | |
| Augustine, Joe Adams | Head | |
| | | |
| Augustine, Westen | Head | |
| Augustine, Michael | Son | |
| | | |
| Augustine, Byron | Head | |
| | | |
| Augustine, Paul | Head | |
| | | |
| Barnes, Belton, Sr. | Head | |
| Barnes, Grace Elliot | Wife | |
| Barnes, Dewey | Son | March 17, 1932 |
| Barnes, Belton, Jr. | Son | November 11, 1943 |

188

AR0005576

Charley, Rock                          Aged
(Bureau of Indian Affairs 1948)

AR0005577

# Appendix T

## Distributees of Scotts Valley Rancheria, 1958

In 1958 the Bureau of Indian Affairs prepared a list of the members of the Scotts Valley Band of Pomo who were "distributees," namely recipients of fee patent deeds to the lots in the rancheria. The distribution of real property was the final step in Termination of the federal relationship with the Tribe.

| Name | Lot | Relationship | Birth Date | Address |
|---|---|---|---|---|
| Byron Augustine | 1 | Distributee | 2-02-1894 | General Delivery, Lakeport, CA. |
| Della Augustine Steele | | Daughter | 4-13-1913 | Same |
| Douglas, Joseph Ray | 2 | Distributee | 6-02-1924 | General Delivery, Lakeport, CA. |
| Bessie Ray | 3 | Distributee | 8-07-1891 | General Delivery, Lakeport, CA. |
| Joanna Boggs | | Granddaughter | 6-29-1945 | Same |
| Marlena Ray Arnold | 4 | Distributee | 5-30-1929 | General Delivery, Lakeport, ,CA. |
| Victoria Joyce Arnold | | Daughter | 3-25-1953 | Same |
| Victor D. Arnold | | Son | 3-31-1954 | Same |
| DeWayne Arnold | | Son | 8-25-1955 | Same |
| Rosia E. Miller | 5 | Distributee | 5-30-1929 | General Delivery, Lakeport, CA. |
| Sylvia Mary Miller | | Daughter | 7-22-1940 | Same |
| Arvada Delphine Miller | | Daughter | 11-22-1942 | Same |
| Henry Byron Miller | | Son | 11-28-1944 | Same |
| Leslie Anthony Miller | | Son | 9-29-1948 | Same |
| Clarence Michel Miller | | Son | 2-22-1952 | Same |
| Beatrice M. Arnold | 6 | Distributee | 7-23-1925 | PO Box 963, Corning, CA. |
| Jerridina C. Arnold | | Daughter | 6-24-1939 | Same |
| Kenneth A. Arnold, JR. | | Son | 8-22-1941 | Same |
| Phyllis Arnold | | Daughter | 10-04-1942 | Same |
| Virgil Arnold | | Son | 6-05-1944 | Same |
| Gary Arnold | | Son | 6-23-1947 | Same |

190

AR0005578

| Donald Arnold | | Son | 5-17-1949 | Same |
|---|---|---|---|---|
| Chris M. Ray | 7 | Distributee | 12-24-1926 | General Delivery, Lakeport, CA. |
| Mae Rose Ray | | Wife | 5-25-1928 | Same |
| Chris M. Ray, Jr. | | Son | 3-08-1951 | Same |
| Eugene E. Ray | | Son | 6-17-1952 | Same |
| Rose Mary Ray | | Daughter | 4-05-1954 | Same |
| Frederick K. Ray | | Son | 11–09-1956 | Same |
| Sue Anna Ray | | Daughter | 12-22-1952 | Same |
| Thelma Pearl Boggs | 8 | Distributee | 6-29-1934 | General Delivery, Lakeport, CA. |
| Diana Louisa Boggs | | Daughter | 2-21-1947 | Same |
| Elaine Edwina Boggs | | Daughter | 7-07-1948 | Sam |
| Shirley Ann Boggs | | Daughter | 4-18-1950 | Same |
| Gloria Maria Salas | | Daughter | 10-27-1952 | Same |
| Bennett Elliott | | Joint Distri-butee with Wife | 4-11-1912 | Rt. 1, Box 186, Lakeport, CA. |
| Beulah Elliott | | Wife | 4-01-1919 | Same |
| Dale Elliott | | Son | 6-10-1947 | Same |
| Ignatius Elliott | | Son | 10-13-1948 | Same |
| Arlene Elliott | | Daughter | 7-09-1954 | Same |
| Delores Elliott | | Stepdaughter | 8-11-1941 | Same |
| George L. Ray | 10 | Distributee | 10-22-1931 | General Delivery, Lakeport, CA. |
| George L. Ray, Jr. | | Son | 6-25-1956 | Same |
| Belton Barnes | 11 | Distributee | 10-20-1906 | General Delivery, Lakeport, CA. |
| Grace Barnes | | Wife | 1-01-1907 | Same |
| Arvila Barnes | | Daughter | 8-24-1947 | Same |
| Belton Barnes | | Son | 11-11-1944 | Same |

(Bureau of Indian Affairs 1958)

AR0005579

    

MIWOK     United Auburn Indian Community
MAIDU     of the Auburn Rancheria

| Gene Whitehouse | John L. Williams | Danny Rey | Jason Camp | Calvin Moman |
| Chairman | Vice Chairman | Secretary | Treasurer | Council Member |

November 7, 2016

Mr. Lawrence S. Roberts
Principal Deputy Assistant Secretary -
 Indian Affairs
U.S. Department of the Interior
Mail Stop 3642
1849 C Street, NW
Washington, D.C. 20240

> **RECEIVED**
>
> NOV **8** 2016
>
> **AS - IA**
> **Office of Indian Gaming**

Subject: Scotts Valley Band of Pomo Indians – Request for "Restored Lands" in the City of Vallejo, Solano County, California

Dear Mr. Roberts:

On behalf of the United Auburn Indian Community ("United Auburn"), enclosed is a detailed historical report prepared by Dr. Stephen Dow Beckham, Professor of History Emeritus at Lewis & Clark College.

This report was commissioned by United Auburn to help the Department evaluate whether particular land purchased in the City of Vallejo for the Scotts Valley Band of Pomo Indians ("Scotts Valley Band") qualified for gaming under the "restored lands" exception of the Indian Gaming Regulatory Act. We understand the requested Indian Lands Determination will be issued before the Department processes the fee-to-trust application that Scotts Valley has filed for the subject parcel.

In order to qualify for a restored lands exception, the Scotts Valley Band must demonstrate that it has a "significant historical connection" to this land in Solano County, despite the fact that the parcel is located more than 90 miles in driving distance from the Band's homelands in Lake County, California. The targeted land is also within the aboriginal territory of the Yocha Dehe Wintun Nation and other Indians of Patwin heritage.

Dr. Beckham's report presents conclusive evidence that the Scotts Valley Band lacks a significant historical connection to this land in Solano County. The unratified 1851 treaty upon which Scotts Valley relies, the Treaty of Lupiyuma, did not describe any cession of lands used and occupied by the signatory tribes, as was the case for all of the 1851-52 unratified treaties. All of these only described the lands to be reserved. That does not help Scotts Valley here, since

Tribal Office   10720 Indian Hill Road   Auburn, CA 95603   (530) 883-2390   FAX (530) 883-2380

AR0005580

RECEIVED

AS IA
Office of Indian Gaming

the lands reserved for the Clear Lake Indians were not within Solano County, but rather, the general area that is now Lake County, their homelands and where the Treaty of Lupiyuma was negotiated. In addition, the Treaty was signed by eight different tribes and the Interior Department already determined that the Scotts Valley Band could not document that any of the ceded lands were lands in the exclusive possession and control of the Band.[1]

The Scotts Valley Band also relies on a map that was created 48 years after the Treaty was signed, by a cartographer who was not familiar with the State of California, and who was asked to delineate the lands ceded (but not described by) the Treaty of Lupiyuma. As Dr. Beckham's report demonstrates, the cartographer incorrectly assumed that this unratified 1851 Treaty included the Wappo, Southern Patwin, and Coast Miwok tribes to the south, when these tribes were not involved in the negotiation of this Treaty.

Finally, the Scotts Valley Band offers no historical documentation demonstrating the existence of "villages, burial grounds, occupancy, or subsistence use" in Solano County, as required by Interior regulations. Instead, the Band is only able to provide inferred or circumstantial evidence, based on several unsubstantiated and transient non-tribal contacts in the area now known as Solano County. The Department should reject this approach in any Indian Lands Determination, as it did in its 2012 decision involving the Scotts Valley Band's proposal for a casino in Contra Costa County, California.[2]

United Auburn urges the Department to deny the request by the Scotts Valley Band for a restored lands exception, based on the historical documentation presented in Dr. Beckham's report and the lack of any reliable evidence of a significant historical connection to any lands in Solano County, California.

Sincerely,

Gene Whitehouse
Chairman

Enclosure

---

[1] Letter from Donald E. Laverdure, Acting Assistant Secretary – Indian Affairs, U.S. Department of the Interior, to The Honorable Donald Arnold, Chairperson, Scotts Valley Band of Pomo Indians, at 14, May 25, 2012 ("The land that the Band's Ca-la-na-po ancestors' thus ceded could exist anywhere in Royce Area 296, which extends south to the San Pablo Bay, but also extends north to the Clear Lake area.").

[2] *Id.* at 9-10 ("There is no actual evidence in the record to support such an assumption. The Department will not draw any firm conclusions from such inferences. Part 292 requires reliable documentation of use or occupancy; inferences are insufficient to establish a significant historical connection."). *See also* Gaming on Trust Lands Acquired After October 17, 1988, 73 Fed. Reg. 29,354, at 29,366 (May 20, 2008) ("The definition of 'significant historical connection' establishes criteria which requires something more than evidence that a tribe merely passed through a particular area.").

cc: Paula Hart, Office of Indian Gaming
    Jennifer Turner, Office of the Solicitor
    Bethany Sullivan, Office of the Solicitor

AR0005583



November 8, 2016

Tribal Council

Leland Kinter
Chairman

James Kinter
Secretary

Anthony Roberts
Treasurer

Mia Durham
Member

Matthew Lowell, Jr.
Member

**Via Electronic Mail and Federal Express**

The Honorable Lawrence Roberts
Principal Deputy Assistant Secretary for Indian Affairs
lawrence.roberts@ios.doi.gov
MS-3642-MIB
U.S. Department of the Interior
1849 C St. N.W.
Washington, D.C. 20240

Re:    The Yocha Dehe Wintun Nation's Response to the Scotts Valley Band of
       Pomo Indians' Request for "Restored Lands" in the City of Vallejo,
       Solano County, California, Under the Indian Gaming Regulatory Act

Dear Assistant Secretary Roberts:

On behalf of the Yocha Dehe Wintun Nation, I write to thank you for meeting with us in Riverside, California, on August 30, 2016, and for additionally agreeing to delay making a decision on the Scotts Valley Band of Pomo Indians' request for a determination of whether land located in the City of Vallejo, California, would be eligible for gaming pursuant to the Indian Gaming Regulatory Act (IGRA) and its implementing regulations, until we had an opportunity to submit our views on the merits of the request. We respectfully submit that Scotts Valley cannot make the required showing.

As we explained during our visit, Scotts Valley's request to have lands in the City of Vallejo "restored" for its use under the IGRA — to build a casino — is of deep concern to Yocha Dehe. This is Patwin territory, and it is an area with which we maintain strong connections. Along with its two sister Patwin tribes, Yocha Dehe has been identified by the California Native American Heritage Commission as the "Most Likely Descendant" for purposes of Native American remains in Solano County, a regulatory designation confirming the State of California's view that the Patwin groups are those with a significant historical connection to the Vallejo area. We have worked many years to build up our cultural resource department, and to strengthen relations with surrounding non-tribal governments and agencies, so we can protect the sacred

AR0005584

The Honorable Lawrence Roberts
November 8, 2016
pg. 2

burial sites and resources of our Patwin forbears throughout our territory, including Solano County. As an embodiment of this ongoing work, we, and our sister Patwin tribe, the Kletsel Dehe Band of Wintun Indians (also known as Cortina), together hold a unique cultural preservation easement on a waterfront park owned by the City of Vallejo, so we can protect, in perpetuity, the human remains and resources buried there. We understand the site Scotts Valley wants to turn into a casino contains prehistoric archeological resources, and that it is less than two miles from a site believed to be a Patwin village and burial ground. Suffice it to say, we strongly oppose the request of Scotts Valley — a Pomo tribe from rural Lake County, with no documented cultural, linguistic or historic ties to this area, and whose reservation and existing headquarters are *approximately 90 miles* from the land it wants "restored" for its use. For the reasons explained below, Scotts Valley fails to meet the requirements for "restored lands" here.

### Scotts Valley Lacks A "Significant Historic Connection" to the Vallejo Parcel It Wants "Restored" For Gaming

We respectfully submit that, as applied to the Vallejo parcel Scotts Valley's Las Vegas investor has acquired for gaming, the Tribe cannot satisfy the IGRA and the regulatory requirements for any restored tribe to secure restored lands. To that end, we enclose a legal analysis addressing why Scotts Valley does not meet the criteria for "restored" lands under the IGRA and its implementing regulations. In support of that analysis, we also enclose several expert reports: (1) an ethnogeographic and ethnohistoric study prepared by Jennifer Whiteman, M.A., the focus of which is the connection of the Pomo and Patwin to the proposed project area; (2) a report by Dr. Andrés Reséndez, Ph.D., discussing the historical record regarding the unratified treaties the United States negotiated with California tribal groups in 1851 and 1852, and the enslavement and forced labor of California Indians; and (3) a report by Stephen Dow Beckham, addressing, in part, the distribution of Indian tribal groups in Northern California (focusing primarily on the Pomo, Coastal Miwok, Wappo and Patwin). In addition, we include several historical documents separately bearing on Scotts Valley's claim to a "significant historical connection" to the Vallejo parcel it proposes developing for gaming. (Those documents, while not included in the electronic submission with this correspondence and the legal analysis, will be delivered to you by Federal Express.)

Distilled, the record and analysis compel a number of conclusions bearing on Scotts Valley's claimed entitlement to restored land in Vallejo. Among them:

- Scotts Valley is a Pomo tribe, with an historic homeland on the western side of Clear Lake, approximately 90 miles from the City of Vallejo. The Pomo are among the most

their lands were already being taken away by Mexican and American ranchers, the U.S. government offered to set aside "one reservation of land"—as McKee called it— where the Clear Lake Indians could live—"preferably in one rancheria or village"—and where they could remain without fear of encroachment from the whites.  Even a cursory reading of the minutes of this 1851 treaty will reveal that the land being discussed was located in Clear Lake and did not refer to any other lands farther afield and surely did not extend to the area of white settlements and ranches along the northern rim of the San Pablo Bay.


### 2.  Access to a Vallejo location

As part of the treaty the U.S. government agreed to deliver flour and beef to the Clear Lake Indians in the fall of 1851.  However, Commissioner McKee warned that he would not send any agents with the provisions to Clear Lake, "as the mountains surrounding this lake are impassable for wagons, and it would cause the President great expense to send it here [Lup-Yomi] now."  Instead, the commissioner made arrangements with "General J.M. Estelle, of Vallejo" to provide beef as may be required "at such time and place as he may direct."  Given the context, it seems clear that General James Madison Estelle offered his ranch on the Bay of San Francisco near Vallejo as a pickup point out of convenience and not because there was a connection to the historic presence of the Clear Lake Indians at that place.  Moreover, the report by historian Albert L. Hurtado submitted by the SVBI shows that one of the reasons for selecting General Estelle's ranch as the pickup point may have been to defraud the federal government.  As it turns out, Estelle and McKee had formed a partnership to procure the supplies promised to the Clear Lake Indians at lower prices than they would charge the federal government and pocket the difference (Hurtado, p. 87).  The report by Hurtado also recounts how the Clear Lake Indians had to travel fifty or sixty miles "through white settlements" to retrieve the provisions, underscoring yet again that Clear Lake was the Indians' homeland and that, because of this onerous arrangement, they were forced to venture into an area that by 1851 was entirely dominated by ranches and settlements of white peoples (Hurtado, p. 87).  Finally, Commissioner McKee conducted multiple treaties with various Indian groups all over the state of California and similar pickup locations were selected out of convenience.  For instance, in a similar treaty conducted with natives around the Klamath River the provisions were distributed at Durkee's Ferry for the very same reasons of convenience (Sen. Ex. Docs., 33 Cong., Spec. Sess., Doc. 4, pp. 216-218).

Declaration of James Thomas Christopher Kinter

I, James Thomas Christopher Kinter, declare as follows:

(1)  I am a citizen of the federally-recognized Yocha Dehe Wintun Nation, whose federally-owned trust land is in Yolo County, which is contiguous to Solano County.  I am an elected officer of the Tribe's governing body, serving as Secretary to the Tribal Council.  I also serve as chairman of a number of Tribal agencies and committees, including but not limited to its Fire Commission, which oversees the Yocha Dehe Fire Department.  In addition, I teach history of the Tribe to the Tribal children, and serve as the Tribal Historic Preservation Officer ("THPO") for Yocha Dehe.  I have personal knowledge of the matters contained in this declaration, and if called as a witness, could and would testify competently thereto.

 (2)  I have been actively involved in the Tribe's Cultural Resources Department for the past seven years, and I am intimately familiar with the manner by which the Tribe monitors cultural resources (sacred burials and cultural resources affiliated with the Patwin people) throughout Yocha Dehe's ancestral territory.  The territory that Yocha Dehe actively monitors includes Solano County, in which Yocha Dehe serves as the Most Likely Descendant, with the sanction of the Native American Heritage Commission, for the Native people who once lived in and around modern-day Solano County.

(3)  Because Solano County is an area affiliated with the Patwin people, Yocha Dehe and its sister Patwin tribe (Kletsel Dehe Band of Wintun Indians (also known as Cortina)) became involved in the development of a waterfront park in the City of Vallejo that threatened burial grounds there.  I participated directly in the Tribe's negotiation of an unprecedented cultural preservation easement with the City of Vallejo, providing the Tribe and Cortina unique access rights, so as to preserve and protect, in perpetuity, all cultural resources located at the waterfront, city-owned park known as Glen Cove.  The Cultural Easement enabled the controversial park project to proceed, while allowing the Patwin tribes to protect the sanctity of the cultural resources interred there.  A true and correct copy of the Easement's recorded face page is attached here.

(4)  My work as THPO for the Tribe requires me to be closely involved with the Cultural Resources Department, including its creation of maps, maintenance of key documents, and monitoring of cultural resources throughout Yocha Dehe's ancestral territory.  Yocha Dehe has developed Geographic Information Systems (GIS) layers that assist the Tribe in mapping its known village sites with the known archaeological data at the California Historic Resources Information System.  Based on my position with the Tribe, and familiarity with the records maintained by the Tribe's Cultural Resources Department, I am aware that the area targeted for

AR0005603

the development of a gaming facility by the Scotts Valley Band of Pomo Indians is culturally significant to Yocha Dehe.

(5)  I understand that a location on the very parcel Scotts Valley seeks to build a casino contains a known prehistoric Franciscan Chert quarry and a historic serpentine quarry.  The record for this site (CA-SOL-275 (P-48-000116)) was last updated in 1980.  The prehistoric quarry is culturally significant to Yocha Dehe, as Patwin people would likely have utilized the resources within the area.  Not far from this quarry (within a mile and a half) is what appears to be a site most likely affiliated with the Patwin people (consisting of debitage that consists of both obsidian and Franciscan chert). This site is consistent with cultural resources components (midden, stone flakes, and shell) found at burial and village sites and given its location in proximity to the quarry, the area likely would have been a gathering place, and place of trade for the Patwin people who once lived in the area.  This site record (CA-SOL-317 (P-48-000152)) was last updated in 2011.

 I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed this 8th day of November 2016 at the Yocha Dehe Wintun Nation within Yolo County, near Brooks, California.


James Thomas Christopher Kinter

101866085\V-1

AR0005605



RECORDING REQUESTED BY AND
WHEN RECORDED MAIL TO:

City of Vallejo
GRANTOR
Attn: City Attorney's Office
555 Santa Clara Street
Vallejo, CA  94590

Recorded in Official Records, Solano County
**Marc C. Tonnesen**
Assessor/Recorder

8/08/2011
2:20 PM
AR51
CE

P  CITY OF VALLEJO

Doc#:  201100069302    Titles:  1    Pages:  126

| | |
|---|---|
| Fees | 388.00 |
| Taxes | 0.00 |
| Other | 0.00 |
| PAID | $388.00 |

Space Above Line for Recorder's Use Only

The undersigned grantor declares:
Documentary transfer tax is $ ——0——
( ) computed on full value of property conveyed, or
( ) computed on full value less value of liens and
   encumbrances remaining at time of sale.

# DEED OF CONSERVATION AND CULTURAL EASEMENT

THIS DEED OF CONSERVATION & CULTURAL EASEMENT (**"Conservation & Cultural Easement"**) is made and entered into this 22nd day of July, 2011 (**"Effective Date"**) by and between the following parties: (1) The City of Vallejo (referenced as **"Grantor"**), on the one hand, and the Yocha Dehe Wintun Nation, (**"Yocha Dehe"**), and the Cortina Band of Wintun Indians, (**"Cortina"**), two federally recognized Indian tribes (collectively referenced as **"Grantees"**), on the other hand.  The Greater Vallejo Recreation District ("GVRD" or **"Lessee"**) currently leases the Property pursuant to the current Master Lease between Grantor and Lessee dated December 20, 1974, extended on May 8, 2008 and expiring on May 8, 2033, and serves as manager of the land and proponent of the Glen Cove Waterfront Master Plan project to be built thereon, and joins this Easement for the purposes or articulating its consent to be bound by its terms. The City, Grantees, as well as GVRD and any other lessee of the Property that is subject to the Conservation & Cultural Easement, are collectively referenced as **"Parties."**

## RECITALS

A.      Grantor owns approximately 15 acres of real property located in the City of Vallejo, State of California, generally known as the Glen Cove Waterfront Park and more particularly described in **Exhibit A** attached hereto and incorporated herein by reference, together with all improvements and appurtenances thereto (the "Property").  A map of the Property identifying the improvements existing on the Property as of the date of this Easement and various other natural features of the Property is attached hereto as **Exhibit B** and incorporated herein by reference ("Property Map").

B.      Yocha Dehe and Cortina (together, **"Grantees"**) are federally recognized Indian tribes with cultural and historic interests and rights in the Property.  The Property is within Grantees' aboriginal Patwin territory, and the California Native American Heritage Commission, the state agency charged with preserving and protecting historic Native American

1

j:\claudia\glen cove park\easement 07-19-11.doc

RECORDING REQUESTED BY AND                )
WHEN RECORDED MAIL TO:                     )
                                           )
City of Vallejo                            )
GRANTOR                                    )
Attn: City Attorney's Office               )
555 Santa Clara Street                     )
Vallejo, CA  94590                         )
                                           )

*Recorded in Official Records,*
*Doc#: 2011 100069302*
*Solano County*
*8/08/2011    2:20 PM*

Space Above Line for Recorder's Use Only

# DEED OF CONSERVATION AND CULTURAL EASEMENT

THIS DEED OF CONSERVATION & CULTURAL EASEMENT (**"Conservation & Cultural Easement"**) is made and entered into this 22nd day of July, 2011 (**"Effective Date"**) by and between the following parties: (1) The City of Vallejo (referenced as **"Grantor"**), on the one hand, and the Yocha Dehe Wintun Nation, (**"Yocha Dehe"**), and the Cortina Band of Wintun Indians, (**"Cortina"**), two federally recognized Indian tribes (collectively referenced as "Grantees"), on the other hand.  The Greater Vallejo Recreation District ("GVRD" or "Lessee") currently leases the Property pursuant to the current Master Lease between Grantor and Lessee dated December 20, 1974, extended on May 8, 2008 and expiring on May 8, 2033, and serves as manager of the land and proponent of the Glen Cove Waterfront Master Plan project to be built thereon, and joins this Easement for the purposes or articulating its consent to be bound by its terms. The City, Grantees, as well as GVRD and any other lessee of the Property that is subject to the Conservation & Cultural Easement, are collectively referenced as **"Parties."**

## RECITALS

A.      Grantor owns approximately 15 acres of real property located in the City of Vallejo, State of California, generally known as the Glen Cove Waterfront Park and more particularly described in **Exhibit A** attached hereto and incorporated herein by reference, together with all improvements and appurtenances thereto (the "Property").  A map of the Property identifying the improvements existing on the Property as of the date of this Easement and various other natural features of the Property is attached hereto as **Exhibit B** and incorporated herein by reference ("Property Map").

B.      Yocha Dehe and Cortina (together, **"Grantees"**) are federally recognized Indian tribes with cultural and historic interests and rights in the Property.  The Property is within Grantees' aboriginal Patwin territory, and the California Native American Heritage Commission, the state agency charged with preserving and protecting historic Native American

1

AR0005607

cultural resources, has identified and designated Grantees as the "Most Likely Descendant" of the Native Americans who once inhabited the Property.

C.    The Property possesses natural, cultural, scenic, recreational, historical, and open space characteristics, "Conservation & Cultural Values" ("CCVs") valuable to Grantees, the State of California, and the public in general.

D.    The Legislature of the State of California, as set forth in California Civil Code Sections 815 to 816, has found and declared it to be the public policy and in the public interest of this State to encourage the preservation of land predominantly in its natural, scenic, agricultural, historical, forested, or open-space condition. In furtherance of the Land Conservation Commitment and the public policy purposes, as set forth above and in Section 5097.9 of the California Public Resource Code, Grantor desires to grant a Conservation & Cultural Easement over the Property to Grantees. As federally recognized California Native American tribes, Grantees are eligible to hold a Conservation & Cultural Easement pursuant to California Civil Code Section 815.3(c).

E.    The Parties desire through this Conservation & Cultural Easement to ensure the permanent protection of the Conservation & Cultural Values (the **"CCVs"**) of the Property, which shall include sacred sites as defined herein, archeological resources, native vegetation and habitats, and other culturally important, aesthetic, visual, biological, and historic attributes of the Property. Specifically, the Parties desire to assure that the CCVs of the Property will be protected, conserved and sustained forever as provided herein, and that uses of the Property that are inconsistent with these CCVs will be prevented or remedied. Subject to the protection of all sacred sites on the Property, the Parties agree that use of the Property as a public park and dedicated open space is consistent with the CCVs.

F.    The Parties further desire that this Conservation & Cultural Easement will not interfere with the current use of the Property as a park and open space, and that the activities of the Grantees as described in this Conservation and Cultural Easement will be carried out in a manner that does not interfere with the quiet enjoyment of the surrounding neighborhood or the lawful use of the Property by the public.

## AGREEMENT

In consideration of the foregoing recitals, the respective agreements of the Parties which are hereinafter set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and pursuant to the laws of the State of California and in particular California Civil Code Section 815, *et seq.,* Grantor hereby voluntarily grants and conveys to Grantees, and Grantees hereby accept from Grantor, a perpetual Conservation & Cultural Easement in, on, over and across the Property, restricting in perpetuity the uses which may be made of the Property and granting to Grantees rights in the Property, all on the following terms and conditions:

2

j:\claudia\glen cove park\easement 07-19-11.doc

1.    **Conservation & Cultural Purposes and Values**. The purposes of this Conservation & Cultural Easement ("**Conservation & Cultural Purposes**") are:

   a)  to contribute to the protection of the Property, by preserving and protecting the Cultural Conservation Values ("CCVs") articulated in this Conservation and Cultural Easement;

   b)  to ensure that the Property will be retained in perpetuity in its natural, cultural, scenic, recreational, historic, and open space condition;

   c)  to prevent any use of the Property that will significantly impair, degrade or interfere with the CCVs of the Property;

   d)  to allow and preserve specified use of the Property by Grantees, including the affirmative right to take action, at Grantees' own expense, to return the Property to its native condition through the planting and cultivation of native species, and the related right to harvest culturally significant plants from the Property without disturbance to the CCVs and without negatively impacting the use of the Property as a park and open space by Grantor, Lessee or the public;

   e)  to enable Grantees to work directly, collaboratively and cooperatively with Grantor and Lessee, to preserve the privacy, sanctity, and integrity of native burial sites by (1) preventing further public disclosure of known burial sites, and altogether preventing public disclosure of burial sites that may be discovered in the future, including any findings of archeological materials, human remains, cultural resources, or funerary or sacred objects; (2) minimizing and avoiding disturbance of any culturally important sites to the greatest extent possible; (3) ensuring Grantees' traditions and cultural values are respected and honored in connection with the discovery and treatment of any culturally important sites that may be uncovered during or after construction on the Property during Lessee's implementation of the Glen Cove Waterfront Master Plan (including any obligations derived from the environmental analyses and documents prepared in connection with the Glen Cove Waterfront Master Plan); and

   f)  to ensure meaningful consultation, as defined in Section 12 below, and consistent with California law, with Grantees regarding any activity that could or likely would affect a burial site or site of cultural significance on the Property before engaging in such activity; and

   g)  to allow the Grantees access to the Property to exercise cultural and traditional practices and life ways at a reasonable time, and without interference to the enjoyment of the Property and surrounding lands by others, and subject to the existing permitting process or reasonable prior notice to Lessee or City as set forth in Section 3(b)(ii).

---

3

AR0005609

Subject to the following terms and conditions, Grantor intends that this Conservation & Cultural Easement will confine the uses of the Property to such activities that are consistent with the Conservation & Cultural Purposes set forth herein.

2.    **Existing Conditions Report.** In furtherance of this Conservation & Cultural Easement, the Parties hereby agree to prepare or cause to be prepared, upon completion of the Glen Cove Park Waterfront Master Plan, an existing baseline conditions report (**"Report"**) containing an accurate, up to date recordation of the physical, existing baseline condition of the Property. The Report shall serve as an objective, though nonexclusive, information baseline for monitoring compliance with the terms of this Conservation & Cultural Easement. The purpose of the report shall be solely to inform the Parties and the public as to existing conditions as of the time the report is made. Notwithstanding the foregoing, if a controversy arises with respect to the nature and extent of the physical or biological condition of the Property, or the historical or cultural uses of the Property, or the permitted uses of the Property under this Conservation & Cultural Easement, the Parties shall not be foreclosed from utilizing any and all other relevant documents, surveys or other evidence or information to assist in the resolution of the controversy. The Grantees shall prepare and/or fund the preparation of the Report. Drafts of the report will be made available to all Parties. After meaningful input, all Parties will acknowledge the Report's content and accuracy before it may be deemed effective in satisfaction of this provision. Upon completion, the Report shall be properly recorded. Notwithstanding the requirements of this Section 2 herein, nothing in this Conservation & Cultural Easement shall be interpreted or implemented in a manner inconsistent with California (and, to the extent applicable, federal) law providing for the confidentiality of cultural resources.

3.    **Rights Conveyed to Grantees.** In order to accomplish the Conservation & Cultural Purposes, Grantor will transfer and convey to Grantees the following rights and interests, each of which Grantees shall have the right and primary obligation, to undertake at their own expense:

   a) **Preserve and Protect.** Grantees may identify, preserve and protect in perpetuity the CCVs of the Property.

   b) **Entry and Access Rights.** Grantees and Grantees' members, officers, employees, contractors, subcontractors, consultants, representatives, and agents, including entities authorized by one or more Grantee to conduct monitoring activities (**"Grantees' Representatives"**), are hereby granted rights of access to enter upon the Property, using appurtenant easements and rights-of-way, if any, and may enter upon the Property at reasonable times in order to:

      i.   identify current uses of the Property and practices thereon;

      ii.  exercise cultural and traditional practices, subject to Grantor or Lessee's approval of Grantee's application for an event permit with reasonable time place manner restrictions. **Exception**: Grantees shall have a limited exception from seeking a permit for purposes of

4

AR0005610

conducting religious ceremonies which do not involve fire, drumming or amplified music and which involve no more than 10 persons by giving 15 days' written notice addressed to Lessee's General Manager. Such ceremonies shall be conducted without interference to the enjoyment of the Property by the public and surrounding lands by third parties;

iii. monitor and help facilitate all parties' compliance with this Conservation & Cultural Easement;

iv. study and make scientific observations of the CCVs;

v. prevent or remedy any condition on the Property or use of the Property that is inconsistent with the Conservation and Cultural Purposes;

vi. restore and/or require the restoration of such areas or features of the Property that may be damaged by any activity or use inconsistent with the CCVs;

vii. take all actions reasonably necessary by Grantees to identify, preserve, protect, and monitor in perpetuity the CCVs, all in compliance with the provisions of **Section 13.**

c) **Enforcement.**     Subject to and in accordance with the provisions of **Section 13,** Grantees have the right to enforce the terms of this Conservation & Cultural Easement, to seek injunction of any activity on the Property or other use of the Property which is inconsistent with the terms stated herein, and to enforce any obligation to restore such areas or features of the Property as may hereafter be damaged as a result of any such inconsistent activity or use.

**4.     Prohibited Uses.** Any activity on or use of the Property which is inconsistent with the Conservation & Cultural Purposes and/or CCVs is prohibited. Without limiting the generality of the foregoing, Grantor and Lessee will not engage in, or authorize, the following prohibited uses (collectively, **"Prohibited Uses"**), except as expressly permitted under the Permitted Uses Section of this Conservation & Cultural Easement; as required to be undertaken under any Applicable Law (as defined below), or as explicitly agreed to in writing by the Parties:

a) **Public Disclosure of Native Burial Locations.** Any action taken by Grantor, Lessee or their respective or collective agents that would or reasonably could result in the public disclosure of native burial sites, archeological materials, human remains, cultural resources, or funerary or sacred objects on the Property.  Grantee and Lessee and their respective agents shall take all reasonable steps to protect the non-disclosure and confidentiality of all records reflecting, and correspondence pertaining to, the precise location of sacred sites on the Property, and no such records may be disclosed in any fashion without Grantees' prior written approval and at no time shall any Party take

5

AR0005611

any action inconsistent with any applicable local, state, or federal requirement providing for the confidentiality of sacred sites and records thereof, including but not limited to California Government Code sections 6254(r) and 6254.10. In compliance with California law, the City and Lessee agree to remove from public posting and access to all portions of the Master Plan and environmental record prepared for the Project that in any way identify the ascertainable location of any "sacred sites." For purposes of this Cultural & Conservation Easement, "sacred sites," shall include any sites that contain, or are believed to contain, Native American archeological materials, burial sites, human remains, cultural resources, or funerary or sacred objects.

b) **Ground-disturbing Activity**. As used herein, ground-disturbing activity means any disturbance to the soil such that an archaeological object could be damaged or destroyed by digging or grading. Minor Disturbances include installation of bicycle racks, emergency holes, garbage can or recycle bin posts, gardening and landscape maintenance (existing activity), plantings, plant aeration, poles for utilities, road/trail barriers and signs. Major Disturbances include concrete slab installation, public utilities (trenched), large tree trunk removal, construction, water line installation, terracing, and digging that does not constitute a Minor disturbance. Any ground-disturbing activity, whether Major or Minor, engaged in without 30 days prior notice with Grantees is prohibited. Emergency holes for purposes of repairs to water mains or for public safety are exempted from this requirement, and in such cases noticing to Grantees shall occur as soon as feasible. Upon receipt of the notice of a Minor Ground Disturbing Activity, Grantees may nevertheless require consultation, in Grantee's discretion. Major ground-disturbing activities require the consultation and approval of Grantees, consistent with the Conservation and Cultural Purposes. Monitors employed or appointed by Grantees may be present for the duration of any ground-disturbing activity, at Grantee's discretion. If, during said activity, archeological materials, burial sites, human remains, cultural resources, or funerary or sacred objects are encountered, all activity must cease and Grantees must be notified in a reasonable time and manner. Lessee must notify Grantees within 24 hours of such discovery. Upon the discovery of human remains, the Parties shall comply with the requirements of applicable California state law, including, but not limited to, Section 7050.5 of the California Health and Safety Code and Section 5097.98 of the California Public Resources Code. To achieve, and in conformity with, the Easement's Conservation & Cultural Purposes set forth herein, all non-parties to this Conservation & Cultural Easement, including members of the public, may be excluded from the Property during any ground-disturbing activity, for purposes of protecting the safety of the public, the Parties' agents and any of Grantees' Representatives who are present, and additionally, for purposes of protecting the sanctity of any sacred sites that are known to exist in a particular location and/or that may be discovered as a result of ground-disturbing activity.

6

AR0005612

c)  <u>Activity Involving Human Remains</u>.  Any activity involving an attempt to handle, mitigate, or re-inter human remains without formal consultation with and approval from Grantees.

d)  <u>Construction and Development</u>.  Construction or placement of any additional structures or improvements on the Property, including, but not limited to, residential, industrial, office, or other buildings, underground or above-ground tanks, billboards, advertising facilities, or sewer systems or lines that will significantly impair or interfere with the CCVs.  Existing utilities may be maintained and repaired/replaced as necessary and limited new development may take place in accordance with the Glen Cove Waterfront Park Master Plan.

e)  <u>Use or Transfer of Development Rights</u>.  All development rights that are now or hereafter allocated to, implied, reserved, or inherent in or to the Property are terminated and extinguished, and may not be used on or transferred to any portion of the Property as it now or hereafter may be bounded or described, or to any other property (whether adjacent or otherwise).  Nothing in this subsection shall be construed as applying to the Glen Cove Waterfront Park Master Plan.

f)  <u>Subdivision</u>.  Legal or *de facto* sale or gift of less than the whole of the Property, or any division, subdivision or partitioning of the Property.

g)  <u>Motorized Vehicles</u>.  Use of any motorized vehicles off of existing roadways on the Property, with the exception of vehicles utilized by any lessee, agent of Grantor, Grantee or a third-party beneficiary for the purposes of maintaining and landscaping the Property (including, but not limited to, a lawn mower), and vehicles used to facilitate access by handicapped members of the public, or by Grantees and/or their agents to protect or preserve the CCVs.  No motorized vehicle use by the general public is allowed at any time, with the exception of motorized wheelchairs or other equipment needed for mobility by the elderly or persons with physical disabilities.

h)  <u>Dumping or Salvage</u>.  There shall be no dumping, storage or other disposal on the Property of soil, trash or garbage except for (a) refuse generated on the Property which may be disposed of on the Property on a temporary basis prior to its removal from the Property in areas where the CCVs of the Property are not adversely impacted, or (b) compostable refuse generated on the Property which may be disposed of on the Property in a responsible manner which does not significantly impair the CCVs of the Property. There shall be no dumping, storage or other disposal on the Property of ashes, sludge, Hazardous Substances (as defined below), or other unsightly or dangerous materials. There shall be no storage or disassembly on the Property of inoperable automobiles, trucks, or other vehicles or equipment for purposes of sale, or rental of space for that purpose.

7

AR0005613

i)  <u>Vegetation</u>.  Except (a) in an emergency for purposes of disease or insect control or to prevent property damage, personal injury, or flooding, (b) as part of a pre-approved Native American cultural resource gathering, or (c) as part of ordinary, pre-existing landscape maintenance, fire hazard, or weed removal programs, there shall be no removal, cutting or destruction on the Property of native vegetation.  There shall be no introduction on the Property of any non-native plant.

j)  <u>Roads and Trails</u>.  Construction of roads or trails beyond those identified on the Glen Cove Waterfront Park Master Plan, as may be amended.

k)  <u>Alteration of Land or Excavation</u>.  Filling, excavating, grading, draining or dredging on the Property, nor any change in the general topography of the Property.

l)  <u>Gardens and Landscaping</u>.  There is to be no planting of non-native vegetation on the Property.

m)  <u>Mining and Drilling</u>.  There shall be no mining, drilling, removing, or exploring for or extracting of minerals, oil, gas, coal, or other hydrocarbons, soils, sands, gravel, loam, rocks or any other material on, under, or at the Property.

n)  <u>Cultural Resource Degradation</u>.  There shall be no activities, actions or uses that disturb or impair any cultural resources on the Property.  In addition to their efforts to preserve known cultural resources, the Parties will cooperate to identify additional cultural resources at the Property to be protected from harm in accordance with all applicable laws.

o)  <u>Water Resources</u>.  There shall be no development of any waters on the Property for commercial or industrial purposes.  There shall be no activities, actions or uses detrimental to water conservation, erosion control, soil conservation, or fish and wildlife habitat preservation, and no manipulation or alteration of natural water courses, wetland, stream bank, shorelines or bodies of water or activities or uses detrimental to water quality, including, without limitation:

(A)  Degradation, pollution of any surface or subsurface waters, or unauthorized placement of revetments or rip-rapping;

(B)  Bank protection or any other manipulation or other alteration of natural water courses, wetland, stream bank, shoreline, or other body of water; and

j:\claudia\glen cove park\easement 07-19-11.doc

AR0005614

(C)   Any other activity which may destabilize the banks of any course or body of water, and any uses or activities which would pollute, degrade or drain the surface or subsurface waters.

**5.   Changes in Use.** It is the intent of all Parties that the use of the Property shall remain, in perpetuity, as a public park and open space. It is further the intent of both Grantor and Grantees that the use or uses of any surrounding or neighboring properties shall not be deemed to be circumstances justifying the termination, extinguishment or modification of this the Conservation& Cultural Easement. In addition, the inability of Grantee, or Grantee's successors, or assigns, to conduct or implement any or all of the uses permitted under the terms of this Conservation & Cultural Easement shall not impair the validity of the Conservation & Cultural Easement or be considered grounds for the termination, extinguishment or modification of same.

**6.   Unauthorized Third Party Uses and Grantor's Obligations.** If Grantees discover any unauthorized third-party use or activity on the Property that violates the terms of this Conservation & Cultural Easement, and Grantees gives Grantor and Lessee written notice thereof, Grantor and Lessee shall meet with Grantees to discuss Grantor and Lessee's reasonable efforts to stop or prevent any such unauthorized use of the Property. Grantees may meet and confer with Grantor and/or Lessee to propose additional efforts to prevent such use or activity which Grantees may undertake, at Grantees' sole expense, but shall not be obligated to undertake. Grantor shall not unreasonably withhold consent to such additional efforts to be undertaken by Grantees. If Grantor permits Grantees to use such additional efforts, Grantees shall comply with any requirements reasonably imposed by Grantor in connection with such efforts, and vice versa.

**7.   Acts of God.** Nothing in this Conservation& Cultural Easement shall require Grantor to take any action to restore the condition of the Property after any Act of God, including, without limitation, fire, flood, storm, or earth movement.

**8.   Public Access:** The Parties agree that access by members of the general public is permitted on the Property subject to the following:

a)   Limitations on Public Access: Grantor and Lessee have the right to make reasonable rules and regulations to reasonably control or limit use by the public, by posting or other means, and agree to restrict any use that may interfere with or be harmful to other members of the public using the Property, the CCVs, or the quiet use and enjoyment of neighboring private property.

Grantor and Lessee reserve the right to restrict public access to areas of the Property under study or for safety purposes. Grantees and Grantor may agree to restrict public access for other reasons, but only to the extent and for the duration necessary to assure safety, to permit necessary monitoring or maintenance, or to preserve other CCVs of the Property.

The Parties claim all of the rights and immunities against liability for injury to the public to the fullest extent of the law.

9

AR0005615

**b)** <u>Permitted Uses</u>:  The Parties agree that the following examples of types of public uses, while not an exclusive list, are permitted, subject to Subsection (a) above and reasonable time, place and manner restrictions: low-impact outdoor recreation, nature study, traditional outdoor activities that do not require structures or cause significant surface alteration, outdoor education, scientific research, and access for all members of the public to exercise their cultural beliefs and traditions.

**9.    Grantor Reserved Rights.**  Notwithstanding anything to the contrary in this Conservation & Cultural Easement, Grantor expressly reserves all rights accruing from ownership of the Property, including the right to engage in or permit or invite others to engage in all uses of the property that are not expressly prohibited by this Conservation & Cultural Easement and are not inconsistent with the CVVs/Conservation & Cultural Purposes set forth herein (**"Grantor's Reserved Rights"**).  The Parties expressly agree that the Property may be improved pursuant to the Glen Cove Waterfront Master Plan, as amended by a concurrent or subsequent memorandum of understanding signed by the Parties, or other proper action, and nothing in this Easement shall be construed to prevent such improvements.  All interests in the Property not expressly transferred and conveyed to Grantees by this Conservation & Cultural Easement shall remain with Grantor.  In exercising Grantor' Reserved Rights, Grantor will use reasonable efforts to consult with Grantees and to employ methods and practices that will not significantly impair the Conservation & Cultural Values.  As owner of the Property, Grantor agrees to fully support and consent to Grantees' efforts to repatriate cultural resources and human remains taken from the Property by third parties pursuant to state and federal laws, including, but limited to, Section 5097.991 of the California Public Resources Code and Sections 3001 to 3013 of Title 25 of the United States Code, all at the Grantee's cost.

**10.    Title Warranty.**  Grantee takes rights under this easement to the Property "as is" subject to existing liens or encumbrances.

**11.    Subsequent Easements.**  After the Effective Date, Grantor hereby agrees to provide Grantee the right of first refusal with respect to any purchase of the Property that is the subject of this Conservation & Cultural Easement, and the Parties further agree that such right may be exercised only upon condition that Grantee agrees that Property will remain a dedicated park and open space subject to existing easements and encumbrances and the jurisdiction of the City of Vallejo in the event of purchase to Grantee.

**12.    Meaning and Requirements of Consultation, and Requirement of Confidentiality.**

**a)** As used herein, "consultation" means the meaningful and timely process of seeking, discussing and considering carefully and in good faith the views of others, in a manner that is cognizant of the Grantees' cultural values, and where feasible, reaching agreement.

---

10

j:\claudia\glen cove park\easement 07-19-11.doc

b) Consultation between or among the City and/or Lessee on the one hand, and Grantees on the other hand, shall be conducted in a way that is mutually respectful of the other Party's sovereignty.

c) The Grantor and any Lessee shall, in connection with any consultation, respect the Grantees' cultural and spiritual values and rights, and recognize Grantees' need for confidentiality with respect to places that have traditional tribal cultural significance.

d) Formal consultation shall require actual and immediate written notice of the subject of such consultation to the designated representative of both Grantees, and require an actual meeting with a designated representative of at least one Grantee to discuss methods and steps for proceeding with respect to the subject of such consultation. To the extent the designated representative of the Grantee desires and requests, the result of such formal consultation, and any plan associated therewith, shall be memorialized in writing.

e) The Parties agree that all information and materials shared pursuant to any consultation with respect to the location, handling, treatment of sacred sites on the Property, including repatriation of any remains or resources, is confidential and may not be disclosed in accordance with California law. The Parties shall take all reasonable steps to protect the confidentiality of any such documents, records and information exchanged pursuant to a consultation under this Cultural and Conservation Easement, including, but not limited to, a requirement that the agents of Grantor and/or Lessee execute a Non-Disclosure Agreement at Grantees' request.

13.    **Responsibility for Operations.** Subject to and with express agreement between the Parties, nothing in this Conservation & Cultural Easement shall be construed as giving any right or ability to Grantees to exercise physical or managerial control of the day-to-day operations of the Property. Without placing any limitation on the foregoing sentence, the Parties agree as follows:

a) Mitigation and Restoration. Grantees agree to collaborate and cooperate with Grantor and Lessee in complying with the requirements of the Glen Cove Waterfront Park Master Plan, including any mitigation requirements imposed pursuant to the approval of such Plan, subject to the understanding that the Parties can agree to modify the Plan in a way that does not potentially increase environmental impacts. Grantees further agree that they will actively monitor the Property to ensure compliance with the CCVs in this Easement, and work proactively with Grantor and Lessee to ensure consistency with the Glen Cove Waterfront Master Plan and the CCVs in this Easement, and subject to any agreed upon modification to the Glen Cove Waterfront Park Master Plan.

b) Condition of Property. Grantees shall have no duty or responsibility for (i) the operation or maintenance of the Property except to the extent specifically

11

j:\claudia\glen cove park\easement 07-19-11.doc

AR0005617

undertaken by Grantees as permitted under this Conservation & Cultural Easement, or as specifically requested by Grantor and Lessee and agreed to by Grantees in writing; (ii) the monitoring of any hazardous conditions thereon; or (iii) the protection of Grantor, Lessee, the public, or any other person or entity from any risks relating to conditions on the Property, except to the extent that the risks involved are the result of the activities of Grantees or Grantees' Representatives on the Property.

c) Taxes. Grantees shall have no duty or responsibility for real property taxes and assessments levied by competent authority on the Property.

d) Permits and Approvals. Each Party shall be responsible for obtaining any and all applicable governmental permits and approvals for, and otherwise complying with all applicable laws relating to, its activities on the Property. No Party shall unreasonably withhold any permit or other approval from another Party.

e) No Owner or Operator Liability. The Parties do not intend this Conservation & Cultural Easement to be, and this Conservation & Cultural Easement shall not be, construed such that it creates in or gives to either Grantee any of the following:

    i.   The obligations or liability of an "owner" or "operator" or "arranger," as those terms are defined and used in CERCLA;

    ii.   The obligations or liabilities of a person described in 42 U.S.C. Section 9607(a)(3) or (4);

    iii.  The right to investigate and remediate any hazardous substances associated with the Property; or

    iv.  Control over Grantor's ability to investigate, remove, remediate or otherwise clean up any hazardous substances associated with the Property.

f) Reporting to Grantee. Not less than annually, Grantor and Lessee shall make reasonable efforts to inform Grantees of any construction and/or development activities anticipated on the Property within the following twelve (12) months. In the event either Grantee determines that any of the anticipated activities may violate the terms of this Conservation & Cultural Easement, (1) the Grantee (or Grantees, as the case may be) shall within thirty (30) days provide written notice to Grantor and Lessee of that determination, and (2) the Parties will meet and confer regarding the anticipated activities within thirty (30) days after the date of the written notice. In no event may Grantor and Lessee begin any construction or development activities without first consulting with Grantees.

j:\claudia\glen cove park\easement 07-19-11.doc

AR0005618

14.    **Enforcement and Remedies**

a) <u>Notice of Violation</u>.   If a Party hereto (the **"Non-Breaching Party"**) determines there is a violation of the terms of this Agreement by another Party hereto or that a violation is threatened by a Party hereto (a **"Violation"**), written notice of such Violation (the **"Violation Notice"**) and a demand for corrective action sufficient to cure the Violation shall be given by the Non-Breaching Party to the Party allegedly violating this Agreement (the **"Breaching Party"**).   Upon receipt of the Violation Notice, the Breaching Party shall immediately cease all activities that are the subject of the Violation Notice.   Within fourteen (14) days after delivery of a Violation Notice, Grantor, Lessee, and Grantees shall meet at a location that Grantor, Lessee and Grantees agree upon to discuss the circumstances of the alleged or threatened Violation and to attempt to agree on appropriate corrective action. If the Parties determine that it is appropriate and desirable, a duly qualified expert in the subject matter of the alleged or threatened Violation (the **"Consulting Expert"**) shall attend the meeting.   The Parties shall each pay one-fourth of the costs of retaining the services of the Consulting Expert for such discussion; provided, however, that if Grantor, Lessee, and Grantees are unable to agree upon a Consulting Expert, each Party may retain the services of an expert at its own expense.   If the Parties are unable to agree on appropriate corrective action within thirty (30) days after such meeting, then the Non-Breaching Party shall deliver a further written notice to the Breaching Party to demand reasonable, particular corrective action to cure the Violation (the **"Second Notice"**).   Upon the giving of a Second Notice, the Breaching Party shall promptly commence, and thereafter diligently pursue to completion, corrective action sufficient to cure the Violation and, where the Violation involves injury to the Property resulting from any use or activity inconsistent with the CCVs or the Conservation Purposes, to restore the portion of the Property so injured.   If a Violation is not cured within thirty (30) days after the delivery of the Second Notice (the **"Final Cure Period"**), or if the cure reasonably requires more than thirty (30) days to complete and there is failure to begin the cure or failure to continue diligently to complete the cure within the thirty (30) day period, the Parties shall submit the claims or disputes to mediation as provided in **Section 14(b)**.

b) <u>Mediation</u>.   Except as provided in **Section 14(d)**, Grantor, and Lessee, if appropriate, and Grantees agree to first meet, confer and negotiate any Violation Notice pursuant to **Section 14(a)** and then mediate pursuant to this **Section 14(b)** with respect to any claim or dispute arising out of or relating to this Agreement, before resorting to court action.   If the Parties fail to settle such claim or dispute prior to the expiration of the Final Cure Period or within such additional time period as the Parties may agree in writing, the Parties agree to submit the matter to mediation.   Any Party may commence mediation by providing to the other Party a written request for mediation, setting forth the subject of the claim or dispute and the relief requested.   Except as

13

AR0005619

provided herein or by written agreement of the Parties, the mediation shall be conducted in the City of Vallejo, or other appropriate location within 25 miles of the City of Vallejo, as may be agreed on by the Parties, pursuant to reasonable and appropriate mediation rules and procedures mutually acceptable to the Parties. The Parties will select a mutually acceptable qualified mediator, and will cooperate in good faith in scheduling the mediation proceedings. The Parties agree to participate in such mediation proceedings in good faith for at least ninety (90) days (the **"Mediation Period"**), and to share equally in its costs. All offers, promises, conduct and statements, whether oral or written, made in the course of the mediation by any of the Parties, their employees, agents, experts and attorneys, and by the mediator (including mediator's employees), are confidential, privileged and inadmissible for any purpose, including impeachment, in any litigation or other proceeding involving the Parties, but evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation. Except as provided in **Section 14(d)**, no Party may commence an action arising out of or relating to this Agreement until the Parties have completed the consultation required in **Section 14(a)** and mediation required in accordance with this **Section 14(b)**.

**c)** Legal Remedies. If the Parties are not able to settle the claim or dispute through consultation and mediation pursuant to **Section 14(a)** and/or **Section 14(b)** above, the Non-Breaching Party may bring an action at law or in equity in a court of competent jurisdiction to enforce compliance with the terms of this Agreement, to recover any damages to which such Non-Breaching Party may be entitled for violation of the terms of this Agreement or for any injury to the CCVs of the Property, or for other equitable relief, including, but not limited to, the restoration of the Property to the condition in which it existed prior to the Violation. The Parties agree that Grantees shall have the right and authority to pursue legal action, and enforce the terms of this Easement, vis-à-vis any members of the public who have violated, or threaten to violate, the terms and protections of the Easement. The Parties further agree that such right and authority does not relieve the City of any role or obligation to enforce applicable and duly-enacted laws, ordinances or rules that regulate or prohibit particular activities on the Property.

**d)** Injunctive Relief. If Grantees in their reasonable discretion, determine that circumstances require immediate action to prevent or mitigate significant damage to the CCVs from a Violation of this Easement, whether by a Party hereto or a third party, Grantees may pursue its remedies under this **Section 14(d)** without (i) giving the Violation Notice, or participating in consultation, or giving the Second Notice, all as required under **Section 14(a)**, and/or (ii) without participating in mediation required in **Section 14(b)**, *ex parte* as necessary, by temporary or permanent injunction without the necessity of proving either actual damages or the inadequacy of otherwise available legal remedies, and to require the restoration of the Property to the condition that

14

AR0005620

existed prior to any such injury, but such lack of necessity does not relieve Grantees of proving their case or adhering to the law in a civil action. The remedies described in this **Section 14(d)** shall be cumulative and shall be in addition to all remedies now or hereafter existing at law or in equity, including but not limited to, the remedies set forth in California Civil Code Section 815 *et seq.* The failure of any Party to discover a Violation or to take immediate legal action shall not bar taking such action at a later time.

e)  Costs of Enforcement.  In any action, suit or other proceeding undertaken to enforce the provisions of this Conservation & Cultural Easement, the prevailing Party shall be entitled to recover from the non-prevailing Party all reasonable costs and expenses, including without limitation, attorneys' and experts' fees and costs, and if such prevailing Party shall recover judgment in any action or proceeding, such costs and expenses shall be included as part of the judgment.

f)  Enforcement Discretion.  Enforcement of the terms of this Conservation & Cultural Easement shall be at the respective discretion of Grantees and Grantor and any forbearance to exercise rights of enforcement under this Conservation & Cultural Easement in the event of any breach of any term of this Conservation & Cultural Easement shall not be deemed or construed to be a waiver of such term or of any subsequent breach of the same or any other term of this Conservation & Cultural Easement or of any rights under this Conservation & Cultural Easement.  No delay or omission in the exercise of any right or remedy upon any breach shall impair such right or remedy or be construed as a waiver.

15.  **Notices.**  Any notice or other communication required or permitted under this agreement shall be either personally delivered or transmitted by registered or certified mail, return receipt requested, postage prepaid, or by a recognized overnight courier, such as Federal Express or Airborne Express, addressed to the parties as follows:

>  **THE CITY OF VALLEJO:**
>  City Manager
>  555 Santa Clara Street
>  Vallejo, CA  94590
>
>  With a copy to:
>  City Attorney
>  555 Santa Clara Street
>  Vallejo, CA  94590
>
>  **CORTINA BAND OF WINTUN INDIANS:**
>  Chairperson, Tribal Council
>  P.O. Box 1630
>  Williams, CA  95987

15

j:\claudia\glen cove park\easement 07-19-11.doc

AR0005621

**YOCHA DEHE WINTUN NATION:**
Chairperson, Tribal Council
18960 Puhkum Road
P.O. Box 18
Brooks, CA  95606

**GREATER VALLEJO RECREATION DISTRICT:**
General Manager
395 Amador Street
Vallejo, CA  94590-6394

With a copy to:
GVRD Counsel
Rogaski, Preovolos, Weber & Patterson, LLC
455 Devlin Road, Suite 100
Napa, CA  94558

The date of any notice or communication shall be deemed to be the date of receipt if delivered personally, or the date of the receipt or refusal of delivery if transmitted by mail or overnight courier. Any Party may change the address for notice by giving notice to the other party in accordance with this Section 15.

16.    **Amendment.** This Conservation & Cultural Easement may be amended by Grantor and Grantees or their respective successors and assigns, by mutual written agreement of Grantor and Grantees. Without limiting the scope of the aforementioned power to amend, the Parties anticipate that future amendments may be necessary to reflect boundary adjustments, clarifications, and corrections to the Conservation & Cultural Easement and agree to mutually cooperate in good faith to accomplish such future amendments, to the extent such amendments are solely to clarify the terms of this Conservation & Cultural Easement and do not impair the conservation purposes. Any such amendment shall be consistent with the purposes of this Conservation & Cultural Easement and shall not affect its perpetual duration, and Grantees shall promptly record the amendment in the official records of Solano County, and shall thereafter promptly provide a conformed copy of the recorded amendment to Grantor and lessee. Notwithstanding the foregoing, Grantor and Grantees have no right or power to consent to any action or agree to any amendment of this Grant that would result in substantial alteration to or destruction of any of the beneficial public values or limit the term or result in termination of the Conservation & Cultural Easement, or adversely affect the qualification of the Conservation & Cultural Easement as a Conservation & Cultural Easement under California Civil Code Section 815 *et seq.* or the status of Grantee as an entity authorized to acquire and hold Conservation & Cultural Easements under California Civil Code Section 815.3 or qualified to hold Conservation & Cultural Easements pursuant to 26 U.S.C. 170(h)(3) of the California Civil Code. Any amendment to this Conservation & Cultural Easement shall comply with California Civil Code Section 815 *et seq.*

16

j:\claudia\glen cove park\easement 07-19-11.doc

17. **General Provisions.**

    a) **Applicability of existing local rules and ordinances.** Nothing in this Easement shall be deemed to impair or amend any existing state or local rule, regulation or ordinance of general applicability. Existing and future general park rules and regulations will continue to apply to Grantees as well as the general public.

    b) **Governing Law.** This Conservation & Cultural Easement shall be governed by, and construed and enforced in accordance with, the laws of the State of California, and to the extent applicable, the laws of the United States.

    c) **No Public Dedication.** Nothing contained in this Conservation & Cultural Easement shall be deemed to be a gift or dedication of any portion of the Property to the general public.

    d) **Liberal Construction.** Any general rule of construction to the contrary notwithstanding, this Conservation & Cultural Easement shall be liberally construed in favor of Grantee to effect the purposes of this Conservation & Cultural Easement and the policy and purpose of California Civil Code Sections 815 to 816. If any provision in this Conservation & Cultural Easement is found to be ambiguous, an interpretation consistent with the purposes of this Conservation & Cultural Easement which recognizes any reserved rights of Pacific Gas & Electric Co. and Grantor's Reserved Rights that would render the provision valid shall be favored over any interpretation that would render it invalid.

    e) **Further Assurances.** Each Party hereto agrees to execute and deliver to the other Party such further documents or instruments as may be necessary or appropriate in order to carry out the intentions of the Parties as contained in this Conservation & Cultural Easement.

    f) **Severability.** If any provision of this Conservation & Cultural Easement shall be unenforceable or invalid, the same shall not affect the remaining provisions of this Conservation & Cultural Easement and to this end the provisions of this Conservation & Cultural Easement are intended to be and shall be severable.

    g) **Entire Agreement.** This Conservation & Cultural Easement sets forth the entire agreement of the Parties with respect to the Conservation & Cultural Easement and supersedes all prior discussions, negotiations, understandings, or agreements relating to the Conservation & Cultural Easement all of which are merged herein.

    h) **No Forfeiture.** Nothing contained herein will result in a forfeiture or reversion of Grantor's title in any respect.

j:\claudia\glen cove park\easement 07-19-11.doc

AR0005623

i) **Successors.** The Conservation & Cultural Easement shall be a servitude running with the land in perpetuity. The covenants, terms, conditions, and restrictions of this Conservation & Cultural Easement shall be binding upon, and inure to the benefit of, the Parties hereto and their respective successors and assigns and shall continue as a servitude running with the Property. Grantees shall not assign their rights under this Conservation & Cultural Easement without the written consent of Grantor, which shall not be unreasonably withheld.

j) **Recordation.** Grantees shall promptly record this Conservation & Cultural Easement in the official County records, and shall thereafter promptly provide a conformed copy of the recorded Conservation & Cultural Easement to Grantor. Grantees may re-record at any time as may be required to preserve its rights in this Conservation & Cultural Easement.

k) **Termination of Rights and Obligations.** Grantor's and any lessee's rights and obligations under this Conservation & Cultural Easement shall terminate only upon written transfer of Grantor's interest in all or portions of either the Conservation & Cultural Easement or the Property, except that liability for acts or omissions occurring prior to transfer shall survive the transfer.

l) **Captions.** The captions in this Conservation & Cultural Easement have been inserted solely for convenience of reference and are not a part of this Conservation & Cultural Easement and shall have no effect upon construction or interpretation.

m) **List of Exhibits.** The following exhibits are attached hereto and incorporated herein:

Exhibit A - Legal Description of the Property

Exhibit B – Property Map

n) **Counterparts.** This Conservation & Cultural Easement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**IN WITNESS WHEREOF,** Grantor has granted to Grantees, and Grantees have accepted this Conservation & Cultural Easement and the Parties mutually agree to the covenants set forth above, as of the Effective Date.

(SIGNATURES ARE ON THE FOLLOWING PAGES)

18

j:\claudia\glen cove park\easement 07-19-11.doc

AR0005624

Agreed to and executed by GRANTOR:

**THE CITY OF VALLEJO**
A municipal corporation

By: _Phil Batchelor_
Phil Batchelor
City Manager

Attest: _Dawn C. Abrahamson_
Dawn Abrahamson
City Clerk

APPROVED AS TO FORM

By: _Frederick G. Soley_
Frederick G. Soley
City Attorney

*EACH SIGNATURE MUST BE PROPERLY ACKNOWLEDGED.*

*FOR TRIBAL COUNCIL REPRESENTATIVE, ONLY CHAIRPERSON SIGNATURE
REQUIRES AUTHORIZATION. PLEASE ATTACH APPROPRIATE NOTARY
ACKNOWLEDGMENT ON AN 81/2 X 11" SHEET.*

j:\claudia\glen cove park\easement 07-19-11.doc

AR0005625

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Solano_ }

On _7-21-11_ before me, _DAWN G. Abrahamson, Notary Public_
                Date                          Here Insert Name and Title of the Officer

personally appeared _Phil Batchelor_
                                        Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Dawn G. Abrahamson_
                    Signature of Notary Public

DAWN G. ABRAHAMSON
Commission # 1827375
Notary Public - California
Alameda County
My Comm. Expires Jan 15, 2013

Place Notary Seal Above

--- **OPTIONAL** ---

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

### Description of Attached Document

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

### Capacity(ies) Claimed by Signer(s)

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer Is Representing: _____

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer Is Representing: _____

© 2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5907   Reorder: Call Toll-Free 1-800-876-6827

AR0005626

Agreed to and executed by GRANTEES:

**CORTINA BAND OF WINTUN INDIANS**
A federally-recognized Indian tribal government

By: _Charlie Wright_____
　　Charlie Wright, Chairperson
　　Business Committee


APPROVED AS TO FORM:

By:_____
　　Alex Cleghorn
　　California Indian Legal Services, Inc.
　　Legal Counsel for Cortina Band of Wintun Indians


*EACH SIGNATURE MUST BE PROPERLY ACKNOWLEDGED.*

*FOR TRIBAL COUNCIL REPRESENTATIVE, ONLY CHAIRPERSON SIGNATURE
REQUIRES AUTHORIZATION. PLEASE ATTACH APPROPRIATE NOTARY
ACKNOWLEDGMENT ON AN 81/2 X 11" SHEET.*

20

AR0005627

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Solano_

On _7-21-11_ before me, _Dawn G. Abrahamson, Notary Public_
Date                              Here insert Name and Title of the Officer

personally appeared _Charlie Wright_
Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Dawn G. Abrahamson_
Signature of Notary Public

Place Notary Seal Above

**DAWN G. ABRAHAMSON**
Commission # 1827375
Notary Public - California
Alameda County
My Comm. Expires Jan 15, 2013

─────────── OPTIONAL ───────────
*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____  Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

© 2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5907   Reorder: Call Toll-Free 1-800-876-6827

AR0005628

**YOCHA DEHE WINTUN NATION,**
A federally-recognized Indian tribal government

By:_____
    Marshall McKay, Chairperson
    Tribal Council


APPROVED AS TO FORM:


By:_____
    Paula M. Yost
    SNR Denton US LLP
    Legal Counsel for Yocha Dehe Wintun Nation


*EACH SIGNATURE MUST BE PROPERLY ACKNOWLEDGED.*

*FOR DISTRICT REPRESENTATIVE, ONLY GENERAL MANAGER SIGNATURE*
*REQUIRES AUTHORIZATION. PLEASE ATTACH APPROPRIATE NOTARY*
*ACKNOWLEDGMENT ON AN 81/2 X 11" SHEET*

j:\claudia\glen cove park\easement 07-19-11.doc

AR0005629

## CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Solano_

On _7-21-11_ before me, _Dawn G. Abrahamson, Notary Public,_
       Date                              Here Insert Name and Title of the Officer

personally appeared _Marshall McKay_
                                   Name(s) of Signer(s)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____
                 Signature of Notary Public

**DAWN G. ABRAHAMSON**
Commission # 1627375
Notary Public - California
Alameda County
My Comm. Expires Jan 15, 2013

Place Notary Seal Above

---

**OPTIONAL**

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Description of Attached Document**

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**

Signer's Name: _____
☐ Individual
☐ Corporate Officer --- Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer Is Representing: _____

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

RIGHT THUMBPRINT
OF SIGNER
Top of thumb here

Signer Is Representing: _____

©2007 National Notary Association · 9350 De Soto Ave., P.O.Box 2402 · Chatsworth, CA 91313-2402 · www.NationalNotary.org  Item #5907  Reorder: Call Toll-Free 1-800-876-6827

Agreed to and executed by LESSEE for purposes of ARTICULATING
ITS CONSENT TO THE TERMS HEREIN:

**GREATER VALLEJO RECREATION DISTRICT**

By: _____
Shane MacAffee
General Manager

APPROVED AS TO FORM:

By: _____
Chester A. Rogaski, Jr.
Rogaski, Preovolos, Weber & Patterson, LLC
District Counsel

*EACH SIGNATURE MUST BE PROPERLY ACKNOWLEDGED.*

*FOR TRIBAL COUNCIL REPRESENTATIVE, ONLY CHAIRPERSON SIGNATURE
REQUIRES AUTHORIZATION. PLEASE ATTACH APPROPRIATE NOTARY
ACKNOWLEDGMENT ON AN 81/2 X 11" SHEET.*

22

j:\claudia\glen cove park\easement 07-19-11.doc

AR0005631

# CALIFORNIA ALL-PURPOSE ACKNOWLEDGMENT

State of California

County of _Solano_ }

On _7-22-11_ ___ before me, _Dawn G. Abrahamson, Notary Public_
   Date                        Here Insert Name and Title of the Officer

personally appeared _Shane MacAfee_
                     Name(s) of Signer(s)

DAWN G. ABRAHAMSON
Commission # 1827375
Notary Public - California
Alameda County
My Comm. Expires Jan 15, 2013

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Dawn G. Abrahamson_
                Signature of Notary Public

Place Notary Seal Above

—————————— OPTIONAL ——————————

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

## Description of Attached Document

Title or Type of Document: _____

Document Date: _____ Number of Pages: _____

Signer(s) Other Than Named Above: _____

## Capacity(ies) Claimed by Signer(s)

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

Signer's Name: _____
☐ Individual
☐ Corporate Officer — Title(s): _____
☐ Partner — ☐ Limited ☐ General
☐ Attorney in Fact
☐ Trustee
☐ Guardian or Conservator
☐ Other: _____

Signer Is Representing: _____

RIGHT THUMBPRINT OF SIGNER
Top of thumb here

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5907   Reorder: Call Toll-Free 1-800-876-6827

Exhibit A

Legal Description of the Property

GLEN COVE WATERFRONT PARK

Description:

Real property in the City of Vallejo, County of Solano, State of
California, described as follows:
Being a portion of that certain 61.58 acre parcel of land as shown on
that Record of Survey Map filed July 15, 1981 in Book 15 of Surveys, at
Page 89, in the office of the County Recorder of Solano County, described
as follows: 3

PARCEL 1 (GLEN COVE PARK SITE)

      Beginning at a point on the westerly line of Bailey Avenue as shown
on Sheet 1 of said Record of Survey Map, from which a 1" iron pipe with
tag LS 3618 at the northerly terminus of the course shown as N 02° 11'
34" E, 479.61 feet on sheet 1 of said Record of Survey Map, bears S 87°
48' 26" E, 30.00 feet; thence from said Point of Beginning S 02° 11' 34"
W along said westerly line of Bailey Avenue a distance of 62.22 feet;
thence northwest-erly 19.86 feet along the arc of a non-tangent curve to
the left, from which the center bears S 52° 16' 01" W, having a radius of
50 feet, through a central angle of 22° 45' 17"; thence northwesterly
31.85 feet along the arc of a reverse curve to the right, from which the
center bears N 29° 30' 44" E, having a radius of 28 feet, through a
central angle of 65° 10' 21"; thence northerly
23.85 feet along the arc of a compound curve to the right, from which the
center bears S 85° 18' 54" E, having a radius of 470 feet, through a
cen-tral angle of 2° 54' 28"; thence S 87° 48' 26" E, 28.88 feet to the
Point of Beginning, and containing 0.034 acres, more or less.

PARCEL 2 (GLEN COVE PARK SITE)

      Beginning at the Southwest corner of Bailey Avenue as shown on
sheet 1 of said Record of Survey Map; thence westerly along the southerly
line of said 61.58 acre parcel of land and along the Mean High Tide Line
of the Carquinez Straits of the Sacramento River, the following 8
courses:

(1) S 61° 15' 36" W, 23.21 feet;

(2) S 09° 09' 45" W, 31.40 feet;

(3) S 57° 05' 41" W, 40.50 feet;

(4) S 30° 57' 50" W, 58.31 feet;

(5) N 31° 25' 47" W, 42.19 feet;

(6) N 74° 00' 23" W, 163.32 feet;

AR0005633

(7) S 74° 11' 19" W, 117.44 feet;

(8) S 39° 31' 22" W, 103.71 feet;

thence leaving said southerly line, N 41° 45' 11" W, 77.06 feet to the southeast corner of the Lands of Verducci, as shown on sheet 1 of said Record of Survey Map; thence along the easterly and northerly lines of said Lands of Verducci, N 02° 11' 34" E, 75.00 feet and N 87° 48' 26" W, 25.00 feet to the southeast corner of the Lands of Smithson as shown on sheet 1 of said Record Of Survey Map; thence along the easterly and northerly lines of said Lands of Smithson, N 02° 11' 34", 175.01 feet and N 87° 48' 26" W, 35.00 feet; thence leaving said northerly line, N 02° 11' 34" E, 95.00 feet; thence N 79° 50' 00" E, 338.81 feet; thence N. 65° 50' 00" E, 166.83 feet; thence N 03° b 47' 46" W, 130.00 feet; thence easterly 117.01 feet along the arc of a non-tangent curve to the left, from which the center bears N 86° 12' 14" E, having a radius of 50.00 feet, through a central angle of 134° 05' 07" to the westerly line of said Bailey Avenue; thence S 02° 11' 34" W along said westerly line of Bailey Avenue, a distance of 487.33 feet to the Point of Beginning, and containing 4.895 acres, more or less.

Bearings and distances contained herein conform with the California Coordinate System, Zone 11. To obtain ground level distances, multiply distances described by 0.9999282.

PARCEL 3 (GLEN COVE PARK SITE)

All that certain real property situated in the State of California, County of Solano, City of Vallejo as to all but the tideland portion and County of Solano, State of California, as to the tideland portion described as follows:

All of Block 1, 4, 20 and 21, inclusive, as shown on that certain map entitled: "Map No. 2 of Glen Cove, Solano County, California", filed in the office of the County Recorder of Solano County, California, August 7, 1903, in Book 1 of Maps, Page 52; including that portion of the southerly 1/2 of Center Street, adjacent to the North boundary of said Blocks 1 and 4, all that portion of East Street lying between said blocks, and all of the street lying between Block 1 and Block 20, (said streets having been abandoned), and also including the East 1/2 of that portion of Bailey Avenue adjacent to the West boundary of said Block 4 and 21.

Excepting therefrom any portion thereof lying southerly of the southerly line of Tideland Survey No. 15. Approximately 8.942 acres, more or less.

**EXHIBIT A-2**

(to Easement)

AR0005634



**EXHIBIT B**
(to Easement)

GLEN COVE WATERFRONT PARK MASTER PLAN
LandPeople, landscape architects & planners

FIGURE 3: Existing Park Conditions

AR0005635

Noting the negotiators lacked "any knowledge whatsoever of California Indians or their cultural practices, especially those regarding land ownership and use," Professor Heizer placed the entire treaty-making effort in proper but disturbing perspective:

> We know today that most of the so-called tribes were nothing more than villages. We can also assume that men listed as 'chiefs' were just as likely not to be chiefs, or at least tribelet heads who are called chiefs by anthropologists. Further, since land was owned in common, even chiefs had no authority to cede tribelet or village lands. Rarely, if ever, in United States history have so few persons without authority been assumed to have had so much, and given so much for so little in return to the federal government. The three Commissioners did not have the slightest idea of the actual extent of the tribal lands of any group they met with. Their orders were to secure Indian land title to California, and they managed to do this to their satisfaction by making treaties with some Indians and then dividing all of California west of the Sierra-Cascade crest into eighteen unequal cession areas which, happily, quite covered the entire region. If the Commissioners had made 12 treaties, the ceded areas would have been larger; if they had made 30 treaties, the areas would have been smaller.
>
> Taken all together, one cannot imagine a more poorly conceived, more inaccurate, less informed and less democratic process than the making of 18 treaties in 1851-52 with the California Indians. It was a farce from beginning to end…

(*See* HEIZER, EIGHTEEN UNRATIFIED TREATIES, p. 5 [Tab B].)

Not surprisingly given the foregoing, the treaties themselves make no mention of the lands to be relinquished, only the lands to be reserved. (*See* Whiteman Report, App'x. C (Treaties I, O) [Tab E]; *see generally* S. EXEC. DOC. 4, 32ND CONG., SPEC. SESS., JOHN MCKEE, MINUTES KEPT BY JOHN MCKEE, SECRETARY, ON THE EXPEDITION FROM SONOMA THROUGH NORTHERN CALIFORNIA 134-80 (Comm. Print 1851), [the "MCKEE MINUTES"] [attached as Tab A] (detailing discussion of

AR0005687

lands to be reserved, and on which Indians would be relocated, but nowhere discussing the scope of ceded lands); *see also* Andrés Reséndez, Comments about the historical basis for the Scotts Valley Band of Pomo Indians' Request for Indian Lands Determination in the City of Vallejo (Nov. 2016) (unpublished manuscript) [the "Reséndez Report"], pp. 2-3 [Tab D]; Stephen Dow Beckham, Scotts Valley Band of Pomo: Preliminary Report for "Indian Lands Determination," Vallejo, Solano County, California (Nov. 2016) (unpublished manuscript) [the "Beckham Report"], p. 62 (in regard to the Treaty of Lupiyuma, "a paper was executed and duly signed by the principal chiefs, defining the limits of a reserve on which they were to reside as their own possession, stipulating also, for the removal to it, of all the tribes on Russian and headwaters of Eel Rivers.") [Tab F].)) Nor does the map documenting the McKee expedition travels identify any ceded lands. That document only identifies lands reserved by the McKee treaties. (*See* George Gibbs, Sketch of the Northwestern part of California, Accompanying a Journal of Col. Reddick McKee, U.S. Indian Agent during the summer and fall of 1851 (undated) [Tab L].) In sum, the areas to be ceded by the unratified California treaties were nowhere documented during the treaty-making process and, they were, therefore, nowhere defined or described in any of the treaty documents.

A simple reading of the pertinent provision of the 1836 treaty at issue in the *Grand Traverse* case, as compared with the same operational provision of the Treaty of Lupiyuma, also known as Treaty O, underscores this critical point. The United States' treaty with the Ottawa goes into minute detail in identifying the land the tribal signatories ceded:

> Article 1.
>
> The Ottawa and Chippewa nations of Indians cede to the United States all the tract of country within the following boundaries: Beginning at the mouth of Grand river of Lake Michigan on the north bank thereof, and following up the same to the line called for, in the first article of the treaty of Chicago of the 29th of August 1821, thence, in a direct line, to the head of Thunder-bay river, thence with the line established by the treaty of Saganaw of the 24th of September 1819, to the mouth of said river, thence northeast to the boundary line in Lake Huron between the

AR0005688

> United States and the British province of Upper Canada, thence northwestwardly, following the said line, as established by the commissioners acting under the treaty of Ghent, through the straits, and river St. Mary's, to a point in Lake Superior north of the mouth of Gitchy Seebing, or Chocolate river, thence south to the mouth of said river and up its channel to the source thereof, thence, in a direct line to the head of the Skonawba river of Green bay, thence down the south bank of said river to its mouth, thence, in a direct line, through the ship channel into Green bay, to the outer part thereof, thence south to a point in Lake Michigan west of the north cape, or entrance of Grand river, and thence east to the place of beginning, at the cape aforesaid, comprehending all the lands and islands, within these limits, not hereinafter reserved.

Treaty with the Ottawa, Etc., 1836, U.S.-Ottawa-Chippewa, art. I, Mar. 28, 1836, 7 Stat. 491.

The difference between this language and that at issue in Treaty O with the Clear Lake tribes is stark and significant. The comparable provision in Treaty O states:

> Article 3.
>
> The said tribes or bands *hereby jointly and severally relinquish, cede, and forever quit claim to the United States, all their right, title, claim, or interest of any kind*, which they or either of them have *to lands or soil in California.*

Treaty Made at Camp Lupiyuma ("Treaty O"), August 20, 1851, unratified (emphases added) (Whiteman Report, App'x. C [Tab E].).

Moreover, no map of the land to be ceded was developed during the negotiation and signing of Treaty O — only a map of the lands reserved was created. Nor did the minutes of the meetings with the government's primary treaty negotiator, Commissioner Redick McKee, record any discussion of the land to be ceded by virtue of the treaty negotiation. (MCKEE MINUTES, p. 141 [Tab A].) In contrast, Treaty O's Article 4 discusses the land to be reserved to the signatory tribes

12

in great detail, and the minutes describe the Clear Lake Indians' reservation as encompassing "all of the Clear Lake valley proper...."[10]    (*Id.*)    No land encompassing any part of what is modern day (but distant) Solano County, including Vallejo, is mentioned as land to be reserved for the Clear Lake Indians.

2.    **Royce Map Area 296 Is Not A Reasonable Proxy For The Lands Historically Occupied And Ceded By The Signatories To "Treaty O".**

While George Gibbs (an interpreter and member of the McKee expedition) contemporaneously documented the lands reserved by the tribes during the expedition, it was not until 1899 – *nearly forty-eight years after Treaty O was*

---

[10]    Article 4 of Treaty O provides, "To promote the permanent settlement and improvement of said tribes or bands, it is hereby stipulated and agreed on the part of the United States, that the following tract or district of land shall be appropriated and set apart as an Indian reservation, and the use and possession thereof forever guaranteed to the said tribes, their successors, and to such other tribes as the United States may hereafter remove from the valley of the Russian river or elsewhere, and settle thereupon, to wit: commencing at a point on Clear lake, where a spur from Mount McKee (heretofore called the Chemisal mountain) juts into the same; thence along a line running southwardly over said mountain and over the hills behind the same to the summit level of the mountains dividing the Clear lake valley from the waters of the Rio Dolores; thence westwardly along the same and along the summit of those dividing said valley from the waters of Russian river, to where said mountains meet those dividing said valley from the waters of Eel river; thence along said ridge to a point where said last-mentioned mountains meet those dividing said valley from the waters of the Sacramento; thence along the summit of the same to a point due north of the place of beginning; thence south to the said point. Containing all that part of the valley of Clear lake lying westward of said Mount McKee, the habitable part of said tract being by estimation about twelve miles in length by about six miles in width, together with the exclusive right of fishing in that part of said lake included within the foregoing boundaries.  It is however expressly understood and agreed that the United States reserves the right of way over said lands, and of using for farming purposes any quantity thereof not exceeding one thousand acres; also the right to establish such military posts, erect such buildings, and make such improvements for the accommodation of their agent and other officers or servants as the President may direct; also, that said tribes or bands shall never sell or alienate their right or claim to any part thereof, except to the United States, nor shall they ever lease to or permit white men to settle, work, or trade upon any part thereof without the written permission of the United States Indian agent for the district. And it is further understood and agreed that, if the tribe or band of Indians known as the Cho-tam-o-man-as, now living near the lower end of Clear lake, but not directly represented in this council, shall so desire, the said tribe or band may remove to, and settle upon said reservation without further stipulation, and thereby become entitled to a just proportion of the land and other benefits contemplated in this treaty, as fully, according to their numbers, as if they were present and parties to this compact."

AR0005690

*negotiated and signed* – that the first map identifying the lands ceded (but not described or delineated) was produced (by Charles Royce). In the description of this map, Royce only states, "Cede all claim to other territory" and "Reserve a tract on Clear Lake."[11] These notes appear in the Schedule of Indian Cessions, which accompanied a set of maps identifying lands ceded by Indian tribes across the United States. No other documentation or note supports the identification of the Land cession 296 on Royce California Map 1.[12]

However, as it happened, the map Royce prepared for the Treaty of Lupiyuma was "grossly inaccurate," "embracing a vast tract extending from Clear Lake on the north to San Pablo and San Francisco bays on the south and from the Sacramento River on the east to west of the Napa River to the west." (Beckham Report, p. 64 [Tab F]; *and see* Map [Tab C].) The Royce map ignored that Commissioner McKee never met with representatives of some of the tribes who actually lived in the area that Treaty O would be deemed (years later) to have ceded — not the Wappo, Coast Miwok, or Southern Patwin. (*See* Beckham Report, p. 64 ("The map gratuitously assumed the negotiations with the eight tribelets in the vicinity of Clear Lake ceded the lands of the Wappo, Southern Patwin and Coast Miwok to the south. Those tribes never met with Redick McKee in any treaty council. The Royce map showing Cession No. 296 is erroneous and in no way reflected tribal distribution, use or occupancy of lands in the boundaries it delineated.") [Tab F]); *see also* Reséndez Report, pp. 2-3 [Tab D].) Moreover, historical evidence shows that at least some Patwin located in the area purportedly relinquished by Treaty O actually participated in the negotiations for a different treaty. (*See* Whiteman Report, pp. 26-27, App'x. C [Tab E]; *see also* Map [Tab C].)

In fact, less than three weeks after McKee treated with the Clear Lake Indians, Commissioner O.M. Wozencraft negotiated a treaty at Camp Colus, on September 9, 1851. This treaty is known as "the Treaty with the Colus-Willeys, Co-ha-na, Tat-nah, Cha-doc-duc, Cham-net-co and Toc-de tribes of Indians of California," or

---

[11] EIGHTEENTH ANNUAL REPORT OF THE BUREAU OF AMERICAN ETHNOLOGY TO THE SECRETARY OF THE SMITHSONIAN INSTITUTION 1896-97, INDIAN LAND CESSIONS IN THE UNITED STATES, PART 2 784-85 (Charles C. Royce, comp. 1899) (compiling Native American land cessions from 1784-1894).

[12] *Id.*, at 784.

AR0005691

"Treaty I." (Whiteman Report, pp. 24-25 [Tab E].) The title is especially important in this case because at least three of the signatories were Patwin – Cha-doc-duc, Cham-net-co (also spelled as Chemoco, Chemocu and Chem-met-co) and the Toc-de (also spelled as Tokti or Tō'ktī). (Whiteman Report, pp. 24-25 [Tab E].) The Cham-net-co and Toc-de traveled from their villages on Putah Creek and Bartlett Creek, respectively. Both villages are located well within the area allegedly ceded by Treaty O, and in the case of Cham-net-co, it is literally in the center of that territory. (Whiteman Report, pp. 24-25 [Tab E].) In the case of the Yocha Dehe Wintun Nation, its direct ancestors' homeland – the Capay Valley (including the villages of Imil and Kisi) – is included in the area Royce mistakenly identified as ceded by Treaty O. (*See* Treaty at Camp Colus, September 9, 1851, unratified; Map, [Tab C]; Whiteman Report, pp. 28-29, App'x. B (Kroeber, Bennyhoff Maps) [Tab E].)

Cham-net-co and Toc-de obviously existed when the Treaty at Camp Lupiyuma was signed on August 20, 1851, because they signed a treaty with O.M. Wozencroft less than three weeks after that date at Camp Colus. It is equally obvious that the same two villages would not have designated the Clear Lake Indians as their successors in interest and then embarked on a lengthy voyage to treat with Commissioner Wozencraft and cede their interest in their territory again. And although the direct ancestors of the Yocha Dehe Wintun Nation do not appear to have participated in the treaty council at Camp Colus (or Camp Lupiyuma for that matter), the historical evidence shows they never died out or moved from their homes. Nor did they, or any Patwin tribe, ever give the Clear Lake Indians the authority to cede their Patwin lands to anyone. (*See* Whiteman Report, pp. 28-37 [Tab E].)

> ### 3.    Scotts Valley Rewrites History To Suggest The Clear Lake Indian Tribes Succeeded The Patwin Tribes When Negotiating With The United States.

Despite the historical record detailed above, Scotts Valley argues the United States recognized and treated the Clear Lake Indians as successors to the Patwin, the former occupants of the lands in the Vallejo area. (Scotts Valley Memo, p. 20.) Scotts Valley makes this assertion after first conceding the area that included San Pablo Bay and Vallejo in particular was "part of the territory of the Patwin people."

15

John McKee, "Minutes Kept by John McKee, on the Expedition From Sonoma, through Northern California,"
August 1851, Sen. Ex. Docs., 33 Cong., Spec. Sess., Doc. 4, pp. 134-180 (688).

**136** . **S. Doc. 4.**

were also made, and runners despatched to various tribes of Indians above and below us, on this river, for the purpose of collecting the chiefs and captains at some convenient point near this, so that the agent may meet them in council; and that any Indians that may arrive at this camp for the purpose of meeting him should be supplied with food, viz: bread and beef. Distance 12¼ miles—total, 73 miles.

JOHN McKEE, <em>Secretary.</em>

*Camp Lupiyuma, near Clear lake, August 17, 1851.*—R. McKee and party, composed of secretary, and Gibbs as interpreter, with a sufficient number of pack-mules to transport provisions and such presents as are designed for the Indians; also ten head of cattle, with a detachment of ten dragoons in charge of Major Wessells as an escort—all under the guidance of two Indian guides—left the main camp at an early hour this morning, and commenced ascending the mountains dividing the Russian river and Clear Lake valleys, following a narrow, precipitous trail leading in many places through a dense forest, with oak and chemisall undergrowth. The axes were used freely to permit the pack-animals to pass safely. Rain commenced falling when the summit of the mountain had been gained, which rendered the descent into this valley very difficult. Very much to the surprise of all, the rain has continued all the afternoon. We are encamped upon the table-lands immediately adjoining the lake. Several Indians have visited camp this evening, and we expect to have several chiefs in council to-morrow.

Distance estimated at 15 miles.

General Estelle and staff and Messrs. Price and Shirland (the two latter gentlemen residents at one time in this valley) have also accompanied the agent, and are encamped near us.

JOHN McKEE, <em>Secretary.</em>

*Camp Lupiyuma, August 18, 1851.*—According to agreement a number of the chiefs and braves of the Clear Lake Indians met agent McKee, at an early hour this morning, in council. Present: Mr. George Gibbs, interpreter; Major Wessells, of the escort; General J. M. Estelle, of the California militia, and staff; and Messrs. Smith, McDonald, and Whitehorn. After an hour spent in ascertaining names and location of chiefs present and their tribes, the secretary reported the following-named chiefs as being present:

Julio, representing the Ca-ba-na-po tribe and captains;
Prieto, representing the Ha-bi-na-pa tribe and captains;
Ku-kee, representing the Do-no-ha-be tribe and captains;
Moh-shaw, representing the Moal-kai tribe and captains;
Chi-bee, representing the How-ru-ma tribe and captains;
Cal-i-a-hem, representing the Che-com tribe and captains;
Con-chu, representing the Cha-net-kai tribe and captains; and
Cee-ne, representing the Me-dama-ree tribe and captains.

Mr. Ed. Shirland, having lived for several months among the Indians in this neighborhood, offered his services as an assistant interpreter, which were accepted. Mr. George Whitehorn was also employed in

Scanned by KJD - 2009

AR0005716

Case 1:19-cv-01544-ABJ    Document 61-1    Filed 12/17/21    Page 283 of 449

John McKee, "Minutes Kept by John McKee, on the Expedition From Sonoma, through Northern California,"
August 1851, Sen. Ex. Docs., 33 Cong., Spec. Sess., Doc. 4, pp. 134-180 (688).

the same capacity. The chiefs Con-chu and Co-e-ne live with their tribes upon the hills dividing the waters of Clear lake from Eel river, and are not familiar with the language of the Clear Lake tribes. Two or three Indians present, and familiar with Spanish, were selected to communicate *directly* to the chiefs. Agent McKee addressed the chiefs, and said: "Brothers, listen to my talk. We come among you as friends to learn the cause of your troubles, if you have any, and your condition generally. What I say comes straight from the heart, and there shall be no crook in my path, nor fork in my tongue; listen attentively, and give me your minds after you have heard." Chiefs replied, "that they were happy to see us as *friends*, and that inquiry would be made as to their condition; this is what we want, and we will deal fairly with you; speak the truth only; we are glad to learn you will speak the truth." Agent McKee resumed: "I understand that several treaties have been made with portions, perhaps all of you, by officers of the Spanish-Mexican government and by private individuals. But I come from the Great Father, the President, at Washington, the most powerful and the *richest chief* on this continent, and anything I may do in his name will be final and binding upon you, if he approves. That Great Father, my chief, has conquered this country, and you are his children now, and subject in all things to him." Chiefs replied: "It is good." Agent resumed: "Brothers, we know you were the original owners of these broad lands, and that the Spaniards, Mexicans, and Californians have been in turn your conquerors and masters, until finally the President, my great chief, has conquered and owns this country. The President has learned that his red children in California are at war with the whites and among themselves; are very poor and ignorant; and he has sent three commissioners among them to inquire into their condition."

Chief Julio inquired who this Great Father, the President was, and where he lived, and said he wanted information concerning him; and if he is the good chief represented, that he was willing to live subject to him. The agent endeavored to give them a proper understanding of the locality and power of the United States, and of the President, and said that his warriors were more numerous than the leaves around this camp; that he had many other red children east of the big mountains, and had found by experience that it was good for them to live in one settlement, where they would be protected and taught the arts and habits of civilized life, draw their subsistence from the soil, and have a home of their own; that when once collected the product of their labor should be their own; that these settlements were not designed upon the old mission principle, where the Indian labored to make the white man rich. Some of the Great Father's children were bad men, but the great majority were good; he wished his red children to live together, that they might be protected both from bad whites and bad Indians, and that all who disobeyed his laws would be severely punished and compelled to acknowledge his authority. These matters were dwelt upon and repeated until the chiefs professed to have an understanding of them all. Chief Prieto inquired how the President collected his red children east of the mountains, &c. Agent replied that several tribes sometimes were brought into one settlement and

AR0005717

John McKee, "Minutes Kept by John McKee, on the Expedition From Sonoma, through Northern California," August 1851, Sen. Ex. Docs., 33 Cong., Spec. Sess., Doc. 4, pp. 134-180 (688).

**138**                         **S. Doc. 4.**

provided with farmers, mechanics, teachers, &c., &c.  Several of the chiefs immediately inquired, with some earnestness, if it was intended for them (those present) *to live together* in one rancheria, or village, and thus make one people of them.  This appeared to be an exciting question among the chiefs, as it might affect their authority.  Agent McKee explained that they must live upon one reservation of land, and, if they chose, upon different portions of it; but that the President preferred they should all live in one village, and peaceably together, and the advantages of so doing were fully explained; further, that some six or seven treaties had been entered into with Indians in the southern part of this State, who were now living peaceably together, &c.  The chief Ku-kee said he lived at the head of Clear lake, and inquired why he could not be subject to the President, and remain there.  Agent McKee again explained the kind intention of the President in settling the tribes together.  The chief Moh-shaw said he believed it was through *pity* for the Indians, and to improve their condition, that these arrangements were proposed; that heretofore the white men among them had derided and made sport of their distress.  Chief Prieto said he had heard of the treaties made with the Indians on the San Joaquin river, &c., and he was glad to see the agent among them for that purpose, and that he would act in good faith, though they had been often deceived; that he was willing to do now what the agent might advise, and pledge himself and his people for his own good faith to-day.

Agent McKee resumed: "The President has very many red children living beyond the big mountains, and settled happily upon lands of their own, where white men were not permitted among them; that they were cultivating the soil, raising stock, &c., and had now no cause for war, neither among themselves nor with the whites.  The President wishes to improve you in the same way, and has sent his agents among you for that purpose.  He is well satisfied that is the best plan for you; if you will agree to be settled in this way you must give up all right to all other lands, and never move again without the President's permission.  But your young men may hire out to work upon the different ranches, if they are well-behaved, and the agent gives them permission.  Your families, however, must always remain at one place.  The agent sent among you will settle all your difficulties and prevent the whites from injuring you, and will cause guilty Indians and guilty whites to be punished.  The President will also give you teachers, farmers, and mechanics, to teach you many things and improve your condition very much."  After the above was fully explained, the chief Julio said he was fully sensible of the great inferiority of the Indians to the whites, and that it was not important to him whether the teachers given to the tribes were *red or white*, so they were good men, and would treat his people kindly and improve their condition.  He wished his young people to know more than he did, and live at peace with all the world; further, we have all heard your talk, and think well of it.  Agent McKee said: "I do not know when these things can be done for you—the President must first give his permission: it may be one or two years; but I will advise it, and I think it will be done after awhile."  Chief Julio said that they (the chiefs) would be governed by the wishes of the agent, as they believed it would result for their good.

AR0005718

John McKee, "Minutes Kept by John McKee, on the Expedition From Sonoma, through Northern California," August 1851, Sen. Ex. Docs., 33 Cong., Spec. Sess., Doc. 4, pp. 134-180 (688).

## S. Doc. 4. 139

Agent McKee again resumed: "It will cost the President much money and trouble to do all these things, and his laws must be obeyed; guilty Indians must be punished, and it must be distinctly understood that all Indians guilty of crime must be delivered up to the authorities of the State of California for trial. Such men must not be harbored among you, and it will be your duty to inform upon them. Whites will be dealt with in the same manner as Indians—equal justice to all. I wish you fully to understand that these arrangements cannot be completed for you now; but I have a few presents, and some hard bread and beef, which I will give you as an evidence of the good will of the President towards you; but he must first approve of my acts before you can receive any permanent benefit.

"I wish you chiefs to retire and consult upon these three points, viz: Concerning some tract of land you can all agree to live upon; 2. Whether you will agree to have any tribes of Indians, not represented here, live with you upon the same land; 3. Give me, as near as you can, the number of each of your tribes. This last I wish you to be very particular about. You may now retire, and meet me again in two hours." All of these remarks were explained through the interpreters, at suitable intervals, and all the gentlemen present were satisfied the Indians had received a proper understanding of the matters treated of. Council adjourned, to meet at 4 p. m.

JOHN McKEE, *Secretary.*

*August 18—4 o'clock p. m.*—Council convened, and agent McKee expressed his readiness to listen to any remarks the chiefs might have to make upon the subject given them for consideration in the morning. The chiefs, in turn, said they would prefer remaining at their own homes, if it could be so ordered; but they believed the agent had spoken in good faith, and they would do as he requested. Again, that any Indians the President might send to live with them would be received as brothers and treated kindly. The chiefs here produced several bundles of sticks or broken twigs, as the number of souls in each band. The secretary counted the same, and reported the number claimed by Con-chu and Coe-ne, from the hills in the direction of Eel river, 150 souls; Julio claimed 160; Cal-i-a-hem, 91; Chi-bee, 40; Prieto, 65; Moh-shaw, 45; and Ku-kee, 70. These numbers included all at home and abroad. As these totals fell so far short of the number of Indians living about this lake as estimated by the two gentlemen present, who had lived among them, agent McKee determined to test the accuracy of the report by counting himself the men, women and children of two rancherias, or villages, near the camp, and requested the chiefs Julio and Prieto to bring *their whole tribes* together in the morning, which was agreed to. Agent again: "The ten cattle I have brought with me are intended as a present to you, and for your women and children, and I will have two bullocks killed for you this evening. You must divide the beef among all the Indians in this neighborhood."

Council was then adjourned, to meet at 10 o'clock to-morrow morning.

JOHN McKEE, *Secretary.*

AR0005719

Case 1:19-cv-01544-ABJ    Document 61-1    Filed 12/17/21    Page 286 of 449

John McKee, "Minutes Kept by John McKee, on the Expedition From Sonoma, through Northern California,"
August 1851, Sen. Ex. Docs., 33 Cong., Spec. Sess., Doc. 4, pp. 134-180 (688).

*Camp Lupiyuma, Tuesday morning, August 19, 1851.*—R. McKee rode out early this morning, in company with several gentlemen, to examine this valley with reference to the expediency of setting it apart as an Indian reservation; returned and commenced the council at 10 o'clock, as per agreement. Present: interpreters, Major Wessells, and same company of gentlemen that were present upon yesterday morning; also the eight chiefs and their captains named in yesterday's minutes.

Chief Prieto reported that his men, women, and children were present. The secretary proceeded to number them, with the following result:

Present, 14 men; 17 women; 8 boys and girls. Reported absent, 15 men; 35 women; 5 boys and girls. Total tribe: 29 men; 42 women; 13 boys and girls—84.

Chief Julio was also near with his people.

Present, 52 men; 56 women; 23 children. Reported absent, 33 men; 25 women; 6 children. Total tribe: 85 men; 81 women; 29 children—195.

Their numbers, as counted, exceeded the account given yesterday, and Prieto and Julio, upon being questioned as to the cause of the discrepancy, replied that the names of some of their old people had escaped their recollection, but that they had endeavored to deal fairly, and wished to speak the truth. Agent, assuming that the whole number would be increased in same proportion, added 25 per cent. to the number given in by the chiefs yesterday, and estimated that the number of Indians living in the Clear Lake valley, who would be affected by a treaty, would be 900 or 1,000 souls, all told—far short of the generally supposed number. The following questions were asked the chief Julio:

Have you any knowledge of a Supreme Being, or prime cause of all things?

Reply. I know the grass grows, that the trees grow and produce acorns and leaves, but the cause I am ignorant of. I think there is some great power in the heavens, and that it has a good head and wishes the Indian well, but don't know much about it—how should I know?

Query. Is there a bad spirit?

Reply. I know there are bad men and bad animals, and suppose there must be a bad spirit somewhere; but there shall be *no more bad Indians* with us.

Query. What becomes of Indians after death?

Reply. I know that we must all die, and are liable to die at any time and place, but what becomes of us I don't know. You ought to know; you are a people of reason, and know more than we do.

Query. Do you think you live at all after death?

Reply. No idea—you must know.

Query. Why do you burn the body?

Reply. Because it has always been the custom with us; and, besides, it is of no more use.

AR0005720

John McKee, "Minutes Kept by John McKee, on the Expedition From Sonoma, through Northern California," August 1851, Sen. Ex. Docs., 33 Cong., Spec. Sess., Doc. 4, pp. 134-180 (688).

**S. Doc. 4.**                    **141**

Many questions of similar import received nearly the same character of replies. They have no definite idea of anything spiritual, but are aware the whites are familiar with these subjects. The object of this questioning of the chiefs was explained, and the council adjourned, to prepare copies of a treaty.

JOHN McKEE, *Secretary.*

*Tuesday afternoon, August 19.*—Council convened at 3 o'clock. Present: interpreters, Major Wessells, General J. M. Estelle, and same company of gentlemen and Indians as were present at the first meeting. Agent McKee proceeded to explain to the Indians the nature of the proposed treaty, and what he proposed giving them in the name of the President. He would give them all of the Clear Lake valley proper, upon condition they would all live in it peaceably, and agree that all other tribes the President may send among them to live should be received as brothers, &c. The eight chiefs, Coene, Kukee, Mohshaw, Julio, Prieto, Conchu, Chibee, and Caliahem, each in his turn agreed to live upon the reservation, upon the conditions; and those living now without its limits promised to move into it immediately, and use their best endeavors to induce other Indians to come with them. Chibee said he was sure a chief called Kabui, living near him at the foot of the lake, would come with him. Agent said provision would be made for all. A draught of the reservation was shown and explained, until the chiefs understood it fully, and said that this was the first time white men had talked together kindly. The several articles of the treaty were read and explained, as also the necessity of good behavior on their part, until all the Indians expressed themselves satisfied, and to have a full understanding of the agreement. Council was then adjourned, to prepare a duplicate copy. A bullock was ordered to be killed for the Indians, and a quantity of hard bread distributed. After the Indians had retired, R. McKee submitted the treaty to Major Wessells, of the escort, General Estelle, and several other gentlemen who have been present at the different councils at this camp, for the purpose of obtaining any advice or suggestions they might propose. The paper, with its several articles contemplating provision for 1,000 souls, was read and considered. Its stipulations were highly approved of by the several gentlemen, and the consummation of the treaty, as written, advised, as being honorable to the government and satisfactory to the people of California.

JOHN McKEE, *Secretary.*

*Camp Lupiyuma, Wednesday morning, August 20.*—Agent R. McKee met the eight chiefs, Prieto, Julio, Conchu, Coene, Chibee, Caliahem, Kukee, and Mohshaw, at an early hour. Interpreters, Major Wessells, General Estelle and staff, and a number of Indian braves, were also present. The several articles of the treaty as agreed upon were read separately, and again fully explained; also the duty due the government of the United States by the Indians. That no agent would be sent among them at present, and that any flour and beef given them this fall the chiefs must send runners for, as the mountains surrounding this lake are impassable for wagons, and it would cause the

AR0005721

John McKee, "Minutes Kept by John McKee, on the Expedition From Sonoma, through Northern California,"
August 1851, Sen. Ex. Docs., 33 Cong., Spec. Sess., Doc. 4, pp. 134-180 (688).

**142**                              **S. Doc. 4.**

President great expense to send it here now. The chiefs said they were perfectly willing to enter into and sign the treaty, and send after any food the agent might give them.

Agent McKee resumed: General Estelle's ranche is on the Bay of San Francisco, near Vallejo, and he has agreed to take care of any flour I may order for you, as some of your people are sick, and you must send to his ranche for it.

This was agreed to.

R. McKee again: Should any disturbances or difficulties arise among you, or with the whites, you must also go to General Estelle, as he has offered to advise you in these matters till I return. There are two gentlemen present—Messrs. Price and Shirland—who have property, cattle, and horses, upon this reservation. You must permit and assist them to remove their stock, and you must not destroy any of it.

These things were all agreed to. One copy of the treaty was placed in the hands of a gentleman present, and the other read aloud by the secretary, and after examination *pronounced duplicates.* The copies were then signed by R. McKee, the eight chiefs, and such of their braves as were selected; their names written by the secretary, so as to preserve the original pronunciation, and each Indian made his mark. Treaty was then witnessed by the secretary, interpreters, officers, and gentlemen present, and exchanged by chief Julio, he being selected to preserve one copy. R. McKee then proceeded to distribute presents of bread, blankets, shirts, axes, hats, pants, handkerchiefs, &c., to the chiefs, for themselves and braves. The remainder of the ten head of cattle were given them, and they advised to drive or kill and carry the meat home, for their women and children. Council was then closed, all expressing much gratification that an amicable arrangement had been effected with these bands, among whom it has been dangerous for whites to visit.

> JOHN McKEE, *Secretary.*

The Clear Lake Indians appear to be very poor, ignorant, and lazy. Some of the young men and women go off to the different ranches in Sonoma and Russian river valleys, and work for food and clothing, and thus acquire a knowledge of the Spanish language. Their principal food consists of fish and acorns, the lake affording quantities of the former, and the oak on the hills the latter. Many of them have beards and mustaches. The Indians met here are those against whom an expedition was sent about one year ago under Captain Lyons, United States army, because of the murder of two whites living among them. We have since learned that the death of the whites was caused by their own imprudence and cruelty to the Indians working for them, and that many innocent persons have suffered in consequence. They are fearful of troops, and it has been fatiguing and laborious work to bring the Indians to a correct understanding of the object of the agent in coming among them, through three interpreters.

R. McKee ordered fifty sacks of flour to be sent from San Francisco to Estelle's ranche for the use of the Indians in this reservation; and after again explaining that it must be sent for, we broke up our camp, and reached the main camp, on Fernando Felix's ranche, after a hard ride

AR0005722

John McKee, "Minutes Kept by John McKee, on the Expedition From Sonoma, through Northern California," August 1851, Sen. Ex. Docs., 33 Cong., Spec. Sess., Doc. 4, pp. 134-180 (688).

## S. Doc. 4. 143

of eight hours. Two chiefs accompanied the agent to be present at any meeting with the Russian River Indians, and assist in giving information to them of the object of his visit, &c.

JOHN McKEE, *Secretary.*

*Camp Fernando Felix, Russian river, California, August* 21, 1851.— Some three or four hundred Indians had assembled at our camp during the absence of R. McKee at Clear lake. Several ranche owners living in the valley were also with us. With them R. McKee advised, explaining his desire to remove all the Indians from this river to the Clear lake reservation, leaving this valley for the whites; and from them obtained much information relative to names, condition, habits, &c., of the Indians. The plan for collecting them all in one place was fully approved.

Agent McKee then met the Indians in council, and, after examination, five principal chiefs were reported present. Major Wessells and Dr. J. S. Griffin, of the escort, three ranche owners, Messrs. Gibbs, Shirland, and Whitehorn, as interpreters, were also present. R. McKee said: I am sorry to find some misunderstanding has prevented many of the Indians on this river from meeting me here. I have taken great pains to have all understand the object of my coming here, and hoped to have met very many more here to-day. R. McKee then proceeded to dwell at length upon the following points: That they were now the children of the Great Father at Washington, and subject to his laws. You are no longer slaves to the rancheros, but free. You are now personally responsible for your behavior. You must respect the Spaniards, ranche owners, &c., and protect their property. The whites then will respect you. Our laws are all equal, and justice will be meted out alike to whites and Indians. You must no longer burn the grass, and destroy property. The Great Father wishes to improve your condition, and have you all settled together. The reasons for so doing and the plan of settling Indians in one reservation were dwelt upon. The chiefs Prieto and Julio were introduced. These chiefs were parties to the treaties at Clear lake; and Prieto spoke to the Indians present, giving them details of the councils there, and expressing his belief that the arrangements contemplated were for the benefit of the Indians. The chiefs and several of their captains said in turn, in substance, that they were pleased with what had been said. The names of the chiefs were now ascertained to be Chas-kan, Ko-yo-ta-was-sa, Cal-pel-la, Chi-bem, and Jose Maria Cal-the-la; the latter the first captain under Santiago, an old chief sick at home. When asked if they would remove to a home, if given them, of their own, and where they could be taught to farm, read, write, and be clothed, Cal-pel-la said he was pleased with the proposition—that he had always lived peaceably and quietly, and wished to continue to do so. Chi-bem, in substance, the same. Chas-kan and Ko-yo-ta-was-sa said they would live contentedly upon homes of their own. Jose Maria said he thought it was well. R. McKee said, I wish you to retire and consult among yourselves whether you will all go over to the Clear lake and live. I have told you what the President will do for you, if you will agree to go there and remain. It is the President's wish you should do so. I

AR0005723



1:1,750,000

Date: 11/8/2016





Miles
0    12.5    25



N

Appendix A
Table of Patwin Villages

AR0005849

| Dialect Group | #* | Village Name | Location and Description |
|---|---|---|---|
| **Hill Patwin** | | | Hill Patwin territory and above Knights Landing district lie within the area shown as ceded in Treaty O (Royce 1899 area 296). |
| South of Cache Creek, Listed from south to north | J35 | Tolenas | Mapped in Johnson (1978:350) in the plains above Suisun Bay based on Bennyhoff (1961,1977:164). In Bennyhoff (1977:164) Tolenas is shown as a tribelet name along the western boundary of Patwin territory. |
| | | Suisun Sooesoon | Village mapped by Bennyhoff (1977:164) just north of Suisun Bay. A big Pooewin rancheria (Merriam 1967:271). |
| | | CA-SOL-243 | Archaeological site mapped by Bennyhoff (1977:164) on the east side of Suisun Creek, just northwest of Suisun. |
| | | CA-SOL-234 | Archaeological site shown just south of Aguasto in Bennyhoff (1977:164). |
| | | Sogoreate | Subsidiary village to Aguasto shown on map in Bennyhoff (1977:164). |
| | J34 | Aguasto | Village site at Vallejo. Mapped in Johnson (1978:350) based on Bennyhoff (1961). Bennyhoff (1977:164) placed this village in Patwin territory based on mission data. |
| | J33 | Suskol | Very little data, but may represent tribelet capital (Kroeber 1932:262). Also mapped in Johnson (1978:350) on the Napa River at the mouth of the bay. |
| | J32 | Tuluka Tulukai Too-loo'-kah | Very little data, but may represent tribelet capital (Kroeber 1932:262). Also mapped in Johnson (1978:350) south of the town of Napa. From Merriam : A large Pooewin rancheria, a short distance southeast of Napa. An old Spainard named K-tan'-nah (Geatanno?) Juarez took possession of the land on which the rancheria was located [the asylum is there now [in 1906] (Merriam 1967:271). |
| | J31 | Napato Nap-pah | Mapped in Johnson (1978:350) at the town of Napa based on Bennyhoff (1961 [1977:164]). Merriam recorded this Pooewin rancheria as near Too-loo'-kah (Merriam 1972:271). |
| | J30 | Soneto | Mapped in Johnson (1978:350) between the towns of Napa and Vacaville. |
| | J29 | Ula-to Ululato | Very little data, but may represent tribelet capital (Kroeber 1932:262). Located near Vacaville (Johnson 1978:350). Also mapped in Johnson (1978:350) on the south side of Ulatis Creek. A big Pooewin rancheria (Merriam 1967:271). |
| | | Pe'nia Laguna | The big Pooewin rancheria at Vacaville (Merriam 1967:271). |
| | | Topai-dihi Tōpa'idihi | Very little data, but may represent tribelet capital (Kroeber 1932:262). From tōpa'I, a word said by the Capay Valley Wintun to come from the language of the people about Napa. This village was very indefinitely located by the informant as on the west bank of Putah creek at a point about twenty miles upstream from the town of Winters (Barrett 1908:294). |
| | | Now-wa-ke-nah tribe | Lived in Long valley and their number was one hundred said to have been located only a very short distance north of Suisun City (Barrett 1908:291). |
| Putah Creek | | Topayto | Mapped by Bennyhoff (1977:164) on the east side of Putah Creek above Chemoco. |

AR0005853



Kroeber (1925: Plate 34).

AR0005863



Kroeber (1932).

AR0005864



Map 5

Distribution
of tribes of
Wintoon stock

Merriam (1967: Map 5).

AR0005866



Bennyhoff (1977: Map 2).

AR0005868

52

(I.)

TREATY MADE AND CONCLUDED AT CAMP COLUS, ON SACRAMENTO RIVER, CALIFORNIA,
SEPTEMBER 9, 1851, BETWEEN O. M. WOZENCRAFT, UNITED STATES INDIAN
AGENT, AND THE CHIEFS, CAPTAINS, AND HEAD MEN OF THE COLUS, WILLAYS,
&C., TRIBES OF INDIANS.

. . . . . . .

ART. 3. To promote the settlement and improvement of said tribes or bands, it is hereby stipulated and agreed that the following districts of country in the State of California shall be and is hereby set apart forever, for the use and occupancy of the aforesaid tribes or bands, to-wit: commencing on the east bank of the Sacramento river, at a point where the northern line of Sutter's claim is said to strike said river, running out in said line in an easterly direction three miles; thence in a southeasterly direction fifteen miles to a point within three miles of the Sacramento river; from said point in a line due west to the Sacramento river, and from said point up said river to the point of beginning. It is furthermore understood and agreed upon by both parties that the tribes or bands of Indians living upon the adjacent coast range, on the Sacramento river from the mouth of Stone creek to the junction of Feather and Sacramento rivers, and on Feather river to the mouth of Yuba river, shall be included in the said reservation; and should said bands not come in, then the provisions, &c., as set apart in this treaty, to be reduced in a ratio commensurate with the numbers signing the treaty. Provided, That there is reserved to the United States government the right of way over any portion of said territory, and the right to establish and maintain any military post, public building, school-house, houses for agents, teachers, and such others as they may deem necessary for their use or the protection of the

AR0005871

53

Indians. The said tribes or bands, and each of them, hereby engage that they will never claim any other lands within the boundaries of the United States, nor ever disturb the people of the United States in the free use and enjoyment thereof.

. . . . . . .

In testimony whereof, the parties have hereunto signed their names and affixed their seals, this ninth day of September, in the year of our Lord one thousand eight hundred and fifty-one.

O. M. WOZENCRAFT,

<u>United States Indian Agent</u>.

<u>For and in behalf of the Colus</u>.

SCI-OAC, his x mark.                    [SEAL.]

<u>For and in behalf of the Willays</u>.

HO-OAK, his x mark.                    [SEAL.]

<u>For and in behalf of the Co-he-na</u>.

LOUIS, his x mark.                    [SEAL.]

<u>For and in behalf of the Tat-nah</u>.

HOO-KA-TA, his x mark.                    [SEAL.]

<u>For and in behalf of the Cha</u>.

LA-LOOK, his x mark.                    [SEAL.]

<u>For and in behalf of the Doc-duc</u>.

MI-KA-LA, his x mark.                    [SEAL.]

AR0005872

54

<u>For and in behalf of the Cham-met-co</u>.

WI-TE-BUS, his x mark.                    [SEAL.]

<u>For and in behalf of the Toc-de</u>.

CO-NE, his x mark.                        [SEAL.]

Signed, sealed, and delivered, after being fully explained, in

presence of --

Thomas Wright, <u>Second Lieutenant, 2d infantry</u>,

<u>Commanding escort</u>.

C. D. Semple.

————  —

(J.)

TREATY MADE AND CONCLUDED AT THE FORK OF THE COSUMNES RIVER, SEPTEMBER 18,
1851, BETWEEN O. M. WOZENCRAFT, UNITED STATES INDIAN AGENT, AND
THE CHIEFS, CAPTAINS, AND HEAD MEN OF THE CU-LU, YAS-SI, ETC.,
TRIBES OF INDIANS.

. . . . . . .

ART. 3.  To promote the settlement and improvement of said tribes

or bands, it is hereby stipulated and agreed that the following district

of country in the State of California shall be and is hereby set apart

forever for the sole use and occupancy of the aforesaid tribes of Indians,

to wit:  commencing at a point on the Cosumnes river, on the western line

of the county, running south on and by said line to its terminus, running

east on said line twenty-five miles, thence north to the middle fork of

the Cosumnes river, down said stream to the place of beginning; to have

and to hold the said district of country for the sole use and occupancy of

AR0005873

Adam Johnston, <u>Agent</u>.

E. D. Keyes, <u>Captain third artillery, commanding escort</u>.

W. S. King, <u>Assistant surgeon, U. S. Army</u>.

I. M. Lendrum, <u>First lieutenant 3d artillery</u>.

H. G. J. Gibson, <u>Second lieutenant 3d artillery</u>.

N. H. McLean, <u>Second lieutenant 2d infantry</u>.

I. F. A. Marr.

---

(O.)

TREATY MADE AND CONCLUDED AT CAMP LU-PI-YU-MA, AT CLEAR LAKE, STATE OF CALIFORNIA, AUGUST 20, 1851, BETWEEN REDICK McKEE, INDIAN AGENT ON THE PART OF THE UNITED STATES, AND THE CHIEFS, CAPTAINS AND HEAD MEN OF THE CA-LA-NA-PO, HA-BI-NA-PO, ETC., ETC., TRIBES OF INDIANS.

---

A treaty of peace and friendship made and concluded at Camp Lu-pi-yu-ma, on the south side of Clear Lake, between Redick McKee, one of the Indian agents specially appointed to make treaties with the various Indian tribes in California, on the part of the United States, and the under-signed chiefs, captains and head men of the tribes or bands of Indians now in council at this camp, known as the Ca-la-na-po tribe, represented by the chief, Ju-lio and captains; Ha-bi-na-po tribe, represented by the chief, Pri-e-to and his captains; Da-no-ha-bo tribe, represented by the chief, Ku-kee; Mo-al-kai tribe, represented by the chief, Moh-shan and his captains; Che-co tribe, represented by the chief, Cal-i-a-him and his captains; How-ku-ma tribe, represented by the chief, Chi-bec and his captains; Cha-nel-kai tribe, represented by the chief, Con-chu; and the

AR0005874

Me-dam-a-dec tribe, represented by the chief, Co-e-u-e.

ARTICLE 1. The said tribes or bands acknowledge themselves, jointly and severally, under the exclusive jurisdiction, authority, and protection of the United States, and hereby bind themselves to refrain hereafter from the commission of all acts of hostility and aggression towards the government or citizens thereof, and to live on terms of peace and friendship among themselves and with all other Indian tribes which are now or may hereafter come under the protection of the United States.

ART. 2. Lest the peace and friendship established between the United States and the said tribes should be interrupted by the misconduct of individuals, it is expressly agreed that for injuries received on either side, no private revenge or retaliation shall take place, or be attempted; but instead thereof, complaint shall be made by the party aggrieved to the other, through the Indian agent of the United States in their district, whose duty it shall be to investigate, and, if practicable, adjust the difficulty; or in case of acts of violence being committed upon the person or property of a citizen of the United States by an Indian or Indians belonging to or harbored by either of said tribes or bands, the party or parties charged with the commission of the crime shall be promptly delivered up when demanded, to the civil authorities of the State of California for trial; and in case the crime has been committed by a citizen or citizens of the United States upon the person or property of an Indian or Indians of either of said tribes, the agent shall take all proper measures to bring the offender or offenders to trial in the same way.

ART. 3. The said tribes or bands hereby jointly and severally relinquish, cede, and forever quit claim to the United States, all their

right, title, claim, or interest of any kind, which they or either of
them have to lands or soil in California.

ART. 4.  To promote the permanent settlement and improvement of
said tribes or bands, it is hereby stipulated and agreed on the part of
the United States, that the following tract or district of land shall
be appropriated and set apart as an Indian reservation, and the use and
possession thereof forever guaranteed to the said tribes, their successors,
and to such other tribes as the United States may hereafter remove from
the valley of the Russian river or elsewhere, and settle thereupon, to
wit:  commencing at a point on Clear Lake, where a spur from Mount McKee
(heretofore called the Chemisal mountain) juts into the same; thence along
a line running southwardly over said mountain and over the hills behind
the same to the summit level of the mountains dividing the Clear lake
valley from the waters of the Rio Dolores; thence westwardly along the
same and along the summit of those dividing said valley from the waters
of Russian river, to where said mountains meet those dividing said valley
from the waters of Eel river; thence along said ridge to a point where
said last-mentioned mountains meet those dividing said valley from the
waters of the Sacramento; thence along the summit of the same to a point
due north of the place of beginning; thence south to the said point.
Containing all that part of the valley of Clear lake lying westward of
said Mount McKee, the habitable part of said tract being by estimation
about twelve miles in length by about six miles in width, together with
the exclusive right of fishing in that part of said lake included within
the foregoing boundaries.  It is however expressly understood and agreed
that the United States reserves the right of way over said lands, and of

AR0005876

using for farming purposes any quantity thereof not exceeding one thousand acres; also the right to establish such military posts, erect such buildings, and make such improvements for the accommodation of their agent and other officers or servants as the President may direct; also, that said tribes or bands shall never sell or alienate their right or claim to any part thereof, except to the United States, nor shall they ever lease to or permit white men to settle, work, or trade upon any part thereof without the written permission of the United States Indian agent for the district. And it is further understood and agreed that, if the tribe or band of Indians known as the Cho-tan-o-man-as, now living near the lower end of Clear lake, but not directly represented in this council shall so desire, the said tribe or band may remove to, and settle upon said reservation without further stipulation, and thereby become entitled to a just proportion of the land and other benefits contemplated in this treaty as fully, according to their numbers, as if they were present and parties to this compact.

ART. 5. To aid the said tribes or bands in their subsistence while removing to and making their settlement upon the said lands, the United States, in addition to the presents of ten head of beef cattle, three sacks of bread, and sundry clothing, made to them at this council, will also furnish them, free of charge, at or near Vallejo, or elsewhere, as may be most convenient, with one hundred (100) head of beef-cattle, to average in weight five hundred pounds net, and two hundred (200) sacks of flour of fifty pounds each, in all ten thousand pounds, during the present year (1851), and a like quantity in each of the years 1852 and 1853, to be divided among them by the agent according to their respective numbers

AR0005877

85

ART. 6.  As early as convenient after the ratification of this treaty by the President and Senate, in consideration of the premises, and with a sincere desire to encourage said tribes in acquiring the arts and habits of civilized life, the United States will also furnish them with the following articles, to be divided among them by the agent according to their respective numbers and wants, during each of the two years succeeding the said ratification, viz:  four hundred pairs strong pantaloons, four hundred cotton (hickory) shirts, three hundred linsey gowns, assorted, generally small, three thousand yards calico, three thousand yards brown sheeting, thirty pounds Scotch thread, six dozen pairs scissors, assorted, twelve dozen thimbles, five thousand needles, assorted, five hundred pairs two and a half point Mackinaw blankets, one thousand pounds iron, two hundred pounds steel; and in like manner in the first year for the permanent use of the said tribes, and as their joint property, viz:  twenty-five brood mares and one stallion, fifty milch cows and two bulls, eight yoke of work-cattle with yokes, chains, &c., two large wagons, eight pair work-mules or horses, (one pair for each tribe) four breaking ploughs, eight small ploughs, eight sets harness for plough horses or mules, seeds of all proper kinds for planting and sowing, one hundred chopping axes, small size, with handles, one hundred axes, half-size, with handles, twelve mattocks, thirty dozen butcher knives, two hundred garden or corn hoes, fifty heavy spades, four grindstones, one United States flag. The stock enumerated above and the product thereof, shall be marked or branded "U. S." and with such other letter or letters as will at all times designate the same to be the property of the said tribes; and no part or portion thereof shall be killed, exchanged, sold or otherwise

parted with without the assent and direction of the agent.

ART. 7. The United States will also employ and settle among said tribes, at or near their principal town or settlement, one practical farmer, who shall act as superintendent or director of all agricultural operations, to reside among them, with two assistants, all of practical knowledge and industrious habits; one carpenter or worker in wood, to direct and aid in the construction of houses, repairing ploughs, wagons, &c.; one blacksmith; one principal school-teacher, with two male and two female assistant teachers to instruct said tribes in reading and writing the English language, &c., upon the manual-labor system, as well as in the domestic arts of housekeeping; all the above-named teachers, farmers and mechanics to be maintained and paid by the United States for the period of five years, and as long thereafter as the President shall deem advisable. The government of the United States will also erect suitable school-houses, dwellings, and shops for the accommodation of the teachers, farmers, and mechanics above specified, and for the protection of the public property.

ART. 8. These articles to be binding on the contracting parties when ratified and confirmed by the President and Senate of the United States.

In testimony whereof, the parties have hereunto signed their names and affixed their seals this twentieth day of August, anno Domini eighteen hundred and fifty-one.

REDICK McKEE,                    [SEAL.]

United States Indian Agent.

For and in behalf of the Ca-la-na-po tribe.

JU-LIO, his x mark, chief.                    [SEAL.]

CHA-CO-DA-NO, his x mark.    [SEAL.]

PE-BOR-QUOR-TO, his x mark.   [SEAL.]

MAH-CO-ME-A, his x mark.    [SEAL.]

KOY-WY-NOL-YO, his x mark.   [SEAL.]

KAI-A-DAN-O, his x mark.    [SEAL.]

For and in behalf of the Ha-bi-na-po tribe.

PRI-E-TO, his x mark, chief.   [SEAL.]

CHEE-NO, his x mark.     [SEAL.]

KAH-LOOSE, his mark.     [SEAL.]

For and in behalf of the Da-no-ha-bo tribe.

KU-KEE, his x mark, chief.    [SEAL.]

For and in behalf of the Mo-al-kai tribe.

MOH-SHAN, his x mark, chief.   [SEAL.]

YAH-TZA, his x mark.     [SEAL.]

TEE-BEE, his x mark.     [SEAL.]

For and in behalf of the Che-com tribe.

CAL-I-A-HIM, his x mark, chief.  [SEAL.]

HAL-LE-TOC, his x mark.    [SEAL.]

CO-TO-LO-YAH, his x mark.   [SEAL.]

CHU-TE-YAN, his x mark.    [SEAL.]

For and in behalf of the How-ku-ma tribe.

CHI-BEC, his x mark, chief.   [SEAL.]

SAC-CON, his x mark.     [SEAL.]

CHE-KAI, his x mark.     [SEAL.]

AR0005880

88

<u>For and in behalf of the Cha-nel-kai tribe.</u>

       CON-CHU, his x mark, chief.       [SEAL.]

<u>For and in behalf of the Me-dam-a-dec tribe.</u>

       CO-E-U-E, his x mark, chief.       [SEAL.]

Signed, sealed and delivered, after being fully explained, in presence of --

       John McKee, <u>Secretary</u>.

Witnesses--

       Geo. Whitehouse.

       George Gibbs.

       E. D. Shirland.

       H. W. Wessels, <u>Brevet Major U. S. army, commanding escort</u>.

       J. M. Estill, <u>Maj. Gen. 2d div. Cal. militia</u>.

       F. D. Kohles.

       M. H. N. Kendig.

       W. A. Cornwall.

       Jas. M. M. Brown Smith.

       T. F. W. Price.

       Walter McDonald.

---

(P.)

TREATY MADE AND CONCLUDED AT CAMP FERNANDO FELIZ, ON RUSSIAN RIVER, IN THE
    STATE OF CALIFORNIA, AUGUST 22, 1851, BETWEEN REDICK McKEE, INDIAN
    AGENT, ON THE PART OF THE UNITED STATES, AND THE CHIEFS, CAPTAINS,
    AND HEAD MEN OF THE SAI-NELL, YU-KI-AS, ETC., ETC., TRIBES OF
    INDIANS.

· · · · · · ·

AR0005881



*Figure 1. Project Location Map showing Traditional Territories and Locations Discussed in the Text (adapted from Johnson 1978:350).*

AR0005886

# ETHNOGEOGRAPHIC OVERVIEW

Vallejo is located within the ethnographic territory of the Patwin, and the Vallejo Property is adjacent to a Patwin ethnohistoric village site that is part of a complex of Patwin habitation sites with burial grounds.  The following overview highlights the aspects of Patwin ethnogeography that are pertinent to the current study.  The reader is referred to Kroeber (1932) and Johnson (1978) for additional information about the Patwin.

**Traditional Territory**

At the time of Euroamerican contact, the Patwin occupied the southwest portion of the Sacramento Valley.  This territory extended from the lower hills of the eastern North Coast Ranges to the Sacramento River and from Princeton south to San Pablo and Suisun bays, including the City of Vallejo (Johnson 1978:350).  Powers (1976 [1877]:218) describes the people inhabiting the lower portion of the Sacramento valley, "on the middle and lower Sacramento, west side, there is one of the largest nations of the State . . . [t]hey have a common language, with little divergence of dialects for so great an area as it embraces." The territorial boundaries of the Patwin have been drawn by various investigators and tend to be consistent from the earliest map by Bancroft in 1874 to the more modern and generally referenced map by Johnson in 1978 (see the maps included in Appendix B).  The main differences are in the southern and eastern boundaries and internal group classifications (Johnson 1978:350).  Identification of the western boundary of the Patwin has been consistent since 1874.  Patwin territory extended 90 miles north to south and 40 miles east to west, encompassing the "lower Sacramento, from near Princeton on the river and Stonyford in the hills, south to Suisun and San Pablo bays" (Kroeber 1932:253).  The Sutter Buttes and the Montezuma Hills were excluded from Patwin territory as both were considered 'unclaimed' and used by more than one group (Johnson 1978:351).  Suisun Bay and the Vallejo area have been consistently included in Patwin traditional territory.

Patwin territory has been divided into three regions from east to west:

> Both banks of the Sacramento River and its attendant dense tree, vine and brush vegetations interspersed with tule marshes; flat open grassland plains with occasional oak groves; and the lower hills of the eastern Coast Range mountain slope rising to an elevation of 1,400 feet.  Most of the population was concentrated along the river in large villages.  Because much of the plains were submerged from floodwaters in winter and quite dry in the summer, occupation of this region was sparse and seasonal.  Tribelets in the hills lived in the numerous intermontane valleys, particularly along the drainages of Cache and Putah creeks [Johnson 1978:351].

Patwin are generally divided by anthropologists into primary subdivisions of Hill Patwin and River Patwin.  River Patwin occupied the west side of the lower Sacramento River below the mouth of the Feather River and the lower reaches of Cache and Putah creeks in

AR0005890

the Sacramento Valley. Hill Patwin occupied the lower, eastern slopes of the southern North Coast Ranges (Figures 1 and 2).

Johnson (1978:350) summarizing Whistler (1976) further divides the Patwin into the following dialects: Hill Patwin groups Kabalmem, Cache Creek, Cortina, Tebti; and River Patwin groups Colusa and Grimes, Knights Landing, and Suisun. By the time Kroeber conducted research on the Patwin in the summers of 1923 and 1924, the population had been reduced to fewer than 200 and had congregated in six communities. Kroeber (1932:254) identified one settlement on the river near Colusa; four in the hills at Rumsey, Cortina, Stonyford, and Grindstone; and a family or two in the upper Cache creek drainage. Kroeber (1932:256) also divided the Patwin based on dialects, providing a list of districts: River Patwin, the Southeastern Wintun; Koru division, the Colusa district; Saka division, the Grimes district; Yodoi division, the Knights Landing district; and Hill Patwin, the Southwestern Wintun district.



*Figure 2. Patwin Territory and Village Sites from Johnson (1978:350).*

AR0005891

Merriam also subdivided the Interior (Hill Patwin) and the River Patwin groups into several dialect groups (Table 1, Figure 3). The City of Vallejo is within Merriam's Pooewin dialect territory. On July 9, 1906 Merriam encountered an informant who spoke the Poo'-e-win dialect named Philip who worked for E. Steiger, a German vineyard owner 2.5 miles south of Glen Ellen and 5 miles north of Sonoma. Merriam recorded a vocabulary and boundary descriptions from Philip who stated that Soo'-e-soon' was the name of a valley and people. Philip thought the people were Poo'-e-win and that Soo'-e-soon is a Spanish name, but other Indians insisted that is the original name (Merriam 1967). This indicates that Philip was not the sole surviving Patwin from the Pooewin dialect area, but rather that the survivors had found refuge as laborers for non-native settlers.

*Table 1. Patwin Groups summarized from Merriam (1967:262-263).*

| Group | Tribelet | Location and Description |
|---|---|---|
| Interior or Hill Patwin | Choo-hel-mem-sel | Occupying the western half of Colusa County and a smaller area in southern Glenn County where their northern boundary runs easterly from the junction of Stony and Little Stony creeks to a north-south line passing a mile or two east of Sites and four or five miles east of Venado (Mt. House), and thence westerly to the mountains, crossing Bear Valley and about three miles south of Leesville. Their territory is broadest in the latitude of Sites and Lodoga, where it reaches westerly to the high mountains of the California and National Forest. |
| | Chen-po-sel | Reaching north to the divide north of Hough Springs and holding the North Fork of Cache Creek, Long Valley, and the greater part of Bear Valley all the way south to its junction with Cash Creek, and west to include the Lol-sel. |
| | Lol-sel | The Lol-sel reached Bartlett Springs and the south-east part of Bartlett Mt. Their western boundary was in contact with the eastern boundary of the Clear Lake Pomo. The Chen-po-sel south of them touch the Tu-le-yo-me [Mewan, Lake Miwok]. |
| | Klet-win (Klet-sel) | In Cortena Valley and Sand Creek, reaching from a little below Williams south to the southern boundary of Colusa County. |
| | Win-ko-pah | In Capay Valley, extending southward from the head of that valley, a few miles north of Rumsey, they are hemmed in on the north, east, and west by mountainous ridges. This is the area the Yocha Dehe currently reside. |
| | Na-pah (Nan-noo-ta-we) Napa | Holding a section of Napa Valley from Yountville to (and including) Napa City, and extended northeasterly over Wooden Capell and Berryessa valleys to the southeastern part of Pope Valley. The western part of Pope Valley. The western boundary west and south of Pope Valley lies along the east base of Howell Mt., where it abuts against the territory of the Mi-yahk-mah tribe [Yukean, Wappo], south of which, between Yountville and Napa City, it spread westerly to the mountains between Napa and Sonoma Valleys to Sonoma Creek. |
| | Too-loos'too-e | From Suscol up to Napa. There was a Too-loos'-too-e Rancheria of Ki'-e-tan'-nah near Napa. Another informant said the Too-loos'-too-e were Win (same name used by the Indians near Cortina) |

AR0005892

| Group | Tribelet | Location and Description |
|---|---|---|
| River Patwin | Ko-roo | Along both sides of Sacramento River from a little north of Princeton south to Sycamore and including the Marysville Buttes. The Indians say that the barren part of the flat plain from Delevan southerly to south of Maxwell (and apparently nearly to Williams) was not claimed by either the Ko-roo on the east or the Choo-hel-mem-sel on the west, but was a desolate "No-man's-land" which at intervals formed the battlefield between the two [tribelets]. |
|  | Pat'-win Patwin | From Sycamore to Knight's Landing, a little west of Dunnigan on the west and a few miles on the east side of the river. |
|  | Poo-e-win Pooewin | From the land west of the Sacramento River from Knight's Landing to Suisun Bay and San Pablo Bay. Its western boundary is Sonoma Creek as far north as Sonoma where it turns east passing just south of Napa along Tulucay Creek and hence north easterly, its western boundary from there the eastern boundary of the Nan-too-ta-we. The City of Vallejo is within the Pooewin district. |



*Figure 3. Portion of Merriam's Map of Wintoon Stocks (1967: Map 5).*

Kroeber (1932:254) noted that the Patwin "in the north seem to feel themselves as having been rather near dialectic relatives of the southerners, and all evidence points to so close a cultural resemblance between northern hill and northern river Patwin that the southern Patwin may be expected also to have affiliated strongly."

AR0005893

A series of unpublished notes by Sr. Platon Vallejo and a vocabulary secured by J.A. Mason are on file at the Yocha Dehe Wintun Nation (Gettleman 2016; Vallejo n.d. a, n.d. b).  The Vallejo materials were not used by Barrett, Kroeber, Merriam or Johnson as they have only recently been discovered.  Vallejo (n.d. a:5 [1908]) discusses the traditional boundaries of the Patwin and describes the southern boundaries as the hills between Petaluma and Sonoma valleys, providing evidence of the Patwin area further west.  Vallejo states that Napa is the capitol, or main village, and connects the Vallejo area to Napa, within Patwin territory in the 1850s.  Analysis of Vallejo's vocabulary, recorded at the town of Vallejo in 1916, provides "indisputable linguistic evidence that this area (Vallejo) has the same language as Capay Valley" and identical to Hill Patwin (Gettleman 2016).  Platon Vallejo (n.d a:19 [1908]) asks philosophical questions of his Patwin servant: "whose descendents we are ask you? Patwin! Like the grasses of the fields . . . have been here before other men!"

In contrast, no published ethnogeographic or linguistic studies place Vallejo within the traditional territory of Scotts Valley or any other Pomo group.

**Villages**

The most comprehensive sources for the locations of Patwin villages include Barrett (1908:290-297), Bennyhoff (1977:164), Heizer (1972), Johnson (1978:350), Kroeber (1932:259-264; 349-352), and Merriam (1966:61).  The data are compiled in a table presented in Appendix A.  Only the portion of the table that discusses sites within the vicinity of Vallejo is shown in the text of this report (Table 2).  Several of the maps compiled for Patwin territory and villages are presented in Appendix B.  The data were compiled for several decades through informant interviews and review of historic documents such as mission records, journals, and maps of early explorers in the area.  Many of the villages recorded by Barrett (1908) were occupied at the time he met his informants or within recent tribelet memory. It is important to note that Kroeber (1925:355) identified that the "inequality in distribution of sites . . . reflects the incompleteness of knowledge, not any notable unevenness of occupancy."

It is important to note that in maps spanning from 1874 to the present, the project area is shown within Patwin territory and there are no Pomo habitation sites or villages identified within the vicinity of Vallejo, or Solano County in general (maps provided in Appendix B).  Beckham (2016) provides an analysis of early ethnographic studies of the Pomo from the late 1800s and early 1900s.  Beckham concludes that:

> nowhere in any ethnographical account – manuscript or published – did Pomo informants provide any information on the northwest shore of San Pablo Bay, the north shore of San Francisco Bay, the Napa River watershed, nor anywhere in Solano County. . . no Pomo informant identified use and occupancy of any kind in the vicinity of Vallejo in Solano County [Beckham 2016:41].

AR0005894

*Table 2. Villages of the Hill Patwin Dialect Group, in the project vicinity compiled from Barrett (1908:290-297), Bennyhoff (1977:164), Johnson (1978:350), Kroeber (1932:259-264; 349-352), and Merriam (1966:61).*

| #* | Village Name | Location and Description |
|---|---|---|
| | | Hill Patwin territory is within the area shown as ceded in Treaty O (Royce 1899 area 296). |
| J35 | Tolenas | Mapped in Johnson (1978:350) in the plains above Suisun Bay based on Bennyhoff (1961, 1977:164). In Bennyhoff (1977:164) Tolenas is shown as a tribelet name along the western boundary of Patwin territory. |
| | Suisun Sooesoon | Village mapped by Bennyhoff (1977:164) just north of Suisun Bay. A big Pooewin rancheria (Merriam 1967:271). |
| | CA-SOL-243 | Archaeological site mapped by Bennyhoff (1977:164) on the east side of Suisun Creek, just northwest of Suisun. |
| | CA-SOL-234 | Archaeological site shown just south of Aguasto in Bennyhoff (1977:164). |
| | Sogoreate Ssogoreate | Subsidiary village to Aguasto shown on map in Bennyhoff (1977:164). Listed in Mission records with Aguasto. |
| J34 | Aguasto | Village site at Vallejo. Mapped in Johnson (1978:350) based on Bennyhoff (1961). Bennyhoff (1977:164) considered this village Patwin based on mission data. |
| J33 | Suskol | Very little data, but may represent tribelet capital (Kroeber 1932:262). Also mapped in Johnson (1978:350) on the Napa River at the mouth of the bay. Village in historical battle between Francisco Solano and Vallejo. |
| J32 | Tuluka Tulukai Too-loo'-kah | Very little data, but may represent tribelet capital (Kroeber 1932:262). Also mapped in Johnson (1978:350) south of the town of Napa. From Merriam (1967:271): A large Pooewin rancheria, a short distance southeast of Napa. An old Spaniard named K-tan'-nah (Geatanno?) Juarez took possession of the land on which the rancheria was located (the asylum is there now [in 1906]). |
| J31 | Napato Nap-pah | Mapped in Johnson (1978:350) at the town of Napa based on Bennyhoff (1961 [1977:164]). Merriam recorded this Pooewin rancheria as near Too-loo'-kah (Merriam 1972:271). |
| J30 | Soneto | Mapped in Johnson (1978:350) between the towns of Napa and Vacaville. |
| J29 | Ula-to Ululato | Very little data, but may represent tribelet capital (Kroeber 1932:262). Located near Vacaville (Johnson 1978:350). Also mapped in Johnson (1978:350) on the south side of Ulatis Creek. A Pooewin rancheria (Merriam 1967:271). |
| | Pe'nia Laguna | The big Pooewin rancheria at Vacaville (Merriam 1967:271). |
| | Topai-dihi Tōpa'idihi | Very little data, but may represent tribelet capital (Kroeber 1932:262). From tōpa'l, a word said by the Capay Valley Wintun to come from the language of the people about Napa. This village was very indefinitely located by the informant as on the west bank of Putah creek at a point about twenty miles upstream from the town of Winters (Barrett 1908:294). |
| | Now-wa-ke-nah tribe | Lived in Long Valley and their number was one hundred and said to have been located only a very short distance north of Suisun City (Barrett 1908:291). |

*Village numbers come from two sources: Johnson (1978:350) shown as J# and Kroeber (1932) shown as K#. Kroeber numbered principal villages/tribelet centers, but not subsidiary settlements. Data from other sources are not numbered.

Patwin ancestral archaeological site CA-SOL-234 and ethnohistoric village Aguasto, listed in Table 2, are located at the City of Vallejo adjacent to the Vallejo Property (Figures 2 and 4). Scotts Valley erroneously labels village 34 as Suskol [Suscol], which is actually village 33 in Johnson (1987:350), and describes the Patwin village in Napa County as the closest village to the Vallejo parcels. Aguasto is clearly shown in Patwin territory by Bancroft (1888a), Barrett (1908), Bennyhoff (1977), Heizer (1978), Johnson (1978 village 34),

AR0005895

Kroeber (1925, 1932), Merriam (1904, 1955, 1966, 1967) and Powell (1976 [1877]).  The only source to question that conclusion is Milliken (2009), who labels the village as Huchiun-Aguasto within Costanoan territory.  It is worth noting that based on mission records, Bennyhoff (1977) considered Aguasto a Patwin village and Huchiun a separate Costanoan village (see Figure 4).  It is also worth noting that nowhere in the ethnographic record is Pomo suggested for the village's tribal affiliation.

It is possible that Aguasto may have been a multi-lingual village, as it is situated along the southwestern border of Patwin territory with the Costanoan (Figure 1).  Villages along territorial borders were often multi-lingual, with intermarriage between neighboring groups considered a political advantage to maintain peaceful relations.  Intermarriage between tribelets and tribal groups is well documented in Kroeber (1932).  However, there is no indication of intermarriage between Aguasto and Pomo groups, nor Pomo languages being spoken at Aguasto.



*Figure 4.  Portion of Bennyhoff (1977:Map 2) showing location of CA-SOL-234 and ethnohistoric village Aguasto in Patwin Territory.*

AR0005896

The ethnohistoric villages and archaeological sites in the vicinity of Vallejo Property document habitation, occupation, and burial complexes used by Patwin ancestors to the Yocha Dehe.  There is no evidence in the historical revord of any Scotts Valley or Pomo to habitation, use, or burial complex sites within the vicinity of the Vallejo Property.

**Social Identification**
The Patwin were organized into tribelets, generally composed of a principal village with subsidiary settlements.  Kroeber defined the political organization of the Patwin tribelets, similar to most central California tribelets, as:

> groups of small size, definitely owning a restricted territory, nameless except for their tract or its best known spot, speaking usually a dialect identical with that of several of their neighbors, but wholly autonomous.  This more definite concept must replace the vaguer one of the 'village' or 'village community.'  If the tribelet was concentrated in one settlement, as among the Clear Lake Pomo, the village and the tribelet happened to coincide . . . this was most frequently not the case, especially in hill country.  Usually, therefore, the village was but an incident in the history and consciousness of the tribelet.  The latter was the functioning unit. . .Most Californian informants think in terms of places, and indiscriminately list dozens of 'rancherias' – that is, spots inhabited at one time or another – within what can have been the territory of but one or two tribelets [Kroeber 1932:258-259].

Kroeber, in discussing Patwin tribelets, is saying that one must consider the tribelet as a whole, rather than focus on individual villages.  The area near Vallejo is classified as most closely related to the same tribelet area as the community at Rumsey, the original rancheria of the modern Yocha Dehe, before settlement on more suitable trust land to the south, in Brooks (Johnson 1978; Kroeber 1932; see also Figure 2, Appendix B).

Each village was under the authority of a chief, who directed village activities.  The villages within a tribelet area were under the leadership of a head chief who resided at a village with a dance house.  The position of chief was hereditary, passed from father to son, and was the highest rank attainable.  The primary function of the chief was to administer economic and ceremonial activities, "he knew the village ownership of tree groves and fishing and hunting areas . . . the chief presided over ceremonies, deciding when and where they should be held and which villages should be invited" (Johnson 1978:354).  Villages with a dance house appear to have been the residences of head chiefs of tribelets, those without were subsidiary villages (Kroeber 1932:259).

**Inter-Tribal Relationships and Trade**
In border areas, most inter-tribal relations were friendly.  For example, there was frequent exchange between the Patwin of Long Valley and the Southeastern Pomo.  This is evidenced by the fact that "Long Valley Patwin could freely visit Clear Lake to fish or hunt with or without permission, depending on the particular Pomo tribelet" (Johnson 1978:353).

---

AR0005897

The Patwin traded for various commodities and subsistence resources using clamshell disk beads as a medium of exchange, with numerous trade routes crossing Patwin territory to neighboring groups (see Davis (1961) map in Appendix B).  River Patwin obtained shell beads from the Hill Patwin, who obtained them from their Pomo neighbors (Johnson 1978:352).  Obsidian was obtained from sources in the southern North Coast Ranges, primarily in Napa Valley.

Marriages between tribelets, trade, alliances, and cooperative ventures, as well as disputes and incidents of trespass and conflict, most often occurred among neighboring tribelets. Inter-marriage solidified positive relationships with neighboring tribes and tribelets for trade and reciprocal hunting and gathering rights.  Neighboring tribes and tribelets were known to engage in cooperative ventures and ceremonies with chiefs from other tribelets (Kroeber 1932).

Johnson (1978:352) asserts that not all external relationships were friendly, particularly with the Napa Valley region, and that conflicts with Napa Valley groups probably affected the ability of the River Patwin to acquire obsidian from sources there.

It is worth noting that the Vallejo area was not near to any border area known to contain both Patwin and Pomo groups.  Not surprisingly, there is no specific historical record of direct trade between the Patwin groups residing at and near Vallejo and the Pomo groups residing at and near Clear Lake.  Nor is there any evidence that inter-regional trade resulted in Pomo habitation sites at or near Vallejo.

AR0005898

illnesses were reported at Mission San José. Mortality rates at the missions fluctuated from year to year and place to place. At Mission San José, for example, the rate averaged 160 per 1000 from 1798-1800 and rose to 195 per 1000 between1801-1805. Milliken (2009:172) proposes that the high death rates were "chronic, caused by food- and water-borne diseases that were endemic in the villages and, increasingly over time, the indirect effects of endemic syphilis."

As mortality rates increased, the Patwin (and others) began to identify less with specific locations such as Aguasto or Suskol and instead to identify with the larger Patwin group (and, in some cases, to join with other Patwin settlements such as Rumsey, Cortina, and Colusa). In other words, Patwin people did not disappear even though Patwin village names began to be used less often. This is contrary to Scotts Valley's assertion that the Patwin people had fled the area, opening the way for the Pomo to move in, (notwithstanding the neighboring Wappo, Coast Miwok, and Costanoan).

*Table 3. Mission baptisms compiled from Gordon (2006), Merriam (1968), and Milliken (2009).*

| Group | Mission | Years | Baptisms |
|---|---|---|---|
| Aguastos | Mission Dolores | 1800-1809 | 16 |
| Huchiun-Aguasto | Mission Dolores | 1788-1811 | 384 |
| Chemoco | Mission San Francisco Solano | 1824-1834 | 34 |
| Churup | Mission San Rafael | 1839 | 2 |
| Malaca | Mission Dolores | 1815-1821 | 64 |
| | Mission San Francisco Solano | 1827-1832 | few |
| Napa (Napato) | Mission Dolores | 1809-1815 | 57 |
| Napa Caguapatto | Mission Dolores | 1812 | 9 |
| | Mission San José | 1814-1818 | 164 |
| Suisuns (Rancheria Soneto) | Mission Dolores | 1810-1816 | 326 |
| Tolena | Mission Dolores | 1812 | 9 |
| | | 1815-1820 | 138 |
| | Mission San José | | 19 |
| Ululato | Mission Dolores | 1815-1822 | 301 |

*

The mission records for Aguasto and neighboring village of Ssogoreate show that between 1788 and 1811 approximately 400 neophytes were taken into the missions from these two locations (Gordon 2006; Merriam 1968; Milliken 2009). This represents a large Patwin population taken into the missions from the vicinity of Vallejo.

When the missions were secularized (1834-1836), tribal territories within the outreach areas had become obscured as the native population sought refuge in remote areas further away from the missions, often with other villages, and on the large tracts of land awarded to Mexican citizens. Non-native settlement was increasing, placing the existing native population in turmoil and making native re-settlement on traditional lands inhospitable. Labor on the ranchos was available and often forced upon those who lived on the land.

Native American Ethnography and Ethnohistory in the Vicinity of Vallejo, California
Northwest Cultural Resource Consultants
November 20162016

18

AR0005900

There is no evidence of Pomo settlement in the San Pablo or Suisun bay areas during the mission period.

**Land Grants, Ranchos, and Indian Labor**
Non-native settlers such as Mariano Vallejo and John Sutter integrated Indian laborers, including Patwin, into their large agricultural and ranching operations in Northern California.  John Sutter, a Swiss entrepreneur, arrived in California in 1839 and exploited the resources and native populations of Northern California, including Patwin, in order to establish dominion over the Central Valley.  The Vallejo family dominated the region north of San Francisco Bay.

Mariano G. Vallejo obtained a Mexican land grant after mission secularization and assumed military authority of Sonoma Mission and the Indians residing there, including the surviving Patwin from the San Pablo and Suisun bay areas.  The Indians, including the Patwin from the mission and those living along the banks of Suscol Creek, provided a labor force for Vallejo.  George C. Yount obtained a Mexican land grant in Napa Valley in 1832 and, under Vallejo's advice, formed alliances and a work force from local native groups (Johnson 1978:351).  Several land grants within Patwin territory were awarded in the 1830s and 1840s, a few of which are listed in Table 4.

*Table 4. Land Grants in Patwin territory (compiled from Johnson 1978:351 and Beckham 2016:109).*

| Grantee | Year | Area |
|---|---|---|
| George Yount | 1832/1836 | Rancho La Jota and Rancho Caymus in Napa Valley |
| José Francisco Armijo | 1840 | Rancho Tolenas (Napa and Solano Counties) |
| Vaca and Peña families | 1842/1843 | Rancho Los Putos lower part of Putah Creek |
| William Gordon | 1843 | Cache Creek |
| Gen. J. Bidwell | 1843/1844 | Rancho Los Ulpinos Northern area in Colusa County |
| John and William Wolfskill | 1840-1843 | Rancho Rio de los Putos Putah Creek |
| Francisco Solano | 1842 | Rancho Suisun ( owned by M.G. Vallejo in 1850) |
| M.G. Vallejo | 1843 | Rancho Suscol Partly in Napa County |
| Col. J.B. Chiles | 1844 | Chiles Valley in the southern hill region |
| Thomas O. Larkin | 1846 | Colusa County |

One of the Vallejos' Indian laborers was Francisco Solano, a Suisun Patwin who was baptized at Mission Dolores on July 24, 1810 at the age of 10 or 12.  His native name was Sina (also Sem-Yet-hó, meaning brave or fierce hand) and his father's name was recorded as Sulapy (Gordon 2006; Vallejo n.d. a).  Solano was transferred to Mission Solano in 1824 (Gordon 2006).  Solano was one of only two natives to receive a land grant from the Mexican government, the Rancho Suisun land grant in 1824 which was transferred to M.G. Vallejo in 1850 (Beckham 2016).  Salvador Vallejo first encountered Solano when he heard that Solano was gathering a force to oppose him at the Patwin village of Suskol, on the

AR0005901

northern boundary of Vallejo's Rancho Suscol land claim. A battle ensued and after defeat, Solano and Salvador Vallejo formed an alliance.

According to Scotts Valley, Hurtado (2016:26) reports that "Vallejo agreed to aid Solano in his wars against the Pomos and Wapos if the Patwin would remain at peace with him" and the other settlements near Sonoma, but then disappeared from the historical record in the 1840s and may have passed away in 1849 or 1850. In Scotts Valley's view, this timeline supports the idea that the Patwin left their traditional homeland near Vallejo not long after the Missions were secularized.

However, in a letter dated 1908, Platon Vallejo records the last time he saw the Patwin Chief Solano in 1856-7 (Vallejo n.d. a:8). Solano had escaped capture at the "Bear Flag episode" in 1846 and gone to live at "the home of his tribe, standing in the Valley of Sonoma east to Temelpa" (Vallejo n.d. a:10). Platon Vallejo's records confirm that the Patwin remained in their traditional homeland long after secularization of the Missions and were present in Vallejo at the time of the treaty delegations in 1851-1852.

Isidora Filomena, one of Solano's wives, was the daughter of a chief from Churuc-to on Cache Creek. Kroeber considered this synonymous with Churup (-labe) on the lowest part of Cache Creek, near the present town of Yolo. Isidora was stolen from her village and later married Solano. Solano and Isidora had eight children, with only one surviving to adulthood. She reported that Solano was considered the Patwin chief of the "Suisun-es, Topay-to-s, Yoloi-to-s, and Churucto-s" (Kroeber 1932:352 citing Sanchez1930). Vallejo and vicinity were within Solano's region. Platon Vallejo recorded Solano as the chief of:

> A once sturdy and numerous race, the Suisun tribe; several branches of which were the Malacas [sp], Petalumal, Napal, Yoloytoy, Soscols, Sonomas, Temelepa, Tolays, Olompalis, Torchicas [sp], all under one chief, Sina Yet-hó, the Prince Solano; and were known as the Suisun Tribe. . .They lived in the region from the Sierras to the sea, north and east of the Bay [Vallejo n.d. a:14 (1908)].

Another land grant was awarded to William Knight who built a house on the Yodoy mound at the western edge of Knights Landing in Patwin territory. In 1906 Kathryn Simmons published "Traditions and Landmarks of Yolo" in the Woodland *Daily Democrat*. She writes that Yolo is a corruption of Yodo, named after Patwin Chief Yodo. The "population was sparse at the time of settlement on account of an epidemic and taking away of the Indians to missions. After secularization, Knight brought back ninety at one time to his grant" (Simmons 1906 in Kroeber 1932:354).

The Sacramento Valley, lower parts of the Suisun delta, and Napa Valley were the most impacted by settlers, while incursion to the upland areas was less frequent until after the 1840s (Johnson 1978:351). Numerous forays into Indian villages to capture laborers are documented, including in Patwin and Pomo territory. One example that is documented by Scotts Valley occurred in 1848, when 172 Indians from several tribal groups in the Clear

AR0005902

## Treaty Making

The formal government to government treaty process with native groups in California began in 1846. The widely publicized armed battle between Whites and Indians on Bear River was the trigger that led the U.S. government to begin making treaties in California (Heizer 1972a, 1972b, 1978). Three treaty commissioners, George W. Barbour, Redick McKee, and O.M. Wozencraft, were appointed to travel the state beginning in January of 1851 to gather representative Indians together to sign boilerplate treaties ceding undisclosed lands in exchange for a defined treaty area. The intent was to remove Indians to reservations, and, in exchange, to provide them with resources and protection so that they could live unmolested with some degree of support from the U.S. government (Gibbs 1853; Heizer 1972a, 1978).

The treaties differ in wording, but each of the 18 treaties stipulated that a certain tract of land would be set aside for sole occupancy of signatory tribes as a reservation. Various measures to aid and improve conditions were promised: a school teacher, farmer, blacksmith, farm animals, agricultural instruments, seed, and cloth. In return the Indians "tribes or bands hereby jointly and severally relinquish, cede, and forever quit claim to the United States, all their right, title, claim, or interest of any kind, which they or either of them have to lands or soil in California" (Heizer 1978:702). The treaties do not delineate the land to be ceded, they only outline the land to be appropriated and set apart as reservations.

The treaties were never ratified by the U.S. Senate based primarily on objections raised by the California State Legislature, and some U.S. Senators. Heizer asserts that the failure of the U.S. Senate to ratify the 18 California treaties and thus provide protection and support for the vulnerable native population had a more rapid and destructive effect on the California Indian population and culture than any other single event. In the years 1850 to 1870, the native population of California was reduced from about 100,000 to 30,000 (Cook 1976b). Had the treaties been ratified and honored and the agreement proceeded as planned, it is possible that many more California Indians would have survived (Heizer 1978:704).

### *Treaty I*

Treaty I was signed at Camp Colus (near the modern town of Colusa), on the Sacramento River on September 9, 1851 by O. M. Wozencraft representing the United States government and Sci-oac for the Colus tribe; Ho-oak for the Willays tribe; Louis for the Co-he-na tribe; Hoo-ka-ta for the Tat-nah tribe, La-look for the Cha tribe; Ki-ka-la for the Doc-duc tribe; Wi-te-bus for the Cham-met-co tribe; and Co-ne for the Toc-de tribe.

AR0005906

*Table 5. Patwin Villages represented in Treaty I compiled from Barrett (1908:290-297), Bennyhoff (1977:164), Heizer (1972a), Johnson (1978:350), Kroeber (1932:259-264; 349-352), and Merriam (1966:61).*

| #* | Village Name | Location and Description |
|---|---|---|
| K2 | Ts'a' (Cha) | Three miles below Princeton (Kroeber 1932:259). |
| K5 | Tatno<br>That'-nah<br>Tat-nah | Two or three miles farther down, perhaps two miles above Colusa (Kroeber 1932:260). On the west side above Til-til (Merriam 1966:61). |
| J5 | Dok'-dok<br>Duc-duc | Shown on map in Johnson (1978:350) near the town of Colusa, just north of Koru. |
| J6,<br>K6 | Koru'<br>Ko'-roo<br>Ko'-loos<br>Colus | In Colusa city, which takes its name there from.  This was the most important community within the dialect of district, and built a weir across the river (Kroeber 1932:260). On the east side of the river, not far from Sah-kahs and near present Colusa (Merriam 1966:61). Shown on map in Johnson (1978:350) |
| J26 | Chemocu<br>Chemoco<br>Chem-met-co | Shown on map in Johnson (1978:350) and Bennyhoff (1977:164) on the west side of Putah Creek.  One of the villages represented by signatories of Treaty I (Heizer 1972a:53); however, this village is located within the area shown by Royce (1899) as ceded under Treat y O, 296. |
| J24 | Tokti<br>Tŏ'ktī<br>Toc-de | One mile below Tebti (Kroeber 1932:350).  Near the west bank of Bartlett creek at a point about opposite the present Cache Creek Ridge Rancheria which is back on the ridge a short distance west of the creek (Barrett 1908:295).  Shown on map in Johnson (1978:350) on the east side of Barlett Creek, just north of Ho'lokomi.  One of the villages represented by signatories of Treaty I (Heizer 1972a:53).  This village is located within the area shown as ceded under Treat y O, 296 on Figure 5 (Royce 1899). |

*Village numbers come from two sources: Johnson (1978:350) shown as J# and Kroeber (1932) shown as K#

### Treaty O

Treaty O was signed at Camp Lu-pi-yu-ma, at Clear Lake on August 20, 1851 by Redick McKee representing the United States government and Ju-lio, Cha-co-da-no, Pe-bor-quor-to, Mah-co-me-a, Koy-wy-nol-yo, and Kai-a-dan-o for the Cal-la-na-po tribe; Pri-e-to, Chee-no, and Kah-loose for the Ha-bi-na-po tribe; Ku-kee for the Da-no-ha-bo tribe; Moh-shan, Yah-tza, and Tee-bee for the Mo-al-kai tribe; Cal-i-a-him, Hal-le-toc, Co-to-lo-yah, and Chu-te-yan for the Che-com tribe; Chi-bec, Sac-con, and Che-kai for the How-ku-ma tribe; Con-chu for the Cha-nel-kai tribe, and Co-e-u-e for the Me-dam-a-dec tribe.  The tribes represented have been identified as Pomo villages at Clear Lake with the last two from the Russian River (Gibbs in Heizer 1972b; Merriam 1967).  Gibbs notes that the first six tribes collectively are called Ná-po-batín or 'many houses' and the Russian River tribes the Boh-Napo-batín or 'western many houses' (Gibbs in Heizer 1972b:110).  The Indians of the portion of the lake South of Mt. McKee speak a different language "that resembles more the Mu-tistul between the heads of Napa and Putos Creeks, or some of those lying between the lake and the bay of San Pablo" (Gibbs in Heizer 1972b:110).

AR0005907

***Treaty-Making Process***

Throughout the United States, the process by which treaties were negotiated, signed, ratified (or not), and honored (or not) was highly problematic.  That was particularly true for Treaty O.

George Gibbs, who accompanied Redick McKee in the Treaty making party and kept detailed journals, noted that the commissioners erred in assuming that any named group they came across was a tribe (Gibbs 1853:110 in Heizer 1972b:4).  It is known that the three commissioners lacked knowledge concerning the California Indian political and social structure (Beckham 2016:61; Heizer 1972a, 1978).  Heizer (1972a) states that:

> None of the Commissioners had any knowledge whatsoever of the California Indians or their cultural practices, especially those regarding land ownership and use . . . most of the so-called tribes were merely villages and that the men listed as "chiefs" were likely not to be chiefs . . . Further, since land was owned in common, even chiefs had no authority to cede tribelet or village land [Heizer 1972a:4].

These 'tribes' are recognized today as villages, localities within a tribelet.

AR0005908



*Figure 5. Portion of Royce (1899) Map showing Treaty I (298,299) and Treaty O (295, 296).*

A second issue was that the treaty-making process included a small subset of the the tribes in the area; many bands were not aware of or present to sign the treaties. Beckham supports this argument:

> The geographical areas identified in the agreements made with Commissioner Redick McKee were secured within a matter of a few days with but limited interaction with the Pomo. Entire bands or language groups of Pomo were probably unaware of the McKee councils and did not participate in the agreements. [Beckham 2006:72].

Analyzing Gibbs' journals of 1851, the path taken to Clear Lake started in Sonoma, travelled north, and followed the Russian River. No contact was made with the Indians to the south or east of Clear Lake. McKee (1851:238) admits that it was "impossible to visit on this

AR0005909

journey many of the smaller tribes or bands." Gibbs (1853:113) also noted that some groups were suspicious and reluctant to enter into treaties or meet with government officials.

According to Vallejo (n.d. a), Francisco Solano was alive and living in Vallejo in 1851, at the time of the treaties. Solano was recorded as the chief of the Suisun Tribe (Patwin), with numerous villages in the San Pablo and Suisun bay areas. However, he was not invited to any treaty party.

A third set of issues concerned communication. Heizer (1972a:3) states that "in some instances, it seems highly unlikely that the so-called interpreters know the several native tongues of the people who were being parlayed with. And while there may have been some kind of communication, there is great probability that the literal wording of the treaties often was not, and indeed could not be, made intelligible to the Indians present." Gibbs documented the issues in translation during the treaty making process on August 25, 1851:

> In fact, the object of the agent, in the process of double translation through which it passed, was never fairly brought before them. The speeches were first translated into Spanish by one, and then into the Indian by another; and this, not to speak of the very dim ideas of the last interpreter, was sufficient to prevent much enlightenment under any circumstances. But the truth was, that the gentlemen for whose benefit they were meant by no means comprehended any possible motive on our part but mischief. That figurative personage, the great father at Washington, they had never heard of. They had seen a few white men from time to time, and the encounter had impressed them with a strong desire to see no more, except with the advantage of manifest superiority on their part. Their earnest wish was clearly to be left alone [Gibbs in Heizer 1972a:116].

A fourth set of issues concerned self-dealing and corruption among the treaty negotiators. Article 5 of Treaty O guaranteed that a certain amount of food would be made to the Indian signatories "at or near Vallejo, or elsewhere, as may be most convenient" to the government (Heizer 1972a:84). The location "at or near Vallejo" was the ranch of General J.M. Estelle who was a member of McKee's treaty delegation. Before the expedition left Sonoma, McKee had arranged for Estelle to provide cattle (at prices to be guaranteed by the government) to groups signing treaties. Treaty P requires the same pick up place for provisions at or near Vallejo. In short, Vallejo was not chosen because it was a significant site to the tribes signing treaties O and P, but rather because it was convenient for the US government and offered the opportunity for profit to a member of the treaty delegation. (A similar provision of Treaty Q, provided that the tribe(s) would pick up their items from Durkee, a member of the treaty delegation, at his place of business (Sen. Ex. Docs., 33 Cong., Spec. Sess., Doc. 4, p. 162)).

AR0005910

The official minutes of Treaty O proceedings state that: "the chiefs must send runners for as the mountains surrounding this lake are impassable for wagons, it would cause the President great expense to send it here [to Clear Lake] now."

Finally, it is worth noting that Treaty O did not make any provisions for reserved rights to off-reservation hunting, fishing, and gathering. In fact, Treaty O did not even provide a right of access that would allow its Indian signatories to access General Estelle's Ranch via private land. The Army considered this arrangement "injudicious" and criticized McKee for "requiring the Indians to make a long journey into the white settlements."

Perhaps the paramount summary of the treaty process was Heizer's (1972a:5) statement that "taken all together, one cannot imagine a more poorly conceived, more inaccurate, less informed, and less democratic process than the making of the 18 treaties in 1851-1852 with the California Indians."

**Royce Maps**

Treaty O, like other California treaties, does not delineate specific lands to be ceded by Indian tribes. It only outlines the land to be appropriated and set apart as a reservation. The minutes and journals of the treaty-making parties did not include any contemporaneous documentation of ceded areas, and the treaties were originally considered non-jurisdictional, meaning that they did not identify land the belonged to a specific person or tribe (Heizer 1972a, 1978).

Maps purporting to show "ceded areas" were not created until 1899, approximately 47-48 years after the treaties. The maps were made by Charles Royce, who used the data provided in the Schedule of Indian Land Cessions (Royce 1899:784-787, included in Appendix C). Detailed data describing ceded land for numerous treaties across the United States are listed in that table. In the Schedule of Indian Land Cessions, the data for Treaty O, simply states: "Reserve a tract on Clear Lake. Cede all claim to other territory" (Royce 1899:784-785). Similarly, the data for Treaty I states: "Reserve a tract on Sacramento river. Cede all claim to other territory" (Royce 1899:786-787). There is no other data to document the methods Royce used to in mapping the area shown as ceded in Treaties I and O.

To date, no other source of information has been identified that supports the methods Royce used in determining the ceded areas on the 1899 maps for the California Treaties of 1851-1852. When Royce was preparing the land cessions map, Bancroft (1874) and Powell (1976 [1877]) had both published maps of the area showing Pomo and Patwin (or Wintoon) territory (included in Appendix B). The maps show the vicinity of Vallejo clearly within Patwin territory and not shown as Pomo. Beckham summarizes the Royce maps and ceded areas with the following statement:

AR0005911

The map gratuitously assumed the negotiations with the eight tribelets in the vicinity of Clear Lake ceded the lands of the Wappo, Southern Patwin, and Coast Miwok to the south. Those tribes never met with Redick McKee in any treaty council. The Royce map showing Cession No. 296 is erroneous and in no way reflected tribal distribution, use, or occupancy of lands in the boundaries it delineated [Beckham 2016:64].

Heizer (1972a:5) states that "the three commissioners did not have the slightest idea of the actual extent of tribal lands of any group they met with." This problem was not abstract. Treaty I is labeled 298 and the area of ceded lands is labeled 299 on Figure 5 (Royce 1899). The Colus, Tat-nah (Tatno), Cha, Doc-duc (Dok'-dok), Cham-met-co (Chemoco), and Toc-de (Tockti) have been identified as Patwin villages associated with recorded ethnohistoric villages shown on maps (Figure 2, and on Johnson's (1978:350) and Kroeber's (1925, 1932) maps in Appendix B), discussed in Table 5, and Appendix A. The villages of Chemoco and Tockti are located in the area that Royce mapped as ceded in Treaty O (296 on Figure 5) despite having representatives who signed Treaty I.

Treaty O is labeled 295 and the area of ceded lands is labeled 296 on Figure 5 (Royce 1899). The lands ceded in Treaty 0 encompass traditional territories of the Patwin, Pomo, Wappo, Lake Miwok, and Coast Miwok. The lands which were to be set aside (labeled as 295) are located in the traditional territory of the Pomo and Wappo. The lands ceded encompass a majority of the traditional territory of the Patwin, specifically the Hill Patwin. Numerous Patwin settlements have been identified throughout the ceded lands, including Vallejo Property identified Appendix A and shown on maps in Appendix B. Again, it is important to note that the villages of Chemoco and Tockti are located in the area shown as ceded in Treaty O (296 on Figure 5) despite having representatives who signed Treaty I.

In short, it appears that the Royce Map area 296 does not provide a reasonable proxy for the area historically occupied by Scotts Valley and other Pomo groups.

**Early Twentieth Century**
During the latter part of the nineteenth century and the early years of the twentieth century, the Patwin survived by hunting, gathering, and through wage labor on farms and ranches (Johnson 1978; 1880 and 1900 US Census [in Appendix D]). Although their traditional territory is located in the midst of a rich agricultural and horticultural region; many Indian people were living in severe distress, starving and isolated. This was particularly true for the elder generations (Kelsey 1906).

By the beginning of the twentieth century, most northern California Indians had been driven from their villages, with some exceptions (Castillo 1978:713). Patwin people either lived in remote localities or they lived on or near the edges of small towns, working as laborers. Researchers such as Kroeber, Barrett, and Merriam recorded the recollections of elders regarding as many native settlement clusters as researchers could glean.

AR0005912

1932:254).  The total population was less than 200.  It is important to note that the surviving Patwin "in the north seem to feel themselves as having been rather near dialectic relatives of the southerners, and all evidence points to so close a cultural resemblance between northern hill and northern river Patwin that the southern Patwin may be expected also to have affiliated strongly" (Kroeber 1932:254).

In 1916, Dr. J. Alden Mason obtained a Suisun dialect vocabulary from an old Indian, Sr. Platon Vallejo, at the town of Vallejo (Kroeber 1932:354; Gettelman 2016; Vallejo n.d. b). Vallejo said that he had spoken that dialect as a boy.  Analysis of Platon Vallejo's vocabulary provides "indisputable linguistic evidence that this area (Vallejo) has the same language as Capay Valley" and is identical to Hill Patwin (Gettelman 2016).

***The Rumsey Rancheria***
Between 1906 and 1909, the settlements at Rumsey (Figure 7), Colusa, and Cortina were among reservations created under appropriation acts, indicative of the need and vitality of these communities at that time (Davis 1994:696).  The reservations did not have to deal with the raids and lawlessness that characterized earlier times and provided sanctuary for the surviving Patwin, including the refugees from the San Pablo and Suisun bay areas (Davis 1994:696).  However, the land at the Rumsey Rancheria was too barren to support farming and the tribe became dependent upon the U.S. Government for survival (Yocha Dehe 2016b:5).



*Figure 7. Rumsey Rancheria, Cache Creek Valley; 1904 (OAC C. Hart Merriam Collection of Native American Photographs, T. WINTOON STOCK, 19p. Ko-pa (Copeh or Win) P1:1).*

The Rumsey Band "gained a hard-won relocation to a small parcel of land further south in the Capay Valley, where they managed to cultivate small amounts of food" in 1948 (Yocha Dehe 2016a:6).  The tribe changed its name in 2009, from the Rumsey Band of Wintun

AR0005914

Indians to the Yocha Dehe Wintun Nation. Yocha Dehe means "Home by the Spring Water" in Patwin (Yocha Dehe 2016a:4). "The name change represents an important mark in time for the people of the Yocha Dehe," connecting the Tribe's people to their heritage (Yocha Dehe 2016b).

The Yocha Dehe and Cortina Indian Rancheria are recognized by the Native American Heritage Commission (NAHC) as Most Likely Descendants for the City of Vallejo and vicinity. The Yocha Dehe and Cortina Band entered into an agreement in July, 2016 with the City of Vallejo and the Greater Vallejo Recreational District to oversee protection of sacred ancestral sites on public property at the Glen Cove recreation area in the southern portion of Vallejo overlooking the Carquinez Strait (Yocha Dehe 2016:c). "We are proud to accept this responsibility not only as descendants of the Native Americans who have lived here for thousands of years, but also as Californians who understand these sites are a part of all of our history here" (Yocha Dehe 2016c).

### Census Data

Three primary census sources were relied upon for this research: the Kelsey Census 1905-06, the Terrell Census 1915, and the Rumsey Group Census February 1938. In 1905-06 the Bureau of Indian Affairs (BIA) appointed Special Agent C. E. Kelsey, to examine the condition of homeless Indians in California, and to make recommendations on how best to alleviate their situation. Kelsey's report resulted in congressional appropriation for the purchase of land and the development of water systems for the California tribes identified in the census (Castillo 1978:714; Kelsey 1906, 1971). In addition to the Kelsey census, a later census was undertaken by John J. Terrell, Special Indian Agent for the BIA in 1915. His task was to determine the land and water needs of the California Indians.

The general federal census of the population, undertaken every ten years, proved valuable in locating Yocha Dehe ancestors in 1900, 1910, and 1930. The count was conducted in precincts or districts, often related to the schools within a particular county in non-urban areas. Indian populations were often noted in relation to ranches; however, Indian people were often left out of the general population counts, because they maintained a low social profile for their own safety or because they were simply overlooked.

The prominent lineage names on the Rumsey Group Census of 1938 are Lorenzo, Buck, Lowell, McKay, and Mitchell (census data is included in Appendix D).

### Lorenzo

The Lorenzo lineage traces back through Mateo Lorenzo who is identified on the 1900 federal census, Kelsey's census 1905-1906, the 1907 list of Rumsey Band of Indians, the 1910 federal census, and Terrell's 1915 census. According to the 1900 federal census for Guinda Township, Rumsey Precinct, Mateo Lorenzo was born in 1872 and was living at Rumsey with his wife of 9 years, Sutaphina (Seraphina, Sutphina, Sutterfina) born in 1875. Mateo was a day laborer. They had three children living at their home, including son Henry born in 1897, listed as head of household on the 1938 Rumsey Census. The family is listed as Digger Indians, all born in California as well as their parents. Mateo Lorenzo and his

AR0005915

# ANALYSIS OF SCOTTS VALLEY'S DOCUMENTATION

This section provides a review of the documents submitted by Scotts Valley to the Department of the Interior in connection with Scotts Valley's request for a Restored Lands determination for the Vallejo Property. On the basis of that documentation, the following conclusions are presented. The documents indicate that:

1. The Vallejo Property is not within, contiguous with, or within 25 miles of either of the two reservations associated with Scotts Valley prior to its termination: the Sugar Bowl Rancheria or the Big Valley Rancheria, both located in Lake County, California.

2. Scotts Valley has not provided evidence that its ancestors were forced into labor at or immediately surrounding the Vallejo Property. The ranchos operated by the Vallejo family were vast in size. The documentary record does not support a conclusion that Scotts Valley's ancestors ever labored at or near the Vallejo Property. Nor does it indicate that involuntary labor for the Vallejo family was performed in a tribal capacity. There is no evidence that labor conditions led Scotts Valley to abandon its villages at Clear Lake and establish new habitation sites in the vicinity of Vallejo.

3. The Vallejo Property is not explicitly ceded in Treaty O or any other treaty-related document identified by Scotts Valley.

4. There is no ethnogeographic or ethnohistorical evidence that the signatories to Treaty O were (or should have been) treated as a single tribal entity. In fact, documentary evidence submitted by Scotts Valley in connection with a prior unsuccessful application for a restored lands determination in Richmond, California advocates a contrary position. It is also worth noting that Scotts Valley's position with respect to Clear Lake "tribelets" appears to be inconsistent with its contention that Patwin speaking communities near Vallejo should be considered independent entities rather than a part of the Patwin community as a whole.

5. The unusual documentary record presented here suggests that the Royce Maps for California, prepared nearly 50 years after Treaty O, do not serve as an appropriate proxy for the lands used and occupied by Clear Lake Pomo groups (including Scotts Valley's ancestors). The map area associated with Treaty O includes known Patwin villages whose leaders executed Treaty I. Also, ceded areas were identified after the completion of the treaty making process (Heizer 1972a) and without any documentary basis. Royce created his maps using the data provided in the Schedule of Indian Land Cessions (Royce 1899:784-787), which does not identify the Vallejo Property or any other specific boundaries (Royce 1899:784-785).

6. Article 5 of Treaty O states that provisions for the signatories of Treaty O would be delivered "at or near Vallejo, or elsewhere, as may be most convenient" to the government. The same location was also chosen for the signatories of Treaty P. The documents

AR0005922

submitted by Scotts Valley show that the location "at or near Vallejo" was the ranch of General J.M. Estelle, who was a member of the treaty delegation.  The documentary record also shows that McKee had arranged for Estelle to provide cattle for groups signing treaties before the expedition left Sonoma (Hurtado 2016:78).  In other words, Estelle's Ranch was not chosen because it was a significant site to the tribes signing treaties O and P (a fact that could not have been known at the time of the choice), but rather because it was convenient for the US government and provided a source of income to a member of the treaty delegation.

7.  Portions of Scotts Valley's submission assert that the Patwin had abandoned the Vallejo area by 1851 and that Pomo groups, including Scotts Valley, relocated to Vallejo thereafter. However, the documentary record shows that many Patwin, including Chief Solano, remained in their traditional territory in the vicinity of Vallejo well after 1851 (Johnson 1978:352 Table 1; Kelsey 1905:13-14, Vallejo n.d. a).  It is also worth noting that there is no documentary evidence that Scotts Valley (or other Pomo groups) permanently relocated their villages, burial grounds, or other tribal activities to the Vallejo area.

8.  The documents submitted by Scotts Valley do not contain specific evidence that its ancestors used or occupied the Vallejo Property or the immediately surrounding area.

9.  There is general agreement in the academic literature that the Vallejo Property is within Patwin ancestral territory.  Scotts Valley's documentation does not identify any published ethnographic work placing the Vallejo Property within Scotts Valley or Pomo territory.

AR0005923

totally different linguistic stock than the Pomo.  They occupied part of the country south of the Pomo toward San Francisco and San Pablo bays (Powers 1877:194-95).

Powers' informants defined the aboriginal area of the Pomo as the country at the headwaters of the Russian and Eel rivers and along the estuaries of the coast to the west.  Most importantly, he pointed out the significant dialectic differences in Pomo that rendered communication more and more challenging within the Pomo language area.  It is important to note that the southern boundary of Pomo languages was at least seventy miles north of San Pablo Bay and that tribes speaking other languages completely different from Pomo inhabited that country.

### Samuel Alfred Barrett, 1903–06

In 1901 Samuel A. Barrett (1879-1951) entered the University of California, Berkeley.  He paid for his college education by selling his prized Pomo Indian basketry collection.  He had grown up at Yukiah, California, where his father owned a general store and often took baskets in payment for staples.  Barrett graduated with a B.A. in 1905 and then commenced studies for a Ph.D. with Dr. Alfred L. Kroeber.  Three years later Barrett earned the first doctorate in anthropology from the University of California.  Barrett moved to Columbia University to carry out post-doctoral studies with Dr. Franz Boas, Kroeber's mentor.  Following that work, Barrett returned to California well-trained in linguistics, ethnology, archaeology, and museology.  He ultimately had a distinguished career at the Milwaukee Public Museum (Laszewski 2009).

Barrett traveled in 1903, 1904, and 1906 through Pomo country south of Cape Mendocino to work with dozens of tribal informants.  Phoebe Apperson Hearst, a patron and collector of Native American arts and crafts, funded Barrett's research at the same time she was purchasing items for what became the Phoebe Apperson Hearst Museum of Anthropology at the University of California, Berkeley. The museum, founded in 1901, became a major depository for material culture, archaeological objects, and art of indigenous cultures around the world.  Barrett explained the mission for his extensive field reconnaissance in northwestern California:

6

AR0005967

to be removed, as he could get no other labor, while at the same time he abused them as thieves who had killed his cattle and eaten his crop. His case seemed a hopeless one. It is that of many of his class, but the wheels of state must crush some victims in their inexorable career.

The distance travelled to-day was, by odometer, ten miles, to which one should be added for lockage, making the total from Sonoma a little over seventy-one and one-half miles.

SUNDAY, AUG.17th.—Col.M'Kee started for Clear Lake, accompanied by Major Wessells and nine of the command as an escort, and a small pack-train carrying presents and provisions. Several gentlemen from the country below, who had come up on a hunting excursion, also went over. The men were mounted on mules to save the horses, as the road was a severe one; and the appearance of the cavalcade was amusing enough; with the heavy trappings of the mounted riflemen on their diminutive chargers, especially as some of the animals were exceedingly restive under the clattering of sabres and yagers. Our road after leaving the valley was an almost uninterrupted ascent to the summit of the great range which bounds the valley of the *lake on the west, the path being an. Indian trail, distinctly enough marked. The morning had been cloudy, and towards noon it set in pretty steadily to drizzle, continuing through the day, an occurrence rare at this season. The ascent in all was a very great one, the crest of the mountains being covered only with chemisal, dwarf-oak, and mansanita bushes. Just before reaching the summit we entered on a pretty little valley, two or three miles in length, and completely circled in the mountain, containing fine grass. Passing the divide, we came upon a steep descent ending in an abrupt pitch into the cañon of an arroya below, down which was a well-worn path, probably the equal labor of Indians and bears, guarded on either side by a thicket. Here was our almost entire descent to the level of the valley, which is probably not less than a thousand feet above that of Russian river. We would down the arroya, now dry except in spots, and passing to the right of a couple of small tule ponds, cross some low hills into Clear Lake valley, towards its head. The bottom of the arroya widens out near these ponds, and bends to the left; the stream itself, when full, forming one branch of the principle tributary of the lake. At the ponds we saw a number of ducks and some deer, and a little beyond found the remains of a huge grizzly bear, which some vaqueros had, during the preceding spring , lassoed and baited with bulls. Stroking the lake, our trail ran through the tule marshes which border its western side to camp. This was in an oak grove in the bottom, upon a small stream, and some four miles from its extremities. The march to-day was estimated at fifteen miles.

MONDAY, AUG.18th.—The morning was again threatening, and the sky did not clear until the afternoon. To-day about seventy-five Indians from the different bands on the lake, including the principal chiefs and head men, came into council. The objects and wishes of the government were explained to them by the agent, and some provisions distributed. They all appeared highly gratified, and grunted their approbation with perfect unanimity, particularly at the promise of beef. Most of these people were entirely naked, and very filthy, and showed less sense of decency in every respect, than any we had ever met with. Their women did not come with them; having, for the most part, been sent up to the hills. Towards evening we rode to the lake and visited the nearest rancheria. This, which was only a summer residence, was pitched in a clump of willow bushes in the tule, and consisted of the rudest huts of twigs and rushes. A few old women only remained, who were pounding seeds in a pinole; and they appeared to have a considerable stock both of these and of dried fish. Of fish, the lake abounds with different kinds among . which, a species of bass, so called at least, is considered the best. The fishing season is the fall and winter, when numbers of

AR0006159

the adjoining tribes come down.  The seeds, which are of anise
and of various grasses are collected by the women, who carry
suspended on their backs a conical basket, holding about a
bushedl, and in the hand a smaller one, suitable for a scoop.
With this they sweep among the ripe grass, with a motion *similar
to that of a man cradling; throwing the seed over the left
shoulder into the larger one.  The pinole is pounded in baskets
of firm texture, having a hole in the bottom, which is placed
upon a smooth stone, and is afterwards stored for winter use.
The acorn, however, abundant everywhere, furnishes their chief
article of food.  Their principal ingenuity is shown in the
making of baskets, some of these being of very fine and close
texture, capable of holding water.  In fact, they boil in
them by dropping in heated stones.  The women generally wear a
small, round, bowl-shaped basket on their heads; and this is
frequently interwoven with the red feathers of the woodpecker,
and edged with the plume tufts of the blue quail.  They appeared
to have no earthen or stone utensils, nor any of wood, except
pipes, ladles, and pestles.  Their canoes, or rather rafts, are
made of bundles of the tule plant, a gigantic bulrush, with a
round, smooth stem, growing in marshy grounds to the height of ten
or twelve feet.  The pipe is a straight stick, the bowl being a
continuation of the stem enlarged into a knob, and is held
perpendicularly.  They use a species of native tobacco of
nauseous and sickening odor.  The winter houses, which are large
lodges supported on poles, and covered with the universal tule,
they always burn on leaving them in spring, to get rid of the
vermin.  The only building of this band which remained was the
"Ser-a-loo," or sweat-house.  This, which is used by them as a
species of daily indulgence, is simply heated by fires, without
the aid of water, and on leaving it, they take to the stream to
cool themselves.  It is generally built in a concial form, and
the one here was about twelve feet high by twenty wide, with the
earth excavated for a couple of feet deep within.  The circles or
mounds on which they have been built, are found in many places
around the lake not now inhabited, and, from their number, as
well as the great size of some, afford evidence of a formerly
much larger population.

As regards this, fact, there is but little doubt, nor of the
principal cause of the diminution in the ravages of the small-
pox, at no very remote period.  Some old Indians, who carry with
them the marks of the disease, state it positively; and it is
reported, by native Californians, that over 100,000 (Note: Doubt-
ful--H.R.S.) perished of this disease in the valleys drained by
the Sacramento and the San Joaquin.

Concerning the religious belief of these, as well as the adjoining
Indians, it is difficult to obtain conclusive information.
One of this tribe, who had been for three or four years among
the whites, and accompanied the expedition, on being questioned
as to his own belief in a deity, acknowledged his entire
ignorance on the subject.  As regarded a future state of any
kind, he was equally uninformed and indifferent; in fact, did
not believe in any for himself.  As a reason why his people did
not go to another country after death, while the white might,
he assigned that the Indians burned their dead, and he supposed
that there was an end of them; a speculation, however, probably
originating at the moment, and not forming part of the national
faith.  Some of those who, during our conference, were questioned
on the subject, admitted, that as *there were good and bad men
and animals, there might be good and bad spirits, and that it
was reasonable that there should be a maker of what they saw
around them; but they added, that these things were for white men
to know about.  Mr. Benjamin Kelsey, who had lived for some time
among these people, and whose intelligence and familiarity with
Indian customs renders him a reliable informant, states, on the
contrary, that among themselves the old men go through ceremonies,

AR0006160

at night and morning, of a devotional character, singing, crying, and making signs; and that an Indian in his employment, who spoke Spanish, explained that it was like what the priests did. The custom of burning the dead is universal here, and through the length of Russian river; and, as we afterwards found, among cognate tribes at the head of Eel River.

In personal appearance, many of the Clear Lake Indians are of a very degraded caste; their foreheads naturally being often as low as the compressed skulls of the Chinooks, and their forms commonly small and ungainly. They, as well as the river tribes, cut their hair short. They have also considerable beard and hair on the person. Few of the men have any clothing at all. The women, however, wear, even from the earliest childhood, a short fringed petticoat, generally of deer-skin, around the loins, but suffer the upper part of the body, to be exposed. Sore eyes and blindness, the result of smoke and dirt, were common. It may be noticed that phymosis is common among all the Indian tribes of this country.

A vocabulary of this language was obtained from the Indian who accompanied us, and who spoke Spanish sufficiently to be enabled to interpret with his people. It was carefully taken down, and may be relied on as tolerably accurate. Many of the words will be found identical with those of the Indians on the upper parts of Russian and Eel rivers; and indeed he was able to converse with most of these--understanding them, however, much better than he could reply. (Vide Par. IX, Language).

TUESDAY, AUG.19. -- The preliminaries of the treaty were agreed upon in council this morning, a larger assemblage being present than yesterday. In the mean time an examination of the country was made, as well as time and means afforded, with a view to a reservation. The length of the lake has generally been stated at 60 miles, but it probably does not exceed 30 or 35. The width near the head is from eight to ten miles. It is divided near the middle by a spur from the high mountain below our camp, which extends nearly across it, and the lower portion is much narrower than the upper. The general course is from north-west to south-east. Its waters empty by an outlet into Cache creek; a stream which heads in a high peak to the northward, and runs toward the Sacramento, losing itself in a tule swamp nearly opposite the mouth of Feather river. The lake has been generally represented as lying within the Sacramento valley, but its actual position is in a great basin of the mountains which border it on the west; for although the waters of the lake run toward that river, it *is yet separated from it by a part of the chain, though a canon in which Cache creek forces its way. Surrounded on every side by mountains, this valley is completely isolated from the adjoining country, there being no access except by difficult trails. Of these there are several; the usual one being from Napa across to Putos creek, or the Rio Dolores, as sometimes called, which heads to the south-west, and runs nearly parallel to Cache creek towards the Sacramento; losing itself, like the former, in a swamp, except during the rainy season. The principal valley upon the lake is that upon which we encamped, lying on the western side, and extending from mount M'Kee towards the head. The extent of this may be stated at ten miles in length, by an average width of four. A more beautiful one can hardly be pictured. Covered with abundant grass, and interspersed with groves of superb oaks of the most varied and graceful forms, with the lake and its green margin of tule in front, and the distance bounded everywhere by precipitous ranges, it combines features of surpassing grandeur and loveliness. Flowers of great variety and elegance abound, the woods are filled with game, and in the season innumerable flocks of water-fowl enliven the shores. Two or three other valleys lie within the mountains, which generally come down to the water, but none of the size and value of this. Upon the lake are several islands, of

Page 109

- 8 -

AR0006161

of which the largest, called "Battle island," about a mile long,
is at the northern end. Several mineral springs occur in the
neighborhood, and at one of them, on the eastern shore, sulphur
is found in great abundance, and in solid and pure deposits.
Salt springs also exist among the mountains, from which the
Indians, during the dry season, procure what they require; and
further to the north-east, near the southern head of Cottonwood
creek, rock-salt is obtained, for which the Lake Indians trade.

A cattle ranch was formerly maintained in this valley, and the
adobe house, erected by the owners, was still standing about
three miles from our camp, but at this time unoccupied. It was
here that Andrew Kelsey and Charles Stone were killed, by the
Indians, in December, 1849; a murder which was severely punished
during the next spring, by a party of troops under Captain Lyons,
who succeeded in bringing up a mountain howitzer and two boats
from below. The Indians, who had forted upon the creek, at the
upper end of the lake, being driven out by a shot, were pursued
in the boats to the island by a detachment of infantry, and on
their trying to escape to the shore, attacked by the dragoons,
who met them waist-deep in the tule. The utter rout and severe
loss which they suffered, had effectually subdued them, and
undoubtedly brought about the readiness with which they now met
the overtures of the agent.

WEDNESDAY, AUG. 20th.--The council was again assembled, and the
treaty explained to them as engrossed. The tribes represented
were the Hula-napo, Habe-napo, Dah-no-have, Moal-kai, She-kom,
and How-ku-ma, belonging to the lake, and the Shanel-kaya and
Bedah-marek, living in a valley situated to the north of it, on
the east fork, *of Russian river. Provision was also made for the
admission of the Cho-tan-o-man-as, living toward the outlet of
the lake, but not present; and for the settlement of any other
tribes the government may remove from other places. These are all
more properly bands than tribes; each village, as is the case
generally with the Indians of this part of California at least,
having its separate chief. The names have each its signification.
Thus, "Habe-napo" means stone house, "Dahno-habe," stone mountain,
"Badah-marek," lower people, etc. They give to the first six
tribes collectively the name of "Na-po-batin", or many houses;
an appellation, however, not confined to themselves, as they term
the Russian river tribes the "Boh-Napo-batin," or western many
houses. The name "Lu-pa-yu-ma" which, in the language of the
tribe living at Coyote valley, on Putos river, signifies the same
as Habe-napo, is applied by the Indians in that direction to these
bands, but is not recognized by themselves. Each different
tribe, in fact, seems to designate the others by some corresponding
or appropriate word in its own language, and hence great confusion
often arises among those not acquainted with their respective
names. They have no name for the valley itself, and call the
different spots where they reside after those of the bands.
In fact, local names do not seem to be applied to districts of
country, though they may be sometimes to mountains. Rivers seem
to be rather described than named -- thus Russian river is called
here Boh-bid-ah-me, or "the river to the west."

The Shanel-Kayas and Bedah-marek speak a language, or more
probably dialect, different from the Napo-batin, as do also the
Indians of the portion of the lake south of Mt. M'Kee. That of
the latter, perhaps, resembles more the Mutistul between the
heads of Napa and Putos creeks, or some other of those lying
between the lake and the bay of San Pablo. How many really
different languages will ultimately be determined between the
heads of the Russian river and San Francisco bay, it is impossible
to conjecture. On a cursory examination there appear to be
several; but more critical enquiry will, perhaps, reduce them.
That of the Napo-batins, in its various dialects, seems to be one
of the most extensive; reaching from the Sacramento range to the
coast, and up as far as the head-waters of the Eel river.

- 9 -

AR0006162

It is difficult to ascertain the real numbers of these people. Common report had stated it at some 2500 or 3000; but the nearest approach which could be made to a count gave but 511 as the total of souls in the six tribes of the valley, and 150 to the two living in the mountains, who were represented by their chiefs only. To this twenty five per cent was added, as the probable number of those not returned. The proportion of men, women, and children seemed to vary greatly. The men of the two nearest rancherias were with great difficulty persuaded to bring in their families, and their ratios were as follows:—

Huta-napo, 85 men, 81 women, 29 children.
Habe-napo, 29 do.  41 do.   13 do.

Page 111

*The details of the treaty appear elsewhere, and need not be repeated. It provided for the reservation of that part of Clear Lake valley lying to the northward of Mt. M'Kee, as designated on the accompanying maps, and for the assembling here of the tribes of Russian river, the coast and bay, and of the head of Eel river; the Indians to be furnished with teachers, agricultural implements, domestic animals, and seeds, and assisted in supporting themselves for the space of two years. As regards the suitableness of the reservation for its purpose, there can hardly be a doubt. The spot is isolated to a degree unusual even on the Pacific; abounds in all that is necessary for a large number of people in their savage state, and is capable of being made in the highest degree productive by cultivation. If the system pursued in this respect in the States is adhered to in California, (and in no other way can the condition of these Indians be elevated, or their extinction be averted,) it must be by removing at least their families from among the whites; and turning them to some fixed occupation. The central position of the lake country will easily enable such numbers as can be spared, to hire themselves out during the working season; while the stores provided at home will sustain them in the winter. They appear sufficiently tractable to admit of teaching, and to be averse to labor from indolence, rather than from pride. Great patience and tact will necessarily be requisite, and care should be exercised in selecting their teachers for these among other quali-fications. We started on the return route about half past twelve, and reached the top of the mountain in four hours. The afternoon was fine, and we here enjoyed a magnificent view of the country and lake behind us. Some of the party left the trail by which we came up, at the head of the little valley, and descended by one leading to the left. An hour and a half of rapid travel brought us to Feliz's, where we learned that the camp had moved up a mile and a half further for better grass. We reached it a little after dark, and found that the rest had already arrived. During our absence, some Spaniards and vaqueros had lassoed and killed five grizzly bears in the immediate vicinity of the ranch. This amuse-ment, which may be considered the national one of California, is performed by from two to four men, all mounted. One of them rides towards the bear, and as he rears, catches a paw with the noose, takes a turn round the horn of his saddle, and immediately starts at speed. Another following, lassoes in like manner the other foot, and spurs in a contrary direction, to prevent the bear overhauling the first rope, which he would otherwise speedily do. If there are more, they secure his hind feet and head, and the bear, thus rendered powerless, is dragged to a tree and made fast. Sometimes a wild bull is coupled with the bear by a riata, and the two turned loose to fight it out, the conflict generally ending with the death of both parties. This pastime seems tolerably dangerous to the uninitiated, but is pursued with astonishing fearlessness and dexterity by the Californians; nor are some of the American settlers much behind them in either.

Page 112

Today a large rattlesnake of a bright green color was noticed among the hills near *Clear Lake. A large yellow species is also

– 10 –

AR0006163



United States Department of the Interior

OFFICE OF THE SECRETARY
WASHINGTON, D.C. 20240

**SEP 0 1 2011**

The Honorable Merlene Sanchez
Chairperson, Guidiville Band of Pomo Indians
401 B Talmage Road
Ukiah, California, 95482

Dear Chairperson Sanchez:

I am writing concerning the Guidiville Band of Pomo Indians' (Band) application for the
Department of the Interior to acquire a parcel of land in Richmond, California (Point Molate
Parcel or Parcel) in trust for gaming purposes. In connection with that application, I must first
determine whether the parcel would qualify as "restored lands" of the Tribe, under the Indian
Gaming Regulatory Act (IGRA), 25 U.S.C. § 719(b)(1)(B)(iii), commonly referred to as IGRA's
Restored Lands Exception, and the regulations set forth in 25 C.F.R. Part 292.[1]

### Decision

I have considered the Band's application, pursuant to IGRA and the Department of the Interior's
(Department) regulations at 25 C.F.R. Part 292, which implement § 2719 of IGRA. I have also
carefully reviewed the Band's voluminous submissions[2] supporting its request and the
submissions from many supporters and opponents of the Band's proposal, including detailed
analyses from Contra Costa County and the City of Richmond.

I regret to inform you that the Department has determined that the 425-acre parcel in Richmond,
California, does not qualify as restored lands of the Tribe under IGRA.

The Band has not claimed that the parcel would be eligible for gaming under any other exception
to IGRA's general prohibition against gaming on newly acquired lands. Therefore, it is my
determination that the Parcel, if acquired in trust, would not be eligible for gaming under IGRA.
I have set forth the basis for my decision below.

### Background

In December 2004, the Guidiville Band of Pomo Indians requested to have approximately 425
acres of land in Richmond, California taken into trust, in part, for the purpose of gaming.[3] Under

---

[1] 25 C.F.R. Part 292, which implements § 2719 of IGRA, went into effect on August 25, 2008.
[2] The Band submitted an advocacy memorandum and accompanying documentation in February 2006 (and has
supplemented that submission with additional material since that time. The Band's request and supplemental
submissions delineate its restored tribe status and present its rationale for taking the lands into trust as part of the
Band's restoration. The submissions also include detailed descriptions of the Parcel.
[3] By letter dated December 6, 2004, the Band requested that the Bureau of Indian Affairs (BIA) Regional Director
take action to acquire the Point Molate Parcel in trust for the Band. Letter to Clay Gregory, Regional Director,
Pacific Region, BIA from Donald Duncan, Vice Chair, Guidiville Band of Pomo re Land Acquisition of Property

1

Sonoma Counties.[65] However, historical evidence of a general connection to any land located in any of those counties is not the equivalent of documentation of the Band's own historical connection to Point Molate, or parcels in its vicinity. Instead, the Band must provide historical documentation of its villages and burial grounds located at, or subsistence and occupancy use of, the Parcel, or lands in its vicinity. Alternatively, the Band must show the Parcel is located in the vicinity of specific sites or specific areas for which the Band can offer historical documentation.

### a.  Early Pomo "Use and Occupancy."

McClurken contends that Pomo use and occupancy of the Bay Area dates back approximately 6000 years. The historic village of Olompali, McClurken asserts, was originally occupied by Pomo and is located near present-day Novato, California. Novato is approximately 15 miles from Point Molate, across the San Pablo Bay.[66] However, the record indicates that Olompali is believed to be a village of the Coastal Miwok, not the Pomos.[67]

McClurken also references an aboriginal trade route between the Clear Lake region and the Pacific coast and states that the Band's Pomo ancestors traveled on this trail to engage in commerce and harvest natural resources.[68] The Band's argument regarding a trade route between the Clear Lake region and San Pablo Bay's northern shores is unsubstantiated by the sources cited by McClurken. However, even assuming such a trade route existed (a conclusion that is not supported by the record), the Band cannot establish its subsistence use or occupancy based on the fact that its ancestors traveled to various locations to trade and interact with other peoples and then returned to the Clear Lake region. Subsistence use and occupancy requires something more than a transient presence in an area. "Subsistence" is defined as "a means of subsisting as the *minimum* (as of food and shelter) necessary to support life."[69] Accordingly, activities that would tend to show a tribe was using land for subsistence purposes might include sowing, tending, harvesting, gathering and hunting on lands and waters. "Occupancy" can be demonstrated by a consistent presence in a region supported by the existence of dwellings, villages or burial grounds, as alluded to in the regulations. The Band's claims with respect to a trade route do not demonstrate occupancy or subsistence use or activities on the Parcel or in its vicinity.[70] Moreover, the preamble to the regulations makes clear that "something more than

---

[65] *See* Assoc. of Bay Area Governments, Bay Area Counties, *at*
http://www.abag.ca.gov/abag/local_gov/county/county.html (last visited Aug. 20, 2011).
[66] Jan. 2006 GBP Report, at 125-28.
[67] *See* Pamela McGuire Carlson and E. Parkman, "An Exceptional Adaptation: Camillo Ynitia. The Last Headman of the Olompalis," *California History*, vol. 65, no. 4, p. 239 (December 1986) ("[t]he Spanish who arrived in the San Francisco Bay Area in the late eighteenth century found the Coast Miwok village of Olompali . . ."). It is also important to note that evidence of Pomo occupancy does not, without more, indicate use or occupancy by the Band.
[68] *See, e.g.,* Jan. 2006 GBP Report, at 31-32.
[69] Webster's New Collegiate Dictionary 1153 (G. & C. Merriam Co. 1979).
[70] McClurken's report states that the Pomo, without reference to a specific band, travel to "the coast" with only "the absolute requirements of the march to Bodega Bay" to clam and gather kelp. *See* Jan. 2006 GBP Report, at 32-33. But that trip was to "the coast north of San Francisco" and the source McClurken relies on for this point states that the "long promontory which projects just north of Bodega Bay, and guards its entrance, has for countless years been the favorite, in fact about the only, fish camp for Indians in all that region." *See* John W. Hudson, "Pomo Wampum Makers an Aboriginal Double Standard," at p. 11-13, in *Seven Early Accounts of the Pomo Indians and Their Culture*, assembled and edited by Robert F. Heizer (Berkeley: Archaeological Research Facility, Department of Anthropology, University of California, 1975). Although McClurken offers this as evidence of the Band ritually

14

AR0006235



# United States Department of the Interior

OFFICE OF THE SECRETARY
Washington, DC  20240

## MAY 2 5 2012

The Honorable Donald Arnold
Chairperson, Scotts Valley Band of Pomo Indians
301 Industrial Avenue
Lakeport, California  95453

Dear Chairperson Arnold:

I am writing regarding the Scotts Valley Band of Pomo Indians' (Scotts Valley Band or Band) application for the Department of the Interior (Department) to acquire six parcels of land in Contra Costa County, California (Richmond Parcels or Parcels) in trust on its behalf for gaming purposes. In connection with that application, the Department must first determine whether the Parcels, if taken into trust, would qualify as "restored lands" under the Indian Gaming Regulatory Act (IGRA)[1] and the regulations set forth in 25 C.F.R. Part 292.

## Decision

I have considered the Band's application pursuant to IGRA and the Department's regulations at 25 C.F.R. Part 292, which implement § 2719 of IGRA. I have also carefully reviewed the Band's voluminous submissions supporting its request, as well as the submissions of many of the supporters and opponents of the Band's proposal.

I regret to inform you that the Department has determined that the six parcels of land in Contra Costa County, California, do not qualify as restored lands of the Band under IGRA.

The Band has not claimed that the parcels would be eligible for gaming under any other exception to IGRA's general prohibition against gaming on lands acquired in trust after October 17, 1988. Therefore, it is my determination that the Parcels, if acquired in trust on behalf of the Band, would not be eligible for gaming under IGRA. I have set forth the bases for my decision below.

## Background

The Richmond Parcels consist of approximately 29.87 acres in the unincorporated area of Contra Costa County, California, adjacent to the City of Richmond. They include six contiguous parcels located at 81 Parr Boulevard, 155 Parr Boulevard, 177 Parr Boulevard, and 2701 Goodrick Avenue. The Parcels are on the southern side of San Pablo Bay, in the San Francisco Bay area. They are approximately 78 miles south of the Band's current tribal headquarters and former Scotts Valley Rancheria, both located in the Clear Lake area in Lake County, California. See map, following.

---

[1] 25 U.S.C. § 2719(b)(1)(B)(iii).

AR0006385



Figure 1: Richmond Parcels and Scotts Valley Tribal Headquarters and Former Rancheria

AR0006386

On January 22, 2005, the Band filed its fee-to-trust application for the Richmond Parcels. Several months later, on November 9, 2005, the Band requested an Indian Lands Determination, seeking the Department's determination that the Richmond Parcels are eligible for gaming pursuant to IGRA's restored lands exception.[2]  Thereafter, the Band and the County of Contra Costa (County) submitted extensive information to the Department arguing, respectively, for and against a restored lands determination and refuting the other's claims.[3]  The Department has carefully reviewed and considered these submissions, as well as other materials now within the administrative record.

---

[2] Request for Indian Lands Determination from the Scotts Valley Band of Pomo Indians to the Bureau of Indian Affairs, U.S. Dep't of Interior (Nov. 9, 2005) [hereinafter Band's Nov. 9, 2005 Request for Indian Lands Determination].

[3] *See* Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to Kenneth Salazar, Sec'y, U.S. Dep't of Interior (Oct. 18, 2011) [hereinafter Band's Oct. 18, 2011, letter]; Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to Pilar Thomas, Deputy Solicitor of the Division of Indian Affairs, U.S. Dep't of Interior (Oct. 18, 2010) [hereinafter Band's Oct. 18, 2010, letter]; Letter from Paul Filzer, Attorney, Scotts Valley Band of Pomo Indians, to Scott Keep, Assistant Solicitor, U.S. Dep't of Interior, and Jonathan Damm, Attorney-Advisor, U.S. Dep't of Interior (May 18, 2009) [hereinafter Band's May 18, 2009, letter); Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to George Skibine, Acting Assistant Sec'y – Indian Affairs, U.S. Dep't of Interior (Oct. 21, 2008) [hereinafter Band's Oct. 21, 2008, letter]; Letter from Federal Glover, Chair of the Board of Supervisors, Contra Costa County, to Scott Keep, Assistant Solicitor, U.S. Dep't of Interior, and Jonathan Damm, Attorney-Advisor, U.S. Dep't of Interior (Sept. 30, 2008) [hereinafter County's Sept. 30, 2008, letter]; Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to George Skibine, Acting Assistant Sec'y – Indian Affairs, U.S. Dep't of Interior (Sept. 2, 2008) [hereinafter Band's Sept. 2, 2008 letter]; Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to George Skibine, Acting Assistant Sec'y – Indian Affairs, U.S. Dep't of Interior (Aug. 25, 2008) [hereinafter Band's Aug. 25, 2008, letter]; Letter from Federal Glover, Chair of the Board of Supervisors, Contra Costa County, to Scott Keep, Assistant Solicitor, U.S. Dep't of Interior, and Jonathan Damm, Attorney-Advisor, U.S. Dep't of Interior (July 23, 2008) [hereinafter County's July 23, 2008, letter]; Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to George Skibine, Acting Assistant Sec'y – Indian Affairs, U.S. Dep't of Interior (June 10, 2008) [hereinafter Band's June 10, 2008, letter]; Letter from Paul Filzer, Attorney, Scotts Valley Band of Pomo Indians, to Scott Keep, Assistant Solicitor, U.S. Dep't of Interior, Jane Smith, Attorney-Advisor, U.S. Dep't of Interior, and Jonathan Damm, Attorney-Advisor, U.S. Dep't of Interior (May 16, 2008) [hereinafter Band's May 16, 2008, letter]; Letter from Donald Arnold, Chairman, Scotts Valley Band of Pomo Indians, to Carl Artman, Assistant Sec'y – Indian Affairs, U.S. Dep't of Interior (April 30, 2008) [hereinafter Band's April 30, 2008, letter]; Letter from Cathy Christian, Attorney, Contra Costa County, to George Skibine, Dir. of the Office of Indian Gaming Mgmt., U.S. Dep't of Interior (April 22, 2008) [hereinafter County's April 22, 2008, letter]; Second Supplement to the Request for Indian Lands Determination from the Scotts Valley Band of Pomo Indians to the Bureau of Indian Affairs, U.S. Dep't of Interior (Oct. 10, 2007) [hereinafter Band's Oct. 10, 2007, Second Supplement to Request for Indian Lands Determination]; Supplement to the Request for Indian Lands Determination from the Scotts Valley Band of Pomo Indians to the Bureau of Indian Affairs, U.S. Dep't of Interior (Mar. 31, 2007) [hereinafter Band's March 31, 2007, Supplement to Request for Indian Lands Determination]; Letter from John Gioia, Board of Supervisors Chair, to Carl Artman, Assoc. Solicitor, U.S. Dep't of the Interior, and Scott Keep, Assistant Solicitor, U.S. Dep't of Interior (Dec. 11, 2006) [hereinafter County's Dec. 11, 2006, letter]. These are the major submissions of the Band and the County; not a complete list of the materials submitted and considered.

3

Pursuant to section 2719 of IGRA, "land acquired by the Secretary in trust for the benefit of an Indian tribe after the [October 17, 1988] date of enactment of [IGRA]," commonly referred to as "newly acquired land," is eligible for gaming only if the land meets one of the statutory exemptions or exceptions.[4] The "restored lands exception" dictates that IGRA's general prohibition against gaming on newly acquired land does not apply to land taken into trust as part of "the restoration of lands for an Indian tribe that is restored to Federal recognition."[5] The regulations set forth in Part 292, effective on August 25, 2008, implement section 2719 of IGRA, including the restored lands exception.[6] Part 292 requires two inquiries for determining whether newly acquired land qualifies as restored land: (1) whether the tribe is a "restored tribe"[7] and (2) whether the newly acquired land meets the "restored land" criteria set forth in section 292.11.[8]

## Analysis

### I.    The Band qualifies as a "restored tribe."

A tribe must first demonstrate that it is a "restored tribe" in order for its newly acquired land to qualify as restored land eligible for gaming purposes. Part 292 dictates that a tribe qualifies as restored if the following conditions are met:

> (a) The tribe at one time was federally recognized, as evidenced by its meeting the criteria in § 292.8;
>
> (b) The tribe at some later time lost its government-to-government relationship by one of the means specified in § 292.9;
>
> (c) At a time after the tribe lost its government-to-government relationship, the tribe was restored to Federal recognition by one of the means specified in § 292.10 . . . ."[9]

In a memorandum dated November 18, 2008, the Solicitor's Office of the Department of the Interior determined that the Band "satisfied the requirements of 25 C.F.R. § 292.7(a)-(c) and thus qualifies as a 'restored tribe' for purposes of [the restored lands exception]."[10] That memorandum, hereby incorporated by reference, found that the Band was restored to Federal recognition pursuant to a Stipulation for Entry of Judgment in *Scotts Valley Band of Pomo Indians of the Sugar Bowl Rancheria v. United States*, No. C-86-3660 WWS (N.D. Cal. Mar. 15,

---

[4] 25 U.S.C. § 2719(a). Department regulations define "newly acquired land" as "land that has been taken, or will be taken, in trust for the benefit of an Indian tribe by the United States after October 17, 1988." 25 C.F.R. § 292.2.

[5] 25 U.S.C. § 2719(b)(1)(B)(iii).

[6] 73 Fed. Reg. 35,579 (June 24, 2008) (amending the effective date); 73 Fed. Reg. 29,354 (May 20, 2008) (publishing the final rule).

[7] 25 C.F.R. § 292.7(a)–(c).

[8] *Id.* § 292.7(d).

[9] *Id.* § 292.7(a)–(c).

[10] Memorandum from Edith Blackwell, Assoc. Solicitor, U.S. Dep't of the Interior, to George Skibine, Acting Dep. Asst. Sec'y for Policy and Econ. Dev. 4 (Nov. 18, 2008).

4

AR0006388

1991).[11]  The Department published the notice of the Band's Federal recognition status in the Federal Register on February 12, 1992.[12]

## II.    The Band has not demonstrated that the Richmond Parcels, if taken into trust, would qualify as "restored lands."

According to Part 292, "[i]f [a] tribe was restored by a Federal court determination in which the United States is a party or by a court-approved settlement agreement entered into by the United States," the tribe must establish connections to the land by meeting the requirements set forth in section 292.12 in order for its newly acquired land to qualify as restored.[13]  As the Band was restored to Federal recognition in the *Scotts Valley* litigation, it must establish that the Richmond Parcels qualify as restored land pursuant to the requirements set forth in section 292.12.[14]

Section 292.12 requires a tribe to demonstrate three independent connections to its newly acquired land: (1) a "modern connection" to the land; (2) a "significant historical connection" to the land; and (3) a "temporal connection" between the date of the acquisition of the land and the date of the tribe's restoration.[15]

### A.    The evidence does not demonstrate that the Band has a "significant historical connection" to the Richmond Parcels.

One of the three connections a tribe is required to demonstrate under section 292.12 is a "significant historical connection to the land."[16]  Part 292 defines "significant historical

---

[11] *Id.*

[12] 57 Fed. Reg. 5,214 (Feb. 12, 1992).

[13] 25 C.F.R. § 292.11(c).

[14] The County argues that the Stipulated Judgment limits the Federal Government's ability to take land into trust for the Band – only allowing land within the boundaries of the former Scotts Valley Rancheria and land outside the boundaries that meet specific qualifications. County's July 23, 2008, letter at 23. According to the County, in agreeing to the Stipulated Judgment, the Band recognized that its rights to acquire trust land were limited and, therefore, the Band does not have significant modern or temporal connections to the Richmond Parcels, as they are not included in the land set out in the Stipulated Judgment. *Id.* The Band asserts that this argument contradicts precedent. Band's Sept. 2, 2008 letter at 11. Although the Stipulated Judgment dictates that the government "agree[s] to accept in trust status any land within the boundaries of the former" Scotts Valley Rancheria and certain other land previously held in trust that meets certain requirements, Stipulation for Entry of Judgment at 5–11, *Scotts Valley Band of Pomo Indians of the Sugar Bowl Rancheria v. United States*, No. C-86-3660 WWS (N.D. Cal. Mar. 15, 1991), it does not limit the Band's restored land to those parcels.

[15] 25 C.F.R. § 292.12(a)–(c). These criteria incorporate concepts from judicial opinions authored prior to the promulgation of Part 292, which instructed that "land that could be considered [restored] might appropriately be limited by the factual circumstances of the acquisition, the location of the acquisition, or the temporal relationship of the acquisition to the restoration." *Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt*, 116 F. Supp. 2d 155, 164 (D.D.C. 2000) (quoting *Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Attorney for the W. Dist. of Mich.*, 198 F. Supp. 2d 920, 935 (W.D. Mich. 2002)).

[16] 25 C.F.R. § 292.12(b).

AR0006389

connection" to mean either: (1) "the land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty" or (2) the tribe has "demonstrate[d] by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land."[17] This definition provides two methods by which a tribe may establish a significant historical connection to newly acquired land—either by the last reservation method or by the use or occupancy method.

### 1. The Richmond Parcels are not located within the boundaries of the Band's last reservation under a ratified or unratified treaty.

The first method for establishing a significant historical connection to newly acquired land is to show that such land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty.[18] The Richmond Parcels are not located within the Band's last reservation under a ratified or unratified treaty; nor does the Band assert that they are. Therefore, the Band cannot use this particular method to establish a significant historical connection to the Richmond Parcels.

### 2. The Band did not provide adequate historical documentation demonstrating the existence of its villages, burial grounds, occupancy, or subsistence use in the vicinity of the Richmond Parcels.

Another way that a tribe can establish a significant historical connection to newly acquired land is to "demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land."[19] In support of its request for "restored lands" status, the Band presented five general categories of claimed historical connections:

(1) Possible Ca-la-na-po use and occupancy of lands south of San Pablo Bay;
(2) Suisin Patwin use and occupancy of lands south of San Pablo Bay;
(3) Ca-la-na-po use and occupancy of lands immediately north of San Pablo Bay;
(4) Suisun Patwin use and occupancy of lands immediately north of San Pablo Bay; and
(5) Relocation of citizens of the Scotts Valley Band to the San Francisco Bay area from the 1920s through the 1960s as a result of Federal policies.

Each of these historic connection categories are discussed below. After a thorough review and analysis of the record, the Department concludes that each of the Band's claimed historical connection categories fails to demonstrate the "existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the [Richmond Parcels]." Therefore, the Scotts Valley Band has not demonstrated a significant historical connection to the land sufficient to qualify for the restored lands exception under 25 C.F.R. Part 292.

---

[17] *Id.* § 292.2.

[18] *Id.*

[19] *Id.*

AR0006390

### a. The Band has not established that the Ca-la-na-po were located at the San Pablo Rancho, which included the Richmond Parcels.

The Scotts Valley Band's first proffered significant historical connection to the Richmond Parcels is based on its claim that its Ca-la-na-po ancestors used and occupied lands south of San Pablo Bay, including the Parcels themselves. Specifically, the Band claims that its Ca-la-na-po ancestors were among the Indians in the Clear Lake area who were captured, transported to, and then enslaved on, San Pablo Rancho in the mid-1800s, which included the Richmond Parcels.[20] For purposes of Part 292, an applicant tribe's historical references must be specific to the applicant tribe. Here, the Band has not satisfied its burden to demonstrate that the references in the historic documentation to the Indians at San Pablo Rancho are references to the history of this particular Band.

Part 292 requires a tribe to establish a significant historical connection to newly acquired land based on evidence of "the tribe's" historic use and occupancy.[21] Whether demonstrating restored tribe status or a significant historical connection, a tribe must use history that is its own.[22] The tribe's history of use and occupancy inherently includes the use and occupancy of its tribal predecessors, even if those tribes had different political structures and were known under different names.[23] Due to the reality that tribal names and political structures change over time, an applicant tribe is not limited to the historical sources that bear its current name. However, the

---

[20] *See, e.g.,* Band's Oct. 18, 2011, letter at 41; Band's May 18, 2009, letter at 1; Band's Oct. 21, 2008, letter at 3–5; Band's May 16, 2008, letter at 3; Band's Oct. 10, 2007, Second Supplement to Request for Indian Lands Determination at 10. It should be noted that prior to its October 2011 submission, the Band claimed that San Pablo Rancho was located in what is today the City of Richmond, contiguous to the Richmond Parcels. Band's Oct. 18, 2010, letter at 10.

[21] 25 C.F.R. § 292.2.

[22] *See, e.g.,* Letter from Larry Echo Hawk, Assistant Sec'y – Indian Affairs, to Merlene Sanchez, Chairperson, Guidiville Band of Pomo Indians 19 (Sept. 1, 2011) [hereinafter Guidiville Lands Determination] In the Guidiville Lands Determination, the Department considered whether the Guidiville Band established a significant historical connection to land located in the Richmond area through its ancestor language group, the Pomo, who had various connections to land in the San Francisco Bay area, concentrated most heavily north of San Pablo Bay. *Id.* The Department determined that, since "the majority of the Band's evidence document[ed] connections of Pomo Indians or indigenous populations, generally, to lands north of San Pablo Bay," "the [Guidiville] Band ha[d] [not] provided documentation sufficient to demonstrate that its ancestors, as opposed to other Pomo Indians or Indian peoples in the area, engaged in subsistence use or occupancy upon or in the vicinity of the [newly acquired land]." *Id.* "[W]ithout more," the Department explained, "such vague and speculative evidence [could not] support the arguments and claims advanced in the Band's voluminous submissions." *Id.*

[23] *See* 73 Fed. Reg. 29,345, 29,362 (May 20, 2008). The regulations in section 292.8 do not include specific language requiring a tribe to prove that it is the political and genealogical successor of a tribe that was previously federally recognized, because as the Department explained, these concerns are "addressed and inherent in the restored lands analysis in the Band's Aug. 25, 2008, letter at 2. Such specific language, however, was not included because the requirement is inherently understood, not because the Department was adopting a less stringent standard.

7

AR0006391

applicant tribe must demonstrate, for example through a line of political succession or significant genealogical descent, that a particular historical reference is part of the applicant tribe's history. Once that is established, a tribe may rely on the historic use and occupancy of a predecessor tribe from which it succeeds to establish a significant historical connection to newly acquired land.[24]

The Band offers evidence that it is a political successor to the Ca-la-na-po Indians and relies on the Ca-la-na-po's history for the purposes of establishing a significant historical connection to the Richmond Parcels. According to the Band, Shuk Augustine was a Ca-la-na-po Chief when the Ca-la-na-po signed an unratified 1851 treaty, which would have ceded land from eight signatory tribes to the Federal Government.[25] The Band claims a direct political descent from the Ca-la-na-po Tribe – through an "unbroken connection between the Ca-la-na-po Tribe, led by Shuk Augustine, through the Yimba, led by Joe Augustine, through the present day federally-recognized Tribe."[26] According to the Band, leadership of Chief Shuk Augustine's Ca-la-na-po Band was passed from him to his brother Peter Augustine, and to Peter's son Joe Augustine, who called the Band the Yimba. When the United States purchased the Scotts Valley Rancheria for the Band, Joe Augustine ensured that the Band received its own land so that it could continue its existence as a unified political entity.[27] The Band claims that, according to lineal descent traced in 2007, 92 percent of its citizens are direct lineal descendants of Chief Shuk Augustine.

The Band has provided evidence of political and genealogical descent from the Ca-la-na-po. This evidence, however, has not sufficiently established that the Indians who were forced into labor on San Pablo Rancho, south of San Pablo Bay, were Ca-la-na-po. The Scotts Valley Band relies primarily on an 1853 report from the office of Edward F. Beale, Superintendent of Indian

---

[24] In other Indian lands opinions, the Department and NIGC have permitted tribes to rely on historic use and occupancy of tribes from which they politically succeed in establishing a significant historical connection to newly acquired land. See, e.g., Memorandum from John Hay, Staff Attorney, Nat'l Indian Gaming Comm'n, to Philip Hogen, Chairman, Nat'l Indian Gaming Comm'n 10–11 (Oct. 18, 2007) [hereinafter Mooretown Indian Lands Determination] (permitting the Tribe to rely on the historic use and occupancy of the tribe for which the Rancheria was set aside); Memorandum from Penny Coleman, Acting General Counsel, Nat'l Indian Gaming Comm'n, to Chairman, Nat'l Indian Gaming Comm'n 10–11 (Mar. 14, 2003) [hereinafter Mechoopda Indian Lands Determination] (permitting the Tribe to rely on the historic use and occupancy of a predecessor tribe of whom the Tribe was the sole surviving group in establishing a significant historical connection to newly acquired land). Similarly, a tribe may claim treaty rights of a predecessor tribe by demonstrating that it is the modern political successor of such a tribe. See, e.g., United States v. Washington, 520 F.2d 676, 693 (9th Cir. 1975), cert. denied, 423 U.S. 1086 (1976); United States v. Michigan, 471 F. Supp. 192, 218, 249 (W.D. Mich. 1979) (acknowledging that the plaintiff Tribes were the successors in interest to the Indians who were party to the Treaty of 1836 and, thereby, retained the fishing rights protected in that treaty).

[25] The 1851 Treaty is also referred to as the Ca-la-na-po Treaty and the Camp Lu-Pi-Yu-Ma Treaty.

[26] Band's Oct. 21, 2008, letter at 5.

[27] See e.g., Band's Aug. 25, 2008, letter at 5–6 (explaining that Joe Augustine requested that the Federal Government acquire the Scotts Valley Rancheria for the Band). A letter from the Scotts Valley Indians to the Commissioner of Indian Affairs requesting land is attached as Exhibit 9 of the Band's August 2008 submission.

AR0006392

Affairs for the State of California.[28] This report included information relayed from Indian Agent Jenkins regarding his investigation of San Pablo Rancho in Contra Costa County. Agent Jenkins had reported that Indians were brought into Contra Costa County from "some place near Clear Lake."[29] The District Attorney of Contra Costa County also had reported that various individuals from Napa County were "in the habit of kidnapping Indians in the mountains near Clear Lake.[30] He said that 136 such Indians had been captured and brought into Contra Costa County to serve as slaves, and that they were in the possession of the Napa County individuals who captured them and "sundry other persons who ha[d] purchased them in [Contra Costa] county."[31]

Agent Jenkins further relayed that he was asked to return Indian children, who had been captured and taken as slaves, to the Yo-Kei Tribe.[32] According to the Band, the term "Yo Kei" referred to the Big Valley,[33] and when used by Superintendent Beale, "Yo-Kei Tribe" specifically referred to the Indians in the Big Valley.[34] At the time of Superintendent Beale's report, the Ca-la-na-po were living in the Big Valley area of Clear Lake.[35] The Band thus extrapolates from Superintendent Beale's report and the correspondence contained therein that "[b]ecause at least some, and perhaps all, of the Indians at San Pablo Rancho were from Big Valley, and because the Ca-la-na-po was the Tribe located in, and controlling access to, the Big Valley, it would be unreasonable to conclude that there were not Ca-la-na-po Indians among those kidnapped and working at San Pablo Rancho."[36]

The Band's contention is based on a negative inference, rather than any positive evidence. It proffers that it would be unreasonable not to conclude that the Ca-la-na-po were among those individuals who were taken to the San Pablo Rancho. There is no actual evidence in the record to support such an assumption. The Department will not draw any firm conclusions from such inferences. Part 292 requires reliable historical documentation of use or occupancy; inferences

---

[28] Band's Oct. 18, 2011, letter at 41–42 (citing Edward F. Beale, Superintendent of Indian Affairs in California, S. Doc. No. 32-57 (1853) [hereinafter 1853 Beale Report]).

[29] Id. at 41(citing 1853 Beale Report at 9).

[30] Id. (citing 1853 Beale Report at 10).

[31] Id.

[32] Id. at 41(citing 1853 Beale Report at 9–10).

[33] Id. (citing Ruth Lewis, et. Al., Stories and Legends of Lake County 3 (Press Democrat 1949) (1935) [hereinafter Lewis, Stories and Legends of Lake County]).

[34] Id. at 41–42. The Band does not cite any sources for this assertion.

[35] Id. at 41–42 (citing Sally McLendon & Robert L. Oswalt, Pomo: Introduction, in Smithsonian Handbook vol. 8 286 fig.6 (ed. Robert F. Heizer 1978) [hereinafter McLendon & Oswalt, Smithsonian Handbook]). It should be noted that the Band also claims its ancestors, under the leadership of Chief Shuk Augustine, were employed on the Vallejo Ranchos in the 1840s and signed the 1851 Treaty ceding land north of San Pablo Bay. See infra Part II.A.2.c.

[36] Band's Oct. 18, 2011, letter at 42; see also Band's Oct. 18, 2010, letter at 9 (stating that Indians kidnapped from Big Valley and enslaved on San Pablo Rancho were likely from Chief Shuk Augustine's Band and citing to the same 1853 Beale Report).

AR0006393

are insufficient to establish a significant historical connection.[37] The Scotts Valley Band has not established with the necessary degree of certainty that the Ca-la-na-po were among the Indians taken to the San Pablo Rancho. First, several tribes were located in the Clear Lake area in 1853.[38] The Indians taken from Clear Lake could have come from any one or more of those tribes. Second, we cannot ascertain whether Indian Agent Jenkin's specific reference to the "Yo Kei" relates to the Ca-la-na-po. The only evidence cited by the Band for the term "Yo Kei" as being a reference to the Big Valley is a 1935 compilation of stories and legends, which explained that the Indian name for the largest valley in the Clear Lake area, Big Valley, was "Yo-Ka-Koi."[39] Additionally, the Band has not shown that the Ca-la-na-po alone inhabited the Big Valley. The Smithsonian Handbook relied upon by the Band indicates that there was at least one other tribe inhabiting the Big Valley at the time.[40] This evidence does not provide reliable historical documentation establishing Ca-la-na-po presence at San Pablo Rancho.

The Band has not provided sufficient evidence that its Ca-la-na-po ancestors were among those forced into labor on San Pablo Rancho. Therefore, the Band has not demonstrated a significant historical connection to the Richmond Parcels through its claim that the Ca-la-na-po used and occupied lands south of San Pablo Bay.

### b. The Band has not established that it is the successor of the Suisin Patwin Indians, and so may not rely on those connections south of San Pablo Bay.

The Band next claims a significant historical connection to the Richmond Parcels through possible genealogical connections to the Suisin Patwin Indians. According to the Band, the Suisin Patwin Indians made subsistence use and occupancy of lands south of San Pablo Bay, including Contra Costa County, in which the Richmond Parcels are located.[41] The Band,

---

[37] For example, in the Guidiville Indian Lands Determination, the Guidiville Band similarly claimed that members of its ancestors' linguistic group, the Pomo, were taken from Ukiah, the location of the Band's Rancheria, and forcibly removed to San Pablo Rancho. Guidiville Indian Lands Determination at 17. The Department determined that the evidence was inconclusive as to whether the Guidiville Band's ancestors were among those Indians relocated to San Pablo Rancho, and without reliable historical documentation, the Band did not establish a significant historical connection to its newly acquired land. *Id.* The NIGC similarly determined in the 2004 Karuk Indian Lands Opinion that an ethnologist's statement that it was "likely" there existed tribal settlements in the area of the Tribe's newly acquired land was not sufficient evidence to establish a significant historical connection with the land. Letter from Penny Coleman, Acting General Counsel, Nat'l Indian Gaming Comm'n, to Bradley Bledsoe Downes, Attorney, Karuk Tribe of California 8 (Oct. 12, 2004) [hereinafter 2004 Karuk Indian Lands Opinion]. The Tribe later submitted more conclusive evidence of its significant historic connections to the vicinity of its newly acquired land, and obtained a different result. Memorandum from John Hay, Senior Attorney, Nat'l Indian Gaming Comm'n, to Tracie Stevens, Chairwoman, Nat'l Indian Gaming Comm'n (April 3, 2012) [hereinafter 2012 Karuk Indian Lands Determination].

[38] *See* McLendon & Oswalt, Smithsonian Handbook at 283-288 (discussing Yima, She-Kom, Dah-no-habe, Xowalek, Ca-la-na-po (qu-la-na-po), and Xa-be-na-po, among others, surrounding Clear Lake.

[39] Lewis, Stories and Legends of Lake County at 3.

[40] *See* McLendon & Oswalt, Smithsonian Handbook at 286 fig. 6, 306.

[41] Band's Oct. 18, 2011, letter at 45.

10

however, fails to establish a significant historical connection to the Richmond Parcels based on this claimed connection because it has not sufficiently demonstrated that it is a successor of the Suisin Patwin Indians.

According to evidence submitted by the Band, Victoria Frese, daughter of Mary and Fernando Frese, married Chief Shuk Augustine's son, Robert, in the early 1880s.[42] The Band contends that Mary and Fernando Frese were Suisin Patwin, but the evidence is not conclusive.[43] The Band states that when the Scotts Valley Rancheria was established, 94 percent of its citizens were members of the extended Frese-Augustine family, and that as of 2007, 92 percent of its citizens were Mary and Fernando's direct lineal descendants.

While it may be true that many of the Band's current citizens descend from the union between Victoria and Robert, and therefore from Mary and Fernando Frese, the record is not conclusive that Mary and Fernando Frese were Suisin Patwin Indians. Moreover, even if they were Suisin Patwin Indians, there is no evidence in the record to suggest that the marriage of Victoria Frese into the Ca-la-na-po Band created any political union between the Ca-la-na-po and the Suisin Patwin, or that the two tribes combined. Under these circumstances, such possible genealogical descent *alone* is not sufficient to demonstrate succession from the Suisin Patwin.

Some Indian lands opinions issued prior to promulgation of the Part 292 regulations allowed tribes to demonstrate significant historical connections to newly acquired land through the documented history of a former tribe from which the applicant tribe can show significant

---

[42] *See, e.g., id.* at 38. The Band relies on 1900 and 1910 census reports for its assertion.

[43] *See, e.g., id.* at 8–9; Band's May 16, 2008, letter at 3. *But see* Band's Oct. 18, 2011, letter at 43; Band's March 31, 2007, Supplement to Request for Indian Lands Determination at 2 (alleging that Mary and Fernando were most likely either Patwin or Wappo). At best, the Band's evidence indicates that Mary and Fernando were probably Suisin Patwin. According to a 1910 census, attached as Exhibit 18 to the Band's October 2011 submission, Mary was born in the early 1940s in Cameros Valley, near the City of Napa in southern Napa County, and Fernando was born near Sonoma City, Sonoma County. Band's Oct. 18, 2011, letter at 43 (citing Thirteenth Census of the United States: 1910—Indian Population, at 23A-25B); Band's Sept. 2, 2008 letter at 9. According to the Band, which cites the Vallejo Memoirs attached as Exhibit 12 to its October 2011 submission, the Vallejo Ranchos subsumed the area in the 1840s and the Suisin Patwin were the dominant Indians in the area at that time. Band's Oct. 18, 2011, letter at 43 (citing Dr. Platon M.G. Vallejo, Memoirs of the Vallejos 11–12, 13–15, 26–27, 29–30 (ed. James H. Wilkins 1915)). The Band further asserts, based on an 1880 census attached as Exhibit 19 to its October 2011 submission, that Mary and Fernando lived in a Suisin Patwin community in Long Valley after leaving the Bay area. *Id.* at 43 (citing Tenth Census of the United States: 1880—Indian Population, Household of Indian Fernand). The County disputes this evidence and the Band's conclusion that Mary and Fernando were Suisin Patwin. County's July 23, 2008, letter at 18 (claiming Fernando was not Indian at all and that Mary was Pomo); *id.* (stating there is no evidence for Mary and Fernando's birthplace); *id.* (stating there is evidence that Victoria was Mexican and Yacqui Indian); *id.* at 21 (indicating that Victoria claimed she was born at sea). *But see* Band's Sept. 2, 2008 letter at 9, 10 (pointing out that a 1910 census shows Victoria as Clear Lake and born on San Francisco Bay). The County also points to early 1900 census information in which Band citizens stated that they were Pomo or from Clear Lake, claiming this as proof that the Band and its ancestors were not Suisin Patwin. County's July 23, 2008, letter at 19 (asserting that census information identifies members as Clear Lake or Pomo); *see also id.* (stating that Band citizens' affidavits gathered in 1910 and 1928 claimed that they and their grandparents lived in the Clear Lake area).

11

*genealogical* descent, without discussion of political succession.[44] These opinions are distinguishable, not only because they preceded the promulgation of the statute's implementing regulations, but also because they do not identify any countervailing evidence of political succession from a different tribe. According to the record, when the Scotts Valley Rancheria was established in 1911, the Band existed as a strong political entity led by the Augustine family, both politically and genealogically descended from the Ca-la-na-po.[45] Although the Band itself recognizes the importance of evidence related to political succession in this case,[46] it has not demonstrated that Victoria's marriage into the already existing Ca-la-na-po Band created a political tie to the Suisin Patwin or combined the two tribes.[47]

---

[44] *See, e.g.*, Memorandum from Kaush Arha, Assoc. Solicitor – Indian Affairs, U.S. Dep't of Interior, to Carl Artman, Chairman, Assistant Sec'y – Indian Affairs, U.S. Dep't of Interior 7–8 (July 13, 2007) [hereinafter Tolowa Indian Lands Determination] (permitting the Tribe to rely on the historic use and occupancy of a preexisting tribe from which 86 of the Tribe's 98 citizens traced their ancestry); Memorandum from Penny Coleman, Acting General Counsel, Nat'l Indian Gaming Comm'n, to Montie Deer, Chairman, Nat'l Indian Gaming Comm'n 12–13 (Aug. 5, 2002) [hereinafter Bear River Indian Lands Determination] (permitting the Tribe to rely on the historic use and occupancy of a tribe from which some of its ancestors genealogically descend to establish a significant historical connection to newly acquired land). The D.C. Circuit affirmed this practice when it acknowledged that restored land can include land occupied by a tribe's ancestors. *City of Roseville v. Norton*, 348 F.3d 1020, 1027 (D.C. Cir. 2003). In that case, the court reasoned that, if the Tribe were required to prove a historical connection to its newly acquired land, it could rely on the historic use and occupancy of ancestors of "the surviving families" of two tribes that were placed on the Rancheria. *Id.* at 1022, 1027.

[45] *See, e.g.*, Band's Oct. 18, 2011, letter at 36; Band's Oct. 18, 2010, letter at 6 (recognizing the Scotts Valley Rancheria was purchased for a distinct group of Indians rather than a disparate group of people, which is often the case for California Rancherias). The Band in its most recent submission even called Joe Augustine's early 1900s Band the "Ca-la-na-po." Band's Oct. 18, 2011, letter at 38; *see also* Band's June 10, 2008, letter at 2 (explaining that the Scotts Valley Rancheria was purchased for the Augustine Band of the Ca-la-na-po, and was distinguishable from other Rancherias that effectively created a new tribe); Band's Oct. 10, 2007, Second Supplement to Request for Indian Lands Determination at 4 ("The Scotts Valley Rancheria was established solely and exclusively for the remnant Augustine Band of the Ca-la-na-po Tribe."). Further, in claiming that it qualifies as a restored tribe, the Band points to the Ca-la-na-po's government-to-government relationship with the Federal Government established in the 1851 Treaty as evidence that it was at one time federally recognized. Band's Oct. 18, 2011, letter at 13–14.

[46] *See, e.g.*, Band's Sept. 2, 2008 letter at 8 (claiming that successorship involves both genealogical and political succession and that "political successorship is demonstrated by remarkably consistent succession of leadership"). In its October 2010 submission, the Band argued for the first time that it succeeded from the Suisin Patwin and, in doing so, no longer stated political succession was necessary. Band's Oct. 18, 2010, letter at 7.

[47] In one submission, the Band asserted that Victoria became the matriarch of the Band. Band's Oct. 10, 2007, Second Supplement to Request for Indian Lands Determination at 33. The Band did not, however, support this assertion with any evidence that she led the Band in such a way as to succeed from the Suisin Patwin politically. The Band acknowledges that Victoria's parents, Mary and Fernando Frese, were not Suisin Patwin leaders and that, "[u]nlike chief Augustine, who was a significant historic figure . . ., Mary and Fernando Frese were simple Indians." Band's Oct. 18, 2011, letter at 43.

AR0006396

Accordingly, the Band has not established a sufficient nexus between itself and the Suisin Patwin Indians, and it may not use the Suisin Patwin's history of subsistence use and occupancy to establish a significant historical connection to the Richmond Parcels for purposes of Part 292.

### c. The Ca-la-na-po's use and occupancy of Vallejo Rancho lands north of San Pablo Bay was not in the vicinity of the Richmond Parcels.

The Band also claims a significant historical connection to the Richmond Parcels based on the Ca-la-na-po's use and occupancy of land north of the San Pablo Bay. The Band has submitted evidence it claims demonstrates that the Ca-la-na-po were integral to the operation of two ranchos, the Vallejo Ranchos, owned by Mariano Vallejo in the 1840s.[48] The Band fails to establish a significant historical connection to the Richmond Parcels based on this claimed connection because these activities were not within the vicinity of the Richmond Parcels.

It is first important to understand that subsistence use and occupancy requires something more than a transient or occasional presence in an area. Activities that would tend to show a tribe was using land for subsistence purposes might include sowing, tending, harvesting, gathering, fishing, and hunting. "Occupancy" can be demonstrated by a consistent presence, supported by the existence of dwellings, villages, or burial grounds, as alluded to in the regulations.[49]

According to the Band, in 1841, a detachment of Mexican soldiers traveled to Clear Lake and brought Chief Shuk Augustine and his followers to the Vallejo Ranchos, located north of San Pablo Bay. The principal industry of the Vallejo Ranchos was the export of hides and tallow. Chief Shuk Augustine served as the lead vaquero, or cattle driver, for the Vallejo Ranchos, and he regularly drove cattle between Clear Lake and the Vallejo Ranchos. He also led a band of the Ca-la-na-po from the Clear Lake area to the Vallejo Ranchos to assist with planting and

---

[48] *See, e.g.,* Band's Oct. 18, 2011, letter at 33, 38; Band's Oct. 18, 2010, letter at 8; Band's Sept. 2, 2008 letter at 2. It should be noted that in other submissions the Band claims that its ancestors served as cattle drivers for Salvador Vallejo. *See, e.g.,* Band's May 16, 2008, letter at 3; Band's April 30, 2008, letter at 9, 10. The Band in past submissions has claimed that its Ca-la-na-po and Suisin Patwin ancestors participated in a "regional interface center" in which Wappo, Patwin, Coast Miwok, Costanoan, and Pomo interacted socially, culturally, and economically while working on the Ranchos. *See, e.g.,* Band's May 18, 2009, letter at 2 ("Prior to 1850 the Bay Area and the lands to the immediate north of the Bays were a 'regional Interface Center' in which Wappo, Patwin, Coast Miwok, Costanoan, and yes, Pomo, interacted socially, culturally and economically for their daily existence, and Chief Augustine and his Band of the historic Ca-la-na-po Tribe were part of this social, cultural and economic system."); Band's Sept. 2, 2008 letter at 4; Band's Aug. 25, 2008, letter at 11–12; Band's April 30, 2008, letter at 18. The County argued that this theory was unsubstantiated. County's July 23, 2008, letter at 6–8. The Department in the Guidiville Indians Lands Determination found the "regional interface center" theory to be unfounded and insufficient to establish a significant historical connection. Guidiville Indian Lands Determination at 15. The Band also previously presented evidence of Pomo baptisms during the 1820s and 1830s at Mission San Rafael located north of San Pablo Bay. Band's April 30, 2008, letter at 10. The Guidiville Determination similarly found such evidence insufficient, as it pertained only to Pomo-language speakers generally and was located north of the Bay. Guidiville Indian Lands Determination at 16–17.

[49] *See* Guidiville Indian Lands Determination at 14.

AR0006397

harvesting.[50] The Band claims that Chief Shuk Augustine and his band of Ca-la-na-po built many of the adobe houses of old Sonoma while working on the Vallejo Ranchos. By the 1880s, the Ca-la-na-po had migrated from the Vallejo Ranchos back to the Clear Lake area. According to the Band, the Ca-la-na-po's work on the Vallejo Ranchos constituted significant use and occupancy of the land.

The Band attempts to bolster its claim that its Ca-la-na-po ancestors used and occupied land north of San Pablo Bay through the unratified 1851 Treaty.[51] The eight signatory tribes to the treaty would have ceded land to the Federal Government beginning in the Clear Lake area and continuing south to the northern shores of San Pablo Bay.[52] The Band asserts that Mariano Vallejo and his brother directed the three Indian agents charged with negotiating treaties with the California tribes to the Ca-la-na-po because "the Indians the Vallejos were most familiar with were the Ca-la-na-po, having employed Chief Augustine and his Band of Ca-la-na-po as vaqueros and laborers for more than a decade."[53] According to the Band, the treaty signifies the United States' recognition of the Ca-la-na-po as possessing aboriginal title to lands just north of San Pablo Bay, where the Vallejo Ranchos were located.

The 1851 Treaty does not demonstrably add to the Band's claims of significant use and occupancy of the vicinity. First, eight tribes signed the treaty ceding territory to the Federal Government. The land that the Band's Ca-la-na-po ancestors' thus ceded could exist anywhere in Royce Area 296, which extends south to the San Pablo Bay, but also extends north to the Clear Lake area.[54] Additionally, even if the Ca-la-na-po's ceded lands extended to the southern boundary of Royce Area 296, there is no dispute that the Parcels lay outside of that ceded territory, and the Band has not provided any evidence to indicate that the Band made use of any lands beyond that southern boundary.

Even assuming Ca-la-na-po use and occupancy of land immediately north of San Pablo Bay, such land is not within the vicinity of the Richmond Parcels. The Band asserts that land within a 25-mile radius from newly acquired land qualifies as within the vicinity of such land.[55] It bases this position on the use of such a distance marker in other sections of Part 292. We disagree with

---

[50] In previous submissions, the Band claimed that evidence of a historic Indian trail between Clear Lake and San Pablo Bay supported its assertion that the Augustine Band herded cattle between Clear Lake and San Pablo Bay and provided seasonal farm labor on the Vallejo Ranchos. Band's Sept. 2, 2008 letter at 5; Band's April 30, 2008, letter at 9; Band's March 31, 2007, Supplement to Request for Indian Lands Determination at 15.

[51] Treaty with Ca-la-na-po, etc. (Aug. 20, 1851), in 4 Indian Affairs, Laws and Treaties (Charles J. Kappler ed. 1927) [hereinafter the 1851 Treaty].

[52] In the late 1800s, Charles Royce compiled 67 maps outlining Indians' land cessions to the United States between the creation of the United States and 1894. He depicted the land that would have been ceded under the 1851 Treaty in California Map 2. USGenWeb Archives, United States Digital Map Library, Indian Land Cessions, California 2, Map 7, http://usgwarchives.net/maps/cessions/ilcmap7.htm (last visited April 20, 2012).

[53] Band's Oct. 18, 2011, letter at 40.

[54] See note 52, supra.

[55] See, e.g., Band's Oct. 18, 2010, letter at 8; Band's Aug. 25, 2008, letter at 11.

AR0006398

the Band's application of a 25-mile radius to define the term "vicinity." Where the Department intended to use 25 miles as a relevant distance in the regulations, it did so explicitly.[56] As to the term "vicinity," the Department chose no such bright line.

The Department used the word "vicinity" in the Part 292 regulations to permit a finding of restored land on parcels where a tribe lacks any direct evidence of actual use or ownership of the parcel itself, but where the particular location and circumstances of available direct evidence on other lands cause a natural inference that the tribe historically used or occupied the subject parcel as well.[57] Part 292's inclusion of the word "vicinity" was not meant to expand IGRA's definition of "restored land," which always has been limited to lands that a tribe used or occupied.[58] It was included because it would be unduly burdensome and unrealistic to require a tribe to produce direct evidence of actual use or occupancy on every parcel within a tribe's historic use and occupancy area. A definition of "vicinity" based solely on proximity would expand "restored land" beyond land that was historically used or occupied by a tribe. Instead, a determination of whether a particular site with direct evidence of historic use or occupancy is within the vicinity of newly acquired land depends on the nature of the tribe's historic use and occupancy, and whether those circumstances lead to the natural inference that the tribe also used or occupied the newly acquired land.[59]

---

[56] 25 C.F.R. § 292 (defining "appropriate state and local officials" to mean "the Governor of the State and local government officials within a 25-mile radius of the proposed gaming establishment"); *id.* (defining "nearby Indian tribe" to mean "an Indian tribe with tribal Indian locations located within a 25-mile radius of the location of the proposed gaming establishment, or, if the tribe has no trust lands, within a 25-mile radius of its government headquarters"); *id.* § 292.6(d)(2) (permitting a tribe that does not have a reservation to establish a modern connection to newly acquired land by demonstrating that "[t]he land is within a 25-mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least 2 years at the time of the application for land-into-trust" to meet the "initial reservation" exception); *id.* § 292.12(a)(3) (permitting a tribe to establish a modern connection to newly acquired land by demonstrating that "[t]he land is within a 25-mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least 2 years at the time of the application for land-into-trust" to meet the "restored lands" exception).

[57] During the promulgation of Part 292, the Department received a suggestion that it include a requirement that a tribe submit "evidence of an aboriginal or significant historical connection to the land, including cultural ties based upon actual inhabitance." 73 Fed. Reg. 29,354, 29,368 (May 20, 2008). In response, the Department explained that such a requirement was inconsistent with IGRA. *Id.*

[58] *Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney*, 198 F. Supp. 2d 920, 935 (W.D. Mich. 2002); *Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt*, 116 F. Supp. 2d 155, 162 (D.D.C. 2000) ("Under a natural (and broad) reading of the provision, restored tribes which reacquired lands previously held by the tribe would qualify for the exemption."). An exception to this general rule is in the context of some tribal specific restoration acts where Congress identifies certain lands that must be considered restored, irrespective of any prior use or occupancy.

[59] This analysis is, necessarily, fact-intensive, and will vary based on the unique history and circumstances of any particular tribe. Past Indian lands determinations by the Department and the NIGC are instructive. A number of those decisions have found that a tribe established a significant historical connection to newly acquired land by providing evidence of historic use and occupancy of land other than the newly acquired land at issue, but implicating use of the newly acquired parcels. In the NIGC's Bear River Indian Lands Determination, in addition to the Tribe's ancestors living in the area, the Tribe had

15

AR0006399

Even assuming the Band's history is accurate as it relates to the Ca-la-na-po's use of the Rancho land north of San Pablo Bay, and that this use represents significant use and occupancy, there is no natural inference that the Band used and occupied lands south of San Pablo Bay. Petaluma Rancho, granted to Mariano Vallejo in 1834, encompassed some 66,622 acres. Its boundaries were the Petaluma Creek to the west, the Sonoma Creek to the east, and the Salt Marsh, near San Pablo Bay, to the south.[60] Suscol Rancho, granted to Mariano Vallejo in 1843, encompassed some 84,000 acres located east of Rancho Petaluma. Its southern and western boundaries were San Pablo Bay and its eastern boundary was present day Benecia.[61] Both Ranchos, which together constitute the Vallejo Ranchos, were located on the northern side of San Pablo Bay. The Band's Richmond Parcels are located on the southern side of San Pablo Bay. The Band has provided no evidence that its ancestors working at the cattle ranches on the north side of the Bay

---

provided evidence of numerous instances of historic use and occupancy (e.g., historic villages, sacred sites, and the Tribe's rancheria) surrounding its newly acquired land. Bear River Indian Lands Determination at 12 ("[W]ithin a one (1) mile radius of the parcel are: a mythic pond that is the setting of an old tribal story; two (2) aboriginal villages . . . that were major [tribal ancestor] settlements in 1850; and two major trails . . . that ran from the Eel River towards the North. Within a three (3) mile radius of the parcel are: five (5) aboriginal villages . . . and a town founded in 1870 after European contact . . . . Between three (3) and four (4) miles from the parcel is Table Bluff, the site of a mythic flood in a [tribal ancestor] story telling of the re-population of the world. Within a six (6) mile radius of the parcel are: the first [tribal ancestor] town established after European contact; eleven aboriginal villages . . . and the Rohnerville Rancheria.") (internal citations omitted). The NIGC concluded that "[b]ecause the parcel is located in the middle of these many sites that were used by the [tribe's ancestors], we can assume that the parcel, too, was used by the [tribe's ancestors]." *Id.* at 13. Similarly, in its Cowlitz Indian Lands Determination, the NIGC found that "while the documentation does not specifically identify the [newly acquired land] as a historically important parcel, this lack of a specific nexus is not determinative in light of the other factors weighing in favor of the Tribe's assertion that these lands are restored lands." Memorandum from Penny Coleman, Acting General Counsel, Nat'l Indian Gaming Comm'n, to Philip Hogen, Chairman, Nat'l Indian Gaming Comm'n 11 (Nov. 22, 2005) [hereinafter Cowlitz Indian Lands Determination]. The fact that the Cowlitz Tribe established that it used the surrounding area "for hunting, fishing, frequent trading expeditions, occasional warfare, and if not permanent settlement, then at least seasonal villages and temporary camps" was sufficient to create an inference that it had used and occupied its newly acquired land. *Id.* at 11. Among evidence of other historical use and occupancy sites, the Tribe established that within three miles of the newly acquired land there existed the site of a historical Cowlitz tribal battle, a Cowlitz fur trading track, and a village or summer encampment. *Id.* at 11–12. In its 2012 Karuk Indian Lands Determination, the NIGC similarly found that the Tribe's newly acquired land qualified as restored, despite lacking evidence of use and occupancy on the land, because the Tribe provided direct "evidence of historical connections between the Tribe and the vicinity of [its newly acquired land] sufficient to weigh in the Tribe's favor." 2012 Karuk Indian Lands Determination at 10.

[60] *See* Band's Oct. 18, 2011, letter at 33–34 (citing Calisphere, Plat of the Petaluma Rancho, http://content.cdlib.org/ark:/13030/hb15800396/ (last visited May 3, 2012)). The map of Petaluma Rancho was created for the United States Northern District of California land case number 321 and is attached as Exhibit 9 to the Band's October 2011 submission.

[61] *See id.* at 34 (citing Vacaville Heritage Council, Map Number Seven: Napa County, http://www.solanohistory.net/maps/view/813 (last visited May 3, 2012)). The map of Suscol Rancho is reflective of the Historical Atlas Map of Solano County, California, and is attached as Exhibit 10 to the Band's October 2011 submission.

16

AR0006400

ever crossed the Bay. [62]  Rather, the evidence in the record shows that the Ca-la-na-po frequently traveled north from the Ranchos, driving cattle and visiting their homeland near Clear Lake. Thus, no natural inference can be gleaned that the Ca-la-na-po ever visited the Richmond Parcels. Moreover, even if the Band's ancestors did occasionally visit the Richmond Parcels, this would not be enough to demonstrate subsistence use of the land in order to qualify as a *significant* historical connection.

Therefore, the Band has not established a significant historical connection to the Richmond Parcels by virtue of this claimed connection.

### d. The Band has not established a sufficient nexus with the Suisin Patwin's historical use and occupancy, and so may not rely on those connections north of San Pablo Bay.

The Band also alleges a significant historical connection to the Richmond Parcels based on Suisin Patwin subsistence use of land north of San Pablo Bay. The Band claims that in the late 1830s, the Suisin Patwin, under the leadership of Chief Solano, provided the labor force for the Vallejo Ranchos. As previously discussed, the Band has not demonstrated that it may rely on historic use and occupancy of the Suisin Patwin in order to establish a significant historical connection. Therefore, the Band fails to establish a significant historical connection to the Richmond Parcels based on these claimed connections.

---

[62] The Band references the Ca-la-na-po's tule boats, which it claims were capable of navigating the Bay, and speculates that the Tribe may have used them to cross the Bay to fish, hunt, and gather. Band's Oct. 18, 2010, letter at 9; Band's Sept. 2, 2008 letter at 4. The Band produces no such evidence to that effect, however. The Band also claims that all participants in the "regional interface center," especially rancho workers, fished in the waters of San Pablo Bay. *See, e.g.,* Band's April 30, 2008, letter at 8, 15; Band's Oct. 10, 2007, Second Supplement to Request for Indian Lands Determination at 12. For this assertion, the Band's ethnologists rely on Silliman's book on the archaeology of Rancho Petaluma, which states that "fish occupied an important place in the menu for Native American people." Heather A. Howard & James M. McClurken, Historical Background for Response to Solicitor Inquiry 10 (2007) [hereinafter Howard & McClurken, Second Supplement to Use and Occupancy Report] (citing Stephen W. Silliman, Lost Laborers in Colonial California: Native Americans and the Archaelogy of Rancho Petaluma 163–64 (2004)). The researchers also rely on the work of ethnologist S.A. Barret, who said that there was "no definite knowledge obtainable concerning fishing and other rights on the waters of San Francisco and San Pablo Bays, but from all that can be gathered it seems probable that these were neutral grounds and that the Indians in the region had equal rights in these waters off shore." *Id.* at 16 (citing S.A. Barrett, *The Ethno-Geography of the Pomo and Neighboring Indians, in* American Archaeology and Ethnology 7, 306–07 (Frederic Ward Putnam ed., 1908)). Such evidence is not tribe specific and, without more, does not demonstrate the Band's use or occupancy of land south of San Pablo Bay.

17

AR0006401

### e. The Band's citizens' relocation to the San Francisco Bay area between the 1920s and the 1960s does not constitute the Band's significant historical use or occupancy.

The Band's last claimed significant historical connection to the Richmond Parcels is that, from the 1920s through the 1960s, the Federal policies of relocation and termination resulted in the relocation of the Band to the San Francisco Bay area.[63]

The Scotts Valley Band claims that, due to unsuitable conditions at the Scotts Valley Rancheria, only 3 of the original 46 distributees under the Band's Distribution Plan owned and resided on land within the former Rancheria at the end of the termination era in 1972. Of those 46 distributees, 30 had relocated to the San Francisco Bay area. Some citizens' relocation was due to their involvement in the BIA's employment assistance program provided under the Rancheria Act, which allowed them to receive job training in the San Francisco Bay area. The Band further states that the California Rancheria Task Force assembled to study the termination of California tribes under the Rancheria Act in its 1972 report suggested relocating the Band.[64]

This category of claimed historical connection fails for several reasons. First, individual citizens' migration to the San Francisco Bay area does not constitute the Band's relocation or a significant activity of the Band itself. Additionally, the San Francisco Bay area is quite large,[65] and the Band has not established that the individuals' new homes were located on or within the vicinity of the Richmond Parcels. Finally, evidence of the Band's citizens' movements as late as the 1960s is more of a *modern* era activity, as opposed to *historic,* as those two terms are used in the Part 292 regulations.[66]

---

[63] Band's Oct. 18, 2011, letter at 45–46.

[64] The Band does not claim that the Task Force's suggestion was ever acted upon, which implies that the Band was not relocated away from the Clear Lake area.

[65] According to the Band, its references to the "San Francisco Bay area" encompass nine counties that border San Francisco Bay and San Pablo Bay. Band's Aug. 25, 2008, letter at 3 n.4.

[66] The Band itself asserts that the evidence it has presented that relates to Federal policies during the termination era is intended to explain why such large numbers of Band citizens reside in the San Francisco Bay area now. *See* Band's April 30, 2008, letter at 13 ("The Tribe's discussion of Federal policies during the Termination Era in the context of the modern nexus between the Tribe and the Richmond Property was an explanation of why such large numbers of tribal members now reside in close proximity to the Richmond Property, not an attempt to equate modern residency with historic use and occupancy."); *id.* at 14 ("The Tribe's discussion of the Federal Government's failure to maintain operable systems on the Rancheria is offered as an explanation of why tribal members were forced to abandon the Rancheria, and not as an attempt to equate modern residency with historic use and occupancy."); *id.* at 20 ("The Beckham Report simply fails to understand that the Tribe's discussion of these Federal policies is not offered to establish a historic nexus, but instead, to demonstrate the Tribe's modern day nexus to the area in which the Property is located, and perhaps most importantly, that the Tribe's modern day presence in the Bay Area is the direct result of the Federal policies of Termination and Relocation.").

18

AR0006402

### B. The Department does not address whether the Band has established modern or temporal connections to the Richmond Parcels.

As previously stated, Section 292.12 requires a tribe to demonstrate three independent connections to its newly acquired land: (1) a "modern connection" to the land; (2) a "significant historical connection" to the land; and (3) a "temporal connection" between the date of the acquisition of the land and the date of the tribe's restoration.[67] As the Band has failed to establish a significant historical connection to the Richmond Parcels, the land does not qualify as restored lands. Therefore, there is no present need to address whether the Band has established modern or temporal connections to the Parcels.

### Conclusion

I believe that the Parcels do not meet the regulatory requirements to qualify for the Restored Lands Exception to IGRA's general prohibition against gaming on lands acquired in trust after October 17, 1988. The Band has not claimed that the Parcels would be eligible for gaming under any other exception to this prohibition. Therefore, it is my determination that the Parcels, if acquired in trust on behalf of the Band, would not be eligible for gaming under the IGRA.

This decision does not preclude the Band from considering alternative, non-gaming uses for the Parcels. The limitation imposed by Congress on lands acquired for gaming purposes should not be interpreted as a prohibition against acquiring land in trust for any other purpose. Therefore, if the Band wishes to have the Department acquire the land in trust for any other purpose, please amend the application accordingly. Please be advised that the Department would review such an application pursuant to our regulations at 25 C.F.R. Part 151, which require us to consider, among other factors, the purpose for which the land would be used, environmental concerns, and public comments.

Should the Band wish to continue to pursue gaming on the Parcels, it will need to submit an application for a Secretarial Determination pursuant to 25 U.S.C. § 2719(b)(1)(A).

I regret that our decision could not be more favorable at this time.

Sincerely,

Donald E. Laverdure
Acting Assistant Secretary – Indian Affairs

---

[67] 25 C.F.R. § 292.12(a)-(c).

AR0006403



FEDERATED INDIANS OF
# GRATON
R A N C H E R I A

July 8, 2016

Larry Roberts, Acting Assistant Secretary – Indian Affairs
Office of the Secretary
United States Department of Interior
1849 C Street, N.W., MIB 4160
Washington, DC 20240


Re: Scotts Valley "Restored Lands" Opinion


Dear Acting Assistant Secretary Roberts:

I am contacting you because we have recently learned that the Department of the Interior is considering granting a favorable "restored lands" opinion to the Scotts Valley Band of Pomo Indians to allow it to establish tribal gaming in or near the City of Vallejo, California. Tribes have been unable to get information from the Department concerning the request. A favorable restored lands decision is patently inappropriate under the current circumstances and would violate IGRA, the Department's own regulations and common sense, and would unleash a public reaction that we fear would harm both Indian Country and the Department. We ask that this secretive process be opened to allow opponents, proponents and independent experts to assess and comment.

A positive restored lands determination pursuant to 25 U.S.C. §2719(b)(1)(B)(iii) would not only contravene the rationale of the Assistant Secretary's May 5, 2012, denial of Scotts Valley's previous restored lands request, but it would require the Department to disregard the clear intent of IGRA and every prior restored lands decision, and would inevitably result in repercussions that could devastate the Department's ability to take any land into trust for Indian tribes. We implore you not to issue a positive determination without a meaningful opportunity for tribes and other stakeholders to comment on this application. To do otherwise would violate the Department's general fiduciary obligation to Indian tribes as well as breach the specific trust responsibility that IGRA imposes on the Secretary not to harm other tribes when it makes restored lands determinations. It is unfair and perhaps unlawful to hide from that responsibility by keeping the process under wraps until it is too late for affected tribes to timely point out defects in the application.

1

AR0006657

The site proposed by Scotts Valley is located more than sixty miles from its original reservation in Lake County. The "restored lands" exception of IGRA is has appropriately been used only for lands located within a few miles from the tribe's original lands; the Department has never approved a request for restored lands in California more than 15 miles from the original reservation.

Furthermore, the request by Scotts Valley does not meet the requirements of the IGRA regulations for restored lands because the tribe cannot establish a requisite historical connection to the proposed site. As stated in 25 CFR 292.12, a tribe must demonstrate three *independent* connections to its newly acquired land to make it restored for the purpose of IGRA:

(a) A "modern" connection to the land;

(b) A "significant historical connection" to the land, meaning, as defined in 25 CFR 292.2, either: (1) "the land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty" or (2) the tribe "can demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land"; and

(c) A "temporal connection" between the date of the acquisition of the land and the date of the tribe's restoration.

The Scotts Valley application stretches each of these requirements to the breaking point. As to the temporal connection, they apparently waited 24 years after restoration before discovering that lands in the City of Vallejo are necessary for them to enjoy the benefits of sovereignty. For a modern connection, Scotts Valley apparently argues that this element is satisfied by having a Tribal TANF office located in an entirely different county (their TANF offices are located in both Lakeport, Lake County, and Concord, Contra Costa County). It should be noted that Scotts Valley's TANF doesn't even serve residents of the City of Vallejo or of Solano County.

But it is the "significant historical connection" and the potential breach of fiduciary duty to other Indian tribes that we primarily address today and that we hope will cause the Department to reassess this apparent rush to judgment and allow a more knowledgeable and even-handed evaluation. It takes audacity for Scotts Valley to argue that a historical record that demonstrates only that a few male members were seasonally employed somewhere within the vast land-holdings of Mariano Vallejo somehow constitutes a significant historical connection between their tribe and a specific parcel in Vallejo. Because the process has been conducted outside of public scrutiny and because the Scotts Valley Tribe has not seen fit to share its application with the public, we hope you understand that we are forced to make some assumptions concerning what the application alleges. If some if these assumptions are inaccurate, that only strengthens our request that this application not be rushed through to approval until the Department complies with pending Freedom of Information Act requests and allows affected tribes, other governmental entities and the public to comment.

2

AR0006658

This is not the first attempt by Scotts Valley to obtain "restored" lands to which it never had any ties: the Department of the Interior has previously rejected claims that Scotts Valley used any of the lands on the northern shores of San Pablo and Suisun bays for subsistence. As the Department's May 5, 2012, letter to Scotts Valley clarifies, the tribe's historical, archaeological, geographical and cultural roots are at the Sugar Bowl Rancheria located near Lakeport, California, adjacent to the western shore of Clear Lake in Lake County. Lakeport is at least 60 miles north of the proposed Vallejo casino parcel. We understand that the current Scotts Valley request alleges that tribal members worked as rancheros on the Vallejo Rancho. But no credible evidence exists that Scotts Valley ever established villages or burial grounds, hunted, fished or raised crops in or near Vallejo. Vague evidence that a few members of its predecessor tribe did transient work within the vast holdings that collectively comprised the Vallejo Ranchos is not credible or relevant because many Indians from a multitude of regions and tribes worked in the ranchos following the dispersion of Indians after the Mission period.

Even if there is historical evidence that some Ca-la-na-po worked on some land within any of the three Vallejo Ranchos, there is no evidence that links these lands to the current Vallejo site or its immediate vicinity. The Vallejo Ranchos comprised well over 100,000 acres of land stretching from Petaluma Creek to Benicia. Both the Department's and the courts' restored lands decisions have required great specificity and evidence showing a tribe's historical use of a specific parcel or land in its immediate vicinity. An opinion that the Vallejo lands are "restored" would contravene the Department's 2012 denial of Scott Valley's prior request for lands in Richmond, 78 miles from its original reservation, and would undermine every previous restored lands determination made by courts, the NIGC or the Department.

In addition to the distance of Scotts Valley's requested "restored" lands from their original Rancheria being several times further than the furthest distance for an approved restored lands request made by any California tribe and perhaps for any tribe ever, neither the Department, NIGC or the courts have ever sanctioned such a determination where the requesting tribe has leapfrogged over an existing tribal casino to get closer to a greater segment of the gaming public and placed the existing tribal casino in a disadvantaged position. This request will adversely affect many existing tribal casinos. Many unrelated tribes and villages lived and still live between the Lakeport Rancheria and the proposed casino location. An opinion favorable to Scotts Valley would harm all of the tribes located between Scotts Valley's proposed site in Solano County and its original reservation in Lake County. Allowing Scotts Valley to restore lands beyond the existing lands of other tribes and siphon off their gaming patrons violates the Secretary's trust obligation not to make restored lands determinations that harm other tribes.

Scotts Valley owns lands in Lake County that would qualify as restored lands, and the attorneys involved in this effort are simply trying to manipulate the system. But it is the Department's secrecy as it considers Scott Valley's request which is most concerning. If the request is not summarily rejected, as it should be, then the process should be opened to public scrutiny and comment, and not conducted as a backroom deal. The stakes go beyond the interests of one tribe: an ill-advised opinion along the I-80 East Bay Corridor would spur legislative attempts to end the Department's ability to take land into trust and diminish tribal

3

AR0006659

rights under IGRA.  It would undoubtedly generate a harsh response from the public and other tribes, embroil the Department in litigation, and undermine public confidence in the Department's ability to administer any land decisions.  Congress established the restored lands exception to put restored tribes back where they would be if they had never been terminated, not to give them an unfair advantage.  It is not for the Department to use the restored lands exception in a way clearly never intended by Congress, to the detriment of other tribes and behind a cloak of secrecy from the public.  If Scotts Valley wants to pursue gaming in Vallejo, it should request a two-part determination from the Secretary and concurrence by the Governor.

We would appreciate you looking into this matter and assisting us in encouraging the Department to conduct an open, fair and fact-based process.  We reserve the right to comment further when we are able to gain full access to the submissions of Scotts Valley Rancheria in this matter.

Sincerely yours,

Greg Sarris
Chairman

AR0006660



City Attorney's Office · 555 Santa Clara Street · Vallejo · CA · 94590 · 707.648.4545

July 28, 2016

VIA FACSIMILE, EMAIL & FEDEX
Honorable Lawrence Roberts
Acting Assistant Secretary for Indian Affairs
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240
Fax:    (202) 208-7163
Email: ia_meeting_request@bia.gov

## Re: Request for "Restored Lands" Opinion from Scotts Valley Band of Pomo Indians

Dear Assistant Secretary Roberts:

It has been brought to our attention that the Scotts Valley Band of Pomo Indians ("Scotts Valley Band," or "Band") has recently requested an opinion from the Office of Indian Gaming (OIG) of the U.S. Department of the Interior concerning whether its proposal to build and operate a casino in or near the City of Vallejo qualifies under the "restored lands" exception of Section 20(b)(1)(B)(iii) of the Indian Gaming Regulatory Act (IGRA).    25 U.S.C. § 2719(b)(1)(B)(iii). As the municipal governmental entity that has jurisdiction over the area where the Scotts Valley Band's proposed casino would be located, the City of Vallejo has an important interest in the issue of whether the Band's proposed casino qualifies under IGRA's restored lands exception, and therefore provides the following comments for your consideration concerning the Band's request for an opinion.

First, since the City of Vallejo has jurisdiction over the lands where the Scotts Valley Band's proposed casino would be located, we request that the City be fully apprised and informed concerning the Department of the Interior's processing of the Band's request for an opinion, and that we be given an opportunity to review submitted documents and fully participate in the process. If the OIG issues an opinion concluding that the Scotts Valley Band qualifies under IGRA's restored lands exception, the opinion would pave the way for the Department of the Interior to approve the Band's construction and operation of the casino in or near the City of Vallejo. The Department's approval of a tribal casino in or near the City of Vallejo would significantly affect the City and its residents in several significant ways. Approval of a tribal casino would limit the City's authority to regulate the use of land in the area where the casino would be located, and would limit the City's authority to apply its taxing authority to the area. Approval of a tribal casino would also unquestionably cause significant impacts to the natural and human environment in and around the City of Vallejo. Such a casino

AR0006671

Honorable Lawrence Roberts
RE: Request for "Restored Lands" Opinion from Scotts Valley Band of Pomo Indians
July 28, 2016
Page 2

would entail biological impacts, water impacts, impacts on traffic and noise to the neighboring area, among others. Such impacts must be analyzed under the National Environmental Policy Act (NEPA), and, in providing an environmental review under NEPA, the Department of the Interior cannot provide for a piecemeal or segmented review, ignore cumulative impacts, or otherwise commit the agency to an action without first considering these impacts. Therefore, the City of Vallejo has a significant interest in any action taken by the Department of the Interior that might result in approval of the Scotts Valley Band's proposed casino, or that might pave the way for such departmental approval by issuance of an opinion that the Band qualifies under IGRA's restored lands exception.

Second, on the merits of the Scotts Valley Band's request for an opinion, we have serious doubts that the Band's proposed casino qualifies under IGRA's restored lands exception. In order to qualify under this exception, the Band would need to demonstrate that it has three types of "connections" to the lands where the casino would be located, specifically a "modern connection," a "significant historical connection" and a "temporal connection." 25 C.F.R. § 292.12(a), (b), (c). In our view, the Scotts Valley Band does not satisfy all of these connection requirements, and perhaps meets none of them.

Third, the Scotts Valley Band does not appear to have a "modern connection" to the lands where its proposed casino would be located. To satisfy this requirement, the Band would need to demonstrate that the lands are "within reasonable commuting distance" of the Band's reservation, and are within a 25-mile radius of the Band's headquarters or other governmental facilities. 25 C.F.R. § 292.12(a). According to our understanding, the Band's proposed casino, which would be located in or near the City of Vallejo in Solano County, is at least 60 miles from the Band's reservation, which is located in the Clear Lake area in Lake County, and where its headquarters and governmental facilities are located. Therefore, it is doubtful that the Band satisfies the "modern connection" requirement as applied to its proposed casino.

Fourth, the Scotts Valley Band does not appear to have a "significant historical connection" to the lands where its proposed casino would be located. To satisfy this requirement, the Band would need to demonstrate that the lands are "within the boundaries of" the Band's last reservation under a ratified or unratified treaty, or "by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land." 25 C.F.R. § 292.12(b) (establishing "significant historical exception" requirement); Id. at § 292.2 (defining "significant historical connection"). As mentioned above, the lands where the Band's proposed casino would be located are at least 60 miles from where the Band's reservation is located, and thus the lands are not "within the boundaries of" the Band's reservation. Further, according to our understanding, there is no "historical documentation" demonstrating that the Band's villages, burial grounds, occupancy or subsistence use are located in the vicinity of the land where the proposed casino would be located. Therefore, it is doubtful that the Band satisfies the "significant historical connection" requirement as applied to its proposed casino.

Case 1:19-cv-01544-ABJ    Document 61-1    Filed 12/17/21    Page 365 of 449

Honorable Lawrence Roberts
RE: Request for "Restored Lands" Opinion from Scotts Valley Band of Pomo Indians
July 28, 2016
Page 3

Fifth, the Scotts Valley Band does not appear to have a "temporal connection" to the lands where its proposed casino would be located, although, to be sure, this is less clear. To satisfy this requirement, the Band would need to demonstrate that it has "submitted an application to take the land into trust within 25 years after the tribe was restored to Federal recognition . . . ." 25 C.F.R. § 292.12(c)(2). According to our understanding, the Scotts Valley Band was restored to federal recognition on September 6, 1991, as the result of settlement of litigation that the Band brought against the United States. 57 Fed. Reg. 5214 (February 12, 1992). Therefore, to satisfy the "temporal connection" requirement, the Band would need to submit an application for approval of its casino by no later than September 6, 2016. In addition, since the Secretary of the Interior can approve an Indian gaming operation only if the lands are taken into trust, the Scotts Valley Band would also need to submit an application to have the lands taken into trust by the September 6, 2016, date. To date, the Scotts Valley Band apparently has not applied for approval of its casino operation or to have the lands taken into trust. Therefore, unless the Band submits both applications by the September 6, 2016, date, the Band would not satisfy the "temporal connection" requirement as applied to its casino.

For the foregoing reasons, the City of Vallejo has serious doubts concerning whether the Scotts Valley Band can satisfy the "connection" requirements of the IGRA regulations and thus whether the Band qualifies under IGRA's restored lands exception. In any event, since the City of Vallejo has jurisdiction over the lands in question, the City requests that it be kept fully informed and apprised of any developments concerning the Band's proposal, and that it be given an opportunity to fully participate in the process. If the Department of the Interior approves the Band's proposed casino in or near the City of Vallejo, or issues an opinion that the Band qualifies under IGRA's restored lands exception, the City of Vallejo would be obliged to fully consider its available legal remedies that would oppose any such action by the Department of the Interior.

Sincerely,

Claudia Quintana
City Attorney, City of Vallejo

cc    Paula Hart, Director, Office of Indian Gaming
      Honorable Mayor and Members of Vallejo City Council
      Daniel E. Keen, City Manager, City of Vallejo

**BOARD OF SUPERVISORS**

**ERIN HANNIGAN**
District 1, Chairwoman, (707) 553-5363
**LINDA J. SEIFERT**
District 2, Vice-Chair (707) 784-3031
**JAMES P. SPERING**
District 3, (707) 784-6136
**JOHN M. VASQUEZ**
District 4, (707) 784-6129
**SKIP THOMSON**
District 5, (707) 784-6030



SOLANO
COUNTY

**BIRGITTA E. CORSELLO**
County Administrator
(707) 784-6100

675 Texas Street, Suite 6500
Fairfield, CA 94533-6342
Fax (707) 784-6665

www.solanocounty.com

August 23, 2016

VIA OVERNIGHT MAIL, EMAIL, AND FACSIMILE

The Honorable Lawrence Roberts
Acting Assistant Secretary for Indian Affairs
United States Department of the Interior
MS-3642-MIB
1849 C Street, N.W.
Washington, D.C. 20240
Email: sarah_walters@ios.doi.gov
Facsimile: (202) 208-5320

Re: "Restored Lands" Exception Request from Scotts Valley Band of Pomo Indians

Dear Assistant Secretary Roberts:

The County of Solano ("County") recently learned that the Scotts Valley Band of Pomo Indians ("Scotts Valley Band") on January 29, 2016 applied to the Office of Indian Gaming ("OIG") of the U.S. Department of the Interior ("Department") for a determination that certain real property acquired within the city limits of Vallejo is eligible for the establishment of gaming operations under the "restored lands" exception of the Indian Gaming Regulatory Act ("IGRA") at 25 U.S.C. 2719(b)(2)(B)(iii). Pursuant to IGRA's implementing regulations at 25 C.F.R. 292.12, the Scotts Valley Band cannot meet the requisite criteria necessary to establish a connection to the newly acquired lands. Additionally, for OIG to grant the determination would not only be contrary to IGRA and OIG's past actions in prior restored lands determinations, such an action would fly in the face of the trust responsibilities incumbent upon the Department of the Interior not to harm other tribes when making restored lands determinations. The County therefore requests that such a determination be denied based upon both the facts and the law at issue here.

Initially, the County is deeply concerned at the lack of transparency exhibited by both the Scotts Valley Band and the Department in this determination process. The public and local governments (tribal, county, and city) should have been provided notice and an opportunity to comment on this request for a determination, particularly in this extremely unusual situation where the tribe has requested an *expedited* "restored lands" determination *absent* a concurrent fee-to-trust application. In the seven months since the exception request was submitted, neither the Scotts Valley Band nor the Department ever contacted or otherwise notified the County that the Scotts Valley Band was seeking to establish a gaming site using the "restored lands" exception within the geographical boundaries of the County. For the Department to base its determination solely on the Scotts Valley Band's assertions that it qualifies for the "restored lands" exception and cutting out any potential contrary evidence that tribes, cities, or the County may have poisons and undermines what is supposed to be a fair and balanced process and flies in the face of the congressional intent for enacting the "restored lands" exception. In order to cure the procedural irregularities that have occurred thus far in this matter, the County requests that any consideration by the Department of the "restored lands" exception be concurrent with consideration of the recently filed fee-to-trust application to ensure proper notice and a comment period of all the pertinent issues.

Re: "Restored Lands" Exception Request from Scotts Valley Band of Pomo Indians
August 22, 2016
Page 2 of 3

As you know, IGRA allows for the establishment of gaming operations on acquired lands located outside of a tribe's original lands if a tribe can demonstrate three types of connections to the land as described in 25 CFR 292.12: a "modern connection"; a "significant historical connection"; and, a "temporal connection". The Scotts Valley Band, however, cannot demonstrate all three types of connections; accordingly, its request for a determination of a "restored lands" exemption must be denied.

The County has been unable to find any "modern connection" between the Scotts Valley Band and the proposed gaming site in Vallejo or any other location within the borders of Solano County. (25 CFR 292.12(a).) Moreover, the County knows of no Scotts Valley Band governmental offices and no sizable membership of that tribe residing within the geographic boundaries of Solano County. In fact, the Scotts Valley Band has its governmental headquarters in Lakeport within Lake County, which is over 80 miles away from the City of Vallejo. Lake County is also the site of the tribe's original reservation. While the Scotts Valley Band does have Tribal TANF offices in both Contra Costa County and Lake County, according to the "FAQ" on its website at http://www.svtribaltanf.org/about-us/faqs/, these offices refuse to provide any services to residents of Vallejo or Solano County. The presence of a tribal social services office in a neighboring county that will not provide services to any tribal members living in Solano County cannot satisfy the "modern connection" requirement, regardless of how close to the Solano County border this particular office is located. In prior cases, the Department has refused to give credence to a tribal government office established solely for the advancement of establishing a gaming site, and this case should be no different. (See, *e.g.* pages 6-9 of the Letter from Larry Echo Hawk, Assistant Secretary for Indian Affairs to the Honorable Merlene Sanchez, Chairperson of the Guidiville Band of Pomo Indians available at http://www.bia.gov/cs/groups/public/documents/text/idc015051.pdf.) Further, it is our understanding that the OIG has never granted a "restored lands" determination in California for lands more than 15 miles away from a tribe's original reservation site, much less the more than 80 miles at issue here. No reasonable rationale exists for the Department to disturb that precedence now.

The County concedes that the Scotts Valley Band may be able to establish a "temporal connection" between the date the proposed gaming site was acquired and the date of the tribe's restoration. 25 CFR 292.12(c)(2) requires that a tribe show that it submitted an application to take land into trust within 25 years of regaining federal recognition. The tribe appears to have had federal recognition restored on September 6, 1991 and submitted a fee-to-trust application for the proposed gaming site in Vallejo on August 11, 2016. Despite seemingly complying with the "letter of the law", it strains credulity that it took 24 years, 11 months and one week for the Scotts Valley Band to determine that lands within the City of Vallejo were necessary to the tribe's sovereignty and should therefore be taken into trust on its behalf.

The Scotts Valley Band's claims are weakest in regards to its "significant historical connection" to the proposed gaming site in Vallejo. (25 CFR 292.12(b).) Simply, no significant historical connection exists as defined by the regulations, evidenced by, among other things, the fact that the proposed gaming site in Vallejo is not within the boundaries of any Scotts Valley Band reservation established by treaty. Further, the Department, in deciding the Scotts Valley Band did not have significant historical connections to lands in adjacent Contra Costa County, found that no historical connection exists between land in the Vallejo area and the Scotts Valley Band. (See, specifically, sections II(A)(2)(c) and (d) at pages 13-18 in the May 25, 2012 letter from Acting Assistant Secretary for Indian Affairs Donald E. Laverdure to the Honorable Donald Arnold, Chairperson of the Scotts Valley Band of Pomo Indians, available at http://www.bia.gov/cs/groups/public/documents/text/idc-018517.pdf).

AR0006722

Re: "Restored Lands" Exception Request from Scotts Valley Band of Pomo Indians
August 22, 2016
Page 3 of 3

Although the County has not been able to obtain a copy of the Scotts Valley Band's request for a restored lands determination for the Vallejo site or any of its supporting documentation[1], the County believes that the Department's previous 2012 determination and the documents submitted by the parties in that matter clearly establish inadequate and insignificant historical connections between the Scotts Valley Band and the Vallejo site. Specifically, the letter written to you by Dr. Stephen Beckham on August 11, 2016 (attached) regarding the tribe's most recent attempt to locate a casino away from their historic lands conclusively establishes that the Scotts Valley Band was not historically connected to the Vallejo site. Dr. Beckham also authored a report entitled, "The Scotts Valley Band of Pomo Indians: Traditional Use and Occupancy Areas and Residency in Lake County, California" in 2006 (available at https://www.standupca.org/off-reservation-gaming/contraversial-applications-in-process/scotts-valley-band-of-pomo-indians/B8123429.pdf), which presents an in-depth examination of the areas the Scotts Valley Band historically resided in and used. This report and Dr. Beckham's letter confirm that historically the Scott's Valley Band neither resided in nor used lands within the modern-day City of Vallejo.

As discussed above, if the Scotts Valley Band is unable to satisfy any of the three requirements for the "restored lands" exception in 25 C.F.R. 292.12, then the determination must be denied. Here, the Scotts Valley Band can, at most, meet one of the three requirements and the Department must therefore deny the request for a "restored lands" exception to 25 U.S.C. 2719(a).

Finally, while this letter expresses opposition to a positive determination for a "restored lands" exemption sought by the Scotts Valley Band for the Vallejo site, the County wishes to make clear that it is not necessarily "anti-casino" or "anti-gaming". However, this "reservation shopping" by the Scotts Valley Band takes away economic opportunity from tribes that actually have historic ties to the lands encompassed by Solano County. A denial of the "restored lands" exemption requested by the Scotts Valley Band is not only merited under the facts and law at issue here, but would ensure the Department meets its trust obligations by refusing to be complicit in harming local tribes and their economic interests for the benefit of a single distant tribe.

The County appreciates your time and attention to our concerns and we are available to meet with you at your earliest convenience to further discuss this matter. We would also request that we be notified of any actions taken or opinions issued, whether advisory or not, by the Department in regards to this "restored lands" exception request.

Sincerely,

cc: Paula Hart, Director, Office of Indian Gaming
    Mayor Osby Davis, City of Vallejo

---

[1] The County therefore explicitly reserves the right to comment further once we are able to access the full submissions to the Department from the Scotts Valley Band on this matter.

AR0006723



A Tradition of Stewardship
A Commitment to Service

**Board of Supervisors**

1195 Third St.
Suite 310
Napa, CA 94559
www.countyofnapa.org

Main: (707) 253-4421
Fax: (707) 253-4176

**Alfredo Pedroza**
Chairman

September 20, 2016

The Honorable Lawrence Roberts
Acting Assistant Secretary for Indian Affairs
United States Department of the Interior
MS-3642-MIB
1849 C Street, N.W.
Washington, D.C. 20240

**Re: "Restored Lands" Exception Request from Scotts Valley Band of Pomo Indians:**

Dear Assistant Secretary Roberts:

The Board of Supervisors voted unanimously today to oppose the Scotts Valley Band of Pomo Indians' application for a determination that certain real property acquired within the city limits of Vallejo is eligible for the establishment of gaming operations under the "restored lands" exception of the Indian Gaming Regulatory Act ("IGRA") at 25 U.S.C. 2719(b)(2)(B)(iii).

The Board opposes the application for the following reasons:

First, the lack of transparency concerning this particular application is alarming. The standard procedure calls for an Indian Lands Determination and a fee-to-trust application to be filed concurrently. This triggers a number of notification requirements, allowing local jurisdictions to offer input and comments early in the process. This was the case in the Scotts Valley Indians' prior effort to site a casino in Richmond, California, in 2012, but not for the current application. Further, the Scotts Valley Indians requested an *expedited* "restored lands" determination absent a fee-to-trust application. There are many local issues that necessitate local input. The proposed area already suffers from severe traffic problems and severe water issues. A casino would exacerbate these two problems and many others, not just for Vallejo and Solano County, but for other surrounding areas as well, including Napa County, whose boundary is less than a mile from the proposed casino site.

Second, the Scotts Valley Indians have no connection to the land in Vallejo where it seeks to site a casino. The Scotts Valley Indians' governmental headquarters is in Lakeport within Lake County, which is over 80 miles away from the City of Vallejo. Lake County is also the site of the tribe's original reservation. Further, there is no sizable membership of Scotts Valley Indians residing in or around Vallejo. Napa County has worked hard to maintain its agricultural heritage and stands opposed to what is commonly called "casino shopping" by Native Americans seeking to site a casino in lands that may be highly sensitive and critical to the population, its economy, and culture.

| Brad Wagenknecht | Mark Luce | Diane Dillon | Alfredo Pedroza | Keith Caldwell |
|---|---|---|---|---|
| District 1 | District 2 | District 3 | District 4 | District 5 |

Page 2
**Napa County, California, oppose letter**
**"Restored Lands" Exception Request from Scotts Valley Band of Pomo Indians**

Third, we believe the recent United States Supreme Court decision, Carcieri v. Salazar, No. 07–526 (2/24/09) disqualifies the Scotts Valley Indians from acquiring land for casino purposes, since they were not officially recognized by the federal government by 1934. The Carcieri decision held that the Secretary of Interior does not have the authority to take land into trust for tribes who were not "under federal jurisdiction" in 1934, when the Indian Reorganization Act was enacted.

For these reasons, we strongly request that you terminate the Scotts Valley Band of Pomo Indians' application for an Indian Lands Determination and follow the standard procedures discussed above for all such applications going forward.

Sincerely,

Alfredo Pedroza
Chairman, Napa County Board of Supervisors

cc:
    U.S. Senator Dianne Feinstein
    Congressman Mike Thompson
    Senator Lois Wolk
    Assembly Member Bill Dodd
    Members, Napa County Board of Supervisors
    Leanne Link, Napa County Executive Officer
    Minh Tran, Napa County Counsel
    Thane Young, Van Scoyoc Associates
    Holly Fraumeni, Platinum Advisors
    Paul Yoder, Karen Lange, Shaw, Yoder, Antwih
    Rural County Representatives of California
    California State Association of Counties

AR0006741

November 14, 2016

To:          The Honorable Lawrence Roberts

                  Principal Deputy Assistant Secretary for Indian Affairs

From:      Albert L Hurtado

                  Consulting historian for the Scotts Valley Band of Pomo Indians (SVBI)

Re:         Comments on reports submitted by the Yocha Dehe Nation regarding

                  SVBI Request for Determination

In September 2015 I was retained to write a history of the Scotts Valley Band of Pomo Indians (SVBI) with particular attention to their connection with the country in the vicinity of Vallejo, California. The SVBI were preparing a request for Indian land determination so that they could acquire land in Vallejo. After reviewing reports by McClurken, et al. that were prepared in support of a previous request for Indian land determination in Richmond that had failed, I decided that additional research needed to be done in the Spanish, Mexican, and early U.S. periods. My report is entirely independent from the McClurken efforts. The research, narrative, and conclusions are my own and are based primarily on research in published and unpublished primary documents at the California State Library, Bancroft Library, Huntington Library, National Archives, and Solano County.

I have now reviewed the reports of Andrés Reséndez, "Comments about the historical basis for the Scotts Valley Band of Pomo Indians' Request for Indian Lands

1

AR0006789

San Pablo Bay region. This movement was sometimes compulsory but may have been voluntary on the part of some Indians. These movements were a significant part of SVBI history during the Mexican and early U.S. era.

The record does not place any identifiable individual Indians on the subject property, which was known as Rancho Suscol, but it is natural to infer that some of the Clear Lake Indians worked there. Like other Mexican ranchos the need for labor at Suscol was great and Indians supplied most of it. Suscol was claimed by Mariano, and it is reasonable to think that Salvador sent some of his Indian workers to assist when needed. William Heath Davis, a contemporary of the Vallejos, general statement that Clear Lake Indians worked on the ranches north of San Francisco Bay includes Suscol although he does not specifically mention it.[1] Augustine's statement that Clear Lake Indians were sent south to the valleys where they were sold does includes Suscol as well, although he does not mention the name of any particular rancho. Napa Valley as defined by James D. Hart in *A Companion to California*, extends from "near where the Napa River empties into San Pablo Bay north to the Macaymas Mts," a definition that includes the part of the Suscol claim near the subject property.[2] The case for Clear Lake Indians working on Suscol is a natural inference from the historical record.

If we eliminate inference and stick with direct evidence we know that, according to Augustine, Clear Lake Indians were sent to Napa to build a house for Salvador Vallejo, approximately eleven miles from the project site. Clear Lake Indians (including SVBI ancestors) also were known to work in Sonoma

---

[1] See my original report, p. 45.
[2] (Berkeley: University of California Press, 1987), 345.

3

AR0006791

**COMMITTEES**
CHAIR: TRANSPORTATION
ACCOUNTABILITY AND
   ADMINISTRATIVE REVIEW
INSURANCE
VETERANS AFFAIRS

CHAIR: SELECT COMMITTEE
ON IMPROVING BAY AREA
TRANSPORTATION SYSTEMS

**WEBSITE**
www.assembly.ca.gov/frazier

*Assembly*
*California Legislature*



**JIM FRAZIER**
ASSEMBLYMEMBER, ELEVENTH DISTRICT

**STATE CAPITOL**
P.O. BOX 942849
SACRAMENTO, CA 94249-0011
(916) 319-2011
FAX (916) 319-2111

**DISTRICT OFFICES**
1261 TRAVIS BOULEVARD, SUITE 110
FAIRFIELD, CA  94533
(707) 399-3011
FAX (707) 399-3030

150 CITY PARK WAY
BRENTWOOD, CA 94513
(925) 513-0411
FAX (925) 513-3511

November 14, 2016

Honorable Lawrence S. Roberts
Acting Assistant Secretary – Indian Affairs
United States Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

**Subject:**     Scotts Valley Band of Pomo Indians' Request for an Indian Lands Opinion

Dear Assistant Secretary Roberts,

I write in support of the proposal of the Scotts Valley Band of Pomo Indians to establish a reservation homeland in the City of Vallejo, California – a location close to my district.

It is my understanding that the Tribe has no land in trust or restricted status. The Tribe has requested the Secretary of the Interior to accept trust title to an undeveloped 128-acre parcel of land along Interstate 80 upon which the Tribe intends to build a tribal community complete with tribal member housing, a governmental headquarters, health facilities, and economic development projects including a gaming facility.

As you know, the Tribe's status as a federally recognized Indian tribe was unlawfully terminated in 1965 under the California Rancheria Act (Pub. L 85-671) and subsequently restored by federal court order in 1991. However, in the 25 years since restoration of its federal status there has been no restoration of its aboriginal or reservation land. The Tribe has informed me that the property is located within the area ceded to the United States in 1851 under an unratified treaty, which *per se* demonstrates a significant historical connection to the land. It is further my understanding that the Tribe readily satisfies the restored tribe and restored lands requirements under federal regulation (25 CFR §§ 292.7-292.11).

This Tribe has faced decades of hardship and injustice and it is past time for the federal government to correct the harms inflicted upon this Indian tribe and its members.

Sincerely,

JIM FRAZIER
Assemblymember, 11th District

AR0006803

**DENNIS BUNTING**
County Counsel
(707) 784-6145

**AZNIV DARBINIAN**
Assistant County Counsel
(707) 784-6140

675 Texas Street, Suite 6600
Fairfield, CA 94533-6342
(707) 784-6140
Fax (707) 784-6862
www.solanocounty.com

**OFFICE OF COUNTY COUNSEL**



LEE AXELRAD
BERNADETTE S. CURRY
KIMBERLEY GLOVER
JAMES W. LAUGHLIN
RAMONA M. MARGHERIO
LORI A. MAZZELLA
PETER MILJANICH
JOANN IWASAKI PARKER
DAVINA SMITH
CLARISA SUDARMA
DANA VAUGHN
DANIEL WOLK
KIMBERLY ALEXANDER YARBOR
Deputy County Counsels

December 23, 2016                        VIA U.S. POSTAL AND ELECTRONIC MAIL

The Honorable Lawrence Roberts
Principal Deputy Assistant Secretary for Indian Affairs
United States Department of the Interior
MS-3642-MIB
1849 C Street, N.W.
Washington, D.C. 20240
Email: lawrence.roberts@ios.doi.gov

Re:  The County of Solano's Legal Memorandum in Response to the Scotts Valley Band of Pomo Indians
Restored Lands Request for Vallejo, County of Solano, California

Dear Assistant Secretary Roberts:

Thank you again for meeting with us while we were in Washington, D.C. to discuss the application by the
Scotts Valley Band of Pomo Indians ("Scotts Valley") for a restored lands determination under 25 U.S.C.
2719(b)(1)(B)(iii) in the City of Vallejo in Solano County.

At that time, you encouraged us to submit further correspondence and information regarding the County's
concern that Scotts Valley lacks both a significant historical and a modern connection to the lands for which
it is seeking a restored lands determination. The County of Solano hopes the attached legal memorandum
is helpful to you in making a decision on the restored lands determination.

Sincerely,

*Davina Smith*
Davina Smith
Deputy County Counsel

cc: John R. Hay, Assistant Solicitor, Division of Indian Affairs
    Jennifer Turner, Acting Assistant Solicitor, Division of Indian Affairs
    Bethany Sullivan, Attorney, Division of Indian Affairs

Enclosures

**Legal Memorandum by the County of Solano in Response to the Scotts Valley Band of Pomo Indians Restored Lands Request for Vallejo, County of Solano, California**

In January of 2016, the Scotts Valley Band of Pomo Indians (Scotts Valley) submitted a request for a restored lands determination for lands located in the City of Vallejo within the County of Solano (County). Upon discovering this request in late summer of 2016, the County quickly sent the Department of the Interior (Department) a letter opposing the request for a restored lands determination due to our belief upon the facts we possessed at the time that Scotts Valley did not qualify for such an exemption. Since that letter was sent in August, the County has endeavored to research in-depth the documents submitted by Scotts Valley in support of their request, along with those opposing the request submitted by the Yocha Dehe Wintun Nation (Yocha Dehe), and the United Auburn Indian Community (United Auburn), as well as letters from the City of Vallejo, the City of American Canyon, Napa County, Yolo County, Federated Indians of Graton Rancheria and Senator Dianne Feinstein, Representative Mike Thompson, Representative John Garamendi, Representative Doug LaMalfa, and Representative Jared Huffman.

Based upon our research into the submitted documents, the County remains steadfast in its position that Scotts Valley has not provided sufficient information that supports either a "modern connection" or a "significant historical connection" to the lands in Vallejo and therefore, we respectfully ask the Department to deny the restored lands request in this matter.

## 1. Restored Lands Determination

Although the Indian Gaming Regulatory Act (IGRA) (25 U.S.C 2701 *et seq.)* generally prohibits gaming on lands taken into trust after 1988, there is an exception that allows for gaming when "lands are takin into trust as part of the restoration of lands for an Indian tribe that is restored to Federal recognition". (25 U.S.C. 2719(b)(1)(B)(iii).) In order for a particular parcel to be "restored lands" under IGRA, three criteria must be met, two of which are at issue here: a "modern connection" (25 CFR 292.12(a)) and a "significant historical connection" (25 CFR 292.2 and 292.12(b)). The County's research indicates that Scotts Valley cannot show either a "modern connection" nor a "significant historical connection" to the lands in Vallejo.

## 2. Scotts Valley Does Not Have A "Modern Connection" To Land In Vallejo For Which It Is Seeking A Restored Lands Determination

A modern connection may be established in one of several ways: the site is a "reasonable commuting distance" from the tribe's reservation; if the tribe has no reservation, then the land is near where a significant number of tribal members reside; the site is within 25 miles of the tribe's headquarters or other tribal governmental facilities, which have existed for two years prior to the fee-to-trust application; and "other factors". (25 CFR 292.12(a).)

Here, the tribe does not have a reservation, although we understand they hold land in fee in Lake County. Documents submitted by Scotts Valley indicate that no tribal members live in Vallejo or even in Solano County. The Declarations submitted by Scotts Valley indicate that the majority of their tribal members live in proximity to their tribal headquarters in Lake County. For those tribal

2

AR0006849

members that reside in Contra Costa County, it would be useful to know when they established residency in that county and whether those time frames coincided with

Scotts Valley appears to believe that their tribal TANF office in Concord, Contra Costa County satisfies this "modern" connection. This office is located over 20 miles away (ranging from 22.1 to 24.7 miles, depending on the route used in Google Maps) from the proposed casino and hotel site in Vallejo. When deciding whether to allow a tribe to administer and operate a TANF program, the U.S. Department of Health and Human Services (DHHS) merely looks at whether the tribe is federally recognized and whether they can administratively serve the geographic area. (45 CFR 286.65 and 286.75.) No inquiry is made by DHHS into whether the tribe has any connection to the geographic area in which it intends to provide tribal TANF services.

This TANF office, which provides services to Indians, regardless of tribal affiliation, who live in Contra Costa, as well as tribal members in Lake, Mendocino, and Sonoma Counties[1], was established as part of Scotts Valley's unsuccessful request for a restored lands determination in Contra Costa County. A review of the Scotts Valley tribal TANF webpage and Scotts Valley Facebook pages show that virtually all tribal activities take place at the tribal headquarters in Lakeport, near the Scotts Valley ancestral homeland, rather than at the TANF office in Concord. In prior cases, the Department has refused to give credence to a tribal government office established solely for the advancement of establishing a gaming site, and this case should be no different. (See, *e.g.* pages 8-9 of the Letter from Larry Echo Hawk, Assistant Secretary for Indian Affairs to the Honorable Merlene Sanchez, Chairperson of the Guidiville Band of Pomo Indians available at http://www.bia.gov/cs/groups/public/documents/text/idc015051.pdf.)

The final way that Scotts Valley could potentially establish a "modern connection" to the land in Vallejo is through "other factors". Although not defined, the preamble to the Part 292 regulations indicate that the Department of Indian Affairs intended for the modern connections test to be "a means of evaluating whether the surrounding community had adequate prior notice, actual or constructive, of a tribe's governmental presence in or near the community." (73 Fed. Reg. 29365 and 29366 (May 20, 2008).) Here, the County of Solano had no notice whatsoever of the Scotts Valley band's "governmental presence" in Contra Costa County. Representatives of the tribe had not introduced themselves or otherwise made any overtures to any of the Solano County Board of Supervisors until months after they submitted their request for a restored lands determination. Nor have members of Scotts Valley otherwise made themselves known in Solano County by, for example, requesting AB52 tribal consultation for projects in the County that are within the tribe's area of traditional and cultural affiliation (Cal. Pub. Resources Code 21080.3.1(b)), or by having a Scotts Valley Tribal Historic Preservation Officer (THPO) or other tribal liaison active in Solano County to provide educational outreach programs to local grade school children or provide Pomo language conservation and rejuvenation efforts or coordinate the Native American Graves Protection and Repatriation Act for Scotts Valley in Solano County. Scotts Valley has been conspicuously absent from Solano County until they and their investors decided this was a profitable location for a casino.

Scotts Valley cannot meet the "modern connection" test required for a restored lands determination and therefore their request must be denied.

---

[1] Scotts Valley is specifically not allowed to provide services in Solano County or in the City of Vallejo.

AR0006850

**3.** **Scotts Valley Does Not Have A "Historical Connection" To Land In Vallejo For Which It Is Seeking A Restored Lands Determination**

Both Yocha Dehe and United Auburn have submitted extensive and well-researched expert reports refuting Scotts Valley's claim of a "significant historical connection" to the Vallejo site. After reviewing their submissions, as well as the evidence submitted by Scotts Valley[2], the County joins Yocha Dehe and United Auburn in asserting that Scotts Valley has not submitted sufficient evidence to demonstrate a "significant historical connection" to the subject land in Vallejo. As discussed further below, the County has identified in the Scotts Valley documentation a number of unresolved and unsubstantiated issues, as well as internal contradictions, that raise serious questions as to the origin of the modern Scotts Valley tribe and their connection to land in Vallejo.

### A. Scotts Valley's Expert Reports

The reports submitted by the Scotts Valley Band include legal memoranda prepared by Steven J. Bloxham of Fredericks Peebles & Morgan LLP; a report by anthropologist Dr. Dorothea J. Theodoratus; a report by historian Dr. Albert L. Hurtado; and a report co-authored by anthropologists Dr. Heather A. Howard and Dr. James M. McClurken. Mr. Bloxham's legal memoranda and all three experts state that the present Scotts Valley Band descends primarily from Pomo Indians who lived at Clear Lake prior to the United States acquiring California. Each of the three expert reports focus on a different period of the Scotts Valley Band history. In general, Dr. Theodoratus addresses the Pomo origins of the Scotts Valley Band; Dr. Hurtado examines the period from around 1820-1860; and Drs. Howard and McClurken focus on the genealogy of the Scotts Valley Band members accorded a reservation in 1911.

### B. Theodoratus: Contradicting Evidence on the Origin of the Modern Scotts Valley Band

#### i.    Overview of Clear Lake Pomo Indians

Dr. Theodoratus presents a general overview of the Pomo Indians who lived around Clear Lake, citing several well-known scholars who wrote about these indigenous settlements. According to these studies, Pomo is a term that anthropologists and linguists have used to describe a linguistic family of related dialects, spoken by Indians who occupied a swath of land that extended about 130 miles along what is commonly referred to as the Coast Range from about Bodega Bay north and extending east-west about 100 miles from the Pacific coast east to the Sacramento River. By contrast, the Indians who lived immediately north of San Francisco and San Pablo Bay (the location of Vallejo) spoke dialects of different language families: Patwin, Wappo or Coast Miwok.

Like the other language family designations that scholars have used to describe California Indians, Pomo is not a cultural or political description. Pomo is not a "tribe" or "nation" and the Indians who spoke these related Pomo dialects did not recognize an overarching political, cultural or social relationship amongst the groups (called village-communities and/or "tribelets" by scholars) whose members spoke closely related dialects. Amongst Pomo-speakers (whose dialects were not necessarily mutually intelligible), scholars have identified Northern, Eastern, Southwestern and

---

[2] These reports include legal memoranda prepared by Steven J. Bloxham of Fredericks Peebles & Morgan LLP; a report by anthropologist Dr. Dorothea J. Theodoratus; a report by historian Dr. Albert L. Hurtado; and a report co-authored by anthropologists Dr. Heather A. Howard and Dr. James M. McClurken.

4

Southeastern Pomo-speaking areas that in turn have been further divided geographically by scholars (e.g., northern, southern, etc.). Each tribelet was autonomous, often having at least one permanent village and perhaps a few seasonal camps within a given valley. The Pomo speakers around upper and western Clear Lake spoke Eastern Pomo which in turn had dialectal variations among the tribelets living around the Lake.

ii.    Scotts Valley's Experts Disagree on Who the Historic Scotts Valley Tribe was and How They Relate to the Modern Tribe

Theodoratus states that the Scotts Valley Band are descendants of one tribelet (variously termed Yemabak/Yima/Boilkai/Moal-kai) which occupied land northwest of the town of Lakeport on the western side of Clear Lake. Some of Theodoratus' sources state that a Northern Pomo group (Komli) immigrated to Clear Lake from the Ukiah Valley (to the north and west of Clear Lake) just before non-Indian contact. The Komli were allowed to reside with the Yemabak and at first retained a separate captain. Over time, the two groups amalgamated into a single tribelet at Scotts Valley. Dr. Theodoratus presents no information as to when the two groups no longer had separate captains and no longer spoke variations of Pomo.

By contrast, the Scotts Valley Tribal Chairman submitted a statement that his Band is descended from three Eastern Pomo tribelets that occupied territories on the west side of Clear Lake: Yimabak/Moalkai, Kulanapo and Habenepo. These tribelets were among several that were party to the August 20, 1851 Treaty that was negotiated by Agent Redick McKee. In turn, the Howard and McClurken report claims that the modern Scotts Valley Band has ancestors from diverse Pomo villages (not just from the Eastern Pomo ones around Clear Lake) as well as from some non-Pomo villages.

Theodoratus' report not resolve this core issue of which tribelet(s) were the ancestors of the modern Scotts Valley band; instead, it raises more questions. Is the present Scotts Valley Band descended from one or three Clear Lake Pomo tribelets? If the latter, how and when did these three tribelets "amalgamate" after they were individually identified on the August 20, 1851 Treaty? There were between 7 and 13 Pomo tribelets at Clear Lake during the pre-contact period however there were only eight listed on the 1851 Treaty. What happened to the others before and after the Treaty was negotiated? How does the membership of the community at Scotts Valley, which was historically located northwest of Lakeport, relate to that of the recognized tribe known as the Big Valley Rancheria, located south of Lakeport, which was and still is in the ancestral territory of the Kulanapo and adjacent to that of the Habenapo, the other two tribelets from which present Scotts Valley members supposedly descend? Do all of the Indians for whom a Scotts Valley reservation was ultimately established in 1911 northwest of Lakeport in fact descend from three Clear Lake tribelets?[3]

Theodoratus presents information about selected Scotts Valley families, yet the scanty data again begs numerous questions. For example, a large number of contemporary Scotts Valley tribal members descend from Clear Lake Pomo Captain Augustine (1830-1919) who purportedly was a prominent figure historically. However, his brother and the latter's descendants are not members of the Scotts Valley Band. Are they members of other Clear Lake Pomo bands? How did Captain Augustine's sole son become the ancestor of a large number of contemporary Scotts Valley Band

_____

[3] The Howard and McClurken report states that those at the 1911 reservation came from many different tribelets, something that is not addressed by Theodoratus.

5

AR0006852

members? Who else was a member of the Band contemporaneously with Captain Augustine in the nineteenth century?

The fact that there are different views about the Scotts Valley Band's ethnographic origin is itself problematic. To establish that they have a "significant historic connection" to the subject land, Scotts Valley must show who comprised the historic Scotts Valley Band and how they are related to the modern Scotts Valley Band. They have not established that with the Theodoratus report.

## C. **Theodoratus: Scotts Valley Has No Connection to Vallejo**

Theodoratus provides no information in her report that connects the Scotts Valley Band historically to land in or near Vallejo. To the contrary, all of the scholarly studies that she cites underscore that the area around San Francisco and Vallejo were inhabited by Patwin, Wappo and Miwok speakers, not Pomo. These studies also state that the respective territories of the Clear Lake tribelets were restricted to the land near the lake itself and did not extend anywhere near San Francisco or Vallejo. While some Clear Lake Pomo visited Bodega Bay on the Pacific Coast seasonally for shells, this was within Pomo territory and there is no mention that Clear Lake Pomo visited further south along the Pacific Coast or that they utilized resources in the area of Vallejo which was in Patwin territory.[4]

In fact, early anthropologists could not find Indian informants to provide information about the pre- or early-contact villages in the San Francisco area precisely because the indigenous settlements and way of life there had been destroyed by Spanish, Mexican and American settlements long before the Indian informants who were interviewed in the twentieth century were born. By contrast, Barrett (who did fieldwork in 1903-1906) did find substantial Eastern Pomo informants who named ancestral villages in the Clear Lake area because they had for the most part lived beyond the reach of the Spanish missions and many were still living at Clear Lake.

Information in Theodoratus' supporting documentation (although not discussed in her report) also raises serious questions about Bloxham's argument that because the lands ceded by the August 20, 1851 Treaty at Clear Lake extended to San Pablo Bay, this provides a "significant historical connection" between the Scotts Valley Band and the land at Vallejo. All of the scholarly literature provided with Theodoratus' report on the Eastern Pomo underscores that each tribelet at Clear Lake had a clear, circumscribed territory at the lake and in no instance did these territories extend into areas occupied by non-Eastern Pomo tribelets. Eastern Pomo tribelets did not occupy the land around San Francisco and Vallejo. Instead, that was the territory of the Patwin, Wappo and Miwok. Just because the US government included the non-Eastern Pomo land in the ceded lands of the Clear Lake Treaty does not mean that the signatory tribes knew that this land was included or consented to its inclusion. While the Treaty did discuss the location of the proposed reservation to which the tribes would be relocated at the north of the Lake, it said nothing about the extent of the lands ceded that extended well beyond any territory of the tribes involved. As the archaeologist and scholar of California Indian history Robert Heizer wrote,

> The three [federal] Commissioners did not have the slightest idea of the actual extent of tribal lands of any group they met with. Their orders were to secure Indian land title to California, and they managed to do this to their satisfaction by making treaties with some Indians and then dividing all of California west of the Sierra Cascade crest into eighteen unequal cession areas which, happily quite

---

[4] Hurtado's unsubstantiated claim to the contrary, discussed below

6

AR0006853

covered the entire region. If the commissioners had made 12 treaties, the ceded areas would have been larger; if they had made 30 treaties the areas would have been smaller.[5]

Thus, the fact that the unratified 1851 Treaty intended to cede land well beyond the identified territories of the signatory tribes, does not in itself indicate that there was, in practice, a "significant historical connection" between those tribes and Vallejo.

In short, the Theodoratus report itself does not address any historical connection between the Scotts Valley Band and the land at Vallejo. However, the sources that she cites to do contain information about the Eastern Pomo tribelets around Clear Lake and they establish that the Scotts Valley Band has historic ties in the Clear Lake area. The same sources do not address any connections between the various claimed ancestral Scotts Valley tribelets to the land at Vallejo.

### D. Hurtado: Interactions Between Mexicans, Americans And Indians, But No Documented Evidence Of The Scotts Valley Ancestors Involvement

Hurtado's report focuses on the Mission period from 1820 to 1860. Despite discussing various historical events concerning the interactions between Indians and Mexicans and Americans during the targeted time frame, the report provides no documented information between these events and the ancestors of the Scotts Valley Band.

i.    <u>No Evidence that Scotts Valley Ancestors were at Missions or worked at Ranchos in Sonoma</u>

Hurtado states that Pomo Indians were at the missions of San Rafael, San Francisco, Solano and Sonoma. However, the document he cites[6] as authority for this indicates that the Pomo at these missions were Western and Northwestern Pomo, *not* the Eastern Pomo at Clear Lake. As at least one writer has pointed out, the Western and Northwestern Pomo were more readily captured by soldiers for the missions because of the geography where they were located; soldiers easily travelled up the valleys to round up potential neophytes in North Pomo territory. By contrast, Clear Lake lies in the middle of "precipitous" mountains with steep trails that made ascent and descent arduous. Difficult access served in part as protection for the Clear Lake Indians from Spanish and Mexican raiding parties. This does not mean that they were wholly immune to raids. However, again, the fact that Barrett's early twentieth century Eastern Pomo informants could identify as many villages as they could at Clear Lake in 1903-06 demonstrates that the Eastern Pomo occupied many of them throughout the nineteenth century, something that was definitely not the case with the indigenous settlements to the north and east of the San Francisco Bay area.

After the missions were secularized, Hurtado's report also leaves unanswered many questions with respect to what happened to the neophytes (Christianized Indians) at the missions. While it was common for the neophytes to become laborers at Mexican ranchos after secularization, Hurtado provides no evidence that the Indians who worked at Mariano Vallejo's rancho in Sonoma County were from Clear Lake and specifically from the tribelets that are allegedly ancestral to the

---

[5] Heizer, Robert F. *The Eighteen Unratified Treaties of 1851-1852 Between California Indians and the United States Government.* Archaeological Research Facility Department of Anthropology University of California, Berkeley 1972:5

[6] Several of Theodoratus' sources also state that the Indians of Clear Lake were largely beyond the reach of the San Francisco area missions.

7

AR0006854

contemporary Scotts Valley Band. If the neophytes at the missions were not Clear Lake Indians to begin with, then there is no evidence that Clear Lake Indians generally and Scotts Valley ancestors in particular were forced to work at ranchos in Patwin territory and far from their indigenous villages.

ii.    <u>Francisco Solano and the August 1851 Treaty do not Provide a Basis for a "Significant Historic Connection"</u>

Hurtado spends a lot of pages in his report detailing the exploits of Francisco Solano, a Suisan Patwin Indian who had been raised at a mission and rose to the position of *alcalde* (mayor) in one. After the missions were secularized, Solano, who initially fought Mexican ranchero Mariano Vallejo, later developed a mutually beneficial relationship with Vallejo and his brother Salvador, owners of vast ranchos. Solano helped find and force Indians to work on the Vallejo ranchos for which he was well compensated.

Insofar as the Clear Lake tribelets are concerned, Solano's import is that his partnership with the Vallejo bothers helped them become extremely successful rancheros who eventually controlled over 200,000 acres of land for whom thousands of Indians were forced to labor involuntarily. Salvador Vallejo made his first visit to the Clear Lake area around 1840 and established a rancho on the west side of Clear Lake. Clear Lake Indians were forced to work on this rancho under harsh conditions. However, in 1847, Vallejo sold his rancho to a partnership of Americans - brothers Benjamin and Andrew Kelsey, Charles Stone and Edward Shirland - who treated the Indian laborers even worse. The intolerable conditions prompted the Indians to later murder Andrew Kelsey and Charles Stone in 1849. This in turn led the Americans to seek retribution from the Clear Lake Indians, indiscriminately killing men, women and children.

While this sad history provides no ethnographic information about the relationship among the Clear Lake tribelets in the 1840's, it does explain why, when in August 1851 Agent Redick McKee trekked over the mountain to Clear Lake to make a treaty[7] with the Indians there, the Eastern Pomo Indians were receptive to being accorded a reservation. Quite simply, the promised reservation was a welcome haven from which they would not be expelled, and where they were, at least in theory, not be assaulted or forced to work as virtual slaves on settlers' ranchos. Agent McKee underscored this when he described the proposed reservation to the Indians.

Most of the Treaty provisions were standard. Article 6 described the various goods to be furnished to the tribes to "encourage the said tribes in acquiring the arts of and habits of civilized life", (e.g., clothing, cloth, implements, livestock, seeds, etc.) and Article 5 described "presents" that were given to the signatory tribal leaders on the spot for showing up and agreeing to the terms of the agreement: "ten head of beef cattle, three sacks of bread, and sundry clothing."

However, what was highly unusual was a provision in Article 5 which stated that additional provisions would be provided "free of charge". These goods would be furnished "at or near Vallejo, *or elsewhere, as may be most convenient,* with one hundred (100) head of beef-cattle, to average in weight five hundred pounds net, and two hundred (200) sacks of flour of fifty pounds each, in all ten thousand pounds, during the present year (1851), and a like quantity in each of the years 1852 and 1853…" (84, added emphasis).

---

[7] This was one of 18 such agreements made by the federal government throughout the newly acquired California.

8

Hurtado points out the place of pickup for these goods was at a ranch owned by James Estelle who had previously gone into the cattle business with Mariano Vallejo and Vallejo's son-in-law, purchasing a portion of the old Soscol claim near San Pablo Bay and now calling the land Eden Ranch. Prior to the 1851 Treaty, Estelle had secured an agreement from Agent McKee to sell beef to the federal government for the Indians, doing so at greatly inflated prices and thereby securing himself a tremendous profit at the government's expense.[8]

While Hurtado and his sources make it clear the Clear Lake Indians did make the 50- to 60-mile trek to Eden Ranch to pick up the "free" goods, their doing so before the treaty was ratified, coupled with a senior official getting wind of the inflated beef trafficking, forced McKee to cancel any further disbursements to the Indians. Although Bloxham cites this incident as a "significant historical connection" to the Vallejo area (where Eden Ranch was located), the details of this incident undermine his argument. For one thing, it is clear that the location was chosen because it was profitable *for Estelle* and perhaps also for McKee's son. Certainly the location was not at all convenient for the Indians since it was far away and out of their home territory, forcing them to pass through areas settled by whites who could have harassed them or worse. In addition, the location had no social, cultural or political meaning *for the Indians.* Further, the activity occurred only once and was not repeated because all of the 18 California Treaties were never ratified. Indeed, McKee was severely reprimanded by his superior for having dispensed any goods for the Indians at Eden Ranch since he was not authorized to do so for a treaty that was not ratified.

It is also important to point out that Hurtado provides no evidence that the Clear Lake Indians stayed in the Eden Ranch area after they received the flour. In fact, there is good reason to surmise that they returned to Clear Lake as soon as possible. The Indians thought they had just consented to an agreement that secured them a safe parcel of land. There was no reason for them not to hurry home to take advantage of this promised haven.

As is clear from the above discussion, Hurtado's lengthy discussion of Solano, the Vallejo brothers and the treaty of August 1851 is largely irrelevant in regards to the ancestors of the Scotts Valley Band and does not establish the "significant historic connection" necessary for a restored lands determination for lands in the city of Vallejo.

iii.    <u>No Evidence that Ancestral Members of the Modern Scotts Valley Tribe were in Solano County in the 1850s or 1860s.</u>

Hurtado discusses several issues of questionable relevance to the Scotts Valley Band. He notes for example that Indians were kidnapped for labor in the second half of the nineteenth century and that there were Indian children with no listed last name in households not headed by an Indian adult in the 1852 and 1860 Solano County censuses. While these individuals may in fact have been kidnapped at some point in their life, Hurtado provides no evidence that those children were Scotts Valley ancestors or even from Clear Lake. They could have been kidnapped from myriad tribes in California. Without specific evidence that these individuals were in fact from Clear Lake and from the tribelets that were allegedly ancestral to the Scotts Valley Band, the data is of no significance with respect to the Band's historic connection to land at Vallejo.

---

[8] Estelle had accompanied McKee on the treaty-making trip to Clear Lake; the provision requiring pickup of flour and beef at his ranch was not coincidental. Moreover, McKee's grown son had stayed with Estelle at Eden ranch prior to the treaty and had clearly secured a deal with his host.

9

Also irrelevant is Hurtado's speculation that the names of two herders on an 1850 Solano County census – Chinito and Napomusano – "seem to be Indian names" (94). However, "Chinito" is a Spanish diminutive form of "chino" (Chinese) which could indicate that the person was Asian or it could have been a nickname that was given because of some physical trait or behavior. Similarly, "Napomusano" is a variation of a common Spanish name, "Nepomuceno." This name could refer to a Mexican Indian or a California Indian. The fact that there may have been Indian herders of unknown tribal affiliation in Solano County, a county outside of the Eastern Pomo territory, in 1850, 1852 or 1860 is not evidence that the Scotts Valley Band had a "significant historical connection" to Vallejo.

Hurtado also cites no supporting documentation for the following statements in his "Conclusion."

> "Indians from Clear Lake had gone to the shores of San Pablo Bay for generations before the arrival of Euro-Americans." (99)

> "In the nineteenth century the homes and ranches of the North Bay Region were common places of employment for Indians. Clear Lake was often mentioned as a place of origin for these workers whether enslaved, indentured, or free. Under these violent and inhumane conditions, the North Bay region became a part of the SVBI homelands." (99)

> "The historical record frequently refers to 'Clear Lake Indians' without further identification. Yet when non-Indian observers specifically described Clear Lake Indians who were driven to work on the ranchos in the North Bay region they mention Rancho Lup-Yomi and Scotts Valley." (99-100)

> "In all cases that have come to my attention "Clear Lake Indians" taken as captives were Habenapo, Kulanapo, and Yimabak/Molakai who were associated with Rancho Lup-Yomi and Scotts Valley. Thus the preponderance of evidence supports a conclusion that the 'Clear Lake Indians' who are mentioned in the record are the Habenapo, Kulanapo, and Yimabak/Molakai-the ancestors of today's SVBI." (100)

In addition to citing no documentary evidence for the above claims, it appears that Hurtado believes that any reference to a Clear Lake Indian means that the person is an ancestor of Scotts Valley. This is not true. Historically there were other tribelets at Clear Lake which are today other recognized tribes: e.g., Big Valley Rancheria and Robinson Rancheria. Indeed, the Big Valley Rancheria is located on the site of one of the tribelets from which the Scotts Valley Band claims to descend. Yet Dr. Hurtado does not address this fact nor its implications for identifying Scotts Valley Band ancestors versus Big Valley Rancheria ancestors in historical documentation.

There is much in the Hurtado report that does not address the composition and actions of the historical ancestors of the Scotts Valley Band. And much that he does address is speculative and without documentary support, as discussed above. This simply does not provide the necessary evidence to show that Scotts Valley has a "significant historical connection" to lands in Vallejo

**E.  Howard And McClurken Report: Lack of Documented "Significant Historical Connections" Between Residents of the Scotts Valley (Sugar Bowl) Rancheria and Vallejo**

    i.   <u>Howard and McClurken's Interpretation of Scotts Valley Rancheria Marriage Patterns is Unsupported by Historical Ethnography.</u>

10

AR0006857

According to the Howard and McClurken Report the Indians who were accorded a reservation in 1911 known as the Scotts Valley or Sugar Bowl Rancheria not only descended from Clear Lake Pomo, but also from non-Eastern Pomo and even non-Pomo Indians who were born outside of the Clear Lake area. The reason for this stems from the way in which the Rancheria was established.

In the early 1900's, Agent Charles E. Kelsey was charged with establishing trust land for "landless Indians." Because the criterion was simply that the Indians be landless, the rancherias that he created could and in fact did include people from diverse tribes and cultural groups placed together simply because they were "landless Indians". These individuals could include those who were born in other areas but who were themselves landless in a given location at the time Kelsey was taking a census of Indians in need of land. While Kelsey initially wanted to settled the landless Indians around Lakeport on a rancheria at the north of the Lake, at the request and urging of Joe Augustine (a nephew of Captain Augustine), this did not occur and a separate rancheria was established on lands southwest of Clear Lake.

Howard and McClurken have traced the genealogies of those on the initial list of 1911 Scotts Valley Rancheria and found many who were born outside of the Clear Lake area. The authors then state that intra-Pomo marriages and movement were historical cultural patterns of the Pomo generally and evident among the Clear Lake Pomo during the early contact period. They also note that the flexible marriage and settlement patterns were encouraged by the multiplex pressures upon the Indians by the coercive practices of the Spanish, Mexicans, and Americans.

It is certainly understandable that high indigenous mortality, forced indigenous labor, and eviction from their traditional villages wreaked havoc on pre-contact Pomo marriage and residence patterns. Given the relative small size of Clear Lake villages in the second half of the nineteenth century, it would have been difficult to find unrelated marriage partners locally. Since these numbers decreased drastically by the turn of the century (some village had less than 50 people, some just a few occupied houses), it is also understandable that Clear Lake Pomo married people beyond their small social circle, perhaps met when engaged as migrant laborers beyond Clear Lake. The issue is not that intermarriages occurred, but rather how Howard and McClurken are interpreting these marriages.

The writers seem to be claiming that the tribal origin of the non-Clear Lake Pomo who married Clear Lake Pomo should be now be considered part of the modern Scotts Valley Band's geographic area to which the Band potentially has a "significant historical connection." But this claim does not rest upon historical ethnography, as shown below, notwithstanding their assertions.

Several anthropological studies have noted that newly-wed Eastern Pomo couples had the flexibility of residing with the parents of the wife or groom and may indeed live at one or other for a time. Eventually, however, the couple settled at one or the other village long term and generally remained there. Thus, when a non-Clear Lake Indian married a Clear Lake Indian and lived his/her whole life in a given Clear Lake tribelet and raised children there with the Clear Lake spouse, this did not alter the *tribelet's* identity nor did it extend rights of the Clear Lake *tribelet* to the non-Clear Lake natal village-community. While the non-Clear Lake person may retain options in his/her natal village-community, the marriage did not change the options of the Clear Lake *tribelet*.

Howard and McClurken's report takes a huge leap by assuming, for example, that if a non-Clear Lake spouse came from Napa, that relationship now affords the entire Scotts Valley Band a

11

AR0006858

"significant historical connection" to Napa. This is unsupported by historical ethnography and cannot serve as a basis for a restored lands determination.

> ii.    Insufficient Connection is Presented Between the 1911 Rancheria and the Yemabak/Komli Village Communities, alleged to be the Ancestors of the modern Scotts Valley Band

While Howard and McClurken do not fully explore this issue, it is important to note that the newly created Sugar Bowl Rancheria (Scotts Valley Rancheria) was *not* geographically located in Scotts Valley and thus *not* located where the Yemabak/Komli (who were sometimes called the Scotts Valley Indians) were situated historically. Herein lies a critical issue that is a source of confusion in analyzing the contemporary Scotts Valley tribe's history.

According to Hurtado's report, Captain Augustine was a Kulanapo Pomo (36) yet none of the three expert reports discuss how the Kulanapo, Habenepo and Yemabak/Komli village communities came to be considered a single entity nor when it happened. Captain Augustine's nephew, Joe Augustine, is responsible for getting Kelsey to create a separate rancheria which was primarily, although not exclusively, accorded to Augustine kin[9]. However, the relationship of the 1911 rancheria to the historical village-community at Scotts Valley, the Yemabak/Komli, is never explained.

By using the term "Scotts Valley" both for the historic village-community of Yemabak/Komli and the rancheria created in 1911 by Kelsey, one is apt to assume a continuous historical tie between these two entities that may not exist. The various expert reports do not in fact explain and document what that connection is. Thus, several questions must be posed. If Captain Augustine was Kulanapo, then why is the rancheria (whose members are mostly his descendants from his son) not called a Kulanapo rancheria? Most importantly, how is the Sugar Bowl/Scotts Valley Rancheria related to the Kulanapo descendants who belong to the Big Valley Rancheria? None of the expert reports clearly address the relationship of the Scotts Valley Band to the recognized Big Valley Band. Yet the latter was located -- and today remains located -- in one of the territories of the tribelets claimed to be ancestral of the Scotts Valley Band and clearly shares genealogical ties with the latter.

There are numerous issues to be analyzed closely with respect to the Howard and McClurken report. As with the other two reports, a significant deficiency remains in addressing how the three tribelets became a single entity in the nineteenth century, assuming they did, and how the members of the 1911 Scotts Valley Rancheria are related to the historical Scotts Valley village(s). What also needs to be evaluated is the "significant historical connection" between the historic Scotts Valley village(s), the 1911 Scotts Valley Rancheria, and the restored modern Scotts Valley Band to the land in Vallejo.

In order to demonstrate a "significant historical connection" between the present Scotts Valley Band and the proposed parcel of land in Vallejo, it is necessary to first understand who comprised the Band historically and then evaluate that entity's historical relationship to the land at Vallejo. Yet the expert reports submitted by Scotts Valley present information that is often ambiguous, irrelevant, contradictory and in some cases not supported by the source documents they cite to for

---

[9] This does not mean that all Augustine kin lived at the 1911 Scotts Valley Rancheria, for they did not. It only means that the descendants of Captain Augustine's only son Robert and the latter's wife, Victoria, comprised the majority of the residents on the 1911 Rancheria.

12

AR0006859

their authority. Given this lack of clarity regarding the origins of the modern day Scotts Valley Band, the tribe cannot present sufficient evidence of a "significant historical connection" to the lands in Vallejo.

### 4. Conclusion

 Scotts Valley has failed to present adequate information to establish either a "modern connection" or a "significant historical connection" to justify a restored lands determination for land in Vallejo. The County of Solano therefore respectfully requests that the Scotts Valley Band's request for a restored lands determination for property in Vallejo be denied.

13

AR0006860



# SCOTTS VALLEY BAND OF POMO INDIANS

January 10, 2017

The Honorable Lawrence S. Roberts
Acting Assistant Secretary- Indian Affairs
United States Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

Re:     Restored Lands Opinion Request to Inactive Status

Dear Assistant Secretary Roberts:

On behalf of the Scotts Valley Band of Pomo Indians, we hereby request that the Department of the Interior take no action on the Tribe's January 29, 2016, request for an Indian Lands Opinion with respect to property in Vallejo, California. The Tribe asks that the Department classify the Tribe's Indian Lands request as inactive, effective as of the date of this letter.

The basis for the request is that the administrative record is not in a position to close before the end of the current Administration. First, we are aware that since we last spoke, the Department received an extensive analysis from Solano County, dated December 23, 2016, opposing the Tribe's request. Neither the Department nor Solano County have yet to provide the Tribe a copy of that submission. Of course, the Tribe must be allowed to respond to that analysis before the administrative record closes, but the Tribe cannot reasonably do so before the end of the current Administration. Second, both you and the Office of the Solicitor, Division of Indian Affairs, have recently alerted the Tribe that the Department requires more evidence of the Tribe's historical connections to the Vallejo parcel, and specifically a certain type of evidence, characterized as "more direct evidence," before it can determine that the Tribe satisfies that requirement. Under the circumstances, the Tribe must also be allowed a reasonable period of time to develop and present that additional evidence.

The Tribe greatly appreciates the efforts you and the Department have made trying to meet the commitment you made to us to issue a decision prior the end of the current Administration. However, as it stands, there has been nothing issued on our request by the Department, and under

Honorable Lawrence S. Roberts
January 10, 2017
Page 2 of 2

the circumstances we formally request the administrative record be left open and our request be placed on "inactive" status pending the Tribe responding to these recent developments.

Sincerely,

Shawn Davis, Chairman
Scotts Valley Band of Pomo Indians

cc:    Paula Hart, Director, Office of Indian Gaming
       Eric Shepard, Associate Solicitor, Office of the Solicitor

    

MIWOK
MAIDU

United Auburn Indian Community
of the Auburn Rancheria

| Gene Whitehouse | John L. Williams | Calvin Moman | Jason Camp | Gabe Cayton |
| Chairman | Vice Chairman | Secretary | Treasurer | Council Member |

March 6, 2017

Mr. Michael Black
Acting Assistant Secretary -
  Indian Affairs
U.S. Department of the Interior
Mail Stop 3642
1849 C Street, NW
Washington, D.C. 20240

Subject: Scotts Valley Band of Pomo Indians – Request for "Restored Lands" in the City of Vallejo, Solano County, California

Dear Mr. Black:

On behalf of the United Auburn Indian Community ("United Auburn"), enclosed is a supplemental historical report prepared by Dr. Stephen Dow Beckham, Professor of History Emeritus at Lewis & Clark College. This supplemental report is submitted in opposition to the request by the Scotts Valley Band of Pomo Indians ("Scotts Valley Band") for a legal opinion that land purchased in Vallejo, California qualifies for gaming under the "restored lands" exception of the Indian Gaming Regulatory Act.

Dr. Beckham's supplemental report responds to a memorandum dated December 6, 2016, by Albert Hurtado, Ph.D, one of the historians working for the Scotts Valley Band.

Dr. Beckham's research provides further evidence that the Scotts Valley Band lacks the requisite "significant historical connection" to any land in Vallejo or Solano County, California. The statements and conclusions in the Hurtado memorandum are all speculative and do not provide any direct evidence that the ancestors of the Scotts Valley Band established any type of tribal or governmental presence in Vallejo or Solano County.

Dr. Beckham's report also demonstrates that the Scotts Valley Band's reliance on a relationship with General James Estell is misplaced. A review of a robust historical record involving the General does not produce one single letter or report confirming that he provided any assistance or advice to the Scotts Valley Band, or to any other tribe located in the Clear Lake region. In fact, the alleged trip taken by representatives of the Scotts Valley Band to receive beef cattle and

Tribal Office    10720 Indian Hill Road    Auburn, CA 95603    (530) 883-2390    FAX (530) 883-2380

AR0006868

flour promised in the unratified 1851 Treaty of Lupiyuma cannot be documented and probably did not occur.

Finally, Dr. Beckham's research demonstrates that any reliance on the Royce cession map of this 1851 Treaty is flawed. The Royce map was drawn almost fifty years after the Treaty was negotiated and the Treaty language does not describe any cession of lands in it. Instead, the Treaty language was limited to a description of an area of land reserved for Indian use in the Clear Lake Basin. And it has been well established that the Treaty was negotiated only with the Pomo of Clear Lake and Upper Eel River and not the Wappo, Southern Patwin, and Coast Miwok Tribes that occupied the area between Clear Lake and Vallejo.

The Scotts Valley Band still is unable to offer historical documentation demonstrating the existence of "villages, burial grounds, occupancy, or subsistence use" in Solano County, as required by Interior regulations. Instead, the Band can only present inferred or circumstantial evidence that is based primarily on transient activities of individuals who may, or may not, be the ancestors of various Pomo tribes.

United Auburn continues to urge the Department to deny the request by the Scotts Valley Band for a restored lands opinion, based on the lack of any reliable evidence of a significant historical connection to any lands in Solano County, California.

Sincerely,

Gene Whitehouse
Chairman

Enclosure

cc: Paula Hart, Office of Indian Gaming
    Jennifer Turner, Office of the Solicitor
    Bethany Sullivan, Office of the Solicitor

AR0006869

**A Discussion of Albert Hurtado's
"Additional Comments on the Yocha Dehe Response,
December 6, 2016"**

Stephen Dow Beckham
17 January 2017

1. At p. 4 Hurtado provides a quotation from Palmer's *History of Napa and Lake Counties* (1881) to attempt to link the Scotts Valley Band of Pomo to Vallejo, California.   The statement based on information from early settlers is that "large numbers of the Lake Indians would come down every season and engage in work, and they made good hands also.   Many of the adobe houses of old Sonoma were built by those Indians . . ." (Hurtado 2016b).

**Comment**: The site of the labor mentioned was in Sonoma nearly twenty-five miles northwest of Vallejo.   There is no specific identification of Indians of the Scotts Valley Band working at any rancho in Solano County nor in Vallejo.   The work was individual, not tribal.   The labor of individual Indian men on a rancho or in a community such as Sonoma did not confirm the "significant historical connection" of the Scotts Valley Band of Pomo to specific locations in Sonoma, Napa, or Solano counties.   Virtually all of Hurtado's initial report and his "Additional Comments" are not tribal, but rather the effort to link individual Indians through labor to a possible location. The evidence he cites does not accomplish that objective.   It is vague, mostly non-specific to site, and does not identify Scotts Valley Band of Pomo ancestors by name, band, village, or tribe.

2. At pp. 4-5 Hurtado refers to an Indian man present at the McKee treaty council at Clear Lake in August, 1851, who had "lived among the whites for three or four years.   George Gibbs made note of this fact and that the man expressed no understanding of a deity" (Hurtado 2016b).   Hurtado's "Additional Comment" proceeds with speculations:

■ "The Indian **may have lived** with the Vallejo/Stone/Kelsey/ Shirland ranchers at Clear Lake . . . ."

1

Stephen Dow Beckham:1/2017

- ■ "or [since he accompanied the expedition] **more likely had lived** for three or four years at one of the ranchos in the Sonoma or Napa valleys."

- ■ **"It is even possible** that the Indian came north with John McKee or General Estell from Eden Ranch . . . ."

**Comment**: These statements are all speculative and do nothing to establish a "significant historical connection" of the Scotts Valley Band of Pomo Indians in the Patwin Indian tribal homeland, a distance of 87.4 miles from the Scotts Valley Rancheria at Lakeport, California.

3. At pp. 5-7 Hurtado states that James M. Estell was a **"trusted advisor"** to the Clear Lake Indians" and that **"Estell's role did not end with the treaty negotiations and the delivery of provisions at his Vallejo ranch."**   Hurtado writes: "**Estell was acting as their agent in the place of McKee until further notice.**"   Hurtado concludes: "**McKee insisted that the Indians must 'go to' Estell, thus directing them to apply for advice and assistance at Eden Ranch, just as they were required to pick up government provisions there.   Thus, McKee established under government authority a relationship with Estell and the Vallejo area**" (Hurtado 2016b:6-7). [Emphasis supplied.]

**Comment**: These conclusive statements about James M. Estell and his relations with the Clear Lake Pomo Indians merit discussion because they are not true.

- ■ Hurtado has not cited a single letter or report confirming that Estell provided assistance, advice, or counsel to the Scotts Valley Pomo or the other Pomo Indians of the Clear Lake region.   There is no documentation that Estell ever made a second trip to Clear Lake to meet with Pomo Indians other than that with McKee in late August, 1851, when Estell was driving cattle to feed the McKee treaty party and the U.S. Army escort.   There is likewise no evidence of any subsequent meetings between Pomo Indians and General Estell at his ranch near Vallejo.

The potential sources of such documentation are the following:

2

Stephen Dow Beckham:1/2017

~ Letters Received, 1849-82, California Superintendency of Indian Affairs.   Microcopy 234, Rolls 32 and 33, 1849-1853, National Archives, Washington, D.C.

Roll 32, for example, contains 1,146 pages of documents.   In this entire record, 1849-52, there is but one letter written by James Estell on July 6, 1852, to Redick McKee.   This letter related to charges raised by Major Henry Wessells and General E. A. Hitchcock of fraud perpetrated by Estell and McKee in supplying beef cattle to the McKee Treaty Commission and its military escort.   There is no information in that letter nor anywhere in the field records of the California Superintendency confirming that Estell was an "advisor" or "agent" for the Indians of Clear Lake or any Indians in California.

~ Correspondence of the California Superintendency of Indian Affairs, 1849-59, published in the *Annual Report of the Commissioner of Indian Affairs*.   A review of these records of the California Superintendency of Indian Affairs during this period of ten years to the death of James Estell in 1859 produces not a single letter to or from him nor any identification of his role as an "advisor" or "agent" for the Indians of Clear Lake or the Scotts Valley Band of Pomo.   This set of correspondence is available on-line at http://digicoll.library.wisc.edu/cgi-bin/History/History-idx?type= browse&scope=HISTORY.COMMREP.

~ James Estell was mentioned approximately eighty times between 1850 and 1859 in the *Daily Alta California, Sacramento Daily Union, Marysville Herald*, and other newspapers.   Hurtado has not provided any evidence from the contemporary press that Estell had any relationship as advisor or agent for the Clear Lake Pomo.

Between 1851 and his death in 1859 Estell was primarily engaged in contracting convict labor and operating San Quentin Prison. His public life was filled with controversies. *The Daily Bee* (Sacramento, CA.), commented on his death in an article on April 27, 1859: "We cannot now remember the mutations in his connection with the Penitentiary, so numerous have the changes been, but he was never wholly unconnected with it, save for a very short period, and it is safe to say, that in them all, he came out uppermost. No man has

3

Stephen Dow Beckham:1/2017

received one tenth the money from the State that General Estill [Estell] did; and no man made greater profit on what he received."

~ General James Estell was "damaged goods" because of his deal-making, especially from his lucrative and controversial operation of San Quintin [Quentin] Prison.   In 1851 to expedite sale of cattle from his ranch, he took in John McKee, son of Redick McKee who was secretary to the northwestern California operations of the Treaty Commission.   John McKee was to work as Estell's financial partner in driving beef cattle along the route of the Commission's travels.   The cattle were to feed the Commission team, the military escort, and the Indians gathering for their respective councils with Commissioner McKee.   Redick McKee later appointed his son John as Indian Agent to the Indians of Scotts Valley in the upper Klamath watershed, a mining district adjacent to the Oregon border.   On his return from the 1851 expedition, Major Henry Wessells made known to military officials and the Department of the Interior what he considered the unconscionable actions of the McKees and Estell in the supply of beef cattle.[1]

In a letter of March 21, 1852, to Captain E. D. Townsend, Assistant Adjutant General, Pacific Division, U.S. Army, Wessells explained:

"I will state in full my reasons for introducing those remarks in my report, promising however, that they were made officially, as

---

[1]

Edward F. Beale, California Superintendent of Indian Affairs, in a letter of September 30, 1852, to Luke Lea, Commissioner of Indian Affairs, attached a certified statement signed by H. C. Logan: "On or about the middle of November, 1851, cattle were driven to the North by Genl. Estell, he has told me frequently, that they belonged jointly to himself and Mr. John McKee, Son and Secretary of Redick McKee Esq Indian Agent.   The cattle were destined for the tribes of Scotts & Shasta valley or the Northern Indians.   I believe this Mr. John McKee to be the same gentleman appointed about that time by his Father as temporary Indn. Agent for Scotts Valley.   I was told by Col. McKee himself that Genl. Estell had taken in his son into partnership or made him interested in this Cattle Speculation, and was also told that they had made a very handsome amount of money out of the operation.   Col. McKee appointed a man named Geo. P. Armstrong to receive certain cattle and deliver them to the Indians.   I delivered a drove of cattle Seventy two head in May last.   I know of my own knowledge that very few of them have been given to the Indians" (Logan 1852).

4

Stephen Dow Beckham:1/2017

AR0006873

an officer of the Government, uninfluenced in any particular, by
either private or personal considerations, and pointed solely at
the system (if so it is called) of issuing fresh beef to the Indians,
as it came under my notice."
Wessells continued:

"An expedition to Clear Lake, and thence through the Coast
range to Humbol[d]t bay, and Klamath river, had been
contemplated in the early part of last summer, and as the time
approached for its departure, public attention to a considerable
extent, was directed towards it; it afforded a pretty general topic
for conversation, but I observe that the chief point of interest
attached to it, was a certain herd of beef cattle, destined to
follow the march, and for the use of such Indian tribes as were
willing to treat.  This however, was previous to my being
detached for that service, and as it was no concern of my own, I
gave to it but little attention.

On assuming command of the Escort, repeated inquiries were
made of me, as to the manner of furnishing beef to the Indians,
whether purchased in open market on the hoof, or contracted for
in the usual way with the lowest bidder–speculation was rife
throughout the country, and this seemed to be looked upon as a
grand speculation.   Of course I could give no satisfactory reply
to questions of that nature, as it was no business of my own, but
from a constant repetition of the subject, my attention was
forcibly, and unwillingly directed toward it.   I heard the belief
repeatedly expressed 'that it was a swindling transaction,' 'that
the herd of beef cattle controlled the movements of the
Expedition,' and it is possible that I have expressed the same
opinion, it may have been an er[r]oneous one, I hope it was.

It was observed that a son of the acting Commissioner [McKee]
holding the appointment of Secretary, was Agent for the owners
of the cattle, and had entire control of the issues – it was also
believed that he was a partner in the concern, or directly
interested in the profits such was my own belief, having been so
informed by the chief herdsman of the drove, and this is one
feature in the system which I could not fail to condemn.   At one
time, some eight or ten head of cattle were turned over to
Indians on the hoof, their weight being estimated as I believed
at the time in a very careless way, to say the least, and the

5

Stephen Dow Beckham:1/2017

amount reported to the Commissioner.   The amounts will show, whether the contractors had any reason to complain of the profits, since seventy five dollars with a certain share of the profits, was paid for the largest and best American oxen in the herd, as I was informed by the owner of them.
On another occasion, a small quantity of beef, which should not otherwise be disposed of, was reported to the Commissioner as having been issued to Indians in his temporary absence when no Indians were present to receive it, this being related to me by the man who killed the animal, and who ought to have known the circumstances, being at the time employed as a hand of Sub-driver to the herd – if this information was correct, and I believe it was, the Commissioner was deceived, and a fraud, to a small extent was perpetrated on the Government.   I know myself, that no Indians were in Camp at the time, at all events, whether true or not, I was only [?] satisfied in my own mind that frauds could be practiced with impunity unless a different system of accountability was adopted.

At another time, a beeve, broken down on the road, and unable to walk, was butchered at a distance of nearly a mile from camp, by the same individual above mentioned, and he was directed by the chief drover, to drag the animal, and leave it there for issue to Indians, when no Indians were present.   This was told me by the man himself, as a first rate joke, showing how easy it was to dispose of broken down cattle.   Of course I am not aware that this beef was charged as an issue, but was satisfied that the occurrence took place as stated, and if actually charged, the commissioner was deceived" (Wessells 1852).

4.   In his initial report of January 29, 2016, and in his report of December 6, 2016, Hurtado mentions that Pomo Indians from Clear Lake traveled to Estell's ranch near Vallejo to receive beef cattle promised by McKee in the treaty negotiation of August, 1851.   He raises this matter, for example, on p. 5 of the second report: "It has already been noted in my first report that McKee told the Clear Lake Indians to take delivery at James M. Estell's Eden Ranch near Vallejo (84-85)."   This single trip in 1851 to take delivery of cattle is cited to prove "significant historical connection" of the Scotts Valley Band of Pomo to a location 87 to 107 miles to the southeast of their rancheria. [107 miles is the calculated distance between Lakeport and Vallejo, a drive of two

6

Stephen Dow Beckham:1/2017

hours and eight minutes in 2017.]

**Comment:** The matter of the single delivery of articles promised in the unratified Treaty of Lupiyuma merits close examination because it is used to prove "significant historical connection" to Vallejo.

■ On March 23, 1852, General Ethan A. Hitchcock, commander at Benicia Barracks on San Francisco Bay, wrote to Commissioner Redick McKee:

"I declined to furnish you the flour and you informed me that you could procure it in San Francisco, but whether you did or not, and if so, how the delivery was made I have never inquired.

In addition to this I have to state that on no occasion subsequent to your treaty with the Clear Lake Indians and while you were absent on the expedition further north, I saw a considerable body of those Indians encamped by the brook at Genl. Estell's house, within nine miles of this place, whither the Indians had come to receive a quantity of beef in fulfillment, as I understood, of your arrangements. **They had left their proper homes, and had traveled 50 or 60 miles through the white settlements, to receive that beef from your contractor**, and if it was in any way authorised by you I must take leave to say that nothing could have been more ill-judged, to say nothing of the manner of the issues while on the other hand, if it was not, contemplated by you, the occurrence of the fact under cover or pretence of your authority would be sufficient of itself to furnish the most decisive proof of irregularity, as pointed at by Major Wessel[l]s.  Who superintended the issue of the beef on that occasion, or why it was issued at all, was and still is, equally unknown to me, while the connection of your son with General Estell in the contract of the latter was a matter of public notice, and, as I have, the connection was known to yourself, except that you chose to speak of your son as being an Agent of the contractor, in whose house he had been domiciled a number of weeks before the expedition started, and to all appearances was so at the time you made the contract with General Estell (Hitchcock 1852a). [Emphasis supplied.]

~ Hitchcock confirmed he saw Indians from Clear Lake camped near Estell's ranch on a trip "to receive a quantity of beef."  Of relevance is the context of this visit.  Hitchcock wrote:

7

Stephen Dow Beckham:1/2017

**"They had left their proper homes, and had traveled 50 or 60 miles through the white settlements, to receive that beef from your contractor . . . ."**  The commanding general of the Department of the Pacific noted that these Indians' "proper homes" (namely the place of their aboriginal "use and occupancy") was distant "50 or 60 miles through the white settlements."  The Clear Lake Pomo were visitors to the Estell Ranch for a single-purpose trip (Hitchcock 1852a).

▪ On July 6, 1852, James Estell wrote to Redick McKee:

"In conclusion I will say, for the information of Gen. Hitchcock that I was so dissatisfied with what had occurred, that **I sold out the two hundred head of cattle I had promised to furnish the Clear Lake Tribes to Col. McKee's order, some months   afterwards, to Messrs. Chenery & Hubbard, allowing them to go on my ranch & select from 3000 head** the largest oxen at $20 per head, which in the market then have brought 10 cts per lb.  Rather than attempt again to follow up the contract, and I am told by these Gentl[men] they will make no money" (Estell 1852a) [Emphasis supplied.]

~ Estell thus explained that no cattle were distributed at his ranch to Clear Lake Indians.  He claimed he had sold them to Chenery and Hubbard.  Since the Senate had not ratified the Treaty of Lupiyuma and Congress had not appropriated funds to pay for the cattle promised in the treaties, Estell's decision to sell his cattle to another party is perhaps   understandable.

▪ Also in his letter of July 6, 1852, James Estell said to Redick McKee:

"He [General Hitchcock] intends to convey the impression that Ind[ian]s were sent to my ranch to consume beef at the expense of the U. States that he saw them there himself &c.  I would reply that no charge was ever made by me, for beef or other provisions consumed on my Ranch, and if not so, like all other contracts, it certainly can be found in the payment of the money" (Estell 1852a).

~ Estell thus confirmed that he did not distribute cattle to Clear Lake Indians by the terms of the Treaty of Lupiyuma at his ranch near Vallejo.  He sold the cattle to Chenery and Hubbard.

8

Stephen Dow Beckham:1/2017

- On July 20, 1852, Redick McKee in a letter to Luke Lea, Commissioner of Indian Affairs, addressed the matter of distribution of government supplies:

  "In relation to the Flour for which some of the Clear Lake Indians came over to the Susqual Ranch, and for which they were delayed some days, owing to the absence of Gen. Estell, I will say, **it was not dealt out there as rations, but faithfully carried home, & delivered to the chiefs according to my directions, for the use principally of the sick & infirm**. This information I had from Mr. Geo. P. Armstrong, the Interpreter.  Another Gentl[ema]n residing at the Lake, Mr. Logan, has recently told me that some weeks after, he saw some 25 Sacks of the flour, stored in the house of one of the chiefs, and that it was considered a most acceptable & useful present. Thus it appears that Genl. H[itchcock] has taxed his imagination, & powers of conjecture as to the supposed trade by the Indians, of their flour, for Genl. Estell's beef, at the brook near his house, nine miles from Benicia altogether unprofitably" (McKee 1852b).

  ~ McKee thus affirmed that the single visit of Indians from Clear Lake to Susqual Ranch was to pick up bags of flour that they "**faithfully carried home**" to Clear Lake. [Emphasis supplied.]

- The duplicity of Redick McKee in the matter of the beef contracts with General James Estell led General Ethan Allen Hitchcock to advise Edward F. Beale, California Superintendent of Indian Affairs, on September 21, 1852, that he did not want McKee to travel with the U.S. Army troops about to depart on a military reconnaissance from headquarters at Benicia to the Oregon border.  Hitchcock said:

  "In regard to Agent McKee I regret to say, but do so from a sense of duty, that his presence with the troops will not in my opinion be productive of any advantage to the public. Information to some extent and rumors to a much greater extent have impaired my confidence in Col. McKee's usefulness as a public agent and I do not hesitate to request that he may not be directed to accompany the troops" (Hitchcock 1852b).

5.  At pp. 13-14 Hurtado refers to the several tribes living north of

9

Stephen Dow Beckham:1/2017

San Francisco and San Pablo bays and wrote: "Agent McKee did not negotiate another treaty with these Indians because he did not have to" (Hurtado 2016b).

**Comment**: Commissioner Redick McKee do not know who these Indians were.  He never visited them nor secured information on the Bay Miwok, Patwin, and Wappo tribes.  He sent no sub-agents to collect information on who they were, where they lived, or how many of them there were.  When he submitted his summary report on the population of Indians in the district where he was making treaties, he identified only the following:

1. In the valleys of Sonoma and Russian river there may be in all, say 1,200.
2. On Clear lake and mountains adjacent, 1,000.
3. In the two first valleys of south fork of Eel river, with language and customs similar to the above, and who should be colonized with them, from 1,000 to 1,100 say, 1,100.
4. On the coast, from the old Russian settlement at Fort Ross, down to San Francisco, and around the bay, by St. Raphael, Petatoma, &c., 500.
5. On the mountains and valleys of Eel river, South, Middle and Vanderson's forks, and about its mouth, 500.
6. From the mouth of Eel river south, on ____ river, Cape Mendocino, and to Fort Ross, say, 400.
7. On Humboldt bay, and north to Mad river, a mile or so above the head of the bay, 300.
   Total 5,000
   (McKee 1852:237-238) [Spellings are those of McKee]

6. At p. 14, Hurtado draws a conclusion: "And, as the Yocha Dehe memorandum points out, there were indeed Indians living closer to Vallejo than to Clear Lake.  They just happened to be Clear Lake Indians" (Hurtado 2016b).

**Comment**: Hurtado provides no documentation for this conclusion. He ignores nearly 150 years of scholarly work on tribal distribution and the presence of Patwin, Wappo, and Coast Miwok tribes who occupied approximately eighty miles of country lying between San Francisco and San Pablo bays and the homeland of the Clear Lake Pomo and Lake Miwok.  With no specific evidence he asserts that this territory was occupied by "Clear Lake Indians."

10

Stephen Dow Beckham:1/2017

Hurtado's conclusion is refuted by numerous scholarly linguistic and tribal distribution studies such as those by Stephen Powers (1875), Samuel H. Barrett (1904, 1908), C. Hart Merriam (1907), Alfred L. Kroeber (1908 1925), E. W. Gifford (1937), Omer C. Stewart (1943), Fred B. Kniffen (1939), Andrew P. Vayda (1967), Sally McClendon (1978), Michael J. Lowy (1978), Robert Oswalt (1978), and Victor Golla (2011).

Hurtado's conclusion is further refuted by General E. A. Hitchcock's observation in 1852 that the "proper homes" of the Indians from Clear Lake were at Clear Lake which he estimated at fifty or more miles north of Benicia (Hitchcock 1852a).

On September 4, 1856, Thomas J. Henley, California Superintendent of Indian Affairs, confirmed the presence of Indians continuing to live in the counties between San Francisco and San Pablo bays and Clear Lake.  He noted: "In Mendocino, Colsui, Yolo, Napa, Sonoma, and Marin counties . . . 15,000."  Although there had been population decline because of disease and relocation, Henley yet reported a significant Native American presence in the 1850s in these counties (Henley 1856:245-246).

7.  At p. 15 Hurtado concludes: "As a practical matter this number of Indians scattered over an extent of territory simply could not be separately negotiated with."

**Comment**: Hurtado dismisses the prospect of practical negotiation of a treaty with the Indians living in present Sonoma, Napa, Marin, and Solano counties on the basis of the "extent of territory" they occupied. This is an astounding claim in light of the history of Indian treaties in the United States.   The federal government several times entered into agreements for millions of acres.   The Nez Perce Treaty of June 11, 1855, for example, ceded nearly nine million acres in southeastern Washington, northeastern Oregon, and west-central Idaho.   Hurtado's conclusion is not substantiated in the history of treaty relationships between tribes and the United States.

8.  On p. 15 Hurtado refers to Major Henry Wessells' comment in 1851 about the Pomo Indians who met with Redick McKee along the Russian River.   He quoted Wessells who wrote that these

11

Stephen Dow Beckham:1/2017

Pomo had "been for years employed or had been residents on the different ranches of the valley, and seem to have become identified with the estates, though producing little in proportion to the numbers so employed."

**Comment**: Hurtado's conclusion that these Pomo had developed a "sense of identification with the ranches where they were employed" may be true.   The ranches referred to by Major Wessells, however, were not at Vallejo, nor in the Napa Valley, nor along Sonoma Creek. They were forty-five to seventy miles west in the valley of the Russian River.

9. On pp. 17-19 Hurtado argues that the Royce cession map of 1899 must be valued as a historical document.

**Comment**:   While Royce often correctly mapped Indian land cessions, his map for California, published in 1899, was fatally flawed.   The legal definition of ceded lands is in the language of the treaty, not a map drawn forty-eight years later.   The unratified treaty of August 20, 1851, did not define the land cession.   It only identified an area of land reserved for Indian use in the Clear Lake Basin.   The treaty was negotiated only with the Pomo of Clear Lake and upper Eel River and not the numerous tribes, bands, and villages occupying the large area embraced in Royce's erroneous map.

Sources Cited:

Beale, E. F.
> 1852 Letter of September 30 to Luke Lea.   Letters Received, California Superintendency of Indian Affairs, 1849-1882, Microcopy 234, Roll 32, Frs. 587-589, National Archives, Washington, D.C.

Hitchcock, E. A.
> 1852a Letter of March 23 to Redick McKee.   Letters Received, California Superintendency of Indian Affairs, 1849-1882, Microcopy 234, Roll 32, Frs. 829-833, National Archives, Washington, D.C.

12

Stephen Dow Beckham:1/2017

AR0006881

1852b Letter of September 21 to Edward F. Beale.  Letters Received, California Superintendency of Indian Affairs, 1849-1882, Microcopy 234, Roll 32, Frs. 593-595, National Archives, Washington, D.C.

Henley, Thomas J.
1856 Letter of September 4 to George W. Manypenny.  *Annual Report of the Commissioner of Indian Affairs*, 236-246. Washington, D.C.: A. O. P. Nicholson, Printer,

Hurtado, Albert
2006a Report, January 29, 2016.  Report submitted to Scotts Valley Band of Pomo.

2006b Additional Comments on the Yocha Debe Response. Report submitted to the Scotts Valley Band of Pomo.

Logan, H. C.
1852 Signed Statement, September 21, Attachment to Letter, E. F. Beale to Luke Lea, September 30, 1852.  Letters Received, California Superintendency of Indian Affairs, 1849-1882, Microcopy 234, Roll 32, Fr. 590, National Archives, Washington, D.C.

McKee, Redick
1852a Letter of September 12, 1851, to Luke Lea.  *Annual Report of the Commissioner of Indian Affairs, 1851,* 237-238.  Washington, D.C.: Gideon & Company, 1852.

1852b Letter of July 20 to Lue Lea.  Letters Received, California Superintendency of Indian Affairs, 1849-1882, Microcopy 234, Roll 32, Frs. 930-933, National Archives, Washington, D.C.

13

Stephen Dow Beckham:1/2017

AR0006882



City of
VALLEJO
California

Office of the City Manager · 555 Santa Clara Street · Vallejo · CA · 94590 · 707.648.4576

September 1, 2016

The Honorable Lawrence Roberts
Acting Assistant Secretary for Indian Affairs
U.S. Indian Affairs Bureau
MS-3642-MIB
1849 C St., N.W. #4160
Washington, D.C. 20240

## RE: Request for "Restored Lands" Opinion From Scotts Valley Band of Pomo Indians

Dear Assistant Secretary Roberts:

As you may recall, the City of Vallejo sent you a letter, dated July 28, 2016, expressing our views concerning the request by the Scotts Valley Band of Pomo Indians ("Tribe") for an opinion on whether its proposed gaming facility in or near the City of Vallejo qualifies as a "restored land" for purposes of the "restored lands" exception in the Indian Gaming Regulatory Act ("IGRA"). As indicated in our letter, the City of Vallejo opposes the Tribe's proposed gaming facility in or near the City of Vallejo, and does not believe that the proposed facility qualifies under IGRA's "restored lands" exception. More specifically, the City of Vallejo believes that the Tribe's proposed facility does not meet the "significant historical connection," "modern connection" and "temporal connection" requirements of the Department of the Interior's IGRA regulations set forth in 25 C.F.R. § 292.12.

After our July 28 letter was sent, the Tribe provided to us a copy of its request for an opinion, dated January 28, 2016, and a copy of the Tribe's application to have the lands taken into trust, dated August 11, 2016. After reviewing these documents, and in particular a document attached to the opinion request labeled "Legal Analysis by Steven J. Bloxham, Frederick Peebles & Morgan LLP" (hereinafter "Legal Analysis"), we remain convinced that the Tribe's proposed gaming facility does not meet the "modern," "significant historical" and "temporal" requirements of the regulations. In this letter, we would like to briefly explain why we continue to believe that the Tribe's opinion request, even as amplified by the Tribe's Legal Analysis, does not demonstrate that the Tribe's proposed facility qualifies under IGRA's "restored lands" exception. The cited page references are to the pages in the Tribe's Legal Analysis except as otherwise noted.

We remain concerned that Department's timeline for review of this request is unnecessarily short and has excluded the City of Vallejo's opportunity to provide meaningful input to the

AR0006899

Department prior to its pending decision. Our analysis is based upon a cursory review of the Tribe's documents, and does not represent the entirety of arguments which we may have made had we had additional time to review this request. **Accordingly, the City respectfully requests that the Department delay its opinion on this matter for ninety (90) days to allow the City time to more fully review the Tribe's application and supporting documentation, and provide meaningful input on the City's position.**

### 1. "Significant Historical Connection"

The IGRA regulations provide that the Tribe must demonstrate that it has a "significant historical connection" to the land where its proposed gaming facility would be located.  25 C.F.R. § 292.12(b).  The City of Vallejo does not believe that the Tribe has demonstrated that it has a "significant historical connection" to the lands where its proposed gaming facility would be located.

On May 25, 2012, the Solicitor of the Department of the Interior issued an opinion letter stating that the Tribe did not have a "significant historical connection" to lands in or near the City of Richmond, California, where the Tribe earlier proposed to conduct a gaming facility, and therefore that the Tribe's proposed facility did not qualify under IGRA's "restored lands" exception.  The City of Richmond is located in the San Francisco Bay area, near the City of San Francisco.  The City of Vallejo is also located in the San Francisco Bay area, also near the City of San Francisco and only about six miles away from the City of Richmond.  Thus, the Cities of Richmond and Vallejo are located in approximately the same area in reference to where the Tribe's historic homeland is located, and where its former rancheria was located, which is in the area around Clear Lake in northern California.  Since the Solicitor concluded that the Tribe did not have a "significant historical connection" to the lands in the City of Richmond where its proposed gaming facility would have been located, the Tribe does not appear to have a "significant historical connection" to the lands in the City of Vallejo where its currently proposed gaming facility would be located.  Because of the close proximity of the Cities of Richmond and Vallejo, there is no basis for concluding that the Tribe has a "significant historical connection" to lands in one of these areas but not the other.

The Solicitor's opinion letter also concluded (p. 6) that the Tribe has not demonstrated that its "villages, burial grounds, occupancy, or subsistence use" were located in the vicinity of the "Richmond parcels," and that this provided another basis for the conclusion that the Tribe did not have a "significant historical connection" to the area.  Similarly, although the Tribe has submitted a lengthy historical report by Mr. Albert L. Hurtado, which provides an extensive analysis of the Tribe and its history, the historical report does not indicate that the Tribe had villages, burial grounds, occupancy or subsistence use, at least to any substantial degree, in the vicinity of the City of Vallejo.

The Tribe's Legal Analysis contends (p. 11) that the Tribe meets the "significant historical connection" requirement because the land where its proposed gaming facility would be located is "within the area ceded by the Tribe and the Clear Lake Bands to the United States under an

AR0006900

unratified treaty." In the following discussion, however, the Tribe states that it is a successor to the "Clear Lake Bands" (p. 12), and that the Clear Lake Bands were "located in and around Clear Lake, California" (p. 11). Further, the Tribe's historic homeland, where its former rancheria was located, is in the Clear Lake area as well. The Clear Lake area is located at a substantial distance—roughly 60 miles—from the City of Vallejo. Thus, assuming that the Tribe was a successor to the Clear Lake Bands located in the Clear Lake area, the Clear Lake Bands were located a substantial distance from the City of Vallejo and thus did not have a significant historical connection to the area where the Tribe proposes to conducts its gaming facility—thus further proving the Tribe does not have a significant historical connection to the area.

The Tribe's Legal Analysis contends (p. 21) that the unratified treaty entered into by the United States and the Clear Lake Bands demonstrated that the Tribe has a significant historical connection to lands in the vicinity of the City of Vallejo, because the treaty contained a provision stating that the United States would furnish certain goods to the Clear Lake bands "at or near Vallejo, or elsewhere," for their subsistence. The Tribe's Legal Analysis does not, however, indicate why the United States agreed to furnish goods to the Clear Lake band at that particular location. There may be numerous reasons why the United States would have agreed to furnish goods to the Clear Lake bands at that location that would have no relevance to whether the Clear Lake Bands have a significant historical connection to that area. Indeed, it is likely that the United States agreed to deliver goods to the Indians at that location because it was convenient for the United States to do so, and the tribes would then be responsible for transporting the goods to their respective reservations. In fact, the Tribe's Legal Analysis states (p. 22) that the unratified treaty "necessarily contemplated that the bands would have a right of access to and from Vallejo—to travel from their reservation to Vallejo to receive the provisions, and to return to their reservation from Vallejo with the provisions they received." The fact that the treaty may have contemplated that the Tribe would receive their supplies in the Vallejo area does not demonstrate that the Tribe has a "significant historical connection" to the area. Otherwise, an Indian tribe would be able to qualify for IGRA's "restored lands" exception in many different locations by simply demonstrating that it historically received its supplies in the different locations. In any event, the fact that the United States agreed to deliver goods to the Tribe in the Vallejo area does not demonstrate that the Tribe has a significant historical connection to the area, particularly because its historic homeland was located in the Clear Lake area, far from where the Tribe proposes to conduct its gaming operation.

The Tribe also contends (pp. 22-27) that it has "reserved rights to such off-reservation lands identical in kind and similar in scope to those established in treaties that reserved off-reservation hunting, fishing and gathering rights over lands ceded in those treaties." On the contrary, the federal reserved rights doctrine, as established by the Supreme Court in *Winters v. United States*, 207 U.S. 564 (1908), and its progeny, recognizes that federal reserved rights may exist only on lands reserved from the public domain for specific federal purposes, such as for Indian purposes, and does not recognize that such reserved rights may exist on lands that have not been reserved for specific purposes. Therefore, the reserved rights doctrine does not authorize the Tribe to claim a reserved right on off-reservation lands.

AR0006901

The City of Vallejo also disagrees with the Tribe's contentions that an Indian "encampment" near the City of Vallejo (p. 24), or the fact that the Band's ancestors were "held as captive labor" near the City of Vallejo (p. 25), establishes a "significant historical connection" within the meaning of IGRA's "restored lands" exception. Although these factors, if true, may warrant sympathy for the plight of the Tribe's ancestors, the factors are not relevant in determining that the Tribe has a significant historical connection to the lands where its proposed gaming facility would be located.

In sum, the City of Vallejo believes that the Tribe has failed to demonstrate that it has a "significant historical connection" to the lands where its proposed gaming facility would be located, and thus that the lands do not qualify under IGRA's "restored lands" exception.

## 2.    "Modern Connection"

The IGRA regulations provide that the Tribe must demonstrate that it has a "modern connection[]" to the land where its proposed gaming facility would be located. 25 C.F.R. § 292.12(a). The City of Vallejo does not believe that the Tribe has demonstrated that it has a "modern connection" to the lands where its proposed gaming facility would be located.

The Solicitor's above-referenced opinion letter contains a map (p. 2) indicating that the Tribe's headquarters and former rancheria ("Scotts Valley Tribe HQ & Former Rancheria") were located near the Town of Lakeport, in northern California. According to a scale on the map, the Tribe's headquarters and former rancheria appear to be approximately 80 miles north of the "Richmond Parcels" depicted on the map. The map also depicts the location of the City of Vallejo, which is slightly north of the Richmond Parcels. According to the scale on the map, the Tribe's headquarters and former rancheria appear to be approximately 70 miles north of the City of Vallejo. In short, the Tribe's headquarters and former rancheria are located a substantial distance from the City of Vallejo, where it proposes to conduct its gaming operation. Because of the distance between the Tribe's headquarters and former rancheria, on the one hand, and the City of Vallejo, on the other, the Tribe does not satisfy the "modern connection" requirement of the IGRA regulations, and for the same reason does not satisfy the "significant historical connection" either.

The Tribe's Legal Analysis contends (p. 5) that the Tribe meets the "modern connection" requirement because it maintains its "southern governmental offices" in Contra Costa County, and has done so for more than two years. On the contrary, the City of Vallejo believes that the "modern connection" requirement cannot be satisfied by an Indian tribe's establishment of a satellite office in the area where it proposes to conduct a gaming operation, far removed from where the tribe's former reservation (or in this case, former rancheria) was located. Otherwise, an Indian tribe would be able to conveniently establish a satellite office—a "southern," "northern," "eastern" or "western" office—in the area where it proposes to conduct a gaming facility, and then claim that it satisfies the "modern connection" requirement of the IGRA regulations. The establishment of a satellite office for the purpose of, or at least with the claimed effect of, satisfying the "modern connection" requirement does not comply with either

the spirit or the letter of the regulations and would serve to interfere with the rights and economic interests of recognized tribes with connections to the area.

The Tribe's Legal Analysis asserts (p. 5) that the lands where the Tribe's proposed gaming facility would be located is "near" where a significant number of the Tribe's members reside, because the Bureau of Indian Affairs ("BIA") in an unrelated matter has designated the counties of Mendocino, Lake, Sonoma and Contra Costa as the Tribe's "near-reservation areas" for purposes of providing financial assistance and social services to its members. The City of Vallejo believes that the designation of these areas as "near-reservation areas" for purposes of providing financial assistance and social services does not mean that the lands are "near" the location of the Tribe's former rancheria or the residences of the Tribe's members for purposes of determining whether IGRA's "restored lands" exception applies. Thus, the fact that the BIA may have designated these areas as "near-reservation areas" for purposes of providing financial assistance and social services is not relevant to whether the Tribe has satisfied the "modern connection" requirement of the IGRA regulations.

In sum, the City of Vallejo believes that the Tribe has failed to demonstrate that it has either a "significant historical connection" or a "modern connection" to the lands where its proposed gaming facility would be located, and thus that the lands do not qualify under IGRA's "restored lands" exception.

We appreciate the opportunity to provide the City of Vallejo's views concerning the Tribe's proposed gaming facility. In closing, we again respectfully request that the Department delay its opinion on this matter for ninety (90) days to allow the City time to more fully review the Tribe's application and supporting documentation.

Sincerely,

Daniel E. Keen
City Manager

Cc:     Paula Hart, Director, Office of Indian Gaming
        Mayor and Members of City Council
        Claudia Quintana, City Attorney
        Fredericks Peebles & Morgan LLP

AR0006903



July 18, 2016

Tribal Council

**Leland Kinter**
*Chairman*

**James Kinter**
*Secretary*

**Anthony Roberts**
*Treasurer*

**Mia Durham**
*Member*

**Matthew Lowell, Jr.**
*Member*

<u>VIA HAND DELIVERY AND FEDERAL EXPRESS</u>

The Honorable Lawrence Roberts
Acting Assistant Secretary for Indian Affairs
MS-3642-MIB
U.S. Department of the Interior
1849 C St. N.W.,
Washington, D.C. 20240

> Re:    Request for "restored lands" opinion for land in City of Vallejo,
> Solano County, by the Scotts Valley Band of Pomo Indians

Dear Assistant Secretary Roberts:

On behalf of the Yocha Dehe Wintun Nation, a federally-recognized Indian tribe in Northern California ("Yocha Dehe" or "Tribe"), I write to follow up on our June 29, 2016, correspondence regarding the effort by the Scotts Valley Band of Pomo Indians ("Scotts Valley") and its Las Vegas investor to have certain lands in the City of Vallejo, Solano County, determined to be "restored lands" if taken into trust for Scotts Valley and, thereby deemed eligible for gaming under the Indian Gaming Regulatory Act (25 U.S.C. § 2719(b)(1)(B)(iii).)

We understand the Department of Interior, through the Office of Indian Gaming (within the Office of the Assistant Secretary-Indian Affairs), may be on the brink of issuing a decision in this matter. Scotts Valley is a tribe whose original reservation is more than 60 miles away from the City of Vallejo, in Lake County. As the Department has never "restored lands" to a California tribe more than 15 miles from its original reservation, we find it shocking the Department would consider reaching such an unprecedented result here — on a matter of vital public interest — without notifying, or soliciting input from, members of the public, the state and local governments, let alone the federally-recognized tribes most affected by this decision and to whom the Department owes a fiduciary duty and trust responsibility.

AR0007015

Immediately upon learning of this development, we called for more transparency on this matter, and requested the Department slow down the process, so the public and interested stakeholders, including our Tribe, could have a meaningful opportunity to participate, and address the merits of Scotts Valley's submission, *before* a decision is made. We have received no response or acknowledgment from the Department.

By this correspondence, Yocha Dehe expresses its opposition to Scotts Valley's request. While the Department has not provided Yocha Dehe (or other interested parties) with access to any information about Scotts Valley's request for an Indian lands determination — including, most critically, Scotts Valley's actual submission — we have managed to collect some information bearing on the merits of the request. As Yocha Dehe has only recently learned of this development, and as the Tribe remains in the process of collecting relevant information, it reserves the right to further supplement this submission.

## I.    Yocha Dehe Possesses A Unique Ancestral Connection to Lands Within Solano County But Received No Notice Of The Lake County Tribe's Request for "Restored Lands" There.

While the precise parcel(s) for which Scotts Valley seeks legal entitlement to game has not been publicly disclosed, we understand the land in question is generally located near the intersection of Interstate-80 and Highway 37 in Vallejo. Yocha Dehe, and its two sister Patwin tribes to the north (Cortina Band of Wintun Indians (Kletsel Dehe) and Colusa Indian Community (Cachil Dehe Wintun), possess a unique connection to these lands. It is, in fact, undisputed that the northeastern area of San Francisco/San Pablo Bay was the homeland of Patwin (or Wintu-speaking) groups, and all of the area encompassing Vallejo, indeed all of Solano County, is well recognized as Patwin (or Wintu) territory. It would be a great concern to Yocha Dehe if, in its submission to the Department, Scotts Valley is seeking to arrogate for itself our own tribal historical record in Solano County. We reject any claims Scotts Valley may be making to be a successor in interest to any historical tribe with ties to Yocha Dehe ancestral lands.

Consistent with our status as Most Likely Descendant of the native people who once inhabited Vallejo (as confirmed by the indisputable historical record and as sanctioned by California's Native American Heritage Commission), we and our sister tribes have worked closely with the City of Vallejo to protect from disturbance and desecration the burial sites and cultural resources affiliated with our Patwin forebears. These resources exist throughout Vallejo, and indeed all of Solano County. As recently as 2011, Yocha Dehe and the Cortina Band of Wintun Indians (Kletsel Dehe) — both Patwin tribes — entered an unprecedented cultural preservation easement with the City, giving both tribes the power, in perpetuity, to protect cultural resources at a well-known landing site on the north side of San Pablo Bay, in an area

AR0007016

policy favoring consultation with adversely affected tribal governments, which was developed to ensure *full, fair and informed* decision-making by the federal government.[2]

### III. Federal Law Precludes A Positive Restored Lands Determination In Vallejo For The Scotts Valley Tribe.

Yocha Dehe has long supported other tribal governments' pursuit of economic development, in their own best interest, on land within their ancestral territory. However, Scotts Valley is not seeking to game on lands within its ancestral territory, but rather, within Yocha Dehe's. (*See* Native American Heritage Commission map of cultural and linguistic territory of California Indian Tribes, at http://test-nahc.ca.gov/Native_Americans/CulturalAreas_Languages.html.) It is well known, and indeed widely accepted, that Pomo people inhabited the areas encompassing what are known today as Lake, Lakeport, Mendocino, Napa, and Sonoma Counties. Among the Pomo tribes, Scotts Valley's original reservation was in rural Lake County, on the western shores of Clear Lake. While the Department has not disclosed the precise location of the Solano County lands for which the Pomo tribe now seeks "restoration," we understand it to be within the City of Vallejo, at the intersection of Interstate 80 and Highway 37. This is more than 60 miles from Scotts Valley's original reservation.[3] Based on just the preliminary analysis that we have been able to conduct,[4] Scotts Valley's request for gaming lands within Vallejo does not meet IGRA's requirements for "restored lands." 25 U.S.C. 2719(b)(1)(B)(iii). This conclusion is further buttressed by the Department's own application of IGRA and its implementing regulations to prior requests, including one by Scotts Valley, and that of another Pomo tribe, for an area just a few miles away from Vallejo, in

---

[2]    Notably, a federal agency may be entitled to no deference where there is an unexplained change in its position or practice. *See Encino Motorcars, LLC v. Navarro et al.*, Case No. 15-415, 579 U.S. ___ (June 20, 2016) (noting that "the Department gave little explanation for its decision to abandon its decades-old practice," and finding the agency must demonstrate "good reasons" for doing so).

[3]    While Yocha Dehe is reluctant to use the pejorative phrase "off reservation shopping," there is no question that Scotts Valley and its Las Vegas investor are "in the market" for a gaming site outside Scotts Valley's home territory of Lake County, where Yocha Dehe understands Scotts Valley possesses fee land that easily qualifies as restored lands and could be placed in trust. The Term Sheet between Scotts Valley and its financial backer identifies the Project as the "[d]evelopment of a gaming enterprise on the north side of the San Pablo Bay in Napa County, Solano County or Sonoma County" — apparently anywhere but Lake County, the Tribe's actual homeland, and more precisely, anywhere closer to the San Francisco Bay Area.

[4]    This position statement is necessarily preliminary because the public lacks access to Scotts Valley's submission. We also face significant time constraints in its preparation given our understanding that the Department intends to act by the end of July 2016. Accordingly, as earlier stated, Yocha Dehe reserves the right to supplement this position statement.

    

MIWOK    United Auburn Indian Community
MAIDU    of the Auburn Rancheria

| Gene Whitehouse | John L. Williams | Danny Rey | Jason Camp | Calvin Moman |
| Chairman | Vice Chairman | Secretary | Treasurer | Council Member |

August 12, 2016

The Honorable Sally Jewell
Secretary
U.S. Department of the Interior
1849 C Street, NW
Washington, D.C. 20240

Subject: Scotts Valley Casino Proposal in Vallejo, California

Dear Secretary Jewell:

On behalf of the United Auburn Indian Community ("United Auburn"), I write to express strong
opposition to a request by the Scotts Valley Band of Pomo Indians ("Scotts Valley" or "Band")
to authorize a proposed gaming facility in Solano County, California. We understand that Scotts
Valley has asked for a favorable restored lands opinion under the Indian Gaming Regulatory Act,
in order to support a potential land-into-trust application at a site in Vallejo.

The parcel in question is within the aboriginal territory of the Yocha Dehe Wintun Nation and
other Indians of Patwin heritage. The land is located more than 90 miles in driving distance from
the homelands of the Scotts Valley Band in Lake County, California. Many scholars have
studied the Band's history and Scotts Valley is not able to affirmatively demonstrate a significant
historical connection in Solano County under Interior Department regulations.[1]

Nor can the Band establish a bona fide modern connection, as the distance from the Band's
territory to Vallejo is more than a commutable distance and the substantial majority of Scotts
Valley members do not live in this part of California.

The Department already denied the Band's restored lands arguments in a 2012 Indian lands
determination involving a land-into-trust application for a casino in Contra Costa County, south

---

[1] *See* 25 C.F.R. § 292.2 ("*Significant historical connection* means the land is located within the boundaries of the
tribe's last reservation under a ratified or unratified treaty, or a tribe can demonstrate by historical documentation the
existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land."). Interior
Department regulations also require a tribe to establish a significant historical connection to the actual parcel under
consideration. *See* 25 C.F.R. § 292.12(b).

AR0007087

of San Pablo Bay.[2]  The Band is now urging the Department to accept many of the same historical arguments for lands northeast of San Pablo Bay.

In its 2012 Indian lands determination, the Department rejected the Band's contention that it was a successor-in-interest to the Suisun Patwin Indians.[3]  The Department also found that an unratified 1851 Treaty did not substantiate the Band's claims north of San Pablo Bay, as eight tribes signed the Treaty and the land area ceded by the Band's ancestors could have existed anywhere within the Treaty's boundaries.[4]  Additionally, the Department disregarded the Band's "regional interface center" argument in an earlier Indian lands determination issued to the Guidiville Band of Pomo Indians.[5]

The remaining argument the Band can make regarding an historical presence in Vallejo is that some of its members left the Clear Lake area to work as cattle drivers for the Vallejo Ranchos in the 1840's.[6]  However, the Department expressed skepticism about the transient nature of this activity and whether it would meet the more rigorous standard of "subsistence use and occupancy" under the regulations.[7]

The Band's arguments also lack sincerity on the modern connection test.  Despite being denied authorization for gaming in its earlier land-into-trust application, the Band has maintained an office in Concord, California.  Even though the Band does not meet the other criteria for a modern connection to the Vallejo parcel, the Band will argue that its government office in Concord is within the requisite 25-mile radius from its new proposed casino location.  The Department should reject this manipulation of the regulations as it did in the 2011 Guidiville determination, where it was skeptical of a government office established only for the purpose of advancing a land-into-trust application.[8]

---

[2] Letter from Donald E. Laverdure, Acting Assistant Secretary – Indian Affairs, U.S. Department of the Interior, to The Honorable Donald Arnold, Chairperson, Scotts Valley Band, May 25, 2012, *available at* http://www.bia.gov/cs/groups/public/documents/text/idc-018517.pdf (hereinafter "Scotts Valley Determination").
[3] *Id.* at 13 ("Accordingly, the Band has not established a sufficient nexus between itself and the Suisin (sic) Patwin Indians, and it may not use the Suisin (sic) Patwin's history of subsistence use and occupancy to establish a significant historical connection … for purposes of Part 292.")
[4] *Id.* at 14 ("The land that the Band's Ca-la-na-po ancestors' thus ceded could exist anywhere in Royce Area 296, which extends south to the San Pablo Bay, but also extends north to the Clear Lake area.").
[5] *Id.* at 13, footnote 48.  The Band argued in earlier submissions to the Department that its ancestors participated in a "regional interface center" in which Wappo, Patwin, Coast Miwok, Costanoan, and Pomo interacted socially, culturally, and economically which working at the Vallejo Ranchos.  The Department rejected this theory as unfounded in the Guidiville restored lands determination issued on September 1, 2011.  Letter from Larry Echo Hawk, Assistant Secretary – Indian Affairs, U.S. Department of the Interior, to The Honorable Merlene Sanchez, Chairperson, Guidiville Band of Pomo Indians, at 15, September 1, 2011, *available at* http://www.bia.gov/cs/groups/public/documents/text/idc015051.pdf (hereinafter "Guidiville Determination").
[6] *See Scotts Valley Determination* at 13.
[7] *Id.* ("It is first important to understand that subsistence use and occupancy requires something more than a transient or occasional presence in an area.  Activities that would tend to show a tribe was using land for subsistence purposes might include sowing, tending, harvesting, gathering, fishing, and hunting.  'Occupancy' can be demonstrated by a consistent presence, supported by the existence of dwellings, villages, or burial grounds, as alluded to in the regulations.").
[8] *Guidiville Determination* at 6-9.

Based on these facts, United Auburn urges the Department to reject the Scotts Valley Band's request for a favorable restored lands decision. This land is significantly outside of the Band's aboriginal territory and the arguments for a significant historical connection and a modern connection to the proposed parcel in Vallejo are insufficient to meet the tests in the regulations.

If the Department decides to proceed with this process, United Auburn expects to be consulted as a nearby Indian tribe. While Solano County is not within the aboriginal territory of United Auburn, our Tribe will be significantly impacted by this gaming facility proposed by Scotts Valley. And, for all tribes in California, a favorable ruling for Scotts Valley would nullify the meaning of aboriginal lands and establish a precedent that would be extremely harmful to tribal sovereignty.

Sincerely,

Gene Whitehouse
Chairman
United Auburn Indian Community

cc: Larry Roberts, Acting Assistant Secretary – Indian Affairs
    Jody Cummings, Deputy Solicitor

**From:** Greg Sarris <GSarris@gratonrancheria.com>
**To:** Lawrence_roberts@ios.doi.gov
**Sent:** 10/17/2016 12:48:34 PM
**Subject:** Letter from Chairman Sarris - Federated Indians of Graton Rancheria
**Attachments:** Scotts Valley letter to DOI Roberts 070816 FINAL.pdf

Dear Mr. Roberts,

Thank you for the time you took with me this morning regarding the Scotts Valley application.  Attached is the letter that was received by your office on July 11, 2015.  Should you have any further questions, please contact me.

Again, thank you for your time and consideration on this matter.

Sincerely,
Chairman Sarris
Federated Indians of Graton Rancheria

AR0007461



FEDERATED INDIANS OF
# GRATON
R A N C H E R I A

July 8, 2016

Larry Roberts, Acting Assistant Secretary – Indian Affairs
Office of the Secretary
United States Department of Interior
1849 C Street, N.W., MIB 4160
Washington, DC 20240

Re: Scotts Valley "Restored Lands" Opinion

Dear Acting Assistant Secretary Roberts:

I am contacting you because we have recently learned that the Department of the Interior is considering granting a favorable "restored lands" opinion to the Scotts Valley Band of Pomo Indians to allow it to establish tribal gaming in or near the City of Vallejo, California. Tribes have been unable to get information from the Department concerning the request. A favorable restored lands decision is patently inappropriate under the current circumstances and would violate IGRA, the Department's own regulations and common sense, and would unleash a public reaction that we fear would harm both Indian Country and the Department. We ask that this secretive process be opened to allow opponents, proponents and independent experts to assess and comment.

A positive restored lands determination pursuant to 25 U.S.C. §2719(b)(1)(B)(iii) would not only contravene the rationale of the Assistant Secretary's May 5, 2012, denial of Scotts Valley's previous restored lands request, but it would require the Department to disregard the clear intent of IGRA and every prior restored lands decision, and would inevitably result in repercussions that could devastate the Department's ability to take any land into trust for Indian tribes. We implore you not to issue a positive determination without a meaningful opportunity for tribes and other stakeholders to comment on this application. To do otherwise would violate the Department's general fiduciary obligation to Indian tribes as well as breach the specific trust responsibility that IGRA imposes on the Secretary not to harm other tribes when it makes restored lands determinations. It is unfair and perhaps unlawful to hide from that responsibility by keeping the process under wraps until it is too late for affected tribes to timely point out defects in the application.

1

AR0007462

The site proposed by Scotts Valley is located more than sixty miles from its original reservation in Lake County. The "restored lands" exception of IGRA is has appropriately been used only for lands located within a few miles from the tribe's original lands; the Department has never approved a request for restored lands in California more than 15 miles from the original reservation.

Furthermore, the request by Scotts Valley does not meet the requirements of the IGRA regulations for restored lands because the tribe cannot establish a requisite historical connection to the proposed site. As stated in 25 CFR 292.12, a tribe must demonstrate three *independent* connections to its newly acquired land to make it restored for the purpose of IGRA:

(a) A "modern" connection to the land;

(b) A "significant historical connection" to the land, meaning, as defined in 25 CFR 292.2, either: (1) "the land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty" or (2) the tribe "can demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land"; and

(c) A "temporal connection" between the date of the acquisition of the land and the date of the tribe's restoration.

The Scotts Valley application stretches each of these requirements to the breaking point. As to the temporal connection, they apparently waited 24 years after restoration before discovering that lands in the City of Vallejo are necessary for them to enjoy the benefits of sovereignty. For a modern connection, Scotts Valley apparently argues that this element is satisfied by having a Tribal TANF office located in an entirely different county (their TANF offices are located in both Lakeport, Lake County, and Concord, Contra Costa County). It should be noted that Scotts Valley's TANF doesn't even serve residents of the City of Vallejo or of Solano County.

But it is the "significant historical connection" and the potential breach of fiduciary duty to other Indian tribes that we primarily address today and that we hope will cause the Department to reassess this apparent rush to judgment and allow a more knowledgeable and even-handed evaluation. It takes audacity for Scotts Valley to argue that a historical record that demonstrates only that a few male members were seasonally employed somewhere within the vast land-holdings of Mariano Vallejo somehow constitutes a significant historical connection between their tribe and a specific parcel in Vallejo. Because the process has been conducted outside of public scrutiny and because the Scotts Valley Tribe has not seen fit to share its application with the public, we hope you understand that we are forced to make some assumptions concerning what the application alleges. If some if these assumptions are inaccurate, that only strengthens our request that this application not be rushed through to approval until the Department complies with pending Freedom of Information Act requests and allows affected tribes, other governmental entities and the public to comment.

2

AR0007463

This is not the first attempt by Scotts Valley to obtain "restored" lands to which it never had any ties: the Department of the Interior has previously rejected claims that Scotts Valley used any of the lands on the northern shores of San Pablo and Suisun bays for subsistence. As the Department's May 5, 2012, letter to Scotts Valley clarifies, the tribe's historical, archaeological, geographical and cultural roots are at the Sugar Bowl Rancheria located near Lakeport, California, adjacent to the western shore of Clear Lake in Lake County. Lakeport is at least 60 miles north of the proposed Vallejo casino parcel. We understand that the current Scotts Valley request alleges that tribal members worked as rancheros on the Vallejo Rancho. But no credible evidence exists that Scotts Valley ever established villages or burial grounds, hunted, fished or raised crops in or near Vallejo. Vague evidence that a few members of its predecessor tribe did transient work within the vast holdings that collectively comprised the Vallejo Ranchos is not credible or relevant because many Indians from a multitude of regions and tribes worked in the ranchos following the dispersion of Indians after the Mission period.

Even if there is historical evidence that some Ca-la-na-po worked on some land within any of the three Vallejo Ranchos, there is no evidence that links these lands to the current Vallejo site or its immediate vicinity. The Vallejo Ranchos comprised well over 100,000 acres of land stretching from Petaluma Creek to Benicia. Both the Department's and the courts' restored lands decisions have required great specificity and evidence showing a tribe's historical use of a specific parcel or land in its immediate vicinity. An opinion that the Vallejo lands are "restored" would contravene the Department's 2012 denial of Scott Valley's prior request for lands in Richmond, 78 miles from its original reservation, and would undermine every previous restored lands determination made by courts, the NIGC or the Department.

In addition to the distance of Scotts Valley's requested "restored" lands from their original Rancheria being several times further than the furthest distance for an approved restored lands request made by any California tribe and perhaps for any tribe ever, neither the Department, NIGC or the courts have ever sanctioned such a determination where the requesting tribe has leapfrogged over an existing tribal casino to get closer to a greater segment of the gaming public and placed the existing tribal casino in a disadvantaged position. This request will adversely affect many existing tribal casinos. Many unrelated tribes and villages lived and still live between the Lakeport Rancheria and the proposed casino location. An opinion favorable to Scotts Valley would harm all of the tribes located between Scotts Valley's proposed site in Solano County and its original reservation in Lake County. Allowing Scotts Valley to restore lands beyond the existing lands of other tribes and siphon off their gaming patrons violates the Secretary's trust obligation not to make restored lands determinations that harm other tribes.

Scotts Valley owns lands in Lake County that would qualify as restored lands, and the attorneys involved in this effort are simply trying to manipulate the system. But it is the Department's secrecy as it considers Scott Valley's request which is most concerning. If the request is not summarily rejected, as it should be, then the process should be opened to public scrutiny and comment, and not conducted as a backroom deal. The stakes go beyond the interests of one tribe: an ill-advised opinion along the I-80 East Bay Corridor would spur legislative attempts to end the Department's ability to take land into trust and diminish tribal

3

rights under IGRA. It would undoubtedly generate a harsh response from the public and other tribes, embroil the Department in litigation, and undermine public confidence in the Department's ability to administer any land decisions. Congress established the restored lands exception to put restored tribes back where they would be if they had never been terminated, not to give them an unfair advantage. It is not for the Department to use the restored lands exception in a way clearly never intended by Congress, to the detriment of other tribes and behind a cloak of secrecy from the public. If Scotts Valley wants to pursue gaming in Vallejo, it should request a two-part determination from the Secretary and concurrence by the Governor.

We would appreciate you looking into this matter and assisting us in encouraging the Department to conduct an open, fair and fact-based process. We reserve the right to comment further when we are able to gain full access to the submissions of Scotts Valley Rancheria in this matter.

Sincerely yours,

Greg Sarris
Chairman

4



June 29, 2016

**Tribal Council**

**Leland Kinter**
*Chairman*

**James Kinter**
*Secretary*

**Anthony Roberts**
*Treasurer*

**Mia Durham**
*Member*

**Matthew Lowell, Jr.**
*Member*

The Honorable Lawrence Roberts
Acting Assistant Secretary for Indian Affairs
MS-3642-MIB
U.S. Department of the Interior
1849 C St. N.W.,
Washington, D.C. 20240

> Re:   Scotts Valley Band of Pomo Indians fee-to-trust gaming application
>        for land in Solano County

Dear Assistant Secretary Roberts:

The Yocha Dehe Wintun Nation has recently learned that the Scotts Valley Band of Pomo Indians ("Scotts Valley") has submitted an application to the Bureau of Indian Affairs to take land into trust for gaming purposes in the City of Vallejo, Solano County, California. I am writing to you, on behalf of the Tribal Council of the Yocha Dehe Wintun Nation, to express our concern with this application.

As you may be aware, the Yocha Dehe Wintun Nation has been very supportive of other tribes' efforts to achieve economic self-sufficiency, including through gaming activities under the provisions of the Indian Gaming Regulatory Act ("IGRA"). However, the Nation would not support another tribe's attempt to have land taken into trust for gaming within the ancestral territory of another tribe. Solano County is within the Nation's ancestral territory, and indeed, as the Most Likely Descendant of the people who lived there, our tribe holds an unprecedented perpetual conservation easement for the protection of sacred burials and cultural resources within the City of Vallejo. As a result, we are troubled by the Scotts Valley plans to move into our ancestral lands in Solano County.

We have written to the Director of the Office of Indian Gaming to request a copy of the Scotts Valley application pursuant to the Freedom of Information Act. We ask that you grant us the opportunity to review the Scotts Valley application so that we can determine whether our concerns with this application are warranted, and especially whether the proposed land to be taken into trust qualifies for gaming under any of the exceptions contained in Section 20 of IGRA. We also request that you refrain from issuing a determination on whether the land qualifies for gaming until we have had the opportunity to submit our views on this issue after we have been given access to the documentation provided by Scotts Valley. We understand the Department has provided a similar procedural opportunity to other tribes concerned about gaming-related determinations affecting their interests, and we request the same process.

Thank you for your assistance in this matter of great importance to the Yocha Dehe Wintun Nation. Please feel free to contact me directly should you have any questions regarding this request.

Sincerely,

Leland Kinter, Chairman,
Yocha Dehe Wintun Nation

Cc: Paula Hart, Director, Office of Indian Gaming



OFFICE OF THE GOVERNOR

January 13, 2017

Honorable Sally Jewell
Secretary of the Interior
Department of the Interior
1849 C Street NW
Washington, DC 20004

RE: Scotts Valley Band of Pomo Indians request for restored lands advisory opinion

Dear Secretary Jewell:

I understand the Scotts Valley Band of Pomo Indians (Tribe) has requested that the Department of the Interior, through the Office of Indian Gaming, provide an advisory opinion regarding "restored lands" that could entitle the Tribe to game on a parcel despite the lack of evidence establishing a historical connection between the land and Pomo tribes.

Our concerns are both procedural and substantive. Decisions of this nature are of vital interest to all Californians, particularly including the tribal, county and local governments that may be affected. No decision should be made without the opportunity for meaningful input from all interested parties.

Process aside, it is difficult to understand how a favorable restored lands opinion could be justified. The proposed parcel is not within the boundaries of a prior reservation and we are not aware of evidence that the Tribe's predecessors made continuous use and/or occupancy of lands in the vicinity of the proposed gaming site. To be clear, I am not writing to oppose assistance for the Tribe, but rather in support of a process that fairly and equitably resolves issues in a manner consistent with the evidence and controlling principles of federal law. We genuinely respect Assistant Secretary Roberts and his efforts to ensure that all tribes have the opportunity to benefit from those activities that appropriately generate revenue for tribal governments. Tribal-state gaming compacts within California have created a unique framework for sharing revenue with tribes that may be disadvantaged by their geographic location. If there is interest in exploring specific ways to provide further assistance to the Tribe through any of these mechanisms, please let me know.

Sincerely,

Joginder S. Dhillon
Senior Advisor for Tribal Negotiations

cc: Lawrence S. Roberts, Acting Assistant Secretary-Indian Affairs

AR0009874

*ASIA signature*

*DUE - 9/20/16*



965485

CITY OF
AMERICAN
CANYON

RECEIVED

2016 SEP -8 AM 9: 06

September 1, 2016

VIA OVERNIGHT MAIL, E-MAIL, and FACSIMILE
Sarah_walters@ios.doi.gov
(202) 208-5320

The Honorable Lawrence Roberts
Acting Assistant Secretary for Indian Affairs
United States Department of the Interior
MD-3642-MIB
1849 C Street, N.W.
Washington, D.C. 20240

Re: "Restored Lands" Exception Request from Scotts Valley Band of Pomo Indians

Dear Assistant Secretary Roberts:

The City of American Canyon ("American Canyon") and its subsidiary fire protection district, the American Canyon Fire Protection District ("ACFPD"), like other local agencies have recently learned that the Scotts Valley Band of Pomo Indians (the "Scotts Valley Band" or "Applicant") on January 29, 2016 applied to the Office of Indian Gaming ("OIG") of the U.S. Department of the Interior ("Department") for a determination that certain real property acquired within the City of Vallejo ("Vallejo") is claimed to be eligible for the establishment of gaming operations under the "restored lands" exception of the Indian Gaming Regulatory Act ("IGRA") See, 25 U.S.C. 2719(b)(2)(B)(iii). Pursuant to IGRA's implementing regulations at 25 C.F.R. 292.12, the Scotts Valley Band cannot meet the requisite criteria necessary to establish a connection to the newly acquired lands. Additionally, for OIG to grant the determination would not only be contrary to IGRA and OIG's past actions in prior restored lands determinations, such an action would fly in the face of the trust responsibilities incumbent upon the Department of the Interior not to harm other tribes when making restored lands determinations.

The American Canyon and ACFPD believe that such a determination cannot be presently made, incorporating the positions advanced by Vallejo, Solano County and others. American Canyon and ACFPD believe the presentation in the Fee-to-Trust Application Section 5 is cursory and conclusionary as presented in the balance of this communication.

Like other local agencies, American Canyon and ACFPD believe the lack of transparency in the entire proceeding to date raises questions of due process, even under the authorized authority for the proceeding which the Scotts Valley Band is pursuing.



AR0010713

The American Canyon city limits and the ACFPD boundary limits are located within two miles and a little over three quarters of mile respectively from the proposed casino site.

The impact on resources, particularly water, is of great concern to American Canyon as it, and other local agencies, are still under regulations from the State of California ("State") Water Resources Control Board limiting use of water. American Canyon is particularly concerned as a significant portion of its water is obtained under a long term contract (50 years) from Vallejo[1]. Vallejo's vested water rights date back more than 125 years (see, *Green Valley Landowners Assn. v. City of Vallejo* (2015) 241 Cal App 4th 425) and are subject to a complex integrated regulatory and contractual framework overseen by the State Department of Water Resources.

The Vallejo water supply is of critical economic importance to American Canyon, due in large part to domestic, agricultural and industrial uses, including vineyards and wine bottling industries located within American Canyon and its Water Service Area. These industries provide significant employment, tourism, and tax revenue in American Canyon, all of which are based on a continuous dependable supply of water. There is a concern that the density of water use for the proposed casino resort would strain the already limited water resources available in Solano and Napa counties, particularly given the persistent and ongoing drought conditions faced by the State of California.

In addition to furnishing and supplying water, an accurate description of the financial baseline should recognize that Vallejo has recently emerged from bankruptcy (U.S. Bankruptcy Court, Eastern District of California, Petition No. 08-26813), a process which did *not* include its enterprise functions, again including water throughout the immediate area to the North including American Canyon and Napa County. The ability for Vallejo to adequately provide municipal services, including but not limited to police and fire protection, to the proposed casino is not addressed in the Fee-to-Trust Application of the Scotts Valley Band, which includes as Exhibit 13.1 the Vallejo Comprehensive Annual Financial Report. Despite declaring that the loss of property tax revenue will have a *"de minimis"*[2] impact on local property tax revenue due to the removal of the land from tax rolls pursuant to 25 C.F.R. § 151.10(e), there is no analysis of the cost imposed on surrounding local agencies to provide essential municipal services to the site, nor the potential displacement of jobs caused by the casino resort.

In summary, the Applicant should present a complete financial baseline analysis of both financial and enterprise service rather than deferring that analysis to some yet to be defined environmental review in the future.

American Canyon and the ACFPD is also concerned that only an environmental phase 1 analysis was performed with respect to the proposed property. Given the proximity of the site to known faults http://gmw.consrv.ca.gov/shmp/download/quad/CORDELIA/maps/CORDELIA.PDF, an environmental phase 2 would be more appropriate, especially in view of the obvious need for revision of state highway right-of-way and access to the proposed casino site. Fire protection services are frequently provided to Vallejo by the ACFPD, due to existing Mutual and Automatic Aid Agreements with Vallejo. ACFPD responds to incidents in Vallejo on an approximately 3:1 ratio when compared to responses by the

---

[1] Water received from Vallejo is discussed at length in Section 7.1.2 and other portions of the American Canyon Urban Water Management Plan, available at: http://www.cityofamericancanyon.org/home/showdocument?id=9691

[2] See, Scotts Valley Band Fee-to-Trust Application, pg. 23.

 .647.4360  |  4381 Broadway Street, Suite 201  |  American Canyon, CA 94503  |  www.cityofamericancanyon.org

Vallejo Fire Department into American Canyon.[3]  The proposed casino would almost guarantee an increase in responses to the area by both agencies, and must be accounted for in the review of the proposed project's impacts.

This brief reference to facts not considered or advanced in the Trust Application shows the need for further presentation by the Applicant on the governmental services, particularly through the enterprise water system of Vallejo.

American Canyon and ACFPD appreciate your time and attention to our concerns and we are available to meet with you at your earliest convenience to further discuss this matter.

American Canyon and ACFPD would also request that we be notified of any actions taken or opinions issued, whether advisory or not, by the Department in regards to this "restored lands" exception request.

Sincerely,

Leon Garcia, Mayor
City of American Canyon

cc:    Osby Davis, Mayor
       City of Vallejo

       Erin Hannigan, Chairwoman
       Solano County Board of Supervisors

---

[3] http://www.cityofamericancanyon.org/home/showdocument?id=9535

 .647.4360  |  4381 Broadway Street, Suite 201  |  American Canyon, CA 94503  |  www.cityofamericancanyon.org

AR0010715

DIANNE FEINSTEIN
CALIFORNIA



SELECT COMMITTEE ON INTELLIGENCE · VICE CHAIRMAN
COMMITTEE ON APPROPRIATIONS
COMMITTEE ON THE JUDICIARY
COMMITTEE ON RULES AND ADMINISTRATION

# United States Senate

WASHINGTON, DC 20510-0504
http://feinstein.senate.gov
July 22, 2016

The Honorable Sally Jewell
Secretary
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

Dear Secretary Jewell:

I write to you deeply concerned about a potential off-reservation casino in California, proposed by the Scotts Valley Band of Pomo Indians for land that is 60 miles away from its reservation. As you know, I oppose off-reservation gaming, given the detrimental impacts and broad ramifications for the surrounding community. In light of the precedent this Department's forthcoming decision could set, I ask that you provide my staff with an update as soon as possible.

As I understand it, the Department of the Interior, through the Bureau of Indian Affairs, may grant Scotts Valley's request for "restored lands,"[1] paving the way for a casino 60 miles from the tribe's reservation. The Office of Indian Gaming, within the Bureau of Indian Affairs, recently sent a letter to the tribe that indicates the agency is currently working on an Indian Lands Determination for the Tribe. The property for which Scotts Valley has requested an Indian Lands Determination is located in Vallejo, California, an urbanized part of the northern Bay Area that is more than 60 miles from the Band's original reservation in distant, rural Lake County.

Most troubling is the lack of transparency. There has been no notice to the surrounding tribes with historic ties to the area. The affected cities and counties are similarly left in the dark. And the agency has failed to provide any notice to the State. That's a problem.

Transparency and a robust dialogue with the public are vital for decisions like this that have a profound impact on the health of the surrounding community. As these casinos move closer to urban centers, crime, gambling addiction, and other negative effects will be exacerbated in local communities. In particular, casino operators know full well that vulnerable populations – such as senior citizens and people on fixed incomes – are drawn in, and often lose their meager means to pay for these gambling activities.

These casinos can also cause conflicts with local communities since the Indian Gaming Regulatory Act does not require tribes or the Department of the Interior to mitigate the effects of

---

[1] As that term is used in the Indian Gaming Regulatory Act (25 U.S.C. § 2719(b)(1)(B)(iii)).

AR0010870

casino developments. That is true even if the casino is incompatible with the local communities'
planned land uses for the area, is not welcomed by the local government, and creates increased
burdens on local resources like police, fire, water, and traffic.

Equally problematic are the questions of fundamental fairness to other tribes, some who
have ancestral ties to the area. The "restored lands" exception was never intended to give
restored tribes an open-ended license to game on newly acquired lands. Its purpose, instead, was
to promote parity between established tribes, which had substantial land holdings at the time of
IGRA's passage, and restored tribes, which did not. But Congress also imposed limits on the
Bureau's discretion: To benefit from the restored lands exception, a tribe must establish a
"modern," "historical," and "temporal" connection to tribal land.[2] Yet given the void of
information, it is unclear on what basis the Bureau intends to rest its decision.

It is of the utmost importance, then, that the surrounding community and the State be
provided the opportunity to express their views, the importance of which cannot be understated.
The input of the impacted community can provide vital information necessary to the decision
making process. That's just good public policy.

Pending a staff briefing, I ask that you direct the Office of Indian Gaming to discontinue
its efforts to develop or issue any decision with regard to Scotts Valley's request for an Indian
Lands Determination until the public and impacted governments have a reasonable opportunity
to review and provide their views on the Band's proposal.

Sincerely,

Dianne Feinstein
United States Senator

---

[2] 25 C.F.R. § 292.12

AR0010871

# Congress of the United States
## Washington, DC 20515

August 29, 2016

The Honorable Sally Jewell
Secretary of the Interior
Department of the Interior
1849 C Street NW
Washington, DC 20004

Dear Secretary Jewell:

We write you today with concerns regarding a matter pending before the Department of the Interior (DOI). We have learned that the Office of Indian Gaming is working with the Scotts Valley Band of Pomo Indians to issue an Indian Lands Determination that could allow for a casino in the city of Vallejo, California.

The property for which the Scotts Valley Tribe has requested an Indian Lands Determination is more than 70 miles from the Tribe's headquarters in Lake County, California. It is our understanding that the Scotts Valley Tribe does not provide any significant services in Vallejo. For example, the Tribe's Temporary Assistance for Needy Families (TANF) program does not have offices in Vallejo or elsewhere in Solano County.

It is particularly concerning that the Scotts Valley Tribe's request for an Indian Lands Determination is not following the common procedure that many of our constituents have come to expect. In nearly all cases, a request for an Indian Lands Determination and a fee-to-trust application are filed concurrently, which as you are aware, triggers a number of notification requirements. Such was the case with the Scotts Valley Tribe's previous effort to establish a casino in Richmond, California, which was firmly rejected by DOI in 2012.

Additionally, concurrent consideration of the Indian Lands Determination and fee-to-trust application provides the public and local, state, and tribal governments the opportunity to offer input and comments early in the process. Not only is it essential that stakeholders and interested parties have an opportunity to express their views from the outset, but concurrent consideration can provide DOI with vital information that may not otherwise enter the record.

As representatives of the citizens and governments most affected by this decision, we would like to know why this process was bifurcated in this particular case as well as the steps DOI has taken to fully examine the Tribe's current and historical connection to the land in question. We also request that the Office of Indian Gaming not issue a decision until a response to our inquiry is provided.

AR0010872

Sincerely,

**MIKE THOMPSON**
Member of Congress

**JARED HUFFMAN**
Member of Congress

**JOHN GARAMENDI**
Member of Congress

cc:  Larry Roberts, Acting Assistant Secretary-Indian Affairs

AR0010873

# Congress of the United States

Washington, DC 20515

November 29, 2016

The Honorable Sally Jewell
Secretary
U.S. Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

Dear Secretary Jewell:

We write to ask you to delay issuing a determination under the Indian Gaming Regulatory Act regarding the Scotts Valley casino proposal until the Department of the Interior conducts a full and robust public comment period.

As you know, we have serious concerns about this potential off-reservation casino proposed by the Scotts Valley Band of Pomo Indians. As we understand it, the Department of the Interior, through the Bureau of Indian Affairs, may grant Scotts Valley's request for "restored lands."[1] Interior's decision would pave the way for a vast hotel and casino operation, to be developed on land that is 70 miles away from its tribal headquarters in Lake County, without the Tribe clearly providing evidence of their historical connection to the area to the public.

We are concerned with the manner in which the Department of the Interior is conducting its evaluation of the casino development—a process that has entirely failed to take into account the opposition and concerns of surrounding counties and cities, not to mention tribes in the area that consider the area their aboriginal territory. By bifurcating the process—that is, isolating Interior's consideration of gaming from the broader land-into-trust process—Interior has short-circuited an important agency precedent that previously allowed for the public, local, State, and tribal interests to offer their input and comments at the outset.

Soliciting input early in the process matters. Public input must serve as an important contribution to the decision making process. But the manner in which

---

[1]    As that term is used in the Indian Gaming Regulatory Act (25 U.S.C. § 2719(b)(1)(B)(iii)).

PRINTED ON RECYCLED PAPER

AR0011564

Interior is conducting the process suggests that any public input that may occur will serve only to rationalize or justify a decision already made. We expect much more of Interior.

Decisions of this nature are of vital interest to Californians, as well as the tribal, county and local governments that may be affected. Cities and counties bear the brunt of reduced tax revenues, they often must make up for drain on public services, and they suffer the consequences of any other detrimental impacts from the project, whether environmental or otherwise.

Equally problematic are the questions of fundamental fairness to other tribes, some who have ancestral ties to the area. With more than one hundred sovereign tribal nations within California, we understand the challenges of furthering the interests of every tribal government in ways that respect the rights of other tribes and all Californians. But sound public policy requires a process that is inclusive and transparent.

We ask, therefore, that the Department of the Interior refrain from issuing its Indian Lands Determination until the public has had the opportunity to provide input on the ongoing fee-to-trust application.

Sincerely,

Dianne Feinstein
United States Senator

Mike Thompson
Member of Congress

Doug LaMalfa
Member of Congress

John Garamendi
Member of Congress



# United States Department of the Interior

### OFFICE OF THE SECRETARY
Washington, DC 20240

**FEB 07 2019**

The Honorable Shawn Davis
Chairman, Scotts Valley Band of Pomo Indians
1005 Parallel Drive
Lakeport, California 95453

Dear Chairman Davis:

I am writing regarding the Scotts Valley Band of Pomo Indians' (Scotts Valley Band or Band) request that the Department of the Interior (Department) acquire 128.32 acres of land in the City of Vallejo, Solano County, California (Vallejo Parcel or Parcel) into trust on its behalf pursuant to 25 C.F.R. § 151.9.[1] On January 28, 2016, the Band further requested a "restored lands" determination with regard to the Parcel.[2] I have therefore considered whether the Parcel, if taken into trust, would qualify as "restored lands" within the meaning of Federal regulations governing Indian gaming.[3] If the Parcel does qualify, then it would be exempt from the general prohibition on gaming on lands acquired by the Secretary of the Interior (Secretary) in trust after October 17, 1988.[4]

## I. DECISION

I have considered the Band's application pursuant to the Indian Gaming Regulatory Act (IGRA) and the Department's regulations at 25 C.F.R. Part 292, which implement Section 2719 of IGRA. I have also reviewed the voluminous documentation that the Band submitted in support of its Request,[5] as well as materials submitted by parties opposed to the Request. Alongside local

---

[1] Letter and accompanying application from Gabriel Ray, Chairman, Scotts Valley Band of Pomo Indians, to Amy Dutschke, Reg'l Dir., Pac. Reg'l Office, Bureau of Indian Affairs (Aug. 11, 2016); *see also* 25 U.S.C. § 5108 (previously codified at 25 U.S.C. § 465) (authorizing the Secretary to acquire land for the purpose of providing land to Indians). The United States does not currently hold any land in trust for the Band.

[2] Letter from Gabriel Ray, Chairman, Scotts Valley Band of Pomo Indians, to Lawrence S. Roberts, Acting Assistant Sec'y – Indian Affairs, Dep't of the Interior (Jan. 28, 2016) [hereinafter, the "Request"]. *See also* 25 C.F.R. § 292.3(b) (regarding gaming on "newly acquired lands that require a land-into-trust application").

[3] *See* 25 C.F.R. § 292.7 (setting forth the criteria for meeting the requirements of the "restored lands" exception).

[4] *See* 25 U.S.C. § 2719(b)(1)(B)(iii) (listing the exception from the prohibition for restored lands). Alongside tribal member housing, a governmental headquarters, and health facilities, the Band is interested in developing an "integrated casino resort" on the Parcel to serve as the "economic engine" for its tribal community. Letter from Shawn Davis, Chairman, Scotts Valley Band of Pomo Indians, to John Tahsuda III, Principal Deputy Assistant Sec'y – Indian Affairs, Dep't of the Interior (May 3, 2018). The casino would offer class II and III gaming, as defined in the Indian Gaming Regulatory Act ("IGRA"). 25 U.S.C. §§ 2701–2721, 18 U.S.C. § 1166.

[5] *See, e.g.*, Letter and accompanying materials from Shawn Davis, Chairman, Scotts Valley Band of Pomo Indians, to John Tahsuda III, Principal Deputy Assistant Sec'y – Indian Affairs, Dep't of the Interior (May 3, 2018); Memorandum and accompanying materials from Steven J. Bloxham, Fredericks Peebles & Morgan LLP, to Lawrence S. Roberts, Acting Assistant Sec'y – Indian Affairs (Nov. 14, 2016); Letter from Steven J. Bloxham, Fredericks Peebles & Morgan LLP, to Eric Shepard, Assoc. Solicitor, Div. of Indian Affairs, Office of the Solicitor, Dep't of the

1

governments,[6] objecting parties include the Yocha Dehe Wintun Nation (Yocha Dehe) and the United Auburn Indian Community of the Auburn Rancheria.[7]

Upon review of these various submissions, I regret to inform you that the Department has determined that the Parcel does not qualify as restored lands within the meaning of applicable law. Specifically, the Band has failed to provide sufficient evidence of a "significant historical connection" to the Parcel, as required to qualify this particular property for the restored lands exception.[8] I have set forth the bases for my decision below.

## II. LEGAL FRAMEWORK

The IGRA was enacted "to provide express statutory authority for the operation of such tribal gaming facilities as a means of promoting tribal economic development, and to provide regulatory protections for tribal interests in the conduct of such gaming."[9] Section 20 of IGRA generally prohibits gaming on lands taken into trust after October 17, 1988.[10] However, Congress expressly carved out the restored lands exception to this prohibition, which authorizes gaming on lands that were "taken into trust as part of the restoration of lands for an Indian tribe that is restored to Federal recognition."[11] One of the purposes behind the restored lands exception is "ensuring that tribes lacking reservations when IGRA was enacted are not disadvantaged relative to more established ones."[12]

Part 292 of Title 25, Code of Federal Regulations, implements Section 20 of IGRA. For a parcel to meet the requirements of the restored lands exception, a tribe must demonstrate the following:

> (1) the tribe has been restored to Federal recognition, as defined in 25 C.F.R. §§ 292.7(a)-(c), 292.8–292.10; and

---

Interior (Sept. 15, 2016); Letter and accompanying table from Patrick R. Bergin, Fredericks Peebles & Morgan LLP, to Paula L. Hart, Dir., Office of Indian Gaming (Apr. 5, 2016); Legal Analysis by Steven J. Bloxham, Fredericks Peebles & Morgan LLP (Jan. 29, 2016); Report by Albert L. Hurtado, Historian (Jan. 29, 2016); Report by Dorothea J. Theodoratus, Anthropological Consultant (Jan. 29, 2016); Consolidated Report by Heather H. Howard et al. (Steven J. Bloxham ed. 2016).

[6] *See, e.g.*, Letter from Erin Hannigan, Chairwoman, Bd. of Supervisors, Solano Cnty., to Lawrence S. Roberts, Acting Assistant Sec'y – Indian Affairs, Dep't of the Interior (Aug. 23, 2016); Letter from Claudia Quintana, City Attorney, City of Vallejo, to Lawrence S. Roberts, Acting Assistant Sec'y – Indian Affairs, Dep't of the Interior (July 28, 2016).

[7] *See, e.g.*, Letter and accompanying report from Gene Whitehouse, Chairman, United Auburn Indian Cmty. of the Auburn Rancheria, to Lawrence S. Roberts, Principal Deputy Assistant Sec'y – Indian Affairs, Dep't of the Interior (Nov. 7, 2016); Letter, legal memorandum, and accompanying materials from James Kinter, Tribal Sec'y, Yocha Dehe Wintun Nation, to Lawrence S. Roberts, Principal Deputy Assistant Sec'y – Indian Affairs, Dep't of the Interior (Nov. 8, 2016); Letter, legal memorandum, and accompanying materials from Leland Kinter, Tribal Chairman, Yocha Dehe Wintun Nation, to Lawrence S. Roberts, Principal Deputy Assistant Sec'y – Indian Affairs, Dep't of the Interior (Nov. 22, 2016).

[8] *See* 25 C.F.R. § 292.12(b).

[9] *Grand Traverse Band of Ottawa and Chippewa Indians v. U.S. Attorney for the W. Dist. of Mich.*, 198 F. Supp. 2d 920, 933 (W.D. Mich. 2002), *aff'd*, 369 F.3d 960 (6th Cir. 2004); *see also* 25 U.S.C. § 2702(1) (stating that one purpose of IGRA is to "provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments").

[10] 25 U.S.C. § 2719(a).

[11] 25 U.S.C. § 2719(b)(1)(B)(iii).

[12] *City of Roseville v. Norton*, 348 F.3d 1020, 1030 (D.C. Cir. 2003).

2

> (2) the lands qualify as restored lands, as defined in 25 C.F.R. §§ 292.7(d), 292.11–292.12.

### (a) Restored Tribe Criteria

In a memorandum dated November 18, 2008, the Solicitor's Office opined that the Band qualified as a restored Tribe for the purposes of the restored lands exception.[13] The Band was terminated pursuant to the California Rancheria Act[14] and restored to Federal recognition pursuant to a Stipulation for Entry of Judgment in *Scotts Valley Band of Pomo Indians of the Sugar Bowl Rancheria v. United States* (the "1991 Stipulated Judgment").[15] The Department published the notice of the Band's Federal recognition status in the Federal Register on February 12, 1992.[16] Therefore, the Band is a restored Tribe and has met the requirement of the first part of the two-part restored lands exception analysis.

### (b) Restored Lands Criteria

Section 292.11 sets forth the criteria for newly acquired lands to qualify as restored lands. Relevant here, the Band was restored pursuant to a Federal court determination in which the United States was a party or by a court-approved settlement agreement entered into by the United States (specifically, the 1991 Stipulated Judgment). The Band therefore must demonstrate that the Parcel meets the requirements of 25 C.F.R. § 292.12.[17]

Under 25 C.F.R. § 292.12, the tribe must demonstrate (a) "modern connections" to the newly acquired land; (b) "a significant historical connection to the land"; and (c) "a temporal connection between the date of the acquisition of the land and the date of the tribe's restoration."

The Band has demonstrated the required modern[18] and temporal[19] connections to the Parcel. The question is therefore whether the Band has demonstrated that it has a "significant historical connection" to the Parcel. Section 292.12(c) states that one of the criteria that a tribe must meet for the purposes of the restored lands exception is a significant historical connection to the land. A

---

[13] Memorandum from Edith R. Blackwell, Assoc. Solicitor, Div. of Indian Affairs, Office of the Solicitor, Dep't of the Interior, to George T. Skibine, Acting Assistant Sec'y for Policy & Econ. Dev., Dep't of the Interior (Nov. 18, 2008).
[14] Act of Aug. 18, 1958, Pub. L. No. 85-671, 72 Stat. 619, *amended by* Act of Aug. 11, 1964, Pub. L. 88-419, 78 Stat. 390.
[15] No. C-86-3660 WWS (N.D. Cal. Mar. 15, 1991).
[16] Notice of Reinstatement to Former Status for the Guidiville Band of Pomo Indians, the Scotts Valley Band of Pomo Indians and Lytton Indian Community of CA, 57 Fed. Reg. 5,214 (Feb. 12, 1992).
[17] 25 C.F.R. § 292.11(c).
[18] In relevant part, the Band has demonstrated that (1) both the Parcel and the Band are located in the same state, 25 C.F.R. § 292.12(a), and that the Parcel is within a 25-mile radius of the tribe's headquarters or other tribal governmental facilities that have existed at that location for at least 2 years at the time of the application for land-into-trust. 25 C.F.R. § 292.12(a)(3). *See generally* Memorandum from Scotts Valley Band of Pomo Indians 1 n.3, 4 n.6 (May 3, 2018); Fee-to-Trust Application, Scotts Valley Band of Pomo Indians, 16–18 (Aug. 11, 2016).
[19] In relevant part, the Band requested to take the Parcel into trust on August 11, 2016, *see* Letter and accompanying application from Gabriel Ray to Amy Dutschke, *supra* note 1, within 25 years of its restoration to Federal recognition, *see* 57 Fed. Reg. 5,214 (listing the "[e]ffective" date of reinstatement to pre-termination status as September 6, 1991), and the Band is not gaming on other lands. 25 C.F.R. § 292.12(c)(2).

AR0011599

tribe can establish a "significant historical connection" where (1) "the land is located within the boundaries of the tribe's last reservation under a ratified or unratified treaty, . . ." or (2) "a tribe can demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land."[20]

The Band has not made the required showing, and the Parcel therefore does not qualify as "restored lands" within the meaning of IGRA. I elaborate below.

## III. APPLICATION OF RESTORED LANDS CRITERIA TO THE VALLEJO PARCEL

### (a) As a preliminary matter, the evidence indicates that the Scotts Valley Band is a successor-in-interest to the Ca-la-na-po and the Mo-al-kai.

If a tribe is seeking to establish a historical connection to a parcel through evidence of subsistence use or occupancy by the tribe's predecessors, as the Band is here, it is important to identify those predecessors. As the Department acknowledged in a 2012 restored lands determination concerning an unrelated set of parcels submitted by the Band, the Band has established a line of political succession and significant genealogical descent from the Ca-la-na-po tribelet, and it is a successor-in-interest to the Ca-la-na-po.[21] Additionally, the Band has provided persuasive evidence of political succession or significant genealogical descent from another tribelet, the Mo-al-kai.

Dorothea Theodoratus, an anthropologist commissioned by the Band, wrote in her report that kin groups among Pomo Indians "were both ambilateral and ambilocal, which allowed for movement of members among the tribelets . . . ."[22] An analysis relating to the connection between an alleged predecessor of the Band and the Band itself must acknowledge the "flexibility of Pomo social and political structure."[23]

Here, the evidence suggests such fluidity existed between the Ca-la-na-po (also known as the Kulanapo or Hoolanapo) and the Mo-al-kai (also known as the Molkai, Yimaba, or Yimabak). In a 1928 interview with Scotts Valley Band's ancestor Joe Augustine, anthropologist Omer Stewart explained: "Joe Augustine was identified as being chief of the 'Yimaba of Scotts Valley,' with parents from the 'village of Kulanapo.'"[24] Aside from the bloodline tying the Mo-al-kai to the Band, the fact that the aboriginal territory of the Mo-al-kai overlaps with the land presently

---

[20] 25 C.F.R. § 292.2.

[21] *See* Letter from Donald E. Laverdure, Acting Assistant Sec'y – Indian Affairs, Dep't of the Interior, to Donald Arnold, Chairperson, Scotts Valley Band of Pomo Indians 12 (May 25, 2012) [hereinafter, the "2012 Restored Lands Determination"], *available at* https://www.bia.gov/sites/bia.gov/files/assets/public/pdf/idc-018517.pdf ("According to the record, when the Scotts Valley Rancheria was established in 1911, the Band existed as a strong political entity led by the Augustine family, both politically and genealogically descended from the Ca-la-na-po.").

[22] Report by Dorothea J. Theodoratus, *supra* note 5, at 3.

[23] Comments on Documents Regarding "Restored Lands" in the Vicinity of Vallejo, Solano County, CA by Dorothea J. Theodoratus 2 (Nov. 13, 2016).

[24] Memorandum from Steven J. Bloxham, Fredericks Peebles & Morgan LLP, to Lawrence S. Roberts, Acting Assistant Sec'y – Indian Affairs 11 (Nov. 14, 2016). That Joe Augustine is related to members of the present-day is undisputed. *See, e.g.*, Scotts Valley Band of Pomo: Preliminary Report for "Indian Lands Determination," Vallejo, Solano County, California from Stephen D. Beckham to United Auburn Indian Cmty. 26–26 (Nov. 7, 2016) [hereinafter, the "Beckham Report"] (in report submitted to tribe opposing the Band's Request, stating that Joe Augustine is "a collateral relative of several current members of the Scotts Valley Band of Pomo").

AR0011600

occupied by the Band is also significant.  The Mo-al-kai were located in Scotts Valley, west of Lakeport, on the western shore of Clear Lake,[25] and the Band continues to reside there, with a tribal government headquarters at Lakeport.[26]

In light of this information, evidence of both the Ca-la-na-po's and Mo-al-kai's historical connection to the Vallejo Parcel is relevant to this analysis.[27]

### (b) The Vallejo Parcel is not located within the boundaries of the Band's last reservation under a ratified or unratified treaty.

Because the Vallejo Parcel is not located within the boundaries of the Band's last reservation (or the reservation promised to its ancestors), the Band cannot establish a significant historical connection through the first method listed above.  As background, the Ca-la-na-po tribelet was one of eight tribal signatories to an unratified treaty with the United States, signed in August 1851.[28] The tribal signatories "jointly and severally" ceded "their right, title, claim, or interest of any kind" to lands in California.[29]  In exchange, the United States designated a tract of land to be set apart as an Indian reservation, on the western shore of Clear Lake, Lake County, California.[30]  In the late 1800s, cartographer Charles Royce compiled maps depicting Indians' land cessions in the United States, including the land that would have been ceded under the 1851 Treaty, as well as tracts set apart for reservations, including the reservation at Clear Lake.[31]  The area numbered "296" (Area 296) in the map below shows the ceded territory, and the area numbered "295" (Area 295) shows the Clear Lake reservation, in relation to San Francisco and Sacramento.

---

[25] Memorandum from Steven J. Bloxham to Lawrence S. Roberts, *supra* note 24, at 12; *see also* Comments on Reports Submitted by the Yocha Dehe Nation Regarding SVBI Request for Determination from Albert L. Hurtado, Historian, to Lawrence S. Roberts, Acting Assistant Sec'y – Indian Affairs 8 (Nov. 14, 2016) [hereinafter, the "Hurtado Comments"] ("Scotts Valley . . . was the home of Molkai and Yimabak Pomo.").

[26] Report by Dorothea J. Theodoratus, *supra* note 5, at 5.

[27] The Band also claims a connection to the Ha-bi-na-po tribelet that occupied the eastern portion of Big Valley, as discussed in Legal Analysis by Steven J. Bloxham, *supra* note 5, at 12; however, the evidence is insufficient to establish such a finding. Furthermore, as discussed below in Part III.d.iii.B, whether or not the connection exists is not dispositive in this restored lands determination.

[28] Treaty with Ca-la-na-po, etc. (Aug. 20, 1851), *in* 4 *Indian Affairs, Laws and Treaties* (Charles J. Kappler ed., 1927) [hereinafter, the "1851 Treaty"], *available at* https://dc.library.okstate.edu/digital/collection/kapplers/id/24015.

[29] *Id.* art. 3.

[30] *Id.* art. 4.

[31] Charles C. Royce & Cyrus Thomas, *Indian Land Cessions in the United States* (1899), *available at* https://www.loc.gov/resource/g3701em.gct00002 (select "Image 7 of 67" ("California 1")).

5

AR0011601



The Vallejo Parcel is located in the southwestern portion of Area 296, south of Napa, clearly outside of the boundaries of the reservation under the 1851 Treaty. The Parcel is similarly far from the rancheria that the United States acquired for the Band in 1911 (Scotts Valley Rancheria), which Area 295 encompasses.[32]

### (c) The Vallejo Parcel is not proximate to the boundaries of the Band's last reservation under a ratified or unratified treaty.

In previous restored lands determinations relating to California tribes, the Department has noted that "[a] parcel's proximity to a tribe's historic reservation or rancheria is evidence that the tribe has a significant historical connection to that parcel."[33] For example, in reaching a favorable determination on the Wilton Rancheria's restored lands request, the Department noted that the tribe's proposed site was less than six miles from the tribe's historic rancheria.[34] Similarly, in reaching a favorable restored lands determination regarding the Mechoopda Indian Tribe of the Chico Rancheria, the Department explained that the land at issue was only ten miles from the

---

[32] Consolidated Report by Heather H. Howard et al., *supra* note 5, at 4 (stating that "in the 1910s, the federal government established the Scotts Valley (or Sugar Bowl) Rancheria, on lands southwest of Clear Lake").
[33] Record of Decision, Trust Acquisition of 35.92 +/- Acres in the City of Elk Grove, California, for the Wilton Rancheria 67 (Dep't of the Interior Jan. 2017).
[34] *Id.*

AR0011602

tribe's former Rancheria.[35]  Here, the Parcel is located approximately 90 driving miles (75 straight-line miles) southeast of the former Scotts Valley Rancheria, near the present-day city of Lakeport. As such, the distance between the Vallejo Parcel and the Band's historic Rancheria, standing alone, does not evince a significant historical connection.

### (d) The Band has not demonstrated the existence of the Band's villages, burial grounds, occupancy or subsistence use in the vicinity of the Parcel.

The Band does not assert that the Parcel is in the vicinity of the Band's villages or burial grounds.[36]  Therefore, the Band must establish a significant historical connection to the Vallejo Parcel by demonstrating its occupancy or subsistence use in the vicinity of the land.  As noted in the 2012 Restored Lands Determination, "[t]he tribe's history of use and occupancy inherently includes the use and occupancy of its tribal predecessors, even if those tribes had different political structures and were known under different names."[37]  Evidence of use and occupancy by the Ca-la-na-po and Mo-al-kai is therefore relevant to this determination, as well.

> (i) The joint and several cession of the large area encompassing the Vallejo Parcel by the eight tribal signatories does not automatically demonstrate occupancy or subsistence use in the vicinity of the Parcel by the specific signatories related to the Band.

First, the Band argues that its ancestors' cession of land pursuant to the 1851 Treaty *per se* demonstrates use and occupancy sufficient to establish a significant historical connection to the Vallejo Parcel, given that the ceded land (Area 296) encompasses the Parcel.[38]  In support of its argument, the Band cites the district court's decision in *Grand Traverse Band of Ottawa and Chippewa Indians v. United States Attorney for the Western District of Michigan*,[39] as well as the Office of the Solicitor's M Opinion concerning the Pokagon Band of Potawatomi Indians' (Pokagon Band) request for restored lands.[40]  According to the Band, these opinions establish that lands ceded by treaty and subsequently returned to a tribe qualify, *per se*, as restored lands for the purposes of the restored lands exception.[41]  However, the Band misconstrues the reasoning in both *Grand Traverse Band* and the Pokagon Band Opinion.

---

[35] Letter from Kevin K. Washburn, Assistant Sec'y – Indian Affairs, Dep't of the Interior, to Dennis Martinez, Chairman, Mechoopda Indian Tribe of Chico Rancheria 25 (Jan. 24, 2014). Additionally, the land at issue was located within the boundaries of a reservation that would have been established through an unratified treaty, thus establishing a significant historical connection through the first method listed above. *Id.*

[36] *See, e.g.*, Legal Analysis by Steven J. Bloxham, *supra* note 5, at 20 (stating that, prior to the 1850s, "the area in and around what is now the City of Vallejo and adjacent portions of southern Napa and Solano counties were part of the territory of the Patwin people" and that "the record indicates that by 1851 there were no surviving Patwin (*or any other Indian*) villages, and not independent bands or tribes, in southern Napa and Solano Counties") (emphasis added) (citations omitted).

[37] 2012 Restored Lands Determination, *supra* note 21, at 7.

[38] Memorandum from Scotts Valley Band of Pomo Indians, *supra* note 18, at 24–25 (citations omitted).

[39] 198 F. Supp. 2d 920 (W.D. Mich. 2002), *aff'd*, 369 F.3d 960 (6th Cir. 2004) ["*Grand Traverse Band*"].

[40] Sol. Op. M-36991 (Sept. 19, 1997) [hereinafter, the "Pokagon Band Opinion"], *available at* https://solicitor.doi.gov/opinions.html.

[41] Legal Analysis by Steven J. Bloxham, *supra* note 5, at 7–8, 27; *see also* Memorandum from Steven J. Bloxham to Lawrence S. Roberts, *supra* note 24, at 2.

AR0011603

A. *Grand Traverse Band*

In holding that a casino site qualified for gaming under the restored lands exception, the Federal district court in *Grand Traverse Band* concluded that "the Band's evidence clearly established that the parcel was of historic, economic and cultural significance to the Band."[42]  The fact that the parcel fell within the boundaries of land the Band's predecessors had ceded via treaty was merely one of several facts supporting that conclusion, but it was not a stand-alone proposition, as the Band asserts.  The court further observed:

> The land, located on the east shore of Grand Traverse Bay, is at the heart of the region that comprised the core of the Band's aboriginal territory and was historically important to the economy and culture of the Band. . . . The Band itself has occupied the region continuously from at least 100 years before treaty times until the present. . . . In the late nineteenth century, Band members continued to reside on the east shore of Grand Traverse Bay and sought title to land in order to remain in the region.[43]

The facts here are distinguishable from those supporting the favorable decision in *Grand Traverse Band*.  First, the court found that the land at issue was located only 1.5 miles outside of the reservation contemplated by the 1836 treaty between the United States and the Ottawa and Chippewa, of which representatives of the Grand Traverse Band were signatories.[44]  The court additionally found evidence suggesting that the proposed acquisition site was located within the boundaries of the contemplated reservation at the time the treaty was signed.[45]  As noted above, such evidence—not present here—helps establish a significant historical connection.  Second, while the land in *Grand Traverse Band* lies at the core of that tribe's aboriginal territory, the Vallejo Parcel is 90 miles by road (75 straight-line miles) away from the Band's aboriginal territory.  Finally, as explained below in Part III.d.ii–iii, unlike the tribe in *Grand Traverse Band*, which had continuously resided on the land in question for uninterrupted centuries, the Scotts Valley Band has failed to establish a comparable level of historical connection to the parcel in question.  *Grand Traverse Band* therefore does not establish the bright line rule concerning ceded territory that the Band asserts.

B. Pokagon Band Opinion

As in *Grand Traverse Band*, the fact that the Pokagon Band parcel fell within an area ceded by one or more of the Pokagon Band's predecessors was an important, but non-dispositive, reason why the Office of the Solicitor recommended a favorable restored lands determination.  As background, Congress restored the Pokagon Band through the Pokagon Restoration Act (Act).[46]  The Act directed the Secretary to "acquire real property for the Band" and named ten counties in Michigan and Indiana that would comprise the Band's "service area."[47]

---

[42] 198 F. Supp. 2d at 925.
[43] *Id.*
[44] *Id.* at 936.
[45] *Id.* at 925.
[46] Restoration of Federal Services to the Pokagon Band of Potawatomi Indians, Pub. L. No. 103-323, 108 Stat. 2152 (previously codified at 25 U.S.C. §§ 1300j) (1994).
[47] *Id.* §§ 6–7, 108 Stat. at 2154.

AR0011604

In the Pokagon Band Opinion, the Office of the Solicitor concluded that the parcel in question qualified as restored lands because (1) the parcel fell within the ten-county service area identified in the Act and (2) the service area was part of the territory that the Band's predecessors had ceded to the United States through treaties.[48]  In contrast, the Vallejo Parcel does not fall within the Scotts Valley Band's service area, which includes the counties of Mendocino, Lake, Sonoma, and Contra Costa, but not Solano.[49]  Additionally, whereas Congress established the Pokagon Band's service area through the Act, the Bureau of Indian Affairs (BIA) designated the Scotts Valley Band's service area pursuant to 25 C.F.R. Part 20.

Furthermore, there are fundamental differences between the legal analysis in the Pokagon Band Opinion and the one required here.  First, the Pokagon Band Opinion predated the implementation of 25 C.F.R. Part 292 by more than ten years,[50] and it did not discuss the modern, temporal, and significant historical connections described in § 292.12 that are central to the Scotts Valley Band determination.[51]  Even if the Pokagon Band Opinion established a standard whereby lands ceded by treaty qualify, *per se*, as restored lands—which it does not—the Department did not incorporate that standard into the criteria deemed necessary for lands to qualify as restored when it promulgated Part 292, which the Band must now satisfy.[52]

Second, even if the Pokagon Band's request had been reviewed under Part 292, the Pokagon Band was restored by Congressional legislation, whereas the Scotts Valley Band was restored under the terms of a stipulated judgment.  Consequently, lands sought by the Scotts Valley Band must qualify as restored under § 292.11(c) and § 292.12, whereas lands sought by tribes restored in the manner of the Pokagon Band must meet the standards established in § 292.11(a).[53]  Also, § 292.11(a)(1) sets out criteria that would not have required the Pokagon Band to establish the modern, temporal, and significant historical connections that the Scotts Valley Band must show under § 292.12.

Restored lands determinations issued after the Pokagon Band Opinion confirm that a parcel's location within an area ceded by treaty is not a dispositive factor in establishing a significant historical connection.  For example, as early as 2004, prior to the implementation of Part 292, the National Indian Gaming Commission (NIGC) concluded that the Karuk Tribe of California (Karuk Tribe) failed to show a "sufficient historical nexus" to a parcel even though the parcel was located within the cessation area of a treaty.  In reaching a decision unfavorable to the Karuk Tribe, the NIGC explained, in part, that evidence of "aboriginal settlements" at the location of the parcel was

---

[48] Pokagon Band Opinion, *supra* note 40, at 7–8.

[49] *See* Notice of Near-Reservation Designations for California Tribes, 65 Fed. Reg. 31,188 (May 16, 2000) (listing "near-reservation designations" that are "appropriate for the extension of BIA financial assistance and/or services" for certain California tribes).

[50] *Compare* 73 Fed. Reg. at 29,354 (listing the effective date of Part 292 as June 19, 2008), *with* Pokagon Band Opinion, *supra* note 40 (stating date of issuance as September 19, 1997).

[51] *See* Pokagon Band Opinion, *supra* note 40, at 7–8 (containing a brief analysis—limited to only one paragraph—as to whether the parcel in question was restored).

[52] For a discussion on the Department's authority to exclude non-legislatively created, ad hoc standards from its regulations, see *Miami Nation of Indians of Indiana, Inc. v. Babbitt*, 887 F. Supp. 1158, 1169–70 (N.D. Ind. 1995).

[53] *See* Record of Decision, Trust Acquisition of 165.81± Acres in the City of South Bend, Indiana, for the Pokagon Band of Potawatomi Indians 57–59 (Dep't of the Interior Nov. 2016).

AR0011605

"scant and based largely on the speculation of an ethnologist."[54]  Similarly, when the NIGC issued an updated, favorable Indian Lands Opinion to the Karuk Tribe in 2012, the NIGC based the change in its opinion on new evidence showing a history of Karuk activity around the parcel, not on the location of the parcel within the cessation area.[55]  Specifically, a historian commissioned by the Karuk Tribe had uncovered a decades-old BIA report finding that "'the aboriginal subentities of the Karok [sic] Tribe consisted of the communities at Happy Camp, Orleans and Siskiyou (Yreka),'" Yreka being the location of the parcel at issue in that matter.[56]  The BIA report, combined with additional correspondence from the BIA acknowledging "aboriginal camp sites" in those communities, as well as oral history corroborating the written record, established a historical connection between the Karuk Tribe and the parcel in question.[57]

Based upon the different laws and facts at issue in both *Grand Traverse Band* and the Pokagon Band Opinion as compared to those of Scotts Valley Band, those two opinions do not establish a *per se* rule that parcels within ceded territory are "restored lands."  While that may create a favorable inference for the Band here, the Band must still demonstrate additional historical connection comparable to that identified in *Grand Traverse Band* and for the Pokagon Band and the Karuk Tribe.  As discussed *infra*, the Scotts Valley Band has failed to establish such historical connection.

> (ii) <u>Vallejo's designation in the 1851 Treaty as a pick-up site for promised provisions and the subsequent collection of provisions at that site do not demonstrate occupancy or subsistence use in the vicinity of the Parcel by the Band or its ancestors.</u>

Next, the Band argues that Vallejo's designation in the 1851 Treaty as a pick-up site for promised provisions and the subsequent collection there of such provisions demonstrate the Band's occupancy and subsistence use in the vicinity of the Parcel.[58]  Under Article 5 of the 1851 Treaty, the United States promised to furnish the signatory bands with supplies such as cattle, bread, and clothing for pick-up "at or near Vallejo."[59]  Albert Hurtado, a historian commissioned by the Band to prepare a report in conjunction with its Request, identified the likely pick-up site for the supplies as the ranch of J.M. Estelle, a general in the California State Militia.[60]  The location of Gen. Estelle's ranch is 2.4 miles from the Vallejo Parcel.[61]  The Band asserts that the 1851 Treaty reserved rights to those pick-up site lands akin to reserved hunting, fishing, and gathering rights found in other treaties.[62]  According to the Band, its ancestors made use of the lands by exercising

---

[54] Indian Lands Opinion from Penny J. Coleman, Acting Gen. Counsel, Nat'l Indian Gaming Comm'n, to Bradley G. Bledsoe Downes, Dorsey & Whitney LLP 7–8 (Oct. 12, 2004), *available at* https://www.nigc.gov/images/uploads/indianlands/17_karuktribeofcalifornia.pdf.

[55] Memorandum from John R. Hay, Senior Attorney, to Tracie Stevens, Chairwoman, Nat'l Indian Gaming Comm'n 10 (Apr. 3, 2012), *available at* https://www.nigc.gov/images/uploads/indianlands/Karuk4912.pdf.

[56] *Id.*

[57] *Id.*

[58] Memorandum from Steven J. Bloxham to Lawrence S. Roberts, *supra* note 24, at 9; *see also* Legal Analysis by Steven J. Bloxham, *supra* note 5, at 21–25.

[59] 1851 Treaty, *supra* note 28, art. 5.

[60] Report by Albert L. Hurtado, *supra* note 5, at 84–86.

[61] *Id.* at 102–05.

[62] Legal Analysis by Steven J. Bloxham, *supra* note 5, at 21–25.

AR0011606

treaty-reserved rights in the vicinity of the Parcel and by camping at the Estelle ranch while awaiting the delivery of the provisions promised under Article 5.[63]

The Band's argument is unavailing. The activities described here do not constitute occupancy or subsistence use of the lands in the vicinity of the Vallejo Parcel. In the restored lands determination relating to the Guidiville Band of Pomo Indians' (Guidiville Band) request for restored lands, the Department explained:

> Subsistence use and occupancy requires something more than a transient presence in an area. . . . Accordingly, activities that would tend to show a tribe was using land for subsistence purposes might include sowing, tending, harvesting, gathering and hunting on lands and waters. "Occupancy" can be demonstrated by a consistent presence in a region supported by the existence of dwellings, villages or burial grounds, as alluded to in the regulations.[64]

The Guidiville Band had sought to establish a significant historical connection to a parcel near an aboriginal trade route that, according to the Guidiville Band, its ancestors had used to engage in commerce and harvest natural resources. In response, the Department concluded that "the Band cannot establish its subsistence use or occupancy based on the fact that its ancestors traveled to various locations to trade and interact with other peoples and then returned to the Clear Lake region."[65]

The situation here is analogous; the encampments at the Estelle ranch for the purpose of picking up supplies—pursuant to an arrangement that was to last only three years (1851–1853)—do not

---

[63] *Id.* at 23–25.

[64] Letter from Larry Echo Hawk, Assistant Sec'y – Indian Affairs, Dep't of the Interior, to Merlene Sanchez, Chairperson, Guidiville Band of Pomo Indians 14 (Sept. 1, 2011) [hereinafter, the "Guidiville Restored Lands Determination"], *available at* https://www.bia.gov/sites/bia.gov/files/assets/public/pdf/idc015051.pdf. For an example of the kinds of activities that constitute occupancy and subsistence use, see Record of Decision, Secretarial Determination Pursuant to the Indian Gaming Regulatory Act for the 305.49-Acre Madera Site in Madera County, California, for the North Fork Rancheria of Mono Indians 60–61 (Dep't of the Interior Sept. 2011), explaining that the tribe's predecessors: "hunted game in the areas of the San Joaquin Valley near the Site," "gathered plants and other materials from the areas of the San Joaquin Valley near the Site," "occupied the Fresno River Farm in the vicinity of the Site," and "earned a living from activities, such as logging and agriculture, conducted on lands in the vicinity of the Site." For another example, see *Confederated Tribes of Grand Ronde Cmty. of Oregon v. Jewell*, stating that the Secretary found the following evidence of the Cowlitz occupancy and use in the vicinity of the parcel at issue:

> (1) the Cowlitz's occupancy, namely hunting camp sites and "treaty-time" villages, at Warrior's Point, a site on the Columbia River and only three miles from the Parcel; (2) the Cowlitz reliance on the natural resources of the Columbia River for subsistence use and trade; (3) Cowlitz' "extensive and intensive" trading activities at both Bellevue Point (ten miles from the Parcel), and the intersection of the Lewis River and Columbia River (three miles from the Parcel); (4) a major battle between the Cowlitz and the Chinook at a site three miles from the Parcel; (5) historical report about an individual Cowlitz who used the Lewis River area for subsistence hunting, (about 6 miles from the Parcel); (6) the fact that Cowlitz were expert boatmen and helped guide large boats carrying goods through the mouth of the Lewis River, less than three miles from the Parcel; (7) census information showing that the Cowlitz occupied the lands in the vicinity of the Parcel.

75 F. Supp. 3d 387, 413–14 (D.D.C. 2014), *aff'd*, 830 F.3d 552 (D.C. Cir. 2016).

[65] Guidiville Restored Lands Determination, *supra* note 64, at 14.

AR0011607

demonstrate subsistence use or occupancy. The plain language of the 1851 Treaty and the related minutes of the treaty negotiations indicate that the United States chose Vallejo as the pick-up location because it was convenient for federal officials[66] who were reluctant to deliver provisions to the Clear Lake bands in the mountainous territory where they lived.[67] Contrary to the Band's assertion, the short-term right to collect provisions at Vallejo differs significantly from a treaty-reserved right that would demonstrate occupancy or subsistence use, such as a right to hunt, fish, or gather at a designated site in perpetuity.[68]

> (iii) Evidence of the Band's ancestor Augustine living and laboring on ranchos north of San Pablo Bay does not demonstrate occupancy or subsistence use in the vicinity of the Vallejo Parcel.

Lastly, the Band argues that its documented, historical connection to the Vallejo Parcel has existed since the 1840s or earlier, upon the advent of the ranching economy in the San Pablo Bay region.[69] In support of its claim, the Band has submitted documentation concerning an individual named Augustine, a "chief of the Hoolanapo Indians" who lived and worked in the North Bay region during the mid-1800s.[70] "Many in the Scotts Valley Tribe trace ancestry back to Augustine," and the Band contends that Augustine's biography helps establish the Band's significant historical connection to the Parcel.[71] According to the Band's anthropologist, Augustine's whereabouts and activities are representative of those of the Band's ancestors in general and shed light on their shared experiences.[72] Furthermore, Augustine's life is relatively well-documented, which is unique given the disruption in Pomoan village life, economy, and culture that occurred during the timeframe at issue.[73] The Band's documentation includes contemporaneous accounts and

---

[66] 1851 Treaty, *supra* note 28, art. 5 (designating the pick-up site "at or near Vallejo, or elsewhere, as may be most convenient").

[67] Legal Analysis by Steven J. Bloxham, *supra* note 5, at 23 (quoting an excerpt from the minutes, which read: "[A]ny flour and beef given [to the Clear Lake bands] this fall the chiefs must send runners for as the mountains surrounding this lake are impassable for wagons, and it would cause the President great expense to send it here now.").

[68] *See, e.g.*, Treaty with the Ottawa, etc. (Mar. 28, 1836), *in* 2 *Indian Affairs, Laws and Treaties* (Charles J. Kappler ed., 1904), *available at* https://dc.library.okstate.edu/digital/collection/kapplers/id/26291 (stating that the perpetual right of fishing at the falls of St. Mary's reserved by an earlier treaty "remains unaffected"); *see also* 73 Fed. Reg. at 29,366 ("The definition of 'significant historical connection' establishes criteria which require something more than evidence that a tribe merely passed through a particular area.").

[69] Memorandum from Scotts Valley Band of Pomo Indians, *supra* note 18, at 11 (stating that "the record is clear that between 1842 and 1847, Clear Lake Indians became a significant source of labor on all of the ranchos north of San Francisco").

[70] Lyman L. Palmer, *History of Napa and Lake Counties* 49 (1881).

[71] Dorothea J. Theodoratus et al., *Clear Lake Indian Census Data Early 1800s to 1911 (Emphasis on Eastern Pomo)* 81 (2018) (stating, further, that by 1958, "when the tribe was terminated under the Rancheria Act, 90.1% of the tribe were Augustine descendants"); *see also* Supplemental Report: History of the Scotts Valley Band of Pomo Indians and the San Pablo Bay Region by Albert L. Hurtado et al. 15 (May 3, 2018) [hereinafter, the "Supplemental Report"] (explaining how that percentage was calculated).

[72] *See* Albert L. Hurtado, *Chief Augustine: Significant Ancestor of the Scotts Valley Band of Pomo Indians* 11 (2018) ("Augustine's history illustrates a significant connection between [the Band's ancestors] and the region that includes the [Vallejo Parcel].").

[73] *See* Theodoratus et al., *supra* note 71, at 5 (stating that, in the mid-1800s, "[a]lthough some concentrated village life continued to exist among Indian communities, many previous Indian village-life patterns were forced into a new, somewhat dispersed, living pattern accompanied by new labor patterns"); *see also* Lowell J. Bean & Dorothea J. Theodoratus, Western Pomo and Northeastern Pomo, *in* 8 *Handbook of North American Indians* 299 (Robert F. Heizer ed., 1978) (explaining that, in the 1830s, "diseases, plus displacement, enslavement, massacres, raids, and the

AR0011608

anecdotal evidence tracking his movement, as well as genealogical data about his family.[74]  What follows is an abbreviated discussion of Augustine's life and the surrounding context as submitted by the Band, followed by an analysis of the information presented.

### A. Augustine and the Agricultural Economy in the North Bay Region

The earliest reference to Augustine suggested by the Band seems to be on a list of Indian children baptized in 1837 at Mission San Francisco Solano, located in the city of Sonoma, 17 miles from the Parcel.[75]  The list includes a six year-old child named Agustin who "could have been [the Band's ancestor] Augustine, but this is not verified."[76]  According to the Band, 29 other Pomo children were baptized at the mission at that time, at least 14 of whom were from the same village as Augustine, and at least two of whom were ancestors of the present-day Band.[77]  The Band alleges that the children "were instructed in the Roman Catholic faith and trained to do manual labor, including ranch work," at the mission.[78]

Based on an 1880 interview with historian Lyman Palmer, Augustine had returned to the Clear Lake area by around 1840, where he observed Salvador Vallejo take "formal possession" of the valley where the Band's ancestors lived.[79]  Salvador Vallejo's older brother was Mariano Vallejo, a Mexican military commander who, according to the Band's historian, "exercised nearly absolute personal and official power over land and life in the North Bay region."[80]  Mariano Vallejo acquired huge swaths of land formerly associated with Mexican missions,[81] including Ranchos Suscol and Petaluma.[82]  Andrés Reséndez, a historian commissioned by the Yocha Dehe (which opposes the Band's Request), states that Rancho Suscol (the rancho within which the Vallejo Parcel is located) was an 84,000-acre property, and Rancho Petaluma was 66,000 acres.[83]  The Band's historian estimates that by 1846 the Vallejo family's landholdings totaled 220,000 acres "from the Pacific Ocean to Suisun Bay and north to Clear Lake."[84]

The livestock operations on those ranchos were labor-intensive, and, according to the Yocha Dehe's historian, a study of Rancho Petaluma estimates that "at any one time there may have been between 600 and 1000 Indian laborers living there."[85]  Although Rancho Suscol was located in

---

beginnings of Anglo-American migration set the stage for the ever more rapid decline of the Pomo people and their cultural heritage" in the ensuing decades).

[74] *See generally* Hurtado, *supra* note 72 (containing excerpts from such material); Theodoratus et al., *supra* note 71, at 29–31 (summarizing census data pertaining to Augustine and his family).

[75] Memorandum from Scotts Valley Band of Pomo Indians, *supra* note 18, at 14–15.

[76] Theodoratus et al., *supra* note 71, at 29.

[77] Supplemental Report by Albert L. Hurtado et al., *supra* note 71, at 7–8.

[78] *Id.* at 8.

[79] Palmer, *supra* note 70, at 49; *see also* Beckham Report, *supra* note 24, at 106 (discussing Palmer's interview with Augustine); Hurtado Comments, *supra* note 25, at 8 (explaining that Salvador Vallejo oversaw the creation of Rancho Lup-Yomi in an area known as Big Valley, near Clear Lake).

[80] Report by Albert L. Hurtado, *supra* note 5, at 23.

[81] Hurtado Comments, *supra* note 25, at 7.

[82] Report by Albert L. Hurtado, *supra* note 5, at 42–43.

[83] Comments About the Historical Basis for the Scotts Valley Band of Pomo Indians' Request for Indian Lands Determination in the City of Vallejo by Andrés Reséndez, Professor, Dep't of History, Univ. of Cal., Davis 3 (Nov. 2016) [hereinafter, the "Reséndez Comments"].

[84] Report by Albert L. Hurtado, *supra* note 5, at 43.

[85] Reséndez Comments, *supra* note 83, at 3.

13

traditional Patwin territory,[86] and Rancho Petaluma was located in traditional Coast Miwok territory,[87] Salvador Vallejo raided Pomo Indian communities "in order to force them to work on the ranchos owned by the Vallejos and others."[88] Ultimately, Indians from the Clear Lake area, Coast Miwok, Southern Patwin, and Wappo all labored on ranchos established in what had been Coast Miwok and Patwin territory.[89] According to the Band's historian, the Band's ancestors, including Augustine, helped "tend the thousands off [sic] animals that roamed in Big Valley" and drove cattle to slaughter grounds on San Pablo Bay.[90] In 1847, Salvador Vallejo sold Rancho Lup-Yomi to new owners,[91] who at one point used Augustine and other Indians as forced labor to build adobe houses in Sonoma.[92] Augustine escaped after about a month and fled back to Clear Lake where his wife and infant child resided.[93]

Augustine next appears in an 1850 census (created in 1926 by anthropologist E.W. Gifford) that identifies him as a "Kulanapo" chief,[94] living at Clear Lake in an Eastern Pomo village.[95] The historical record is then scant in regard to Augustine's whereabouts and activities between 1850 and 1870. During those decades, farming became an increasingly important part of the economy, and Indians from the Clear Lake area started engaging in a pattern of migrant labor on ranchos south of their aboriginal territory.[96] By the 1860s, Clear Lake Indians mixed seasonal work on ranchos in Napa Valley and elsewhere in the North Bay region with subsistence farming and fishing at Clear Lake.[97]

The next reference to Augustine seems to be in the 1870 census data for Napa City Township, Napa County, which indicates that, at age 38, Augustine was living in a household of 17 Indians of varying ages, a "collection of native people working out from the household."[98] The Band also identifies a few other possible or confirmed ancestors living in Napa in 1870.[99] In total, the 1870 census lists 43 Indians living in Napa County at the time, compared with 17 in Lake County (with

---

[86] Hurtado Comments, *supra* note 25, at 6; *see also* Jennifer Whiteman, *Native American Ethnogeography and Ethnohistory in the Vicinity of Vallejo, California* 33 (2016) ("The Yocha Dehe and Cortina Indian Rancheria are recognized by the Native American Heritage Commission (NAHC) as Most Likely Descendants for the City of Vallejo and vicinity.").

[87] Reséndez Comments, *supra* note 83, at 3.

[88] Hurtado Comments, *supra* note 25, at 8; *see also* Supplemental Report by Albert L. Hurtado et al., *supra* note 71, at 3 (explaining that, between the 1830s and 1860s, some Pomo Indians worked voluntarily for white ranchers as a matter of economic necessity, but others were enslaved as children and transported southward to Solano, Napa, and Sonoma counties); Report by Albert L. Hurtado, *supra* note 5, at 89 (stating that, in the early 1850s, "[t]he Indians were subject to . . . a law that gave whites legal authority to indenture Indian adults and children as farm workers and domestic servants").

[89] Reséndez Comments, *supra* note 83, at 5.

[90] Supplemental Report by Albert L. Hurtado et al., *supra* note 71, at 4–5.

[91] Report by Albert L. Hurtado, *supra* note 5, at 57.

[92] *Id.* at 64.

[93] *Id.*

[94] Theodoratus et al., *supra* note 71, at 29.

[95] *Id.* at 5.

[96] Supplemental Report by Albert L. Hurtado et al., *supra* note 71, at 13.

[97] *Id.* at 14 (quoting a federal agent who witnessed the "integration of wage labor in Napa Valley and subsistence farming at Clear Lake").

[98] Theodoratus et al., *supra* note 71, at 30.

[99] Addendum to the Supplemental Report: History of the Scotts Valley Band of Pomo Indians and the San Pablo Bay Region by Albert L. Hurtado et al. 7–8 (Dec. 2018) [hereinafter, the "Addendum to the Supplemental Report"].

AR0011610

only one in Big Valley and one in Lakeport).[100] Augustine and the other Indians in the household may have been working at nearby Rancho Tulucay at the time,[101] approximately 11 miles north of the Vallejo Parcel.[102]  The name listed next to Augustine's on the census is that of Chi-Bem, who may have signed the 1851 Treaty on behalf of the How-ru-ma (one of the eight tribal signatories to the treaty).[103]

Augustine's name next appears in the 1880 census data for Lakeport Township, Lake County, which places him, age 50, in a household with his wife Mary, his brother or Mary's brother, and two younger males, ages 15 and 40.[104] The 1880 Lakeport census lists many other households occupied by Indian families in the area, which is approximately 90 miles by road (75 straight-line miles) northwest of the Vallejo Parcel, including the household next to Augustine's consisting of Augustine's brother Pete, Pete's wife, and their son.[105] By 1911, the year that the United States acquired the Scotts Valley Rancheria for the Band, "a number of Augustine descendants and relatives were present at the rancheria" and "continued to reside at Lakeport" through the mid-1900s,[106] although the Band contends that it also maintained a connection with Napa County through 1918, as demonstrated by a contemporaneous record indicating that several Scotts Valley people contracted the Spanish influenza there.[107] Augustine died around 1919 at or near the age of 89.[108]

    B.  Analysis of the Narrative Presented Above

As a starting point, the fact that the Parcel falls within aboriginal territory of the Patwin people, and not the Pomo, is not, *ipso facto*, a barrier to a favorable determination for the Band.  As the NIGC explained in its 2012 Karuk Indian Lands Opinion, "IGRA's restored lands exception does not require the [tribe] to demonstrate that it was the only tribe with historical connections to the area, or that the subject area was the only place where the [tribe] has historical connections."[109] Nevertheless:

> evidence of the presence of . . . Pomos, generally, on ranchos in the Bay Area, by itself, does not demonstrate the Band's occupancy or subsistence use on or in the vicinity of the Parcel.  The Band must offer historical documentation of its significant historical

---

[100] *Id.* at 10. The 1870 census data, which documents a sizeable Indian presence in the North Bay region but a noticeable absence around Clear Lake, is consistent with the conclusion drawn by the Band's historian and anthropologist that "the period from 1837 to 1870 was an era of diaspora" for the Band's ancestors, followed by a period of repatriation to the Clear Lake area. Supplemental Report by Albert L. Hurtado et al., *supra* note 71, at 4.

[101] Hurtado, *supra* note 72, at 9 (stating that the census recorded Augustine living "just one household away" from Cayetano Juarez, the owner of Rancho Tulucay); *see also* Beckham Report, *supra* note 24, at 112 (stating that the 17 Indians in the household "were probably workers on Rancho Tulucay," and, in regard to Augustine, stating that "[i]t is not known if he was identical to the Augustine of the Scotts Valley Rancheria or was another Indian named Augustine").

[102] Memorandum from Scotts Valley Band of Pomo Indians, *supra* note 18, at 15.

[103] Theodoratus et al., *supra* note 71, at 53.

[104] *Id.* at 30, 78.

[105] *Id.* at 30, 71–78.

[106] *Id.* at 31.

[107] Addendum to the Supplemental Report, *supra* note 99, at 8–9.

[108] Report by Dorothea J. Theodoratus, *supra* note 5, at 11.

[109] Memorandum from John R. Hay to Tracie Stevens, *supra* note 55, at 12.

AR0011611

connection to the Parcel, not simply evidence of Pomoan presence in the much larger Bay Area.[110]

The first shortcoming in the Band's evidence is the inability of the Band to demonstrate that its specific predecessors (the Ca-la-na-po and Mo-al-kai)—as opposed to Indians generally (Pomo or otherwise) in the Clear Lake area—occupied land or engaged in subsistence use in the vicinity of the Parcel. The lack of an identifiable Ca-la-na-po or Mo-al-kai presence in the vicinity of the Parcel contrasts with the descriptions in favorable decisions of tribes occupying land or using land for subsistence in the vicinity of a parcel.[111] In addressing the lack of such identifying information, the Band's historian points out that "[t]he historical record frequently refers to 'Clear Lake Indians'" and that "[i]n all cases that have come to [his] attention 'Clear Lake Indians' taken as captives were Habenapo, Kulanapo, and Yimabak/Molakai who were associated with Rancho Lup-Yomi and Scotts Valley."[112] The historian's suggestion that the term "Clear Lake Indians" refers only to those tribelets to which the Band claims a connection is unpersuasive in light of other information provided about Indians traditionally associated with the Clear Lake area.  For example, Peter Kunkel, an anthropologist cited by the Band's anthropologist who conducted significant ethnographic research on Pomo subdivisions,[113] observed:

> [T]here may have been seven to twelve tribelets in residence in the 'lake zone.' . . . Four of these tribelets spoke an Eastern dialect, one spoke Southeastern, and two spoke both Northern and Eastern dialects.  The non-Pomo groups included the Lake Miwok located southeast of the Lake and a small area . . . of a Wappo use area located on the Lake in the southern portion . . . . In general, data show the Clear Lake area to be one of fluctuating diversity."[114]

Even if the Band were a successor-in-interest not only to the Ca-la-na-po and Mo-al-kai, but also to the Ha-bi-na-po, the Department cannot assume without more information that references to Clear Lake Bands and to the Band's predecessors are one and the same given the variety of ethnic groups and the number of tribelets that lived around the lake and worked on North Bay ranchos.

Likewise, it would be erroneous to attribute the connections made by a specific tribal member like Augustine, or a handful of members, to the entire Band, or to its predecessors.  In support of its request for restored lands, the Guidiville Band had sought to establish a significant historical connection to a parcel in the Bay Area based, in part, on approximately a dozen of its ancestors' participation in the federally-sponsored BIA Outing Program.[115] That "[a]llegedly 'voluntary'" program had relocated young Indian women to the Bay Area in the first decades of the twentieth

---

[110] Guidiville Restored Lands Determination, *supra* note 64, at 17.

[111] *See, e.g.*, Record of Decision, Trust Acquisition of, and Reservation Proclamation for the 151.87-Acre Cowlitz Parcel in Clark County, Washington, for the Cowlitz Indian Tribe 128–29 (Dep't of the Interior Apr. 2013) (mentioning the Cowlitz Indian Tribe's "villages and/or hunting camp sites along the Columbia River," which a contemporaneous account described as "several large lodges of [Cowlitz] Indians; in all probably one hundred persons," in the vicinity of the parcel at issue in that decision).

[112] Report by Albert L. Hurtado, *supra* note 5, at 99–100.

[113] Report by Dorothea J. Theodoratus, *supra* note 5, at 2.

[114] *Id.* at 4.

[115] Guidiville Restored Lands Determination, *supra* note 64, at 13.

AR0011612

century to work as domestic servants for white middle-class families.[116] In rejecting the Band's argument, the Department explained: "As regrettable as the Outing Program was, the relocation of some of the Band's members to various locales throughout the Bay Area does not equate to the Band itself establishing subsistence use or occupancy in the region apart from its Rancheria in Ukiah."[117] While the historical treatment of the local Indians here is similarly inexcusable, and even assuming *arguendo* that all of the sometimes inconclusive references to Augustine that the Band provided did in fact refer to the same individual, Augustine's varied and singular experiences—his possible baptism at Mission San Francisco Solano in 1837, his construction of houses in Sonoma in the late 1840s, his dwelling in Napa in 1870, among others—are of limited evidentiary value in establishing the significant historical connections of Band *in toto*.[118]

Furthermore, even assuming that Augustine's living and labor patterns are representative of those of the Band's ancestors, such patterns do not constitute occupancy or subsistence use. In fact, Augustine's back-and-forth movements between the Clear Lake area and the North Bay region reveal an inconsistent, if not transitory, presence at odds with the Band's claim to occupancy and subsistence use of the Parcel. Returning to the examples in the previous paragraph, although allegedly baptized at Mission San Francisco Solano in Sonoma, Augustine returned to Clear Lake shortly thereafter to witness Salvador Vallejo's takeover.[119] Although forced to work in Sonoma, Augustine escaped after about a month and returned to Clear Lake, where his wife and infant child were living.[120] Also, although part of a household in Napa, Augustine appears to have lived not in a family dwelling, like the one at Clear Lake reflected in the 1880 census data,[121] but in a house of migrant workers,[122] with at least one person of an unrelated tribelet or ethnic group.[123] While the definition of a "significant historical connection" does not include a temporal requirement,[124] Augustine's on-again, off-again presence in the North Bay region over a 30- to 40-year span stands in stark contrast to the description of, for example, the Grand Traverse Band's continuous, centuries-old connection to the parcel of land at issue in *Grand Traverse Band*.

---

[116] *Id.* at 18.

[117] *Id.* at 19.

[118] The Band also seeks to establish its historical connection to the North Bay region by highlighting marriages between certain members and non-Band members, Indian or otherwise, who happen to hail from the North Bay region. *See, e.g.*, Supplemental Report by Albert L. Hurtado et al., *supra* note 71, at 15–18. By the same logic applied to Augustine's connections, it would erroneous to attribute such individual connections to the Band as a whole. *See* Beckham Report, *supra* note 24, at 97 (stating, "While this documentation is a measure of the mixed ancestry of modern tribal members, it misrepresents who were the Scotts Valley Band of Pomo of Lakeport, California.").

[119] Palmer, *supra* note 70, at 49. The record does not disclose how long Augustine or any other children remained in residence at the mission. Memorandum from Scotts Valley Band of Pomo Indians, *supra* note 18, at 15, 17. Nor does the record document the extent of religious instruction or vocational training received by the Band's ancestors, which the Band alleges took place. *See* Supplemental Report by Albert L. Hurtado et al., *supra* note 71, at 8; *see also* Addendum to the Supplemental Report, *supra* note 99, at 1–3. Thus, insofar as the Band seeks to establish a close connection with the Parcel based on its ancestors' presence at the mission, the evidence is insufficient.

[120] Report by Albert L. Hurtado, *supra* note 5, at 64.

[121] Theodoratus et al., *supra* note 71, at 30, 78.

[122] *Id.* at 30.

[123] *Id.* at 53.

[124] 73 Fed. Reg. at 29,366. However, this requirement, while not creating a *per se* temporal requirement (i.e., a minimum of 40 years), nevertheless contemplates the length of connection factoring into the overall consideration of historical ties. *Id.*

17

AR0011613

Finally, even if Augustine's experience as migrant worker extended to the Band's other ancestors, and even if such work constituted occupancy or subsistence use, there is no evidence—direct or inferential—indicating that the Band's ancestors conducted such activity on the Parcel (as opposed to elsewhere). As the Department noted in the 2012 Restored Lands Determination, "IGRA's definition of 'restored land' . . . always has been limited to lands that a tribe used or occupied."[125] If the Band cannot provide direct evidence of historic use or occupancy on the Parcel itself, then it must provide direct evidence of historic use or occupancy close enough to the vicinity of the Parcel that one could naturally infer that the Band also used or occupied the Parcel.[126]  The Bear River Indian Lands Determination offers an instructive example of direct evidence leading to a natural inference of historic use or occupancy.[127]  Like the Scotts Valley Band, the Bear River Band of the Rohnerville Rancheria, a restored California Tribe, sought to game on a parcel located outside the boundaries of the reservation contemplated by the tribe's unratified treaty.[128]  The Bear River Band demonstrated that the parcel in question is located among many sites known to have been used by the tribes' ancestors.[129]  Based on the presence of such surrounding sites, the NIGC concluded that it could assume that the parcel, too, was used by the tribes' ancestors.[130]

Here, the Band asserts that evidence of the Band's ancestors working at various ranchos owned by the Vallejos creates an inference that those ancestors must have also worked at Rancho Suscol.[131] (As noted above, the boundaries of Rancho Suscol would have surrounded the Vallejo Parcel). However, such an inference, even if granted, is insufficiently broad and cannot serve as the basis to connect the Band with the Parcel itself.  Rancho Suscol extended over "approximately 84,000 acres — an area equal to more than 130 square miles"; in contrast, the Vallejo Parcel comprises only 128 acres.[132]  Similarly, the Band's alleged, generalized connection with Napa County through 1918 falls short of establishing a significant historical connection to the Parcel itself.

The shortcomings in the Band's evidence here are analogous to those described in the Guidiville Restored Lands Determination, which concerned a nearby group of Pomo Indians that endured some of the same consequences from non-Indian contact in the 1800s that the Band's ancestors

---

[125] 2012 Restored Lands Determination, *supra* note 21, at 15.

[126] *Id.*

[127] *See* Memorandum from NIGC Acting General Counsel to NIGC Chairman Deer 12–13 (Aug. 5, 2002), *available at* https://www.nigc.gov/general-counsel/indian-lands-opinions.

[128] *Id.* at 12.

[129] *Id.* (listing, in part: within a one-mile radius of the parcel, "a mythic pond that is the setting of an old tribal story" and "two (2) aboriginal villages . . . that were major [tribal ancestor] settlements in 1850"; within a three-mile radius of the parcel, "five (5) aboriginal villages"; and, within a six-mile radius of the parcel, "the first [tribal ancestor] town established after European contact; eleven aboriginal villages . . . and the Rohnerville Rancheria").

[130] *Id.* at 13.

[131] *See, e.g.*, Hurtado Comments, *supra* note 25, at 3 ("The record does not place any identifiable individual Indians on . . . Rancho Suscol, but it is natural to infer that some of the Clear Lake Indians worked there. . . . Suscol was claimed by Mariano, and it is reasonable to think that Salvador sent some of his Indian workers to assist when needed. . . . The case for Clear Lake Indians working on Suscol is a natural inference from the historical record."); Legal Analysis by Steven J. Bloxham, *supra* note 5, at 2–3 ("The Tribe has a 'significant historical connection' to the land because . . . the land is within Rancho Suscol . . . where the Tribe's ancestors were *probably* enslaved and held as captive labor . . . .") (emphasis added); Report by Albert L. Hurtado, *supra* note 5, at 45 ("Given the amount of work associated with the cattle industry in the 1840s it is *probable* that Mariano Vallejo employed Clear Lake Indians on Rancho Soscol as well as his other properties.") (emphasis added).

[132] Supplemental Legal Memorandum in Opposition to the Scotts Valley Band of Pomo Indians' Request for "Restored Lands" in the City of Vallejo, Solano County, California from Yocha Dehe 10 (Nov. 22, 2016).

18

AR0011614

did. In that determination, the Department acknowledged that "the mission and rancheria eras were marked by significant displacement of Indian peoples in present-day northern California"; nevertheless, the Department found that Guidiville Band's ethno-historian did not provide "reliable historical documentation of the Band's presence on the Parcel, or lands in its vicinity."[133] Here, while the Band's narrative concerning its ancestors' dispersal throughout the North Bay region during the mid-1800s is compelling, missing from this Request is the identification of significant historical sites in the vicinity of the Parcel, similar to that provided by the applicant tribe the Bear River Indian Lands Determination. While a general connection to Rancho Suscol would place the Band's ancestors in the vicinity of the Parcel, it does not create the necessary, natural inference that they occupied or used the Parcel itself.

## IV. CONCLUSION

Based upon the reasoning detailed above, I have concluded that the tribe has failed to demonstrate the required significant historical connection to the Vallejo Parcel. Consequently, the Department should decline to take the Vallejo Parcel in trust for gaming purposes as the Parcel does not meet the regulatory requirements necessary to qualify for the restored lands exception under IGRA.

I note that this decision is limited to whether or not the parcels could be considered restored lands. I offer no opinion on whether the tribe could use other IGRA exemptions for gaming on lands acquired after 1988, specifically 25 U.S.C. § 2719(b)(1)(A). Further, an unfavorable restored lands determination does not preclude the Band from considering, if it so chooses, alternative, non-gaming uses for the Parcel.

I regret that our decision could not be more favorable at this time.

Sincerely,

John Tahsuda
Principal Deputy Assistant Secretary – Indian Affairs

---

[133] Guidiville Restored Lands Determination, *supra* note 64, at 17.

AR0011615